Reed R. Kathrein (139304)
Peter E. Borkon (212596)
Nicholas S. Singer (306098)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com
nsinger@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs and Proposed Lead
Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| ROBERT COLMAN and HILARY TAUBMAN-DYE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THERANOS, INC., a corporation, ELIZABETH HOLMES, an individual, RAMESH BALWANI, an individual,<br><br>Defendants. | No. 5:16-cv-06822-NC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**<br><br>Hearing Date: March 1, 2017<br>Time: 1:00 PM<br>Courtroom: 7, 4th Floor<br>Judge: Hon. Nathanael Cousins |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     STATEMENT OF FACTS ........................................................................................1

III.    ARGUMENT ............................................................................................................5

        A.      The Complaint Satisfies Federal Rule of Civil Procedure Rule 9(b) .........................5

        B.      Plaintiffs Adequately Plead That Defendants Made Their Statements for the Purpose
                of "inducing a purchase or sale" .................................................................................6

        C.      The Complaint Adequately Pleads Reliance ............................................................8

        D.      Defendants are Liable Under California Corporations Code §§ 25400 and 25500 .10

                1.      Plaintiffs Purchased Securities Offered and Sold by Theranos ....................11

                2.      Liability Under California Corporations Code § 25500 Applies to "*any
                        security affected by*" Defendants' Acts ........................................................12

                3.      Liability Under California Corporations Code § 25400 Applies to "any person
                        [who] directly or indirectly" Sells or Offers to Sell ......................................16

        E.      Defendants are Sellers to Plaintiffs Under California Corporations Code §§ 25401 and
                25501 ........................................................................................................................16

                1.      Defendants are in Privity with Plaintiffs ........................................................17

                2.      Defendants are Liable as Control Persons ......................................................19

        F.      Defendants are Liable Under California Bus. and Professions Code § 17200,
                California's UCL ......................................................................................................20

                1.      The UCL Covers Defendants' Acts ................................................................20

                2.      The Available Remedies at Law do not Extinguish Plaintiffs' UCL claims .22

        G.      The Complaint Sufficiently Pleads Damages, Diminution in Value, and That the
                Securities were Affected by Defendants' Acts ........................................................24

IV.     CONCLUSION ........................................................................................................24

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4
5

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC,*
    70 Cal. Rptr. 3d 199 (Ct. App. 2007) ....................................................... 18

6

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................... 7

7
8

*Benson v. JPMorgan Chase Bank, N.A.,*
    2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) ................................... 21, 22

9
10

*Betz v. Trainer Wortham & Co.,*
    829 F. Supp. 2d 860 (N.D. Cal. 2011) ..................................................... 21

11
12

*Bowden v. Robinson*
    67 Cal. App. 3d 705 (1977) ............................................................... 17, 23

13

*Bowen v. Ziasun Technologies, Inc.,*
    116 Cal.App.4th 777 (2004) ....................................................... 20, 21, 22

14
15

*Cal. Amplifier, Inc. v. RLI Ins. Co.,*
    94 Cal. App. 4th 102 (2001) ..................................................................... 17

16

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ............................................................................. 21

17
18

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. 534 (N.D. Cal. 2009) ............................................................. 21

19
20

*Citing Silver Hills Country Club v. Sobieski,*
    55 Cal. 2d 811 (1961) ............................................................................... 13

21

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.,*
    35 Cal. 3d 197 (Cal. 1983) ........................................................ 1, 6, 10, 20

22
23

*Deutschman v. Beneficial Corp.,*
    841 F.2d 502 (3d Cir. 1988) ..................................................................... 15

24

*Diamond Multimedia Systems, Inc. v. Superior Court,*
    19 Cal. 4th 1036 (1999) ................................................................ 11, 13, 14

25
26

*Fletcher v. Sec. Pac. Nat'l Bank,*
    23 Cal. 3d 442 (1979) ............................................................................... 20

27
28

PLS.' OPP'N TO DEFS.' MOT. TO DISMISS PLS.'
CLASS ACTION COMPL. – 16-CV-06822-NC
10650.11  934567v1

*Hamilton Jewelers v. Dep't of Corps.*,
    37 Cal. App. 3d 330 (1974) ................................................................................. 13

*In re Harmonic, Inc., Sec. Litig.*,
    2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ..................................................... 22

*In re Heritage Bond Litig.*,
    289 F. Supp. 2d 1132 (C.D. Cal. 2003) ................................................................. 5

*In Duttweiler v. Triumph Motorcycles (Am.) Ltd.*,
    2015 WL 4941780 (N.D. Cal. Aug. 19, 2015) .................................................... 23

*Jackson v. Fischer*,
    931 F. Supp. 2d 1049 (N.D. Cal. 2013) ............................................................... 19

*Kwikset Corp. v. Superior Court*,
    51 Cal.4th 310 (2011) ......................................................................................... 20

*In re Lehman Bros. Sec. & ERISA Litig.*,
    903 F. Supp. 2d 152 (S.D.N.Y. 2012) ................................................................ 14

*McCalden v. Cal. Library Ass'n*,
    955 F.2d 1214 (9th Cir. 1992) ............................................................................. 22

*McMahon v. Marsh & McLennan Companies, Inc.*,
    2010 WL 2308437 (Cal. Ct. App. June 10, 2010) ..................................... 13, 14, 15

*Mirkin v. Wasserman*,
    5 Cal. 4th 1082 (1993) .............................................................................. 11, 13, 18

*Mirkin v. Wasserman*,
    858 P.2d 568 (Cal. 1993) ..................................................................................... 18

*Morgan v. AT&T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235 (2009) .......................................................................... 6, 10

*Moss v. Kroner*,
    197 Cal. App. 4th 860 (2011) .............................................................................. 13

*Murphy v. Kenneth Cole Productions, Inc.*
    40 Cal.4th 1094 (2007) ........................................................................................ 13

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................... 19

*Ontario Public Service Emps. Union Pension Trust Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004) .................................................................................. 15

*Opperman v. Path, Inc.*,
   84 F. Supp.3d 962, 976 (N.D. Cal. 2015)........................................................................ 10

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
   151 Cal. App. 4th 688 (2007) ..................................................................................... 21

*People for the Ethical Treatment of Animals v. Whole Foods Mkt. Cal., Inc.*,
   2016 WL 362229 (N.D. Cal. Jan. 29, 2016) ............................................................ 6, 10

*People v. Miller*,
   192 Cal. App. 3d 1505 (1987) .................................................................. 11, 12, 15, 17

*Prata v. Superior Court*,
   91 Cal.App.4th 1128 ................................................................................................... 23

*Reiger v. Altris Software, Inc.*,
   1999 WL 540893 (S.D. Cal. Apr.30, 1999) ............................................................... 13

*Rhynes v. Stryker Corp.*,
   2011 WL 2149095 (N.D. Cal. May 31, 2011) ............................................................ 23

*Robinson v. C.R. Bard, Inc.*,
   2016 WL 3361825 (N.D. Cal. June 17, 2016) ........................................................... 24

*Roskind v. Morgan Stanley Dean Witter & Co.*,
   80 Cal.App.4th 345 (2000) ........................................................................................ 20

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) ...................................................................................... 15

*Sharp v. Arena Pharm., Inc.*,
   2013 WL 12094819 (S.D. Cal. Mar. 29, 2013) ..................................................... 18, 19

*Siegal v. Gamble*,
   2016 WL 1085787 (N.D. Cal. Mar. 21, 2016) ........................................................... 21

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ................................................................................................. 9

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
   2010 WL 2545415 (W.D. Wash. June 21, 2010) ....................................................... 14

*Zapata Fonseca v. Goya Foods Inc.*,
   2016 WL 4698942 (N.D. Cal. Sept. 8, 2016) ........................................................ 23, 24

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................................. 14, 15

1

**STATUTES**

2

Cal. Bus. & Prof. Code § 17200 ................................................................................. *passim*

3

Cal. Bus. & Prof. Code § 17204 ................................................................................. 23

4

Cal. Bus. & Prof. Code § 17205 ................................................................................. 22

5

Cal. Corp. Code § 25400 ............................................................................................ *passim*

6

Cal. Corp. Code § 25401 ............................................................................................ 16, 17, 19

7

Cal. Corp. Code § 25500 ............................................................................................ *passim*

8

Cal. Corp. Code § 25501 ............................................................................................ 17, 19

9

Cal. Corp. Code § 25504 ............................................................................................ 18, 19

10

11

**OTHER AUTHORITIES**

12

13

17 C.F.R. § 230.500-508 ............................................................................................ 3

14

17 C.F.R. § 240.10b-5 ................................................................................................ 14

15

Fed. R. Civ. P. 8 ......................................................................................................... 5, 22

16

Fed. R. Civ. P. 9 ......................................................................................................... 5, 6, 22

17

Fed. R. Civ. P. 10-b5 ................................................................................................. 14, 15

18

Fed. Rules Evid. R 201 .............................................................................................. 2

19

20

21

22

23

24

25

26

27

28

- iv -

1

## I.    INTRODUCTION

2        Sellers of unregistered securities have a duty, under California law, to assure their statements

3   are free from material falsehoods or omissions.  When they violate this duty, they are liable to those

4   who lost their investment due to the Seller's words or silence.  Depending on the degree of their

5   wrongdoing – their knowledge or intent – California law makes these sellers liable to purchasers of

6   "any security affected" in the market by their statements, or only those who buy directly or indirectly

7   from them.  In this case, Defendants touted a highly accurate and commercially ready proprietary

8   technology to the public, and pulled in almost $700 million in investor funds as a result.  Sadly, this

9   technology never existed. It was not accurate, nor was it commercially ready. Defendants admit the

10  falsity of their statements but deny their basic responsibility.

