1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Nathanael M. Cousins, Magistrate Judge

4

5   COLMAN, et al.,                )
                                   )
6           Plaintiffs,            )
                                   )
7       vs.                        )  No. C 16-06822-NC
                                   )
8   THERANOS, INC., et al.,        )
                                   )
9           Defendants.            )
    _____ )

10

                                   San Jose, California
11                                 Wednesday, March 1, 2017

12   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 1:11 - 1:40 = 29 MINUTES
13

    APPEARANCES:
14

15  For Plaintiffs:
                               Hagens, Berman, Sobol,
16                               Shapiro, LLP
                               715 Hearst Avenue, Suite 202
17                             Berkeley, California 94710
                        BY:    REED R. KATHREIN, ESQ.

18
                               Robbins, Geller, Rudman and
19                               Dowd, LLP
                               655 West Broadway, Suite 1900
20                             San Diego, California 92101
                        BY:    JASON A. FORGE, ESQ.

21  For the Defendant Theranos:
                               Wilmer, Cutler, Pickering,
22                               Hale and Dorr, LLP
                               950 Page Mill Road
23                             Palo Alto, California 94304
                        BY:    MICHAEL A. MUGMON, ESQ.

24
                (APPEARANCES CONTINUED ON NEXT PAGE)
25

2

1  APPEARANCES:   (Cont'd.)

2  For Defendant Theranos:

3                            Wilmer, Cutler, Pickering,
                              Hale and Dorr, LLP
                              60 State Street
4                            Boston, Massachusetts 02109
                         BY: ROBERT KINGSLEY SMITH, ESQ.
5
   For Defendant Holmes:
6
                              Cooley, LLP
                              3175 Hanover Street
7                            Palo Alto, California 94304
                         BY: PATRICK EDWARD GIBBS, ESQ.
8
                              Davis, Wright, Tremaine, LLP
9                            San Francisco
                              505 Montgomery Street
10                           Suite 800
                              San Francisco, California
11                            94111
                         BY: ALLISON ANN DAVIS, ESQ.
12
   Transcribed by:          Echo Reporting, Inc.
13                           Contracted Court Reporter/
                              Transcriber
14                           echoreporting@yahoo.com

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Wednesday, March 1, 2017</u>                    <u>1:11 p.m.</u>

2                     P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE CLERK:  Calling Civil 16-6822, Robert Colman,

5  et al., versus Theranos, Incorporated, et al.

6          THE COURT:  Come on forward.  Good afternoon.

7          MR. MUGMON:  Good afternoon, your Honor.  Michael

8  Mugmon for Theranos, Incorporated.  With me is my colleague,

9  Rob Smith.

10         THE COURT:  Welcome.

11         MR. MUGMON:   Thank you.

12         MR. GIBBS:  Good afternoon, your Honor.  Patrick

13 Gibbs from Cooley for Elizabeth Holmes.

14         THE COURT:  Welcome.

15         MS. DAVIS:  And good afternoon, your Honor.

16 Allison Davis for --

17         THE COURT:  Good afternoon.  Welcome.

18         MR. KATHREIN:  Good afternoon, your Honor.  Reed

19 Kathrein with Hagens Berman, and Jason Forge with Robbins,

20 Geller, on behalf of Colman and Hilary Dye-Taubman (sic).

21         THE COURT:  Good afternoon.

22         MR. FORGE:  Good afternoon, your Honor.

23         THE COURT:  All right.  Just some logistics.  We

24 are making a recording of today's proceeding.  As you can

25 see, there's no court reporter present.  A transcript can be

4

1  created from the recording.  For that reason, if everyone

2  will speak close to a microphone or Ms. Davis has

3  exemplified well speaking loudly enough to be captured from

4  anywhere, that will assist the making of a good record.

5      We're, of course, here on the motion to dismiss which

6  is filed jointly by all the Defendants of the complaint, the

7  complaint asserting various violations of California state

8  law.  We're here under the class action jurisdictional

9  bases, of course not deciding the -- whether a class is

10  certified or not today.  That's potentially to come on

11  another day if the case proceeds forward.  There was one

12  claim, the constructive fraud claim, that the Plaintiffs did

13  not oppose the dismissal of.  So the Defense can already

14  declare victory at least as to one claim, but there are

15  other claims presented in the case that are a closer call.

16      There are, of course, three Defendants.  So I'm taking

17  that you're going to be arguing on behalf of each or are

18  there individual arguments that other Defendants would like

19  to make?

