# Attachment B

EFiled:  Apr 20 2017 10:00PM EDT
Transaction ID 60501447
Case No. 2017-0262-JTL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PARTNER INVESTMENTS, L.P., | : | |
| a Delaware limited partnership, | : | |
| PFM HEALTHCARE MASTER FUND, L.P., | : | |
| A Cayman Islands limited partnership, and | : | |
| PFM HEALTHCARE PRINCIPALS | : | |
| FUND, L.P., a Delaware limited partnership, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. _2017-026_2-JTL |
| | : | |
| THERANOS, INC., a Delaware corporation, | : | |
| ELIZABETH A. HOLMES | : | PUBLIC VERSION -- |
| FABRIZIO BONANNI | : | Filed: April 20, 2017 |
| WILLIAM H. FOEGE, and | : | |
| DANIEL J. WARMENHOVEN, | : | |
| | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT FOR
## INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Partner Investments, L.P. ("PIM"), PFM Healthcare Master Fund,

L.P. ("HCMF"), and PFM Healthcare Principals Fund, L.P. ("HCP") (collectively,

"Plaintiffs" or "PFM"), by and through their attorneys, allege upon knowledge as to

themselves and their own conduct, and otherwise upon information and belief, as

follows:

## NATURE OF THE PROCEEDING

1.     This action seeks declaratory and injunctive relief to, among other

things, enjoin Defendants Theranos, Inc. ("Theranos" or the "Company"), Elizabeth

Holmes ("Holmes"), Fabrizio Bonanni ("Bonanni"), William H. Foege ("Foege"),

and Daniel J. Warmenhoven ("Warmenhoven") (collectively, "Defendants") from consummating a self-interested and coercive exchange offer that breaches their fiduciary duty of loyalty, constitutes corporate waste, and fails entire fairness review.

2.     Through a string of repeated lies, misrepresentations, misleading statements, and omissions of material information, Theranos, Holmes, and former Chief Operating Officer and member of the Board of Directors Ramesh Balwani ("Balwani") induced PFM to invest approximately $96.1 million in Theranos in February 2014.  PFM became a holder of Series C-2 Preferred Stock in the Company, with a liquidation preference ahead of holders of the Company's common stock and holders of the Company's Series A and B Preferred Stock, and *pari passu* with the holders of Series C and C-1 Preferred Stock.  After it became clear that Theranos, Holmes, and Balwani had fraudulently induced PFM's investment and continued to lie and omit material information throughout the parties' business relationship, PFM brought an action in the Delaware Court of Chancery (the "Fraud Action") against Theranos, Holmes, and Balwani (the "Fraud Action Defendants"), to rescind PFM's Stock Purchase Agreement and recover restitutionary, compensatory, and other relief.  *See Partner Investments, L.P. et al. v. Theranos, Inc., et al.*, C.A. No. 12816-VCL (Del. Ch.).  The Fraud Action is set for trial in June 2017 before Vice Chancellor Laster, and the parties are actively engaged in fact discovery.

2

3.      With Theranos hemorrhaging cash, and faced with mounting evidence revealing the fraudulent scheme of the Fraud Action Defendants, Holmes engineered an Offer to Exchange Preferred Stock ("Exchange Offer") that would inoculate the Fraud Action Defendants, including herself, and all former and current executives, employees, and directors, from future legal action and deprive PFM of the ability to recover any judgment it may ultimately obtain in the Fraud Action.  With the Board's approval, Theranos distributed the Exchange Offer to holders of its Series C-1 and C-2 Preferred Stock on March 20, 2017.  *See* Ex. A, Information Statement.

4.      Notably, the Defendants did not appoint a special committee of disinterested directors to review the Exchange Offer, and while the Board approved the offer, it has expressed no position on whether the Company's shareholders should participate in it.  *See* Ex. A at 5 (Information Statement) ("NEITHER THE COMPANY NOR ITS BOARD NOR ANY OF ITS OFFICERS OR EMPLOYEES IS MAKING ANY RECOMMENDATION AS TO WHETHER A HOLDER SHOULD PARTICIPATE IN THE EXCHANGE.").

5.      The Exchange Offer allows Series C-1 and Series C-2 preferred stockholders who agree to release the Company, its Board, and others from liability for their fraudulent conduct to obtain a higher liquidation preference to which they otherwise are entitled under the Company's Articles of Incorporation.  Participating stockholders will receive shares in "Series C-1A," "Series C-1B," and "Series C-

2A" preferred stock, allowing them to jump PFM—a Series C-2 preferred stockholder—in line for a higher liquidation preference in the event of liquidation, dissolution, or winding up of the Company, unless PFM also agrees to release Defendants from liability.  The Exchange Offer is therefore designed to put PFM to a Hobson's Choice and penalize PFM for exercising its rights to hold the Company, Holmes, and Balwani accountable for their fraudulent misrepresentations and omissions—all while insulating Defendants from liability for their wrongful conduct.

6.     The Exchange Offer is set to close at 5:00 p.m., Eastern Time, on April 14, 2017.  If the Exchange Offer is permitted to proceed, PFM will end up with a substantially decreased liquidation preference, making it virtually impossible to collect on any judgment it obtains in the Fraud Action if the Company declares bankruptcy—a very likely scenario given that as of December 31, 2016, the Company had less cash on hand than the amount of relief PFM seeks in the Fraud Action and no discernable source of revenue.  *See* Ex. A (Annex H); *see also id.* at 140 (Annex G-1).

7.     In addition, the Exchange Offer is rife with intentionally false and misleading disclosures and omissions of material information that any reasonable stockholder would need to know before deciding whether to release the Defendants from liability for their past actions.  Most glaring is Theranos's failure to disclose

4

the overwhelming evidence against the Fraud Action Defendants.  But there are numerous other disclosure issues, including Theranos's utterly incomplete financial disclosures, which merely describe the Company's cash position at a high level and nothing more.  *See* Ex. A at 187 (Annex H).

