# Attachment J

PUBLIC VERSION --
FILED MAY 26, 20

EFiled: May 26 2017 04:28PM EDT
Transaction ID 60653463
Case No. 2017-0262-JTL

# EXHIBIT

# A

Page 1

1          IN THE COURT OF CHANCERY STATE OF DELAWARE

2                        ---oOo---

3

4    PARTNER INVESTMENTS, L.P.
     a Delaware limited
5    partnership, PFM HEALTHCARE
     MASTER FUND, L.P., a Cayman
6    Islands limited partnership,
     and PFM HEALTHCARE PRINCIPALS
7    FUND, L.P., a Delaware limited
     partnership,

8
                         Plaintiffs,
9

10   vs.                              C.A. No. 12816-VCL

11   THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
12   an individual, RAMESH BALWANI,
     an individual, and DOES 1 - 10,

13
                         Defendants.
14   _____/

15

16

17       VIDEOTAPED DEPOSITION OF PRANAV PATEL, Ph.D.

18                 PALO ALTO, CALIFORNIA

19               THURSDAY, MARCH 9, 2017

20

21

22   BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23   CSR LICENSE NO. 9830

24   JOB NO. 120791

25

1            IN THE COURT OF CHANCERY STATE OF DELAWARE

2                          ---oOo---

3

4     PARTNER INVESTMENTS, L.P.
      a Delaware limited
5     partnership, PFM HEALTHCARE
      MASTER FUND, L.P., a Cayman
6     Islands limited partnership,
      and PFM HEALTHCARE PRINCIPALS
7     FUND, L.P., a Delaware limited
      partnership,

8
                       Plaintiffs,
9

10    vs.                              C.A. No. 12816-VCL

11    THERANOS, INC., a Delaware
      corporation, ELIZABETH HOLMES,
12    an individual, RAMESH BALWANI,
      an individual, and DOES 1 - 10,

13
                       Defendants.
14    _____/

15

16          Videotaped Deposition of Pranav Patel,

17    Ph.D., taken on behalf of the Plaintiffs, on

18    March 9, 2017, at Gibson Dunn & Crutcher LLP,

19    1881 Page Mill Road, Palo Alto, California

20    94304, beginning 10:23 a.m., and commencing at

21    3:49 p.m., Pursuant to Notice, and before me,

22    ANDREA M. IGNACIO, CSR, RPR, CRR, CLR ~ License

23    No. 9830.

24

25

```
                                                        Page 3
 1   A P P E A R A N C E S:

 2

 3

 4       FOR THE PLAINTIFFS:

 5          GIBSON, DUNN & CRUTCHER

 6          By:  MATTHEW KAHN, Esq.

 7               SARAH CUNNINGHAM, Esq.

 8          555 Mission Street

 9          San Francisco, California 94105

10

11

12

13

14       FOR THE DEFENDANT THERANOS, INC.:

15          WILMERHALE

16          By:  ANDREA JEFFRIES, Esq.  (Los Angeles)

17               S. ZUBIN GAUTAM, Ph.D., Esq. (Palo Alto)

18          350 South Grand Avenue

19          Los Angeles, California 90071

20

21

22

23

24

25
```

1   A P P E A R A N C E S:   (Cont.)

2

3

4      FOR THE DEFENDANT SUNNY BALWANI:

5         DAVIS WRIGHT TREMAINE

6         By:   LAUREN RAINWATER, Esq.

7         1201 Third Avenue

8         Seattle, Washington 98101

9

10

11

12

13      FOR THE DEFENDANT ELIZABETH HOLMES:

14         COOLEY

15         By:   Alexandra LEEPER, Esq.

16         3175 Hanover Street

17         Palo Alto, California 94304

18

19

20

21

22      ALSO PRESENT:   Reynaldo Abesamis, Jr., Videographer

23                        ---oOo---

24

25

]

1              PALO ALTO, CALIFORNIA

2          THURSDAY, MARCH 9, 2017

3                10:23 A.M.

4

5

6

7          THE VIDEOGRAPHER:  Good morning.  This is the

8     start of Disc labeled No. 1 of the video deposition of

9     Pranav Patel.

10          In the matter of Partner Investments, L.P.,

11     et al., versus Theranos, Inc., et al.  In the Court

12     of Chancery of the State of Delaware.  Case

13     No. 12816-VCL.

14          This deposition is being held at 1881 Page

15     Mill Road, Palo Alto, California, on March 9, 2017, at

16     approximately 10:23.

17          My name is Reynaldo Abesamis, Jr., from

18     TSG Reporting, Inc., and I am the legal video

19     specialist.

20          The court reporter today is Andrea Ignacio,

21     in association with TSG Reporting.

22          Will counsel please introduce yourselves,

23     beginning with the questioning attorney.

24          MS. CUNNINGHAM:  Sarah Cunningham from

25     Gibson, Dunn & Crutcher, on behalf of plaintiffs.

1          MR. KAHN:  Matthew Kahn from Gibson Dunn, for

2     the plaintiffs.

3          MS. RAINWATER:  Lauren Rainwater, on behalf

4     of Sunny Balwani.

5          MS. LEEPER:  Allie Leeper from Cooley, on

6     behalf of Elizabeth Holmes.

7          MR. GAUTAM:  Zubin Gautam from WilmerHale, on

8     behalf of Theranos.

9          MS. JEFFRIES:  Andrea Jeffries, WilmerHale,

10    Theranos.

11         THE VIDEOGRAPHER:  Any -- anyone on the

12    phone?

13         Will the court reporter please swear in the

14    witness.

15

16              PRANAV PATEL,

17         having been sworn as a witness

18       by the Certified Shorthand Reporter,

19            testified as follows:

20

21              EXAMINATION

22    BY MS. CUNNINGHAM:

23      Q    Okay.  Good morning.  Thank you for being

24    here.  And we again apologize about the delay this

25    morning.  I'm glad you made it.

1    A    Yes.

2    Q    Now, if we'd go to Slide 248 of Exhibit 155.

3    A    (Witness complies.)

4    Q    Is the data represented on -- in these graphs

5    identical to the data represented on -- in the graphs

6    on Slide 244 of Exhibit 231?

7    A    Yes.

8    Q    Is the data -- or was the data on Slide 248

9    generated using a Bio-Rad device?

10    A    Yes.

11    Q    And, is the data reflected on Slide 250 of

12    Exhibit 155 identical to the data represented on

13    Slide 26 of Exhibit 231?

14    A    Yes.

15    Q    And, is the data generated for -- or is the

16    data represented on Slide 250 of Exhibit 155 generated

17    using a Bio-Rad device?

18    A    Yes.

19    Q    And, on Slide 251 of Exhibit 155, is that

20    identical to the data that is in the chart on Slide 27

21    of Exhibit 231?

22    A    Yes.

23    Q    And, is the data -- or is the chart on

24    Slide 251 of Exhibit 155 generated using a Bio-Rad

25    device?

1       A    Yes.

2       Q    All right.

3           Would you agree with me that, if you didn't

4    know from prior experience that the data on these

5    slides in Exhibit 155 was Bio-Rad data, there's

6    nothing on these slides indicating that it's Bio-Rad

7    data; is that correct?

8           MS. JEFFRIES:  Objection; form.

9           THE WITNESS:  No, there's nothing that

10   suggests it's from Bio-Rad.

11          MS. CUNNINGHAM:  Q.  So you agree with me;

12   right?

13      A    Yes.

14          MS. JEFFRIES:  Objection to form.

15          MS. CUNNINGHAM:  Q.  And, in fact, would you

16   agree that this data on these slides that we've just

17   discussed in Exhibit 155 appear to be presented as

18   Theranos data?

19          MS. JEFFRIES:  Objection to form.

20          THE WITNESS:  So, even if it's from Bio-Rad,

21   it's still Theranos data.

22          MS. CUNNINGHAM:  Q.  Do you believe that it

23   appears to be represented as though it were generated

24   on a Theranos device?

25      A    No.

1            MS. JEFFRIES:  Objection to form.

2            MS. CUNNINGHAM:  Q.  Why not?

3      A    It doesn't say Bio-Rad.  It doesn't say

4  anything else, either.  It can be on -- yeah.

5      Q    Does it say "Theranos" on each slide?

6      A    Yes.

7      Q    And does it say "Theranos Confidential" on

8  each slide?

9      A    Yes.

10     Q    Now, let's turn to Slide 255 of Exhibit 155.

11     A    (Witness complies.)

12     Q    Do you know what device was used to create

13  these charts?

14     A    I believe it was a Theranos device that was

15  developed before my time there.

16     Q    Do you?

17     A    Or they were still using it while I joined

18  Theranos.

19     Q    Do you know what device that was?

20     A    No.

21     Q    How can you tell that it's a device that they

22  were using before your time there?

23     A    I've seen the data and the data analysis.

24  And the way that it's represented, it basically was

25  the Theranos analysis software.  And the data --

Page 115

1          MS. CUNNINGHAM:  Q.  Do you remember who the

2     person was that he was being aggressive towards?

3          MS. RAINWATER:  Objection; form.

4          THE WITNESS:  Matt Percival, I believe.

5     That's all I remember.

6          MS. CUNNINGHAM:  Q.  Do you remember what

7     Matt Percival's job was?

8       A    Yeah, he reported to Daniel.  His original

9     job of interacting with us -- sorry -- was towards

10    designing a bunch of primers for the assays that we

11    were working on.

12         Later on he was also tasked with coming up

13    with these plans, more like a project manager of some

14    sort, in a loose definition, to -- to come up with

15    plans to which -- to achieve these goals.

16      Q    And, do you remember what you were discussing

17    in this meeting when you saw Sunny yell at Matt

18    Percival?

19         MS. RAINWATER:  Objection to form.

20         MS. JEFFRIES:  Objection.

21         THE WITNESS:  No, I don't remember the

22    details.  I think the meetings were towards these

23    goals, and how are you going to achieve it.

24         MS. CUNNINGHAM:  Q.  Do you -- was it your

25    understanding that Sunny was frustrated about the

1    progress with respect to these goals?

2              MS. JEFFRIES:  Objection; form.

3              MS. RAINWATER:  Objection.

4              THE WITNESS:  I don't know his state of

5    feelings, no.

6              MS. CUNNINGHAM:  Q.  What did you perceive in

7    the room?

8        A    That the -- they were deadly serious about

9    hitting these goals, and they were willing to do

10   anything that was going to -- that was going to be

11   necessary.  And there was definitely a push from them

12   towards everybody else to sort of, like, try and make

13   this happen.

14       Q    When you say there was "a push from them,"

15   what do you mean by that?

16       A    You know, push, motivate, direct them, ask of

17   them.

18       Q    Right.

19             Oh, I actually meant who -- who you meant by

20   "them" was?

21       A    All of us in this project.  Like, everybody

22   had their own sections, you know.  Some people were

23   dealing with the global project things for us.  You

24   know, are these assays ready for somebody else?  Is

25   manufacturing ready for somebody else?  Are devices

Page 117

1    ready?  So all the sort of, like, team leads, if you
2    like, or their domain leads.
3        Q   So, is it your testimony that Sunny was
4    putting pressure with respect to these goals?
5            MS. RAINWATER:  Objection.
6            MS. JEFFRIES:  Objection to form.
7            THE WITNESS:  He was putting pressure.  I
8    mean, I don't know how sort of, like, this gets
9    communicated in this sort of stuff.  But there --
10   there is always pressure from all the managers
11   toward -- like, I don't know.
12           Like, what's -- are we talking about, like,
13   unfair pressure or, like, what?  Even then, it's sort
14   of, like, my -- how I perceive it sort of stuff.  I
15   don't know.
16           I don't feel comfortable, sort of, with that
17   answer.
18           MS. CUNNINGHAM:  Q.  Did it feel unfair to
19   you?
20       A   It -- it felt -- it felt a little bit
21   aggressive in terms of, like, you know, what we wanted
22   to achieve in -- in the given amount of time, the --
23   the things that needed to happen.  But I don't know.
24           I mean, you know, people who are actually
25   doing something and people who are asking, there is

TSG Reporting Worldwide  877 702 9580

Page 158

1              CERTIFICATE OF REPORTER

2

3       I, ANDREA M. IGNACIO, hereby certify that the

4   witness in the foregoing deposition was by me duly

5   sworn to tell the truth, the whole truth, and nothing

6   but the truth in the within-entitled cause;

7       That said deposition was taken in shorthand

8   by me, a disinterested person, at the time and place

9   therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12      That before completion of the deposition,

13  review of the transcript [x] was [ ] was not

14  requested.  If requested, any changes made by the

15  deponent (and provided to the reporter) during the

16  period allowed are appended hereto.

17      I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22  Dated: March 9th, 2017

23  _____

24  ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

25

# EXHIBIT

# B

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2             - - -oOo- - -

3

4  PARTNER INVESTMENTS,     )
   L.P., a Delaware limited  )
5  partnership, PFM        )
   HEALTHCARE MASTER FUND,   )
6  L.P., A Cayman Islands    )
   limited partnership, and  )  Case No.
7  PFM HEALTHCARE PRINCIPALS  )
   FUND, L.P., a Delaware    )  C.A. No.: 12816-VCL
8  limited partnership,      )
                        )
9         Plaintiffs,    )
                        )
10  vs.                  )
                        )
11  THERANOS, INC., a       )
   Delaware corporation,     )
12  ELIZABETH HOLMES, an     )
   individual, RAMESH       )
13  BALWANI, an individual,    )
   and DOES 1-10,         )
14                        )
          Defendants.    )
15                        )
                        )
16                        )

17

18

19     VIDEOTAPED DEPOSITION OF FARZIN SHADPOUR

20          (Pages 1 - 356)

21  Held at the Law Offices of Gibson, Dunn & Crutcher

22    555 Mission Street, San Francisco, California

23      Thursday, March 2, 2017, 9:02 a.m.

24         - - - -

25   REPORTED BY:  ELAINA BULDA-JONES, CSR #11720

1

BARKLEY
court Reporters

```
 1                        APPEARANCES

 2

 3     For the Plaintiffs:

 4           Gibson, Dunn & Crutcher LLP
             555 Mission Street, 30th Floor
 5           San Francisco, California 94105-0921
             BY:  MATTHEW S. KAHN, ESQ.
 6           BY:  SARAH CUNNINGHAM, ESQ.
             415.393.8212
 7           Mkahn@gibsondunn.com
             Scunningham@gibsondunn.com
 8
             Heyman Enerio Gattuso & Hirzel LLP
 9           300 Delaware Avenue, Suite 200
             Wilmington, Delaware 19801
10           BY:  AARON NELSON, ESQ.
             (PRESENT TELEPHONICALLY)
11           302.472.7312
             Anelson@hegh.law
12

13
       For the Defendant Theranos and The Witness:
14
             Wilmer Cutler Pickering Hale and Dorr LLP
15           950 Page Mill Road
             Palo Alto, California 94304
16           BY: CHRIS JOHNSTONE, ESQ.
             650.858.6103
17           Chris.johnstone@wilmerhale.com

18           Wilmer Cutler Pickering Hale and Dorr LLP
             1875 Pennsylvania Avenue, NW
19           Washington, D.C. 20006
             BY:  MEGHAN M. INGRISANO, ESQ.
20           202.663.6604
             Meghan.ingrisano@wilmerhale.com

21

22

23

24

25

                              2
```

BARKLEY
Court Reporters

```
 1   For the Defendant Ramesh Balwani:

 2          Davis Wright Tremain LLP
            505 Montgomery Street, Suite 800
 3          San Francisco, California 94111-6533
            BY:   ALLISON DAVIS, ESQ.
 4          (PRESENT TELEPHONICALLY)
            415.276.6584
 5          Allisondavis@dwt.com

 6

 7   Also present:

 8          Michael Barber, videographer

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

BARKLEY
Court Reporters

```
 1              THE VIDEOGRAPHER:  Good morning.  My name
 2      is Michael Barber.  I'm a videographer associated
 3      with Barkley Court Reporters, located at 201
 4      California Street, Suite 375, San Francisco,
 5      California 94111.
 6              The date is March 2nd, 2017.  The time is
 7      9:02 a.m.
 8              This deposition is taking place at Gibson,
 9      Dunn & Crutcher LLP in San Francisco, California, in
10      the matter of Partner Investments L.P., et al.,
11      versus Theranos, Inc., et al., in the Court of
12      Chancery of the State of Delaware, CA No. 12816-VCL.
13              This is the videotaped deposition of
14      Farzin Shadpour, being taken on behalf of the
15      Plaintiff.
16              Counsel, would you please identify
17      yourselves for the record and state whom you
18      represent.
19              MR. KAHN:  Matthew Kahn, Gibson, Dunn &
20      Crutcher, for Plaintiffs.
21              MS. CUNNINGHAM:  Sarah Cunningham, Gibson,
22      Dunn & Crutcher, for the Plaintiffs.
23              MR. JOHNSTONE:  Chris Johnstone at
24      WilmerHale on behalf of Mr. Shadpour and the
25      Defendant Theranos, Inc.
```

6

BARKLEY
Court Reporters

```
 1              MS. DAVIS:  Allison Davis, Davis Wright
 2    Tremaine, for Ramesh Balwani.
 3              (Whereupon, a brief discussion off the
 4    record.)
09:03  5          THE VIDEOGRAPHER:  Okay, now.  Would the
 6    court reporter please state -- swear in the witness.
 7                    FARZIN SHADPOUR,
 8    called as a witness by the Plaintiffs herein, being
 9    first duly sworn by the Certified Shorthand Reporter
10    was thereupon examined and testified as is
11    hereinafter set forth.
12                    EXAMINATION
13    BY MR. KAHN:
14         Q.    Good morning, Mr. Shadpour.
09:03  15        A.    Good morning to you.  How are you doing
16    today?
17         Q.    I'm good.  How are you?
18         A.    Good.
19         Q.    Thank you for being here.
09:03  20        A.    Certainly.
21         Q.    Have you ever had the pleasure of being
22    deposed before?
23         A.    No, this is my first experience.  I'm
24    looking forward to learning how it goes.
09:03  25        Q.    Okay.  Good.  Well, I hope we'll make it
```

7

BARKLEY
Court Reporters

1    other agreements with Theranos or have you ever had

2    any other agreements with Theranos in writing?

3        A.   I remember signing a contract for that RSU

4    contract.  But, again, I don't think -- I didn't

11:12   5    find a copy of it, so I don't know if I have a

6    hardcopy somewhere that I'm not aware of.

7            But, again, I don't know -- if I have a

8    copy of it, I am not aware of where it is right now.

9        Q.   Okay.

11:12  10        A.   Yes.

11        Q.   And leaving aside, then, your employment,

12    confidentiality, separation, and stock option

13    agreements, anything else that you had ever with

14    Theranos as a written contract?

11:12  15        A.   As a -- I was -- I'm not sure if this

16    constitutes a contract or not, but I was a CEO of a

17    Theranos subsidiary, and so as --

18            (Reporter clarification.)

19            THE WITNESS:  A CEO of a Theranos

11:13  20    subsidiary, and so a result of that, there was some

21    paperwork associated with that.  I don't know if

22    that constitutes a contract or not.

23    BY MR. KAHN:

24        Q.   What subsidiary were you CEO of?

11:13  25        A.   It was called, if I'm not mistaken,

127

```
 1    Protegic Procurement Company.
 2         Q.   Okay.  And when was that?
 3         A.   If I'm not mistaken, we incorporated it
 4    sometime either in 2013 or 2014.
11:13  5         Q.   Okay.  To your knowledge, does it still
 6    exist?
 7         A.   To my knowledge, it existed until my last
 8    day, so...
 9         Q.   And were you the CEO of it the whole time?
11:13 10         A.   Yes, sir.
11         Q.   What was the purpose of that subsidiary,
12    if you know?
13         A.   Yes, it was to essentially -- there are
14    times that companies, it's not unique to Theranos or
11:14 15    anything, when they want to procure goods and
16    services and perhaps they are working on a
17    proprietary product, they don't want it to be widely
18    known or the suppliers publicize it.
19              In addition to a confidentiality
11:14 20    agreement, another layer is to use a subsidiary.
21         Q.   Got it.
22         A.   Yeah.
23         Q.   So Theranos might not want the world to
24    know it's buying X item, and so it forms a sub
11:14 25    called something generic; is that right?
```

128

BARKLEY
Court Reporters

1    A.   Yes.

2    Q.   Okay.  Other than that CEO agreement, all

3  the other agreements we have identified --

4    A.   Yes.

11:14   5    Q.   -- were there any other agreements with

6  Theranos at any time?

7    A.   I don't recall.

8    Q.   Do you presently have any agreements with

9  Theranos other than the severance agreement?

11:14  10    A.   The only one that is in effect is that

11  one.  I don't think any other one would be in

12  effect, no.

13    Q.   Do you have any consulting agreement with

14  Theranos?

11:14  15    A.   No.

16    Q.   Have you been promised anything in

17  exchange for your testimony today?

18    A.   No.

19    Q.   Okay.  Were you given any instructions to

11:15  20  testify in a particular way today?

21    A.   No.

22    Q.   Okay.

23    A.   Well, unless -- truthfully, obviously,

24  yes.

11:15  25    Q.   That's an important one.

129

1    BY MR. KAHN:

2        Q.   So they said, "We're going to open lots of

3    stores in Walgreens."

4        A.   Yes, uh-huh.  Yeah.

11:53  5        Q.   Okay.  And then you said, "Give me some

6    specifics so I can plan the global supply chain"?

7        A.   I asked -- I asked the -- for the

8    specifics within that lead time, so it's not that I

9    had the expectation to know long-terms plans that

11:53  10    were beyond that lead time, yes.

11        Q.   I understand.  And what was the lead time

12    that you asked for?

13        A.   If I remember --

14            MR. JOHNSTONE:  Objection to form.

11:53  15            THE WITNESS:  If I remember correctly,

16    maybe the longest lead item was eight weeks, if I'm

17    not mistaken.

18    BY MR. KAHN:

19        Q.   Okay.  So what I'm getting at is, in

11:53  20    response to your request --

21        A.   Yes.

22        Q.   -- to be given specific information so

23    that you could plan the supply chain --

24        A.   Yes.

11:54  25        Q.   -- you eventually were told about 40

163

BARKLEY
Court Reporters

1    specific stores that would open, correct?

2        A.   Actually, to be exact, I think it ended up

3    being -- the total of the Walgreens locations ended

4    up being 41, if I'm not mistaken.

11:54  5        Q.   Okay.

6        A.   If you are being exact.

7        Q.   Well, I want to be exact.

8        A.   Yes.  I -- okay.  So then I -- then I

9    don't remember the exact number.  But if I -- if I

11:54  10   am referring to my memory, I want to say that it

11   ended up being 41, if I'm not mistaken.  I remember

12   41 more than 40.

13       Q.   Got it.

14       A.   Yes.

11:54  15       Q.   So you -- but you were never given

16   information about any other Walgreens store openings

17   beyond those 41 for the purposes of your lead time

18   supply chain management, correct?

19       A.   Yes, that's correct.

11:54  20       Q.   Okay.  Now, Mr. Blickman says in the last

21   sentence, "We never give guidance or publicly

22   disclose future markets or store openings at this

23   point."

24            Do you see that?

11:55  25       A.   Yes.

164

BARKLEY
porters

1     Q.   Okay.  What was your understanding of what

2  he meant by that?

3     A.   That the company has a policy of not

4  giving public disclosure on future markets that it

11:55  5  wants to exploit.

6     Q.   Did that strike you as odd?

7     A.   No.

8     Q.   No, okay.

9        Did you -- in your experience at Theranos,

11:55  10  did Theranos have a culture of secrecy?

11        MR. JOHNSTONE:  Objection to form.

12        THE WITNESS:  In terms of the policy of

13  essentially keeping plans proprietary, I would say

14  it's a policy more than --

11:55  15  BY MR. KAHN:

16     Q.   Yeah, I -- so --

17     A.   Yes.

18     Q.   -- here's what I'm trying to get at, sir.

19  You know, there is -- you would agree with me, I

11:56  20  think, that different industries and different

21  companies require different levels of confidential

22  treatment of their business, right?

23        So like an arms manufacturer that is a

24  government contractor might have a different need

11:56  25  for secrecy than the corner store down the street.

165

ARKLEY
1ort Reporters

1                    DEPOSITION OFFICER'S CERTIFICATE

2

3      STATE OF CALIFORNIA        )
                                  )   Ss.
4      COUNTY OF SAN FRANCISCO    )

5

6              I, Elaina Bulda-Jones, CSR 11720, hereby

7      certify:

8              I am a duly qualified Certified Shorthand

9      Reporter, in the State of California, holder of

10     Certificate Number 11720 issued by the Court

11     Reporters Board of California and which is in full

12     force and effect.  (Bus. & Prof. § 8016)

13             I am not financially interested in this

14     action  and am not a relative or employee of any

15     attorney of the parties, or of any of the parties.

16     (Civ. Proc. §  2025.320(a))

17             I am authorized to administer oaths or

18     affirmations pursuant to California Code of Civil

19     Procedure, Section 2093(b) and prior to being

20     examined, the deponent was first placed under oath

21     or affirmation  by me. (Civ. Proc. §§ 2025.320,

22     2025.540(a))

23             I am the deposition officer that

24     stenographically recorded the testimony in the

25     foregoing deposition and the foregoing transcript is

                                353

RKLEY
Reporters

1    a true record of the testimony given.  (Civ. Proc. §

2    2025.540(a))

3             I have not, and shall not, offer or

4    provide any services or products to any party's

5    attorney or third party who is financing all or part

6    of the action without first offering same to all

7    parties or their attorneys attending the deposition

8    and making same available at the same time to all

9    parties or their attorneys.  (Civ. Proc. §

10   2025.320(b))

11            I shall not provide any service or

12   product consisting of the deposition officer's

13   notations or comments regarding the demeanor of any

14   witness, attorney, or party present at the

15   deposition to any party or any party's attorney or

16   third party who is financing all or part of the

17   action, nor shall I collect any personal identifying

18   information about the witness as a service or

19   product to be provided to any party or third party

20   who is financing all or part of the action. (Civ.

21   Proc. § 2025.320(c))

22   Dated: March 3, 2017

23

24   _____

25

                        354



# EXHIBIT

# C

Confidential

Page 1

1        IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
2

         PARTNER INVESTMENTS, L.P., a
3        Delaware limited partnership,
         PFM HEALTHCARE MASTER FUND,
4        L.P., a Cayman Islands limited
         partnership, and PFM HEALTHCARE
5        PRINCIPALS FUND, L.P., a
         Delaware limited partnership,
6

                    Plaintiff,
7

         vs.                              Case No. 12816-VCL
8

9        THERANOS, INC., a Delaware
         corporation, ELIZABETH HOLMES,
10       an individual, RAMESH BALWANI,
         an individual, and DOES 1-10,
11

                    Defendants.
12       ---------------------------------/
13

14                  ** CONFIDENTIAL **
15         VIDEOTAPED DEPOSITION OF TYLER SHULTZ
16              San Francisco, California
17                Monday, March 6, 2017
18
19
20
21       Reported by:
22       LORRIE L. MARCHANT, CSR No. 10523
                          RMR, CRR, CCRR, CRC
23

24       Job No. 120731
25

Confidential

Page 2

1                    March 6, 2017

2                        9:42 a.m.

3

4         Videotaped deposition of TYLER SHULTZ,

5         held at the offices of Gibson Dunn &

6         Crutcher LLP, 555 Mission Street, San

7         Francisco, California, before Lorrie L.

8         Marchant, a Certified Shorthand Reporter,

9         Registered Merit Reporter, Certified

10        Realtime Reporter, California Certified

11        Realtime Reporter, Certified Realtime

12        Captioner.

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential

