# Exhibit A



EFiled: Apr 12 2017 12:19PM EDT
Transaction ID 60462832
Case No. 12816-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PARTNER INVESTMENTS, L.P., a Delaware limited partnership, PFM HEALTHCARE MASTER FUND, L.P., A Cayman Islands limited partnership, and PFM HEALTHCARE PRINCIPALS FUND, L.P., a Delaware limited partnership, | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 12816-VCL |
| THERANOS, INC., a Delaware corporation, ELIZABETH HOLMES, an individual, RAMESH BALWANI, an individual, and DOES 1-10, | : | **Original Version Filed: March 23, 2017** |
| Defendants. | : | **Revised Redacted Public Version Filed: April 12, 2017** |

## SECOND AMENDED VERIFIED COMPLAINT

Plaintiffs Partner Investments, L.P. ("PIM"), PFM Healthcare Master Fund, L.P. ("HCMF"), and PFM Healthcare Principals Fund, L.P. ("HCP") (collectively, "PFM"), by and through their attorneys, allege upon knowledge as to themselves and their own conduct, and otherwise upon information and belief, as follows:

## NATURE OF THE PROCEEDING

1. From approximately September 2013 through the present, the Defendants Theranos, Inc. ("Theranos" or the "Company"), its Chief Executive Officer, Elizabeth Holmes ("Holmes"), and its former Chief Operating Officer, Ramesh Balwani ("Balwani"), have defrauded PFM and its investors. Theranos,

Holmes, and Balwani repeatedly made misrepresentations, misleading statements, and material omissions about, among other things, the Company's technology, methods, regulatory interactions, and business plan. On multiple occasions, Theranos, Holmes, and Balwani knowingly, intentionally, and with the intent to deceive, lied and made material omissions to PFM and its investment professionals to induce PFM to make an investment of approximately $96.1 million in Theranos. These misrepresentations and omissions were made to benefit, and did financially benefit, Theranos, and also enriched Holmes and Balwani personally.

2. Theranos, Holmes, and Balwani repeatedly and knowingly lied that, among other things, the Company had developed a proprietary technology[1] that worked; the Company's proprietary technology was ready for commercial use to perform nearly all laboratory tests on a few drops of blood drawn from a patient's finger; and the Company was on the cusp of receiving all necessary regulatory clearances and approvals. While making material misrepresentations, Theranos and its executives concealed the ugly truth about the commercial viability of their technology and methods, the status of their regulatory interactions, and their ability to meet their rollout commitments. Now, reduced to a shadow of its purported

---

1 Unless otherwise stated, all references to Theranos's "proprietary technology" refer to the finger stick used to draw a blood sample, the sample collection device and nanotainer used to collect and store the sample, and the analyzer used to test the sample.

former self, Theranos has announced that it is shutting down its laboratories and patient testing centers and laying off more than 40% of its employees – finally abandoning any pretense that its proprietary technology ever was capable of performing as the Defendants represented to PFM that it did.

3. As a result of the repeated lies, misrepresentations, misleading statements, and material omissions by the Defendants, the Company and its personnel are under investigation by the United States Department of Justice ("U.S. DOJ") and the Securities and Exchange Commission ("SEC"). In addition, inspections by regulatory agencies such as the Centers for Medicare and Medicaid Services ("CMS") and the Food and Drug Administration ("FDA") have raised a number of questions regarding, among other things: the Company's deficient laboratories; its use of an uncleared medical device; its design for a blood sample collection device that did not ensure it would actually conform to user needs and intended uses; and its failure to include proper patient safety and ethical protocols in its clinical studies for certain diagnostic tests.

4. As the Defendants' web of deceit unraveled, inspectional findings by regulators forced the Company to void tens of thousands of its customers' blood test results, raising the specter of patient harm. Indeed, after finding in January 2016 that deficient practices in one of Theranos's laboratories posed "immediate jeopardy to patient health and safety," CMS took action in July 2016 to impose significant

sanctions that presaged the recent demise of the Company's laboratory operations. These sanctions include revoking Theranos's Clinical Laboratory Improvement Amendments ("CLIA") certification, imposing a monetary penalty of $10,000 per day for each day of non-compliance with the conditions necessary for CLIA certification, and banning Holmes and Balwani, and thereby Theranos itself, from owning or operating a laboratory for at least two years.

5. This is not a case about a startup that merely missed targets or failed to succeed. This is a case about repeated lies, misrepresentations, misleading statements, and failures to disclose material information, which not only were intended to induce – and did induce – PFM to invest approximately $96.1 million in Theranos, but also continued throughout the course of the parties' relationship. Accordingly, PFM brings this action for relief.

## PARTIES

6. Plaintiff PIM is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

7. Plaintiff HCMF is a limited partnership organized under the laws of the Cayman Islands, with its principal place of business in San Francisco, California.

8. Plaintiff HCP is a limited partnership organized under the laws of Delaware, with its principal place of business in San Francisco, California.

9. Defendant Theranos is a corporation organized under the laws of the State of Delaware, with its principal place of business in Palo Alto, California.

10. Defendant Holmes is the founder, Chief Executive Officer, and Chairman of the Board of Directors of Theranos. Holmes is also the controlling stockholder of Theranos.

11. Defendant Balwani is the former President and Chief Operating Officer of Theranos and a former member of its Board. Balwani "retired" from these positions in or about May 2016.

12. Defendants Does 1-10 have not yet been identified but have liability to PFM arising out of or relating to the subject matter of this lawsuit; therefore, PFM sues these defendants under fictitious names. PFM will seek to amend this Complaint when the true names and roles of such defendants are discovered.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over this matter pursuant to 8 *Del. C.* § 111(a)(2) and 10 *Del. C.* § 341.

14. This Court has personal jurisdiction over Theranos because it is a corporation organized under the laws of the State of Delaware.

15. This Court has personal jurisdiction over Holmes and Balwani pursuant to 10 *Del. C.* §§ 3114(a)-(b), because they were at all relevant times alleged herein directors and officers of Theranos, a corporation organized under the laws of this

State. Personal jurisdiction over Holmes, a party to the Series C-2 Preferred Stock Purchase Agreement entered into on February 4, 2014, by Plaintiffs PIM, HCMF, and HCP on the one hand, and Defendants Theranos and Holmes on the other ("Stock Purchase Agreement"), is also proper pursuant to the terms of the Stock Purchase Agreement, which provides in relevant part:

> 7.14 *Jurisdiction; Venue*. . . . Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph.

16. The Court also has jurisdiction over Holmes and Balwani pursuant to 10 *Del. C.* § 3104. As set forth herein, Holmes and Balwani conspired to commit fraud and to induce PFM to invest in Theranos's Series C-2 Preferred Stock.

17. Venue is proper in this Court because Plaintiffs PIM and HCP are Delaware limited partnerships; Defendant Theranos is a Delaware corporation; and, pursuant to the Stock Purchase Agreement and the Amended and Restated Investors' Rights Agreement dated February 3, 2014 ("Investors' Rights Agreement"), any action arising out of or relating to the Stock Purchase Agreement must be brought in a Delaware court. As a result, this Court has jurisdiction over this matter pursuant to 6 *Del. C.* § 2708(b), which grants the courts of Delaware jurisdiction over actions arising out of contracts in which the parties have specified that Delaware law governs. The Stock Purchase Agreement provides in relevant part:

> 7.3 *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.
>
> . . .
>
> 7.14 *Jurisdiction; Venue.* Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement.

The Investors' Rights Agreement provides in relevant part:

> 5.3 *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.
>
> . . .
>
> 5.11 *Jurisdiction; Venue.* Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement.

## FACTUAL BACKGROUND

### I. Theranos and Its Claims of Revolutionary Blood Testing

18. Founded by the Defendant Holmes in 2003, Theranos is a private life sciences company in the health care sector that claimed to revolutionize the laboratory testing industry with innovative methods for drawing and testing blood

and interpreting patient data to improve outcomes and lower health care costs. Theranos operated largely under the radar and in secret for approximately ten years, until 2013, when Theranos began to publicize its supposedly revolutionary technologies. At various points since its founding, Theranos has sought investors to help fund its operations.

19. Theranos claimed that it developed proprietary equipment capable of running comprehensive blood tests from as little as a few drops of blood, which are approximately 1/100th to 1/1000th the size of a typical venous blood draw (or "venipuncture"). Theranos also claimed to have developed a proprietary method to draw drops of blood from a patient's finger using a finger stick and to collect and store that blood (a "capillary sample") in a proprietary device called a "nanotainer." The blood stored in the nanotainer would then be tested using Theranos's proprietary laboratory equipment, or "analyzers," which would provide accurate results to customers in a matter of hours.

20. Theranos touted the many alleged advantages of its proprietary methods and technologies. Theranos claimed that the small sample size would be a key benefit for multiple populations, including elderly patients with collapsed veins, patients with diseases requiring frequent blood tests, and children (or adults) with a fear of needles. Theranos also claimed that another key advantage was the significant cost savings associated with its proprietary blood tests, advertising that it

billed all of the tests on the Clinical Lab Fee Schedule at rates 50% or more below the Medicare reimbursement rate. And Theranos further claimed that its laboratory infrastructure produced test results in significantly less time than traditional testing methodologies (hours rather than days), minimized the risk of human error, and increased the accuracy of results.

21. Highlighting its supposed technological and operational capabilities, Theranos actively publicized its launch beginning in or around September 2013. The Company announced in a September 13, 2013 press release that it had "eliminat[ed] the need for larger needles and numerous vials of blood" as its samples "are either taken from a tiny finger stick or a micro-sample taken from traditional methods[.]" Another Theranos press release, dated November 13, 2013, described "blood sample[s] as small as a few drops – 1/1,000 the size of a typical blood draw" and similarly advertised that Theranos had "eliminat[ed] the need for large needles and numerous vials of blood typically required for diagnostic lab testing."

22. Echoing the Company's statements, Holmes told the ***Wall Street Journal*** in a September 8, 2013 article that Theranos could "run any combination of tests, including sets of follow-on tests" at once, very quickly, all from a single small blood sample. Indeed, Theranos's website prominently featured a nanotainer balanced on the tip of a finger and the slogan: "one tiny drop changes everything."

"Now, for the first time," the website claimed, Theranos's "laboratory can perform your tests quickly and accurately on samples as small as a single drop."

23. On September 9, 2013, the Company announced plans to roll out Theranos "wellness centers" inside the retail locations of one of the most well-known and successful pharmacy chains in the United States (the "Pharmacy Chain"). Theranos claimed in a press release the same day that with its first Pharmacy Chain location launching in Silicon Valley, "consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours." Theranos began offering tests to the public in late 2013 through wellness centers located in Pharmacy Chain stores in Palo Alto, California and Phoenix, Arizona.

## II. The Defendants Make False Representations, Misleading Statements, and Material Omissions to PFM to Induce PFM to Invest Approximately $96.1 Million

24. Plaintiffs PIM, HCMF, and HCP are private investment funds, which invest capital received from investors. HCMF and HCP's investments, and the investments that PIM made together with HCMF and HCP, are focused on the health care sector, through both the public and private markets. In late 2013, PFM began considering an investment in Theranos. PFM initially reviewed and relied upon, among other things, Theranos's press releases and the statements made by the

Company and its executives as reported in the media, including the September 2013 *Wall Street Journal* article.

25. Then, on or about December 12, 2013, PFM representatives had an initial meeting with the Defendant Holmes at Theranos. During that meeting, Holmes stated that Theranos's proprietary technology performed blood tests covering 1,000 of the 1,300 Current Procedural Terminology ("CPT") codes that traditional laboratories can perform on blood samples. She also stated that Theranos would be placing its testing centers in more than 8,100 Pharmacy Chain locations across the United States. In addition, she stated that Theranos's proprietary technology was being used by pharmaceutical companies in clinical trials and was also being used by the U.S. military, including aboard medevac helicopters.

26. Soon after this initial meeting between PFM and Theranos, PFM informed Holmes that it was interested in investing in Theranos. Holmes stated that Theranos would work with PFM to provide the information it needed to move the process forward.

27. In the due diligence meetings that followed, Theranos, Holmes, and Balwani made repeated representations regarding the existing state of Theranos's technology and methods, its strategic business model and scheduled rollout, and the status of its submissions to the FDA, all in order to persuade PFM that Theranos was poised to be an incredibly disruptive player in the laboratory testing industry that

was worth a substantial investment. Throughout this process, while making every effort to maintain their characteristic secrecy, Theranos, Holmes, and Balwani presented scientific data that PFM used to evaluate the investment opportunity, and they also made select directors and product managers available to PFM to back up and confirm their claims. PFM also assessed and examined the regulatory issues related to Theranos's technology, conferred with experts in the field and insurance companies, personally had blood tests performed at Theranos wellness centers and compared the results to prior blood test results, and discussed the Company's supposed potential with doctors. As later events would reveal, however, the statements made by Theranos, Holmes, and Balwani – upon which PFM justifiably relied in its diligence effort and which ultimately induced PFM's investment – were in fact a mix of misrepresentations, half-truths, and material omissions.

28. Similar to the statements Holmes made to PFM in December 2013, Holmes and Balwani stated during a January 10, 2014 due diligence meeting with PFM representatives that Theranos had developed and validated blood tests on its proprietary technology – which it was using on actual patient samples – that covered between 1,000 and 1,050 CPT codes. They explained that these codes accounted for 99.9% of all laboratory requests, and that Theranos had a technical solution in place that would enable it to perform blood tests associated with all 1,300 possible codes. They also stated that Theranos was capable of running 70 blood tests on a capillary

sample on a single cartridge[2] inserted into its proprietary analyzer, and that it would soon be able to run even more. According to Holmes and Balwani, the reason Theranos had operated in "stealth mode" for the previous ten years was that it wanted to launch only when it could offer customers all of the tests offered by its competitors – the clear and unequivocal message being that, since the Company was now out in the open, it was then at the point of offering all such tests using its proprietary technology in a commercial setting. Critically, Holmes and Balwani also stated that Theranos was actively in the process of obtaining FDA clearance or approval for each of the proprietary blood tests it had developed and validated.

29. With Theranos now ostensibly able to complete all but a miniscule proportion of its customers' laboratory requests commercially using its proprietary technology, Holmes and Balwani asserted during the January 10, 2014 meeting that the Company was ready to scale up and roll out on a national basis in retail stores, hospitals, and physicians' offices. Holmes and Balwani highlighted their existing contracts with the Pharmacy Chain and a leading retail grocery chain (the "Grocery Chain"), both of which were claimed to be contractually committed to opening a minimum number of Theranos locations, as well as their contracts with several of

2 A Theranos "cartridge" is a single-use component of Theranos's proprietary testing system. When a customer has a capillary sample taken, that sample, stored in a nanotainer, is placed in the cartridge, which also contains the reagents for the set of assays needed in a given test order. That cartridge is then inserted into the analyzer for testing.

the country's largest healthcare provider systems. They told PFM that Theranos testing centers would be opened in the more than 8,000 Pharmacy Chain locations nationwide and that the Grocery Chain had already built out Theranos testing centers in approximately 1,000 locations. They made additional representations regarding the use of Theranos's proprietary technology by the U.S. military, stating that when soldiers in the field were infected they would now be able to use Theranos's proprietary technology to identify the infection in an hour, and that Theranos's proprietary technology also could be installed in Navy submarines. Indeed, Holmes and Balwani presented Theranos's business strategy and rollout schedule as concrete, in process, and profitable, thus supporting selling its shares to PFM at $17 per share, which they told PFM was a premium over the prior round that had just "recently" closed at $15 per share.[3]

30. The rollout schedule, which would ensure Theranos's national presence over the course of the following two years, was described by Holmes and Balwani

---

3 It is unclear whether the statements in January 2014 by Holmes and Balwani that Theranos had "recently" sold shares to other investors at $15 per share were, in fact, truthful. Although Theranos appears to have sold Series C-1 Preferred shares for $15 far earlier in 2010, the Company's own Amended and Restated Certificate of Incorporation from January 14, 2014 recorded the Series C-1 Preferred price to be just $3 per share following a 5-for-1 split. Nor does it appear that Series C-2 Preferred shares ever were sold for $15, as the Company's February 7, 2014 Certificate of Designation of Series C-2 Preferred Stock states that the Original Issue Price of each share was $17. If Theranos never issued stock to other investors in or about early 2014 at $15 per share, the statements to the contrary made by Holmes and Balwani to PFM were materially false and misleading.

in the January 10, 2014 meeting as having two phases. In phase one, Theranos would distribute its proprietary nanotainers to testing locations (including retail pharmacies, hospitals, and physicians' offices), but would maintain its proprietary analyzers in offsite laboratories. Once a patient gave blood via a finger stick, a nanotainer containing the blood would be sent to a Theranos laboratory, the sample would be run on Theranos's proprietary analyzers, and Theranos "guaranteed" results within four hours. By the end of 2014, **any** test requested by a customer – not just the "99.9%" said by the Defendants to be already available as of this January 2014 meeting – would be performed using a finger stick. In phase two, beginning in 2015, Theranos would install its analyzers in the testing locations themselves (as opposed to testing the samples at its centralized laboratories), and patients would receive their results within 30 minutes (as opposed to four hours).

31. This rollout schedule was a material factor underlying Theranos's financial strategy, which formed the basis of its stated valuation of $17 per share. In addition to the proven success of the commercial viability of its proprietary technology, the Company said that there were three key drivers of its financial strategy: the number of Theranos testing locations, the number of patients per day at each location, and the price per test. Holmes and Balwani portrayed the contracts it already had in place – and particularly its partnership with the Pharmacy Chain – as critical, concrete drivers of profitability. As Balwani stated during a March 2014

hearing before the Arizona Senate Health and Human Services Committee, "[o]ne of the big advantages of working with" the Pharmacy Chain was "the accessibility," which was "a very key point." Holmes and Balwani also pointed to Theranos's agreement with the Grocery Chain, which would further boost its national presence and profile.

