# EXHIBIT 8

CONFIDENTIAL

Page 1

1  IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
2
   PARTNER INVESTMENTS, L.P., a
3  Delaware limited partnership,
   PFM HEALTHCARE MASTER FUND,
4  L.P., a Cayman Islands limited
   partnership, and PFM HEALTHCARE
5  PRINCIPALS FUND, L.P., a
   Delaware limited partnership,
6
            Plaintiff,
7
   vs.                                    Case No. 12816-VCL
8
9  THERANOS, INC., a Delaware
   corporation, ELIZABETH HOLMES,
10 an individual, RAMESH BALWANI,
   an individual, and DOES 1-10,
11
            Defendants.
12 _____/
13
14            ** CONFIDENTIAL **
15         VIDEOTAPED DEPOSITION OF
16      THE HONORABLE GEORGE P. SHULTZ
17          San Francisco, California
18           Tuesday, April 4, 2017
19
20
21
22 Reported by:
23 LORRIE L. MARCHANT, CSR No. 10523
                RMR, CRR, CCRR, CRC
24
25 Job No. 121073

TSG Reporting - Worldwide   877-702-9580

Confidential                                    TH-COL0000005413

CONFIDENTIAL

Page 2

1        April 4, 2017
2          10:07 a.m.
3
4   Videotaped deposition of THE HONORABLE
5   GEORGE P. SHULTZ, held at the offices of
6   Gibson, Dunn & Crutcher, LLP, 555 Mission
7   Street, 30th Floor, San Francisco,
8   California, before Lorrie L. Marchant, a
9   Certified Shorthand Reporter, Registered
10  Merit Reporter, Certified Realtime
11  Reporter, California Certified Realtime
12  Reporter, Certified Realtime Captioner.
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential                                                TH-COL0000005414

CONFIDENTIAL

Page 3

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4           GIBSON, DUNN & CRUTCHER
             BY:  MATTHEW KAHN, ESQ.
 5                ELI LAZARUS, ESQ.
             555 Mission Street
 6           San Francisco, CA 94105
 7
 8
 9   FOR THE DEFENDANT THERANOS:
10           WILMERHALE
             BY:  THOMAS STRICKLAND, ESQ.
11           1875 Pennsylvania Avenue, NW
             Washington, DC 20006
12
13
             WILMERHALE
14           BY:  KATIE MORAN, ESQ.
             350 South Grand Avenue
15           Los Angeles, CA 90071
16
17
18   FOR THE DEFENDANT RAMESH BALWAMI:
19           DAVIS WRIGHT TREMAINE
             BY:  BEN BYER, ESQ. (via phone)
20           1201 Third Avenue
             Seattle, WA 98101
21
22
23   (Continued)
24
25
```

Confidential                                        TH-COL0000005415

