# EXHIBIT 9

Confidential

Page 1

```
 1     IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
 2
       PARTNER INVESTMENTS, L.P., a
 3     Delaware limited partnership,
       PFM HEALTHCARE MASTER FUND,
 4     L.P., a Cayman Islands limited
       partnership, and PFM HEALTHCARE
 5     PRINCIPALS FUND, L.P., a
       Delaware limited partnership,
 6
                      Plaintiff,
 7
       vs.                                    Case No. 12816-VCL
 8
 9     THERANOS, INC., a Delaware
       corporation, ELIZABETH HOLMES,
10     an individual, RAMESH BALWANI,
       an individual, and DOES 1-10,
11
                      Defendants.
12     _____/
13
14                   ** CONFIDENTIAL **
15          VIDEOTAPED DEPOSITION OF TYLER SHULTZ
16                San Francisco, California
17                  Monday, March 6, 2017
18
19
20
21     Reported by:
22     LORRIE L. MARCHANT, CSR No. 10523
                       RMR, CRR, CCRR, CRC
23
24     Job No. 120731
25
```

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                      TH-COL0000005704

Confidential

Page 2

1              March 6, 2017

2                 9:42 a.m.

3

4       Videotaped deposition of TYLER SHULTZ,

5       held at the offices of Gibson Dunn &

6       Crutcher LLP, 555 Mission Street, San

7       Francisco, California, before Lorrie L.

8       Marchant, a Certified Shorthand Reporter,

9       Registered Merit Reporter, Certified

10      Realtime Reporter, California Certified

11      Realtime Reporter, Certified Realtime

12      Captioner.

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    TH-COL0000005705

Confidential

Page 3

```
 1            A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3           GIBSON, DUNN & CRUTCHER
             BY:  MATTHEW KAHN, ESQ.
 4                ANGELA POON, ESQ.
             555 Mission Street
 5           San Francisco, CA 94105
 6
 7
 8   FOR THE DEFENDANT RAMESH BALWAMI:
 9           WILMERHALE
             BY:  CHRISTOPHER DAVIES, ESQ.
10           1875 Pennsylvania Avenue, NW
             Washington, DC 20006
11
12
             WILMERHALE
13           BY:  WILLIAM ROTH, ESQ. (telephonically)
             7 World Trade Center
14           250 Greenwich Street
             New York, New York 10007
15
16
             DAVIS WRIGHT TREMAINE
17           BY:  STEPHEN RUMMAGE, ESQ.
                  JOHN McKAY, ESQ. (telephonically)
18           1201 Third Avenue
             Seattle, WA 98101
19
20
             DAVIS WRIGHT TREMAINE
21           BY:  KELLY GORTON, ESQ.
             505 Montgomery Street
22           San Francisco, CA 94111
23
24
25
```

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                TH-COL0000005706

Confidential

Page 4

1       A P P E A R A N C E S
2
3  FOR THE DEFENDANT, ELIZABETH HOLMES:
4           COOLEY
            BY:  MICHELLE RHYU, Ph.D., Esq.
5           3175 Hanover Street
            Palo Alto, CA 94304
6
7
8  FOR THE WITNESS, TYLER SHULTZ:
9           Taylor & Company Law Offices
            BY:  JONATHAN PATCHEN, ESQ.
10          One Ferry Building
            San Francisco, CA 94111
11
12
13 ALSO PRESENT:
14          Ramesh Balwani
15          Alex Dias, Videographer
16                 ---oOo---
17
18
19
20
21
22
23
24
25

Confidential

TSG Reporting - Worldwide   877-702-9580

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    TH-COL0000005707

Confidential

Page 5

1       SAN FRANCISCO, CALIFORNIA
2         MONDAY, MARCH 6, 2017
3              9:48 A.M.
4       THE VIDEOGRAPHER: Good morning. This is
5  the beginning of Disk No. 1 in the deposition of
6  Mr. Tyler Shultz in the matter Partners Investment,
7  LLP, et al., versus Theranos, Inc., et al. In the
8  Court of Chancery of the State of Delaware, Case
9  No. 12816-VCL.
10      This deposition is being held at
11 555 Mission Street, Suite 3000, San Francisco,
12 California, on March 6th, 2017, at 9:42 a.m. My
13 name is Alex Dias, from TSG Reporting, Inc. Our
14 court reporter today is Lorrie Marchant.
15      Will counsel please introduce yourselves.
16      MR. KAHN: Matthew Kahn. Gibson, Dunn &
17 Crutcher. For plaintiffs.
18      MS. POON: Angela Poon. Gibson, Dunn &
19 Crutcher. For plaintiffs.
20      MR. RUMMAGE: Steve Rummage. Davis Wright
21 Germane, for defendant, Sunny Balwani.
22      MS. GORTON: Kelly Gorton from Davis Wright
23 Germane for the defendant Sunny Balwani.
24      MR. BALWANI: Sunny Balwani.
25      MR. DAVIES: Chris Davies on behalf of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                TH-COL0000005708

