# Exhibit W
# (Filed Under Seal)

CONFIDENTIAL

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

6

              Plaintiff,
7
     vs.                              Case No. 12816-VCL
8

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

11

              Defendants.
12   ----------------------------/

13

14               ** CONFIDENTIAL **
15            VIDEOTAPED DEPOSITION OF
16          THE HONORABLE GEORGE P. SHULTZ
17             San Francisco, California
18              Tuesday, April 4, 2017
19

20

21

22   Reported by:
23   LORRIE L. MARCHANT, CSR No. 10523
                       RMR, CRR, CCRR, CRC
24

25   Job No. 121073

Confidential

CONFIDENTIAL

1              April 4, 2017

2                 10:07 a.m.

3

4    Videotaped deposition of THE HONORABLE

5    GEORGE P. SHULTZ, held at the offices of

6    Gibson, Dunn & Crutcher, LLP, 555 Mission

7    Street, 30th Floor, San Francisco,

8    California, before Lorrie L. Marchant, a

9    Certified Shorthand Reporter, Registered

10   Merit Reporter, Certified Realtime

11   Reporter, California Certified Realtime

12   Reporter, Certified Realtime Captioner.

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential

```
 1                  A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4            GIBSON, DUNN & CRUTCHER
              BY:  MATTHEW KAHN, ESQ.
 5                 ELI LAZARUS, ESQ.
              555 Mission Street
 6            San Francisco, CA 94105

 7

 8

 9   FOR THE DEFENDANT THERANOS:

10            WILMERHALE
              BY:  THOMAS STRICKLAND, ESQ.
11            1875 Pennsylvania Avenue, NW
              Washington, DC 20006

12

13
              WILMERHALE
14            BY:  KATIE MORAN, ESQ.
              350 South Grand Avenue
15            Los Angeles, CA 90071

16

17

18   FOR THE DEFENDANT RAMESH BALWAMI:

19            DAVIS WRIGHT TREMAINE
              BY:  BEN BYER, ESQ. (via phone)
20            1201 Third Avenue
              Seattle, WA 98101

21

22

23   (Continued)

24

25
```

Confidential

1              A P P E A R A N C E S

2

3   FOR THE DEFENDANT, ELIZABETH HOLMES:

4           COOLEY
            BY:  KATHLEEN GOODHART, ESQ.

5           101 California Street
            San Francisco, CA 94111

6

7

8   FOR THE WITNESS, THE HONORABLE GEORGE P. SHULTZ:

9           FARELLA BRAUN & MARTEL
            BY:  DOUGLAS YOUNG, ESQ.

10              JESSICA NALL, ESQ.
            235 Montgomery Street

11          San Francisco, CA 94104

12

13

14          YOUNG CONAWAY STARGATT & TAYLOR
            BY:  MARTIN LESSNER, ESQ.

15          Rodney Square
            1000 North King Street

16          Wilmington, DE 19801

17

18

19   ALSO PRESENT:

20          Marcus Majers, Videographer

21                  ---oOo---

22

23

24

25

Confidential

CONFIDENTIAL

1          SAN FRANCISCO, CALIFORNIA

2          TUESDAY, APRIL 4, 2017

3              10:07 A.M.

4      THE VIDEOGRAPHER:  Good morning.  This is

5  the start of tape labeled No. 1 of the videotaped

6  deposition of Secretary George Shultz in the matter

7  of Partner Investments, LP, et al., versus Theranos,

8  Inc., et al., in the Court of Chancery of the State

9  of Delaware.  Case No. 12816-VCL.

10      This deposition is being held at

11  555 Mission Street, 30th Floor, San Francisco,

12  California, on April 4th, 2017, at approximately

13  10:07 a.m.

14      My name is Marcus Majers from TSG

15  Reporting, Inc., and I am the legal video

16  specialist.  The court reporter today is

17  Lorrie Marchant, in association with TSG Reporting.

18      Will counsel please introduce themselves.

19      MR. KAHN:  Matthew Kahn from Gibson, Dunn &

20  Crutcher, for plaintiffs.

21      MR. LAZARUS:  Eli Lazarus from Gibson, Dunn

22  & Crutcher, also for plaintiffs.

23      MR. STRICKLAND:  Tom Strickland,

24  WilmerHale, for the company, Theranos.

25      MS. GOODHART:  Kathleen Goodhart, Cooley,

Confidential

1   for Elizabeth Holmes.

