* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

# Exhibit X

Page 1

1              ADMIRAL GARY ROUGHEAD

2               IN THE COURT OF CHANCERY

3                OF THE STATE OF DELAWARE

4    PARTNER INVESTMENTS, L.P., a        )

5    Delaware limited partnership;       )

6    PFM HEALTHCARE MASTER FUND, L.P.,   )

7    a Cayman Islands limited            )

8    partnership; and PFM HEALTHCARE     )

9    PRINCIPALS FUND, L.P., a            )

10   Delaware limited partnership,       )

11              Plaintiffs,       )Case No.

12        vs.                     )12816-VCL

13   THERANOS, INC., a Delaware          )

14   corporation; ELIZABETH HOLMES,      )

15   an individual; RAMESH BALWANI,      )

16   an individual; and DOES 1-10,       )

17              Defendants.        )

18

19              HIGHLY CONFIDENTIAL

20

21   VIDEOTAPED DEPOSITION OF ADMIRAL GARY ROUGHEAD

22               Arlington, VA

23               March 24, 2017

24   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR, CLR

25   JOB NO. 121072

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1               ADMIRAL GARY ROUGHEAD

2

3

4

5

6                       March 24, 2017

7                       11:02 a.m.

8

9

10          The videotaped deposition of ADMIRAL GARY

11   ROUGHEAD, held at the offices of Caulkins & Bruce,

12   2300 Wilson Boulevard, Arlington, Virginia, pursuant

13   to agreement before Tina M. Alfaro, a Registered

14   Professional Reporter and Certified Realtime

15   Reporter of the State of Virginia.

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

1             ADMIRAL GARY ROUGHEAD

2   A P P E A R A N C E S:

3       ON BEHALF OF THE PLAINTIFFS:

4       HEYMAN ENERIO GATTUSO & HIRZEL

5       BY: KURT HEYMAN, ESQ.

6           AARON NELSON, ESQ.

7           300 Delaware Avenue

8           Wilmington, Delaware 19801

9

10          On behalf of the Plaintiffs;

11      APPEARED TELEPHONICALLY ON BEHALF OF THE

12      DEFENDANT THERANOS:

13      WILMERHALE

14      BY: KATIE MORAN, ESQ.

15          350 South Grand Avenue

16          Los Angeles, California 90071

17

18      APPEARED TELEPHONICALLY ON BEHALF OF THE

19      DEFENDANT RAMESH BALWANI:

20      DAVIS WRIGHT TREMAINE

21      BY: KELLY GORTON, ESQ.

22          505 Montgomery Street

23          San Francisco, California 94111

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

1           ADMIRAL GARY ROUGHEAD

2    APPEARANCES:  (Cont'd)

3         ON BEHALF OF THE DEPONENT:

4         MUNGER TOLLES & OLSON

5         BY: GREGORY WEINGART, ESQ.

6             350 South Grand Avenue

7             Los Angeles, CA  90071

8

9    and

10        YOUNG CONWAY STARGATT & TAYLOR

11        BY: PAUL LOUGHMAN, ESQ.

12            Rodney Square

13            1000 North King Street

14            Wilmington, Delaware 19801

15

16

17   ALSO PRESENT:  David Campbell (videographer)

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 5

```
 1                    ADMIRAL GARY ROUGHEAD
 2                        I N D E X
 3                      EXAMINATION
 4   WITNESS                                    PAGE
 5   ADMIRAL GARY ROUGHEAD
 6      By Mr. Heyman                           9
 7                        EXHIBITS
 8   ROUGHEAD EXHIBITS                          PAGE
 9   Exhibit 542                                44
        Financial statement,
10      Roughead-Theranos-0000069
11   Exhibit 543                                46
        SEC document, Roughead-Theranos-362
12
     Exhibit 544                                73
13      E-mail, PFM-Army-00019
14   Exhibit 545                                78
        E-mail, PFM-Army-00073
15
     Exhibit 546                                85
16      E-mail, Roughead-Theranos-63
17   Exhibit 547                                89
        E-mail
18
     Exhibit 548                                93
19      E-mail, TH-PFM-159784
20   Exhibit 549                                93
        E-mail, TH-PFM-848203
21
     Exhibit 550                                93
22      (Not described)
23   Exhibit 551                                116
        5/9/14 meeting minutes, TH-PFM-4511577
24
     Exhibit 552                                116
25      Handwritten notes, Roughead-Theranos-27
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     ADMIRAL GARY ROUGHEAD
2       EXHIBITS
        (Cont'd)
3

