# Exhibit Y
# (Filed Under Seal)

Page 1

1      IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

       PARTNER INVESTMENTS, L.P., a
3      Delaware limited partnership,
       PFM HEALTHCARE MASTER FUND,
4      L.P., a Cayman Islands limited
       partnership, and PFM HEALTHCARE
5      PRINCIPALS FUND, L.P., a
       Delaware limited partnership,

6
                    Plaintiff,
7
       vs.                              Case No. 12816-VCL
8

9      THERANOS, INC., a Delaware
       corporation, ELIZABETH HOLMES,
10     an individual, RAMESH BALWANI,
       an individual, and DOES 1-10,

11
                    Defendants.
12     ---------------------------/

13

14                  ** CONFIDENTIAL **

15         VIDEOTAPED DEPOSITION OF TYLER SHULTZ

16              San Francisco, California

17              Monday, March 6, 2017

18

19

20

21     Reported by:

22     LORRIE L. MARCHANT, CSR No. 10523
                         RMR, CRR, CCRR, CRC

23

24     Job No. 120731

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1             March 6, 2017

2                 9:42 a.m.

3

4       Videotaped deposition of TYLER SHULTZ,

5       held at the offices of Gibson Dunn &

6       Crutcher LLP, 555 Mission Street, San

7       Francisco, California, before Lorrie L.

8       Marchant, a Certified Shorthand Reporter,

9       Registered Merit Reporter, Certified

10      Realtime Reporter, California Certified

11      Realtime Reporter, Certified Realtime

12      Captioner.

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

```
1                    A P P E A R A N C E S
2      FOR THE PLAINTIFFS:
3                GIBSON, DUNN & CRUTCHER
                 BY:  MATTHEW KAHN, ESQ.
4                     ANGELA POON, ESQ.
                 555 Mission Street
5                San Francisco, CA 94105
6
7
8      FOR THE DEFENDANT RAMESH BALWAMI:
9                WILMERHALE
                 BY:  CHRISTOPHER DAVIES, ESQ.
10               1875 Pennsylvania Avenue, NW
                 Washington, DC 20006
11
12
                 WILMERHALE
13               BY:  WILLIAM ROTH, ESQ. (telephonically)
                 7 World Trade Center
14               250 Greenwich Street
                 New York, New York 10007
15
16
                 DAVIS WRIGHT TREMAINE
17               BY:  STEPHEN RUMMAGE, ESQ.
                      JOHN McKAY, ESQ. (telephonically)
18               1201 Third Avenue
                 Seattle, WA 98101
19
20
                 DAVIS WRIGHT TREMAINE
21               BY:  KELLY GORTON, ESQ.
                 505 Montgomery Street
22               San Francisco, CA 94111
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

1               A P P E A R A N C E S

2

3    FOR THE DEFENDANT, ELIZABETH HOLMES:

4              COOLEY
               BY:  MICHELLE RHYU, Ph.D., Esq.

5         3175 Hanover Street
          Palo Alto, CA 94304

6

7

8    FOR THE WITNESS, TYLER SHULTZ:

9              Taylor & Company Law Offices
               BY:  JONATHAN PATCHEN, ESQ.

10        One Ferry Building
          San Francisco, CA 94111

11

12

13   ALSO PRESENT:

14        Ramesh Balwani

15        Alex Dias, Videographer

16                   ---oOo---

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1          SAN FRANCISCO, CALIFORNIA

2          MONDAY, MARCH 6, 2017

3              9:48 A.M.

4          THE VIDEOGRAPHER:  Good morning.  This is

5    the beginning of Disk No. 1 in the deposition of

6    Mr. Tyler Shultz in the matter Partners Investment,

7    LLP, et al., versus Theranos, Inc., et al.  In the

8    Court of Chancery of the State of Delaware, Case

9    No. 12816-VCL.

10         This deposition is being held at

11   555 Mission Street, Suite 3000, San Francisco,

12   California, on March 6th, 2017, at 9:42 a.m.  My

13   name is Alex Dias, from TSG Reporting, Inc.  Our

14   court reporter today is Lorrie Marchant.

15         Will counsel please introduce yourselves.

16         MR. KAHN:  Matthew Kahn.  Gibson, Dunn &

17   Crutcher.  For plaintiffs.

18         MS. POON:  Angela Poon.  Gibson, Dunn &

19   Crutcher.  For plaintiffs.

20         MR. RUMMAGE:  Steve Rummage.  Davis Wright

21   Germane, for defendant, Sunny Balwani.

22         MS. GORTON:  Kelly Gorton from Davis Wright

23   Germane for the defendant Sunny Balwani.

24         MR. BALWANI:  Sunny Balwani.

25         MR. DAVIES:  Chris Davies on behalf of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

1   Theranos.

2          MS. RHYU:  Michelle Rhyu from Cooley on

3   behalf of Elizabeth Holmes.

4          MR. PATCHEN:  Jonathan Patchen of Taylor &

5   Patchen on behalf of the witness.

6          THE VIDEOGRAPHER:  Thank you.

7          Will counsel on the phone please introduce

8   yourself.

9          MR. KAHN:  Is anyone there on the phone?

10  Hello.  I hear a noise.  Can whoever is on the phone

11  please identify themselves.

12          MR. DAVIES:  I think it's William Roth of

13  Wilmer.  But let me e-mail him.  I'm not sure it's

14  worth ...

15          MR. RUMMAGE:  Yeah, it's not worth waiting.

16          MR. KAHN:  All right.  Let's proceed.

17          THE VIDEOGRAPHER:  Will the court reporter

18  please swear in the witness.

19                  TYLER SHULTZ,

20    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

21              EXAMINATION BY MR. KAHN

22          BY MR. KAHN:

23      Q.   Good morning, Mr. Shultz.

24      A.   Good morning.

25      Q.   Have you ever been deposed before?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 15

1   impressed by her management skills.  And I felt like

2   she was very manipulative.

3       Q.   Let's -- let's take those one at a time.

4            So you said that after joining Theranos,

5   you became less impressed with Ms. Holmes' skills as

6   a scientist; is that accurate?

7       A.   Yes.

8       Q.   Okay.  Why is that?

9       A.   Well, first of all, the -- the woman who I

10  worked for, who was named Aruna, she had, you know,

11  pretty frequent meetings with Elizabeth.  And it

12  seemed like the ideas that Aruna was trying to

13  communicate to Elizabeth, like, Elizabeth didn't

14  quite understand.  And I think that frustrated our

15  team.

16           And then once I started working with the

17  Theranos devices, I realized that there was nothing

18  really revolutionary about it.  It was like a slight

19  modification of what already existed.  So, whereas,

20  originally I thought there was some, you know, new

21  technology that allowed for processing and, you

22  know, testing small volumes of blood, I realized

23  that it was -- yeah, just a slight modification of

24  technology that has existed for a long time.

25      Q.   Do you know whether Ms. Holmes understood

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

1    A.    I just thought of one.

2    Q.    Yes, please.  What else did you think of?

3    A.    When -- so she told him that they had a

4    confidentiality agreement, a one-page

5    confidentiality agreement that they wanted me to

6    sign, when they suspected that I had spoke to The

7    Wall Street Journal.

8         And then when I went to my grandfather's

9    house, the lawyers came and presented me with, like,

10   a notice to appear in court on -- like, two days

11   later, a letter from David Boise and, like, a TRO.

12   And so, you know, it's not even close to what they

13   had agreed on.

14        So she clearly told him something to draw

15   me into his house so that her lawyers could be there

16   to serve me these papers.  And that is just like

17   a -- like a classic Elizabeth Holmes move.

18   Q.    Okay.  I'm -- I'm definitely going to be

19   asking you questions about that last series of

20   events later on today.

21   A.    Okay.

22   Q.    Right now I want to ask you a couple of

23   questions about Ms. Holmes's statement about the

24   science and the technology.  Let's start with the

25   first one.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          You said that Ms. Holmes said that Theranos

2     could run thousands of tests from a single drop of

3     blood, and that was a false statement; correct?

4          MR. RUMMAGE:  Object to the form.

5          THE WITNESS:  Yes.  That's a false

6     statement.  I don't know if she ever said

7     "thousands."  She definitely said "hundreds."

8          BY MR. KAHN:

9     Q.   Okay.

10     A.   Maybe up to a thousand.  She would use

11     terms like "full panel," and that was not true.

12     Q.   Did you hear Ms. Holmes make those

13     statements?

14     A.   Yes.

15     Q.   To whom did you hear her make them?

16     A.   She made those statements, you know, to my

17     entire family.  Like at family gatherings, to my

18     grandfather, to reporters.  I would read about it.

19     I never heard her make those statements to

20     reporters, but it was reported that they could run

21     hundred of tests.

22     Q.   And did you hear her make those statements

23     at the time that you were a Theranos employee?

24     A.   Yeah.

25     Q.   Okay.  And to your knowledge, did

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1    Ms. Holmes know at the time she made those

2    statements that Theranos could not do all those

3    tests?

4              MR. RUMMAGE:  Object to the form.

5              THE WITNESS:  She -- yeah, she knew.

6              BY MR. KAHN:

7         Q.   How do you know she knew?

8         A.   Because I know at some point I told her.

9    And she continued to make those statements.

10         Q.   Do you know who the plaintiff is in this

11    case, who I represent, who's suing?

12         A.   It's a mutual fund.

13         Q.   A hedge fund.  It's called Partner Fund.

14              Have you ever heard of it?

15         A.   Only through this, yeah.

16         Q.   Do you know anyone that's affiliated with

17    Partner Fund?

18         A.   No.

19         Q.   Okay.  You said that Ms. Holmes said that

20    Theranos was only using third-party blood analyzers

21    to validate Theranos's own machines, but that

22    Theranos was not using third-party blood analyzers

23    to actually run clinical tests.

24         A.   Yeah.

25         Q.   And that was a false statement; correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        BY MR. KAHN:

2        Q.   Okay.  Of the approximately 30 assays or

3   tests that the validation team attempted to validate

4   during your time at Theranos, how many, to the best

5   of your recollection, were successfully validated?

6        MR. DAVIES:  Objection.  Form.

7        MR. KAHN:  What's the problem with that

8   question?

9        MS. RHYU:  You haven't established that

10  approximately 30 were done or you haven't laid a

11  foundation to sufficiently establish his role in all

12  of the validation assays that were performed.

13       MR. KAHN:  Okay.  I disagree with you.  I

14  think I have.

15       BY MR. KAHN:

16       Q.   All right.  So do you have my question in

17  mind, or do you want me to read it back?

18       A.   So while I was there, we had seven tests

19  that were being offered to the public.  So those

20  seven tests had passed validation.  But there were,

21  I believe, some other tests that had passed

22  validation that were still in what we called the

23  production phase that were not yet, you know, being

24  used for -- for patient samples.  And I don't know

25  exactly how many tests those were.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

Page 33

1      Q.   Was it more than five?

2      A.   I mean, my guess would be somewhere around

3   five to ten.  Yeah.  I don't know what the exact

4   number was.

5      Q.   Okay.  So I want to make sure that I have

6   it right.  So during your time on the validation

7   team, to the best of your recollection, Theranos had

8   successfully validated seven tests and was offering

9   them to patients.

10         It also had successfully validated five or

11   ten other tests, but it wasn't yet offering them to

12   patients.  And other than that, no tests had been

13   validated; is that correct?

14              MR. RUMMAGE:  Object to form.

15              THE WITNESS:  That sounds about right,

16   yeah.

17              BY MR. KAHN:

18      Q.   Okay.  And do you recall -- let me back up.

19         Approximately what dates, to the best of

20   your recollection, were you on the validation team?

21      A.   So I was on the validation team, you know,

22   about from when I started until about a month before

23   I left, with maybe somewhere around a month period

24   where I was on the production team.  I don't

25   remember if I went from validation to the production

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    team back to validation or if maybe production could

2    have been maybe the last thing I did before I went

3    back to the protein engineering group.

4        Q.   Okay.  So -- so you were on the validation

5    team from roughly September 2013 to March 2014?

6        A.   Yeah.  About that.

7        Q.   Okay.  And during your -- during that

8    period, from about September 2013 to about

9    March 2014, were there, to the best of your

10   knowledge, only seven validated tests that Theranos

11   was offering to clinical patients?

12            MR. RUMMAGE:  Object to the form.

13            THE WITNESS:  Yes.

14            BY MR. KAHN:

15       Q.   So if Theranos or someone from Theranos was

16   claiming in that period that it had hundreds of

17   tests that were validated, that would be a false

18   statement?

19       A.   Yes.

20       Q.   And I think you previously testified that

21   Ms. Holmes made a statement about hundreds of tests.

22            Do you recall Mr. Balwani making any

23   statements in the September 2013 to March 2014 time

24   period about the number of tests that Theranos had

25   successfully validated?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

1    impact their work as well.  They're using the same

2    method, the same devices, doing the same assays.

3        Q.   Did you ever hear any of your coworkers who

4    worked in the CLIA lab complain about problems like

5    these in the Theranos blood analyzer devices?

6        A.   Yes.

7        Q.   What do you recall about those complaints?

8        A.   One specific one that I remember is my

9    coworker Erika was getting really frustrated with

10   the tips falling off, so she started keeping track

11   of how often the tips fell off.  And Suraj, who was

12   maybe her manager, told her to stop doing that.

13       Q.   Did -- do you -- did Erika tell you if

14   Suraj gave a reason for why she should stop doing

15   that?

16       A.   She didn't -- no, I don't know.

17       Q.   And Erika worked in the CLIA lab?

18       A.   Yeah.

19       Q.   Okay.  And do you recall any other

20   complaints from anyone who worked in the CLIA lab

21   about how the machines were working?  And, sorry,

22   just by "machines," I mean the Theranos blood

23   analyzing devices.

24       A.   Not really specifically.  I think most

25   people were aware of all the problems.  But a lot of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1    people would, you know, pretty much joke about how

2    awful they were.

3        Q.   Do you remember any particular jokes or

4    comments?

5        A.   Not really.

6        Q.   It's okay.

7        A.   I mean some jokes were -- like, during

8    demonstrations, the joke was that they put it --

9    they would put the cartridge into the device, and

10   there was a glove there that would take it and go

11   run it somewhere else because they knew that the

12   demo wasn't going to work.  That was a pretty common

13   joke.

14            I remember actually at the Nut House, I

15   went out with some of my housemates, and I saw some

16   of the product managers there.  And one of them was

17   hitting on one of my friends.  And one of the

18   product managers was, like, trying to make it happen

19   and was saying that he was clean, STD free.  But we

20   were making jokes about how we didn't actually know

21   because he was tested with a Theranos device.

22       Q.   And by the way, the Nut House, do you mean

23   Antonio's Nut House, the bar?

24       A.   Yeah.  Yeah.

25       Q.   Okay.  So kind of backing up, earlier today

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

Page 71

1    Q.   Did anyone comment to you on your suddenly

2    being moved in response to having raised questions?

3              MR. RUMMAGE:   Object to the form.

4              THE WITNESS:   Not that I remember, no.

5              BY MR. KAHN:

6    Q.   How did you feel about being transferred at

7    that time?

8    A.   I was definitely happy.

9    Q.   You didn't feel like you were being

10   punished in some way for speaking up?

11   A.   No.  I mean, it was definitely a move in

12   the right direction scientifically that I wanted to

13   go in.  And I actually really enjoyed working in

14   that lab.

15   Q.   How would you describe the business culture

16   at Theranos during your time there?

17             MR. RUMMAGE:   Object to the form.

18             THE WITNESS:   What do you mean by "business

19   culture"?

20             BY MR. KAHN:

21   Q.   What was it like to work there?

22   A.   Like I said before, they expect a lot of

23   hours, weekends, late nights.  Definitely work hard

24   first.  It seemed like working smart was not a

25   priority, but working hard was.  Yeah.  And then,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you know, basically do what you're told.  Don't

2    question.

3        Q.   Did you form an impression that it was not

4    acceptable or encouraged to ask questions?

5        A.   Yeah.

6             MR. RUMMAGE:  Object to the form.

7             BY MR. KAHN:

8        Q.   How did you form that impression?

9        A.   Um --

10       Q.   I mean, I know you mentioned that the woman

11   Tina on your first day.

12       A.   Right.

13       Q.   But anything beyond that?

14       A.   Also, I think on that first day, I may be

15   mistaken with her name.  I think her name may have

16   been Surekha.

17       Q.   Okay.

18       A.   And Tina, I think, was the manager before

19   her who I had only heard about.

20       Q.   Okay.

21       A.   Yeah.  It was just, you know, people -- I

22   mean, that was -- that was the culture.  People

23   knew.  They would say, "Don't speak up or you get

24   fired."

25             I know Erika told me that she wanted to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1    write a similar e-mail to the one that I did to

2    Elizabeth or Sunny, and her manager told her not to.

3    Said you don't want to speak up.

4           She said -- I mean, she told me that he

5    told her, "Don't speak up.  If you speak up, then

6    you're on their radar.  You don't want to be on

7    their radar."

8        Q.   And that manager was Suraj?

9        A.   Actually, that was Mark.  He was the

10   manager of the CLIA lab.

11       Q.   Do you remember Mark's last name?

12       A.   No.  I'm not very good with the last names.

13       Q.   No problem.

14       A.   I think it started with a C.  Like Italian

15   or something.

16       Q.   In addition to having a "don't ask

17   questions culture," did you form an impression that

18   Theranos had a secretive culture?

19       A.   Yeah, definitely.

20       Q.   And what was that impression based on?

21       A.   Like, I didn't see a Theranos device until

22   I was working with a Theranos device.  So during my

23   internship and then when I -- those first days when

24   I was in the binders group, I never saw a Theranos

25   device.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1    And there were barricades, you know, hiding

2    them or locked doors, where a lot of them were --

3    whenever -- there was one -- so whenever, like, an

4    outside vendor came in, they would put up these

5    barricades to essentially, you know, direct where

6    they walked so they couldn't go or see anything that

7    they didn't want them to see.

8    But I remember in one funny instance, I

9    think they were fixing something in the light.  And

10   so the guy came in, and there were barricades

11   everywhere.  And then he gets on a 12-foot ladder to

12   fix the lights, he can see over all the barricades.

13   So from that I thought I think these

14   barricade are for us to, like, show how paranoid

15   they are.  They don't actually care if the guy

16   fixing the light can see what's going on because the

17   barricade isn't blocking his view at all.

18   So my impression from that is that the

19   barricades are for us, to show how much they care

20   about secrecy.

21   Also, I remember one of the guys that I was

22   training, Tim, got in some sort of trouble for

23   talking about what they were doing in the production

24   team.  I don't remember exactly what it was, but I

25   remember he put a note to himself over his bench

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 75

1    that said, "Do not talk to people about what you're

2    doing in the lab."  Like, do not -- it was something

3    like "Do not talk to people who aren't in your lab

4    about what you're doing, even within the company."

5        Q.   Do you remember what kind of trouble he got

6    in?

7        A.   I don't remember.  I just remember he had

8    this, like, Post-it note or something on his bench

9    that said, "Do not talk to people about lab work."

10       Q.   I don't suppose you remember Tim's last

11   name?

12       A.   Definitely not.

13       Q.   Okay.

14       A.   I'm sorry.

15       Q.   That's okay.  Continue.

16       A.   But, I mean, Tim -- Tim at some point

17   connected with me on Facebook.  I don't remember.

18   So I'm definitely friends with him on Facebook.

19       Q.   Okay.

20       A.   So I could find his last name.

21       Q.   Did you ever form an understanding during

22   your time at Theranos as to why there was this

23   culture of secrecy?

24       A.   Well, they made it sound like they just had

25   something so special that they didn't want it to get

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1    BY MR. KAHN:

2        Q.   Did anyone tell you, in sum and substance,

3    that Mr. Balwani was aware that patient blood was

4    being tested in the CLIA lab even after quality

5    control checks failed for that day?

6        A.   Yeah.  Suraj told me that.

7        Q.   Okay.  And so when Erika and others told

8    you that they wished to confront Mr. Balwani about

9    this, it was not a confrontation to inform him what

10   was going on, but rather a confrontation that this

11   thing that he knew was going on should stop; is that

12   right?

13       A.   You know, I can't exactly remember.  I know

14   that the three of them were pretty close, and they

15   all had concerns.  But then I remember Erika was

16   probably the most concerned.  And her -- the manager

17   of the CLIA lab told her not to -- not to do that.

18       Q.   Okay.  What about Stella?  What concerns

19   did Stella have, to your knowledge?

20       A.   Well, I remember Stella saying one time

21   that she had to call a patient and tell him or her

22   to go to the emergency room.  And I was really

23   surprised by that because that didn't seem like it

24   would be her job at all.

25       Q.   Did she tell what you the circumstances

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

1    were that were causing her to have to make this

2    call?

3        A.   I -- I think it was high potassium.  I

4    think she ran a test, it came back really high, and

5    she was instructed to call the patient and tell them

6    to go to the emergency room.

7        Q.   Do you know who instructed her to do that?

8        A.   No.  I don't know.

9        Q.   So what -- you said that Stella wanted to

10   speak up but felt that she couldn't.  So what was it

11   that she wanted to speak up about?

12           MS. RHYU:  Objection as to form.

13           BY MR. KAHN:

14       Q.   To your knowledge.

15       A.   I can't remember specifically what she had

16   concerns with, but I think all of our concerns were,

17   you know, pretty aligned.

18       Q.   And what do you mean by that?

19       A.   Like, I think we were concerned that we

20   weren't giving patients the right results, and that

21   concern kind of manifested its way in different ways

22   for different people.  But I think at the end of the

23   day, everyone was concerned that we weren't giving

24   patients the right results.

25       Q.   Do you think in 2013 and 2014 that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

1    Ms. Holmes was aware that Theranos was not giving

2    patients the right results?

3              MR. RUMMAGE:  Object to the form of the

4    question.

5              THE WITNESS:  I don't know.

6              BY MR. KAHN:

7        Q.   What about Mr. Balwani?

8              MR. RUMMAGE:  Object to the form of the

9    question.

10             THE WITNESS:  Based on what Suraj told me

11   and what other people were telling me, I would say,

12   yes, he knew.

13             BY MR. KAHN:

14       Q.   Okay.  You mentioned that Aruna had

15   concerns that she was afraid to speak up about.

16             Do you know what those concerns were?

17       A.   I remember Aruna being most concerned with

18   disregard of the scientific method.

19       Q.   What do you mean by that?

20       A.   Things like deleting data and replacing it

21   rather than adding to data and looking at -- you

22   know, looking at everything.  You know, being

23   selective in what you decide to look at and use.

24             I don't think Aruna was ever serious about

25   speaking up, though.  I just know she had concerns.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   zone, we would test it on the Macro-Vue RPR card.

2        Q.   Okay.  What is the issue or issues that you

3   are raising in this e-mail to Dr. Young?

4        A.   I think the issue I'm raising here is that

5   the predicate method seems to be better than our

6   method, so why -- why have a Theranos test when we

7   have this third-party card, this RPR card, that

8   works better than our test?

9        Q.   And by "predicate method," what do you

10  mean?

11       A.   Like a previous -- like a previous method

12  or the method that we are comparing our results to.

13       Q.   So in other words, why is Theranos working

14  on something that is not as good as the existing

15  method?

16       A.   Yeah.  Or why would we be offering a test

17  for public consumption that is not as good as an

18  already existing method.

19       Q.   And why did you think that the Theranos

20  method was not as good as the already existing

21  method?

22       A.   The sensitivity wasn't as good.  Even their

23  sensitivity that we reported in our validation

24  documentation wasn't as good as the sensitivity they

25  reported for the -- this similar Remel RPR card.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

Page 131

1    Q.    Is sensitivity the same as CV or different?

2    A.    Very different.

3    Q.    Okay.  So what does "sensitivity" mean?

4    A.    Sensitivity means the percentage of people

5    who actually are afflicted with the disease that you

6    correctly diagnosed as being afflicted with the

7    disease.

8          So if ten people -- if you test ten people

9    who are syphilis positive and you tell nine of them

10   that they're syphilis positive and the other one you

11   say negative, then you have 90 percent sensitivity.

12   Q.    Got it.

13         And so your understanding at this time that

14   you sent this e-mail was that the predicate method

15   had a sensitivity of 97 percent; is that correct?

16   A.    Yes.

17   Q.    And what was your understanding of the

18   Theranos method sensitivity?

19   A.    Well, before equivocal zone, it's only

20   80 percent.  And then after equivocal zone, I think

21   it was 95 percent.

22   Q.    Okay.  In the last sentence of this e-mail

23   the last paragraph -- rather, first sentence of the

24   last paragraph, you say:  "We claim that our tests

25   are more accurate than any other testing method."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 138

"pre-validations" or "mini validations"?

A.   I don't remember hearing those, no.

Q.   Okay.  So in this e-mail to Ms. Holmes, in
the middle of the third paragraph, there's a
sentence that starts "the first issue."

Do you see that?

A.   Yep.

Q.   Okay.  And you write:  "The first issue I
have with this is that there's no penalty for
repeating an experiment.  We repeat and delete
rather than repeat and add.  In our validation
reports, there is never any mention of how many
attempts of precision or comparability testing it
took to get the data that's presented."

Did I read that correctly?

A.   I think so.

Q.   Okay.  What's the issue with that, in your
view?

A.   You know, if you, like, flip a coin enough
times, eventually you're going to get ten heads in a
row, and then you can say, "Oh, this coin returns
heads every time."  That's what I'm getting at.

Q.   So did you think that it was misleading for
Theranos to handle repeat experiments in this
fashion?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1          MR. RUMMAGE:  Object to the form.

2          THE WITNESS:  I think it was misleading,

3     yes.

4          BY MR. KAHN:

5     Q.    Why?

6     A.    Because in a validation documentation, you

7     see, you know, a handful of, you know, various tests

8     that we would do.  And it looks like you just did it

9     one time, and that's what you got.  But really each

10    one of those was repeated -- potentially repeated

11    and potentially repeated many times.

12    Q.    So you -- in your view, the Theranos

13    validation documentation is misleading because of

14    this issue?

15    A.    Right.  There's a lot of data about that

16    test that is not being presented in the validation

17    documentation.

18    Q.    To your knowledge, did this issue with

19    respect to omitting information about repeated

20    testing exist in validation documentation for all of

21    Theranos's assays?

22         MR. RUMMAGE:  Object to the form.

23         THE WITNESS:  As far as I could tell, yes.

24         BY MR. KAHN:

25    Q.    Can you, sitting here today, recall any

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 140

1    specific testing that had this issue of missing

2    information?

3        A.   Definitely syphilis.  I think -- I don't

4    think there was ever validation -- like, a

5    validation process that we went through where we

6    didn't repeat something.

7        Q.   And to your knowledge, every time an

8    experiment or anything else was repeated as part of

9    the validation testing, the fact that there had been

10   repeating was omitted from the validation

11   documentation?

12           MR. RUMMAGE:  Object to the form of the

13   question.

14           THE WITNESS:  Right.  Or I thought that if

15   you were to repeat one set of experiments, you

16   should repeat the entire validation.  So you --

17   instead of picking, you know, one experiment from

18   here, one experiment from here and one experiment

19   from here and then putting it all together, that it

20   should be one cohesive push.  And if one of them

21   fails, then you start over.

22           BY MR. KAHN:

23       Q.   What would cause Theranos to repeat an

24   experiment that was part of the validation process?

25       A.   So in precision, if the CV was too high,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 147

1    recall the names of anyone else with whom you

2    discussed your concern about missing data from the

3    validation reports regarding repeated testing?

4              MR. PATCHEN:  Object to form.

5              THE WITNESS:  I think Aruna definitely had

6    concerns.  I think actually the phrase "repeat and

7    delete" came from Aruna.  I think I'm using her

8    words there.  Yeah, she was the one who was saying,

9    "This repeat and delete is not right.  We need to

10   repeat and add."

11             BY MR. KAHN:

12   Q.   Okay.  Anyone else you recall discussing

13   this with?

14   A.    Not specifically.  But it was a pretty well

15   known -- like, common knowledge that what we were

16   doing was not real science.

17   Q.   Did you believe at the time that this

18   common knowledge was commonly held by Ms. Holmes and

19   Mr. Balwani as well?

20             MR. RUMMAGE:  Object to the form.

21             THE WITNESS:  I don't know if it was held

22   by them.

23             BY MR. KAHN:

24   Q.   So next in your e-mail -- again, it's on

25   the third paragraph, you talk about the second

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 148

1  problem.  You wrote:  "The second problem that I

2  have is that our equivocal zone is adjusted and

3  widened until we see the sensitivity and specificity

4  that we want to report.  Almost regardless of what

5  the data looks, like we can adjust this zone until

6  we get the 95 percent sensitivity that we want to

7  see.  Tellingly, out of the 247 patients that we

8  tested, 66 of them were syphilis positive.  More

9  patients fell into our equivocal zone than we

10  correctly diagnosed as testing positive for

11  syphilis."

12          Did I read that correctly?

13      A.   I think so.

14      Q.   Okay.  What is the "equivocal zone"?

15      A.   So the equivocal zone is essentially an

16  area where you don't make a decision about positive

17  or negative -- about a positive or negative result.

18  You say we don't know, so we're going to test it on

19  a different platform.  In this case it was the card,

20  the Macro-Vue card.

21      Q.   And the Macro-Vue card was a different

22  platform manufactured by some third party, not

23  Theranos; right?

24      A.   Yes.

25      Q.   Okay.  And does this equivocal zone only

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 149

1    come up in the context of qualitative assays, where

2    it's yes or no?

3         A.    Yeah.

4         Q.    Okay.  So basically equivocal zone is like

5    the "maybe" zone?

6         A.    Is the "we don't know" zone.

7         Q.    Okay.  All right.  And you said that --

8    here that "It's a problem that our equivocal zone is

9    adjusted and widened until we see the sensitivity

10   and specificity that we want to report."

11             In your view, why is that a problem?

12        A.    Because using that equivocal zone, you

13   can -- you can -- like, if we wanted to show

14   99 percent sensitivity, we could have shown

15   99 percent sensitivity.  So if you're loose with

16   that equivocal zone, then you can pretty much show

17   anything that you want to show.

18             For instance, if you have a test where the

19   one -- the tests that you expect to be negative come

20   out to be, you know, levels one, and then five,

21   five, five, five, and then the ones you expect to be

22   positive come out ten and then five, five, five,

23   five, even though most of them return five, you

24   could set an equivocal zone around five and say, "We

25   have 100 percent sensitivity because we got the ten

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1    right and we got the one right."

2           So it seemed to me like there should be,

3    like, some rule about how to establish that

4    equivocal zone.  Whereas what Daniel Young told me

5    was, "We want to show 95 percent sensitivity, so I

6    move these bars around until we have 95 percent

7    sensitivity."

8      Q.   So was it your understanding in this time

9    period that Theranos was manipulating the equivocal

10   zone to get to whatever outcome it wanted to get to?

11          MR. RUMMAGE:  Object to the form of the

12   question.

13          THE WITNESS:  Yes.

14          BY MR. KAHN:

15     Q.   Did you think that was a problem?

16     A.   I did think that was a problem.

17     Q.   Why?

18     A.   Because in this case, the equivocal zone

19   was large enough that -- at least here I say that

20   more patients were in the equivocal zone than we

21   actually correctly diagnosed as positive, which

22   means our test doesn't work for a large portion of

23   the population.  For a large number of tests that we

24   tested, we couldn't come up with a result, so we

25   tested on a third-party device.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 151

1          So I guess here I'm trying to figure out

2     what is the point of having a Theranos test for

3     syphilis when so often we end up testing on a

4     third-party device anyway, and that third-party

5     device has a higher advertised sensitivity than us.

6          I'm pretty sure those cards use about the

7     same volume of sample as well.  They're really fast.

8     So I just don't see what the advantage is of having

9     a Theranos syphilis test.

10     Q.    So I have a couple of questions.

11          First of all, the sensitivity number that's

12     reported here, 95 percent --

13     A.    Yeah.

14     Q.    -- is that reported in the validation

15     report?

16     A.    Yes.

17     Q.    Okay.  So in your mind, does this issue

18     with respect to the equivocal zone render those

19     validation reports reporting a 95 percent

20     sensitivity inaccurate?

21          MS. RHYU:  Object as to form.

22          THE WITNESS:  So it's accurate using that

23     equivocal zone, but it is still misleading.  Saying

24     95 percent sensitivity makes it sound like if you

25     test 100 people known to be positive for syphilis,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

Page 164

1     A.   Yes.

2     Q.   Okay.  And you reference here "our previous

3 discussion."

4        Is that a reference to your meeting in

5 early February with Ms. Holmes?

6     A.   Yes.

7     Q.   So on page 18 you talk about the vitamin D

8 assay, and then you follow it on pages 19 to 20 with

9 three scatter plot graphs.

10       Do you see those?

11    A.   Yeah.

12    Q.   I'm going to ask you about those, but first

13 let's just look at -- back at page 18.

14       You say here in this e-mail to Ms. Holmes

15 that you checked the two-tip validation data.

16       Is that the two-tip validation data for

17 vitamin D test?

18    A.   Yes.

19    Q.   Okay.  And you say that you "found that the

20 CVs for our three levels were 18, 16 and 19 percent,

21 when calculated based on the median of each

22 precision run and 23, 23 and 25 percent when

23 calculated based on the entire data set."

24       Did I read that correctly?

25    A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1    Q.   So is this the investigation that you did

2    to determine that the statement on the Theranos

3    website, that there is a less than 10 percent CV for

4    the vitamin D assay, was incorrect?

5    A.   Yes.  I also remember checking the

6    validation documentation.  And maybe these weren't

7    the exact numbers on the validation documentation,

8    but they weren't -- they weren't less than

9    10 percent.

10   Q.   So your recollection is that you both

11   looked at the actual CVs recorded on the validation

12   documentation, and you did your own data analysis

13   and calculated your own CVs using both the Theranos

14   median method and your recommended all data method;

15   correct?

16   A.   Yeah.  Yes.

17   Q.   Okay.  So can you tell us, on the graphs on

18   pages 19 to 20, what are we looking at here?

19   A.   So these are -- these are scatter plots of

20   the results from precision testing.  I believe there

21   were three different -- three different levels of a

22   high, medium, and low.

23        And -- so this is two tips, so I actually

24   can't remember if these are both tips or if this is

25   the median of the two tips.  Because we did either

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY