* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

# ATTACHMENT B

| Withheld Exhibits | |
|---|---|
| **Deponent** | **Withheld Exhibit** |
| Erika Cheung | **Exhibits 132, 133, 134, 135, and 136—all produced by witness in response to subpoena.  9:4-19 (Att. B, p. 2); 13:1-4 (Att. B, p. 6).**<br>132:  Resignation Letter, a copy of which was seized by Theranos on way out of building.  10:3-20 (Att. B, p. 3); 16:11-19:3 (Att. B, pp. 7-7.3).<br>133 and 134:  Letter and envelope from Theranos's outside counsel.  10:21-11:9 (Att. B, pp. 3-4); 21:23-22:2 (Att. B, pp. 8-9).<br>135:  Complaint letter sent to HHS regarding Theranos's CLIA-certified lab.  12:2-12 (Att. B, p. 5).<br>136:  Email correspondence related to complaint to CMS. 12:17-25 (Att. B, p. 5). |
| William Frist | **Exhibits 869, 870, 871, 872—all produced by witness voluntarily or in response to subpoena.  35 (Att. B, p. 11).**<br>869:  Theranos Director package for witness, including slide deck about Theranos's technology.  35-37 (Att. B, pp. 11-13).<br>870:  Email from Holmes to investor Rob Walton that Walton forwarded to witness.  61-63.  (Att. B, pp. 14-16).<br>871:  Emails between witness, Holmes, and crisis manager Heather King, regarding WSJ exposé.  65-66.  (Att. B, pp. 17-18).<br>872:  Email from witness to Bill Foege, explaining that Theranos's Board had no responsibility for the integrity of Theranos's testing and had not been given any tools or oversight responsibility.  74-75.  (Att. B, pp. 19-20). |
| Nicholas Haase | **Exhibits 69, 70, 71, 72—all produced by witness in response to subpoena.  20-22.  (Att. B, pp. 22-24).**<br>69:  Employment agreement.  21.  (Att. B, p. 23).<br>70:  Termination of employment letter.  21.   (Att. B, p. 23).<br>71:  Termination certification.  22.  (Att. B, p. 24).<br>72:  Reminder of confidentiality agreement.  22.  (Att. B, p. 24). |
| Kimberly MacDowell | **Exhibits 298, 299, 300, 301, 302—all produced by witness in response to subpoena.  16-23.  (Att. B, p. 26-33).**<br>298:  Separation agreement from Theranos.  16-17.  (Att. B, pp. 26-27).<br>299:  Confidentiality letter.  19.  (Att. B, p. 29).<br>300:  Print out of Outlook contacts from witness's Theranos account.  20.  (Att. B, p. 30). |

| | |
|---|---|
| | 301: Book of business cards from Theranos. 21-22. (Att. B, pp. 31-32). |
| | 302: Excel spreadsheet with Theranos contacts for healthcare providers. 22-23. (Att. B, pp. 32-33). |
| Tracy Masson | **Exhibits 324, 326, 333, 334, 335, 336, 337, 338, 339, 340, 341—all but two of which produced by witness in response to subpoena. 136-163. (Att. B, pp. 39-66). Remaining two appear to have been produced by third-party Walgreens in response to subpoena. 66, 94. (Att. B, pp. 35 and 37).**<br>324: Email with slide deck about Theranos-Walgreens partnership meeting. 66-67. (Att. B, pp. 35-36).<br>326: Email chain containing representations about venous and finger blood-draw percentages at Theranos Wellness Centers. 94-95. (Att. B, pp. 37-38).<br>333: Response from CMS regarding its California lab inspection. 136. (Att. B, p. 39).<br>334: CMS sanctions letter (available publicly). 144-146. (Att. B, pp. 47-49).<br>335: Letter from Holmes to FDA, trying to get approval for Theranos's blood tests. 147-148. (Att. B, pp. 50-51).<br>336: Email from Balwani to witness containing typo about a customer's test results. 149-151. (Att. B, pp. 52-54).<br>337: Email chain between witness and Balwani about Theranos's roster of phlebotomists and problems with Walgreens. 152-153. (Att. B, pp. 55-56).<br>338: Conditional offer of employment from Theranos. 155-156. (Att. B, pp. 58-59).<br>339: Separation agreement and release. 157-158. (Att. B, pp. 60-61).<br>340: Recall letter for Siemens reagent. 158-159. (Att. B, pp. 61-62).<br>341: Photocopies of business cards for people with whom witness did business while at Theranos. 163-164. (Att. B, pp. 66-67). |
| Ashkon Niroomand | **Exhibit 371—one document produced by witness in response to subpoena. 21. (Att. B, p. 69).**<br>371: Screenshot of a negative review of Theranos posted on Glassdoor, which led to an aggressive effort by Balwani to identify the author rather than address the identified problems. 106. (Att. B, p. 70). |
| Anthony Nugent | **Exhibits 213, 214, 215, 216—all produced by witness in response to subpoena. 9-16. (Att. B, pp. 72-79).**<br>213: Emails between witness and Theranos's HR manager. 9-10. (Att. B, pp. 72-73). |

| | |
|---|---|
| | 214:  Theranos exit documents, including confidentiality warnings.  10-11.  (Att. B, pp. 73-74).<br>215:  Witness notes of certain events at Theranos, including when an employee was fired after raising concerns about the way blood was handled in Theranos's lab, which was related to a Cal/OSHA inspection, during which Holmes lied to the investigators about Theranos's handling practices.  16-20.  (Att. B, pp. 79-83).<br>216:  Witness's resumé.  29.  (Att. B, p. 84). |
| Mona Ramamurthy | **Exhibits 9, 10, 11, 12, 13, 14, 15, 16, 17, 18—all produced by witness in response to subpoena.  36:8-43:12.  (Att. B, pp. 86-93).**<br>9:  Employment offer letter from Theranos.  37.  (Att. B, p. 87).<br>10:  Employment offer letter from Theranos.  37.  (Att. B, p. 87).<br>11:  Separation agreement with Theranos.  38.  (Att. B, p. 88).<br>12 and 13:  Email and attachment related to exit package for Theranos employee.  39.  (Att. B, p. 89).<br>14:  Email with copies of review letters memorializing merit increases at Theranos.  40.  (Att. B, p. 90).<br>15:  Signed exit documents from Ex. 13.  40.  (Att. B, p. 90).<br>16:  COBRA and health information for exit packages.  41.  (Att. B, p. 91).<br>17:  Email and attachments (presumably HR-related).  41-42.  (Att. B, pp 91-92).<br>18:  Exit documents for departing Theranos employee.  42.  (Att. B, p. 92).<br>All exhibits were in witness's personal email account, rather than company account.  42.  (Att. B, p. 92). |
| Gary Roughead | **Exhibits 542, 543, 544, 545, 546, 552, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579—all apparently produced by witness in response to subpoena, produced by the witness to the SEC, obtained via FOIA request, or obtained via third-party subpoena.  45:21-23 (Att. B, p. 96); 47:4-11. (Att. B, p. 97).**<br>542:  Theranos-furnished financial statement.  44-45. (Att. B, pp. 95-96).<br>543:  Theranos PowerPoint deck, typical of what provided to Board. 47-49.  (Att. B, pp. 97-99).<br>544 and 545:  Theranos-related emails apparently produced by Army in response to FOIA request.  75, 78- |

79.  (Att. B, pp. 100-102).

548 and 549:  Theranos-related emails with U.S. Army Lab apparently produced in response to third-party subpoena.  94:12-23.  (Att. B, p. 103).

551:  Theranos Board Meeting minutes.  116:8-11.  (Att. B, p. 104).

552:  Witness's related handwritten notes related to Theranos Board meeting.  116:19-117:10.  (Att. B, pp. 104-105).

553:  Theranos Board meeting minutes.  122.  (Att. B, p. 106).

554:  Theranos-related email between witness and fellow Board member Richard Kovacevich.  131-34.  (Att. B, p. 107-110).

555:  Email between witness and Holmes regarding investors' reactions to WSJ exposé.  134-36.  (Att. B, pp. 110-112).

556:  Email to Theranos Board and defendants Holmes and Balwani from Heather King, crisis-management counselor regarding WSJ exposé.  138:6-17.  (Att. B, p. 113).

557:  Theranos-related emails between witness and fellow Board member Richard Kovacevich regarding WSJ exposé.  142:13-143:12.  (Att. B, pp. 114-115).

558:  Email from Holmes confirming that Theranos using venous blood draws exclusively.  143:22-144:18.  (Att. B, p. 115-116).

559:  Email between Board members and Holmes about WSJ exposé.  145:13-146:11.  (Att. B, pp. 117-118).

560:  Email between Board members and Holmes about WSJ exposé.  146:15-147:13.  (Att. B, pp. 118-119).

561:  Email to Theranos Board and defendants Holmes and Balwani from Heather King, crisis-management counselor about WSJ exposé.  148:9-25.  (Att. B, p. 120).

562:  Email from Theranos Board member Kovacevich responding to King's email.  149:17-150:9.  (Att. B, pp. 121-122).

564:  Email from Holmes to witness about Theranos response to WSJ exposé.  152:10-14.  (Att. B, p. 122).

565:  Continuing emails about response to WSJ exposé.  152:15-153:3.  (Att. B, pp. 122-123).

566:  Continuing emails about response to WSJ exposé.  153:8-154:10.  (Att. B, pp. 123-124).

567:  Continuing emails about response to WSJ exposé.  155.  (Att. B, p. 125).

568:  Continuing emails about response to WSJ exposé.

| | |
|---|---|
| | 156. (Att. B, p. 126).<br>569: Continuing emails about response to WSJ exposé. 158. (Att. B, p. 127).<br>570: Continuing emails about WSJ exposé. 159. (Att. B, p. 128).<br>571: Continuing emails about response to WSJ exposé. 160. (Att. B, p. 129).<br>572: Continuing emails about response to WSJ exposé. 161-162. (Att. B, pp. 130-131).<br>573: Continuing emails about response to WSJ exposé. 164-165. (Att. B, pp. 132-133).<br>574: Continuing emails about response to WSJ exposé. 166. (Att. B, p. 134).<br>575: Continuing emails about response to WSJ exposé. 167. (Att. B, p. 135).<br>576: Continuing emails about response to WSJ exposé, including Board member request for independent review. 172. (Att. B, p. 136),<br>577: Continuing emails about response to WSJ exposé, including Board member request for independent review. 173. (Att. B, p. 137).<br>578: Continuing emails about response to WSJ exposé, including response to Board member request for independent review. 174. (Att. B, p. 138).<br>579: Email between Board members regarding agenda for meeting to discuss recommendations to management in wake of WSJ exposé. 176. (Att. B, p. 139). |
| Farzin Shadpour | **Unnecessary** |
| George Shultz | **Exhibits 722, 723, 724—produced by witness either voluntarily or pursuant to subpoena.**<br>722: Witness's published interview of Holmes. 28. (Att. B, p. 141).<br>723: Letter witness wrote to Governor Jerry Brown on behalf of Theranos. 30. (Att. B, p. 142).<br>724: Letter witness wrote Holmes, suggesting a response to the WSJ exposé and manifesting the witness's false impressions about Theranos's technologies. 62-64. (Att. B, pp. 143-145). |
| Tyler Shultz | **Exhibit 120—produced by witness either voluntarily or pursuant to subpoena.**<br>120: Email exchange between witness and defendants Balwani and Holmes about, *inter alia*, test results that were inconsistent with defendants' public representations. 163-165:9. (Att. B, pp. 147-149). |
| Tim Smith | **Exhibit 651—produced by witness pursuant to subpoena. 10. (Att. B, p. 151).** |

| | |
|---|---|
| | 651:  Collection of documents witness gathered in response to subpoena, including his initial offer letter from Theranos.  10.  (Att. B, p. 151). |
| Danise Yam | **Exhibits 437 and 438—one of which appears to have been produced by third-party Walgreens in response to subpoena (202) (Att. B, p. 153), and other produced by witness in response to subpoena.  212.  (Att. B, p. 158).**<br><br>437:  Amended and Restated Theranos Master Services Agreement with Walgreens, reflecting terms (financial and otherwise) of Theranos-Walgreens partnership.  202-206.  (Att. B, p. 153-157)<br><br>438:  Witness's separation documents from Theranos, including confidentiality warning letter.  213-214.  (Att. B, pp. 159-160). |

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

3    PARTNER INVESTMENTS, L.P., a
     Delaware limited partnership,
4    PFM HEALTHCARE MASTER FUND,
     L.P., a Cayman Islands limited
5    partnership, and PFM HEALTHCARE
     PRINCIPALS FUND, L.P., a
6    Delaware limited partnership,

7                    Plaintiff,

8        vs.                          Case No. 12816-VCL

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

11

                     Defendants.
12   ------------------------------/

13

14               ** CONFIDENTIAL **

15     VIDEOCONFERENCE DEPOSITION OF ERIKA CHEUNG

16               Los Angeles, California

17               Tuesday, March 7, 2017

18

19

20

21

22

23   Reported By:

24   SUSAN A. SULLIVAN, CSR #3522, RPR, CRR

25   Job No. 120737

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 9

1      A    No.

2           MS. HENRY:   Okay.   Joe, can you grab Tab 4,

3   please.

4           Please mark Exhibit 131 which is the

5   subpoena to Erika Cheung.

6           (Cheung Exhibit 131, Notice of Service of

7   Subpoena, marked for identification, as of this

8   date.)

9      Q    BY MS. HENRY:   Do you recognize this

10  document?

11     A    Yes.

12     Q    And this is the subpoena that was served on

13  you in this case, correct?

14     A    Right.

15     Q    And it asks that you produce any documents

16  that you might have responsive to the subpoena.

17     A    Right.

18     Q    And you did produce some documents, correct?

19     A    Yes.

20     Q    Okay.

21          MS. HENRY:   Joe, can you grab Tab 1 through

22  five that are remaining.

23          Let's mark Exhibit 132.

24          (Cheung Exhibit 132, Letter to Theranos,

25  Inc. from Erika Cheung dated April 16, 2014, Bates

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1    No. Cheung-001, marked for identification, as of

2    this date.)

3            MS. HENRY:  And I'll state for the record

4    that Exhibit 132 is Bates numbered Cheung 001 for

5    identification.

6        Q   Do you recognize Exhibit 132, Cheung 001?

7        A   Yes, I recognize it.

8        Q   What is it?

9            MR. RUMMAGE:  May I interrupt you.  We're

10   not getting the documents by PDF which was the

11   agreement so can somebody take care of that?

12   Otherwise we can scroll through the document, we're

13   relying on what you show on the WebEx.

14           THE REPORTER:  I don't know who that is.  I

15   don't know who was speaking.

16           MR. RUMMAGE:  I'm sorry.  That was Mr.

17   Rummage.  Thank you.

18       Q   BY MS. HENRY:  And what is Exhibit 132?

19       A   This is the initial resignation letter that

20   I had written the day that I had left Theranos.

21           MS. HENRY:  Please mark Exhibit 133.

22           (Cheung Exhibit 133, Letter to Ms. Erika

23   Cheung from Boies, Schiller & Flexner LLP dated June

24   26,105, Bates Nos. Cheung-002 to Cheung-003, marked

25   for identification, as of this date.)

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 11

1     Q    BY MS. HENRY:  Do you recognize Exhibit 133

2   which is Bates numbered Cheung 002 to 003 at the

3   bottom?

4     A    Yes.

5     Q    And what is Exhibit 133?

6     A    This is a note that was hand delivered to me

7   when I was at work from David Boies after I had

8   stopped working at Theranos and I received it in the

9   summer of 2015.

10         MS. HENRY:  Let's mark Exhibit 134.

11         (Cheung Exhibit 134, Copy of an envelope,

12   Bates No. Cheung-004, marked for identification, as

13   of this date.)

14         MS. HENRY:  I'll state for the record that

15   Exhibit 134 is Bates numbered Cheung-004.

16     Q    Do you see Exhibit 134?

17     A    Yes.

18     Q    And what is Exhibit 134?

19     A    This is the envelope that I received, the

20   letter from David Boies Schiller, and it has an

21   address on there that I because only living in that

22   house temporarily so it was very strange to me that

23   they had gotten ahold of this address because it

24   wasn't registered.  In no way was I permanently

25   living there, it was only Monday through Friday.  I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 12

1    stayed at a friend's house.

2              MS. HENRY:  Let's mark Exhibit 135 which is

3    Bates numbered Cheung 005 to 008.

4              (Cheung Exhibit 135, Email chain, Bates

5    Nos. Cheung-005 to Cheung-008, marked for

6    identification, as of this date.)

7         Q    BY MS. HENRY:  Do you recognize Exhibit 135?

8         A    Yes.

9         Q    And what is Exhibit 135?

10        A    This is the complaint letter that I sent to

11   CLIA after I had worked at Theranos also in the

12   summer of 2016.

13             MS. HENRY:  Let's mark Exhibit 136.

14             (Cheung Exhibit 136, Email chain, Bates

15   Nos. Cheung-009 to Cheung-015, marked for

16   identification, as of this date.)

17             MS. HENRY:  Exhibit 136 is Bates numbered

18   Cheung 009 through 015.

19        Q    Do you recognize Exhibit 136?

20        A    Can you repeat the numbers again?

21        Q    Oh, yeah.  Cheung 009 to 015.

22        A    Yes, I recognize this document.

23        Q    And what is Exhibit 136?

24        A    This is my email correspondence with Gary.

25   It is a complaint to CMS.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 13

1    Q    Is this -- are Exhibits 132, 133, 134, 135

2    and 136 everything that you produced in response to

3    your subpoena?

4    A    Yes.

5    Q    You attended the University of California

6    Berkeley for college, correct?

7    A    Correct.

8    Q    And you graduated in 2013?

9    A    Correct.

10    Q    And you earned a B.A. in molecular and cell

11    biology while at Berkeley, right?

12    A    Yes.

13    Q    And you also earned a B.A. in linguistics?

14    A    Yes.

15    Q    Did you do any postgraduate work?

16    A    No.

17    Q    And after you graduated from Berkeley you

18    were employed at Theranos, correct?

19    A    Correct.

20    Q    And when did you join Theranos?

21    A    I joined Theranos in October of 2013.

22    Q    And how did you hear about the employment

23    opportunity at Theranos?

24    A    Berkeley has these student career fairs and

25    I had gone up and talked to one of the HR

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

1    working with quality controls, with the accuracy of

2    patient samples, with some of the protocols and the

3    standards in which we processing patient samples.

4    And I had a conversation with the COO that made it

5    clear to me that sort of the values of the company

6    and my own personal values didn't align so I decided

7    to leave.

8         Q    And who was the COO with whom you had the

9    conversation?

10        A    Sunny Balwani.

11        Q    If you could take a look at Exhibit 132

12   again.

13        A    Yes.  Okay.

14        Q    And did you voluntarily choose to leave

15   Theranos?

16        A    Yes.

17        Q    Exhibit 132 is a letter you testified that

18   you wrote.  Do you recall writing this letter?

19        A    Yes.

20        Q    And was this letter ever formally submitted

21   to Theranos?

22        A    No.

23        Q    Why wasn't this letter --

24        A    Not formally, but -- it wasn't formally

25   submitted but it got confiscated from me during my

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 17

1   exit interview.

2       Q   Okay.  Why didn't you formally submit this

3   letter to Theranos?

4       A   I didn't formally submit it because my boss

5   at the time had instructed me like why would you --

6   why would you want to be on their radar as someone

7   that contested this company, like just leave on a

8   clean slate.  At this point a lot of us were pretty

9   nervous about different tactics that Theranos had

10  used so he just advised me it is just better to just

11  leave and don't say anything that could potentially

12  be inflammatory or raise any sort of alarm and

13  that's why I didn't submit it.  I just submitted

14  sort of a generic two-week, two-week notice letter.

15      Q   And what tactics were you concerned about at

16  the time?

17      A   Theranos took the secrecy so -- it was so

18  important to them to keep everything so secret and

19  just my interactions of what had gone on with Tyler

20  Schultz who was a close friend of mine and how he

21  had contacted their family and said like Elizabeth

22  Holmes is or Elizabeth Holmes called his grandfather

23  saying that Tyler was trying to sabotage him and the

24  fact that he -- she would do something like that was

25  very scary, just -- I don't know.  I just didn't

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
Confidential

Page 18

1    feel -- I didn't feel comfortable with the company,

2    I didn't feel comfortable with their tactics, so I

3    really just wanted to separate myself from the whole

4    organization and just sort of go about my business.

5         Q    And you mentioned you spoke with your boss

6    about this letter, Exhibit 132.  Who did you speak

7    with it about?

8         A    I spoke about it with Mark Pandori.

9         Q    And you also mentioned that Exhibit 132 was

10   confiscated from you.  How was it confiscate?

11        A    During my exit interview with Mona I had a

12   backpack and she said, "So you didn't take anything

13   with you?"

14             And I said, "No, I didn't."  And I opened my

15   bag just to like show transparency like I didn't

16   have anything and this letter was placed in my

17   backpack.

18             And she was, "Well, what's that?"

19             And I was just caught off guard and I said,

20   "Oh, it was my initial resignation letter," and I

21   gave it to her.

22             And she said, "Yes, this is exactly the type

23   of information that would break your confidentiality

24   agreement," and so she took it.  And then I asked

25   her not to show it to anyone, you know, that wasn't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

Confidential

Page 19

1    my official resignation letter submission.  And so

2    that's -- that's how she got her hands on a copy of

3    this resignation letter.

4        Q    And before you wrote Exhibit 132 had you

5    discussed any of the issues in the letter with

6    anybody at Theranos?

7        A    Yes.

8        Q    And which issues did you discuss with

9    someone at Theranos?

10       A    I brought up issues with machines sort of

11   not working properly, with quality control problems,

12   issues with Capsys cartridges which are essentially

13   these units where we pre-fill all the reagents in

14   and reagent control and their stability.  I brought

15   up issues with just protocols around processing

16   patient samples and what were the appropriate

17   procedures, what weren't.  Yeah, that's -- and

18   basically any -- any issues that we were seeing,

19   particularly in the clinical lab and issues with

20   stability, with our reagents, issues with accuracy

21   of our results and the fact that there was so much

22   inconsistency on information results in addition to

23   our quality control.

24       Q    And who did you raise these issues with at

25   Theranos?

Att. B - p. 7.3 of 160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 21

1       How did Theranos contact you after you

2   voluntarily terminated your employment?

3       A   So in the summer of 2015 Mona had called me

4   back once and said to get back to her and I just

5   figured I didn't need to talk to these people so I

6   just chose not to.  And then she called again and

7   left a message and she said, "You need to get back

8   to me ASAP."  And like I don't work for these people

9   anymore, I don't want to really deal with them.

10      And then they came into my work and someone

11  was sitting in the parking lot while I was work and

12  my coworker said, because I was working late, "Do

13  you" -- "are you okay staying here late?  There's

14  someone in the parking lot for a long time and we're

15  just concerned like are you going to get in your car

16  safely."

17      And so is, "Well, that's a little

18  concerning, do you mind walking me to my car."

19      So they walked me to the car and this person

20  came and delivered that letter to me and then I got

21  after that a letter also saying that they had

22  delivered this, this request to me.

23      Q   And the letter that was delivered to you by

24  the man in the parking lot was -- is the one that's

25  in Exhibit 133 with the envelope in Exhibit 134; is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 22

1    that correct?

2        A    Correct.

3        Q    And you mentioned that the address in both

4    Exhibit 1133 and 134 was a temporary address,

5    correct?

6        A    Correct.

7        Q    Did your mom know the address at that time?

8        A    No, no one -- it was kind of a strange

9    situation.  I was in between homes and had struck up

10   this deal where Monday through Friday I stayed at a

11   friend's house and then during the weekend I would

12   go camping or I would go to Los Angeles or Seattle

13   and just travel so it was sort of a strange

14   situation.  But yeah, my mother did not know this

15   address, no one knew who I lived.  The only people

16   who knew who I lived were my co-workers, my one

17   coworker who I lived with, Julia, and I know she

18   didn't give this address to anyone.

19       Q    After you voluntarily left your employment

20   at Theranos, where did you work next?

21       A    I worked at Antibody Solutions.

22       Q    And what was your title at Antibody

23   Solutions?

24       A    I was a research associate in

25   immunochemistry.

Page 1

1      CONFIDENTIAL-WILLIAM FRIST, M.D.
2            IN THE COURT OF CHANCERY
3              STATE OF DELAWARE
4                No. 12816-VCL
5   PARTNER INVESTMENTS,
    L.P., a Delaware limited partnership,
6   PFM HEALTHCARE MASTER
    FUND, L.P., a Cayman Islands
7   limited partnership, and PFM
    HEALTHCARE PRINCIPALS
8   FUND, L.P., a Delaware
    limited partnership,
9
10                   Plaintiffs,
11  vs.
12  THERANOS, INC., a Delaware corporation,
    ELIZABETH HOLMES, an
13  individual, RAMESH BALWANI,
    an individual and DOES 1-10,
14
15                   Defendants.
16  _____X
17
18      *CONFIDENTIAL-UNDER PROTECTIVE ORDER*
19          VIDEOTAPED DEPOSITION OF
20       SENATOR WILLIAM H. FRIST, M.D.
21            Nashville, Tennessee
22          Thursday, April 20, 2017
23
24  Reported by: RANDI GARCIA
25  Job No. 121075

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 35

1        CONFIDENTIAL-WILLIAM FRIST, M.D.

2        Q.    Okay.  Did you buy any stock in

3   Theranos?

4        A.    No.

5        Q.    Not at any time?

6        A.    No.

7        Q.    Okay.  And did you receive any

8   financial information about Theranos before you

9   joined the board?

10       A.    Very little.  Very little.  My -- my

11  main purpose on the board was on the -- the

12  clinical aspects in an advisory capacity, and

13  don't recall going to any detail.  I'm sure

14  that in packets of materials they sent, there

15  were financial materials to some extent, but

16  did not review them.  Knew that that was not my

17  purpose in this advisory capacity.

18       Q.    Why don't we -- you mentioned

19  receiving a package of materials.  Why don't

20  we -- it's a good segue.

21       (Thereupon, Exhibit 869 was marked for

22       identification.)

23            THE WITNESS:  Good.

24            MR. HEYMAN:  For the record,

25       Exhibit 869 begins with Bates number Frist

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 36

1        CONFIDENTIAL-WILLIAM FRIST, M.D.

2        335.

3            It's a very thick stack of documents.

4    BY MR. HEYMAN:

5        Q.   Do you recall if this is the package

6    you received?  It has your name.  On the front

7    it says "Theranos Director Package Prepared for

8    Discussion with Senator Bill Frist."

9        A.   I remember receiving the package and

10   it makes sense to assume this is it.

11       Q.   All right.

12       A.   Seems a lot thicker, but that's -- so

13   the answer would be yes.

14       Q.   Okay.  Aaron's happy to get rid of

15   those so that other people can carry them

16   instead of him.

17           MR. BENEDETTO:  I'm giving them back.

18   BY MR. HEYMAN:

19       Q.   Let's first look at the page with the

20   Bates number Frist 441.

21           See that slide or page?

22       A.   Yes.

23       Q.   And you see under the first bullet

24   point it says towards the end that, "Theranos'

25   technology," and the quote is "generates

Page 37

1          CONFIDENTIAL-WILLIAM FRIST, M.D.

2     significantly higher integrity data than

3     currently possible"?

4          A.   Yes.

5          Q.   And at the time did you believe that

6     was true?

7          A.   Yes.

8          Q.   And based --

9          A.   I knew it was equal to or better.  I

10    didn't have the experience or the knowledge to

11    know if it was higher than but certainly

12    believed it was equal to or better than.

13         Q.   And what was the basis for that

14    belief?

15         A.   Just conversations directly with

16    Ms. Holmes, principally.

17         Q.   So you had not actually seen this

18    integrity data yourself?

19         A.   No.

20         Q.   Okay.  And sitting here today, do you

21    still believe that Theranos' integrity data was

22    higher than currently possible?

23         A.   Just don't know at this time

24    unless -- believe it or not, just the scientist

25    in me would say unless I saw the data and

Page 61

1          CONFIDENTIAL-WILLIAM FRIST, M.D.

2          identification.)

3               MR. HEYMAN:  Is this one?  Apparently

4          we don't have a stapler.

5               MR. JACOBSON:  Here you go.

6               MR. HEYMAN:  Thank you.

7               MR. JACOBSON:  We will staple that

8          for you.

9     BY MR. HEYMAN:

10              Q.   Senator, I'm putting before you

11         Exhibit 870, which is some e-mails beginning

12         with the Bates number Frist 269.

13              A.   Yes.

14              Q.   And it looks like there is -- that

15         there's an e-mail, if you go down about a third

16         of the page, from Greg Penner --

17              A.   Yes.

18              Q.   -- to Elizabeth Holmes and others.

19              A.   Yes.

20              Q.   And it looks like it is forwarded to

21         you by Rob Walton?

22              A.   Yes.

23              Q.   Do you understand why you were

24         receiving this e-mail?

25              MR. BENEDETTO:  Object to form.

Confidential

Page 62

1    CONFIDENTIAL-WILLIAM FRIST, M.D.

2        THE WITNESS:  Rob Walton is a friend

3    who I hunt with and, you know, know

4    socially.  And Greg Penner is -- just

5    looking at this, I don't know if they

6    worked together or he did investments.   I

7    don't know if this is an outside private

8    equity fund or -- I don't know.

9        And one time with Rob and Greg I

10   talked on the phone -- I don't know if it

11   was Greg -- because as I said, I don't

12   recall the name, and Rob Walton being

13   Walmart was interested in the technology

14   and had discussions with Elizabeth long

15   before I was involved, or that's my

16   impression, long before I was involved.

17       And since we hunted and he knew that

18   I was on the board of advisors for

19   Theranos, would send this to me.  And I

20   don't know if this was about old

21   investment, new investment, an investment

22   at all.  But I remember at the time he was

23   thinking about either -- I don't know if

24   it was taking it into the Walmart stores

25   or investing.

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Page 63

CONFIDENTIAL-WILLIAM FRIST, M.D.

2          And this letter, I received it, and

3          I -- kind of looking at it, what I think

4          is the first time right now.

5    BY MR. HEYMAN:

6          Q.   Okay.  So did you ever discuss this

7      e-mail with Elizabeth Holmes?

8          A.   No.  I clearly did not discuss this

9      e-mail with her because this is sort of new to

10     me.  At the time I would have read Rob's e-mail

11     and probably moved on.

12          But I did sort of come to the gist of

13     it, had talked to Elizabeth about Rob because

14     they had a dialogue going and had said that he

15     had asked me about it, that I had given him

16     sort of my impressions of where we are.  And

17     that's sort of the extent of it.

18          Q.   Okay.  Did anyone in the media reach

19     out to you to discuss The Wall Street Journal

20     article?

21          A.   The Wall Street Journal called -- I

22     don't know if it was the fellow writing the

23     articles, because I do a lot of media.  But I

24     knew at the time that I didn't want to get

25     involved at that level with the media doing an

Confidential

Page 65

1    CONFIDENTIAL-WILLIAM FRIST, M.D.

2         MR. BENEDETTO:  Object to form.

3         THE WITNESS:  I can't -- I can't

4    answer that.  I was not involved in the

5    preparation of it, if it were.

6    (Thereupon, Exhibit 871 was marked for

7    identification.)

8  BY MR. HEYMAN:

9         Q.   Senator, you have Exhibit 871, which

10   are some e-mails with the first page Frist 253.

11   And --

12        A.   Yes.

13        Q.   -- fair to say that these are some

14   e-mails between, it looks like, you and Heather

15   King and Elizabeth Holmes regarding The Wall

16   Street Journal article?

17        A.   Yes.  Yes.  Starting with back before

18   an assistant in my office says give the live

19   summary of the community's objections.

20   Interesting -- yes.  E-mails back and forth

21   about the article.  I guess it's the article.

22        What day did the article come out,

23   first article, roughly?  I have forgotten.

24   October?

25        Q.   Around October 16.

Confidential

Page 66

1        CONFIDENTIAL-WILLIAM FRIST, M.D.

2        A.   So right before this.  Yes.  Okay.

3        Q.   Excuse me.  You see, it looks like

4   there is an e-mail from you dated October 15 at

5   8:29 a.m.?  First page near the top.

6        A.   Oh, first page.  October 15, wrote --

7   yes.

8        Q.   And it says -- it looks like you say,

9   "This is all manageable and exactly what we had

10  prepared for.  It will be a hit to reputation

11  that we can readily recover from if the next

12  seven days are handled well as planned.  Now we

13  all need to stay focused and discipline and not

14  create stories in our response."

15       A.   Yes.

16       Q.   You wrote that?

17       A.   Yes.

18       Q.   And so what did you -- what did you

19  mean that this is all manageable and exactly

20  what we prepared for?

21       A.   When you are in a growing company

22  which -- which is just that, is growing, and

23  you have problems that are coming in or

24  challenges, or challenges to either what you're

25  doing, or integrity, or attacks, or revelations

Confidential

Page 74

1      CONFIDENTIAL-WILLIAM FRIST, M.D.

2      capacity, it was too much.

3           Q.   Did you have any other concerns about

4      joining?

5           A.   No.  No.

6           (Thereupon, Exhibit 872 was marked for

7           identification.)

8 BY MR. HEYMAN:

9           Q.   Senator, Exhibit 872 has Bates number

10     Frist 260 and it looks like some e-mails

11     between you and Bill Foege dated October 28th

12     and 29, 2015.  I will just ask you to take a

13     look at that for yourself for a second.

14          A.   Yes.

15               Yes.

16          Q.   I am wondering whether this refreshes

17     your recollection about any other concerns you

18     might have had about joining the medical

19     advisory board.

20          A.   Just adds to it.  The -- the fact

21     that the medical board is an additional

22     responsibility from what we had ever been asked

23     to do, I just didn't have time to go, as I

24     said, to be responsible for the integrity of

25     testing with all the other things that I have

Page 75

1     CONFIDENTIAL-WILLIAM FRIST, M.D.

2  going on.

3         And that if you aren't given the

4  tools to do that quickly and not knowing

5  whether would be given those tools, I'm not

6  about to take on another, you know, 25 hours a

7  month or a week, whatever it would take.

8     Q.   You say here in the e-mail at the

9  bottom, you say, "We have reviewed nothing as a

10  group that other board members I have not

11  seen."

12     A.   I see.  "I do not want people to

13  assume that we have been in a position for a

14  longer period of time and that we have a

15  special responsibility of scientific oversight

16  because we reviewed nothing as a group that

17  other board members I have not seen" -- I don't

18  know what this means.  Yeah.  It's important

19  because right now, as a medical board, the

20  assumption is that you have reviewed scientific

21  data that you are counseling, advising on

22  scientific data.  And we had not done that,

23  hadn't been provided the tools to do that.

24         Nor as an advisor, was that a

25  capacity that I'd agree to serve in.  And to

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED CERTIFIED COPY

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2                      ---o0o---

3

4

5    PARTNER INVESTMENTS, L.P., a     )
     Delaware limited partnership,    )
6    PFM HEALTHCARE MASTER FUND,      )
     L.P., a Cayman Islands limited   )
7    partnership, and PFM HEALTHCARE  )
     PRINCIPALS FUND, L.P., a         )
8    Delaware limited partnership,    )
                                      )
9                Plaintiffs,          )
                                      )
10        vs.                         ) C.A. No. 12816-VCL
                                      )
11   THERANOS, INC., a Delaware       )
     corporation, ELIZABETH HOLMES,   )
12   an individual, RAMESH BALWANI,   )
     an individual, and DOES 1-10,    )
13                                    )
                 Defendants.          )
14   _____)

15

16

17            DEPOSITION OF NICHOLAS HAASE

18               March 2, 2017

19

20

21

22

23

24   JOANNA B. BROWN, CSR No. 8570, RPR, CRR, RMR.
     420902
25   SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose          (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez          (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn          (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5586 Chicago        00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    connection with today's deposition?

2        A    No.

3        Q    Did you consult with a lawyer on your own

4    behalf?

09:59  5        A    Yes.

6        Q    Other than that lawyer, have you spoken to

7    anybody -- any employee of the company or

8    representative of the company in preparation for your

9    deposition here today?

09:59  10           MS. JEFFRIES:  I'll just caution the witness

11    to answer "yes" or "no" to that question on the grounds

12    of privilege.

13           THE WITNESS:  No.

14    BY MR. CHAN:

10:00  15        Q    All right.  That subpoena towards the back of

16    it directs you to bring documents if you happen to have

17    those documents in your personal possession.

18           Did you bring any in connection with that

19    today?

10:00  20        A    Yes, sir.

21        Q    Can you provide those, please.

22        A    Yes.  The --

23           MS. JEFFRIES:  I would just request a copy of

24    those once you have the opportunity.

10:00  25           THE WITNESS:  The first document here is my

20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1   "At Will Employment, Confidential Information and

2   Invention Assignment Agreement" that I signed when I

3   first began employment.

4           MR. CHAN:  Let me mark this as Exhibit 69,

10:00   5   please.

6           (Deposition Exhibit 69 was marked for

7           identification by the reporter, a

8           copy of which is attached hereto.)

9   BY MR. CHAN:

10:00   10      Q    What's the next document?

11      A    The next document is a termination of

12  employment letter from Mona Ramamurthy, the head of HR.

13          MR. CHAN:  Exhibit 70, please.

14          THE WITNESS:  The third is a --

10:01   15          MR. CHAN:  Why don't we finish up with this

16  one.

17          THE WITNESS:  Okay.  The third is my

18  termination certification when I resigned.

19          MR. CHAN:  And this one, let's please mark as

10:01   20  Exhibit 71.

21          (Deposition Exhibit 70 and Exhibit 71 were

22          marked for identification by the reporter,

23          copies of which are attached hereto.)

24  BY MR. CHAN:

10:01   25      Q    Do you have one more document?

21

BARKLEY
*court* *Reporters*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1      A    Yes, sir.  It's a reminder of my

2   confidentiality agreement and states the start and end

3   date of my employment.

4           MR. CHAN:  Let's please mark this as

10:01   5   Exhibit 72.

6           MR. CHAN:  We are going to mark it.

7           THE WITNESS:  Okay.

8           (Deposition Exhibit 72 was marked for

9           identification by the reporter, a

10:02  10           copy of which is attached hereto.)

11   BY MR. CHAN:

12      Q    Okay.  According to these documents, your last

13   day of employment at Theranos was August 31st --

14      A    2016; correct.

10:02  15      Q    -- 2016.  I'm going to show these to counsel

16   too.

17           Let's go now into your background.

18      A    Okay.

19      Q    What's your educational background?

10:03  20      A    I have a bachelor's in biochemistry with a

21   minor in biology from Purdue University and a Ph.D. in

22   chemistry from Georgia Tech.

23      Q    Any other degrees?

24      A    No, sir.

10:03  25      Q    After your schooling, did you work?

22

BARKLEY
Court Reporters

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
Confidential

1

2    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

3

     PARTNER INVESTMENTS, L.P., a
4    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
5    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
6    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

7

          Plaintiff,

8

     vs.                                    Case No.
9                                           12816-VCL

10

11   THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
12   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

13

          Defendants.
14   ---------------------------/

15

16              ***CONFIDENTIAL***

17       DEPOSITION OF KIMBERLY MACDOWELL

18            Phoenix, Arizona

19          Tuesday, March 14, 2017

20

21

22

23   Reported by:

24   JUDI JOHNSON, CSR No. 50853
                    RMR, CRR, RPR, CLR

25   Job No. 120801

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 16

1                    KIMBERLY MACDOWELL

2    instant messages, in preparation for today?

3         A     Not that I recall.

4         Q     Okay.  Did you review any other materials

5    other than the six or so documents that we were

6    mentioning?

7         A     No.

8         Q     Okay.  All right.  So I received this

9    morning from your counsel a set of documents.  Do

10   you know what these documents are?

11        A     Can you --

12              MR. JOHNSTONE:  Objection to form.

13        A     Can you show me?

14        Q     We -- yes, I will show you.  But did you

15   produce documents -- did you hand over documents to

16   your counsel to be handed over to us this morning?

17        A     I did.

18        Q     Okay.  We can just walk through each of

19   these.

20              MR. LAZARUS:  Could this be marked as

21        Exhibit Number 298, please.

22              (Whereupon, Bates document

23        ALFONSO-00011-30 was marked as Plaintiff's

24        Exhibit 298 for identification, as of this

25        date.)

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 17

1                   KIMBERLY MACDOWELL

2          MS. DAVIS:  Can you describe the document

3      to me for the phone, please.  A date or Bates

4      number.  Thanks.

5          MR. LAZARUS:  Oh, sure.  So I guess we're

6      starting with Alfonso PFM 11.  (Handing.)

7      A     Okay.

8      Q     Can you identify what this document is?

9      A     Yes.  This is a copy of my separation

10  agreement from Theranos.

11     Q     Okay.  And what is the date on that

12  document?

13     A     It -- I don't see a date.

14     Q     Did you sign this document?

15     A     Let me look for that.  I did.  This is

16  not -- this is a copy, so this isn't the signed --

17     Q     Okay.

18     A     -- version that I would have sent hard

19  copy in of.  So there's not a date on it.  The only

20  date is that it is effective December 5th, 2016.

21     Q     Okay.  And did you sign a document that

22  was identical to that one that we're looking at

23  today?

24     A     I did.

25     Q     Okay.  And I reviewed it briefly.  Does

Confidential

Page 18

1                        KIMBERLY MACDOWELL

2    it say that your -- you would be given severance

3    pay?

4        A      I'm reading it right now because I'm

5    looking to see if it notes it as severance pay.  It

6    notes it as lump sum and then equivalent to four

7    months of salary and target commissions.  It notes

8    the COBRA coverage lump sum.

9        Q      Okay.  We can --

10       A      And then it notes a bonus payment, which

11   I think I just said, so ...

12       Q      Okay.  Is the bonus payment different

13   from the four-months-equivalent payment?

14       A      Yes.

15       Q      Okay.  How much was the bonus?

16       A      The bonus payment -- the transition bonus

17   was █████████████

18       Q      Okay.  Thank you.

19       A      Uh-huh.

20              MR. LAZARUS:  Can we mark this as the

21       next exhibit, please.

22              (Whereupon, Bates document

23       ALFONSO-00001-2 was marked as Plaintiff's

24       Exhibit 299 for identification, as of this

25       date.)

Confidential

Page 19

1                    KIMBERLY MACDOWELL

2          MR. LAZARUS:  Which I believe would be

3      Number 299.  So this is -- Exhibit Number 299

4      has Bates number Alfonso PFM 00001.  (Handing.)

5      BY MR. LAZARUS:

6      Q      Can you identify what this document is?

7      A      Yes.  This is a confidentiality letter.

8      Q      Okay.  And what is the date on that?

9      A      October 6th, 2016.

10     Q      Okay.  And did you sign that letter?

11     A      No.

12     Q      Okay.  Who did sign that letter?

13     A      Mona Ramamurthy.

14     Q      Okay.  And is that -- that's a letter

15 addressed to you?

16     A      It says, "dear employee."

17     Q      Okay.

18     A      It is a letter that everyone received --

19     Q      I see.

20     A      -- on this date.

21     Q      Okay.  And what in substance does it say?

22            MR. JOHNSTONE:  Object to form.

23     BY MR. LAZARUS:

24     Q      You can answer.

25     A      Go ahead and answer?

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 20

1                     KIMBERLY MACDOWELL

2        Q      Yes.

3        A      It speaks to confidentiality being

4    serious and basically not sharing proprietary

5    information outside the organization.

6        Q      Okay.

7        A      It also speaks to non-solicitation.

8        Q      Okay.  Thank you.

9        A      Uh-huh.

10             MR. LAZARUS:  And next we're going to

11       mark as Exhibit 300 a document that's labeled

12       with the Bates number Alfonso PFM 3.

13             (Whereupon, Bates document

14       ALFONSO-0003-10 was marked as Plaintiff's

15       Exhibit 300 for identification, as of this

16       date.)

17       BY MR. LAZARUS:

18       Q      Can you identify what this document is?

19       A      Yes.

20       Q      What is that?

21       A      It is a printout of my Outlook contacts

22   at -- from my Theranos work account.

23       Q      Okay.  Thank you.

24             And do you know what date that was printed

25   out?

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

```
                                                     Page 21
 1                      KIMBERLY MACDOWELL
 2      A     It says October 27th, 2016, at 12:13 p.m.
 3      Q     Okay.  So is it your understanding that
 4   that reflects the contacts that you had listed in
 5   Outlook at that time and date?
 6      A     Yes.
 7      Q     Okay.  I think we can set that one aside.
 8      A     (Witness complies.)
 9            MR. LAZARUS:  And the next document we
10      will be marking as Exhibit 301 is Alfonso PFM
11      31.
12            (Whereupon, Bates document
13      ALFONSO-00031-48 was marked as Plaintiff's
14      Exhibit 301 for identification, as of this
15      date.)
16   BY MR. LAZARUS:
17      Q     And what is this document?
18      A     This is a copy of business cards from a
19   business card book.
20      Q     Okay.  Where did this business card
21   book -- where was it found?
22      A     For when I worked at Theranos or for
23   this?
24      Q     Let's start with for the deposition
25   today.  Where was it before the deposition today
```

Att. B - p. 31 of 160

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 22

1                     KIMBERLY MACDOWELL

2    that -- where you retrieved it?

3         A      Yeah.  On a bookshelf.

4         Q      Okay.

5         A      At home.

6         Q      At your home?

7         A      At home.

8         Q      Okay.  And where was it kept when you

9    were working at Theranos?

10        A      In my desk.

11        Q      Okay.  At Ther- -- in -- at the office?

12        A      At Theranos office.

13        Q      Okay.  And so you took that home with you

14   when you left the company?

15        A      Correct.

16        Q      Okay.

17               MR. LAZARUS:  All right.  I think we will

18        now mark Alfonso PFM 49 as Exhibit 302.

19               (Whereupon, Bates document

20        ALFONSO-00049-53 was marked as Plaintiff's

21        Exhibit 302 for identification, as of this

22        date.)

23        A      Thank you.

24        Q      Can you identify what this document is?

25        A      It is an Excel spreadsheet with contact

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

Page 23

1                         KIMBERLY MACDOWELL

2    information on it.

3         Q    Okay.  Contact information for whom?

4         A    It looks like providers, healthcare

5    providers, and potentially staff within doctors'

6    offices.

7         Q    Okay.  And do you remember using this

8    Excel spreadsheet?

9         A    I don't recall using this exact one, but

10   the contact information I clearly thought was

11   valuable so I found it with these --

12        Q    Okay.

13        A    -- business cards, so I made a copy for

14   the purposes of this meeting.

15        Q    I see.  And the contact information, was

16   that something that you had printed out at home?

17        A    This was -- yes.  This was what I had

18   printed out, so I sent a copy of it.

19        Q    Okay.  Thank you.  All right.

20             MR. LAZARUS:  Could I get folder number

21        59, please.

22             So we will be marking as Exhibit 303 a

23        document that is labeled "subpoena."

24             (Whereupon, Subpoena was marked as

25        Plaintiff's Exhibit 303 for identification,

Att. B - p. 33 of 160

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 1

1

2     IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

3

      PARTNER INVESTMENTS, L.P., a
4     Delaware limited partnership,
      PFM HEALTHCARE MASTER FUND,
5     L.P., a Cayman Islands limited
      partnership, and PFM HEALTHCARE
6     PRINCIPALS FUND, L.P., a
      Delaware limited partnership,

7

          Plaintiff,

8

      vs.                                    Case No.
9                                            12816-VCL

10

11    THERANOS, INC., a Delaware
      corporation, ELIZABETH HOLMES,
12    an individual, RAMESH BALWANI,
      an individual, and DOES 1-10,

13

               Defendants.
14    ----------------------------/

15

16              ***CONFIDENTIAL***

17          DEPOSITION OF TRACY MASSON

18              Phoenix, Arizona

19          Wednesday, March 15, 2017

20

21

22

23    Reported by:

24    JUDI JOHNSON, CSR No. 50853
                      RMR, CRR, RPR, CLR
25    Job No. 120804

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 66

                    TRACY MASSON - CONFIDENTIAL

1

2      approximately 10:30 a.m.  We are back on the

3      record.

4           MR. JOHNSTONE:  Now that we're back on

5      the record, now is as good a time as any to

6      designate the transcript and the videotape as

7      confidential.  I didn't want to interrupt Matt,

8      so I'm doing it now.

9           MR. KAHN:  I'm not going to concede

10     whether now is as good a time as any, but your

11     designation's noted.

12     BY MR. KAHN:

13     Q     Ms. Masson, you've been handed a document

14     marked Exhibit 323.  This is a -- sorry.  324,

15     right?

16     A     Yes.

17     Q     And this is an E-mail plus attachment.

18     The E-mail is dated May 6th, 2014, and the first

19     Bates number is WBA-PFM-0002013.

20           Okay.  You see this E-mail is from someone

21     named Patty Haworth, H-A-W-O-R-T-H.

22           Do you know who that is?

23     A     Yes.

24     Q     Who's she?

25     A     She was a project manager for Walgreens.

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 67

1                    TRACY MASSON - CONFIDENTIAL

2      Q     Okay.  And if you turn to the slide deck

3   that starts on the next page, or rather two pages

4   in, you see it's titled "Diagnostic Testing -

5   Theranos Partnership Executive Steering Committee

6   Meeting," May 6th, 2014.

7            Do you recognize this slide deck?

8      A     No.

9      Q     Okay.  Do you know what the "executive

10  steering committee meeting" is?

11     A     I had heard of it.  It was a collection

12  of Walgreens and Theranos people.

13     Q     Okay.  Do you know approximately how

14  frequently it met in 2014?

15     A     I don't.

16     Q     Do you know what the meetings covered?

17     A     I don't.

18     Q     Did they cover the Theranos-Walgreens

19  partnership?

20     A     That would be my assumption, but I don't

21  know.

22     Q     Okay.  Were you part of the executive

23  steering committee?

24     A     No.

25     Q     Did you ever attend -- to your

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 94

1                    TRACY MASSON - CONFIDENTIAL

2              You may put that aside.

3              MR. LAZARUS:  (Handing.)

4              MR. KAHN:  We'll mark this as 326,

5       please.

6              (Whereupon, Bates document

7       WBA-PFM-0001230-1232 was marked as

8       Plaintiff's Exhibit 326 for identification,

9       as of this date.)?

10      A      Thank you.

11      Q      Ms. Masson, you've been handed a document

12   marked Exhibit 326.  It's an E-mail chain,

13   top-level E-mail, dated October 22nd, 2014.  First

14   Bates number is WBA-PFM-0001230.  (Handing.)

15             I draw your attention to the bottom of the

16   first E-mail, so it's the last page of the document.

17      A      (Witness complies.)

18             Okay.

19      Q      The last page of the document.

20      A      Okay.  Okay.

21      Q      And you see at the bottom, there is a

22   heading that says "Venous Draws Percentage"?

23      A      Yes.

24      Q      And in this E-mail, Mr. Fosque writes:

25   "Percentage of venous draws are at approximately

Confidential

Page 95

1                    TRACY MASSON - CONFIDENTIAL

2     40 percent venous versus 60 percent finger stick

3     across the AZ and CA stores."

4              Do you see that?

5        A    Yes.

6        Q    And to your knowledge, was that an

7     accurate figure -- strike that.

8              To your knowledge, were those accurate

9     figures as of this time, October 22nd, 2014?

10       A    I don't recall what they were at this

11    time.

12       Q    Okay.  So you have no idea whether this

13    is right or not?

14       A    I don't know.

15       Q    Okay.  Do you know -- separately from

16    this E-mail, do you know whether one of the reasons

17    that Theranos' venous-draw percentage was higher

18    than had been hoped for by Theranos was that

19    Theranos had not successfully developed all of the

20    tests necessary to run on the small samples

21    collected from finger sticks and, therefore, was

22    having to use more of the tests that get run on the

23    larger venous-draw samples?

24              MR. JOHNSTONE:  Objection to form.

25       A    First of all, I don't know what the goal

Confidential

Page 136

1                    TRACY MASSON - CONFIDENTIAL

2        333, please.

3                (Whereupon, Bates document

4        MASSON-PFM-000006-11 was marked as

5        Plaintiff's Exhibit 333 for identification,

6        as of this date.)

7     BY MR. KAHN:

8        Q      You've been handed a document marked

9     Exhibit 333.

10               MR. KAHN:  For those of you joining us on

11        the phone, the next several exhibits are going

12        to be documents that Ms. Masson produced this

13        morning.

14               This document, Exhibit 333, first Bates

15        number is MASSON-PFM-6.

16     BY MR. KAHN:

17        Q      Do you recognize this as a document that

18     you provided to your attorney in response to the

19     subpoena?

20        A      Yes.

21        Q      Okay.  What is this document?

22        A      It's a response on CMS -- from CMS on the

23     California lab inspection.

24        Q      And did you have this document in your

25     personal possession?

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1                    TRACY MASSON - CONFIDENTIAL

2        A       I did.

3        Q       Why?

4        A       I -- I had a file at work that -- of

5   things that I would print and refer to them if they

6   were long, if they were detailed, and I brought

7   that home with me when I left the company.

8        Q       Why did you bring it home with you when

9   you left the company?

10       A       To refer back to it if I ever needed to.

11  I also didn't really go through the folder very

12  much.

13       Q       Did you tell anyone at Theranos you were

14  taking it with you when you left?

15       A       Nope.

16       Q       Did you tell Ms. Ramamurthy?

17       A       No.

18       Q       Did you talk to Ms. Ramamurthy when you

19  left the company?

20       A       I talked to her -- yeah.

21       Q       Okay.  And did she instruct you that you

22  shouldn't take any Theranos confidential materials

23  with you when you left?

24       A       I don't recall specifically saying that

25  to me.

Confidential

1                    TRACY MASSON - CONFIDENTIAL

2        Q     Okay.  Since you received the subpoena,

3    has anyone from Theranos contacted you about your

4    having these documents in your possession?

5        A     No.

6        Q     Did you turn over the originals to your

7    lawyer or just copies of them?

8        A     They would've been printouts that I got

9    online.  So these are just -- yeah, I just gave

10   copies, scanned copies.

11       Q     So the Exhibit 333, is this a document

12   you have in electronic form?

13       A     No.  I had it -- I had it in paper.  I

14   scanned it to my attorney.

15       Q     I see.  So you still have this document

16   and all other documents you produced at your home?

17       A     Yes.

18       Q     Okay.  And to be clear, no one from

19   Theranos ever told you at any time, including

20   through today, that there was anything improper

21   about you having any of the documents you've

22   produced today in your personal possession since

23   you left Theranos?

24       A     I don't recall talking to anybody about

25   documents.

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 139

                    TRACY MASSON - CONFIDENTIAL

1

2       Q       So the answer to my question is yes?

3       A       Say the question again.

4       Q       No one from Theranos ever told you at any

5   time, including through today, that there was

6   anything improper about you having any of the

7   documents that you have produced today in your

8   personal possession since leaving Theranos?

9       A       Since leaving Theranos, no.

10      Q       Why did you print out and put in a folder

11  this particular document, Exhibit 333?

12      A       So at the time, you know, we were -- I

13  wanted to know what this was.  I -- you know, I

14  wanted to understand what was in it, and I would

15  print it to be able to go back to it.  It's

16  complicated information.  Obviously, I wanted to

17  understand it.  It's a big deal for the company.

18              So I put it in a folder and I -- I

19  probably read it at the time, put it in the folder,

20  set it aside.

21      Q       Why is this document, Exhibit 333, a big

22  deal for the company?

23      A       It talks about proposed sanctions from

24  CMS.

25      Q       And what -- would you have an

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 140

1                    TRACY MASSON - CONFIDENTIAL

2      understanding of what those sanctions were?

3         A      Yes.

4         Q      What were they?

5         A      It -- it -- can I refer to it?

6         Q      Sure.

7         A      So I think it talks in here -- this talks

8      about the actual deficiencies that we had.  I don't

9      know if it talks about proposed sanctions.

10               Oh, yeah, it does back here.  So it could

11     be stopping reimbursement of Medicare, a money

12     penalty, limitations of the ability to do hematology

13     tests, things like that.

14        Q      This letter relates to Theranos'

15     laboratories in both Arizona and California?

16        A      No, this would have been just California.

17        Q      Okay.  And at the time, in March 2016,

18     you were the VP of operations?

19        A      No.

20        Q      No?  When do you become VP of operations?

21        A      I think it was in May.

22        Q      Okay.

23        A      It -- it coincided with when Sunny

24     stepped down as COO and president.

25        Q      Got it.

Confidential

1                    TRACY MASSON - CONFIDENTIAL

2              To your knowledge, is anything in this

3     letter, Exhibit 333, inaccurate?

4        A    I'm -- I don't know.

5        Q    Okay.  Do you ever -- during your time at

6     Theranos, did you ever work from home?

7        A    Yes.

8        Q    And how frequently, roughly?  Daily

9     basis?  Weekly?  Monthly?

10       A    Well, if it had to do -- I mean, I

11    probably answered E-mails at night or in the

12    morning, daily.

13       Q    Okay.  So you worked from home at least a

14    little bit on a, roughly, daily basis while at

15    Theranos?

16       A    Uh-huh.  Yes.

17            Sorry.  I promise by the end of the day,

18    I'll get it.

19       Q    And when you worked from home, do you

20    sometimes use your personal laptop computer?

21       A    Not usually, no.

22       Q    Why is that?

23       A    I can't say that I ever did.

24       Q    Do you have a Theranos laptop computer?

25       A    Not anymore.

Confidential

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

Page 142

1                    TRACY MASSON - CONFIDENTIAL

2        Q      Did you at the time?

3        A      I did.

4        Q      And you took it home with you?

5        A      Yes.

6        Q      Every night?

7        A      Yes, pretty much.

8        Q      Okay.  Do you ever remember a time when

9    you didn't have your Theranos laptop at home with

10   you and you needed to do some Theranos work?

11       A      I don't recall, but it -- it may have

12   happened.  But I almost always had my Theranos

13   computer with me.

14       Q      Okay.  And did you ever do any Theranos

15   work, like responding to E-mails or sending text

16   messages from your personal mobile phone?

17       A      Not that I recall.

18       Q      Did you have a Theranos-issued mobile

19   phone?

20       A      Yes.

21       Q      Okay.  And did you ever do any work for

22   Theranos -- strike that.

23              Did you ever use your personal E-mail

24   account for Theranos business?

25       A      No.

Confidential

Case 5:16-cv-06822-NC   Document 138   Filed 08/11/17   Page 56 of 170
* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 143

1                   TRACY MASSON - CONFIDENTIAL

2       Q       You're sure?

3               MR. JOHNSTONE:  Objection.

4       A       If -- if somebody personal to me, purely

5    personal, was giving me feedback on their Theranos

6    ex- -- experience or asking me questions, then it's

7    possible Theranos came up in my personal E-mail,

8    but I -- I don't recall ever using my personal

9    E-mail for Theranos business.

10      Q       Did you ever send yourself -- you know,

11   sometimes you might send yourself E-mails to your

12   personal address from your Theranos address for

13   things you wanted to look at a different time?

14      A       No.

15      Q       Okay.  Have you ever sent text messages

16   as part of your Theranos work?

17      A       Yes.

18      Q       And did you ever use a personal phone for

19   that?

20      A       I don't recall ever doing that.

21      Q       Are you're sure you never did that?

22      A       I -- I left my phone in the airport one

23   time, so I had to contact the IT team to tell them

24   to close that phone down.  And that was it.  And if

25   my team needed to get ahold of me, but I -- they

Confidential

Case 5:16-cv-06822-NC Document 138 Filed 08/11/17 Page 57 of 170
* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 144

1          TRACY MASSON - CONFIDENTIAL

2    reissued the phone as soon as they could.

3       Q    What about texting from your personal

4    phone --

5       A    No, there wouldn't be any reason to do

6    that.

7       Q    Let me finish.

8       A    Sorry.

9       Q    For example, texting from your personal

10   phone, I'm running late to a meeting, can we talk

11   in 10 minutes?  Anything like that?

12      A    I don't recall that.

13      Q    Okay.

14           MR. KAHN:  Let's mark Exhibit 334,

15      please.

16           (Whereupon, Bates number is

17      MASSON-PFM-000012-44 was marked as

18      Plaintiff's Exhibit 334 for identification,

19      as of this date.)

20   BY MR. KAHN:

21      Q    You've been handed a document marked

22   Exhibit 334.  It's a July 17, 2016 letter from CMS.

23   First Bates number is MASSON-PFM-12.

24           Do you recognize this as a document you

25   turned over to your lawyer to produce in response to

Confidential

Page 145

1                    TRACY MASSON - CONFIDENTIAL

2    the subpoena?

3        A     I do.

4            MR. JOHNSTONE:  One -- one note.  I think

5        you said "July 17th," and it's "July 7th" on

6        the face of the document.

7            ATTORNEY1:  I agree with you.  It is

8        July 7th.  Thank you.

9    BY MR. KAHN:

10       Q     What is this document, Ms. Masson?

11       A     I believe this is the notice that CMS was

12   issuing sanctions --

13       Q     Okay.

14       A     -- to Theranos.

15       Q     And -- and is this relating only to the

16   California lab or to the Arizona lab as well?

17       A     It's about the California lab.  The

18   revocation of or -- where is it?  There's a piece

19   of this that if -- that would impact the Arizona

20   lab potentially too.

21       Q     Okay.  And at this time period,

22   July 2016, you were the VP of operations, right?

23       A     Yes.

24       Q     And so at least from an operations

25   perspective the CLIA lab in California fell under

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

1                    TRACY MASSON - CONFIDENTIAL

2    your responsibilities, correct?

3        A    True.

4        Q    Okay.  So do you have an understanding of

5    why CMS imposed the sanctions reflected in

6    Exhibit 334?

7        A    Generally.

8        Q    What -- what do you know?

9        A    Well, there's a lot of details behind

10   that.  So I understood that they had a lab

11   inspection that did not go well.  They had -- they

12   had responded a few times to -- I don't know

13   exactly how many or the details behind it, and CMS

14   did not accept their responses.

15       Q    Now, as the VP of operations at this

16   time, didn't you feel like it was your -- partially

17   your responsibility that this happened?

18       A    No.

19       Q    Why not?

20       A    I wasn't over the lab when the inspection

21   took place or before that.

22       Q    Were you involved in the efforts to

23   attempt to avoid the imposition of sanctions?

24       A    I was not.

25       Q    No role whatsoever?

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 147

1                    TRACY MASSON - CONFIDENTIAL

2       A      No.   Some of my -- the people who worked

3    for me helped out with documents in California, but

4    I was not involved.

5       Q      Okay.   And why did you have this document

6    in your personal possession?

7       A      It was important to the company.   I

8    wanted to review it.   I don't like to review long

9    documents or detailed documents like this online.

10   So I'd print them out, and I printed them out at

11   work and had them in a folder.

12      Q      Okay.

13             MR. KAHN:   Three hundred thirty-five,

14      please.

15             (Whereupon, Bates number is

16      MASSON-PFM-000059-62 was marked as

17      Plaintiff's Exhibit 335 for identification,

18      as of this date.)

19             THE WITNESS:   Thank you.

20   BY MR. KAHN:

21      Q      You've been handed a document marked

22   Exhibit 335.   This is a letter on Theranos'

23   stationery, dated March 1, 2015.   Bates number is

24   starting MASSON-PFM-000059.

25             Do you recognize this as a document that

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 148

1                    TRACY MASSON - CONFIDENTIAL

2      you provided to your counsel in response to the

3      subpoena?

4           A      Yes.

5           Q      And what's -- what's this document about?

6           A      I believe this is a document, a letter

7      that Elizabeth sent to the FDA basically supporting

8      the FDA -- working with the FDA to get tests

9      approved.

10          Q      Okay.  And why did you have this document

11     in your possession?

12          A      At the time, it was an important

13     document.  It was noteworthy.  It was important.

14          Q      In what way?

15          A      We as a company were saying that we

16     really wanted to work with the FDA for our tests to

17     be approved.

18          Q      Do you know anything about submissions

19     the company made to the FDA?  Applications to the

20     FDA?

21          A      No.

22          Q      Outside your job?

23          A      Yes.

24          Q      Okay.

25                 MR. KAHN:  Three hundred thirty-six,

Confidential

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

Page 149

1                    TRACY MASSON - CONFIDENTIAL

2          please.

3                    (Whereupon, Bates number is

4          MASSON-PFM-000056 was marked as Plaintiff's

5          Exhibit 336 for identification, as of this

6          date.)

7          BY MR. KAHN:

8          Q      Ms. Masson, you've been handed a document

9     marked Exhibit 336.  (Handing.)

10                 This is -- it appears to be part of an

11    E-mail chain.  The top-level E-mail is dated

12    March 31, 2014.  The Bates number is MASSON-PFM-56.

13                 Do you recognize this as a document that

14    you provided to your counsel in response to the

15    subpoena?

16         A      Yes.

17         Q      And am I correct that the fact that at

18    the top of the E-mail your name appears above a

19    black line -- that this is a document that you

20    printed out and had in hard copy?

21         A      Yes.

22         Q      Okay.  I draw your attention to the

23    bottom of the page where it says "Page 154."

24                 Do you see that?

25         A      Yes.

Confidential

Page 150

1            TRACY MASSON - CONFIDENTIAL

2      Q      Okay.  Is this document part of a larger

3  collection of documents you printed all at once?

4      A      I don't -- I don't know.  It -- it might

5  have been part of my -- like, a personnel folder

6  that I had, but I don't recall how I got it in hard

7  copy.  I mean, I'm sure I printed it.  I just don't

8  know what it was with.

9      Q      Were there some documents that you

10  provided to your counsel that weren't provided to

11  us?

12      A      I don't know.

13            MR. KAHN:  Chris?

14            MR. JOHNSTONE:  We've provided a complete

15      response to the subpoena subject to the

16      responses and objections that we provided to

17      you on Monday.

18            MR. KAHN:  Oh, yeah.  You did objections

19      and responses this time.

20            MR. JOHNSTONE:  Correct, Counsel.

21            MR. KAHN:  That's right.  I forgot.

22  Okay.

23  BY MR. KAHN:

24      Q      So what's going on in this E-mail chain?

25      A      Oh, so this -- I don't -- I honestly

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1            TRACY MASSON - CONFIDENTIAL

2    don't know why I have this in a hard copy.  But at

3    the time, it was initially a huge deal to me and

4    then ended up very funny because, frankly, Sunny

5    would -- just like everybody could -- fat finger on

6    an iPhone.  And so he was basically telling me down

7    here that we had an issue with something that one

8    of my phlebotomists did collecting a sample, and

9    you can see he said -- he's trying to say, we have

10   death with that error on our end.

11       Q     Uh-huh.

12       A     And I was trying to get ahold of him, but

13   it became clear that the issue wasn't -- I mean,

14   he -- he was kind of going on with it.  He's like,

15   I'll talk to you later, I'll talk to you later.

16   Which wasn't a huge deal because it ended up not

17   being death, and he didn't understand what he

18   wrote.

19            So when I did get to talk to him, I

20   pointed it out and he, just like he said, he's like,

21   I'm having a heart attack just reading this because

22   I didn't under- -- I mean, he's so focused on

23   patient care that this was just a strange set of

24   circumstances that at the end of it, knowing that it

25   wasn't what it seemed like, it was funny.

Confidential

Case 5:16-cv-06822-NC   Document 138   Filed 08/11/17   Page 65 of 170
* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 152

1                   TRACY MASSON - CONFIDENTIAL

2        Q     I see.  Okay.

3              MR. KAHN:  Let's make this 337, please.

4              (Whereupon, Bates number is

5        MASSON-PFM-000057 was marked as Plaintiff's

6        Exhibit 337 for identification, as of this

7        date.)

8        BY MR. KAHN:

9        Q     You've been handed a document marked

10   Exhibit 337.  (Handing.)

11             This is an E-mail, top level July 11,

12   2014, Bates Number MASSON-PFM-57.

13             This is something that you produced to

14   your lawyers in response to the subpoena?

15       A     Yes.

16       Q     Okay.  What's going on here?

17       A     I -- I think the first part of this is

18   periodically Sunny would ask me how many

19   phlebotomists we had.  And he had a list, and I had

20   a list.

21             And at one point he said, well, what

22   happened -- I think in this E-mail chain, he

23   probably said, what happened to this person or that

24   person?

25             And I'm like, no, this is the real number,

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 153

TRACY MASSON - CONFIDENTIAL

1   

2   here's who went -- here's who came, blah, blah,

3   blah.  And that's why I said, don't mess with me and

4   my team because I knew who was on my team.

5           And then, you know, he just -- we had a --

6   we had a good relationship, and he was giving good

7   feedback on what I was doing.  And I was telling

8   him, look, I love my job.

9           You know, it was -- it was -- it was a

10  great job.  It was a great place to work.  He was a

11  great boss, and we just had a moment here.  So I

12  think I kept it.

13      Q    Did you like working for Mr. Balwani?

14      A    I did.

15      Q    Why?

16      A    He was passionate.  He -- he cared about

17  what we were attempting to do on a mission -- from

18  a mission perspective.  He really cared about

19  employees.  He was direct, which I appreciate.

20  I -- he -- he was just -- he was a good person to

21  work for.

22      Q    Okay.  In the second E-mail from the

23  bottom of this chain -- that's the first E-mail

24  written by Mr. Balwani.

25      A    Uh-huh.

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 154

TRACY MASSON - CONFIDENTIAL

1

2     Q     At the end, he references, "short-term

3  challenges thrown at you by WAG."

4     A     Uh-huh.

5     Q     Do you see that?

6     A     Yes.

7     Q     Do you know what he was referring to

8  there?

9     A     I don't know, specifically.  I mean, I

10  think that there -- at the time I can tell you

11  there -- since this was the time period when we

12  were bringing up the 40 stores, there were

13  construction issues.  Any -- any number of things

14  that you have with a launch.  Construction issues.

15  A lot of times our patients would complain about

16  the cleanliness of the bathrooms at Walgreens, so

17  it was a constant battle about cleaning bathrooms,

18  making sure the rooms were clean.  So -- and it

19  wasn't -- it was not always well received and

20  tackled by Walgreens.

21            MR. LAZARUS:  (Handing.)

22            MR. KAHN:  I don't want to do that one.

23            Let's get this one.  Whatever's next.

24            THE REPORTER:  338.

25            MR. KAHN:  Okay.

Confidential

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

Page 155

TRACY MASSON - CONFIDENTIAL

1

2          (Whereupon, Bates number is

3     MASSON-PFM-000189-200 was marked as

4     Plaintiff's Exhibit 338 for identification,

5     as of this date.)

6   BY MR. KAHN:

7     Q    Ms. Masson, you've been handed a document

8   marked Exhibit 338.  (Handing.)

9          It's a January 8th, 2014 letter that also

10  has, I think, an attachment to it, at least some

11  exhibits.

12    A    Yes.

13    Q    And the Bates numbers starts with

14  MASSON-PFM-189.

15         Do you recognize this as a document you

16  gave to your attorneys in response to the subpoena?

17    A    Yes.

18    Q    Okay.  And is this your offer letter from

19  Theranos?

20    A    Yes.

21    Q    Okay.  In the first paragraph of the

22  first page, it says that you got a conditional

23  offer of employment.  Do you see that?

24    A    Yes.

25    Q    Do you know what it was conditioned on?

Confidential

Case 5:16-cv-06822-NC  Document 138  Filed 08/11/17  Page 69 of 170
**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

Page 156

1                  TRACY MASSON - CONFIDENTIAL

2        A     No.

3        Q     Okay.  Look down, fourth paragraph.  Do

4   you see it says, "Please be advised that our offer

5   of employment is conditioned upon your signing the

6   at-will employment, confidential information, and

7   invention assignment agreement."

8              Do you see that?

9        A     Yes, I see that.

10       Q     Did you sign that document?

11       A     Yes.

12       Q     Go to the second page.

13       A     (Witness complies.)

14       Q     Do you see it says there up at the top:

15   "In the event of termination of your employment

16   with the company or at any other time at the

17   company's request, you agree to deliver promptly to

18   the company all property of the company that is in

19   your possession or control."

20             Do you see that?

21       A     Yes.

22       Q     But you didn't do that when you left the

23   company because you took that folder of documents

24   with you?

25       A     I did take that folder, yes.

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1               TRACY MASSON - CONFIDENTIAL

2       Q       Yeah.  So that was inconsistent with this

3   obligation?

4       A       Looks like it.

5       Q       But just to be clear, to date, Theranos

6   has not attempted to enforce that obligation as to

7   the documents that you've produced here, right?

8       A       Absolutely not.  They have not contacted

9   me.  And the documents, other than the E-mails, are

10  public.

11      Q       Okay.

12              MR. KAHN:  338.

13              THE REPORTER:  9.

14              MR. KAHN:  9.

15              (Whereupon, Bates number is

16          MASSON-PFM-126 was marked as Plaintiff's

17          Exhibit 339 for identification, as of this

18          date.)

19      BY MR. KAHN:

20      Q       You've been handed a document marked

21  Exhibit 339.  (Handing.)

22              This is a document titled "Separation

23  Agreement and Release"?

24      A       Yes.

25      Q       First Bates number is MASSON-PFM-126.

Page 158

1                    TRACY MASSON - CONFIDENTIAL

2              Do you see that?

3       A       Yes.

4       Q       And is this the agreement you signed with

5    Theranos upon leaving the company?

6       A       Yes.

7       Q       Okay.  Go to the Exhibit B to this

8    agreement.  It's the page ending in 136.

9       A       (Witness complies.)

10      Q       Do you know what's reflected in this

11   three-page chart?

12      A       I believe it is the ages and positions of

13   people who were in the same reduction of force as I

14   was.

15      Q       Thank you.

16              MR. KAHN:  Let's make this 340, please.

17              (Whereupon, Bates number is

18        MASSON-PFM-000186-188 was marked as

19        Plaintiff's Exhibit 340 for identification,

20        as of this date.)

21      BY MR. KAHN:

22      Q       Ms. Masson, you've been handed a document

23   marked Exhibit 340.  (Handing.)

24              It's a letter dated September 8, 2015.

25   It's three pages long, and it has a Bates number

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 159

1                    TRACY MASSON - CONFIDENTIAL

2    starting with MASSON-PFM-186.

3                Do you recognize this as a document that

4    you produced to your lawyers in response to the

5    subpoena?

6        A     I do.

7        Q     What is going on in this document?

8        A     This was related to a Siemens recall for

9    reagent for an A1c test.

10       Q     What does that all mean?

11       A     So reagent is what you -- is something

12   that you buy to use for a test assay.  A1c is a

13   test.  Siemens did a recall on the reagent that

14   they sold us for that test.

15               And then in here, in general, it's talking

16   about the fact that -- that there was this issue --

17   that you're eligible -- because of that, you're

18   eligible to receive complimentary retesting.  We

19   will only resume using that analyzer and assay once

20   we're satisfied that Siemens has fully addressed and

21   resolved the current issues.

22       Q     So in this time period, September 2015,

23   Theranos was buying reagents from Siemens for use

24   in blood testing?

25       A     Yes.

Confidential

Case 5:16-cv-06822-NC   Document 138   Filed 08/11/17   Page 73 of 170
* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 160

1                     TRACY MASSON - CONFIDENTIAL

2        Q       Okay.  And to your knowledge, during this

3    time period, was Theranos also making any of its

4    own reagents for use in patient blood testing?

5        A       I don't know the answer to that.

6        Q       Okay.  Do you recall, roughly, in

7    September 2015 how much money Theranos was spending

8    on a monthly basis on buying reagents from

9    companies such as Siemens?

10       A       I didn't know that at that time.

11       Q       That was Mr. Shadpour's area?

12       A       Yes.

13       Q       Because you did that job in your prior

14   job but not anymore?

15       A       Right.

16       Q       Okay.

17       A       "Prior job" meaning prior company?

18       Q       Right.

19       A       Yes.

20       Q       That's what I meant.  Okay.

21               If you look down to the bullet points on

22   the first page, do you see that?

23       A       Yes.

24       Q       It says here:  "Theranos has ceased use

25   of the Siemens analyzer and assay."

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 161

1              TRACY MASSON - CONFIDENTIAL

2          So first question, where it says "Siemens

3   assay," in your mind is that the same as the

4   reagent?

5      A     It's -- the reagent is a -- is a -- is a

6   physical thing.  The assay, in my terms, would

7   include the process around using that and the

8   equipment.

9      Q     Okay.  And just to be clear, in

10  September 2015, Theranos was using the Siemens

11  hemoglobin A1c assay; is that correct?

12     A     In the Arizona lab.

13     Q     Okay.  And do you know what they were

14  doing in the California lab?

15     A     I don't.

16     Q     Okay.

17     A     I don't recall.

18     Q     Okay.  And also in September 2015,

19  Theranos was using a Siemens-made analyzer in the

20  Arizona lab to conduct the hemoglobin A1c test,

21  correct?

22     A     I -- so I don't know if we were back to

23  using Siemens at that point this September.  I

24  don't recall the time frame because there was a

25  period of time when tests were being sent out.

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 162

1                    TRACY MASSON - CONFIDENTIAL

2       Q       Let me ask it a little differently.

3               Did you ever recall hearing that Theranos

4    was making its own blood analyzer?

5       A       I knew -- I knew there was equipment that

6    we had that would analyze blood.

7       Q       Okay.  But that -- I'll call it a

8    Theranos analyzer.  Okay?

9       A       Okay.

10      Q       Am I correct that, during your time at

11   Theranos, the Arizona lab never used Theranos

12   analyzers to analyze patient blood?

13              MR. JOHNSTONE:  Objection to form.

14      A       That is accurate.

15      Q       Okay.  In other words, during your time

16   at Theranos, Theranos only used third-party

17   manufactured analyzers such as Siemens analyzers to

18   test customer blood, correct?

19      A       One clarification there.  That's all we

20   had in the Arizona lab.  That doesn't mean that we

21   didn't test them in the California lab.

22      Q       Sure.  And let me -- let me ask my

23   question better because I meant to include that

24   qualifier.

25              During your time at Theranos in the

Confidential

1                    TRACY MASSON - CONFIDENTIAL

2    Arizona lab, Theranos only used third-party

3    manufactured analyzers, such as Siemens analyzers,

4    to test customers' blood, correct?

5        A      Correct.

6        Q      Okay.  Do you recall roughly how many

7    third-party analyzers were in use in the Arizona

8    lab at any given time during your time there?

9               MR. JOHNSTONE:  Objection to form.

10       A      I don't know.  I don't know.

11       Q      More than 10?

12       A      Yes.

13       Q      More than 20?

14       A      I don't think so.  I don't remember.

15       Q      Okay.

16              MR. KAHN:  341.

17              COURT REPORTER:  341.

18              MR. KAHN:  Okay.

19              (Whereupon, Bates number is

20        MASSON-PFM-0003310348 was marked as

21        Plaintiff's Exhibit 341 for identification,

22        as of this date.)

23    BY MR. KAHN:

24       Q      Ms. Masson, you've been handed a document

25    marked Exhibit 341.  (Handing.)

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 164

1                    TRACY MASSON - CONFIDENTIAL

2              This appears to be a series of photocopies

3    of business cards.  The Bates numbers start with

4    MASSON-PFM-331.

5              Do you recognize this as something you

6    provided to your counsel in response to the

7    subpoena?

8         A    Yes.

9         Q    And what are we looking at here?

10        A    Business cards I had from just doing

11   business with different people.

12        Q    And on the front page, for example, there

13   are three Siemens business cards?

14        A    Yes.

15        Q    And did you have those business cards

16   because the Arizona lab was running mood tests on

17   Siemens ana- -- Siemens analyzers?

18        A    Yes.

19        Q    And using Siemens assays?

20        A    Yes.

21        Q    Okay.  Do you recall roughly how much

22   money Theranos paid you at the time you left the

23   company in December 2016?

24        A    Paid me for what?

25        Q    Total.

Confidential

Page 1

1                 IN THE COURT OF CHANCERY STATE OF DELAWARE

2

3      PARTNER INVESTMENTS, L.P., a        )
       Delaware limited partnership, PFM )
4      HEALTHCARE MASTER FUND, L.P., A    )
       Cayman Islands limited             )
5      partnership, and PFM HEALTHCARE    )
       PRINCIPALS FUND, L.P., a Delaware )
6      limited partnership,               )
                                          )
7                     Plaintiffs,         )
                                          ) C.A. No. 12816-VCL
8           vs.                           )
                                          ) Volume I
9      THERANOS, INC., a Delaware         )
       corporation, ELIZABETH HOLMES, an )
10     individual, and RAMESH BALWANI, an)
       individual, and DOES 1 - 10,      )
11                                        ) Pages 1 to 211
                      Defendants.         )
12     _____)

13

14

15

16

17

18           VIDEOTAPED DEPOSITION OF ASHKON NIROOMAND

19                      San Diego, California

20                   Wednesday, March 15, 2017

21

22

23

24     Reported by:
       ELIZABETH BORRELLI, CSR No. 7844, CCRR, CLR
25     Job NO: 120802

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 21

```
 1              MS. JEFFRIES:  Objection to form.

 2    BY MS. HENRY:

 3         Q.   Did you produce documents in response to

 4    the subpoena that is Exhibit 3- -- 370?

 5         A.   I was not asked to produce documents with

 6    respect to the subpoena.

 7         Q.   Oh.  Do you see see page 9 of

 8    Exhibit 370 --

 9         A.   Yes.

10         Q.   -- where it says, under part B, "Document

11    Requests"?

12         A.   Yes.

13         Q.   And it seeks communications concerning

14    alleged misconduct at Theranos?

15         A.   Yes.

16         Q.   Yes.

17              MS. HENRY:  Okay.  Let me mark

18    Exhibit 371.

19              (Whereupon Exhibit 371 was marked for

20              identification.)

21    BY MS. HENRY:

22         Q.   Do you recognize Exhibit 371?

23         A.   Yes, I do.

24         Q.   And what is Exhibit 371?

25         A.   It is a screenshot of a review on
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 106

1    suppressing these allegations from spreading to the

2    public."

3             What did you mean by that statement?

4             MS. JEFFRIES:  Objection to form.

5             THE WITNESS:  I believe that the statement

6    was self-explanatory in that in -- from the -- my

7    personal opinion in the lab, there was an aggressive

8    effort to figure out who wrote it and almost no

9    effort to alleviate the concerns brought up to those

10   in the lab.

11   BY MS. HENRY:

12       Q.   Who was trying to find out who wrote the

13   glass door review at Theranos?

14       A.   Sunny Balwani.

15           MS. JEFFRIES:  Objection to form.

16   BY MS. HENRY:

17       Q.   Was there anybody else trying to

18   find -- strike that.

19           Was there anyone other than Sunny Balwani

20   trying to find out who wrote the glass door review?

21       A.   To --

22           MR. ZOLLAR:  Objection to form.

23           THE WITNESS:  To the best of my knowledge,

24   no.

25   BY MS. HENRY:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 1

1              IN THE COURT OF CHANCERY STATE OF DELAWARE

2                          ---oOo---

3

4     PARTNER INVESTMENTS, L.P.
      a Delaware limited
5     partnership, PFM HEALTHCARE
      MASTER FUND, L.P., a Cayman
6     Islands limited partnership,
      and PFM HEALTHCARE PRINCIPALS
7     FUND, L.P., a Delaware limited
      partnership,

8

                     Plaintiffs,
9

10    vs.                              C.A. No. 12816-VCL

11    THERANOS, INC., a Delaware
      corporation, ELIZABETH HOLMES,
12    an individual, RAMESH BALWANI,
      an individual, and DOES 1 - 10,

13

                     Defendants.
14    _____/

15

16

17        VIDEOTAPED DEPOSITION OF ANTHONY NUGENT

18             SAN FRANCISCO, CALIFORNIA

19           WEDNESDAY, FEBRUARY 8, 2017

20

21

22    BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23    CSR LICENSE NO. 9830

24    JOB NO. 120808

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 9

1      Q    Do you recognize this as the subpoena that

2   you received and that you're here to testify in

3   response to today?

4      A    Yes, I do.

5      Q    Okay.

6      A    Yeah.

7      Q    And did you produce some documents in

8   response to the subpoena?

9      A    Yes, I did.  I searched for documents, and

10  everything I found, I turned over to you.

11     Q    Okay.  Great.

12          And, I'm going to show you those documents --

13     A    Sure.

14     Q    -- in a couple of batches so that you can

15  tell us what they are.

16     A    Sure.

17          MR. KAHN:  So, can I get Tab 12, please.

18          We'll mark this as 213.

19          (Document marked Exhibit 213

20           for identification.)

21          MR. KAHN:  Thanks.  Okay.

22     Q    You've been handed a document marked

23  Exhibit 213.

24          Do you recognize this document as being a

25  series of e-mails between you and Mona Ramamurthy of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 10

1    Theranos, as well as some e-mails with an attorney?

2         A    Yes, and an accountant.

3         Q    And an accountant?

4              Okay.  Great.

5         A    Yes.

6         Q    Thank you.

7              And, you sent and received those e-mails?

8         A    Yes.

9         Q    Okay.  You can put those to the side.

10             MR. KAHN:  Get Tab 13.  You can just hand me

11   one copy, and you can pass the rest of them.

12             We'll mark this as Exhibit 214, please.

13             (Document marked Exhibit 214

14              for identification.)

15             MR. KAHN:  You've been handed now a document

16   marked Exhibit 214.

17        Q    Do you recognize this as documents that

18   Theranos provided you at the time you departed the

19   company on or around August 25th, 2013?

20        A    Yes, yes.

21        Q    Okay.

22        A    Yeah, I just checked the second page, so I

23   recognize the...

24        Q    Do you see on -- go ahead and keep that

25   document in front of you.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 11

1     A    Sure.

2     Q    Do you see on the first page where, under the

3  heading "Confidentiality," the second sentence says:

4          "During your employment as vice president

5  product development with Theranos from July 2, 2007,

6  to August 25, 2013" --

7          Do you see that?

8     A    Yes.

9     Q    Was your title at Theranos vice president of

10 product development for your whole time there?

11    A    I -- based on this document, that's what I

12 believe.  I was not sure when I was there for a number

13 of years what my title was, though.

14    Q    Okay.

15    A    Yeah.

16    Q    But, you did at least at some point have the

17 title of vice president?

18    A    Yes, I did.  Yes, yes, yes, yeah, yeah, yeah.

19 I wasn't sure if they had changed it.  Sorry.

20    Q    No problem.

21    A    Yeah.

22    Q    If you'd go to the second page.

23    A    (Witness complies.)

24         Yeah.

25    Q    And -- and for the record, by the way --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 12

1    we're supposed to do this, and I failed to.

2          Exhibit 213 was Bates numbered Nugent '1 to

3    Nugent '9.

4          And this Exhibit 214 is Bates numbered

5    Nugent '10 to Nugent '23.

6          So, if you'd look at the second page, which

7    has a mark Nugent '11.  You'll see we put that on

8    there --

9    A    (Witness complies.)

10         Yes.

11   Q    -- just for convenience.

12         In the second paragraph, the letter from

13   Ms. Ramamurthy to you says:

14         "We reserve the right to notify your

15   subsequent employer about these obligations."

16         And, do you understand that to be a reference

17   to confidentiality obligations?

18   A    Yes.

19   Q    And what do you understand this reservation

20   of rights, regarding notifying your subsequent

21   employer, to mean?

22   A    I perceived it as a form of threat.

23   Q    A form of a threat?

24   A    A threat that they would -- if I -- that they

25   could interfere with my subsequent employment if they

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 13

1    felt the need to.

2       Q    Did you ever hear, during your time at

3    Theranos, that Theranos, in fact, had made good on

4    this threat in --

5       A    Yes.  There was --

6       Q    Mr. Nugent, make sure you let me finish.

7       A    Sorry.  Yeah.

8       Q    I know you know where I'm going --

9       A    Okay.  Sorry.

10      Q    -- with this, for the record.

11      A    Yeah.

12      Q    So, did you ever hear, during your time at

13   Theranos, that Theranos, in fact, had made good on

14   this threat to interfere with an employee's subsequent

15   employment?

16      A    Yes.

17      Q    What did you hear?

18      A    There was an employee of mine -- sorry.  His

19   name escapes me just for a minute.  Anthony DeLaCruz.

20   Sorry.  And he had left the company, resigned; I mean,

21   not in adversarial circumstances.

22          And sometime subsequent to that, I heard from

23   other employees that they had sent a letter to his new

24   employer, stressing his confidentiality obligations,

25   or something to that effect, yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 14

1      Q    Did you hear anything else about that, like

2    the impact it had on his employment?

3      A    I don't know fully about his impact.

4           MR. MUGMON:  And Mr. Nugent, I apologize.  If

5    you could also give counsel here an opportunity to

6    object to any questions, that would be much

7    appreciated.

8           THE WITNESS:  So how do I do that?

9           MR. KAHN:   Q.   So here's the way to do this.

10   So --

11     A    Yeah.

12     Q    -- I ask the question, and you pause.

13     A    Okay.

14     Q    Pause just for a beat.

15     A    Okay.

16     Q    Make sure you heard my question, and you

17   think about your answer.

18     A    Okay.

19     Q    While you're doing that --

20     A    Yeah.

21     Q    -- Counsel gets a chance to say "object to

22   the form," which he may do.

23     A    Okay.  Got you.

24     Q    Now, if he says "object to the form," you can

25   still answer.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 15

1      A    Yes.

2      Q    But just kind of -- that's the procedural

3  kabuki --

4      A    He's objecting to your form of question?

5      Q    Exactly.

6      A    The form of your question?

7           Okay.  Not my answer?

8           MR. MUGMON:  I -- I appreciate that.

9           THE WITNESS:  Yeah.

10          MR. MUGMON:  And I will object to the form of

11  Mr. Kahn's last question.

12          THE WITNESS:  Okay.  Got you.

13          MR. KAHN:  Okay.

14     Q    Do you recall what the question was?

15     A    Yes.  It was, did I know of adversarial

16  consequences from the letter being received?

17          I -- I don't know the subsequent -- I don't

18  know anything beyond that the letter had been sent.

19     Q    Okay.  And, other than the experience that

20  Mr. DeLaCruz had --

21     A    Yeah.

22     Q    -- are you aware of any other instances in

23  which Theranos sent letters to subsequent employers of

24  Theranos' former employees?

25     A    Me personally, no.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

1    Q    Okay.

2    A    Yeah.

3    Q    You can put that document to the side.

4    A    Sure.

5         MR. KAHN:  We'll mark this as Exhibit 215.

6         (Document marked Exhibit 215

7          for identification.)

8         MR. KAHN:  And now, Mr. Nugent, you've been

9    handed a document marked Exhibit 215, which is Bates

10   numbered Nugent '24 to '28.  The title of the document

11   is:

12        "Tony Nugent, Theranos History,

13   4 November 2013."

14   Q    Is this something that you drafted?

15   A    Yes.

16   Q    And does this record your recollection of

17   certain events at the time that you worked at

18   Theranos?

19   A    Yes.

20        MR. MUGMON:  Objection as to form.

21        MR. KAHN:  Okay.

22   Q    And you drafted it around November 3rd, 2013?

23   A    Yes.

24   Q    Okay.  And were these events fresh in your

25   mind at that time because you recently had left

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 17

1    Theranos?

2        A    Yes.

3        Q    Okay.  If you'd take a look at the last

4    paragraph of the first page, which then goes on to the

5    second page, and then there's a subsequent paragraph

6    on the same topic.  Could you review those

7    two paragraphs, and then I have a question for you,

8    please.

9        A    So the last paragraph --

10       Q    Yeah, the --

11       A    -- on the first page, and the second --

12   through to the second para- -- the paragraph on the

13   second page?

14       Q    Right.

15            So starting --

16       A    Yeah.

17       Q    -- on the first page, the words "I also."

18       A    Yeah.

19       Q    And on the second page, going to "date on

20   that."

21       A    (Witness reading document.)

22            Yes.

23       Q    Okay.  What is the OSHA incident that you're

24   describing in this -- these two paragraphs?

25            MR. MUGMON:  Objection as to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 18

1              THE WITNESS:  We had, I believe, an employee

2      who was uncomfortable with the way we were handling

3      blood in the laboratories.  And I think she had

4      complained about it, and I think she was terminated.

5      And I think she complained -- I believe she complained

6      to Cal/OSHA.

7              So Cal/OSHA arrived at the Hillview facility

8      to do an inspection.  Elizabeth and Gary Frenzel, but

9      mainly Elizabeth, walked them around the building

10     during the inspection.

11             After the inspection -- I should back up a

12     small bit.

13             So, I think their -- their concern or the

14     employee's concern was to do with when you take the

15     top off of a test tube of blood, you can aerosolize

16     the blood.

17             And I -- I can recall my time when I worked

18     in Cholestech, we never seemed to really care about

19     that.  Some people would say, Well, if that's true,

20     why would you go to the bathroom?

21             So I -- you know, I mean, you know -- so it

22     may be -- but this employee was concerned and had been

23     terminated.  And so, based on that, we ended with a

24     Cal/OSHA inspection.

25             At the time, we didn't have any procedures,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 19

1    as far as I remember, in place, related to this

2    aerosolizing of blood.  I think it would be a concern,

3    for example, if you were working with blood that had

4    TB or something, this type of thing.

5         And -- but we had a glove box.  So a glove

6    box is a self-contained unit, and you put your hands

7    in and gloves inside.  That glove box was actually

8    used for filling reagents into vials to manufacture

9    the cartridges.  That -- that was the reason I

10   purchased that glove box.  It was not used for

11   handling blood.

12        I -- Elizabeth had told them that we were

13   using the glove box for that.

14        MR. KAHN:  I'm sorry.

15   Q    Just to clarify --

16   A    Sorry.

17   Q    -- by "Elizabeth," you mean Elizabeth Holmes?

18   A    Elizabeth Holmes.

19   Q    And, Ms. Holmes had told who that you were

20   using the glove box?

21   A    The inspectors or the investigators, I guess

22   they are.

23   Q    Okay.  And then what was it that Ms. Holmes

24   told the inspectors that Theranos was using the glove

25   box to do?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

Page 20

1     A    Test -- that was where they did the blood --
2    you know, handling the blood.
3     Q    So Miss -- Ms. Holmes told the Cal/OSHA
4    invest- -- inspectors --
5     A    Yeah.
6     Q    -- or investigators that Theranos was using
7    the glove box to handle blood that potentially had
8    infectious diseases that could be aerosolized?
9     A    Yes.
10         MR. MUGMON:  Objection as to form.
11         THE WITNESS:  Yes.
12         MR. KAHN:  Q.  And was that a true statement
13   by Ms. Holmes?
14    A    No.
15         MR. MUGMON:  Objection to form.
16         MR. KAHN:  Q.  And how do you know?
17    A    Because I purchased the box for filling
18   cartridges and reagents, and it was never, ever used
19   for handling blood.
20    Q    So, you witnessed Ms. Holmes lying to the
21   Cal/OSHA inspectors?
22    A    I believe so.
23         MR. MUGMON:  Objection as to form.
24         MR. KAHN:  Q.  Did you confront Ms. Holmes
25   about this?

Att. B - p. 83 of 160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

Page 29

1    certain exactly what they were going to do with me at

2    that point.

3         MR. KAHN:   Q.   Had you heard, as of

4    November 2013, of any instances where Theranos sent a

5    threatening letter to a former employee who had listed

6    Theranos on his or her résumé or LinkedIn page?

7         MR. MUGMON:   Objection as to form.

8         THE WITNESS:   I don't know exactly that I

9    could say that I know of a person.   I -- I don't

10   recall it right now.   There may have been, and I may

11   have been aware of it at the time.   But I don't recall

12   this day, this morning, yeah.

13        MR. KAHN:   Let me get the next tab, please.

14        We'll mark this Exhibit 216.

15        (Document marked Exhibit 216

16         for identification.)

17        MR. KAHN:   Mr. Nugent, you've been handed a

18   document marked Exhibit 216.   It's Nugent '29 to '30.

19    Q    Is this a copy of your résumé, sir?

20    A    Yes.

21    Q    And is this your résumé as of now, or as of

22   sometime in 2013?

23    A    This was a résumé I prepared to accompany the

24   previous document we discussed to -- to provide the

25   attorney that I asked for a consultation with at the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED     CERTIFIED COPY

```
 1        IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

 2                         ---o0o---

 3

 4

 5

 6        PARTNER INVESTMENTS, L.P., a          )
          Delaware limited partnership,         )
 7        PFM HEALTHCARE MASTER FUND,           )
          L.P., a Cayman Islands limited        )
          partnership, and PFM HEALTHCARE       )   Case No. C.A.
 8        PRINCIPALS FUND, L.P., a              )   NO. 12816-VCL
          Delaware limited partnership,         )
 9                                              )
                      Plaintiff,                )
10                                              )
                 vs.                            )
11                                              )
          THERANOS, INC., a Delaware            )
12        corporation, ELIZABETH HOLMES,        )
          an individual, RAMESH BALWANI,        )
13        an individual, and DOES 1-10,         )
                                                )
14                    Defendant.                )
                                                )
15

16

17

18                         ---o0o---

19             TUESDAY, FEBRUARY 28, 2017

20

21            VIDEOTAPED DEPOSITION OF

22           MONA BADANI RAMAMURTHY

                           ---o0o---
23

24        REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
          420899
25
```

SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1    A.    Theranos hasn't had much litigation.  The

2    only litigation that I can recall was at the

3    beginning of my tenure at Theranos, which is a

4    patent litigation.

10:03  5         So as a company in general, we haven't had

6    too much litigation, so I can't recall being

7    involved in any other interrogatory responses.

8         MS. BEDELL:  Let's mark the next exhibit.

9             (Reporter marked Exhibit No. 8 for

10:04 10            identification.)

11    Q.    BY MS. BEDELL:  The court reporter has

12    just handed you Exhibit No. 8, and while you take a

13    look at it, I will just note for the record that it

14    is titled:  "Notice of Subpoena."

10:05 15         You were served with a subpoena, correct?

16    A.    That's correct.

17    Q.    And you brought an envelope -- a manila

18    folder of documents today in response to the

19    subpoena, yes?

10:05 20    A.    My attorneys brought a manila folder with

21    the documents in response to the subpoena, correct.

22    Q.    Where did the documents responsive to the

23    subpoena come from, do you know?

24    A.    They came from my personal email account.

10:06 25    Q.    Let's mark Exhibit No. 9.

36

BARKLEY
Reporters

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1          (Reporter marked Exhibit No. 9 for

2          identification.)

3      Q.   BY MS. BEDELL:  Let me state for the

4   record that Exhibit No. 9 bears Bates No.

10:06  5   Ramamurthy-PFM-000001 to 2.

6          What is Exhibit No. 9?

7      A.   It appears to be a copy of my offer

8   letter.

9          However, I am not sure if this was my

10:07  10   initial offer letter or revised offer letter.  I

11   received two versions of offer letters from

12   Theranos, an initial offer letter and a revised

13   offer letter.

14      Q.   Let's mark Exhibit No. 10.

10:07  15          (Reporter marked Exhibit No. 10 for

16          identification.)

17      Q.   BY MS. BEDELL:  Exhibit No. 10 bears Bates

18   No. Ramamurthy-PFM-000003 to 4.

19          What is Exhibit No. 10?

10:08  20      A.   It appears to be a copy of my offer

21   letter.  Appears to be the same copy of my offer

22   letter as Exhibit No. 9.

23      Q.   And you're still not sure whether -- which

24   one is the final version or whether it is a final?

10:08  25      A.   I am not.  I believe, actually, in

37

BARKLEY
Court Reporters

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1  reviewing this, this looks to be the final offer

2  letter because it has my signature of acceptance at

3  the end.

4     Q.   That's Exhibit No. 10 that looks to be the

10:08  5  final version?

6     A.   Exhibit No. 10 is the final version.

7  Exhibit No. 9 is the offer letter without my

8  signature.  Exhibit No. 10 is my offer letter with

9  my signature, so my accepted offer letter and the

10:08 10  final version.

11     Q.   Let's mark Exhibit 11.

12          (Reporter marked Exhibit No. 11 for

13          identification.)

14     Q.   BY MS. BEDELL:  And Exhibit 11 bears Bates

10:09 15  No. Ramamurthy-PFM-000005 to 12.

16          Do you recognize that document?

17     A.   I do.

18     Q.   What is it?

19     A.   It is my separation agreement with the

10:09 20  company.

21     Q.   Let's mark Exhibit 12.

22          (Reporter marked Exhibit No. 12 for

23          identification.)

24     Q.   BY MS. BEDELL:  Exhibit 12 bears Bates No.

10:09 25  Ramamurthy-PFM-00013.

38

BARKLEY
Court Reporters

Confidential

1          What is Exhibit No. 12?

2     A.    It appears to be an email with the subject

3    "Letter."  There was likely an attachment to this,

4    which may be the next document that you have.

10:10  5     Q.    Mark Exhibit 13.

6                (Reporter marked Exhibit No. 13 for

7                identification.)

8     Q.    BY MS. BEDELL:  Exhibit No. 13 bears Bates

9    No. 0000 -- strike that.

10:10 10          Exhibit No. 13 bears Bates No.

11    Ramamurthy-PFM-000015.

12     A.    14 to 15.

13     Q.    14 to 15.  Thank you.

14          What is it?

10:11 15     A.    It looks like it was part of an exit

16    document or exit package that I was preparing for a

17    departing employee.

18     Q.    Can you take a look at this set of

19    documents and see whether that's a family, cover

10:11 20    letter and letters?

21     A.    Certainly.  Yes, it looks to be an email

22    with attachments.

23     Q.    Let's have the court reporter mark that as

24    Exhibit No. 14.

10:11 25                (Reporter marked Exhibit No. 14 for

39

BARKLEY
Court Reporters

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1          identification.)

2          Q.   BY MS. BEDELL:   Exhibit No. 14 bears Bates

3     No. Ramamurthy-PFM-000016 to 19, correct?

4          A.   That's correct.

10:12  5          Q.   And what is Exhibit No. 14?

6          A.   Exhibit 14 is an email with copies of my

7     review letters memorializing my merit increases at

8     the company.

9          Q.   Okay.   Can you please take a look at these

10:12 10    set of documents and confirm that they are a

11    family.

12          A.   I believe it is a family.   It looks as

13    though the attachments are duplicates.   So I am not

14    sure if there was one attachment to this email or

10:13 15    two, but it appears to be a family.

16          Q.   Let's mark that as Exhibit 15.

17               (Reporter marked Exhibit No. 15 for

18               identification.)

19          Q.   BY MS. BEDELL:   Exhibit 15 bears Bates

10:13 20    Nos. Ramamurthy-PFM-000019 [verbatim] to 22.

21               What is Exhibit No. 15?

22          A.   They are the exit documents that I spoke

23    about earlier.   This one has my signature on it.

24    The one previously did not have my signature on it.

10:14 25          Q.   Can you please take a look at that set of

40

BARKLEY
Court Reporters

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1    documents and let me know whether you believe them

2    to be a family?

3         A.   I don't believe these are a family.  As I

4    recollect, I believe these COBRA documents were --

10:14  5    they were separate, but these may be a family --

6         Q.   Okay.

7         A.   -- if you'd like to mark them separately.

8         Q.   Yes, I would.  Thank you.

9              Let's mark Exhibit 16.

10:15  10             (Reporter marked Exhibit No. 16 for

11             identification.)

12         Q.   BY MS. BEDELL:  Exhibit No. 16 bears Bates

13    Nos. Ramamurthy-PFM-000024 to 30?

14         A.   Correct.

10:16  15         Q.   And what is Exhibit No. 16?

16         A.   They are COBRA documents and health

17    information that we provide as a part of our exit

18    package to departing employees.

19         Q.   Let's mark Exhibit No. 17.

10:16  20             (Reporter marked Exhibit No. 17 for

21             identification.)

22         Q.   BY MS. BEDELL:  Exhibit No. 17 bears Bates

23    Nos. Ramamurthy-PFM-000023.

24              What is it?

10:17  25         A.   It is an email, and I believe what you

41

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1    have in your hand are the attachments.

2        Q.    And what is the date of the email in

3    Exhibit No. 17?

4        A.    Saturday, November 15th, 2014.

10:17  5        Q.    Let's mark Exhibit No. 18.

6              (Reporter marked Exhibit No. 18 for

7              identification.)

8        Q.    BY MS. BEDELL:  Exhibit No. 18 bears Bates

9    Nos. Ramamurthy-PFM-000031 to 34.

10:18  10             What is it?

11       A.    They are exit documents for a departing

12   employee.

13       Q.    What is the date of Exhibit No. 18?

14       A.    November 15th, 2014.

10:18  15       Q.    Thank you.  And you mentioned before that

16   these documents were in your personal email

17   account?

18       A.    They were.

19       Q.    And which email account is that?

10:18  20       A.    That's

21       Q.    And why were these emails in your personal

22   account?

23       A.    I was having trouble printing them at work

24   and these may have been ones that we were

10:18  25   preparing, exit documents for departing employees,

42

BARKLEY

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *

1    so I printed them at home.

2         Q.    What were your job responsibilities as

3    head of human resources at Theranos?

4         A.    I was responsible for the human resources

10:18  5   function at Theranos, including all aspects of

6    employment, from recruiting to onboarding to

7    including orientation, benefits, compensation, all

8    HR matters, Workers' Compensation, leave of

9    absences and any other HR functions at the company,

10:19 10   including termination, performance management,

11   annual performance review cycles and other HR

12   matters.

13        Q.    Did you also conduct exit interviews?

14        A.    I did conduct some exit interviews.

10:19 15        Q.    Did your responsibilities as head of human

16   resources at Theranos change over time?

17        A.    Predominantly continued to manage the HR

18   function, including all aspects of HR.

19            I believe I continued to have pretty much

10:20 20   the same responsibilities over time, which included

21   managing the employees on the HR team, managing the

22   function.

23            I had taken on additional projects and

24   additional work over time, but my responsibilities

10:20 25   remained the same.

43

BARKLEY
*Court Reporters*

Confidential

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
HIGHLY CONFIDENTIAL

Page 1

1                    ADMIRAL GARY ROUGHEAD

2                 IN THE COURT OF CHANCERY

3                OF THE STATE OF DELAWARE

4   PARTNER INVESTMENTS, L.P., a        )

5   Delaware limited partnership;       )

6   PFM HEALTHCARE MASTER FUND, L.P., )

7   a Cayman Islands limited            )

8   partnership; and PFM HEALTHCARE    )

9   PRINCIPALS FUND, L.P., a            )

10  Delaware limited partnership,       )

11                  Plaintiffs,         )Case No.

12       vs.                            )12816-VCL

13  THERANOS, INC., a Delaware          )

14  corporation; ELIZABETH HOLMES,      )

15  an individual; RAMESH BALWANI,      )

16  an individual; and DOES 1-10,       )

17                  Defendants.         )

18

19                 HIGHLY CONFIDENTIAL

20

21    VIDEOTAPED DEPOSITION OF ADMIRAL GARY ROUGHEAD

22                    Arlington, VA

23                    March 24, 2017

24  REPORTED BY:  Tina Alfaro, RPR, CRR, RMR, CLR

25  JOB NO. 121072

Att. B - p. 94 of 160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 44

1                ADMIRAL GARY ROUGHEAD

2          THE WITNESS:  To cover legal fees.

3     BY MR. HEYMAN:

4          Q.  Is the company covering your legal fees for

5     today's deposition?

6          A.  That is my understanding.

7          Q.  And do you know whether the company is

8     paying out of its own pocket or whether it has

9     insurance coverage?

10         A.  It has insurance coverage.  I don't know

11    how they're handling the -- the charges.

12         Q.  You don't know whether insurance is

13    covering the expenses in this litigation?

14         A.  I don't know if -- if they're exercising

15    that policy or if they're using some other means.  I

16    don't know.

17         Q.  Okay.

18              Do you recall Theranos providing you with

19    financial statements before you joined the board?

20         A.  I don't recall.

21                      (Roughead Exhibit 542 was

22                       marked as requested.)

23    BY MR. HEYMAN:

24         Q.  I guess we will mark as Exhibit 542 a

25    document and I think I'm supposed to identify these

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 45

                    ADMIRAL GARY ROUGHEAD

1    by Bates number, which says Roughead-Theranos-

2    0000069.  Maybe I had an extra zero in there.  I'm

3    not sure.

4            Admiral, do you see this document before

5    you?

6        A.  I do.

7        Q.  And have you seen it before?

8        A.  I believe I have.  It's consistent with

9    some of the financial documents that were presented

10   at the board meeting.

11       Q.  So you didn't receive this before getting

12   on the board?

13       A.  When I agreed to go on the board I was not

14   given a package that I recall ahead of my agreeing

15   to go on the board.  I think it's possible that this

16   may have been presented at the first board meeting,

17   but the process of on-boarding I don't recall being

18   provided a packet of material prior to agreeing to

19   be on the board.

20       Q.  Okay.  So I have other documents too,

21   including a PowerPoint that was from your

22   production.  Do you believe you were given all these

23   things after going on the board?

24       A.  I can't recall what the timeline was,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 47

                    ADMIRAL GARY ROUGHEAD

1

2                        marked as requested.)

3    BY MR. HEYMAN:

4         Q.  Okay.  Admiral, I'm putting before you

5    Exhibit 543, which begins with the Bates number

6    Roughead-Theranos a bunch of zeros and then 362.  Do

7    you see that?

8         A.  I see that.

9         Q.  And this is a packet that we received that

10   we understand you produced to the SEC.

11        A.  Okay.

12        Q.  Do you recall this document?

13        A.  I don't recall the document, particularly

14   given that it's a briefing for someone else.  It

15   doesn't ring a bell with me.

16        Q.  Well, yeah.  Do you know who William Perry

17   is?

18        A.  I do.

19        Q.  Who is he?

20        A.  He is the former secretary of defense who

21   also has been involved in and was on the board of

22   Theranos.

23        Q.  And did he join at or about the same time

24   as you did?

25        A.  I believe we came on at the same time, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 48

1           ADMIRAL GARY ROUGHEAD

2       Q.   And that was in connection with

3   establishing a larger and more formal board?

4       A.   That's correct.

5       Q.   Okay.  And so do you have any understanding

6   why you would have had in your possession a briefing

7   for Dr. Perry that you produced to the SEC?

8       A.   It could have been in -- provided to me at

9   a board meeting.  I don't know how this came into my

10  possession.

11      Q.   So do you recall anything about this

12  document?

13      A.   No.  As I leaf through, some of the slides

14  are consistent with what I had seen at some of the

15  board meetings.

16      Q.   So you were shown PowerPoints at board

17  meetings at times?

18      A.   That's correct.

19      Q.   And do you think you might have been shown

20  this?

21      A.   Or elements of it, yes.

22      Q.   Or elements of it?

23           Do you know who would have made a

24  presentation of these slides to the board?

25      A.   It could have been Elizabeth, it could have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

1          ADMIRAL GARY ROUGHEAD

2     been Sonny, one of the two, but Elizabeth was the

3     one that presented most of the information.

4          Q.  And just for the record, Elizabeth is

5     Ms. Holmes?

6          A.  That's correct.

7          Q.  And Sonny is Mr. Balwani?

8          A.  That's correct.

9          Q.  Okay.  Let's turn to page 3 of this

10    document.  Do you recall seeing a slide like this

11    before?

12         A.  I do.

13         Q.  Okay.  And do you see the first bullet

14    point says that "Theranos's technology" -- and then

15    I'm paraphrasing and then I'm quoting from the final

16    line -- "Generates significantly higher integrity

17    data than currently possible"?

18         A.  Yes.

19         Q.  And did you understand that to be true at

20    the time of this presentation?

21         A.  I did.

22         Q.  Okay.  Based on what?

23         A.  Based on some data that was presented at

24    the briefings and how the tests that was run on

25    Theranos proprietary compared against some of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 75

1              ADMIRAL GARY ROUGHEAD

2        Q.   Okay.  I get it now.

3             All right.  And were you aware that

4    Theranos also had contacts with CENTCOM?

5        A.   I was made aware of that, yes.

6        Q.   Okay.  Were you involved in that at all?

7        A.   I was not.

8        Q.   Okay.  So have you ever seen -- Exhibit 544

9    has a Bates No. PFM-Army-00019.  Have you ever seen

10   these e-mails before?

11       A.   I can't recall if I've seen them before.

12       Q.   Okay.  At any time?

13       A.   I can't recall.

14       Q.   Okay.  Regardless of whether you've seen it

15   before, do you see in the second e-mail I guess it

16   is which is dated April 25, 2013 --

17       A.   Correct.

18       Q.   -- it says "Rear Admiral Dahl doesn't want

19   to close the door but wants the company to

20   understand there's a process"?

21       A.   Right.

22       Q.   "And that we must do things by the book"?

23       A.   Right.

24       Q.   Were you aware that Rear Admiral Dahl had

25   these views?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 78

1                    ADMIRAL GARY ROUGHEAD

2    approval process or some government agency like FDA

3    or CLIA process.

4        A.  What I'm referring to is the ability for

5    the military to go forward with an authorization,

6    and I think in the document here and in some other

7    documents it was clear that there was an interest in

8    having an FDA approval, and the idea was how do you

9    bring the entities together to see if there's a way

10   to accelerate the fielding of the capability.

11       Q.  So is this a document that you reviewed to

12   refresh your recollection?

13       A.  No, it's not.

14       Q.  It's not.  Okay.  So was it your

15   understanding that the military, including the Navy,

16   wanted FDA approval before they could go forward

17   with the technology?

18       A.  My understanding was that there was a

19   desire, as I understood it, to make sure it was okay

20   with FDA to use the equipment.

21                    (Roughead Exhibit 545 was

22                     marked as requested.)

23   BY MR. HEYMAN:

24       Q.  Okay.  Let's -- let's look at Exhibit 545,

25   which is Bates numbers -- well, begins with Bates

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 79

ADMIRAL GARY ROUGHEAD

1

2   No. PFM-Army-00073.

3        A.   Correct.

4        Q.   Have you seen these e-mails before?

5        A.   I don't recall seeing these e-mails.

6        Q.   Okay.  And could you turn to the second

7   page of that.  It appears to be a November 6, 2012

8   e-mail from Colonel Kent Kester to a Kenneth

9   Bertram?

10       A.   Uh-huh.  I see that.

11       Q.   Do you see that?

12            And it says "I learned this morning that

13  this device is being pushed by General Mattis,

14  CENTCOM, yet it remains unapproved by FDA.  Clinical

15  validation in the U.S. has not occurred either.  It

16  would appear from the information paper I sent you

17  last night that there's an intentional effort to

18  shortcut a variety of processes necessary prior to

19  field."

20            Were you aware at any time that these were

21  the views of anybody in the military?

22       A.   For the exchange that I see taking place

23  here I was not privy to this activity.  I was not in

24  the loop on this activity.  And one of the points

25  that I made to Theranos is that -- and I want to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 94

1                ADMIRAL GARY ROUGHEAD

2        Q.  Yeah, I'm not trying to make you review

3    every --

4        A.  But I do want to review them --

5        Q.  That's fine.

6        A.  -- to make sure I know what I'm talking

7    about.

8        Q.  That's fine.

9                    (Witness reviewing document.)

10   BY THE WITNESS:

11       A.  Okay.

12       Q.  So 548 and 549 are talking about a

13   presentation, right?

14       A.  Exactly.

15       Q.  To what organization?

16       A.  As best as I can tell, it is an

17   organization that -- let me get the right -- it is a

18   discussion between Theranos and individuals at a

19   U.S. Army lab -- or research and development

20   command, I should say, that, again, trying to come

21   to terms on how the military in this instance, this

22   particular organization and Theranos can enter into

23   a cooperative agreement.

24       Q.  And so there was a presentation in late

25   January of 2014, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 116

1                    ADMIRAL GARY ROUGHEAD

2        Q.  Okay.

3                    (Roughead Exhibits 551 and 552

4                    were marked as requested.)

5   BY MR. HEYMAN:

6        Q.  All right.  Let's mark a couple documents.

7   All right.  For the record, Admiral, we're putting

8   in front of you Exhibits 551 and 552.  551 is

9   Theranos minutes of a board of directors meeting

10  from Friday, May 9, 2014, the first page Bates

11  number is TH-PFM-4511577, and 552 appears to be some

12  handwritten notes and its Bates number is

13  Roughead-Theranos-27.

14              Have you seen these documents before?

15       A.  I have.

16       Q.  And are these your -- on 552 are these your

17  personal notes?

18       A.  They are.

19       Q.  And looking at these together -- it looks

20  likes the date at the upper corner of 552 is 5/9/14,

21  correct?

22       A.  That is correct.

23       Q.  Is it fair to say that these are your

24  personal notes from the board meeting?

25       A.  I'm not sure that they would be from a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 117

1                    ADMIRAL GARY ROUGHEAD

2       board meeting.  They could be notes that I jotted

3       down afterwards, but they're -- they're notes that I

4       made to myself basically on 5/9/14.

5            Q.  Okay.  Relating to Theranos?

6            A.  Correct.

7            Q.  All right.

8                And these -- you were at this 5/9/14 board

9       meeting, correct?

10           A.  Correct.

11           Q.  And could you look on page 3 of the

12      minutes, it's 551, and there's a personnel overview

13      in the middle of the page?

14           A.  Correct.

15           Q.  And there's a statement that Ms. Holmes was

16      talking about the company's key hires and then she

17      also discusses the fact that David Helfet had agreed

18      to be the chairman of the company's medical advisory

19      board and she presented an overview of the company's

20      efforts to build an advisory team, correct?

21           A.  Correct.

22           Q.  Do you know who David Helfet is?

23           A.  I -- I can't recall his CV, but he was

24      discussed at the board.

25           Q.  Okay.  And have you ever met him?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 122

                      ADMIRAL GARY ROUGHEAD

1

2        A.  He had been working with the company.  The

3   exact legal arrangement I don't want to speak to

4   that.

5        Q.  He'd been giving legal advice?

6        A.  Providing advice, correct.

7        Q.  And do you know whether his appointment to

8   the board related to the forthcoming Wall Street

9   Journal article?

10       A.  I don't know if it did.  I don't know if it

11  did or not.

12       Q.  Did anyone ask or talk about whether

13  Mr. Boies joining the board would represent a

14  conflict of any kind given his role in providing

15  legal advice?

16       A.  I can't say for certain.  However, at that

17  point, you know, we -- my sense is we were an

18  advisory board and -- and I think we perhaps

19  discussed it, but ultimately he joined the board.

20       Q.  Well, didn't you actually become an

21  advisory board around the same time that Mr. Boies

22  joined the board of directors?

23       A.  I'd have to look at the dates of when these

24  occurred.

25                      (Roughead Exhibit 553 was

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 131

1                    ADMIRAL GARY ROUGHEAD

2        Q.   All right.  But the article came out in

3   October of 2015 and you remained on the board of

4   counselors until the end of 2016, correct?

5        A.   That is correct.

6        Q.   And you're not aware of any third-party

7   validations being obtained in between those times?

8        A.   That's correct.

9            MR. HEYMAN:  Why don't we -- we're going to

10  mark a few documents.  Off the record.

11           THE VIDEOGRAPHER:  Do you want to go off

12  the record, sir?

13           MR. HEYMAN:  If it's going to be that much

14  of a process, no.

15           Tell you what, I'm going to ask a few more

16  questions and then maybe we will take a break and

17  we'll mark a bunch of documents during the break

18  just so we're not taking up time on the record.

19           MR. WEINGART:  I'd appreciate that.

20           MR. HEYMAN:  If that's okay with everybody.

21                    (Roughead Exhibits 554 and 555

22                     were marked as requested.)

23  BY MR. HEYMAN:

24       Q.   Admiral, I'm placing before you

25  Exhibits 554 and 555, and for the record 554 is an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 132

1               ADMIRAL GARY ROUGHEAD

2    e-mail from you to -- I never pronounce his name

3    right.  Could you --

4         A.  Kovacevich.

5         Q.  Kovacevich.

6             -- dated October 25, 2015 and it is

7    Roughead-Theranos-1649.  And then 555 is an e-mail

8    from you to Ms. Holmes dated the following day,

9    October 26, 2015, and it is Roughead-Theranos-1656.

10        A.  Right.

11        Q.  Have you seen these items before?

12        A.  I've seen them before.

13        Q.  And they are -- they are e-mails from you

14   to these people, correct?

15        A.  That's correct.

16        Q.  And have you seen these recently?

17        A.  No, I haven't.

18        Q.  Okay.

19            So in your -- in the first e-mail, which is

20   from you to Mr. Kovacevich, you say "In my reply to

21   Heather and Elizabeth on the info they passed" -- I

22   assume it is -- "along I asked about investor

23   reaction to the news.  I have not received a reply

24   and I'm interested in what you are hearing."

25            Why were you saying this to Mr. Kovacevich

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 133

1                  ADMIRAL GARY ROUGHEAD

2      at this time?

3          A.  One, because I have high regard for his

4      awareness of investor issues.  He lives out in

5      California and -- and I just wanted to get a sense

6      from him what his take was on -- on the swirl that

7      was occurring subsequent to the publication of the

8      Wall Street Journal articles.

9          Q.  So you had asked Ms. Holmes and Ms. King

10     about information they passed along and you

11     specifically asked about investor reaction?

12         A.  That's what I recollect from this e-mail,

13     correct.

14         Q.  Do you recall what information they passed

15     along?

16         A.  I can't recall the discussion that -- that

17     they had with me that I wrote this note subsequent

18     to it.  I can't -- I can't recall that.

19         Q.  And -- but you had not received a reply to

20     your inquiry at this point, right?

21         A.  That's what the e-mail says.

22         Q.  Do you know if you ever did?

23         A.  I received in subsequent discussions

24     attitudes of people -- and I think it could have

25     been at one of the subsequent board meetings --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 134

1              ADMIRAL GARY ROUGHEAD

2    how -- what the conversation and the chatter was

3    about the articles, but I can't recall if I received

4    a reply subsequent to this e-mail.

5         Q.  From Ms. King and Ms. Holmes?

6         A.  Ms. Holmes, that's correct.

7         Q.  And you say in the next sentence "As you

8    know, the story has been picked up by other major

9    outlets and Theranos's rebuttal has not yet produced

10   strong third-party support for the company."

11        A.  Right.

12        Q.  What did you mean by that?

13        A.  Consistent what I mentioned earlier, that

14   my belief was that there needed to be third parties

15   that would validate and support Theranos and the

16   technology that they were pursuing.

17        Q.  And then let's look at 555.  This is an

18   e-mail from you to Ms. Holmes, correct?

19        A.  That's correct.

20        Q.  Dated the following day and you thank her

21   for her a call she gave you?

22        A.  Right.

23        Q.  Do you recall the substance of that

24   conversation?

25        A.  I do not recall the substance of that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 135

1               ADMIRAL GARY ROUGHEAD

2    conversation.

3         Q.  Okay.  And then you say "One other thought.

4    I always try to think about how statements made in

5    the midst of an event will sound six months later in

6    content, tone, and balance."

7         A.  Right.

8         Q.  What did you mean by that?  Why were you

9    saying that?

10        A.  I can't recall the particulars, but having

11   dealt with significant newsworthy events, oftentimes

12   the way that you initially respond to include the

13   emotion of the response may appear and feel good at

14   the time, but I always try to do the mental exercise

15   of saying, okay, six months from now is it balanced,

16   is it substantive, and did it address the issues at

17   hand.  And so that was the intent and I can't recall

18   what elements of either press releases or statements

19   that I was reading in the media caused me to say,

20   you know, do this mental exercise, I think it would

21   be a good thing to do.

22        Q.  Is it fair to say that you were concerned

23   about the responses that had been made on behalf of

24   the company to date?

25        A.  I think -- I would not say I was concerned,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 136

1              ADMIRAL GARY ROUGHEAD

2    but I just wanted to be able to provide some advice

3    that said, you know, try to remove yourself from the

4    immediate issue, get yourself out about six months,

5    and think about how the articulation will be

6    assessed at that point.  And I can't -- I can't

7    recall the particulars that caused me to say that.

8              MR. HEYMAN:  All right.  Why don't we take

9    that break and we will mark a bunch of documents.

10             THE VIDEOGRAPHER:  Going off the record at

11   2:41 p.m.

12                  (A short break was had.)

13             THE VIDEOGRAPHER:  We are back on the

14   record at 2:55 p.m.

15   BY MR. HEYMAN:

16      Q.  All right.  Admiral, I've placed in front

17   of you exhibits that are marked 556 through 579.

18      A.  Okay.

19      Q.  And just for the record, I'm going to say

20   how I intend to handle these is it's possible that

21   we may skip over some of them.

22      A.  Okay.

23      Q.  So I will identify each one by Bates number

24   as I reference it.  To the extent we skip over any,

25   we will send an e-mail around to counsel that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 138

1                    ADMIRAL GARY ROUGHEAD

2        Q.   Okay.

3                         (Roughead Exhibit 556 was

4                          marked as requested.)

5    BY MR. HEYMAN:

6        Q.   In 556 that's before you this is an e-mail,

7    at least the bottom one is an e-mail from Heather

8    King to, it looks like, members of the board of

9    counselors at least and Elizabeth Holmes and Sonny

10   Balwani, right?

11       A.   Right.

12       Q.   And it's dated October 16, 2015.  So that

13   would be the day after the Wall Street Journal

14   article came out.

15       A.   Okay.

16       Q.   And you received this e-mail?

17       A.   Right.

18       Q.   Have you reviewed it recently?

19       A.   I have not.

20       Q.   Okay.  And do you see that there's a

21   description in the e-mail from Ms. King that says

22   "Here are the facts" and she lists the three steps

23   for finger stick technology, right?

24       A.   Uh-huh.

25                    THE REPORTER:  Yes?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 142

1                    ADMIRAL GARY ROUGHEAD

2     exactly that question essentially, right?

3          A.   That's correct.

4          Q.   In his response e-mail to Heather King,

5     right?

6          A.   That's the question he's asking.

7          Q.   And specifically he says "Do I understand

8     correctly that the tests are then being done on lab

9     equipment and not Edison"; is that right?

10         A.   That's the question he's asked, yes.

11         Q.   Do you know what the response to that was?

12         A.   I can't recall.

13                         (Roughead Exhibit 557 was

14                          marked as requested.)

15    BY MR. HEYMAN:

16         Q.   Okay.  And let's look at 557, which is

17    Roughead-Theranos-3647, and it's some e-mails, the

18    last of which is dated October 17, 2015, right?

19         A.   Wait a minute.  Okay.

20         Q.   And we see at the bottom of page 1 there's

21    I guess a reprint of the e-mail we had just seen

22    from Mr. Kovacevich, right?

23         A.   Correct.

24         Q.   And it looks like the following day he --

25    he essentially reiterates his question, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 143

1                 ADMIRAL GARY ROUGHEAD

2       A.   On -- on the 17th?

3       Q.   Yes.

4       A.   That's -- that's the way I read it, yes.

5       Q.   Okay.  So he's -- he's asking "How many of

6   our customer submissions are being tested on lab

7   equipment versus Edison?"  And he says "If I

8   understand what's being said there's very little as

9   we are focused on the FDA testing for Edison and are

10  nanotubes and not for active customers as we can't

11  do both at the same time for some reason," right?

12      A.   That's what's stated in the e-mail.

13      Q.   And do you recall having any reaction to

14  that at the time?

15      A.   I can't recall what my reaction was at the

16  time.

17      Q.   Did you think those were fair questions?

18      A.   I thought they were fair questions.

19      Q.   Okay.  And do you recall what the response

20  was?

21      A.   I don't recall a response.

22                    (Roughead Exhibit 558 was

23                     marked as requested.)

24  BY MR. HEYMAN:

25      Q.   Okay.  So let's look at 558, which begins

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 144

1                 ADMIRAL GARY ROUGHEAD

2    with Roughead-Theranos-3650, and it looks like if

3    you look at the bottom of the first page, that

4    that's the e-mail we just saw?

5        A.   Correct.

6        Q.   And it looks like this is a response from

7    Ms. Holmes, right?

8        A.   Correct.

9        Q.   And is it fair to say she confirms that

10   Theranos is only using venous draws at this time?

11       A.   Let me read the e-mail.

12       Q.   Sure.

13                  (Witness reviewing document.)

14   BY THE WITNESS:

15       A.   And your question again, please.

16       Q.   She confirms that Theranos is only using

17   venous draws at this time, correct?

18       A.   That's correct.

19       Q.   And this is before these e-mails and this

20   particular statement you were not aware of that?

21       A.   Not aware of venous draws being used to

22   do --

23       Q.   For commercial purposes?

24       A.   For commercial purposes.

25       Q.   Okay.  And does she also confirm in here

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 145

                    ADMIRAL GARY ROUGHEAD

1    that Theranos is running tests on commercially

2    available equipment as opposed to Theranos

3    technology?  And that is for commercial purposes

4    again.

5        A.   That is -- that is what she is saying, yes,

6    while awaiting clearance on the Nanotainers.

7        Q.   All right.  So let's look at -- and you saw

8    this document before, right, 558?

9        A.   I did, but not recently.

10       Q.   Okay.  And 557 you also saw?

11       A.   Yes, but, again, not recently.

12                    (Roughead Exhibit 559 was

13                     marked as requested.)

14   BY MR. HEYMAN:

15       Q.   Okay.  How about 559, did you see that

16   before?

17       A.   It was in my e-mail queue and yes, I've

18   seen it before.

19       Q.   All right.  And just for the record, 559 is

20   Roughead-Theranos-3658, and it looks like there's

21   the same Elizabeth Holmes e-mail that we just saw

22   and then there's a response from Senator Nunn dated

23   October 17, 2015, right?

24       A.   That's correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 146

1                    ADMIRAL GARY ROUGHEAD

2          Q.  And he says, among other things, "The most

3     serious WSJ allegation is that Theranos has

4     intentionally misled the regulatory agency," right?

5          A.  That is the allegation that has been made.

6          Q.  Right.  And that that's the most serious

7     allegation?

8          A.  That -- that is the way it's articulated,

9     yes.

10         Q.  Did you agree with that?

11         A.  I would -- I would agree with that, yes.

12         Q.  Okay.  And do you recall what Ms. Holmes'

13    response was to this?

14         A.  I do not recall.

15                      (Roughead Exhibit 560 was

16                       marked as requested.)

17    BY MR. HEYMAN:

18         Q.  Okay.  Let's look at 560, which is

19    Roughead-Theranos-3671, which, like the last ones,

20    it looks like it's Senator Nunn's e-mail and then

21    with a response from Elizabeth Holmes also dated

22    October 17th; is that correct?

23         A.  That is correct.

24         Q.  And you've seen this before?

25         A.  Yes, but not recently.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 147

1          ADMIRAL GARY ROUGHEAD

2      Q.  Okay.  And it says -- she responds "There

3  is no question on attacking these core falsehoods.

4  We have been preparing for this and will be doing

5  exactly that."  Do you see that?

6      A.  I see that.

7      Q.  Do you understand what preparation she was

8  talking about?

9      A.  I do not understand what the preparations

10  were that she's talking about.

11      Q.  You were not apprised of those

12  preparations?

13      A.  No, not that I recall.

14      Q.  Do you think this had something to do with

15  being aware in advance of the Wall Street Journal

16  article?

17      A.  I would say that being aware that there

18  would likely be an article coming out, being

19  prepared to respond to that article, yet not knowing

20  what was in the article, and I think that's what any

21  organization would be doing if -- if they knew that

22  there was an investigative reporter that was doing

23  work on the company.

24      Q.  And do you know whether the preparations

25  that she's referring to involved Mr. Boies?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 148

1                   ADMIRAL GARY ROUGHEAD

2         A.   I do not know that.

3         Q.   Okay.  Do you remember -- this is where I

4    got confused earlier.  Do you remember the board of

5    directors and the board of counselors being asked to

6    deliver its own statement at some point?

7         A.   I can't recall specifically the request to

8    do that.

9                        (Roughead Exhibit 561 was

10                        marked as requested.)

11   BY MR. HEYMAN:

12        Q.   Okay.  Well, let's look at 561 --

13        A.   Okay.

14        Q.   -- which, for the record, is

15   Roughead-Theranos-3723, which appears to be an

16   e-mail from Heather King it looks like to you and a

17   number of other members of the board of counselors

18   and possibly even the board of directors and

19   Ms. Holmes and Mr. Balwani; do you see that?

20        A.   Yes.

21        Q.   And this appears to be a draft that's being

22   sent to you?

23        A.   Okay.

24        Q.   Is that correct?

25        A.   That's correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 149

                    ADMIRAL GARY ROUGHEAD

1

2        Q.  And it says -- and it says that it's based

3   on Elizabeth's discussions with you this weekend; do

4   you see that?

5        A.  Yes, I see that.

6        Q.  Do you recall having discussions with

7   Ms. Holmes about this statement?

8        A.  I can't recall that, but if it's reported

9   that we had discussions, you know, I'm assuming that

10  we did.

11       Q.  And you see the draft statement there,

12  right?

13       A.  That's correct.

14       Q.  Did you agree with that draft statement?

15       A.  I can't recall if I made any

16  recommendations -- recommended changes or not.

17                         (Roughead Exhibit 562 was

18                          marked as requested.)

19  BY MR. HEYMAN:

20       Q.  Okay.  Let's look at 562.  562, for the

21  record, is Roughead-Theranos-3725, and it looks like

22  there's the same e-mail from Ms. King and then

23  there's a response from Mr. Kovacevich and then a

24  response from you, and the response from you is

25  dated October 26, 2015, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 152

1                    ADMIRAL GARY ROUGHEAD

2    BY MR. HEYMAN:

3         Q.  Okay.  Let's look at 563.  I'm sorry.  I

4    guess I switched --

5              MR. WEINGART:  That one is part of 562.

6              MR. HEYMAN:  Okay.  We're going to skip

7    that and we're going to go to 564, but I will tell

8    people that 563 was Roughead-Theranos-3724.

9    BY MR. HEYMAN:

10        Q.  564 is Roughead-Theranos-3729 and it

11   appears to be a response from Ms. Holmes to you of

12   the same date, October 26, 2015, where she accepts

13   your change, right?

14        A.  Right.

15                   (Roughead Exhibit 565 was

16                    marked as requested.)

17   BY MR. HEYMAN:

18        Q.  Okay.  And 565 looks to be -- okay.  575 --

19   565, jeez, it's getting late in the day,

20   Roughead-Theranos-3731, looks like your two-word

21   response to Ms. Holmes' e-mail that we were just

22   looking at, correct?

23        A.  Yes.

24        Q.  It says at the top "Great Gary"?

25        A.  Right.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 153

1                    ADMIRAL GARY ROUGHEAD

2         Q.   And it's of the same date, correct?

3         A.   Correct.

4         Q.   And you've seen all of these e-mails before

5    that we've been looking at?

6         A.   Not recently, but I've seen them before.

7         Q.   Okay.

8                         (Roughead Exhibit 566 was

9                          marked as requested.)

10   BY MR. HEYMAN:

11        Q.   Okay.  Now let's go to 566, which is

12   TH-PFM-826306.  It appears -- well, I'll let you

13   take a look at this generally and then I'll ask you

14   some questions.

15                        (Witness reviewing document.)

16   BY THE WITNESS:

17        A.   Okay.

18        Q.   It looks like, among other things -- are

19   you okay?

20        A.   I am.

21        Q.   Okay.  It looks like, among other things,

22   Secretary Schultz agreed with your statement or your

23   change?

24        A.   Agreed with the statement -- or agreed with

25   the suggestion of Dick Kovacevich.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 154

1               ADMIRAL GARY ROUGHEAD

2          Q.  Isn't that what you were providing the

3     wording for?

4          A.  Well, I think I -- I think Dick -- I think

5     Mr. Kovacevich came in with a comment, then I came

6     in with a comment.

7          Q.  Okay.

8          A.  So I was just being clear that -- that

9     George Schultz is responding to Dick Kovacevich's

10    edit.

11         Q.  Okay.  What -- did somebody request a call?

12         A.  I can't recall if -- you know, who

13    requested it.  It appears from the e-mail that --

14    and I don't know who the -- that Heather King is

15    offering the opportunity.  Whether that was based on

16    request or whether that was the company saying if

17    you want to talk further this is the call-in code.

18    I don't know whether it was initiated by Theranos or

19    was prompted by a request.  I can't recall that.

20         Q.  Well, do you see the e-mail in the middle

21    of the first page from Elizabeth Holmes saying one

22    director requested a call?

23         A.  Okay.  All right.  I see that and I don't

24    know who that would have been.

25         Q.  Okay.  Did you participate in this call?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 155

1                    ADMIRAL GARY ROUGHEAD

2          A.   I can't recall.

3                      (Roughead Exhibit 567 was

4                      marked as requested.)

5    BY MR. HEYMAN:

6          Q.   Okay.  Well, let's look at 567, which is

7    Roughead-Theranos-3794, and it appears to include

8    most of the e-mails that were on the past item and

9    it's an e-mail from Dr. Perry to -- in response to

10   all those e-mails.  Have you seen this before?

11         A.   I have seen it before, but not recently.

12         Q.   Okay.  And in this e-mail Dr. Perry says

13   "the statement" -- or "The draft statement does not

14   really address the most critical issue, namely the

15   allegations that Theranos's machine, Edison, might

16   be giving faulty readings"; do you see that?

17         A.   I see that.

18         Q.   Do you agree that that was a critical

19   issue?

20         A.   That was an allegation and a significant

21   allegation.

22         Q.   Now, were -- was the board of counselors in

23   a position to address that issue?

24         A.   I think it's consistent with what I

25   mentioned before, the importance of getting outside

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
HIGHLY CONFIDENTIAL

Page 156

1                    ADMIRAL GARY ROUGHEAD

2    sources, outside authoritative sources to -- to

3    assess and comment on the technology that was being

4    used.

5                         (Roughead Exhibit 568 was

6                          marked as requested.)

7    BY MR. HEYMAN:

8        Q.  Okay.  And let's look at 568, which begins

9    Roughead-Theranos-3825, and it looks like this is a

10   response from Mr. Kovacevich to Dr. Perry and then

11   Dr. Perry responding again to Mr. Kovacevich; is

12   that correct?

13       A.  That's correct.

14       Q.  And these are all dated -- these -- well,

15   the top one is dated October 28th?

16       A.  Right.

17       Q.  So the -- Kovacevich says "I believe

18   according to David Boies tests have been done with

19   even more samples than that the results of which has

20   or will soon be released."  That was a mouthful.

21            Did you agree with that statement by

22   Mr. Kovacevich and was that your understanding as

23   well?

24       A.  I -- I'm -- I can't recall the comparative

25   tests that are being referred to here.  I can't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 158

1                  ADMIRAL GARY ROUGHEAD

2    there were the term board, board of counselors,

3    board of directors was confusing and would have been

4    confusing to those that were trying to understand

5    who was who and who was doing what to whom.

6         Q.  And you've seen Exhibit 568 before, right?

7         A.  I have, but not recently.

8                      (Roughead Exhibit 569 was

9                       marked as requested.)

10   BY MR. HEYMAN:

11        Q.  Okay.  And then 569 looks like you're

12   sending an e-mail to Heather on October 27th that

13   says you've been on the road and was there a call or

14   any changes to the statement, and then she responds,

15   right?

16        A.  Correct.

17        Q.  Okay.  And does that suggest you were not

18   on the call?

19        A.  That suggests I was not on the call.

20        Q.  Okay.  Does that refresh your

21   recollection?

22        A.  It does refresh my recollection.  The

23   circumstances why I wasn't on the call I don't know,

24   but obviously the statement is that I didn't

25   participate in the call.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 159

1                    ADMIRAL GARY ROUGHEAD

2          Q.   Okay.  And 569, for the record, is

3    Roughead-Theranos-3811.  And Ms. King tells you

4    there was a call and there were no changes, right?

5          A.   Okay.  Understood.  Yes.

6                         (Roughead Exhibit 570 was

7                         marked as requested.)

8    BY MR. HEYMAN:

9          Q.   Okay.  So 570, let's look at, is

10   Roughead-Theranos-3831, and it looks like following

11   Heather King's e-mail to you, you e-mail Elizabeth

12   Holmes and you ask her to call you and you say "It

13   appears WSJ has more in their chamber," right?

14         A.   Correct.

15         Q.   Why did you say that?

16         A.   Because of the -- and I'd have to go back

17   and read the article, but my sense was that there

18   were indications in the article that I read that --

19   that the Wall Street Journal had more information

20   that they would eventually be reporting on.

21         Q.   And I'm sorry, where did you learn that?

22         A.   I inferred it from the article, that I

23   recall, yes.

24         Q.   And did she ever call you?

25         A.   I can't recall.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
HIGHLY CONFIDENTIAL

Page 160

                    ADMIRAL GARY ROUGHEAD

1

2                          (Roughead Exhibit 571 was

3                          marked as requested.)

4    BY MR. HEYMAN:

5        Q.  Let's look at 571, which is

6    Roughead-Theranos-3839, and, again, you've seen all

7    these e-mails we're talking about before, right?

8        A.  I have, but not recently.

9        Q.  Okay.  And 571 looks like Ms. Holmes is

10   responding to the e-mail we saw earlier from

11   Dr. Perry?

12       A.  Right.

13       Q.  And this is dated October 28, 2015 and she

14   says that she -- "As she announced with Toby

15   Cosgrove at Cleveland Clinic on Monday, we are also

16   preparing to publish our data, including with

17   independent third parties," right?

18       A.  That's what the e-mail says, yes.

19       Q.  And she also says that they have

20   independent blinded sample scores from our auditors,

21   right?

22       A.  That's what the e-mail says, yes.

23       Q.  And she says those have been reviewed with

24   the board every meeting?

25       A.  That's what the e-mail says.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 161

1                ADMIRAL GARY ROUGHEAD

2        Q.   Do you recall reviewing blinded sample

3   scores from the auditors at every board meeting?

4        A.   I recall seeing comparative tests, but I do

5   not recall them being from auditors or not.

6        Q.   Do you know who Theranos's auditors were --

7        A.   I do not.  I do not know.

8        Q.   Or what auditors she's talking about?

9        A.   I do not know.

10       Q.   Do you know if they were independent from

11  Theranos?

12       A.   I do not know.

13       Q.   Okay.  And -- and this is a reference to --

14  there's a reference to Cleveland Clinic and maybe I

15  asked you this before.  Wasn't Mr. Helfet associated

16  with Cleveland Clinic?

17       A.   I don't know.  I'd have to look at his

18  bio.

19       Q.   All right.

20                  (Roughead Exhibit 572 was

21                   marked as requested.)

22  BY MR. HEYMAN:

23       Q.   And then we'll look at 572, which is

24  Roughead-Theranos-3860, and is it fair to say that

25  at the top is a response from Dr. Perry to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 162

                    ADMIRAL GARY ROUGHEAD

1    Ms. Holmes' e-mail that we just looked at dated

2

3    October 28, 2015?

4        A.  It appears to be, yes.

5        Q.  Okay.  And do you see that -- that he says

6    he feels a responsibility to understand what data

7    the company has to refute the most serious

8    allegation in the WSJ article, namely, alleged

9    inaccuracies and blood sample results processed by

10   Edison?

11       A.  Yes.

12       Q.  Okay.  And, to your knowledge, was that

13   data that he's talking about ever provided to the

14   board of directors or the board of counselors?

15       A.  I can't recall if it was provided to the

16   board of counselors or to the board of directors,

17   and I saw this as an exchange between Bill Perry and

18   Elizabeth where he also wanted to look at -- at the

19   data.

20       Q.  And you agreed that the board should look

21   at the data?

22       A.  We -- I would say that we agreed that we

23   wanted to look at data that would refute the

24   allegations of the Wall Street Journal and -- and,

25   moreover, that that data should be third party

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 164

1                  ADMIRAL GARY ROUGHEAD

2        Q.   Okay.   Do you have any reason to doubt his

3   statement about whether he's seen the data or not?

4        A.   I don't have reason to doubt his statement.

5        Q.   And do you think you saw the data that he's

6   referring to at any point?

7        A.   I can't recall if I saw the data that he's

8   referring to and what he wanted to see given his

9   technical background.

10                        (Roughead Exhibit 573 was

11                        marked as requested.)

12   BY MR. HEYMAN:

13        Q.   All right.   Let's look at 573 -- is this

14   the one I wanted?   I see.   573 is Roughead-Theranos-

15   3781 and it looks like -- if you -- feel free to

16   look through it, but it looks like this contains a

17   response at the bottom of the first page to

18   Dr. Perry's e-mail we just saw from Sonny Balwani

19   also dated October 28, 2015, and then it looks like

20   also Senator Frist responds to that on October 29th

21   and Mr. Kovacevich also responds on October 29th; is

22   that right?

23        A.   That is correct.

24        Q.   And you've seen these e-mails before?

25        A.   I have, but not recently.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 165

1              ADMIRAL GARY ROUGHEAD

2        Q.  All right.  And it looks like Sonny Balwani

3   is saying that Theranos will publish its data in the

4   future, right?  Feel free to look at it.

5                    (Witness reviewing document.)

6   BY THE WITNESS:

7        A.  That is correct.

8        Q.  And it looks like Mr. Balwani is saying

9   that the aim is to publish them in peer-reviewed

10  journals and that they would be submitting the data

11  in a matter of a couple weeks, right?

12       A.  That is correct.

13       Q.  And it looks like Senator Frist suggests

14  that that's not sufficient?

15       A.  Simply -- as I read this, simply saying

16  that we're going to answer your questions in the

17  future is a -- is an insufficient answer -- this is

18  my view -- is an insufficient answer given the need

19  for timely responses to the allegations that were

20  being made.  Kicking the can out months in advance

21  was not going to be helpful to the company.

22       Q.  All right.  And then Mr. Kovacevich

23  responds to that and he has a reference to release

24  of the CLIA data.  Do you know what data he's

25  talking about?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 166

1                 ADMIRAL GARY ROUGHEAD

2        A.  I don't know what he's talking about.

3        Q.  He says it's been shared with the board

4   periodically?

5        A.  Right.

6        Q.  But you don't recall it?

7        A.  I don't recall CLIA data.  I recall data

8   that the board viewed.  I can't say that it was CLIA

9   data or not CLIA data.

10                    (Roughead Exhibit 574 was

11                     marked as requested.)

12  BY MR. HEYMAN:

13       Q.  Okay.  574 is Roughead-Theranos-3873 and --

14  and this appears to be Dr. Perry's response to the

15  same e-mail we had seen before from Mr. Balwani,

16  right?

17       A.  It does appear to be that, yes.

18       Q.  And you saw this before, right?

19       A.  But not recently.

20       Q.  Not recently.  And the response is dated

21  October 29, 2015, right?

22       A.  Right.

23       Q.  And he responds "I assume your finger stick

24  samples are being analyzed on Edison"?

25       A.  That's what he responds.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 167

1              ADMIRAL GARY ROUGHEAD

2        Q.   And did you understand what that response

3   meant?

4        A.   That they were being analyzed on what I

5   referred to as the box.

6        Q.   Okay.  And do you know what the response to

7   that was?

8        A.   I can't recall, but I'm waiting for the

9   next e-mail.

10                    (Roughead Exhibit 575 was

11                     marked as requested.)

12   BY MR. HEYMAN:

13        Q.   You are correct.  575, which is

14   Roughead-Theranos-3887, and he said -- and this is

15   Mr. Balwani's response to Dr. Perry's e-mail that we

16   just looked at and it's dated October 30th, and he

17   says in essence that the studies will be performed

18   on Theranos's devices and Nanotainers, right?

19        A.   That's what he says, yes.

20        Q.   Okay.  And can you look at the

21   second-to-last sentence of his response.  It says

22   "Here too our data looks excellent and we have

23   proven close to perfect correlation with traditional

24   venous draw method"; do you see that?

25        A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 172

1              ADMIRAL GARY ROUGHEAD

2                   (Roughead Exhibit 576 was

3                   marked as requested.)

4    BY MR. HEYMAN:

5         Q.  And if you look at 576 is Roughead-

6    Theranos-3707, right?

7         A.  Correct.

8         Q.  And it appears that this -- let me get my

9    bearings.  Okay.  It looks like this contains an

10   e-mail -- or the top e-mail is one from Dr. Perry to

11   Elizabeth Holmes dated November 2, correct?

12        A.  That is correct.

13        Q.  And you saw this before, right?

14        A.  But not recently.

15        Q.  And he reiterates his request for an

16   independent review?

17        A.  He does.

18        Q.  Okay.  And he requests a face-to-face board

19   meeting?

20        A.  He does.

21        Q.  And he says "The issues here involve no

22   less than the company's reputation for integrity.

23   There can be no more -- no issue more important for

24   the board."

25        A.  That's what he says.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 173

1                    ADMIRAL GARY ROUGHEAD

2        Q.  Did you agree with that?

3        A.  I agreed with that.

4        Q.  And did Ms. Holmes respond to this?

5        A.  I can't recall.

6                    (Roughead Exhibit 577 was

7                     marked as requested.)

8    BY MR. HEYMAN:

9        Q.  Okay.  Let's look at -- did I lose the rest

10   of them?  Here they are.  577 has Roughead-Theranos-

11   3712 and it's -- looks like another e-mail from

12   Dr. Perry to Elizabeth Holmes dated November 4th,

13   correct?

14       A.  Correct.

15       Q.  And it looks like he's again reiterating

16   his request for --

17       A.  Correct.

18       Q.  -- independent review and for a meeting,

19   right?

20       A.  That's correct.

21       Q.  And did Ms. Holmes agree to an independent

22   review at this time?

23       A.  I think my sense is that over a period of

24   time, even, you know, predating the Wall Street

25   Journal articles, that there was agreement that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 174

1                 ADMIRAL GARY ROUGHEAD

2    third-party validation of the tests were important,

3    and I believe that was a view shared by the company

4    and shared by members of the board, because, as I've

5    said on several occasions, it's important that

6    someone other than Theranos is validating the

7    technology.

8         Q.   But as of this date no such independent

9    review had happened, correct?

10        A.   It had not happened, no.

11                       (Roughead Exhibit 578 was

12                        marked as requested.)

13   BY MR. HEYMAN:

14        Q.   All right.  And then let's look at 578,

15   which is actually Kissinger-Theranos-2119, and it

16   looks like this is a response from Ms. Holmes to

17   Dr. Perry on November 5th, correct?

18        A.   Correct.

19        Q.   And you saw this e-mail before, right?

20        A.   Yes, but not recently.

21        Q.   Okay.  And -- and she says "To be sure we

22   are all well aware of the importance of publishing

23   independent comparative tests.  That is, in fact,

24   the heart of our strategy for disapproving these

25   falsehoods."  Right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
HIGHLY CONFIDENTIAL

Page 176

1              ADMIRAL GARY ROUGHEAD

2          MR. HEYMAN:  Problem?

3          MR. WEINGART:  No.  I thought I didn't have

4    it, but I found it.

5    BY MR. HEYMAN:

6      Q.  579, it says that it's

7    Mattis-Perry-Roughead-Theranos-181, and it appears

8    to be an e-mail from Senator Nunn to yourself and

9    several others, well, Henry Kissinger, Dr. Perry,

10   and -- I guess that's it -- and it has an agenda for

11   the four of you to discuss, correct?

12     A.  Correct.

13     Q.  And wasn't this separate and apart from the

14   board meeting?

15     A.  That's what the -- the meeting call was

16   about.  Yes, this would have been separate from a

17   board meeting.

18     Q.  Okay.  And why did you -- the four of you

19   have a call separate from a board of counselors

20   meeting?

21     A.  I can't recall exactly, but obviously it

22   was to have a discussion about where we were and

23   what recommendations that we should make to

24   management.

25     Q.  And was there a reason you wanted to have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
CONFIDENTIAL

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

6

             Plaintiff,

7

     vs.                              Case No. 12816-VCL

8

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

11

             Defendants.
12   ----------------------------/

13

14            ** CONFIDENTIAL **
15         VIDEOTAPED DEPOSITION OF
16       THE HONORABLE GEORGE P. SHULTZ
17         San Francisco, California
18          Tuesday, April 4, 2017

19

20

21

22   Reported by:
23   LORRIE L. MARCHANT, CSR No. 10523
                   RMR, CRR, CCRR, CRC

24

25   Job No. 121073

Confidential

Page 28

1   available blood analyzers made by companies like

2   Siemens, you would have wanted to know that; right?

3           MS. GOODHART:  Objection.  Form.

4           THE WITNESS:  Right.

5           MR. KAHN:  Let's mark that, please.

6           (Marked for identification purposes,

7            Exhibit 722.)

8           BY MR. KAHN:

9       Q.   So, Secretary Shultz, a document has just

10  been put in front of you.  It's marked Exhibit 722.

11          (Discussion off the record.)

12          MR. KAHN:  Okay.  So, Secretary Shultz,

13  you've been handed a document marked Exhibit 722.

14          And the Bates number, for those on the

15  phone, starts with TGPS00010537.

16          BY MR. KAHN:

17      Q.   Do you recall when you interviewed

18  Ms. Holmes on March 12, 2015?

19      A.   Yes.

20      Q.   Okay.  I would like to ask you just a

21  couple of questions about some specific statements

22  that Ms. Holmes made during the interview.

23          MR. YOUNG:  Just for your record, you said

24  March 12, and this says March 13.  I don't know if

25  that matters to you.

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 30

1            So Ms. Holmes said:

2                "So we've redeveloped the lab

3            infrastructure to make it possible to run

4            any combination of lab tests from tiny

5            droplets of blood.  People can come in

6            and do full service laboratory testing

7            with a fingerstick as opposed to having

8            tubes and tubes taken from your arm.  We

9            do that not just for basic tests, but for

10           any tests."

11           Secretary Shultz, did you understand all of

12      that to be true at the time of this interview in

13      March 2015?

14           MS. GOODHART:  Objection.  Form.

15           THE WITNESS:  Yes.  Yes.

16           BY MR. KAHN:

17      Q.   Thank you.

18           And did you believe it to be true because

19      you had discussed it with Ms. Holmes?

20           MS. GOODHART:  Objection.  Form.

21           THE WITNESS:  I can't recall all

22      discussions I had with her.  But this was in line

23      with the general understanding I had of why this was

24      so important.

25      ///

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 62

1   they had before?

2           MS. GOODHART:  Objection.  Form.  Misstates

3   testimony.

4           THE WITNESS:  No.  They provided

5   information before.  It's just that they -- they

6   provided information about this particular subject.

7           BY MR. KAHN:

8      Q.   Okay.  So what did you mean when you said

9   they were much more extensive with slides?

10     A.   Just on this subject.  They used slides in

11  practically all the board meetings to subsequent...

12     Q.   Okay.  When you read The Wall Street

13  Journal articles, did you personally feel that

14  information had been kept from you that should have

15  been provided to you before?

16     A.   No.  I didn't feel that.  I was -- I was

17  upset at the articles and wanted to know what was

18  taking place.

19          MR. KAHN:  Let me get 27, please.

20          (Marked for identification purposes,

21           Exhibit 724.)

22          MR. KAHN:  Mr. Secretary, you've been

23  handed a document marked Exhibit 724.

24          For those on the phone, it's a letter dated

25  October 26th, 2015, Bates-numbered TGPS00014435.

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 63

1          BY MR. KAHN:

2      Q.   Mr. Secretary, do you recognize this to be

3  a letter that you sent to Ms. Holmes in

4  October 2015?

5      A.   Well, I see I signed it.

6      Q.   Okay.  This letter suggests that

7  Ms. Holmes -- or I don't want to put words in your

8  mouth.  The letter says:

9              "Dear Elizabeth, you might consider

10             sending out a statement along these

11             lines."

12             And then you have something that you

13  suggest.

14             Did you discuss such a statement with

15  Ms. Holmes after sending this letter, to your

16  recollection?

17      A.   I don't remembering having a major

18  discussion about it.

19      Q.   Do you remember having any discussion about

20  it?

21      A.   No.  But this was a suggestion of mine --

22  on my part, that she might make a statement along

23  these lines.

24      Q.   Okay.  And my question is do you recall

25  discussing your suggestion later?

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 64

1        A.    Probably we did, but I don't remember it.

2        Q.    Okay.  In your proposal for this statement,

3    in the second paragraph of the proposal, you

4    suggested that Theranos or Ms. Holmes state:

5                  "All of the tests are performed on

6            Theranos-developed and produced

7            machinery."

8            Do you see that?

9        A.    Yes, I do.

10        Q.    Okay.  Did you believe that to be an

11    accurate statement at the time that you wrote it?

12        A.    Yes.

13        Q.    Okay.  And did you believe that to be an

14    accurate statement at the time that you wrote it

15    based, in part, on your discussions with Ms. Holmes?

16            MS. GOODHART:  Objection.  Form.

17            THE WITNESS:  I -- I don't have any

18    recollection of a particular discussion.  This was

19    my belief that I put down here.  Where it came from

20    exactly.

21            BY MR. KAHN:

22        Q.    Okay.  And when you sent this letter to

23    Ms. Holmes, did she respond to it and say,

24    "Mr. Secretary, the statement that all of the tests

25    are performed on Theranos-developed and produced

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
Confidential

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

3    PARTNER INVESTMENTS, L.P., a
     Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
      partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
      Delaware limited partnership,

6

                 Plaintiff,
7

     vs.                              Case No. 12816-VCL
8

9    THERANOS, INC., a Delaware
      corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
      an individual, and DOES 1-10,

11

                 Defendants.
12   ------------------------------/

13

14              ** CONFIDENTIAL **

15       VIDEOTAPED DEPOSITION OF TYLER SHULTZ

16            San Francisco, California

17             Monday, March 6, 2017

18

19

20

21   Reported by:

22   LORRIE L. MARCHANT, CSR No. 10523
                      RMR, CRR, CCRR, CRC

23

24   Job No. 120731

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
Confidential

Page 163

1           BY MR. KAHN:

2       Q.   Mr. Shultz, you've been handed a document

3    marked Exhibit 120.  This is Bates stamped TS13

4    through TS24.

5           And do you recognize this as the e-mail

6    that you sent to Ms. Holmes along with a response to

7    that e-mail from Mr. Balwani?

8       A.   Yes.

9       Q.   Okay.

10          MR. RUMMAGE:  Can I just note for the

11   record, is this how it was produced in the TS0013,

12   without a date or anything at the top of the --

13          MR. KAHN:  Yes.

14          MR. RUMMAGE:  Okay.

15          MR. KAHN:  Okay.  Or let me say that is my

16   understanding, and I will confirm.

17          MR. RUMMAGE:  Okay.

18          BY MR. KAHN:

19      Q.   All right.  So I want to look at this

20   version for the next questions because it's in

21   color.

22          If you turn to page 18 of this document, do

23   you recognize the text on page 18 that is in black

24   font to be the part of your e-mail that went to

25   Ms. Holmes originally?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***

Confidential

Page 164

1        A.    Yes.

2        Q.    Okay.  And you reference here "our previous

3   discussion."

4             Is that a reference to your meeting in

5   early February with Ms. Holmes?

6        A.    Yes.

7        Q.    So on page 18 you talk about the vitamin D

8   assay, and then you follow it on pages 19 to 20 with

9   three scatter plot graphs.

10            Do you see those?

11       A.    Yeah.

12       Q.    I'm going to ask you about those, but first

13   let's just look at -- back at page 18.

14            You say here in this e-mail to Ms. Holmes

15   that you checked the two-tip validation data.

16            Is that the two-tip validation data for

17   vitamin D test?

18       A.    Yes.

19       Q.    Okay.  And you say that you "found that the

20   CVs for our three levels were 18, 16 and 19 percent,

21   when calculated based on the median of each

22   precision run and 23, 23 and 25 percent when

23   calculated based on the entire data set."

24            Did I read that correctly?

25       A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
Confidential

Page 165

1    Q.   So is this the investigation that you did

2    to determine that the statement on the Theranos

3    website, that there is a less than 10 percent CV for

4    the vitamin D assay, was incorrect?

5    A.   Yes.   I also remember checking the

6    validation documentation.   And maybe these weren't

7    the exact numbers on the validation documentation,

8    but they weren't -- they weren't less than

9    10 percent.

10    Q.   So your recollection is that you both

11    looked at the actual CVs recorded on the validation

12    documentation, and you did your own data analysis

13    and calculated your own CVs using both the Theranos

14    median method and your recommended all data method;

15    correct?

16    A.   Yeah.   Yes.

17    Q.   Okay.   So can you tell us, on the graphs on

18    pages 19 to 20, what are we looking at here?

19    A.   So these are -- these are scatter plots of

20    the results from precision testing.   I believe there

21    were three different -- three different levels of a

22    high, medium, and low.

23         And -- so this is two tips, so I actually

24    can't remember if these are both tips or if this is

25    the median of the two tips.   Because we did either

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

6

             Plaintiff,
7

     vs.                              Case No. 12816-VCL
8

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

11

             Defendants.
12   ----------------------------/

13

14              ** CONFIDENTIAL **
15   VIDEOTAPED DEPOSITION OF TIMOTHY FREDERICK SMITH
16            San Francisco, California
17             Monday, April 3, 2017

18

19

20

21   Reported by:
22   LORRIE L. MARCHANT, CSR No. 10523
                   RMR, CRR, CCRR, CRC
23

24   Job No. 121994
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 10

1          MS. HENRY:  Let's mark Exhibit 651.

2          (Marked for identification purposes,

3           Exhibit 651.)

4          BY MS. HENRY:

5     Q.    Do you recognize Exhibit 651?

6     A.    This is the first time I have seen this

7  cover page.

8          MR. JOHNSTONE:  If you need, you can move

9  the staple up so you can read it.

10         THE WITNESS:  Thank you.

11         Without going through every page, it looks

12  correct.

13         BY MS. HENRY:

14    Q.    And what does it appear to be?

15    A.    So this is my initial offer letter, which I

16  signed back when I started with the company.

17    Q.    The entire set of documents is your

18  production in response to the subpoena; is that

19  correct?

20    A.    That's correct.

21    Q.    Okay.  And on the first page of the

22  production, not the cover sheet, what is the Bates

23  number at the bottom?

24    A.    TSmith-PFM-00001.

25    Q.    And on the last page, what's the ending

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,          Case No.
6                                           12816-VCL
             Plaintiffs,
7       vs.
8    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
9    an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,
10
             Defendants.
11   _____
12
13              ** CONFIDENTIAL **
14
15        VIDEOTAPED DEPOSITION OF DANISE YAM
16              Palo Alto, California
17            Thursday, March 16, 2017
18
19
20
21
22
23
24   REPORTED BY:
     CYNTHIA MANNING, CSR No. 7645, CLR, CCRR
25   JOB NO. 120830

Att. B - p. 152 of 160

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 202

1      Q.  And Theranos owed Walgreens interest on

2  that note; right?

3      A.  Yes.

4          MR. KAHN:  Okay.  Can I get 23?

5  BY MR. KAHN:

6      Q.  And that note was part of the Theranos

7  Amended and Restated Master Services Agreement with

8  Walgreens; right?

9      A.  Not sure.

10         MR. KAHN:  Let's take a look.

11         (Deposition Exhibit 439 was marked for

12         identification)

13 BY MR. KAHN:

14     Q.  You've been handed a document marked

15 Exhibit 439.

16         Do you see that the title of this document,

17 on the first page, is "Amended and Restated Theranos

18 Master Services Agreement"?

19     A.  Yes.

20         MR. KAHN:  And for the phone, this document

21 Bates number starts at WBA-PFM-48.

22 BY MR. KAHN:

23     Q.  Okay.  If you turn in the document to

24 Schedule H-1 --

25     A.  Schedule H?

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 203

1      Q.  H-1.  It begins on the page that has a

2  Bates number ending in 76.  Bottom right-hand corner

3  says "76."

4      A.  Got it.

5      Q.  Okay.  And Schedule H-1, which is titled

6  "Convertible Promissory Note" --

7      A.  Yeah.

8      Q.  -- this is the note between Walgreens and

9  Safeway; correct -- sorry, strike that -- Walgreens

10  and Theranos; correct?

11      A.  Correct.

12      Q.  Okay.  Do you see at the beginning of the

13  note, after the words "for value received," Theranos

14  is referred to as "the Company"?

15      A.  Yes.

16      Q.  Okay.  And do you see in the -- a little

17  bit further in, a couple words in, WVC Investments,

18  LLC is referred to as "Investor"?

19      A.  Yes.

20      Q.  Okay.  And then turn to the next page, at

21  the top, do you see the section lower case A, called

22  "Optional Conversion"?

23      A.  Right.

24      Q.  If you look at the second line of that

25  section, near the end of the second line, it reads:

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 204

1          "Investor" -- that's Walgreens -- "may

2          elect to convert all or any part of the

3          outstanding principal amount up to $20

4          million of this note into fully paid and

5          non-assessable shares of the Company's

6          Series C-1 preferred stock."

7          Do you see that?

8     A.   Yes.

9     Q.   Okay.  And then if you look down to the

10    eighth line of this paragraph, the line starting

11    with the word "locations," do you see that?

12    A.   Yes.

13    Q.   Then after the parenthetical, it reads:

14         "Investor" -- again, that's Walgreens --

15         "may elect to convert all or any part of

16         the remaining outstanding principal amount

17         of this note into fully paid and

18         non-assessable shares of the Company's

19         Series C-1 preferred stock."

20         Do you see that?

21    A.   Yes.

22    Q.   Okay.  Do you know whether Theranos and

23    Walgreens ever agreed to amend either of the

24    provisions we just read relating to who had the

25    power to elect to convert the note?

**\* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED \***
CONFIDENTIAL

Page 205

1      A.  Not that I know.

2      Q.  Okay.  And do you know whether this note

3  was ever amended to permit Theranos, instead of

4  Walgreens, to decide whether the note would be

5  converted or not?

6      A.  Not that I know.

7      Q.  Okay.  So as far as you are aware, Exhibit

8  439 contains, in this schedule H-1, the currently

9  operative note between Walgreens and Theranos;

10  correct?

11      A.  This one was the only copy I had.

12      Q.  Okay.  So as far as you're aware, this

13  Exhibit 439 contains, in this schedule H-1, the

14  currently operative note between Walgreens and

15  Theranos; correct?

16      A.  Yes.

17      Q.  Okay.  Go back to the first page of the

18  note and take a look at Section 1, lower case B,

19  little Roman three.

20          Do you see that?

21      A.  Yes.

22      Q.  Okay.  And do you see in that section that

23  the note is payable back to Walgreens 60 months

24  after Walgreens makes a demand for repayment -- six

25  months -- sorry, six months after Walgreens makes a

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 206

1   demand for repayment?

2        A.   Yes.

3        Q.   Okay.  To your knowledge, has Walgreens

4   made a demand for repayment of this note?

5        A.   No, I don't -- I am not aware of that.

6        Q.   Okay.  During your time at Theranos, did

7   you ever hear that Walgreens had made a demand for

8   repayment of the note?

9        A.   Not that I'm aware of.

10        Q.   To your knowledge, did Walgreens ever elect

11   to convert the note to equity?

12        A.   Not that I'm aware.

13        Q.   During your time -- you can put that aside.

14        During your time at Theranos, did you ever

15   attend a meeting -- and you can close this laptop

16   screen, too.

17        During your time at Theranos, did you ever

18   attend a meeting of Theranos' board of directors?

19        A.   No.

20        Q.   During your time at Theranos, were you ever

21   invited to attend a Theranos' board of directors

22   meeting?

23        A.   No.

24        Q.   During your time at Theranos, did you ever

25   interact in any way with anyone who was a member of

Confidential

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 212

1          A.   I don't recall particularly incidents of

2     that.

3               MR. KAHN:   Do we have those documents, the

4     separation agreement?

5               MR. DAVIES:   Do we have it?

6               MS. INGRISANO:   Oh, yeah.

7               MR. DAVIES:   Do you want to take a quick

8     break or do you want to --

9               MR. KAHN:   I'm just going to --

10              MS. INGRISANO:   Can I have like two

11    minutes?

12              MR. DAVIES:   We'll put this together

13    whenever you want, but...

14              MR. KAHN:   Yeah.   I'm ready.   I am

15    basically done, but I just want to look at those

16    and -- let's go off the record.

17              THE VIDEOGRAPHER:   Off the record at 3:59

18    p.m.

19              (Recess taken)

20              THE VIDEOGRAPHER:   Back on the record at

21    4:02 p.m.

22              MR. KAHN:   Let's mark this as 440.

23              (Deposition Exhibit 440 was marked for

24              identification)

25    //

* REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED *
CONFIDENTIAL

Page 213

1    BY MR. KAHN:

2        Q.  Ms. Yam, you have been handed a packet of

3    documents that together were marked as Exhibit 440.

4    They were just handed to me a moment ago.  And they

5    are Bates stamped YAM-PFM-1 to 117.

6            Do you recognize these documents?

7        A.  Oh.  Yes.

8        Q.  Okay.  Let's take them one at a time.

9            So turning to the document that starts at

10   YAM-PFM-2, is this the confidentiality letter that

11   Theranos sent you upon being -- you being informed

12   that you would be leaving the company?

13           Ms. Yam, I'm looking at the document that

14   starts with page 2.

15           MR. DAVIES:  Yeah.

16   BY MR. KAHN:

17       Q.  Is this the confidentiality letter that

18   Theranos sent you when they advised you that you

19   would be terminated?

20       A.  Yes.

21       Q.  Okay.  If you turn to -- all the way almost

22   to the back, the document that starts with page

23   number YAM-PFM-106.  And then actually go to the

24   next page that starts 107.

25       A.  Yes.

```
                                              Page 214
1       Q.  Is this document the separation agreement
2   and release that Theranos sent you at the time that
3   you were terminated?
4       A.  Yes.
5           MR. KAHN:  I have no further questions at
6   this time.
7           MR. DAVIES:  Just give us two minutes.
8           MR. KAHN:  Yeah.  Off the record.
9           THE VIDEOGRAPHER:  Off the record at 4:05
10  p.m.
11          (Pause in the proceedings)
12          THE VIDEOGRAPHER:  Back on the record at
13  4:06 p.m.
14          MR. DAVIES:  Consistent with our earlier
15  promise, no more questions from us.
16          MR. LOMBARD:  None from us.
17          MR. KAHN:  Ben?
18          MR. DAVIES:  Ben, you're on that, too.
19          MR. BYER:  No questions from me.
20          MR. KAHN:  Let's release the witness.
21          THE VIDEOGRAPHER:  This concludes today's
22  deposition of Danise Yam on March 16, 2017, which
23  consists of three media and volume number 1.  The
24  original media will remained in the custody of TSG
25  Reporting.
```

Confidential