1   Michael A. Mugmon (251958)
    WILMER CUTLER PICKERING
2       HALE AND DORR LLP
    950 Page Mill Road
3   Palo Alto, CA 94304
    Telephone: +1 650 858 6000
4   Facsimile: +1 650 858 6100
    michael.mugmon@wilmerhale.com
5
    Christopher Davies (admitted *pro hac vice*)
6   WILMER CUTLER PICKERING
        HALE AND DORR LLP
7   1875 Pennsylvania Avenue, NW
    Washington, DC 20006
8   Telephone: +1 202 663 6000
    Facsimile: +1 202 663 6363
9   christopher.davies@wilmerhale.com

10  Timothy Perla (admitted *pro hac vice*)
    Robert K. Smith (admitted *pro hac vice*)
11  Jessica Lewis (SBN 302467)
    WILMER CUTLER PICKERING
12      HALE AND DORR LLP
    60 State Street
13  Boston, MA 02109
    Telephone: +1 617 526 6000
14  Facsimile: +1 617 526 5000
    timothy.perla@wilmerhale.com
15  robert.smith@wilmerhale.com
    jessica.lewis@wilmerhale.com
16
    *Attorneys for Defendant Theranos, Inc.*
17
    [Additional counsel listed on following page.]
18
                    **UNITED STATES DISTRICT COURT**
19
                    **NORTHERN DISTRICT OF CALIFORNIA**
20
                    **SAN JOSE DIVISION**

21  ROBERT COLMAN and HILARY            Case No.  5:16-cv-06822-NC
    TAUBMAN-DYE, Individually and on Behalf
22  of All Others Similarly Situated,       **DEFENDANTS' OPPOSITION TO**
                                            **PLAINTIFFS' MOTION FOR**
23                        Plaintiffs,       **CLASS CERTIFICATION UNDER**
                                            **RULE 23(B)(3)**
24      vs.
                                            Date: March 28, 2018
25  THERANOS, INC., ELIZABETH HOLMES,       Time: 1 p.m.
    and RAMESH BALWANI,                     Courtroom: 7, 4th Floor
26                                          Judge: Hon. Nathanael Cousins
                          Defendants.
27

28

───────────────────────────────────────────────

1

COUNSEL CONTINUED:

2

Matthew Benedetto (252379)
WILMER CUTLER PICKERING
     HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5300
Facsimile: +1 213 443 5400
matthew.benedetto@wilmerhale.com

3

4

5

6

*Additional Attorney for Defendant Theranos, Inc.*

7

8

Kathleen Goodhart (165659)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: +1 415 693 2012
Facsimile: +1 415 693 2222
kgoodhart@cooley.com

9

10

11

12

Stephen C. Neal (170085)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: +1 650 843 5000
Facsimile: +1 650 849 7400
nealsc@cooley.com

13

14

15

16

*Attorneys for Defendant Elizabeth Holmes*

17

18

Allison A. Davis (139203)
Kelly Gorton (300978)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone: +1 415 276 6500
Facsimile: +1 415 276 6599
allisondavis@dwt.com
kellygorton@dwt.com

19

20

21

22

Stephen M. Rummage (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Telephone: +1 206 757 8136
Facsimile: +1 206 757 7136
steverummage@dwt.com

23

24

25

26

*Attorneys for Defendant Ramesh Balwani*

27

28

1

# **TABLE OF CONTENTS**

2

TABLE OF CONTENTS...................................................................................................... i

3

TABLE OF AUTHORITIES ............................................................................................... ii

I.      INTRODUCTION ...................................................................................................1

4

II.     BACKGROUND .....................................................................................................2

5

        A.      Theranos and Its Private Investors ..............................................................2

6

        B.      Available Public Information Concerning Theranos ...................................4

7

        C.      The Putative Class Representatives ..............................................................5

8

                1.      Robert Colman ...................................................................................5

9

                2.      Hilary Taubman-Dye .........................................................................6

10

                3.      Thomas Brodie M.D. .........................................................................7

11

                4.      Mai N. Pogue ....................................................................................7

        D.      The Putative Class........................................................................................8

12

        E.      Prior Class Proceedings ..............................................................................9

13

III.    ARGUMENT ...........................................................................................................9

14

        A.      Plaintiffs' Class Definition Is Fundamentally Flawed..............................9

        B.      Plaintiffs Have Failed to Establish That Common Issues of Law

15

                Predominate ...............................................................................................11

16

                1.      Plaintiffs Have Not Met Due Process Requirements.....................12

17

                2.      Under the Governmental Interest Test, Many States' Laws Apply ..........13

18

                3.      Given That Multiple States' Laws Apply, Predominance is
                        Lacking ...........................................................................................14

19

        C.      Plaintiffs Have Failed to Establish that Common Issues of Fact

20

                Predominate ...............................................................................................15

21

                1.      Common Issues of Fact Do Not Predominate Counts IV-VI ...................15

                2.      Common Issues of Fact Do Not Predominate Count I .............................19

22

                3.      Common Issues of Fact Do Not Predominate Count III..........................22

23

                4.      Releases Raise Additional Individual Issues (All Counts) ......................23

        D.      Plaintiffs Have Not Proven Superiority ....................................................23

24

IV.     CONCLUSION......................................................................................................25

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**                                                                                    **Page(s)**

3

*Amchem Prods., Inc. v. Windsor,*
4
    521 U.S. 591 (1997)....................................................................................24

5

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013)....................................................................................20
6

*Andren v. Alere, Inc.,*
7
    2017 WL 6509550 (S.D. Cal. Dec. 20, 2017)....................................13, 15

8

*Berger v. Home Depot USA, Inc.,*
    741 F.3d 1061 (9th Cir. 2014) ...................................................................22
9

*Betz v. Trainer Wortham & Co.,*
10
    829 F.Supp.2d 860  (N.D. Cal. 2011) .......................................................22

11

*Birnberg v. Milk St. Residential Assocs. Ltd. P'ship,*
12
    2003 WL 21267103 (N.D. Ill. May 29, 2003) ..........................................24

13

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) .....................................................................18
14

*Briseno v. ConAgra Foods, Inc.,*
15
    844 F.3d 1121 (9th Cir. 2017) ...................................................................10

16

*Brooks v. Darling Int'l, Inc.,*
17
    2017 WL 1198542 (E.D. Cal. Mar. 31, 2017) ..........................................10

18

*Buchanan v. Tata Consultancy Servs., Ltd.*
    2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ..........................................10
19

*Carr v. New York Stock Exch., Inc.,*
20
    414 F.Supp. 1292 (N.D. Cal. 1976) ..........................................................24

21

*City Solutions, Inc. v. Clear Channel Communications,*
22
    365 F.3d 835 (9th Cir. 2004) .....................................................................15

23

*Cohen v. Trump,*
    303 F.R.D. 376 (S.D. Cal. 2014) ..............................................................18
24

*Daniel F. v. Blue Shield of Cal.,*
25
    305 F.R.D. 115 (N.D. Cal. 2014)..............................................................10

26

*Darisse v. Nest Labs, Inc.,*
27
    2016 WL 4385849 (N.D. Cal. Aug. 15, 2016) .............................12, 15

28

- ii -

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ...................................................................15, 17

*Dealertrack, Inc. v. Huber*,
    460 F.Supp.2d 1177 (C.D. Cal. 2006) .............................................................15

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ...........................................................16, 19, 20, 21

*Ehret v. Uber Techs., Inc.*,
    148 F.Supp.3d 884 (N.D. Cal. 2015) ...............................................................22

*Est. of Felts v. Genworth Life Ins. Co,*,
    250 F.R.D. 512 (W.D. Wash. 2008) .................................................................24

*In re First Alliance Mortgae Co.*,
    471 F.3d 977 (9th Cir. 2006) ............................................................................18

*In re: First Am. Home Buyers Prot. Corp. Class Action Litig.*,
    313 F.R.D. 578 (S.D. Cal. 2016) ................................................................14, 17

*Gartin v. S & M NuTec LLC*,
    245 F.R.D. 429 (C.D. Cal. 2007) .....................................................................15

*Gbarabe v. Chevron Corporation*,
    2017 WL 956628 (N.D. Cal. Mar. 13, 2017)...................................................10

*Gianino v. Alacer Corp.*,
    846 F. Supp. 2d 1096 (C.D. Cal. 2012) .............................................12, 13, 14, 15

*Gonzalez v. Proctor & Gamble Co.*,
    247 F.R.D. 616 (S.D. Cal. 2007) .....................................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014).....................................................................................19

*In re Hitachi Television Optical Block Cases*,
    2011 WL 9403 (S.D. Cal. Jan. 3, 2011)...........................................................13

*In re Hyundai & Kia Fuel Econ. Litig.*,
    881 F.3d 679 (9th Cir. 2018) ..........................................................11, 13, 15, 18, 19

*In re Intuitive Surgical Securities Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .................................................18

*Javine v. San Luis Ambulance Serv., Inc.*,
    2015 WL 12672090 (C.D. Cal. Jan. 13, 2015.................................................23

*Lilly v. Jamba Juice Co.*,
    308 F.R.D. 231 (N.D. Cal. 2014)....................................................................24

*Lim v. Helio LLC*,
 2012 WL 12884439 (C.D. Cal. Apr. 8, 2012) ...................................................................23

*Mazza v. American Honda Motor Co.*,
 666 F.3d 581 (9th Cir. 2012) ..................................................................................... *passim*

*Milne Employees Ass'n v. Sun Carriers*,
 960 F.2d 1401 (9th Cir. 1991) ..........................................................................................15

*In re Morning Song Bird Food Litigation*,
 320 F.R.D. 540 (S.D. Cal. 2017) .......................................................................................18

*Nguyen v. BDO Seidman, LLP*,
 2009 WL 7742532 (C.D. Cal. July 6, 2009).......................................................................24

*Pablo v. ServiceMaster Glob. Holdngs Inc.*,
 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .....................................................................23

*Palmer v. Stassinos*,
 236 F.R.D. 460 (N.D. Cal. 2006)........................................................................................11

*Phillips Petroleum Co. v. Shutts*,
 472 U.S. 797 (1985).............................................................................................................12

*Poulos v. Caesars World, Inc.*,
 379 F.3d 654 (9th Cir. 2004) ..............................................................................................16

*Primavera Familienstiftung v. Askin*,
 178 F.R.D. 405 (S.D.N.Y. 1998) ........................................................................................24

*Probe v. State Teachers' Ret. Sys.*,
 780 F.2d 776 (9th Cir. 1986) ................................................................................................9

*Rogers v. Epsom Am., Inc.*,
 648 Fed. Appx. 717 (9th Cir. 2016).....................................................................................22

*Siegal v. Gamble*,
 2016 WL 1085787 (N.D. Cal. Mar. 21, 2016).....................................................................22

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
 308 F.R.D. 630 (N.D. Cal. 2015)........................................................................................24

*Tidenberg v. Bidz.com, Inc.*,
 2009 WL 605249 (C.D. Cal. Mar. 4, 2009).........................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011).......................................................................................................9, 18

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) .................................................................10

*Zinser v. Accufix Research Inst. Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................16, 24, 25


**State Cases**

*Bowen v. Ziasun Techs., Inc.*,
    116 Cal. App. 4th 777 (2004) ..............................................................................22

*Calif. Amplifier, Inc. v. RLI Ins. Co.*,
    94 Cal. App. 4th 102 (2001) ................................................................................19

*Mirkin v. Wasserman*,
    858 P.2d 568 (Cal. 1993) ........................................................................15, 18, 20

*Norwest Mortg., Inc. v. Super. Ct.*,
    72 Cal. App. 4th 214 (1999) ..........................................................................12, 13

*Shersher v. Super. Ct.*,
    154 Cal. App. 4th 1491 (2007) ............................................................................23


**Rules**

Fed. R. Civ. P 23 ..............................................................................................9, 18, 23


**Other Authorities**

Joseph C. Long, et.al., *Blue Sky Law* § 9:1 .....................................................................14

Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation*, Ch.11.B
    (6th ed. 2011; 2018 Supplement)...................................................................14

Manual for Complex Litigation (4th) § 21.222 ............................................................10

Newberg on Class Actions §§ 3:5, 4:88 (5th ed.) ..................................................10, 24

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
5:16-cv-06822-NC

Defendants oppose Plaintiffs' Motion For Class Certification ("Mot.") and submit with this Opposition: (i) the Declaration of Sanjay Unni ("Unni Dec."), (ii) the Declaration of Alexander White ("White Dec."); and (iii) the Declaration of Timothy Perla ("Perla Dec.").[1]

## I.   INTRODUCTION

Having failed in their previous attempt to certify a class—an attempt that left this Court expressing "concerns about the certification of a class in this case"—Plaintiffs press their last hope of gaining unwarranted leverage.  They ask the Court to take the unprecedented step of certifying a class of "indirect" investors, all of whom purchased in an inefficient market under individualized circumstances.  Yet Plaintiffs are unable to cite a single case in which a court has certified an indirect investor class—and they provide this Court no reason to break new ground.

**_Flawed Class Definition:_**  A class must have an objective and precise class definition—one that makes clear who is in and who is out.  Plaintiffs' definition turns on subjective criteria (_i.e.,_ one's "purpose" in investing), and their fallback definition relies on vague concepts (_i.e.,_ who has been "identified" or "solicited").  Worse, both definitions push "indirect" investing to absurdity—embracing investors with only a remote connection to Theranos.  For example, Mai Pogue invested in an entity that is _four levels removed_ from an investment in Theranos.

**_Common Issues of Law Do Not Predominate:_**  Putative class members reside in many different states, yet Plaintiffs do not address due process or choice of law.  However, the analysis required by _Mazza v. American Honda Motor Co._, 666 F.3d 581 (9th Cir. 2012) shows that many states' laws would govern a class, and that common issues of law do not predominate as a result.

**_Common Issues of Fact Do Not Predominate:_**  Putative class members could have read any of _thousands_ of public references to Theranos—or none—and could have received _private_ information—or not—but the only way to know is individual fact-finding.  Indeed, as Appendix A shows, even the putative class representatives had very different bases for investing.  Thus, Plaintiffs' fraud claims cannot be certified due to the dramatic variation in facts that would

---

[1] Citations to "Pl. Ex. []" refer to exhibits to the Kathrein Declaration, Dkt. No. 177-04. Citations to "Def. Ex. []" refer to exhibits to the Perla Declaration.  Citations to docket entries ("Dkt. No. []") refer to docketed materials that are not resubmitted herewith.  All emphasis is added, and citations and quotations omitted, unless otherwise noted.

underpin the justifiable reliance analysis.  The same is true for the UCL claim, which (in addition to not applying to securities) requires that each class member be exposed to the same misrepresentation.  The same result also follows for Section 25500, which requires that a misrepresentation affect each class member's purchase price.  As Dr. Unni explains, in an inefficient market such as this one, the only way to know whether an alleged misrepresentation affected a purchaser's price is to *examine each transaction*.

***No Superiority:***  Plaintiffs have made no showing that class treatment would be manageable.  They did not submit the required trial plan.  Further, putative class members are sophisticated private investors with large stakes (up to $15 million), who have not supported this case despite Plaintiffs' campaign to enlist their assistance.  The sole putative class member Plaintiffs deposed testified that Defendants did nothing wrong, and there is no "real case there."

In short, there is no basis for this Court to grant Plaintiffs' unprecedented motion.

## II.     BACKGROUND

### A.      Theranos and Its Private Investors

Theranos has never been a public company.  It has never published quarterly or annual reports or prospectuses, announced financial results, held public investor calls, or publicly disseminated information about its business plans or finances.  White Dec. ¶ 4.  Instead, Theranos has raised money through private stock sales to sophisticated investors.  *Id.* ¶¶ 5-6 (chart of stockholders).  As Dr. Unni explains, Theranos securities were traded very thinly and there is no evidence they traded in an efficient market.  Unni Dec. ¶¶ 11(a), 31, 37-61.  Diligence materials were not uniform, and investors received varied information.   For instance, Lucas Ventures Group XI, LLC ("LVG XI")—in which Colman invested—received information through conversations, meetings, and correspondence between Donald Lucas and Theranos personnel.  *See* Def. Ex. 1 (Lucas Tr.) at 27:6-8; 58:11-17; 60:10-14; 66:12-20.  In contrast, Celadon Technology Fund VII, LLC ("Celadon")—in which Taubman-Dye invested—bought Theranos stock from another stockholder and received nothing from Theranos.  White Dec. ¶¶ 10, 12.  Other investors received varied meetings, lab tours, and confidential documents.  *Id.* ¶ 8.

Plaintiffs try to distract from the stark differences among investors by disparaging

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No.  5:16-cv-06822-NC

Theranos and its personnel.[2]  Their simplistic and false narrative is that the "technology" "never actually worked."  Mot. 5-6.  While Defendants cannot correct all of Plaintiffs' misstatements in the space allowed, some background is apt.  Theranos' "technology" was not, as Plaintiffs posit, confined to an Edison 3.5 device with a limited testing menu.  The Edison 3.5 was just one iteration of a testing device within a suite of hardware, software, chemical assays, procedures, and expertise.  Def. Ex. 7 (C. Holmes Tr.) at 141:24-143:24 (identifying different devices developed); *see also* Def. Ex. 8 (Smith Tr.) at 30:9-13; 32:8-33:22; 34:10-15; 47:13-18 (similar).  Theranos has many technologies—embodied in *hundreds of patents*—related to the collection, storage, transportation, and testing of small blood samples.  White Dec. ¶ 3.  Further, the technologies evolved.  As the Walgreens relationship rolled out, Theranos expanded geographically through a model in which blood samples collected at Walgreens were shipped to a central laboratory for high volume processing.  It was no secret that Theranos used traditional blood draws (even Taubman-Dye received one), did not analyze blood onsite, and did not operate only Edisons.  For instance, Theranos' Arizona lab (opened in early 2015) was registered with the Centers for Medicare and Medicaid Services as a "moderate complexity" lab, which by regulation meant that it could not run "high complexity" technologies, such as proprietary fingerstick tests.[3]  Def. Ex. 9 (Masson Tr.) at 173:5-174:20; *see also* C. Holmes Tr. at 88:9-16; 89:1-13.  This was a matter of public record.

Finally, Plaintiffs' assertion that Theranos is "worthless" (Mot. 7) is false.  They cite only a dated *Fortune* news article's guesstimate that the Company's value has decreased and say-so declarations of putative class representatives—no financial valuation evidence.  Mot. 7, n.30.

---

[2] Plaintiffs feebly launch their Background recitation with a distorted assertion about the personal lives of two Theranos executives.  Mot. 2.  However, as a major investor and putative class member testified, the fact that two executives had a personal relationship was both known and "had no bearing on the company whatever."  *See* Lucas Tr. at 25:19-26:14; 40:2-14.

[3] Plaintiffs assert that Theranos used "commercial equipment."  Mot. 6.  They appear to be referring to the ADVIA 1800, a machine that allows users to program their own proprietary assays.  Theranos configured the ADVIA to run its proprietary small-volume tests, which it paired with homegrown technologies for collecting, preserving, and transporting small samples.  Def. Ex. 10 (Gong Tr.) at 65:7-66:5; 67:4-14; 67:22-25; 68:15-24; 103:12-104:15; 185:7-15.  This was an implementation of the goal of processing small blood samples.

1   But even Brodie agrees that Theranos has value because of its extensive patent portfolio.  Def.

2   Ex. 4 (Brodie Tr.) at 141:12-142:8.  Indeed, the technology that supposedly never worked has

3   yielded an FDA-cleared test (on a Theranos-manufactured machine) for herpes simplex virus

4   type 1.  Def. Ex. 11.  Theranos also recently closed a significant financing (Brodie Tr. at 141:12-

5   21)—which a "worthless" entity could not accomplish.

6         **B.**    **Available Public Information Concerning Theranos**

7         Plaintiffs also suggest, without offering evidence, that available *public* information about

8   Theranos did not vary over a three-year period.  Their sweeping (but unsupported) assertions of

9   uniformity,[4] focusing on two press releases and one news article from 2013 (Mot. 10), does not

10   begin to acknowledge the actual scope and variety of the public information.  In fact, over the

11   class period, Theranos received *more than 5,000* mentions in the press.  *See* Perla Decl. ¶¶ 2-3;

12   *see also* Am. Compl. ¶¶ 22-25, 31-33 (cataloguing numerous media references to Theranos).

13         Even press releases were not uniform.  A July 2013 press release announced two new

14   board members (Pl. Ex. Z); even Colman agrees it was *not false*.  Col. Tr. at 96:5-23.  The next

15   two press releases (Pl. Ex. BB; Def. Ex. 12) addressed Walgreens.  Far from suggesting that all

16   Theranos testing would use fingerstick, the releases stated that some draws used "traditional

17   methods."  Pl. Ex BB; Def. Ex. 12.  Other press releases addressed board appointments,

18   partnerships, FDA proceedings, officer appointments, and other matters.  Def. Exs. 13-17.

19         Plaintiffs also theorize that Theranos was secretly trying through publicity to sell

20   securities (Mot. 3).  But none of Theranos' press releases mentioned securities or investing,

21   supplied information on which investors rely (*e.g.,* financials, business plans), or otherwise

22   suggested any agenda to attract investment.  Indeed, the launch strategy documents Plaintiffs cite

23   (Pl. Ex. F) nowhere mention investors among the "target audiences" and, as Colman was

24   informed in late 2013, Theranos *did not need money*; it permitted new investment as a favor to

25   longtime investors.  Def. Ex. 21 (email to Colman); Col. Tr. at 74:19-75:7; 79:25-80:10.

26         Most importantly, Plaintiffs ignore *private* information entirely, which is what most of

27

28       [4] For instance, Plaintiffs assert that "Defendants' representations about Theranos remained the same throughout the [class] period" (Mot. 5), but they cite only two documents.  *See* Mot. n.19.

1    even the putative class representatives based their investments on.

2        **C.**     **The Putative Class Representatives**

3           Although Plaintiffs recently (at the last minute) tried repeatedly to change the putative

4    class representatives,[5] their Motion as noticed identifies four putative class representatives.

5          **1.**     **Robert Colman**

6           Colman is a sophisticated, wealthy investment banker who had made dozens of private

7    investments before investing $500,000 in LVG XI on September 25, 2013.  Pl. Ex. OO ¶ 1; Col.

8    Tr. at 15:13-16:10.  He was offered his investment in Idaho, where he resided.  Col. Tr. at 34:10-

9    14.  He invested based on two telephone calls with Donald Lucas (a venture capitalist with

10    whom Colman had invested repeatedly) and one email from Lucas.  *Id.* at 64:5-23; 69:3-16;

11    71:21-25; 74:19-75:11.  The most significant factor was Lucas's recommendation—the

12    investment was a "leap of faith" based on Lucas.  *Id.* at 30:21-23.  Colman believes he read

13    materials that Lucas forwarded to him, potentially including two press releases and a *Wall Street

14    Journal* article.  *Id.* at 76:10-77:22; 97:1-10.  Colman invested under the misimpression that

15    Theranos used fingerstick blood draws for all blood tests, and testified that it "definitely would

16    have made a difference" if he had known otherwise.  *Id.* at 65:22-66:2; 88:16-23.  But when

17    confronted with clear disclosures (from the very materials he claims to have read), he conceded

18    Theranos had stated publicly that it used traditional blood draws.  *Id.* at 94:4-95:25.

19           Colman signed an LVG XI Subscription Agreement (Def. Exs. 18-19) in which he agreed

20

21    ─────────────────────
  [5] Since inception, Colman and Taubman-Dye have been the only proposed class representatives.
22    Without warning, six weeks after the deadline to file an amended complaint, Plaintiffs' Motion added Thomas Brodie and Mai Pogue as proposed class representatives. Plaintiffs' counsel
23    changed course yet again on the evening before this Opposition was due, emailing defense counsel that they hoped to substitute BF Last Investments and Pogue Capital Fund for Brodie
24    and Pogue. Def. Ex. 43. Then, after midnight on the very day this Opposition was due, Plaintiffs' counsel withdrew Pogue Capital Fund entirely. *Id.*  Eleventh hour emails to defense counsel do
25    not suffice to amend a Complaint or a noticed motion, particularly given the prejudice associated with making such a change after completion of class discovery. Thus, this Opposition responds
26    only to the pending Motion and addresses the putative class representatives the Motion identifies. And even if Pogue and Brodie are not class *representatives*, their investment facts remain
27    relevant as examples of how the experiences of class *members* vary. Further, the mere fact that Plaintiffs' counsel proposed a representative (Pogue) who perjured herself during deposition and
28    submitted a false Declaration (discussed *infra*) reflects on Plaintiffs' counsel's adequacy.

1   his investment was "speculative."  *Id.* at 27:23-28:5.  He also represented that he was "not

2   subscribing for the Interest as a result of any advertisement, article, notice or other

3   communication published in any newspaper, magazine, or similar media or broadcast over

4   television or radio, or any other form of general advertising."  *Id.* at 32:6-15.  During deposition,

5   he admitted that ***representation was false***.  *Id.* at 32:6-34:4.  He also represented that he was not

6   investing in reliance on statements by Lucas, which he now seeks to retract.  *Id.* at 38:22-42:12.

7        Colman signed an Operating Agreement (Def. Ex. 20) granting "broad authority" to

8   Lucas as managing member, whom he appointed as his attorney in fact.  Col. Tr. at 20:13-20.

9   The purpose of the broad authority was to allow the managing member to "make decisions on

10  behalf of the partners." *Id.* at 38:15-18.  Lucas later relied upon that appointment to release LVG

11  XI claims (including Colman's claims) as part of a tender offer.  "I am their attorney in fact as

12  general partner, and made th[e] decision … to accept that deal."  Lucas Tr. at 91:10-14.

13                    **2.    Hilary Taubman-Dye**

14       Taubman-Dye's investment could not be more different from Colman's.  Her August 13,

15  2015 investment in Celadon remains her only private investment ever.  Def. Ex 2 (TD Tr.) at

16  107:14-17; 108:9-10.  She invests in what she "likes" (all of her examples were large public

17  companies), and her testimony reflects a relative lack of sophistication.  *Id.* at 116:5-13; 116:22-

18  23; 117:2-22; 118:9-23.  She consulted no advisors, and received no information about Theranos

19  from Celadon. *Id.* at 9:25-10:6; 82:22-85:8; 132:7-15.  She did not negotiate price.  *Id.* at

20  111:19-112:5. She did not rely on anything authored by Defendants.  *Id.* at 90:20-92:20; 93:18-

21  20; 94:18-21; 97:6-16; 100:15-101:12.  Instead, she invested based on: (i) a positive experience

22  with blood tests at Walgreens[6]; (ii) a conversation with her doctor; (iii) her belief that a certain

23  venture capitalist had invested; (iv) her belief that a Stanford professor supported Theranos; and

24  (v) online research, though she could identify with confidence only one article in *Fortune*.  *Id.* at

25  37:3-5; 38:6-23; 41:12-21; 136:18-23; 141:13-142:3; 151:13-24; 152:20-155:21.

26       Before investing, Taubman-Dye signed a memorandum (Def. Ex. 24) acknowledging that

27

28  _____
    [6] Taubman-Dye received a *traditional* venous blood draw at Walgreens, and thus understood
    that not all draws used fingerstick technology.  TD Tr. at 41:22-43:18.

public information about Theranos was limited and could be incomplete or inaccurate, as well as highlighting other risks of a private investment.  She also signed a Subscription Agreement (*id.*) containing similar warnings, and a representation that she "has received no general solicitation or general advertising (including communications published in any newspaper, magazine, email, or by electronic means on the internet or other broadcast) . . . ."

### 3.    Thomas Brodie M.D.

On December 30, 2013, Brodie invested in BF Last Investments LLC, which invested in in Black Diamond Ventures XII-B, LLC ("BDV").  Def. Ex. 27; Brodie Tr. at 27:15-18; 80:8-81:11.  He invested primarily based on his participation in a conference call that included Ms. Holmes.  *Id.* at 48:6-49:15.  He also considered the recommendation of the BDV fund manager, various media and press releases, and his views about Theranos' technology based on his personal experience as a medical doctor.  *Id.* at 20:3-21:2; 22:22-24:9; 25:14-27:1; 62:5-63:5. He signed a BDV subscription agreement in which he represented that he was not investing "as a result of or subsequent to" any "article" "published in any newspaper, magazine, or similar media or broadcast."  Def. Ex. 27.

### 4.    Mai N. Pogue

Pogue is a Florida fund manager who lied during her deposition about her history as the target of SEC enforcement,[7] and made *three false statements* in her Declaration (Pl. Ex. RR).[8]  In September 2015, she invested approximately $150,000 in Pogue Capital LLC, Fund D ("Fund D"), which she combined with money from 11 other largely foreign investors.  Pogue Tr. at 23:21-23; 25:22-26:4; 55:10-11; 151:14-25.  Fund D purchased shares of OPA Holdings SPV, LP ("OPA"), a New York partnership.  *See id.* at 136:21-23; Def. Ex. 36 (OPA Form D).  Pogue, in yet another misstatement, testified that OPA in turn purchased Theranos stock.  Pogue Tr. at

---

[7] *Compare* Def. Ex. 5 (Pogue Tr.) at 9:1-3 ("Q. Have you been the subject of a government enforcement action?  A. No.") *with* Def. Ex. 34 (SEC Order initiating action and fining Pogue).
[8] Pogue Declaration paragraph 1 falsely identifies the number and class of shares purchased; paragraph 7 falsely states that she had read the Amended Complaint; and, as she noted on questioning by her counsel, paragraph 10 falsely states that she is prepared to take an "active role" as a class representative.  Pogue Tr. at 176:5-8; 194:7-10; 200:16-25.

1   115:14-21; 127:6-8.  In fact, OPA tried *unsuccessfully* to purchase Theranos stock,[9] and instead

2   purchased an interest in Cassin Family Partners, LP ("Cassin").  Def. Ex. 37.  Cassin had

3   purchased (and still owns) Theranos Class B and C stock in 2006.  White Dec. ¶¶ 11, 13.  In

4   other words, Pogue is *four levels* removed:  Pogue → Fund D → OPA → Cassin → Theranos.

5         In deciding to invest, Pogue relied principally on a proprietary third-party research report

6   (costing $3,000) supplied by OPA.  Pogue Tr. at 83:20-24; Def. Ex. 31 (copy of report).  She

7   also claims to have spoken with the principal of OPA, conducted online research, sought out Ms.

8   Holmes's Stanford classmates, and contacted persons whose blood was tested by Theranos.

9   Pogue Tr. at 60:2-6; 73:18-20; 75:3-8; 83:15-22.  When pressed, she could not identify any false

10  statement made by a Defendant.  Pogue Tr. at 112:12-114:3.

11        **D.    The Putative Class**

12        Plaintiffs seek to certify a class defined as follows:

13              All persons or entities who, from July 29, 2013, through October 5,
                2016, purchased or acquired securities of an entity for the express
14              purpose of making corresponding purchases of Theranos securities.

15  Mot. 1.[10]  Information available about putative class members makes clear that their facts vary:

16  •   *Different States*:  Even Plaintiffs' incomplete lists of putative class members (resubmitted
        by Defendants with addresses unredacted) reflect residents of Florida, Idaho, Ohio,
17      Minnesota, Oregon, Illinois, Washington, Indiana, Colorado, Arkansas, New York,
        Texas, New Jersey, Utah, and Nevada.  Def. Exs. 41-43.
18

19  •   *Different Timing*:  Putative class members invested on dates scattered over the course of
        more than three years, meaning, that their circumstances necessarily differed.
20

21  •   *Different Investment Prices in Different Investments*:  Putative class members paid
        different unit prices.  They also acquired interests in funds that invested in different
22      classes of Theranos stock with materially different rights.  White Dec. ¶¶ 5-6.

23  •   *Different Private Information*:  Putative class members received different private
        information, or none at all, from their funds.  *See supra* § II.C.
24

25  •   *Different Public Information*:  Public information about Theranos varied over time.  *See
        supra* § II.B.  Further, as the putative class representatives demonstrate, irrespective of
26

27  ⁹ Theranos has a right of first refusal over transactions in its stock.  When OPA attempted to
    purchase stock from a shareholder, Theranos purchased the stock instead.  White Dec. ¶¶ 9-11.
28  ¹⁰ Plaintiffs' offer a fallback: "All investors in the funds which have been identified as having
    solicited investors for the purposes of investing in Theranos stock during the Class Period."

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No.  5:16-cv-06822-NC

what was *available*, there are stark differences in what, if anything, they *actually read*.

- *Different Entities and Agreements:*  Putative class members invested in many different entities (*e.g.*, partnerships, LLCs.  *See* Pl. Ex. A (listing some investment funds).  They signed different suites of agreements, in which they made various representations and agreements giving rise to various defenses, including releases of all Defendants.

### E.    Prior Class Proceedings

On November 28, 2016, Colman and Taubman-Dye filed a complaint falsely stating that they had each purchased "Theranos securities."  Dkt No. 1 ¶¶ 11-12.  The Court thereafter made two Rule 23 rulings: (i) denying Plaintiffs' motion to certify under Rule 23(b)(1), noting "further concerns about the certification of a class in this case," Def. Ex. 6, and (ii) granting Theranos' motion to strike actual Theranos stockholders from the class definition.  Dkt. No. 143.

Plaintiffs took a single class deposition of Donald Lucas.  Even though he invested millions and is a putative class member, he testified that *Defendants had done nothing wrong, no one was deceptive, and there was no "real case there."*  Lucas Tr. at 91:3-9.[11]

## III.    ARGUMENT

Rule 23 is not "a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Rather, Plaintiffs must "prove … that [their proposed class] *in fact*" satisfies Rule 23.  *Id.* (emphasis in original).  Thus, the "rigorous analysis" required "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim."  *Id.* at 351.

Here: (i) the class definition is subjective and imprecise; (ii) common legal issues do not predominate, (iii) common factual issues do not predominate, and (iv) superiority is lacking.[12]

### A.    Plaintiffs' Class Definition Is Fundamentally Flawed

Rule 23 requires a class definition that is precise, making membership capable of objective determination, sometimes referred to as a need for "definiteness."  *Probe v. State*

---

[11] Plaintiffs otherwise offer a distorted, inaccurate summary of Lucas' actions, supported by nonspecific record citations.  *E.g.,* Mot. 3 (citing "pp. 26-45").  The transcript speaks for itself.  For instance, Mr. Lucas explained that his title as Theranos "special advisor," which Plaintiffs cast as an investment solicitation role (Mot. 3), was an honorific in recognition of Lucas' father's prior service to Theranos.  Lucas Tr. at 41:6-14 ("There was no there, there" to title).

[12] Given overlap among the Rule 23 elements, this memorandum focuses on predominance and superiority.  However, Defendants do not waive any Rule 23 requirements, and the reasons why predominance is lacking also demonstrate the absence of commonality and typicality.

1    *Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986); *see Briseno v. ConAgra Foods, Inc.*, 844

2    F.3d 1121, 1124-25, n.3, 4 (9th Cir. 2017); *Brooks v. Darling Int'l, Inc.*, 2017 WL 1198542, at

3    *6-9 (E.D. Cal. Mar. 31, 2017); *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089

4    (N.D. Cal. 2011) (clear definition begets clarity "later on [regarding] whose rights are merged

5    into the judgment,… who gets the benefit of any relief and who gets the burden of any loss").  A

6    class definition that is imprecise invites satellite litigation.  *See Daniel F. v. Blue Shield of Cal.*,

7    305 F.R.D. 115, 124 (N.D. Cal. 2014); *Xavier*, 787 F. Supp. 2d at 1089.[13]

8             Here, Plaintiffs' primary class definition refers to persons who invested for the "express

9    purpose" of making a corresponding Theranos investment.  "Express purpose" is a mental state

10   that cannot define class membership.  *Xavier*, 787 F. Supp. 2d at 1089 (denying certification

11   where membership inquiry "would come down to the state of mind of the putative class

12   member"); Manual for Complex Litigation (4th) § 21.222 (definition "should avoid subjective

13   standards (*e.g.*, a plaintiff's state of mind)"); Newberg on Class Actions § 3:5 (5th ed.) (similar).

14            Plaintiffs' fallback definition—the ***fifth*** different class definition Plaintiffs have proposed

15   since the inception of this case—captures investors in funds that "have been identified as having

16   solicited investors for the purposes of investing in Theranos stock."[14]  This is fatally vague.

17   Identified by whom, and when?  What constitutes a solicitation?  What if only some investors in

18   a fund were solicited?  Indeed, if solicitation is the standard, then Taubman-Dye is not in the

19   putative class because she admits Celadon did not solicit her.  TD Tr. at 9:2-10.

20            Further, both definitions are unclear how "indirect" an investor can be and still be within

21   the class.  Pogue, for instance, is four levels removed from Theranos.  And she testified that a

22   Pogue Capital Fund D investor is a fund whose investors are also in the proposed class (Pogue

23

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [13] Plaintiffs' assertion that they "need not establish that the Class is sufficiently 'definite'" (Mot.
     8) misstates the law.  *Briseno* excluded definiteness from its holding that administrative

25   feasibility is not required, and affirmed the definiteness requirement.  844 F.3d at 1124-25, n.3,
     4.  *See also, e.g., Gbarabe v. Chevron Corporation*, 2017 WL 956628, at *13 (N.D. Cal. Mar.

26   13, 2017) (citing *Briseno* and denying certification for lack of definiteness).  The case that
     Plaintiffs cite, *Buchanan v. Tata Consultancy Servs., Ltd.* 2017 WL 6611653 (N.D. Cal. Dec. 27,

27   2017), addresses only administrative feasibility, not definiteness.
     [14] *Compare* Mot. 1 n.2 *with* ECF No. 1 at ¶ 81 (original complaint) *and* ECF No. 109-3 at i

28   (proposing two alternate definitions) *and* ECF No. 173 at ¶ 86 (amended complaint).

1    Tr. at 174:19-24)—meaning there is a *fifth level*.  Many putative class members from Plaintiffs'

2    lists are funds with underlying investors.  Pl. Exs. CC-KK.  Plaintiffs never explain how far

3    down this "indirect" investing rabbit hole their class definition would go or, if they intend

4    artificially to cut it off, where and on what principle.  *See Palmer v. Stassinos*, 236 F.R.D. 460,

5    463 (N.D. Cal. 2006) (denying certification where "boundaries of the[] proposed classes are ill-

6    defined").  Further, they offer no method to avoid the multiple recovery issues inherent in such a

7    class, given that (under their theory of "indirect" recovery) OPA, Pogue Capital, and Pogue

8    could all recover for the same underlying investment.  (Previously, when a double recovery issue

9    arose with respect to LVG XI and Celadon, the issue was resolved because both funds intervened

10   to disclaim interest.  *See* Dkt. No. 159.)  This problem would multiply across a class.[15]

11          Finally, Plaintiffs could not avoid the problem by forsaking any definition and declaring

12   (in what would be their ***sixth*** iteration of the proposed class) that the class comprises only

13   investors in specific funds.  First, any class that runs only "one level" removed from an actual

14   investment in Theranos would not even include Pogue and Brodie.  Second, the fact that

15   Plaintiffs cannot articulate a cohesive definition shows the absence of commonality and

16   predominance.  Finally, class treatment cannot be superior if Plaintiffs' ever-changing class

17   definitions now exclude many of the "indirect" investors they have claimed to represent.

18          **B.     Plaintiffs Have Failed to Establish That Common Issues of Law Predominate**

19          Where, as here, a plaintiff seeks to certify state law claims, and putative class members

20   reside in many states, Plaintiff must "demonstrate[] through evidentiary proof that [laws of

21   affected states] do not vary in material ways that preclude a finding that common legal issues

22   predominate."  *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 692-93 (9th Cir. 2018)

23   (decertifying settlement class); *Mazza,* 666 F.3d 581 (similar).  Here, Plaintiffs' own exhibits list

24   putative class members from many states.  Yet, they chose not to brief due process or choice of

25

26   _____

     [15] Even putative class representatives found their class definitions unclear.  *See* TD Tr. at
27   170:21-172:2; 173:12-174:2; 201:4-203:25; Col. Tr. at 117:19-121:2.  They could not, for
     instance, discern: (i) how "indirect" a class member could be; (ii) whether investors in
28   diversified funds were included; and (iii) whether fund managers who invested in their own
     funds were included.   Col. Tr. at 117:19-121:2; TD Tr. at 173:12-174:2; 201:4-203:25.

1   law, and "[a] party cannot raise new legal arguments and theories in a reply brief."  *Gianino v.*

2   *Alacer Corp.*, 846 F. Supp. 2d 1096, 1104, n.2 (C.D. Cal. 2012).  This supports denial of

3   Plaintiffs' Motion without further consideration, but undertaking the analysis called for by

4   *Mazza* nonetheless reveals that predominance is lacking.  The analysis has three steps:

5   (i) Plaintiffs must show that applying California law would comport with due process; (ii) if so,

6   then California's governmental interest test determines which states' laws apply; and (iii) if

7   multiple states' laws apply, then variations defeat predominance unless Plaintiffs prove that the

8   differences are immaterial and manageable.  *Mazza*, 666 F.3d at 589.

9               **1.      Plaintiffs Have Not Met Due Process Requirements**

10          Plaintiffs must prove that applying California law comports with due process under

11  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).  *Mazza*, 666 F.3d at 588; *Norwest Mortg.,*

12  *Inc. v. Super. Ct.*, 72 Cal. App. 4th 214, 225-27 (1999).  This requires that California have

13  "significant contact or significant aggregation of contacts" with each class member.  *See Phillips*,

14  472 U.S. at 818.  The inquiry focuses on state contacts with absent class members, not with

15  defendants.  Thus, the Court examines factors such as whether the injury occurred in California.

16  *Norwest Mortg., Inc.*, 72 Cal. App. 4th at 225-27.  Showing that defendant is incorporated, does

17  business, or is subject to personal jurisdiction in state is not enough.  *Id.*

18          Here, Plaintiffs have offered no evidence that foreign putative class members have any

19  California contacts.  There is no evidence that they traveled to California to invest, and the

20  reasonable inference is that whatever was received was in their home states.  *See Tidenberg v.*

21  *Bidz.com, Inc.,* 2009 WL 605249, at *4 (C.D. Cal. Mar. 4, 2009) (drawing "reasonable inference

22  [] that Plaintiff accessed [challenged] website from a computer in Texas, the state where she

23  resides"); *see also* Colman Tr. at 34:10-14 (stating that he invested from Idaho); Pogue Tr. at

24  186:25-187:2 (same from Florida).  Further, injury occurs where challenged statements are

25  received.  *Mazza*, 666 F.3d at 593-94; *Darisse v. Nest Labs, Inc.*, 2016 WL 4385849, at *15

26  (N.D. Cal. Aug. 15, 2016) (same); *Gianino*, 846 F. Supp. 2d at 1102-03 (same).  As a result,

27  foreign putative class members also were injured in their home states, not California.  Finally,

28  many putative class members (like Pogue) invested in funds based outside California, meaning

- 12 -

1    there is no California transaction to which the California securities laws could possibly apply.

2        Plaintiffs could make no headway by asserting that Theranos disseminated misleading

3    statements from California.  Putative class members (*e.g.*, Taubman-Dye) did not read statements

4    authored by Theranos; instead, they read media that could have originated anywhere.  Further,

5    putative class members (*e.g.,* Colman, Brodie, Pogue) could have received their information

6    from funds.  In those instances, the funds, not Theranos, disseminated the communications.  *In re*

7    *Hitachi Television Optical Block Cases*, 2011 WL 9403, at *7 (S.D. Cal. Jan. 3, 2011) (where

8    Defendants' products were sold through intermediary, plaintiffs' argument that the defendants'

9    "marketing efforts … originated at [the defendants'] headquarters" in California was "cavalier"

10   and "insufficient"); *Andren v. Alere, Inc.*, 2017 WL 6509550, at *16 (S.D. Cal. Dec. 20, 2017)

11   (similar where blood testing company sent brochures to doctors who in turn shared them).

12       Thus, Plaintiffs have not met their burden of showing that applying California law

13   complies with due process.  The Court thus need not reach the remaining steps before denying

14   class certification.  *See Norwest Mortg., Inc.*, 72 Cal. App. 4th at 227-28 (where due process

15   requirement not met, "there is no occasion for applying the [governmental interest test]").

16           **2.    Under the Governmental Interest Test, Many States' Laws Apply**

17       Even if the Court were to apply step two of the *Mazza* analysis (*i.e.,* California's

18   governmental interest test), doing so would show that many states' laws apply.  The test asks

19   whether: (i) out-of-state law materially differs from California law; (ii) each state has an interest

20   in having its own law apply; and (iii) other states' interests would be more impaired if their law

21   were not applied.  *In re Hyundai & Kia Fuel Econ. Litig.,* 881 F.3d at 692-93 (citing *Mazza*).

22       With respect to the first factor, the potentially applicable state laws vary in material ways.

23   Appendix B catalogs some of the important differences, including intent standards, reliance

24   standards, burdens of proof, availability of damages, and elements.  Consistent with this, the

25   Ninth Circuit has held that consumer protection laws are "a creature of the state in which they

26   are fashioned" and differ materially.  *Mazza*, 666 F.3d at 591 (vacating class certification

27   because UCL materially differed from other states' consumer protection laws); *Gianino*, 846 F.

28   Supp. 2d at 1102 (finding material differences among consumer protection and fraud laws). *See*

1  *also* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation*, Ch.11.B (6th ed. 2011;

2  2018 Supplement) (blue sky laws come "in a variety of shapes and sizes.").

3        With respect to the second and third factors, in deception cases, states have a compelling

4  interest in applying their own laws to their residents, trumping any interest of California in

5  applying its laws to foreign residents.  In that regard, courts "recognize the importance of

6  federalism and every state's right to protect its consumers and promote those businesses within

7  its borders." *Gianino*, 846 F.Supp.2d at 1103; *Mazza*, 666 F.3d at 592 (similar); *see also* Joseph

8  C. Long, et.al., *Blue Sky Law* § 9:1 (state blue sky laws "more paternalistic" than federal

9  securities laws).  Thus, "every state would be impaired in its ability to protect the consumers

10  within its borders if California law were applied to all claims of the nationwide class." *Gianino*,

11  846 F.Supp.2d at 1103.  This is true even if a foreign state enacts laws that are less strict than

12  California law, which is itself a policy choice.  *Mazza,* 666 F.3d at 592.

13        Accordingly, in misrepresentation cases, *Mazza* directs the Court to apply the laws of the

14  state in which an asserted misrepresentation was received, *not* the place of origin. *Id.* at 593-94.

15  Thus, here, the state laws of each putative class member's residence apply. *Id.*; *Gianino*, 846 F.

16  Supp. 2d at 1103 (denying certification on choice of law grounds, noting foreign states have

17  compelling interest in applying their own laws); *In re: First Am. Home Buyers Prot. Corp. Class*

18  *Action Litig.*, 313 F.R.D. 578, 603 (S.D. Cal. 2016), *aff'd sub nom. Carrera v. First Am. Home*

19  *Buyers Prot. Co.*, 702 F. App'x 614 (9th Cir. 2017) (similar for fraud and UCL).

20        **3.    Given That Multiple States' Laws Apply, Predominance is Lacking**

21        Where multiple states' laws apply, predominance is lacking absent circumstances (not

22  present here) rendering variations immaterial and manageable.  Here again, *Mazza* controls.

23  After finding that numerous states' laws would apply to a class, the Ninth Circuit found

24  predominance lacking due to the lack of common issues of law.  666 F.3d at 594-97.  Thus,

25  district courts have found that common questions of law do not predominate where:

26  • misrepresentations related to real estate were created in California but communicated to
class members in their home states, even though defendant had a call center in California,

27  *In re: First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313 F.R.D. at 603;

28  • misrepresentations related to blood monitoring devices were communicated through

physicians in class members' home states, despite corporation being headquartered in San Diego that created brochures in California, *Andren*, 2017 WL 6509550, at *20.

- misrepresentations regarding efficacy of nutritional supplement were observed in home states, even though defendant was based in and made marketing decisions in California, *Gianino*, 846 F. Supp. 2d at 1103;

- misrepresentations related to thermostat products were disseminated through various channels in class members' home states, including online and retail outlets, even though manufacturer's headquarters was in California, *Darisse*, 2016 WL 4385849, at *15.

The same result follows here.  Plaintiffs cannot show that issues of law predominate.

### C.   Plaintiffs Have Failed to Establish that Common Issues of Fact Predominate

#### 1.   Common Issues of Fact Do Not Predominate Counts IV-VI

Plaintiffs' counts for Deceit, Fraudulent Concealment, Constructive Fraud, and Negligent Misrepresentation require proof of justifiable reliance.  *Mirkin v. Wasserman*, 858 P.2d 568, 570-71 (Cal. 1993) (fraud and deceit); *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012) (fraudulent concealment); *Dealertrack, Inc. v. Huber*, 460 F.Supp.2d 1177, 1183 (C.D. Cal. 2006) (constructive fraud)[16]; *Milne Employees Ass'n v. Sun Carriers*, 960 F.2d 1401, 1408 (9th Cir. 1991) (negligent misrepresentation); Mot. 20, n.102 (conceding reliance element). Reliance requires that the misrepresentation be an immediate cause of plaintiff's purchase, such that otherwise she would not, in all reasonable probability, have made it.  *City Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 840 (9th Cir. 2004).  Further, recovery is denied "[i]f the conduct of the plaintiff [in relying upon a misrepresentation] in the light of his own intelligence and information was manifestly unreasonable."  *Davis*, 691 F.3d at 1163.

Courts routinely recognize that the need to prove justifiable reliance in a deception-based action presents an individualized fact question that defeats class certification.  *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d at 704-05 (denying certification based on "factual differences regarding used car owners' exposure to the misleading statements"); *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624 (S.D. Cal. 2007) (denying certification where "proposed class members received a variety of different representations"); *Gartin v. S & M NuTec LLC*, 245

---

[16] Plaintiffs' constructive fraud claim also presents individualized issues because it requires proof of "a fiduciary or confidential relationship."  *Dealertrack*, 460 F.Supp.2d at 1183.

1    F.R.D. 429, 437 (C.D. Cal. 2007) (same); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th

2    Cir. 2004) (denying certification where linking misrepresentations to losses amounts to

3    individualized reliance); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 942 (9th Cir. 2009)

4    (denying certification because individualized reliance issues predominated); *Zinser v. Accufix*

5    *Research Inst. Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (same).

6          Here, Appendix A and the background section summarize differing investor

7    circumstances.  Below are examples of questions that require individualized fact-finding:

8          ***What (if anything) did each putative class member read?***  The finder of fact cannot

9    decide whether a statement misled someone without knowing *whether she read it.  Mazza,* 666

10   F.3d at 595-96.  But there were thousands of references to Theranos in media, and even the

11   putative class representatives read different materials.  *See* Appendix A.  There is no way to

12   avoid one-by-one fact-finding as to what (if anything) they read, and then to determine whether

13   that particular mix of materials was misleading.  For instance, if Colman proved he relied on a

14   September 2013 press release, that would not aid Taubman-Dye, who did not read it.  Further, to

15   the extent fact-finding shows an investor relied on third party materials, the fact finder would

16   need to decide if Defendants bore legal responsibility for those materials.  Even the putative class

17   representatives testified that individual inquiry is the only way to gain the relevant facts

18   concerning each class member.  TD Tr. at 172:8-173:11; Colman Tr. at 123:9-124:9.

19         Plaintiffs insist everyone is "similarly situated" because all information about Theranos

20   was uniform, but that is no answer.  Mot. 24-25.  Even that would not eliminate the core question

21   of whether a putative class member read *anything* misleading.  Moreover, the record shows

22   information was not uniform.  As detailed above, even Theranos' own press releases contained

23   varied content.  And Plaintiffs do not even begin to address *private* materials (which even

24   putative class representatives relied on) or the vast amount of media concerning Theranos.

25         Moreover, the class period extends over three years, which introduces more variation.

26   An early investor necessarily had access to different information than a late investor.  A 2013

27   investor could not have read a not-yet-published 2015 statement, and a 2015 investor who relied

28   on a two-year-old 2013 statement would be subject to obvious attack for relying on stale

1   material.  Further, Plaintiffs contend the "truth" about Theranos began to emerge by 2015.  Mot.

2   6.  Thus, an investor in 2015 is differently situated from an earlier one.  *See, e.g.*, TD Tr. at

3   170:10-20 (testifying that to invest after Oct. 2015 would have been "imprudent").  Finally, the

4   technology itself changed over three years; the Court cannot abstractly adjudicate the veracity of

5   a statement (*e.g.*, "the testing menu was limited") without regard for *when* it was read.

6        ***What private information did class members learn?***  Discovery has exposed the falsity

7   of Plaintiffs' theory that putative class members invested based on publicity.  Even putative class

8   representatives relied largely on private sources: Colman relied entirely on Lucas, Brodie relied

9   on a private conference call involving Holmes, and Pogue relied on proprietary research from

10   OPA.  Thus, the Court must consider what private information individual class members learned,

11   which is another layer of individualized inquiry.  *See In re: First Am. Home Buyers Prot. Corp.*

12   *Class Action Litig.*, 313 F.R.D. at 606 (denying certification where "representations were made

13   between the area managers and the real estate agents, and also between the real estate agents and

14   the purchasers will therefore require a highly individualized inquiry").  Further, even if fund

15   managers did not pass along information, they made recommendations on which at least some

16   class members (*e.g.*, Colman) relied, making the fund managers' knowledge relevant.

17        ***Was reliance justifiable?***  *A further* individualized question concerns whether reliance

18   was justified.  "Whether reliance [on a misrepresentation] was reasonable *is a question of fact for*

19   *the jury*, and may be decided as a matter of law only if the facts permit reasonable minds to come

20   to just one conclusion."  *Davis*, 691 F.3d at 1163.  The evidence relevant to this issue will vary

21   based on what each investor read and knew.  There is, for instance, a vast gulf between the

22   reasonableness of making a large investment in sole reliance on a magazine article, versus based

23   on extensive private information provided by a fund.  *When* an investor invested also matters.

24        Further, the individual terms of investor agreements bear on the reasonableness of

25   reliance, and those terms varied.  Colman represented he had *not* relied on news articles or

26   Lucas.  Taubman-Dye made clearly untrue representations about her sophistication.  Other

27   investors' subscription documents undoubtedly have varying and equally relevant content.

                                           \* \* \*

28

1    Given the extensive, necessary, and individualized factual inquiry, predominance is

2    lacking.  None of the arguments in Plaintiffs' Motion salvages their position.

3    *First*, Plaintiffs cannot successfully claim that certification is appropriate based on a

4    "common course of conduct."  Mot. 20-21.  Plaintiffs' predicate assertion that all putative class

5    members received "similar misrepresentations" (Mot. 21) is false as explained above.  Plaintiffs'

6    assertion that only fraud could have led to a Theranos investment is belied by the only class

7    deposition they took: a large investor and putative class member who admits he was *not* misled.

8    Further, this case is nothing like the cases that Plaintiffs cite, which all involved

9    orchestrated conduct, uniform statements to class members, and (inapplicable here) presumptions

10   of reliance.  In *In re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006), the

11   defendant had trained mortgage sales agents to make uniform misrepresentations to borrowers

12   about monthly payments, points, and fees, and gave them a "script that was required to be

13   memorized."  In *Blackie v. Barrack*, 524 F.2d 891, 905-08 (9th Cir. 1975), a public company

14   misrepresented financial figures concerning inventory, and the court found (based on a

15   presumption that California has rejected) that to the extent reliance was required it was

16   presumed.[17]  The court in *Cohen v. Trump*, 303 F.R.D. 376, 385 (S.D. Cal. 2014), likewise

17   invoked a reliance presumption, and the case involved uniform assertions about Trump

18   University.  *In re Morning Song Bird Food Litigation*, 320 F.R.D. 540 (S.D. Cal. 2017), involved

19   alleged deception on bird food labeling—which failed to disclose harmful chemicals in the

20   food—to which every class member was exposed.  Finally, *In re Intuitive Surgical Securities

21   Litig.*, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) involved public securities traded in an

22   efficient public market, which gave rise to the fraud on the market presumption of reliance.

23   *Second*, Plaintiffs fare no better asserting that varied communications to class members

24   do not matter.  Mot. 22.  The cited cases (*In re Intuitive Surgical Securities Litig.* and *In re First*

25

26   _____

     [17] *Blackie* allowed a presumption of reliance on omissions related to publicly traded securities
27   under federal law, citing *Affiliated Ute*.  524 F.2d at 906.  But California has found "no reason to
     adopt the *Ute* presumption as California law."  *Mirkin*, 858 P.2d at 574.  Further, *Blackie*
28   predates the controlling decisions on securities fraud class actions (*e.g.*, *Basic*, *Halliburton*) and
     Rule 23 requirements (*e.g., Dukes, Comcast, Amgen, Mazza, Hyundai*).

1    *Alliance Mortgage Co.*) state no such thing.  And, just a few weeks ago, the Ninth Circuit

2    reversed class certification because of "factual differences regarding used car owners' exposure

3    to the misleading statements."  *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d at 704-05.

4          *Third*, Plaintiffs suggest a pivot to an omission claim.  Mot. 23.  But that would not

5    obviate the need for individual proof of reliance on statements from which information allegedly

6    was omitted.  "For everyone in the class to have been exposed to the omissions . . . it is necessary

7    for everyone in the class to have viewed the allegedly misleading advertising."  *Mazza*, 666 F.3d

8    at 596.  As explained above, proof of exposure to statements will be individual.  Further, an

9    omission is actionable only upon proof of a duty to disclose.  *Desai*, 573 F.3d at 939.  Finally,

10   Plaintiffs' omission argument turns on the *Affiliated Ute* presumption of reliance (Mot. 23

11   n.111), which California law does not recognize.  *Supra* n.17.

12                 **2.      Common Issues of Fact Do Not Predominate Count I**

13         Section 25500 prohibits market manipulation: a defendant is liable for making misleading

14   statements *that affect the prices of securities transactions*.  "[T]he price of the security must be

15   affected by [the misrepresentation] in order for there to be liability."  *Calif. Amplifier, Inc. v. RLI*

16   *Ins. Co.*, 94 Cal. App. 4th 102, 111-12 (2001).   Here, predominance is lacking because whether

17   an alleged misrepresentation affected a particular investor's purchase price—the causation

18   element referred to as "price impact"—presents an individual question.[18]

19         Plaintiffs ask the Court to rely on precedent involving federal securities claims.  Mot. 16.

20   Federal securities case law makes clear that certification turns on showing the securities traded in

21   an efficient market (which leads to the "fraud on the market" presumption).  *See, e.g., Desai*, 573

22   F.3d at 941-42 (denying certification due to "fatal concession" of lack of market efficiency).

23   This is because "the market price of shares traded on well-developed markets reflects all publicly

24   available information, and, hence, any material misrepresentations."  *Halliburton Co. v. Erica P.*

25   *John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014).  Thus, a purchaser in an efficient market, by

26   paying the market price, pays a price affected by any misrepresentation.  *See id.*  But in an

27

28   ───────────────
     [18] Section 25500 separately sets forth the measure of damages once liability has been found.
     Although that calculation too would be individualized, this brief focuses on causation.

1   inefficient market that does not reflect all available information, this logic reverses, and each

2   transaction must be reviewed separately to ascertain price impact, defeating predominance.

3   *Desai*, 573 F.3d at 941-42.  Without the fraud-on-the-market presumption that flows from a

4   finding of market efficiency, "individual reliance issues would overwhelm questions common to

5   the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462-63 (2013).

6       This concept holds under Section 25500.  Although it does not require *the purchaser* to

7   have read a misleading statement, it still requires price impact, which requires *someone* to have

8   relied, or else the price would not be affected at all.  Thus, the California Supreme Court, citing a

9   treatise by the drafters of Section 25500, explained:

10      All that is required is that the plaintiff establish that the price
        which he paid or received was affected by the defendant's conduct
11      or statements, ***which would of course assume that someone acted
        on the basis of the defendant's wrongful conduct.***
12

13   *Mirkin*, 858 P.2d at 580 (citing Marsh & Volk, Practice Under the Cal. Securities Law (1993)

14   § 14.05[6], at p. 14–53) (footnote omitted).

15      Dr. Unni's Declaration explains how establishing price impact relates to market

16   efficiency.  In an efficient market, market participants rapidly (through trading) incorporate all

17   information (including misrepresentations) into the market price.  Unni Dec. ¶¶ 21-22.  As a

18   result, market purchasers experience price impact by purchasing at the prevailing market price.

19   *Id.*  In an inefficient market, no market-wide mechanism exists to incorporate information into

20   price.  Instead, for a misrepresentation to inflate a particular transaction price, that purchaser (or

21   an agent) must hear the misrepresentation and pay more because of it.  *Id.* ¶¶ 17, 19.

22      Here, Plaintiffs have made no effort to show that Theranos stock (and securities issued by

23   funds that held Theranos stock) ever traded in anything remotely resembling an efficient market.

24   Transactions were sparse, separated in time, private, and prices lacked sensitivity to events.  *Id.*

25   ¶¶ 29-31; 33-35; 38-61.  As a result, the market was inefficient, and for a misrepresentation to

26   increase a particular purchase price, someone involved (*e.g.*, fund manager, investor) needs to

27   have overpaid due to it.  *Id.* ¶¶ 17, 19, 60.  Thus, to determine whether a given transaction

28   occurred at a price affected by misrepresentation, *one must examine the facts of that specific*

- 20 -

1    *transaction.*  *Id.* ¶¶ 19, 36, 59.

2          If anything, this case presents a uniquely complex individual question of price impact

3    because putative class members are "indirect" investors who invested in many different funds.

4    Any evaluation of price impact would need to examine those securities' characteristics, as well

5    as the funds' underlying transactions in Theranos stock.  *Id.* ¶ 63.  Further, even if there were

6    limited periods of uniform price impact (not the case), simply determining *when* someone made

7    a decision to invest requires individualized inquiry.  *Id.* ¶ 35.

8          Nothing in Plaintiffs' Motion even attempts to address the individual nature of price

9    impact in this case.  Plaintiffs cite *no case* in which a Court has ever certified a class of

10   "indirect" investors, let alone one arising in an inefficient market.  Overgeneralizations that

11   securities cases are often certified (Mot. 16) backfire because they almost always arise in

12   efficient markets.  Where (as here) securities do *not* trade in an efficient market, courts *deny*

13   class certification.  *See Desai*, 573 F.3d at 941-42.  Plaintiffs also cannot sweep away

14   individualized issues by asserting that an overarching fraud inflated all prices.  As explained

15   above and by Dr. Unni, in an inefficient market, that proposition is incorrect because there is no

16   class wide mechanism to incorporate information (misrepresentations or otherwise) into price.

17         Indeed, the evidence demonstrates an absence of uniform price impact because securities

18   prices did not uniformly increase as challenged statements were made.  For instance, PEER

19   Ventures Group IV, LP ("PEER IV"), a fund that (per Pl. Ex. A) holds nearly half of putative

20   class members' investment dollars, had four separate closings that straddled the class period:

21   May 2013 (prior to class period), September 2013, December 2013, and January 2014 (months

22   into class period).  *See* Def. Ex. 41.  However, the subscription price (in terms of each

23   subscriber's capital commitment) *did not change*.  *See* Pl. Ex. II, § 3 (PEER Subscription

24   Agreement reflecting no price change); *see also* Unni Dec. ¶ 64.  Another example, several

25   Theranos stockholders paid the *same price* for shares of C-1 preferred stock in March 2013, June

26   2013, and January 2014.  White Dec. ¶ 6; Unni Dec. ¶ 43.  These examples—reflecting

27   unchanged transaction prices before and after challenged statements—could not exist if those

28   statements had uniformly inflated securities transaction prices.  Instead, if any individual prices

1   were impacted, it could only be due to transaction-specific circumstances.

2        In sum, in this case, price impact presents individual issues for the same reasons the

3   reliance element of fraud presents individual issues, and predominance is lacking.

4              **3.       Common Issues of Fact Do Not Predominate Count III**

5        The Court also should not certify a UCL class.  As a threshold matter, absent class

6   members cannot pursue UCL claims because they are securities purchasers, and the UCL "does

7   not apply to securities transactions."  *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 790

8   (2004); *see also Siegal v. Gamble*, 2016 WL 1085787, at *7 (N.D. Cal. Mar. 21, 2016)

9   ("Plaintiffs' UCL claims are not viable . . . because the UCL's protections do not extend to

10  securities transactions . . . "); *Betz v. Trainer Wortham & Co.*, 829 F.Supp.2d 860, 866 (N.D.

11  Cal. 2011) ("No court . . . has allowed Section 17200 claims to proceed where, as here, the

12  predicate acts are securities transactions.").  This explains why Plaintiffs' memorandum does not

13  cite a single case involving a UCL claim stemming from a securities transaction.[19]

14       Regardless, the individualized issues discussed above—*e.g.,* who read what—also defeat

15  predominance.  A UCL class must *not* include a class member "who was never exposed to an

16  alleged false or misleading advertising . . . campaign."  *Mazza*, 666 F.3d at 596.  Thus:

17              [W]hen the class action is based on alleged misrepresentations, a
                class certification denial will be upheld when individual evidence
18              will be required to determine whether the representations at issue
                were actually made to each member of the class.
19

20  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) (denying UCL

21  certification).  This proposition of law controls here: the only way to tell which putative class

22  members were exposed to which statements (if any) is individualized inquiry, which renders

23  predominance lacking.  *Id.; Rogers v. Epson Am., Inc.,* 648 Fed. Appx. 717, 719 (9th Cir. 2016)

24  (predominance lacking where exposure to misrepresentation constituted individualized issue);

25  *Ehret v. Uber Techs., Inc.*, 148 F.Supp.3d 884, 894-95, 900 (N.D. Cal. 2015) (similar).[20]

26

27  [19] Although Defendants' briefing on the earlier class certification motion highlighted that the
    UCL does not cover securities, the Court did not reach the issue.  Further, Plaintiffs have in the
28  past responded by positing the existence of a split of authority that does not in reality exist.
    [20] Plaintiffs' cited cases (*Vaccarino, Newton, Plascencia, Baghdasarian*) are irrelevant because

Further, the UCL raises an individual issue as to the availability of restitution.  "[T]he remedy the plaintiff seeks must be truly 'restitutionary in nature'—that is, it must represent the *return* of money or property the *defendant acquired* through its unfair practices."  *Shersher v. Super. Ct.*, 154 Cal. App. 4th 1491, 1498 (2007).  Here, whether Theranos acquired a given investor's money varies.  Taubman-Dye, for instance, invested in Celadon, which purchased Theranos stock from another investor; Theranos is not holding her money.  Likewise, Pogue invested through a lengthy chain in Cassin.

### 4.    Releases Raise Additional Individual Issues (All Counts)

The defense of release presents an individual issue that affects many putative class members.  *See Javine v. San Luis Ambulance Serv., Inc.*, 2015 WL 12672090 (C.D. Cal. Jan. 13, 2015) (denying certification where some putative class members had released claims); *Pablo v. ServiceMaster Glob. Holdings Inc.*, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) (class treatment not superior where some putative members were bound by arbitration clauses); *Lim v. Helio, LLC*, 2012 WL 12884439, at *1 (C.D. Cal. Apr. 18, 2012) (similar).  In 2017, Theranos completed a tender offer in which most stockholders released claims against Defendants.  *See* Dkt. No. 53 (briefing on tender offer).  Defendants received releases from eight of the funds on Plaintiffs' Exhibit A, and therefore many putative class members' claims, including Brodie and Colman, have been released.  The same would be true for many other class members.

### D.    Plaintiffs Have Not Proven Superiority

Plaintiffs also have not proven that class treatment is superior under Fed. R. Civ. P. 23(b)(3).  Under the Rule, factors relevant to the superiority determination include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  *Id.*

These factors effectuate the "[t]he policy at the very core of the class action mechanism

they involved consumers who received the same disclosures in uniform transactions.

1  … to overcome the problem that small recoveries do not provide the incentive for any individual

2  to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

3  591, 617 (1997).  Thus, a "showing that class members do not have an incentive to prosecute

4  their own claims or lack the wherewithal to protect their individual interest" is important to a

5  finding of superiority.  *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc*., 308 F.R.D. 630, 640

6  (N.D. Cal. 2015).  Where putative members are sophisticated parties capable of representing

7  their own interests, superiority is lacking.  *See Est. of Felts v. Genworth Life Ins. Co.*, 250 F.R.D.

8  512, 526 (W.D. Wash. 2008) (no superiority where "relatively large premiums that class

9  members invested in [annuities] mean that there is substantial incentive for an individual . . . to

10  bring suit"); *Birnberg v. Milk St. Residential Assocs. Ltd. P'ship*, 2003 WL 21267103, at *7

11  (N.D. Ill. May 29, 2003) (no superiority where putative members were "sophisticated

12  investors"); *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 411 (S.D.N.Y. 1998) (same).

13    Similarly, "in large claim situations, courts generally find individual lawsuits superior to

14  a class action."  Newberg on Class Actions § 4:88 (5th ed.); *see, e.g.*, *Nguyen v. BDO Seidman,*

15  *LLP*, 2009 WL 7742532, at *8 (C.D. Cal. July 6, 2009) (named plaintiff "and the putative class

16  he seeks to represent are well-paid employees seeking years-worth of overtime back-pay,

17  penalties, and attorney fees . . . weighs heavily against class certification").  That is because each

18  member of the class "ha[s] a substantial stake in making individual decisions".  *Amchem*, 521

19  U.S. at 616; *see also Birnberg*, 2003 WL 21267103, at *7 (finding that "[t]he existence of . . .

20  large individual claims . . . undercuts the alleged superiority of the class action"); *Askin*, 178

21  F.R.D. at 411 (denying certification given "the amount of each claim"); *Carr v. New York Stock*

22  *Exch., Inc.*, 414 F. Supp. 1292, 1305 (N.D. Cal. 1976) (same).[21]

23    This case is the poster child for lack of superiority.  It is rife with manageability problems

24  due to the individualized issues to be litigated.[22]  Indeed, given the choice of law issue, Plaintiffs

25

26  [21] Plaintiffs display the weakness of their position by focusing on *Lilly v. Jamba Juice Co.*, 308

27  F.R.D. 231 (N.D. Cal. 2014) (Mot. 24)—a case involving purchasers of *$2 fruit smoothie kits.*
[22] *Nguyen*, 2009 WL 7742532, at *8 ("class action would be unmanageable given the

28  predominance of the individual issues necessary to establish [the defendant]'s liability for each
of the putative class members"); *Zinser*, 253 F.3d at 1189 (similar).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No.  5:16-cv-06822-NC

1    were required to offer "a suitable and realistic plan for trial of the class claims." *Zinser*, 253

2    F.3d at 1189 (court abuses its discretion by certifying multistate class if plaintiffs offer no trial

3    plan).  But Plaintiffs offered no trial plan, or other indication of how a class could be managed.

4          Further, each putative class member has the wherewithal and incentive to individually

5    prosecute a claim.  Because this case concerns unregistered private investments, all putative class

6    members are accredited investors with large incomes and high net worth.[23]  Many putative class

7    members are sophisticated entities, likely with counsel.  And investments are sufficiently large to

8    incentivize individual suits by anyone who feels deceived.  Indeed, all four putative class

9    representatives invested six or seven figures; no one on Plaintiffs' investor lists (Pl. Ex. CC-KK)

10   invested less than tens of thousands of dollars; and some invested $15 million.  *See Zinser*, 253

11   F.3d at 1191 (class members' claims of $50,000 do not support certification).

12         Nor is there any reason to concentrate litigation in this Court.  Putative class members

13   reside in many states.  Where, as here, class members are "located across the country and where

14   the witnesses and the particular evidence will also be found across the country, plaintiffs have

15   failed to establish any particular reason why it would be especially efficient for this Court to hear

16   such a massive class action lawsuit." *Zinser*, 253 F.3d at 1191.  Further, Plaintiffs' assertion that

17   this Court should entertain a class action because it has already been adjudicating this case (Mot.

18   25) is unsupported by citation and proves too much.

19         Finally, class treatment makes no sense because putative class members have shown no

20   support for this suit.  Plaintiffs' counsel has been seeking their support since at least April

21   2016.[24]  Recently, Plaintiffs blanketed them with subpoenas, and sought voluntary support.  *See*

22   Perla Decl. ¶ 4.  None emerged.  Instead, the only putative class member that Plaintiffs deposed

23   stated that he was not misled, and that there is no "real case there."  Lucas. Tr. at 91:3-9.

24   **IV.    CONCLUSION**

25         For the foregoing reasons, the Court should deny Plaintiffs' Motion.

26

27   [23] SEC Accredited Investors Bulletin, *at* https://www.sec.gov/files/ib_accreditedinvestors.pdf.
     [24] https://www.hbsslaw.com/cases/Theranos/pressrelease/theranos-hagens-berman-continues-
28   its-investigation-of-theranos-incs-representations-to-investors-on-news-of-possible-regulatory-
     ban

1    Dated:  March 9, 2018                          By: /s/  Michael A. Mugmon
2                                                       Michael A. Mugmon (251958)
                                                        WILMER CUTLER PICKERING
3                                                          HALE AND DORR LLP
                                                        950 Page Mill Road
4                                                       Palo Alto, CA 94304
                                                        Telephone: +1 650 858 6000
5                                                       Facsimile: +1 650 858 6100
                                                        michael.mugmon@wilmehale.com
6
                                                        Christopher Davies (admitted *pro hac vice*)
7                                                       WILMER CUTLER PICKERING
                                                           HALE AND DORR LLP
8                                                       1875 Pennsylvania Ave., NW
9                                                       Washington, DC 20006
                                                        Telephone: +1 202 663 6000
10                                                      Facsimile: +1 202 663 6363
                                                        christopher.davies@wilmehale.com
11
                                                        Timothy Perla (admitted *pro hac vice*)
12                                                      Robert K. Smith (admitted *pro hac vice*)
                                                        Jessica Lewis (CA SBN 302467)
13                                                      WILMER CUTLER PICKERING
                                                           HALE AND DORR LLP
14                                                      60 State Street
15                                                      Boston, MA 02109
                                                        Telephone: +1 617 526 6000
16                                                      Facsimile: +1 617 526 5000
                                                        timothy.perla@wilmerhale.com
17                                                      robert.smith@wilmerhale.com
                                                        jessica.lewis@wilmerhale.com
18
19                                                      Matthew Benedetto (252379)
                                                        WILMER CUTLER PICKERING
20                                                         HALE AND DORR LLP
                                                        350 South Grand Avenue, Suite 2100
21                                                      Los Angeles, CA 90071
                                                        Telephone: +1 213 443 5300
22                                                      Facsimile: +1 213 443 5400
                                                        matthew.benedetto@wilmerhale.com
23
24                                                      *Attorneys for Defendant Theranos, Inc.*
25
26
27
28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No.  5:16-cv-06822-NC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/  Kathleen Goodhart
Kathleen Goodhart (165659)

COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: +1 415 693 2012
Facsimile: +1 415 693 2222
kgoodhart@cooley.com

Stephen C. Neal (170085)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: +1 650 843 5000
Facsimile: +1 650 849 7400
nealsc@cooley.com

*Attorneys for Defendant Elizabeth Holmes*

/s/  Allison A. Davis
Allison A. Davis (139203)
Kelly Gorton (300978)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone: +1 415 276 6500
Facsimile: +1 415 276 6599
allisondavis@dwt.com

Stephen M. Rummage (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Telephone: +1 206 757 8136
Facsimile: +1 206 757 7136
steverummage@dwt.com

*Attorneys for Defendant Ramesh Balwani*

- 27 -

## <u>SIGNATURE ATTESTATION</u>

I am the ECF User whose identification and password are being used to file the foregoing Opposition.  In compliance with Local Rule 5-1(i)(3), I hereby attest that the other signatories have concurred in this filing.

Dated: March 9, 2018                                     WILMER CUTLER PICKERING HALE
                                                                              AND DORR LLP

                                                                   By: <u>/s/  Michael A. Mugmon</u>
                                                                              Michael A. Mugmon

**Appendix A – The Putative Class Representatives' Varied Bases for Investing**

| Investor | Invested In | Basis for Investing |
|---|---|---|
| Robert Colman<br><br>(Idaho resident) | LVG XI on Sept. 13, 2013 | • Recommendation by Donald Lucas.<br><br>• Two telephone calls and one email with Lucas. Email linked a press release and Wall Street Journal article.<br><br>• Misimpression that all Theranos blood tests used fingerstick technology, notwithstanding contrary public disclosure. |
| Hilary Taubman-Dye | Celadon on Aug. 13, 2015 | • Favorable experience with Theranos blood test (via traditional venous blood draw) at Walgreens.<br><br>• Learning that a prominent venture capitalist had invested.<br><br>• Learning that a Stanford professor supported Theranos.<br><br>• Conversation with her doctor.<br><br>• Online research, including one *Fortune* article and potentially other materials that she was unable specifically to identify. |
| Thomas Brodie, M.D. | BF Last Investments on Dec. 31, 2013, which invested in BDV | • Teleconference with Holmes.<br><br>• Views about blood testing technology formed because of being medical doctor.<br><br>• Recommendation of BDV fund manager.<br><br>• Information supplied by manager of BDV, including press and media. |
| Mai Pogue<br><br>(Florida resident) | Pogue Capital, Fund D on Sept. 22, 2015, which invested in OPA, which invested in Cassin Partners | • "Disruptive Insights" proprietary research report supplied by OPA at cost of $3,000.<br><br>• Conversation with the OPA fund manager.<br><br>• Online research. |

\* Sources for all propositions in Appendix A can be found in Defendants' Opposition Brief.

1

**Appendix B – Selected State Law Variations and Conflicts**

2

*Preliminary note:  for brevity, the Appendix focuses on the fifteen states that Plaintiffs' exhibits*

3

*show to be residences of putative class members:  Idaho, Florida, Ohio, Minnesota, Oregon, Illinois, Washington, Indiana, Colorado, Arkansas, New York, Texas, New Jersey, Utah, and*

4

*Nevada.  However, many putative class members' residences remain unknown, and certification would require Plaintiffs to address all 50 states.  For instance, Pogue during her deposition*

5

*identified additional investors in Virginia, Connecticut, and abroad.*

6

**Common Law Fraud Claims**

7

- <u>*Distinct Legal Elements*</u>:  The states differ markedly in articulating the elements of fraud.

8

   At one extreme, Utah requires plaintiffs prove nine elements: "(1) [t]hat a representation was made; (2) concerning a presently existing material fact; (3) which was false;

9

   (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that

10

   he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting

11

   reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage"[25]  At the other end, New Jersey requires a

12

   showing of only three elements:  "plaintiffs must demonstrate that: (1) defendant made a material misrepresentation or omission of fact; (2) knowing the misrepresentation to be

13

   false or the omission to be material, and intending the other party to rely on it; and (3) the other party did in fact rely on the misrepresentation or omission to its detriment."[26]

14

- <u>*Intent Standards*</u>:  Intent standards also vary significantly among the states.  For example,

15

   in Colorado, a fraud claim requires proof that the defendant had actual knowledge of the statement's falsity.[27]  Similarly, California requires that the defendant make the

16

   representation with "knowledge of [its] falsity" and the intent to induce reliance on it.[28]

17

   Other states, including Indiana, Illinois, Ohio, and Texas also require an element of scienter or proof of recklessness.[29]  However, some states, such as Arkansas, do not

18

   require a showing of scienter and instead will allow plaintiffs to show merely that a

19

   [25] *Mikkelson v. Quail Valley Realty*, 641 P.2d 124, 126 (Utah 1982).

20

   [26] *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 752 A.2d 807,813 (N.J. Super. App. 2000) (citation omitted).

21

   [27] *Concord Realty Co. v. Continental Funding Corp.*, 776 P.2d 1114, 1117-18 (Colo. 1989)

22

   (elements of fraud include proof of "knowledge on the part of the one making the representation that it was false").

23

   [28] *Engalla v. Permanente Med. Group, Inc.*, 938 P.2d 903, 914 (Cal. 1997) ("A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an intent to induce reliance on it." (citation omitted)).

24

   [29] *Tutwiler v. Snodgrass*, 428 N.E.2d 1291, 1296 (Ind. App. 1981) ("An essential element of

25

   actionable fraud is that the alleged misrepresentation was known to be false or made recklessly."), *abrogated on other grounds by Bud Wolf Chevrolet, Inc. v. Robertson*, 508 N.E.2d

26

   567 (1987); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 536 (Ill. 1989) ("reckless disregard for its truth or falsity"); *Cohen v. Lamko, Inc.*, 462 N.E.2d 407, 409 (Ohio

27

   1984) ("utter disregard and recklessness"); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847

28

   S.W.2d 218, 222 (Tex. 1992) (misrepresentation made "recklessly without any knowledge of the truth and as a positive assertion").

defendant acted without knowledge or verification of the truth of her representations.[30]

- _Evidentiary Standard:_  Most states require plaintiffs prove a common law fraud claim by "clear and convincing evidence."[31]  Others, including California, allow recovery if fraud is proven by a "preponderance of the evidence."[32]

- _Reliance:_  There is also great variation from state to state as to the type of reliance plaintiffs are required to prove in support of fraud claims.  Some states, such as New York, have adopted the least demanding reliance standard, mere actual reliance.[33]  Other states, including Utah, have adopted the most demanding standard, that of reasonable reliance.[34]  Still other states, such as California and New Jersey, have adopted an intermediate standard, requiring proof of justifiable reliance.[35]

- _Standard Governing Omissions:_  In omissions cases, states such as Colorado and Indiana require proof of "active concealment."[36]  In other states, including New York and Nevada, mere "failure to disclose important and relevant facts" can constitute fraud.[37]  California has specifically rejected the _Affiliated Ute_ presumption of reliance on material misstatements.[38]

- _Statute of Limitations:_  The statute of limitations on fraud claims varies widely among the

---

[30] _Curtis Lumber Co., Inc. v. La. Pac. Corp._, 618 F.3d 762, 774 (8th Cir. 2010) (Arkansas law) (defining constructive fraud as "the making of misrepresentations by one who, not knowing whether they are true or not, asserts them to be true without knowledge of their falsity and without moral guilt or evil intent").

[31] _See, e.g._, _Wharf v. Burlington N.R.R. Co._, 60 F.3d 631, 637 (9th Cir. 1995) (Washington law); _Europlast Ltd. v. Oak Switch Sys. Inc._, 10 F.3d 1266, 1272 (7th Cir. 1993) (Illinois law); _Otto Roth & Co., Inc. v. Gourmet Pasta, Inc._, 715 N.Y.S.2d 78, 80 (N.Y. App. Div. 2000); _Sowards v. Rathbun_, 8 P.3d 1245, 1249 (Idaho 2000); _Daibo v. Kirsch_, 720 A.2d 994, 999 (N.J. Super. App. Div. 1998); _Gallant v. Board of Med. Examiners_, 974 P.2d 814, 818 (Or. Ct. App. 1999); _Andalex Resources, Inc. v. Myers_, 871 P.2d 1041, 1046 (Utah App. 1994).

[32] _See, e.g._, _Liodas v. Sahadi_, 19 Cal.3d 278, 288 (1977); _Ultracuts Ltd. V. Walmart Stores Inc._, 343 Ark. 224, 234 (Ark. 2000); _English Coal Co., Inc. v. Durcholz_, 422 N.E.2d 302, 310 (Ind. Ct. App. 1981).

[33] _Otto Roth & Co., Inc. v. Gourmet Pasta, Inc._, 715 N.Y.S.2d 78,79 (N.Y. App. Div. 2000).

[34] _Mikkelson v. Quail Valley Realty_, 641 P.2d 124, 126 (Utah 1982) (requires "that the other party, acting reasonably and in ignorance of its falsity; [] did in fact rely upon it").

[35] _Mirkin v. Wasserman_, 858 P.2d 568, 570-71 (Cal. 1993) (fraud and deceit); _See_ N.J. Model Jury Instructions, (Civil) § 3.30E ("Whether the plaintiff was justified in relying on the representation depends upon whether the fact represented is one that a reasonable man would consider important in reaching a decision in the transaction in question.").

[36] _See e.g._, _Franklin Supply Co. v. Tolman_, 454 F.2d 1059, 1067 (7th Cir. 1971) (Colorado law) (fraud requires more than mere non-disclosure); _Ludwig v. Ford Motor Co._, 510 N.E.2d 691, 697 (Ind. Ct. App. 1987) ("[C]oncealment must be active and intentional.").

[37] _McGregor v. Dimou_, 422 N.Y.S.2d 806, 8-10 (N.Y. Civ. Ct. 1979) (mere failure to disclose important and relevant facts can constitute fraud); _Epperson v. Roloff_, 719 P.2d 799, 804 (Nev. 1986) (non-disclosure actionable where defendant alone has material facts).

[38] _Mirkin v. Wasserman_, 858 P.2d 568, 570-71 (Cal. 1993).

states.  In some states, like California and Arkansas, fraud claims must be brought within three years of the date on which the cause of action accrues.[39]  In other states, the statute of limitations is much longer.  For example, in New York, the statute of limitations is six years while it is five and four years in Illinois and Florida, respectively.[40]

### Consumer Protection Laws

- *Prohibited Behavior:*  The scope of each state's consumer protection law varies widely.  For example, the New Jersey Consumer Fraud Act proscribes several broad categories of behavior, including "unconscionable commercial practice, deception, [and] fraud . . ."[41]  The California Unfair Competition Law ("UCL") is similarly expansive, prohibiting "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."[42]  In stark contrast, the consumer protection statutes in Colorado, Minnesota, and Oregon do not include a general prohibition against deception and instead only prohibit a closed list of specifically-identified acts.[43]

- *Interpretive Guidance:*  States place varying degrees of import on federal regulations when interpreting their own consumer protection laws.  Accordingly, even similarly phrased statutes are subject to disparate interpretations.  For example, states such as New York follow recent Federal Trade Commission ("FTC") guidance and use the FTC's "reasonable person" test to evaluate a defendant's allegedly "deceptive" behavior.[44]  Other states, such as Texas, measure the deceptiveness of challenged actions by their

---

[39] *See Miles v. A.O. Smith Harvestore Products, Inc.*, 992 F.2d 813, 816 (8th Cir. 1993) (Arkansas law); *David K. Lindemuth Co. v. Shannon Fin. Corp.*, 660 F. Supp. 261, 263 (N.D. Cal. 1987).

[40] *See BRS Assocs., LP v. Dansker*, 246 B.R. 755 (S.D.N.Y. 2000); *Kolson v. Vembu*, 869 F. Supp. 1315, 1329 (N.D. Ill. 1994); *Marulanda v. Marrero*, 162 B.R. 20, 25 (S.D. Fla. 1993).

[41] N.J. Stat. Ann. § 56:8-2 (proscribing "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . whether or not any person has in fact been misled, deceived or damaged thereby. . . .").

[42] Cal. Bus. & Prof. Code § 17200; *see People v. McKale*, 602 P.2d 731, 733 (Cal. 1979) ("California courts have consistently interpreted such language broadly . . . to include[] anything that can properly be called a business practice and at the same time is forbidden by law." (citation omitted)).

[43] Colo. Rev. Stat. § 6-1-105; Minn. Stat. § 325D.44; Or. Rev. Stat. § 646.608(4) (limiting actionable conduct to conduct which the Attorney General has previously declared unfair or deceptive); *see also* Nat'l Consumer L. Ctr., Consumer Protection in the States (2009), http://www.nclc.org/images/pdf/udap/analysis-state-summaries.pdf.

[44] *See Blue Cross of W. N.Y. Inc. v. Corcoran*, 163 A.D.2d 877, 878 (N.Y. App. Div. 1990) (deceptiveness must be judged by the overall impression to be reasonably expected on a person of average education and intelligence); *see also* Fla. Stat. Ann. § 501.204(2) ("[D]ue consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts . . . ").

potential effect on the least sophisticated consumer.[45]  Still others, including Ohio, have adopted their own unique approaches for evaluating deceptiveness.  In Ohio, "an act is deceptive if it has the likelihood of inducing a state of mind in the consumer that is not in accord with the facts."[46]

• *Rights of Action:*  State law also varies in how it establishes who constitutes a "consumer" under the law and whether those consumers can pursue private rights of action or class actions.  Some states, such as New Jersey and Oregon, expressly provide for a private cause of action.[47]  Other states' consumer protection laws do not contain express provisions.[48]  Further, some states apply restrictions on class actions in the consumer protection context.  For example, in Utah, class actions are allowed only with respect to an act or practice specified as a violation in a rule "adopted by the enforcing authority before the act occurred."[49]

• *Intent Standards:*  State law differs considerably regarding the intent requirement under local consumer protection laws.  California's UCL has no scienter requirement.[50]  In contrast, states such as New Jersey and Utah require a showing of intent to deceive.[51]  Still others, such as Illinois, require only a showing that defendant intended to induce plaintiff's reliance.[52]  In Arkansas, Idaho, Nevada, plaintiffs must show that a defendant knew her conduct was deceptive in order to recover each state's consumer protection laws.[53]  In Oregon, plaintiffs must demonstrate that the defendant's actions were

---

[45] *RRTM Rest. Corp. v. Keeping*, 766 S.W.2d 804, 808 (Tex. App. 1988) ("The applicable standard is 'whether the statement has a tendency to deceive the ignorant, the unthinking, and the credulous who do not stop to analyze but are governed by appearances and general impressions.'") (citation omitted).

[46] *See State ex rel. Celebrezze v. Ferraro*, 578 N.E.2d 492, 494 (Ohio App. 1989) (citation omitted).

[47] N.J. Stat. Ann. § 56:8-2.12 (authorizing private right of action for a refund); Or. Rev. Stat. Ann. § 646.638 (providing a private right of action under the Oregon Unlawful Trade Practices statute).

[48] *See, e.g.*, *Ly v. Nystrom*, 615 N.W.2d 302, 311 (Minn. 2000) (citing Minn. Stat. Ann. § 8.31).

[49] Utah Code Ann. § 13-11-17(2)(a); *see also Workman v. Nagle Constr., Inc.*, 802 P.2d 749, 754-55 (Utah App. 1990) (Bench, J., concurring in result) (noting that a class action could not be brought until after publication of a rule or entry of a final judgment declaring the defendant's activities illegal).

[50] *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 591 (9th Cir. 2012) ("[T]he California laws at issue here [including the Unfair Competition Law] have no scienter requirement."). Texas likewise does not require proof of an intent to deceive.  *Williams v. Trail Dust Steak House, Inc.*, 727 S.W.2d 812, 814 (Tex. App. 1987) (no showing of intent to deceive required).

[51] N.J. Stat. Ann. § 56:8-2 (knowledge and intent required for omissions); Utah Code §§ 13-11-4(2), 13-11-5(3) (knowing or intentional); *Knapp v. Potamkin Motors Corp.*, 602 A.2d 302, 304 (N.J. Super. Ct. 1991) (delineating higher standard of proof required in private actions).

[52] *Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 198 (Ill. 1992) (plaintiff need only prove intent of defendant that plaintiff rely on defendant's statement).

[53] Ark. Code Ann. § 4-88-107(a)(1) (deceptive trade practices include "[k]nowingly making a false representation as to the characteristics . . . uses, benefits . . . of goods"); Colo. Rev. Stat. Ann § 6-1-105(1)(e) ("A person engages in a deceptive trade practice when, in the course of such

"willful."[54]

- _Reliance:_  In some states, such as Florida, New Jersey, and New York, no showing of reliance is required under consumer protection laws.[55]  Other states, such as Oregon, require reliance only with respect to certain types of violations.[56]  In the context of class actions, some states, including California, require a class representative to prove reliance while other states relax reliance requirements.[57]

- _Public Interest:_  California's UCL often does not require plaintiffs to demonstrate that deceptive conduct affected a public interest whereas other states, such as Washington, require a plaintiff demonstrate the "public interest impact" of an unfair or deceptive act.[58]  New York also requires a showing that the alleged act affected the consuming public at-large.[59]

- _Notice Requirements:_  Many states require a plaintiff send the defendant a detailed

---

person's business . . . the person . . . [k]nowingly makes a false representation as to the characteristics . . . uses, benefits . . . or quantities of goods . . . ."); Idaho Code Ann. § 48-603 ("The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know . . . ."); Nev. Rev. Stat. Ann. § 598.0915 ("A person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he or she . . . [k]nowingly makes a false representation as to the characteristics . . . or quantities of goods . . . .").

[54] _Luedeman v. Tri-West Constr. Co._, 592 P.2d 281, 282 (Or. App. 1979) ("A wilful [consumer protection law] violation occurs when the person committing the violation knew or should have known that his conduct was a violation.").

[55] _See, e.g._, _Egwuatu v. South Lubes, Inc._, 976 So.2d 50, 53 (Fla. 1st DCA 2008); _Dabush v. Mercedes–Benz USA, Inc._, 874 A.2d 1110 (N.J. Super. 2005); _Stutman v. Chem. Bank_, 731 N.E.2d 608 (N.Y. 2000); _Thompson v. Am. Tobacco Co., Inc._, 189 F.R.D. 544, 553 (D. Minn. 1999).

[56] _Sanders v. Francis_, 561 P.2d 1003, 1006 (Or. 1977) ("Whether ORS 646.638(1) requires reliance as an element of causation necessarily depends on the particular unlawful practice alleged.").

[57] _In Re Tobacco II Cases_, 207 P.3d 20 (Cal. 2009) (requiring that class representatives in UCL class action show reliance to satisfy standing requirement of having suffered "injury in fact"); _see also Amato v. Gen. Motors Corp._, 463 N.E.2d 625, 629 (Ohio App. 1982) ("[P]roof of reliance may be sufficiently established by inference or presumption from circumstantial evidence to warrant submission to a jury without direct testimony from each member of a class.").

[58] _Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co._, 719 P.2d 531, 533 (Wash. 1986) ("We hold that to prevail in a private [consumer protection] action . . . a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in a trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation").

[59] _H2O Swimwear, Ltd. v. Lomas_, 560 N.Y.S.2d 19, 21 (N.Y. App. Div. 1990) (noting that N.Y. Gen. Bus. L. § 349 "has been held to apply solely to matters affecting the public interest and involving transactions of a recurring nature").

demand letter, at varying dates, before a plaintiff files a complaint.[60]  Other states require that notice be given to a defendant within a prescribed time period.[61]  In Indiana, however, this limitations period does not apply to an "incurable deceptive act," which is one committed "as part of a scheme, artifice, or device with intent to defraud or mislead."[62]  Other states, such as Oregon, require that a plaintiff first provide notice to the state attorney general, with varying consequences for failure to comply.[63]

- _Available Relief:_  California's UCL only affords restitution and injunctive relief whereas other states permit damages, treble damages, or even punitive damages.[64]  States that permit damages include Florida, Illinois, New Jersey, Ohio, Texas, and Washington.[65]  States that permit treble damages include New Jersey, Ohio, and Washington.[66]  Notably, some states, such as Ohio and Colorado, impose restrictions on relief when consumer protection claims are brought as part of a class, as opposed to an individual action.[67]

- _Required Residence of Class Representative:_  Some states, such as Connecticut, require an in-state resident to be the named plaintiff in a class action brought under state

---

[60] Tex. Bus. & Com. Code Ann. § 17.505(a) ("[A] consumer shall give written notice to the person at least 60 days before filing the suit advising the person in reasonable detail of the consumer's specific complaint . . . .").

[61] _See, e.g._, _A.B.C. Home & Real Estate Inspection, Inc. v. Plummer_, 500 N.E.2d 1257, 1262-63 (Ind. App. 1986) (overturning award under Indiana Deceptive Consumer Sales Act where plaintiff failed to provide proper notice within statutory period).

[62] Ind. Code Ann. §§ 24-5-0.5-2(a)(8), 24-5-0.5-5(a).

[63] Or. Rev. Stat. Ann. § 646.638(2) ("A person that brings an action under . . . this section shall mail a copy of the complaint or other initial pleading to the Attorney General at the time the action commences. . . . [A] court may not enter judgment for the plaintiff until proof of mailing is filed with the court.").

[64] _See Korea Supply Co._ v. _Lockheed Martin Corp._, 63 P.3d 937, 943 (Cal. 2003) ("While the scope of conduct covered by the [California Unfair Competition Law] is broad, its remedies are limited.  A UCL Action is equitable in nature; damages cannot be recovered.").

[65] _See_ Fla. Stat. Ann. § 501.211; 815 Ill. Comp. Stat. 505/10a(a); N.J. Stat. Ann. § 56:8-19; Ohio Rev. Code Ann. § 1345.09(A)-(B); Tex. Bus. & Com. Code § 17.50(b), (d); Wash. Rev. Code Ann. § 19.86.090.

[66] _See_ N.J. Stat. Ann. § 56:8-19; Ohio Rev. Code Ann. § 1345.09(B); Wash. Rev. Code Ann. § 19.86.090. Other states allow for punitive damages.  _See_ 815 Ill. Comp. Stat. 505/2AA; Tex. Bus. & Com. Code § 17.50.

[67] Ohio Rev. Code Ann. § 1345.09(B) (limiting class action damages to actual damages or other appropriate relief whereas individual plaintiffs may collect up to treble damages); Colo. Rev. Stat. Ann. § 6-1-113(2) ("Except in a class action . . . any person who, in a private civil action, is found to have engaged in or caused another to engage in any deceptive trade practice listed in this article shall be liable in an amount equal to the sum of: (a) The greater of: (I) The amount of actual damages sustained; or (II) Five hundred dollars; or (III) Three times the amount of actual damages sustained, if it is established by clear and convincing evidence that such person engaged in bad faith conduct . . . ."); _see also Robinson v. Lynmar Racquet Club, Inc._, 851 P.2d 274, 278 (Colo. App. 1993) (holding that under Colo. Rev. Stat. Ann. § 6-1-113 individual actions (but not class actions) may seek treble damages and attorneys' fees).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No.  5:16-cv-06822-NC

consumer protection laws.[68]

## State Securities Claims/Blue Sky Laws

- *Inconsistent Adoption of Uniform Securities Act:*  State securities laws vary significantly from state to state and continue to come "in a variety of shapes and sizes."[69]  To date, there have been four attempts at creating a Uniform Securities Act ("Act"), three of which are still currently in force.[70]  The second uniform act was promulgated in 1956 and is still in effect in Arkansas, Colorado, Oregon, and Washington.[71]  In 1985, another version of the Act was promulgated and adopted by several states, including Nevada and Utah.[72]  Idaho is among the states to enact yet another version of the Act, which was created in 2002.[73]  Many other states have declined to adopt a specific version of the Uniform Securities Act, including Florida, Illinois, New Jersey, Ohio, and Texas.[74]  Still other states appear to belong in a league of their own:  Professor Loss, the draftsman of the Uniform Act, describes New York as "provid[ing] a considerably different pattern of fraud enforcement" and California as employing a "distinctive pattern of fraud enforcement" from the uniform acts.[75]

- *Market Manipulation Provisions:*  Given the disparate adoption of the uniform acts, it is

---

[68] *Fraiser v. Stanley Black & Decker, Inc.*, 109 F. Supp. 3d 498, 505 (2015).

[69] Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation*, Ch.11.B (6th ed. 2011; 2018 Supplement).

[70] Joseph C. Long, et.al., *Blue Sky Law* § 9:4. The drafting and adoption process of the civil-liability provisions of the Uniform Securities Act.

[71] *Id.*; *see* Ark. Code Ann. §§ 23-42-101 to 23-42-509; Colo. Rev. Stat. § 11-51-103 to 11-51-1008; Or. Rev. Stat. Ann. §§ 59.005 to 59.451; Wash. Rev. Code §§ 21.20.005 to 21.20.940; *see also Schultz v. Rector-Phillips-Morse, Inc.*, 552 S.W.2d 4, 8-9 (Ark. 1977) (recognizing Arkansas's adoption in 1959 of the Uniform Securities Act of 1956); *People v. Terranova*, 563 P.2d 363, 365 (Colo. App. 1976) (recognizing Colorado's adoption of the Uniform Securities Act of 1956).  Arkansas's civil-liability provisions are located in Ark. Code Ann. § 23-42-106.  Colorado's civil-liability provisions are located in Colo. Rev. Stat. § 11-51-604.  Oregon's civil-liability provisions are included in Or. Rev. Stat. Ann. § 59.115.  Washington's civil-liability provisions are included in Wash. Rev. Code § 21.20.430.

[72] *See* Nev. Rev. Stat. Ann. §§ 90.211 to 90.860; Utah Code Ann. §§ 61-1-1 to 61-1-108.  Nevada's civil-liability provisions are contained in Nev. Rev. Stat. Ann. § 90.660.  Utah's civil-liability provisions are contained in Utah Code Ann. § 61-1-22.

[73] *See* Idaho Code Ann. §§ 30-14-101 to 30-14-703.  Idaho's civil-liability provisions are contained in Idaho Code Ann. § 30-14-509(b).

[74] *See* Fla. Stat. Ann. §§ 517.011 to 517.32; 815 Ill. Comp. Stat. Ann. 5/1 to 5/19; N.J. Stat. Ann. §§ 49:347 to 49:383; Ohio Rev. Code Ann. §§ 1707.01 to 1707.99; Tex. Rev. Civ. Stat. Ann. art. 581-10-1 to 581-45; *see also Dillon v. Axxsys Intern., Inc.*, 385 F. Supp. 2d 1307, 1313 n.4 (M.D. Fla. 2005) (discussing Florida's Blue Sky Law), *aff'd*, 185 Fed. Appx. 823 (11th Cir. 2006); *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 672-73 (7th Cir. 2007) (discussing Illinois Securities Law).

[75] Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation*, Ch.1.B at 26, 28 (6th ed. 2011; 2018 Supplement) (noting the "basic provision" of New York's Martin Act, referred to as a "fraud act," is a "grant of investigatory power to the Attorney General.").

not surprising that "market manipulation" provisions have been addressed inconsistently among the states' local blue sky laws.  For example, the 1985 version of the Act included a provision specifically prohibiting "market manipulation."[76]  Accordingly, states adopting that version of the Act, such as Nevada, specifically prohibit "market manipulation" under a statutory provision distinct from general securities fraud provisions.[77]  The earlier 1956 version of the Act, on the other hand, contained no such counterpart.[78]  In further contrast, the general fraud provision in the 2002 version of the Act reaches "market manipulation" and is interpreted as a parallel to Federal Rule 10b-5.  Therefore, the 2002 version of the Act contains no express provision akin to the 1985 Act's prohibition on "market manipulation" but does appear to provide similar coverage.[79]  Given the divergence within their adoption of the uniform laws, many states analyze securities fraud claims under the general fraud provisions related to misstatements and omissions, while other states analyze such claims under market manipulation-specific caselaw.

- *Reliance:*  State courts are divided over whether misstatement and omissions claims under their respective blue sky laws require a showing of reliance.  States adopting the Uniform Securities Act of 1956, such as Arkansas and Oregon, do not require that a plaintiff prove transaction causation or reliance.[80]  Others, such as Minnesota and Washington, construe the scope of liability in line with Rule 10b-5 and incorporate a reliance requirement.[81]

- *Intent Standards:*  States enforce divergent scienter requirements under their respective blue sky laws pertaining to misstatement and omissions claims.  In some states, plaintiffs

---

[76] 69A Am. Jur. 2d Securities Regulation—State § 197 ("The Revised Uniform Securities Act of 1985 includes a provision specifically prohibiting market manipulation and states that a person may not . . . employ any other deceptive or fraudulent device, scheme, or artifice to manipulate the market in a security.")

[77] Nev. Rev. Stat. Ann. § 90.580 ("A person shall not . . . [e]mploy any other deceptive or fraudulent device, scheme or artifice to manipulate the market in a security . . . .")

[78] *See* 69A Am. Jur. 2d Securities Regulation—State § 197.

[79] *See* Uniform Securities Act of 2002 § 501, Official Comment 5 to § 501 ("Because Section 501, like Rule 10b-5, reaches market manipulation, this Act does not include the RUSA market manipulation Section 502, which had no counterpart in the 1956 Act.") (citing Louis Loss & Joel Seligman, Securities Regulation Ch.10.D (3d ed. 1991)).

[80] *Everts v. Holtmann*, 667 P.2d 1028, 1033 (Or. App. 1983) (stating that Oregon's version of Section 410(a)(2) "imposes liability without regard to whether the buyer relies on the omissions or misrepresentation"); *Lane v. Midwest Bancshares Corp.*, 337 F. Supp. 1200, 1210 (E.D. Ark. 1972) (describing the plaintiff's lack of knowledge as the only reliance requirement under Arkansas's version of Section 410(a)(2)); *see also Arnold v. Dirrim*, 398 N.E.2d 426, 435-36 (Ind. Ct. App. 1979) (holding that reliance is not an element under Indiana's version of Section 410(a)(2)); *Kaufman v. i-Stat Corp.*, 754 A.2d 1188 (N.J. 2000).

[81] *Merry v. Prestige Cap. Mkts., Ltd.*, 944 F. Supp. 2d 702, 709 (D. Minn. 2013) (stating that Minnesota's version of Section 410(a)(2) requires "reliance upon the misrepresentation or omission"); *Eagle Fund, Ltd. v. Sarkans*, 823 N.E.2d 783, 787 (Mass. App. Ct. 2005) (construing Washington's version of Section 410(a)(2) and holding "reasonable reliance [to be] a requirement").

need not plead scienter, but defendants may avoid liability by proving the absence of their negligence.  For example, in states such as Washington, which have adopted the Uniform Securities Act of 1956, "scienter is not required in an action for fraud or misrepresentation."[82]  Similarly, in Texas, a plaintiff is not required to plead scienter to establish seller liability under the anti-fraud provisions of the Texas Securities Act, but a plaintiff is still "subject to a 'reasonable care' defense."[83]  In other states, such as Colorado, plaintiffs must plead and prove that the defendant acted with scienter for misrepresentations and omissions claims.[84]

- *Timeliness Bars:*  States also differ significantly in their application of timeliness bars under their respective securities laws.  Some states, including Illinois, Indiana, and Washington, employ a single limitations period subject to equitable tolling and accrual upon discovery.[85]  This approach is consistent with the 1956 version of the Act.  Other states, including California, Colorado, Idaho, Minnesota, Nevada, Ohio, Oregon, Texas, and Utah, adopt a dual limitations period that includes a shorter statute of limitations capped by a longer statute of repose.[86]  This latter approach is consistent with the 2002 version of the Act.

---

[82] *Aspelund v. Olerich*, 784 P.2d 179, 182 (Wash. App. 1990) (interpreting Washington's version of Section 410(a)(2), which contains statutory language similar to Rule 10b-5, and stating that "[s]cienter is not required in an action for fraud or misrepresentation under The Securities Act of Washington").

[83] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343 (5th Cir. 2008).

[84] *See* Colo. Rev. Stat. § 11-51-604(2.6)-(3); *see also* Joseph C. Long, et.al., *Blue Sky Law* § 9:46, Pleading and Proving Liability for Material Misstatements and Omissions—The Defendant's Knowledge, Negligence, or Scienter, 12A Blue Sky Law § 9:46.

[85] 815 Ill. Comp. Stat. 5/13(D) (three-year time limit); Ind. Code § 23-19-5-9(g) (three-year time limit); Wash. Rev. Code § 21.20.430(4)(b) (three-year time limit).

[86] Cal. Corp. Code § 25506(b) (two-year statute of limitations triggered on discovery and five-year statute of repose triggered on the date of the transaction constituting the violation); Colo. Rev. Stat. § 11-51-604(8) (two-year statute of limitations triggered upon discovery and five-year statute of repose triggered on the date of the purchase, the sale, or the violation); Idaho Code Ann. § 30-14-509(j)(2) (two-year statute of limitations triggered upon discovery and five-year statute of repose triggered on the date of the violation); Minn. Stat. § 80A.76(j)(2) (two-year statute of limitations triggered upon discovery and five-year statute of repose triggered on the date of the violation); Nev. Rev. Stat. Ann. § 90.670 (two-year statute of limitations triggered upon discovery and five-year statute of repose triggered on the date of the violation); Ohio Rev. Code Ann. § 1707.41(D) (two-year statute of limitations triggered upon discovery and five-year statute of repose triggered on the date of the purchase); Or. Rev. Stat. Ann. § 59.115(6) (two-year statute of limitations triggered upon discovery and three-year statute of repose triggered on the date of the sale); Tex. Rev. Civ. Stat. Ann. Art. 581-33(H)(2) (three-year statute of limitations triggered upon discovery and five-year statute of repose triggered on the date of the sale); Utah Code Ann. § 61-1-22(7)(a) (two-year statute of limitations triggered upon discovery and five-year statute of repose triggered on the date of the violation).  *See generally* Joseph C. Long, et.al., *Blue Sky Law* § 9:51, Statutory Affirmative Defenses to Civil Liability for Material Misstatements and Omissions—Timeliness Bars Applicable to Claims for Material Misstatements and Omissions.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No.  5:16-cv-06822-NC

- *Available Remedies:*  Recovery under state securities law varies significantly from state to state.  For example, some states, such as Arkansas and Minnesota, only allow plaintiffs to recovery punitive damages if they pursue a parallel tort law claim.[87]  Other states, such as Illinois, independently provide for punitive damages regardless of the cause of action.[88]

- *Attorney's Fees:*  State law also varies with regard to attorney's fees that are recoverable under state securities acts.  Under the Uniform Securities Act of 1956, plaintiffs may recover attorney's fees regardless of whether a plaintiff's main recovery is actual rescission or rescissional damages.[89]  Many states, including Indiana, "mandate" an award of attorney's fees.[90]  Other states, including Idaho and Colorado, have suggested that such an award is within the discretion of the trial court, which is consistent with the approach recommended by the Uniform Securities Act of 2002.[91]

---

[87] *Mitchell v. Beard*, 513 S.W.2d 905, 929 (Ark. 1974) ("[W]here an action is brought and sustained both under the Securities Act and common law fraud, punitive damages are recoverable."); *Sprangers v. Interactive Tech., Inc.*, 394 N.W.2d 498, 503-04 (Minn. Ct. App. 1986) (investor pursuing claim under Minnesota securities laws could not recover punitive damages, but could do so if independent tort was established).

[88] *Anvil Inv. Ltd. Partnership v. Thornhill Condominiums, Ltd.*, 407 N.E.2d 645, 653 (Ill. App. 1980) ("[A]bsent any sort of statutory prohibition, punitive damages are awarded independent of the cause of action.")

[89] Uniform Securities Act of 1956, § 410(a)(2), Official Comment to § 410(a) ("The measure of damages when the plaintiff is not in a position to tender back the security is the same under Clauses (1) and (2).  It is designed to be the substantial equivalent of rescission.").

[90] *Olive v. Lyttle*, 48 Fed. Appx. 591, 594 (7th Cir. 2002) (mandating an award of attorney's fees under Indiana's version of § 410(a)(1)).

[91] *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 776 (9th Cir. 1984) (holding that decision to award attorney's fees under Idaho's securities laws was "within the sound discretion of the trial judge"); *MidAmerica Fed. Saving & Loan Ass'n v. Shearson/Am. Express, Inc.*, 962 F.2d 1470, 1476-77 (10th Cir. 1992) (expressing "serious[] doubt" that an attorney's fee award was mandatory under the Colorado securities laws); *see also* Uniform Securities Act of 2002, Official Comment 12 to § 509 ("The reasonable attorneys' fees specified in Section 509 are permissive, not mandatory.").