\* \* \* UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 \* \* \*

Reed R. Kathrein (139304)
Peter E. Borkon (212596)
Danielle Smith (291237)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com
danielles@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs and Proposed Lead
Counsel for the Class*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| ROBERT COLMAN and HILARY TAUBMAN-DYE, Individually and on Behalf of All Others Similarly Situated, | No. 5:16-cv-06822-NC |
| | CLASS ACTION |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER RULE 23(B)(3)** |
| vs. | Date:         March 28, 2018 |
| THERANOS, INC., et al., | Time:         1:00 PM |
| | Courtroom:   7, 4th Floor |
| Defendants. | Judge:        Honorable Nathanael Cousins |
| | DATE ACTION FILED: Nov. 28, 2016 |

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at a time and place to be determined by the Court, before the Honorable Judge Nathanael Cousins of the United States District Court for the Northern District of California, San Jose Division, located at Courtroom 7, 4th Floor, 280 South 1st Street, San Jose, CA 95113, Plaintiffs will, and hereby do, move for an order, pursuant to Rule 23 of the Federal Rules of Civil Procedure (the "Rules"), certifying a class pursuant to Rule 23(b)(3), appointing Plaintiffs as class representatives, appointing their counsel as class counsel.

Specifically, Plaintiffs will and hereby do move this Court to:

1)      Certify the following Class:

Class
All persons or entities who, from July 29, 2013, through October 5, 2016, purchased or acquired securities of an entity for the express purpose of making corresponding purchases of Theranos securities.[1]

2)      Appoint Plaintiffs Robert Colman and Hilary Taubman-Dye, and Class Members Thomas Brodie M.D. and Mai N. Pogue, as Class Representatives (Upon appointing Class Members Brodie and Pogue as Class Representatives, Plaintiffs will, with leave of court, amend the Complaint to name Brodie and Pogue as Plaintiffs); and

3)      Appoint the firms of Hagens Berman Sobol Shapiro LLP and Robbins Geller Rudman & Dowd LLP as counsel for the class;

The motion is based on this Notice of Motion and Motion for Class Certification Under Rule 23(b)(3); the accompanying Memorandum of Points and Authorities, Declarations and Exhibits; the pleadings and papers on file in this action; oral argument; and such other matters as the Court may consider in hearing this motion.

---

[1] Alternatively, the Class could be defined as all investors in the funds which have been identified as having solicited investors for the purposes of investing in Theranos stock during the Class Period. These funds ("Direct Purchaser Funds") are identified in Exhibit A to the Declaration of Reed R. Kathrein in Support of Plaintiffs Motion for Class Certification and consist of a limited set of the funds listed in Appendix A of Defendants' Motion to Limit the Putative Class Definition including Celadon and OPA Holdings. *See* Defs.' Mot. to Limit Class, ECF No. 102-1. Plaintiffs believe that all of the Direct Purchaser Funds have already been identified through discovery. If discovery reveals any changes in the information to the identification of the eligible Direct Purchaser Funds, Plaintiffs will amend the list.

* * * UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 * * *

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 2

II.  BACKGROUND ............................................................................................... 2

III. LEGAL STANDARDS FOR CLASS CERTIFICATION ................................ 7

IV. ARGUMENT ................................................................................................... 8

    A. The Class and Subclass Meet All Requirements of Rule 23(a) ................. 8

        1. The Class is Definite and Ascertainable ................................................ 8

        2. The Class is Sufficiently Numerous ...................................................... 9

        3. This Litigation Concerns Common Questions of Law and Fact ........... 9

        4. Plaintiffs' Claims are Typical of Class Members' Claims .................. 12

        5. The Proposed Class Representatives Will Fairly and Adequately Protect Class Interests 13

    B. This Case Satisfies the Requirements Under Rule 23(b)(3) ..................... 14

        1. Common Questions of Law or Fact Predominate ............................... 14

            a. Common Questions Predominate as to Plaintiffs' Claim for Securities Fraud in Violation of Cal. Corp. Code §§ 25400(d) & 25500 (Count I) ................................... 15

            b. Common Questions Predominate as to Plaintiffs' Claim for Violation of California's Unfair Competition Law (Count III) ................................ 18

            c. Common Questions Predominate as to Plaintiffs' Claims for Fraud and Deceit (Count IV), Fraudulent Concealment (Count V), and Negligent Misrepresentation (Count VII) ................................... 20

            d. Any Arguments Regarding Differences in Communications, Direct Purchaser Funds, Loss Causation Are Inapposite, Unpersuasive, and Unable to Defeat Class Certification ................................... 22

        2. A Class Action is Superior to Other Available Methods for Fairly and Efficiently Adjudicating This Controversy ................................... 24

V.  CONCLUSION ............................................................................................... 25

* * * UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 * * *

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
  2017 WL 1806583 (N.D. Cal. May 5, 2017)..............................................................13

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ..............................................................................................23

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..........................................................................................15, 24

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ..............................................................................................17

*Baghdasarian v. Amazon.com, Inc.*,
  258 F.R.D. 383 (C.D. Cal. 2009)..........................................................................20

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................................................17

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ..........................................................................18, 21

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ................................................................................8

*Brown v. China Integrated Energy Inc.*,
  2015 WL 12720322 (C.D. Cal. Feb. 17, 2015) .......................................................7

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ........................................................8

*In re Celera Corp. Sec. Litig.*,
  2014 WL 722408 (N.D. Cal. Feb. 25, 2014) .......................................................8, 9

*Cohen v. Trump*,
  303 F.R.D. 376 (S.D. Cal. 2014) ..........................................................................21

*Colman v. Theranos, Inc.*,
  2017 WL 1383717 (N.D. Cal. Apr. 18, 2017)........................................................16

*In re Cooper Companies Inc. Sec. Litig.*,
  254 F.R.D. 628 (C.D. Cal. 2009).....................................................................16, 17

\* \* \* UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 \* \* \*

*Daniel v. Ford Motor Co.*,
   806 F.3d 1217 (9th Cir. 2015) ...................................................................................23

*Des Roches v. Cal. Physicians' Serv.*,
   320 F.R.D. 486 (N.D. Cal. 2017) ......................................................................7, 9, 12

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ....................................................................................12

*Feller v. Transamerica Life Ins. Co.*,
   2017 WL 6496803 (C.D. Cal. Dec. 11, 2017) ...........................................................9

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ..............................................................................21, 22

*Flaxel v. Johnson*,
   541 F. Supp. 2d 1127 (S.D. Cal. 2008) ...................................................................16

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ...........................................................................14, 24

*Hanson v. Berthel Fisher & Co. Fin. Servs., Inc.*,
   2014 WL 2434000 (N.D. Iowa May 29, 2014) .......................................................16

*Hatamian v. Advanced Micro Devices, Inc.*,
   2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ........................................................23

*In re Intuitive Surgical Sec. Litig.*,
   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ........................................................22

*Katz v. China Century Dragon Media, Inc.*,
   287 F.R.D. 575 (C.D. Cal. 2012) ............................................................................17

*Kmiec v. Powerwave Tech., Inc.*,
   2015 WL 12914343 (C.D. Cal. Dec. 4, 2015) ........................................................16

*Korolshteyn v. Costco Wholesale Corp.*,
   2017 WL 1020391 (S.D. Cal. Mar. 16, 2017) .........................................................15

*Lee v. Carter-Reed Co. L.L.C.*,
   4 A.3d 561 (N.J. 2010) .............................................................................................18

*In re: Lenovo Adware Litig.*,
   2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ........................................................15

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ....................................................................................18

*In re Lidoderm Antitrust Litig.*,
   2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .............................................................7

\* \* \* UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 \* \* \*

*Lilly v. Jamba Juice Co.*,
   308 F.R.D. 231 (N.D. Cal. 2014) ....................................................................................13, 24

*Lozano v. AT & T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ....................................................................................................19

*Martin v. Monsanto Co.*,
   2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) ............................................................14, 15, 24

*Mass. Mut. Life Ins. Co. v. Super. Ct.*,
   119 Cal. Rptr. 2d 190 (2002) ...................................................................................................19

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ......................................................................................................9

*Miletak v. Allstate Ins. Co.*,
   2010 WL 809579 (N.D. Cal. Mar. 5, 2010) .............................................................................14

*In re Morning Song Bird Food Litig.*,
   320 F.R.D. 540 (S.D. Cal. 2017) ..................................................................................15, 18, 22

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,
   311 F.R.D. 532 (N.D. Cal. 2015) ..............................................................................................13

*Newton v. Am. Debt Servs., Inc.*,
   2015 WL 3614197 (N.D. Cal. June 9, 2015).............................................................................19

*Plascencia v. Lending 1st Mortg.*,
   259 F.R.D. 437 (N.D. Cal. 2009) ..............................................................................................20

*Results ByIQ LLC v. Netcapital.com LLC*,
   2013 WL 4835838 (N.D. Cal. Sept. 11, 2013)..........................................................................18

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ..................................................................................................12

*In re Seagate Tech. II Sec. Litig.*,
   843 F. Supp. 1341 (N.D. Cal. 1994)..........................................................................................17

*In re Sohaei*,
   2013 WL 209601 (Bankr. N.D. Cal. Jan. 17, 2013)..................................................................18

*Torres v. JC Penney Corp. Inc.*,
   2013 WL 1915681 (N.D. Cal. May 8, 2013)..............................................................................19

*Trigueiro v. Bank of Am., N.A.*,
   2015 WL 4983599 (E.D. Cal. Aug. 19, 2015) ..........................................................................21

*United States v. Ctr. for Emp't Training*,
   2016 WL 4210052 (E.D. Cal. Aug. 9, 2016) ............................................................................20

*United States v. Kennedy*,
   726 F.3d 968 (7th Cir. 2013) ...................................................................................18

*Vaccarino v. Midland Nat. Life Ins. Co*.,
   WL 3200500 (C.D. Cal. June 17, 2013) ....................................................................19

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ....................................................................................25

*Viterbi v. Wasserman*,
   191 Cal. App. 4th 927 (2011) ...................................................................................16

*Ward v. United Airlines, Inc.*,
   2016 WL 1161504 (N.D. Cal. Mar. 23, 2016) ........................................................7, 9

*Williamson v. Gen. Dynamics Corp*.,
   208 F.3d 1144 (9th Cir. 2000) ..................................................................................20

**Statutes**

Cal. Corp. Code § 25400 ..............................................................................................15, 23

Cal. Corp. Code § 25500 ..............................................................................................16, 18

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

Fed. R. Civ. P. 10(b) ..........................................................................................................16

* * * UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 * * *

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether a class should be certified under Fed. R. Civ. P. 23(b)(3)?

2.      Whether the class should be defined as "All persons or entities who, from July 29, 2013, through October 5, 2016, purchased or acquired securities of an entity for the express purpose of making corresponding purchases of Theranos securities."[2]

3.      Whether to appoint Plaintiffs Robert Colman and Hilary Taubman-Dye, and Class Members Thomas Brodie M.D., and Mai N. Pogue as Class Representatives; and

4.      Whether to appoint the firms of Hagens Berman Sobol Shapiro LLP and Robbins Geller Rudman & Dowd LLP as counsel for the class.

---

[2] Alternatively, the Class could be defined as all investors in the funds which have been identified as having solicited investors for the purposes of investing in Theranos stock during the Class Period. These funds ("Direct Purchaser Funds") are identified in Exhibit A to the Declaration of Reed R. Kathrein in Support of Plaintiffs Motion for Class Certification and consist of a limited set of the funds listed in Appendix A of Defendants' Motion to Limit the Putative Class Definition including Celadon and OPA Holdings. *See* Defs.' Mot. to Limit Class, ECF No. 102-1. Plaintiffs believe that all of the Direct Purchaser Funds have already been identified through discovery. If discovery reveals any changes in the information to the identification of the eligible Direct Purchaser Funds, Plaintiffs will amend the list.

## I.  INTRODUCTION

This Motion poses a straightforward overarching inquiry for the Court: should the overwhelming evidence of Defendants' fraud be presented in a single action that adjudicates all common factual and legal issues, or should approximately two hundred defrauded "indirect shareholder" investors in the putative class be forced to either forgo recovery or initiate individual actions to present the same evidence and litigate the same factual and legal issues against the same Defendants?  For the reasons stated herein, the only reasonable answer is that the class should be certified.

## II.  BACKGROUND

Defendant Theranos, Inc. ("Theranos" or the "Company") is a private company started by Defendant Elizabeth Holmes ("Holmes").[3]  Between 2009 and 2016, Holmes ran the company with her secret boyfriend, with whom she lived, Defendant Ramesh Balwani ("Balwani").[4]  She appointed Balwani to be the President, Chief Operating Officer, and Vice-Chairman of the board of directors (the "Board") in May 2009, and he served until May 2016 when Holmes decided he should resign.[5]

In July 2013, Donald Lucas – a venture capitalist who had a relationship with over 100 investors (*e.g.* Lucas Venture Group ("LVG") IV, L.P., and XI LLC), whose father had been the Chairman of Theranos from 2006-2013 and advisor to a fund which solicited investors for Theranos (Peer Ventures Group IV, L.P.), and whose cousin controlled another fund of investors in Theranos (Black Diamond Ventures XII-B, LLC) – heard that Theranos "was looking to raise some money."  Shortly afterwards, Defendant Holmes confirmed that Defendants were seeking to sell

---

[3] Answer to Amended Class Action Complaint for Violations of California's Securities, Unfair Competition, and Common Law ("Answer to Am. Complaint"), ¶ 20, ECF No. 175 (Admission).

[4] Defendant Theranos, Inc.'s Responses and Objections to Plaintiffs' First Set of Interrogatories (from *Partner Investments, L.P. et al. v. Theranos, Inc., et al*., C.A. No. 12816-VCL (Del. Ch. Mar. 23, 2017)) ("*Partner*" or "*Partner* Litigation") ("First Set *Partner* Interrog.") Resp. 8, attached to the Declaration of Reed R. Kathrein in Support of Plaintiffs' Motion for Class Certification ("Kathrein Decl.") at Exhibit P; Kathrein Decl. Ex. S (Transcript of Deposition of Christian Holmes ("C. Holmes Dep."), pp. 152-167).

[5] Kathrein Decl. Ex. S (C. Holmes Dep., pp. 152-167).  Defendant Holmes told her brother, Christian Holmes, that she was considering telling members of the Board of this relationship in the 2014/15 timeframe.  Kathrein Decl. Ex. S. (C. Holmes Dep., pp. 164-67).

Theranos shares, and made Lucas a "special adviser" who would then use his connections to find investors.[6] Holmes also let other general partners of investor funds (which she referred to as "part of our company" or family) know that Defendants were seeking to sell more shares.[7] As Holmes reached out to investors, she directed the company to begin to keep a list of the funds that invested in Theranos, to be called "direct shareholders," and those who invested in those funds, to be called "indirect shareholders".[8]

Donald Lucas, like the Class (defined below), professes that Defendants' statements led him to believe that Theranos "had established a Board" to which Holmes reported and from which Holmes took direction; had developed "these sophisticated boxes" that could run "over 100 tests, from a single drop of blood and produce just as accurate results as taking a venous draw"; and that "these very sophisticated boxes would be placed in Walgreen's stores."[9]

In July 2013, Theranos dropped its private persona, and mounted a public campaign to attract media attention, and to meet a Walgreens launch commitment, as "delays" and "slippage" had caused a deal with Blue Cross Blue Shield to fall through.[10] As part of that plan, on July 29, 2013, Defendants published Theranos's first press release, announcing that Wells Fargo's Chairman and CEO, Richard Kovacevich, and retired four-star Marine general James "Mad Dog" Mattis were appointed to the Company's Board alongside Henry Kissinger, former Secretary of State, Treasury, and Labor George Schultz, and Senator Samuel Nunn, among others.[11]

---

[6] Kathrein Decl. Ex. T (Transcript of Deposition of Donald Lucas ("Lucas Dep.") pp. 18-20, 26-45).

[7] Kathrein Decl. Ex. B (Aug. 3, 2013 email between Elizabeth Holmes and General Partner of Peer Venture Partners).

[8] Kathrein Decl. Ex. H (Aug. 1, 2013 email from Elizabeth Holmes).

[9] Kathrein Decl. Ex. T (Lucas Dep. pp. 26-45).

[10] Kathrein Decl. Ex. D (email correspondence reflecting Blue Cross Blue Shield deal falling through); Ex. E (Defendants negotiating for accelerated payments of $75 million and 50/50 cost sharing in exchange for exclusivity and shared goal of quick roll-out); Ex. F (2013 Corporate Communication Strategy); Ex. G (Detailed talking points in prep for Holmes interview with Joe Rago of the Wall Street Journal "that leads Joe to conclude that Theranos has the potential to fundamentally change the U.S. healthcare system" with "Nation's first high complexity lab that runs all its tests on microsamples" "compared to needle and vials").

[11] Kathrein Decl. Ex. Z (July, 29, 2013 Press Release).

In August 2013, Defendants wooed Wall Street Journal writer Joseph Rago[12], who on September 8, 2013 published an article on Theranos that included Holmes's claims that the Company could use its automated miniaturized proprietary devices to run comprehensive blood tests, that are faster and cheaper than conventional methods, requiring only a few drops of a patient's blood.[13]

On September 9, 2013, Theranos and Walgreens issued a joint press release announcing their plan to roll out Walgreens wellness centers, in which "consumers can now complete any clinician-directed lab test with as little as a few drops of blood and provide results in a matter of hours."[14]

Using the publicity generated from the September 8, 2013 Wall Street Journal article and the September 9, 2013 Walgreens/Theranos press release, Defendants solicited and sold interests in Theranos.[15]  Lucas and other Direct Purchaser Funds then reached out to investors, repeated these public statements and referred potential "indirect investors" to the publicity.[16] Even presentations to Direct Purchaser Funds contain these same messages.[17]

---

[12] *See e.g.* Kathrein Decl. Ex. C (Aug. 12, 2013 email to Elizabeth Holmes regarding Theranos's "launch strategy").

[13] Kathrein Decl. Ex. AA; T (Lucas Dep pp. 70-71; Plaintiffs Dep. Ex. 45) (Sep. 8, 2013 WSJ Article).

[14] Kathrein Decl. Ex. T (Lucas Dep pp. 70-71); and Kathrein Decl. Ex. BB (Sep. 9, 2013 Walgreens Press Release).

[15] *See e.g.* Kathrein Decl. Ex. I (Nov. 15, 2013 email showing Defendants using press publicity to convince Iconiq Capital ("Iconiq") to invest; and Dec. 21, 2013 email showing Iconiq asking for scientist to have access to lab and do a "medical efficacy review," and meeting with Walgreens.  Iconiq never invested after seeking non-public information.); *See also* Kathrein Decl. Ex J (Dec. 16, 2013 Holmes email to Theranos Stockholders touting Topol/Medscape publicity and inviting further investment ); Kathrein Decl. Ex. K (Dr. Topol's Medscape Year End Review 2013, "Theranos will be in all Walgreens stores before long, leveraging microfluidic technology to do hundreds of assays with a droplet of blood") and Kathrein Decl. Ex. L (Nov. 18, 2013 video interview by Eric Topol, M.D. stating, "So we looked at the combination of the tiny blood sample . . . .  Then we focused a great deal on these tests and validated and verified them over the years, building an infrastructure that was highly automated and standardized such that the quality of the data that we generate could be used in an actionable manner by clinicians.").

[16] *See e.g.,* Kathrein Decl. Ex. M (email correspondence containing communications to shareholders referencing WSJ article); Kathrein Decl. Ex. T (Lucas Dep. pp. 63-71); Kathrein Decl. Ex. Y (Lucas Dep. Exs. 38, 39, 40, 41 and 42).

[17] Kathrein Decl. Ex. T (Lucas Dep. pp. 63-71; Kathrein Decl Ex. Y (Lucas Dep. Exs 38, 39, 40, 41 and 42) (August 2013 Slide Deck "The actionable information you need;1/1000 the size of a typical blood draw. Theranos runs any test available in central laboratories, and processes all sample types.").

After learning of Theranos's widely disseminated representations about its luminary Board, proprietary and groundbreaking technology, and partnership with Walgreens, Plaintiffs and the Class Members (defined below) purchased interests in Theranos through investment entities.[18] Defendants' representations about Theranos remained the same throughout the period that the Class made such purchases, and Defendants never revealed the truth.[19]

It is now beyond any legitimate dispute that Defendants knew that their "revolutionary technology" never actually worked.  Christian Holmes, the Director of Commercial Operations and Defendant Holmes's brother, testified that, when Theranos announced the launch of the retail operations with Walgreens:

- Theranos's proprietary technology was not ready for "prime time";

- its menu of blood tests was "limited";

- "the objective was to increase the capability of what was on the [Theranos] device over time"; and

- "[t]he point was to be able to establish a customer base to introduce the service."[20]

Moreover, Adam Rosendorff, Theranos's former lab director, testified that only 12 assays, or tests, were ever able to run on Theranos equipment ("Theranos Sample Processing Unit," "TSPU," "Edison" or "3.5"), and then only for a limited period of time until they were shut down.[21]

---

[18] *See* Kathrein Decl. Exs. OO (Colman Declaration); PP (Taubman-Dye Declaration); QQ (Brodie Declaration) and RR (Pogue Declaration).  *See also* Kathrein Decl. Ex. A (Identifying Direct Purchaser Funds in which Class Members invested during the Class Period).  Answer to Am. Comp. ¶ 43, ECF No. 175 (Admitting millions of sales after July 2013).

[19] *See e.g.* Answer to Am. Compl. ¶¶ 32-37, 39, 41, ECF No. 175; *See also* Kathrein Decl. Ex. J (email of Elizabeth Holmes to Stockholders dated Dec. 16, 2013 soliciting more investments and representing: "With our launch to consumer healthcare this year, we are rapidly scaling to establish a national footprint and capture the opportunity we have to serve ***as the only certified, national laboratory capable of running any of its laboratory tests from a few tiny droplets of blood*** . . . .  In line with past communications, Theranos is now making its new announcements publicly and posting all such information in real-time on its newsfeed at www.theranos.com or in the Press section of the site.").  *See also* Kathrein Decl. Ex. W (Mar. 13, 2015 interview of Holmes by George Shultz stating same at p.7).

[20] Kathrein Decl. Ex. S (C. Holmes Dep. pp. 266-272).

[21] Kathrein Decl. Ex. P (First Set Partner Interrog. Resp. 15); Kathrein Decl. Ex. V (Transcript of Deposition of Adam Rosendorff ("Rosendorff Dep."), pp. 31-36) (Only twelve assays run on Edison with only three in 2013); 254-62 (only two Edison tests had been developed by November 2013; no fingerstick assays had been validated by September 2013; and Theranos had not attempted to validate any prior to August 2013; the total number of clinician directed lab tests is about 500 and Theranos could not run 90% of them; and until Rosendorff left in December 2014 no tests had passed proficiency testing); pp. 275-276

Theranos had not begun attempting to validate its 3.5 for patient testing by August 20, 2013,[22] and by November 25, 2013 had not even developed standard operation procedures for proficiency testing on its own lab developed devices.[23]  Theranos itself has now confirmed that all other tests were run on commercial equipment purchased from other vendors.[24]  According to the person brought in to run Theranos's CLIA lab in mid-2013 (the one that could do patient testing), the statement from the Sep. 9, 2013 Walgreens Press Release that "consumers can now complete any clinician-directed lab test with as little as a few drops of blood and provide results in a matter of hours" was false.[25]

By late 2015, the truth was emerging.  On October 16, 2015, the Wall Street Journal and other media outlets were reporting that Theranos conducted 90% of its blood tests on traditional machines.[26]  Defendants disputed the Wall Street Journal Article profusely, and publicly still do.[27]  However, over time their credibility has diminished.[28]  Consequently, not a single share of Theranos stock has been sold, or traded by Theranos since 2015.[29]  Given that Defendants were

(Theranos would have to send out 40% of commonly requested blood tests to third parties and then only if taken by venous draw.).

[22] Kathrein Decl. Ex. N (Aug. 20, 2013 email from Sunny Balwani to Elizabeth Holmes forwarding communications from Laboratory Director).

[23] Kathrein Decl. Ex. O (Nov. 25, 2013 Email reflecting communications from CLIA lab director Adam Rosendorff to Elizabeth Holmes and Sunny Balwani).

[24] Kathrein Decl. Ex. Q (Defendant Theranos, Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories (*Partner* Litigation) ("Second Set Partner Interrog.") Resp. 64).  *See also* Kathrein Decl. Ex. R (Defendant Theranos, Inc.'s First Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories (*Partner* Litigation) ("First Set Partner Supplemental Interrog.") Resp. 28 (identifying non-proprietary devices purchased from third parties), and Resp. 29 (identifying third party companies that performed blood tests for Theranos patients).

[25] Kathrein Decl. Ex. V (Rosendorff Dep. pp. 197-205).

[26] *See* Answer to Am. Compl. ¶ 51, ECF No. 175 (Admissions).

[27] *See id*. at ¶¶ 52-53 (Admissions).

[28] *See id*. at ¶¶ 54-79 (Admissions).

[29] *See* Kathrein Decl. Ex. X (30(b)(6) Deposition of Theranos by and through its corporate designee, Alexander White ("White Dep.") Exs. 9, 23-28 (noting no sales by Defendants since 2014, no sales by insiders other than Donald A. Lucas to his own investors since 2015, and no exercise of Right of First Refusal ("ROFO"), redemptions or purchases by Theranos, Holmes or its assignees since 2015 (since the fraud was partially revealed)).

operating a massive fraud, investments in Theranos are considered worthless.[30]  As a result, Plaintiffs and the Class have been damaged and deserve redress through this action.

## III.   LEGAL STANDARDS FOR CLASS CERTIFICATION

Class certification "is appropriate when a plaintiff can show that all of the prerequisites of Rule 23(a) and at least one of the requirements of Rule 23(b) has been met."[31]  Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."[32]  That is, the class "must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action."[33]

Under Rule 23(b), moreover, a plaintiff must establish either "(1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication."[34]

When reviewing motions for class certification, "district courts are generally bound to take the substantive allegations of the complaint as true."[35]  Nevertheless, the record in this case already

---

[30] Answer to Am. Compl. ¶ 84, ECF No. 175 (Admission Forbes estimate of at least 90% drop in value); Kathrein Decl. Exs. OO (Colman Declaration); PP (Taubman-Dye Declaration); QQ (Brodie Declaration) and RR (Pogue Declaration).

[31] *Ward v. United Airlines, Inc.*, No. C 15-02309 WHA, 2016 WL 1161504, at *2 (N.D. Cal. Mar. 23, 2016) (citing *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956-57 (9th Cir. 2013)).  Citations, internal quotations, and footnotes omitted and emphasis added unless otherwise noted.

[32] *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 495-96 (N.D. Cal. 2017) (quoting Fed. R. Civ. P. 23(a)).

[33] *Id.* at 496.

[34] *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *8 (N.D. Cal. Feb. 21, 2017) (citing Fed. R. Civ. P. 23(b)).

[35] *Brown v. China Integrated Energy Inc.*, No. CV 11-02559 BRO (PLAx), 2015 WL 12720322, at *4 (C.D. Cal. Feb. 17, 2015) (citing *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982)).

demonstrates that there is overwhelming evidence supporting the merits of Plaintiffs' claims.[36]

Moreover, "[a] trial court has broad discretion in making the decision to grant or deny a motion for

class certification."[37]

Pursuant to these principles, Plaintiffs seek certification of the following class of indirect

purchasers of Theranos securities (the "Class" or "Class Members"):

> All persons or entities who, from July 29, 2013, through October 5,
> 2016, purchased or acquired securities of an entity for the express
> purpose of making corresponding purchases of Theranos securities.[38]

As discussed below, the Class satisfies each element under Rule 23(a) and Rule 23(b)(3).

## IV.  ARGUMENT

### A.  The Class and Subclass Meet All Requirements of Rule 23(a)

#### 1.  The Class is Definite and Ascertainable

For class certification, the Ninth Circuit does not impose any requirements other than those

enumerated under Rule 23.[39]  Accordingly, Plaintiffs need not establish that the Class is

sufficiently "definite" or "ascertainable."[40]  Nonetheless, the Class does meet those factors.

Theranos kept records of every fund that directly purchased its stock ("Direct Purchaser Funds"),

and Defendants have already identified those Direct Purchaser Funds for the Court.[41]  Those Direct

Purchaser Funds, in turn, kept records identifying their own investors who purchased during the

Class Period – *i.e.*, the indirect purchasers who are putative Class Members.  All other Direct

---

[36] *See, e.g.*, Mot. for Injunctive Relief and to Provisionally Certify a Mandatory Limited Fund Class and Mot. to Shorten Time, ECF No. 109.

[37] *In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2014 WL 722408, at *2 (N.D. Cal. Feb. 25, 2014) (citing *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010)).

[38] Excluded from the Class are Defendants, the officers and Directors of Theranos at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

[39] *See Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121, 1126 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 313 (2017) ("[T]he language of Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification.  Mindful of the Supreme Court's guidance, we decline to interpose an additional hurdle into the class certification process delineated in the enacted Rule.").

[40] *See Buchanan v. Tata Consultancy Servs., Ltd.*, No. 15-cv-01696-YGR, 2017 WL 6611653, at *21 (N.D. Cal. Dec. 27, 2017) (holding that defendant's "reliance on . . .  ascertainability criteria . . . is misplaced" given "the Ninth Circuit's ruling in *Briseno*" (quoting *Briseno*, 844 F.3d at 1126)).

[41] *See* Kathrein Decl. Ex. A (Identifying Direct Purchaser Funds in which Class Members invested during the Class Period); *See also* Defs.' Mot. to Limit Class, Jun. 30, 2017, ECF No. 102-1.

Purchaser Funds have been identified, and most of the Class Members have already been identified through discovery and the Direct Purchaser Funds can identify any remaining Class Members.[42]  In addition, through discovery of the Direct Purchaser Funds documents with their investors, those Direct Purchaser Funds who accepted investments for purposed of investing in Theranos, have also been identified.[43]  Thus, even if the Court considered definiteness and ascertainability, those doctrines pose no concerns for the Class.[44]

### 2.    The Class is Sufficiently Numerous

"[G]enerally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the numerosity requirement is satisfied."[45]  Here the Class more than exceeds that threshold.  Plaintiffs have submitted evidence demonstrating that the Class would include well over 200 individuals, all of whom purchased interests in the Direct Purchaser Funds during the Class Period for the express purpose of the Direct Purchasers acquiring Theranos securities.[46]

### 3.    This Litigation Concerns Common Questions of Law and Fact

Rule 23(a)(2) requires that the Court find "questions of law or fact common to the class."[47]  This requirement has "been construed permissively," such that "for purposes of Rule 23(a)(2), even a single common question will do."[48]

---

[42] *See, e.g.*, Kathrein Decl. Exs. CC-NN (documents from Direct Purchaser Funds identifying investor Class Members).

[43] *See* Kathrein Decl. Ex. A.

[44] *Feller v. Transamerica Life Ins. Co.*, No. 2:16-cv-01378-CAS-AJW, 2017 WL 6496803, at *15-16 (C.D. Cal. Dec. 11, 2017).

[45] *Celera*, 2014 WL 722408, at *2 (quoting Fed. R. Civ. P. 23(a)(1) and citing *Miletak v. Allstate Ins. Co.*, No. C 06-03778 JW, 2010 WL 809579, at *10 (N.D. Cal. Mar. 5, 2010)).

[46] *See* Kathrein Decl. Exs. CC-GG (identifying that Peer Ventures Group IV LLP has at least 18 investors, Black Diamond Ventures XII-B, LLC has 35 investors, Mendenhall TF Partners has 9 investors, and Lucas Venture Group XI, LLC has 52 investors, and Lucas Venture Group IV has about 96 investors); *see also* Kathrein Decl. Ex. HH (Declaration of Matthew Larrabee ("Larrabee Decl.")) at ¶ 2(e) ("Over 40 individuals purchased and continue to hold membership units in Celadon").

[47] *Des Roches*, 320 F.R.D. at 496 (quoting Fed. R. Civ. P. 23(a)(2)).

[48] *Id.* (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) ("[C]ommonality only requires a single significant question of law or fact."); *Ward*, 2016 WL 1161504, at *2 ("[Plaintiff]'s claims present numerous common questions capable of common answers, so Rule 23(a)(2), which requires only a single significant question of law or fact common to the class, is satisfied.") (citing *Abdullah*, 731 F. 3d at 956.).

As summarized previously by the Court, this case involves a common contention that Defendants misleadingly represented that Theranos had "developed proprietary technology that would allow commercial pharmacies to run a multitude of highly accurate blood tests from a few drops of a patient's blood."[49]  Theranos also misleadingly represented that it has a true esteemed Board of Directors, to give it credibility. More specifically, Plaintiffs will prove that Defendants made numerous misrepresentations in press releases and news articles released prior to and during the period of purchases from July 29, 2013 to October 5, 2016 ("Class Period"), beginning with:

- July 29, 2013, press release entitled *Theranos Announces New Members of its Board of Directors* (announcing a luminary Board of Directors that included George Shultz and Henry Kissinger);[50]

- September 8, 2013, the Wall Street Journal Article, by Joseph Rago entitled *Elizabeth Holmes: The Breakthrough of Instant Diagnosis* (claiming Theranos could run comprehensive blood tests, that are faster and cheaper than conventional methods, using its automated miniaturized proprietary devices using only a few drops of a patient's blood);[51] and

- September 9, 2013, press release entitled *Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service* (claiming "consumers *can now* complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours.")."[52]

Through those and other publicly-disseminated materials, Defendants repeated these misrepresentations in many immaterial variations – and that remained uncorrected – over the next two years:

- Theranos had an esteemed Board of Directors that included Wells Fargo & Co. Chairman and CEO Richard Kovacevich, retired four-star Marine General James "Mad Dog" Mattis, former Secretary of State Henry A. Kissinger, former Senator Samuel Nunn, William J. Perry, former Admiral Gary Roughead, and former Secretary of State, Treasury and Labor George P. Shultz;[53]

---

[49] *See* Order on Mot. to Dismiss at 1, ECF No. 63.

[50] *See* Kathrein Decl. Ex. Z and Answer to Am. Compl. ¶ 22, ECF No. 175.

[51] *See* Kathrein Decl. Ex. AA and Answer to Am. Compl. ¶ 23, ECF No. 175.

[52] *See* Kathrein Decl. Ex. BB (Sept. 9 Press Release). and Answer to Am. Compl. ¶ 25, ECF No. 175.

[53] See Kathrein Decl. Ex. AA (Sept. 8, 2013 WSJ Article).

- Theranos claimed with its new partnership with Walgreens that consumers could "now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours";[54]

- Theranos's had a CLIA-certified laboratory that had "the ability to run its tests on micro-samples using Theranos proprietary devices";[55] and

- Theranos's technology eliminated multiple lab trips because it could "run any combination of tests, including sets of follow-on tests," at once, very quickly, and from a single micro sample.[56]

For example, one and a half years later, Elizabeth Holmes was still lying, in a public interview with George Shultz, that:

> We focus on access in the context of the fact that people don't generally like large needles being stuck in their arms. So we've redeveloped the lab infrastructure *to make it possible to run any combination of lab tests from tiny droplets of blood. People can come in and do full-service laboratory testing with a finger stick as opposed to having tubes and tubes taken from your arm. We do that not just for basic tests but for any tests.*[57]

Accordingly, this litigation poses common questions of law and fact as to whether those representations were false or misleading. Similarly, there are common questions as to whether Defendants omitted the following material facts:

- Theranos's technology was not then commercially ready, its tests were not comprehensively validated nor highly accurate, and for this reason, bought and ran blood tests on commercially available machines from other vendors;

- Theranos lied to Walgreens in order to obtain the purportedly profitable contractual arrangement with Walgreens, and to be able to establish a consumer footprint for whenever it's technology would become available; and

- Theranos esteemed Board was not an acting true Board; they were powerless, never voted, and functioned as figureheads brought on solely to create credibility.

---

[54] *Id.*

[55] *See id.*

[56] *See id.*

[57] *See* Kathrein Decl. Ex. W (Transcript of interview of Elizabeth Holmes by George Shultz, Preventive Medicine (Sanford Institute for Economic Policy Research SIEPR Summit-March 13, 2015), Exhibit 722, Deposition of Secretary George Shultz at p. 7) *See also* Stanford Institute for Economic Policy Research (SIEPR), *George Shultz Interviews Elizabeth Holmes at the 12th SIEPR Economic Summit* at minutes 28-30, YouTube (Mar. 25, 2015), https://www.youtube.com/watch?v=CB5_68CIt_k.

At a minimum, there is an overarching, material common question for all Class Members as to whether Theranos had developed and did possess any such functioning and commercially ready proprietary technology. Thus, Plaintiffs have satisfied commonality under Rule 23(a)(2).

### 4.    Plaintiffs' Claims are Typical of Class Members' Claims

Under Rule 23(a)(3) a representative party must have claims that "are typical of the claims . . . of the class."[58]  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability."[59]  The test of typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."[60]

This requirement is "permissive and requires only that the representative's claims are *reasonably co-extensive* with those of the absent class members; they need n*ot be substantially identical*."[61]  Ultimately, "[t]he commonality and typicality requirements . . . [b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."[62]

The claims of Plaintiffs Robert Colman and Hilary Taubman-Dye, and Class Members Thomas Brodie, M.D. and Mai N. Pogue, and the remaining Class Members all arise from a single course of events:

---

[58] Fed. R. Civ. P. 23(a)(3).

[59] *Des Roches*, 320 F.R.D. at 503 (quoting Fed. R. Civ. P. 23(a)(3); *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).

[60] *Ellis*, 657 F.3d at 984.

[61] *Des Roches*, 320 F.R.D. at 503 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *Walter v. Hughes Commc 'ns, Inc.*, No. 09-2136 SC, 2011 WL 2650711, at *8 (N.D. Cal. July 6, 2011) ("[I]t is enough if their situations share a common issue of law or fact and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.").

[62] *Id.*

- Defendants publicly made common misleading statements to investors and concealed material information from investors and did so for the purpose of inducing the purchase of interests in Theranos securities;

- Each Class Member purchased an interest in Theranos securities after these misrepresentations were made or material facts were omitted; and

- Each Class Member suffered financial harm caused by Defendants' actions above, when the truth came out and the value of their securities collapsed.

There are no distinctions in the underlying course of conduct giving rise to – or the evidence supporting – Class Members' claims. Furthermore, the law for each of the claims upheld by the Court is identical for the Class Representatives and each Class Member.[63] Thus, none of the Class Representatives has unique facts, is asserting any unique arguments, or is facing any unique defenses that threaten to become the focus of the litigation.

### 5. The Proposed Class Representatives Will Fairly and Adequately Protect Class Interests

Rule 23(a)(4)'s adequacy requirement considers "(1) [whether] the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) [if] the representative plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class."[64] The adequacy-of-representation requirement "'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)."[65] "Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement."[66]

Plaintiffs Robert Colman, Hilary Taubman-Dye, Thomas Brodie, M.D. and Mai N. Pogue have no conflicts of interest with the Class. They were allegedly injured in the same manner and

---

[63] *See* Order on Mot. to Dismiss, ECF No. 63 (upholding claims of §§25400(d)/25500 securities fraud (Count I), violation of California's unfair competition law (Count III), fraud and deceit (Count IV); fraudulent concealment (Count V), and negligent misrepresentation (Count VI).

[64] *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-6314-YGR, 2017 WL 1806583, at *9 (N.D. Cal. May 5, 2017) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003)).

[65] *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 240 (N.D. Cal. 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626, n.20 (1997)).

[66] *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 540 (N.D. Cal. 2015) (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015)).

seek the same relief as that sought by the Class and Subclass.  *See* Kathrein Decl. Exhibits OO (Colman Declaration); PP (Taubman-Dye Declaration); QQ (Brodie Declaration) and RR (Pogue Declaration).  These facts are sufficient to establish this aspect of the adequacy element.[67]

Additionally, the conduct and testimony of Plaintiffs Robert Colman and Hilary Taubman-Dye, as well as Thomas Brodie, M.D. and Mai N. Pogue, confirm that each will vigorously prosecute this action on behalf of the Class and Subclass.[68]  "Although there are no fixed standards by which vigor can be assayed, considerations include competency of counsel."[69]  Here, Plaintiffs' counsel are qualified lawyers experienced in the successful prosecution of consumer and securities class actions.[70]

**B.**    **This Case Satisfies the Requirements Under Rule 23(b)(3)**

Under Rule 23(b)(3), Plaintiff must demonstrate that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.[71]

**1.**    **Common Questions of Law or Fact Predominate**

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones.  For purposes

---

[67] *See, e.g.*, *Miletak*, 2010 WL 809579, at *12 ("In this case, Plaintiff's interests coincide with the interests of other members of the proposed class because they were allegedly injured in the same manner and seek the same relief.  Thus, Plaintiff does not have any apparent conflict of interest with the proposed class.").

[68] Both Plaintiffs have overseen the litigation, conferred with counsel regularly, reviewed documents filed with the Court, produced documents to Defendants, and provided verified responses to Theranos's interrogatories.  *See* Kathrein Decl. Exhibit PP (Taubman-Dye Declaration); *See* Kathrein Decl. Exhibit OO (Colman Declaration).  Moreover, each Plaintiff and Class Representative is prepared to testify at deposition, attend and testify at Court hearings, and participate in settlement negotiations, as necessitated by the litigation.  *See* Kathrein Decl.Exs. OO (Colman Declaration), PP (Taubman-Dye Declaration), QQ (Brodie Declaration), and RR (Pogue Declaration).  Thus, there is no basis for Defendants to argue that Plaintiff Taubman-Dye or Plaintiff Colman would be an inadequate class representative.

[69] *Hanlon*, 150 F.3d at 1021.

[70] The attached firm résumés set forth the experience and expertise of counsel in class actions.  *See* Kathrein Decl. Exhibit TT (Firm résumé of Robbins Geller Rudman & Dowd LLP); Exhibit SS (Firm résumé of Hagens Berman Sobol Shapiro LLP).

[71] Fed. R. Civ. P. 23(b)(3); *Martin v. Monsanto Co.*, No. ED CV 16-2168-JFW (SP$_X$), 2017 WL 1115167, at *6 (C.D. Cal. Mar. 24, 2017).

of this analysis, an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof."[72]

Importantly, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."[73] Indeed, "[t]he overarching focus [is] whether trial by class representation would further the goals of efficiency and judicial economy."[74]  Accordingly, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis."[75]

Finally, "the predominance inquiry begins with the elements of the underlying causes of action."[76]  Ultimately, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."[77]

Here, the elements of each cause of action demonstrate that common factual and legal questions predominate over individualized questions.

### a. Common Questions Predominate as to Plaintiffs' Claim for Securities Fraud in Violation of Cal. Corp. Code §§ 25400(d) & 25500 (Count I)

To succeed on a claim under §§25400 and 25500, the Class must establish that: (1) Defendants sold or offered for sale securities; (2) Defendants made any statement which was, at the time and in the light of the circumstances under which it was made, false or

---

[72] *Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-cv-709-CAB-RBB, 2017 WL 1020391, at *5 (S.D. Cal. Mar. 16, 2017) (quoting *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)).

[73] *Id.* at *5 (quoting *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013).

[74] *Martin*, 2017 WL 1115167, at *6 (quoting *Vinser v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009)).

[75] *In re Morning Song Bird Food Litig.*, 320 F.R.D. 540, 551 (S.D. Cal. 2017).

[76] *In re: Lenovo Adware Litig.*, No. 15-md-02624-RMW, 2016 WL 6277245, at *17 (N.D. Cal. Oct. 27, 2016) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

[77] *Amchem*, 521 U.S. at 625.

misleading with respect to any material fact, or which omitted to state any material fact; (3) Defendants intended to induce the purchase of securities through those misleading statements or omissions; and (4) Class members were affected by those acts of market manipulation.[78]  Importantly, it is irrelevant whether any Class member relied on the false statements or omissions, as "Section 25500 'extends liability to all persons affected by market manipulation without requiring reliance or privity.'"[79]  Therefore, this cause of action is particularly well-suited for class treatment.[80]  Indeed, "[d]istrict courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action."[81]  Because of the overlap in elements for federal securities claims under §10(b) and Rule 10b-5 and California securities claims under §§25400 and 25500, the Court may rely on precedent analyzing federal securities claims.[82]

Each element of a violation of §§25400 and 25500 is susceptible to generalized, class-wide proof.  First, it is undisputed that Defendants sold or offered for sale securities.[83]

Second, class-wide proof will establish that Defendants made false or misleading statements about material facts and/or omitted material facts.  In securities cases, "a statement is misleading if it would give a reasonable investor the impression of a state of affairs that

[78] See Colman v. Theranos, Inc., 16-cv-06822-NC, 2017 WL 1383717, at *2 (N.D. Cal. Apr. 18, 2017) (setting forth various elements that plaintiffs must establish to proceed under §§25400, 25500).

[79] Id at *2 (quoting California Amplifier, Inc. v. RLI Ins. Co., 94 Cal. App. 4th 102, 109 (2001)).

[80] In re Cooper Companies Inc. Sec. Litig., 254 F.R.D. 628, 632 (C.D. Cal. 2009) ("As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'") (quoting Epstein v. MCA, Inc., 50 F.3d 644, 668 (9th Cir. 1995)).

[81] Kmiec v. Powerwave Tech., Inc., No. SACV 12-00222-CJC (JPRx), 2015 WL 12914343, at *4 (C.D. Cal. Dec. 4, 2015).

[82] See, e.g., Hanson v. Berthel Fisher & Co. Fin. Servs., Inc., No. 13-CV-67-LRR, 2014 WL 2434000, at *13 (N.D. Iowa May 29, 2014) ("[T]he court agrees with Defendants' assertion that federal cases construing federal securities laws are persuasive authority when interpreting California . . . securities laws."); Viterbi v. Wasserman, 191 Cal. App. 4th 927, 939 (2011) ("[F]ederal cases construing federal securities laws are persuasive authority when interpreting our state securities law."); "California's securities fraud provisions are analogous to §10(b) and Rule 10b-5."); Flaxel v. Johnson, 541 F. Supp. 2d 1127, 1144-45 (S.D. Cal. 2008) ("[T]he Court grants plaintiffs' motion for summary judgment on . . . causes of action for state-law securities fraud to the same extent (i.e., with regard to the same transactions) as the Court granted summary judgment on plaintiffs' cause of action for federal securities fraud.").

[83] See, e.g., Answer to Am. Compl., ¶¶ 12-13, 43, ECF No. 175 (admitting that "Lucas Venture Group XI, LLC acquired Theranos securities," "Celadon Technology Fund VII, ILC acquired Theranos securities," and "after September 2013 Defendants sold Theranos securities to investors").

differs in a material way from the one that actually exists."[84]  Furthermore, "[b]ecause materiality is judged according to an objective standard, the materiality of [the defendant]'s alleged misrepresentations and omissions is a question common to all members of the class."[85]

Under these standards, common questions predominate as to whether Defendants made false statements of material facts or omitted material facts.  As discussed above, and recognized by the Court, this case involves a common contention that Defendants misleadingly represented that Theranos had "developed proprietary technology that would allow commercial pharmacies to run a multitude of highly accurate blood tests from a few drops of a patient's blood."[86]  It is a common question for the entire Class whether or not that representation – and the others identified above – were misleading.  It is also a common question whether a reasonable person would find these representations to be material.  Because those inquiries focus on an objective "reasonable person" standard, the parties need not adjudicate how each member of the Class interpreted Defendants' statements.  Rather, the factfinder can determine in a single trial whether each statement was misleading and material.

Third, the issue of Defendants' intent is equally subject to common proof.  That issue focuses on Defendants and, as such, is disconnected from any individualized inquiries.  Just as with the issue of falsity, therefore, a single trial can adjudicate for the entire Class whether Defendants' acted with the requisite intent.[87]

Finally, the methodology for determining the class-wide damages arising from Defendants' conduct can track the statute, which provides for the difference between the

---

[84] *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

[85] *Amgen Inc.,* 568 U.S. at 459; *see also Katz v. China Century Dragon Media, Inc.,* 287 F.R.D. 575, 587 (C.D. Cal. 2012) ("[T]esting the materiality of . . . alleged misrepresentations does not turn on an individualized analysis.  Instead, whether the alleged misrepresentations were material . . . is subject to the objective, reasonable person standard—one that can be adjudicated on a classwide basis.").

[86] *See* Order on Mot. to Dismiss at 1, ECF No. 63.

[87] *See, e.g.*, *In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1358 (N.D. Cal. 1994) ("Because proof of the existence of a misstatement or omission, scienter, and price inflation all constitute questions of law and fact common to the class, virtually no individual questions remain, and the predominance prerequisite is easily satisfied."); *Cooper*, 254 F.R.D. at 632 ("The common questions of whether misrepresentations were made and whether Defendants had the requisite scienter predominate over any individual questions of reliance and damages.").

amount paid and the value of the securities had Defendants told the truth.[88]  Under that methodology – and for Plaintiffs' remaining causes of action – the damages consist of the full purchase price paid by each Class Member.  Had Defendants told the truth (*e.g.*, that Theranos was a fraud that could ***not*** accurately or quickly perform myriad blood tests from a drop of blood), the securities would have been worthless.[89]  And courts nationwide acknowledge that a full refund approach is warranted where a defendants' fraud renders the purchased item worthless.[90]  In any case, whether investments in Theranos were worthless or held some minimal market value is a fact-based issue that can be determined by the jury on a class-wide basis.[91] The amount of each Class Member's damages under that methodology – a question that exists in virtually every certified class action – cannot defeat predominance.[92]

### b.  Common Questions Predominate as to Plaintiffs' Claim for Violation of California's Unfair Competition Law (Count III)

"The UCL prohibits any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.  An act can be alleged to violate any or all of the three

---

[88] *See* Cal. Corp. Code § 25500 ("damages shall be the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his purchase or sale in the absence of" the "act or transaction" that violated Section 25400).

[89] *See* Kathrein Decl. Ex. X (White Dep. Exs. 9, 23-28 (noting no sales by Defendants since 2014, no sales by insiders other than Donald A. Lucas to his own investors since 2015, and no exercise of ROFO, redemptions or purchases by Theranos, Holmes or its assignees since 2015 (since the fraud was partially revealed)).

[90] *See, e.g.*, *Morning Song Bird*, 320 F.R.D. at 556 (holding that "Plaintiff's damages model measures damages consistent with their theory and can be measured on a class-wide basis" where Plaintiff sought "a full refund of monies paid for the bird food they allege was actually . . . worthless"); *United States v. Kennedy*, 726 F.3d 968, 973-974 (7th Cir. 2013) (holding that "actual losses" was total amount paid for fraudulent artwork); *Lee v. Carter-Reed Co. L.L.C.*, 4 A.3d 561, 580 (N.J. 2010) ("[T]he ascertainable loss here is the purchase price of a bottle of broken promises.").

[91] Courts have held in a variety of contexts that "market value" is an objective test.  *See, e.g.*, *Results ByIQ LLC v. Netcapital.com LLC*, No. C 11-0550 SC, 2013 WL 4835838, at *6 (N.D. Cal. Sept. 11, 2013) ("Market value is an objective measure of damages."); *In re Sohaei*, No. ADV 11-1040DM, 2013 WL 209601, at *2 (Bankr. N.D. Cal. Jan. 17, 2013) ("[T]he 'out-of-pocket' measurement of damages relies on objective criteria (such as market value) and not on subjective expectations of the defrauded party.").

[92] *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 513-514 (9th Cir. 2013) ("In this circuit . . . damage calculations alone cannot defeat certification"; "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment.").  Once the jury determines whether Theranos investments were worthless or held some minimal market value, then individual damages would require no more than mechanically performing an arithmetic exercise for each Class Member.

prongs of the UCL – unlawful, unfair, or fraudulent."[93]  Here, common issues predominate as to each of the prongs as "relief under the UCL is available without individualized proof of deception, reliance and injury."[94]

California's UCL borrow[s] violations of other laws and treats them as unlawful business practices independently actionable under section 17200.  Violation of almost any federal, state, or local law may serve as the basis for a UCL claim" under the unlawful prong.[95]  Therefore, by establishing that Defendants committed securities fraud, the Class will also establish Defendants' liability under the UCL, and the same common issues will predominate for both claims.[96]  To prevail under the UCL's unfair prong, a plaintiff must "show that the challenged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and the court would then need to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."[97]  A number of courts have recognized that "where a plaintiff's claim under the 'unfair' prong hinges on the existence of a uniform business practice or series of practices amenable to some degree of precise definition, certification of a Rule 23(b)(3) class may be warranted."[98]

---

[93] *Torres v. JC Penney Corp. Inc.*, No. 12-cv-01105-JST, 2013 WL 1915681, at *6 (N.D. Cal. May 8, 2013); *see also Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) ("Each prong of the UCL is a separate and distinct theory of liability.").

[94] *Mass. Mut. Life Ins. Co. v. Super. Ct.*, 97 Cal.App 4th 1282, 1288, 119 Cal. Rptr. 2d 190, 193 (2002), as modified on denial of reh'g (May 29, 2002) (collecting cases).

[95] *Vaccarino v. Midland Nat. Life Ins. Co*., No. CV 11-5858 CAS (MAN$_X$), 2013 WL 3200500, at *17 (C.D. Cal. June 17, 2013).

[96] *See, e.g.*, *id.*, at *18 (holding that "predominance is met for plaintiffs' unlawful practices claim under the UCL" where predominance was met for the underlying statutory violation).

[97] *Newton v. Am. Debt Servs., Inc*., No. C-11-3228 EMC, 2015 WL 3614197, at *10 (N.D. Cal. June 9, 2015).

[98] *Id.* (holding that predominance was satisfied where "the alleged 'unfair' conduct appears uniform across all class members – either [plaintiff] will be able to show that Defendants structured their affairs to charge excessive prorating fees, or not.  And the Court may make one uniform determination of whether the utility of the conduct outweighed the harm to class members."); *see also Lozano*, 504 F.3d at 737 (affirming district court's holding "that individual circumstances would not defeat the predominance of common issues" where "[Plaintiff]'s claim was based on uniform disclosures made by [Defendant] to all its consumers" and "the individual circumstances regarding how these disclosures were read or received would not destroy predominance").

The UCL prohibits any activity that is likely to deceive members of the public. Thus, "unlike a claim for common law fraud, liability under the UCL does not require reliance and injury."[99]  Accordingly, a claim under this prong is well-suited to class treatment because liability depends on a showing about the defendant's conduct, rather than any elements addressing conduct by the plaintiffs or class.[100]

Here, the Class will show that Defendants' representations and omissions about their proprietary blood testing technology were likely to deceive members of the public and/or investors. That common inquiry does not require individualized proof or the resolution of individualized issues for members of the Class.  Either Defendants' conduct was likely to deceive or it was not. There is no need for dozens of separate actions on that issue.  Hence, the Class has demonstrated predominance for the fraud prong of their UCL claim.[101]

      **c.**      **Common Questions Predominate as to Plaintiffs' Claims for Fraud and Deceit (Count IV), Fraudulent Concealment (Count V), and Negligent Misrepresentation (Count VII)**

Reliance – which is the only element not addressed by the above analysis of Counts II and III – also poses a common question to be resolved on a class-wide basis without individualized inquiries.[102]  The Ninth Circuit "has followed an approach that favors class treatment of fraud

---

[99] *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 448 (N.D. Cal. 2009).

[100] *See id.* ("Plaintiffs may prove with generalized evidence that Defendants' conduct was 'likely to deceive' members of the public.  The individual circumstances of each class member's loan need not be examined because the class members are not required to prove reliance and damage.  Common issues will thus predominate on the UCL claim.").

[101] *See, e.g.*, *Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 390 (C.D. Cal. 2009) (finding predominance for fraud-based UCL claim where questions as to whether defendant's disclosures were misleading were "common to the entire class and [require] no separate inquiry into the actions or beliefs of individual class members" and "are significant because they have a direct bearing on the ability of each class member to prove Defendant's liability").

[102] For Count IV, fraud requires: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage." *United States v. Ctr. for Emp't Training*, No. 2:13-cv-01697-KJM-KJN, 2016 WL 4210052, at *9 (E.D. Cal. Aug. 9, 2016).  For Count V, "[c]oncealment requires that: (1) the defendant concealed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant concealed or suppressed the fact with an intent to defraud; (4) the plaintiff was unaware of the fact and would have acted if he or she had known about it; and (5) the concealment caused the plaintiff to sustain damage." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1156 n.3 (9th Cir. 2000).  For Count VII, negligent misrepresentation differs from fraud "only insofar as negligent misrepresentation does not carry a requirement of intent to induce reliance, or a requirement that the

claims stemming from a common course of conduct."[103]  Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, "courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions."[104]  Accordingly, "[c]ourts have found that reliance can be established on a class-wide basis where the behavior of plaintiffs and class members cannot be explained in any way other than reliance upon the defendant's conduct."[105]  Ultimately, these principles promote class treatment where reliance is an element of a claim, as "[t]he class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims."[106]

The Class's behavior can be explained only through reliance on Defendants' misrepresentations.  Theranos's *raison d etre* was that it had "developed proprietary technology that would allow commercial pharmacies to run a multitude of highly accurate blood tests from a few drops of a patient's blood."[107]  Defendants did not offer anything else for investment. Therefore, the only explanation for any class member's investment is that the class member relied on this representation.

Furthermore, this is not a case where Defendants ever made any material representations that are unique to any Class Member that is different from those common representations and omissions alleged.  Rather, the *sine qua non* of Theranos was a fraud, while all Class members

---

defendant actually know the representation is false."  *Trigueiro v. Bank of Am., N.A.*, No. 2:14-cv-02556-MCE-EFB, 2015 WL 4983599, at *5 (E.D. Cal. Aug. 19, 2015).

[103] *In re First All. Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006).

[104] *Blackie*, 524 F.2d at 902.

[105] *Cohen v. Trump*, 303 F.R.D. 376, 358 (S.D. Cal. 2014) (collecting cases).

[106] *First All. Mortg.*, 471 F.3d at 992.

[107] *See* Order on Mot. to Dismiss at 1, ECF No. 63.

relied on the representation that Theranos was not only revolutionary but real and commercially ready.

In sum, Defendants exposed the entire Class to a common course of fraudulent statements and concealments about blood testing technology – as well as a luminary Board and a prolific partnership with Walgreens – and there is a common-sense inference that Class members would not have invested in Theranos had they known the truth about Theranos's core business.[108] Thus, common issues predominate for the fraud-based and negligent-based claims, and class certification is warranted for Counts IV, V, VI, and VII.

> ### d.   Any Arguments Regarding Differences in Communications, Direct Purchaser Funds, Loss Causation Are Inapposite, Unpersuasive, and Unable to Defeat Class Certification

Defendants cannot legitimately contend that predominance (or commonality or typicality) is defeated by purported differences in communications to Class Members, differences in the Direct Purchaser Funds, or differences in the loss causation from Defendants' fraud.

First, as to purportedly different communications, courts within the Ninth Circuit have repeatedly rejected such arguments, holding that variances in a defendants' statements to class members do not negate class certification.[109] Even of the applicable precedent permitted such parsing of communications, Defendants cannot reasonably contend that their material representations about Theranos differed between Class Members. The record evidence thus far

---

[108] *See Morning Song Bird*, 320 F.R.D. at 555 ("Plaintiffs' theory is Plaintiffs would not have purchased the bird food if they knew it was poison. The Court finds a common sense inference can be made that the class members relied upon Defendants misrepresentation that the product was bird food and not bird poison. As such, reliance can be determined on a class-wide basis.").

[109] *See, e.g.*, *First All. Mortg.*, 471 F.3d at 991 (acknowledging "that representations made to brokers or salesmen which are intended to be communicated to investors are sufficient to warrant class standing, even where the actual representations to individuals varied" and rejecting "a talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral misrepresentations, unless those representations are all but identical"); *In re Intuitive Surgical Sec. Litig.,* No. 5:13-cv-01920-EJD, 2016 WL 7425926, at *6 (N.D. Cal. Dec. 22, 2016) ("Mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information. . . . In general, the cases hold that if the plaintiff has received information from company insiders that confirms, reflects, repeats, or even digests publicly available market information, that plaintiff is an appropriate class representative."). To the extent Defendants are challenging Class Members' reliance on specific communications, the argument is inapposite. As stated above, reliance is not an element of the Class's securities fraud claim, and for the common law fraud claims, reliance can be established through proof of Defendants' common course of conduct in misrepresenting key components of Theranos's business.

confirms that Class Members were exposed to Defendants' widely disseminated public representations regarding Theranos's all-star Board, revolutionary blood-testing technology, and ability to fulfill a fruitful partnership with Walgreens.[110]  Unless Defendants disclosed to certain Class Members that Theranos was conducting a fraud (an absurd proposition), all Class Members are similarly situated vis-à-vis the misrepresentations at issue in this case.  To the extent Defendants omitted material information, moreover, exposure to and reliance on the fraud can be presumed for the Class.[111]

Second, the Direct Purchaser Funds lack any differences that are material to Defendants' common course of misrepresentations or Defendants' liability.[112]  The structures of the Direct Purchaser Funds do not affect the elements of each cause of action, which (as addressed above) are subject to uniform resolution for the Class.  Indeed, as stated by the Court, liability will depend on Defendants' actions, not on minor differences between the Class Members or between the conduits through which the Class Members invested in Theranos.[113]

Finally, any arguments about loss causation are inapposite.  It is axiomatic that inquiries into loss causation are not appropriate at the class certification stage.[114]

---

[110] *See* Kathrein Decl. Exs. OO (Colman Declaration); PP (Taubman-Dye Declaration); QQ (Brodie Declaration) and RR (Pogue Declaration).

[111] *See, e.g.*, *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("To prove reliance on an omission . . . [a] plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision.  A plaintiff may do so by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently.  That one would have behaved differently can be presumed, or at least inferred, when the omission is material."); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.").

[112] *See* Kathrein Decl. Exs. II, KK-NN (Direct Purchaser Funds' Operating Agreements, Subscription Agreements, and Limited Partnership Agreements).

[113] *See* Order on Motion to Dismiss at 2-5, ECF No. 63 ("The question presented to the Court is whether plaintiffs, as indirect share purchasers, can hold Theranos and its officers liable for securities fraud.  The Court finds that plaintiffs can proceed under California Corporations Code § 25400(d) because that code section seeks to protect the market generally from a security seller's misrepresentations. . . .  The purpose of Section 25400(d) is [to] prevent the manipulation of the market by fraud, *and it focuses on the actions of the seller of the securities, not the relationship between seller and buyer*.").

[114] *See, e.g.*, *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-00226 YGR, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) ("This is nothing more than an attack on loss causation, or Plaintiffs' ability to 'show that a misrepresentation that affected the integrity of the market price also caused a subsequent

> ### 2.     A Class Action is Superior to Other Available Methods for Fairly and Efficiently Adjudicating This Controversy

Defendants have argued in the past that a class action, here, is not superior because the Class Members are sophisticated.  But sophistication is not a factor for the court to consider under Rule 23(b)(3), as evidenced by the Private Securities Litigation Reform Act, which seeks to have sophisticated investors and institutions seek to be the lead plaintiff is securities fraud class actions.[115]  Rather the factors a court is to consider are: "(1) the class members' interest in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action."[116]  Other courts have summarized that "[t]he superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case."[117]

Here, as in *Lilly*, no class member, or even Direct Purchaser Fund smaller than the $100 million *Partner* Fund, has shown the willingness to finance and file separate litigation against Defendants which have spent tens of millions defending Theranos, Holmes and Balwani through the war chest created by the accumulated investor funds.  The cost for Class members to litigate individually would represent a substantial portion of, if not eclipse, any potential recovery.[118]

---

economic loss.' . . .  These sorts of inquiries into loss causation are properly addressed by a fact-finder on the merits; Plaintiffs need not show loss causation as a condition of class certification.  Defendants' arguments are therefore misplaced." (quoting *Halliburton*, 563 U.S. at 812).

[115] *See e.g.*, 15 U.S. Code § 77z-1(a)(3)(B)(iii)(I)(bb) (requiring the court to "adopt a presumption that the most adequate plaintiff in any private action arising under this subchapter is the person or group of persons that [...] in the determination of the court, has the largest financial interest in the relief sought by the class…".

[116] *Martin*, 2017 WL 1115167, at *9.

[117] *Lilly*, 308 F.R.D. at 241 (citing *Hanlon*, 150 F.3d at 1023).  "[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'"  *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, *et al.*, *Federal Practice & Procedure* §1777 (2d ed. 1986)).

[118] *See, e.g.*, *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

Even if some Class members would choose to undertake the cost of individual litigation, class-wide adjudication will be cheaper and more efficient on both sides.[119]

Second, Theranos is rapidly running out of money, and it is committing more financial resources to its lawyers than to developing a replacement for its discredited technology. Piecemeal litigation would drive up Theranos's legal expenses to the point where it might as well sign over all of its assets to its lawyers.

Finally, it will be far more efficient for this Court – which has presided over this case for nearly 15 months – to manage this class action than it would be for dozens of courts to manage individual actions brought by each indirect investor in Theranos.  Indeed, class certification will avoid duplicative discovery and potentially inconsistent results on numerous legal and factual issues that are common to the Class.  Simply put, class certification will reduce litigation costs and promote greater efficiency, and no realistic alternative exists.

## V.   CONCLUSION

For the reasons stated above, Plaintiffs and the Class respectfully request that the Court: (1) certify the Class and Subclass; (2) appoint Plaintiffs and the proposed Class Members as Class Representatives; (3) appoint Plaintiffs' counsel as Class Counsel; and (4) issue any further relief that that Court deems proper.

DATED: February 16, 2018          HAGENS BERMAN SOBOL SHAPIRO LLP


                                  By _____/s/ Reed R. Kathrein_____
                                  Reed R. Kathrein (139304)
                                  Peter E. Borkon (212596)
                                  Danielle Smith (291237)
                                  HAGENS BERMAN SOBOL SHAPIRO LLP
                                  715 Hearst Avenue, Suite 202
                                  Berkeley, CA 94710
                                  Telephone: (510) 725-3000
                                  Facsimile:  (510) 725-3001
                                  reed@hbsslaw.com
                                  peterb@hbsslaw.com
                                  danielles@hbsslaw.com

[119] *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("[C]lasswide litigation of common issues will reduce litigation costs and promote greater efficiency.").

Steve W. Berman (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
*Counsel for Plaintiffs and Proposed Lead*
*Counsel for the Class*

Paul J. Geller (admitted *Pro Hac Vice*)
ROBBINS GELLER RUDMAN
    & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile:  (561) 750-3364
pgeller@rdrdlaw.com

Dennis J. Herman
ROBBINS GELLER RUDMAN
    & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 228-4545
Facsimile:  (415) 288-4534
dennish@rgrdlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423
jforge@rgrdlaw.com

Constantine P. Economides (admitted *Pro Hac Vice*)
ROBBINS GELLER RUDMAN
    & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile:  (561) 750-3364
ceconomides@rdrdlaw.com

*Additional Counsel for Plaintiffs*

* * * UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 * * *

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and served via the

Court's ECF filing system on all attorneys of record on this 16th day of February, 2018.

_/s/ Reed R. Kathrein_
Reed R. Kathrein