**\* \* \* UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 213 DATED APR. 26, 2018 \* \* \***

# EXHIBIT NN

# SHAREPOST

# Subscription Agreement

*For the exclusive use of: Hillary & John Dye*
*CTF VII (Series B - Theranos): SP-12*
*07/10/2015*

CONFIDENTIAL                    TH-PLTF-001187

## INSTRUCTIONS FOR SUBMISSION OF SUBSCRIPTION DOCUMENTS

For your subscription (your "**Subscription**") to be considered for acceptance by Celadon Technology Fund VII, LLC (the "**Company**"), you must take the following actions:

1. **_Complete_ and _sign_:**

   (a) The Subscription Agreement for the purchase of Units (the "**Series B Units**") of the Company;

   (b) The signature page to the Company's Operating Agreement;

   (c) An IRS Form W-9 or W-8BEN, or other forms, as applicable; and ✓

   (d) The Subscriber Suitability Certification.

2. You are _required_ to provide government-issued identification for the Subscriber.

   (a) **Individual Subscribers:** If the Subscriber is an individual, the Company requires a copy of a form of government-issued identification such as a driver's license or passport. If more than one person is signing the Subscription document, both signers are required to submit government-issued identification.

   (b) **Entity Subscribers:** If the Subscriber is an entity, the Company requires (i) a copy of the ✓ entity's certificate of formation, trust or other organizational document, and (ii) a copy of a form of government-issued identification such as a driver's license or passport of the person authorized to enter into this Subscription Agreement.

   (c) **Identification may be:**

   (i) faxed to (650) 409-2182; or

   (ii) e-mailed to operations@sharespost.com.

YOUR SUBSCRIPTION WILL NOT BE CONSIDERED FOR ACCEPTANCE UNLESS AND UNTIL EACH OF THE ACTIONS LISTED ABOVE ARE COMPLETED.

Upon receipt of the executed Subscription Agreement, Operating Agreement, IRS Form W-9 or W-8BEN, or other form (as applicable), the Subscriber Suitability Certification, the Escrow Agreement and copy(ies) of government-issued identification, your Subscription will be considered for acceptance by the Celadon Capital Management LLC (the "**Manager**").

You will be required to wire funds to U.S. Bank National Association or other suitable escrow agent selected by the Manager (the "**Escrow Agent**"), according to wire instructions provided by the Manager. 

All Subscription funds will be held in an escrow account in the Company's name at the Escrow Agent, pending a closing. If the Manager, in its sole discretion, rejects a subscription, either in whole or in part, the rejected portion of the subscription funds will be returned to the Subscriber without interest or deduction. The minimum subscription is $100,000 per investor, which may be increased

Private and Confidential
Celadon Technology Fund VII, LLC

in $10,000 increments. The Manager may, in its sole discretion, waive the minimum investment and increments requirement.

Questions regarding execution and submission of these documents and wire transfers should be directed to the SharesPost Financial Corporation Private Securities Group at (800) 279-7754 Option #2 or privatesecurities@sharespost.com

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

CONFIDENTIAL                                   TH-PLTF-001189

## CELADON TECHNOLOGY FUND VII, LLC
## SERIES B UNITS
## SUBSCRIPTION AGREEMENT

Celadon Technology Fund VII, LLC
221 Pine Street, 6th Floor
San Francisco, CA 94104

Prospective Subscribers:

The undersigned subscriber (the "**Subscriber**") has received and carefully read the Celadon Technology Fund VII, LLC Offering Memorandum dated July 7, 2015 including any attached supplements, exhibits and appendices (collectively, the "**Offering Memorandum**"), and the Operating Agreement (the "**Operating Agreement**"), which describes the terms and conditions by which a Subscriber may participate and invest in the Series B Units (the "**Series B Units**") of Celadon Technology Fund VII, LLC, a Delaware limited liability company (the "**Company**"). Capitalized terms used and not defined in this subscription agreement (this "**Subscription Agreement**") have the meanings given them in the Operating Agreement.

1. *Subscription.* Subject to the terms and conditions of this Subscription Agreement and the Operating Agreement, the Subscriber hereby subscribes for and agrees to purchase the number of Series B Units of the Company in an aggregate dollar amount (the "**Investment Amount**") equal to the (i) number of Series B Units, multiplied by (ii) $19.30 per Series B Unit, which is inclusive of a $0.40 per unit Service Fee, as indicated by the Subscriber on the signature page hereof. Upon receipt of the (i) executed Subscription Agreement, (ii) executed Operating Agreement, (iii) executed IRS Form W-9, W-8BEN, or other form (as applicable), (iv) executed Subscriber Suitability Certification, and (v) copy(ies) of government-issued identification, your Subscription will be considered for acceptance by the Company. Failure to provide any one of the foregoing may result in the Celadon Capital Management LLC (the "**Manager**") rejecting this Subscription Agreement without further notice.

<u>The Subscriber agrees that this Subscription is irrevocable and binding on the Subscriber</u>. The Subscriber understands that if, for any reason, this transaction is not consummated, the funds received by the Company pursuant to this transaction will be returned to the Subscriber, without interest or deduction of any kind.

2. *Acceptance of Subscription; Series B Unit Price.* The Subscriber acknowledges that the Manager has the right to accept or reject this Subscription, in whole or in part, for any reason, and that this Subscription is deemed accepted by the Manager only when the Manager has provided the Subscriber notice that this Subscription is accepted. ONCE YOU HAVE SUBMITTED YOUR SUBSCRIPTION, YOU MAY NOT WITHDRAW SUCH SUBSCRIPTION FOR ANY REASON. The Subscriber agrees that subscriptions need not be accepted in the order received or any other allocation rational. Upon rejection of this Subscription Agreement for any reason, this Subscription Agreement will be deemed null and void and of no further force or effect.

3.  *Representations, Warranties and Covenants of the Subscriber.* The Subscriber hereby represents, warrants to and covenants with the Company as follows:

(a) The Subscriber agrees to pay all costs and expenses incurred by or on behalf of the Company, including reasonable attorneys' fees and disbursements, to enforce the Subscriber's obligations in the event of any default in respect of its obligations under this Subscription Agreement.

(b) Under Sections 1441, 1442 and 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), the Company may be required to withhold tax on certain transfers or distributions to a Subscriber who becomes a unit holder of the Company (a "**Unit Holder**") if the Unit Holder is a non-U.S. person (see Section 7). In addition, backup withholding may be required under certain circumstances. To inform the Company whether withholding or backup withholding is required with respect to the Subscriber's Series B Units, the Subscriber must complete a Form W-9 or applicable Form W-8 and must furnish the Company with an updated IRS Form W-9 or updated IRS Form W-8 as may be required under the IRS instructions to such forms, the Code or any applicable Treasury Regulations.

(c) The Subscriber acknowledges and agrees that the Series B Units will be issued subject to the terms of this Subscription Agreement and the restrictions and limitations on ownership and transfer described in the Operating Agreement.

(d) The Subscriber is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**") and that the information provided by the Subscriber to the Company in its Subscriber Suitability Certification is complete, accurate and true in every respect.

(e) The Subscriber has carefully examined the Offering Memorandum and acknowledges that the Company has no financial or operating history, and that an investment in the Company and the Company's proposed investment in the securities of Theranos Inc. ("**Theranos**" and the "**Theranos Securities**") is highly speculative and involves a high degree of risk.

(f) The Series B Units in the Company will be associated exclusively with the Theranos Securities to be purchased with the proceeds of this offering.

(g) The Subscriber has been advised that there will be no market for the Series B Units or otherwise for its investment in the Company; and it will not be possible to readily liquidate this investment. The Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to such Subscriber's net worth; the Subscriber's investment in the Company will not cause such overall commitment to become excessive; and the Subscriber can afford to bear the loss of such Subscriber's entire investment in the Company.

(h) The Subscriber has adequate means of providing for the Subscriber's current needs and personal contingencies and has no need for liquidity in the Subscriber's investment in the Company.

(i) The Subscriber satisfies any special suitability or other applicable requirements of its state of residence and the state in which the transaction by which the Series B Units are purchased occurs. The Subscriber understands that if the jurisdiction of its principal place of business, residence or

CONFIDENTIAL

domicile is outside the United States, it is the Subscriber's responsibility to satisfy itself as to full observance of the law of any relevant territory outside the United States in connection with the offer and sale of the Series B Units, including obtaining any required governmental or other consent and observing any other applicable formalities. The Subscriber represents that it meets any additional or different suitability standards imposed by the securities and other laws of the jurisdiction of its principal place of business, residence or domicile applicable to or required in connection with an investment in the Company and that it has received any required governmental or other consents or approvals in connection with its purchase of Series B Units in the Company. The Subscriber understands that if it is a person or entity described in this paragraph, it may be required to make additional representations to the Manager and the Company in connection with the applicable laws of the applicable jurisdiction.

(j) The Subscriber understands and agrees that the Manager may cause the Company to make an election under Section 754 of the Code or an election to be treated as an "electing investment partnership" for purposes of Section 743 of the Code. If the Company elects to be treated as an electing investment partnership, the Subscriber shall cooperate with the Company and the Manager to maintain that status and shall not take any action that would be inconsistent with such election. Upon request, the Subscriber shall provide the Manager with any information necessary to allow the Company to comply with (a) its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and (b) its obligations as an electing investment partnership.

(k) Unless the Subscriber has indicated otherwise in the Subscriber Suitability Certification submitted by it herewith, if the Subscriber is, for United States federal income tax purposes, a partnership, a grantor trust, an S corporation or an entity that is disregarded as an entity separate from its owner for U.S. federal income tax purposes that is owned by any of the foregoing (each a "**Flow Through Entity**"), the Subscriber hereby represents that no other person (a "**Beneficial Owner**") will be treated as a Member in the Company pursuant to Treas. Reg. Section 1.7704-1(h)(3) by reason of the fact that: (a) substantially all of the value of such Beneficial Owner's interest in the Flow Through Entity is attributable to the Flow Through Entity's interest (direct or indirect) in the Company; and (b) a principal purpose of the use of the tiered arrangement is to permit the Company to satisfy the 100 partner limitation set forth in Treas. Reg. Section 1.7704-1(h)(1)(ii).

(l) The Subscriber represents that no part of the funds used by the Subscriber to acquire an Interest constitutes assets of any "employee benefit plan" with the meaning of Section 3(3) of the United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or assets allocated to any insurance company separate account in which any such employee benefit plan (or its related trust) has any interest, or any "individual retirement account" or "individual retirement annuity" within the meaning of Section 408 of the Code.

(m) The Subscriber has such knowledge and experience in financial and business matters that such Subscriber is capable of evaluating the merits and risks of an investment in the Company, or the Subscriber has employed the services of an investment adviser, attorney or accountant to read all of the documents furnished or made available by the Company to such Subscriber and to evaluate the merits and risks of such an investment on the Subscriber's behalf.

CONFIDENTIAL                                                                                                                    TH-PLTF-001192

CONFIDENTIAL

(n) The Subscriber confirms that the Company has made available to Subscriber the opportunity to ask questions of, and receive answers from, the Manager concerning the Company and the Company's investments in the Theranos Securities, as described in the Offering Memorandum, and otherwise to receive any additional information, to the extent that the Company or the Manager possess such information or could acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information contained in the Offering Memorandum.

(o) The Subscriber acknowledges that it has been advised that there will be no disclosure materials of any kind regarding Theranos or the Theranos Securities provided by Theranos, the Company, the Manager, SharesPost Financial Corporation or any of their respective officers, directors, members, managers, employees or related parties in connection with the Subscriber's investment.

(p) The Subscriber acknowledges that it will have no direct interest in any Theranos Securities, and that Theranos Securities shall be held solely by the Company. Further, the Subscriber acknowledges that they shall make no representations as to any direct ownership in the Theranos Securities.

(q) The Subscriber acknowledges that the Company has no affiliation with Theranos.

(r) The Subscriber acknowledges that none of the Manager, the Company or any of their affiliates is rendering or has rendered any advice or recommendations to invest in the Company and that no oral or written representations have been made to the Subscriber other than those in the Offering Memorandum.

(S) THE SUBSCRIBER ACKNOWLEDGES THAT THE MANAGER SHALL HAVE THE AUTHORITY TO ENGAGE AFFILIATES OF THE MANAGER (INCLUDING, WITHOUT LIMITATION, AFFILIATES THAT PROVIDE BROKERAGE SERVICES AND INVESTMENT ADVISORY SERVICES) ON THE COMPANY'S BEHALF, PROVIDED THAT THE COSTS OF SUCH SERVICES ARE ON TERMS NO LESS FAVORABLE TO THE COMPANY THAN THE COMPANY COULD OBTAIN FROM AN UNRELATED THIRD PARTY PROVIDING SIMILAR SERVICES AND THAT SUCH SERVICES ARE OBTAINED IN ACCORDANCE WITH APPLICABLE LAW. THE SUBSCRIBER EXPRESSLY ACKNOWLEDGES THAT THE COMPANY MAY ACQUIRE THERANOS SECURITIES FROM THIRD PARTIES REPRESENTED BY AN AFFILIATED BROKERAGE FIRM AND THAT THE BROKERAGE FIRM MAY RECEIVE COMMISSIONS FOR SUCH SALES. THE SUBSCRIBER EXPRESSLY ACKNOWLEDGES THAT THE COMPANY AND THE MANAGER ARE AFFILIATES OF SHARESPOST, INC.

(T) THE SUBSCRIBER ACKNOWLEDGES THAT THE SUBSCRIBER IS PURCHASING THE SERIES B UNITS BASED ON THE SUBSCRIBER'S OWN ASSESSMENT AND KNOWLEDGE OF THERANOS INC. AND THE THERANOS SECURITIES. SUBSCRIBER REPRESENTS THAT SUBSCRIBER IS SUFFICIENTLY SOPHISTICATED IN VALUING PRIVATE COMPANY SECURITIES WITHOUT THE BENEFIT OF FINANCIAL, OPERATING OR OTHER INFORMATION PROVIDED BY THERANOS INC. AND DETERMINING A PRICE THAT REFLECTS THE ABSENCE OF SUCH INFORMATION AND LIQUIDITY FOR THE THERANOS SECURITIES. SUBSCRIBER FURTHER REPRESENTS THAT SUBSCRIBER HAS COMPLETED A VALUATION OF THE THERANOS SECURITIES TO BE PURCHASED WITH THE SALE PROCEEDS OF THE SERIES B UNITS AND THAT THE PRICE PER SHARE TO THE COMPANY OF THE THERANOS SECURITIES (EQUAL

TO THE PER SERIES B UNIT PRICE BEFORE THE SERVICE FEE) FAIRLY REFLECTS THE LACK OF INFORMATION AND LIQUIDITY OF THE THERANOS SECURITIES AND REPRESENTS AN ATTRACTIVE INVESTMENT TO SUBSCRIBER GIVEN SUBSCRIBERS FINANCIAL AND INVESTMENT FACTS AND CIRCUMSTANCES.

(u) The Subscriber hereby acknowledges that the Subscriber has been advised that this offering has not been registered with, or reviewed by, the Securities and Exchange Commission ("SEC") because this offering is intended to be a non-public offering pursuant to Section 4(a)(2) and Regulation D of the Securities Act. The Subscriber represents that the Series B Units are being purchased for the Subscriber's own account, for investment purposes only and not with a view for distribution or resale to others. The Subscriber agrees that the Subscriber will not sell or otherwise transfer the Series B Units unless they are registered under the Securities Act or unless in the opinion of counsel satisfactory to the Manager an exemption from registration is available. The Subscriber understands that the Series B Units have not been registered under the Securities Act by reason of a claimed exemption under the provisions of the Securities Act that depends, in part, upon the Subscriber's investment intention. The Subscriber understands that it is the position of the SEC that the statutory basis for such exemption would not be present if the Subscriber's representation merely meant that the Subscriber's present intention was to hold such Series B Units for a short period, such as the capital gains period of tax statutes, for a deferred sale or for any other fixed period.

(v) The execution, delivery and performance by the Subscriber of the Subscription Agreement are within the powers of the Subscriber, have been duly authorized and will not constitute or result in a breach or default under, or conflict with, any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency or any agreement or other undertaking to which the Subscriber is a party or by which the Subscriber is bound; and, if the Subscriber is not an individual, will not violate any provision of documents governing the Subscriber. The signatures on the Subscription Agreement are genuine and the signatory, if the Subscriber is an individual, has legal competence and capacity to sign it, or, if the Subscriber is not an individual, the signatory has been duly authorized to execute the same; and the Subscription Agreement constitutes the legal, valid and binding obligations of the Subscriber, enforceable in accordance with its terms.

(w) The Subscriber acknowledges that Subscriber has received no general solicitation or general advertising (including communications published in any newspaper, magazine, e-mail or by electronic means on the Internet or other broadcast) and that no public solicitation or advertisement with respect to the offering of the Series B Units has been made to such Subscriber.

(x) The Subscriber has relied solely upon the advice of its own tax and legal advisors with respect to the tax and other legal aspects of this investment, and not upon the Company, the Manager or SharesPost Financial Corporation for such advice.

(y) The Subscriber understands that the Company will not register as an investment company under the Investment Company Act of 1940, as amended (the "**Investment Company Act**") under one or more exceptions thereto. If the Subscriber is not a natural person, the Subscriber certifies that:

CONFIDENTIAL                                           TH-PLTF-001194

(i) it is "one person" for purposes of Section 3(c)(1) of the Investment Company Act.

(ii) it was not formed for the purpose of investing in the Company nor did or will the equity owners of the Subscriber entity contribute additional capital to purchase Series B Units.

(iii) its equity owners are not permitted to opt in or out of particular investments made by the Subscriber, and each person participates in investments made by the Subscriber pro rata in accordance with its interests in the Subscriber and

(iv) if the Subscriber is subscribing to purchase interests in excess of ten percent (10%) of the aggregate capital contributions made to the Company, the Subscriber is not an investment company within the meaning of the Investment Company Act or a company excepted from such definition thereunder.

(z) By executing and delivering this Subscription Agreement, the Subscriber covenants to the Company that, except with the prior written permission of the Company, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any information contained in the Offering Memorandum, the Subscription Package and the Company's Operating Agreement, including the exhibits and attachments thereto. For the avoidance of doubt, the aforementioned covenant shall preclude the Subscriber from making public disclosure regarding the investment in the Series B Units or the Theranos Securities. The provisions of this Section 3(z) shall be in addition to, and not in substitution for, the provisions of any separate nondisclosure agreement executed by the parties hereto with respect to the transactions contemplated hereby.

(aa) THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE SECURITIES HAVE NOT BEEN APPROVED, DISAPPROVED OR RECOMMENDED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(bb) There are no contracts, agreements or understandings between the Subscriber and any person that would give rise to a claim for any brokerage commission, finder's fee or other like payment with respect to the offer or sale of the Series B Units to the Subscriber.

(cc) The Subscriber represents and warrants that the amounts contributed by it to the Company in respect of this Subscription Agreement were not and are not directly, or to the Subscriber's knowledge indirectly, derived from activities that may contravene federal, state or foreign laws and regulations, including anti-money laundering and terrorist financing laws and regulations. The Subscriber also represents and warrants to, and agrees and covenants with, the Company, as of the date hereof that none of (i) the Subscriber, (ii) any person controlling or controlled by the Subscriber, (iii) if the Subscriber is a privately held entity, any person having a beneficial interest in the

CONFIDENTIAL

TH-PLTF-001195

Subscriber, or (iv) any person for which the Subscriber is acting as agent or nominee in connection with this Subscription Agreement is located in a country or territory or is an individual or entity named on any list administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), nor is any such person or entity prohibited from investing in the Company under any OFAC administered sanctions or embargo programs. Federal regulations and Executive Orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals: The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at www.treas.gov/ofac.

(dd) The Subscriber agrees to notify promptly the Company should the Subscriber become aware of, or has any reason to suspect, any change in anti-money laundering representations in Section 3(cc) above, or if there is any change in the information affecting these representations. The Subscriber acknowledges that, if at any time it is discovered that any of the representations set forth in Section 3(cc) are incorrect, or if otherwise required by applicable laws or regulations related to money laundering and similar activities, the Company may be obligated to freeze the account of the Subscriber by segregating assets of the Subscriber in compliance with government regulations, and if required by law, the Company may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges and agrees that the Company may, by written notice to the Subscriber, suspend any payment to the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company. The Subscriber also understands and agrees that the Company may release confidential information about the Subscriber and, if applicable, any underlying beneficial owners of the Subscriber, to law enforcement agencies to the extent necessary to ensure compliance with all applicable laws, rules and regulations.

(ee) The Subscriber understands that information relating to the Subscriber shall appear on the financial statements and other records of the Company. The Subscriber acknowledges and agrees that (i) other Members may receive such information as permitted by the Operating Agreement or as required by applicable laws and may share such information with their advisors and other parties and (ii) the Company, the Manager and their respective affiliates may disclose the Subscriber's nonpublic personal information to the Company's accountants, attorneys and other service providers, and to securities regulatory authorities and governmental authorities, as necessary or appropriate to effect, administer and enforce the Operating Agreement and the Members' rights and obligations thereunder. The Company, the Manager and their respective affiliates may also release information about the Subscriber if directed to do so by the Subscriber, or if compelled to do so by law or in connection with any government or self-regulatory organization request or investigation. By executing this Agreement, the Subscriber consents to the foregoing collection, use and disclosure of its personal information. In addition, the Subscriber hereby acknowledges and agrees to the disclosure by the Manager, the Company and their respective affiliates of the Subscriber's Capital Commitment to Members and to the agents and representative of the Manager, the Company and their affiliates in connection with the management and the operation of the Company.

(ff) The Company reserves the right to request such information as is necessary to verify the identity of the Subscriber – as well any individual or entity having a beneficial interest in, or signatory or other similar authority over, the Subscriber and any transferee of the Series B Units – and may

CONFIDENTIAL　　　TH-PLTF-001196

seek to verify such identity and the source of funds for the Subscription. The Subscriber shall promptly on demand provide such information and execute and deliver such documents as the Company may request to verify the accuracy of the Subscriber's representations and warranties herein or to comply with any law or regulation to which the Company may be subject. In the event of any delay or failure by the Subscriber to produce any information required for verification purposes, the Company may refuse to accept this Subscription Agreement or may suspend any payment to the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations. The Subscriber warrants that the investment in the Series B Units is not being acquired, and will not be held, in violation of any applicable laws. The Subscriber agrees to indemnify and hold harmless the Company against any loss, claim, cost, damage or expense arising from a failure to process any subscription or distribution if such information as has been required by the Company has not been provided by the Subscriber or which the Company may suffer as a result of any violations of law, rule or regulation committed by the Subscriber.

4. *Indemnification*. The Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations, warranties and covenants in Section 3 and that the Company and the Manager have relied upon such representations, warranties and covenants, and the Subscriber hereby agrees to indemnify and hold harmless the Company, its Manager, SharesPost Financial Corporation and their respective officers, directors, controlling persons, agents, managers and employees, from and against any and all losses, damages or liabilities (including without limitation, reasonable attorney's fees) due to or arising out of a breach of any representation, warranty or covenant made by the Subscriber herein. Notwithstanding the foregoing, however, no representation, warranty, covenant, acknowledgment or agreement made by the Subscriber shall in any manner constitute a waiver of any rights granted to the Subscriber under federal or state securities laws.

5. *Survival of Agreements, Representations and Warranties*. All representations, warranties and covenants contained in this Subscription Agreement and the indemnification contained in Section 4 shall survive the acceptance of this Subscription.

6. *Restrictions on Transfer*. The Subscriber understands and agrees that the Subscriber's investment in the Series B Units pursuant to Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D thereunder, the Series B Units shall not be sold, pledged, hypothecated or otherwise transferred unless they are registered under the Securities Act and applicable state securities laws or are exempt from such securities laws. The Subscriber also understands that Series B Units are subject to contractual restrictions on transfer contained in the Operating Agreement.

7. *Withholding*. The Manager is required to withhold a certain portion of the taxable income and gain allocated or distributed to each Subscriber unless the Subscriber provides documentation confirming that such Subscriber is not subject to withholding, or is subject to a reduced rate of withholding. The following information is provided to assist the Subscriber in complying with the U.S. rules for backup withholding and withholding with respect to income earned by foreign persons. This information is only a summary, and is not a substitute for the advice of a tax advisor. Each Subscriber is urged to consult with a tax advisor concerning the application of the U.S. withholding rules to such Subscriber.

CONFIDENTIAL

TH-PLTF-001197

The type of documentation required by the Subscriber is a function of whether the Subscriber is a Foreign Person. "**Foreign Persons**" include nonresident aliens, foreign corporations, foreign partnerships, foreign trusts or foreign estates (as each of those terms is defined in the Code and Treasury Regulations). In the case of entities that are disregarded for purposes of U.S. tax law (e.g. fiscally transparent entities with a single owner that have not elected to be taxed as a corporation for U.S. tax purposes), such entities are treated as U.S. persons of Foreign Persons depending on the residence and status of their owners, rather than on where the disregarded entities are organized. Thus, a Subscriber that is a U.S. disregarded entity with a foreign owner will generally be treated as a Foreign person and should complete and submit the appropriate Form W-8 (as discussed below) based on the owner's status. A Subscriber that is a foreign disregarded entity with a U.S. owner will generally be treated as a U.S. person and should complete and submit a Form W-9 (as discussed below).

If the Subscriber is a U.S. person, please complete IRS Form W-9. Such Subscriber agrees to notify the Manager within sixty (60) days if the Subscriber ceases to be a U.S. person.

If the Subscriber is a Foreign Person, please complete Form W-8BEN, Form W-8ECI, Form W-8EXP or Form W-8IMY (along with any accompanying withholding certificates) as appropriate.

8. *Subscriber Qualification.* The Subscriber has furnished the Company with a completed and executed Subscriber Suitability Certification, the information in which is true and correct in all respects and which is incorporated by reference in this Subscription Agreement.

9. *Modification.* Neither this Subscription Agreement nor any provision hereof shall be waived, modified, changed, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, change, discharge or termination is sought to be enforced.

10. *Notices.* All notices, requests, consents and other communications shall be given pursuant to the relevant provisions of the Operating Agreement.

11. *Binding Effect.* Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and assigns. If the Subscriber is more than one person, the obligation of such Subscriber shall be joint and several and the agreements, representations, warranties, covenants and acknowledgments herein contained shall be deemed to be made by and be binding upon each such person and his, her or its heirs, executors, administrators, successors, legal representatives and assigns.

12. *Entire Agreement.* This Subscription Agreement, together with the Operating Agreement and any exhibits hereto and the other items included in the subscription materials of which this Subscription Agreement is a part, and together with any other agreements that may be entered into between the parties hereto pursuant to the Operating Agreement, contains the entire agreement of the parties with respect to the matters set forth herein and there are no representations, covenants or other agreements except as stated or referred to herein or as are embodied in the Operating Agreement. To the extent the provisions of the Operating Agreement conflict with the provisions of this Subscription Agreement, the provisions of the Operating Agreement shall control.

CONFIDENTIAL

CONFIDENTIAL

13. *Severability.* Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such provision(s) shall be reinterpreted to the fullest extent enforceable, and such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Subscription Agreement which are valid, enforceable and legal.

14. *Assignability.* This Subscription Agreement is not transferable or assignable by the Subscriber or any successor thereto.

15. *Applicable Law.* This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to the principles relating to the conflict of laws.

16. *Arbitration.* The parties agree to submit all controversies relating to the subject matter of this Subscription Agreement to arbitration in accordance with the following provisions and understand that:

(a) Arbitration is final and binding on the parties.

(b) The parties are waiving their right to seek remedies in court, including the right to a jury trial.

(c) Pre-arbitration discovery is generally more limited and different from court proceedings.

(d) The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by arbitrators is strictly limited.

(e) Arbitrators typically include a minority of arbitrators affiliated with the securities industry.

(f) All controversies which may arise between the parties concerning this Subscription Agreement shall be determined by arbitration pursuant to the rules then pertaining to the Financial Industry Regulatory Authority, Inc. in San Francisco, California. Judgment on any award of any such arbitration may be entered in the courts of the State of California or in any other court having jurisdiction of the party against whom such award is rendered. Any notice of such arbitration or for the confirmation of any award in any arbitration shall be sufficient if given pursuant to this Subscription Agreement. The parties agree that the determination of the arbitrators shall be binding and conclusive upon them.

17. *Confidentiality; Certain Disclosures.* The Manager, the Company and SharesPost Financial Corporation will use best efforts to keep the information provided in the Subscriber Suitability Certification strictly confidential. They may present this Subscription Agreement and the information provided in the Subscriber Suitability Certification to such parties as they deem advisable if compelled by law or called upon to establish the availability under any federal or state securities laws of an exemption from registration of the offering or if the contents thereof are relevant to any issue in any action, suit, or proceeding to which the Manager or the Company is a party or by which it is or may be bound.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

*For the exclusive use of: Hilary & John Dye*
*CTF VII (Series B - Theranos): SP-12*
*07/10/2015*

CONFIDENTIAL

TH-PLTF-001200

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement as of _____, 2015.

**TOTAL INVESTMENT AMOUNT:** $ $100,007.00

If the Subscriber is an INDIVIDUAL, or if purchased as JOINT TENANTS, as TENANTS IN COMMON, or as COMMUNITY PROPERTY by more than one individual:

_____
Signature of Subscriber

_____
Print Name of Subscriber

_____
Signature of Co-Subscriber

_____
Print Name of Co-Subscriber

Mailing Address         Residence Address
(if not residence)

_____   _____
City, State and Zip Code   City, State and Zip Code

_____
Social Security Number of Subscriber

_____
Social Security Number of Co-Subscriber

Read + Approved
*Hilary Tal Oye* ✗
8·13·15

*For the exclusive use of: Hilary & John Oye*
*CTF VII (Series B - Theranos) SP-12*
*07/10/20*

Private and Confidential
Celadon Technology Fund VII, LLC
(Signature Page to Subscription Agreement)

CONFIDENTIAL                                        TH-PLTF-001201

If the Subscriber is an ENTITY:

Type of Ownership:
(Check One)

\_\_\_\_ Corporation
\_\_\_\_ Partnership
\_\_\_\_ Limited Liability Company
\_\_\_\_ Limited Liability Partnership
\_\_\_\_ Trust
\_\_\_\_ Pension or Profit Sharing Plan or Trust
✓ Individual Retirement Account
\_\_\_\_ Tax Exempt Organization
\_\_\_\_ Estate
\_\_\_\_ Other (specify) _____

The Entrust Group FBO Hilary Dye IRA # [redacted]

Print Name of Entity

The Entrust Group
By: Monica Blaz
Its: Authorized Signer
555 12th Street, Suite 1250
Oakland, California 94607
Tax ID Number: [redacted]

Signature of Subscriber's Authorized Signatory

Print Name of Subscriber's Authorized Signatory

Print Title of Authorized Signatory

THE ENTRUST GROUP
555 12th Street, Suite 1250
Oakland, California 94607
www.TheEntrustGroup.com

Principal Business or Mailing Address

City, State and Zip Code

The Entrust Group Inc.
Tax ID Number: [redacted]

Federal Tax Identification Number

Read & Approved
Hilary Tal Dye
8-13-15

Private and Confidential
Celadon Technology Fund VII, LLC
(Signature Page to Subscription Agreement)

*Stamp overlay: "For the exclusive use of: Hilary & Adam Dye & Therapas B - Therapas) Series B - CTF VII (Series B - Therapas) 07/10/2015"*

Accepted as of     October 21    , 2015

**CELADON TECHNOLOGY FUND VII, LLC**

By: Celadon Capital Management, LLC, its Manager

*Ryan Stroub* (DocuSigned)
2BE956EDE7EE446...

*For the exclusive use of: Hilary & John Dye*
*CTF VII (Series B - Theranos): SP-12*
*07/10/2015*

# TH-PLTF-001186
## Metadata

| | | |
|---|---|---|
| **All Custodians** | Hilary Taubman-Dye | USER |
| **Author** | Brooke Roberts | USER |
| **BeginFamily** | TH-PLTF-001184 | ORIGINAL |
| **Custodian** | Hilary Taubman-Dye | USER |
| **EndFamily** | TH-PLTF-001203 | ORIGINAL |
| **Filename** | Acceptance_letter_Dye_Celadon_Technology_Fund_VII_LLC_Series_B_TransLett_OffMem_SubAg_OpAg.pdf | ORIGINAL |
| **MD5 Hash** | 208b84a80904917196400e93170f541c | ORIGINAL |
| **Produced From** | #501.1 | ORIGINAL |
| **SHA1 Hash** | 74a53dbd74ab9316d4c41f698fb6681d53b9d6db | ORIGINAL |
| **Title** | Final signed docs | USER |