1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                 NORTHERN DISTRICT OF CALIFORNIA

9

10   ROBERT COLMAN, et al.,
                                          Case No. 16-cv-06822-NC
11                    Plaintiffs,
                                          **ORDER DENYING PLAINTIFFS'**
12          v.                            **MOTION FOR CLASS**
                                          **CERTIFICATION**
13   THERANOS, INC., et al.,
                                          Re: ECF 177
14                    Defendants.

15

16          This lawsuit accuses life sciences company Theranos of defrauding investors by

17   touting revolutionary blood testing technology that never existed. Plaintiffs Robert Colman

18   and Hilary Taubman-Dye seek to certify under Federal Rule of Civil Procedure 23(b)(3) a

19   class of "indirect investors"—those who purchased interests in entities that bought

20   Theranos stock—for their claims of fraud, misrepresentation, and market manipulation.

21          Five of Plaintiffs' six claims have a reliance element, an individualized issue that

22   defeats predominance under Rule 23(b)(3) and makes class treatment unwarranted. While

23   common issues predominate the remaining claim for market manipulation under California

24   law, the totality of weaknesses in the proposed class make individual actions superior, on

25   balance, to a class action. The Court therefore DENIES Plaintiffs' motion for class

26   certification.

27

28

*United States District Court*
*Northern District of California*

# I.     Background

## A.     Parties

Defendant Theranos, Inc. is a private life sciences company founded in 2003 by defendant Elizabeth Holmes. Holmes is Theranos's Chief Executive Officer and Chairwoman. Defendant Ramesh "Sunny" Balwani is the former President, Chief Operating Officer, and board member of Theranos.

Plaintiffs and proposed class representatives Robert Colman and Hilary Taubman-Dye purchased securities in third-party investment funds, purportedly for the express purpose of having the third-party funds use their investments to acquire Theranos securities.

## B.     Factual Background

This lawsuit centers on Theranos's grand claim that it developed revolutionary technology allowing for comprehensive, low-cost, and accurate blood tests using just a few drops of blood pricked painlessly from a patient's finger. After allegedly developing its technology and raising venture capital for the first ten years of its existence, Theranos began its public-facing operations in 2013. Theranos posted its first press release to its website on July 29, 2013, announcing as board members then-U.S. Marine General James "Mad Dog" Mattis and former Wells Fargo chairman and CEO Richard Kovacevich. *See* Kathrein Decl. Ex. Z (ECF 177-6). These names joined an already-illustrious board that included the likes of former U.S. Secretary of State Henry Kissinger, former U.S. Senator Samuel Nunn, and former U.S. Secretary of Defense William Perry, among others. *See id.*

On September 8, 2013, the Wall Street Journal published a purportedly revelatory account of Theranos's technology and Holmes's vision for the company. *See* Kathrein Decl. Ex. AA (ECF 177-6). The article proclaims that Holmes's "inventions, which she is discussing in detail here for the first time, could upend the industry of laboratory testing and might change the way we detect and treat disease." *Id.* The day after the article was published, Theranos announced a partnership with Walgreens, revealing plans to roll out Theranos's pinprick testing at "Wellness Centers" inside Walgreens stores nationwide, and

United States District Court
Northern District of California

1    claiming "consumers can now complete any clinician-directed lab test with as little as a

2    few drops of blood and results available in a matter of hours." Kathrein Decl. Ex. BB (ECF

3    177-6).

4         From 2013 to 2015, Theranos issued numerous press releases and Holmes gave

5    dozens of interviews. These public statements heralded Theranos's technology and

6    approach to preventative medicine. *E.g.*, Kathrein Decl. Ex. W (ECF 217-24) (Holmes

7    stating in a March 13, 2015, interview with George Shultz that Theranos has "shifted the

8    model" by lowering costs for full-service laboratory testing and "redeveloped the lab

9    infrastructure to make it possible to run any combination of lab tests from tiny droplets of

10   blood"). The interviews and press releases consistently emphasized the technology's low

11   cost, accuracy, comprehensiveness, and the small amount of blood needed to do it all. *See*,

12   *e.g.*, Kathrein Decl. Exs. L, M, W, Y, AA, BB (ECF 217-13, 217-14, 217-24, 217-26, 177-

13   6); Perla Decl. Exs. 13–17 (ECF 191-13–191-17); *see also* Perla Decl. Exs. 13, 14 (ECF

14   191-13, 191-14) (announcing additional prestigious board members).[1] Holmes made

15   similar claims in direct correspondence with potential investors, sometimes directing them

16   to the public media coverage Theranos was receiving. *See*, *e.g.*, Kathrein Decl. Exs. I, J, M

17   (ECF 217-10, 217-11, 217-14).

18        While Theranos was garnering this favorable public attention, investors bought

19   stock. Theranos had already conducted three series of stock sales (Series A Preferred,

20   Series B Preferred, and Series C Preferred), and from January 2013 to October 2016,

21   Theranos sold Series C-1 and C-2 Preferred Stock to over 30 individuals and investment

22   entities. *See* White Decl. ¶¶ 5–6 (ECF 216-1). The Series C-1 and C-2 stock investments

23   ranged in value from approximately $50,000 to approximately $125 million. *See id.* ¶ 6.

24   One of these investors was Lucas Venture Group XI, LLC, which purchased 471,333

25   shares of Series C-1 stock for just over $7 million. *Id.*; *see* Kathrein Decl. Ex. X (ECF 217-

26

27   ───────────────

28   [1] Plaintiffs' amended complaint identifies dozens of other press releases, interviews, and
     media stories conveying substantially the same narrative. *See* Am. Compl. ¶¶ 20–43 (ECF
     173).

United States District Court
Northern District of California

25 at 2). During this 2013 to 2016 period, investors also purchased Theranos stock from other investors. For example, Celadon Technology Fund VII, LLC purchased 410,000 shares of Series C Preferred Stock from another investor on December 15, 2015. *See* Kathrein Decl. Ex. X (ECF 217-25 at 12).

Most relevant to this case, Plaintiffs and others indirectly invested in Theranos by purchasing ownership interests in funds that owned or planned to purchase Theranos stock. Among these indirect investors, Colman claims to have spent $500,000 to purchase a membership interest in Lucas Venture Group XI, LLC, for the purpose of funding Lucas Venture Group XI's subsequent purchase of 471,334 shares of Theranos's Series C-1 Preferred Stock. Colman Decl. ¶ 1 (ECF 217-35). Similarly, Taubman-Dye asserts she purchased an ownership interest in Celadon Technology Fund VII, LLC for the purpose of funding Celadon's corresponding purchase of 410,000 shares of Theranos Series C-1 Preferred Stock. Taubman-Dye Decl. ¶ 1 (ECF 217-36). Taubman-Dye invested just over $100,000. *Id.*

According to Plaintiffs' evidence, other indirect investors contributed anywhere from $15,000 to $17,350,200 to finance purchases of Theranos shares. Kathrein Decl. Exs. CC–FF (ECF 177-7). These include, for example, investments in:

- Peer Ventures Group IV, LP, with investment amounts ranging from $15,000 to $17,350,200, *id.* Ex. CC;
- Lucas Venture Group XI, LLC, with investment amounts ranging from $15,000 to $1 million, *id.* Ex. DD;
- Lucas Venture Group IV, LP, with investment amounts ranging from $250,000 to $10 million, *id.* Ex. EE;
- Black Diamond Ventures XII-B, LLC, with investment amounts ranging from $100,000 to $1 million, *id.* Ex. FF.

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs identify a complete list of the funds in which indirect investors invested (excluding family trusts or family investment vehicles):

| Fund | Close Purchase Date | # of Shares | Price | Investment Series | Total Investment |
|---|---|---|---|---|---|
| Hall Black Diamond II, LLC | 12/31/2013 | 325,000 | $15 | C-1 | $4,875,000 |
| Black Diamond Ventures XII-B, LLC | 12/31/2013 | 356,660 | $15 | C-1 | $5,349,900 |
| Peer Ventures Group IV, L.P. | 1/14/2014 | 1,169,995 | $15 | C-1 | $17,549,925 |
|  | 2/5/2014 | 779,411 | $17 | C-2 | $13,249,987 |
| Lucas Ventures Group IV, L.P. | 1/14/2014 | 33,334 | $15 | C-1 | $500,010 |
| Lucas Ventures Group XI, LLC | 1/14/2014 | 471,333 | $15 | C-1 | $7,069,995 |
| Lucas Venture Group XV, LLC | 1/6/2016 | 33,331 | $18 | Class A Common | $599,958 |
| Lucas Ventures Group XVIII,LLC | 7/14/2016 | 55,520 | $14 | C | $777,280 |
|  | 9/24/2016 | 14,439 | $10 | Class A Common | $144,390 |
|  | 11/2/2016 | 24,000 | $7 | C | $168,000 |
| Mendenhall TF Partners | 1/14/2014 | 87,500 | $15 | C-1 | $1,312,500 |
| Holbrook Meadow LLC | 1/14/2014 | 30,005 | $15 | Preferred B | $450,075 |
| Bendel Fund | 12/29/2014 | 249,998 | $17 | C-2 | $4,250,000 |
| Celadon Technology Fund VII, LLC | 12/15/2015 | 410,000 | $19 | Preferred C | $7,790,000 |
| OPA Holdings SPV, LP (by purchase of Cassin Family Partners, LP) | 12/31/2015 | 359,474 | $15 | Series B/C | $5,354,550 |
| **TOTAL** | | | | | **$69,441,570** |

 Kathrein Decl. Ex. A (ECF 217-2).

On October 15, 2015, the Wall Street Journal published an article challenging Theranos's validity by reporting Theranos was not actually using its revolutionary technology for the tests it offered. *See* Am. Compl. ¶ 51. Theranos vehemently defended itself against this and subsequent similar accusations, but significant public fallout—and litigation—ensued. Prominently, Walgreens sued Theranos for breach of contract. *Walgreens Co. v. Theranos, Inc.*, No. 16-cv-1040-UNA (D. Del. Nov. 8, 2016). And an investor group that purchased nearly $100 million of Series C stock, Partner Investments, LP, sued Theranos for securities fraud. *Partner Investments, L.P. et al. v. Theranos, Inc., et al.*, No. 12816-VCL (Del. Ch. Mar. 23, 2017). More recently, the U.S. Securities and Exchange Commission brought civil fraud claims against Theranos, Holmes, and Balwani. *Sec. and Exch. Comm'n v. Holmes*, No. 18-cv-01602-EJD (N.D. Cal. Mar. 14, 2018)

(action against Theranos and Holmes); *Sec. and Exch. Comm'n v. Balwani*, No. 18-cv-01603-BLF (N.D. Cal. Mar. 14, 2018) (action against Balwani). Holmes and Theranos settled the charges against them without admitting or denying wrongdoing. *See* ECF 9, 10 in Case No. 18-cv-01602-EJD.

### C.   Procedural History

Plaintiffs filed their original class action complaint on November 28, 2016. *See* ECF 1. Defendants moved to dismiss the complaint, which the Court granted in part and denied in part by dismissing Plaintiffs' securities fraud claim under California Corporations Code §§ 25401 and 25501 and denying the motion on the remaining claims. *See* ECF 63. Defendants then moved to limit Plaintiffs' putative class, which the Court granted by excluding from any class definition the set of direct investors listed in Appendix A to that motion, ECF 102-1. *See* ECF 143. Fearing Defendants' financial insolvency in the wake of settlements in other actions, Plaintiffs moved on July 14, 2017, to provisionally certify a mandatory limited fund class and to enjoin Defendants' funds. ECF 109. The Court denied the request. *See* ECF 124.

Plaintiffs then filed an amended class action complaint, alleging six causes of action against all defendants:[2]

(1) securities fraud under California Corporations Code §§ 25400(d) and 25500;

(2) violation of California's Unfair Competition Law, California Business and Professions Code § 17200;

(3) fraud and deceit under California Civil Code §§ 1709 and 1710 and common law;

(4) fraudulent concealment under California Civil Code § 1710 and common law;

(5) constructive fraud under California Civil Code § 1573 and common law; and

(6) negligent misrepresentation under California Civil Code § 1710 and common

---

[2] The numbering for the claims in the amended complaint includes the now-dismissed cause of action under Cal. Corp. Code §§ 25401 and 25501, and lists two different claims as "Count V." The Court will refer to Plaintiffs' claims by the numbers listed in this order.

United States District Court
Northern District of California

1    law.

2    *See* Am. Compl. (ECF 173).

3        Plaintiffs now move for class certification under Federal Rule of Civil Procedure

4    23, specifically Rule 23(b)(3). ECF 177. Plaintiffs define the class they seek to certify as:

5        All persons or entities who, from July 29, 2013, through October 5, 2016,
6        purchased or acquired securities of an entity for the express purpose of
         making corresponding purchases of Theranos securities.
7

8    Class Cert. Mot. at i, 1, 8. Plaintiffs propose as class representatives themselves (Robert

9    Colman and Hilary Taubman-Dye) and another purported indirect investor, BF Last

10   Investments, LLC. *See id.*; Reply Br. at 4. Defendants oppose the motion. ECF 188.

11       This Court has federal subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), and

12   all parties have consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c). ECF

13   6, 23, 25, 26.

14   **II.    Legal Standards**

15       As the parties seeking certification, Plaintiffs bear the burden of demonstrating

16   compliance with Federal Rule of Civil Procedure 23. *See Comcast Corp. v. Behrend*, 569

17   U.S. 27, 33 (2013). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*

18   *Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, Plaintiffs must affirmatively

19   demonstrate compliance with all four requirements of Rule 23(a), and at least one of the

20   sub-sections of Rule 23(b). *Id.; see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180,

21   1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001).

22       Rule 23(a) imposes four prerequisites: (1) the class must be "so numerous that

23   joinder of all members is impracticable" (numerosity); (2) there must be "questions of law

24   or fact common to the class" (commonality); (3) the claims or defenses of the named

25   plaintiffs must be "typical of the claims or defenses of the class" (typicality); and (4) the

26   named parties must show that they "will fairly and adequately protect the interests of the

27   class" (adequacy). Fed. R. Civ. P. 23(a)(1)-(4).

28       To certify a Rule 23(b)(3) class, as sought here, Plaintiffs must also show that

United States District Court
Northern District of California

1   "questions of law or fact common to class members predominate over any questions

2   affecting only individual members" (predominance); and that a class action is "superior to

3   other available methods for fairly and efficiently adjudicating the controversy"

4   (superiority). Fed. R. Civ. P. 23(b)(3).

5       The Court's "class-certification analysis must be rigorous and may entail some

6   overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret.*

7   *Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (internal quotations and citations

8   omitted). "That is so because the class determination generally involves considerations that

9   are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."

10  *Comcast*, 569 U.S. at 33–34 (internal quotations and citations omitted). However, the

11  ultimate goal under Rule 23 is to determine whether efficiency and justice are best served

12  by plaintiffs pursuing their claims on behalf of a class as "an exception to the usual rule

13  that litigation is conducted by and on behalf of the individual named parties only." *Wal-*

14  *Mart*, 564 U.S. at 348 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). The

15  decision whether to certify a class is entrusted to the sound discretion of the district court.

16  *Zinser*, 253 F.3d at 1186.

### III. Discussion

18      The Court discusses the components of Plaintiffs' motion in the following order:

19  first, the class definition; second, the Rule 23(a) requirements; and third, the Rule 23(b)(3)

20  requirements.

### A. Class Definition

22      The Ninth Circuit has not adopted a threshold "ascertainability" or "administrative

23  feasibility" test for putative class definitions. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d

24  1121, 1124 n.4, 1126 (9th Cir. 2017). But nonetheless a class must not be vaguely defined

25  and must be "sufficiently definite to conform to Rule 23." *Probe v. State Teachers' Ret.*

26  *Sys.*, 780 F.2d 776, 780 (9th Cir. 1986); *accord Briseno*, 844 F.3d at 1124 n.4. Plaintiffs'

27  proposed class definition has shifted through multiple iterations of vaguery, so the Court

28  discusses it before delving into the Rule 23 issues.

The amended class action complaint initially contemplated certifying a class defined as: "All persons or entities who, from July 29, 2013, through October 5, 2016, purchased or acquired securities of an entity for the purpose of making corresponding purchases of Theranos securities" (with Defendants and their relevant affiliates excluded). Am. Compl. ¶ 86. Plaintiffs' motion for class certification offers the same definition, except that it adds the word "express" before "purpose." Class Cert. Mot. at i, 1, 8. With little explanation, the motion also states: "Alternatively, the Class could be defined as all investors in the funds which have been identified as having solicited investors for the purposes of investing in Theranos stock during the Class Period." *Id.* at i, 1. Those funds are listed in Exhibit A to the supporting Kathrein declaration, *see* ECF 217-2, which is included in the background section of this order.[3]

Defendants' attack the definition by arguing it requires peering into class members' state of mind and includes an infinite chain of indirect investors. *See* Opp. at 10–11. In response to the first argument, Plaintiffs specify in their reply brief that "express purpose" effectively means *expressed* purposed—i.e. that the investors "*expressly* indicated, confirmed, or were informed that their investment would correspond to purchases of Theranos securities." Reply Br. at 3 (emphasis in original). Plaintiffs offer as the source of such expressed purpose "the correspondence, operating documents, and/or subscriptions of the funds." *Id.* In response to the second argument, Plaintiffs further narrow the class to investors "removed from Theranos by one level"—that is, investors who purchased on interest in an entity that itself owns Theranos stock. *Id.*

Thus, by the Court's best understanding of Plaintiffs' intent, and for purposes of this motion, the proposed class is defined as:

> All persons or entities who, from July 29, 2013, through October 5, 2016, purchased or acquired securities of one of the entities listed in Exhibit A, ECF 217-2, or other entity that purchased Theranos stock, for the purpose— as expressed in pre-purchase correspondence, operating documents, and/or

---

[3] Future references to "Exhibit A" refer to this document.

United States District Court
Northern District of California

subscriptions of the funds—of making corresponding purchases of Theranos securities.

It is not lost on the Court that Plaintiffs have struggled to define the class they seek to represent. The repeated necessity to tweak and clarify raises eyebrows about the benefits of managing this case as a class action. *See Probe*, 780 F.2d at 780. Still, after much ado, a class definition has emerged, and the Court proceeds with its analysis using the definition hewn above.

### B.   Rule 23(a) Is Satisfied.

#### 1.   Numerosity: The Class Is Sufficiently Numerous.

As the first Rule 23(a) requirement, Plaintiffs must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In determining practicality of joinder, courts often consider: "(1) the number of individual class members; (2) the ease of identifying and contacting class members; (3) the geographical spread of class members; and (4) the ability and willingness of individual members to bring claims . . ." *Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. 12-cv-5080 CRB, 2013 WL 3802807, at *2 (N.D. Cal. July 17, 2013).

Here, the first and third of these factors weigh for certification, while the second and fourth weigh against. Plaintiffs have submitted evidence that over 200 individuals invested in the entities listed in Exhibit A, all of whom Plaintiffs claim did so for the express purpose of acquiring Theranos shares. *See* Kathrein Decl. Exs. CC–HH (ECF 177-7) (showing the number of investors in several of the entities listed in Exhibit A). These 200+ putative class members are spread across the country, making joinder more difficult. Yet they are also easily identifiable and contactable, as the Exhibit A entities maintain records of their investors. *See id.* And these relatively high-value investments, made through private networks that suggest sophisticated parties, are conducive to individual claims. On balance, the geographic spread of the over-200 potential class members satisfies Rule 23(a)(1)'s numerosity requirement, but only weakly.

### 2.   Commonality: Common Questions Exist.

Next, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(b). Trivial or tangential common questions do not fulfill this prerequisite. Instead, "commonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.' " *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (alteration in original) (quoting *Wal-Mart*, 564 U.S. at 350). Unlike Rule 23(b)(3)'s predominance requirement, which balances common questions against individual ones, "commonality only requires a single significant question of law or fact." *Id.* at 589.

Here, all of Plaintiffs claims center on their core contention that Defendants lied about their technology and "the *sine qua non* of Theranos was a fraud." Class Cert. Mot. at 21. This core question—whether Defendants made untrue statements about Theranos's technological capabilities and potential—is material to all of Plaintiffs' claims and capable of class-wide resolution. Commonality is satisfied.

### 3.   Typicality: Plaintiffs Are Sufficiently Typical of the Class.

Third, Plaintiffs' claims must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This standard is "permissive," and claims are typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Plaintiffs' claims are sufficiently typical to satisfy this requirement, as all class members' claims involve the same rough fact pattern: they claim to have invested in entities to acquire Theranos securities and to have been harmed by Defendants' alleged misrepresentations.

That said, the Court notes two potential storm clouds that cast a shadow over typicality. First, the indirect investors that compose the proposed class invested in different entities that purchased different types of Theranos stock. Exhibit A depicts twelve investment funds that invested in the following types of Theranos stock: "C," "C-1," "C-

2," "Class A Common," "Preferred B," Preferred C," and "Series B/C." *See* ECF 217-2. While the finer details are not known to the Court, Defendants concede that "[d]ifferent series of preferred stock have different liquidation preferences. Series C, C-1, and C-2 Preferred are senior in preference to Series A and B Preferred." White Decl. ¶ 5 (ECF 216-1). Because hierarchy exists between the entities that class members invested in, it seems likely that indirect investors would run up against similar antagonism.

Related to the varied stock the intermediate funds owned, some funds signed releases that could impact class members' claims. Between August 2016 and August 2017, Theranos negotiated a share offer and exchange with shareholders of Series C-1 and C-2 Preferred stock. *See* White Decl. ¶¶ 9–12 (ECF 101-5). Black Diamond Ventures XII-B, LLC, Lucas Venture Group XI, LLC, and Peer Ventures Group IV, LP—each of which some putative class members invested in—are among the entities who participated in the tender offer and released their claims against Theranos. *See id.* Ex. 15 (ECF 101-33).

Both the differences in stock type and the intermediate funds' releases could reflect atypicality in putative class members' claims. At this point, it is only uncertainty that prevents either issue from independently barring class certification; more information is needed to know how much, if at all, they bear on class members' claims. At least one of Plaintiffs' claims—market manipulation under California Corporations Code §§ 25400(d) and 25500—does not require privity and extends to downstream securities purchases, so the varied stocks and legal releases could potentially not come into play. Still, these outstanding issues raise concerns about the typicality of Plaintiffs' claims and the overall wisdom of adjudicating the indirect investors' claims as a class.

The Court will return to this topic in discussing Rule 23(b) predominance and superiority. But under Rule 23(a)(3)'s permissive standard, and without knowing whether or how differences in stock type and releases affect class members' claims, the rough similarities suffice. *See Hanlon*, 150 F.3d at 1020; *Pederson v. Airport Terminal Servs.*, No. 15-cv-02400-VAP (SPx), 2018 WL 2138457, at *5 (C.D. Cal. Apr. 5, 2018) (finding typicality satisfied where "[t]he fact-pattern for Plaintiffs [was] similar, if not identical, to

the fact-pattern for other Settlement Class members").

### 4. Adequacy: Plaintiffs Are Adequate Representatives.

Finally, Plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine this, the Court asks two questions: first, do the proposed class representatives and their counsel "have any conflicts of interest with other class members"; and second, will the proposed class representatives and their counsel "prosecute the action vigorously on behalf of the class"? *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1020).

On the first question, the stock liquidation preferences noted above could lead to antagonism within the class if these preferences factor into indirect investors' claims. Conversely, class treatment might nullify competing independent judgments against Defendants' battle-scarred litigation coffers. On the second question, class counsel did not demonstrate vigorous prosecution when it struggled to define a class (noted above) and failed to identify appropriate class representatives. Most notably, the Court is concerned by the fact that Plaintiffs' counsel proposed Mai Pogue and Thomas Brodie as class representatives in the motion for class certification, but then hastily clarified in the reply brief and at the hearing that neither Pogue nor Brodie even falls within the class. *Compare* Class Cert. Mot. at i *with* Reply Br. at 4. Counsel that is unable to timely define the class, and representatives who are not in the class, seem unlikely candidates to adequately protect class members' interests. The large range of class members' investments—from as little as $15,000 to over $17 million—also calls into question the appropriateness of Colman and Taubman-Dye as representatives, who respectively have $100,000 and $500,000 at stake. Thus, at best, Plaintiffs scrape past the adequacy requirement by the skin of their teeth.

In sum, Plaintiffs have established that the baseline requirements for class certification under Rule 23(a) are met, though not without important question marks.

### C. Rule 23(b)(3) Is Not Satisfied.

The Court next turns to Rule 23(b)(3). As noted above, Plaintiffs must show that common questions predominate over individual ones, and that a class action is superior to

individual actions in fairly and efficiently adjudicating this case. The Court discusses predominance first and then superiority.

### 1. Predominance: Individual Issues Predominate Most Claims.

The first line of inquiry is whether individual or common issues would predominate class-wide litigation. As the Ninth Circuit summarized:

> The Rule 23(b)(3) predominance inquiry is far more demanding than Rule 23(a)'s commonality requirement. The presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). Rather, a court has a duty to take a close look at whether common questions predominate over individual ones, and ensure that individual questions do not overwhelm questions common to the class. In short, the main concern of the predominance inquiry under Rule 23(b)(3) is the balance between individual and common issues.

*In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 691 (9th Cir. 2018) (internal quotation marks, citations, and alterations omitted) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Hanlon*, 150 F.3d at 1022 (9th Cir. 1998); *Comcast*, 569 U.S. at 34; *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545–46 (9th Cir. 2013)).

The Court first finds as an overarching problem that variations in class members' investments raise red flags that color the predominance analysis but do not independently defeat class treatment. On the specifics of Plaintiffs' claims, the Court finds that individual issues predominate for the five of Plaintiffs' six claims that have a reliance element, while common issues predominate for the sole remaining claim of market manipulation. On balance, this leaves the market manipulation claim as the sliver of Plaintiffs' case that is predominated, albeit weakly, by common issues.

### a. Investor Funds' Stock Purchases Varied.

First, as an overarching issue, the earlier-noted typicality concerns about varied stock types and releases apply in full force to the predominance analysis. As noted under Rule 23(a)(3), the funds that putative class members invested in purchased varied stocks with competing liquidation preferences, and some funds released their claims against Theranos. *See* Kathrein Decl. Ex. A (ECF 217-2); White Decl. ¶ 5 (ECF 216-1); White

United States District Court
Northern District of California

Decl. ¶¶ 9–12, Ex. 15 (ECF 101-5, 101-33). As a result, class treatment could require the Court to make complicated liquidation preference determinations and navigate legal releases that reshape the contours of class membership. If so, highly individualized determinations would be required, and rifts and turmoil within the class would be inescapable. The Court is chary to wade into such stormy seas.

Cognizant of this looming concern, the Court next turns to analyzing each of Plaintiffs' claims.

### b. Plaintiffs' Reliance-Based Claims Are Overwhelmed by Individualized Factual Issues.

Five of Plaintiffs' six claims include an element of reliance.[4] *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (fraud and deceit); *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606 (2014) (fraudulent concealment); *Tyler v. Children's Home Soc'y*, 29 Cal. App. 4th 511, 548 (1994) (constructive fraud); *Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co.*, 520 F. Supp. 2d 1184, 1195 (C.D. Cal. 2007) (negligent misrepresentation). By its nature, reliance is an individualized inquiry that demands individualized proof unless a presumption of reliance applies. There are two possible presumptions here.[5] First, there is precedent in the context of false advertising claims for inferring reliance where large-scale advertising makes it highly likely that all putative class members were exposed to a material misrepresentation. Second, reliance is inferred in some securities fraud claims under a "fraud-on-the-market" theory. For the reasons below, neither presumption applies here.

### i. Reliance Cannot Be Presumed Under *Mazza*.

The first option for presuming reliance typically crops up in false advertising claims. Where individualized proof of reliance would be difficult, courts sometimes infer

---

[4] The Court construes Plaintiffs' UCL § 17200 claim to be grounded in fraud, and so considers it with Plaintiffs' other reliance-based fraud claims in a single analysis.

[5] Plaintiffs do not claim, and neither party addresses in depth, a third possibility: the presumption articulated in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54 (1972). Like the parties, the Court does not consider this presumption.

1   that consumers were exposed to (and relied on) a business's misrepresentations based on

2   the large scale and widespread nature of the advertising. *See In re Tobacco II Cases*, 46

3   Cal. 4th 298, 320 (2009). However, the Ninth Circuit has held that presuming reliance is

4   improper except in extraordinary cases of intense, long-term advertising campaigns where

5   exposure is highly likely. *Mazza*, 666 F.3d at 596; *Hyundai*, 881 F.3d at 703–04.

6       The Ninth Circuit squarely addressed this issue in *Mazza*. There, consumers sued

7   Honda under California law for alleged misrepresentations and omissions in

8   advertisements about Honda's Collision Mitigation Braking System ("CMBS"). 666 F.3d

9   at 585. The advertising campaign included a 2006 product brochure, television

10  commercials describing the system's operation—including one that ran for a week in

11  November 2005 and another that ran from February to September 2006—and a print ad in

12  magazines from March to September 2006. *Id.* at 586. Smaller-scale advertising continued

13  into 2007. *Id.* at 586–87. The district court certified a nationwide class under Rule

14  23(b)(3), relying on *Massachusetts Mutual Life Insurance Co. v. Superior Court*, 97 Cal.

15  App. 4th 1282 (2002), to find that an inference of reliance was appropriate in assessing

16  predominance. *See id.* at 595.

17      The Ninth Circuit looked to *Mass. Mutual* and the California Supreme Court's

18  subsequent decision in *Tobacco II*, and rejected a reliance presumption for the plaintiffs'

19  claims against Honda. The court reasoned that "*Tobacco II's* holding was in the context of

20  a 'decades-long' tobacco advertising campaign where there was little doubt that almost

21  every class member had been exposed to defendants' misleading statements." *Id.* at 596.

22  Honda's product brochures and TV commercials fell short of the large-scale advertising in

23  *Tobacco II*, the court found, "and this difference is meaningful." *Id.* Noting that exposure

24  to misrepresentations is necessary for damages, the Ninth Circuit reasoned that the

25  "limited scope" of Honda's advertising, relative to *Tobacco II*, made it unreasonable to

26  assume all class members saw and relied on Honda's alleged misrepresentations and

27  omissions. *Id.*; *see also Davis-Miller v. Automobile Club of Southern California*, 201 Cal.

28  App. 4th 106, 125 (2011) ("An inference of classwide reliance cannot be made where there

1    is no evidence that the allegedly false representations were uniformly made to all members

2    of the proposed class."). In no unclear terms, the Ninth Circuit concluded: "In the absence

3    of the kind of massive advertising campaign at issue in *Tobacco II*, the relevant class must

4    be defined in such a way as to include only members who were exposed to advertising that

5    is alleged to be materially misleading." *Id.*

6           In light of this proviso, many district courts have refused to permit a presumption of

7    class-wide reliance. For example, the court in *In re Clorox Consumer Litigation* declined

8    to certify a Rule 23(b)(3) class, finding that individual issues of exposure and reliance

9    outweighed common questions. 301 F.R.D. 436, 439 (N.D. Cal. 2014). There, Clorox ran

10   an advertising campaign asserting that its carbon-containing Fresh Step cat litter was more

11   effective at eliminating odors than other products, making that representation in television

12   commercials and on the back panel of the product's packaging. *Id.* at 444. The advertising

13   campaign lasted approximately 16 months. *Id.* Responding to the plaintiffs' assertion of

14   class-wide exposure, Clorox produced evidence from an advertising analytics company

15   concluding that "not enough people are seeing, or possibly remembering, the advertising"

16   and that only 11% of consumers read the back panel of cat litter packaging. *Id.* Based on

17   this evidence of incomplete exposure, the court concluded the defined class was overbroad

18   and that common issues would not predominate over individualized ones. *Id.* at 446.

19          Similarly, a presumption of reliance was found to be inappropriate in *In re MyFord*

20   *Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2016 WL 7734558, at *22 (N.D. Cal.

21   Sept. 14, 2016). In *MyFord*, consumers sued Ford Motor Company, in relevant part, for

22   misleading advertisements about Ford's "MyFord Touch" feature. The advertisements at

23   issue were promotions run on Ford's website and in print brochures, with consumer

24   exposure potentially spanning a two-and-one-half-year period. *Id.* at 21. The court

25   observed that this period was "far from a 'decades-long' campaign . . .[and] is shorter even

26   than the three years of advertising found insufficient in *Mazza*." *Id.* at 21 (quoting *Mazza*,

27   666 F.3d at 586). Furthermore, the court noted the dearth of evidence "as to the proportion

28   of the class that likely saw or were exposed to the website, thus failing to establish that the

United States District Court
Northern District of California

campaign was 'pervasive.'" *Id.* at 21. As for the print brochures, the plaintiffs provided "no evidence about the size, reach, or scope" of the campaign, which was fatal to a reliance presumption. *Id.* at 21.

In contrast, highly targeted, well-orchestrated advertising campaigns may permit an inference of exposure and reliance, even post-*Mazza*. In *Makaeff v. Trump University, LLC*, the plaintiffs alleged that the defendants made false representations in advertisements, mailings, and programs involving Trump University. No. 3:10-cv-0940-GPC-WVG, 2014 WL 688164, at *1 (S.D. Cal. Feb. 21, 2014). According to the plaintiffs, the defendants used an "orchestrated outreach campaign" to entice consumers into various programs, where the marketing materials "uniformly referred to the business as 'Trump University'" and "claimed that Donald Trump was integrally involved." *Id.* at *3. Assessing predominance on the plaintiffs' unfair competition and false advertising claims, the court recognized that the "critical question" for inferring reliance was "whether the putative class members were exposed to the same alleged misrepresentations." *Id.* at *13.

On the one hand, it reasoned, the advertising at issue was "not part of a massive advertising campaign. On the other hand, unlike the limited advertising in *Mazza*, there [was] evidence that the [Trump University] multi-media promotional campaign was uniform, highly orchestrated, concentrated and focused on its intended audience." *Id.* The "targeted, concentrated, and efficient" campaign made it "highly likely that each member of the putative class was exposed to the same misrepresentations." *Id.*; *see also Cohen v. Trump*, 303 F.R.D. 376, 385 (S.D. Cal. 2014) (considering similar claims against Trump University and concluding—though without discussing *Mazza*—that reliance was not subject to individualized proof where "the behavior of plaintiffs and class members [could not] be explained in any way other than reliance upon the defendant's conduct").

Likewise, courts in product-packaging cases frequently distinguish from *Mazza*, inferring that any statement or omission appearing on a product's packaging is highly likely to reach consumers' eyes. *See*, *e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1105–06 (C.D. Cal. 2015) (presuming exposure to an omission

where e-cigarette packaging consistently failed to include certain ingredients); *McCrary v. Elations Co., LLC*, No. 13-cv-00242 JGB (OPx), 2014 WL 1779243, *13 (C.D. Cal. Jan. 13, 2014) ("Defendant does not argue, nor could it, that its clinical proof claims were of limited scope, since it placed them on the packaging of every unit of Elations sold over an 18-month period. The factual dissimilarity of *Mazza* renders it inapplicable"); *Brickman v. Fitbit, Inc.*, No. 3:15-cv-02077-JD, 2017 WL 5569827, at *5 (N.D. Cal. Nov. 20, 2017) ("Fitbit made the same representations about sleep-tracking functionality on every package for every device at issue, and has not demonstrated a significant exposure gap among consumers.").

Further sharpening the point on *Mazza's* reach, the court in *Ehret v. Uber Technologies, Inc.* refused to certify a broad class of consumers, but certified a fragment of the class that had almost certainly been exposed to a misleading advertisement. 148 F. Supp. 3d 884, 899–901 (N.D. Cal. 2015). There, consumers sued Uber Technologies, Inc. over Uber's representation that, as part of its uberTAXI service, it would automatically charge a 20% "gratuity" for its drivers while in fact it kept much of the charge for itself. For a roughly one-year proposed class period, the representation appeared on various pages of Uber's website and blogs, and was included in certain emails sent to consumers. The court found that the website and blog pages "[fell] short of the 'decades-long' advertising campaign in *Tobacco II*, [and] the highly targeted advertising campaign in *Makaeff*." *Id.* at 900. And because the 20% gratuity statement appeared in small corners of Uber's website, drowned out by other information, the court reasoned that, like *Clorox's* back-panel labeling, even visiting Uber's website did not guarantee exposure to the misrepresentation. *Id.* at 900–01. As a further hiccup to showing exposure, the court noted that "individuals may have downloaded the Uber app based on word of mouth" or used the uberTAXI service because they were previous Uber users. *Id.* at 900. Thus, while the court found that "there may have been a consistent misrepresentation" throughout the class period, the plaintiff could not "show that Uber advertised the 20% gratuity in a manner such that there [was] 'little doubt that almost every class member had been exposed' to the

Case No. 16-cv-06822-NC          19

misrepresentation," *id.* (citing *Mazza*, 666 F.3d at 595–96), "or that it was 'highly likely' that each class member was so exposed." *Id.* (citing *Makaeff*, 2014 WL 688164, at *13).

Drawing a line however, the court certified a class of individuals who received certain e-mail advertisements that "specifically and heavily" promoted the uberTAXI service and prominently displayed the 20% gratuity statement. *Id.* at 901. In the emails, the court noted, the uberTAXI service "was not diluted by" information about other services, and "the email featured three bullet points expressly stating that 'the metered fare + 20% gratuity will be charged' to the rider." *Id.* Based on these features, the court reasoned that customers receiving the email "were highly likely to have seen and been exposed to the alleged misrepresentation about the 20% tip," thereby allowing a class-wide inference of exposure. *Id.*

Post-dating all of these cases, the Ninth Circuit took up the issue again in *Hyundai*, 881 F.3d at 703–04. There, the district court had certified a settlement class, in part by finding that the "extensive sweep" of Hyundai's advertising campaign permitted an inference of exposure and reliance. *Id.* at 696. Reviewing the certification, the Ninth Circuit found the district court abused its discretion by permitting this inference without identifying "any evidence in the record regarding the extent of the advertising campaign" for certain car models and without providing "any reasoning regarding how this advertising reached the level of the cigarette advertising campaign" in *Tobacco II*. *Id.* at 704. Thus, *Hyundai* firmly reaffirms *Mazza's* core holding and permits an inference of reliance only in cases where the massive scale of advertising virtually guarantees that all class members have been exposed to an alleged misrepresentation.

In light of this caselaw, the *Tobacco II* presumption of reliance is wholly inapplicable to Plaintiffs' case against Theranos. As an initial matter, all of the cases discussed above deal with representations made to consumers via advertisements or product packaging. Here, we are in the world of securities, with alleged misrepresentations made via press releases, media coverage, and private conversations. But even assuming the product advertising-related caselaw applies to Theranos's self-promotional publicity

campaign, neither the scale nor nature of Defendants' representations warrants a presumption of exposure and reliance.

First, the scale of Defendants' publicity campaign falls far short of the tobacco advertising campaign in *Tobacco II*, and more closely resembles the campaigns found inadequate in *Mazza*, *Clorox, MyFord*, *Ehret*, and *Hyundai*. By Plaintiffs' account, Theranos first "mounted a public campaign to attract media attention" in July 2013, and the fraud was exposed on October 16, 2015. Class Cert. Mot. at 3–6. Thus, at most, Defendants' campaign spanned slightly more than two years. This is comparable to the roughly three-year campaign in *Mazza*, the 16-month advertising campaign in *Clorox*, the two-and-one-half-year advertising period in *MyFord*, the one-year class period in *Ehret*, and the two-year campaign in *Hyundai*. In all of these cases, the courts found the campaigns' scales to be fatally incomparable to the decades-long period in *Tobacco II*, and the Court reaches the same conclusion here.

Beyond temporal scale, Plaintiffs offer little evidence to suggest that the nature of Theranos's publicity campaign warrants a presumption of exposure and reliance. To rehash, the publicity campaign (maximally inclusive of Plaintiffs' evidence and allegations) included:

> Press releases: Spanning July 29, 2013 to August 25, 2016, these releases variously promoted Theranos's luminary board, announced partnerships (e.g., with Walgreens), provided updates on technology developments and regulatory approvals, responded to press stories, and generally promoted the Theranos brand and vision. With few exceptions, the press releases also state or reference Theranos's fundamental claim that it could comprehensively test a small sample of blood. *See* Class Cert. Mot. at 3-6; Am. Compl. ¶¶ 22, 25, 29, 51–53; Kathrein Decl. Ex. Z (ECF 177-6); Perla Decl. Exs. 12–17 (ECF 191-12–191.17).

> Media Coverage: Beginning with the laudatory September 8, 2013, Wall Street Journal article and continuing until the October 16, 2015, Wall Street Journal exposé, the

amended complaint chronicles the many press stories, most glowing, that were published during the heyday of Theranos's rise. *See* Am. Compl. ¶¶ 31–33. As just one example, Plaintiffs point to an October 1, 2014, Business Insider article titled *How One Entrepreneur is Transforming Blood Testing* detailed Holmes's story as a Stanford University dropout and proclaimed that Theranos, through its partnership with Walgreens, could painlessly collect tiny drops of blood for testing. *See* Am. Compl. ¶ 33(q).

Private email communications, many of which leveraged Theranos's favorable publicity to encourage investment. For example, a November 15, 2013, email from Holmes to Iconiq Capital partner Will Griffith includes links to press articles and states, "We're starting to see people all over the country evangelizing Theranos as a solution to healthcare and economic challenges." Kathrein Decl. Ex. I (ECF 217-10); *see also id.* Ex J (ECF 217-11) (Dec. 16, 2013 Holmes email to Theranos Stockholders touting publicity and inviting further investment ); Ex. M (ECF 217-4) (email correspondence containing communications to shareholders referencing the September 8, 2013, Wall Street Journal article).

This campaign does not resemble the one that warranted certification in *Makaeff* (or sub-class certification in *Ehret*) because it is not so "targeted, concentrated, and efficient" that all potential class members can be presumed to have seen it. *Makaeff*, 2014 WL 688164, at *13. An important part of the court's conclusion in *Makaeff* was the "substantial evidence" that class members paid for Trump University seminars for reasons that "track[ed] the advertising and promotional information" and the logical extrapolation that anyone who participated in the programs must have seen the fraudulent ads. *Id.* That is, strong evidence bolstered the assumption that Trump University participants almost necessarily had been exposed to the misrepresentation that Donald Trump was meaningfully involved and that the program was an accredited university.

Plaintiffs' best argument that similar facts exist here is the totality of evidence

suggesting that Defendants were deliberate in the messages they perpetuated through the media, and aggressively pursued private investment by appealing to that publicity. Viewed this way, Defendants' publicity and fundraising campaign appears orchestrated and targeted. In particular, the emails to investors making the alleged misrepresentations and linking to favorable press coverage resemble the emails in *Ehret* that "specifically and heavily" promoted the uberTAXI service and prominently displayed the 20% gratuity statement. 148 F. Supp. 3d at 901.

From this lens, if Plaintiffs were seeking to certify a class of investors who communicated directly with Defendants or even purchased shares directly from Theranos, an inference similar to the one in *Makaeff* and *Ehret* might be warranted. But, crucially, the proposed class here does not include parties who purchased Theranos securities from Theranos; these are *indirect* investors with a degree of separation between them and Defendants. This separation places added importance on alleged misrepresentations that were made publicly, which indirect investors might have seen or heard. But *Mazza* bars a presumption of reliance based on the two-ish years of Theranos publicity alone, so the supplemental influence of Defendants' targeted persuasion is necessary to transform this case into one like *Makaeff*. For indirect investors, any privately-made misrepresentation would have to trickle farther down a network of investors. With the added variables inherent in this game of telephone, the justification for presuming reliance withers.

To be sure, it is entirely possible that most or even all members of the proposed class were exposed to and relied on the allegedly fraudulent Theranos story. But it is also possible that many of the 200+ proposed class members invested for reasons unrelated to Defendants' alleged misrepresentations. It is easy to imagine, for example, that someone invested simply because a friend suggested it, or because all that percolated down the grapevine was vague insight that Theranos was a fast-growing company, or had promising (but unspecified) technology. *Cf Ehret* 148 F. Supp. 3d at 900 (noting that "individuals may have downloaded the Uber app based on word of mouth" or used the uberTAXI service because they were previous Uber users). Plaintiffs have not offered sufficient

1    reason to presume these possibilities away. Proving reliance is therefore something that

2    Plaintiffs will have to do for each class member, and this highly individualized inquiry

3    predominates over issues common to the class.

### ii.   Fraud-on-the-Market Does Not Apply to This Inefficient Market.

6    The second possibility for presuming reliance is the fraud-on-the-market theory.

7    While Plaintiffs do not argue for it, Defendants attack the theory at some length as an

8    argument against common proof of price impact for Plaintiffs' §§ 25400(d) and 25500

9    claim. *See* Opp. at 19–21. The Court discusses the theory here, because it is a method for

10   inferring reliance, not price impact more generally.

11   Arising in the context of federal Rule 10b-5 securities fraud cases, the fraud-on-the-

12   market theory allows a presumption of reliance to avoid imposing impossible evidentiary

13   burdens on class action plaintiffs. The thrust of the theory is this: because "the market

14   price of shares traded on well-developed markets reflects all publicly available

15   information," and because "[a]n investor who buys or sells stock at the price set by the

16   market does so in reliance on the integrity of that price," then an investor who purchases

17   stock in an efficient market has relied on the public information that set the price,

18   including any misrepresentations. *Basic Inc. v. Levinson*, 485 U.S. 224, 242–47 (1988); *see*

19   *also Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 134 S. Ct. 2398, 2408

20   (2014) (reaffirming *Basic*).

21   To invoke the rebuttable presumption of reliance under a fraud-on-the-market

22   theory, Plaintiffs must show that: "(1) that the alleged misrepresentations were publicly

23   known, (2) that they were material, (3) that the stock traded in an efficient market, and (4)

24   that the plaintiff traded the stock between the time the misrepresentations were made and

25   when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2408.

26   Defendants here challenge the third element—whether Theranos stock sold in an

27   efficient market. To determine market efficiency, the Ninth Circuit has endorsed the five-

28   factor test articulated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989). *See*

United States District Court
Northern District of California

*Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). Under this test, the Court considers: "(1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC Registration Form S-3; and (5) whether there are 'empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.' " *Baker v. SeaWorld Entm't, Inc.*, No. 14-cv-2129-MMA (AGS), 2017 WL 5885542, at *9 (S.D. Cal. Nov. 29, 2017) (quoting *Binder*, 711 F. Supp. at 1287).

The *Cammer* factors plainly demonstrate that Theranos stock did not trade in an efficient market. Rather than purchasing stocks traded at high weekly volumes in well-established, fluid markets monitored by market makers and arbitrageurs, Plaintiffs were private investors using private channels to purchase Theranos shares in discrete offerings. Thus, the Court firmly agrees with Defendants that the fraud-on-the-market presumption of reliance cannot apply here, because Theranos securities were not sold in an efficient market. The presumption is also inappropriate here simply because Plaintiffs assert that they and other class members relied, not on a fraud-tainted market price, but on Defendants' alleged misrepresentations themselves.

Because the presumption rejected in *Mazza* and the fraud-on-the-market presumption both do not apply, the Court finds that individualized issues of reliance would predominate over common issues for Plaintiffs' five reliance-based claims. The Court therefore DENIES Plaintiffs' motion to certify a class on counts two through six of the amended complaint: violation of UCL § 17200 claim (which sounds in fraud), fraud and deceit, fraudulent concealment, constructive fraud, and negligent misrepresentation.

### c. Common Issues Predominate Plaintiffs' Market Manipulation Claim.

The sole remaining claim considered for class certification is Plaintiffs' market manipulation claim under California Corporations Code §§ 25500 and 25400(d). Section 25400(d) provides that it is unlawful for a person selling or offering for sale securities "to

make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact." And § 25500 provides that any willful violator of § 25400 is liable to "any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction."

To establish liability under § 25500 for violation of §25400(d), Plaintiffs must show: (1) Defendants sold or offered to sell securities; (2) Defendants made a materially false or misleading statement or omission; (3) Defendants' false statement or omission was made to induce the purchase or sale of securities; and (4) Plaintiffs purchased a security at a price that was affected by Defendants' actions. *See* Cal. Corp. Code §§ 25400(d), 25500. Unlike Plaintiffs' other claims, § 25500 generously "extends liability to all persons affected by market manipulation without requiring reliance or privity." *California Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 109 (2001).

With reliance out of the equation, the elements for a § 25500 market manipulation claim do not demand individualized inquiries. The first three of the elements above probe Defendants' actions and intent, which are subject to common proof. The fourth element—showing Defendants' actions affected the price of the securities Plaintiffs purchased—is subject to common proof under Plaintiffs' theory of the case. Specifically, if Plaintiffs can prove their assertion that Theranos securities would have been valueless absent Defendants' alleged misrepresentations, then any non-zero amount paid for Theranos shares would be "affected by" the alleged market manipulation. Thus, liability could be established class-wide, even though calculating each class member's damages would then require individualized assessment. "[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)," *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013), so common issues predominate the substance of Plaintiffs' § 25500 claim.

The inquiry does not end there, however. Adjudicating Plaintiffs' market

manipulation claim on behalf of a nationwide class requires a determination that variations in state law will not create overwhelming individualized issues. This determination requires the following three-step analysis:

(1) First, out of due process concerns, "the class action proponent must establish that the forum state's substantive laws may be constitutionally applied to the claims of a nationwide class." *Hyundai*, 881 F.3d at 691–92. If they cannot be constitutionally applied, then nationwide certification is not warranted. If they can be constitutionally applied, the analysis proceeds to step two.

(2) Second, using the forum state's choice-of-law rules, the court determines whether only the forum state's substantive laws apply, or whether multiple states' laws apply. *Id.* at 692. If only the forum state's laws apply, then "the representation of multiple states does not pose a barrier to class certification." *Id.* (quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 141 (2d Cir. 2015)). But if multiple states' laws apply, the analysis proceeds to step three.

(3) Third, the court determines whether, in adjudicating the claim under multiple states' laws, common questions will predominate over individual issues, and "whether litigation of a nationwide class may be managed fairly and efficiently." *Id.*

Applying this three-step test and California's choice-of-law rules, the Court finds Defendants have not satisfied their burden of establishing that multiple states' laws rightfully apply here. Thus, as only § 25500 need apply, individualized issues arising from conflicting state laws do not defeat predominance.

### i. Step One: California Has Sufficient Contact with Plaintiffs' Claims.

"Under California's choice of law rules, the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza*, 666 F.3d at 589 (quoting *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 921 (2001). This requirement is readily

United States District Court
Northern District of California

satisfied here, because Theranos's headquarters are in California, approximately one fourth[6] of putative class members are California residents, and many of Defendants' alleged misrepresentations (e.g., Theranos press releases) emanated from California. *See Mazza*, 666 F.3d at 590 (finding "California [had] a constitutionally sufficient aggregation of contacts to the claims of each putative class member . . . because Honda's corporate headquarters, the advertising agency that produced the allegedly fraudulent misrepresentations, and one fifth of the proposed class members are located in California"); *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 978 (N.D. Cal. 2017) (finding California had constitutionally sufficient contacts over a nationwide class's California Cartwright Act claims where the defendant's principal place of business was in California, the defendant "made business decisions related to its anticompetitive conduct in California," and "negotiated the licenses at issue in California").

Thus, Plaintiffs have satisfied their step-one burden of showing that California law may constitutionally be applied to all class members' claims.

### ii. Step Two: California's Choice-of-Law Rules Do Not Reveal a Foreign State Interest Superordinate to California's.

Once the class action proponent demonstrates that application of California law is constitutional, "the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Mazza*, 666 F.3d at 589–90 (quoting *Wash. Mutual*, 24 Cal. 4th at 921). California law applies on a class-wide basis only if other states' interests do not outweigh California's interest in having its law applied. *Id.* at 590. This determination requires yet another three-step test, probing governmental interest:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.
>
> Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular

---

[6] "[A]t least 60" out of over 200. Reply Br. at 14 n.57.

case to determine whether a true conflict exists.

Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Id.* (quoting *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 81–82 (2010)).

The Court finds that, while Defendants have pointed in broad strokes to material differences between states' market manipulation laws, they have not met their burden of showing that other jurisdictions have an interest in the application of their laws to Plaintiffs' claims that outweighs California's interest in the application of § 25500.

### 1.  Affected Jurisdictions' Laws Differ.

On the first step of California's choice-of-law rules, the Court finds that Defendants have met their burden of showing that §§ 25400(d) and 25500 differ from other states' securities laws, though only insofar as some states do not have a specific market manipulation provision. For example, states like Colorado that adopted the 1956 version of the Uniform Securities Act do not have a specific market manipulation provision. *See* Colo. Rev. Stat. § 11-51-103 to 11-51-1008; *People v. Terranova*, 563 P.2d 363, 365 (Colo. App. 1976) (recognizing Colorado's adoption of the Uniform Securities Act). And states like Idaho that enacted the 2002 version of the Uniform Securities Act similarly do not have a market manipulation provision, although § 501 of the 2002 version is considered to reach market manipulation claims in the same way that federal Rule 10b-5 does. *See* Idaho Code Ann. § 30-14-501 (West) ("Because Section 501, like Rule 10b-5, reaches market manipulation, [citation] this Act does not include the RUSA market manipulation Section 502, which had no counterpart in the 1956 Act.") (citing 8 Louis Loss & Joel Seligman, Securities Regulation Ch.10.D (3d ed. 1991)). Rule 10b-5 has a reliance element, including for market manipulation claims. *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) ("Regardless of whether a § 10(b) plaintiff

*United States District Court*
*Northern District of California*

alleges a misrepresentation, omission, or [market] manipulation, he must plead and prove . . . reliance . . .") (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006)).

Based on these divergences in uniform law adoption, it is reasonable to conclude California's market manipulation laws are among the most permissive. By not requiring reliance or privity, plaintiffs suing under § 25500 have to prove less than, say, plaintiffs suing under state laws mirroring Rule 10b-5. Because Defendants do not present state law variations in any finer detail, the Court simply considers more broadly whether applying § 25500 to a nationwide class would create a conflict between California and states with more restrictive market manipulation laws (e.g. nonexistent or requiring reliance).

## 2. Other States' Interests Do Not Conflict with California's.

To determine each state's interest under the second step California's choice-of-law rules, the Court looks once again to *Mazza*. In *Mazza*, the Ninth Circuit was fundamentally concerned with states' right to calibrate "the optimal balance between protecting customers and attracting foreign business." 666 F.3d at 591. The business protection concern was salient in *Mazza*, because Honda sold its vehicles to the class members (through its authorized dealerships) in multiple states. *Id.* at 589.

As applied to Theranos, it is less clear what foreign state interests are threatened by applying § 25500 to Plaintiffs' claims. First, regarding consumer protection, the generous scope of § 25500 would increase out-of-staters' ability to recover against alleged market manipulation emanating from California. So it is unlikely any states' consumer protection interest would be impinged by applying § 25500. And in terms of attracting business (or otherwise promoting favorable in-state business conditions), other states have no in-state defendant to protect (or attract) because Theranos is a California corporation and was seeking investments, not business opportunity.

The court in *In re Qualcomm* made a similar observation for class claims under California law permitting treble damages for successful antitrust plaintiffs. 292 F. Supp. at

979–80. Noting that states have an interest in protecting resident defendants from excessive financial burdens, the court found this interest did not apply "[w]hen the state 'has no defendant residents to protect.'" *Id.* (quoting *Hurtado v. Superior Court*, 522 P.2d 666, 672 (1974)). By the flip side of the same coin, the court found a state "has no interest in denying full recovery to its residents injured by [out-of-state] defendants." *Id.* (quoting *Hurtado*, 522 P.2d at 670) (alteration in original); *see also Munguia v. Bekins Van Lines, LLC*, No. 11-cv-01134-LJO, 2012 WL 5198480, at *10 (E.D. Cal. Oct. 19, 2012). The same logic applies here.

In sum, the Court cannot find (and Defendants do not provide) state interests that would be compromised by applying § 25500 to a nationwide class action against Theranos. Thus, the Court need not reach the third step of California's governmental interest test, which balances conflicting state interests against each other.

Similarly, the Court does not reach the third step of the larger state interest predominance test, because "the representation of multiple states does not pose a barrier to class certification" on Plaintiffs' § 25500 claim. *Hyundai*, 881 F.3d at 692 (quoting *Johnson*, 780 F.3d at 141). Individual state law issues do not predominate Plaintiffs' market manipulation claim.

### d.  Predominance Summary

Thus, to summarize the predominance analysis: there are overarching red flags for all of Plaintiffs' claims regarding differences in stock and the existence of legal releases; reliance creates highly individualized issues for five of Plaintiffs' claims; but neither individualized elements of proof nor individualized state law issues predominate Plaintiffs' market manipulation claim.

This returns the analysis to the second part of Rule 23(b)(3): superiority.

### 2.  Superiority: Class Treatment Is Not Superior for Plaintiffs' § 25500 Claim.

Having established that individualized issues predominate for five of Plaintiffs' six claims, and that common issues predominate for Plaintiffs' § 25500 claim, the final

Case No. 16-cv-06822-NC                31

question is simply a microcosm of the larger class certification analysis: Is class treatment of Plaintiffs' market manipulation claim superior to adjudicating class members' claims individually? The answer is no, because the marginal efficiencies of class treatment on this sliver of Plaintiffs' case do not surmount the lingering uncertainties in managing the proposed class.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. Making this determination involves a comparative analysis of alternatives and consideration of the nonexhaustive factors enumerated in Rule 23(b). *Id.* Those factors are: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

In this case, like many, the alternative to class certification would be permitting individual actions by putative class members against Defendants. Considering the Rule 23(b) factors, the Court is persuaded that individual actions, rather than a class action, is the superior method of adjudicating Plaintiffs' § 25500 claim. There are three reasons: (1) class members' claims are viable individually; (2) the likelihood of individual reliance-based claims undermines the efficiency of class treatment; (3) uncertainties remain regarding the class definition, typicality and predominance, and class counsel.

### a.   Individual Claims Are Viable.

First, class certification is not necessary to allow individual class members to pursue their claims. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). For example, in *Hanlon*,

1   the Ninth Circuit found that class treatment was the superior alternative when individual

2   actions would be for "a small amount of consequential damages"—the cost of replacing a

3   car door latch—and where the relevant burdens of proof were nearly impossible to meet

4   through individual actions. 150 F.3d at 1023. Conversely, large individual claims

5   susceptible to individual proof weigh against certification. *See*, *e.g.*, *Cole v. Gene by Gene,*

6   *Ltd.*, 322 F.R.D. 500, 508 (D. Alaska 2017) (finding an individual claim for $100,000

7   "weigh[ed] strongly against class certification"); *Stoudt v. E.F. Hutton & Co.*, 121 F.R.D.

8   36, 38 (S.D.N.Y. 1988) (finding superiority was defeated where the plaintiff "possesse[d]

9   sufficient wealth to benefit from a tax shelter and [sought] recovery in the amount of 'at

10  least' $60,000").

11          Here, individual claims would entail parties sophisticated enough to navigate early-

12  phase investment in a private biotechnology startup, with claims that range from $15,000

13  to as much as $17,350,200. *See* Kathrein Decl. Exs. CC–FF (ECF 177-7). These facts

14  resemble those in *Cole* and *Stoudt* and contrast with the near-worthless individual claims

15  in *Hanlon* and other low-value claim cases. *See*, *e.g.*, *Westfall v. Ball Metal Beverage*

16  *Container Corp.*, No. 16-cv-02632-KJM-GGH, 2018 WL 705534, at *7 (E.D. Cal. Feb. 5,

17  2018) (considering employment claims based on $29-per-hour wages and concluding that

18  the "relatively small individual claims . . . do not make individual litigation attractive or

19  sustainable").

20          Thus, the large dollar values of the indirect investors' claims, belonging to

21  sophisticated parties, shows that individual actions are a logistically and economically

22  viable alternative to class treatment.

23                      **b.   Fraud Claims Must Be Brought Individually.**

24          Second, certifying a narrow class hardly increases efficiency since class members

25  would still need to bring their fraud claims individually. Even if the Court were to certify a

26  class for Plaintiffs' market manipulation claim, any class member wishing to pursue a

27  reliance-based fraud claim against Theranos would nonetheless have to bring an individual

28  action. So while there is some efficiency to be gained by determining in one fell swoop

whether Defendants made intentional misrepresentations that inflated securities prices, doing so on top of class members' individual fraud claims is a net inefficiency. This weighs for permitting individual control over all claims.

### c.   Overarching Uncertainties Defeat Superiority.

Finally, and most importantly, the persistent weaknesses in other facets of Plaintiffs' motion for class certification demonstrate that a class action is inferior to individual actions. The Court noted repeatedly throughout this analysis its concerns regarding the class definition, class counsel's failure to timely provide appropriate class representatives, variations in the types of stock investors purchased, and the existence of releases. These concerns' additive power is persuasive.

The decision whether to certify Plaintiffs' market manipulation claim is a close one. The proposed class satisfies Rule 23(a)'s prerequisites—though barely—and the Court determined that common issues predominate this claim. But on balance, the marginal benefits of certifying this narrow class do not outweigh the class's overall weaknesses. Nor do they justify contending with the significant complications likely to arise if a class were certified and a concern like stock liquidation preferencing came to fruition. Thus, as a whole, the totality of factors show that class treatment is not superior to individual actions. Plaintiffs' class certification motion is DENIED.

## IV.  Conclusion

Because individualized issues of reliance predominate the bulk of Plaintiffs' claims, and because weaknesses in the proposed class outweigh the marginal benefits of certifying the remaining market manipulation claim, the Court DENIES Plaintiffs' motion for class certification.

**IT IS SO ORDERED.**

Dated: May 31, 2018                    _____
                                                        NATHANAEL M. COUSINS
                                                        United States Magistrate Judge