Joshua Koltun (Bar No. 173040)
Attorney
1 Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Non-Party Jigsaw Productions, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE

| | |
|---|---|
| ROBERT COLMAN and HILARY TAUBMAN-DYE, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>THERANOS, INC., ELIZABETH HOLMES, and RAMESH BALWANI,<br><br>          Defendants. | Case No.:  5:16-cv-06822-NC<br><br>**MOTION TO INTERVENE OF NONPARTY JIGSAW PRODUCTIONS IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER**<br><br>Date:        Off Calendar per ECF 239<br>Judge:      Hon. Nathanael Cousins<br>Courtroom: 7, 4th Floor<br><br>Filed herewith:<br><br>Declaration of Alex Gibney<br>Declaration of Erica Cheung<br>Request for Judicial Notice<br>Proposed Order |

Joshua Koltun ATTORNEY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joshua Koltun ATTORNEY

*TABLE OF CONTENTS*

TABLE OF AUTHORITIES ................................................................................................ iii

CORPORATE DISCLOSURE UNDER FRCP 7.1 .................................................................. v

NOTICE OF MOTION AND MOTION TO INTERVENE ...................................................... 1

STATEMENT OF RELIEF SOUGHT ..................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

SUMMARY ............................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 2

PROCEDURAL BACKGROUND ........................................................................................... 6

ARGUMENT ........................................................................................................................... 8

I.      Jigsaw Should Be Permitted to Intervene for the Limited Purpose of Opposing Defendant's
        Motion for Protective Order and to Seek Removal of Confidentiality Designations ................... 8

II.     The "Good Cause" Standard for Protective Orders Incorporates First Amendment Concerns;
        Although Scrutiny is Not as Strict as for Judicial Records, It Is Nevertheless Robust ................. 8

        A. The Proponent has the Heavy Burden to Show that a "Particularized Harm Will Result from
           the Disclosure" ......................................................................................................................... 10

           1.    The Burden of Showing "Particularized Harm" Cannot Be Met Merely By Showing
                 that One's Opponent Intends to Disseminate Material to the Media ....................... 10

           2.    Allegations of Third Party Interests Are Subject to the Same Strict Burdens ........... 11

           3.    The Particularized Showing Must be that Disclosure Will Cause a Sufficient
                 Incremental Impact ........................................................................................................ 12

           4.    The Generic Premise that Videotapes Are Inherently Likely to Cause Harm is
                 Unsound ........................................................................................................................... 12

        B. Even if a Sufficient Showing of Particularized Harm Has Been Made, that Harm May Be
           Outweighed by Legitimate Public Interest in Those Facts or Allegations ......................... 14

        C. If the Balance of Private and Public Interests Tips In Favor of Disclosure, the Court Must
           Ensure that the Protection is Narrowly Tailored to Redact Only So Much of the Discovery
           Material As Necessary ............................................................................................................. 16

III.    Defendants have Failed to Show "Good Cause" to Modify the Existing Protective Order to Bar
        Dissemination of All Materials (or of Videotapes) to the Media or General Public, or to Relieve

Defendant's of Their Immediate Duty to Make Sparing and Surgical Confidentiality Determinations. ....................................................................................................16

A. Defendants Sole Showing -- that Plaintiff Wishes to Disseminate Videotapes to the Media – Cannot Be a Sufficient Showing of "Particularized Harm" ..................................16

B. Disclosure of Testimony that Substantially Supports the Public Allegations at the Heart of this Case Would Not Constitute a Sufficient Showing of Harm ........................................17

C. The Intense Public Interest in This Matter Outweighs any Harm ............................................17

D. Defendants Have Not Shown any Third Party Privacy Interest that Warrants Protection......20

E. Defendants Cannot Claim to Have Relied Upon a Protective Order that Expressly Told Them Not to Do What They Did ........................................................................................................21

IV.  Any Remaining Legitimate Concerns Should Be Handled By Surgical Redactions or Other Measures To Protect Privacy..........................................................................................................22

CONCLUSION....................................................................................................................................22

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

### TABLE OF AUTHORITIES

*CASES*

*Beckman*,
   966 F.2d a (9th Cir. 1992) ............................................................................... 9

*Constand v. Cosby*,
   112 F. Supp. 3d 308 (E.D. Pa. 2015) ............................................. 15, 18, 19

*Felling v. Knight*,
   211 F.R.D. 552, (SD Ind. 2003) .................................................................. 15

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20, (1984) ...................................................................................... 9

*Flaherty v. Seroussi*,
   209 F.R.D. 295 ............................................................................................ 17

*Foltz v. State Farm Mut. Auto Ins. Co.,* 331 F.3d 1122 (9th Cir. 2003) ...............................9, 11, 21-22

*Harmon v. City of Santa Clara*,
   323 F.R.D. 617, 624-625 (N.D. Cal. 2018) ................................ 11-12, 12, 15, 18, 19, 20

*Humboldt Baykeeper v. Union Pac. R.R.*,
   244 F.R.D. 560 (N.D. Cal. 2007) ................................... 9, 10, 11, 12, 15, 20

*In re CBS*,  828 F.2d 958 (2d Cir. 1987) .................................................... 14, 15

*In re Roman Catholic Archbishop*, 661 F.3d 417, 424 (9th Cir. 2011)  ...... 9, 10, 11, 12, 13, 14, 16, 21

*Lopez v. CSX Transp. Inc*, 2015 WL 375643, (W.D. Pa June 16, 2015) ............................................ 11

*Low v. Trump Univ.* No. 3:10-cv-0940-GPC-WVG,
   2016 U.S. Dist. LEXIS 101329 (S.D. Cal. Aug. 2, 2016) ...................................... 13, 14

*Phillips v. GMC*,
   307 F.3d 1206 (9th Cir. 2002) ............................................................ 8, 9, 10

*Pia v. Supernova Media, Inc.*,
   275 F.R.D. 559 (D. Utah 2011) ............................................................. 11, 17

*Public Citizen v. Liggett Group*, 858 F.2d 775 (1st Cir. 1988) ......................... 9

*Sampson v. City of El Centro*,
   No. 14cv1807-L (DHB), 2015 U.S. Dist. LEXIS 188854 (S.D. Cal. Aug. 31, 2015) ... 9,11, 15, 16, 21, 22

*San Jose Mercury News, Inc. v. United States Dist. Court*,
   187 F.3d 1096 (9th Cir. 1999) ................................................................. 8, 10

*Schiller v. City of N.Y.*,
   2007 U.S. Dist. LEXIS 32746 (S.D.N.Y. May 4, 2007) ................................ 8, 12, 13

*Todd v. Tempur-Sealy Int'l, Inc.*,
    No. 13-cv-04984-JST (MEJ), 2015 U.S. Dist. LEXIS 27803 (N.D. Cal. Mar. 6, 2015) ......... 12, 17

*United States ex rel.* Franklin *v. Parke-Davis*,
    210 F.R.D. 257 (D. Mass. 2002) .............................................................................. 8, 21

*Valley Broadcasting Co. v. United States Dist. Court*,
    798 F.2d 1289 (9th Cir. 1986) .............................................................................. 13, 14

**STATUTES**

Cal. Civ. Code § 3344 ........................................................................................... 20

**RULES**

*Fed.R.Civ.P.* 26(c) ...................................................................................... *passim*

Joshua Koltun ATTORNEY

## *CORPORATE DISCLOSURE UNDER FRCP 7.1*

Jigsaw Productions does not have a parent corporation.  Kew Media Group, a Canadian public company, owns more than 10% of its stock.

Jigsaw Motion to Intervene                                                                                    16-cv-06822-NC

*Joshua Koltun* ATTORNEY

### *NOTICE OF MOTION AND MOTION TO INTERVENE*

TO PLAINTIFF ROBERT COLMAN and HILARY TAUBMAN-DYE, individually and on behalf of all others similarly situated, and DEFENDANTS THERANOS, INC., ELIZABETH HOLMES, and RAMESH BALWANI, and their COUNSEL OF RECORD: PLEASE TAKE NOTICE that as soon as counsel may be heard,[1] in Courtroom Four of this court, located at 280 South 1st Street, San Jose, Nonparty Jigsaw Productions ("Jigsaw") will appear and move the Court to allow it to intervene in this matter for the limited purpose of opposing Defendant's Motion for a Rule 26(c) Protective Order.  This motion is based upon the Memorandum of Points and Authorities that follows, on the Declarations of Alex Gibney, Erika Cheung, and the Request for Judicial Notice, on all the pleadings, records and files in this case, and on such further material and argument as may be submitted at or before the hearing on this motion.

### *STATEMENT OF RELIEF SOUGHT*

Nonparty Jigsaw Productions respectfully requests this Court to (i) allow Jigsaw to intervene for the limited purpose of opposing Defendant's Motion for a Rule 26(c ) Protective Order, (ii) Deny the Motion for a Rule 26(c ) Protective Order, (iii) deny Defendant's overbroad wholesale designations, or (alternatively) order Defendants expeditiously to comply with the terms of this Court's existing Protective Order.

### *MEMORANDUM OF POINTS AND AUTHORITIES*

### *SUMMARY*

Defendant's motion rests primarily on two erroneous premises.  The first is that it is "improper" to share discovery materials with the public.  The Ninth Circuit has repeatedly held the exact opposite. In the absence of a showing of "good cause," a party is free to disseminate discovery materials.  This Court entered a stipulated Protective Order, based on this Court's model Protective Order, which reminded the parties that discovery materials were subject to "public disclosure" and

---

[1] Ordinarily, under these procedural circumstances, counsel would set this matter to be heard at the same time as the underlying motion that the [proposed] intervenor seeks to oppose.  However, since the underlying motion has been taken off calendar by order of the Court (ECF 239), counsel assumes that this motion to intervene may only be scheduled for hearing at the discretion of the Court.  Jigsaw requests that in the event that a hearing is scheduled on the Motion for Protective Order, this Motion to Intervene be heard at that hearing as well.

commanded them to be cautious and sparing in designating any materials that they contend deserved different treatment.  Defendants flagrantly disregarded the order and designated everything "Confidential."  They now ask this Court to retroactively bless their misconduct, on the mistaken premise that Plaintiff revealed its purportedly "improper" willingness to share videotapes with an award-winning documentary filmmaker interested in this case.

If they cannot obtain this Court's blessing for wholesale confidentiality designations (pending filing of documents), Defendants ask that the Court bar the sharing of videotapes, arguing that the law treats videotapes and transcripts differently.  Again, the Ninth Circuit has specifically held that there is no such rule, and has rejected similar technophobic assertions as "speculative."

Moreover, under the Ninth Circuit tests, even if Defendants had made a showing of "particularized harm," this Court would still have to decide whether the public interest in this matter would outweigh any assertions of harm.  As this Court has recognized, there is great public interest in this matter that has been further intensified by the SEC charges and settlements.  Defendant's burden to show particularized harm that would outweigh that interest was heavy.  Instead of even attempting to meet it, Defendants have made no showing at all.  Their motion therefore must be denied.

### *FACTUAL BACKGROUND*

Defendant Theranos, Inc. is a private life sciences company founded in 2003 by defendant Elizabeth Holmes. Theranos purported to have developed proprietary technology that would allow commercial pharmacies to run a multitude of highly accurate blood tests from a few drops of a patient's blood.  Beginning in 2013, Theranos began an extensive advertising campaign and concluded a contract with Walgreens to promote its technology.

From 2013 to 2015, Holmes and other Theranos spokespersons gave dozens of interviews and distributed numerous press releases discussing the groundbreaking possibilities of their technology. (This brief will refer to media reports, not for the truth of facts stated therein, but because these media reports are themselves relevant on issues that will be discussed in the legal argument).  The media attention to the purported revolution in public health was quite intense.  Holmes appeared on the covers of *Fortune* and *Forbes* and was interviewed and profiled by *Vanity Fair* and the *New Yorker,* among many other publications. Answer to FAC, ECF 175 ¶ 31-33.  Numerous media outlets repeated

Theranos' claims that, with its technology, a tiny "nanotainer," small enough to balance on one finger, it was able to, as the Wall Street Journal repeated, quickly "run any combination of tests, including sets of follow-on tests." Request for Judicial Notice ("RJN,"), ¶1, Exh. A.

Theranos recruited a Board of Directors that included many public figures such as Secretary of State George Schultz, and engaged prominent attorney David Boies.  Secretary Schultz publicly repeated Theranos' claims about its technologies' astonishing capabilities.  ECF 217-24 at 3 (Shultz, interviewing Holmes at Stanford "Summit": "where our system is deploying pretty fully, that is a concrete example of what happened to prices."  Holmes: "Sure, we offer our tests at 50 – 90 percent off of Medicare's reimbursement rates.  … That's something that people can afford.").

Several former employees of Theranos have testified that, while Theranos was making these public statements, they became concerned that the technology was not performing as represented.  ECF138-8 at, 87:10-24 ("everyone was concerned that we weren't giving patients the right results") 138-9 at 15:23-16:7 (Erika Cheung resigned over issues of "quality control" and "accuracy of patient samples" and testing protocols).  They also testified that they were threatened with legal action by David Boies and that Theranos demanded that Schultz sign a nondisclosure agreement.  ECF 138-8 at 23:2-17; ECF138-9 at 11:19-24.  (Testimony quoted herein are public portions of the testimony that have been filed in the docket of this Court and unsealed by order of this Court.  Defendants object to de-designating even the portions of the video depositions that correspond to the public portions of the transcript).

Meanwhile, John Carreyrou, a reporter for the *Wall Street Journal,* was pursuing a story on whether Theranos' "revolutionary" technology actually worked.  In his recently published book, *Bad Blood,* Carreyrou alleges that after Theranos learned of the *Journal* investigation, it sent a delegation including Boies and Theranos' general counsel to the *Journal's* offices. RJN, ¶ 2, Exh. B.  In that meeting, Carreyrou said, Theranos denied the allegations that its technology did not work but insisted that they could not discuss details because the details were "trade secrets."  *Id.*  The *Journal* was told that "we do not consent to your publication of our trade secrets."

On October 15, 2015, the *Wall Street Journal* published an article titled "Hot Startup Theranos Has Struggled With Its Blood-Test Technology; Silicon Valley lab, led by Elizabeth Holmes, is valued

Joshua Koltun ATTORNEY

at $9 billion but isn't using its technology for all the tests it offers." RJN, ¶3 , Exh C. The article

questioned the viability of Theranos' technology. It reported that Theranos ran all but a small fraction

of its tests on conventional machines and that irregularities in the way Theranos tested the accuracy of

its devices raised serious doubts as to the devices' reliability. *Id.*

Theranos immediately issued a press release emphatically denying the story:

> Today's Wall Street Journal story about Theranos is factually and scientifically erroneous and
> grounded in baseless assertions by inexperienced and disgruntled former employees and
> industry incumbents.
> …
> Theranos' products and services have proven accurate and reliable for tens of thousands of
> satisfied customers through millions of tests and experiences and in ongoing review by our
> various regulators.

RJN, ¶ 4, Exh. D.

However, in a press release a few days later Theranos disclosed that the FDA had, a month

earlier, warned it that the nanotainer was an "uncleared medical device" that it was unlawfully

shipping, and that Theranos had stopped shipping it. RJN, ¶ 5, Exhs E & F.

Various regulators began to issue subpoenas to Theranos, including the United States Justice

Department (DOJ) The U.S. Securities and Exchange Commission (SEC), The Centers for Mfedicare

and Medicaid Services (CMS) and the Food and Drug Administration (FDA). Answer to FAC, ECF

175, ¶ 66.

After inspecting Theranos' Newark, CA laboratory, CMS notified Theranos of various

deficiencies and that the laboratory was "not in compliance," and that "the deficient practices  of the

laboratory pose immediate jeopardy to patient health and safety." RJN, ¶ 6, Exh. G. CMS later

rejected Theranos' attempts to correct the deficiencies, and "determined that the laboratory's

submission does not demonstrate that the laboratory has come into Condition-level compliance and

abated immediate jeopardy." RJN, ¶ 7, Exh. H.  In July 2017 CMS imposed sanctions that essentially

shut down Theranos' laboratory and banned Holmes, Balwani and Theranos from operating a

laboratory for two years. RJN, ¶ 8,  Exh. H.  A few months later Theranos announced that it was

closing all of its clinical laboratories and patient testing centers.  Answer to FAC, ¶ 79.

Joshua Koltun ATTORNEY

In March of this year the SEC filed a complaint in this Court against Defendants, and simultaneously announced that they had reached a settlement with Theranos and Holmes, who had neither admitted nor denied wrongdoing. RJN, ¶ 9, Exh. J.  Holmes agreed, among other consequences, to pay $500,000 in penalties to the SEC, relinquish control of the company, and be barred from serving as an officer or director of a public company for 10 years.  *Id.*  In a press release, the SEC summarized the charges as follows:

> Theranos, Holmes, and Balwani made numerous false and misleading statements in investor presentations, product demonstrations, and media articles by which they deceived investors into believing that its key product – a portable blood analyzer – could conduct comprehensive blood tests from finger drops of blood, revolutionizing the blood testing industry.  In truth … Theranos' proprietary analyzer could complete only a small number of tests, and the company conducted the vast majority of patient tests on modified and industry-standard commercial analyzers manufactured by others.
> . . .
> "The Theranos story is an important lesson for Silicon Valley," said Jina Choi, Director of the SEC's San Francisco Regional Office.  "Innovators who seek to revolutionize and disrupt an industry must tell investors the truth about what their technology can do today, not just what they hope it might do someday."

*Id.*

The media has been intensely interested in reporting on Theranos' downfall.  *See, e.g.,* RJN, ¶ 10 , Exh. J, *see also* ECF 213 at 4-5 (noting "intensified" public interest in light of SEC charges and settlement).  For example, Theranos was recently featured in a 60 Minutes segment entitled "the Theranos Deception," featuring, among other things, interviews with Tyler Schultz.  RJN, ¶ 11, Exh. M.  In response to the segment, Theranos issued the following statement:

> We believe the story was misleading and incomplete, in part because it relied on sources who were not with the Company for long and lacked the experience to speak to the points they made. More important than the numerous factual inaccuracies, however, is the overall misimpression of Theranos that the story left.  Like many startups, Theranos began with grand ambitions. We had a complex goal to improve medical testing across a range of technologies, from software to chemistries to devices. In hindsight, we made progress but did not meet all of our expectations.

RJN, ¶ 12, Exh. M.

Joshua Koltun ATTORNEY

### *PROCEDURAL BACKGROUND*

In October 2017 the parties in this case submitted a stipulated protective order, apparently adopting without change this Court's model order, and this Court entered the Order.  ECF 62.

The first sentence of the Order is: "Disclosure and discovery activity in this action are likely to involve production of ***confidential, proprietary, or private*** information for which ***special*** protection from public disclosure and from use for any purpose other than prosecuting this litigation ***may*** be warranted".  Section 1 (emphasis added).  "The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles." *Id.*

The Order provided that the "Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards."   The designating party "must designate for protection only those parts … that qualify … so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order."  Section 5.1. "Mass, indiscriminate, or routinized designations are prohibited."  Id.

"Where it is impractical to identify separately each portion of testimony that is entitled to protection," the designating party can invoke on the record its right to take 21 days to make such designations.  Section 5.2 (b).

Any party may challenge a designation, and it does not waive its right to do so by electing not to do so promptly.  Section 6.1.  If after meeting and conferring, the parties cannot resolve a challenge, the designating party has the burden to file a motion "to retain confidentiality," and the burden of persuasion shall be on the designating party.  Section 6.3.

Defendants didn't do any of that.  Instead, they produced all depositions designated, in their entirety, either Confidential, or Highly Confidential (Defendants refer to these as "the Contested Depositions," but it actually is all the depositions).  Smith Decl., ¶ 1.  Defendants took the position that they could do so, and that all material in these depositions would be protected.  *Id.,* ¶ 3. Defendants chose to review and consider de-designating only such materials as Plaintiff chose to file

1   in Court.  *Id.*  According to Defendants, "there is no reason Defendants should expend substantial

2   resources" to reconsider its blanket designations, "absent a pressing need," i.e. when Plaintiff is filing

3   with the Court, "particularly given Theranos' current financial condition."  Motion at 13.

4        Alex Gibney is a well-known journalist and a documentary filmmaker.  Jigsaw Productions

5   ("Jigsaw") is his production company.  Gibney Decl., ¶1.  His films have won numerous awards and

6   significant recognition. *Id.*  He is preparing a feature-length documentary about Theranos. *Id., ¶*2.

7   The central focus of the documentary is to explore how Theranos, once valued at $9 billion, could

8   later be cited as a "massive fraud" by the SEC, a Silicon Valley tale that was too good to be true.  The

9   untitled documentary will examine how this could have happened and who is responsible, while also

10  exploring the psychology of deception.  *Id.*

11       As part of his investigation seeking answers to these questions, Gibney approached plaintiffs

12  counsel, Reed Kathrein, and requested copies of any videotapes of depositions.  *Id., ¶*3.  Kathrein

13  informed him that although Plaintiffs were willing to share such videotapes, Defendants had

14  designated them Confidential in their entirety.  *Id.*  Thus Kathrein could not share the depositions

15  unless and until Defendants removed the designations or the designations were removed by Court

16  order.  *Id.*  Gibney responded by addressing a *pro se* letter to the Court directly about the situation.

17  ECF 212.  Although Gibney did not have the benefit of counsel in drafting that letter, and to some

18  extent misunderstood the procedural posture and legal framework at issue, he effectively preserved his

19  rights and put the parties on notice of his interest in the matter.

20       Kathrein formally invoked Section 6.2 of the Protective Order on May 4, asking that

21  Defendants "review the deposition transcripts, exhibits and video ... and provide specific

22  confidentiality designations, rather than mass designations."  ECF 225-4.  To clarify, Jigsaw is

23  actually requesting a subset of 11 videos, not all of them.  Gibney Decl., ¶ 4, *see also* ¶5 (5 potential

24  future depositions).

25       Defendants responded to Plaintiff's request with the instant motion, asking for a new

26  protective order that would "preclude[ any Party] from using any discovery produced in this Action

27  for any purpose other than litigating the merits of their claims in this Action, and from filing

28  deposition video with the Court absent the Court's prior approval," and deferring "adjudication of

Joshua Koltun ATTORNEY

Defendant's confidentiality designations of deposition transcripts produced in this Action … until those confidentiality designations bear on the litigation of the merits of Plaintiff's claims."  Proposed Order, ECF 225-6.

### *ARGUMENT*

### I.      *Jigsaw Should Be Permitted to Intervene for the Limited Purpose of Opposing Defendant's Motion for Protective Order and to Seek Removal of Confidentiality Designations*

Since "the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public," a media company may intervene to argue on behalf of the public that there was no "good cause" for denying it access to the discovery materials.  *San Jose Mercury News, Inc. v. United States Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999).  *United States ex rel. Franklin v. Parke-Davis*, 210 F.R.D. 257, 257-58 (D. Mass. 2002) (in case involving claims that defendant made false claims in connection with the marketing and sale of its drug, media entities must be permitted to intervene to argue against claims by defendant that protective order barred dissemination to the media of nonprivileged documents); *Schiller v. City of N.Y.*, 2007 U.S. Dist. LEXIS 32746, at *3-4 (S.D.N.Y. May 4, 2007) (newspaper may intervene to lift confidentiality designations on documents concerning police "intelligence gathering").

Thus Jigsaw, as a documentary film producer, may assert its own and the public's rights to access to discovery materials – in particular videotapes – that Plaintiffs have indicated they are willing to share.

### II.     *The "Good Cause" Standard for Protective Orders Incorporates First Amendment Concerns; Although Scrutiny is Not as Strict as for Judicial Records, It Is Nevertheless Robust*

"Generally, the public can gain access to litigation documents and information produced during discovery unless the party opposing disclosure shows 'good cause' why a protective order is necessary." *Phillips v. GMC*, 307 F.3d 1206, 1210 (9th Cir. 2002) (citing *San Jose Mercury News*, 187 F.3d at 1103); *accord In re Agent Orange" Product Liability Litig*., 821 F.2d 139, 145 (2d Cir. 1987) ("[I]f good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public.")

1        This presumption that materials obtained in discovery may be disseminated to the public –

2   absent a showing of good cause to the contrary -- is grounded in the First Amendment. *Seattle Times*

3   *Co. v. Rhinehart*, 467 U.S. 20, 31-32, (1984) ("It is, of course, clear that information obtained through

4   civil discovery authorized by modern rules of civil procedure would rarely, if ever, fall within the

5   classes of unprotected speech identified by decisions of this Court, …there certainly is a public

6   interest in knowing more about respondents, [which] may well include most -- and possibly all -- of

7   what has been discovered;" however First Amendment interests are insufficient to negate protective

8   order supported by "good cause"[2]); *Public Citizen v. Liggett Group*, 858 F.2d 775, 780 (1st Cir. 1988)

9   ("Indeed, the Supreme Court has noted that parties have general first amendment freedoms with

10  regard to information gained through discovery and that, absent a valid court order to the contrary,

11  they are entitled to disseminate the information as they see fit."); *Humboldt Baykeeper v. Union Pac.*

12  *R.R.*, 244 F.R.D. 560, 561-62 (N.D. Cal. 2007) (presumption of openness informing "good cause"

13  analysis arises from Seattle Times' admonition that First Amendment interests be limited as narrowly

14  as possible); *accord Sampson v. City of El Centro*, No. 14cv1807-L (DHB), 2015 U.S. Dist. LEXIS

15  188854, at *26-27 (S.D. Cal. Aug. 31, 2015).

16       Consequently the Ninth Circuit applies a three-prong test to determine whether "good cause"

17  has been shown as to justify restricting the dissemination of particular material.

18       ***First***, the party seeking protection has the burden to show "particularized harm will result from

19  disclosure of information to the public." *In re Roman Catholic Archbishop*, 661 F.3d 417, 424 (9th Cir.

20  2011) (quoting *Phillips*, 307 F.3d at 1211). "Broad allegations of harm, unsubstantiated by specific

21  example or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman,* 966 F.2d at 476 (9th

22  Cir. 1992) (citation omitted).

23       ***Second,*** "if the court concludes that such harm will result from disclosure of the discovery

24  documents, then it must proceed to balance 'the public and private interests to decide whether

25  [maintaining] a protective order is necessary.'" *Roman Catholic,* 661 at 424(quoting *Phillips*, 307

26  F.3d at 1211). The Ninth Circuit has indicated that the district court should consider the following

27

28  [2] *Seattle Times* involved a particularized protective order issued in conjunction with an order to
compel a party to produce its confidential membership lists. *Id.* at 25-27.

Joshua Koltun ATTORNEY

"*Glenmede* factors," which are neither mandatory nor exhaustive:

> 1) whether disclosure will violate any privacy interests; 2) whether the information is being sought for a legitimate purpose or for an improper purpose; 3) whether disclosure of the information will cause a party embarrassment; 4) whether confidentiality is being sought over information important to public health and safety; 5) whether the sharing of information among litigants will promote fairness and efficiency; 6) whether a party benefitting from the order of confidentiality is a public entity or official; and 7) whether the case involves issues important to the public.

*Phillips*, 307 F.3d at 1211 (quoting *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).

**Third,** if the first two tests are met "the court must still consider whether redacting portions of the discovery material will nevertheless allow disclosure." *Roman Catholic*, 661 F.3d at 425 (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136-37 (9th Cir. 2003)).

    **A.**    **The Proponent has the Heavy Burden to Show that a "Particularized Harm Will Result from the Disclosure"**

        **1.**    **The Burden of Showing "Particularized Harm" Cannot Be Met Merely By Showing that One's Opponent Intends to Disseminate Material to the Media**

Permeating Defendant's motion is the premise that under Rule 26(c), use of discovery materials for any purpose other than the litigation is "improper." Motion at 2, 8, 9, 12, 13. Since *any* use of discovery material for *any* purpose other than litigation is "improper," it follows that an indication that one intends to share discovery material with the media is an admission of this purportedly "improper" purpose. *Id.*

Defendants are fundamentally mistaken. Their premise reverses the burdens imposed by the Rule and by the First Amendment. As discussed above, "the public can gain access" to discovery materials absent a showing of "good cause." *Phillips,* 307 F.3d at 1210; *San Jose Mercury News*, 187 F.3d 1103. Therefore, a protective order cannot "be justified solely on the basis of a showing that a party who lawfully acquired information through civil discovery intended not only to use it in the litigation but also to disseminate it in some other setting." *Humboldt Baykeeper*, 244 FRD at 562. "If the drafters of Rule 26(c) had wanted to create a presumption against use of discovered information for any purpose external to the litigation," they would have "omitted the good cause requirement" and instead have "inserted into Rule 26 a provision that prohibited any such use absent a stipulation of all

Joshua Koltun ATTORNEY

parties or a court order that could issue only after a showing of good cause for the specific intended external use." *Id*. at 562-63.

*Sampson*, a case on which Defendants heavily rely, flatly contradicts their basic premise. "[G]eneral allegations of injury to reputation . . . or embarrassment that may result from dissemination of privileged documents is insufficient to justify judicial endorsement of an umbrella confidentiality agreement." *Id.*, 2015 U.S. Dist. Lexis 188854 *24-25 (quoting *Glenmede Trust*, 56 F.3d at 484 and citing *Kamakana v. City & County of Honolulu*, 447 F.3d 1172,1179 (9th Cir. 2006), *Foltz*, 331 F.3d at 1136).[3]

Of course, where the proponent has provided specific examples of, or articulated reasons why, disclosure of material would be an "embarrassment" under Rule 26(c ), the court must still find that the purported harm is sufficiently serious to warrant protection.  In *Flaherty v. Seroussi,* for example, plaintiff's counsel stated that he intended to publicize the deposition to "humiliate" the deponent, but the "mere fact that some level of discomfort, or even embarrassment, may result from the dissemination of [the] deposition testimony is not in and of itself sufficient to establish good cause to support the issuance of protective order."  *Id.,* 209 F.R.D. 295, (N.D.N.Y. 2001); *accord Pia v. Supernova Media, Inc.*, 275 F.R.D. 559, 561-62 (D. Utah 2011) (entertainment attorney denied protective order against dissemination of videotaped deposition).

### 2.   *Allegations of Third Party Interests Are Subject to the Same Strict Burdens*

The burden to show a "particularized harm" is no less strict when the purported embarrassment would be to a third party.  *Roman Catholic*, 661 F.3d at 425-26.  In *Sampson,* a showing by an undercover police officer that a video would identify him and blow his cover was deemed a sufficient privacy interest to be a particularized harm.  *Id.,* 2015 U.S. Dist. Lexis LEXIS 188854, at *21-23; *but*

---

[3] Plaintiffs contend that courts "routinely hold" that disclosure to third parties for a purpose other than litigation is "plainly" improper.  Motion at 2, 8.  Plaintiffs rely on cases that state that dissemination of discovery material to the media/public is improper, but provide no analysis as to how that can be reconciled with the contrary Ninth Circuit authority discussed in this brief.  *See Lopez v. CSX Transp.,* 2015 WL 375643, (W.D. Pa June 16, 2015); *Crossfit, Inc. v. Nat'l Strength and Conditioning Ass'n,* 2015 WL 124466532 (S.D. Cal. July 16, 2015) *Walker v. Life Ins. Co. of the Southwest,* No. 10-cv-9198 (C.D.Cal. Aug 18, 2011) (unpublished minute order).
The other case on which Plaintiffs rely, *Sampson v. City of El Centro,* emphatically supports Jigsaw, as discussed in this brief.

Joshua Koltun ATTORNEY

*see Harmon v. City of Santa Clara*, 323 F.R.D. 617, 624-625 (N.D. Cal. 2018) (privacy interest of undercover police officer outweighed by public interest).  But an entity cannot assert a "privacy" interest in information that it always understood would be of " considerable and legitimate interest" to the government and the public. *Humboldt Baykeeper v. Union Pac. R.R.*, 244 F.R.D. 560, 565 (N.D. Cal. 2007).

### 3.    The Particularized Showing Must be that Disclosure Will Cause a Sufficient <u>Incremental</u> Impact

Moreover, the requirement is to show that "particularized harm ***will result from*** disclosure of information to the public." *Roman Catholic,* 661 F.3d at 424 (emphasis added).  Thus the showing must be of some substantial amount of harm separate and apart from information that the public already knows or is likely to otherwise learn.  *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-cv-04984-JST (MEJ), 2015 U.S. Dist. LEXIS 27803, at *20-23 (N.D. Cal. Mar. 6, 2015) (proponent of protecting draft documents had not shown harm that would arise from differences between the draft documents and those that were ultimately made public); *cf. Harmon*, 323 F.R.D. at 627 (claim of monetary sanctions based on purported harm of release of video designated "confidential" is denied because "it is impossible to disambiguate between harm caused to the defendants because of the video, versus harm that befell them as a result of public awareness of the lawsuit and settlement more generally.")

The same principle of incremental harm applies when the purported harm is that the disclosure will taint the jury.  If the disclosure would simply be cumulative to the pretrial publicity that the jury would inevitably be exposed to anyway, that showing cannot be met.  *Schiller* 2007 U.S. Dist. LEXIS 32746, at *12.  By the same token, a claim of potential jury taint is insufficient where the information to be disclosed is likely to be seen at trial in any event.  *Id*. at *16.

### 4.    The Generic Premise that Videotapes Are Inherently Likely to Cause Harm is Unsound

Defendants argue that the Court may bar dissemination of videotapes even where it would allow dissemination of transcripts, on the grounds that videotapes are "more easily manipulated" than written documents and can be used to craft "an inaccurate and incomplete" narrative. Motion at 6.

In *Sampson*, on which Defendants heavily rely, the court rejected as "broad and speculative" the contention that videotape would be "manipulated" and would therefore taint the jury. *Id.* 2015 U.S. Dist. LEXIS 188854, at *20-21 (S.D. Cal. Aug. 31, 2015); *cf. Schiller* 2007 U.S. Dist. LEXIS 32746, at *12 (rejecting claim that documents would be used in a misleading fashion).

Defendants cite *Low v. Trump Univ.,* in which the court took it as self-evident that the videotapes of then-candidate Trump's depositions, as opposed to the deposition transcripts, were likely to be manipulated in a manner that would increase the likelihood of jury taint. *Id.*, No. 3:10-cv-0940-GPC-WVG, 2016 U.S. Dist. LEXIS 101329, at *16 (S.D. Cal. Aug. 2, 2016).  Insofar as the court was making a finding "[g]iven the context of the case and the timing of Media Intervenors' request," in the midst of a presidential campaign in which the deponent was a candidate, and in which "'cut[]' and 'splic[ed]' segments of [Donald Trump's] deposition videos would appear in both media reports ***and in political advertisements*** aired nationwide ***prior to the trial date in November,"*** the court's concern with jury taint is understandable. *Id.* (emphasis added).  The court's conclusion that the videotapes would be more conducive to manipulation than the transcripts is, however, questionable.

In any event, the general proposition advanced by Defendants -- that video is an inherently manipulable medium that should be treated differently than transcripts -- is unsound.  The Ninth Circuit has rejected the notion that there should be a "built-in biases for or against" disclosure of "taped evidence for subsequent broadcast," requiring that the trial court start with "a strong presumption" in favor of access, to be overcome only "on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture." *Valley Broadcasting Co. v. United States Dist. Court*, 798 F.2d 1289, 1293 (9th Cir. 1986).  To be sure, *Valley Broadcasting* involved sealed tapes that had been filed in court, so the "strong presumption" in favor of access is stronger than as to as-yet-unfiled videotape.  Nevertheless the court's reasoning -- "we recognize that the added danger of jury taint arising from the transmission of the tapes themselves may vary from case to case, we reemphasize that the district court must articulate the factual basis for the danger without relying on hypothesis or conjecture" (*Id.* 798 F.2d at 1295) – correlates directly to the burden for showing "particularized harm" under the Rule 26(c ).  In *Valley Broadcasting,* the trial court was held to have

- 13 -

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

1  abused its discretion by relying on the the "conjecture" that the jury would be "incrementally

2  prejudiced by the tapes themselves."  *Id.* at 1297.

3      Significantly, Alex Gibney is not a political operative who creates political attack

4  advertisements for use in a heated political campaign.  *Compare Low, supra,* at *16.  He is an award

5  winning documentarian who has produced numerous acclaimed full-length feature documentaries.

6  Gibney Decl., ¶ 2.  Moreover, there is an important difference between videotapes of depositions and

7  videotapes taken by the news media in an interview.  If the media videotape an interview, the

8  interviewee will not ordinarily have the complete tape in his possession.  Thus if the videotape is

9  manipulated in a misleading fashion, the interviewee is not in a position (at least not immediately) to

10  rebut the manipulation.  But here the Defendants have access to the complete video and thus will be in

11  an immediate position to expose or rebut any manipulation (by Jigsaw or anyone).

12      Moreover, as one court has pointed out, raw "transcripts lack a tone of voice, frequently

13  misreport words and often contain distorting ambiguities as to where sentences begin and end."  *In re*

14  *CBS*, 828 F.2d 958, 960 (2d Cir. 1987).  "Videotaped depositions thus convey the meaning of

15  testimony ***more accurately*** and preserve demeanor evidence as well."  *Id.* (*emphasis added.*).  The

16  public has as much an interest in being able to assess the demeanor of people testifying as do jurors or

17  judges-as-factfinders.[4]

18      **B.      Even if a Sufficient Showing of Particularized Harm Has Been Made, that Harm**
           **May Be Outweighed by Legitimate Public Interest in Those Facts or Allegations**

19      Even if the proponent can make a particularized showing of "embarrassment" under Rule

20  26(c), the Court must determine whether the public interest in disclosure of that embarrassing fact or

21  allegation may outweigh any harm to him.  *Roman Catholic Archbishop* involved discovery materials

22  containing old allegations of sexual abuse against a priest.  *Id.,* 661 F.3d at 426.  Such allegations are

23  certainly embarrassing, indeed "scandalous."   The priest had shown the "particularized harm" that if

24  the allegations were disclosed, his "career and life [would] be ruined."  *Id.* The court noted that "the

25  mere allegation of misconduct in the discovery documents filed in this case, without more, does not

---

[4] A situation in which the raw transcript was inculpatory where a videotape would have been exculpatory led to an amusing plot twist (spoiler alert!) in the movie *My Cousin Vinnie.*

1  create a public interest sufficiently large to outweigh the priests' private interests in confidentiality."

2  *Id.* at 427.  "There had been no judicial determination regarding the truth of the allegation, nor had the

3  priest been given an opportunity to put on evidence, provide argument, or otherwise litigate the

4  allegations."  *Id.*  The case involved something more than "mere allegations in discovery documents,"

5  however -- the allegations in question had been "brought to the attention of the district attorney, who

6  did not prosecute because the statute of limitations had run."  *Id. at* 427.  The court below had been

7  within its discretion to conclude that the public interest "in knowing who might sexually abuse

8  children" outweighed the priest's interest in privacy, given that he continued to work as a priest in his

9  community and "his clerical duties [might] bring him into contact with children." *Id.* at 428.

10  Similarly, even though the release of a bodycam video would implicate the privacy interests of

11  police officers, especially those who work undercover, which was a particularized harm, the public

12  interest in police transparency and preventing police abuse outweighed that harm. *Harmon*, 323

13  F.R.D. at 624-25; *accord Sampson*, 2015 U.S. Dist. LEXIS 188854 at * 28-29, 33-34 (public interest

14  outweighs privacy interests of uniformed police officers)); *Felling v. Knight,* 211 F.R.D. 552, 554-55,

15  (SD Ind. 2003) (same, basketball coach, high-profile case).

16  The public interest factor is not limited to public officials.  *See, e.g., Roman Catholic*.  Public

17  interest is heightened when the information sought "would improve the ability of governmental

18  agencies to assure the public [safety]." *Humboldt Baykeeper,* 244 F.R.D. at 567 (environmental

19  hazards).

20  The public interest will be heightened where the person seeking protection has thrust himself

21  into the public eye with respect to the subject matter of the disclosures.  *See, e.g. Harmon*, 323 F.R.D.

22  at 624 (N.D. Cal. 2018) ("the City's police chief commented publicly on the video of the incident and

23  the lawsuit's settlement [brought] the dispute even more squarely into the public eye."); *Constand v.*

24  *Cosby*, 112 F. Supp. 3d 308, 315-16 (E.D. Pa. 2015) (entertainer frequently publicly aired his views

25  on relevant issues).

26

27

28

Joshua Koltun ATTORNEY

### C.     If the Balance of Private and Public Interests Tips In Favor of Disclosure, the Court Must Ensure that the Protection is Narrowly Tailored to Redact Only So Much of the Discovery Material As Necessary

Even where the balance of private and public factors tips in favor of disclosure, "the court must still consider whether redacting portions of the discovery material will nevertheless allow disclosure." *Roman Catholic.,* 661 F.3d at 425.  In that case, the Court held that the private and public factors balanced differently for the two third parties, one a priest who had long ago retired, the other one who continued to have pastoral duties in the community.  The public interest in knowing the identity of the retired priest was diminished.  Even if he had ever posed a danger to the community, he no longer did.  His privacy interest could be accommodated by redacting his identifying information. *Id.* at 428.  But because the former priest still potentially posed a threat to children, however, his identity should be publicly disclosed.  *Id.  Accord, Sampson,* 2015 U.S. Dist. LEXIS 188854, at *34 (privacy interests can be accommodated by blurring or redacting identities and medical conditions of unrelated third parties).

### III.     Defendants have Failed to Show "Good Cause" to Modify the Existing Protective Order to Bar Dissemination of All Materials (or of Videotapes) to the Media or General Public, or to Relieve Defendant's of Their Immediate Duty to Make Sparing and Surgical Confidentiality Determinations.

### A.     Defendants Sole Showing -- that Plaintiff Wishes to Disseminate Videotapes to the Media – Cannot Be a Sufficient Showing of "Particularized Harm"

Defendants purported showing of "particularized harm" is that any dissemination of discovery material to the media, indeed any use of such material for any nonlitigation purpose – is "improper." Mot. at 2, 8, 9 12, 13.  As a matter of law, this cannot, by itself, constitute a "particularized showing of harm." *See section II.A.1 above.*  The variant argument that dissemination of videotapes is improper even where dissemination of the transcript would be proper is similarly unsound.  *See section II.A.4 above.*

Defendants have indicated that *"*[s]hould the Court believe it is necessary to adjudicate what portions of the Contested Depositions merit protection under the Existing Protective Order, Defendants will promptly identify and justify the portions of each deposition that warrant a confidentiality designation and submit those designations to the Court for adjudication." Mot. at 12 n.4.  If the Court permits Defendants more time to do what Defendants were ordered to do in the first

place, it should at least provide guidance along the following principles so that the next round of designations is not overbroad.

### B.      Disclosure of Testimony that Substantially Supports the Public Allegations at the Heart of this Case Would Not Constitute a Sufficient Showing of Harm

To a very large degree the Complaint repeats the story that, for better or worse, was reported in the media, both during the initial "fairy tale" phase of Theranos' growth, through the Wall Street Journal expose, the regulatory investigations, charges, sanctions and settlements.

To be sure, neither the allegations of the media, or the regulators, or of plaintiff, have yet been proven in this Court.  Perhaps the deposition answers will undermine the media/government/plaintiff's narrative – indeed perhaps they will completely negate that narrative.  But if that is the case, where is the "embarrassment?"

It seems likely, however, that at least some, if not all, of the testimony in the deposition runs along the lines of the deposition testimony that has already been made public.  For example, did Theranos make the following statement, was that statement true, what percentage of tests was Theranos performing on its own "revolutionary" machines as opposed to conventional machines at that time, etc etc.  *See, e.g.,* ECF 133-8; 133-9 (public excerpts Tyler Schultz and Cheung testimony).  Such testimony may be "embarrassing" in the colloquial sense, but not in the sense that Rule  26(c) is designed to protect.  *Flaherty,* 209 F.R.D. 295; *Pia,* 275 F.R.D. at 561-62.  Moreover, if the testimony is supportive of what has already been reported in the media, in particular as regards the government regulators' charges, determinations, sanctions, and settlements, it is not sufficient to show harm, and in any event, is cumulative.  *Todd,* 2015 U.S. Dist LEXIS 27803 at *20-23; *Schiller,* 2007 U.S.Dist.LEXIS at *16.  Similarly, such testimony will likely be cumulative of what is publicly filed or presented at trial.  *Id.*  The release of the videos will not have any substantial incremental impact.[5]

### C.      The Intense Public Interest in This Matter Outweighs any Harm

Assuming arguendo that the depositions contain material that Rule 26(c) recognizes as "embarrassing," the intense and legitimate public interest in this matter outweighs any such harm.

---

[5]The Court has other tools that it can use, and will have to use, to minimize jury taint, such as rigorous voir dire.  For example, the Court can ask whether prospective jurors have seen the Jigsaw documentary.

Joshua Koltun ATTORNEY

1  Defendants blandly assure the court that depositions "do not concern issues of public safety, and only

2  very few of the depositions are of public entities or officials. … largely concern Theranos's

3  operations, capabilities, and business arrangements. No matters of public policy are at stake."  Mot. at

4  10.

5        That is absurd.  At the heart of the case is the allegation that Theranos' "operation" was a

6  massive fraud.  Its "proprietary technology" was "a remarkable innovation that was going to save

7  millions of lives" and "change the world."  FAC, ¶3.  Instead, "findings by regulators," exercising the

8  powers the public have conferred on them to enforce its safety policies, "forced Theranos to void tens

9  of thousands of customers' blood test results, raising the specter of patient harm."  *Id., ¶* 6. They

10  "forced Theranos to void thousands of customers' blood tests," and " imposed significant sanctions,"

11  revoking needed certifications, fining Theranos for "noncompliance" and "banning Holmes and

12  Theranos from owning or operating a laboratory for at least two years."  *Id.,* RJN, ¶  , Exh.    .   Had

13  Theranos' fraudulent "operation" not been exposed, thousands more, if not millions. might have been

14  put at risk.  These allegations are of the utmost public interest.

15        This case involves not only whether members of the public were put at risk for their health and

16  safety, but also whether investors were defrauded.  The *Glenmede* factors include not only "(4)

17  information important to health and safety," but also "(7) whether the case involves issues important

18  to the public."  Defendants "do not contest, for purposes of this motion, that this Action involves

19  issues important to the public."  Motion at 8, n.2.

20        The public interest in Defendants is heightened by the way in which Defendants thrust

21  themselves into the public eye with their claims to a revolutionary technology.  *Harmon*, 323 F.R.D.

22  at 624.  Theranos's many statements in the media touting its purported technological breakthrough are

23  at the heart of this case alleging fraud-on-the-market.  The holding in the Bill Cosby case is

24  instructive, notwithstanding the factually dissimilar context.  In that case, the court noted that Cosby

25  was entitled to a certain amount of privacy as an entertainer, but held that his rights to privacy

26  concerning allegations that he is a rapist were diminished by his having "donned the mantle of public

27  moralist and mounted the proverbial electronic or print soap box to volunteer his views on, among

28  other things, childrearing, family life, education, and crime."  *Constand*, 112 F. Supp. 3d at 315-16.

Joshua Koltun  ATTORNEY

1  "The stark contrast between Bill Cosby, the public moralist and Bill Cosby, the subject of serious

2  [albeit as-yet unproven] allegations concerning improper (and perhaps criminal) conduct, is a matter

3  as to which the AP--and by extension the public--has a significant interest." *Id.* at 316-17.  "This

4  point is particularly relevant here where the allegations of improper conduct are not collateral to, or

5  background information in, the case but rather form its very essence." *Id* at 317 (E.D. Pa. 2015)

6  (granting media access to Cosby's deposition testimony). Similarly, here

7          In *Roman Catholic,* the unproven allegations against the (nonretired) priest were deemed to be

8  of a great enough public interest to warrant disclosure, because the allegations had been serious

9  enough to bring to the district attorney, even though he had declined to charge due to the statute of

10  limitations.  The public interest in safety is even greater here, because the government regulators

11  charged with public safety did investigate the allegations, concluded they were correct, and imposed

12  sanctions on Defendants, essentially forcing Theranos to halt testing operations.  The public interest in

13  these matters outweighs the putative "embarrassment" that Theranos and its surrogates will suffer if

14  their testimony is made public.

15          That public interest is not limited to the question whether a fraud occurred.  It also extends to

16  mechanics of how it may have occurred and why it took so long for questions to be raised. The public

17  is legitimately interested in understanding how and why the media repeated a narrative that presented

18  Theranos in such a generous light.  That story is particularly resonant.  According to media reports

19  and public testimony, Theranos used its putative legal rights to protect "proprietary" or "trade secret"

20  information to throw a veil of secrecy around questions concerning its technology's performance.

21  Theranos deployed formidable legal firepower to intimidate employees who sought to bring

22  discrepancies between Theranos' public statements and its actual operations to light.   ECF133-8 at

23  23:3-17, 133-9 at 11:19-12:1 (Tyler Schultz and Cheung testimony concerning legal threats by Boies

24  and demand to sign NDA).  According to Carreyrou, these same tactics were reportedly used in an

25  effort to squelch the *Wall Street Journal* expose.  RJN, ¶ 2, Exh. B. Theranos' image-preserving

26  techniques are of intense public interest not only because of the facts of the case but because of the

27  ongoing national conversation concerning the use of these tactics in other well-publicized situations.

28  *Harmon*, 323 F.R.D. at 625 (video should be disclosed given public interest and "national discussion,"

- 19 -

Joshua Koltun ATTORNEY

both about "police treatment of minorities" and whether police should be using body cameras) (*citing Sampson,* 2015 U.S. Dist. LEXIS 188854 at *28-29).

### D.     Defendants Have Not Shown any Third Party Privacy Interest that Warrants Protection

Defendants argue that the videos implicate the "privacy rights of numerous individuals who are not parties to this litigation and have not consented to the public dissemination of their likenesses." Mot. at 9. The burden to show a "particularized harm" is just as heavy for "third parties." *Roman Catholic,* 661 F.3d at 424 ___.   Defendants have made no greater showing of "harm" to those persons than to Defendants.[6]

Defendants have persuaded a number of nonparty deponents to join the motion.  Of those nonparty deponents, the only one whose deposition Jigsaw requests in particular is that of former Secretary Schultz.  He is a public figure, and specifically with respect to Theranos he played a role in presenting its narrative in the public square.  *See, e.g.* ECF 217-24 at 3.

Moreover, whether or not Secretary Schultz has "been implicated in any alleged wrongdoing," his role as a prominent member of the Theranos board is a legitimate subject of public interest, as to which he can claim no "privacy" interest, certainly not one that weighs heavily in the balance. *Harmon*, 323 F.R.D. at 624,  *Humboldt Baykeeper*, 244 F.R.D. at 565.

Moreover, Jigsaw has requested several depositions of third parties who have not joined the motion.  The public interest in what they have to say is similarly intense.  Indeed, some of these deponents themselves reportedly helped bring Theranos' failure to "meet expectations" to light, despite what they say were considerable efforts deployed by Theranos to intimidate them into silence. ECF 133-8 at 23:2-17, 133-9 at 11-19-112:1, RJN, ¶ 2 , Exh. B at 240-249, 255-266, 301 (Carreyrou thanking Tyler Schultz for coming forward and helping break WSJ expose).  Indeed, Jigsaw has reached at least one deponent who has specifically stated that he is willing for his video deposition to be shared with Jigsaw.  Tyler Schultz Decl.

---

[6] Insofar as Defendants suggest that a documentary filmmaker needs to obtain the consent of any individual to show his "likeness" in the documentary, they are mistaken.  Cal. Civ. Code § 3344.

Joshua Koltun ATTORNEY

At a minimum, the portions of videos that correspond to publicly filed transcripts should be released.  But it seems likely that some, if not all that remain designated "confidential," are of a similar nature to what has already been made public and should also be released.

    **E.**    ***Defendants Cannot Claim to Have Relied Upon a Protective Order that Expressly Told Them Not to Do What They Did***

Citing the fifth *Glenmede* factor, Defendants claim to have "produced the Contested Depositions with the understanding that they would remain protected under the Existing Protective Order until Plaintiffs filed the Contested Depositions with the Court and the burden shifted to Defendants to justify what portions of the Contested Depositions relevant to Plaintiffs' filings required continued protection."  Motion at 10.

Defendants are not using the term "understanding" to mean any sort of agreement that they worked out with Plaintiffs.  That agreement is the stipulated, existing Protective Order.  They are using the term "understanding" to mean an interpretation privately held by Defendants as to what was required by this Court's Protective Order.  Defendants do not make any argument whatsoever that this "understanding" is actually supported by the language of that Order.

Entry of protective orders like this Court's model protective orders do not constitute any finding of "good cause" concerning any particular information.  *Roman Catholic,* 661 F.3d at 424.  They simply create a mechanism for the parties to make designations of confidentiality and narrow any differences thereon in an orderly fashion before presenting any disputes to the court.

Defendants argue that their "understanding" of the Existing Protective Order is what caused them to "acquiesce" in "cloned" discovery from the PFM Litigation.  Motion at 10.  This is precisely the argument rejected by one of Defendants' authorities, which pointed out that the Ninth Circuit has rejected it as well.  *Sampson,* 2015 U.S. Dist LEXIS  at 30-31, citing *Foltz,* 331 F.2d at 1138 (proponents cannot rely on blanket protective order entered before findings of "good cause"); *accord United States ex rel. Franklin v. Parke-Davis*, 210 F.R.D. 257, 260-61 (D. Mass. 2002) (citing *Public Citizen* 858 F.2d at 790.)

*Joshua Koltun ATTORNEY*

1

***IV.    Any Remaining Legitimate Concerns Should Be Handled By Surgical Redactions or Other Measures To Protect Privacy***

2    Of course, to the extent that the depositions contain information of the sort that this Court has

3    recognized should be subject to redaction, -- as with this Court's recent order ECF. 213 – the same

4    sort of material can be redacted from the videotapes.  *Roman Catholic,* 661 F.3d at 425, *Foltz,* 331

5    F.3d at 1136-37.  If what needs to be redacted is the person's identity, this can be accomplished by

6    blurring the face and altering the voice.  *Sampson,* 2015 U.S. Dist.LEXIS at 188854 at * 34.

7    ***CONCLUSION***

8    For the reasons stated, Jigsaw respectfully requests the Court to (i) allow Jigsaw to intervene

9    for the limited purpose of opposing Defendant's Motion for a Rule 26(c ) Protective Order, (ii) Deny

10    the Motion for a Rule 26(c ) Protective Order, (iii) deny Defendant's overbroad wholesale

11    designations, or (alternatively) order Defendants expeditiously comply with the terms of this Court's

12    existing Protective Order.

13

14    Dated: June 1, 2018                                        _____\s_____

15                                                                                Joshua Koltun
                                                                                   Attorney for Non-Party
16                                                                                Jigsaw Productions.

17

18

19

20

21

22

23

24

25

26

27

28