11       Defendants' argument is not merits based.  They seek to carve out technically icy exceptions

12  and create mountainous hurdles to evade recovery.  They argue, first, the Complaint lacks

13  particularity.  They argue that reliance, intent to induce, and damages are insufficiently pled.  Next

14  Defendants seek to categorize Plaintiffs as outcasts whose beneficial interests in their unregistered,

15  federally-exempt shares are unworthy of California state protection or even this court's equitable

16  powers to deter.  Defendants also urge a narrow interpretation of the California unfair trade practices

17  act, as limited to deterring other people's bad conduct, not theirs.  For the reasons set forth below,

18  Defendants' escapist arguments should be rejected, and their motion denied.[1]

19

## II.    STATEMENT OF FACTS

20       Theranos, Inc. ("Theranos") is a private company that sold itself to investors as

21  revolutionizing the laboratory testing industry with innovative methods for drawing and testing blood

22  and interpreting patient data to improve outcomes and lower health care costs.[2]  Defendant Elizabeth

23  Holmes ("Holmes") founded Theranos in 2003, filed a Rule 506 exemption with the Securities and

24  Exchange Commission ("SEC") and raised over $92 million through the sale of unregistered

25

26

---

27       [1] Plaintiffs agree to dismissal, without prejudice, of Count VI for constructive fraud.

28       [2] *See* Class Action Complaint for Violations of California's Securities, Unfair Competition, and
Common Laws, filed Nov. 28, 2016, ECF No. 1 ("Compl."), ¶ 19.

- 1 -

PLS.' OPP'N TO DEFS.' MOT. TO DISMISS PLS.'
CLASS ACTION COMPL. – 16-CV-06822-NC
10650.11   934567v1

1   securities to accredited investors by 2010.[3]  In June 2012, Theranos entered into a contract whereby

2   Walgreens agreed to roll out Theranos's innovative finger stick technology in new Theranos

3   Wellness Centers within Walgreens.[4]  By mid-2013, Defendants began implementation of a strategy

4   to entice investors to fund this commitment.[5]

5       In July 2013, Theranos, Holmes and former Company President, Chief Operating Officer and

6   board member, Ramesh Balwani ("Balwani") opened Twitter accounts and began granting

7   interviews and sending out tweets lauding Theranos's technology.[6]  On July 29, 2013, Theranos

8   posted its first press release, announcing that Wells Fargo's Chairman and CEO, and a retired four-

9   star Marine general were appointed to the Company's board of directors alongside a former

10  Secretary of State and a former Senator, among others.[7]  In August 2013, Defendants recruited a

11  *Wall Street Journal* writer with exclusive access to publish an article on September 8, 2013 – one

12  day before Theranos would announce its Walgreens partnership in a national press release.  The

13  article included Defendants' claims that Theranos could run comprehensive, highly accurate blood

14  tests in its proprietary "nanotainer" technology using only a few drops of a patients' blood.

15  Theranos's website prominently featured its nanotainer device balanced on the tip of a finger and the

16  slogan: "one tiny drop changes everything."  "Now, for the first time," the website claimed,

17  Theranos's "laboratory can perform your tests quickly and accurately on samples as small as a single

18  drop."  On September 9, 2013, Theranos announced its contract with Walgreens to immediately roll

19  out Wellness Centers that would complete any clinician-directed lab test with as little as a few drops

20  of blood.

21

22

23      [3] *Id.*; *See* Theranos Notice of Exempt Offering of Securities,
    https://www.sec.gov/Archives/edgar/data/1313697/000131369710000004/xslFormDX01/primary_do
24  c.xml; *See also* 17 C.F.R. § 230.506  Rule 506, Regulation D; SEC, Fast Answers, Rule 506,
    Regulation D. https://www.sec.gov/answers/rule506.htm. The court "may take judicial notice on its
25  own" of facts "can be accurately and readily determined from sources whose accuracy cannot
    reasonably be questioned." USCS Fed. Rules Evid. R 201.

26      [4] Compl., ¶ 20.

27      [5] *Id.*, ¶ 21.

        [6] *Id.*
28      [7] *Id.*

- 2 -

1    Defendants' media campaign coincided with the implementation of the JOBS Act, which, for

2    the first time, permits the "general solicitation" and "general advertising" in the sale of Rule 506

3    unregistered securities, provided the issuer takes reasonable steps to verify that the purchasers are

4    accredited investors. [8]  Using the publicity generated from the September 8, 2013 *Wall Street Journal*

5    article and the September 9, 2013 Walgreens/Theranos press release, Defendants solicited investors,

6    their advisors and aggregators who would form partnerships to hold shares for the benefit of

7    investors.  These investors were tightly controlled by Defendants as Rule 506 requires that investors

8    meet specific qualifications and confirm that the chain of ownership includes only accredited

9    investors.[9]

10    Plaintiffs and the Class are direct or beneficial owners of Theranos shares purchased after

11    reading or hearing of Theranos's representations about its proprietary and groundbreaking

12    technology and its roll out in partnership with Walgreens.  Plaintiff Colman relied on the

13    representations provided to him by a Theranos "strategic adviser" and son of one of Theranos's

14    original founders contained in the *Wall Street Journal* article and September press release

15    announcing the Walgreens partnership and roll out.  Compl., ¶¶ 11, 26-27.

16    Plaintiff Taubman-Dye's purchase – through an outfit that provides liquidity to Theranos

17    shares by allowing Theranos or its accredited investors to sell their shares to other accredited

18    investors verified by Theranos – occurred near the end of the Class Period, after an extensive media

19    campaign in financial publications that repeated the fraudulent statements and omitted material facts

20    she relied upon.  *See Id.*, ¶¶ 22-25, 28, 30-40.  Like Plaintiff Colman, Plaintiff Taubman-Dye

---

22    [8] *See* Sec 201(a) of the JOBS Act. *See also* SEC, Eliminating the Prohibition Against General
      Solicitation and General Advertising in Rule 506 and Rule 144A Offerings, available at
23    https://www.sec.gov/info/smallbus/secg/general-solicitation-small-entity-compliance-guide.htm. The
      amendments, required by the JOBS Act, became effective September 23, 2013. *See also Forbes*, The
24    New ABCs of Private Placements: 506(b) and 506(c), available at
      http://www.forbes.com/sites/mraneri/2015/03/11/the-new-abcs-of-private-placements-506b-and-
25    506c/#7a85ab995c03.

26    [9] Rule 506 (b) and (c) requires that the issuer take reasonable steps to assure that investors in
      their exempt securities (or who have beneficial interests in those securities through a corporation,
27    partnership or entity organized for the purpose of acquiring the securities offered) qualify either have
      "knowledge and experience in financial and business matters that he is capable of evaluating the
28    merits and risks of the prospective investment," or are accredited investors.  *See aslo* 17 C.F.R. §
      230.500-508; *see also* § 230.502(d) Limitations on resale.

- 3 -

affirmatively alleges her individual reliance on these statements as repeated in the lengthy campaign. *Id.*, ¶ 12.  Moreover, upon disclosure of the October 2015 *Wall Street Journal* exposé, partially revealing the truth, Plaintiff Taubman-Dye attempted to cancel her transaction, clearly displaying that she would not have bought Theranos securities had she been aware of the truth.  *Id.*, ¶¶ 12, 50.

Specifically, both Plaintiffs Colman and Taubman-Dye relied on the statements that "*Theranos had developed a commercially ready groundbreaking blood test technology that was highly accurate, that involved drawing only a few droplets of blood, and was being rolled out by Walgreens.*"  *Id.*, ¶¶ 11, 12.  Plaintiffs also specifically allege that they were "not aware of the material omissions alleged" in the complaint.  *Id.*

Unfortunately, Defendants' revolutionary technology never actually existed.  By October 16, 2015, the *Wall Street Journal* and other media outlets reported that Theranos conducted 90% of its blood tests on traditional machines.  A Theranos attorney admitted to the *Wall Street Journal* that the actual use of the technology was not a reality, but "a goal."  *Id.*, ¶ 50(c).  Though Theranos immediately launched an attack on the *Wall Street Journal* and other media outlets claiming Theranos's technology was utilized for 80 blood tests, the release of new news reports over the coming year made clear that Theranos falsely represented its technology.  An FDA/CMS inspection later revealed that Theranos's technology was used in only twelve blood tests for a short period of time.  *Id.*, ¶¶ 70, 71.  The truth lies in stark contrast to Defendants' claims at the beginning of the Class Period that Theranos could "run any combinations of tests. . . from a single blood sample" and "consumers can now complete any clinician-directed lab test with as little as a few drops of blood."  *Id.*, ¶¶ 23-24.

Now Walgreens has ended its relationship with Theranos and has sued for breach of contract.  *Id.*, ¶¶ 68, 77.  Theranos has closed its laboratories, no longer runs tests and is focused on a new scheme developing a so-called mini-lab.  *Id.*, ¶¶ 69, 73, 75.

As a result of Defendants' false and misleading statements, and their failure to disclose information that made other statements materially misleading, Plaintiffs and other direct and beneficial investors in Theranos stock sustained damage.  Had Plaintiffs and other Class members

1  known the truth regarding Theranos's technology, they would have never purchased Theranos

2  shares.

3  ### III.   ARGUMENT

4  **A.   The Complaint Satisfies Federal Rule of Civil Procedure Rule 9(b)**

5       Defendants claim that Plaintiffs have not satisfied Fed. R. Civ. P. Rule 9(b) because the

6  complaint does not plead fraud with the requisite particularity.[10] Defendants' argument fails.  The

7  Complaint properly identifies a selection of Defendants' fraudulent or misleading statements and

8  continuously identifies why Defendants' statements are materially false or misleading.

9       Plaintiffs clearly satisfy Fed. R. Civ. P. Rule 9(b) by providing a representative sampling of

10  Defendants' fraudulent advertisements and statements and specifically identifying why Defendants'

11  statements were false.  Plaintiffs' complaint summarizes the salient falsehood that existed throughout

12  the Class Period – a falsely claimed commercially-ready proprietary technology that could take a

13  pinprick's worth of blood, extracted from the tip of a finger instead of intravenously, and test for

14  hundreds of diseases.  *See* Compl., ¶¶ 2-8; 11, 12 (identifying particular falsehoods relied upon by

15  Plaintiffs).

16       Plaintiffs' complaint further pleads the consistent repetition of the Theranos story, of a highly

17  accurate proprietary technology, and the success of its implementation by Defendants over the course

18  of hundreds of public statements, many of which are identified in the complaint.  *See Id*., ¶¶ 23-24,

19  28, 30-40.  It outlines the fabricated credibility created by Theranos through publishing press releases

20  of the Company's luminary Board of Directors, facilitating a false *Wall Street Journal* article, touting

21  its Walgreens agreement that would rollout new Theranos proprietary technology, and disclosing

22  technology that did not exist on the Company's website.  *Id*., ¶ 20.

23       Plaintiffs' complaint also explains why the statements identified on Theranos's web page, in

24  the *Wall Street Journal* and in press releases were false and misleading, including that "(1) Theranos

25  was not 'now' (or ever) capable of performing its agreement with Walgreens; . . . (4) Theranos

26  

27       [10] Counts II (strict seller liability), III (UCL based on unlawful and unfair) and VII (negligent misrepresentation), while predicated on falsity, are not predicated on fraud. While Rule 8 applies to

28  them, Rule 9(b) does not. *Compare In re Heritage Bond Litig*., 289 F. Supp. 2d 1132, 1154 (C.D. Cal. 2003).

- 5 -

1   proprietary technology had not "reached a point at which [it] could make actionable information

2   accessible to physicians and patients" using its proprietary technology; (5) Theranos would have to

3   dilute "micro-samples" and run them on traditional lab machines of competitors in order to create the

4   illusion that their proprietary technology was working. . . ." *Id.*, ¶¶ 25, 29.

5       Plaintiffs next chose a representative sampling of the hundreds of interviews, press releases,

6   and advertisements that repeat the elements of the Theranos story in an effort to expedite efforts by

7   the Court and Defendants to identify these false statements. *Id.*, ¶¶ 30-40.  Plaintiffs again identify in

8   summary why Defendants' statements are false and misleading and replead the basic falsity of and

9   material omissions from Defendants' statements later in the Complaint. *Id.*, ¶ 89.

10       Through their extensive listing of false and misleading statements and identification of facts

11   supporting the falsity of those statements, Plaintiffs have met the pleading requirements of Fed. R.

12   Civ. P. Rule 9(b) – providing a more extensive showing of Defendants' fraudulent statements would

13   only further burden the Court and the parties and provide little more in the way of clarity.

14       Even if the Complaint were not so particular, in *Children's Television*, the California

15   Supreme Court held there are "certain exceptions which mitigate the rigor of the rule requiring

16   specific pleading of fraud."[11]  Where a fraud claim is based upon numerous misrepresentations, such

17   as a misleading advertising campaign, pleading a representative sampling of advertisements or other

18   statements, and stating the misrepresentations made by those statements is sufficient to satisfy Fed.

19   R. Civ. P. Rule 9(b).[12]

20   **B.**    **Plaintiffs Adequately Plead That Defendants Made Their Statements for the Purpose of "inducing a purchase or sale"**

21       A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief

22   that is plausible on its face.  A claim is facially plausible when it "allows the court to draw the

23   

24   

25   

26       [11] *See Comm. on Children's Television, Inc. v. Gen. Foods Corp.,* 35 Cal. 3d 197, 217 (Cal. 1983).

27       [12] *Id.  Compare Morgan v. AT&T Wireless Servs., Inc.,* 177 Cal. App. 4th 1235, 1253-54, 1262 (2009); *People for the Ethical Treatment of Animals v. Whole Foods Mkt. Cal., Inc.*, No. 15-CV-

28   04301 NC, 2016 WL 362229, at *4 (N.D. Cal. Jan. 29, 2016).

PLS.' OPP'N TO DEFS.' MOT. TO DISMISS PLS.'
CLASS ACTION COMPL. – 16-CV-06822-NC
10650.11  934567v1

1  reasonable inference that the defendant is liable for the misconduct alleged."[13]  Determining whether

2  a complaint states a plausible claim for relief is a context-specific task that requires the court to draw

3  on its judicial experience and common sense.[14]

4         Defendants do not contest that Theranos and its executives knowingly issued false statements

5  and omissions.  Instead, Defendants argue that the Complaint does not properly plead that

6  Defendants "intended to induce" Plaintiffs or other investors to rely on their statements.  Defendants

7  contend that the only plausible reading of their statements is that they were intended to attract

8  consumers.[15]  Interestingly, Defendants fail to mention that their media campaign coincided with the

9  implementation of the JOBS Act, which allows companies the right to solicit accredited investors

10  through "general advertising" for the first time.

11         Theranos fed its "consumer facing" story of proprietary technology and imminent success to

12  the *Wall Street Journal*, *Forbes*, *Fortune*, *Crain's Business* and a number of other outlets in an effort

13  by Defendants to create an illusion of success that would facilitate raising money from investors.

14         Theranos raised approximately $93 million from investors prior to the Class Period.  Compl.,

15  ¶ 41.  In anticipation of much larger stock offerings, Defendants attracted the press with the

16  announcement of its luminary Board of Directors (*Id.*, ¶ 21); opened Twitter accounts and began

17  granting interviews (*Id.*, ¶ 22), courted *Wall Street Journal* writer Joseph Rago with an exclusive that

18  would bring Theranos's story out to the world (*Id.*, ¶ 27), and announced an agreement with

19  Walgreens that would roll out the Company's proprietary technology throughout the U.S. (*Id.*, ¶ 24).

20         On September 9, 2013 – the same day Theranos publicly announced its Walgreens

21  partnership and one day after the *Wall Street Journal* published its article disclosing Theranos's

22  proprietary technology – Defendants began soliciting new investors.  Compl., ¶¶ 23, 24, 26.

23  Defendants invited "a select group of people" to invest in follow-on extensions of a 2010 Preferred

24  financing through a current strategic advisor.  Theranos claimed a valuation in 2010 of $6 billion and

25

26         [13] *Ashcroft v. Iqbal,* 556 U.S. 662, 663-687 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

27         [14] *Id.*, at 679.

28         [15] Defendants assert these intent allegations are insufficient to support Counts I, IV, V and VII).

- 7 -

a 2013 valuation of $10 billion.  *Id.*, ¶11, 26-27.  Theranos's letter of invitation referenced the

freshly-published *Wall Street Journal* article and included details of the Company's recent publicity.

*Id.*

After September 9, 2013 and throughout the Class Period, Defendants issued a massive

media campaign in the financial press and media regarding their successful technology and

progress.[16]  With the simultaneous issuance of Series C shares – usually sold to groups such as hedge

funds, investment banks, private equity firms and big secondary market groups "to inject capital into

the meat of a successful business"[17] – Defendants raised at least an additional $632.73 million during

the Class Period.[18]

Plaintiffs adequately plead facts showing that Defendants' statements were directed toward

inducing investors.

**C.      The Complaint Adequately Pleads Reliance**

Plaintiffs more than adequately plead reliance on Defendants' fraudulent statements and/or

omissions as required by California's Unfair Competition Law ("UCL") and fraud statutes.[19]

Plaintiffs Colman and Taubman-Dye specifically allege that they "relied, at least in part, on

Theranos's representations herein, including that:

> Theranos had developed a Commercially ready groundbreaking blood
> test technology that was highly accurate, that involved drawing only a
> few droplets of blood, and was being rolled out by Walgreens.

Compl., ¶¶ 11-12.  Plaintiffs also specifically allege that they were "not aware of the material

omissions alleged herein."  *Id.*, ¶¶ 11-12, 25, 89 (identifying 13 omissions).

Defendants pushed these claims into the public realm using the *Wall Street Journal* writer as

a sales man.  *Id.*, ¶¶ 22-23.  Further, there is little doubt that Defendants' misrepresentations are

material – investors would find it of upmost importance to know that, contrary to public statements,

---

[16] *See* Compl., ¶¶ 30-40.

[17] Shoshann Delvanthal, *Series A, B, C. Funding: What It All Means and How It Works*, Investopedia (Oct. 20, 2015)  Compl. ft. nt. 74.

[18] *Id.*, ¶¶ 41-42.

[19] Defendants contend reliance is insufficiently plead only for Counts III (UCL), IV(fraud), V (fraudulent concealment) and VII(negligent misrepresentation).

- 8 -

1   Theranos did not have a commercially-ready, highly accurate proprietary technology that could

2   change the world.  Similarly, investors would want to know that Theranos was conning Walgreens.

3   *Id.*, ¶¶ 7-8.

4        Plaintiffs here need not demonstrate individualized reliance on one specific article or press

5   release to satisfy the reliance requirement because Plaintiffs allege exposure to a long-term

6   advertising campaign.[20]  Nonetheless, Plaintiff Colman establishes that his purchase occurred after

7   receiving the September 8th *Wall Street Journal* article and September 9th Theranos press release

8   from Lucas.  Compl., ¶¶ 11, 26.  Both the *Wall Street Journal* article and Theranos press release

9   contained the omissions on which Plaintiff Colman affirmatively relied.  *See Id.*, ¶¶ 22-25.

10       Similarly, Plaintiff Taubman-Dye's purchase occurred at the end of the Class Period, after an

11  extensive media campaign repeated the fraudulent statements and omitted material facts she relied

12  upon.  *See Id.*, ¶¶ 22-25, 28, 30-40.  Like Plaintiff Colman, she affirmatively alleges her individual

13  reliance on these statements as repeated in the lengthy campaign.  *Id.*, ¶ 12.  Moreover, upon

14  disclosure of the October 2015 *Wall Street Journal* exposé, Plaintiff Taubman-Dye attempted to

15  cancel her transaction, clearly displaying that she would not have bought Theranos securities had she

16  been aware of the truth.  *Id.*, ¶¶ 12, 50.

17       To state a cause of action under the fraudulent prong of Section 17200, "it is necessary only

18  to show that 'members of the public are likely to be deceived.'  Allegations of actual deception [and]

19  reasonable reliance . . . are unnecessary."[21]  Reliance may be inferred "wherever there is a showing

20  that a misrepresentation was material . . . A misrepresentation is judged to be 'material' if 'a

21  reasonable man would attach importance to its existence or nonexistence in determining his choice of

22  action in the transaction in question . . . .'"[22]  As for alleging reliance for fraud, the "realistic setting

23  of the case . . . may make such specific pleading impossible.  A long-term advertising campaign may

24  seek to persuade by cumulative impact, not by a particular representation on a particular date."[23]

25

26       [20] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009).

27       [21] *Children's Television*, 35 Cal. 3d at 211.

28       [22] *In re Tobacco II Cases*, 46 Cal. 4th at 327.

         [23] *Children's Television*, 35 Cal. 3d at 219.

- 9 -

1    Plaintiffs may base their cause of action upon allegations that they acted in response to an advertising

2    campaign.[24]

3        Plaintiffs' allegations differ greatly from the vague allegations found by this Court in *People*

4    *for the Ethical Treatment of Animals*.[25] Unlike plaintiffs in *People for the Ethical Treatment of*

5    *Animals*, Plaintiffs here specifically allege and identify a large representative sample of false and

6    misleading statements made by Defendants, publication dates of those statements, and the media

7    outlet and internet address (when available) of those statements. *See* Compl., ¶¶ 22-25, 28, 30-40.

8        The allegations of reliance in the Complaint surpass those in both *Opperman*, in which

9    plaintiffs properly plead reliance by identifying only a handful of statements made over seven years,

10   and *Morgan*, where the statements occurred over only a few months.[26]

11       Any fair reading of the Complaint indicates Plaintiffs plead specific reliance on statements

12   made by Defendants that are uniform throughout the Class Period; in the event the Court determines

13   further specificity of reliance is required, Plaintiffs respectfully request leave to amend.

14   **D.    Defendants are Liable Under California Corporations Code §§ 25400 and 25500[27, 28]**

15       Victims of securities fraud, including investors who executed market transactions when the

16   transaction price was affected by manipulative activities, may sue to recover their loss under the anti-

17

18

19       [24] *Id.*

20       [25] *People for the Ethical Treatment of Animals*, 2016 WL 362229, at *4.

21       [26] *See Opperman v. Path, Inc.*, 84 F. Supp.3d 962, 976 (N.D. Cal. 2015); *Morgan v. AT & T*
     *Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1258 (2009) ("Although the advertising campaign
22   alleged in this case was not as long-term a campaign as the tobacco companies' campaign discussed
     in Tobacco II, it is alleged to have taken place over many months, in several different media, in
23   which AT&T consistently promoted its GSM/GPRS network as reliable, improving, and
     expanding.").

24       [27] Defendants also argue that their statements were not directed to plaintiffs—but consumers—
     and were not "willful." Defendants were in the process of raising funds when they started their
25   media blitz and knew could not "not know" that their statements would reach potential investors.
     Compl., ¶¶ 2-3. No investor could help but be exposed to Theranos's massive and calculated media
26   blitz which included extensive press releases, articles, interviews, videos, web pages and social
     media. *Id.*, ¶¶ 21-52.

27       [28] Defendants claim that there is no allegation that Holmes or Balwani sold shares. They may not
     have sold themselves, but they controlled all the transactions. *Id.*, ¶ 12 and were control persons of
28   Theranos. *Id.*, ¶¶ 14, 94. *See also* Section E.2, below.

1    fraud provisions of California's securities laws.[29]  Liability extends to *all market trades affected* by

2    market manipulation.[30]  These provisions offer securities fraud victims a remedy for damages

3    without requiring the victim to prove actual reliance or privity.[31]

4         Nevertheless, Defendants seek to limit California's anti-fraud provisions by manufacturing

5    the requirement that Plaintiffs purchased the exact same security sold by Defendants in order to have

6    standing.  Here, Defendants claim that Plaintiffs' beneficial ownership, purchased through an

7    aggregator of investors, is not enough.  Defendants' argument is unavailing.

8         **1.    Plaintiffs Purchased Securities Offered and Sold by Theranos**

9         Defendants' use of intermediaries to peddle their securities to investors, and pool their risk

10   capital, does not vitiate Defendants' liability under the California securities laws.

11        The regulatory exemption used by Defendants to sell Theranos securities acknowledges the

12   reality that these securities may be sold to a chain of qualified investors.  To deter evasion of the

13   exemption meant only for sales to qualified investors, the SEC mandated that the sale of a beneficial

14   interest in an unregistered security is the equivalent to the sale of the original security provided by

15   Rule 506 of Regulation D.  A securities issuer may claim exemption from federal regulation only

16   when all of the beneficial owners of the security meet the accredited investor exemptions of Rule

17   506.  The SEC looks at the entire chain of ownership and beneficial ownership to determine the

18   qualifications of the real purchasers.[32]  If the exemption is met, protection of the accredited investor

19   is left to state law.

20        Similarly, in *People v. Miller*, the court recognized that a securities issuer violated California

21   securities statutes by using a third party to solicit money from investors that the third party placed in

---

22   [29] Codified as Cal. Corp. Code §§25400 and 25500.  *See Diamond Multimedia Systems, Inc. v.*
23   *Superior Court*, 19 Cal. 4th 1036, 1049, 1056 (1999).

     [30] *Id.*  (Citing Marsh & Volk, *Practice Under the California Securities Laws* --"In view of this
24   potentially enormous and virtually unlimited liability, the intention of the defendant to affect the
     market by inducing the purchase or sale of the security by others was a necessary qualification of the
25   defendant's liability.").  The original authors were Harold Marsh, Jr. and Robert Volk. 1 Practice
     Under the California Securities Laws Author(s) (2016). Marsh and Volk drafted the 1968 law. 1-1
26   Practice Under the California Securities Laws § 1.05 (2016). ("*Marsh & Volk*").

27   [31] *See Mirkin v. Wasserman,* 5 Cal. 4th 1082, 1102 (1993); 1-14 Practice Under the California
     Securities Laws § 14.05[6] (2016).

28   [32] *See* footnotes 3 and 9.

                                          - 11 -

an investment pool.[33]  Even though the plaintiff investors received only fractionalized shares in the defendant's trust deeds from the third party, the court found a sufficient connection between the investors and the defendant to impose liability.  The defendant knew that the mortgage company was soliciting funds from the general public and that the investors would receive "fractional interests" or "fractional shares" in the investment pool.[34]

Plaintiffs Colman and Taubman-Dye hold the equivalent of fractionalized shares in Theranos securities.[35]  They were solicited by Defendants through persons who pooled Plaintiffs' investments in partnership funds for the sole purpose of purchasing Theranos securities.  Compl., ¶¶ 11-12.  Defendants knew that these partnerships were formed in order to pool investor funds for the sole purpose of purchasing Theranos stock.  *Id.*

### 2.   Liability Under California Corporations Code § 25500 Applies to "*any* security affected by" Defendants' Acts

More importantly, California securities law does not predicate standing under § 25500 on whether an injured investor purchased the identical or "same" security sold by Defendants.  Investors who purchase "*any* security affected" by Defendants, fraud are protected.  Cal. Corp. Code § 25500 explicitly states that one who willfully violates § 25400 is liable to anyone who purchases "any security" affected:

> Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells *any security at a price which was affected* by such act or transaction for the damages sustained by the latter as a result of such act or transaction.

The drafters' use of the term "any" (as opposed to limiting words including "such", found throughout §§ 25400 and 25500) is consistent with the broad purpose of the statute to include "those interests

---

[33] *See People v. Miller*, 192 Cal. App. 3d 1505 (1987).

[34] *Id.; See Marsh & Volk* § 14.03.

[35] *See* 17 C.F.R. §230.501, Definitions and terms used in Regulation D; § 230.501(e)(3) (Including beneficial owners or persons or entities with beneficial interests in the unregistered securities through partnerships as "purchasers" for purposes of Rule 506 exemptions.).

- 12 -

1    with respect to which the public needs to be protected from fraud."[36]  The courts "focus on the

2    economic realities of a specific transaction."[37]

3           Defendants rely on *McMahon*, an unpublished opinion that is not citable in any California

4    court and thus has no precedential value,[38] for the proposition that Plaintiffs must purchase "the

5    same" security sold by Defendants in order to have a private right of action under Cal. Corp. Code §

6    25500.[39]  However, the California securities code should be read for its plain meaning.[40]  If there is

7    no ambiguity in the language, the court must presume the Legislature meant what it said and the

8    plain meaning of the statute governs.[41]

9           The clear language of the statute imports no "sameness" requirement as imposed in

10   *McMahon*.  There is no ambiguity in the language of the statute as is required to alter the plain

11   meaning of its words.  No legislative history suggests that the securities must be identical.

12   Moreover, the intent of the statute is broad to cover anyone engaged in the market.[42]  The broad term

13   "any security" is consistent with both the intent of state and federal laws to protect investors from

14   any scheme no matter how devised.[43]  When the California Supreme Court in *Diamond Multimedia*

---

[36] 1-1 Practice Under the California Securities Laws § 1.03 (2016).

[37] *Id.*

[38] California Rules of Court, Rule 8.1115(a), states that: "[A]n opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published **must not be cited or relied on** by a court or a party in any other action."

[39] *See McMahon v. Marsh & McLennan Companies, Inc.*, No. B216003, 2010 WL 2308437 at 36-37 (Cal. Ct. App. June 10, 2010).

[40] *Compare Moss v. Kroner,* 197 Cal. App. 4th 860, 878 (2011) ("We read sections [ of the California securities code]. for their plain meaning…").

[41] *Murphy v. Kenneth Cole Productions, Inc.* 40 Cal.4th 1094, 1103 (2007) ("If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citations.]").

[42] This broad view of persons who may be liable has been shared by one justice of the California Supreme Court who concluded that "plaintiff must prove that the defendant was *engaged in market activity* at the time of the misrepresentations ." *Mirkin,* 5 Cal.4th at 1123, (Kennard, J., concurring and dissenting); *See Reiger v. Altris Software, Inc.,* 1999 WL 540893, at *10 (S.D. Cal. Apr.30, 1999) (holding that liability under § 25500 requires the defendant to have directly participated "in the sale of securities or some *other 'market activity'*").

[43] *Hamilton Jewelers v. Dep't of Corps.*, 37 Cal. App. 3d 330, 335 (1974) (The purpose of the California Securities Law is to "protect the public against spurious schemes, however ingeniously devised, to attract risk capital." *Citing Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 814 (1961).

- 13 -

interpreted the use of the similar words "liable to any other person" in the same statute, it refused a narrow definition.[44]

Further, the *Washington Mutual* court rejected the *McMahon* argument stating that a broad reading of the statute "is more persuasive and faithful to the text and purpose of § 25400(d) as that section seeks to punish activity that artificially manipulates the value of securities to the defendant's benefit."[45]  Similarly, Judge Kaplan in *Lehman Brothers* found merit in the *Washington Mutual* court's point of view, but erroneously believed he was bound to follow *McMahon*, apparently unaware that it lacked any precedential value in California.[46]

Even under the federal securities laws, upon which the California securities statute is based, the identical security need not be at issue in order for an injured investor to have standing.[47]  Like Cal. Corp. Code § 25500, Rule 10-b5 standing is derived from the language "in connection with the purchase or sale of *any* security."[48]  For example, in *Zelman*, plaintiffs purchased securities called GOALS, which were "equity linked" notes issued by UBS AG, a party unrelated to the defendant.[49] Each GOAL was linked to the performance of JDS Uniphase Corporation common stock; a GOAL was not an interest in the common stock itself.  The plaintiffs alleged that the defendants' false statements caused the GOALs to be issued and traded at artificially inflated prices.  The court refused to apply a restrictive interpretation on the term "any security," finding that the GOALs' redemption value bore a "direct relationship" to the value of JDSU stock, and that the plaintiffs were

---

[44] *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1052-1056 (1999)(refusing to insert the restrictive words "in this state" after words "any person" as "it is not our function to insert language omitted by the Legislature.").

[45] *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, No. 2:08-md-1919 MJP, 2010 WL 2545415, at *9 (W.D. Wash. June 21, 2010).

[46] *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 194 (S.D.N.Y. 2012).

[47] *Diamond Multimedia Sys.*, 19 Cal. 4th at 1055 (Quoting legislative history by Marsh & Volk, "The fraudulent and prohibited practices enumerated in Part 5 are modeled upon existing Federal laws, both statutory and common law…").

[48] 17 C.F.R. § 240.10b-5.

[49] *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956 (N.D. Cal. 2005).

- 14 -

1    "the precise class for the protection of which the 1934 Act [including § 10(b)] was enacted:

2    participants in the . . . securities markets."[50]

3        Similarly, in *Cendant*, the court noted it was well settled that "§ 10(b) and Rule 10b-5

4    encompass misrepresentations beyond those concerning the investment value of a particular

5    security."[51]  In *Deutschman*, the court held that the purchaser of an option contract had standing to

6    seek damages under § 10(b) for misrepresentations concerning the underlying securities.[52]

7        Finally, *McMahon* is distinguishable.  In *McMahon*, the plaintiffs purchased options in the

8    issuer's securities.  While the holding appears to be *dicta*, as the court found plaintiffs suffered no

9    damages, *McMahon* went on to hold that § 25500 did not extend "to damages based upon options

10   trading in this circumstance."[53]  Defendants "did not offer for sale, either directly [or indirectly] put

11   options."[54]

12       Plaintiffs' purchases here are not analogous to the option contract purchases at issue in

13   *McMahon.*  There, plaintiffs held no beneficial interests or fractionalized ownership of the securities

14   sold by defendants.  Defendants also received no benefit from the option contract trading.  No money

15   flowed up the chain to defendants as in *Miller* or this case – the options were not part of the

16   financing chain from which defendants received funds.

17       Accordingly, this court should apply the plain meaning of the statute – namely that

18   Defendants are "liable to any other person who purchases or sells ***any security at a price which was***

19   ***affected***" by their conduct – and deny Defendants' motion to dismiss claims under §§ 25400 and

20   25500.

21   _____

22       [50] *Id.* at 958-59; *Zelman* also rejected the restrictive interpretation applied by the Second Circuit
     in *Ontario Public Service Emps. Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27

23   (2d Cir. 2004), *cert. denied*, 543 U.S. 1050 (2005), where plaintiffs purchased an entirely unrelated
     security in another company where no direct value link existed stating: "The Court also hesitates to

24   apply Nortel to the present case because the Second Circuit's rationale in that decision is problematic.
     Although the Second Circuit's interpretation of "any security" is not plainly compelled by the

25   statutory language, the court did not support its interpretation by extensive reasoning."  *Zelman*, 376
     F. Supp. 2d at 962.

26       [51] *Semerenko v. Cendant Corp.*, 223 F.3d 165, 177 (3d Cir. 2000).

27       [52] *Deutschman v. Beneficial Corp.,* 841 F.2d 502, 508 (3d Cir. 1988).

         [53] *Id.* at 3, 13.

28       [54] *Id.*

                                                                              - 15 -

**3.      Liability Under California Corporations Code § 25400 Applies to "any person [who] directly or indirectly" Sells or Offers to Sell**

Cal. Corp. Code § 25400 forbids securities sellers from directly or indirectly improperly inducing the purchase or sale of a security.  Cal. Corp. Code § 25400 directly states:

> "It is unlawful for any person, *directly or indirectly*, in this state . . . [i]f such person is a . . . person selling or offering for sale . . . the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading . . . ."

Thus, indirect sales of securities induced by a securities issuer are covered, regardless of any intermediary structure.

Defendants induced Plaintiffs and a multitude of other investors to indirectly purchase their securities through intermediaries.  Theranos raised 85% of its capital – $632.73 million – after beginning its massive media campaign of false statements in July 2013.  Before its campaign, Theranos had raised only $93 million.  Defendants' use of private intermediaries instead of a public exchange, in order to avoid federal listing requirements, does not shield the Defendants from liability for fraud.[55]

Here, Defendants sold Company shares indirectly to investors through Theranos intermediaries and facilitators who held shares on behalf of investors.  *See infra* Section B. Plaintiffs' investments were "invited" and/or "controlled by and occurred with the knowledge and consent of Defendants."  Compl., ¶¶ 11, 12, 26.  Accordingly, the security interests sold to Plaintiffs were indirectly sold by Defendants and liability under Cal. Corp. Code §§ 25400 and 25500 applies.

**E.      Defendants are Sellers to Plaintiffs Under California Corporations Code §§ 25401 and 25501**

While Cal. Corp. Code § 25500 extends liability to all persons affected by market manipulation – and thus requires proof of intentional misrepresentation – Cal. Corp. Code §§

---

[55] Noah Kulwin Report: *Venture Capital Is a Big Reason Tech IPOs Slowed in 2015, and It'll Likely Stay That Way. Recode*, December 21, 2015, available at http://www.recode.net/2015/12/21/11621640/report-venture-capital-is-a-big-reason-tech-ipos-slowed-in-2015-and:  "[T]  this decline in public offerings was brought about by SEC rule changes from the mid-2000s that made it a lot easier to raise significant amounts of money in the private market.").

25401[56] and 25501[57] extend liability to non-intentional conduct and require privity but no proof of damages.[58]  Like Cal. Corp. Code § 25500, § 25501 does not require proof of reliance.[59]

### 1.     Defendants are in Privity with Plaintiffs

Defendants argue that Plaintiffs do not have claims under Cal. Corp. Code §§25401 and 25501 because Plaintiffs did not purchase their securities directly from Theranos but instead purchased securities from Lucas Ventures or Celadon, who in turn bought shares on behalf of Plaintiffs from Theranos.

The *Miller* case rejects this argument under similar circumstances.[60]  There, the original issuer, Miller, knew that an intermediary, Lochmiller, "was soliciting funds from the general public and that multiple investors would receive fractional interests in the notes he issued."  *Id.* at 1512.  The court found Miller guilty under the securities laws after noting, "[t]hat Lochmiller acted as Miller's agent in securing these investors does not create any lack of privity here."  *Id.*

Similarly, the Complaint alleges that Donald Lucas of Lucas Ventures was a "strategic advisor" to Theranos, and his father originally funded Theranos and "mentored' Holmes.  Compl., ¶¶ 11, 26-27.  Plaintiff Colman was "directly solicited . . . at the invitation of Theranos and Holmes" by Lucas ventures.  *Id.*  Colman also relied on "Theranos representations" set forth in the Complaint "that Theranos had developed a Commercially ready groundbreaking blood test technology that was highly accurate, that involved drawing only a few droplets of blood, and was being rolled out by Walgreens."  *Id.*

---

[56] Cal. Corp. Code § 25401 provides, "It is unlawful for any person to offer or sell a security in this state … by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact…."

[57] Cal. Corp. Code § 25501 provides, "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him…."

[58] *Cal. Amplifier, Inc. v. RLI Ins. Co.,* 94 Cal. App. 4th 102, 109 (2001).

[59] *Id.; Bowden v. Robinson* 67 Cal. App. 3d 705, 714-715 (1977); *Marsh & Volk* § 14.05, nt. 12-14.

[60] *See Miller*, 192 Cal. App. 3d at 1512.

1        Plaintiff Taubman-Dye purchased her shares through a SharePost affiliated fund, Celadon,

2    whose purpose was to pool and hold Theranos Series C Preferred shares.  *Id.*, ¶12.[61]  The transaction

3    "was controlled by and occurred with the knowledge and consent of Defendants" who "imposed

4    three separate rights of refusal on the sale."  *Id.*  The first right of refusal allowed Theranos to

5    purchase Company stock on the same terms offered to SharePost; the second offered the same terms

6    to Holmes; the third allowed Theranos to assign their right of first refusal to an undisclosed third

7    party, pursuant to which such Assignee could purchase Theranos securities on the same terms

8    previously offered to Theranos and Holmes.  *Id.*

9        As noted above, sales of exempt unregistered securities are highly regulated and controlled

10   by Theranos.  Theranos had to confirm that every purchaser was an "accredited investor," a

11   "qualified institutional buyer," or otherwise met certain minimum requirements.[62]  Sharepost had to

12   work with Theranos in order to satisfy the Company's refusal rights and other transfer

13   requirements.[63]  The fact that Cal. Corp. Code § 25504 imposes liability on "Broker Dealers and

14   agents" of sellers clearly indicates that the legislature anticipated privity would remain unbroken

15   even when utilizing third parties in securities transactions.[64]

16       Defendants' cases are inapposite.  In *Mirkin*, no claims were made under § 24501, and that

17   court merely pointed out that plaintiff's privity was not required under § 24500 where liability was

18   extended to "any person trading in the market."[65]  In *Apollo Capital Fund*, plaintiffs sought to sue

19   the placement agent (Roth) of the issuer (eNucleus), not the issuer themselves.[66]  Plaintiffs here *are*

20   suing the issuer.  In *Sharp*, the plaintiff "conceded" that he did not have privity with any defendant.

---

[61] Sharepost  is a third-party intermediary that helps private companies like Theranos "manage their secondary transactions by understanding and supporting their unique liquidity and investor preferences." https://sharespost.com/solutions/issuers/.  The sole purpose of the partnership formed by Sharepost, Celadon Technology Fund VII, LLC, was to acquire and on behalf of new investors. Compl., ¶ 12.

[62] See discussion re Rule 506, Regulation D 17 C.F.R. § 230.506(b) and (c) at foot note 9.

[63] *See* Compl., ¶ 12 and Sharepost FAQ  https://sharespost.com/solutions/investors/.

[64] *See Marsh & Volk* § 14.03(c), nt. 46.

[65] *See Mirkin v. Wasserman*, 858 P.2d 568, 581 (Cal. 1993).

[66] *See Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 70 Cal. Rptr. 3d 199, 221 (Ct. App. 2007).

- 18 -

1    In contrast, Plaintiffs in this case have alleged the requisite privity.[67]  In *Jackson*, the Defendants did

2    not make statements, and there was no evidence that securities were ever sold, let alone by the

3    defendants.[68]

4          Unlike Defendants' cited authority, Defendants here have control over who purchases their

5    securities.  Defendants' use of intermediaries as agents to raise funds for their shares creates

6    sufficient privity to impose liability under Cal. Corp. Code §§ 25401 and 25501.

7          **2.      Defendants are Liable as Control Persons**

8          Defendants argue that Holmes and Balwani are not liable in this action because the

9    Complaint does not allege that they actually sold shares.  However, Cal. Corp. Code § 25504

10   provides that "[e]very person who directly or indirectly controls a person liable under § 25501 . . .

11   [is] also liable jointly and severally with and to the same extent as such person . . .."  Cal. Corp. Code

12   § 25504 further explains that when a corporation is found liable for securities violations, that liability

13   extends to "every principal executive officer or director" of the corporation, or any person occupying

14   a similar status.  The Complaint alleges that Holmes and Balwani controlled Theranos.  Compl., ¶

15   94.  Holmes was the founder, Chief Executive Officer, and Chairman of the Board of Directors of

16   Theranos.  Holmes is also the controlling stockholder of Theranos, holding over 50% of the

17   Company's stock.  *Id.* ¶ 14.  Balwani was the President, Chief Operating Officer, and board member

18   of Theranos.  *Id.,* ¶ 15.

19         Similarly, Cal. Corp. Code § 25504.1 imposes liability on "[a]ny person who materially

20   assists any violation of Section . . . 25401 . . . ."  As the highest officers of Theranos, Holmes and

21   Balwani clearly fall into each of these categories of persons secondarily liable.[69]

22

23

24   [67] *Sharp v. Arena Pharm., Inc., No.* 10CV2111-CAB (BLM), 2013 WL 12094819, at *2 (S.D. Cal. Mar. 29, 2013).

25   [68] *See Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1063-64 (N.D. Cal. 2013).

26   [69] Whether a defendant is a controlling person "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. " *No. 84 Emp'r-Teamster Joint Council Pension Tr.*
27   *Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). In the context of corporate control, a seat on the board is sufficient to make prima facia showing of control.  *Id.* at 945-46.

28
                                        - 19 -

**F.      Defendants are Liable Under California Bus. and Professions Code § 17200, California's UCL**

The UCL prohibits and provides civil remedies for unfair competition, which it defines as "any unlawful, unfair or fraudulent business act or practice."  The Legislature intended this "sweeping language" to include "*anything that can properly be called a business practice and that at the same time is forbidden by law*" and provided, courts with 'broad equitable powers to remedy violations.'"[70]  The court may also order restitution without individualized proof of deception, reliance, and injury if it "determines that such a remedy is necessary . . . ."[71]  As such, the statute is particularly suitable to class actions.[72]

**1.      The UCL Covers Defendants' Acts**

Defendants urge that the UCL does not cover the violative securities transactions in question here.  Contrary to Defendants' assertion, California courts are currently split on this issue and, in this case, the UCL applies.

Defendants rely on *Bowen,* from the Fourth Appellate District, for the proposition that the UCL does not apply to securities transactions.[73]  Defendants fail to mention that the First Appellate District directly contravenes *Bowen* in prior and more recent decisions.

In *Roskind*, the First Appellate District held that California's UCL "has always been given a broad and sweeping ambit by our Legislature and our Supreme Court . . . The UCL contains no language supporting an exclusion for securities, and under the plain language of the UCL, we cannot create such an exclusion."[74]  More recently, the First Appellate District in *Overstock* addressed *Bowen*, found its reasoning faulty, and followed *Roskind* in finding that the UCL applied to securities transactions.[75]  The court noted that the Attorney General filed an amicus brief arguing *Bowen* was

---

[70] *See Kwikset Corp. v. Superior Court,* 51 Cal.4th 310, 320 (2011)In *Kwickset*, the Court interpreted the new standing requirement, created by Prop 64, that plaintiff must have "actually lost money or property."  To have standing to bring a UCL claim under this new law, the court found that a representative plaintiff must merely have some sort of economic injury or diminished value.

[71] *Childrens Television,* 35 Cal. 3d. at 211.

[72] *See Fletcher v. Sec. Pac. Nat'l Bank,* 23 Cal. 3d 442, 453 (1979).

[73] *See Bowen v. Ziasun Technologies, Inc.,* 116 Cal.App.4th 777, 788 (2004).

[74] *Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal.App.4th 345, 355, fn. 8 (2000).

[75] *Id.* at 716.

- 20 -

1    wrongly decided.[76]  *Overstock* further looked to the California Supreme Court decision in *Cel-Tech*

2    *Communications*, reiterating that "the sweeping language of the UCL is intended 'to permit tribunals

3    to enjoin on-going wrongful business conduct in *whatever context such activity might occur*.'"[77]

4          Defendants seek refuge in federal decisions attempting to navigate these decisions.  However,

5    even *Siegal*, Defendants' only unequivocal case, erroneously concludes it is bound by *Bowen* and

6    fails to acknowledge the current split amongst the Districts.[78]  *Bowen* has since been rejected by

7    federal decisions, or interpreted narrowly, to avoid application.

8          The *Benson* case provides a thorough background of the split in California courts.[79]  After

9    analyzing current California case law, *Benson* permitted a § 17200 claim based on aiding and

10   abetting a sale of fraudulent securities to go forward, stating:

11             The Court notes that *Overstock* currently constitutes the most recent
              authority on the issue.  Further, the Court finds the *Roskind* and

12            *Overstock* courts' analysis of the UCL persuasive.  As the *Roskind*
              court aptly noted, prior decisions have consistently held that the UCL

13            should be broadly interpreted and applied, "given the creative nature of
              the scheming mind," as well as the impossibility in drafting "in

14            advance detailed plans and specifications of all acts and conduct to be
              prohibited . . . , since unfair or fraudulent business practices may run

15            the gamut of human ingenuity and chicanery."[80]

16   Numerous other federal judges have refused to apply *Bowen* and have narrowed its scope to avoid

17   conflict.[81]

18   _____

19        [76] *Overstock.com, Inc. v. Gradient Analytics, Inc.,* 151 Cal. App. 4th 688, 715 (2007).

20        [77] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 181 (1999).

     [78] *See Siegal v. Gamble*, No. 13-CV-03570-RS, 2016 WL 1085787 (N.D. Cal. Mar. 21, 2016).
21   Moreover, *Siegel's* facts are not analogous to those here.  There, the plaintiffs did not sue the issuer
     as only the aggregators made statements.  Only one plaintiff bought from the aggregator and therefor
22   had a § 24501 claim, but failed to allege when the aggregators made allegedly false statements.

23        [79] *See Benson v. JPMorgan Chase Bank, N.A.,* No. C-09-5272 EMC, 2010 WL 1526394, at *4
     (N.D. Cal. Apr. 15, 2010) (Allowing aiding and abetting a fraudulent securities transaction to go
24   forward under the UCL).

25        [80] *Id.* at *9 (quoting *Roskind,* 80 Cal. App. 4th at 351) (citing *Cel-Tech,* 20 Cal. 4th at 181).

     [81] *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 553 (N.D. Cal. 2009); *See also*
26   *Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860, 866 (N.D. Cal. 2011) ("Since *Bowen*, courts
     have narrowed *Bowen's* broad language and have allowed Section 17200 claims to proceed where the
27   claims were tangentially related to securities transactions.").  *See also* William Stern, *Business &*
     *Professions Code Section 17200 Practice*, Ch. 3-C [3:14-25] (Summarizing prior cases holding
28   securities transactions covered.) and [3:28] (Collecting other state cases holding their Unfair Trade
     Practices and Consumer Protection Laws apply to securities transactions.).

1    Lastly, *Bowen* disapproved of the UCL's application to securities transactions because there

2    already existed a "comprehensive regulatory umbrella of the Securities and Exchange Commission

3    over such transactions."[82]  Correspondingly, *Benson* found that if a transaction is not covered by a

4    federal or statutory scheme, the UCL should apply.  In holding that the UCL covered aiding and

5    abetting a sale of fraudulent securities, *Benson* stated:

6    > The Court's conclusion is bolstered by the fact that federal securities
     > law does not provide a private right of action against aiders and
7    > abettors under Section 10(b) of the Securities Exchange Act of 1934, . .
     > . . Thus, the UCL, interpreted to allow the claim herein, would not
8    > duplicate an available remedy under federal securities laws.[83]

9    Accordingly, if this Court finds that the California securities statutes above do not cover Plaintiffs'

10   transactions, then following the logic in *Bowen* and *Benson*, the UCL should be found to apply here.

11   **2.      The Available Remedies at Law do not Extinguish Plaintiffs' UCL claims**

12   Defendants argue that because Plaintiffs plead other claims, which may be adequate at law,

13   Plaintiffs' UCL claims must be dismissed.  Defendants' logic cannot withstand scrutiny.

14   Fed. R. Civ. P. 8(d)(2) provides that a  party may set out two or more statements of a claim or

15   defense alternatively or hypothetically, either in a single count or defense or in separate ones.[84]

16   These include a mix of legal and equitable grounds.[85]

17   Similarly, the express language of the California legislature states, "[u]nless otherwise

18   expressly provided, the remedies or penalties provided by this chapter are ***cumulative*** to each other

19   and to the remedies or penalties available under all other laws of this state."[86]  The amendments to

20   the UCL by Proposition 64 (2004) further assumed the overlap of legal and equitable remedies, as a

21

22   ───────────────

23   [82] *Bowen*, 116 Cal.App.4th at 786-789, fn. 9.

     [83] *See Benson*, 2010 WL 1526394, at *9.

24   [84] *See In re Harmonic, Inc., Sec. Litig.,* No. C 00-2287 PJH, 2006 WL 3591148, at *8 (N.D. Cal.
     Dec. 11, 2006).

25   [85] In 2007, before amendment for "stylistic only" reasons, this language included the words,
     "whether based on legal, equitable, or maritime grounds."  *See* Notes of Advisory Committee on
26   2007 amendments Fed. R. Civ. P. 8(e)(2); *McCalden v. Cal. Library Ass'n,* 955 F.2d 1214, 1219 (9th
     Cir. 1992).

27   [86] *See* Cal. Bus. & Prof. Code §§ 17205 and 17534.5; *See also* William Stern, *Business &
28   Professions Code Section 17200 Practice*, Ch. 8-A [8:15] (March 2016).

1  plaintiff now must "have lost money or property" to have representative standing.[87]  Plaintiffs who

2  have "lost money or property", therefore, would almost always have legal remedies available in

3  conjunction with their UCL claim.

4          Remedies under the UCL are equitable and the dismissal of relief under the UCL is based on

5  an "abuse of discretion standard."[88]  The purpose of the statute is "to deter future violations of the

6  unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains."[89]  The

7  Legislature considered this purpose so important that it authorized courts to order restitution without

8  individualized proof of deception, reliance and injury if necessary to prevent the use or employment

9  of an unfair practice.[90]  Thus, dismissing a UCL claim before establishing the feasibility of other

10  causes of action, and their adequacy to deter, would be an abuse of discretion.

11          Defendants' case law regarding the UCL is distinguishable.  *Duttweiler* dismissed a UCL

12  request for injunctive relief when defendants no longer manufactured motorcycles with the defect –

13  in such case, injunctive relief would have been impossible.[91]  *Zapata* dismissed a UCL request for

14  injunctive relief where restitution was not sought and both parties agreed that other remedies

15  "allowed plaintiffs to recover money damages."[92]  The dismissals in *Robinson* and *Rhynes* are based

16  on findings that adequate remedies exist.[93]  At this stage in the litigation, it is not possible to

17  determine whether Plaintiffs' legal remedies are sufficient.  Defendants do not agree that any other

18  statute covers the damages of Plaintiffs or the Class.  Moreover, Defendants appear to be continuing

19  to spend the money they raised, at unknown rates of speed, on new ventures not contemplated during

20

21      [87] *See* Cal. Bus. & Prof. Code § 17204. William Stern, *Business & Professions Code Section 17200* Practice, Ch. 7-A [7.3].

22      [88] *See Prata v. Superior Court*, 91 Cal.App.4th 1128, 1136(2001).

23      [89] *Id.* at 1137, *citing Fletcher,* 23 Cal. 3d at 449.

24      [90] *Id.*

25      [91] *In Duttweiler v. Triumph Motorcycles (Am.) Ltd*., No. 14-CV-04809-HSG, 2015 WL 4941780, at *8-9 (N.D. Cal. Aug. 19, 2015).

26      [92] *Zapata Fonseca v. Goya Foods Inc*., No. 16-CV-02559-LHK, 2016 WL 4698942, at *7 (N.D. Cal. Sept. 8, 2016).

27      [93] *Robinson v. C.R. Bard, Inc.,* No. 16-CV-00942-JST, 2016 WL 3361825, at *3 n.3 (N.D. Cal June 17. 2016); *Rhynes v. Stryker Corp*., No. 10-5619 SC, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011).

28

- 23 -

the original investments.  Injunctive or other relief under the UCL may be needed sooner than a jury

trial in order to deter this apparently continuing fraud. [94]

Finally, if the Court is inclined to dismiss Plaintiffs' UCL claim, Plaintiffs respectfully

request leave to amend in order to distinguish the basis of the claims or the relief sought, or why

there may not be an adequate remedy at law.[95]  Alternatively, the dismissal should be without

prejudice to replead after discovery, the availability of recoverable damages is determinable, or

plaintiffs are better able to fashion the remedy to conform to the evidence.

## G.  The Complaint Sufficiently Pleads Damages, Diminution in Value, and That the Securities were Affected by Defendants' Acts

Defendants claim the Complaint does not adequately plead facts demonstrating Plaintiffs'

damage or that Plaintiffs' securities were affected by Defendants' acts.  However, Defendants ignore

Plaintiffs' detailed allegations of the diminution in value of Plaintiffs' securities.  Plaintiff Colman

purchased his interests when Defendants claimed a value of $10 billion.  Compl., ¶¶ 11, 26.  Plaintiff

Taubman-Dye purchased at $19 per share.  *Id.*, ¶ 12.  A multitude of other investors in the Class

purchased at prices between $17 and likely as high as $20 per share before the *Wall Street Journal's*

2015 exposé broke.  *Id.*, ¶¶42, 44, nt. 75.  Plaintiffs' investments, as well as the investments of a

multitude of other investors, have seen an unprecedented drop in value due to Defendants' fraud –

Forbes concluded that Theranos's value dropped from more than $9 billion to $880 million, or over

90%.  Compl., ¶¶ 79-81.  The allegations of this diminution in the value of Theranos is sufficient to

show the great financial harm to Plaintiffs and other Theranos investors.

## IV.   CONCLUSION

For the reasons set forth above, Defendants motion to dismiss Counts I, II, III, IV, V and VII

should be denied. Plaintiffs request that Count VI (constructive fraud) be dismissed without

prejudice.

---

[94] Compl., ¶¶ 73, 81.

[95] *See Fonseca v. Goya Foods, Inc.,* No. 16-CV-02559-LHK, 2016 WL 4698942, at *8 (N.D. Cal. Sep. 8, 2016) ("Plaintiff may be able to distinguish his UCL, FAL, and unjust enrichment claims by demonstrating that they are not rooted in a common factual predicate as Plaintiff's other causes of action.").

- 24 -

1   DATED: February 7, 2017                  Respectfully submitted,

2                                            **HAGENS BERMAN SOBOL SHAPIRO LLP**

3
                                             By: */s/ Reed R.Kathrein*
4
                                             Peter E. Borkon (212596)
5                                            Nicholas S. Singer (306098)
                                             715 Hearst Ave., Suite 202
6                                            Berkeley, CA 94710
                                             Telephone: (510) 725-3000
7                                            Facsimile: (510) 725-3001
                                             reed@hbsslaw.com
8                                            peterb@hbsslaw.com
                                             nsinger@hbsslaw.com
9
                                             Steve W. Berman
10                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                             1918 Eighth Ave., Suite 3300
11                                           Seattle, WA 98101
                                             Telephone: (206) 623-7292
12                                           Facsimile: (206) 623-0594
                                             steve@hbsslaw.com
13
                                             *Counsel for Plaintiffs and Proposed Lead*
14                                           *Counsel for the Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28