20          MR. MUGMON:  The arguments I'll make should apply

21  equally to all Defendants.

22          THE COURT:  All right.  And will you be handling

23  all the arguments for Plaintiffs?

24          MR. KATHREIN:  Yes, I will, your Honor;

25          THE COURT:  All right.  So I've got some questions

5

1   for each side, and I'll give you a chance to argue in

2   support of your briefs.  We do have some other important

3   cases to come to this afternoon.  So I'll ask you to focus

4   on your most important arguments.

5       Big picture here, the Defendants have got a view that

6   if I were to grant the type of relief requested by

7   Plaintiffs that it would be a potential for double recovery

8   and that under cases applying California law, the

9   Plaintiffs, of course, are purchasers of funds, aggregations

10  of different securities, and the funds are not Plaintiffs'

11  and are not Defendants' in the case.  They're not parties to

12  the case, and as I understand the Defense motion, the

13  problem for that is that the funds could be Plaintiffs' and

14  could sue Theranos and the individual Defendants for

15  securities fraud and if I permitted this type of case to go

16  forward, then potentially there could be double exposure for

17  both the sale of securities to the funds and then for the

18  same transactions -- for the same securities that the

19  purchasers, including the Plaintiffs in this case, could sue

20  Theranos and the individual Defendants for the same

21  activity.

22      So that's something that was focused on in the reply,

23  and I'll give you a chance first to say -- to tell me why

24  it's not a problem.

25          MR. KATHREIN:  Thank you, your Honor.  First of

6

1 all, I'd like to set more of a big picture here in terms of

2 our view of the case and --

3          THE COURT:  All right.

4          MR. KATHREIN:  -- and Defendants' liability, and

5 it really came out talking with Jason Forge, a former U.S.

6 Attorney, after he joined us in the case and gave me that

7 perspective of it, goes back to criminal law, the Penal Code

8 and -- or Codes on who is as principal actually for purposes

9 of liability, and he cited me to Penal Code 2 U.S. Statutes

10 that says whoever causes an act to be done which directly

11 performed by him or another would be -- would be an offense

12 to the United States is punishable as a principal.  And he

13 also gave me -- excuse me if I -- unfortunately I did not

14 have a chance to write this down, so I'm going to pull it up

15 on my iPhone, but he cited me to Dressler Understanding

16 Criminal Law, Section 30.06(c) at page 450 where the Court

17 -- where the -- where the treatise basically discusses that

18 where one induces another, even if innocent, to act on its

19 behalf or to perform an act, the combined actus reus, the

20 combined act of both of them makes them principals, and the

21 Court then decides based on their own guilt whether or not

22 they are guilty.  So --

23          THE COURT:  And sorry to interrupt, but just stick

24 with that.  So reference to criminal law, that speaks to the

25 issue of where there's been a -- and here there's not a

1 crime.  It's not a Penal Code violation that's asserted.

2 It's a violation of civil law that has been asserted.  Maybe

3 in another context there might be a crime that's being

4 investigated.  Here we've got a civil lawsuit.

5          MR. KATHREIN:  Well, here -- so can I address

6 the --

7          THE COURT:  Yes.

8          MR. KATHREIN:  -- double recovery?  So our view of

9 the case is -- and, you know, we do not know if the funds

10 themselves can sue, you know.  And also to clarify, these

11 funds held -- were formed fully for the purpose of

12 partnerships, not funds, formed solely for the purposes of

13 purchasing Theranos shares, and if we have to amend, we can.

14 We can say that the -- in the wind-up of the funds, those

15 shares are contingent, can be distributed directly to the

16 partnerships.

17      The only people in the partnerships who would -- the

18 only -- the partnerships only have beneficiaries in them to

19 these stockholders.  There's no one else.  There's no other

20 profit motive of this.  It's solely for purposes of holding

21 the shares.  And if you look at the registration

22 requirements, the reason for that is because these are

23 restricted shares.  They have to be tightly controlled, and

24 Theranos has to control and make sure that everyone who

25 purchases them or purchases them on resale is an accredited

8

1  investor.

2      THE COURT:  I'm sorry.  I'm going to just -- to

3  follow along with you, so if we take your Penal Code 2

4  reference, if we look at whether there's a crime that's been

5  committed, that doesn't tell us who it is that can assert a

6  claim for relief to get remedy for that crime or for that

7  wrong in this circumstance.  It doesn't tell us whether the

8  -- whether the partnerships that were in privity more

9  directly with Theranos are the right people to bring a

10  lawsuit or whether your clients who purchased their

11  interests are in privity and can bring a claim?

12      MR. KATHREIN:  Well, no, it doesn't, but it does

13  say if the partnerships as innocent are acting on behalf of

14  Theranos or do something at Theranos' request -- they don't

15  have to be controlled by Theranos -- that Theranos is still

16  considered a principal for purposes of selling the shares,

17  and it could be the partnership's shares, principal for

18  purposes of selling the partnership shares to -- to our

19  clients.

20      But, I mean, if you look at it, these are not just

21  partnership shares.  They're like as in Zalman and in

22  Deutscheman (phonetic), you have a contingent right directly

23  to those shares as in those two federal cases.  So we think

24  that that and along with Miller and Apollo both show that

25  just because you have an agent, no matter what form that

9

1  agent is, does not break out privity, does not make the

2  principal liable.

3       And now let me address -- does not make the principal

4  not liable or the person who's directing the activity

5  liable.

6       Now, let me talk about double recovery a second there

7  because --

8            THE COURT:  Go ahead.

9            MR. KATHREIN:  -- that really -- that isn't a

10  problem if you look at other -- other statutes, other case

11  law that has had to deal with that.  In principle, that's

12  the antitrust area where double recovery has been often

13  litigated where they -- on the theory of, well, they passed

14  on the losses, and, therefore, the first in line should not

15  be held responsible because -- because -- or should not be

16  allowed to bring a suit because of the fear of double

17  recovery.

18       Well, the California Supreme Court rejected that in

19  Clayworth v. Pfiser.  I'll give you the cite, 49 Ca.4th 758.

20  It's a 2010 decision where the California Court said, you

21  know, that an antitrust defense cannot defeat the Cartwright

22  Act by asserting the pass-on defense and that such an

23  interpretation would not be in accord with maximizing the

24  effective deterrence of the antitrust laws.

25       We go further back, under federal antitrust law, the

10

1 Ninth Circuit came out with the -- the case <u>In Re Western</u>

2 <u>Liquid Asphalt</u>, which is 487 F.2d 19, and that's a case --

3 it's still good law.  It was a case that the Ninth Circuit

4 looked at the pass-on defense and double recovery and said,

5 well, first it assumes that others will sue.  It's an

6 assumption that is not here, and they may or they may not.

7       Second, the Court saw no reason appropriate means

8 cannot be found for properly apportioning damages.

9       Third, the Court said "We do not think we should

10 sacrifice enforcement for judicial economy."

11       And then, fifth, they said that Defendants reasonably

12 foresaw who would be affected by this, and there -- it would

13 be endangered, and, therefore, it's not without expectation

14 that there would be a chain of people who would be in

15 danger.  But in this case --

16            THE COURT:  And what case law -- I'm very familiar

17 with the antitrust case law about direct and indirect

18 purchasers.  What case law best supports the principle that

19 the policy underlying the antitrust law should apply equally

20 here to a securities fraud case?

21            MR. KATHREIN:  Well, it's the -- they're both --

22 they're both -- I don't have a case to cite to you, but

23 they're both statutes that are for protection of consumers

24 or investors, and they're both to deter conduct.  Both of

25 them are to -- one is to deter conduct in securities

11

1 matters, and one is to deter conduct in competition matters.

2       THE COURT:  Let me get the Defense view as to that

3 question.  And, again, starting big picture with the

4 principle of what -- why should I be concerned about double

5 counting?

6       MR. MUGMON:  I appreciate that.  I know the

7 Court's time is tight today.  So I want to focus on that

8 question.  I'll start by saying that Mr. Kathrein has

9 referred to two areas of law that just don't apply here.  I

10 think your Honor pointed out we're talking about -- started

11 off by talking about Penal Codes and then started talking

12 about antitrust provisions.  I'm not sure that those apply

13 here, but I do want to focus on the double recovery point

14 that you raise.

15     You know, at least two courts have held that with

16 respect to 25400(d) and 25500 such security in the language

17 of the statute means the same security.  You know, we've

18 talked about in our briefing the McMann case where the Court

19 held that put options written against the issuer of a

20 security were not the same security, but with --

21 specifically with respect to your question, Mr. Colman says

22 that he bought a member interest in Lucas Venture Group 11.

23 Ms. Taubman-Dye says that she bought units of Seladon

24 Technology Fund 7.  Despite what Plaintiffs argue, these are

25 not fractionalized or indirect shares of Theranos as much as

12

1  ownership -- I think this is a good analogy.  Ownership of a

2  share of an S and P 500 fund, for example, doesn't mean that

3  you own one sliver of 500 issuers' respective shares.  If

4  that were the case, allowing Plaintiffs to recover would

5  mean that an S and P 500 company could be sued both by the

6  company's own shareholders and then again by purchasers in

7  the fund, and that precisely is the sort of double recovery

8  that I think the Court has expressed a concern about.

9         So, you know, our view is you have this same security

10 problem which means that they lack standing, but in light of

11 the double recovery issue that you raise, it's a position

12 that's really not -- not logical here.

13            THE COURT:  Thank you.

14            MR. KATHREIN:  May I address --

15            THE COURT:  You may.

16            MR. KATHREIN:  -- the same security issue?

17            THE COURT:  You may.

18            MR. KATHREIN:  First of all, I'd like to get off

19 my chest that they've cited no published decision.  I didn't

20 realize it until on reply that we actually have a Local Rule

21 in this Court, Local Rule 3-4(3), that prohibits citation to

22 uncertified opinions or orders or pursuant to any similar

23 rule of any other issue in court, and California Rule 48.115

24 says that unpublished decisions are not citable and may not

25 be relied upon.

13

1    If they have done -- if they had made this argument in

2  State Court, they would have been sanctioned.

3         THE COURT:  And it's the McMann decision you're

4  referring to?

5         MR. KATHREIN:  The McMann decision.  Second,

6  though, McMann, if you look at McMann and you look at the

7  two cases that have talked about McMann lower court,

8  Washington court, he rejects the -- the analysis because

9  there's nothing in the statute that limits the word "any."

10  I mean, this -- it's logical that if you have intent to

11  induce someone and you -- and that if you effect any

12  security by that, you're -- you know, the legislature did

13  not want to try and parse out who all was effected by a

14  fraudulent scheme like this.

15         THE COURT:  So any means all?

16         MR. KATHREIN:  Any means all.  At a minimum, if we

17  look at Federal Court where they've looked at the word "any

18  security" with the "in connection with" language, you've got

19  Zalman and Deutscheman, and you have them saying, "Well, in

20  these cases the people who bought the goals, even though

21  they didn't own the stock, there was a potential at the end

22  that securities or cash could be distributed to them."  So

23  they had a contingent right.  And the same with the

24  Deutscheman case, only that case was options, which is

25  completely contrary to McMann because McMann didn't

14

1  recognize options.

2     Now, the other thing about <u>McMann</u> is it's a very messy

3  case.  The Court found there were no damages in any event

4  and -- and really did not have a lot of incentive to -- to

5  dig in further and really deal with this issue.  It's

6  unpublished.  There are reasons why cases are unpublished,

7  and if you look at it, there is no sale.  I could not

8  identify any sales of anything that related to put options

9  anywhere in the case.  The Court points that out, that there

10  were no sales by the company of put options.  No one, not

11  even the -- the funds that held the stock, which weren't the

12  company, the pension funds, they didn't write put options.

13     A put option is something you write for someone else.

14  It's not something the company writes.  And then the Court

15  cites <u>Cayman</u>, the <u>Cayman</u> decision, and I was trying to

16  understand why because the company basically said only

17  sellers are liable under the statute, and we agree with

18  that.  But here we've got a seller, and it goes right on

19  down through a direct chain, no interlude into ownership

20  into our claims.  And to address his issues, we're not

21  talking about mutual funds.  We're talking about funds,

22  venture capital funds which are defined -- under 506 they

23  have to be a qualified institutional investor.  We're not

24  opening it up to things beyond qualified institutional

25  investors where -- where Theranos has to make sure that each

15

1 institutional investor only has accredited investors in it.

2 They control the whole transaction.  They control who gets

3 it, and that's entirely different from someone who's out

4 there writing options in the open market or, for that

5 matter, trading in the open market.  This is not an open

6 market stock.

7          THE COURT:  How many class members will there be

8 in this putative class?

9          MR. KATHREIN:  We don't know.  We don't know.

10          THE COURT:  What do you think?

11          MR. KATHREIN:  I thin over 50, but we need

12 discovery on that, your Honor.

13          THE COURT:  All right.  Mr. Mugmon, I started with

14 your -- your adversary.  Let me go back to you to give me

15 any additional arguments.  I understand the two recovery

16 problem, but tell me your other best -- best shots you'd

17 like to draw my attention to.

18          MR. MUGMON:  Yeah, I'll -- I think we've talked

19 about account one in the same -- same security issue.  I'll

20 focus on a couple of other items.  I'll move on to Count 2,

21 which are the claims under Sections 25401 and 25501, the

22 corporate securities law.

23     As we've said in our briefing, we think this claim

24 fails because Plaintiffs didn't purchase securities from

25 Theranos or indeed from either of the individual Defendants.

16

1  I think the language is clear under 25501, somebody who

2  violates 25401 is liable only to the purchase -- only to the

3  person who purchases the security from him.  That is,

4  there's got to be privity between the Plaintiff and the

5  Defendant.

6       Here there's -- there's no privity.  I'm --

7            THE COURT:  Let me -- I'm going to cut you off

8  there a moment.  I didn't understand very well the

9  Plaintiffs' argument about if there is privity, and I get

10 your argument is that there -- it's not required, but you

11 also had a section saying that there is privity.  So walk me

12 through that.  Why is there privity?

13           MR. KATHREIN:  Okay.  There's privity in this case

14 because both Colman and -- I mean both Lucas, the Lucas

15 Venture Fund and Share Post are acting only as

16 intermediaries -- or acting as agents, and that's where I

17 cite you to Apollo and I believe the -- the Apollo v. Miller

18 case which recognizes that if an agent's in the middle of

19 it, that does not break -- break the privity.

20           THE COURT:  All right.  So if at the end of the

21 day and we're not at trial now --

22           MR. KATHREIN:  Right.

23           THE COURT:  -- the Defense could prove that they

24 weren't acting as agents, then that -- the you lose?

25           MR. KATHREIN:  Agents or if they were not being --

17

1 if they were not being directed and controlled or induced to

2 commit the sale.  I mean, there are triable issues that

3 discovery well help us on.  If it's --

4          THE COURT:  But right now for -- sorry to cut you

5 off -- if they're acting as agents and --

6          MR. KATHREIN:  Right.

7          THE COURT:  -- that gets you privity?

8          MR. KATHREIN:  As intermediaries, agents, yes.

9          MR. MUGMON:  And, your Honor, I -- I disagree with

10 that.  Under the statute there has to be privity between the

11 buyer and the seller.  Even if there's an agency

12 relationship, that doesn't mean privity.

13          MR. KATHREIN:  And that -- again, I would cite you

14 to Miller and I would cite you to Apollo on that issue that

15 in Apollo it was a placement agent, and the Court said you

16 can't sue the placement agent for aiding and abetting -- I

17 mean, you can't sue him as a principal.  You have to sue him

18 for aiding and abetting.  So the statute, 25501 and 25504

19 recognize that there will be agents.  There is agent

20 liability, and there is principal liability, both under the

21 statute that requires privity.  So it foresees, it

22 contemplates agents will be in there, and you -- you can sue

23 one or the other under the different statutes.

24          MR. MUGMON:  And they haven't pleaded anything

25 that's --

18

1          MR. KATHREIN:  Well, if --

2          THE COURT:  I've got that point.  All right.

3 Moving along --

4          MR. MUGMON:  Thank you, your Honor.

5          THE COURT:  -- give me your next -- next shot.

6          MR. MUGMON:  So I'll try to keep it brief here as

7 well.

8          THE COURT:  Yes.

9          MR. MUGMON:  The next claim is under the unfair

10 competition law.

11          THE COURT:  Yes.

12          MR. MUGMON:  This fails because UCL claims may not

13 be premised on securities transactions.  I'm happy to go

14 into those if your Honor would like, but I think the case

15 law speaks for itself on that point.

16          THE COURT:  I'd say there's a split in appellate

17 authority.  There's some cases that go your way, some --

18 some that don't.  Why are yours better?

19          MR. MUGMON:  I think ours are better because -- I

20 wouldn't -- I wouldn't say they're necessarily better or

21 worse.  I think they -- they are what they are.  In those

22 cases I think that Defendants cite in their -- or, I'm sorry

23 -- that Plaintiffs cite in their briefing don't involve

24 actual securities transactions.  They're premised on, you

25 know, a number of other types of -- types of cases.

19

1     So if you look at the Overstock case, for example,

2  you're talking about a situation where that was a claim

3  under the UCL for defamation.  So it had nothing to do with

4  a securities transaction, even though securities was the

5  field in which the claim was brought.

6     I think the same is true with respect to a number of

7  the other cases that we -- we include in our reply brief as

8  well.

9         THE COURT:  So the fact that they've got a fraud

10 -- they've got some claims which are not clearly securities

11 law claims, they've got some other claims thrown in their

12 complaint, that doesn't put it into the -- kind of the same

13 category as Overstock?

14        MR. MUGMON:  Exactly, your Honor.  I think -- I

15 think they can certainly be in the securities -- to use the

16 term the securities field.  That doesn't mean that those

17 involve securities transactions.  I think they also mention

18 the Roskin (phonetic) case in the Court of Appeal.  That

19 involved a broker's failure to adhere -- adhere to a

20 client's instruction and subsequent self-dealing, but the

21 claim itself wasn't over a securities transaction.

22     Third, I think they referenced the Benson v. JP Morgan

23 case.  The Northern District confirmed that actual

24 securities transactions are excluded from UCL liability,

25 even if the UCL could apply, as I mentioned, in the

20

1  securities contest.  And finally, In Re Charles Schwab, the

2  Northern District distinguished Bowen because the

3  Plaintiff's claims in that case didn't concern fraud in the

4  sale of securities.  So I -- in our view, although the UCL

5  can certainly apply in the securities context, securities

6  transactions are the basis for the claim as they plainly are

7  here.  The UCL -- UCL claim simply doesn't work.

8              THE COURT:  Mr. Kathrein?

9              MR. KATHREIN:  First let me just say on the

10 privity issue we also -- the 506 chain of custody we believe

11 puts them in privity.  That's the way the SEC looked at

12 them.

13     We have the better argument on this given the split of

14 the courts because Bowen relied on a Ninth Circuit decision

15 that relied on -- that was dealing with Hawaii law where

16 there's an express exclusion that -- or language in the

17 Hawaiian statute that says it should be construed in

18 accordance with the judicial interpretation of similar

19 federal antitrust statutes.

20     As pointed out in Overstock, that language is not in --

21 in the -- in the California statute.  And Overstock

22 discusses Roskin and it talks about the legislative intent

23 has always been given a broad and sweeping ambit by our

24 legislature and our Supreme Court.  The UCL contains no

25 language supporting an exclusion, and then it goes on.  But

1  the point is even if -- even if <u>Overstock</u> and other courts
2  have avoided applying -- you know, have avoided transactions
3  by saying this is not quite a transaction, they haven't said
4  that <u>Bowen</u> is correct.  They said whether you agree or
5  disagree with <u>Bowen</u> -- and <u>Overstock</u> has plainly said that
6  they disagree with <u>Bowen</u>, Judge Chen plainly said he
7  disagrees with <u>Bowen</u>, but, regardless, in that case he
8  upheld an aiding and abetting claim which involves
9  securities transactions, but he said because aiding and
10 abetting is not covered by the federal statute that gives me
11 further comfort that it should be covered by the UCL.  So as
12 a -- as a last stitch -- or as a last approach to keeping
13 the UCL claim, if -- if we're forced to and you decide that,
14 no, we can't plead it as a securities transaction, we would
15 ask for leave to amend.  There's other things that we can
16 plead that would not be quite a securities transaction such
17 as the keeping of the -- the funds for purpose other than
18 they were intended to be under the unfair prong or possibly
19 others.  So --
20        THE COURT:  So, just to make sure I'm following
21 you, you said so worst came to worst, you're seeking leave
22 to amend to maybe use the approach that got passed -- Judge
23 Chen's review passed it, but that he approved at the
24 pleadings stage under aiding and abetting or some alternate
25 theory?

22

1          MR. KATHREIN:  Correct.

2          THE COURT:  All right.  And why shouldn't I do

3 that?

4          MR. MUGMON:  Well, I'm just going to read you from

5 Overstock.

6          THE COURT:  Yes.

7          MR. MUGMON:  He says:

8              "Whether one agrees with Bowen or

9          not, it's holding that securities

10         transactions are not covered under the

11         UCL bars lawsuits based on deceptive

12         conduct and the sale and purchase of

13         securities."

14    I think it's -- it's a pretty straightforward thing

15 that securities transactions simply do not fall under the

16 UCL.  We'd obviously encourage the Court not to allow

17 Plaintiffs to replead here.  We think that they had ample

18 opportunity to plead the facts that they needed to plead at

19 the outset, didn't do so.  If they had -- if they had better

20 facts, we think they -- they would have pleaded them in the

21 first case.

22         THE COURT:  All right.  Thanks very much.  That

23 concludes the hearing on the motion to dismiss.

24    Now, we've got case management as well.  I mean, you've

25 given me a case management statement, and the most

23

1   significant question presented there was whether this case

2   would be ordered related to Judge Gonzalez Rogers, and she

3   ruled that it is not.  So it stays here, and I thank you two

4   for having consented to the jurisdiction of a magistrate

5   judge.

6       There are, of course, other cases against Theranos in

7   other courtrooms around the country.  When -- if and when we

8   get to the discovery phase, at the very least we'd want to

9   coordinate the efforts there with the efforts here in this

10  District.  My instinct having read your submission is to

11  defer a ruling on the questions of timing of trial and other

12  events until you have a ruling on the motion to dismiss

13  because I think it would be impactful for the discovery you

14  would do and the timing and scope of what you would do.

15      So my suggestion, subject to your feedback, is to defer

16  setting deadlines and making a settlement referral until you

17  have the benefit of a ruling on the motion to dismiss, and

18  then we can quickly reconvene to discuss the timing of later

19  events.

20      Any objection to that?

21          MR. KATHREIN:  Here's my suggestion is because

22  there's so much controversy as to who owns and -- and class

23  certification would become an issue very quickly, I think

24  we'd like to be able to get discovery out at least even on

25  the funds that we're involved with and their communications

24

1   with the funds and who actually owns the stock, and if we

2   could get that, that would probably help us move the case

3   forward towards issues where I think there's -- at least

4   we've pled sufficient where there are triable issues, and we

5   ought to at least get going on that.

6       The only other aspect which would be broader discovery

7   would be getting the discovery that's being produced in the

8   Walgreens or the Partnership case in New Jersey.

9           THE COURT:  All right.  And I'll allow Mr. Mugmon

10  to respond to those requests.

11          MR. MUGMON:  It's not surprising that I concur in

12  the Court's recommendation.  Let me take the discovery

13  question first.  We obviously agree.  We think we have a --

14  a strong motion.  We think that we should not bear the

15  burden of discovery before knowing what claims, if any,

16  survive.  That's obviously, as you well know, an expensive

17  exercise.  And, you know, given that briefing is already

18  done, we don't think there will be any kind of undue delay

19  here.

20      Second, with respect to the related action discovery,

21  certainly it's true that there is a case in the Delaware

22  Court of Chancery, the Partner's case  However, you know,

23  the -- the other -- this other securities case, it concerns

24  representations that were made in private meetings.

25  Plaintiffs' complaint here is based on public statements

25

1 that were challenged.  That's very different.  The discovery

2 is going to be very different.  It involves one particular

3 -- one particular investor, a direct investor I should add,

4 as opposed to Plaintiffs who invested in these third party

5 funds.

6      So, you know, we -- we would not agree to produce

7 documents at this point in that litigation.

8           THE COURT:  All right.  And, of course, if there's

9 leave to amend or even if there's not leave to amend,

10 Plaintiff may seek leave to change the theory in some way to

11 -- to impact the scope of discovery.  Well I'm going to

12 stick with my tentative view on this, which is there are

13 multiple claims.  There are arguments made to dismiss them

14 all or at least to dismiss them with leave to amend, and I

15 think with the lack of prejudice that a short delay is going

16 to be to Plaintiffs, I'm going to defer discovery until a

17 ruling on the motion to dismiss, and then we'll reconvene to

18 set a case schedule, and I promise you I'll have ample --

19 between the dates set, I would figure the Plaintiffs, as far

20 as the timing of the case once we start going -- so that

21 doesn't mean I'm going to set this for trial in 2019 if the

22 case goes on, but I think it's premature to launch discovery

23 before we know there's plausible claims.

24           MR. KATHREIN:  Thank you, your Honor.

25           THE COURT:  Thanks very much.

26

1          MR. MUGMON:   Thanks very much, your Honor.

2          THE COURT:   Appreciate your presentations.

3     (Proceedings adjourned at 1:40 p.m.)

27

1                CERTIFICATE OF TRANSCRIBER

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16           Echo Reporting, Inc., Transcriber

17             Friday, March 3, 2017

18

19

20

21

22

23

24

25