8.      Defendants' approval of the Exchange Offer constituted an egregious breach of their fiduciary duty of loyalty and corporate waste that no subsequent stockholder vote can "cleanse."  Moreover, because the Exchange Offer is the product of bad faith and self-dealing involving a controlling stockholder who is also CEO and Chairman of the Board, it must be reviewed under Delaware's highest form of scrutiny for corporate transactions—entire fairness.  As alleged below, the Exchange Offer fails to meet this demanding standard and must be enjoined to prevent irreparable harm to PFM.

## PARTIES

9.      Plaintiff PIM is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California. PIM is the beneficial owner of 3,263,529 shares of Theranos Series C-2 Preferred Stock, which constitutes 5.8% of Theranos's outstanding Series C-1 and C-2 Preferred Stock.

10.     Plaintiff HCMF is a limited partnership organized under the laws of the Cayman Islands, with its principal place of business in San Francisco, California.

5

HCMF is the beneficial owner of 2,255,096 shares of Theranos Series C-2 Preferred Stock, which constitutes 4% of Theranos's outstanding Series C-1 and C-2 Preferred stock.

11.    Plaintiff HCP is a limited partnership organized under the laws of Delaware, with its principal place of business in San Francisco, California.  HCP is the beneficial owner of 136,669 shares of Theranos Series C-2 Preferred Stock, which constitutes 0.2% of Theranos's outstanding Series C-1 and C-2 Preferred stock.  Collectively, Plaintiffs own roughly 10.2% of Theranos's Series C-1 and C-2 Preferred Stock.

12.    Defendant Theranos is a corporation organized under the laws of the State of Delaware, with its principal place of business in Palo Alto, California.

13.    Defendant Holmes is the founder, CEO, and Chair of the Board of Directors of Theranos.  Holmes is also the controlling stockholder of Theranos. According to the Exchange Offer materials, Holmes "presently holds 100% of [the Company's] issued and outstanding shares of Class B Common Stock, controls 98.9% of the combined voting power of [the Company's] capital stock and therefore is able to control all matters submitted to our stockholders which require at least majority approval of [he Company's] Class A Common Stock, Class B Common Stock and Preferred Stock voting together on an as-converted basis."  Ex. A at 161 (Annex G-1).  Additionally, "Holmes has the ability to influence management and

6

the conduct of [the Company's] affairs as a result of her position as [its] CEO, as a member of [its] board of directors and with her ability to appoint a majority of [its] board of directors." *Id.* Finally, the Company's charter provides that "so long as any holder of Class B Common Stock, like Ms. Holmes, is a member of [its] Board, that board member must be present at any board meetings in order to establish a quorum." *Id.* "Following the Exchange, Ms. Holmes will control 98.3% of the combined voting power of the Company." Ex. A at 169 (Annex G-1).

14.     Defendants Bonanni, Foege, and Warmenhoven are members of Theranos's Board of Directors, which approved the Exchange Offer.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 8 *Del. C.* § 111(a)(2) and 10 *Del. C.* § 341.

16.     This Court has personal jurisdiction over Theranos because it is a corporation organized under the laws of the State of Delaware.

17.     This Court has personal jurisdiction over Holmes, Bonanni, Foege, and Warmenhoven pursuant to 10 *Del. C.* §§ 3114(a)-(b), because they were directors of Theranos, a corporation organized under the laws of this State, during the planning, negotiation, and distribution of the challenged Exchange Offer. Personal jurisdiction over Holmes is also proper because she was at all relevant times alleged herein an officer of Theranos. Additionally, personal jurisdiction over Holmes, a party to the

7

Series C-2 Preferred Stock Purchase Agreement entered into on February 4, 2014, by Plaintiffs PIM, HCMF, and HCP on the one hand, and Theranos and Holmes on the other ("Stock Purchase Agreement"), is proper pursuant to the terms of the Stock Purchase Agreement, which provides in relevant part:

> 7.14 *Jurisdiction; Venue*. . . . Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph.

18.    The Court also has jurisdiction over Holmes pursuant to 10 *Del. C.* § 3104.   As set forth herein, Holmes conspired to substantially decrease the liquidation preference applicable to PFM's Series C-2 Preferred Stock.

19.    Venue is proper in this Court because Plaintiffs PIM and HCP are Delaware limited partnerships; Defendant Theranos is a Delaware corporation; Defendant Holmes has at all relevant times controlled Theranos, a Delaware corporation; and, pursuant to the Stock Purchase Agreement and the Amended and Restated Investors' Rights Agreement dated February 3, 2014 ("Investors' Rights Agreement"), any action arising out of or relating to the Stock Purchase Agreement must be brought in a Delaware court.   As a result, this Court has jurisdiction over this matter pursuant to 6 *Del. C.* § 2708(b), which grants the courts of Delaware jurisdiction over actions arising out of contracts in which the parties have specified that Delaware law governs.  The Stock Purchase Agreement—which Holmes signed

8

on behalf of the Company and as "Shareholder Representative"—provides in

relevant part:

> 7.3    *Governing Law.* This Agreement shall be governed in all respects
> by the internal laws of the State of Delaware as applied to agreements
> entered into among Delaware residents to be performed entirely within
> Delaware, without regard to principles of conflicts of law.
>
> . . .
>
> 7.14    Jurisdiction; Venue.   Each of the parties to this Agreement
> irrevocably submits to the exclusive jurisdiction of the Delaware Court
> of Chancery (and if the Delaware Court of Chancery is unavailable, any
> state or federal court sitting in Wilmington, Delaware), as well as to the
> jurisdiction of all courts to which an appeal may be taken therefrom, in
> any suit, action, or proceeding arising out of or relating to this
> Agreement.

The Investors' Rights Agreement provides in relevant part:

> 5.3    Governing Law. This Agreement shall be governed in all
> respects by the internal laws of the State of Delaware as applied to
> agreements entered into among Delaware residents to be performed
> entirely within Delaware, without regard to principles of conflicts of
> law.
>
> . . .
>
> 5.11    *Jurisdiction; Venue*.   Each of the parties to this Agreement
> irrevocably submits to the exclusive jurisdiction of the Delaware Court
> of Chancery (and if the Delaware Court of Chancery is unavailable,
> any state or federal court sitting in Wilmington, Delaware), as well as to
> the jurisdiction of all courts to which an appeal may be taken therefrom, in
> any suit, action, or proceeding arising out of or relating to this
> Agreement.

The Exchange Offer provides in relevant part:

> 8.1.    Choice of Law.   This Agreement and any claim, cause of action,
> dispute, suit or other proceeding among the parties arising out of or

9

related in any manner to the Agreement shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

8.2.  Exclusive Forum.  EACH PARTY HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE COURT OF CHANCERY OF THE STATE OF DELAWARE FOR THE PURPOSE OF ANY CLAIM, CAUSE OF ACTION, DISPUTE, SUIT OR OTHER PROCEEDING ARISING OUT OF OR RELATING TO THIS                                           AGREEMENT.

## FACTUAL BACKGROUND

I.  **The Defendants Make False Representations, Misleading Statements, and Material Omissions to PFM to Induce PFM to Invest Approximately $96.1 Million in Theranos.**

20.    The Fraud Action Defendants fraudulently induced Plaintiffs' investment of approximately $96.1 million in Theranos and continued to make knowing and material misrepresentations and omissions throughout the parties' years-long relationship.

21.    Prior to PFM's investment in Theranos, the Fraud Action Defendants actively and publicly touted Theranos's purported innovations in drawing and accurately testing small amounts of blood.  The Fraud Action Defendants claimed Theranos had developed and was using in commercial settings proprietary technologies to collect and test blood samples as small as a few drops, thereby eliminating the need for the large needles and numerous vials of blood typically required for diagnostic lab testing.  The Fraud Action Defendants announced that

10

they were rolling out Theranos "wellness centers" in commercial settings, including in leading retail chains nationwide.

22.     PFM and the Fraud Action Defendants began communicating in late 2013 about a potential investment by PFM in Theranos.  In meetings and telephone calls from December 2013 through February 2014, the Fraud Action Defendants made a series of representations to PFM regarding the state of the Company's tests and devices, its strategic business model and scheduled rollout, and the status of its interactions with regulators, portraying Theranos as a revolutionary company in the laboratory testing industry.  For example, they represented that Theranos had developed and validated blood tests on analyzers that it developed and manufactured, which covered 99.9% of all laboratory requests; that Theranos had submitted its analyzer and many of its blood tests to the Food and Drug Administration ("FDA") for clearance; that Theranos was using finger sticks for all but 1-2% of its customers' blood tests, for which it was using traditional venous blood draws as a short-term solution; that Theranos had contracts in place to launch testing centers in thousands of pharmacies at leading retail chains nationwide; and that Theranos's analyzers were being used by pharmaceutical companies and the U.S. military.

23.     In addition, the Fraud Action Defendants showed Plaintiffs correlation charts that purportedly compared test data generated on the analyzers Theranos

11

developed and manufactured to test data generated on traditional laboratory machines, and they stated that the majority of the tests were substantially equivalent to traditional tests and had been submitted to the FDA for clearance. The Fraud Action Defendants also provided PFM with a financial model indicating actual historical revenue of $25 million in 2013 and a gross profit of more than $1 billion in 2015 and listing, in addition to Theranos's purported partnerships with leading retail pharmacy chains, supposed partnerships in place with the U.S. military, hospitals, and physicians' offices.

24.     The Fraud Action Defendants' statements were all lies, which, coupled with their omissions, deceived Plaintiffs into investing in Theranos. On February 4, 2014, in reliance on their false and misleading statements and omissions, PFM purchased 5,655,294 shares of Theranos's Series C-2 Preferred Stock at a purchase price of $17 per share, for a total investment of $96,139,998.

25.     Even after Plaintiffs invested approximately $96.1 million in Theranos, the Fraud Action Defendants continued to misrepresent and omit material facts and conceal that their prior statements had been materially false and misleading. The Fraud Action Defendants never revealed Theranos's extraordinary reliance upon commercially-available blood testing equipment; they repeatedly lied about the extent to which their customers were getting tests by finger stick as opposed to traditional venous draw; they continued to misrepresent the status of their FDA

submissions and expected clearances; and they continued to provide "updates" about Theranos's plans with hospitals and physicians' offices that never even existed.

26.     In late 2015, various media outlets began to publish disturbing news about Theranos.  As more information came to light regarding Theranos's tests and devices, its regulatory interactions, and its business dealings, Plaintiffs realized that the Fraud Action Defendants had made a series of knowing misrepresentations, misleading statements, and material omissions to Plaintiffs both before and throughout their investment in Theranos.

**II.     PFM Brings The Fraud Action Against Theranos.**

27.     On October 10, 2016, PFM filed an action against the Fraud Action Defendants, seeking to recoup its approximately $96.1 million investment in Theranos and seeking restitutionary, compensatory, and other relief.  In an effort to seek relief for its investors as a result of the wide-ranging and long-term fraud perpetrated by the Fraud Action Defendants, PFM's Second Amended Verified Complaint asserts causes of action for:   (1) fraudulent misrepresentation and inducement; (2) fraudulent concealment; (3) securities fraud in violation of Cal. Corp. Code §§ 25401 and 25501; (4) securities fraud in violation of Cal. Corp. Code §§ 25400(d) and 25500; (5) equitable fraud; (6) negligent misrepresentation; (7) breach of fiduciary duty; (8) violation of Delaware's Deceptive Trade Practices Act; (9) breach of the implied covenant of good faith and fair dealing; and

(10) appointment of a receiver.  *See* Second Amended Verified Compl., ¶¶ 101–158, C.A. No. 12816-VCL.  PFM seeks rescission of the stock purchase agreement, restitution of its investment, compensatory damages, treble damages, costs and attorneys' fees, pre- and post-judgment interest, and such other and further relief deemed just and proper.  *Id.* at p. 68, Prayer for Relief.

28.     Under the Court's Scheduling Order, the parties must complete fact discovery by May 7, 2017, expert discovery by May 30, 2017, and pre-trial submissions by June 21, 2017.  *See* Pretrial Sched. Order, C.A. No. 12816-VCL (Feb. 16, 2017).  The case is set for a five-day trial starting on June 26, 2017.  *Id.* The parties have substantially completed document production and are in the process of taking fact depositions.  The powerful and shocking testimony elicited at these depositions, laid out in further detail below, demonstrates that Theranos, Holmes, and Balwani made knowing and intentional misrepresentations and omissions to PFM leading up to, during, and after the February 2014 investment period about, among other things, the capabilities of the Company's tests and devices, the status of the Company's regulatory approvals, and the Company's strategic and financial outlook.

14

**III.    Theranos Now Seeks To Use The Exchange Offer To Insulate Itself And Prevent PFM From Recovering Its Fraudulently Induced Investment.**

29.    Instead of facing the music in light of the mounting evidence in the Fraud Action, Defendants shirk responsibility and seek to ensure that even if PFM gets its day in court, it will never recover its fraudulently induced investment or the damages it sustained as a result of Defendants' conduct.  On information and belief, Holmes exercised her nearly 99% voting control and overwhelming influence such that the Board approved the Exchange Offer—all in order to deprive PFM of its ability to collect on any judgment rendered in the Fraud Action and to shield herself, current and former executives and employees, and current and former board members from liability.  Such an action also benefits certain current and former executives, employees, and board members who will be deposed and might be trial witnesses in the Fraud Action.

30.    On March 20, 2017, Theranos distributed the Exchange Offer to the holders of its First Series C-1 Preferred Stock, Second Series C-1 Preferred Stock, and Series C-2 Preferred Stock "in order to realign [its] relationship with the holders" of such securities and "to protect the Company and its officers, directors and stockholders from any potential legal claims that holders of Series C-1 Preferred and Series C-2 Preferred may have against the Company as stockholders."  Ex. A at 5.

15

A.     **The Exchange Offer Document.**

31.    Behind the cover page of the Exchange Offer is a 13-page unnumbered document that purports to summarize the Exchange Offer, provide reasons for the Exchange Offer, provide warnings about forward-looking statements, and provides limited information about the Exchange Offer.  Annex A is a proposed 25-page Amended and Restated Certificate of Incorporation.  Ex. A at 15-41.  Annex B is a proposed 11-page Exchange and Release Agreement with signature pages.  Ex. A at 42-56.  Annex C  is a proposed 25-page Amended and Restated Investors' Rights Agreement.  Ex. A at 57-90.  Annex D is a proposed 7-page Amended and Restated Voting Agreement with signature pages.  Ex. A at 91-102.  Annex E is a 3-page proposed Stockholder Consent form with signature pages.  Ex. A at 103-12.  Annex F is an Assignment Separate from Certificate form that purports to assign participating stockholders' subordinated Series C-1 and C-2 stock to the Company.  Ex. A at 113-14.  All of these Annexes are separately numbered and paginated, yet many others are not, making review and cross-reference of the various documents cumbersome and confusing.

32.    Annex G-1 is an Investor Presentation is an undated investor presentation that contains (a) a photograph of the "miniLab" with the names of the parts of it, (b) a photograph of various items entitled "Theranos Technologies", (c) a page with two words and no further information:  "BUSINESS PRIORITIES", (d) a

page with just two words: "PRODUCT TIMELINES", and (e) a page with only the phrase "GO-TO-MARKET" and a page entitled "Approach to Market Planning Process" with four bullet-points, one of which states, "We are working towards submission of our Zika product through the FDA's EUA process and FDA 510(k) clearances of more commonly ordered assays on the miniLab platform." Nowhere does the presentation acknowledge or even attempt to explain why these milestones were not realized years ago, as the Fraud Action Defendants represented to PFM that they would be. Another bullet point states that Theranos's research partner will conclude a 9-week research initiative on January 26, 2017, and Theranos "will leverage these insights over the next 4-6 weeks to further quantify a variety of potential market opportunities and develop multi-year revenue projections, culminating in an integrated business plan that we aim to complete in early Q2'17." This supposed six-week period beginning on January 26 concluded by March 9, 2017, yet there is no presentation update, no "integrated business plan," and, as far as Plaintiffs are aware, no update to investors.

33.    The presentation further contains: (f) a page entitled "Selected Deep Dives," and (g) several pages devoted to six clinical areas of focus. Notably, the "Zika: Competitive Overview" slide, which purports to describe the competitive landscape and Theranos's supposed differentiation, makes no mention of Theranos's pre-EUA submission that was submitted as recently as February 2016 and

17

subsequently withdrawn.  Additional slides describe positioning in the Oncology, Pediatrics, and Nursing Homes markets, again without disclosing or describing the fact that these have been Theranos's target markets since 2014, and the Company has failed entirely to break into even one of them.  The presentation concludes with brief biographies of members of the Company's "Technology Advisory Board", the "Scientific & Medical Advisory Board", a "Finance Update", the Board of Directors, the "Executive Team (2016)", and it also includes an "Enterprise Matrix."  Ex. A at 115-46 (Annex G-1).

34.    Annex G-2 is a 7-page unnumbered document entitled "Litigation Summaries."  It concludes with the statement that "[n]either the Company nor its board of directors has commissioned any independent investigation into any of the claims or actions described above."  Ex A. at 148 (Annex G-2).  This was particularly surprising to Plaintiffs, given that the Board's November 2016 response to PFM's request that it engage independent counsel to conduct a factual investigation stated: "the outside directors have exercised proper oversight in accord with Delaware law, including the *Caremark* decision.  The outside directors understand the importance of having reliable information sufficient to make necessary judgments about the decisions facing the company, and have taken steps to get that information and act on it."

18

35.    Annex G-3 is yet another unnumbered a 33-page document entitled "Risk Factors."  Ex. A at 154-86 (Annex G-3).  Annex H is a 1-page slide entitled "Financial Position as of December 31, 2016" that documents the Company's "Beginning Cash Book Balance", "Disbursements", "Net Cash Burn", "Ending Cash Book Balance", and "Ending Available Cash Book Balance."  Ex. A at 187 (Annex H).

36.    An unnumbered page of the "Risk Factors" in Annex G-3 reveals that Holmes "has outstanding notes owed to the Company, which are secured by a portion of the stock she owns in the Company."  Ex. A at 159 (Annex G-3).  "The notes owed to the Company are in the principal amount of approximately $25,867,900."  *Id.*  On "July 19, 2016, the Company extended the maturity date on such notes . . . from August 24, 2016, December 16, 2016 and December 17, 2018 to August 24, 2021, December 16, 2021 and December 17, 2023, respectively."  *Id.* The materials further provide that "[t]his extension of the maturity date was an interested party transaction and approved by the disinterested members of [Theranos's] board of directors"; that "[i]f Ms. Holmes is unable or unwilling to pay these notes back when due, this could have a material impact on the Company's financial position"; and "[i]f the notes are not paid when due, Ms. Holmes could lose or forfeit all or part of the shares of Company stock secured by such notes."  *Id.* There is no statement about whether these are non-recourse and/or full recourse

loans, nor are any other material terms of the loans disclosed.  If the shares serve as the collateral for these loans, then the shares that Holmes contributes to the Exchange Offer reduce the value of the collateral, to the extent there is any, for the loans.

37.    Another unnumbered page in the "Risk Factors" in Annex G-3 reveals that "as of March 1, 2017," Theranos has "voided and corrected approximately 920,000 lab test results."  Ex. A at 173 (Annex G-3).  Theranos states that it "may need to take additional remedial measures going forward," yet there is no description of what these remedial measures might be, whether Theranos or regulators think such remedial measures are likely, or whether such measures may contribute to the Company's ballooning legal risk and expenses.

**B.    <u>Terms of the Exchange Offer.</u>**

38.    According to Theranos, the Exchange Offer was the product of negotiations with certain "Major Investors"—identified as those holding "approximately 81.04% of the First Series C-1 Preferred, 92.05% of the Second Series C-1 Preferred and 75.55% of the total Series C-2 Preferred," Ex. A at 2—and approved by the Board.

39.    The Exchange Offer gives holders of First and Second Series C-1 Preferred and Series C-2 Preferred Stock an opportunity to exchange those shares for three new types of securities:  Series C-1A Preferred Stock, Series C-1B Preferred Stock, and Series C-2A Preferred Stock.  Under the Company's proposed

Amended and Restated Certificate of Incorporation—which would be adopted if the

Exchange Offer is consummated—holders of these three new securities would have

a liquidation preference above Series C-2 Preferred Stockholders like PFM:

> ***In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the holders of the Series C-1A Preferred Stock, Series C-1B Preferred Stock, Series C-1B\* Preferred Stock, Series C-2A Preferred Stock, and Series C-2A\* Preferred Stock*** (collectively, the "Senior Preferred") ***shall be entitled to receive, on a pari passu basis, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Series C-2 Preferred Stock***, Series C-1 Preferred Stock, Series C Preferred Stock, Series B Preferred Stock, Series A Preferred Stock, Class A Common Stock or Class B Common Stock ***by reason of their ownership of such stock, an amount per share for each share of Senior Preferred held by them equal to the sum of (i) the Liquidation Preference specified for such share of Senior Preferred, as applicable, and (ii) all declared but unpaid dividends (if any) on such share of Senior Preferred, as applicable***. If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Senior Preferred are insufficient to permit the payment to such holders of the full amounts specified in this Section 3(a)(i), then the entire assets of the Corporation legally available for distribution shall be distributed pro rata among the holders of the Senior Preferred in proportion to the full amounts they would otherwise be entitled to receive pursuant to this Section 3(a)(i).

Ex. A at 20 (Annex A, § 3(a)(i)) (emphasis added).

40.   Only "[a]fter payment of the Liquidation Preference specified for the

Senior Preferred" above are the "Series C-2 Preferred Stock, Series C-1 Preferred

Stock and the Series C Preferred Stock . . . entitled to receive, on a pari passu basis,

prior and in preference to any Distribution of any assets of the Corporation to the

holders of the Series B Preferred Stock, Series A Preferred Stock, Class A Common Stock or Class B Common Stock," their liquidation preference.  Ex. A at 20 (Annex A, § 3(a)(ii)).

41.    In exchange for additional shares of a company built on a house of lies and liquidity preference in a bankruptcy proceeding, Holmes stands to reap great personal gain and extract substantial cost from the stockholders to whom she owes fiduciary duties of loyalty—all while subordinating PFM.  And, to the extent that the other members of the Board of Directors had an actual voice in this Exchange Offer and voted with Holmes, they went along with this corrupt and unfair plan.  To gain such an enhanced liquidation preference, preferred stockholders must execute a broad general release that immunizes Defendants from liability for their fraudulent or otherwise unlawful conduct.  Section 2.1 of the Exchange Offer Agreement provides, in relevant part, that each participating stockholder:

> ***fully, finally, and forever waives, releases, relinquishes, and discharges the Company*** and (a) its ***current and former officers*** and employees, and ***each of its and their*** affiliates, contractors, consultants, auditors, accountants, financial advisors, professional advisors, ***attorneys***, investment bankers, representatives, insurers, trustees, trustors, agents, professionals, spouses, immediate family members, predecessors, successors, assigns, heirs, executors, or administrators, (b) its ***current and former directors***, and each of their affiliates, contractors, consultants, auditors, accountants, financial advisors, professional advisors, attorneys, investment bankers, representatives, insurers, trustees, trustors, agents, professionals, spouses, immediate family members, predecessors, successors, assigns, heirs, executors, or administrators, (c) ***other stockholders*** (and any of their affiliates) who

22

execute this Agreement, and (d) their respective successors and assigns, (individually, a "Releasee" and collectively, "Releasees") ***from any and all claims, demands, losses, rights, obligations, debts, liabilities, and causes of action of any nature whatsoever, whether known or unknown, suspected or unsuspected, direct or derivative, and that have been or could in the future be asserted in any forum,*** whether foreign or domestic, whether arising under federal, state, common, or foreign law or in equity, ***which Releasors now have or have ever had or may hereafter have directly or indirectly against any Releasee arising out of, based on, or relating in any way to any transaction with the Company or to their capacity as a stockholder of the Company that has occurred up until and including the date hereof*** . . . .

Ex. A at 45 (Annex B, § 2.1) (emphasis added); *see also id.* at 46 (Annex B, §§ 2.2–2.5).  Once a stockholder executes and submits the Exchange Offer Agreement, it cannot "revoke its participation in the Exchange."  *Id.* at 52 (Annex B, § 9).

## IV.   Despite Asking Minority Preferred Stockholders For A Broad General Release Of Liability, The Exchange Offer Materials Contain A Litany Of Material Misrepresentations, Misleading Partial Disclosures, And Material Omissions.

42.   The Exchange Offer contains numerous misrepresentations, partial disclosures, and material omissions—all of which strike to the core of Defendants' improper motives behind the Exchange Offer to benefit a select group of investors at the expense of minority stockholders, obscure the Company's precarious strategic, financial, and legal position, and immunize the Fraud Action Defendants.

43.   The offer materials assert that "[c]ertain of the Company's preferred investors . . . have indicated an interest to participate and exchange their shares of

First Series C-1 Preferred, Second Series C-1 Preferred or Series C-2 Preferred in the Exchange."  Ex. A at 2 (Information Statement).[1]

44.     Further, the Exchange Offer's financial disclosures are inadequate.  The offer materials devote *a single page* to "Financial Information," which purports to convey the Company's unaudited "Financial Position as of December 31, 2016." Ex. A at 188 (Annex H).  But this chart merely discloses the Company's "cash position as of December 31, 2016."  Ex. A at 12 (Information Statement).  The offer materials also include an Investor Presentation with a "Finance Update," (Ex. A at 138 (Annex G-1)), but this, too, is woefully deficient and provides scant additional information about the Company's finances apart from a simplistic chart reflecting the Company's "2017 Cash Outlook."  Ex. A at 142 (Annex G-1).  Notably, the materials provide no disclosure as to how that outlook was generated, which is particularly concerning given that Theranos has never had a permanent Chief Financial Officer, its Controller was laid off in early 2017, and it notes that "[o]ur financials are not yet prepared in accordance with GAAP, nor are our financing

---

[1]     By contrast, Defendants have left PFM in the dark.  On March 20, 2017, Theranos emailed the tender offer to PFM's CFO and did not send the document to PFM's outside counsel despite knowing that PFM was a represented party.  Further, the document could not be printed, and became inaccessible after several days.  The undersigned counsel demanded that Theranos provide a printable or hard copy of the tender offer, and Theranos sent it to counsel on March 24, 2017.

statements currently audited." Ex. A at 160 (Annex G-3).  Nor do the offer materials include any balance sheets, income statements, or similarly robust financial statements that would help stockholders assess whether to participate in the exchange.

45.    What is more, only after certain stockholders release all claims against Defendants are they entitled under the Amended and Restated Investors' Rights Agreement to financial statements with "a detailed capitalization table," a "monthly operating budget for the upcoming fiscal year that includes a projected balance sheet, statement of cash flows and income statement for such fiscal year all prepared in accordance with generally accepted accounting principles consistently applied." Ex. A at 76-77 (Annex C, § 3.1(b), (c)).

46.    This is disturbing, particularly because the Fraud Action Defendants' misstatements and material omissions concerning the Company's financial information played a critical role in their fraudulent inducement of PFM's investment.  Specifically, in January 2014, when PFM was evaluating a potential investment in Theranos, Balwani sent PFM financial results from 2013 and projections for 2014 and 2015 that dramatically and purposefully overrepresented the Company's actual and projected gross profit (to the tune of *$25 million, $130 million, and $980 million* in 2013, 2014, and 2015, respectively), as compared to a similar spreadsheet created just two months later that was sent to a third-party

valuation firm.  The Exchange Offer suggests no change in this pattern of obscuring the Company's true financial condition.

47.    Finally, the Exchange Offer Agreement seeks to obtain a broad, general release of *any and all* liability from preferred stockholders, but the offering materials utterly fail to disclose the extensive and overwhelming evidence of the rampant fraudulent activity by the Fraud Action Defendants that has come to light.  Indeed, PFM has learned that a presentation it was provided by the Fraud Action Defendants prior to its investment, which contains slides filled with material misrepresentation and omissions, was also provided to Theranos Board members and other holders of Theranos shares.  By now, many of these holders have likely been presented with the Exchange Offer but have no way of knowing that PFM has uncovered strong evidence of potential fraud against others as well.  Further, PFM has learned:

- As Theranos's September 2013 Walgreens launch approached, Holmes and Balwani were forced to confront the fact that  Theranos would not be able to fulfill its customers' orders using its own analyzers, so Theranos concealed its use of more than 20 different types of commercially-available analyzers instead;

- A presentation provided to PFM by the Fraud Action Defendants, which purported to show the accuracy of Theranos's tests and their high correlation with predicate methods, actually contained data from the commercial analyzers and *not* Theranos's analyzers;

- Theranos used its own analyzer for just twelve blood tests (and only until the summer of 2015), meaning that all other blood tests— numbering in the hundreds—were performed using commercially-available analyzers;

- In addition to performing blood tests on commercially-available analyzers, rather than Theranos's own analyzers, Theranos sent samples to third-party labs;

- A former employee testified that Holmes knew she was making false statements "[b]ecause I know at some point I told her. And she continued to make those statements[;]"

- The same employee testified that when he told his grandfather (a Theranos Board member) that "most of the tests were being run on third-party machines," Holmes told the Board member "that the only reason they have third-party devices is to validate their own technologies but that no blood tests were run on those devices. And, you know, I worked there, and I – while I was working there, we only ran seven tests on the Theranos devices[;]"

- The Fraud Action Defendants created a wholly-owned subsidiary of Theranos, Protegic Procurement Company, through which it purchased commercially-available analyzers and other devices secretly;

- Theranos's use of commercially-available analyzers was concealed, at the direction of Balwani, by the use of obscure code names for such analyzers in the Company's electronic laboratory information system, among other means;

- The Fraud Action Defendants deliberately hid sections of Theranos's laboratory from regulators;

- Far from the 98% number originally represented to PFM, Theranos performed scarcely more than one third of its customers' tests using finger-stick samples in late 2013 and early 2014;

- The Fraud Action Defendants regularly told PFM that Theranos's percentage of finger-stick tests was much higher than it was in reality;

- Theranos did not submit an application for FDA clearance of its "nanotainer" or its analyzer, despite the Fraud Action Defendants' repeated representations that Theranos had done so;

27

- The Fraud Action Defendants told PFM that Theranos had submitted and would continue to submit hundreds of blood tests to the FDA for clearance, but Holmes only planned to *begin* submitting blood tests to the FDA in mid-2014;

- It often took Theranos *days* to process a blood test and provide results to a customer, a far cry from the four hours or less represented to PFM and publicly proclaimed;

- Although the Fraud Action Defendants represented that Theranos tests had coefficients of variation ("CVs") of 2.5% or less, Theranos's tests had very high levels of variation, and Theranos manipulated data (by dropping "outliers," averaging data points, and using median rather than mean values) in order to bring down CVs;

- The Fraud Action Defendants regularly ran fake "demonstration tests" for prospective investors and business partners that the Fraud Action Defendants and others at their direction pretended were run on Theranos analyzers, but were actually run on commercially-available equipment;

- "Demonstration test" results from the fake demonstrations were regularly massaged and manipulated by the Fraud Action Defendants, including by changing quantitative results to qualitative results, changing reference ranges, eliminating test runs, and removing "H" or "L" indicators next to high or low values;

- Although the Fraud Action Defendants told PFM it had contracts in place to open in more than 8,000 Walgreens stores, neither Theranos's Supply Chain Manager nor its head of Arizona Operations were ever aware of concrete plans to open in more than 41 Walgreens locations;

- Theranos's former Controller (who was at the Company in 2014 and was the closest it had to a CFO) admitted that she had not seen the financial information provided to PFM in early 2014, which reflected an actual gross profit of $25 million in 2013 and projected gross profit of $165 million and $1 billion in 2014 and 2015 respectively, while the historical and projected financial information she prepared *just two months later* —which she testified under oath

were the *actual "management projections"*—reflected an actual gross profit of **$0** in 2013 and projected gross profits of $35 million and $100 million in 2014 and 2015 respectively;

- In or about February 2014, after reading a *Wired Magazine* article containing quotes from Holmes discussing Theranos's purported technological capabilities, a scientist with decades of experience believed such statements were "premature." Shortly thereafter, he told Holmes and Balwani that Holmes should not make such statements, and Balwani interrupted and stated "that will never happen." Upon leaving that meeting with Holmes and Balwani, the scientist walked to his desk and typed a resignation letter, which he submitted in "about a minute and 40 seconds;"

- In a formal complaint to the Centers for Medicare & Medicaid Services ("CMS"), a former employee wrote that Theranos "went to extreme measures to hide what was going on internally in their company from there [sic] own employees and even more so from outside agencies . . . I had directly gone into the COOs [sic] office to address these issues, and was completely disregarded and the conversation turned into him merely attacking my qualifications and ignoring all the evidence I was trying to provide him;"

- The Fraud Action Defendants instilled a culture of secrecy and fear. As one witness testified, "[i]t was a tough culture to constantly fear losing your job if you said anything the CEO or the COO didn't like;" and

- The Fraud Action Defendants' obsession with secrecy "made it sound like they just had something so special that they didn't want it to get stolen. But in my opinion, I think it was they didn't want anyone to realize that they really didn't have anything that innovative."

## IRREPARABLE HARM

48.    PFM is being irreparably harmed by the breaches of fiduciary duty and corporate waste committed by Defendants.

49.   Now that the Fraud Action Defendants' web of lies has collapsed, Theranos has no revenue, no products, and no customers.  And Defendants have admitted that Theranos is continuing to spend the money it received from defrauded stockholders, such as PFM, at a monthly rate of approximately $20 million.  On February 16, 2017, the *Wall Street Journal* revealed that during a January 2017 investor call—from which PFM was wrongly excluded, as it has been without proper cause from all investor communications since the filing of this lawsuit—the Company stated that it has not set aside any reserves for any liabilities despite facing two lawsuits claiming in excess of $240 million in damages.  To stay afloat, in January 2017, Theranos terminated another 40% of its workforce—after a prior reduction of approximately 40% in the fall of 2016.

50.   Moreover, Defendants have not explained why they have not made claims for insurance coverage for legal fees pursuant to a purported Directors and Officers policy with $30 million of coverage.  Upon information and belief, Holmes wants that policy available to her and others should the Company have no choice but to file for bankruptcy.  Indeed, as the Company recognizes in the Exchange Offer materials, "[t]here is no assurance that Ms. Holmes will not be found culpable in any such suits or investigations.  Neither the Company nor its board of directors has commissioned any independent investigation of her culpability of such matters." Ex. A at 174 (Annex G-3).

51.     If the Exchange Offer is permitted to go forward, then PFM will be forced to a Hobson's Choice.  If PFM signs the Exchange Offer Agreement to retain its present liquidation preference, it would have to release its fraud claims against Theranos, Holmes, and Balwani, and cease its Fraud Action on the eve of a trial at which it plans to present compelling evidence of their fraud.  On the other hand, if PFM refuses to participate in the Exchange Offer and maintains the Fraud Action against the Company and its officers, PFM will receive a substantially decreased liquidation preference to the Company's dwindling assets and be unable to enforce any judgment it obtains—making any trial victory pyrrhic.

52.     PFM has no adequate remedy at law.  Only through the exercise of the Court's equitable powers will PFM be protected from irreparable injury.

<u>**COUNT I**</u>
**(Breach of Fiduciary Duty of Loyalty)**
**(Against Defendants Holmes, Bonanni, Foege, and Warmenhoven)**

53.     PFM repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

54.     As members of the Theranos Board of Directors, Holmes, Bonanni, Foege, and Warmenhoven owe Theranos's stockholders the highest duties of care, loyalty and good faith.

55.     By virtue of her status as the majority stockholder of Theranos, Holmes owes fiduciary duties to Theranos and its minority stockholders.

31

56.    Holmes, Bonanni, Foege, and Warmenhoven have breached their fiduciary duties by knowingly engaging in a scheme to penalize stockholders like PFM from exercising their rights and by promulgating a substantively coercive and unfair Exchange Offer.

57.    The Exchange Offer is coercive because the offeror, Theranos, is offering stockholders like PFM—which, as discussed above, have actionable claims against the Company and Defendants—a liquidation preference in exchange for releasing their claims.

58.    Moreover, as described in detail above, the Exchange Offer is coercive because it was only made possible by Defendants' fraudulent scheme and breaches of fiduciary duty.

59.    PFM has been damaged as a result of Defendants' scheme to deprive PFM of its liquidation preference and to ensure that any judgment PFM obtains in the Fraud Action will be uncollectable.

60.    PFM will be additionally and irreparably damaged if Theranos consummates its coercive Exchange Offer.

61.    PFM seeks an order declaring that consummation of the Exchange Offer would constitute a breach of the fiduciary duties owed to Theranos's stockholders.

62.   The damage that PFM has suffered and will continue to suffer is irreparable, and PFM has no adequate remedy at law.  Such conduct will continue to cause irreparable harm unless restrained by this Court.

<u>**COUNT II**</u>
**(Self-Dealing and Waste)**
**(Against Defendants Holmes, Bonanni, Foege, and Warmenhoven)**

63.   PFM repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

64.   Defendants authorized the Exchange Offer in order to benefit themselves by obtaining a broad release of liability for their misconduct.

65.   The Exchange Offer, if consummated, would confer a substantial personal benefit on Defendants, particularly Holmes, who faces substantial liability in the Fraud Action.

66.   The Company will not receive adequate consideration in return for the substantial personal benefit the Exchange Offer confers on Defendants, particularly Holmes.

67.   In approving the Exchange Offer for their own benefit—but not the benefit of the Company or its stockholders—Defendants authorized a transaction for which no business person of ordinary, sound judgment could conclude that the Company received adequate consideration.

68.    As a result of the Defendants' actions, PFM has been and will be damaged.   Unless enjoined by this Court, Defendants will continue to waste corporate assets for their own personal benefit.

69.    The damage that PFM has suffered and will continue to suffer is irreparable, and PFM has no adequate remedy at law.

## COUNT III
### (Breach of Fiduciary Duty of Loyalty)
### (Against Defendant Holmes)

70.    PFM repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

71.    By virtue of the fact that Holmes is the majority and controlling stockholder of Theranos, Holmes stands in a fiduciary relationship with the minority stockholders of Theranos and must deal with Theranos's stockholders fairly, in good faith.

72.    Because Holmes is Theranos's majority and controlling stockholder, her actions are subject to review for entire fairness when she engages in an Exchange Offer that is structurally or substantively coercive or does not disclose all material facts, especially where the Exchange Offer directly benefits her and other directors, Theranos did not seek the recommendation of a special committee as to the Exchange Offer and the Board expressed no opinion as to whether the Company's preferred stockholders should participate in the Exchange Offer.

34

73.     Here, as discussed above, the Exchange Offer is grossly inadequate, coercive, and false and misleading in numerous respects.  Holmes is neither following a fair process nor offering a fair price.

74.     As a result of Holmes's actions, PFM and similarly situated minority stockholders have been and will be irreparably harmed.  Unless enjoined by this Court, Holmes will continue to breach her fiduciary duties owed to Theranos's minority stockholders, all to the irreparable harm of PFM and other similarly situated stockholders.

75.     PFM has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, PFM requests respectfully requests that the Court:

(a)     Temporarily, preliminarily, and permanently enjoin the Board, Theranos, their employees, agents, and all persons acting on their behalves or in concert with them from soliciting any stockholders pursuant to, and/or consummating, the Exchange Offer;

(b)     Declare that Defendants Holmes, Bonanni, Foege, and Warmenhoven have breached their fiduciary obligations to stockholders of Theranos, including PFM;

(c)     Declare that Defendants Holmes, Bonanni, Foege, and Warmenhoven have engaged in self-dealing and corporate waste;

35

(d)     Award PFM its costs, fees and expenses in this action, including reasonable attorneys' and experts' fees; and

(e)     Grant PFM such other and further relief as this Court may deem just and proper.

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

/s/ Patricia L. Enerio
Kurt M. Heyman (# 3054)
Patricia L. Enerio (# 3728)
Aaron M. Nelson (# 5941)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300

Attorneys for Plaintiffs

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Reed Brodsky
200 Park Avenue
New York, NY 10166
(212) 351-4000

Winston Y. Chan
Matthew S. Kahn
Aimee M. Halbert
Sarah Cunningham
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

Dated:  April 6, 2017