```
1                    A P P E A R A N C E S
2      FOR THE PLAINTIFFS:
3               GIBSON, DUNN & CRUTCHER
                BY:  MATTHEW KAHN, ESQ.
4                    ANGELA POON, ESQ.
                555 Mission Street
5               San Francisco, CA 94105
6
7
8      FOR THE DEFENDANT RAMESH BALWAMI:
9               WILMERHALE
                BY:  CHRISTOPHER DAVIES, ESQ.
10              1875 Pennsylvania Avenue, NW
                Washington, DC 20006
11
12
                WILMERHALE
13              BY:  WILLIAM ROTH, ESQ. (telephonically)
                7 World Trade Center
14              250 Greenwich Street
                New York, New York 10007
15
16
                DAVIS WRIGHT TREMAINE
17              BY:  STEPHEN RUMMAGE, ESQ.
                     JOHN McKAY, ESQ. (telephonically)
18              1201 Third Avenue
                Seattle, WA 98101
19
20
                DAVIS WRIGHT TREMAINE
21              BY:  KELLY GORTON, ESQ.
                505 Montgomery Street
22              San Francisco, CA 94111
23
24
25
```

Confidential

Page 4

1              A P P E A R A N C E S

2

3     FOR THE DEFENDANT, ELIZABETH HOLMES:

4              COOLEY
               BY:   MICHELLE RHYU, Ph.D., Esq.

5              3175 Hanover Street
               Palo Alto, CA 94304

6

7

8     FOR THE WITNESS, TYLER SHULTZ:

9              Taylor & Company Law Offices
               BY:   JONATHAN PATCHEN, ESQ.

10             One Ferry Building
               San Francisco, CA 94111

11

12

13    ALSO PRESENT:

14             Ramesh Balwani

15             Alex Dias, Videographer

16                    ---oOo---

17

18

19

20

21

22

23

24

25

Confidential

Page 5

1                SAN FRANCISCO, CALIFORNIA

2                MONDAY, MARCH 6, 2017

3                     9:48 A.M.

4           THE VIDEOGRAPHER:  Good morning.  This is

5      the beginning of Disk No. 1 in the deposition of

6      Mr. Tyler Shultz in the matter Partners Investment,

7      LLP, et al., versus Theranos, Inc., et al.  In the

8      Court of Chancery of the State of Delaware, Case

9      No. 12816-VCL.

10          This deposition is being held at

11     555 Mission Street, Suite 3000, San Francisco,

12     California, on March 6th, 2017, at 9:42 a.m.  My

13     name is Alex Dias, from TSG Reporting, Inc.  Our

14     court reporter today is Lorrie Marchant.

15          Will counsel please introduce yourselves.

16          MR. KAHN:  Matthew Kahn.  Gibson, Dunn &

17     Crutcher.  For plaintiffs.

18          MS. POON:  Angela Poon.  Gibson, Dunn &

19     Crutcher.  For plaintiffs.

20          MR. RUMMAGE:  Steve Rummage.  Davis Wright

21     Germane, for defendant, Sunny Balwani.

22          MS. GORTON:  Kelly Gorton from Davis Wright

23     Germane for the defendant Sunny Balwani.

24          MR. BALWANI:  Sunny Balwani.

25          MR. DAVIES:  Chris Davies on behalf of

Confidential

1    Theranos.

2              MS. RHYU:  Michelle Rhyu from Cooley on

3    behalf of Elizabeth Holmes.

4              MR. PATCHEN:  Jonathan Patchen of Taylor &

5    Patchen on behalf of the witness.

6              THE VIDEOGRAPHER:  Thank you.

7              Will counsel on the phone please introduce

8    yourself.

9              MR. KAHN:  Is anyone there on the phone?

10   Hello.  I hear a noise.  Can whoever is on the phone

11   please identify themselves.

12             MR. DAVIES:  I think it's William Roth of

13   Wilmer.  But let me e-mail him.  I'm not sure it's

14   worth ...

15             MR. RUMMAGE:  Yeah, it's not worth waiting.

16             MR. KAHN:  All right.  Let's proceed.

17             THE VIDEOGRAPHER:  Will the court reporter

18   please swear in the witness.

19                  TYLER SHULTZ,

20     FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

21                EXAMINATION BY MR. KAHN

22             BY MR. KAHN:

23        Q.   Good morning, Mr. Shultz.

24        A.   Good morning.

25        Q.   Have you ever been deposed before?

Confidential

Page 7

1          A.    Nope.

2          Q.    Okay.  I'm going to just quickly go over

3    the rules of the road so we're all on the same page.

4                This is a question-and-answer format.  I

5    ask the questions.  You give the answers.  The court

6    reporter is taking a record, so two important

7    things.  First of all, please make sure to let me

8    finish my question in full before you give your

9    answer so that we're not talking over one another.

10               The other rule is that you have to make

11   sure you answer my questions orally, out loud, as

12   opposed to just nodding or shaking your head.

13               Do you understand?

14         A.    I understand.

15         Q.    Okay.  Great.

16               If you don't understand any of the

17   questions that I ask, please feel free to ask for

18   clarification.  If you need a break at any time,

19   just let me know.  We can go off the record and take

20   a break.

21         A.    All right.

22         Q.    Your counsel, Mr. Patchen, may, from time

23   to time -- or other people in the room may, from

24   time to time make an objection when I ask a

25   question.  They're doing that for the record.  And

Confidential

Page 20

1      A.    I -- I don't know.

2      Q.    Did you ever form an understanding of what

3  the general subject matter was?

4      A.    Yeah.  I mean, there were -- you know,

5  there were, like, kind of rumors, obviously, but I

6  never knew for sure what she put in that letter or

7  what her conversations were with Elizabeth.

8      Q.    Okay.  You also said you that discovered or

9  learned that Ms. Holmes was manipulative.

10         What did you mean by that?

11     A.    I think she's really good at telling you

12  what you need hear to keep going, and she definitely

13  did that.  I mean, she did that with me to some

14  degree, but she did that a lot with my grandfather,

15  I felt.

16     Q.    Can you give some examples, if you're

17  comfortable talking about that?

18     A.    Yeah.  Well, I mean, she became really

19  close with my grandfather, and I felt like she

20  just -- she used her personal relationship with him

21  to, I guess, a business advantage.  And, you know,

22  she would just, like, tell -- like feed him -- and,

23  you know, was feeding me -- basically feeding

24  everybody things that were just completely,

25  factually not true.

Confidential

Page 21

1    Q.   Can you recall any of the factually not
2    true things that Ms. Holmes told you, your
3    grandfather or anyone else?

4    A.   Yeah.

5    Q.   Take your time.

6    A.   I mean, like the big ones are being able to
7    run hundreds of blood tests from a single drop of
8    blood.  I mean, that's, like, a big obvious one.

9         And then, you know, even -- you know, like,
10   my grandfather would go get a Theranos test done,
11   and he would have a needle in his arm, and he -- you
12   know, it's like, well, I thought this was a single
13   drop of blood.  And there would be some, you know,
14   excuse about why they needed to take a venous draw
15   for him, but, you know, for everybody else it was a
16   finger prick.  And he continued to buy into that.

17        And then at one -- at some point I also
18   told him that most of the tests weren't even run on
19   the Theranos platform.  So not only were -- you
20   know, it couldn't run 300 tests in one single drop
21   of blood, but they weren't even running most of the
22   tests on the Theranos devices.  And most of the
23   tests were being run on third-party machines.

24        And he told me that Elizabeth told him --
25   so maybe --

Confidential

1     Q.   Go ahead.

2     A.   Okay.  You know, that -- so Elizabeth -- he

3   said that Elizabeth told him that the only reason

4   they have third-party devices is to validate their

5   own technologies but that no blood tests were run on

6   those devices.  And, you know, I worked there, and

7   I -- while I was working there, we only ran seven

8   tests on the Theranos devices.

9          And she also made it sound like the devices

10  could simultaneously run multiple tests.  But in

11  reality, each device was, you know, calibrated to

12  run one thing at a time.  So if you ordered the

13  seven things that Theranos did test for, it would

14  have to be run on seven different machines.  Or you

15  would have to recalibrate the same machine for each

16  test.  It wouldn't be feasible to actually run all

17  seven tests on one device.

18    Q.   Do you remember any other factually

19  inaccurate statements that Ms. Holmes made?

20    A.   Those were definitely the big ones.  I'm

21  sure there are many others that will come to me at

22  some point.

23    Q.   Sure.  Let me ask you a couple of specific

24  questions about some of the ones you mentioned.

25          So you said --

Confidential

Page 71

1    Q.   Did anyone comment to you on your suddenly
2   being moved in response to having raised questions?
3          MR. RUMMAGE:  Object to the form.
4          THE WITNESS:  Not that I remember, no.
5          BY MR. KAHN:
6    Q.   How did you feel about being transferred at
7   that time?
8    A.   I was definitely happy.
9    Q.   You didn't feel like you were being
10   punished in some way for speaking up?
11   A.   No.  I mean, it was definitely a move in
12   the right direction scientifically that I wanted to
13   go in.  And I actually really enjoyed working in
14   that lab.
15   Q.   How would you describe the business culture
16   at Theranos during your time there?
17          MR. RUMMAGE:  Object to the form.
18          THE WITNESS:  What do you mean by "business
19   culture"?
20          BY MR. KAHN:
21   Q.   What was it like to work there?
22   A.   Like I said before, they expect a lot of
23   hours, weekends, late nights.  Definitely work hard
24   first.  It seemed like working smart was not a
25   priority, but working hard was.  Yeah.  And then,

Confidential

Page 72

1   you know, basically do what you're told.  Don't

2   question.

3       Q.   Did you form an impression that it was not

4   acceptable or encouraged to ask questions?

5       A.   Yeah.

6            MR. RUMMAGE:  Object to the form.

7            BY MR. KAHN:

8       Q.   How did you form that impression?

9       A.   Um --

10      Q.   I mean, I know you mentioned that the woman

11  Tina on your first day.

12      A.   Right.

13      Q.   But anything beyond that?

14      A.   Also, I think on that first day, I may be

15  mistaken with her name.  I think her name may have

16  been Surekha.

17      Q.   Okay.

18      A.   And Tina, I think, was the manager before

19  her who I had only heard about.

20      Q.   Okay.

21      A.   Yeah.  It was just, you know, people -- I

22  mean, that was -- that was the culture.  People

23  knew.  They would say, "Don't speak up or you get

24  fired."

25           I know Erika told me that she wanted to

Confidential

Page 73

1    write a similar e-mail to the one that I did to

2    Elizabeth or Sunny, and her manager told her not to.

3    Said you don't want to speak up.

4              She said -- I mean, she told me that he

5    told her, "Don't speak up.  If you speak up, then

6    you're on their radar.  You don't want to be on

7    their radar."

8        Q.   And that manager was Suraj?

9        A.   Actually, that was Mark.  He was the

10   manager of the CLIA lab.

11       Q.   Do you remember Mark's last name?

12       A.   No.  I'm not very good with the last names.

13       Q.   No problem.

14       A.   I think it started with a C.  Like Italian

15   or something.

16       Q.   In addition to having a "don't ask

17   questions culture," did you form an impression that

18   Theranos had a secretive culture?

19       A.   Yeah, definitely.

20       Q.   And what was that impression based on?

21       A.   Like, I didn't see a Theranos device until

22   I was working with a Theranos device.  So during my

23   internship and then when I -- those first days when

24   I was in the binders group, I never saw a Theranos

25   device.

Confidential

Page 74

1        And there were barricades, you know, hiding

2    them or locked doors, where a lot of them were --

3    whenever -- there was one -- so whenever, like, an

4    outside vendor came in, they would put up these

5    barricades to essentially, you know, direct where

6    they walked so they couldn't go or see anything that

7    they didn't want them to see.

8        But I remember in one funny instance, I

9    think they were fixing something in the light.  And

10   so the guy came in, and there were barricades

11   everywhere.  And then he gets on a 12-foot ladder to

12   fix the lights, he can see over all the barricades.

13       So from that I thought I think these

14   barricade are for us to, like, show how paranoid

15   they are.  They don't actually care if the guy

16   fixing the light can see what's going on because the

17   barricade isn't blocking his view at all.

18       So my impression from that is that the

19   barricades are for us, to show how much they care

20   about secrecy.

21       Also, I remember one of the guys that I was

22   training, Tim, got in some sort of trouble for

23   talking about what they were doing in the production

24   team.  I don't remember exactly what it was, but I

25   remember he put a note to himself over his bench

Confidential

Page 75

1   that said, "Do not talk to people about what you're

2   doing in the lab."  Like, do not -- it was something

3   like "Do not talk to people who aren't in your lab

4   about what you're doing, even within the company."

5       Q.   Do you remember what kind of trouble he got

6   in?

7       A.   I don't remember.  I just remember he had

8   this, like, Post-it note or something on his bench

9   that said, "Do not talk to people about lab work."

10      Q.   I don't suppose you remember Tim's last

11  name?

12      A.   Definitely not.

13      Q.   Okay.

14      A.   I'm sorry.

15      Q.   That's okay.  Continue.

16      A.   But, I mean, Tim -- Tim at some point

17  connected with me on Facebook.  I don't remember.

18  So I'm definitely friends with him on Facebook.

19      Q.   Okay.

20      A.   So I could find his last name.

21      Q.   Did you ever form an understanding during

22  your time at Theranos as to why there was this

23  culture of secrecy?

24      A.   Well, they made it sound like they just had

25  something so special that they didn't want it to get

Confidential

1    stolen.  But in my opinion, I think it was they

2    didn't want anyone to realize that they really

3    didn't have anything that innovative.  And if it did

4    actually work, it would be really easy to re-create.

5        Q.   Why would it be easy to re-create?

6        A.   Everything that went into a Theranos device

7    I could buy online right now.  Pipette tips.  The

8    enzymes that they use are commercially available.

9    The antibodies that they use are commercially

10   available.  The photometer they use is commercially

11   available.  The pipette itself is commercially

12   available.  The arm that moves the pipette tip,

13   commercially available.

14            The cartridge itself, they designed, but

15   you could pretty easily re-create that.  So if -- I

16   mean, I think it is definitely a re-creatable -- an

17   easily re-creatable instrument.

18       Q.   Do you know whether, during the time you

19   were working at Theranos, that Ms. Holmes knew that

20   the enzymes and antibodies that Theranos was using

21   were commercially available?

22            MR. RUMMAGE:  Object to the form of the

23   question.

24            THE WITNESS:  She definitely knew that the

25   enzymes were commercially available, which was why

Confidential

Page 77

1    there was this push in the -- in the antibody

2    engineering group, we're trying to develop our own

3    antibodies so we don't have to use the commercially

4    available ones.

5         BY MR. KAHN:

6         Q.   How do you know that Ms. Holmes definitely

7    knew that the enzymes were commercially available?

8         A.   So the enzyme I can't say for sure.  But we

9    would just -- you know, we would buy it in bulk

10   from, basically, like Sigma or some chemical vendor

11   like that.

12        But she definitely knew about the

13   commercially available antibodies because she knew

14   they had to pay royalties on those if they used them

15   in a commercial test.  Which is why in our group, in

16   the binders group, we were developing our own

17   antibodies so we wouldn't have to rely on

18   commercially available ones.

19        Q.   So to your knowledge, during the time that

20   you were at Theranos, was Theranos paying royalties

21   on the commercially available antibodies Theranos

22   was using?

23        A.   I don't know.

24        Q.   Okay.  And do you know whether, during your

25   time at Theranos, Mr. Balwani was aware that

Confidential

Page 94

1   multiple samples.  So there's a CV for each sample

2   that's run, and then there's also a CV for -- you

3   know, if you run the same sample over and over,

4   there's a CV for, you know, that data set as a

5   whole.

6           BY MR. KAHN:

7       Q.   Okay.  And was the CV measured in order to

8   determine how reliable a given test was when run on

9   a Theranos blood analyzer device?

10      A.   Yes.

11      Q.   Okay.  And am I correct that the higher the

12  CV, the less reliable the test is, and the lower the

13  CV, the more reliable the test is?

14      A.   Yes.

15      Q.   Okay.

16      A.   You get a more consistent result with a

17  lower CV.

18      Q.   During your time at Theranos, did you ever

19  develop a concern about the way in which Theranos

20  was calculating the CV specifically with respect to

21  tests being run on the Theranos blood analyzer

22  device?

23      A.   Yes.

24      Q.   When did you first develop this concern,

25  roughly?

Confidential

Page 95

1      A.    Pretty soon after I started working there,

2   I realized that the CVs were much higher than --

3   than what, you know, Elizabeth's comments would lead

4   you to believe or website would lead you to believe.

5      Q.    And just to be clear, when you said when

6   you started working there, you mean when you began

7   your full-time employment in 2013?

8      A.    Yeah, full-time employment, working in the

9   validation team.  Yeah.  After doing, you know,

10  relatively few precision experiments, you realize

11  that the CVs are higher than -- a lot higher than

12  10 percent.

13     Q.    Okay.  So based on your conversations with

14  Ms. Holmes and what you'd reviewed on the Theranos

15  website prior to joining the validation team, your

16  understanding was that the CVs for tests run on the

17  Theranos blood analyzer device were in the

18  10 percent range?

19              MR. RUMMAGE:  Object to the form.

20              THE WITNESS:  Yes.  Less than 10 percent.

21              BY MR. KAHN:

22     Q.    Okay.  Less than 10 percent.

23              And then when -- after -- shortly after you

24  joined the validation team, you learned that that

25  was not true; correct?

Confidential

Page 96

1      A.    Correct.

2      Q.    Okay.  It sounds like what you are

3  articulating here is a concern that the CVs are

4  higher than you expected them to be; is that

5  correct?

6      A.    Yes.

7      Q.    And -- and to your mind, did that indicate

8  that the tests run on the Theranos blood analyzer

9  device were less reliable than Theranos was

10  representing?

11          MR. RUMMAGE:  Object to the form of the

12  question.

13          THE WITNESS:  Yes.

14          BY MR. KAHN:

15      Q.    Okay.

16      A.    I thought it could be a cause for -- it

17  could be the cause of giving an incorrect result.

18      Q.    What could be the cause?

19      A.    A high CV.

20      Q.    In other words, to your understanding, a

21  high CV increased the likelihood that patient blood

22  run on a Theranos blood analyzer device would be --

23      A.    Inaccurate.

24      Q.    -- inaccurate?

25      A.    Sorry.  Yes.

Confidential

Page 137

1          MR. RUMMAGE:   Object to form.

2          THE WITNESS:   I think that they wanted to

3     have an image that they were more reliable and more

4     accurate than existing methods.  And showing the CV

5     of the whole data set would not really support that

6     argument.

7          BY MR. KAHN:

8          Q.   Other than Dr. Young and Ms. Holmes, did

9     you raise your concern about the methodology for CV

10    testing with anyone else at Theranos?

11         A.   I definitely talked to Michael about it.  I

12    specifically remember talking to Michael about it.

13    I'm sure I talked to a lot of other people about it

14    as well.

15         Q.   What was Michael's response when you told

16    him your concern?

17         A.   You know, he was just kind of like -- I

18    mean, he thought the CVs were way too high.  He did

19    not think that the tests were working well.  He's a

20    funny guy.  He would kind of make lighthearted jokes

21    about all of it.

22         Q.   Let's look back at Exhibit 116, which is

23    your e-mail to Ms. Holmes on April 11th, 2014.

24              Before I ask you a question about this,

25    have you ever heard the term at Theranos

Confidential

Page 138

1    "pre-validations" or "mini validations"?

2         A.    I don't remember hearing those, no.

3         Q.    Okay.  So in this e-mail to Ms. Holmes, in

4    the middle of the third paragraph, there's a

5    sentence that starts "the first issue."

6              Do you see that?

7         A.    Yep.

8         Q.    Okay.  And you write:  "The first issue I

9    have with this is that there's no penalty for

10   repeating an experiment.  We repeat and delete

11   rather than repeat and add.  In our validation

12   reports, there is never any mention of how many

13   attempts of precision or comparability testing it

14   took to get the data that's presented."

15             Did I read that correctly?

16        A.    I think so.

17        Q.    Okay.  What's the issue with that, in your

18   view?

19        A.    You know, if you, like, flip a coin enough

20   times, eventually you're going to get ten heads in a

21   row, and then you can say, "Oh, this coin returns

22   heads every time."  That's what I'm getting at.

23        Q.    So did you think that it was misleading for

24   Theranos to handle repeat experiments in this

25   fashion?

Confidential

Page 139

1          MR. RUMMAGE:  Object to the form.

2          THE WITNESS:  I think it was misleading,

3     yes.

4          BY MR. KAHN:

5     Q.   Why?

6     A.   Because in a validation documentation, you

7     see, you know, a handful of, you know, various tests

8     that we would do.  And it looks like you just did it

9     one time, and that's what you got.  But really each

10    one of those was repeated -- potentially repeated

11    and potentially repeated many times.

12    Q.   So you -- in your view, the Theranos

13    validation documentation is misleading because of

14    this issue?

15    A.   Right.  There's a lot of data about that

16    test that is not being presented in the validation

17    documentation.

18    Q.   To your knowledge, did this issue with

19    respect to omitting information about repeated

20    testing exist in validation documentation for all of

21    Theranos's assays?

22         MR. RUMMAGE:  Object to the form.

23         THE WITNESS:  As far as I could tell, yes.

24         BY MR. KAHN:

25    Q.   Can you, sitting here today, recall any

Confidential

Page 365

1              DEPOSITION OFFICER'S CERTIFICATE

2

   STATE OF CALIFORNIA )

3                       ) ss.

   COUNTY OF SONOMA     )

4

5              I, LORRIE L. MARCHANT, hereby certify:  I

6    am a duly qualified Certified Shorthand Reporter in

7    the State of California, holder of Certificate

8    Number CSR 10523 issued by the Court Reporters Board

9    of California and which is in full force and effect.

10   (Bus. & Prof. Section 8016)

11             I am not financially interested in this

12   action and am not a relative or employee of any

13   attorney of the parties, or of any of the parties.

14   (Civ. Proc. Section 2025.320(a))

15             I am authorized to administer oaths or

16   affirmations pursuant to California Code of Civil

17   Procedure, Section 2093(b), and prior to being

18   examined, the deponent was first duly sworn/affirmed

19   by me.  (Civ. Proc. Section 2025.320, 2025.540(a))

20             I am the deposition officer that

21   stenographically recorded the testimony in the

22   foregoing deposition and the foregoing transcript is

23   a true record of the testimony given.  (Civ. Proc.

24   Section 2025.540(a))

25   ///

Confidential

Page 366

1          I have not and shall not offer or provide

2     any services or products to any party's attorney or

3     third party who is financing all or part of the

4     action without first offering same to all parties or

5     their attorneys attending the deposition and making

6     same available at the same time to all parties or

7     their attorneys.  (Civ. Proc. Section 2025.320(b))

8          I shall not provide any service or product

9     consisting of the deposition officer's notations or

10    comments regarding the demeanor of any witness,

11    attorney or party present at the deposition to any

12    party or any party's attorney or third party who is

13    financing all or part of the action, nor shall I

14    collect any personal identifying information about

15    the witness as a service or product to be provided

16    to any party or third party who is financing all or

17    part of the action. (Civ. Proc. Section 2025.320(c))

18

19    Dated: March 7, 2017.

20

21

22    _____

            LORRIE L. MARCHANT, CSR NO. 10523

23                RMR, CCRR, CRR

24

25

# EXHIBIT

# D

HIGHLY CONFIDENTIAL

Page 1

1            ADMIRAL GARY ROUGHEAD

2            IN THE COURT OF CHANCERY

3            OF THE STATE OF DELAWARE

4    PARTNER INVESTMENTS, L.P., a        )

5    Delaware limited partnership;       )

6    PFM HEALTHCARE MASTER FUND, L.P., )

7    a Cayman Islands limited            )

8    partnership; and PFM HEALTHCARE     )

9    PRINCIPALS FUND, L.P., a            )

10   Delaware limited partnership,       )

11              Plaintiffs,       )Case No.

12        vs.                     )12816-VCL

13   THERANOS, INC., a Delaware          )

14   corporation; ELIZABETH HOLMES,      )

15   an individual; RAMESH BALWANI,      )

16   an individual; and DOES 1-10,       )

17              Defendants.       )

18

19            HIGHLY CONFIDENTIAL

20

21   VIDEOTAPED DEPOSITION OF ADMIRAL GARY ROUGHEAD

22                 Arlington, VA

23                 March 24, 2017

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR, CLR

25   JOB NO. 121072

]

HIGHLY CONFIDENTIAL

1                    ADMIRAL GARY ROUGHEAD

2

3

4

5

6                         March 24, 2017

7                         11:02 a.m.

8

9

10          The videotaped deposition of ADMIRAL GARY

11    ROUGHEAD, held at the offices of Caulkins & Bruce,

12    2300 Wilson Boulevard, Arlington, Virginia, pursuant

13    to agreement before Tina M. Alfaro, a Registered

14    Professional Reporter and Certified Realtime

15    Reporter of the State of Virginia.

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 3

```
 1                    ADMIRAL GARY ROUGHEAD

 2    A P P E A R A N C E S:

 3         ON BEHALF OF THE PLAINTIFFS:

 4         HEYMAN ENERIO GATTUSO & HIRZEL

 5         BY: KURT HEYMAN, ESQ.

 6              AARON NELSON, ESQ.

 7              300 Delaware Avenue

 8              Wilmington, Delaware 19801

 9

10                   On behalf of the Plaintiffs;

11         APPEARED TELEPHONICALLY ON BEHALF OF THE

12    DEFENDANT THERANOS:

13         WILMERHALE

14         BY: KATIE MORAN, ESQ.

15              350 South Grand Avenue

16              Los Angeles, California 90071

17

18         APPEARED TELEPHONICALLY ON BEHALF OF THE

19    DEFENDANT RAMESH BALWANI:

20         DAVIS WRIGHT TREMAINE

21         BY: KELLY GORTON, ESQ.

22              505 Montgomery Street

23              San Francisco, California 94111

24

25
```

HIGHLY CONFIDENTIAL

Page 4

```
 1                    ADMIRAL GARY ROUGHEAD

 2    APPEARANCES:   (Cont'd)

 3         ON BEHALF OF THE DEPONENT:

 4         MUNGER TOLLES & OLSON

 5         BY: GREGORY WEINGART, ESQ.

 6             350 South Grand Avenue

 7             Los Angeles, CA   90071

 8

 9    and

10         YOUNG CONWAY STARGATT & TAYLOR

11         BY: PAUL LOUGHMAN, ESQ.

12             Rodney Square

13             1000 North King Street

14             Wilmington, Delaware 19801

15

16

17    ALSO PRESENT:  David Campbell (videographer)

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL

Page 39

1                    ADMIRAL GARY ROUGHEAD

2    and run?

3         A.   I have not.

4         Q.   You have not.  Okay?

5              MR. WEINGART:  Be sure you -- be sure you

6    wait until he's done.

7              THE WITNESS:  Yeah.  I'm sorry.

8    BY MR. HEYMAN:

9         Q.   You're aware that sometimes when investors

10   would tour the facilities, you know, one of the

11   things they would do would be take a sample of the

12   potential investor's blood and run it through the

13   machines?

14        A.   I'm not aware of that because I was not

15   aware of any investor tours going through the

16   building and what the program was for the investors.

17   I was not part of that.

18        Q.   Okay.  Now, when you -- when you observed

19   demonstrations of blood being taken, was it your

20   understanding that it was being tested on analyzers

21   created by Theranos?

22        A.   Yes.

23        Q.   Okay.  So not a commercially available

24   device?

25        A.   When I watched the demonstrations they were

HIGHLY CONFIDENTIAL

Page 40

1              ADMIRAL GARY ROUGHEAD

2      going into the box.

3           Q.   They went straight into the box?

4           A.   When I watched the demonstrations, yes.

5           Q.   Okay.

6                Do you know whether Theranos at any point

7      was using commercially available analyzers to test

8      the blood instead of the box?

9           A.   I know that they were using commercial

10     analyzers to run comparative tests as they were

11     developing their tests, and -- and it was not until

12     some of the press reporting that I became aware that

13     there was extensive commercial analyzers in use.

14          Q.   So is it your understanding today that

15     there was extensive use of commercial analyzers?

16          A.   That's what I've read in the press.

17          Q.   Do you believe that to be true?

18          A.   I -- I don't have the information that

19     would tell me that it's true or not true.

20          Q.   Have you asked Ms. Holmes?

21          A.   I did not ask her directly, no.

22          Q.   Did you ask Mr. Balwani?

23          A.   No.

24          Q.   Did you ask anybody else at the company?

25          A.   I did not.

HIGHLY CONFIDENTIAL

Page 41

1               ADMIRAL GARY ROUGHEAD

2          Q.   Okay.  Now, when you were -- when you

3     toured your -- the facilities, did you see any

4     commercially available analyzers?

5          A.   I believe I recall seeing some in the

6     context of the developmental work that was going on.

7          Q.   Okay.  So you were aware that they were

8     there?

9          A.   They were there.

10         Q.   Okay.  So let's -- let's -- let's focus

11    now -- we're going to be taking a trip through time

12    today.

13         A.   Okay.

14         Q.   So at times I'm going to ask you to focus

15    on a particular period of time.  So let's talk

16    about, you know, when you became a board member.

17    You know, at the time was it your understanding that

18    Theranos's devices were accurately performing the

19    tests that they were running?

20         A.   That was my understanding.

21         Q.   Okay.  And do you believe that today?

22         A.   I believe that, yes.

23         Q.   And what was your basis for believing they

24    were accurate?

25         A.   Information that was provided to me and to

HIGHLY CONFIDENTIAL

Page 96

1                ADMIRAL GARY ROUGHEAD
2    what this says, right?
3         A.   Correct.
4         Q.   So is it fair to say that this meeting did
5    not go well?
6         A.   They -- they are at an impasse and I -- you
7    know, I leave it to Ms. Holmes and her team to
8    characterize the nature of the meeting.  I don't,
9    you know, know what the real dynamic was.  The
10   bottom line is that they remained at an impasse.
11        Q.   And did -- after this time were there
12   continued efforts to engage with the military?
13        A.   I would have to look at the chronology.  My
14   view was that both the military and Theranos would
15   benefit from being able to deploy the technology and
16   I continued to encourage efforts to be able to bring
17   that to closure.
18        Q.   Well, you say in your response to her
19   e-mail also on 549 you were disappointed that Dahl
20   wasn't there --
21        A.   Right.
22        Q.   -- and you suggest if you agree you would
23   like to call Matt?
24        A.   Correct.
25        Q.   And move it higher in the chain of

HIGHLY CONFIDENTIAL

Page 97

1                    ADMIRAL GARY ROUGHEAD

2    command?

3         A.   Right.

4         Q.   Who's Matt?

5         A.   Matt was the Surgeon General of the Navy.

6         Q.   Okay.   And did you ever call Matt or move

7    it higher in the chain of command?

8         A.   He and I talked and, again, it was in an

9    effort to bring the two sides together to see where

10   progress could be made.

11        Q.   Do you know if you talked after this time

12   or before this time?

13        A.   I would say I probably did talk to Matt

14   Nathan after this, yes.

15        Q.   Okay.

16        A.   Whether it was in an e-mail or a telephone

17   conversation, I can't recall.

18        Q.   Okay.   Did -- but it's fair to say that an

19   impasse remained at this time, correct?

20        A.   As of the end of this e-mail chain, they

21   had not come to agreement on how to go forward.

22        Q.   With the military?

23        A.   With the military.

24        Q.   Okay.   And did Theranos ever end up with a

25   contract or deal with the military?

HIGHLY CONFIDENTIAL

Page 98

1                    ADMIRAL GARY ROUGHEAD

2         A.   Not to my knowledge, no.

3         Q.   Or with any branch of the military?

4         A.   Not that I'm aware of, no.

5         Q.   Okay.  Was Theranos technology ever used in

6    the field?

7         A.   Not that I'm aware of.

8         Q.   Okay.  Was it ever used on submarines?

9         A.   No.

10        Q.   Did your efforts with the military or the

11   Navy Surgeon General end at some point?

12        A.   Yes, because, you know, I'm no longer

13   engaged in that, but I can't recall when I may have

14   stepped down in direct discussion with the Navy.

15   But the issue really is for the military and

16   Theranos to come to some type of agreement, and as

17   you see in the e-mail chains, there are equities on

18   each side that needed to be closed.

19        Q.   But no deal was ever reached with any

20   branch of the military or the DOD?

21        A.   Not that I'm aware of.

22        Q.   Not that you're aware of?

23        A.   Not that I'm aware of.

24             MR. HEYMAN:  All right.  I think -- I think

25   we can take that lunch break.

HIGHLY CONFIDENTIAL

Page 99

```
 1              ADMIRAL GARY ROUGHEAD

 2         THE VIDEOGRAPHER:  Going off the record at

 3    1:12 p.m.

 4                        (Whereupon, at 1:12 p.m., the

 5                         deposition was recessed, to

 6                         reconvene at 1:45 p.m., this

 7                         same day.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              AFTERNOON SESSION
```

HIGHLY CONFIDENTIAL

Page 114

1             ADMIRAL GARY ROUGHEAD

2        A.   I understood that to be another thrust of

3   effort.

4        Q.   And do you know whether Theranos wellness

5   centers ever put into any hospitals?

6        A.   My understanding is that they would not go

7   in as a wellness center as defined in some of the

8   retail outlets.  My understanding is that the lab

9   technology or the boxes or the minilabs would be

10  used in hospitals in the context of providing care

11  to patients in the hospitals.

12       Q.   I see.  That's a fair distinction.  I guess

13  my question is did that ever happen?

14       A.   My understanding is that there were some

15  hospitals where some of the equipment was -- was

16  being used or being tested or being -- being

17  introduced to -- to people in the hospitals.

18  Exactly which ones they were I don't know.

19       Q.   Or how many?

20       A.   I -- I don't know.  I know there was a list

21  of hospitals of interest and I can't recall which

22  ones actually may have moved forward and consummated

23  the deal.

24       Q.   And was another thrust, as I think you put

25  it, of the effort to put Theranos devices this

HIGHLY CONFIDENTIAL

Page 115

1              ADMIRAL GARY ROUGHEAD

2     doctors' office -- offices?

3          A.   That was another dimension that was

4     discussed.  The term "thrust" is my term.

5          Q.   Yes.

6          A.   But that it was envisioned that at some

7     point this would be a service that would facilitate

8     and enhance medical care in individual doctor's

9     offices.

10         Q.   And was that arrangement going to be more

11    like the wellness center approach or more like the

12    hospital approach?

13         A.   My understanding is that it would be more

14    to facilitate the doctors' efforts in diagnosis and

15    in -- in facilitating care, and in my mind I viewed

16    the application in hospitals to deal with more

17    immediate, acute support to medical procedures and

18    activities going on in the hospital.  So in a way

19    similar, but -- but I think there's a difference

20    in -- in the urgency and practice of the technology.

21         Q.   Do you know whether Theranos devices were

22    ever put into place in any doctors' offices?

23         A.   I'm not aware of the specifics of that.

24         Q.   Any?

25         A.   I'm not aware of it.

HIGHLY CONFIDENTIAL

Page 116

1              ADMIRAL GARY ROUGHEAD

2         Q.   Okay.

3                   (Roughead Exhibits 551 and 552

4                    were marked as requested.)

5    BY MR. HEYMAN:

6         Q.   All right.  Let's mark a couple documents.

7    All right.  For the record, Admiral, we're putting

8    in front of you Exhibits 551 and 552.  551 is

9    Theranos minutes of a board of directors meeting

10   from Friday, May 9, 2014, the first page Bates

11   number is TH-PFM-4511577, and 552 appears to be some

12   handwritten notes and its Bates number is

13   Roughead-Theranos-27.

14            Have you seen these documents before?

15        A.   I have.

16        Q.   And are these your -- on 552 are these your

17   personal notes?

18        A.   They are.

19        Q.   And looking at these together -- it looks

20   likes the date at the upper corner of 552 is 5/9/14,

21   correct?

22        A.   That is correct.

23        Q.   Is it fair to say that these are your

24   personal notes from the board meeting?

25        A.   I'm not sure that they would be from a

HIGHLY CONFIDENTIAL

Page 192

1                    ADMIRAL GARY ROUGHEAD

2      STATE OF ILLINOIS        )

3                               ) SS:

4      COUNTY OF C O O K         )

5

6           I, TINA M. ALFARO, Certified Shorthand

7      Reporter No. 084-004220, Certified Realtime

8      Reporter, and Notary Public in and for the State of

9      Illinois, do hereby certify:

10          That ADMIRAL GARY ROUGHEAD, whose

11     deposition is hereinbefore set forth, was duly sworn

12     by me and that said deposition is a true record of

13     the testimony given by such witness.

14          I further certify that I am not counsel for

15     nor in any way related to any of the parties to this

16     suit, nor am I in any way interested in the outcome

17     thereof.

18          In witness, whereof, I have hereunto set my

19     hand this 24th day of March, 2017.

20

21

22

23

24     _____

25              Tina M. Alfaro, CSR, CRR

# EXHIBIT E

CONFIDENTIAL

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

6
               Plaintiff,
7
     vs.                              Case No. 12816-VCL
8
9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,
11
               Defendants.
12   ----------------------------/

13

14                  ** CONFIDENTIAL **
15              VIDEOTAPED DEPOSITION OF
16            THE HONORABLE GEORGE P. SHULTZ
17               San Francisco, California
18                Tuesday, April 4, 2017
19
20
21
22   Reported by:
23   LORRIE L. MARCHANT, CSR No. 10523
                         RMR, CRR, CCRR, CRC
24
25   Job No. 121073

CONFIDENTIAL

Page 2

```
 1            April 4, 2017

 2              10:07 a.m.

 3

 4   Videotaped deposition of THE HONORABLE

 5   GEORGE P. SHULTZ, held at the offices of

 6   Gibson, Dunn & Crutcher, LLP, 555 Mission

 7   Street, 30th Floor, San Francisco,

 8   California, before Lorrie L. Marchant, a

 9   Certified Shorthand Reporter, Registered

10   Merit Reporter, Certified Realtime

11   Reporter, California Certified Realtime

12   Reporter, Certified Realtime Captioner.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 3

1                   A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4              GIBSON, DUNN & CRUTCHER
               BY:   MATTHEW KAHN, ESQ.
5                   ELI LAZARUS, ESQ.
               555 Mission Street
6              San Francisco, CA 94105
7
8
9    FOR THE DEFENDANT THERANOS:
10             WILMERHALE
               BY:   THOMAS STRICKLAND, ESQ.
11             1875 Pennsylvania Avenue, NW
               Washington, DC 20006
12
13
               WILMERHALE
14             BY:   KATIE MORAN, ESQ.
               350 South Grand Avenue
15             Los Angeles, CA 90071
16
17
18   FOR THE DEFENDANT RAMESH BALWAMI:
19             DAVIS WRIGHT TREMAINE
               BY:   BEN BYER, ESQ. (via phone)
20             1201 Third Avenue
               Seattle, WA 98101
21
22
23   (Continued)
24
25

TSC Reporting Worldwide   877-702-9580

0286

CONFIDENTIAL

1              A P P E A R A N C E S

2

3    FOR THE DEFENDANT, ELIZABETH HOLMES:

4            COOLEY
             BY:  KATHLEEN GOODHART, ESQ.

5            101 California Street
             San Francisco, CA 94111

6

7

8    FOR THE WITNESS, THE HONORABLE GEORGE P. SHULTZ:

9            FARELLA BRAUN & MARTEL
             BY:  DOUGLAS YOUNG, ESQ.

10               JESSICA NALL, ESQ.
             235 Montgomery Street

11           San Francisco, CA 94104

12

13

14           YOUNG CONAWAY STARGATT & TAYLOR
             BY:  MARTIN LESSNER, ESQ.

15           Rodney Square
             1000 North King Street

16           Wilmington, DE 19801

17

18

19   ALSO PRESENT:

20           Marcus Majers, Videographer

21                  ---oOo---

22

23

24

25

0287

CONFIDENTIAL

Page 5

1          SAN FRANCISCO, CALIFORNIA

2          TUESDAY, APRIL 4, 2017

3              10:07 A.M.

4          THE VIDEOGRAPHER:  Good morning.  This is

5    the start of tape labeled No. 1 of the videotaped

6    deposition of Secretary George Shultz in the matter

7    of Partner Investments, LP, et al., versus Theranos,

8    Inc., et al., in the Court of Chancery of the State

9    of Delaware.  Case No. 12816-VCL.

10         This deposition is being held at

11   555 Mission Street, 30th Floor, San Francisco,

12   California, on April 4th, 2017, at approximately

13   10:07 a.m.

14         My name is Marcus Majers from TSG

15   Reporting, Inc., and I am the legal video

16   specialist.  The court reporter today is

17   Lorrie Marchant, in association with TSG Reporting.

18         Will counsel please introduce themselves.

19         MR. KAHN:  Matthew Kahn from Gibson, Dunn &

20   Crutcher, for plaintiffs.

21         MR. LAZARUS:  Eli Lazarus from Gibson, Dunn

22   & Crutcher, also for plaintiffs.

23         MR. STRICKLAND:  Tom Strickland,

24   WilmerHale, for the company, Theranos.

25         MS. GOODHART:  Kathleen Goodhart, Cooley,

I

CONFIDENTIAL

Page 6

1   for Elizabeth Holmes.

2           MR. LESSNER:  Marty Lessner, Young,

3   Conaway, Stargatt & Taylor of Wilmington, Delaware,

4   for Secretary Shultz.

5           MS. NALL:  I'm Jessica Nall from Farella

6   Braun & Martel for Secretary Shultz.

7           MR. YOUNG:  Douglas Young, Farella Braun &

8   Martel, for Secretary Shultz.

9           THE WITNESS:  George Shultz for Secretary

10  Shultz.

11          THE VIDEOGRAPHER:  All those joining via

12  telephone conference as well.

13          MR. BYER:  Ben Byer from Davis Wright

14  Tremaine for Sunny Balwani.

15          THE VIDEOGRAPHER:  Will the court reporter

16  please swear in the witness.

17           THE HONORABLE GEORGE P. SHULTZ,

18    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

19                EXAMINATION BY MR. KAHN:

20          BY MR. KAHN:

21     Q.   Good morning, Mr. Secretary.

22     A.   Good morning.

23          MR. YOUNG:  Matthew, before you begin, as

24  we discussed before we started, it's our desire,

25  under whatever protocol you're using, to designate

CONFIDENTIAL

Page 43

1    capable of running?

2        A.   No.

3        Q.   So your understanding as of March 2014 was

4    the Theranos blood analyzer device could run all of

5    the tests that Theranos was offering to patients;

6    right?

7            MS. GOODHART:   Objection.   Form.

8            THE WITNESS:   That was my assumption.

9            BY MR. KAHN:

10       Q.   And that was based on your discussions with

11   Ms. Holmes; correct?

12           MS. GOODHART:   Objection.   Form.

13           THE WITNESS:   And I also could observe that

14   sometimes it took longer than other times for the

15   machine to do whatever it did.   And that was because

16   the things you asked it to do were more complicated

17   than others, but it seemed to do them.

18           BY MR. KAHN:

19       Q.   Okay.   So, again, your understanding, based

20   on your discussions with Ms. Holmes around

21   March 2014, was that the Theranos-manufactured blood

22   analyzer device could run all of the blood tests

23   that Theranos was offering to patients; correct?

24           MS. GOODHART:   Objection.   Form.

25           THE WITNESS:   Yes.

CONFIDENTIAL

Page 44

1       BY MR. KAHN:

2       Q.   And just to make sure I'm being clear, your

3   understanding, based on your discussions with

4   Ms. Holmes around March 2014, was that the

5   Theranos-manufactured blood analyzer not only could

6   run all of the blood tests that Theranos was

7   offering, but it was running all of the blood tests

8   that Theranos was offering; correct?

9            MS. GOODHART:  Objection.  Form.

10           THE WITNESS:  That's what I assumed.  I

11   didn't probe into it.  It didn't occur to me.

12           BY MR. KAHN:

13       Q.   And if, in fact, it was not true that

14   Theranos was running all of the blood tests it

15   offered on the Theranos-manufactured device, that is

16   something you would have wanted to know; correct?

17           MS. GOODHART:  Objection.  Form.

18           THE WITNESS:  I would have wanted to know,

19   and I would have wanted to know why.  For instance,

20   I could conceive that they might not have any space

21   on the ones they were using and they needed to do,

22   just for the sake of time or some other item.

23           But since I didn't know, I didn't have

24   anything to look into.

25           MR. KAHN:  Okay.  We've been going about an

CONFIDENTIAL

Page 45

1    hour.  Would it be all right with you if we take a

2    short five-minute break?

3              THE WITNESS:  Whatever you want to do.

4              MR. KAHN:  Okay.  Great.  Let's go off the

5    record.

6              THE VIDEOGRAPHER:  Off the record at

7    10:58 a.m.

8              (Recess taken, from 10:58 to 11:14.)

9              THE VIDEOGRAPHER:  Back on the record at

10   11:14 a.m.

11             BY MR. KAHN:

12        Q.   Mr. Secretary, am I correct that your

13   grandson, Tyler Shultz, worked for Theranos for a

14   period of time?

15        A.   Yes.

16        Q.   And he left the company around April 2014?

17        A.   I guess so.  Something like that.

18        Q.   Okay.

19        A.   There was a date you can fix.

20        Q.   Do you recall meeting with Tyler about his

21   departure from the company just after he left?

22        A.   Yes.

23        Q.   What do you recall about that?

24        A.   Well, he had come to see me sometime before

25   that, and he said he saw a blood test taken and

CONFIDENTIAL

Page 69

1          DEPOSITION OFFICER'S CERTIFICATE
2   STATE OF CALIFORNIA )
                        ) ss.
3   COUNTY OF SONOMA    )
4          I, LORRIE L. MARCHANT, hereby certify:  I
    am a duly qualified Certified Shorthand Reporter in
5   the State of California, holder of Certificate
    Number CSR 10523 issued by the Court Reporters Board
6   of California and which is in full force and effect.
    (Bus. & Prof. Section 8016)
7          I am not financially interested in this
    action and am not a relative or employee of any
8   attorney of the parties, or of any of the parties.
    (Civ. Proc. Section 2025.320(a))
9          I am authorized to administer oaths or
    affirmations pursuant to California Code of Civil
10  Procedure, Section 2093(b), and prior to being
    examined, the deponent was first duly sworn/affirmed
11  by me.  (Civ. Proc. Section 2025.320, 2025.540(a))
           I am the deposition officer that
12  stenographically recorded the testimony in the
    foregoing deposition and the foregoing transcript is
13  a true record of the testimony given.  (Civ. Proc.
    Section 2025.540(a))
14         I have not and shall not offer or provide
    any services or products to any party's attorney or
15  third party who is financing all or part of the
    action without first offering same to all parties or
16  their attorneys attending the deposition and making
    same available at the same time to all parties or
17  their attorneys.  (Civ. Proc. Section 2025.320(b))
           I shall not provide any service or product
18  consisting of the deposition officer's notations or
    comments regarding the demeanor of any witness,
19  attorney or party present at the deposition to any
    party or any party's attorney or third party who is
20  financing all or part of the action, nor shall I
    collect any personal identifying information about
21  the witness as a service or product to be provided
    to any party or third party who is financing all or
22  part of the action. (Civ. Proc. Section 2025.320(c))
23  Dated: April 4, 2017
24  _____
                 LORRIE L. MARCHANT, CSR NO. 10523
25               RMR, CRR, CCRR, CRC

# EXHIBIT
# F

CONFIDENTIAL

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

6

              Plaintiff,
7

     vs.                              Case No. 12816-VCL
8

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

11

              Defendants.
12   ----------------------------/

13

14                 ** CONFIDENTIAL **
15        VIDEOTAPED DEPOSITION OF MAX FOSQUE
16              Palo Alto, California
17             Wednesday, March 22, 2017

18

19

20

21   Reported by:
22   LORRIE L. MARCHANT, CSR No. 10523
                    RMR, CRR, CCRR, CRC
23

24   Job No. 120966
25

CONFIDENTIAL

Page 2

```
 1              March 22, 2017
 2                 9:05 a.m.
 3
 4    Videotaped deposition of MAX FOSQUE, held
 5    at the offices of Gibson, Dunn & Crutcher,
 6    LLP, 1881 Page Mill Road, Palo Alto,
 7    California, before Lorrie L. Marchant, a
 8    Certified Shorthand Reporter, Registered
 9    Merit Reporter, Certified Realtime
10    Reporter, California Certified Realtime
11    Reporter, Certified Realtime Captioner.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 3

1                A P P E A R A N C E S
2    FOR THE PLAINTIFFS:
3            GIBSON, DUNN & CRUTCHER
             BY:  WINSTON CHAN, ESQ.
4                JESSICA WRIGHT, ESQ.
             555 Mission Street
5            San Francisco, CA 94105
6
7
8    FOR THE DEFENDANT THERANOS:
9            WILMERHALE
             BY:  MEGHAN INGRISANO, ESQ.
10           1875 Pennsylvania Avenue, NW
             Washington, DC 20006
11
12
             WILMERHALE
13           BY:  MATTHEW BENEDETTO, ESQ.
             350 South Grand Avenue
14           Los Angeles, CA 90071
15
16   FOR THE DEFENDANT RAMESH BALWAMI:
17           DAVIS WRIGHT TREMAINE
             BY:  KELLY GORTON, ESQ.
18           505 Montgomery Street
             San Francisco, CA 94111
19
20
             DAVIS WRIGHT TREMAINE
21           BY:  STEPHEN RUMMAGE, ESQ.
                 JOHN McKAY, ESQ. (telephonically)
22               BENJAMIN BYER, ESQ. (telephonically)
             1201 Third Avenue
23           Seattle, WA 98101
24
25

CONFIDENTIAL

Page 4

1                      A P P E A R A N C E S

2

3    ALSO PRESENT:

4              Steve Patipoff, Videographer

5                        ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 5

1              PALO ALTO, CALIFORNIA

2           WEDNESDAY, MARCH 22, 2017

3                   9:05 a.m.

4          THE VIDEOGRAPHER:  Good morning.  This is

5    the start of tape labeled No. 1 in the video

6    deposition of Max Fosque, in the matter of Partner

7    Investments, LP, et al., versus Theranos,

8    Incorporated, et al., being heard in the Court of

9    Chancery of Delaware -- or State of Delaware.

10   No. 12816-VCL.

11          This deposition is being held at Gibson

12   Dunn, 1881 Page Mill Road, Palo Alto, California, on

13   March 22nd, 2017, at approximately 9:05 a.m.

14          My name is Steve Patipoff, from TSG

15   Reporting, the legal video specialist.

16          The court reporter is Lorrie Marchant, in

17   association with TSG Reporting.

18          Will counsel please introduce yourselves.

19          MR. CHAN:  Winston Chan and Jessica Wright

20   for Gibson Dunn on behalf of the plaintiffs.

21          MR. BENEDETTO:  Matthew Benedetto and

22   Meghan Ingrisano from WilmerHale on behalf of the

23   company defendant.

24          MS. RAINWATER:  Lauren Rainwater from Davis

25   Wright Tremaine on behalf of Sunny Balwani.

CONFIDENTIAL

Page 6

1              MR. CHAN:  Is anyone here for Ms. Holmes?

2              MR. BENEDETTO:  No.

3              MR. CHAN:  Okay.  And there's no one on the

4    phone.

5              THE VIDEOGRAPHER:  The court reporter may

6    now swear in the witness.

7                        MAX FOSQUE,

8      FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

9                    EXAMINATION BY MR. CHAN

10             BY MR. CHAN:

11        Q.   Great.  Good morning.  Can you state your

12   name for the record, please.

13        A.   Max Fosque.

14        Q.   How do you spell that?

15        A.   M-A-X F-O-S-Q-U-E.

16        Q.   Where do you live?

17        A.   I live at 715 De Haro Street in

18   San Francisco.

19        Q.   Have you been deposed before?

20        A.   Nope.  First time.

21        Q.   Have you ever been involved in any kind of

22   lawsuit before?

23        A.   Nope.

24        Q.   So just for purposes of today -- and I'm

25   sure you've discussed this with your attorney --

CONFIDENTIAL

Page 202

1          BY MR. CHAN:

2      Q.   Okay.  How about companywide?

3          MS. RAINWATER:  Objection.  Form.

4          BY MR. CHAN:

5      Q.   Companywide.

6      A.   Again, potentially at a given day -- on a

7   given day, 70 percent of the tests performed may

8   have been from capillary collection.  I don't know

9   the exact numbers, but that's theoretically

10  possible.

11     Q.   You're not thinking of a particular point

12  in time?

13     A.   No.

14     Q.   Would you say the same thing about the

15  98 percent figure?

16     A.   I mean, again, it's possible that there was

17  a given day that every test was performed from

18  capillary collection.  I would say that the

19  likelihood of that is probably low.  I'm not aware

20  specifically of a day that that occurred, but it's

21  theoretically possible.

22     Q.   Okay.  What about on an annualized basis?

23     A.   No.

24     Q.   What would you think the highest figure

25  would be on an annualized basis?

CONFIDENTIAL

Page 203

1            MR. BENEDETTO:  Object to form.

2            THE WITNESS:  I mean, I would be guessing.

3            BY MR. CHAN:

4       Q.   Okay.  You can say it's a guess.

5       A.   On an annual basis, the number of tests

6  performed from capillary collection out of all of

7  the tests performed, anywhere from 30 to 60 percent.

8       Q.   Same question for the first quarter of

9  2013.  Sorry.  Fourth quarter of 2013.

10            MR. BENEDETTO:  Object to form.

11            THE WITNESS:  Again, I would be guessing at

12  this point.

13            BY MR. CHAN:

14       Q.   What would your best guess be?

15       A.   Anywhere from, you know, 30 to 50 percent

16  if I had to guess, 25 to 50 percent.

17       Q.   Could it be 98 percent?

18       A.   I don't believe so, no.  Let me rephrase

19  that.  Definitely not.

20       Q.   What makes you say "definitely not"?

21       A.   I just know that out of all the tests that

22  were performed in the fourth quarter of 2014 --

23  2013, I'm very, very confident that 98 percent were

24  not performed from capillary collection.

25       Q.   Have you done that analysis?

CONFIDENTIAL

Page 204

1      A.    I don't believe so.

2      Q.    And then even, let's say, with the

3  figure -- I understand you were, you know, giving a

4  rough estimate.

5            For fourth quarter 2013, for the number

6  that you gave, which was 25 to 50 percent, what

7  percentage of that would have been conducted on the

8  3.5?

9            MR. BENEDETTO:  Object to form.

10           THE WITNESS:  Likely a much lower percent

11 due to the nature of the tests that were performed

12 on the 3.5 in comparison to all of the tests that

13 were performed from capillary collection.

14           BY MR. CHAN:

15     Q.    What ratio would you put to that?

16     A.    Again, I would be guessing.

17     Q.    Your best guess based on your, you know,

18 experience and working with this data.

19     A.    I mean, you know, we ran -- didn't run a

20 comprehensive metabolic panel or a CBC on the Edison

21 device.  That's 14 plus 18 tests in total or results

22 that are -- come up from that, I believe in the

23 fourth quarter of 2013, there were only four tests

24 that were run on the Edison device.  All that gave a

25 single result, so --

CONFIDENTIAL

Page 420

1          DEPOSITION OFFICER'S CERTIFICATE
2   STATE OF CALIFORNIA )
                        ) ss.
3   COUNTY OF SONOMA    )
4            I, LORRIE L. MARCHANT, hereby certify:  I
    am a duly qualified Certified Shorthand Reporter in
5   the State of California, holder of Certificate
    Number CSR 10523 issued by the Court Reporters Board
6   of California and which is in full force and effect.
    (Bus. & Prof. Section 8016)
7            I am not financially interested in this
    action and am not a relative or employee of any
8   attorney of the parties, or of any of the parties.
    (Civ. Proc. Section 2025.320(a))
9            I am authorized to administer oaths or
    affirmations pursuant to California Code of Civil
10  Procedure, Section 2093(b), and prior to being
    examined, the deponent was first duly sworn/affirmed
11  by me.  (Civ. Proc. Section 2025.320, 2025.540(a))
             I am the deposition officer that
12  stenographically recorded the testimony in the
    foregoing deposition and the foregoing transcript is
13  a true record of the testimony given.  (Civ. Proc.
    Section 2025.540(a))
14           I have not and shall not offer or provide
    any services or products to any party's attorney or
15  third party who is financing all or part of the
    action without first offering same to all parties or
16  their attorneys attending the deposition and making
    same available at the same time to all parties or
17  their attorneys.  (Civ. Proc. Section 2025.320(b))
             I shall not provide any service or product
18  consisting of the deposition officer's notations or
    comments regarding the demeanor of any witness,
19  attorney or party present at the deposition to any
    party or any party's attorney or third party who is
20  financing all or part of the action, nor shall I
    collect any personal identifying information about
21  the witness as a service or product to be provided
    to any party or third party who is financing all or
22  part of the action. (Civ. Proc. Section 2025.320(c))
23  Dated:  March 22, 2017
24  _____
            LORRIE L. MARCHANT, CSR NO. 10523
25          RMR, CRR, CCRR, CRC

# EXHIBIT

# G

CONFIDENTIAL

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

6

               Plaintiff,
7
     vs.                              Case No. 12816-VCL
8

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,
11
               Defendants.
12   ----------------------------/

13

14                   * CONFIDENTIAL *

15      VIDEOTAPED DEPOSITION OF MARK PANDORI, Ph.D.

16            San Francisco, California

17            Wednesday, March 8, 2017

18

19

20

21   Reported by:

22   LORRIE L. MARCHANT, CSR No. 10523
                      RMR, CRR, CCRR, CRC

23

24   Job No. 120788

25

CONFIDENTIAL

Page 2

1          March 8, 2017

2             9:13 a.m.

3

4    Videotaped deposition of MARK PANDORI,

5    Ph.D., held at the offices of Gibson, Dunn

6    & Crutcher, LLP, 555 Mission Street, San

7    Francisco, California, before Lorrie L.

8    Marchant, a Certified Shorthand Reporter,

9    Registered Merit Reporter, Certified

10   Realtime Reporter, California Certified

11   Realtime Reporter, Certified Realtime

12   Captioner.

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

```
1               A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4            GIBSON, DUNN & CRUTCHER
             BY:  DANIEL KUO, ESQ.
5            555 Mission Street
             San Francisco, CA 94105
6
7
             GIBSON, DUNN & CRUTCHER
8            BY:  REED BRODSKY, ESQ.
             200 Park Avenue
9            New York, NY 10166
10
11
12   FOR THE DEFENDANT RAMESH BALWAMI:
13           WILMERHALE
             BY: ANDREA JEFFRIES, ESQ.
14               JORDAN SMITH, ESQ.
             350 South Grand Avenue
15           Los Angeles, CA 90071
16
17
18           DAVIS WRIGHT TREMAINE
             BY:  KELLY GORTON, ESQ.
19               JOHN McKAY, ESQ. (telephonically)
             505 Montgomery Street
20           San Francisco, CA 94111
21
22
23   (Continued)
24
25
```

TSG Reporting  Worldwide   877-702-9580

CONFIDENTIAL

Page 4

```
1              A P P E A R A N C E S

2

3   FOR THE DEFENDANT, ELIZABETH HOLMES:

4              COOLEY

               BY:  MICHELLE RHYU, Ph.D., Esq.

5              3175 Hanover Street

               Palo Alto, CA 94304

6

7

8   ALSO PRESENT:

9              Josh Headrick, Videographer

10                   ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 5

1          SAN FRANCISCO, CALIFORNIA

2          WEDNESDAY, MARCH 8, 2017

3               9:13 a.m.

4          THE VIDEOGRAPHER:  This is the start of

5   tape labeled No. 1 of the videotaped deposition of

6   Mark Pandori in the matter Partner Investments, LP,

7   et al. versus Theranos, Inc., et al., in the Court

8   of Chancery of the State of Delaware, No. 12816-VCL.

9          This deposition is being held at

10  555 Mission Street, Suite 3000, San Francisco,

11  California, on March 8, 2017, at approximately

12  9:13 a.m.

13         My name is Joshua Headrick, from TSG

14  Reporting, Inc., and I am the legal video

15  specialist.  The court reporter is Lorrie Marchant,

16  in association with TSG Reporting.

17         Will counsel please introduce yourself.

18         MR. BRODSKY:  My name is Reed Brodsky, from

19  Gibson, Dunn & Crutcher.  With me is my colleague

20  Daniel Kuo, and we represent the plaintiffs in this

21  case.

22         MS. GORTON:  Kelly Gorton, from

23  Davis Wright Tremaine, on behalf of the defendant,

24  Ramesh Balwani.

25         MS. RHYU:  Michelle Rhyu, from Cooley, on

I

CONFIDENTIAL

Page 6

1    behalf of Elizabeth Holmes.

2         MS. JEFFRIES:  Andrea Jeffries.  And with

3    me is Jordan Smith, from Wilmer Hale, on behalf of

4    Theranos.

5         MR. BRODSKY:  Do the people on the phone

6    want to identify themselves?

7         MR. McKAY:  John McKay, Davis Wright

8    Tremaine, with Kelly Gorton, representing Defendant

9    Ramesh Balwani.

10         MR. BRODSKY:  Anybody else?  All right.

11         THE WITNESS:  Shall I introduce myself

12    or --

13         MR. BRODSKY:  Not yet.

14         Do you want to swear the witness in.

15         THE VIDEOGRAPHER:  Will the court reporter

16    please swear in the witness.

17                   MARK PANDORI,

18    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

19                EXAMINATION BY MR. BRODSKY

20         BY MR. BRODSKY:

21    Q.   Good morning.

22    A.   Good morning.

23    Q.   Would you please state your name.

24    A.   Mark Pandori.

25    Q.   Mr. Pandori, where do you live, in general?

CONFIDENTIAL

Page 7

```
1      A.    I live in San Francisco, California.

2      Q.    Have you ever been deposed before?

3      A.    Yes, I believe so.

4      Q.    Approximately how many times?

5      A.    Once.

6      Q.    Approximately how long ago?

7      A.    Six years ago.

8      Q.    What's the nature of that case, in general?

9      A.    Eight years ago.

10           I was an expert witness in a case.  Someone

11     was hurt, and they thought I might have something to

12     say about it.

13     Q.    What -- and what was your expertise or what

14     was --

15     A.    Microbiology.

16     Q.    Okay.  And we'll get into your expertise in

17     a little bit.

18           Let me tell you generally, since the

19     deposition was six to eight years ago, what the

20     general rules of a deposition are.

21           You're under oath to tell the truth.  It's

22     the same oath that people take when they go to court

23     and they're before a federal judge or a vice

24     chancellor or a state court judge, and they swear

25     them in and they swear to tell the truth.
```

CONFIDENTIAL

Page 67

1    an immunoassay test, one immunoassay test, what

2    happened next?  Did it read the results of the

3    immunoassay test?

4        A.    It generated, as I recall, a spreadsheet

5    with numerical results that the lab technician would

6    view to come to a conclusion.

7        Q.    Are you familiar with CV, or coefficient of

8    variation --

9        A.    Yes.

10       Q.    -- that terminology?

11             What does that mean?

12       A.    It's the standard deviation divided by the

13   mean.

14       Q.    And -- and was there -- what's the purpose

15   of coefficient of variation?

16       A.    It's a matter of determining when a piece

17   of -- when used in diagnostic science, let's say,

18   when a piece of equipment generates a numerical

19   result, a quantitative result, how much drift is

20   there.

21             If you look, let's say, a singular known

22   compound and put out in a device, how much drift

23   would there be numerically in a result.

24       Q.    And were there variations between the

25   Edisons in reaching results and performing the same

CONFIDENTIAL

Page 68

1    tests?

2            MS. JEFFRIES:  Objection as to form.

3            THE WITNESS:  Were there variations between

4    Edison?

5            BY MR. BRODSKY:

6        Q.   Was there a CV or a coefficient of

7    variation?

8        A.   There's always some coefficient of variance

9    for any piece of laboratory equipment.

10       Q.   Did you have an understanding of what it

11   was for the Edisons, either specifically per Edison

12   or in general?

13       A.   I don't have a number.

14       Q.   Did you have a percentage in mind, a

15   general percentage?

16           MS. JEFFRIES:  Objection as to form.

17           THE WITNESS:  No, I don't have a number in

18   mind.  I'm sorry.  I don't recall.

19           BY MR. BRODSKY:

20       Q.   Okay.

21       A.   I remember that -- go ahead.

22       Q.   No.  Go ahead.  Sorry.

23       A.   I remember that there were particularly

24   large coefficients of variance compared to what I

25   had seen in my career, but I don't remember what the

CONFIDENTIAL

Page 69

1    numbers were.

2        Q.    What -- what had you seen in your career

3    before?

4        A.    Well, it really depends on the piece of

5    equipment that you're working with.  But, you know,

6    a coefficient of -- it depends on the test and the

7    equipment, but a coefficient of variance, you know,

8    a plus or minus, 10, 20 percent wouldn't be that

9    uncommon in a piece of equipment.

10       Q.    And you say "I remember" -- "I remember

11   that there were particularly large coefficient of

12   variance compared to what I had seen in my career."

13             If 10 or 20 -- a variance of plus or minus

14   10 or 20 percent wouldn't be that uncommon in a

15   piece of equipment, are you saying that the

16   particularly large coefficients of variance that you

17   have -- that you compare that with, that you saw in

18   the Edison, was greater than 20 percent?

19       A.    Yes.

20       Q.    Do you have a sense of how much greater

21   than 20 percent?

22             MS. JEFFRIES:  Objection as to form.

23             THE WITNESS:  Numerically?

24             BY MR. BRODSKY:

25       Q.    30 percent?  Greater than 40 percent?

CONFIDENTIAL

Page 73

1      A.    I don't want to take a break right now.

2      Q.    Okay.  Would you like something to drink

3  or --

4      A.    I have -- my meter will expire at 11:08 on

5  my watch.  That means we have 28 minutes before I

6  have to go and put more money in.

7      Q.    That sounds like an automatic break.

8      A.    We'll call it 11.  How's that?

9      Q.    That sounds fine.

10         Now, for the blood that was used on the

11  Edison for the immunoassays, did you have an

12  understanding of whether that blood came from a

13  fingerstick draw or a -- I'm going to mispronounce

14  this, a venous draw?

15      A.    Pronounced correctly.

16         And your question is for diagnostic

17  testing?

18      Q.    As opposed to what?

19      A.    Let's say research or validation study.

20      Q.    Diagnostic testing.

21      A.    For diagnostic testing, the specimens that

22  would go into Edisons were Nanotainer based, which

23  to my knowledge meant they were collected by

24  fingerstick.

25      Q.    Were there any tests done upon your arrival

CONFIDENTIAL

Page 74

1    and during your time there from venous draw as

2    opposed to fingerstick?

3        A.   Yes.

4        Q.   What percentage of the tests overall?

5        A.   When I arrived?

6        Q.   Sure.   When you arrived, and then let's

7    talk about --

8        A.   When I arrived, I would estimate 90 percent

9    of the testing was venous draw.

10       Q.   And did that change over the time that you

11   were there?

12       A.   It was some -- yes.

13       Q.   How did it change?

14       A.   I would say it got closer to -- it changed

15   a lot.   I'm just going to guess it was more like

16   50/50 when I left.   I think it was about 50/50.

17       Q.   And just so we're clear on the distinction,

18   when you arrived and say it was -- when you arrived,

19   you say, "I would estimate 90 percent of the testing

20   was venous draw."

21            Describe the difference between a venous

22   draw and a fingerstick test.

23       A.   A venous draw involves hypodermic needle

24   being inserted into, generally, the arm, not always,

25   and blood being drawn into a -- from a hypodermic

CONFIDENTIAL

Page 75

1   needle into what's often called a Vacutainer.  And a

2   Vacutainer can be -- will have certain chemicals

3   inside it which either allow or disallow clotting.

4          So you can collect, in a Vacutainer on a

5   venous draw, serum or plasma or whole blood.  And it

6   will turn into serum when it clots.  And that's

7   venous draw.  I think everyone in this room probably

8   has had one.

9      Q.   With respect to -- staying with the same

10  topic on the immunoassays performed -- immunoassay

11  test performed on each Edison in the basement,

12  describe the success or failure of those tests, if

13  I'm using terminology --

14          MS. JEFFRIES:  Objection as to form.

15          THE WITNESS:  So --

16          BY MR. BRODSKY:

17      Q.   You may answer.

18          MS. JEFFRIES:  If you understand it.

19          THE WITNESS:  I understand it.

20          So you're asking that -- how often, if we

21  attempt to run a test on an Edison, would we get a

22  result versus how often would we get a result if we

23  ran it on equipment that was not an Edison?

24          BY MR. BRODSKY:

25      Q.   Correct.

CONFIDENTIAL

Page 357

1            DEPOSITION OFFICER'S CERTIFICATE
2   STATE OF CALIFORNIA)
                        ) ss.
3   COUNTY OF SONOMA    )
4            I, LORRIE L. MARCHANT, hereby certify:  I
    am a duly qualified Certified Shorthand Reporter in
5   the State of California, holder of Certificate
    Number CSR 10523 issued by the Court Reporters Board
6   of California and which is in full force and effect.
    (Bus. & Prof. Section 8016)
7            I am not financially interested in this
    action and am not a relative or employee of any
8   attorney of the parties, or of any of the parties.
    (Civ. Proc. Section 2025.320(a))
9            I am authorized to administer oaths or
    affirmations pursuant to California Code of Civil
10  Procedure, Section 2093(b), and prior to being
    examined, the deponent was first duly sworn/affirmed
11  by me.  (Civ. Proc. Section 2025.320, 2025.540(a))
             I am the deposition officer that
12  stenographically recorded the testimony in the
    foregoing deposition and the foregoing transcript is
13  a true record of the testimony given.  (Civ. Proc.
    Section 2025.540(a))
14           I have not and shall not offer or provide
    any services or products to any party's attorney or
15  third party who is financing all or part of the
    action without first offering same to all parties or
16  their attorneys attending the deposition and making
    same available at the same time to all parties or
17  their attorneys.  (Civ. Proc. Section 2025.320(b))
             I shall not provide any service or product
18  consisting of the deposition officer's notations or
    comments regarding the demeanor of any witness,
19  attorney or party present at the deposition to any
    party or any party's attorney or third party who is
20  financing all or part of the action, nor shall I
    collect any personal identifying information about
21  the witness as a service or product to be provided
    to any party or third party who is financing all or
22  part of the action. (Civ. Proc. Section 2025.320(c))
23  Dated:  March 9, 2017
24
    _____
            LORRIE L. MARCHANT, CSR NO. 10523
25          RMR, CRR, CCRR, CRC

# EXHIBIT H

Page 1

1

2     IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

3

      PARTNER INVESTMENTS, L.P., a
4     Delaware limited partnership,
      PFM HEALTHCARE MASTER FUND,
5     L.P., a Cayman Islands limited
      partnership, and PFM HEALTHCARE
6     PRINCIPALS FUND, L.P., a
      Delaware limited partnership,
7
          Plaintiff,
8
      vs.                                 Case No.
9                                         12816-VCL

10

11    THERANOS, INC., a Delaware
      corporation, ELIZABETH HOLMES,
12    an individual, RAMESH BALWANI,
      an individual, and DOES 1-10,

13
                Defendants.
14    ----------------------------/

15

16               ***CONFIDENTIAL***

17          DEPOSITION OF TRACY MASSON

18               Phoenix, Arizona

19          Wednesday, March 15, 2017

20

21

22

23    Reported by:

24    JUDI JOHNSON, CSR No. 50853
                    RMR, CRR, RPR, CLR
25    Job No. 120804

1                TRACY MASSON - CONFIDENTIAL

2                    March 15, 2017

3                     9:00 A.M.

4

5        Confidential videotaped deposition of

6    TRACY MASSON, held at the offices of SNELL &

7    WILMER, LLP, 400 East Van Buren Street,

8    Phoenix, Arizona, before Judi Johnson, a

9    Certified Shorthand Reporter, Registered

10   Merit Reporter, Certified Realtime Reporter

11   and Registered Professional Reporter.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                    TRACY MASSON - CONFIDENTIAL

2    A P P E A R A N C E S

3    FOR THE PLAINTIFFS:

4        GIBSON DUNN & CRUTCHER
         BY:  MATTHEW KAHN, ESQ.
5              ELI LAZARUS, ESQ.
         555 Mission Street
6        San Francisco, CA 94105

7

8

9    FOR THE DEFENDANT THERANOS:

10       WILMERHALE
         BY:  CHRISTOPHER JOHNSTONE, ESQ.
11             IVAN PANCHENKO, ESQ.
         950 Page Mill Road
12       Palo Alto, CA 94304

13

14

15   FOR THE DEFENDANT RAMESH BALWAMI:

16

         DAVIS WRIGHT TREMAINE
17       BY:  ALLISON DAVIS, ESQ. (telephonically)
               KATHLEEN DRUMMY, ESQ. (telephonically)
18       505 Montgomery Street
         San Francisco, CA 94111
19

20

21   (Continued.)

22

23

24

25

0323

```
 1                     TRACY MASSON - CONFIDENTIAL

 2   A P P E A R A N C E S C O N T I N U E D:

 3

 4   FOR THE DEFENDANT, ELIZABETH HOLMES:

 5         COOLEY
           BY:   (NOT PRESENT)
 6         3175 Hanover Street
           Palo Alto, CA 94304
 7

 8

 9

10   ALSO PRESENT:

11   BILL WATTERS - VIDEOGRAPHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              TRACY MASSON - CONFIDENTIAL

 2      BY THE REPORTER:

 3      Q      Please state your name for the record.

 4      A      Tracy Masson, 7013 North Via De Paesia,

 5   Scottsdale, Arizona 85258.

 6              THE VIDEOGRAPHER:  This is the start of

 7      tape labeled Number 1 in the videotape

 8      deposition of Tracy Masson in the matter

 9      Partner Investments, L.P. versus Theranos, Inc.

10      in the Court of Chancery of the State of

11      Delaware, Case No. 12816-VCL.

12              This deposition is being held at 400 East

13      Van Buren Street, Number 1900, Phoenix, Arizona,

14      on March 15th, 2017, at approximately 9:01 a.m.

15              My name is Bill Watters.  I am the legal

16      video specialist from TSG Reporting, Inc.,

17      headquartered at 747 Third Avenue, New York, New

18      York.  The court reporter is Judi Johnson in

19      association with TSG Reporting.

20              Will the counsels please introduce

21      yourselves.

22              MR. KAHN:  Matthew Kahn with Gibson Dunn

23      and Crutcher for plaintiffs.  Also not in the

24      room, but he'll be back in a moment, Eli

25      Lazarus from Gibson Dunn also for plaintiffs.
```

```
1              TRACY MASSON - CONFIDENTIAL
2         MR. JOHNSTONE:  Chris Johnstone of
3     WilmerHale on behalf of the witness, Ms. Masson
4     and Theranos, Inc.
5         And I think we have some people on the
6     phone as well.
7         MS. DAVIS:  Thank you.  Allison Davis of
8     Davis Wright Tremaine for Ramesh Balwani.
9         MR. KAHN:  Good morning, Allison.
10        MS. DRUMMY:  Kathleen Drummy of Davis
11    Wright Tremaine for Ramesh Balwani.
12        MR. KAHN:  Good morning.
13        THE VIDEOGRAPHER:  Will the court
14    reporter please swear in the witness.
15        COURT REPORTER:  Please raise your right
16    hand.
17    TRACY MASSON, having first been duly sworn, was
18 examined and testified as follows:
19 EXAMINATION
20 BY MR. KAHN:
21    Q    Good morning.
22    A    Good morning.
23    Q    Do you pronounce your last name Masson or
24 Masson?
25    A    Masson.
```

Page 32

1                    TRACY MASSON - CONFIDENTIAL

2     but I remember June being the target.

3          Q     Okay.

4          A     Initially.

5          Q     And at some point -- strike that.

6                And who provided you with all this

7     information I've just -- we've been talking about?

8          A     I think Sunny set the date in conjunction

9     with Walgreens.  There was actually a meeting held

10    with Walgreens and Theranos.  It was actually

11    before I officially started, within the week

12    before, so I could get up to speed.

13         Q     So a week or so before January 27, 2014,

14    you attended a meeting with Theranos and Walgreens

15    so you could get up to speed?

16         A     Yeah.  It was -- yes.

17         Q     And who do you recall was present from

18    Walgreens?

19         A     Nimesh.

20         Q     Jhaveri?

21         A     Yeah, Jhaveri.  A woman named Kim, but I

22    don't remember her last name.  I believe Patty

23    Haworth was there.  I don't recall others.

24         Q     Okay.  And Nimesh is N-I-M-E-S-H.

25    N-I-M-E -- yeah.  And then J-H-A-V-E-R-I.

1                    TRACY MASSON - CONFIDENTIAL

2              Who was present from Theranos at that

3    meeting?

4        A     Kimberly MacDowell, Alfonso at the time.

5    Sunny Balwani, Nick Menchel, Max Fosque, Christian

6    Holmes.  I believe Dan Edlin was there too.

7        Q     Okay.  And at that meeting, it was

8    discussed among Theranos and Walgreens that the

9    target for rolling out all 40 stores was sometime

10   in June 2014; is that correct?

11       A     Yes.

12       Q     Okay.

13       A     That was the target.

14       Q     Do you recall what else you were told

15   about the nature of the Walgreens-Theranos

16   partnership in January 2014, other than there was a

17   plan to get to 40 stores by June 2014?

18       A     Well, there was a plan to be nationwide,

19   but I don't recall specifics around the rollout.

20       Q     Okay.  At the time you joined the company

21   and were first told the details of the

22   Walgreens-Theranos partnership, were you told

23   whether there was a guarantee that Walgreens would

24   support 40 stores as opposed to a hope that they

25   would support 40 stores?

1              TRACY MASSON - CONFIDENTIAL

2      A     Okay.  So first of all, I was never privy

3  to all the details of the Walgreens relationship.

4  So I want to be clear about that.  There was

5  tremendous movement.  Everybody -- it was never a

6  question whether Walgreens was gonna do the 40

7  stores.  That was never a question.

8      Q     All right.  Was there -- so strike that.

9            So 40 stores was firm, for sure happening,

10 correct?

11     A     Yeah.  Yes.

12     Q     Okay.  And then what about beyond 40

13 stores.  Was that also, for sure, absolutely

14 happening or was that more of an open question?

15           MR. JOHNSTONE:  Object -- object to form.

16           If you could give me one second.

17           THE WITNESS:  Sorry.

18           MR. JOHNSTONE:  I don't want to interrupt

19     Matt, so give me one second.

20           THE WITNESS:  Okay.

21           MR. JOHNSTONE:  So give me one second and

22     I can object to form and you can answer the

23     question.

24           THE WITNESS:  Okay.

25     A     I -- it was never a question that I

```
 1                TRACY MASSON - CONFIDENTIAL

 2       A      I have no knowledge of that.

 3       Q      Not -- you don't know one way or the

 4   other?

 5       A      I don't.

 6       Q      Okay.  So in January 2014, you joined

 7   Theranos and you are brought up to speed to some

 8   extent on the Walgreens partnership, correct?

 9       A      Yes.

10       Q      Did you ever learn later that anything

11   you had been told in January 2014 about the

12   Walgreens-Theranos partnership was untrue?

13       A      No.

14       Q      Okay.  And am I correct that, during your

15   time at Theranos, you were actively working as part

16   of the Walgreens-Theranos partnership?

17       A      Yes.

18       Q      Okay.  And what would you say that your

19   role was?  Other than being GM of Arizona

20   operations, what was your role in the

21   Theranos-Walgreens partnership?

22       A      Well, since the initial rollout was to

23   the -- the rest of the 40 stores in Arizona, that

24   was my responsibility, to make sure that that

25   rollout got done.
```

```
 1                  TRACY MASSON - CONFIDENTIAL

 2        Q      So your role, at least in 2014, in the

 3    Walgreens-Theranos partnership, was to make sure

 4    the 40-store rollout got done; is that right?

 5        A      Yes.  And to make sure, you know, quality

 6    was there of the operations, all of those kind of

 7    things.

 8        Q      Right.  Make sure it got done right?

 9        A      Yes.

10        Q      Okay.  So I'm going to break this down.

11    As of January 2014, there were two

12    Theranos-Walgreens locations in Arizona, correct?

13        A      Yes.

14        Q      Okay.  And as of January 2014, you

15    understood the plan was to roll out a total of 40

16    Theranos-Walgreens locations in Arizona by

17    June 2014, correct?

18        A      Initially, yes.

19        Q      Okay.

20        A      That was the initial rollout.

21        Q      And as of January 2014, how many total

22    Walgreens-Theranos locations were planned through

23    the end of the year?  End of 2014?

24        A      I don't know.

25        Q      Okay.  Were the Walgreens-Theranos store
```

```
 1              TRACY MASSON - CONFIDENTIAL
 2    rollouts planned as of January 2014 to be rolled
 3    out in phases or waves?
 4        A    I don't recall when the phasing was done.
 5    I think it was understood that it would be phased
 6    because that's just typically the way things get
 7    done, but I don't recall when that decision was
 8    made.  I don't think the actual stores, which
 9    stores when -- that was -- that definitely wasn't
10    done until after January for those 38 stores.
11        Q    Okay.  And do you remember a time when
12    there was a plan to do things in waves?
13        A    Yes.
14        Q    And do you recall how many waves there
15    were planned to be in 2014?
16        A    There were four waves.
17        Q    Okay.
18        A    Not for just 2014, but just for those
19    stores -- those 38 stores.
20        Q    Got it.  The 38 stores were going to be
21    rolled out in four waves, correct?
22        A    Correct.
23        Q    Okay.  And do you recall how many stores
24    were supposed to be rolled out in the first wave?
25        A    Things adjusted over time, so I don't
```

1                    TRACY MASSON - CONFIDENTIAL

2    "Weekly update"?

3        A    Yes.

4        Q    Okay.  And the purpose of sending Mr.

5    Balwani weekly updates was to make sure he was

6    informed on Arizona operations, correct?

7        A    Sure.

8        Q    Okay.  And this E-mail references someone

9    named Nim.  Is that Nimesh Jhaveri of Walgreens?

10       A    Yeah, Nim.

11       Q    Nim.  Okay.

12            And this E-mail says that Nim asked about

13   the "venous draws being such a high percentage."

14            Do you see that?

15       A    I'm -- I'm reading that part.

16            (Witness reviews the document.)

17       Q    Sure.  It's the third bullet.

18       A    I see it.

19       Q    Okay.  What's a "venous draw"?

20       A    It's where you use a needle to draw

21   blood.

22       Q    And what's a "finger-stick draw"?

23       A    That's where you use a mechanism to stick

24   the finger for the blood.

25       Q    Okay.  And am I correct that, in 2014,

Page 47

1                    TRACY MASSON - CONFIDENTIAL

2       venous draw and finger-stick draw were the two

3       methods being used at the Walgreens-Theranos

4       locations to collect patient blood?

5            A      Yes.

6            Q      Okay.  And as of the date of this E-mail,

7       April 14th, 2014, do you know, roughly, what

8       percentage of the draws being conducted at the

9       Walgreens-Theranos locations were venous as opposed

10      to finger stick?

11           A      I don't know for sure.

12           Q      Okay.  What do you recall roughly?

13           A      50 percent.

14           Q      Okay.

15           A      Just under 50 percent.  I don't -- I

16      don't know the time frame, though, to be specific.

17           Q      Okay.  We'll look at more specific

18      things.

19                  Now, do you see in what we just looked at

20      where Mr. Jhaveri -- or you reported that

21      Mr. Jhaveri asked you about the venous draws being

22      such a high percentage?

23           A      Yes.

24           Q      Do you see that?

25                  Okay.  What did you understand him to mean

```
 1                   TRACY MASSON - CONFIDENTIAL
 2   by "such a high percentage"?
 3        A     I don't know.  I can't speak to that.
 4        Q     Do you recall whether in this time frame
 5   of April 2014 the venous-draw percentage was higher
 6   than what Walgreens and/or Theranos had expected it
 7   to be?
 8        A     I don't know.
 9        Q     Okay.  You don't recall?
10        A     I don't know what they expected it to be.
11        Q     You don't know what Walgreens expected
12   the venous percentage to be?
13        A     I don't.
14        Q     Did you have an understanding in 2014
15   that one of the reasons why Walgreens was
16   partnering with Theranos was because of the
17   finger-stick-draw method?
18        A     I think there were a lot of reasons why
19   they were partnering with Theranos.
20        Q     Yes.  But I asked you whether this was
21   one of the reasons.
22              Did you have that understanding in 2014?
23        A     Yes.
24        Q     Okay.  And so did you have an
25   understanding in 2014 that Walgreens expected that
```

Page 223

1                  TRACY MASSON – CONFIDENTIAL

2                  C E R T I F I C A T E

3

4        I, JUDI JOHNSON, RMR, RPR, CRR, CLR, do hereby

5     certify:

6        THAT the witness whose testimony is hereinbefore

7     set forth, was duly sworn by me; and

8        THAT the within transcript is a true record

9     of the testimony given by said witness.  I further

10     certify that I am not related, either by blood or

11     marriage, to any of the parties to this action; and

12        THAT I am in no way interested in the outcome of

13     this matter.

14        IN WITNESS WHEREOF, I have hereunto set

15     my hand this 15th day of March, 2017.

16

17                  _____

18                  JUDI JOHNSON, RMR, RPR, CRR, CLR

19

20

21

22

23

24

25

# EXHIBIT

# I

Confidential

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

3    PARTNER INVESTMENTS, L.P., a
     Delaware limited partnership,
4    PFM HEALTHCARE MASTER FUND,
     L.P., a Cayman Islands limited
5    partnership, and PFM HEALTHCARE
     PRINCIPALS FUND, L.P., a
6    Delaware limited partnership,

7                   Plaintiff,

8        vs.                        Case No. 12816-VCL

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

11

                   Defendants.
12   - - - - - - - - - - - - - - - - - - - - - - - - - - -/

13

14                  ** CONFIDENTIAL **

15       VIDEOCONFERENCE DEPOSITION OF ERIKA CHEUNG

16               Los Angeles, California

17               Tuesday, March 7, 2017

18

19

20

21

22

23   Reported By:

24   SUSAN A. SULLIVAN, CSR #3522, RPR, CRR

25   Job No. 120737

Confidential

Page 2

```
 1              March 7, 2017

 2              5:08 p.m./9:08 a.m.

 3

 4    VIDEOCONFERENCE DEPOSITION OF ERIKA CHEUNG,

 5    taken by Plaintiffs, at the offices of

 6    Gibson, Dunn & Crutcher LLP, 333 South Grand

 7    Avenue, Los Angeles, California, before

 8    Susan A. Sullivan, CSR, RPR, CRR, State of

 9    California.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential

Page 3

1                A P P E A R A N C E S:

2   FOR THE PLAINTIFFS:

3        GIBSON, DUNN & CRUTCHER

4        BY: TIAUNIA BEDELL, ESQ.

5        333 South Grand Avenue

6        Los Angeles, California 90071

7

8        GIBSON, DUNN & CRUTCHER

9        BY:  JOE NGAN, ESQ. (Videoconference)

10       32/F Gloucester Tower

11       15 Queens Road Central

12       Hong Kong, Hong Kong

13

14       GIBSON, DUNN & CRUTCHER

15       BY:  SARAH CUNNINGHAM, ESQ.  (Via telephone)

16       555 Mission Street

17       San Francisco, California 94105

18

19   FOR THE DEFENDANT RAMESH BALWANI:

20       WILMERHALE

21       BY:  WILLIAM ROTH, ESQ. (Via telephone)

22       7 World Trade Center

23       250 Greenwich Street

24       New York, New York 10007

25

Confidential

Page 4

1    APPEARANCES (Continued):

2    FOR THE DEFENDANT RAMESH BALWANI:

3        WILMERHALE

4        BY:  TIMOTHY PERLA, ESQ.  (Via telephone)

5        60 State Street

6        Boston, Massachusetts 02109

7

8    DAVIS WRIGHT TREMAINE

9        BY:  STEPHEN RUMMAGE, ESQ. (Videoconference)

10            JOHN McKAY, ESQ. (Videoconference)

11       1201 Third Avenue

12       Seattle, Washington 98101

13

14    FOR THE DEFENDANT ELIZABETH HOLMES:

15       COOLEY

16       BY:  MICHELLE RHYU, Ph.D., Esq.  (Via telephone)

17       3175 Hanover Street

18       Palo Alto, California 94304

19

20   VIDEOGRAPHER:

21       SAMUEL CHEN

22

23

24

25

Confidential

1          THE VIDEOGRAPHER:  This is the start of

2    media labeled No. 1 of the video deposition of Erika

3    Cheung in the matter Partners Investments LP,

4    et al., versus Theranos, Inc., et al.

5          This deposition is being held Gibson Dunn,

6    LLP, 32nd Floor, Gloucester Tower, The Landmark,

7    Hong Kong, on March 8th, 2017, at approximately

8    9:08.

9          My name is Samuel Chen.  I am the legal

10   video specialist from TSG Reporting, Inc.

11   headquartered at 747 Third Avenue, New York, NY.

12   The court reporter is Susan Sullivan.

13          Counsel, please introduce yourselves.

14          MS. HENRY:  This Tiaunia Bedell -- sorry,

15   Tiaunia Henry, new name -- of Gibson, Dunn &

16   Crutcher, on behalf of Plaintiff PFM.

17          MS. CUNNINGHAM:  And Sarah Cunningham also

18   on behalf of Plaintiff PFM from Gibson, Dunn &

19   Crutcher.

20          MR. PERLA:  This is Timothy Perla from

21   WilmerHale for defendants, and with me is my

22   colleague William Roth also of WilmerHale.

23          MS. RHYU:  This is Michelle Rhyu of the

24   Cooley firm on behalf of Elizabeth Holmes.

25          THE VIDEOGRAPHER:  Will the court reporter

Confidential

Page 6

1   please swear in the witness.

2         MS. HENRY:  Davis Wright Tremaine, did you

3   state your appearance?  Steve Rummage?  Hello?

4         Who joined?

5         MR. RUMMAGE:  This is Steve Rummage.  We

6   were told to mute the audio on our teleconference

7   and join the phone call instead.

8         MS. HENRY:  Great.  Could you please state

9   your appearance.

10         MR. RUMMAGE:  Sure.  It is Steve Rummage,

11   Davis Wright Tremaine, for Defendant Ramesh Balwani.

12         Also John McKay, Davis Wright Tremaine, for

13   the same party.

14

15   ERIKA CHEUNG,

16       called as a witness, having been duly sworn by

17       the court reporter, was examined and testified

18       as follows:

19

20   EXAMINATION

21   BY MS. HENRY:

22       Q    Please state your name for the record.

23       A    Erika Cheung.

24       Q    I'm going to go over some of the rules of

25   the deposition just so we're on the same page as to

Confidential

Page 45

1        And so how she decided to solve the problem

2    is to take out data points and this was done so

3    frequently where she a basically would be like oh,

4    okay, two out of these six data points are outliers

5    so that one passes and that one passes and that one

6    passes.

7        The thing is at that point I didn't

8    understand like no, you can you do that for the

9    obvious reasons of you can't cherry-pick but,

10   secondly, if you have quality controls fail

11   consecutively in the row that breaks Westgard rules

12   and so you can't -- you really have to recalibrate

13   your whole system in order to run a patient sample.

14       But how it was handled was she basically

15   said like I don't know what the issue was, you know,

16   there were outliers, and so from there she generated

17   a patient result.  So, again, that's not the

18   appropriate way to handle quality control.

19   She wasn't a CLS, she is not certified to sort of

20   make those decisions or to make those calls, and --

21   yeah.  I remember this incident very clearly because

22   it really -- it really sort of initiated me sort of

23   waking up and realizing like whoa, there are a lot

24   of problems here.

25       Q   And who was the associate who came in to

Confidential

Page 46

1   help you and dropped some data points?

2       A   Uyen Do.

3       Q   And did Uyen Do explain any criteria for

4   determining what an outlier was?

5       A   No, no one -- I mean, sure, if it was above

6   like 9,000.  There wasn't -- it wasn't like an

7   established protocol of what was an outlier.

8   Oftentimes it was just like play with the numbers

9   until -- until it works, right?  Until you can get

10  it to pass.  So it is like a game, right?  To like

11  figure out what numbers you have to delete to get

12  the average to make your quality control pass.

13  There was no rhyme or reason to what was considered

14  an outlier.  If you were a good scientist like that,

15  no, you never would do something like that.  There

16  was no rhyme or reason to what would constitute an

17  outlier versus what wasn't.  And sometimes even when

18  you would go by the counts of like, oh, it is above

19  9,000, so that must be an outlier.  If it made

20  precision pass we would still keep it in, right?  So

21  that's why there was just no -- there was no clear

22  guideline for what was considered an outlier, it was

23  just like does it give you a thumbs up or a thumbs

24  down.  If it gives you a thumbs up that yeah, sure,

25  that's an outlier.

Confidential

Page 47

1    Q    You also mentioned a CLS.  What is a CLS?

2    A    A CLS is a clinical lab scientist and they

3  are basically certified to determine whether your

4  quality control procedures are good, whether they

5  pass or not, and they kind of give the go ahead to

6  say this patient, patient sample is acceptable to

7  pass onto the patient.  And they have been trained,

8  right, like they've gotten formalized post-secondary

9  training to be able to make those calls.

10    Q    And was Uyen Do a CLS or a clinical lab

11  associate?

12    A    Uyen Do was a lab associate, she worked in

13  research and development.  She had no affiliation

14  with the clinical lab.

15         This -- this particular incident happened

16  before the Theranos proprietary devices and had

17  gotten completely shifted over to the clinical lab

18  and their operations.  So we were processing patient

19  samples before they had even really gone into the

20  clinical lab and were headed by the clinical lab

21  department because they wanted to get -- yeah.  It

22  was before, this particular sample happened before

23  these types of assays had formally been admitted to

24  the clinical, clinical lab where the CLSs were aware

25  of them, where the lab director was aware of them

Confidential

1 longitudinal trending, enabling earlier insight into

2 the onset/progression of disease and reducing

3 unnecessary secondary procedures from results which

4 currently show up as false positive results."

5       When you worked at Theranos did you witness

6 unprecedented lack of variation from system to

7 system?

8     A    No.  Especially -- I mean, if we're just

9 looking at the small scale of Edison to Edison there

10 was a lot of variation; when running the same sample

11 there was a lot of variation.  When you looked at

12 the validation data like over a course of time you

13 saw that things weren't -- weren't staying -- and

14 then also reagent stability, we were constantly

15 seeing a bunch of issues in QCs, right?  QC

16 reference ranges should be good with reagents for a

17 few months and we were having to redo QC pretty

18 frequently.  Sometimes even several months.

19     Q    Can you repeat the last statement?  The

20 court reporter didn't hear you.

21       MR. RUMMAGE:  Somebody is typing furiously

22 next to their phone and I'm wondering if they could

23 mute.  Thanks.

24       MS. HENRY:  Repeat the last portion of it.

25     Q    Yeah.  If you recall it.  Sorry.  I think

Confidential

Page 153

1    you were saying you had to rerun QCs on some

2    frequent basis but I don't know what.

3         A    Right.  Sometimes we would have to rerun QC,

4    basically reestablish QC reference ranges sometimes

5    multiple times within a month.

6         Q    Please turn to the next page, Page 94 of

7    Exhibit 155, which is titled "Transforming the

8    Clinical Lab."

9              On Page 94 of Exhibit 155 the first

10   paragraph on the right-hand side states, "The <10%

11   CV yielded in Theranos' analysis results from

12   elimination of pre-analytic errors, and provides for

13   precise and actionable information that was

14   previously inaccessible."

15             Was it true at the time you were employed at

16   Theranos that there was less than ten percent CV or

17   coefficient of variation yielded in Theranos's

18   analysis?

19        A    No.  Even in one of the emails Adam had

20   brought up that it should have been less than 20

21   percent.  We rarely had CVs less than ten percent.

22   We were lucky if we had CVs less than 20 percent.

23             MS. HENRY:  Okay.  Let's mark the next

24   exhibit which is Tab 6, Joe, 156.  I Think it has

25   already been marked as 136.  Sorry.

Confidential

Page 154

1          MR. NGAN:   136.

2      Q   BY MS. HENRY:  And Exhibit 136 is your

3  complaint to CLIA, correct?

4      A   Correct.

5      Q   If you turn to the page that is Cheung

6  000 -- or, sorry, 011 where your initial complaint

7  from September 19th begins, do you see that?

8      A   Uh-huh.

9      Q   In the first paragraph of your complaint on

10 Cheung 011 you write, "I've been nervous to send or

11 even write this letter."

12         Why were you nervous to make this complaint

13 to CLIA?

14     A   I was nervous to make the complaint because

15 the whole company really sort of made me

16 uncomfortable, yeah.  I didn't trust them.  The way

17 that they were sort of handling secrecy and the fact

18 that vendors would come in, we would have to hide

19 things from people, we were constantly hiding things

20 from all sorts of people, whether it was regulators

21 or whether it was outside vendors or even people

22 that would come in for demos or even from other

23 employees, yeah.

24         At this time when I left this job I also

25 just how aggressive that Sunny was in talking to him

Confidential

1    and the interactions that I had had with him and

2    Mona really drilling into me just like how important

3    confidentiality was and -- I don't know.  I had

4    never -- again, at this point I was a recent

5    graduate out of college, I never expected to sort of

6    really work with a company that had so many internal

7    issues and internal issues like this, so -- ask

8    there was a part of me too that I was so young and I

9    was like you are not an expert in this field so

10   maybe you did misinterpret what went on so it could

11   just be your own, you know, sort of -- you just

12   misjudged the situation.  But I think as it sort of

13   came about and when they did sort of come after me

14   and I realized like when they were furiously calling

15   me and they threaten to sue me, that they were

16   guilty of something; that they knew that they had

17   done things that were wrong and things that were

18   bad.  And so it sort of shifted me from being in

19   this place of being really fearful and being really

20   scared and being really kind of like frightened of

21   potential retaliation.  So we're like no, they're --

22   they're not doing good things in there.  And the

23   assumptions and the judgments that I had were

24   probably -- were definitely accurate and that's why

25   I went ahead with the report because it was like oh,

Confidential

1    okay, you are not -- it is not a case that you were

2    just young and naive and misjudged the situation,

3    like what went on there was not supposed to go on

4    there and your hunches and intuition about --

5    they're essentially lying to patients is probably on

6    point.

7         Q    In the third to the last sentence of your

8    paragraph states, "I'm ashamed of myself for not

9    filing this complaint sooner."

10             Why were you ashamed of yourself?

11        A    Because Theranos had gone on to keep

12   processing patient samples, right?  Like I knew -- I

13   didn't trust the technology.  I wouldn't -- I

14   wouldn't recommend my sister getting this test done,

15   I wouldn't tell my mother to go in and get these

16   tests done, like I had no business to say it was

17   okay to run them on other people.  And the fact

18   people didn't stand up and say anything and people

19   didn't say like -- who knew the technology, who knew

20   the technology side and said no, it is not okay to

21   tell patients that they have these health results

22   when -- when you can't trust it.  And so I felt bad

23   because it had gone on now for a year.  And how many

24   patients, how many patients have they -- have they

25   processed at this point.  And me working for that

Confidential

Page 199

1    employees to continually crank out assays and

2    patient results."

3         How did they use fear and aggressiveness to

4    pressure employees?

5    A    So even in a case like the last day I worked

6    there the big issue that we were running into was

7    when we had done these internal quality control

8    studies like it was clear, right, the patients, the

9    results were all over the place.  And Sunny sat me

10   down in his office like do you know what actually

11   happened there?  What actually happened was that we

12   had a programming error in our script and it was

13   generating faulty results, right?  And this is the

14   reason we're getting this much variation.

15        So I said, okay, fine, you know, that may be

16   the case but we're still not letting these patients

17   know that we trued up the results.  And then

18   additionally, when I went and actually talked to

19   Karthik, and I was like Karthik, you fixed the

20   script, what was the difference between the two

21   results?  And he was like oh, there was no

22   difference between the data, it was just like a

23   typo.  Things like that, right?  Where, you know,

24   I'm getting pulled into his office, I'm being yelled

25   at, I'm being told that my job is on the line if I

Confidential

Page 200

1    don't sort of abide by just processing, blindly

2    processing patient samples.  And yeah, that

3    pressure, that pressure to just keep cranking out

4    assays and to keep working, you know, even crazier

5    hours than most of us work.  Yeah.  A lot of sort of

6    people were scared of losing their jobs which is

7    really hard because a lot of these people have

8    families, a lot of these people were on, you know,

9    were on J-1 visas, they weren't American citizens,

10   so it -- it was tough.  It was a tough culture to be

11   a part of to constantly fear losing your job if you

12   said anything that the CEO or the COO didn't like.

13       Q    You mentioned that you spoke to Karthik

14   about the potential programming issue that Sunny

15   Balwani told you about.  Who is Karthik?

16       A    Karthik is a statistician.  So he handled --

17   he does like bioinformatics work and basically

18   created the R script that we talked about earlier

19   that auto generates the patient result.

20       Q    And your last sentence on Cheung-014 in that

21   paragraph we have been reviewing states, "Theranos'

22   device, LDT assays and lab protocols are too

23   underdeveloped to start running patient samples; but

24   they continue to still process patient sample using

25   their finger-stick technology."

Confidential

Page 201

1          Why did you think that Theranos' lab

2     protocols and assays and devices were

3     underdeveloped?

4          A    I mean, look at the timespan of these

5     emails.

6               MR. RUMMAGE:  Object to the form.  Rummage.

7          Q    BY MS. HENRY:  You can answer.

8          A    Like even -- even if you look at the context

9     of these emails, I worked there for what, 10 months,

10    six months?  I didn't work there for a very long

11    time and you can even just see the iteration of like

12    well, we're doing quality control this way now and

13    now we're doing it this way, or we went from having

14    two-tip pre-filled cartridges to then having

15    two-tipped Capsys cartridges, then we had six-tipped

16    Capsys cartridges all for our designated, you know,

17    set of assays in the immunoassay team, right?  We

18    had all these, all these just moving pieces all the

19    time.  There was no standardization.  Things were

20    constantly changing and constantly reiterating.  And

21    so many times Sunny caught himself like explaining

22    like mistakes that had been made against patients

23    but nothing was done, right?  Whether it was getting

24    our rating control system in order or whether it was

25    getting our quality control system in order.  So

Confidential

Page 278

1                    REPORTER'S CERTIFICATE

2

3           I, SUSAN A. SULLIVAN, CALIFORNIA CSR No.

4    3522, RPR, CRR, do hereby certify:

5           That prior to being examined ERIKA CHEUNG,

6    the witness named in the foregoing deposition, was,

7    before the commencement of the deposition, duly

8    administered an oath in accordance with C.C.P.

9    Section 2094;

10          That the said deposition was taken before

11   me at the time and place therein set forth, and was

12   taken down by me in shorthand and thereafter

13   transcribed into typewriting under my direction and

14   supervision; that the said deposition is a true and

15   correct record of the testimony given by the

16   witness;

17          I further certify that I am neither counsel

18   for, nor in any way related to any party to said

19   action, nor in any way interested in the outcome

20   thereof.

21          IN WITNESS WHEREOF, I have subscribed my

22   name on this 8th day of March, 2017.

23

24          _____

            SUSAN A. SULLIVAN    CSR

25

# EXHIBIT
# J

CONFIDENTIAL

Page 1

1      IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

       PARTNER INVESTMENTS, L.P., a
3      Delaware limited partnership,
       PFM HEALTHCARE MASTER FUND,
4      L.P., a Cayman Islands limited
       partnership, and PFM HEALTHCARE
5      PRINCIPALS FUND, L.P., a
       Delaware limited partnership,           Case No.
6                                              12816-VCL

            Plaintiffs,
7       vs.

8      THERANOS, INC., a Delaware
       corporation, ELIZABETH HOLMES,
9      an individual, RAMESH BALWANI,
       an individual, and DOES 1-10,

10

            Defendants.
11     _____

12

13                 ** CONFIDENTIAL **

14

15       VIDEOTAPED DEPOSITION OF DANISE YAM

16               Palo Alto, California

17             Thursday, March 16, 2017

18

19

20

21

22

23

24     REPORTED BY:
       CYNTHIA MANNING, CSR No. 7645, CLR, CCRR
25     JOB NO. 120830

CONFIDENTIAL

Page 2

1

2

3                          March 16, 2017

4                           10:07 a.m.

5

6

7

8            Videotaped deposition of DANISE YAM, held

9    at Gibson, Dunn & Crutcher LLP, 1881 Page Mill Road,

10   Palo Alto, California, before Cynthia Manning,

11   Certified Shorthand Reporter No. 7645, Certified

12   LiveNote Reporter, California Certified Realtime

13   Reporter.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

```
 1    A P P E A R A N C E S:

 2

 3

 4         GIBSON, DUNN & CRUTCHER

 5         Attorneys for Plaintiffs

 6              555 Mission Street

 7              San Francisco, CA 94105

 8         BY:  MATTHEW KAHN

 9              ANGELA POON

10

11

12         WILMERHALE

13         Attorneys for Defendant Theranos, Inc.

14              1875 Pennsylvania Avenue, NW

15              Washington, DC 20006

16         BY:  CHRISTOPHER DAVIES

17              MEGHAN INGRISANO

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 4

1    A P P E A R A N C E S (continued):

2

3

4          DAVIS WRIGHT TREMAINE

5          Attorneys for Defendant Ramesh Balwani

6               1201 Third Avenue

7               Seattle, WA 98101

8          BY:   BENJAMIN BYER (Telephonically)

9

10

11

12

13         COOLEY

14         Attorneys for Defendant Elizabeth Holmes

15               1700 Seventh Avenue

16               Seattle, WA 98101

17         BY:   JEFF LOMBARD

18

19

20         Also present:

21               Marcus Majers, Videographer

22

23

24

25

CONFIDENTIAL

Page 5

1              PALO ALTO, CALIFORNIA;

2         THURSDAY, MARCH 16, 2017; 10:07 A.M.

3

4

5         THE VIDEOGRAPHER:  Good morning.

6              This is the start of tape labeled Number 1

7    of the videotaped deposition of Danise Yam in the

8    matter of Partner Investments, L.P., et al., versus

9    Theranos, Inc., et al., in the Court of Chancery of

10   the State of Delaware.  Case Number 12816-VCL.

11             This deposition is being held at 1881 Page

12   Mill Road, Palo Alto, California, on March 16th,

13   2017, at approximately 10:07 a.m.

14             My name is Marcus Majers, from TSG

15   Reporting, Inc., and I am the legal video

16   specialist.

17             The court reporter today is Cynthia

18   Manning, in association with TSG Reporting.

19             Will all counsel present please introduce

20   themselves?

21             MR. KAHN:  Matthew Kahn, from Gibson, Dunn

22   & Crutcher, for plaintiffs.

23             MS. POON:  Angela Poon, from Gibson, Dunn &

24   Crutcher, for the plaintiff.

25             MR. DAVIES:  Chris Davies, of WilmerHale,

CONFIDENTIAL

Page 6

1    for Danise Yam.

2           MS. INGRISANO:  Meghan Ingrisano, from

3    WilmerHale, for Danise Yam.

4           MR. LOMBARD:  Jeff Lombard from Cooley on

5    behalf of Elizabeth Holmes.

6           MR. BYER:  Ben Byer, from Davis Wright

7    Tremaine, on behalf of Sunny Balwani.

8           THE VIDEOGRAPHER:  Thank you.

9           Will the court reporter please swear in the

10   witness.

11

12                    DANISE YAM,

13           having first been duly sworn, testified as

14           follows:

15

16                    EXAMINATION

17   BY MR. KAHN:

18       Q.  Good morning, Ms. Yam.

19       A.  Good morning.

20       Q.  Have you ever been deposed before?

21       A.  No.

22       Q.  Okay.  I'm going to just quickly go through

23   a couple of the ground rules so we're all on the

24   same page.

25           Okay?

CONFIDENTIAL

Page 140

1       "Theranos has provider agreement in place

2       with UHG, the largest private insurer in

3       the U.S."

4       Do you see that?

5    A.   Yes.

6    Q.   As of January 2014, to your knowledge, did

7  Theranos have a provider agreement in place with

8  UHG?

9    A.   Not sure what UHG is.

10    Q.   So you -- so as of January 2014, you knew

11  that Theranos had some provider agreements in place

12  with the insurance companies you mentioned, but you

13  had never heard of an agreement with UHG?

14       MR. DAVIES:  Object as to form.

15       THE WITNESS:  Right.  I know -- I knowed

16  about those contract that I mentioned with

17  BlueCross, because they paid us.  So I saw the money

18  from the bank accounts.

19  BY MR. KAHN:

20    Q.   You can put Exhibit 432 to the side, but

21  leave the laptop open.  We're going to get back to

22  that spreadsheet.

23       You mentioned a couple of times today 409A

24  reports.

25       What is a 409A report?

CONFIDENTIAL

Page 141

1      A.   How I understand that report is the
2  valuation of the company's common stock.   That's
3  what I use that for.
4      Q.   Okay.   And what are the -- first of all,
5  did Theranos typically hire a third party to conduct
6  the valuation of the common stock and generate a
7  409A report?
8      A.   Yes.
9      Q.   Okay.   And was that company Aranca?
10     A.   Yes.
11     Q.   Okay.   And in order for Aranca to do its
12 job and generate a 409A report, you needed to send
13 Aranca some information; correct?
14     A.   Correct.
15     Q.   What were the types of information that you
16 would send to Aranca so that it could create the
17 409A reports?
18     A.   Typically, it would be our capitalization
19 summary, the historical number, and the projection.
20     Q.   Okay.   And when you sent Aranca the
21 historical financial numbers of Theranos, you were
22 careful to make sure that you were sending what you
23 believed to be accurate information; correct?
24     A.   Correct.
25     Q.   And when you sent Theranos projections

CONFIDENTIAL

Page 142

1    of -- sorry, strike that.

2          When you sent Aranca projections of

3    Theranos' future financial performance, you were

4    careful to make sure that the projections were as

5    reliable as you could make them; is that fair?

6          A.   Correct.

7          Q.   Okay.  And what is the purpose of a 409A

8    report?  I understand you said that it's to value

9    the common stock, but, you know, so what.  What do

10   you use it for?

11         MR. DAVIES:  Object to the form.

12   BY MR. KAHN:

13         Q.   Go ahead.

14         A.   Okay.  For my purpose, I use that for the

15   option -- for granting option.

16         Q.   Okay.  So you understood that one of the

17   purposes of the 409A report was, when an employee of

18   Theranos, maybe former employee, who had stock

19   options wanted to exercise the options, and you

20   needed to figure out the price; is that right?

21         A.   Well, yes.  So that's one purpose.

22         The main purpose is for the board to grant

23   option at the fair market value.

24         Q.   Okay.  So when you wanted to issue options

25   to someone new?

CONFIDENTIAL

Page 146

1      A.   Yes.

2      Q.   Okay.  Now, in the "IS" tab, in the top

3  left-hand corner, it says, "Theranos, Inc. February

4  13, 2015."

5           And so am I correct that this document was

6  generated on February 13th, 2015 or thereabouts?

7      A.   Right.

8      Q.   Okay.  And the information in this document

9  is accurate, to the best of your knowledge, as of

10  February 13th, 2015; right?

11      A.   Right.

12      Q.   Okay.  So if you take a look on the income

13  statement, as reflected here in the attachment

14  that's part of 433, you see it's got first -- at the

15  top, it says "figures and dollars."

16           Do you see that?

17      A.   Right.

18      Q.   And then it has "FY 2010, FY 2011," and so

19  on.

20      A.   Yes.

21      Q.   "FY" stands for "fiscal year"?

22      A.   Yes.

23      Q.   Okay.  And am I correct that the numbers

24  here are -- oh, I see.  Okay.  Hold on a second.

25           MR. KAHN:  Let's go off the record for one

CONFIDENTIAL

Page 147

1    minute.  I think I am showing you a different

2    document than I want to show you.  Oh, we got to

3    change the tape?  Great timing.

4           THE VIDEOGRAPHER:  This marks the end of

5    the Disc Number 2.  Off the record at 2:04 p.m.

6           (Recess taken)

7           MR. KAHN:  This marks the beginning of Disc

8    Number 3 in the continuing deposition of Danise Yam.

9    Back on the record at 2:21 p.m.

10          (Deposition Exhibit 434 was marked for

11          identification)

12   BY MR. KAHN:

13      Q.  Okay.  Ms. Yam, you've been handed a

14   document that's been marked Exhibit 434.  It's an

15   e-mail chain with some attachments.  The top-level

16   e-mail is dated -- oh, thanks -- April 4th, 2014.

17      A.  Yes.

18      Q.  And the Bates range starts at

19   THPFM0001449029.

20          And you recognize this as something you

21   sent to Aranca; correct?

22      A.  Yes.

23      Q.  Okay.  And am I correct that, just as with

24   433, the attachments that you sent to Aranca

25   reflecting historical and projections for Theranos'

CONFIDENTIAL

Page 148

1    finances were accurate, to the best of your

2    knowledge, at the time you sent them?

3         A.   Yes.

4         Q.   Okay.  Great.

5              So I want to do the same exercise that we

6    started to do at 433 with 434.

7              And so can you again turn to the attachment

8    that, at the bottom, is labeled "IS."

9         A.   Yes.

10        Q.   Okay.  And am I correct that "IS" is short

11   for "income statement"?

12        A.   Yes.

13        Q.   And this document, at the top left-hand

14   corner, says "March 31, 2014."

15             So is the information in this document

16   correct, to the best of your knowledge, as of March

17   31, 2014?

18        A.   Correct.

19        Q.   Okay.  And for the first four columns on

20   the "IS" tab of Exhibit 434, am I correct that those

21   are historical numbers, because we're in 2014 now

22   and looking at '10, '11, '12, '13?

23        A.   Yes.

24        Q.   Okay.  In the '14 -- FY 2014 and onward,

25   those are projections; correct?

CONFIDENTIAL

Page 153

1    said that you got these projections from Theranos

2    management.

3        A.   Components of that.

4        Q.   I see, okay.

5             So am I correct that the projections that

6    we've just talked about are derived from components

7    provided to you by Theranos management?

8        A.   There are some components that are provided

9    by management, yes.

10       Q.   Okay.  And Mr. Balwani gave you some of

11   those components?

12       A.   Yes.

13       Q.   And Ms. Holmes gave you some of those

14   components?

15       A.   Yes.

16       Q.   And before you sent the e-mail and

17   attachments reflected in Exhibit 434 to Aranca, did

18   you get approval to do so from Mr. Balwani and

19   Ms. Holmes?

20       A.   Yes.

21       Q.   Okay.  So now I'd like you to take a look

22   at Exhibit 64, okay, which is the one on your

23   computer.

24       A.   Okay.

25       Q.   Okay?  Is it still up there?

CONFIDENTIAL

Page 154

1          A.   Yeah.

2          Q.   And let's start with the income statement,

3     the "Pro forma Income Statement" tab.

4               Can you go to that tab, please.

5          A.   Yeah.

6          Q.   And then I'd also like you to go to -- in

7     Exhibit 434, back to the "IS" tab, okay?

8          A.   Yep.

9          Q.   All right.  Now, in Exhibit 64, do you see

10    cell P20?

11         A.   Yeah.

12         Q.   Okay.  And do you see that, in that cell

13    320 [sic], this pro forma income statement is

14    projecting $261 million in total revenue for 2014?

15         A.   Yes.

16         Q.   Okay.  And if you look back to Exhibit 434,

17    the total revenue projected for fiscal year 2014 is

18    only $50 million.

19              Do you see that?

20         A.   Yes.

21         Q.   And Exhibit 64 is from January 2014.

22    Exhibit 434 is from a month and a half later, March

23    2014.

24              Do you have any understanding of why there

25    is an almost 211-million-dollar difference between

CONFIDENTIAL

Page 155

1   the two revenue projections reflected in these two

2   documents?

3        A.   I'm not sure.

4        Q.   Okay.   Let's take a look now at tab --

5   sorry, at cell Q20 in Exhibit 64, okay?

6        A.   Yep.

7        Q.   Do you see that?

8        A.   Yes.

9        Q.   And do you see that that cell is projecting

10  total revenue for Theranos in 2015 of $1.68 billion.

11       Do you see that?

12       A.   Yes.

13       Q.   But if you look back at Exhibit 434, that

14  document, which was only created a month and a half

15  after Exhibit 64, is projecting go only $133,769,000

16  in revenue for fiscal year 2015.

17       Do you see that?

18       A.   Right.

19       Q.   Do you have an understanding of why there

20  is such a massive discrepancy of almost $1.5 billion

21  between the two revenue figures in these two

22  documents?

23       A.   Not sure.

24       Q.   Does that strike you as odd?

25            MR. DAVIES:   Object to form.

CONFIDENTIAL

1          THE WITNESS:  I am not sure.  I don't know.

2    I mean, this -- I only saw this spreadsheet

3    yesterday.

4    BY MR. KAHN:

5        Q.  Okay.  Because Exhibit 434 is something

6    that you personally worked on and vetted before it

7    was sent out of Theranos to Aranca; correct?

8          MR. DAVIES:  Object as to form.

9          THE WITNESS:  Yes.

10   BY MR. KAHN:

11       Q.  But Exhibit 64 is something that you never

12   even set eyes on until yesterday; right?

13       A.  Correct.

14       Q.  And so when Exhibit 64 was sent outside of

15   Theranos to my client, Partner Fund Management, you

16   had never even looked at it before; correct?

17       A.  Correct.

18       Q.  Let's take a look now, in that same tab in

19   Exhibit 64, at the "Gross Profit" line, which is

20   line 31.

21          Do you see that?

22       A.  Yeah.

23       Q.  Okay.  And do you see that, in cell P31,

24   Exhibit 64 is projecting $165 million in gross

25   profit for 2014?

CONFIDENTIAL

Page 157

1      A.   Yes.

2      Q.   But if you look back to Exhibit 434, which

3   was created only a month after a half after Exhibit

4   64, here, Theranos management is projecting only $35

5   million in gross profit for 2014; right?

6      A.   Right.

7      Q.   Do you have any explanation for why there

8   is about 161.5-million-dollar difference between

9   these two gross profit figures?

10          MR. DAVIES:   Object as to form.

11   BY MR. KAHN:

12     Q.   You know what, I -- sorry, that's not good

13   math.

14          About a hundred and -- 125 --

15   130-million-dollar difference?   Is that what it is?

16          MR. DAVIES:   Still object as to form.

17          THE WITNESS:   I'm not sure.

18   BY MR. KAHN:

19     Q.   Okay.   Take a look at cell Q31.

20          Did you see that cell in Exhibit 64?

21     A.   Yes.

22     Q.   And do you see there that Exhibit 64 is

23   projecting a 1.8 -- 1.081-billion-dollar gross

24   profit for 2015?

25     A.   Yes.

CONFIDENTIAL

Page 158

1     Q.   Okay.  But then, if you look at Exhibit

2   434, which was created only a month and a half after

3   Exhibit 64, do you see that Theranos management

4   here, in this document, is projecting only about

5   100-million-dollar gross profit for 2015?

6     A.   Yes.

7     Q.   Do you have any explanation for why there

8   is a nearly 1-billion-dollar difference between the

9   gross profit projected in Exhibit 64 and the gross

10   profit projected in this document, Exhibit 434, that

11   you vetted before it went out to Aranca?

12     A.   Not sure.

13     Q.   Can you think of any reason?

14          MR. DAVIES:  Object to form.

15          THE WITNESS:  I don't know.  I -- I don't

16   know what this spreadsheet in front of me, Exhibit

17   64 -- I don't know what -- I just don't know what

18   that is.  Don't know enough about it.

19   BY MR. KAHN:

20     Q.   I understand.

21          Let me ask you this:  You worked at

22   Theranos between January and end of March 2014;

23   right?

24     A.   Yes.

25     Q.   Did anything of extraordinary significance

CONFIDENTIAL

Page 159

1   to Theranos future profitability occur in that

2   two-month period that maybe could explain this

3   massive difference between these two documents?

4          MR. DAVIES:  Object as to form.

5          MR. LOMBARD:  Object to form.

6          THE WITNESS:  I wasn't really involved in

7   the operation or dealing with customers, so I don't

8   know what could have -- like -- if there is any,

9   like, reason that I'm not aware of.

10  BY MR. KAHN:

11      Q.  Sure.

12        But even though you are not involved in

13  operations, you learned about significant things

14  that happened at Theranos, like the Walgreens

15  partnership and the Safeway partnership and stuff

16  like that; right?

17      A.  I learned about that if there is any cash

18  impacts.  Like, if I receive cash, then I would

19  knowed about that.  But there are some thing --

20  contract that may not have immediate cash impacts.

21      Q.  So can you turn back to that "Cash Flow

22  Statement" tab in Exhibit 434, and also go to the

23  "Cash Flow" tab in Exhibit 64.  I want to ask you

24  about something.

25      A.  Yeah.

CONFIDENTIAL

Page 160

1       Q.  Okay.  Now, do you see, in Exhibit 64, in

2   the "Summary Cash Flow Statement" tab, in cell

3   Q25 -- do you see that this document is projecting

4   $365 million in cash on hand at Theranos at the end

5   of December of 2015?

6       A.  Yes.

7       Q.  Okay.  But if you look back at Exhibit 434,

8   which was only created a month and a half after

9   Exhibit 64, do you see that in this document

10  Theranos is projecting only $67 million in cash on

11  hand at the end of 2015?

12      A.  Yes.

13      Q.  Do you have any explanation for that nearly

14  300-million-dollar difference in the two cash

15  projection figures, when these two spreadsheets were

16  only created a month and a half apart?

17          MR. DAVIES:  Object as to form.

18          THE WITNESS:  Not sure.

19  BY MR. KAHN:

20      Q.  Okay.  So looking, in particular, at

21  Exhibit 434 and the cash flow statement --

22          Are you looking at that?

23      A.  Yeah.

24      Q.  -- there is a lot of line items on here.

25          Did you decide which line items -- I don't

CONFIDENTIAL

Page 161

1    mean the dollar values.  I mean the categories --

2    should go into this cash flow statement?

3         A.   Do I decide?

4         Q.   Yeah.

5         A.   Do I decide?

6         Q.   Well, here's what I'm trying to figure out;

7    right?

8              Okay.  So you are building a cash flow

9    statement, okay?

10        A.   Right.

11        Q.   And one of the items on here is inventory.

12        A.   Mm-hmm.

13        Q.   Do you think inventory is something

14   important to have in a cash flow statement for it to

15   be accurate?

16        A.   So normally this -- this cash flow

17   statement, depending on how much detail we want it

18   to be, then it depends on how the balance sheet is

19   presented.  And whatever that is on the balance

20   sheet, then you just put it onto the cash flow

21   statements.  So if inventory is in balance sheet,

22   then the inventory will be in the cash flow

23   statement, if you want that kind of detail.

24        Q.   Okay.  You can put Exhibit 434 to the side.

25             Can I get tab 11, please.

CONFIDENTIAL

Page 217

1          REPORTER'S CERTIFICATE

2          I, CYNTHIA MANNING, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5          That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    that any witnesses in the foregoing proceedings,

8    prior to testifying, were placed under oath; that a

9    verbatim record of the proceedings was made by me

10   using machine shorthand which was thereafter

11   transcribed under my direction; further, that the

12   foregoing is an accurate transcription thereof.

13         I further certify that I am neither

14   financially interested in the action, nor a relative

15   or employee of any attorney of any of the parties.

16         Before completion of the deposition, review

17   of the transcript [ ] was [X] was not requested.  If

18   requested, any changes made by the deponent (and

19   provided to the reporter) during the period allowed

20   are appended hereto.

21         In witness whereof, I have subscribed my

22   name this 16th day of March 2017.

23

24   _____

25         CYNTHIA MANNING, CSR No. 7645, CCRR, CLR

# EXHIBIT

# K

**CERTIFIED COPY**

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

3    PARTNER INVESTMENTS, L.P., a
     Delaware limited partnership,
4    PFM HEALTHCARE MASTER FUND,
     L.P., A Cayman Islands limited
5    partnership, and PFM
     HEALTHCARE PRINCIPALS FUND,
6    L.P., a Delaware limited
     partnership,
7
                    Plaintiffs,
8
          vs.                          C.A. No. 12816-VCL
9
     THERANOS, INC., a Delaware
10   corporation, ELIZABETH HOLMES,
     an individual, and RAMESH
11   BALWANI, an individual, and
     DOES 1 - 10,
12
                    Defendants.
13   ─────────────────────────────

14

15

16          VIDEO DEPOSITION OF XINWEI "SAM" GONG

17                   March 3, 2017

18

19

20

21

22

23   Reported by:
     QUYEN N. DO
24   CSR No. 12447
     420903
25

**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine       (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose         (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez         (702) 368-0500 Las Vegas     (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills   (702) 368-0500 Henderson     (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4811 Brooklyn         (518) 490-1910 Albany        (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai      001+1+800 222 1231 Hong Kong

1  IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

3  PARTNER INVESTMENTS, L.P., a
   Delaware limited partnership,
4  PFM HEALTHCARE MASTER FUND,
   L.P., A Cayman Islands limited
5  partnership, and PFM
   HEALTHCARE PRINCIPALS FUND,
6  L.P., a Delaware limited
   partnership,

7
                Plaintiffs,
8
        vs.                          C.A. No. 12816-VCL
9
   THERANOS, INC., a Delaware
10 corporation, ELIZABETH HOLMES,
   an individual, and RAMESH
11 BALWANI, an individual, and
   DOES 1 - 10,
12
                Defendants.
13  _____

14

15

16        VIDEO DEPOSITION OF XINWEI "SAM" GONG

17              March 3, 2017

18               9:06 a.m.

19

20           1881 Page Mill Road

21          Palo Alto, California

22

23 Reported by:

24 QUYEN N. DO

25 CSR No. 12447

                        1

ARKLEY
surt Reporters

```
 1   APPEARANCES:

 2

 3        For Plaintiffs:

 4             GIBSON, DUNN & CRUTCHER LLP
               WINSTON Y. CHAN, ESQ.
 5             ELI M. LAZARUS, ESQ.
               555 Mission Street
 6             San Francisco, California  94105-0921
               415.393.8362
 7             415.393.8340
               415.374.8460 Fax
 8             wchan@gibsondunn.com
               elazarus@gibsondunn.com
 9

10        For Defendant Elizabeth Holmes:

11             COOLEY LLP
               ALEXANDRA M. LEEPER , ESQ.
12             3175 Hanover Street
               Palo Alto, California  94304-1130
13             650.843.5376
               650.849.7400 Fax
14             aleeper@cooley.com

15

          For Defendant Theranos, Inc.:
16
               DAVIS WRIGHT TREMAINE LLP
17             KELLY M. GORTON, ESQ.
               505 Montgomery Street, Suite 800
18             San Francisco, California  94111-6533
               415.276.6584
19             415.276.6599 Fax
               kellygortong@dwt.com
20

21

22

23

24   //

25   //
```

2

ARKLEY
rt Reporters

```
 1    APPEARANCES (cont.):

 2

 3            WILMER CUTLER PICKERING HALE and DORR LLP
              S. ZUBIN GAUTAM, ESQ.
 4            MICHAEL MUGMON, ESQ.
              950 Page Mill Road
 5            Palo Alto, California  94304
              650.600.5091
 6            650.858.6103
              650.858.6100 Fax
 7            Zubin.Gautam@wilmerhale.com
              Michael.Mugmon@wilmerhale.com
 8

 9       Also Present:

10            Michael Barber, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                              3
```

BARKLEY
Court Reporters

```
 1                    PALO ALTO, CALIFORNIA;

 2                FRIDAY, MARCH 3, 2017, 9:06 A.M.

 3

 4                          --oOo--

 5

 6           THE VIDEOGRAPHER:  Good morning.  My name

 7    is Michael Barber.  I'm a videographer associated

 8    with Barkley Court Reporters, located at 201

 9    California Street, Suite 375, San Francisco,

10    California 94111.  The date is March 3rd, 2017.  The

11    time is 9:06 a.m.  This deposition is taking place

12    at Gibson Dunn & Crutcher LLP, in Palo Alto,

13    California, in the matter of Partner Investments

14    L.P., et al., vs. Theranos, Inc., et al., in the

15    Court of Chancery of the state of Delaware, CA No.

16    12816-VCL.  This is the videotape deposition of Sam

17    Gong, being taken on behalf of the Plaintiff.

18           Counsel, would you please identify

19    yourselves for the record and state whom you

20    represent.

21           MR. CHAN:  Winston Chan and Eli Lazarus

22    for Gibson Dunn for the Plaintiffs.

23           MR. MUGMON:  Michael Mugmon of Wilmer

24    Cutler Pickering Hale and Dorr on behalf of Sam Gong

25    and Defendant Theranos.
```

8

BARKLEY
ourt Reporters

09:08 1        MR. GAUTAM:  Zubin Gautam of WilmerHale on

09:08 2   behalf of Sam Gong and Defendant Theranos.

09:08 3        MS. GORTON:  Kelly Gorton of Davis Wright

09:08 4   Tremaine on behalf of Ramesh Balwani.

09:08 5        MS. LEEPER:  Alexandra Leeper of Cooley on

09:08 6   behalf of Defendant Elizabeth Holmes.

09:08 7        MR. CHAN:  Anyone on the phone?

09:08 8             (No response)

09:08 9        THE VIDEOGRAPHER:  Thank you.

09:08 10       MR. CHAN:  I guess I'm going to hang up

09:08 11  the phone, then.  Is that okay?

09:08 12       MR. MUGMON:  Why don't we leave the line

09:08 13  open just in case somebody --

09:08 14       MR. CHAN:  Okay.

09:08 15       MR. MUGMON:  -- joins?

09:08 16       THE VIDEOGRAPHER:  Thank you.

09:08 17       Will the court reporter please swear in

09:08 18  the witness?

09:08 19             --oOo--

09:08 20       XINWEI "SAM" GONG,

09:08 21  having been first duly sworn, was examined and

09:08 22             testified as follows:

09:08 23  //

09:08 24  //

09:08 25  //

9

BARKLEY
Court Reporters

10:33  1    the Edison?

10:33  2         A    Some immunoassays.

10:33  3         Q    Which ones; do you know?

10:33  4         A    I don't know the list.

10:33  5         Q    Approximate number?

10:33  6         A    I -- I read the same Wall Street Journal

10:33  7    that you did.

10:33  8         Q    Well, apart from what you learned from the

10:33  9    Wall Street Journal article, do you have knowledge

10:33 10    as to the approximate number of immunoassays that

10:33 11    could be run on the Edison device?

10:33 12         A    No.

10:33 13         Q    Do you know if the assays that were run on

10:33 14    the Edison were Theranos in-house-developed assays?

10:33 15         A    I don't know.

10:33 16         Q    So, in the summer of 2013, when you

10:33 17    started working on the ADVIA project -- and when I

10:33 18    use the -- the term "ADVIA project," do you know

10:33 19    what I'm referring to?

10:33 20         A    Yes.

10:33 21         Q    When you worked on that project, what was

10:33 22    your understanding as why it was necessary to port

10:34 23    the Theranos-developed assays that you had been

10:34 24    working on for the mono lab -- miniLab to a

10:34 25    different device?

74

ARKLEY
urt Reporters

10:34  1          A     I was not told why.

10:34  2          Q     Did you have an understanding that it was

10:34  3     determined that the Theranos-developed devices could

10:34  4     not be used, at that time, to test clinical samples?

10:34  5                 MR. MUGMON:  Objection.

10:34  6                 THE WITNESS:  I was not told that.

10:34  7     BY MR. CHAN:

10:34  8          Q     Did you have that understanding?

10:34  9                 MR. MUGMON:  Objection.

10:34 10                 THE WITNESS:  No.

10:34 11     BY MR. CHAN:

10:34 12          Q     Did you -- in the summer of 2013, did you

10:35 13     have discussions, with anybody in the company, about

10:35 14     why the company sought to -- to be able to run its

10:35 15     assays on the Siemens ADVIA device?

10:35 16          A     I was told not to talk to people about the

10:35 17     project.

10:35 18          Q     You were told not to talk to people about

10:35 19     the project?

10:35 20          A     Correct.

10:35 21          Q     By whom?

10:35 22          A     Daniel Young.

10:35 23          Q     Did he say why?

10:35 24          A     No.

10:35 25          Q     Did he say who -- who made the decision to

                                    75

ARKLEY
urt Reporters

10:35  1    seek to try to run Theranos assays on the ADVIA?

10:35  2         A    No.

10:35  3         Q    Did you ever talk to Elizabeth Holmes

10:35  4    about the ADVIA project that you worked on?

10:35  5         A    Yes.

10:35  6         Q    What did you discuss with her?

10:35  7         A    She just told me that it was an important

10:35  8    project.

10:35  9         Q    Anything else?

10:36  10        A    She checked in on the progress every now

10:36  11   and then.

10:36  12        Q    With you?

10:36  13        A    Yes.

10:36  14        Q    How would she check in with you?

10:36  15        A    There were some meetings and e-mail

10:36  16   exchanges.

10:36  17        Q    Were these one-on-one with her or with

10:36  18   others?

10:36  19        A    Usually with others.

10:36  20        Q    What about with Mr. Balwani?

10:36  21        A    He was in the room sometimes.

10:36  22        Q    Did he also check in with you by e-mail?

10:36  23        A    Yes.

10:36  24        Q    Any other members of Theranos management

10:36  25   that you discussed the status of the ADVIA project?

76

ARKLEY
urt Reporters

```
1                DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA      )
                              )  ss.
4    COUNTY OF SAN FRANCISCO  )

5

6            I, QUYEN N. DO, hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter, in the State of California, holder of

9    Certificate Number CSR 12447 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Bus. & Prof. § 8016)

12           I am not financially interested in this action

13   and am not a relative or employee of any attorney of the

14   parties, or of any of the parties.  (Civ. Proc. §

15   2025.320(a))

16           I am authorized to administer oaths or

17   affirmations pursuant to California Code of Civil

18   Procedure, Section 2093(b) and prior to being examined,

19   the deponent was first placed under oath or affirmation

20   by me. (Civ. Proc. §§ 2025.320, 2025.540(a))

21           I am the deposition officer that

22   stenographically recorded the testimony in the foregoing

23   deposition and the foregoing transcript is a true

24   record of the testimony given.  (Civ. Proc. §

25   2025.540(a))
```

246

BARKLEY
Court Reporters

1          I have not, and shall not, offer or provide

2     any services or products to any party's attorney or

3     third party who is financing all or part of the action

4     without first offering same to all parties or their

5     attorneys attending the deposition and making same

6     available at the same time to all parties or their

7     attorneys.  (Civ. Proc. § 2025.320(b))

8          I shall not provide any service or product

9     consisting of the deposition officer's notations or

10    comments regarding the demeanor of any witness,

11    attorney, or party present at the deposition to any

12    party or any party's attorney or third party who is

13    financing all or part of the action, nor shall I collect

14    any personal identifying information about the witness

15    as a service or product to be provided to any party or

16    third party who is financing all or part of the action.

17    (Civ. Proc. § 2025.320(c))

18    Dated: MARCH 6, 2017

19

20

21

22

23    _____

24

25

247

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2                  (Civ.Proc. § 2025.520(e))

 3    STATE OF CALIFORNIA      )
                               )  ss.
 4    COUNTY OF SAN FRANCISCO  )

 5

 6            I, QUYEN N. DO, hereby certify:

 7            I am the deposition officer that

 8    stenographically recorded the testimony in the foregoing

 9    deposition.

10            Written notice pursuant to Code of Civil

11    Procedure, Section 2025.520(A), having been sent, the

12    deponent took the following action within the allotted

13    period with respect to the transcript of the deposition:

14            (  ) In person, at the office of the

15    deposition officer, made the changes set forth on the

16    original of the transcript.  (The parties attending the

17    deposition have been notified of said changes.)

18            (  ) Approved the transcript by signing it.

19            (  ) Refused to approve the transcript by not

20    signing it.

21            (  ) By means of a signed letter, made the

22    changes and approved or refused to approve the

23    transcript as set forth therein.  (Said letter has been

24    attached to the original transcript and copies thereof

25    mailed to all parties attending the deposition.)
```

BARKLEY
Court Reporters

1              (  )  Failed to approve the transcript within

2      the allotted time period.

3      Dated _____.

4

5

6

7      _____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

249

ARKLEY
ourt Reporters

# EXHIBIT
# L

Page 1

```
 1              IN THE COURT OF CHANCERY STATE OF DELAWARE

 2

 3    PARTNER INVESTMENTS, L.P., a       )
      Delaware limited partnership, PFM )
 4    HEALTHCARE MASTER FUND, L.P., A    )
      Cayman Islands limited            )
 5    partnership, and PFM HEALTHCARE    )
      PRINCIPALS FUND, L.P., a Delaware )
 6    limited partnership,               )
                                         )
 7                    Plaintiffs,        )
                                         ) C.A. No. 12816-VCL
 8            vs.                        )
                                         ) Volume I
 9    THERANOS, INC., a Delaware         )
      corporation, ELIZABETH HOLMES, an )
10    individual, and RAMESH BALWANI, an)
      individual, and DOES 1 - 10,      )
11                                       ) Pages 1 to 211
                      Defendants.        )
12    _____)

13

14

15

16

17

18        VIDEOTAPED DEPOSITION OF ASHKON NIROOMAND

19                  San Diego, California

20                Wednesday, March 15, 2017

21

22

23

24    Reported by:
      ELIZABETH BORRELLI, CSR No. 7844, CCRR, CLR
25    Job NO: 120802
```

Page 2

1

2

3

4

5

6

7

8          Videotaped Deposition of ASHKON

9   NIROOMAND, Volume I, taken on behalf of the

10   Plaintiffs, at 12790 El Camino Real, San

11   Diego, California, commencing at 9:12 a.m.,

12   Wednesday, March 15, 2017, before Elizabeth

13   Borrelli, a Certified Shorthand Reporter in

14   the State of California, License No. 7844.

15                    * * *

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

 3    For the Plaintiffs:

 4            GIBSON DUNN & CRUTCHER
              BY:  TIAUNIA HENRY
 5            Attorney at Law
              333 South Grand Avenue
 6            Los Angeles, CA 90071

 7

 8

 9    For Defendant Theranos, Inc.:

10            WILMERHALE
              BY:  ANDREA JEFFRIES
11            Attorney at Law
              350 South Grand Avenue
12            Los Angeles, CA 90071

13

14

15    For Defendant Ramesh Balwani:

16            DAVIS WRIGHT TREMAINE
              BY:  KELLY GORTON
17            Attorney at Law
              505 Montgomery Street
18            San Francisco, CA 94111

19

20

21    For Defendant Elizabeth Holmes:

22            COOLEY LLP
              BY:  BLAKE ZOLLAR
23            Attorney at Law
              4401 Eastgate Mall
24            San Diego, CA 92121

25
```

```
                                                        Page 4
 1
      For the Witness:
 2              PANAGOPOULOS EMBRY
                BY:  GORDON SATTRO
 3              Attorney at Law
                8880 Rio San Diego Drive
 4              San Diego, CA 92108

 5

 6

 7       Also Present:

 8              TIMOTHY HUNTER, Videographer

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

1                SAN DIEGO, CALIFORNIA; WEDNESDAY, MARCH 15, 2017

2                              9:12 A.M.

3

4                THE VIDEOGRAPHER:  Good morning.  This is

5       the start of tape labeled No. 1 in the videotaped

6       deposition of Ashkon Niroomand in the matter of

7       Partner Investments, L.P., et al. versus Theranos,

8       Inc., et al.  This case is in the Court of Chancery

9       of the State of Delaware, Case No. 12816-VCL.

10               This deposition is being held at

11      12790 El Camino Real, San Diego, California 92130.

12      Today's date is March 15, 2017, and the time on the

13      record is 9:12 a.m.

14               My name is Timothy Hunter from TSG

15      Reporting.  I'm the legal videographer.  Our court

16      reporter today is Eliza- -- Elizabeth Borrelli.

17               Counsel, will you please introduce

18      yourselves and state whom you represent for the

19      record.

20               MS. HENRY:  Tiaunia Henry of Gibson Dunn &

21      Crutcher, representing Plaintiffs PFM.

22               MR. SATTRO:  Gordon Sattro of Panagopoulos

23      Embry, representing Ashkon Niroomand.

24               THE WITNESS:  Niroomand.

25               MR. SATTRO:  Niroomand.

Page 8

1           MS. JEFFRIES:  Andrea Jeffries,

2    WilmerHale, representing Theranos.

3           MS. GORTON:  Kelly Gorton, Davis Wright

4    Tremaine, representing Ramesh Balwani.

5           MR. ZOLLAR:  Blake Zollar, Cooley, for

6    Elizabeth Holmes.

7           THE VIDEOGRAPHER:  Reporter, will you

8    please swear in the deponent to start the

9    deposition.

10                    ASHKON NIROOMAND,

11               having been duly administered

12             an oath in accordance with CCP 2094,

13             was examined and testified as follows:

14                    EXAMINATION

15   BY MS. HENRY:

16       Q.   Good morning.

17       A.   Good morning.

18       Q.   Can you please state and spell your name

19   for the record.

20       A.   My name is Ashkon Niroomand.  That's

21   A-s-h-k-o-n, N-i-r-o-o-m-a-n-d.

22       Q.   And can you please state your address.

23       A.   My current address is 4149 6th Avenue,

24   No. 24, San Diego, California 92103.

25       Q.   And have you ever been deposed before?

Page 107

1          Q.    You also wrote in Exhibit 373 in the

2     fourth paragraph that "The underlying problems could

3     have potentially devastating long-term effects on

4     the company."

5               What potentially devastating long-term

6     effects were you referring to?

7               MS. JEFFRIES:  Object to the form.

8               THE WITNESS:  There were certain -- the

9     effects I was referring to was that if the

10    laboratory didn't fix some of its compliance issues

11    or even its image internally, they could have

12    trouble hiring future personnel and could

13    potentially fail an inspection.

14    BY MS. HENRY:

15         Q.    In Exhibit 373 on the second page towards

16    the bottom it states, "What should Theranos do?"

17    And under No. 1 it states that "Theranos should

18    conduct anonymous" -- I think open parens,

19    exclamation point, close parens, "service"-- "survey

20    among all employees on their view on Theranos'

21    strengths and shortcomings, preferably by an

22    external company to alleviate employees' concerns

23    about retaliation."

24               Did you have concerns about retaliation

25    when you were employed at Theranos?

Page 108

1          MS. JEFFRIES:  Objection to form.

2          THE WITNESS:  Yes.

3   BY MS. HENRY:

4      Q.   And what were your concerns about

5   retaliation when you were employed at Theranos?

6      A.   The company is very secretive so you don't

7   really know how they will tell you if they do.  So I

8   can't speak to specifics, but there's a general fear

9   that Theranos is not afraid to come after you if you

10  speak up.

11          And that was further emphasized by the

12  Glassdoor review response.

13     Q.   And what Glassdoor review response are you

14  referring to?

15     A.   That was Exhibit -- response in

16  Exhibit 371.

17     Q.   Oh, 371 is the glass review door review?

18     A.   Correct.

19     Q.   Is there a response in Exhibit 371?

20     A.   So the internal response.

21     Q.   Oh, okay.  What is the internal response

22  to Exhibit 371 you're referring to?

23     A.   For lack of a better term, it felt as

24  employees are like a witch hunt to figure out who

25  wrote the review instead of addressing the concerns

Page 109

1    laid out in the review.

2        Q.   And then in Exhibit 373, the second number

3    under "What should Theranos do," says "Hire an

4    on-site laboratory director and give them access to

5    all laboratories and departments they are

6    directing."

7              Why did you think that was something

8    Theranos should do?

9        A.   Because a lab director is responsible for

10   the running of a lab and it's their license at

11   stake.  And it's important for workers in the lab to

12   know who the laboratory director is and have

13   communication if there's any issues since both

14   people have licenses that could potentially be at

15   jeopardy.

16       Q.   And when you wrote this letter in

17   Exhibit 373, did Theranos have an on-site laboratory

18   director?

19       A.   No.

20       Q.   Prior to writing the letter that is

21   Exhibit 373, did you raise the lack of an on-site

22   laboratory director with anyone at Theranos?

23       A.   To my coworkers.

24       Q.   Did anyone else at Theranos express

25   concern about the lack of a laboratory director?

1          MS. JEFFRIES:  Objection to form.

2          THE WITNESS:  All of my coworkers.

3    BY MS. HENRY:

4          Q.    And your coworkers were Lindsey, Brian,

5    Calvin and Brooke; is that correct?

6          A.    Including Lina and Godfred.

7          Q.    Does someone by the name of Sunil Dawan

8    [phonetic] raise a bell for you at Theranos -- as an

9    employee of Theranos?

10         A.    The name sounds familiar, but I don't know

11   specifically who that person is.

12         Q.    You didn't interact with that person?

13         MS. JEFFRIES:  Objection to form.

14         MS. HENRY:  To the best of your knowledge,

15   did you interact with that person?

16         THE WITNESS:  To the best of my knowledge,

17   no.

18   BY MS. HENRY:

19         Q.    You mentioned that Adam Rosendorff was,

20   for a time, the laboratory director at Theranos,

21   correct?

22         A.    Correct.

23         Q.    And do you recall what Adam Rosendorff's

24   educational background was?

25         A.    I believe he was an MD.

Page 210

1    STATE OF CALIFORNIA        )
                                )    ss.
2    COUNTY OF LOS ANGELES      )

3

4              I, Elizabeth Borrelli, Certified Shorthand

5    Reporter, Certificate No. 7844, for the State

6    of California, hereby certify:

7              I am the deposition officer that steno-

8    graphically recorded the testimony in the foregoing

9    deposition;

10             Prior to being examined the deponent was

11   by me first duly sworn;

12             The foregoing transcript is a true record

13   of the testimony given.

14

15

16   Dated: March 15, 2017

17

18

19

20

21                      _____

22                      Elizabeth Borrelli, CSR No. 7844

23

24

25

# EXHIBIT
# M

Page 1

1              IN THE COURT OF CHANCERY STATE OF DELAWARE

2                           ---oOo---

3

4    PARTNER INVESTMENTS, L.P.
     a Delaware limited
5    partnership, PFM HEALTHCARE
     MASTER FUND, L.P., a Cayman
6    Islands limited partnership,
     and PFM HEALTHCARE PRINCIPALS
7    FUND, L.P., a Delaware limited
     partnership,

8
                          Plaintiffs,
9

10   vs.                              C.A. No. 12816-VCL

11   THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
12   an individual, RAMESH BALWANI,
     an individual, and DOES 1 - 10,

13
                          Defendants.
14   _____/

15

16

17          VIDEOTAPED DEPOSITION OF ANTHONY NUGENT

18                 SAN FRANCISCO, CALIFORNIA

19                 WEDNESDAY, MARCH 8, 2017

20

21

22   BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23   CSR LICENSE NO. 9830

24   JOB NO. 120808

25

1          IN THE COURT OF CHANCERY STATE OF DELAWARE
2                          ---oOo---
3
4     PARTNER INVESTMENTS, L.P.
      a Delaware limited
5     partnership, PFM HEALTHCARE
      MASTER FUND, L.P., a Cayman
6     Islands limited partnership,
      and PFM HEALTHCARE PRINCIPALS
7     FUND, L.P., a Delaware limited
      partnership,
8
                      Plaintiffs,
9
10    vs.                              C.A. No. 12816-VCL
11    THERANOS, INC., a Delaware
      corporation, ELIZABETH HOLMES,
12    an individual, RAMESH BALWANI,
      an individual, and DOES 1 - 10,
13
                      Defendants.
14    _____/
15
16          Videotaped Deposition of Anthony Nugent,
17     taken on behalf of the Plaintiffs, on March 8,
18     2017, at Gibson, Dunn & Crutcher LLP, 555 Mission
19     Street, Suite 3000, San Francisco, California
20     94105, beginning 9:02 a.m., and commencing at
21     3:02 p.m., Pursuant to Notice, and before me,
22     ANDREA M. IGNACIO, CSR, RPR, CRR, CLR ~ License
23     No. 9830.
24
25

Page 3

1   A P P E A R A N C E S:

2

3

4       FOR THE PLAINTIFFS:

5           GIBSON, DUNN & CRUTCHER

6           By:   MATTHEW KAHN, Esq.

7                 EMMA STRONG, Esq.

8           555 Mission Street

9           San Francisco, California 9405

10

11

12

13

14      FOR THE DEFENDANT THERANOS, INC.:

15          WILMERHALE

16          By:   MICHAEL MUGMON, Esq.

17                SAHAR MAALI, Esq.

18          950 Page Mill Road

19          Palo Alto, California 94304

20

21

22

23

24

25

Page 4

1   A P P E A R A N C E S:   (Cont.)

2

3

4       FOR THE DEFENDANT SUNNY BALWANI:

5           DAVIS WRIGHT TREMAINE

6           By:  BENJAMIN BYER, Esq.

7           1201 Third Avenue

8           Seattle, Washington 98101

9

10

11

12

13      ALSO PRESENT:  Pete Matteson, Videographer

14                  ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1              SAN FRANCISCO, CALIFORNIA

2           WEDNESDAY, MARCH 8, 2017

3                 9:02 A.M.

4

5

6

7          THE VIDEOGRAPHER:  This is the start of disc

8   labeled No. 1 in the videotaped deposition of Anthony

9   Nugent.

10          In the matter of Partner Investments, L.P.,

11   et al., versus Theranos, Inc., et al.  In the Court

12   of Chancery of the State of Delaware.  C.A.

13   No. 12816-VCL.

14          This deposition is being held at 555 Mission

15   Street, Suite 3000, San Francisco, California, on

16   March 8th, 2017, at approximately 9:02 a.m.

17          My name is Peter Matteson from TSG Reporting,

18   Inc., and I am the legal video specialist.

19          The court reporter is Andrea Ignacio, in

20   association with TSG Reporting.

21          Will counsel present please identify

22   yourselves for the record.

23          MR. KAHN:  Matthew Kahn from Gibson, Dunn &

24   Crutcher, for plaintiffs.

25          MS. STRONG:  Emma Strong from Gibson, Dunn &

1    Crutcher, for plaintiffs.

2         MS. MAALI:  Sahar Maali from WilmerHale, for

3    Theranos.

4         MR. MUGMON:  Michael Mugmon from WilmerHale,

5    for Theranos.

6         MR. BYER:  Ben Byer from Davis Wright

7    Tremaine, for Sunny Balwani.

8         THE VIDEOGRAPHER:  Thank you.

9         Will the court reporter please swear in the

10   witness.

11

12                    ANTHONY NUGENT,

13              having been sworn as a witness

14            by the Certified Shorthand Reporter,

15                 testified as follows:

16

17                     EXAMINATION

18   BY MR. KAHN:

19        Q    Good morning, Mr. Nugent.

20        A    Good morning.

21        Q    Have you ever been deposed before?

22        A    Never.

23        Q    Okay.  I'll just quickly run through some of

24   the rules of the road so we're --

25        A    Okay.

Page 95

1  to be -- let me do it.  If it's broken, then it was

2  me; right?

3       So -- but I had a conversation with her

4  that -- I said, I think we can only get you to about

5  150 people.  We're not -- none of us have run

6  divisions.  We've run departments -- small

7  departments.  We're not -- we're start-up kind of

8  people.  We're not big company people.

9       And that she should get someone in or she

10 should start to build a management structure for the

11 company.

12      And so Sunny was not brought in to be that

13 person, as I recall, immediately.  He was -- Sunny is

14 joining the company.

15      It was -- was -- we talked, and I asked her

16 at the time -- I said, Well, what about the

17 relationship?

18      And she said, Well, that's almost

19 nonexistent, or that doesn't exist anymore, something

20 to that effect.

21   Q   Let me just --

22   A   Sorry.

23   Q   Sure.  Let me just interrupt you there.

24   A   Yeah.

25   Q   When you say "relationship" there, what were

1    you referring to?

2        A    Because she had introduced him as her

3    boyfriend.

4        Q    Okay.

5        A    Yeah.

6        Q    Please continue.

7        A    So -- so he came in in the summer of 2009.

8    We believed he brought funding with him or something.

9    That was what I thought was probably the real reason.

10            And proceeded to -- there was an H1N1

11   epidemic, if you recall, around that time, and so he

12   proceeded to jump all over that.  So we were going to

13   somehow be involved in the H1N1 thing or whatever.

14   And so he started diverting all sorts of resources to

15   that, et cetera.

16            So, you know, it was -- yeah, that was his --

17   did I answer the question, or have I -- have I

18   wandered off track?  Sorry.

19       Q    That was great.  Thank you.

20       A    Yeah.

21       Q    What was your experience working with

22   Mr. Balwani?

23       A    Oh, it became really just adversarial from

24   very early on.  He would -- I had started working on

25   the 3.5.

1      Q    And just to stop you there --

2      A    Sorry.  The 2009 3.5, not the 2013 3.5.

3      Q    Thank you.

4      A    I had started to work on that because we

5    wanted -- we had talked about the -- incorporating the

6    centrifuge.

7           And I figured we could get a camera in there

8    within the same -- within a similar form factor in

9    order -- not so much maybe to do spectroscopy at that

10   point, but -- but at least to explore the idea.

11          And also, ever since I had built the first

12   instrument, as I had a conversation with Ian one time,

13   I said, It's just below being -- the size of being

14   ridiculously big.

15          And so the goal was to make it a little more

16   compact because, you know, I had -- I had taken the

17   instrument home to my house and ran CRP on myself on

18   it, and it was -- it was fine.  It could sit in the

19   corner, but still a little bit big.  And -- and so,

20   you know, we wanted to get it down in size.  So I had

21   started that process at the end of 2009.

22          And, while he was engaged in this H1N1, he

23   had been going to Thailand and taking instruments

24   there to measure people's nasal -- something you pull

25   out of the nose and stuff and things like this.

1   at 11:20 a.m.

2        MR. KAHN:   Q.  Mr. Nugent, in your view, did

3   Theranos' business culture change after Mr. Balwani

4   joined the company?

5        MR. MUGMON:  Objection as to form.

6        THE WITNESS:  Yes, very much so.  It was more

7   adversarial within -- within the company; groups

8   against groups, et cetera.  We had been more

9   collaborative before.

10        MR. KAHN:   Q.  Would you describe Theranos'

11   culture, after Mr. Balwani joined, as being siloed?

12        MR. MUGMON:  Objection as to form.

13        THE WITNESS:  Heavily so, yes.

14        MR. KAHN:   Q.  Would you describe Theranos'

15   culture, after Mr. Balwani joined, as being secretive

16   internally at the company?

17        MR. MUGMON:  Same objection.

18        THE WITNESS:  Yeah, very heavily so, yes.

19        MR. KAHN:   Q.  Did you ever witness any

20   conduct by Mr. Balwani or Ms. Holmes after Mr. Balwani

21   joined the company that you would characterize as

22   intimidation towards Theranos employees?

23        MR. MUGMON:  Objection as to form.

24        MR. BYER:  Objection as to form.

25        THE WITNESS:  Yes.  I would say the lady that

1    was fired when she objected about the -- the

2    conditions in the lab, that would -- I would see that

3    as intimidation.  Sending a letter to Anthony

4    DeLaCruz, that's intimidation.

5         I think just even the hiring of a person to

6    run -- to change the name of the department of HR to

7    employment law is in itself intimidating.  I mean,

8    where do you go if you have -- what do you do?  You

9    go -- you go to employment law if I -- if I have a

10   problem?  I mean, that's intimidating in itself.

11        MR. KAHN:  Q.  Theranos changed the name of

12   the HR department to the employment law department?

13   A    Well, she was the head of employment law, so

14   I assume that's what that means.

15   Q    And that's Mona Ramamurthy?

16   A    Yes.

17   Q    Okay.

18   A    Yeah.

19   Q    Can you think of any other examples of what

20   you would characterize as intimidation?

21   A    I don't have all of the details of the

22   encounter, but I had a person working for me,

23   J.P. Chand.

24        And actually, to back up a little bit, I had

25   not taken any vacation in 2007, 2008, 2009.  We were

1    working six-day weeks for Elizabeth.

2         And when Sunny came on -- and I didn't -- I

3    said, Okay.  I'm going to go see my mom and take a

4    vacation.

5         First, he wouldn't -- I couldn't -- you do

6    your vacation request on the computer.  I got no

7    response back.  And so I objected to him at one point.

8         And I -- I don't recall quite fully the

9    details, but I do recall, because I did put it in the

10   2013 record, that he had -- basically, he was

11   stonewalling me on letting me go on vacation.  I told

12   him, You can't deny me vacation, for God's sake.

13        So, you know, this is the kind of thing

14   that -- you're sitting there with supposedly your boss

15   or something or whatever.

16        The other form of intimidation was the idea

17   that, if you worked somewhere in a related field, that

18   they would, you know, take a dim view on that.  And

19   basically, you should find a job in another industry.

20   It was not said in so many words.

21        But there was -- I remember talking to the

22   then head of HR, which was Jodi Sutton.  She's an

23   attorney, so I don't know whether you would ever be

24   able to talk to her.  But that -- what do we do if we

25   leave?

1    Q  So --

2    A  -- openly.

3    Q  -- to your recollection, this woman

4 complained to OSHA about the blood handling, then

5 spoke openly about the blood handling issue in the

6 office, and the next day she was fired?

7    A  No.  It would have been the opposite.  It

8 would have been she would have talked openly, she was

9 fired, and then she went to Cal/OSHA --

10    Q  Okay.

11    A  -- after she was fired.

12    Q  So, your belief is that she was fired for

13 speaking openly about the issue that she later

14 complained to Cal/OSHA about?

15    A  That's correct.

16    Q  Okay.  Before, you told us that during the

17 '07 to '09 time period, feedback was welcomed at

18 Theranos.

19    Did that change after Mr. Balwani joined?

20    MR. MUGMON:  Objection as to form.

21    THE WITNESS:  Yes, I -- I think -- well, from

22 my personal experience -- actually, all -- all of

23 us -- Tim, Gary Frenzel -- Tim Kemp, Gary Frenzel, and

24 I became -- you know, he -- he hired or he found

25 people who would, in essence, agree with him.  And

Page 111

1    then the rest of the people were not included in any

2    of the discussions or -- or issues.  So --

3            MR. KAHN:  Q.  When you said "he hired or he

4    found people," you're referring to Mr. Balwani?

5        A    Mr. Balwani, yes.

6        Q    Okay.

7        A    Yeah.

8        Q    So Mr. Balwani surrounded himself with yes

9    men and shut out all other voices?

10           MR. BYER:  Objection as to form.

11           MR. MUGMON:  Objection as to form.

12           THE WITNESS:  I -- that's -- that's a fair

13   characterization, in my mind.

14           MR. KAHN:  Okay.

15       Q    How did you feel about the change in

16   Theranos' culture that you have described after

17   Mr. Balwani joined?

18       A    How do I feel about it?

19       Q    How -- at the time, how did you feel?

20       A    How did I feel about it?  Well, it became a

21   more stressful place.  I mean, prior to his arrival,

22   the stress was the amount of work she wanted us to do.

23   After he arrived, the stress was the amount -- for me,

24   actually, it was less work that they wanted me to do,

25   but the atmosphere of the place became caustic.

1    Q    Do you recall hearing anyone else at Theranos

2  saying, in sum or substance, that the atmosphere of

3  the place had become caustic after Mr. Balwani joined?

4    A    Those particular words -- but I think you

5  could talk with Gary Frenzel or you could talk with

6  Tim Kemp.  I think you could talk with any number of

7  employees and get a similar answer.

8        Maybe not the specific use of the word

9  "caustic" or whatever.  I mean, they might use toxic

10  instead of caustic.  But I believe -- yeah.

11    Q    In your view, did the change in Theranos'

12  business culture, after Mr. Balwani joined, have an

13  impact on Theranos' work?

14        MR. MUGMON:  Objection as to form.

15        MR. BYER:  Objection to form.

16        THE WITNESS:  Yes, because we made no

17  substantial progress from that point on.

18        MR. KAHN:  Q.  So, in your view, did the

19  development of Theranos' blood analyzer and assays and

20  software suffer as a result of the change in culture

21  that occurred after Mr. Balwani joined?

22        MR. BYER:  Same objection.

23        MR. MUGMON:  Same objection.

24        THE WITNESS:  Yes, yes, yes.  We were --

25  there was not -- there was -- the instrument didn't

Page 227

1                   CERTIFICATE OF REPORTER

2

3          I, ANDREA M. IGNACIO, hereby certify that the

4     witness in the foregoing deposition was by me duly

5     sworn to tell the truth, the whole truth, and nothing

6     but the truth in the within-entitled cause;

7          That said deposition was taken in shorthand

8     by me, a disinterested person, at the time and place

9     therein stated, and that the testimony of the said

10    witness was thereafter reduced to typewriting, by

11    computer, under my direction and supervision;

12         That before completion of the deposition,

13    review of the transcript [x] was [ ] was not

14    requested.  If requested, any changes made by the

15    deponent (and provided to the reporter) during the

16    period allowed are appended hereto.

17         I further certify that I am not of counsel or

18    attorney for either or any of the parties to the said

19    deposition, nor in any way interested in the event of

20    this cause, and that I am not related to any of the

21    parties thereto.

22    Dated: 3-8-2017

23    _____

24    ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

25