32. During the due diligence meeting with PFM on January 10, 2014, Holmes and Balwani walked through a PowerPoint presentation containing numerous correlation charts purportedly comparing test data generated on Theranos's proprietary analyzers to test data generated on traditional laboratory machines. Holmes and Balwani represented to PFM that the Theranos data had been generated on its proprietary analyzers using small samples drawn with its proprietary methods. Based on the correlation charts, Holmes and Balwani stated that the majority of the tests featured in the presentation had correlation coefficients of 0.95 or higher – which, they represented, meant that they were substantially equivalent to traditional laboratory tests and could therefore receive FDA clearance. Holmes and Balwani stated that, as of that January 2014 meeting, the correlation data had been submitted to the FDA for clearance and Theranos was still working on the small number of tests that had correlation coefficients lower than 0.95.

33. On or about January 21, 2014, the Defendants provided PFM with a financial model that set forth, through 2015: the total number of Theranos testing

locations in retail pharmacies; the total number of physicians' offices and hospitals collecting blood samples utilizing Theranos technology and sending them via courier for testing by Theranos; the total number of Theranos testing locations in hospitals; the total number of blood samples processed per month for each testing location; the expected revenue each month; the operating expenses and depreciation each month; and the net income each month. In addition to line items for retail pharmacies, physicians' offices, and hospitals, the model also included line items for "DOD" (Department of Defense), "International," and the production of "minilabs."

34. This financial model estimated a gross profit of more than $1 billion in 2015, and also described certain "intangible" relationships that supposedly had been "valued at multi-billion dollar valuation in the past" [sic]. These included Theranos's "long term strategic partnership with" the Pharmacy Chain, which "ha[d] invested hundreds of millions of dollars in Theranos infrastructure and w[ould] be investing hundreds of millions of additional capital in 2014 and 2015." According to the model, the Pharmacy Chain's contract provided that Theranos would be its "Exclusive Labortory [sic] provider across the entire United States across all of its 8800 pharmacies nationwide," and through this partnership, Theranos would have access to "3400 pharmacies across Europe" as well. In addition, the model stated that the Grocery Chain "ha[d] already built out Theranos Wellness Centers at over 960+ [Grocery Chain] Pharmacies nationwide with an investment of about $400M,"

which would allow Theranos Wellness Centers to "get exposure to tens of millions of unique customers every week." The model further stated that "Theranos ha[d] strategic partnerships in place" with "key" hospitals in the United States, and that these partnerships provided access to "hundreds of hospitals and thousdands [sic] of physician offices."

35. In discussions with PFM on January 21 and 24, 2014, Balwani again stated that Theranos had waited to actively publicize its launch until it could compete effectively with rival commercial laboratory testing companies and that it now performed "99%" to "99.9%" of all laboratory requests using its proprietary technologies. On January 24, 2014, Balwani represented to PFM that the Company had developed around 300 blood tests, and only 1% to 2% of those tests could not be performed using Theranos's capillary samples and had to be performed with micro-samples taken from a venous blood draw instead. Balwani further represented to PFM that the use of venous micro-samples for only 1% to 2% of its customers' tests was a short-term solution that would be in place for only six months, at which point Theranos would be able to perform all of its tests with finger sticks and nanotainers. And, as he and Holmes had represented in the January 10, 2014 meeting, Balwani stated in the January 21, 2014 meeting that Theranos had filed for FDA clearance or approval of all its tests in November 2013 and that it was meeting monthly with the FDA until the tests were cleared. They also touted their

"exclusive" deal with the Pharmacy Chain, reiterating that Theranos testing centers would be located in more than 8,000 Pharmacy Chain locations nationwide, with further access to more than 3,000 locations across Europe.

36.     To PFM's detriment, however, the Defendants' statements during these due diligence meetings were false.   Moreover, the Defendants failed to disclose crucial information that would have materially impacted PFM's decision to invest in Theranos.  The Defendants knew that their statements were false when they made them, and they knew or should have known that their omissions rendered their portrayal of Theranos materially misleading.  Given the positions of Holmes and Balwani at the highest levels of the Company, their statements both before and after PFM's investment were justifiably relied upon by PFM.

**III.   Based on the Defendants' Misrepresentations, Misleading Statements, and Material Omissions, PFM Invests Approximately $96.1 Million in Theranos**

37.     On February 4, 2014, in reliance on the false and misleading statements made by Theranos, Holmes, and Balwani in the fall of 2013 and early 2014, PFM invested in Theranos's Series C-2 Preferred Shares at a purchase price of $17 per share, purchasing a total of 5,655,294 shares for a total investment of $96,139,998. Specifically, PIM invested $55,479,993 for 3,263,529 shares; HCMF invested $38,336,632 for 2,255,096 shares; and HCP invested $2,323,373 for 136,669 shares.

38. Each fund invested on the same terms and conditions and is a party to the same set of agreements with Theranos, each dated February 3, 2014: the Stock Purchase Agreement; the Investors' Rights Agreement; the Amended and Restated Voting Agreement ("Voting Agreement"); and a Side Letter. All of the agreements are governed by Delaware law.

39. On February 7, 2014, Theranos filed the Certificate of Designation of Series C-2 Preferred Stock with the Delaware Secretary of State.

40. In the months and years following PFM's investment, Theranos continued to publicly tout its proprietary technology, representing that the vast majority of its commercially available tests were performed by finger stick, stored in nanotainers, and tested on its own proprietary analyzers. These misrepresentations were consistent with the ones made directly to PFM prior to its investment in Theranos, and were made to reinforce PFM's belief in the truth of such representations, and to lull PFM and others into remaining trusting and non-objecting stockholders.

41. For example, on February 25, 2014, Theranos shared a customer's message on Twitter: "All the tests with one drop rather than vials of blood!" Similarly, in a presentation before the Arizona Senate Health and Human Services Committee on March 12, 2014, Balwani stated that Theranos was "able to provide a majority of the testing from only two or three drops of blood," and although those

drops of blood could be taken from a traditional venipuncture, "most likely patients will prefer a simple finger stick, and we are able to do that." Balwani displayed slides stating, among other things: "Theranos' [sic] proprietary, patented technology runs comprehensive blood tests from finger-stick samples and tests from micro-samples of other matrices"; "all the same tests. one tiny sample" [sic]; and "No big needles. Just a tiny sample. Into our nanotainer." Also in March 2014, a Theranos director representing the Company in a lawsuit stated in court that Theranos could "run a full battery of blood tests . . . by just taking small drops, a few drops of blood." He continued, "[y]ou don't have to go to [the] doctor and have them take it out of your arm the way they do traditionally."

42. In a *USA Today* segment on July 9, 2014, Holmes stated: "Over the last 10 years Theranos has worked to redevelop all of the tests run in a traditional laboratory to be able to take a tiny sample, a few droplets of blood, instead of the big tubes that are traditionally drawn from an arm." Indeed, Holmes explained in an interview on December 9, 2014, as she had previously, that Theranos "spent ten years in stealth mode," because "there was no reason for [them] to talk about it until [they] had done it" – that is, until Theranos's proprietary technology could be used commercially in place of all traditional laboratory methods.

43. During a presentation on December 5, 2014, Holmes discussed the fact that Theranos uses "tiny drops of blood from the finger as opposed to vials and vials

of blood coming from the arm." Similarly, during a TEDMED talk on March 17, 2015, Holmes said that Theranos had "made it possible to run comprehensive laboratory tests from a tiny sample or a few drops of blood that could be taken from a finger" and had "made it possible to eliminate the tubes and tubes of blood that traditionally have to be drawn from an arm and replaced with the nanotainer."

44. Theranos and its executives also continued to represent publicly that the Company had submitted its tests to the FDA for clearance. For example, Holmes stated during the December 9, 2014 interview that "[w]hereas traditional labs . . . have not ever submitted any of their laboratory-developed tests to FDA, we think it's really important" and "so we're doing that." Similarly, in a March 6, 2015 press release, Theranos stated that it "is submitting and will continue to submit all [its] tests to the FDA."

45. In these and other public statements, the Defendants portrayed the Company as revolutionizing the commercial laboratory industry with the finger stick, nanotainer, and tests that were specifically designed to run, and were being run, on customers' drops of blood using Theranos's proprietary analyzers – just as the Defendants had portrayed the Company to PFM in order to induce its investment. As subsequent revelations would make clear, however, Holmes and Balwani knew that their public portrayals of Theranos – like their private portrayals of Theranos to PFM – were false, misleading, and omitted material information.

## IV. PFM Learns of the Defendants' Misrepresentations, Misleading Statements, and Material Omissions

46. Theranos and its executives concealed the truth about the Company's technology, methods, regulatory interactions, and business plan for years. It was not until in or about October 2015, when the *Wall Street Journal* and other media outlets began to publish disturbing details about the nature of Theranos's technology and operations, that questions arose about the veracity of the Defendants' statements. This investigative reporting left the Defendants no choice but to respond, though they did so in a series of opaque, contradictory, and wholly misleading rebuttals that have only raised further questions and have led PFM to realize that the Defendants made a series of knowing misrepresentations, misleading statements, and material omissions to PFM both before and throughout its investment in the Company.

### A. The Defendants misrepresented the number and proportion of tests Theranos was able to perform using its finger-stick technology

47. On January 10 and 24, 2014, while PFM was still considering whether to invest in Theranos, Balwani and Holmes told PFM that Theranos's proprietary technology fulfilled virtually all of the needs of any customer who requested laboratory testing at one of its wellness centers. On January 10, 2014, Balwani and Holmes told PFM that Theranos had developed and validated blood tests on its proprietary technology that covered between 1,000 and 1,050 CPT codes and had a technical solution in place that would enable it to perform blood tests covering the

remaining 250 or so uncommonly used codes. On January 24, 2014, Balwani told PFM that only 1% to 2% of the tests that Theranos had developed could not be commercially performed yet using a finger stick, and as a temporary solution, Theranos drew micro-samples by traditional venipuncture with a smaller needle for 1% to 2% of its customers' tests. Balwani told PFM that the use of venipuncture for only 1% to 2% of customer tests was a short-term solution that would be in place for only six months or so, at which point Theranos would have more wellness centers open and would be able to perform 100% of tests by finger stick. Indeed, on January 28, 2014 – prior to PFM's investment – Theranos posted on Twitter: "Not a big fan of needles? Neither were we. So we got rid of them."

48. Contrary to all of these representations, the October 2015 *Wall Street Journal* exposé revealed that Theranos was only performing around 80 of the approximately 240 tests on its commercial menu using capillary samples – staggeringly fewer than Defendants had said it was performing commercially in order to induce PFM's investment. In a press release issued on October 22, 2015, Theranos conceded that the *Wall Street Journal* had been correct in its reporting; as of December 2014, it performed "more than 80" of the tests on its commercial menu using the finger stick.

49. Holmes subsequently admitted to PFM on January 26, 2016 that Theranos has 236 tests on its Pharmacy Chain menu but performed, as of that

meeting, only 87 of these tests – i.e., 37% – using capillary samples. Indeed, one Theranos director said that the transition to performing every test with nanotainers and Theranos devices would be "a journey." And Theranos's then-General Counsel admitted to *Fortune* in October 2015 that most of the tests listed on Theranos's commercial test menu are done by venipuncture. All of these admissions contradict the Defendants' knowingly false statements to PFM approximately two years earlier, in January 2014, that Theranos's proprietary technology was able to fulfill effectively all of the tests requested by any customer, purportedly because the use of venous blood draws applied to a miniscule number of tests (1% to 2%) and a small number of rarely used CPT codes, and was nothing more than a short-term gap in the Company's technology that would be in place commercially for only a matter of months in early 2014.

50. Theranos's and Holmes's admissions from October 2015 through January 2016 were particularly shocking given that, just five months previously, PFM questioned Balwani about this very issue. In May 2015, a PFM representative reported to Balwani that at a recent conference, an executive of a rival laboratory testing company said he heard Theranos had "mostly switched to a traditional venipuncture blood draw and not the needle prick blood draw that it is well known for." In response, Balwani dismissed this as "false information" and wrote that Theranos was "trying to decide" whether to send a "legal letter" to the executive.

However, given that Theranos, based on its and Holmes's own recent admissions, could not have been performing more than 37% of its tests with the finger stick in May 2015, Balwani blatantly and knowingly lied when he said it was "false information" that Theranos's commercial tests were mostly done by traditional venipuncture.

51. Balwani and Holmes not only knowingly misrepresented the scope of tests Theranos commercially performed with a capillary sample, but also knowingly and falsely represented to PFM on January 10 and 24, 2014 that the finger-stick tests covered **99.9%** of customer blood draws. In fact, after the ***Wall Street Journal*** exposé was published, Theranos disclosed in a press release dated October 22, 2015 that, as of December 2014, the tests it performed with a finger stick covered only **57%** of the blood draws performed on its customers. Just days earlier, on October 16, 2015, Balwani stated that Theranos's finger-stick tests at that time accounted for approximately **50%** of draws, while Holmes subsequently told PFM on January 26, 2016 that the then-available tests covered approximately **60%** of customer requests. The discrepancies in what Theranos, Holmes, and Balwani represented regarding the percentage of customer blood draws performed by finger stick only underscore that the Defendants misled PFM and others regarding their business. Moreover, whatever the percentage at the time, there is no question that the proportion of

customers getting their blood drawn via finger stick fell far short of the originally declared 99.9%.

52. Indeed, prior to the *Wall Street Journal* exposé, Theranos's website prominently featured a nanotainer balanced on the tip of a finger and the slogan: "one tiny drop changes everything." But after the exposé, in a glaring reversal and whitewashing of its prior public statements, Theranos's website read: "Smaller Samples. Smaller Needles. A better Experience."

**B. The Defendants misrepresented the extent to which Theranos tested blood samples using its own proprietary analyzers**

53. Regardless of whether Theranos drew drops of blood by finger stick or a micro-sample by traditional venipuncture with a smaller needle, the Defendants misrepresented that all but a handful of customers' blood tests were run on its own proprietary analyzers. In truth and in fact, until October 2015, Theranos, Holmes, and Balwani knowingly and repeatedly concealed from PFM that Theranos was relying on traditional machines made by other companies to test **all** of its venous micro-samples and that this was the Company's dominant testing practice, rather than using its own proprietary analyzers.

54. The Defendants not only concealed this material information, but affirmatively and falsely told PFM at their January 10, 2014 meeting that Theranos had developed the hardware, software, and chemistries necessary to minimize the existing laboratory infrastructure and that its proprietary analyzers ran every blood

test. Similarly, Theranos stated in a September 2013 press release that it was introducing its own "laboratory services with the ability to run its tests on micro-samples." And Balwani's materials for his March 2014 presentation before the Arizona Senate Health and Human Services Committee falsely stated that "Theranos' [sic] proprietary, patented technology runs comprehensive blood tests from finger-stick samples and tests from micro-samples[.]"

55. It was not until October 21, 2015 – after the *Wall Street Journal* exposé was published – that Holmes admitted to PFM that in instances when Theranos drew a venous micro-sample from customers, it performed the blood tests using traditional machines made by other companies, **not** Theranos's proprietary analyzers. Notwithstanding this admission, Holmes continued to make contradictory and misleading statements about the commercial tests performed using Theranos's proprietary analyzers. For example, during a November 2, 2015 interview, Holmes stated that Theranos tests micro-samples "using proprietary Theranos technology." And, in a March 20, 2016 letter to stockholders, Theranos stated that "[s]amples collected via venipuncture were run using Theranos' [sic] proprietary technologies for certain ordering patterns." During an August 1, 2016 presentation to the American Association of Clinical Chemistry ("AACC"), however, Holmes stated that a Theranos cartridge is designed for use with a capillary sample stored in a

nanotainer, not a vial containing a venous sample – all but confirming that Theranos never tested any venous "micro-samples" using its proprietary analyzers.

56. The Defendants fraudulently and knowingly concealed from PFM the Company's practice of using traditional machines made by other companies to test venous micro-samples, and that this practice predominated Theranos's tests for its customers and dated back to at least late 2013, the exact same time when Theranos was seeking an investment from PFM. In an October 2015 communication to the *Wall Street Journal* on behalf of Theranos, a Company board member admitted that at the time of a December 2013 audit of Theranos's laboratory in Newark, California by CMS, **90%** of the samples were run in the laboratory's "Jurassic Park" room, which contained only the traditional laboratory machines the Company promised that it was making obsolete. And, in a meeting with PFM on April 27, 2016, Holmes revealed that, as of January 2014, Theranos was using traditional machines made by other companies to test blood samples so that it could handle customer volume quickly while "phasing in" its proprietary analyzers.

57. Significantly, these revelations of the December 2013 audit and January 2014 "phasing in" strategy demonstrate that the Defendants not only fraudulently concealed from PFM at the time of its investment that Theranos was running the vast majority of its customers' blood tests on traditional machines made by other companies, but also brazenly lied when they told PFM at the time of its investment

that just 1% to 2% of Theranos's tests and 0.1% of its customer blood draws required the use of traditional venipuncture. Furthermore, according to the Defendants' own admissions, in the years after PFM's investment, Theranos's proprietary technology was used for, at most, 37% of its customers' tests, culminating in at least September 2015 when, as detailed below, Theranos used its proprietary technology for, at most, only the single test cleared by the FDA – or a scant **0.4%** of the Company's commercial testing menu.[4]

**C. The Defendants misrepresented the nature and status of <u>Theranos's submission of its blood tests and nanotainer to the FDA</u>**

58. In the January 10, 2014 due diligence meeting with PFM, Balwani and Holmes falsely stated that Theranos was already working with the FDA to get clearance or approval for each of its proprietary tests. Balwani further falsely stated in a January 24, 2014 call with PFM that the Company had submitted all of the tests it had developed and validated to the FDA in November 2013.

59. On July 1, 2014, following PFM's investment of approximately $96.1 million, Balwani stated that Theranos had not submitted its tests to the FDA for clearance in November 2013, but rather had filed "pre-submissions," which are

---

4 It is likely that Theranos was not in fact using its proprietary analyzers for 37% of its tests by 2015; indeed, Theranos may not have been using its proprietary analyzers at all by mid-2015. In a July 7, 2016 letter to Theranos, CMS stated that Theranos had admitted to the government that, in July 2015, Theranos had stopped using some, if not all, of its proprietary analyzers to test customers' blood samples.

formal written requests for feedback from the FDA to help guide product development and/or application preparation. Years later, on January 26, 2016, Holmes admitted to PFM that Theranos had submitted only 5 to 10 tests to the FDA. Given that a pre-submission is merely a preliminary step that may be taken in preparation for a submission to the FDA, the distinction between the two concepts is critical, and Balwani's and Holmes's representations in this regard prior to PFM's February 2014 investment were fundamentally misleading.

60. From in or about July 2014 through in or about January 2015, Theranos, Holmes, and Balwani continued to misrepresent that the Company had pre-submitted **all** of Theranos's tests to the FDA. In or about February 2015, Balwani represented to PFM that Theranos had pre-submitted only 110 tests, even though Balwani had previously told PFM on January 24, 2014 that the Company had developed and validated approximately 300 tests.[5] On January 26, 2016, Holmes told PFM that Theranos had pre-submitted 120 tests. Because Holmes and Balwani

---

5 On July 10, 2016, in an article entitled "Under Fire, Theranos CEO Stifled Bad News," the *Wall Street Journal* reported that, as recently as June 2016, Holmes told employees that Theranos had developed more than 300 tests using small volumes of blood. However, the *Wall Street Journal* stated that, according to an unnamed source who worked at Theranos, most of the experiments had not progressed beyond laboratory research. By contrast, on January 24, 2014, Balwani had falsely told PFM that Theranos had developed and validated approximately 300 tests.

knew at the time of the January 10, 2014 meeting with PFM that Theranos had not even pre-submitted all of its tests to the FDA, much less submitted all of the tests it had supposedly validated for FDA clearance, their earlier statements to the contrary were knowingly false. Indeed, when asked at the AACC conference how many analytes[6] can be run on Theranos devices, Holmes answered that Theranos has worked on "a large number" of analytes on different versions of its analyzer platform. When asked whether "a large number" meant two thousand or more, Holmes stated that since it started, the Company has developed a few hundred chemistries for different analytes. But when pressed on how many proceeded past the research and development stage, Holmes admitted that only one has received FDA clearance.

61. Theranos has obtained FDA clearance only for its HSV-1 test, which was cleared in July 2015 (and had not even been submitted to the FDA until November 2014). Theranos announced the clearance with much fanfare, misleadingly touting it as supposed proof that its entire platform was a success. Remarkably, the Company issued a press release on July 2, 2015 titled: "Theranos receives FDA clearance and review and validation of revolutionary finger stick technology, test, and associated test system." At the time it made that statement,

6 An "analyte" is the substance whose chemical constituents are identified and measured in a blood test, which is performed by adding one or a series of chemical reagents to the sample.

Theranos, Holmes, and Balwani knew exactly what had been cleared, and its "finger stick technology" and "test system" were not it. Yet again, on July 8, 2015, Theranos referred to itself as having "received clearance of its lab technology from the FDA last week[.]" Balwani made similar misrepresentations by email to PFM on July 20, 2015, describing the HSV-1 clearance as "a onetime process" and saying that "for [the] most part, we don't have to repeat this for each assay we file." This statement misrepresents the reality that the HSV-1 clearance covered a specific clinical use and did not provide FDA marketing clearance for use of Theranos's proprietary technology in other clinical applications. Each test for which Theranos sought marketing clearance would need to satisfy the same regulatory requirements. PFM was not the only investor to which Defendants actively misrepresented the HSV-1 clearance. Also on July 20, 2015, Balwani re-tweeted a message from another investor stating, "Congrats to @theranos for FDA approval for theri [sic] process." In a later post on Twitter on October 16, 2015 – in an apparent attempt at damage control after the *Wall Street Journal* exposé – the Company continued to mischaracterize the nature of what the FDA had actually cleared: "We got FDA clearance of the exact system that @WSJ is questioning." Doubling down on its misrepresentation, Theranos added: "[t]he nanotainer has already been cleared once; we're working to get it cleared again."

62. Similarly, the Company's July 16, 2015 press release regarding the CLIA waiver of the HSV-1 test, which allows the test to be administered in locations outside of traditional clinical laboratories, stated that the "waiver means FDA determined the Theranos test and technology is reliable and accurate[.]" That statement was false; in fact, pursuant to 42 U.S.C. § 263a, a CLIA waiver signifies the FDA's determination that a test is "simple" and poses "an insignificant risk of an erroneous result" based on the FDA's CLIA complexity criteria. In his July 20, 2015 email to PFM, Balwani again misrepresented the nature of the CLIA waiver when he said it was a "game changer" by which Theranos received a CLIA waiver on its "entire system and process." Defendants knew or should have known the true scope of Theranos's limited regulatory clearances and waivers, and their misrepresentations – both in public and private – are consistent with their pattern of lies about the Company's troubled reality.

63. In addition to their misrepresentations regarding the status of seeking FDA clearance or approval for the Company's blood tests, Theranos, Holmes, and Balwani also falsely represented that the Company was in the process of obtaining FDA clearance for its proprietary nanotainer. In the January 21, 2014 meeting with PFM, and again on a call with PFM three days later, Balwani falsely represented that Theranos was actively working with the FDA to get clearance of all of its tests and equipment, and that it had filed for clearance of its nanotainer in November 2013.

Defendants repeatedly represented to PFM (including on an April 1, 2014 call, in an April 25, 2014 meeting, and on a July 1, 2014 call) that they expected a series of clearances, including for the Company's nanotainer, in 2014.

64. But the nanotainer did not obtain FDA clearance by the end of 2014. Nor did it obtain FDA clearance by the end of 2015, notwithstanding Defendants' continued misrepresentations to the contrary, including on October 1 and 16, 2015, that clearance was expected by the end of the year. Completely contradicting the statements he made to PFM in 2014 that Theranos had submitted the nanotainer for clearance in November 2013, Balwani stated in the October 16, 2015 call to PFM that Theranos submitted three different types of nanotainers in or around July 2015. Then, on October 28, 2015, Holmes told PFM that Theranos had begun working on FDA clearance for its nanotainer two years previously (i.e., in the fall of 2013), and had submitted the nanotainer for clearance "a year and a half ago" (i.e., in the spring of 2014). Yet on April 27, 2016, Holmes told PFM that the nanotainer had been submitted for clearance at the end of February 2016. Holmes also stated that "when the data goes in," she expected that "it will be accepted," suggesting that even now, the nanotainer application still may not be complete. These October 2015 and April 2016 conversations demonstrate that regardless of the true status of FDA clearance for the nanotainer, Defendants' representations to PFM before it invested – i.e., that

the nanotainer application had already been filed and that clearance was expected shortly – were completely false.

65. Even assuming that Theranos has actually submitted the nanotainer for FDA clearance at this point, there is no indication of when it will receive FDA clearance – if ever. But a very significant aspect of Theranos's value proposition, upon which PFM relied when it invested in the Company, was its then-present ability to use a finger stick and nanotainer to draw just a few drops of blood without the need for a phlebotomist, all in a commercially viable setting and as a substitute for traditional laboratory businesses.

66. Moreover, in September 2015, the FDA informed Theranos that the nanotainer was not "a Class I exempt medical device," as improperly identified by Theranos, but was "a Class II medical device," and Theranos was unlawfully "shipping [an] uncleared medical device in interstate commerce[.]" The FDA's notice to Theranos was a stinging rebuke that likely means the FDA, in fact, had not yet been asked to clear the nanotainer as a medical device even as late as September 2015, in direct contradiction to the Defendants' prior representations. On the same day, the FDA also observed that even though Theranos had been providing test results to patients using its blood collection devices, the Company had not documented the possible hazards associated with these collection devices. Thus, far

from clearing and approving Theranos's tests and devices, the FDA has raised concerns that have serious implications for patient health and safety.

67. Yet even as recently as June 2016, the Company's website prominently featured a man holding a nanotainer between his thumb and index finger, with the accompanying text asserting that "Theranos receives FDA clearance."[7] To the contrary, as early as September 2015, Theranos stopped using the nanotainer for all but one of its tests because the FDA observed that it was **not** a cleared medical device, and now with the closure of its laboratories, the Company has shuttered its testing operations altogether.

**D. The Defendants misrepresented the reason Theranos stopped using its finger-stick and nanotainer collection method for all but one test**

68. Using a finger stick – as opposed to a venipuncture – to draw blood required the use of Theranos's proprietary nanotainer to collect and store the drops of blood. Unbeknownst to PFM, the FDA had warned Theranos on September 16, 2015 that the nanotainer was an "uncleared medical device" that Theranos was unlawfully "shipping . . . in interstate commerce." After the *Wall Street Journal* exposé, the Company admitted in an October 28, 2015 press release that, when the

7 Notably, the website now includes several disclaimers that the Company's "technology" – including its sample collection device and nanotainer – "has not been cleared or approved by the FDA[.]"

FDA informed Theranos of its position regarding the nanotainer, Theranos stopped using nanotainers "immediately."

69. But the Defendants concealed this material information from PFM for over a month. During a conversation on October 1, 2015, Balwani told PFM that the nanotainer had been submitted to the FDA for clearance, but made no mention of the fact that at that time, Theranos was no longer using the nanotainer for any test but the HSV-1 test. Then, during a call on October 16, 2015, Balwani falsely told PFM that Theranos was still performing 75 to 80 of its available tests using its finger-stick and nanotainer collection method, when in fact it was only using this method for the single HSV-1 test cleared by the FDA.

70. It was not until October 21, 2015 that Holmes disclosed to PFM that Theranos was no longer using its finger-stick and nanotainer collection method for tests that had not been cleared by the FDA (i.e., for all but the HSV-1 test). Indeed, PFM learned on November 16, 2015 that Holmes and Balwani had failed to disclose even to the Pharmacy Chain – Theranos's business partner and the cornerstone of its retail model – that they had stopped using the nanotainer in the Pharmacy Chain's stores. Although it had effectively stopped using finger sticks and nanotainers, Theranos continued to mislead its partners, investors, and the public when it posted on Twitter on October 22, 2015: "Finger-sticks work[.]"

71. Holmes represented to PFM that she had "voluntarily" decided not to use this method while Theranos transitioned to the "FDA framework," but she failed to disclose that the FDA had in fact informed the Company that the nanotainer was an uncleared medical device unlawfully being shipped in interstate commerce. Similarly, in a November 2, 2015 interview at *Fortune*'s Global Forum, Holmes claimed she "was the person who chose, voluntarily, to stop using our nanotainer tubes" and that it was the "decision to transition our systems to the FDA framework, which led us right now, as of this moment, for the last few weeks only, to run just one test" using the finger-stick and nanotainer collection method. Thus, she said, "temporarily, as we transition, which has now been just a few weeks, we would not be using that [nanotainer] tube to collect our samples."

72. Holmes's statements in October and November 2015 that she had "voluntarily" decided, in "the last few weeks," to "temporarily" stop using the nanotainer for all but one test were knowingly false and misleading. In truth and in fact, Theranos had stopped using its finger-stick and nanotainer collection method for all but one of its tests at least as early as September 2015, in response to the communication it received from the FDA. Theranos and its executives not only failed to disclose this material information, but affirmatively and fraudulently represented in October 2015 that Theranos was still actively using finger sticks and nanotainers in a commercial setting for more than just a single test. Indeed, Holmes

falsely told PFM again on January 26, 2016 that the Company was still performing 87 tests using finger sticks and nanotainers in Pharmacy Chain locations. During that meeting, she also admitted that the Company had anticipated that it would have more time before moving to the FDA's "medical device world," but the FDA "gave [Theranos] no transition." This admission was in striking contrast to her previous – and ongoing – misrepresentations that the decision to stop using nanotainers in the meantime was "voluntary."

73. Nor was this shift away from finger sticks and nanotainers "temporary." For at least the one-year period prior to its recent announcement that it is shutting down its blood-testing facilities altogether, Theranos was still using its finger-stick and nanotainer collection method for, at most, only a single test for its customers, and likely in only a single state (Arizona).[8] In any event, recent events have only confirmed that Theranos's abandonment of its signature blood collection method, which had always been touted as the core of its commercial strategy, is permanent.

---

8 As described in further detail below, Theranos stated in June and July 2016 that it was using "a third party reference lab to process samples" for its California patients. Given Holmes's statement that Theranos has "never used commercially available lab equipment for finger stick-based tests[,]" that third party reference lab could not have been processing capillary samples. Thus, it is highly unlikely that Theranos used its finger-stick and nanotainer collection method in California after September 2015.

**E. The Defendants misrepresented Theranos's ability to meet its rollout commitments**

74. From the very beginning, Theranos and its executives presented a business strategy to PFM that was based on rolling out in three key markets: retail pharmacies, hospitals, and physicians' offices. Theranos and its executives represented that the Company already had contracts in place with committed partners including the Pharmacy Chain, the Grocery Chain, and several major healthcare provider networks and payors. They further touted the use of Theranos's proprietary technology in the field by the U.S. military.

75. In January 2014, Theranos and its executives provided its rollout schedule to PFM, which included the planned number of locations on a monthly basis for each of these three markets. For example, Theranos and its executives represented that, beginning in February 2014, it would be in 21 retail pharmacies, and by the end of the following month it would be in 40 physicians' offices. Theranos and its executives also made specific representations about its existing contracts with certain partners, including that the Grocery Chain had guaranteed Theranos wellness centers in at least 1,000 stores (which required a $400 million capital expenditure by the Grocery Chain), and that the Pharmacy Chain similarly made minimum commitments regarding the number of wellness centers it would open (in addition to pledging a large investment in infrastructure).

76. Even before it began to crumble in the face of regulatory scrutiny and fallout from the *Wall Street Journal* exposé, Theranos was in scarcely more than 50 retail pharmacies; it was not in any hospitals or physicians' offices; it had told PFM that its Grocery Chain contract was "dead"; and it had no deal in place with the U.S. military. Then, dealing a fatal blow to Theranos's retail operations, the Pharmacy Chain terminated its contract with Theranos and shut down all of its stores' wellness centers. Many of the initial representations the Defendants made in connection with their rollout timetable, and upon which PFM relied in evaluating its investment, were knowingly false and misleading.

77. On January 10, 2014, Theranos and its executives falsely described their rollout with the Pharmacy Chain and Grocery Chain as not just aspirational, but guaranteed, because each chain was contractually committed to opening a minimum number of Theranos locations. In truth and in fact, Balwani later revealed in a July 1, 2014 call with PFM that the Pharmacy Chain would not roll out to any additional locations until Theranos was drawing blood by finger stick for at least 90% of customers. At the same time, Balwani sent a clear message that the Company was very close to this benchmark, falsely assuring PFM that it would be drawing blood by finger stick for 95% to 97% of its customers by the end of the year. Balwani's statements were false because he knew in July 2014 that Theranos was nowhere close to drawing blood by finger stick for 90% of its customers (as proven

through the Defendants' own subsequent admissions), and therefore he was making representations that he knew were factually impossible. Indeed, Balwani falsely reported to PFM in September 2014 that the Pharmacy Chain was, at the very least, "committed" to opening 500 Theranos locations by the end of 2015. But, again, Balwani knew this statement was false at the time he made it because Theranos was still nowhere close to the 90% benchmark set by the Pharmacy Chain.

78. Moreover, Theranos and its executives had falsely represented to PFM in January 2014 that the second phase of its rollout involved installing its proprietary analyzers in retail pharmacies so that it could run blood tests using its equipment on the spot and provide results in as little as 30 minutes. This was a crucial aspect of Theranos's value proposition and its ability to scale its business nationwide. But it was only after its investment that PFM learned the Pharmacy Chain had no plans to ever put Theranos's proprietary analyzers in its stores – material information that the Defendants intentionally concealed from PFM and misled PFM to believe otherwise.

79. Another key part of the retail rollout was the Defendants' development of software that would enable Theranos to determine "real time eligibility" for its customers' insurance benefits and coverage, the goal of which was to streamline and simplify customer access to Theranos's testing services. Relatedly, Holmes and Balwani also touted the Company's development of software and systems that enabled it to integrate with providers of Electronic Medical Records ("EMR")

software. On or about December 12, 2013, Holmes explained to PFM that Theranos had not only developed proprietary blood-testing equipment, but also had developed software to improve connectivity between its laboratory and the doctors' offices and/or hospitals where customers' EMRs would be maintained. On January 10, 2014, Holmes and Balwani represented to PFM that Theranos had integrated with the top thirty EMR providers and therefore was able to offer simple connectivity to patient records as part of its retail operation. More than a year and a half later, however, during a September 29, 2014 call, Balwani told PFM that Theranos had only integrated with "up to 17" EMR providers and needed to integrate with 13 more in order to reach 30 providers, which would cover 80% of the very fragmented EMR provider market.

80. Whatever the status of EMR integration and "real time" verification of insurance eligibility, it is clear that Balwani and Holmes blatantly misrepresented the state of Theranos's progress in these areas in order to make the retail experience it offered to customers appear seamless and convenient, when in reality, such efforts were merely in their early stages. Given that the success of Theranos's business depended upon large numbers of customers quickly moving in and out of its retail wellness centers each day, this was yet another crucial aspect of Theranos's value proposition about which PFM was materially misled.

81. In addition to the retail rollout, a critical aspect of the Defendants' January 2014 stated business strategy was its expansion into hospitals and physicians' offices nationwide. Holmes and Balwani originally stated that Theranos's services would be in 580 hospitals and 2,400 physicians' offices by the end of 2015, and they repeatedly told PFM that Theranos's expansion was progressing well on both fronts. On April 1, 2014, for example, Balwani falsely reported to PFM that Theranos was having "phenomenal" traction with physicians' offices, which, together with hospitals, would be more important than retail in the long run. Similarly, in a call with PFM on July 1, 2014, Balwani falsely stated that hospital traction was "fantastic."

82. In reality, much like deals with physicians' offices, not one deal with a hospital ever materialized, even assuming such purported deals existed in the first place. Indeed, while Balwani and Holmes repeatedly told PFM that they had partnerships with two specific hospital networks in particular, nothing ever came of either of these purported partnerships. PFM subsequently learned that one of the so-called "partnerships" involved nothing more than a plan for a limited pilot program through which Theranos's technology would be compared against traditional tests at a single clinic – and there is no indication that even that limited pilot program happened. And PFM also learned that one of the operational leads of the other hospital network had never even heard of any supposed "partnership" with Theranos.

83. In a meeting on April 27, 2016, when asked by PFM about the lack of hospital contracts, Holmes claimed for the first time that the hospital business was always intended to merely "fill in" volumes once Theranos launched in the commercial retail market. This assertion completely contradicts the Defendants' representations leading up to PFM's investment that the hospital business was one of the three key markets, along with physicians' offices and retail locations, upon which Theranos's entire business strategy was explicitly based. And with the commercial retail partnerships likewise having gone nowhere, Theranos has effectively failed to roll out in a single market.

V. Theranos's Web of Lies and Deceptions Continues to Unravel

84. Since the *Wall Street Journal*'s exposé and attendant fallout beginning in or about October 2015, nearly every month brings new information about the truth regarding Theranos's technology and business model. There have also been media reports that Theranos employees who tried to raise concerns that the Defendants were misrepresenting Theranos's capabilities either were fired, were forced to leave, or decided to quit rather than perpetuate the fraud being committed.

85. Unbeknownst to PFM at the time, after inspecting Theranos's laboratory in Newark, California in November 2015, CMS notified Theranos of various deficiencies in a survey report dated November 29, 2015. Based on this survey, again unbeknownst to PFM at the time, CMS informed Theranos in a letter

dated January 25, 2016 that the laboratory was "not in compliance" with five conditions necessary for CLIA certification and that "the deficient practices of the laboratory pose immediate jeopardy to patient health and safety." Again unbeknownst to PFM at the time, CMS subsequently rejected Theranos's attempt to remedy these deficiencies, informing it in a letter dated March 18, 2016 that its submission did "not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited" and did "not demonstrate that the laboratory has come into Condition-level compliance and abated immediate jeopardy."

86. CMS is not the only government body investigating Theranos. An April 18, 2016 *Wall Street Journal* article reported, based on anonymous sources, that the U.S. DOJ has launched a criminal investigation into whether Theranos "misled investors about the state of its technology and operations[.]" Theranos and its executives also have acknowledged that there is an ongoing SEC investigation, and the April 18, 2016 *Wall Street Journal* article reported, based on anonymous sources, that the SEC is similarly "examining whether Theranos made deceptive statements to investors when it solicited funding[.]" In addition, on July 26, 2016, members of the House Committee on Energy and Commerce sent letters to CMS and the FDA requesting information about Theranos and its response to the agencies'

actions, noting the Company's "disregard for patient safety and its failure to immediately address concerns by federal regulators[.]"

87. On May 2, 2016, Theranos announced the "retirement" of the Defendant Balwani, a 50-year-old executive and member of the Board of Directors of Theranos who has been with the Company since its inception and has been one of its primary spokespersons and conveyors of false and misleading information about the Company. Balwani's sudden departure from the Company following the recent disclosures in the media, by the Company, and by federal agencies raises serious questions regarding the reasons for his "retirement."

88. On May 18, 2016, the *Wall Street Journal* revealed another major blow for the Company. Theranos voided tens of thousands of test results it provided to patients in 2014 and 2015 because they were invalid, and several consumer class action suits have been filed against the Company as a result. Theranos admitted in a May 19, 2016 letter to stockholders that "[t]he basis for voiding test results in [its] Newark lab was the Newark laboratory's failure to implement and adhere to sufficient quality assessment procedures[.]" Significantly, as is only now apparent, the vast majority of those tests were not even performed using Theranos's proprietary technology, making this unacceptable risk to patient safety even more incomprehensible. Theranos also admitted in its June 12, 2016 letter to stockholders that it had "suspended all testing" in its Newark laboratory.

89. Yet another substantial blow came on June 12, 2016, when the Pharmacy Chain ended its strained relationship with Theranos and announced that it would close all Theranos wellness centers immediately. Theranos does not appear to have any other material source of revenue, and the key component of its business model has been destroyed.

90. Sounding the death knell for Theranos's laboratory operations, CMS issued a notice on July 7, 2016, stating that it would impose significant sanctions against the Company, Holmes, and Balwani. Among other sanctions, CMS is taking action to revoke the CLIA certificate for Theranos's Newark laboratory, impose a monetary penalty of $10,000 per day for each day of non-compliance, cancel the Newark laboratory's approval to receive Medicare and Medicaid payments for all laboratory services, and ban Holmes and Balwani, and thereby Theranos itself, from owning or operating a laboratory for at least two years. As the Company itself recognized in its July 8, 2016 press release regarding the CMS sanctions, once the revocation of its Newark laboratory's CLIA certificate takes effect, "the Arizona lab would cease to operate" as well.

91. CMS's July 7, 2016 letter to Theranos underscores the falsity of the representations made by the Company, Holmes, and Balwani to PFM. For example, the letter states that documentation supplied by Theranos to CMS indicated that at least one of its proprietary analyzers "was not used for patient testing after June 25,

2015," but its submission to CMS stated that the system "was 'fully retired in early-August 2015[,]'" and thus "[p]atient testing was 'retired' later than when the laboratory previously indicated." In other words, the Defendants misrepresented the timing of its decision to stop using its proprietary analyzers for blood tests not only to PFM, but to CMS as well. In addition, the letter lists twelve blood tests for which Theranos indicated it had stopped using its proprietary analyzers in 2014 or mid-2015 – long before any of the Defendants admitted to PFM the true extent of the Company's use of traditional machines in October 2015. The letter also calls out multiple instances in which the Company made "contradictory statements" regarding its use of particular testing methods and devices.

92. Theranos confirmed in its July 8, 2016 press release that, in response to CMS's findings, it effectively shut down its Newark laboratory. It stated in that press release that its "Arizona lab currently processes all the samples that Theranos tests" – though for many patients, "including for [its] California patients," it is using "a third party reference lab to process samples[.]" The Company subsequently reiterated in its August 25, 2016 press release that it "is not conducting patient testing at its Newark facility."

93. But CMS has already indicated that, separate and apart from its concerns with Theranos's testing practices, even the Company's collection procedures raise significant concerns. In its July 7, 2016 letter, CMS stated that it

would expect to see certain information in the Company's laboratory protocol for the process of collecting patient specimens and sending them to another laboratory for testing, including "documented corrective actions related to the high number of clotted specimens received by the laboratory." However, "[n]o such documentation was submitted."

94. Holmes's presentation at the annual AACC meeting on August 1, 2016 further demonstrates the falsity of the representations made by the Defendants in order to induce PFM to invest in Theranos. Holmes presented a supposedly new version of the Theranos proprietary analyzer, called the "miniLab" – a name she and Balwani had previously used to describe the Theranos analyzer over two years ago, in a meeting with PFM on January 10, 2014 (as well as in the financial model provided to PFM on or about January 21, 2014). At that same January 2014 meeting, they also represented that Theranos could perform 70 or more tests on a single cartridge. But in her AACC presentation, Holmes admitted that only a handful of tests could be run on a single cartridge, and that multiple nanotainers of blood may be required to fulfill certain patient requests.

95. Holmes further stated that Theranos's central achievement was that it had built a device capable of performing a broad range of assay methods (clinical chemistry, immunochemistry, hematology, immunology, and molecular biology) on a single platform. But this "central achievement" was never part of the business in

which the Defendants falsely induced PFM to invest, and falls far short of the Company's promises to get rid of the "big bad needle" or to offer all tests to customers using a single capillary sample.[9] Indeed, one scientist who questioned Holmes during the Q&A portion of the AACC discussion later told *Vanity Fair*: "Although I am not sure, it is not clear to me how different [Theranos's earlier technology] and miniLab are. . . . The problem is that they showed us a limited number of tests, and I think we had a right to expect—based on what they had said previously—that they would be able to show a very large number of tests on a single drop of blood. We did not see that." Regardless of whether this "miniLab" is in fact new, Holmes's presentation made strikingly clear that Theranos's technology still is not capable of doing what the Defendants promised it was able to do at the time they induced PFM to invest.

96. Yet another setback came in August 2016, when the FDA issued a notice stating that Theranos had collected data supporting the accuracy of its Zika

---

9 Holmes's emphasis at the AACC presentation on the engineering and components of the analyzer is particularly troubling because she admitted the Company's analyzer technology is constantly evolving; even the single HSV-1 test cleared by the FDA in July 2015 contemplates use of an older version. But if even the August 2016 version of the technology falls short of claims the Company made in 2013 and 2014, it is inconceivable that Theranos's supposed achievements had been realized at the time it induced PFM's investment. Yet Theranos falsely stated as recently as May 2016 that combining all methodologies on a single platform was something that Theranos had "spent over a decade" developing "prior to becoming consumer facing[.]"

test – which Holmes had touted at the AACC presentation – without implementing a protocol approved by an institutional review board to ensure patients are treated safely and ethically during medical studies. In an August 27, 2016 letter to stockholders, the Company admitted that it had withdrawn both its Zika submission and its Ebola submission to the FDA.

97. In October 2016, Theranos put the final nail in its own coffin. It announced that it is closing its clinical laboratories and patient testing centers and laying off approximately 340 – more than 40% – of its employees. In an open letter dated October 5, 2016, Holmes wrote that the Company would "return [its] undivided attention to [its] miniLab platform" and that its "ultimate goal is to commercialize miniaturized, automated laboratories capable of small-volume sample testing[.]" In other words, Theranos has abandoned any attempt to execute the core business model and strategy in which PFM invested – that is, the Company's promised ability to perform nearly all laboratory tests for consumers directly, at a low price, and in a commercial setting, on only a few drops of blood drawn from a patient's finger.

98. Holmes now says that Theranos has a new executive team that will work toward "obtaining FDA clearances" and "building commercial partnerships." That these preliminary benchmarks still have not been realized – nearly three years

after Theranos represented to PFM that they were well in hand – underscores the extent of the Defendants' fraud and deceit.

99. As a result of Defendants' web of lies, Theranos has no revenue, no products, and no customers. Defendants, moreover, have admitted that Theranos is continuing to spend the money it received from defrauded stockholders, like PFM, at a monthly burn rate of approximately $20 million.[10]

| Year | Month | In $000's Unrestricted Cash & Investments |
|---|---|---|
| 2016 | May | $ [redacted] |
| 2016 | June | $ [redacted] |
| 2016 | July | $ [redacted] |
| 2016 | August | $ [redacted] |
| 2016 | September | $ [redacted] |
| 2016 | October | $ [redacted] |

To stay afloat, in January 2017, Theranos terminated another 40% of its workforce. On February 16, 2017, the *Wall Street Journal* revealed that on a January 2017 investor call – from which PFM was wrongly excluded, as it has been without proper cause from all investor communications since the filing of this lawsuit – Theranos confirmed that it had no material revenue in 2015 or 2016, that it had cash on hand of approximately $200 million at year-end, its monthly burn rate is $20 million, it

---

10 Defendant Theranos's Responses and Objections to Plaintiffs' First Set of Interrogatories, dated December 13, 2016, at 128.

has no prospect of future earnings, and it has not set aside any reserves for any liabilities despite facing two lawsuits claiming in excess of $240 million.

100. The true picture of Theranos that has been emerging over the past year bears no resemblance to the company in which PFM was led to believe it had invested. The Company's latest claim is that it is "developing technologies . . . to make it possible for more people, in more places, to get the laboratory tests they need." While Theranos and Holmes are characteristically tight-lipped about the details of the Company's newest business model, it appears that Theranos is now just another company seeking to sell medical hardware – a far cry from the incredibly disruptive player in the laboratory testing industry that it represented itself to be in order to solicit an investment from PFM. Whatever the "real" Theranos is, that reality was concealed from PFM and manipulated through Defendants' long-running deceit, and fundamentally is not what PFM would have invested in for approximately $96.1 million. Accordingly, PFM has no choice but to bring this action in order to obtain relief for its investors.

**COUNT I**

**(Fraudulent Misrepresentation and Inducement)**
**(Against All Defendants)**

101. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

102. The Defendants made statements to PFM that were materially false, including with respect to: (1) the number and percentage of blood tests Theranos was capable of performing commercially using its finger stick and nanotainer; (2) Theranos's use of equipment made by other manufacturers, as opposed to its proprietary analyzers, to test customers' blood samples; (3) regulatory interactions related to Theranos's proprietary technology; (4) Theranos's decision to stop using the finger stick for all but one diagnostic test; and (5) Theranos's rollout in retail pharmacies, hospitals, and physicians' offices.

103. The Defendants knew or had reason to know that such representations were false and/or they made such representations with reckless indifference to the truth. Due to Theranos's extreme secrecy, additional information regarding the Defendants' knowledge of falsity is peculiarly within the Defendants' knowledge and control.

104. The Defendants purposefully made these misrepresentations in order to induce reliance by PFM, including to induce PFM to enter into a contract for the purchase of Theranos shares.

105. PFM was unaware of, and reasonably and justifiably relied upon, the material misrepresentations made by the Defendants, in that PFM purchased Theranos securities.

106. As a direct and proximate result of the fraudulent misrepresentations by the Defendants, PFM has been damaged.

## COUNT II

**(Fraudulent Concealment)**
**(Against All Defendants)**

107. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

108. The Defendants deliberately concealed material information, including with respect to the topics described in paragraph 102. The Defendants had a duty to disclose such information in order to prevent the statements they actually made from being misleading. In addition, Holmes and Balwani, as directors and officers of Theranos, owed fiduciary duties to PFM, as a Theranos stockholder, and had a duty to refrain from any act that breached the trust reposed in them.

109. The Defendants knew or had reason to know that the information they concealed was material, but they purposefully concealed the information to induce reliance by PFM, including to induce PFM to enter into a contract for the purchase of Theranos shares. Due to Theranos's extreme secrecy, additional information regarding the Defendants' knowledge is peculiarly within the Defendants' knowledge and control.

110. PFM reasonably and justifiably relied upon the material omissions made by the Defendants, in that PFM purchased Theranos securities.

111. As a direct and proximate result of the fraudulent omissions by Theranos, Holmes, and Balwani, PFM has been damaged.

**COUNT III**

**(Securities Fraud in Violation of Cal. Corp. Code §§ 25401 and 25501)**
**(Against All Defendants)**

112. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

113. The Defendants offered to sell, and did sell, securities to PFM by means of written and oral communications that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which the circumstances were made, not misleading. These misrepresented and omitted material facts include but are not limited to those described in paragraph 102.

114. PFM reasonably and justifiably relied upon the Defendants' misrepresentations and omissions of material fact in that PFM purchased Theranos securities.

115. As a direct and proximate result of the fraudulent conduct of the Defendants, PFM has been damaged.

**COUNT IV**

**(Securities Fraud in Violation of Cal. Corp. Code §§ 25400(d) and 25500)**
**(Against All Defendants)**

116. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

117. The Defendants, for the purpose of inducing PFM's purchase of securities, made false and misleading statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These misrepresented and omitted material facts include but are not limited to those described in paragraph 102.

118. The Defendants knew or had reasonable grounds to believe that these statements and omissions were false and misleading. Due to Theranos's extreme secrecy, additional information regarding the Defendants' knowledge of falsity is peculiarly within the Defendants' knowledge and control.

119. PFM reasonably and justifiably relied upon the false statements and material omissions made by the Defendants, in that PFM purchased Theranos securities.

120. As a direct and proximate result of the fraudulent conduct of the Defendants, PFM has been damaged.

**COUNT V**

**(Equitable Fraud)**
**(Against All Defendants)**

121. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

122. The Defendants made statements to PFM that were materially false, and they failed to disclose information that made other statements materially misleading, including with respect to the topics described in paragraph 102.

123. The Defendants purposefully made these misrepresentations and omissions in order to induce reliance by PFM, including to induce PFM to enter into a contract for the purchase of Theranos shares.

124. PFM was unaware of, and reasonably and justifiably relied upon, the material misrepresentations and omissions made by the Defendants, in that PFM purchased Theranos securities.

125. As a direct and proximate result of the fraudulent misrepresentations and omissions made by the Defendants, PFM has been damaged.

## COUNT VI

**(Negligent Misrepresentation)**
**(Against All Defendants)**

126. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

127. By virtue of their selling Theranos securities to PFM and accepting PFM's investment, the Defendants had a particular duty to provide accurate information about Theranos's business, based on PFM's pecuniary interest in that

information. In addition, Holmes and Balwani, as directors of Theranos, owed fiduciary duties to PFM, as a Theranos stockholder, and had a duty to refrain from any act that breached the trust reposed in them.

128. The Defendants supplied false information to PFM, including with respect to the topics described in paragraph 102.

129. The Defendants failed to exercise reasonable care in obtaining or communicating information to PFM.

130. PFM reasonably and justifiably relied on the false information communicated by the Defendants, in that PFM purchased Theranos securities.

131. PFM sustained pecuniary loss as a direct and proximate result of its reliance on the false information communicated by the Defendants.

## COUNT VII

**(Breach of Fiduciary Duty)**
**(Against Holmes and Balwani)**

132. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

133. Holmes was a director of Theranos at all relevant times and she owed fiduciary duties to Theranos's stockholders, including PFM. Balwani was a director of Theranos until in or about May 2016 and he owed fiduciary duties to Theranos's stockholders, including PFM.

134. When Holmes and Balwani communicated with PFM after its investment in Theranos about corporate matters, they had a fiduciary duty to exercise due care and loyalty, which included a duty to be honest to PFM. Holmes and Balwani also had a duty to communicate honestly with its stockholders, including PFM, when they made public statements about corporate matters. In addition, Holmes and Balwani had a fiduciary duty to PFM, after its investment in Theranos, to correct any false statements that had been made to PFM prior to its investment.

135. Holmes and Balwani breached their fiduciary duties to PFM by making false representations, misleading statements, and material omissions to PFM after its investment in Theranos, including with respect to the topics described in paragraph 102.

136. Holmes and Balwani further breached their fiduciary duties to PFM by publicly disseminating false representations, misleading statements, and material omissions, including on Theranos's website, on social media, and in statements to the press. As set forth above, Holmes and Balwani made public statements that were materially false and misleading, and that omitted material information, including with respect to the topics described in paragraph 102.

137. Holmes and Balwani further breached their fiduciary duties to PFM by failing to correct the false misrepresentations, misleading statements, and material omissions that had been made to PFM prior to its investment in Theranos. Indeed,

since the filing of this action, PFM has been wrongfully excluded from investor communications, including shareholder letters, emails, and calls.

138. PFM has been and continues to be damaged as a result of Holmes and Balwani's breaches of fiduciary duty.

**COUNT VIII**

**(Violation of the Deceptive Trade Practices Act, 6 *Del. C.* § 2531 *et seq.*)**
**(Against All Defendants)**

139. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

140. The Defendants engaged in deceptive trade practices by, among other things, representing in the course of business that Theranos's proprietary technology had approvals, characteristics, and uses that they did not in fact have, and that its testing equipment and devices were of a particular quality and type when in reality they were not.

141. The Defendants also engaged in deceptive trade practices because their conduct – including their misstatements, omissions, and now, denials in the wake of the recent press coverage – created and continue to create a likelihood of confusion and misunderstanding about the nature of Theranos's technology and operations.

142. Defendants' unfair and deceptive trade practices interfered with the promotion and conduct of PFM's business.

143. PFM has been damaged by the Defendants' willful deceptive trade practices, entitling it to relief for actual losses, treble damages, and attorneys' fees pursuant to 6 *Del. C.* §§ 2533(b), (c).

**COUNT IX**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against Defendants Theranos and Holmes)**

144. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

145. PFM entered into a written Stock Purchase Agreement, Investors' Rights Agreement, Voting Agreement, and Side Letter with Defendants Theranos and Holmes.

146. Under these agreements, Defendants Theranos and Holmes owed PFM the duty of good faith and fair dealing implied in all contracts governed by Delaware law.

147. In the Investors' Rights Agreement, PFM agreed to keep "strictly confidential" "any information provided by [Theranos] to any Investor." (Investors' Rights Agreement, § 3.1(b).) It is evident from this writing that, had the parties thought to negotiate with respect to the honesty of Theranos and Holmes in providing such information, the parties would have agreed that these Defendants were proscribed from making material misrepresentations or omissions regarding Theranos's business and technology during the course of the parties' relationship.

148. Defendants Theranos and Holmes breached these implied terms and the covenant of good faith and fair dealing by, among other things, making statements to PFM throughout the course of the parties' relationship that were materially false, and by failing to disclose to PFM throughout the course of the parties' relationship information that made other statements materially misleading, including with respect to the topics described in paragraph 102.

149. PFM reasonably and justifiably relied upon these Defendants' materially false statements and material omissions.

150. The breaches by Theranos and Holmes deprived PFM of the benefits of the agreements and frustrated PFM's expectations. As a direct and proximate result of Theranos's and Holmes's breaches of their duty of good faith and fair dealing, PFM has been damaged.

**COUNT X**

**(Appointment of a Receiver Pursuant to 8 *Del. C.* § 291 or Applicable Common Law)**

151. PFM repeats and realleges the foregoing paragraphs as if set forth fully here.

152. Section 291 of the Delaware General Corporation Law relevantly provides: "Whenever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1 or

more persons to be receivers of and for the corporation, to take charge of its assets, estate, effects, business and affairs, and to collect the outstanding debts, claims, and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation or otherwise, all claims or suits, to appoint an agent or agents under them, and to do all other acts which might be done by the corporation and which may be necessary or proper."

153.   Under Delaware common law,  a receiver may also be appointed, even over a solvent corporation, upon a showing of fraud, gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss which cannot otherwise be prevented.

154.   PFM is a stockholder and a contingent creditor of Theranos.

155.   Theranos is currently insolvent, or will be by the conclusion of this case, because the company has no revenue, no products and no customers, and its liabilities (including contingent liabilities) exceed its assets, making the appointment of a receiver necessary.  There is no reasonable prospect that Theranos can continue to operate successfully, particularly under the leadership of Defendant Holmes, the current CEO and Chairman of the Board of Directors. As of December 31, 2016, Theranos had cash and cash equivalents of approximately $200 million, and is burning cash at a rate of approximately $20 million per month, much of which upon information and belief is being spent to defend Defendant Holmes, Defendant

Balwani and others from civil and criminal liability in connection with government and regulatory investigations, class action civil suits, and other civil lawsuits including the instant case. Moreover, Theranos concedes that it had no material revenue in 2015 or 2016.

156. Regardless of whether Theranos is insolvent or solvent, however, the appointment of a receiver is necessary based on special and extreme circumstances, due to Defendant Holmes and Defendant Balwani's fraud, gross mismanagement, positive misconduct and breach of trust and fiduciary duties. Under the direction of Defendant Holmes, Theranos continues to act in direct contravention of the best interests of its stockholders and putative creditors, including PFM, by, among other things, continuing to spend its remaining cash on a new purported business plan with no prospect of success and failing to set aside any reserves for liabilities, despite facing two lawsuits seeking $240 million in damages and numerous government investigations. Indeed, just months into its new purported business plan, Theranos recently announced yet another round of massive layoffs, leaving it with only one-quarter of the workforce it had before its initial round of layoffs in October 2016. As set forth more fully above, Defendants have defrauded Plaintiffs of $96.1 million and breached their fiduciary duties to PFM, and thus Theranos will have no means of satisfying the judgment based on its current burn rate and the manner in which Defendant Holmes is operating the company. Defendant Holmes' actions are

destroying value that would otherwise be available to the Company's stockholders and creditors, including PFM.

157. Upon appointment, the receiver should liquidate and distribute the assets of the Company to its creditors and take such other acts as the receiver deems appropriate.

158. Based on the foregoing, the appointment of a receiver is necessary to avoid irreparable harm to the Company, PFM, and its other stockholders and putative creditors. Indeed, Company management led and controlled by Defendant Holmes cannot be trusted to liquidate Theranos's assets themselves because Defendant Holmes is the lead perpetrator of the fraud described herein, has permitted the Company to expend funds when it is insolvent, and/or has done nothing to assure that the Company will be able to pay its creditors.

## PRAYER FOR RELIEF

WHEREFORE, PFM requests judgment against the Defendants as follows:

(a) Rescission of the Stock Purchase Agreement through an order stating that the shares previously issued to PFM are retitled in Theranos's name and returned to Theranos as treasury stock, and requiring Theranos to return to PFM the amount of its investment;

(b) An award of restitution in the amount of PFM's investment in Theranos;

(c) An award of compensatory damages in an amount to be determined at trial;

(d) Pursuant to 6 *Del. C.* § 2533(c), three times the amount of the actual damages proved;

(e) An award of costs, including but not limited to reasonable attorneys' fees pursuant to Section 7.16 of the Stock Purchase Agreement, Section 5.16 of the Investors' Rights Agreement, and/or 6 *Del. C.* § 2533(b);

(f) An award of pre-judgment and post-judgment interest;

(g) The appointment of a receiver under 8 *Del. C.* § 291 or applicable common law; and

(h) Such other and further relief as the Court deems just and proper.

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Patricia L. Enerio*
Kurt M. Heyman (# 3054)
Patricia L. Enerio (# 3728)
Aaron M. Nelson (# 5941)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300

Attorneys for Plaintiffs

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Reed Brodsky
200 Park Avenue
New York, NY 10166
(212) 351-4000

Winston Y. Chan
Matthew S. Kahn
Aimee M. Halbert
Sarah Cunningham
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

Dated: March 23, 2017

**CERTIFICATE OF SERVICE**

Patricia L. Enerio, Esquire, hereby certifies that on April 12, 2017, copies of the foregoing Revised Redacted Public Version of Second Amended Verified Complaint were served electronically upon the following individuals:

Gregory P. Williams, Esquire
Catherine G. Dearlove, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

David E. Ross, Esquire
Benjamin Z. Grossberg, Esquire
Anne M. Steadman, Esquire
Ross Aronstam & Moritz LLP
100 South West Street, Suite 400
Wilmington, DE 19801

*/s/ Patricia L. Enerio*
Patricia L. Enerio (# 3728)

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WALGREEN CO., | ) | |
| Plaintiff, | ) | Civil Action No. |
| v. | ) | JURY TRIAL DEMANDED |
| THERANOS, INC., | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

# COMPLAINT

## INTRODUCTION

1. This case arises from a breach by Defendant Theranos, Inc. ("Theranos") of its contract with Plaintiff Walgreen Co. ("Walgreens"). Theranos failed to meet the most basic quality standards and legal requirements of the contract. Pursuant to the terms of the contract, Theranos now must refund the money it took from Walgreens, and pay all other damages to be proven.

2. Walgreens provides pharmacy, health, and wellbeing services to the communities served by its more than 8,000 stores in the United States. Its core mission is to help people in those communities lead healthier and happier lives.

3. As part of that mission, Walgreens entered into a contract with Theranos, a company that purported to have developed "disruptive" technology that would make blood testing "less invasive, faster, and far more accessible, effective, and actionable." Walgreens provided $140 million to Theranos through the payment of a $100 million "Innovation Fee" and the purchase of a $40 million convertible note.

4.    The fundamental premise of the parties' contract—like any endeavor involving human health—was to help people, and not to harm them.  In this respect, the quality of Theranos's blood testing was critical.  Theranos expressly promised that it would perform all of its obligations both (1) in conformance with the level of care and skill ordinarily exercised by similar companies and in similar circumstances *and* (2) in compliance in all material respects with all applicable laws and regulations.  *See* Ex. A, Amended and Restated Theranos Master Services Agreement, dated June 5, 2012 (the "Agreement"), ¶ 19(c).  Theranos broke each of those promises.

5.    As detailed below, the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") determined that Theranos's quality controls were so deficient that they posed an immediate risk to patient health and safety.  Based on Theranos's failure to fix these and other deficiencies, CMS issued sanctions against Theranos, including, among others, the revocation of Theranos's license to operate one of its two laboratories and the banning of Theranos's founder and Chief Executive Officer, Elizabeth Holmes, from owning or operating a laboratory for at least two years.

6.    In response to CMS's findings, Theranos stated that it would "accept full responsibility" and undertake "comprehensive remedial actions," including "shutting down and subsequently rebuilding the Newark lab from the ground up" and "rebuilding quality systems."

7.    Similarly, in April 2016, Ms. Holmes admitted on the *Today Show* that she is "devastated," and that Theranos will need to "rebuild [its] entire laboratory from scratch so that we can ensure it never happens again."  In August 2016, Ms. Holmes admitted (this time on CNN) that "[a]t the highest level, we didn't have the right leadership in the laboratory" and "we

didn't have the implementation of the quality system in terms of procedures and the associated documentation to ensure that we were realizing the quality standards that we hold ourselves to."

8. Most troublingly, as a result of Theranos's problems, including pervasive issues in its laboratories, Theranos voided and/or corrected tens of thousands of tests without telling Walgreens it was doing so. Walgreens repeatedly sought detailed information from Theranos about those voided tests. Theranos ultimately admitted to Walgreens on June 11, 2016, that 31,000 test reports offered to Walgreens customers were voided. Theranos also admitted that this number represents more than 10% of the test reports provided to Walgreens' customers that used Theranos's services during the course of the relationship between Walgreens and Theranos.

9. Walgreens terminated the Agreement with Theranos on June 12, 2016.

10. Now, Theranos is not even attempting to rebuild its laboratories. On October 5, 2016, in a letter to stakeholders, Ms. Holmes announced that Theranos would close both of its laboratories and all of its blood-drawing centers. Theranos was unable to provide blood-testing services at the level of quality it promised or in compliance with law, and now will not perform blood-testing services at all.

11. Plaintiff brings this action to recover damages, including reimbursement of the $140 million it provided to Defendant under the Agreement that Defendant breached.

**PARTIES**

12. Plaintiff Walgreen Co. is an Illinois corporation with its principal place of business at 108 Wilmot Road in Deerfield, Illinois.

13. Defendant Theranos, Inc. is a Delaware corporation headquartered at 1701 Page Mill Road in Palo Alto, California. Theranos was founded in 2003 by Elizabeth Holmes as

Case 5:16-cv-06822-NC Document 109-5 Filed 07/14/17 Page 77 of 117

a next-generation healthcare system, built on the premise of using proprietary, patented technology to offer nearly the full range of diagnostic tests from only a few drops of blood. Ms. Holmes currently serves as Defendant's CEO and Chairman. For much of the relevant time period, Theranos's President and Chief Operating Officer was Ramesh "Sunny" Balwani.

## JURISDICTION AND VENUE

14. This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a). Defendant is not a citizen of the same state as Plaintiff and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over Defendant because it is a Delaware corporation.

16. Venue rests with this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is a Delaware corporation.

17. The contract between Walgreens and Theranos expressly requires all suits arising from the contract to be brought in the District Court of Delaware. *See* Ex. A, Agreement ¶ 26.

## FACTUAL ALLEGATIONS

**Theranos's Finger-Stick Blood-Testing Technology**

18. Theranos approached Walgreens in early 2010 with the promise of an innovative technology that would revolutionize blood testing.

19. Commercial blood testing traditionally involves the venipuncture methodology of drawing blood using needles and large vials. This process is performed through venous draws.

20. When a Theranos representative contacted Walgreens by e-mail in January 2010, she stated that Theranos had developed "small point-of-care devices that, for the first time,

can run any blood test in real-time for less than half the cost of central lab tests." That e-mail further confirmed that Theranos could offer "in-store blood testing from a single finger-stick." Theranos's device purportedly was capable of detecting "viruses like H1N1 or STDs" or the "earliest appearance of cancers and other diseases," thus "enabling early intervention and initiation of treatment long before complications emerge." Theranos's President and CEO, Ms. Holmes, and President and COO, Mr. Balwani, were interested in introducing their technology to Walgreens and discussing its deployment in Walgreens stores.

21. After some initial conversations, Ms. Holmes and Mr. Balwani made a presentation to Walgreens executive management on March 22, 2010.

22. At the meeting on March 22, using a PowerPoint presentation, Ms. Holmes and Mr. Balwani again told Walgreens' executive management that Theranos had developed a "proprietary, patented technology" capable of running "comprehensive blood tests from a finger-stick in real-time at the point of care, outside of traditional lab settings." Such a setting, of course, would include a retail pharmacy like Walgreens.

23. According to Ms. Holmes and Mr. Balwani, the blood tests would be run on a proprietary device they called "Theranos Systems." On information and belief, this device later was called the "Edison" machine.

24. Ms. Holmes and Mr. Balwani assured Walgreens that the technology was viable and consumer-ready. At the March 22 presentation, Ms. Holmes and Mr. Balwani represented that the proprietary technology had been "comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies." Further, according to Theranos, the technology already had been used by numerous current and past clients, including these same pharmaceutical companies, midsized bio-pharma companies,

prominent research institutions, and U.S. and foreign government health and military organizations.

25.     The next step was to launch the finger-stick technology to consumers, which Theranos represented it would be ready to do as early as later that year. At the March 22 presentation, Ms. Holmes and Mr. Balwani specifically highlighted that a number of the "real-time finger-stick-based tests" would be ready for launch in Walgreens by the fourth quarter of 2010. This included general chemistry panels and standard blood tests, influenza tests, and fertility tests. Ms. Holmes and Mr. Balwani emphasized the health benefits of Theranos's finger-stick testing, such as reduced hospital visits, more effective treatment options, and earlier detection of pregnancy.

26.     The most important requirement of any new entry in the health care space is, of course, the ability to provide high quality and accurate information. Here, Theranos promised that its tests already had met this requirement. Theranos represented that it had "Wellness, Diagnostic & Predictive Tests," and that "[t]hese tests predict the onset of disease far before clinical symptoms and more accurately than conventional testing methods."

27.     Another critical prerequisite to consumer launch was regulatory approval, particularly by the U.S. Food and Drug Administration ("FDA"). At the March 22 presentation, Ms. Holmes and Mr. Balwani told Walgreens' executive management that the Theranos Systems were validated under FDA guidelines, and that Theranos's "systems are classified as non-significant risk devices." Further, regulatory filings were already ongoing in preparation for the launch to consumers.

28.　　Based on Theranos's representations, Walgreens continued to perform additional due diligence.[1] This included engaging consultants and other third-parties.

29.　　In late April 2010, a team at Johns Hopkins University commented on the validity of Theranos's products and technology, and the potential for use within Walgreens stores. Theranos provided the Johns Hopkins review team with proprietary testing data, and gave a demonstration of how its proprietary technology purportedly worked. Based on its review of the data provided by Theranos, the Johns Hopkins team concluded that Theranos's technology was "novel and sound" and could "accurately run a wide range of routine and special assays." Based on what Theranos provided to it, the Johns Hopkins team also noted that one of the "[s]pecial strengths of the technology" was "[a]ccuracy."

30.　　Walgreens also followed up with Theranos as to the status of regulatory approval from the FDA.

31.　　On May 7, 2010, Ms. Holmes sent to Walgreens a "Regulatory Summary" prepared by Theranos. The Regulatory Summary explained that the Theranos Systems were first reviewed by the FDA in 2005 and received approval to be launched in clinical studies. "After receiving endorsement from FDA," the Theranos Systems were "the sole means for collecting all clinical data, including drug concentrations, and CRFs in registrational studies across a broad range of therapeutic areas."

32.　　The Regulatory Summary further represented that Theranos was positioned to receive approval to introduce its technology outside of the clinical field. In particular, panels of tests that had shown predictive value in pharmaceutical clinical studies were currently

---

[1] In connection with Walgreens' continued due diligence, Walgreens and Theranos entered into a Mutual Confidentiality and Non-Disclosure Agreement, which restricted the disclosure of certain information exchanged by the parties. *See* Ex. B.

undergoing studies for approval for use outside of clinical studies. Such approvals were to include direct to consumer sales, use in physician's offices for routine care of patients, and use in retail pharmacy settings.

33. Based on Theranos's representations and other information learned during Walgreens' on-going due diligence, on July 30, 2010, Walgreens and Theranos entered into the Theranos Master Purchase Agreement (the "July 2010 Agreement"). *See* Ex. C. The July 2010 Agreement provided an initial framework for the relationship. The launch of Theranos testing services in Walgreens stores, however, remained subject to further negotiations between the parties. This included, in particular, Theranos receiving further regulatory approval.

34. In order for any lab to perform testing, it is required to comply with all requirements under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), and thus be certified by its state as well as by CMS. In October 2010, Ms. Holmes shared with Walgreens a summary of Theranos' Regulatory Strategy, which stated that Theranos would be proceeding with CLIA certification. The document further stated that, "[a]s the CLIA certification requires us to perform proficiency testing three times a year on sets of blinded samples across the entire clinically relevant dynamic range for every test we offer, starting at the time of CLIA certification, we are constantly generating robust data to support the accuracy and performance of our tests." Theranos further assured Walgreens that, under this regulatory approach, it would "be providing even more comprehensive oversight than a traditional central lab" and that it would "have all of the right infrastructure in place."

35. On December 15, 2010, Ms. Holmes sent to Walgreens a "Regulatory and Business Model Strategy" prepared by Theranos. In that document, Theranos explained that it was "undergoing CLIA certification as a high complexity laboratory." In particular, Theranos

stated that its "core functionality is the laboratory oversight and dynamic controls that characterize CLIA certified labs brought through Theranos' lab infrastructure to the same or higher levels of accuracy than required by current Proficiency Testing standards under CMS guidelines for laboratory performance." Theranos also stated that, "because the performance levels and oversight are what differentiates the Theranos lab infrastructure at its core, Theranos and its regulatory advisers clearly agreed that CLIA-certification is the correct regulatory path and body of oversight for the Theranos lab infrastructure."

36.     Theranos further stated in its December 2010 Regulatory and Business Model Strategy summary that "CLIA certification will allow Theranos to bear the highest burden of oversight from a regulatory standpoint with respect to laboratory testing and will serve as an important demonstration of quality assurance and ongoing performance." Further, Theranos's lab infrastructure would be tested "at least three times a year with blinded samples … for Proficiency Testing demonstrating the quality and safety of Theranos tests." Theranos further represented that its infrastructure had "been thoroughly validated under FDA … guidelines internally and externally by leading centers of excellence to demonstrate the superior quality, safety, and performance not only of the tests themselves but also of the improvements in patient outcomes associated with faster and more accurate laboratory results being delivered to physicians."

37.     In a January 2012 presentation, Ms. Holmes and Mr. Balwani similarly assured Walgreens that Theranos's CLIA-certified labs—which would become the "world's first finger-stick based CLIA-certified lab,"—would offer the "highest quality testing from a finger-stick," and present "[n]o regulatory risk."

38.     In the same presentation, Ms. Holmes and Mr. Balwani further highlighted the purported advancements of its revolutionary technology.  Compared to other traditional blood-testing services, they explained, Theranos's finger-stick technology would require 99.9% less blood.  And it offered a "[s]tate of the art result turnaround" of 4-24 hours.  In short, Theranos would be the "[n]ation's lowest cost and highest quality laboratory provider."

**The June 2012 Agreement**

39.     In June 2012, Theranos and Walgreens entered into the Amended and Restated Theranos Master Services Agreement (the "Agreement").  *See* Ex. A.  The Agreement provided a framework pursuant to which "Theranos Wellness Centers" could operate inside Walgreens stores, in which technicians would collect blood samples.  Consistent with their negotiations and Theranos's representations, it was the parties' intention and expectation that the blood would be collected using Theranos's finger-stick technology.  The blood then would be sent to a Theranos CLIA-certified laboratory for testing, and Theranos would send the blood test results to the requesting physician, who would communicate the results directly to the patients.  This Agreement remained operative throughout the course of the parties' contractual relationship, from June 5, 2012 until June 12, 2016.

40.     During the relevant time period, Theranos owned and operated two offsite CLIA-certified laboratories:  a laboratory in Newark, California, and a laboratory in Phoenix, Arizona.  After receiving CLIA certification, the laboratories remained subject to periodic recertification surveys by CMS to confirm that they remained in compliance.

41.     Under the terms of the Agreement, Walgreens agreed to pay Theranos an Innovation Fee ("Innovation Fee") of up to $100 million dollars.  *See* Ex. A, Agreement ¶ 6(a).  Walgreens paid $25 million of the Innovation Fee shortly after signing the Agreement on June 5, 2012, with the remaining $75 million to be distributed to Theranos upon the achievement of

certain milestones in the rollout of Theranos's testing services in Walgreens stores. Walgreens ultimately would distribute the $75 million to Theranos pursuant to an amendment to the Agreement entered into in December 2013 ("December 2013 Amendment"). *See* Ex. D, December 2013 Amendment ¶ 3.

42. Also pursuant to the Agreement, on June 5, 2012, Walgreens provided $40 million in exchange for a $40 million note, which was convertible into equity under certain circumstances. *See* Ex. A, Agreement ¶ 21, Schedules H-1, H-2.

43. The Agreement made Walgreens' rights clear—in particular to safeguard the health of Walgreens' customers and to protect Walgreens' reputation as a trusted provider in the communities it serves. Theranos promised that it would perform all of its obligations under the Agreement "(i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or [sic] a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws." *Id.* ¶ 19(c).

44. If Theranos were to breach any of those three promises, the Agreement gave Walgreens the right to terminate the relationship for cause. *Id.* ¶ 24(c). In the event Walgreens terminated the Agreement for cause, Theranos would be obligated, "within one hundred eighty (180) calendar days of the termination date [to] refund the Innovation Fee." *Id.* ¶ 24(d)(i)(1).

45. The Agreement also contained a Defense and Indemnification provision. Pursuant to this provision, Theranos agreed that it "will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns … against any claims, demands, suits, or causes of action by third parties … to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in

connection with this Agreement; (b) any breach of this Agreement … by Theranos or its personnel; … (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation ….” *Id.* ¶ 22.1

46. Pursuant to the Agreement, the parties agreed to introduce Theranos services in a select number of Walgreens stores through a “pilot program.” *Id.* Schedule F. The pilot would allow for the parties to test the agreed-upon business and operating model, and thereafter determine whether and how best to expand these services to other Walgreens stores.

47. The Agreement did not require Walgreens to introduce Theranos services into any particular number of stores, nor to expand the number of stores on any particular time frame. Any further expansion remained subject to further negotiations between the parties.

**Theranos Wellness Centers Open at 41 Walgreens Stores**

48. On March 20, 2013, the parties began the pilot with a controlled soft launch at a single store in Phoenix, Arizona.

49. On September 9, 2013, the parties publicly announced the opening of the first Theranos Wellness Center in Palo Alto, California. Later that year, additional Theranos Wellness Centers opened in Walgreens stores in Phoenix. By the fall of 2015, Theranos Wellness Centers were located in 41 Walgreens locations: one in Palo Alto, and the remaining 40 in Arizona.

50. In the December 2013 Amendment, the parties agreed to engage in future discussions on a national roll-out of the Theranos Wellness Centers. *See* Ex. D, December 2013 Amendment ¶¶ 1, 8. This was the last agreement entered into between the parties, and no agreement on the expansion of Theranos Wellness Centers beyond the pilot stores ever was finalized. Nor were any additional locations opened.

**News Reports Raise Concerns Regarding the Accuracy and Viability of Theranos's Blood-Testing Technology, and Theranos Finally Admits it Has Stopped Using its Own Technology**

51. On October 15, 2015, *The Wall Street Journal* published an article raising questions concerning the accuracy of some of Theranos's blood tests. The *Journal* reported that some Theranos employees "were leery about the [Edison] machine's accuracy," and that "one Theranos employee accused the company of failing to report test results that raised questions about the precision of the Edison system." In addition, some doctors stated to the *Journal* that "they stopped steering patients to Theranos because of results they didn't trust." As one internist from Phoenix told the *Journal*, he didn't "'want [his] patients going there until more information and a better protocol are in place.'"

52. The article reported that Theranos was not using its own proprietary technology for a majority of its blood tests. The *Journal* also reported that multiple former Theranos employees shared concerns about Theranos's use of a "special dilution method" for a large number of tests run on traditional testing machines. Because Theranos originally had collected only a small amount of blood using a finger-prick, it had to increase those samples' volume through dilution in order to run the tests on the traditional machines. "For tests done with dilution, the process caused the concentration of substances in the blood being measured to fall below the machines' approved range," the former employees said.

53. The *Journal* continued: "Lab experts say the practice could increase the chance of erroneous results. … 'Anytime you dilute a sample, you're adulterating the sample and changing it in some fashion, and that introduces more potential for error,' says Timothy R. Hamill, vice chairman of the University of California, San Francisco's department of laboratory medicine. Using dilution frequently is 'poor laboratory practice.'"

54.      Finally, the *Journal* noted that former employees "say diluting blood drawn from fingers contributed to accuracy problems [in early 2014] with a test to measure potassium. Lab experts say finger-pricked blood … often mixes with fluids from tissue and cells that can interfere with tests.  Some of the potassium results at Theranos were so high that patients would have to be dead for the results to be correct."

55.      In an interview with CNBC after the *Journal* published its story, Ms. Holmes said, "This is what happens when you work to change things, and first they think you're crazy, then they fight you and then all of a sudden you change the world."  Ms. Holmes further said, "we are doing things differently and we are working to make a difference and that means people raise questions, and that's okay."

56.      In a press release that same day, Theranos stated:  "Theranos' products and services have proven accurate and reliable. …  Our focus remains on ensuring high quality, real –time, actionable information to improve diagnosis and treatment decisions."  Further, "Theranos is working to reinvent the lab experience by providing high quality tests faster, cheaper, and more conveniently, requiring less blood, and causing less patient discomfort than ever before. We lead the industry in transparency and quality."

57.      In another statement issued the next day, Theranos stated:  "Actionable health information means testing done in accordance with the highest quality standards – those standards are FDA quality standards and our standards. … [W]e've always been committed to quality, to the best science, and to ensuring that innovation comes to health care."

58.      Walgreens promptly sought answers from Theranos.  Theranos explained that it had decided to transition from finger-stick blood draws to the traditional venous draws while its blood-collection device was being reviewed for FDA approval.  This was the first time

Walgreens learned of this information. Theranos further assured Walgreens that Theranos's "commitment to FDA and quality systems should give you and … WBA, along with the clinicians and patients we serve[,] confidence in the quality of products and services we provide."

59.     Walgreens also learned that Theranos's Newark laboratory recently had been subject to an inspection by CMS. The inspection was a CLIA recertification and complaint survey of Theranos's Newark laboratory, and was ongoing at the time.

60.     Walgreens continued to ask Theranos for additional information. Specifically, Walgreens requested additional information regarding the CMS audit of the Newark laboratory.

61.     Theranos did not cooperate with Walgreens' requests for information. Theranos only responded to some of Walgreens' requests, missed multiple deadlines and delayed for several weeks for others, and failed to provide any information in response to others.

62.     In particular, Theranos resisted Walgreens' requests for information relating to Theranos's lab leadership. Eventually, Walgreens was allowed to speak with the director of Theranos's Newark lab, Dr. Sunil Dhawan, on November 14. Walgreens learned that Dr. Dhawan was a full-time dermatologist, had no experience prior to Theranos with any lab outside of dermatopathology, and spent only one day a week at the Newark lab.

63.     Further, as Walgreens noted in a November 30 letter to Ms. Holmes, it recently had learned through a press report that the Arizona Department of Health Services had conducted an audit of the Arizona laboratory in April 2015, and that audit had identified a number of quality assurance issues. Theranos had failed to disclose this information to Walgreens. Walgreens again requested all results or feedback, either interim or final, from the CMS audit currently underway at the Newark laboratory.

64.     On December 8, Theranos, through its then-General Counsel, Heather King, responded in writing to Walgreens' November 30 letter.  In the letter, Theranos downplayed the recent news reports as "inaccurate" and "unfair" and presenting a "misleading portrayal of Theranos."  The information Theranos had provided Walgreens thus far purportedly "directly contradict[ed] those articles, demonstrat[ing] the integrity of [Theranos's] lab services, and the safety of [Theranos's] patients."  Theranos also resisted Walgreens' requests for information as seeking "information and actions well beyond the scope of what Walgreens is entitled to."

65.     In the letter, Theranos did admit that the Arizona lab had undergone an inspection by CMS in April 2015.  Theranos assured Walgreens, however, that the issues identified by CMS already had been addressed, and offered to take Walgreens on a tour of the Arizona lab.  With respect to the Newark lab, Theranos stated that the review was "ongoing," and that Theranos was "committed to working with CMS to ensure that all of [its] tests and testing processes meet the highest standards."

66.     Theranos also stated that it was in the process of "updating our quality assurance/control processes to a more automated system."  Theranos further assured Walgreens that Theranos's "experienced lab personnel working hand-in-hand with [its] automated system will lead to the best quality assurance outcomes, which in turn will continue to allow [Theranos] to provide the most accurate and reliable results for [its] patients."

**CMS's Investigation and Other News Reports Raise Concerns Regarding Patient Health and Safety, Which Theranos Attempts to Minimize and Conceal from Walgreens**

67.     Although Walgreens did not know it (because Theranos did not tell Walgreens), on November 20, 2015, CMS had completed the on-site portion of its CLIA recertification and complaint survey of Theranos's Newark laboratory.  CMS concluded the survey on December 23, 2015.

Case 5:16-cv-06822-NC Document 109-5 Filed 07/14/17 Page 90 of 117

68. On January 25, 2016, CMS issued a letter to Theranos, setting forth its findings. As detailed in the letter, CMS concluded "that [the Newark] facility is not in compliance with all of the Conditions required for certification in the CLIA program." Specifically, CMS identified Condition-level deficiencies in the following areas: (1) inadequate operating procedures and Quality Control in the Hematology area; (2) inadequate operating procedures, corrective actions, and equipment preventative maintenance across the lab's analytic systems; (3) inadequate Laboratory Director qualifications and management protocols, including failure to ensure Quality Control and Quality Assurance programs were established and maintained; (4) inadequate Laboratory Technical Supervisor qualifications for high complexity testing; and (5) insufficient number of personnel qualified to perform testing functions of the volume and complexity performed in the laboratory.

69. With respect to the Condition-level deficiency in the Hematology area, CMS found "that the deficient practices of the laboratory pose immediate jeopardy to patient health and safety," with "immediate jeopardy" defined "as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public." A complete listing of all of the deficiencies found during CMS's survey was submitted as an enclosure to the letter (the "CMS Report").

70. Theranos was required promptly to submit to CMS a proposed plan of correction documenting that the immediate jeopardy had been removed and that action had been taken to correct all of the deficiencies identified by CMS (a "Plan of Correction").

71.     Theranos concealed the CMS Report from Walgreens.  On January 27, 2016, *The Wall Street Journal* revealed the existence of the CMS letter and the CMS Report.

72.     The *Journal* quoted Dr. Robert Fitzgerald, professor of pathology and director of toxicology at the University of California, San Diego, who noted that Condition-level deficiencies, like the ones CMS found at Theranos's lab, are "'the most serious level.  …  It doesn't get worse than that from my perspective.'"  Further, Dr. Timothy R. Hamill, vice chairman of the University of California, San Francisco's department of laboratory medicine, told the *Journal* that "[i]t means [Theranos has] a major issue in that lab."  As to the personnel issues noted in the CMS report—that the laboratory director was not qualified and other personnel were inadequately trained—Dr. Hamill told the *Journal* that "[e]ither [Theranos doesn't] have enough personnel, or they don't have qualified personnel or the personnel are not performing their duties properly."

73.     Although Walgreens was not provided with the CMS Report at that time and thus was not privy to its details, it appeared to demonstrate that Theranos was in breach of the warranties it made in the Agreement.  It also ran counter to Theranos's repeated assurances of its commitment to quality.  As early as December 2010, Theranos had assured Walgreens that CLIA certification would allow Theranos "to bear the highest burden of oversight from a regulatory standpoint with respect to laboratory testing and [would] serve as an important demonstration of quality assurance and ongoing performance."  Theranos had repeated these same assurances throughout the course of the parties' relationship.

**Walgreens Issues a Notice of Breach**

74.     The very next day, January 28, 2016, Walgreens sent a letter to Theranos, communicating Walgreens' concerns regarding the CMS letter, none more important than its concerns for its customers' health and safety.  Walgreens insisted, and Theranos agreed, that

Theranos immediately cease sending any clinical laboratory tests obtained at any Walgreens stores to Theranos's Newark laboratory. Walgreens suspended all Theranos blood testing services offered at the Palo Alto Walgreens location, effective immediately, and requested that Theranos promptly provide Walgreens with a copy of the CMS Report.

75.     Walgreens further stated that the deficiencies identified in the CMS letter indicated that Theranos had breached the Warranty provision of the Agreement, which provides that Theranos would perform its obligations under the Agreement "(i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or [sic] a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws." *See* Ex. A, Agreement ¶ 19(c). Accordingly, consistent with paragraph 24(c) of the Agreement, Walgreens' January 28 letter provided notice to Theranos that it was in breach of a material provision of the Agreement.

76.     On February 4, 2016, Theranos (again through Ms. King) responded in a letter to Walgreens. Theranos admitted that there were deficiencies identified in the CMS letter, but attempted to minimize them. Specifically, Theranos represented to Walgreens that many of the issues identified by the CMS letter "have already been corrected, and the CMS Letter is not reflective of the current state of our Newark lab." Theranos asserted that "the CMS Letter identifie[d] curable deficiencies in our Newark lab" and "provide[d] an express mechanism for Theranos to remedy those deficiencies" through the submission of a Plan of Correction.

77.     Theranos also refused to provide Walgreens a copy of the CMS Report until after Theranos submitted its Plan of Correction. (Theranos subsequently allowed Walgreens to view briefly a highly redacted version of the CMS Report, but never did provide the promised copy.)

78.     Theranos's February 4 letter also accused Walgreens of breaching the Agreement.  Notwithstanding CMS's findings with respect to Theranos's Newark lab, Theranos asserted that Walgreens breached the Agreement by suspending services at the Palo Alto store. Theranos insisted that Walgreens continue to offer Theranos services at the store "until the applicable cure period has run."  Theranos also asserted that Walgreens was in breach for purportedly disclosing confidential information to the press, but did not identify any specific instance of such disclosure.  Lastly, Theranos accused Walgreens of not "building out Theranos Wellness Centers nationally in accordance with the Agreement," but again failed to identify a specific contractual provision obligating Walgreens to do so.

79.     Walgreens promptly responded to Theranos's February 4 letter.  In a February 7 letter, Walgreens expressed deep concern at Theranos's refusal to provide Walgreens with a copy of the CMS Report.  Theranos's decisions effectively "limit[ed] Walgreens' access to the existing facts and evidence" and Walgreens' "ability to understand the deficiencies identified by CMS."

80.     The February 7 letter also denied Theranos's claims of Walgreens' purported breach of the Agreement, and noted Walgreens' concern that, "rather than prioritize remedying the significant concerns raised in the CMS Letter and the health and safety of patients, Theranos has elected to use this circumstance as an opportunity to raise Walgreens' purported delay in building out Theranos Wellness Centers nationally and other contractual complaints."

81.     On February 25, Theranos (again through Ms. King) responded to Walgreens' February 7 letter, but declined to provide Walgreens with a copy of the CMS Report.  Theranos also assured Walgreens that "Theranos has been steadfast in its commitment to patient safety," and "has worked comprehensively over the past months to ensure best-in-class systems are in

place in its Newark lab before resuming those tests, including hiring new leadership." Theranos's proposed Plan of Correction, however, remained pending.

82.     In addition, Theranos's letter again accused Walgreens of breaching its confidentiality obligations under the Agreement. Specifically, Theranos cited content in a February 10 article in *The Wall Street Journal* that included "details that Walgreens, uniquely, was privy to" regarding Walgreens' January 28 letter to Theranos, "purported details of discussions between Theranos and Walgreens executives regarding the CMS Letter," and other facts about the two companies' Agreement.

83.     On March 29, 2016, Walgreens responded to Theranos's February 25 letter. Walgreens stated that it was not aware of any leaks within the company, and that "none of the information cited in Theranos's [February 25] letter to which Walgreens was 'uniquely' privy is confidential in any event, much less a disclosure that would reflect a material breach of the Agreement." Further, the content of the article "reflects little more than an interpretation of Walgreens' sentiments and concerns for patient health and safety in light of the CMS Report which, of course, are not confidential information, as defined in the Agreement."

**Additional Events Confirm Theranos Breached the Agreement**

84.     Further events, many of which Theranos did not discuss with or disclose to Walgreens at the time, only confirmed Theranos's persistent quality shortfalls, and that Theranos's representations of having achieved the highest levels of accuracy and quality were unfounded.

85.     On March 28, 2016, the peer-reviewed *The Journal of Clinical Investigation* published a study online comparing "the accuracy and equivalency of clinical laboratory test blood collected via finger prick and tested Theranos against traditional venipuncture followed by

laboratory testing offered through Quest Diagnostics and LabCorp." The study was the first peer-reviewed comparison of Theranos test results with those of other labs.

86. The study showed that Theranos produced more irregular blood test results than the conventional tests. For example, Theranos's results for total cholesterol control were lower by an average of 9.3% than those produced by other lab testing services. The authors concluded that such disparities between testing services could "alter clinical interpretation and health care utilization." *The Wall Street Journal* likewise reported that the disparity in test results, specifically with respect to the cholesterol tests, "differed enough … that they could throw off doctors' medical decisions."

87. The study also found "higher odds for Theranos to report tests outside of the normal range versus the other services." Specifically, the study found that Theranos tests yielded results outside their normal range 1.6 times more frequently than results from Quest and LabCorp. This "increase in abnormal test results can have negative consequences for medicine in the form of extra testing, additional patient visits to clinics/hospitals, and added doctor services, all of which result in additional costs and burdens to patients or to the healthcare system and are potentially harmful, if the abnormal tests were misdiagnoses (i.e., false positives)."

88. On March 31, 2016, CMS publicly released a redacted version of the CMS Report from CMS's inspection of Theranos's Newark lab in the fall of 2015. This report, which Theranos consistently had refused to share with Walgreens, set forth at least some of the significant deficiencies CMS identified during its survey of the Newark lab (others may have been redacted).

89. Numerous press reports that followed detailed Theranos's significant failures to meet its own quality-control standards for its proprietary blood-testing device, the Edison

machine.  As reported by *The Wall Street Journal*, "[e]rratic quality-control results for Edison-run tests were frequent in July 2014 and from February 2015 to June 2015."  Specifically, the CMS Report "showed that 29% of the quality-control checks performed on the company's proprietary blood-testing devices in October 2014 produced results outside the range considered acceptable by Theranos."  "In February 2015, an Edison-run test to measure a hormone that affects testosterone levels failed 87% of quality-control checks."  And "[i]n April and May 2015, a test to measure prostate-specific antigen, or PSA, failed quality-control checks 22% of the time.  The PSA test is used to help detect prostate cancer."

90.     Independent experts in the field expressed shock at the CMS Report, which offered a glimpse for the first time into data on Theranos's Edison machine.  As one expert, an associate professor of pathology at the Weill Cornell Medical College in New York, quoted in *The Wall Street Journal* noted, "'This is the first time that we've actually seen data from the Theranos instrument, and it's as bad as one would have worried it would be.' … 'Based on this data, it's hard for me to believe that they went live with this instrument and tested patient specimens on it.'"

91.     The portions of the CMS Report that were not redacted also contained numerous disturbing findings with regard to tests performed on traditional lab machines.  One such finding concerned a blood clotting test used on patients who take the blood thinner warfarin, known as a PT/INR test.  As reported by *The New York Times*, the CMS Report found that "some equipment for this test was run numerous times without obtaining acceptable quality control.  Yet results were provided to patients."  In fact, a review of the results from April to September 2015 found that 81 of 81 reported final patient results were inaccurate.

92. The consequences of inaccurate PT/INR test results are extremely serious and potentially life-threatening: too much warfarin can lead to internal bleeding and too little can leave a patient with an increased risk of a stroke. As described by the Cleveland Clinic Journal of Medicine, patients who take warfarin "walk a tightrope between bleeding and clotting." "Therefore, everyone who prescribes warfarin, whether a cardiologist, family physician, or internist, needs to understand . . . [h]ow to use the INR to determine the dose of warfarin and monitor its anticoagulant effect."

93. Bloomberg similarly described the CMS Report as:

> [P]aint[ing] a picture of an understaffed and inexperienced startup struggling to meet basic requirements, let alone deliver on its promise to revolutionize the blood-testing industry. ... Several themes arise over and over again: failure to meet quality-control standards, such as not keeping freezers at the temperatures required by manufacturers, lack of proper documentation and missing signatures on paperwork; and unqualified personnel.

94. Moreover, the CMS Report found that Theranos had failed to report errors in patient test results in a timely fashion. In particular, Theranos's Newark lab "failed to notify the authorized person for approximately seven weeks after the surveyer identified a quality control problem."

95. In response to the report, Theranos, through its spokeswoman Brooke Buchanan, admitted that it had "made mistakes in the past in the Newark" lab. Theranos, though, highlighted that the Company had submitted its Plan of Correction and related evidence to CMS that purportedly "addressed how the company has actively ensured that our lab operates at the highest standard."

96. Contrary to Theranos's statements, however, and although Theranos had not informed Walgreens of this fact, CMS *already* had rejected Theranos's proposed Plan of Correction. In a March 18, 2016 letter to Theranos, CMS stated:

> After careful review, we have determined that the laboratory's submission does not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 201[5], and does not demonstrate that the laboratory has come into Condition-level compliance and abated immediate jeopardy.

97. The March 18 letter also set forth a series of proposed sanctions against Theranos for failing to fix these deficiencies, including revoking the Newark lab's CLIA-certification, thus prohibiting the lab from performing any testing. In addition, CMS proposed a sanction that Ms. Holmes and Mr. Balwani would be banned from owning or operating any other lab for at least two years.

98. Theranos hid the CMS letter from Walgreens for almost a month. In fact, it is likely that Theranos would have hidden the CMS letter for longer. Walgreens learned of the letter for the first time on April 13, 2016, when it was reported by the press.

99. CMS's rejection of the Plan of Correction ran counter to numerous of Theranos's prior public statements. For example, in a March 7, 2016 press release, Theranos had stated that it had "actively addressed, and are continuing to address, every issue identified by CMS." It also ran counter to Theranos's repeated assurances to Walgreens that the issues identified by CMS had already been or were in the process of being corrected. As *The New York Times* reported, the "strongly worded letter" from CMS was "the latest blow to the credibility of Theranos and Elizabeth Holmes."

100. On April 18, 2016, on the heels of these revelations, Ms. Holmes appeared on the *Today Show* and admitted the depth of the quality issues at Theranos. Ms. Holmes stated that she was "devastated." She expressed regret that Theranos "did not catch and fix these issues faster." She stated that Theranos would need to "rebuild [its] entire laboratory from scratch so that we can ensure it never happens again."

101.    As Fortune noted in an article later that day, "When [Ms. Holmes] was pressed on whether or not the various violations and deficiencies that Theranos must address should have been fixed from the get-go, Holmes responded, 'Absolutely. Probably the most devastating part of this is that I thought we did.'"

102.    Also on April 18, *The Wall Street Journal* and other news outlets reported that federal prosecutors had opened a criminal investigation into whether Theranos "misled investors about the state of its technology and operations." In addition to the criminal investigation, the *Journal* reported that the Securities and Exchange Commission was examining whether "Theranos made deceptive statements to investors when it solicited funding." As *The New York Times* noted, the investigations were "adding to a series of questions from officials about [Theranos's] inner workings."

103.    In the face of this news, on May 11, 2016, Theranos announced that Mr. Balwani, at the age of 51, was "retiring."

**Theranos Voids Tens of Thousands of Blood Tests and Continues to Refuse to Answer Walgreens' Questions**

104.    On May 18, 2016, *The Wall Street Journal* reported that Theranos had issued "tens of thousands" of corrected blood-test reports to doctors and patients. The corrected reports include the voiding of *all* tests run on Theranos's proprietary blood-testing devices in 2014 and 2015—the same technology that Theranos represented to Walgreens had been thoroughly validated—as well as many tests run on standard laboratory equipment. The article further reported that the corrected tests include results from both the Newark and Phoenix laboratories. As described by Geoffrey Baird, an associate professor in laboratory medicine at the University of Washington in Seattle, a recall of this scale and scope was "unprecedented." A report in *The*

*Washington Post* described the news as a "Consumer nightmare." *New York* magazine said it "revealed the astounding scale of [Theranos's] shortcomings."

105.    Walgreens immediately contacted Dr. Kingshuk Das, Theranos's new Newark lab director, on the morning of May 19, 2016, seeking a better understanding of the scope of the voided reports.  Dr. Das responded that evening.  Dr. Das stated that Theranos had voided all tests conducted on the Edison machines from 2014 through September 2015.  The voided tests also included some tests run in a standard manner on standard laboratory equipment.  Dr. Das estimated that the voided reports involved 50,000 test reports.

106.    Dr. Das also confirmed that the corrected and/or voided tests were not limited to Theranos's Newark laboratory.  Dr. Das told Walgreens that Theranos's Arizona laboratory had to correct approximately 1,000 reports for PT/INR hematology tests, the same tests CMS specifically had identified in its review of the Newark lab as posing immediate jeopardy to patient health and safety.

107.    That evening, Christian Holmes stated in an email to Walgreens that "the basis for voiding test results in [its] Newark lab was the Newark laboratory's failure to implement and adhere to sufficient quality assessment procedures during the period of the CMS review."  Mr. Holmes also shared that Theranos had decided to "void all results for tests which were run during a period when the quality standards in the lab were not consistent with the standards to which the lab holds itself today."

108.    On May 23, 2016, Walgreens sent a letter to Theranos.  The letter demanded confirmation of the tens of thousands of voided and corrected test results and further details from Theranos regarding its decision to issue them, including:

- When did Theranos learn that there were quality control issues with the voided tests?

- When did Theranos first start issuing corrected reports?

- When did Theranos report this information to CMS?

- How many corrected test reports have been issued?

- How many individual test results have been voided or revised?

- How many of those tests were conducted on Edison devices versus standard laboratory equipment?

109.     Meanwhile, beginning in late May, several consumer class actions lawsuits were filed against Theranos.  On May 30, 2016, Walgreens' parent company, Walgreens Boots Alliance, Inc. ("WBA"), was named as a defendant, along with Theranos, in the lawsuit captioned *R.G. v. Theranos, Inc., Walgreens Boots Alliance, Inc., et al.*.  Other similar lawsuits followed, some of which also named WBA as a defendant (collectively, the "Consumer Class Action Litigation").

110.     On June 6, 2016, Walgreens sent a follow-up letter to Theranos, again demanding answers to the questions in the May 23 letter, as well as additional questions concerning Theranos's decision to issue tens of thousands corrected and/or voided reports.

111.     Ms. King, on behalf of Theranos, responded that day with an e-mail that she had been "planning" to respond to Walgreens "this morning," and also would "respond to [the May 23 letter] in writing."  Theranos did not send a written response.

112.     Ms. King also offered to have an oral discussion, but refused to confirm any facts in writing.

113.     On the evening of June 11, 2016, Ms. King spoke with Walgreens and answered the questions set forth in Walgreens' letters of May 23 and June 6 for the first time.  Ms. King stated that Theranos had been aware of quality issues since September 2015.  Ms. King stated that Theranos began voiding test reports and/or issuing corrected reports in November

2015.  Ms. King stated that Theranos voided additional tests between February and April 2016.
Ms. King stated that 31,000 Walgreens customers had received voided test reports, which was
11.3% of total Walgreens customers.  Ms. King also informed Walgreens that Theranos had
issued 93 corrected reports for the PT/INR hematology test.

**Walgreens Terminates its Relationship with Theranos**

114.     On June 12, 2016, Walgreens sent a letter to Theranos terminating the
Agreement for cause, effective immediately.  As set forth in the letter, Theranos had failed to
perform its obligations consistent with paragraph 19(c) of the Agreement, including the
requirement to perform its obligations "(ii) in conformance with that level of care and skill
ordinarily exercised by other professional companies or [sic] a similar size and in similar
circumstances; and (iii) in compliance in all material respects with all applicable laws."
Accordingly, Walgreens terminated all Theranos services within its stores, as of that date.

115.     That evening, the parties discussed and reached agreement on the orderly
transition of Theranos's equipment and services out of Walgreens stores.

116.     Two weeks later, on June 26, 2016, Theranos (through Ms. King) responded
to Walgreens' June 12 termination letter.

117.     Theranos acknowledged that it had issued tens of thousands of voided and/or
corrected test results.  Theranos also acknowledged that it had suspended its operations at its
Newark lab.  Yet Theranos characterized these events as "evidence of cure, not breach," even
though Theranos had voided the test results in secret—without notifying Walgreens.

118.     Theranos also stated that it had "addressed the issues with [Theranos's]
Newark lab—including suspending testing completely—with new leadership and enhanced
quality systems, policies, and procedures.  Because these efforts were complete before
Walgreens terminated the agreement, no cause exists for termination under paragraph 24.c."

119.    Contrary to Theranos's assertions that it had addressed the issues with its Newark lab, however, CMS had rejected Theranos's proposed Plan of Correction on March 18.

120.    On July 1, 2016, the Energy and Commerce Committee of the U.S. House of Representatives announced that ranking members of the Committee had sent a letter to Theranos "requesting information on the company's failure to comply with federal regulatory standards governing clinical laboratory testing and its steps to address flawed test results sent to thousands of medical professionals and patients."

121.    The letter stated: "Given Theranos' disregard for patient safety and its failure to immediately address concerns by federal regulators, we write to request more information about how company policies permitted systematic violations of federal law and how Theranos is working with regulators to address these failures."

122.    In addition, "[g]iven [the members'] ongoing concerns about Theranos's compliance with Federal statutes and regulations and the quality and accuracy of Theranos's testing," the letter requested that Theranos provide a briefing to Committee staff on a number of issues, including "How is Theranos working with regulators to come into compliance with Federal law?"

123.    On July 7, 2016, Walgreens responded to Theranos's June 26 letter.  In the letter, Walgreens refuted Ms. King's assertion that Theranos was not in breach.  The letter further explained that Theranos's quality issues extended beyond its Newark laboratory.  In particular, as noted above, Theranos personnel had admitted to Walgreens personnel that the Arizona laboratory issued approximately 1,000 voided and/or corrected reports for the high risk PT/INR hematology test.

124.     Walgreens' July 7 letter also contested Theranos's assertion that Theranos had cured its breach of the Agreement.  In particular, and contrary to Theranos's claim, Theranos's voiding of tens of thousands of tests results, and doing it secretly no less, only underscored the severity of Theranos's failure to comply with its obligations under the Agreement.

**CMS Issues Final Sanctions Against Theranos, Shutting Down its Newark Laboratory and Banning Ms. Holmes and Mr. Balwani from Owning or Operating a Laboratory for Two Years**

125.     On July 7, 2016, in a letter to Dr. Dhawan, Ms. Holmes, and Mr. Balwani, CMS set forth its final determination with respect to Theranos's Newark laboratory.

126.     The letter first explained that, following CMS's March 18 letter rejecting Theranos's proposed Plan of Correction and setting forth proposed sanctions, CMS received a total of five different submissions from Theranos, collectively referred to as Theranos's "second submission."  Theranos's second submission attempted to demonstrate "a credible allegation of compliance and acceptable evidence of correction."

127.     Following its review of Theranos's collective submissions, CMS stated:

> After careful review, we have determined that the laboratory's second submission again does not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 2015, and does not demonstrate that the laboratory has come into Condition-level compliance and abated the immediate jeopardy.

128.     Based on the finding of immediate jeopardy and Theranos's failure to fix these deficiencies, the July 7 letter also set forth CMS's final sanctions against Theranos.  CMS's sanctions included revocation of the Newark laboratory's CLIA certification, effective September 5, 2016.  In addition, and among other sanctions, CMS determined that Ms. Holmes and Mr. Balwani "are prohibited from owning or operating (or directing) a laboratory for at least (2) years from the date of the revocation."  Other sanctions include:

- Limitation of the laboratory's CLIA certificate for the specialty of hematology
- A Civil Money Penalty
- A Directed Portion of a Plan of Correction
- Suspension of the laboratory's approval to receive Medicare and Medicaid payments for any services performed for the specialty of hematology
- Cancellation of the laboratory's approval to receive Medicare and Medicaid payments for all laboratory services

129. Further, with respect to one of Theranos's allegation of compliance, CMS found "contradictory statements in [Theranos's] submissions call into question the reliability of the information contained in the submissions." Elsewhere, CMS questioned whether Quality Control information "provided by the laboratory in its first or second submission to CMS is reliable."

130. In addition, with respect to Quality Assessment, CMS stated:

> The laboratory again failed to adequately address issues related to quality assessment and provide acceptable evidence of correction … Specifically, the laboratory failed to indicate what measure has been put in place or what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

131. Theranos's own corrective plan, as quoted in the July 7 CMS letter, admitted "that there is a possible patient impact for every test reported from the laboratory's [proprietary] instruments." The corrective plan further acknowledged that the "fraction of patient results truly impacted, and the nature and magnitude of any effect, are unknown."

132. Experts in the field commented on the unprecedented nature of CMS's sanctions. Geoffrey Baird, associate professor in the laboratory medicine department at the University of Washington, stated, "I can't think of anything this severe ever happening to a clinical laboratory of this size and scale."

133.     On July 7, 2016, Theranos issued a statement on its website purporting to continue to work closely with CMS to better understand the agency's findings.  Theranos also stated that it "will continue to carry out its mission under the leadership of its founder and CEO, Elizabeth Holmes"—notwithstanding the federal government sanctions and ongoing investigations.

134.     On July 19, 2016, Walgreens made a demand on Theranos, pursuant to the Defense and Indemnification provision in the Agreement, to defend, indemnify, and hold harmless Walgreens and WBA in the Consumer Class Action Litigation, including reimbursement for the costs of Walgreens' own separate counsel.  To date, Theranos still has not confirmed whether it will agree to do so.

135.     On August 1, 2016, Ms. Holmes spoke at the annual meeting of the American Association for Clinical Chemistry ("AACC").  As described on the AACC's website, Ms. Holmes was expected, for the first time, to "present data at a scientific conference that describes Theranos's technologies, including small sample volume testing and finger-stick collection."

136.     Instead of presenting data on its Edison devices, Ms. Holmes announced a new blood-testing device, called a "miniLab." Indeed, Theranos, in a press release issued that day, announced that this represented "the next phase of the company."

137.     Later that day, in an interview with CNN, Ms. Holmes was asked about CMS's findings with respect to Theranos's laboratories.  Ms. Holmes stated, "At the highest level, we didn't have the right leadership in the laboratory and we didn't have the implementation of the quality system in terms of procedures and the associated documentation to ensure that we were realizing the quality standards that we hold ourselves to."

138.      On October 5, 2016, in an Open Letter from Elizabeth Holmes to Theranos stakeholders, Ms. Holmes announced that, "[a]fter many months spent assessing our strengths and addressing our weaknesses," Theranos had "decided to close its clinical labs and Theranos Wellness Centers."

139.      Ms. Holmes further announced that approximately 340 employees, or 40% of its workforce, would no longer be employed by Theranos.

140.      This announcement reflected a complete abandonment of Theranos's technology and business model that had been the basic premise of its agreements with Walgreens. Theranos was unable to provide blood-testing services at the level of quality it promised or in compliance with law, and now has admitted that it will not perform blood-testing services at all.

**Theranos Has Not Cured its Breach**

141.      Theranos denied its breach, effectively putting Walgreens on notice that Theranos does not intend to provide the payments to Walgreens that would result from a termination for cause.

142.      The Agreement expressly states that, after receiving notice of the breach, "the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days [after receiving written notice] before being in default." Ex. A, Agreement ¶ 24(c). Walgreens provided proper notice on January 28, 2016, which was received by Theranos on February 9, 2016, and then sent its termination notice on June 12, 2016. Accordingly, more than 60 days passed since Theranos received formal notice that it breached a material provision of the Agreement. Theranos's breaches are of such severity that they were not capable of cure. And, in any event, no cure was made within the requisite 60 days.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
### 19(c)(ii)

143. Plaintiff hereby incorporates each and every allegation set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

144. Defendant Theranos entered into the Amended and Restated Theranos Master Services Agreement, dated June 5, 2012, with Plaintiff Walgreens.

145. Pursuant to the Agreement, Walgreens paid Theranos a $100 million Innovation Fee and purchased a $40 million convertible note.

146. Under that Agreement, Theranos promised that it would perform its obligations under the contract "in conformance with that level of care and skill ordinarily exercised by other professional companies or [sic] a similar size and in similar circumstances." Ex. A, Agreement ¶ 19(c)(ii).

147. Theranos has materially breached this warranty.

148. CMS imposed on Theranos an unprecedented series of the most serious sanctions in the clinical laboratory industry, including, among others, revocation of the Newark laboratory's CLIA certificate and banning Ms. Holmes and Mr. Balwani from owning or operating a laboratory for at least two years.

149. CMS's findings and issuance of sanctions show that experts at CMS have concluded not only that Theranos's operations were substandard, but also that Theranos's repeated effort to correct the identified deficiencies itself was a failure. Indeed, following CMS's rejection of Theranos's proposed Plan of Correction on March 18, 2016, Theranos made five additional submissions to CMS. Yet CMS still found these collective submissions to not

constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during CMS's survey completed over 6 months earlier.

150.     Theranos also effectively admitted that it was not performing its testing service with the requisite care and skill when it voided tens of thousands of its test results, from both of its labs, spanning a two-year time period. As Theranos admitted, approximately 30,000 voided test reports were issued to Walgreens customers.

151.     In addition, during an interview on the Today Show, Theranos's CEO Elizabeth Holmes admitted that she was "devastated," expressed regret that Theranos "did not catch and fix these issues faster," and revealed that Theranos would need to "rebuild [its] entire laboratory from scratch so that we can ensure it never happens again." In a July 7, 2016 statement following CMS's July 7 letter, Theranos affirmed that it would "shut[] down and subsequently rebuild[] the Newark lab from the ground." And again, on August 1, 2016, Ms. Holmes admitted in an interview that it "didn't have the right leadership in the laboratory and we didn't have the implementation of the quality system in terms of procedures and the associated documentation to ensure that we were realizing the quality standards that we hold ourselves to." A laboratory that is operated with ordinary care does not leave its CEO feeling devastated, nor does it need to be "shut down" and "rebuil[t] … from scratch."

152.     Now, Theranos is not even attempting to rebuild its laboratories. On October 5, 2016, Ms. Holmes announced that Theranos was shutting down both of its laboratories and all of its remaining blood-drawing centers.

153.     The study performed by the Icahn School of Medicine at Mount Sinai and published in the peer-reviewed *The Journal of Clinical Investigation* provides further independent evidence of a breach of Theranos's duty to act with ordinary care and skill. The

authors there demonstrated that Theranos produced more irregular blood test results than conventional tests offered by other lab testing services, and Theranos's own statements confirmed those findings.

154. The Agreement expressly states that, after receiving notice of the breach, "the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days [after receiving written notice] before being in default." Ex. A, Agreement ¶ 24(c). Walgreens provided proper notice on January 28, 2016, which was received by Theranos on February 9, 2016, and then sent its termination notice on June 12, 2016. Accordingly, more than 60 days passed since Theranos received formal notice that it breached a material provision of the Agreement. Theranos's breaches are of such severity that they were not capable of cure. And, in any event, no purported cure was made within the requisite 60 days.

155. As a result of Defendant's failure to comply with paragraph 19(c)(ii), Plaintiff is entitled, under the Agreement, to a refund of the Innovation Fee and immediate repayment of its purchase of the convertible note.

156. Plaintiff also has suffered further damages, to be proven.

**COUNT II – BREACH OF CONTRACT**
**19(c)(iii)**

157. Plaintiff hereby incorporates each and every allegation set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

158. Defendant Theranos entered into the Amended and Restated Theranos Master Services Agreement, dated June 5, 2012, with Plaintiff Walgreens.

159. Pursuant to the Agreement, Walgreens paid Theranos a $100 million Innovation Fee and purchased a $40 million convertible note.

160.     Under that Agreement, Theranos promised that it would perform its obligations under the contract "in compliance in all material respects with all applicable laws." Ex. A, Agreement ¶ 19(c)(iii).

161.     Theranos has materially breached this warranty.

162.     As previously detailed, CMS conducted a CLIA recertification and complaint survey of Theranos's Newark laboratory in fall 2015, which concluded on December 23, 2015. On January 25, 2016, CMS issued a letter to Theranos setting forth the findings from its survey. In the letter, CMS concluded "that [the Newark] facility is not in compliance with all of the Conditions required for certification in the CLIA program."

163.     The letter further noted that one Theranos program "pose[d] immediate jeopardy to patient health and safety," with 'immediate jeopardy" defined "as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public."

164.     In its February 4 letter to Plaintiff, Defendant acknowledged: "To be sure, the CMS Letter identifies curable deficiencies in our Newark lab, but also provides an express mechanism for Theranos to remedy those deficiencies." In other words, Defendant effectively admitted that it was in breach, albeit one it thought curable.

165.     No cure of a violation of law is possible.

166.     In any event, Theranos's purported cure never came; to the contrary, CMS, in its March 18, 2016 letter, rejected Theranos' Plan of Correction, stating that it did "not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies

cited," and did "not demonstrate that the laboratory has come into Condition-level compliance and abated immediate jeopardy."

167.    Then, in its July 7, 2016 letter, CMS determined that Theranos's subsequent submissions "again [did] not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited" and did "not demonstrate that the laboratory has come into Condition-level compliance and abated the immediate jeopardy."

168.    CMS thus imposed on Theranos an unprecedented series of the most serious sanctions in the clinical laboratory industry, including, among others, revocation of the Newark laboratory's CLIA certificate and banning Ms. Holmes and Mr. Balwani from owning or operating a laboratory for at least two years.

169.    CMS's findings and its issuance of sanctions show that experts at CMS have concluded that Theranos failed to operate in compliance in all material respects with all applicable laws.

170.    Indeed, members of the U.S. House of Representatives stated in a letter to Theranos that, "[g]iven Theranos' disregard for patient safety and its failure to immediately address concerns by federal regulators, we write to request more information about how company policies permitted systematic violations of federal law and how Theranos is working with regulators to address these failures."

171.    The Agreement expressly states that, after receiving notice of the breach, "the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days [after receiving written notice] before being in default." Ex. A, Agreement ¶ 24(c). Walgreens provided proper notice on January 28, 2016, which was received by Theranos on February 9, 2016, and then sent its termination notice on June 12, 2016. Accordingly, more than 60 days

passed since Theranos received formal notice that it breached a material provision of the Agreement. Theranos's breaches are of such severity that they were not capable of cure. And, in any event, no purported cure was made within the requisite 60 days.

172. As a result of Defendant's failure to comply with paragraph 19(c)(iii), Plaintiff is entitled, under the Agreement, to a refund of the Innovation Fee and immediate repayment of its purchase of the convertible note.

173. Plaintiff also has suffered further damages, to be proven.

**COUNT III – BREACH OF CONTRACT**
**Implied covenant of good faith and fair dealing**

174. Plaintiff hereby incorporates each and every allegation set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

175. Defendant Theranos entered into the Amended and Restated Theranos Master Services Agreement, dated June 5, 2012, with Plaintiff Walgreens.

176. Under the Agreement, Theranos agreed to provide blood-testing services at Walgreens stores.

177. Walgreens had a reasonable expectation that Theranos would perform this contractual obligation using its finger-stick technology.

178. Theranos, in its presentations to Walgreens, repeatedly highlighted the viability of its finger-stick technology. From its first presentation to Walgreens in March 2010, Theranos touted its purportedly disruptive technology that offered "comprehensive blood tests from a finger-stick."

179. Similarly, in January 2012, Ms. Holmes and Mr. Balwani again assured Walgreens that its CLIA-certified labs would become the "world's first finger-stick based CLIA-certified lab," and would offer the "highest quality testing from a finger-stick."

180.    Walgreens, accordingly, had a reasonable expectation that Theranos would use its finger-stick technology when performing blood-testing services at Walgreens stores.

181.    This expectation and understanding is further evidenced by the multiple references to the use of the finger-stick technology in the Agreement.  For example, the Agreement expressly states that technicians at Walgreens stores "will draw blood using the finger stick technique."  Ex. A, Agreement ¶ 15.  In addition, in order to perform the blood draws, the Agreement requires Theranos to deliver, among other necessary supplies, "lancets/blood collective devices (finger stick devices)."  *Id.* ¶ 16.

182.    Although Theranos consistently continued to promise the widespread use of finger-stick technology, Theranos did not deliver on that expectation.  In fact, Theranos abandoned using its finger-stick draws altogether in 2015, after the FDA deemed the blood-collection container a medical device subject to regulation.  Defendant failed to inform Plaintiff of this fact until after it was disclosed in the press months later.

183.    Moreover, not only did Theranos fail to perform finger-stick blood draws, it now has admitted it will not perform any blood-testing services at all.  Ms. Holmes announced on October 5, 2016, that Theranos would be shutting down both of its laboratories and all of its remaining blood-draw centers.

184.    Defendant failed to perform in accordance with the parties' expectations that Theranos would perform blood-testing services at Walgreens stores using its finger-stick technology, and therefore breached its implied covenant.  As a result, Plaintiff is entitled, under the Agreement, to a refund of the Innovation Fee and immediate repayment of its purchase of the convertible note.

185.    Plaintiff also has suffered further damages, to be proven.

## COUNT IV – DECLARATORY JUDGMENT

186. Plaintiff hereby incorporates each and every allegation set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

187. Defendant Theranos entered into the Amended and Restated Theranos Master Services Agreement, dated June 5, 2012, with Plaintiff Walgreens.

188. Pursuant to the Agreement, Theranos agreed that it "will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns … against any claims, demands, suits, or causes of action by third parties … to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in connection with this Agreement; (b) any breach of this Agreement … by Theranos or its personnel; … (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation …." x. A, Agreement ¶ 22.1.

189. Several consumer class action lawsuits have been filed against Theranos, some of which also named WBA as a defendant (the "Consumer Class Action Litigation").

190. The claims involved in the Consumer Class Action Litigation trigger each and every one of the above-cited clauses in paragraph 22.1 of the Agreement.

191. On July 19, 2016, Walgreens made a demand on Theranos, pursuant to paragraph 22.1 of the Agreement, to defend, indemnify, and hold harmless Walgreens and WBA in the Consumer Class Action Litigation, including reimbursement for the costs of Walgreens' own separate counsel.

192. Theranos still has not confirmed to Walgreens whether it will agree to do so.

193. Plaintiff seeks a declaration that Defendant is required, per the Agreement, to defend, indemnify, and hold harmless Walgreens and its affiliates (including their respective agents, directors, officers, employees, successors and assigns) in the Consumer Class Action Litigation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

(a) an order awarding Plaintiff a refund of its Innovation Fee, paid pursuant to the Amended and Restated Theranos Master Services Agreement, dated June 5, 2012, in the amount of $100 million;

(b) an order awarding Plaintiff $40 million in repayment of the convertible note;

(c) an order awarding Plaintiff damages it has suffered from being named as a defendant in the Consumer Class Action Litigation, in an amount to be proven;

(d) an order awarding Plaintiff reputational damages, in an amount to be proven;

(e) an order awarding Plaintiff pre- and post-judgment interest to the extent allowed by law;

(f) an order awarding Plaintiff reasonable attorneys' fees and the costs of this action, pursuant to paragraph 26(f) of the Agreement;

(g) an order declaring that Theranos must defend, indemnify, and hold harmless Walgreens and its affiliates (including their respective agents, directors, officers, employees, successors and assigns) in the Consumer Class Action Litigation; and

(h) such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Walgreens demands a jury trial on all issues so triable.

                                        POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ Kevin R. Shannon*

Kevin R. Shannon (#3137)
Arthur L. Dent (#2491)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
kshannon@potteranderson.com
adent@potteranderson.com

*Attorneys for Plaintiff Walgreen Co.*

David A. Gordon
Kristen R. Seeger
Lawrence P. Fogel
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Dated: November 8, 2016
Public Version Dated: January 12, 2017
1237625