```
 1              A P P E A R A N C E S
 2
 3   FOR THE DEFENDANT, ELIZABETH HOLMES:
 4           COOLEY
             BY:  KATHLEEN GOODHART, ESQ.
 5           101 California Street
             San Francisco, CA 94111
 6
 7
 8   FOR THE WITNESS, THE HONORABLE GEORGE P. SHULTZ:
 9           FARELLA BRAUN & MARTEL
             BY:  DOUGLAS YOUNG, ESQ.
10                JESSICA NALL, ESQ.
             235 Montgomery Street
11           San Francisco, CA 94104
12
13
14           YOUNG CONAWAY STARGATT & TAYLOR
             BY:  MARTIN LESSNER, ESQ.
15           Rodney Square
             1000 North King Street
16           Wilmington, DE 19801
17
18
19   ALSO PRESENT:
20           Marcus Majers, Videographer
21                   ---oOo---
22
23
24
25
```

CONFIDENTIAL

Page 5

1           SAN FRANCISCO, CALIFORNIA

2           TUESDAY, APRIL 4, 2017

3                 10:07 A.M.

4        THE VIDEOGRAPHER: Good morning. This is

5   the start of tape labeled No. 1 of the videotaped

6   deposition of Secretary George Shultz in the matter

7   of Partner Investments, LP, et al., versus Theranos,

8   Inc., et al., in the Court of Chancery of the State

9   of Delaware. Case No. 12816-VCL.

10        This deposition is being held at

11  555 Mission Street, 30th Floor, San Francisco,

12  California, on April 4th, 2017, at approximately

13  10:07 a.m.

14        My name is Marcus Majers from TSG

15  Reporting, Inc., and I am the legal video

16  specialist. The court reporter today is

17  Lorrie Marchant, in association with TSG Reporting.

18        Will counsel please introduce themselves.

19        MR. KAHN: Matthew Kahn from Gibson, Dunn &

20  Crutcher, for plaintiffs.

21        MR. LAZARUS: Eli Lazarus from Gibson, Dunn

22  & Crutcher, also for plaintiffs.

23        MR. STRICKLAND: Tom Strickland,

24  WilmerHale, for the company, Theranos.

25        MS. GOODHART: Kathleen Goodhart, Cooley,

Confidential                                    TH-COL0000005417

CONFIDENTIAL

Page 6

1   for Elizabeth Holmes.
2           MR. LESSNER:  Marty Lessner, Young,
3   Conaway, Stargatt & Taylor of Wilmington, Delaware,
4   for Secretary Shultz.
5           MS. NALL:  I'm Jessica Nall from Farella
6   Braun & Martel for Secretary Shultz.
7           MR. YOUNG:  Douglas Young, Farella Braun &
8   Martel, for Secretary Shultz.
9           THE WITNESS:  George Shultz for Secretary
10  Shultz.
11          THE VIDEOGRAPHER:  All those joining via
12  telephone conference as well.
13          MR. BYER:  Ben Byer from Davis Wright
14  Tremaine for Sunny Balwani.
15          THE VIDEOGRAPHER:  Will the court reporter
16  please swear in the witness.
17             THE HONORABLE GEORGE P. SHULTZ,
18    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:
19                  EXAMINATION BY MR. KAHN
20          BY MR. KAHN:
21      Q.  Good morning, Mr. Secretary.
22      A.  Good morning.
23          MR. YOUNG:  Matthew, before you begin, as
24  we discussed before we started, it's our desire,
25  under whatever protocol you're using, to designate

Confidential                                    TH-COL0000005418

Page 7

1  the deposition and the transcript as confidential.
2          MR. KAHN:  Understood.  Thank you.
3          BY MR. KAHN:
4      Q.  Mr. Secretary, it is an honor and a
5  privilege to meet you.  And I'm sorry that we had to
6  drag you here today.  We know your time is valuable,
7  so we'll make this as quick as possible.  I'll dive
8  right in.
9          How did you first become involved with
10 Theranos?
11     A.  A very good colleague of mine at Stanford,
12 named John Shoven, an economist with whom I worked
13 at the Stanford Institute for Economic Policy
14 Research and with whom I have written a book,
15 brought her to see me.
16     Q.  And by "her" you mean Elizabeth Holmes?
17     A.  Elizabeth Holmes.
18     Q.  Okay.  And was that in 2010?  2011?
19     A.  Well, there is an exact date, and I could
20 look that up somewhere.
21         MR. YOUNG:  You don't need to.  Just do
22 your best memory.
23         THE WITNESS:  It was around then.  I think
24 it was in the spring.
25 ///

CONFIDENTIAL

Page 8

```
1            BY MR. KAHN:
2       Q.   Okay.  And when you first met --
3       A.   That's a fact that can be ascertained, so I
4  don't want to...
5       Q.   That's okay.  I'm just trying to generally
6  put us in a time context.
7            When you first met Ms. Holmes, do you
8  recall what she told you about Theranos?
9            MS. GOODHART:  Objection.  Form.
10           THE WITNESS:  Not in detail.  But in
11 general, she described a system of taking blood by a
12 fingerstick and analyzing it in a machine she had
13 invented.  And the process was such that you would
14 enhance the analytic quality of the test.
15           BY MR. KAHN:
16      Q.   Okay.
17      A.   And make it easier, and, therefore, more
18 people likely to take it.
19      Q.   Did you eventually join Theranos's board of
20 directors?
21      A.   Yes.  I think it was always on the advisory
22 board.
23      Q.   Okay.  Do you have an understanding that at
24 one point you were on the board of directors, and
25 later you were on something called the "board of
```

Confidential

TH-COL0000005420

CONFIDENTIAL

Page 9

1  counselors"?
2     A.   Well, there was an overall board which was
3  an advisory board.
4     Q.   Okay.
5     A.   And subsequently that was changed.  And
6  part of the people remained on a -- I guess a more
7  fiduciary board, and I was on an advisory board.
8     Q.   Okay.  So when -- strike that.
9          Did Ms. Holmes ask you to join what you've
10 called the "advisory board"?
11    A.   Yes.
12    Q.   Okay.  And did she tell you why she wanted
13 you to join that board?
14    A.   No.  I just assumed that she knew about me
15 and had discussed me with John Shoven, with whom I'd
16 written a book on healthcare.
17    Q.   What was your understanding of your role on
18 that first board that Ms. Holmes asked you to join?
19    A.   To give advice as best I could, and
20 observing what was going on, making my comments.
21    Q.   And did you understand your role to be only
22 an advisory role?
23    A.   Yes.  That was brought out in one of our
24 meetings with great clarity in an exchange between
25 Senator Sam Nunn and the lawyer, David Boies.

Confidential                                    TH-COL0000005421

1   Q.   Okay.  Did Ms. Holmes tell you that your
2   role on that first board was an advisory role only?
3   A.   Well, she was present at the exchange that
4   I mentioned, and there was subsequent follow-up in
5   paper.  And I think Sam Nunn wrote something, and I
6   wrote, saying I agreed with Sam.
7   Q.   Okay.  And did Ms. Holmes also agree that
8   your role on the board was an advisory role?
9           MS. GOODHART:  Objection.  Form.
10          THE WITNESS:  Well, I just said that she
11  was present at this discussion and that I wrote to
12  her and others did too, so I assume she can read.
13          BY MR. KAHN:
14  Q.   Did Ms. -- do you recall Ms. Holmes saying
15  at this meeting that your role on the board was an
16  advisory role?
17  A.   I don't remember whether she -- how much
18  she took part in the discussion.  The lawyer,
19  David Boies, was representing her, as I understood
20  it.
21  Q.   Okay.  Back before that meeting with
22  Senator Nunn and Ms. Holmes and Mr. Boies, when you
23  first joined the board at that time, did you
24  understand that it was just an advisory role for
25  you?

Confidential                                TH-COL0000005422

Page 11

1   A.   That's what I thought, but it wasn't -- I
2   didn't sort of delve into it much.
3   Q.   Okay.  At the time you joined the board,
4   did Ms. Holmes tell you what your role would be on
5   the board?
6   A.   Not in any explicit way.
7   Q.   Okay.
8   A.   But I noticed that some people who were
9   there at the first meeting I went to weren't there
10  at the next one.  So it was obvious that she was the
11  decider.
12  Q.   Okay.  What do you remember Ms. Holmes
13  telling you at the time you joined the board about
14  what the board's role was in managing Theranos?
15  A.   I don't think there was any explicit
16  discussion about that.
17  Q.   Okay.  Did you get an understanding from
18  your time on the board what the board's role was in
19  managing Theranos?
20  A.   It seemed to me our role was to give
21  advice.
22  Q.   But not to manage?
23  A.   Not to be -- we had no decision-making
24  authority.
25  Q.   If the board had no decision-making

Page 20

1  you could change it, I don't know.
2          BY MR. KAHN:
3      Q.  Okay.  Was it your understanding that all
4  of the tests that Theranos ran were done on that
5  blood that was taken by fingerstick and put into the
6  Nanotainer?
7      A.  Yes.
8          MS. GOODHART:  Objection.  Form.
9          BY MR. KAHN:
10     Q.  Okay.  And did you have that understanding
11 because Ms. Holmes told you that from time to time?
12         MS. GOODHART:  Objection.  Form.
13         THE WITNESS:  I observed on countless
14 occasions somebody, including me, having their
15 finger stuck, and the blood winding up going into
16 this machine.  They did this, and you see a machine,
17 it goes in.
18         BY MR. KAHN:
19     Q.  Sure.  But leaving aside what you observed,
20 did Ms. Holmes also tell you that all of the tests
21 were run on the blood in the Nanotainer?
22         MS. GOODHART:  Objection.  Form.
23         THE WITNESS:  That was my assumption.
24 There wasn't any discussion about it.
25 ///

Page 21

1        BY MR. KAHN:
2        Q.   Did you ever have an understanding that
3   Theranos was running some of its blood tests on
4   blood that was taken with a traditional needle and
5   put into a tube the way that other labs, like Quest,
6   do it?
7        A.   I know that they had a venous draw system,
8   but it was different from the typical one, a little
9   easier.  And when they drew blood, they drew less.
10            And on one occasion when I was there and
11  had my fingerstick and went into the machine and
12  outcome, I saw that there was a venous draw place.
13  I said, "Oh, I'll have a venous draw too."  So I did
14  that.  And it went in the machine and the result was
15  the same.  So it was a little sample of one that
16  said the fingerstick works.
17       Q.   You mentioned the machine that Ms. Holmes
18  invented.  Are you referring to a blood analyzer
19  device that Theranos manufactured?
20       A.   Yes.
21       Q.   Okay.  And have you heard different
22  versions of that device called the "Edison" and the
23  "MiniLab" and things like that?
24       A.   I've seen those words around.  I just
25  always called it "the device."

Page 22

1  Q. Okay. And did you understand, from your
2  discussions with Ms. Holmes, that all the blood
3  tests that Theranos ran were being run on those
4  Theranos-manufactured devices?
5          MS. GOODHART: Objection. Form.
6          THE WITNESS: That was my assumption. We
7  didn't have a big discussion about it.
8          BY MR. KAHN:
9  Q. Well, sure. But when you talked with
10 Ms. Holmes about the blood tests, you and she were
11 talking about running blood tests on
12 Theranos-manufactured devices?
13 A. Yes.
14         MS. GOODHART: Objection. Form.
15         BY MR. KAHN:
16 Q. Was that a "yes"?
17 A. Yes.
18 Q. Okay.
19 A. She has to speak lower so you can hear me.
20 Q. I agree with you.
21         MS. GOODHART: Oh, just to be clear, the
22 objections -- typically the witness waits until the
23 objection has been made so the court reporter can
24 take it down before you respond, and that way we're
25 not talking over each other.