Confidential

Page 6

1  Theranos.
2         MS. RHYU:  Michelle Rhyu from Cooley on
3  behalf of Elizabeth Holmes.
4         MR. PATCHEN:  Jonathan Patchen of Taylor &
5  Patchen on behalf of the witness.
6         THE VIDEOGRAPHER:  Thank you.
7         Will counsel on the phone please introduce
8  yourself.
9         MR. KAHN:  Is anyone there on the phone?
10  Hello.  I hear a noise.  Can whoever is on the phone
11  please identify themselves.
12         MR. DAVIES:  I think it's William Roth of
13  Wilmer.  But let me e-mail him.  I'm not sure it's
14  worth ...
15         MR. RUMMAGE:  Yeah, it's not worth waiting.
16         MR. KAHN:  All right.  Let's proceed.
17         THE VIDEOGRAPHER:  Will the court reporter
18  please swear in the witness.
19               TYLER SHULTZ,
20    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:
21             EXAMINATION BY MR. KAHN
22       BY MR. KAHN:
23    Q.   Good morning, Mr. Shultz.
24    A.   Good morning.
25    Q.   Have you ever been deposed before?

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    TH-COL0000005709

Confidential

Page 298

1    Q.    Elsewhere meaning on what?
2    A.    Like, for instance, during dead week my
3  spring -- spring quarter of senior year, I went and
4  did an alternative break tour with the band
5  Dispatch, and so I followed them around on a tour
6  bus and organized service events and projects before
7  their shows.  Did concert outreach.  Yeah.  I had a
8  blast.  And that was the week before finals.
9          So the day I came back after being on --
10 being on the road for a week with Dispatch, I had to
11 take an organic -- an inorganic chemistry final.
12 You know, that's one example.  I didn't do well on
13 that final.
14   Q.    Okay.  And so I take it you didn't graduate
15 with departmental honors either?
16   A.    No.
17   Q.    You weren't Phi Beta Kappa?
18   A.    No.
19   Q.    And you don't have any postgraduate
20 education; right?
21   A.    No.
22   Q.    And I believe that your tenure at Theranos
23 lasted roughly seven months; is that right?
24   A.    Yeah.  About there.
25   Q.    And is that seven months the sum total of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    TH-COL0000006001

1  your experience with a blood testing laboratory?
2      A.   At the time it was, yeah.
3      Q.   And do you have some experience since?
4      A.   Well, now I work -- I do some blood testing
5  research at Stanford, but it's not like a CLIA
6  laboratory.
7      Q.   So at the time you were writing some of the
8  e-mails we were looking at, the sum total of your
9  experience is the experience you had at Theranos;
10 correct?
11     A.   Yes.
12     Q.   And was it fair to say that the people to
13 whom you were addressing those e-mails were people
14 who had considerably more experience with blood
15 testing laboratories than you did; is that right?
16     A.   Yes.
17     Q.   And you knew that at the time; correct?
18     A.   Yes.
19     Q.   And you knew a lot of them had advanced
20 degrees; correct?
21     A.   Yes.
22     Q.   And they were smart and motivated, in your
23 words; right?
24     A.   Yes.
25     Q.   Okay.  By the way, you made a comment early

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

TH-COL0000006002

1        THE WITNESS:  That's true, yeah.
2        BY MR. RUMMAGE:
3    Q.   And do you know whether there were any
4 components or materials that were manufactured to
5 assist in running small samples on third-party
6 devices?
7    A.   Not that I know of.
8    Q.   When you say "not that I know of," is that
9 something that you would have been aware of?
10   A.   I don't know.
11   Q.   Well, let me ask you a broader question,
12 then.
13        Did you ever participate in running patient
14 samples, finger stick samples, on third-party
15 devices?
16   A.   No.
17   Q.   And so anything you know about that you
18 know from what other people have told you?
19   A.   Yes.
20   Q.   And, in fact, you never were in the CLIA
21 lab; correct?
22   A.   True.  I was never part of the CLIA lab,
23 although there wasn't a physical barrier between the
24 CLIA lab and -- and the downstairs laboratory, there
25 was not a physical barrier between, like, the

```
                                                         Page 306
1    Theranos devices that were used for CLIA and the
2    Theranos devices that were used for validation.
3         Q.   And you know that because?
4         A.   Because I worked there.  I worked in the
5    validation lab, and we would use the same Tecans.
6         Q.   And by the way, you talked about the
7    reasons why Tecans were used.
8              Do you remember talking about that in your
9    testimony?
10        A.   Yeah.
11        Q.   Do you actually know why the decision was
12   made to use the Tecans?
13        A.   I was not involved in that decision-making,
14   no.
15        Q.   And that decision-making was done by people
16   senior to you; correct?
17        A.   Yes.
18        Q.   And they didn't share their reasoning with
19   you; correct?
20        A.   Correct.
21        Q.   So your thoughts as to why the Tecan device
22   was used are not based upon knowledge of why the
23   decision was made by the Theranos personnel who made
24   it; correct?
25             MR. PATCHEN:  Objection.  Form.
```

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                TH-COL0000006009

1  secrecy was to conceal the fact that Theranos's
2  secret devices weren't really all that secret and
3  that a lot of the things that went into them were
4  commercially available; is that right?
5      A.   Yeah.
6      Q.   Okay.  So let me ask you this:  Did you
7  ever go to the Theranos manufacturing facility?
8      A.   No.
9      Q.   Did you ever see all of the components that
10 were fabricated and what went into the Edison
11 device?
12     A.   Well, I saw the open reader.
13     Q.   But that's it; right?
14     A.   Yeah.
15     Q.   You don't know, for example, what
16 tolerances things were manufactured to?
17     A.   No, I don't.
18     Q.   And do you know whether the software that
19 was running the device was off-the-shelf software?
20     A.   I'm sure it was not.
21     Q.   And when you say you're sure it was not,
22 you think it was Theranos proprietary?
23     A.   Theranos was providing the software, yeah.
24     Q.   Okay.  And so you couldn't have gone to a
25 supplier and gotten that stuff; right?

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                TH-COL0000006024

1      A.   That's true, yeah.

2      Q.   And you don't actually know that you could

3 have gotten all of the components to the device

4 through commercial -- commercially available

5 sources?

6      A.   So I had never actually tried to do that.

7 But most of what's in there is in my lab at Stanford

8 right now.

9      Q.   And when you say "most of what's in there,"

10 what do you mean?  Like pipettes and so there's

11 things in your lab?

12     A.   Pipette, pipette tips, photometer, like a

13 mechanical arm.

14     Q.   But you don't know if it's the same

15 mechanical arm, do you?

16     A.   No.  It's probably a different mechanical

17 arm, but --

18     Q.   And different pipettes?

19     A.   Probably different pipettes.

20     Q.   Because the pipettes are specially designed

21 to use with particularly small samples; correct?

22          MR. PATCHEN:  Objection.  Foundation.

23          THE WITNESS:  The pipette itself didn't

24 physically look any different than a normal pipette.

25 ///

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    TH-COL0000006025

1     BY MR. RUMMAGE:
2     Q.   How about the cartridges?
3     A.   The cartridges were different.
4     Q.   And they were manufactured by Theranos too;
5     correct?
6     A.   Yes.
7     Q.   All right.  You also talked about how the
8     binders group was developing antibodies so you
9     wouldn't have to pay -- so Theranos wouldn't have to
10    pay royalties.
11         Do you recall saying that?
12    A.   Yeah.
13    Q.   But then you also testified you weren't
14    sure if Theranos was paying royalties; is that
15    right?
16    A.   So I know that we wanted to develop our
17    antibodies in house so that we weren't relying on
18    commercial antibodies.  And I -- I guess I assumed
19    that it would be -- my understanding was that it was
20    so that we didn't have to pay royalties, and we
21    didn't have to rely on a commercial vendor, because
22    then you're kind of at the mercy of that vendor.
23    Q.   And when you say "my understanding was,"
24    where did you get that understanding?
25    A.   Just from speaking with other scientists

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

TH-COL0000006026

1    Q.   And when you calculated the CV medians, as
2  the name implies, I'm assuming you just used the
3  median; correct?
4    A.   Yes.
5    Q.   You didn't use the mean or the average;
6  right?
7    A.   True.
8         MR. PATCHEN:  Objection.  Vague.  In terms
9  of average.
10        BY MR. RUMMAGE:
11   Q.   You didn't use the mean?
12   A.   Yeah.  True.
13   Q.   And you now understand that, in fact,
14 Theranos doesn't use the medians for any of these
15 tests except for syphilis; correct?  Any of the
16 tests that have been under discussion here today.
17   A.   Yeah.
18        MR. KAHN:  Object to the form.
19        THE WITNESS:  Not sure.
20        BY MR. RUMMAGE:
21   Q.   Well, let's put it this way:  Mr. Balwani
22 responded to you that -- in a couple of places in
23 this e-mail, and I believe some of them were pointed
24 out to you --
25   A.   He says "quantitative, we use mean"?

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

TH-COL0000006043

1  Q.  Correct.
2  A.  So the exception here would be HCV.
3  Q.  HCV?
4  A.  Yes.
5  Q.  In that they use median?
6  A.  It's qualitative.
7  Q.  So you assume they used median?
8  A.  Yes.
9  Q.  Okay. And you weren't aware of that when
10 you were preparing this?
11 A.  No.
12 Q.  Because you weren't familiar with the
13 method through which CV was calculated; correct?
14     MR. KAHN: Object to the form.
15     THE WITNESS: Correct. I just used the
16 median that Daniel had described to me, which was
17 for the syphilis data set.
18     BY MR. RUMMAGE:
19 Q.  And so your knowledge of the method of
20 calculating CV that Theranos used was derived from
21 your conversations with Dr. Young?
22 A.  Yes.
23 Q.  You were not personally involved in the
24 process through which the final CVs for validations
25 were computed; correct?

Confidential

1    A.    No.  Correct.
2    Q.    Somebody else did that?
3    A.    Yes.
4    Q.    And that was the people who were
5  biostatisticians?
6    A.    Yes.
7    Q.    And biostatisticians are trained on this
8  stuff; right?
9    A.    Yes.
10   Q.    And that -- your degree is not in
11 biostatistics; correct?
12   A.    Correct.
13   Q.    All right.  And by the way, the numbers
14 that you have here for the CV medians are numbers
15 that you just computed from data; correct?
16   A.    Correct.
17   Q.    What data did you use?
18   A.    The data that was generated during these
19 validation experiments.
20   Q.    And do you know whether you had access to
21 all of the relevant data?
22   A.    I believe that I did.
23   Q.    And when you say you believe that you did,
24 what's the source of your belief?
25   A.    That you, you know, basically go into a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    TH-COL0000006045

1  correct?
2       A.   Correct.
3       Q.   You were not part of that decision-making?
4       A.   I was not part of that decision.
5       Q.   And you didn't talk to the decision-makers
6  to ask why they did it; correct?
7       A.   Correct.
8            MR. RUMMAGE:  Can we just go off the record
9  for a couple of seconds.
10           THE VIDEOGRAPHER:  Off the record,
11 6:53 p.m.
12           (Recess taken, from 6:53 to 6:57.)
13           THE VIDEOGRAPHER:  Back on the record
14 6:57 p.m.
15           BY MR. RUMMAGE:
16      Q.   So by the way, Mr. Shultz, we talked
17 earlier about whether you had gone out to the
18 manufacturing facility, and I believe you told that
19 us you hadn't; correct?
20      A.   Correct.
21      Q.   And I just want to know, do you have any
22 background in manufacturing devices of this nature?
23      A.   No.
24      Q.   And do you know, at the time that you were
25 working at Theranos, how many assays they had

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    TH-COL0000006050

```
 1   developed for small vine testing?
 2        A.   I don't know how many assays they
 3   developed.
 4        Q.   You don't have any knowledge one way or the
 5   other?
 6        A.   No.
 7        Q.   Over 100?
 8        A.   I would guess less than 100, but I don't
 9   actually know.
10        Q.   It sounds like it's a guess.
11        A.   It's a guess.
12        Q.   All right.  By the way, you had -- you gave
13   some testimony about a test of the analyzer at the
14   White House.
15             Do you recall that?
16        A.   Yeah.
17        Q.   And I think you said you were sitting next
18   to Christian Holmes at some dinner somewhere, and he
19   said he was relieved it went well because it wasn't
20   expected to, or something of that nature; is that
21   right?
22        A.   Yeah.  He said that after the demo
23   completed, he looked over at another product
24   manager, I think it was Dan, and they, like, gave
25   each other -- he said they gave each other this
```