2         MR. LESSNER:  Marty Lessner, Young,

3   Conaway, Stargatt & Taylor of Wilmington, Delaware,

4   for Secretary Shultz.

5         MS. NALL:  I'm Jessica Nall from Farella

6   Braun & Martel for Secretary Shultz.

7         MR. YOUNG:  Douglas Young, Farella Braun &

8   Martel, for Secretary Shultz.

9         THE WITNESS:  George Shultz for Secretary

10   Shultz.

11         THE VIDEOGRAPHER:  All those joining via

12   telephone conference as well.

13         MR. BYER:  Ben Byer from Davis Wright

14   Tremaine for Sunny Balwani.

15         THE VIDEOGRAPHER:  Will the court reporter

16   please swear in the witness.

17          THE HONORABLE GEORGE P. SHULTZ,

18    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

19           EXAMINATION BY MR. KAHN

20         BY MR. KAHN:

21   Q.   Good morning, Mr. Secretary.

22   A.   Good morning.

23         MR. YOUNG:  Matthew, before you begin, as

24   we discussed before we started, it's our desire,

25   under whatever protocol you're using, to designate

Confidential

CONFIDENTIAL

Page 21

1          BY MR. KAHN:

2      Q.   Did you ever have an understanding that

3  Theranos was running some of its blood tests on

4  blood that was taken with a traditional needle and

5  put into a tube the way that other labs, like Quest,

6  do it?

7      A.   I know that they had a venous draw system,

8  but it was different from the typical one, a little

9  easier.  And when they drew blood, they drew less.

10          And on one occasion when I was there and

11  had my fingerstick and went into the machine and

12  outcome, I saw that there was a venous draw place.

13  I said, "Oh, I'll have a venous draw too."  So I did

14  that.  And it went in the machine and the result was

15  the same.  So it was a little sample of one that

16  said the fingerstick works.

17      Q.   You mentioned the machine that Ms. Holmes

18  invented.  Are you referring to a blood analyzer

19  device that Theranos manufactured?

20      A.   Yes.

21      Q.   Okay.  And have you heard different

22  versions of that device called the "Edison" and the

23  "MiniLab" and things like that?

24      A.   I've seen those words around.  I just

25  always called it "the device."

Confidential

Page 22

1    Q.   Okay.  And did you understand, from your

2    discussions with Ms. Holmes, that all the blood

3    tests that Theranos ran were being run on those

4    Theranos-manufactured devices?

5            MS. GOODHART:  Objection.  Form.

6            THE WITNESS:  That was my assumption.  We

7    didn't have a big discussion about it.

8            BY MR. KAHN:

9    Q.   Well, sure.  But when you talked with

10   Ms. Holmes about the blood tests, you and she were

11   talking about running blood tests on

12   Theranos-manufactured devices?

13   A.   Yes.

14           MS. GOODHART:  Objection.  Form.

15           BY MR. KAHN:

16   Q.   Was that a "yes"?

17   A.   Yes.

18   Q.   Okay.

19   A.   She has to speak lower so you can hear me.

20   Q.   I agree with you.

21           MS. GOODHART:  Oh, just to be clear, the

22   objections -- typically the witness waits until the

23   objection has been made so the court reporter can

24   take it down before you respond, and that way we're

25   not talking over each other.

Confidential

CONFIDENTIAL

1    THE WITNESS:  Okay.  So I assume,

2    therefore, you're going to say why you object.

3    MR. YOUNG:  No, no.  Just when he -- when

4    Mr. Kahn asks you a question, we'll just do a --

5    just take a beat, and then if there's an objection,

6    then you can answer.  They don't have to -- they're

7    not allowed, actually, to give long, long speaking

8    objections under the rules.

9    THE WITNESS:  But why -- it would be

10   interesting to me to know why she's objecting.

11   MR. YOUNG:  Well, we'll discuss it off the

12   record another time, after the deposition is over,

13   if that's okay with you.

14   THE WITNESS:  It seems like I'm being left

15   in the dark here.

16   MR. YOUNG:  That's all right.

17   BY MR. KAHN:

18   Q.  Here's what I'll suggest:  I'll ask a

19   question.  If we could just pause for a second.

20   She'll say the words "objection to form."  That's

21   all she's allowed to say.  After she says "objection

22   to form," then you can answer my question.

23   A.  What does "objection to form" mean?

24   Q.  It basically means that she thinks there's

25   something wrong with the way I phrased my question,

Confidential

1  not that there's something wrong about asking you

2  what I'm asking you for, but that I should be

3  wording it in a different way.

4          I disagree with her.  I think my questions

5  are fine.  But I'm allowed to ask the question the

6  way I want to, and she's allowed to say "objection

7  to form."  And if we have to fight about it later,

8  it will be a long time from now.

9          MS. GOODHART:  And the form, the things

10  that could be wrong with his question is he might be

11  asking you to speculate, he might be asking you to

12  testify about something that you don't have a

13  foundation for testifying about, and so I think that

14  his question is improper under the rules, and he can

15  fix his question or not.

16          BY MR. KAHN:

17      Q.   But either way, I suggest that I -- I'll

18  ask it.  She'll say "objection to form," and then

19  you can answer my question, if that's okay with you.

20      A.   Well, okay.  If that's the way you lawyers

21  do it.  It doesn't sound right to me.

22          MR. YOUNG:  That's the way they do it in

23  this particular case, in this particular

24  jurisdiction, so we're in good shape.

25  ///

Confidential

CONFIDENTIAL

Page 25

1          BY MR. KAHN:

2     Q.    Did Ms. Holmes ever tell you that Theranos

3 was running blood tests on patient bloods using any

4 device other than the Theranos-manufactured device

5 that she invented?

6          MS. GOODHART:  Objection.  Form.

7          THE WITNESS:  So now what?

8          MR. YOUNG:  Now you can answer.

9          THE WITNESS:  No.

10          BY MR. KAHN:

11     Q.    Okay.  And you believed that all of the

12 tests that Theranos was running were being done on

13 the Theranos-manufactured blood analyzer device;

14 correct?

15     A.    Yes.

16     Q.    And that was an important fact to you as an

17 investor in Theranos; right?

18          MS. GOODHART:  Objection.  Form.

19          THE WITNESS:  Can I speak a little bit in

20 the answer or "yes" or "no"?

21          MR. YOUNG:  I prefer you answer "yes" or

22 "no" and let him follow up.

23          THE WITNESS:  The point is that she had or

24 has a vision that can have a profound effect on our

25 healthcare system.  And the vision is that blood

Confidential

CONFIDENTIAL

1   contains a lot of information about what's going on

2   in your body.  And if you do it right, what may be

3   going on, in other words, a look into the future.

4          And so since an astonishing proportion of

5   people who are asked by a doctor to get a blood test

6   don't do it, presumably because it's too expensive

7   or too inconvenient or unpleasant, if you could find

8   a way that was inexpensive, located in a handy way,

9   and not obtrusive, then this process would work much

10  better.

11         In addition, you probably have given blood

12  somewhere, and you see it go into some test tubes

13  that sit there, and people hold them and -- so

14  there's no attention paid to what's happening to

15  their temperature.

16         She paid attention to what's happening to

17  their temperature.  Why?  Because when the

18  temperature changes, the blood changes.  And when

19  time passes, the blood changes.  So she wanted to

20  have a system that held the temperature as close as

21  possible to the temperature when it was given.

22  That's the purpose of the Nanotainer.

23         And to get an analytic place pretty

24  apparently near where you give the blood, so you can

25  minimize time.  Time also is a variable.

Confidential

Page 27

1          So if you reduce those variables, then you

2     can compare last week with this week and next week.

3     If you don't reduce the variables, there's so much

4     static that you can't make any decent comparison.

5          But if you can make a comparison like that,

6     then you have, in a sense, a moving picture as a

7     more powerful diagnostic than a snapshot.  So all

8     the way through what she's looking for is a way to

9     use your blood analysis system to understand what's

10    happening to you and what may happen to you.

11          BY MR. KAHN:

12    Q.    Okay.  I understand that.

13          And would you agree with me, though, that

14    one of the key components of Ms. Holmes's vision was

15    using the blood analyzer device that she invented to

16    test the blood?

17          MS. GOODHART:  Objection.  Form.

18          THE WITNESS:  Yes.  And among other

19    reasons, because it's small, light, and easy to move

20    around.  So you can put it somewhere near where you

21    want to use it.

22          BY MR. KAHN:

23    Q.    Right.  And so if it turned out that

24    Theranos was running its blood tests not on the

25    device that Ms. Holmes invented but on commercially

Confidential

CONFIDENTIAL

Page 28

1   available blood analyzers made by companies like

2   Siemens, you would have wanted to know that; right?

3           MS. GOODHART:  Objection.  Form.

4           THE WITNESS:  Right.

5           MR. KAHN:  Let's mark that, please.

6           (Marked for identification purposes,

7            Exhibit 722.)

8           BY MR. KAHN:

9       Q.   So, Secretary Shultz, a document has just

10  been put in front of you.  It's marked Exhibit 722.

11          (Discussion off the record.)

12          MR. KAHN:  Okay.  So, Secretary Shultz,

13  you've been handed a document marked Exhibit 722.

14          And the Bates number, for those on the

15  phone, starts with TGPS00010537.

16          BY MR. KAHN:

17      Q.   Do you recall when you interviewed

18  Ms. Holmes on March 12, 2015?

19      A.   Yes.

20      Q.   Okay.  I would like to ask you just a

21  couple of questions about some specific statements

22  that Ms. Holmes made during the interview.

23          MR. YOUNG:  Just for your record, you said

24  March 12, and this says March 13.  I don't know if

25   that matters to you.

Confidential

CONFIDENTIAL

Page 40

1  time, there was a place in Palo Alto that you could

2  go to and have your finger stuck.

3      Q.   Okay.  And so your understanding in

4  March 2014, when you wrote this letter, based on

5  your discussions with Ms. Holmes, was that blood was

6  being taken from patients at the Theranos Palo Alto

7  location, and all of that blood was being tested on

8  Theranos-manufactured blood analyzer devices;

9  correct?

10          MS. GOODHART:  Objection.  Form.

11          THE WITNESS:  I -- what date is what, I'm

12  not sure.  But, anyway, yes.

13          BY MR. KAHN:

14      Q.   Okay.  Am I correct that -- Mr. Secretary,

15  that no one ever told you, in March 2014 or

16  otherwise, that some of the blood tests that

17  Theranos was running on patient blood were being run

18  on commercially available blood analyzers made by

19  third-party companies like Siemens; correct?

20          MR. YOUNG:  There will be an objection.

21  Nope?  Okay.

22          THE WITNESS:  What?

23          MR. YOUNG:  Go ahead.

24          THE WITNESS:  No, I was not aware of that.

25  ///

Confidential

CONFIDENTIAL

Page 41

1        BY MR. KAHN:

2    Q.    Okay.  And if that was true, that Theranos

3    was doing some of its blood tests on commercially

4    available blood analyzers, that's something that you

5    would have wanted to know; correct?

6             MS. GOODHART:  Objection.  Form.

7             THE WITNESS:  Yes.

8             BY MR. KAHN:

9    Q.    Okay.  And am I also correct --

10    A.    I probably would have assumed there was

11    some reason, and what was the reason.

12    Q.    Okay.  Am I also correct, Mr. Secretary,

13    that no one ever told you, in March 2014 or

14    otherwise, that some of the tests that were done on

15    the patient blood that Theranos collected were done

16    by third-party labs as opposed to being done by

17    Theranos itself?  No one ever told you that;

18    correct?

19    A.    No.

20    Q.    And that's something you would have wanted

21    to know; right?

22             MS. GOODHART:  Objection.  Form.

23             THE WITNESS:  I did.  But it didn't make

24    sense to me, because I saw with my own eyes that the

25    device she invented worked.

Confidential

CONFIDENTIAL

Page 42

1      BY MR. KAHN:

2      Q.   You'll notice, sir, in the last sentence of

3  that second paragraph, you mention the possibility

4  of "demonstrating our system and its implications

5  live for the governor"?

6      A.   Yes.

7      Q.   And by "our system," did you mean the same

8  thing as when you said "infrastructure" earlier?

9      A.   I meant that he would come in and either he

10 or Anne would get their fingers pricked, and he

11 would see that moved to a pallet.  Then he could see

12 it go into a machine, and he would see results come

13 out of the machine.

14      MR. KAHN:  And for the court reporter, I

15 think what he said was "either her or Anne."

16      BY MR. KAHN:

17      Q.   Did Governor Brown or his wife actually

18 have a demonstration done for them, to your

19 knowledge?

20      A.   I think so, yes.  I'm not -- I can't

21 remember explicitly, but I think so.

22      Q.   Okay.  Did you understand, around the time

23 of this letter, that there were still some

24 limitations on the Theranos-manufactured blood

25 analyzer device in terms of tests that it was not

Confidential

CONFIDENTIAL

Page 43

1    capable of running?

2        A.    No.

3        Q.    So your understanding as of March 2014 was

4    the Theranos blood analyzer device could run all of

5    the tests that Theranos was offering to patients;

6    right?

7             MS. GOODHART:  Objection.  Form.

8             THE WITNESS:  That was my assumption.

9             BY MR. KAHN:

10       Q.    And that was based on your discussions with

11   Ms. Holmes; correct?

12            MS. GOODHART:  Objection.  Form.

13            THE WITNESS:  And I also could observe that

14   sometimes it took longer than other times for the

15   machine to do whatever it did.  And that was because

16   the things you asked it to do were more complicated

17   than others, but it seemed to do them.

18            BY MR. KAHN:

19       Q.    Okay.  So, again, your understanding, based

20   on your discussions with Ms. Holmes around

21   March 2014, was that the Theranos-manufactured blood

22   analyzer device could run all of the blood tests

23   that Theranos was offering to patients; correct?

24            MS. GOODHART:  Objection.  Form.

25            THE WITNESS:  Yes.

Confidential

CONFIDENTIAL

Page 44

1        BY MR. KAHN:

2        Q.   And just to make sure I'm being clear, your

3    understanding, based on your discussions with

4    Ms. Holmes around March 2014, was that the

5    Theranos-manufactured blood analyzer not only could

6    run all of the blood tests that Theranos was

7    offering, but it was running all of the blood tests

8    that Theranos was offering; correct?

9             MS. GOODHART:  Objection.  Form.

10            THE WITNESS:  That's what I assumed.  I

11   didn't probe into it.  It didn't occur to me.

12            BY MR. KAHN:

13       Q.   And if, in fact, it was not true that

14   Theranos was running all of the blood tests it

15   offered on the Theranos-manufactured device, that is

16   something you would have wanted to know; correct?

17            MS. GOODHART:  Objection.  Form.

18            THE WITNESS:  I would have wanted to know,

19   and I would have wanted to know why.  For instance,

20   I could conceive that they might not have any space

21   on the ones they were using and they needed to do,

22   just for the sake of time or some other item.

23            But since I didn't know, I didn't have

24   anything to look into.

25            MR. KAHN:  Okay.  We've been going about an

Confidential

CONFIDENTIAL

Page 51

1    Q.   Okay.  In your capacity as a member of

2  Theranos's board at that time, did you think that

3  Theranos should have taken Tyler's concerns

4  seriously?

5    A.   I've had the privilege of managing a lot of

6  big organizations, and I know that if you're going

7  to be successful, you have to have upward

8  communication, because you don't know what's going

9  on down below always.

10      I know Jim Mattis, who's now Secretary of

11  Defense, but he's a Marine, I said "Jim, who did you

12  listen to?"

13      He said, "I listened to the sergeants.

14  They're the people who see."

15      So I think you've got to listen to people

16  like Tyler.  And, of course, I inquired, "What's

17  going on here?"  And I was told that they were just

18  checking something out with this machine.  And it

19  somehow didn't add up to me, but, anyway, that's

20  what I was told.

21    Q.   And who told you that?

22    A.   I think Elizabeth told me that.

23    Q.   Okay.  You said that you have experience

24  managing big organizations.  Do you mean sitting on

25  the board of directors of big organizations?

Confidential

CONFIDENTIAL

Page 52

1       A.   No.  I mean, I was president of Bechtel

2   Company.  I was Secretary of State.  A big

3   organization.

4       Q.   That's a big organization.

5       A.   To make it work, people think being

6   Secretary of State is just running around the world

7   negotiating with people.  No, that's not your

8   primary job.  Your primary job is to manage a huge

9   organization and get it to work for you.

10      Q.   Have you also sat on the board of directors

11  of companies other than Theranos?

12      A.   Yes.

13      Q.   Okay.  Approximately how many?

14      A.   I don't know.  I've sat on GM boards,

15  Chevron board, Boeing board, Gilead Sciences.

16      Q.   So all private companies?

17      A.   Gilead Sciences was a start-up company

18  where we worried about our burn rate.  Now it's very

19  successful.

20      Q.   It is.

21           How would you contrast the role that you

22  played as a director on those boards to your role on

23  the Theranos board that you described as an advisory

24  board?

25      A.   Well, on a fiduciary board, you're

Confidential

Page 53

1   responsible for things that go on, and so you take

2   votes and you work at it that way.

3          In the case of Theranos, nobody took any

4   votes on anything.  We just gave advice, and

5   Elizabeth would decide what she wanted to do.

6      Q.   So am I correct that your understanding of

7   the Theranos board that you served on starting in

8   2011 was that it was not a fiduciary board; it was

9   just an advisory board?

10     A.   Earlier I explained to you the

11  back-and-forth between Senator Nunn and the lawyer,

12  and they established that.  And there was some

13  correspondence, and Sam Nunn said something to

14  Elizabeth, and I sent her a note saying, "I agree

15  with Sam."

16     Q.   And I remember you telling me about that

17  correspondence and that meeting, and I believe that

18  was from 2013.  And you joined the board in around

19  2011.

20          What I'm trying to get at is separate from

21  that meeting.  In your mind when you were on the

22  Theranos board in 2011 and 2012, did you have

23  understanding that that board was just an advisory

24  board and not a fiduciary board?

25          MR. YOUNG:  Objection.  This has been asked

Confidential

Page 54

1   and answered earlier in the day.

2          BY MR. KAHN:

3      Q.   You may answer.

4      A.   I wasn't really thinking about it that way.

5   I was interested in what was going on, and I was

6   impressed with the mission that was set out.  And

7   it's a very important mission, and I was glad to be

8   part of it.  And I was interested to hear as it

9   progressed what was going on.

10     Q.   The board, I think you mentioned, when you

11  were on it, didn't take any votes; is that right?

12     A.   No.

13     Q.   No, that's not right?

14     A.   That's not right.  We never took any votes

15  at Theranos.  It was pointless.  Elizabeth was going

16  to decide whatever she decided.

17     Q.   Okay.  Did the board have a chairman, to

18  your recollection?

19     A.   I think she was the chairman.

20     Q.   Okay.  Do you recall if the board had

21  minutes of board meetings?

22     A.   I think there were minutes.  They

23  distributed some big books occasionally at board

24  meetings and, I looked at them and...

25     Q.   Prior to Mr. Boies's involvement, did -- to

Confidential

CONFIDENTIAL

Page 55

1    your recollection, did the board have counsel

2    advising it?

3         A.   I think Boies was involved right from the

4    beginning, at least as I remember it.  He was not on

5    the board, but he was the counsel.  Later he became

6    a member of the board.

7         Q.   Okay.  Do you recall a time after Tyler

8    left Theranos, when Tyler came to your home and

9    there was some attorneys from the Boies Schiller

10   firm there?

11        A.   I wouldn't call them attorneys.

12        Q.   What would you call them?

13        A.   They were in David Boies's law firm.  They

14   were -- one was a woman.  She was perfectly nice.

15   The man was some sort of an animal.  Wild animal.

16   And he assaulted my grandson.  It's one of the

17   dumbest things I've ever observed.

18            But that ended.  When it did, my wife was

19   about to pick a hand iron out of the fireplace and

20   clobber him.

21        Q.   Okay.  Maybe you can kind of take us back

22   to the beginning of that.

23            How did it come to pass that Tyler came

24   over and the Boies Schiller people were there?

25        A.   Apparently when you become an employee of

Confidential

CONFIDENTIAL

1   Theranos, you sign an agreement of not disclosing

2   what went on.  And they were worried about a Wall

3   Street Journal article, and they thought that Tyler

4   had talked to the reporter.

5          And Elizabeth Holmes told me that she

6   wanted to help Tyler out, and if he would sign

7   something or other, then that would be the end of

8   it.  And so it was arranged that he would meet with

9   the lawyers, I guess, from the David Boies firm, and

10  he would sign something.

11         So he had the meeting.  You know, two of

12  them, there was this woman and this fellow.  I think

13  his name was Brille.  Anyway, he assaulted my

14  grandson to the point where we all got rather angry

15  at him.  So that stopped.

16      Q.   And -- sorry.  Go ahead.

17      A.   And then it was agreed that he -- they

18  would come the next day and present something that

19  Tyler could decide whether or not to sign.

20         So when they left, I called

21  Elizabeth Holmes, and I said, "Your law firm sent

22  over people who were" -- or at least one -- the

23  woman didn't say anything, so nothing against her --

24  "who were totally unacceptable, and they did a

25  terrible job.  If they wanted to somehow get

Confidential

Page 57

1   anything from Tyler, that wasn't the way to do it.

2   It was dumb and totally stupid and one of the worst

3   little things I've ever seen anybody try to do.  As

4   lawyers, you should try to get him out of your

5   profession."

6        Q.   When you say that the man assaulted your

7   grandson, can you be a little more specific?

8        A.   Verbally.  He just went after him.

9        Q.   Do you recall what he said?

10       A.   No, I don't.

11       Q.   Okay.  Did the Boies Schiller people try to

12   get Tyler to sign something that night?

13       A.   No.  They came the next morning.  And my

14   son, Tyler's father, came.  And they presented the

15   woman who was -- he stayed silent.  And the woman

16   presented it all and put it in front of us.

17            And I could sort of see Tyler's wheels

18   spinning and basically saying to himself, "This was

19   prepared by a person who's clearly my enemy.  I

20   should have a lawyer of my own."

21            So we called George Argyris, who I've known

22   for a long time, and he got a lawyer for Tyler.

23   That lawyer must have told him not to say anything

24   or not to sign anything.

25            And his mother complained to me and said,

Confidential

Page 58

1    "I'm his mother.  He won't even talk to me."  But I

2    think he must have felt if she knew something, then

3    this beast would go after her, and he didn't want

4    that to happen to his mother.

5         Q.   And by "the beast," you're referring to?

6         A.   Brille.

7         Q.   Did you have any understanding, based on

8    witnessing the altercation between Brille and Tyler,

9    what it was that Brille was trying to accomplish?

10   Intimidation?  Silencing Tyler?

11        MR. YOUNG:  I'm going to object to the

12   form.

13        THE WITNESS:  I presume that they had this

14   thing they wanted Tyler to sign, and he was trying

15   to intimidate him enough to get him to sign it.

16   That's the only possible explanation.  There is no

17   kind of explanation for the kind of performance he

18   put on.

19        BY MR. KAHN:

20        Q.   Do you remember -- let's move on past that

21   incident.

22             Do you remember that, in or around

23   October 2015, The Wall Street Journal published an

24   article that was critical of Theranos?

25        A.   Yes.  There were a series of articles.  I

Confidential

Page 59

1    don't remember which one you're talking about.

2         Q.   Okay.  You remember that there was -- there

3    was a first one and then there were more?

4         A.   Right.

5         Q.   Okay.  And did you read those articles?

6         A.   Sure.

7         Q.   Do you recall what your reaction was to

8    them?

9         A.   Well, I was -- they were very critical, and

10   I didn't know -- to some extent I felt that you

11   really can't evaluate this carefully.  But then

12   there were reports of things, like the CMS

13   investigation, that said that the Theranos lab was

14   not doing things right.  And that's on appeal, so

15   just where that stands, I don't know.

16        Q.   Any other reactions?

17        A.   Well, I don't like it.

18        Q.   Do you recall having any other reactions to

19   any of the specific allegations made in the

20   articles?

21        A.   I don't remember the discussion

22   subsequently in the board meeting, but Elizabeth did

23   address the article.  And I think Bill Perry, in

24   particular, and Sam Nunn and I -- Bill, in

25   particular, wanted to have some independent

Confidential

CONFIDENTIAL

Page 60

1    examination done.  And I supported that.  I thought

2    it would be a good idea to do.

3        Q.   Was that done, to your knowledge?

4        A.   Not to my knowledge.

5        Q.   Did you have any --

6        A.   But I think they brought in -- I don't

7    know.  I'm away from it.  But they had brought in

8    additional people and people who are supposedly

9    skilled at dealing with regulatory issues.

10       Q.   Do you recall having any one-on-one

11   conversations with Ms. Holmes about The Wall Street

12   Journal articles?

13       A.   I may have had them, but I don't remember

14   any distinct one.

15       Q.   Okay.  Do you remember anything that

16   Ms. Holmes told you personally -- I'm going to ask

17   about board meetings in a minute.

18            Do you remember anything that Ms. Holmes

19   told you personally about The Wall Street Journal

20   articles, such as whether they were false, whether

21   they were true, things like that?

22            MS. GOODHART:  Objection.  Form.

23            THE WITNESS:  I don't remember.

24            BY MR. KAHN:

25       Q.   Okay.

Confidential