ROUGHEAD EXHIBITS        PAGE
4

Exhibit 553        122
  7/13-14/15 meeting minutes,
  TH-PFM-2412647

Exhibit 554        131
  10/25/15 e-mail, Roughead-Theranos-1649
Exhibit 555        131
  10/26/15 e-mail, Roughead-Theranos-1656

Exhibit 556        138
  10/16/15 e-mail
Exhibit 557        142
  10/17/15 e-mail, Roughead-Theranos-3647

Exhibit 558        143
  E-mail, Roughead-Theranos-3650
Exhibit 559        145
  E-mail, Roughead-Theranos-3658

Exhibit 560        146
  E-mail, Roughead-Theranos-3671
Exhibit 561        148
  E-mail, Roughead-Theranos-3723

Exhibit 562        149
  E-mail, Roughead-Theranos-3725
Exhibit 563        151
  Roughead-Theranos-3724

Exhibit 564        151
  E-mail, Roughead-Theranos-3729
Exhibit 565        152
  E-mail, Roughead-Theranos-3731

Exhibit 566        153
  E-mail, TH-PFM-826306

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1
2

ADMIRAL GARY ROUGHEAD
EXHIBITS
(Cont'd)

3

ROUGHEAD EXHIBITS                                    PAGE
4

Exhibit 567                                          155
5       E-mail, Roughead-Theranos-3794
6    Exhibit 568                                          156
        E-mail, Roughead-Theranos-3825
7
Exhibit 569                                          158
8       E-mail, Roughead-Theranos-3811
9    Exhibit 570                                          159
        E-mail, Roughead-Theranos-3831
10
Exhibit 571                                          160
11      E-mail, Roughead-Theranos-3839
12   Exhibit 572                                          161
        E-mail, Roughead-Theranos-3860
13
Exhibit 573                                          164
14      E-mail, Roughead-Theranos-3781
15   Exhibit 574                                          166
        E-mail, Roughead-Theranos-3873
16
Exhibit 575                                          167
17      E-mail, Roughead-Theranos-3887
18   Exhibit 576                                          172
        E-mail, Roughead-Theranos-3707
19
Exhibit 577                                          173
20      E-mail, Roughead-Theranos-3712
21   Exhibit 578                                          174
        E-mail, Kissinger-Theranos-2119
22
Exhibit 579                                          175
23      E-mail,
        Mattis-Perry-Roughead-Theranos-181
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        ADMIRAL GARY ROUGHEAD

2        THE VIDEOGRAPHER:   This is the start of

3   media labeled No. 1 of the video recorded deposition

4   of Gary Roughead in the matter of Partner

5   Investments, LP, et al., versus Theranos, Inc.,

6   et al., in the Court of Chancery of the State of

7   Delaware, Case No. 12816-VCL.  This deposition is

8   being held at 2300 Wilson Boulevard, Suite 240 on

9   March 24, 2017 at approximately 11:02 a.m.

10       My name is David Campbell.  I am the legal

11  video specialist from TSG Reporting, Inc.

12  headquartered at 747 3rd Avenue, New York, New York.

13  The court reporter is Tina Alfaro in the association

14  with TSG Reporting.

15       Counsel in the room and attending via the

16  phone, will you please identify yourselves and whom

17  you represent, and then the court reporter will

18  please swear in the witness and then we can

19  proceed.

20       MR. HEYMAN:   Kurt Heyman for Plaintiffs.

21       MR. NELSON:   Aaron Nelson for Plaintiffs.

22       MR. WEINGART:   Greg Weingart for the

23  witness.

24       MR. LOUGHMAN:   Paul Loughman for the

25  witness.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 9

1           ADMIRAL GARY ROUGHEAD

2           MS. MORAN:  Katie.

3           MS. GORTON:  Kelly Gorton, Davis Wright

4    Tremaine, for Sonny Balwani.

5                   (Witness sworn.)

6           MR. WEINGART:  So, Kurt, just before we

7    start I think I said -- I mentioned off the record

8    we had sent a letter.  We understand that your

9    client's position is that you're -- you want to

10   reserve the ability to recall the witness in light

11   of some pending privilege issues.  We've stated our

12   position that he will only be made available once.

13   I understand you probably don't agree with that, but

14   I just wanted that stated that for the record.

15          MR. HEYMAN:  You have accurately stated the

16   parties' positions.

17   WHEREUPON:

18                ADMIRAL GARY ROUGHEAD,

19   called as a witness herein, having been first duly

20   sworn, was examined and testified as follows:

21                   EXAMINATION

22   BY MR. HEYMAN:

23       Q.  Could you please state your name for the

24   record.

25       A.  Gary Roughead.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 39

1                    ADMIRAL GARY ROUGHEAD

2     and run?

3          A.  I have not.

4          Q.  You have not.  Okay?

5          MR. WEINGART:  Be sure you -- be sure you

6     wait until he's done.

7          THE WITNESS:  Yeah.  I'm sorry.

8     BY MR. HEYMAN:

9          Q.  You're aware that sometimes when investors

10    would tour the facilities, you know, one of the

11    things they would do would be take a sample of the

12    potential investor's blood and run it through the

13    machines?

14         A.  I'm not aware of that because I was not

15    aware of any investor tours going through the

16    building and what the program was for the investors.

17    I was not part of that.

18         Q.  Okay.  Now, when you -- when you observed

19    demonstrations of blood being taken, was it your

20    understanding that it was being tested on analyzers

21    created by Theranos?

22         A.  Yes.

23         Q.  Okay.  So not a commercially available

24    device?

25         A.  When I watched the demonstrations they were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 40

1              ADMIRAL GARY ROUGHEAD

2     going into the box.

3         Q.  They went straight into the box?

4         A.  When I watched the demonstrations, yes.

5         Q.  Okay.

6             Do you know whether Theranos at any point

7     was using commercially available analyzers to test

8     the blood instead of the box?

9         A.  I know that they were using commercial

10    analyzers to run comparative tests as they were

11    developing their tests, and -- and it was not until

12    some of the press reporting that I became aware that

13    there was extensive commercial analyzers in use.

14        Q.  So is it your understanding today that

15    there was extensive use of commercial analyzers?

16        A.  That's what I've read in the press.

17        Q.  Do you believe that to be true?

18        A.  I -- I don't have the information that

19    would tell me that it's true or not true.

20        Q.  Have you asked Ms. Holmes?

21        A.  I did not ask her directly, no.

22        Q.  Did you ask Mr. Balwani?

23        A.  No.

24        Q.  Did you ask anybody else at the company?

25        A.  I did not.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          ADMIRAL GARY ROUGHEAD

2      Q.  Okay.  Now, when you were -- when you

3   toured your -- the facilities, did you see any

4   commercially available analyzers?

5      A.  I believe I recall seeing some in the

6   context of the developmental work that was going on.

7      Q.  Okay.  So you were aware that they were

8   there?

9      A.  They were there.

10     Q.  Okay.  So let's -- let's -- let's focus

11  now -- we're going to be taking a trip through time

12  today.

13     A.  Okay.

14     Q.  So at times I'm going to ask you to focus

15  on a particular period of time.  So let's talk

16  about, you know, when you became a board member.

17  You know, at the time was it your understanding that

18  Theranos's devices were accurately performing the

19  tests that they were running?

20     A.  That was my understanding.

21     Q.  Okay.  And do you believe that today?

22     A.  I believe that, yes.

23     Q.  And what was your basis for believing they

24  were accurate?

25     A.  Information that was provided to me and to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1                    ADMIRAL GARY ROUGHEAD

2     us in the form of presentations.

3         Q.  And presentations at the demonstrations; is

4     that what you're talking about?

5         A.  At the demonstrations and in some of the

6     summary information that we were given at the

7     meetings.

8         Q.  Okay.  Are you aware as we sit here today

9     that Theranos voided tens of thousands of results?

10        A.  I'm aware of that.

11        Q.  Okay.  And that does not change your view

12    about the accuracy of the tests?

13        A.  It calls it into question and I've not seen

14    the comparative data to be able to opine on the

15    accuracy of it or not.

16        Q.  You received a salary as a director,

17    correct?

18        A.  I did.

19        Q.  █████████████

20        A.  That's correct.

21        Q.  And you -- you received stock options?

22        A.  I -- yes, I did.

23        Q.  And you exercised those options?

24        A.  I exercised those options.

25        Q.  And how much stock did you purchase?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 61

1          ADMIRAL GARY ROUGHEAD

2     Q.  But you never saw any third-party

3  validation data?

4     A.  Not that I recall, no.

5     Q.  Okay.  Do you know whether in the entire

6  history of your involvement with Theranos it ever

7  obtained any third-party validation?

8     A.  I can't say with certainty that they --

9  that they did.  I don't know.

10     Q.  Okay.  Let's turn to the next slide in this

11  packet, slide 16.

12     A.  16?

13     Q.  Yeah.  And this slide is titled "Finger

14  stick-based testing."  You see the first bullet on

15  the left says "All 2,000 plus currently run

16  tests/CPT codes are available through Theranos"?

17     A.  I see that bullet.

18     Q.  What's a CPT code?

19     A.  I can't recall, but I recollect -- I can't

20  recall exactly.

21     Q.  Okay.  Would it -- would it -- is it fair

22  to say it's a code for a particular type of test?

23     A.  That -- that's what I would say.

24     Q.  All right.  And probably used by the

25  insurers?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1              ADMIRAL GARY ROUGHEAD

2        A.  Yes.

3        Q.  Okay.  So does this suggest to you that

4   Theranos can currently run 2,000-plus tests?

5        A.  That's what the slide suggests.

6        Q.  Okay.  And was it your understanding at any

7   point that Theranos could run 2,000-plus tests?

8        A.  My understanding is it could run a

9   significant number of tests, and now that I'm

10  looking at this document, obviously 2,000 was the

11  number that was presented.  Running the test and

12  having the certifications to run the test I think

13  are two separate things.

14       Q.  Okay.  But would this imply that the test

15  could be run with accuracy?

16       A.  It would imply that, yes.

17       Q.  Okay.  And is it your understanding that

18  Theranos technology could ever in the history of

19  your involvement with it run 2,000-plus tests with

20  accuracy?

21       A.  My understanding was that it could run the

22  large number of tests and I would -- I would not

23  question that number.

24       Q.  So sitting here today, you think that was

25  accurate?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 63

1                 ADMIRAL GARY ROUGHEAD

2      A.   Yes.

3      Q.   And this is notwithstanding the

4  invalidation of tests that we discussed earlier?

5      A.   That is correct because I'm not aware of

6  what the exact invalidation factors were.

7      Q.   You haven't seen that?

8      A.   I have not seen that.

9      Q.   Have you ever attempted to look into that?

10     A.   I did not, no.

11     Q.   And, you know, is this a number that was

12  accurate early on in your involvement, as far as you

13  know?

14     A.   My recollection is that early on I don't

15  recall the number being that high, but I'd have to

16  look back at materials from an earlier date.

17     Q.   Do you know, let's say early 2014, whether

18  this 2,000-plus tests figure was accurate?

19     A.   I can't recall numbers and correlations to

20  dates.   I just can't recall that.

21     Q.   Do you recall when -- do you recall seeing

22  a slide like this before?

23     A.   I recall seeing a slide that -- that

24  addressed the number of tests that Theranos was

25  developing and working on, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 64

1          ADMIRAL GARY ROUGHEAD

2      Q.  And do you recall when that was?

3      A.  I would say early on in the period when I

4  began to get some formal presentations, which would

5  be around the time that the board was formed.

6      Q.  Okay.  And is it -- is it possible that the

7  2,000-plus figure was in that early presentation?

8      A.  I would want to refer to the documents to

9  get the time number correlation.

10     Q.  Do you know what the time correlation is to

11 this document that was in your production?

12     A.  I don't know.

13     Q.  And in talking about the 2,000-plus tests

14 that Theranos can currently -- currently run, would

15 that mean using the finger stick?

16     A.  That was my understanding.

17     Q.  Okay.  And would it also mean using what

18 you've called the box?

19     A.  That was my understanding.

20     Q.  And the Nanotainer?

21     A.  Yes.

22     Q.  Okay.  And you don't sitting here today

23 have a recollection of how many tests could be run

24 at the time you joined versus some later period?

25     A.  I can't recall that.  I'd have to refer

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1          ADMIRAL GARY ROUGHEAD

2    back to documentation that was made available at

3    that time.

4         Q.  Okay.  And does -- this slide doesn't

5    mention the use of third-party machines, does it?

6         A.  It does not.

7         Q.  And does it mention venipuncture?

8         A.  It does not.

9         Q.  Okay.  And you had made a distinction --

10             MS. MORAN:  Hi.  This is Katie.  For those

11    of us on the phone, can you give the Bates range or

12    the Bates on that actual slide.

13             MR. HEYMAN:  Sure.  It's Roughead-Theranos,

14    a bunch of zeros, and 378.

15             MS. MORAN:  Thanks.

16    BY MR. HEYMAN:

17         Q.  Okay.  And the -- and you see the fourth

18    bullet point on there that refers to CLIA

19    certification?

20         A.  That's correct.

21         Q.  And it says "With CLIA certification" --

22             MR. WEINGART:  You mean the fifth, right?

23             MR. HEYMAN:  Yes.  I'm sorry, I

24    miscounted.

25    BY MR. HEYMAN:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 129

1                    ADMIRAL GARY ROUGHEAD

2    directors or the board of counselors ever conduct an

3    investigation into the matters raised by the Wall

4    Street Journal article?

5         A.  I can -- I can speak that the board of

6    counselors never convened in an investigation.

7         Q.  Do you know whether the board of directors

8    did?

9         A.  I don't know what the board of directors

10   did.

11        Q.  Did the board of counselors take any steps

12   in response to the Wall Street Journal article?

13        A.  We discussed the nature of the allegations

14   in the board and then what the company was going to

15   do to respond to the allegations that were being

16   made.

17        Q.  And what was the decision about what the

18   company would do?

19        A.  My recollection is that the gist of the

20   conversation was that, one, the company had to

21   respond to the allegations, but most importantly the

22   company needed to obtain some outside sources or

23   third-party validation of the technology; that the

24   best counter would be what others would say in

25   support of the technology and the -- and the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

1              ADMIRAL GARY ROUGHEAD

2    company.

3              And so the -- the discussion really focused

4    on, you know, how could the company go about doing

5    that, how could the company go about getting outside

6    technical experts to address the questions that were

7    being raised by the Wall Street Journal, and then

8    that was basically the thrust of what the -- the

9    advisors were about.

10        Q.  And was Ms. Holmes aware of the advisors'

11   views on these things?

12        A.  Absolutely.

13        Q.  And what was her reaction to that?

14        A.  That the company was working to obtain

15   those validations.

16        Q.  And did the company ever obtain those

17   validations?

18        A.  To the best of my knowledge, that is a work

19   in progress.

20        Q.  So to this day you're not aware of any

21   validations obtained by the company, third-party

22   validations?

23        A.  I'm not aware of any, nor do I currently

24   have an affiliation with the company.  So I don't

25   know what has been produced.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

1          ADMIRAL GARY ROUGHEAD

2     Q.  All right.  But the article came out in

3  October of 2015 and you remained on the board of

4  counselors until the end of 2016, correct?

5     A.  That is correct.

6     Q.  And you're not aware of any third-party

7  validations being obtained in between those times?

8     A.  That's correct.

9          MR. HEYMAN:  Why don't we -- we're going to

10  mark a few documents.  Off the record.

11          THE VIDEOGRAPHER:  Do you want to go off

12  the record, sir?

13          MR. HEYMAN:  If it's going to be that much

14  of a process, no.

15          Tell you what, I'm going to ask a few more

16  questions and then maybe we will take a break and

17  we'll mark a bunch of documents during the break

18  just so we're not taking up time on the record.

19          MR. WEINGART:  I'd appreciate that.

20          MR. HEYMAN:  If that's okay with everybody.

21                    (Roughead Exhibits 554 and 555

22                     were marked as requested.)

23  BY MR. HEYMAN:

24     Q.  Admiral, I'm placing before you

25  Exhibits 554 and 555, and for the record 554 is an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

1              ADMIRAL GARY ROUGHEAD

2    e-mail from you to -- I never pronounce his name

3    right.  Could you --

4         A.  Kovacevich.

5         Q.  Kovacevich.

6              -- dated October 25, 2015 and it is

7    Roughead-Theranos-1649.  And then 555 is an e-mail

8    from you to Ms. Holmes dated the following day,

9    October 26, 2015, and it is Roughead-Theranos-1656.

10        A.  Right.

11        Q.  Have you seen these items before?

12        A.  I've seen them before.

13        Q.  And they are -- they are e-mails from you

14   to these people, correct?

15        A.  That's correct.

16        Q.  And have you seen these recently?

17        A.  No, I haven't.

18        Q.  Okay.

19             So in your -- in the first e-mail, which is

20   from you to Mr. Kovacevich, you say "In my reply to

21   Heather and Elizabeth on the info they passed" -- I

22   assume it is -- "along I asked about investor

23   reaction to the news.  I have not received a reply

24   and I'm interested in what you are hearing."

25             Why were you saying this to Mr. Kovacevich

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 133

1          ADMIRAL GARY ROUGHEAD

2   at this time?

3        A.  One, because I have high regard for his

4   awareness of investor issues.  He lives out in

5   California and -- and I just wanted to get a sense

6   from him what his take was on -- on the swirl that

7   was occurring subsequent to the publication of the

8   Wall Street Journal articles.

9        Q.  So you had asked Ms. Holmes and Ms. King

10  about information they passed along and you

11  specifically asked about investor reaction?

12       A.  That's what I recollect from this e-mail,

13  correct.

14       Q.  Do you recall what information they passed

15  along?

16       A.  I can't recall the discussion that -- that

17  they had with me that I wrote this note subsequent

18  to it.  I can't -- I can't recall that.

19       Q.  And -- but you had not received a reply to

20  your inquiry at this point, right?

21       A.  That's what the e-mail says.

22       Q.  Do you know if you ever did?

23       A.  I received in subsequent discussions

24  attitudes of people -- and I think it could have

25  been at one of the subsequent board meetings --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          ADMIRAL GARY ROUGHEAD

2    how -- what the conversation and the chatter was

3    about the articles, but I can't recall if I received

4    a reply subsequent to this e-mail.

5          Q.   From Ms. King and Ms. Holmes?

6          A.   Ms. Holmes, that's correct.

7          Q.   And you say in the next sentence "As you

8    know, the story has been picked up by other major

9    outlets and Theranos's rebuttal has not yet produced

10   strong third-party support for the company."

11         A.   Right.

12         Q.   What did you mean by that?

13         A.   Consistent what I mentioned earlier, that

14   my belief was that there needed to be third parties

15   that would validate and support Theranos and the

16   technology that they were pursuing.

17         Q.   And then let's look at 555.  This is an

18   e-mail from you to Ms. Holmes, correct?

19         A.   That's correct.

20         Q.   Dated the following day and you thank her

21   for her a call she gave you?

22         A.   Right.

23         Q.   Do you recall the substance of that

24   conversation?

25         A.   I do not recall the substance of that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 138

1              ADMIRAL GARY ROUGHEAD

2        Q.  Okay.

3                    (Roughead Exhibit 556 was

4                    marked as requested.)

5    BY MR. HEYMAN:

6        Q.  In 556 that's before you this is an e-mail,

7    at least the bottom one is an e-mail from Heather

8    King to, it looks like, members of the board of

9    counselors at least and Elizabeth Holmes and Sonny

10   Balwani, right?

11       A.  Right.

12       Q.  And it's dated October 16, 2015.  So that

13   would be the day after the Wall Street Journal

14   article came out.

15       A.  Okay.

16       Q.  And you received this e-mail?

17       A.  Right.

18       Q.  Have you reviewed it recently?

19       A.  I have not.

20       Q.  Okay.  And do you see that there's a

21   description in the e-mail from Ms. King that says

22   "Here are the facts" and she lists the three steps

23   for finger stick technology, right?

24       A.  Uh-huh.

25                THE REPORTER:  Yes?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 139

1              ADMIRAL GARY ROUGHEAD

2    BY MR. HEYMAN:

3        Q.  Is that a yes?

4        A.  Yes.

5        MR. WEINGART:  Well, okay.  It's a

6    statement from Theranos, it's not a statement from

7    her, but just so the record's clear unless I'm

8    misreading this.

9        MR. HEYMAN:  Well, it's in the e-mail.

10        MR. WEINGART:  I agree with that.

11        MR. HEYMAN:  That's right.  It's in the

12    draft statement.  That's -- that's fair.

13        MR. WEINGART:  Okay.  It looks to me like

14    this was already posted as opposed to being drafted

15    based on --

16        THE WITNESS:  That's the statement that's

17    in there, that it's a posted statement.

18        MR. HEYMAN:  Oh.  I'm sorry.  I am

19    incorrect, you are correct.

20    BY MR. HEYMAN:

21        Q.  Okay.  So this was the statement that was,

22    in fact, released?

23        A.  That's what the e-mail says, yes.

24        Q.  Okay.  And -- and it lists -- the statement

25    lists the facts, correct, these three points, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 140

1                ADMIRAL GARY ROUGHEAD

2        A.  Yes.  Yes.

3        Q.  And these three points, that was your

4   understanding of how the technology was supposed to

5   work, right?

6        A.  Exactly.

7        Q.  Okay.  And do you see the statement -- this

8   is, again, in the statement on the second page.  It

9   says "And as of this exact moment" -- this is in I

10  think the penultimate paragraph.  "And as of this

11  exact moment" --

12       A.  I'm trying to find your spot.

13       Q.  It begins "As we continue," the paragraph

14  begins.  It sort of all runs together.  I'm pointing

15  down here.  "As we continue with" --

16       A.  I've got that.

17       Q.  Right.  The next sentence says "As of this

18  exact moment that means temporarily using a

19  different tube, tubes for venous blood, so we can

20  maintain the quality standards," correct?

21       A.  Correct.

22       Q.  Now, prior to seeing this statement did you

23  know that Theranos was doing testing using venous

24  blood?

25       A.  I knew that they were doing testing using

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
HIGHLY CONFIDENTIAL

Page 141

1           ADMIRAL GARY ROUGHEAD

2   venous blood as part of the -- the comparative

3   process and developing the technology.

4       Q.  Now, is this -- is that what this statement

5   is talking about, or is it talking about using

6   venous blood for actual testing?

7       A.  It -- it reads to me that the -- that

8   there's a temporary use of using venous blood while

9   the Nanotainer is receiving the certifications that

10  it needs.

11      Q.  So that would mean using venous blood in

12  lieu of the Nanotainer, correct?

13      A.  That's -- that's what this says, yes.

14      Q.  Okay.  And were you aware prior to seeing

15  this statement that the company was using venous

16  blood in lieu of the Nanotainer?

17      A.  For -- for testing and validation purposes,

18  yes.

19      Q.  Okay.  What about just for purposes of

20  running blood tests?

21      A.  I was not aware of that.

22      Q.  You became aware of that from receiving

23  this statement?

24      A.  Yes.

25      Q.  And it looks like Mr. Kovacevich asks

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY