# Exhibit B

Reed R. Kathrein (139304)
Peter E. Borkon (212596)
Danielle Smith (291237)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com
danielles@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs and Proposed Lead*
*Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ROBERT COLMAN and HILARY TAUBMAN-DYE, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiffs,<br><br>        vs.<br><br>THERANOS, INC., et al.,<br><br>                          Defendants. | No. 5:16-cv-06822-NC<br><br>CLASS ACTION<br><br>**DECLARATION OF REED R. KATHREIN IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' BRIEF ON TIMELINESS OF RENEWED MOTION FOR CLASS CERTIFICATION (ECF NO 274)**<br><br>Date:         TBD<br>Time:         TBD<br>Courtroom:  7, 4th Floor<br>Judge:        Honorable Nathanael Cousins<br><br>DATE ACTION FILED: Nov. 28, 2016 |

I, REED R. KATHREIN, hereby declare as follows:

1.      I am an attorney duly licensed to practice before all the courts of the state of California.  I am a member of the law firm of Hagens Berman Sobol Shapiro LLP, Counsel of record for Plaintiffs Robert Colman and Hilary Taubman-Dye in the above-entitled action. I have personal knowledge of the matters stated herein, and, if called upon, I could and would competently testify thereto.

2.      Attached hereto are true and correct copies of the following documents and testimony referenced in Plaintiffs' Reply to Defendants' Response To Plaintiffs' Brief On Timeliness Of Renewed Motion For Class Certification (ECF No. 274), filed herewith:

Exhibit 1:      Email from Defense counsel dated February 17, 2018 requesting expedited discovery responses;

Exhibit 2:      The following documents related to Defendant Theranos's discovery requests to Plaintiff Robert Colman:

   a.   Defendant Theranos's First Set Of Requests For Production Of Documents To Plaintiff Robert Colman, dated May 26, 2017;
   b.   Operating Agreement for Lucas Venture Group XI, LLC, bates stamped TH-PLTF-000118 – TH-PLTF-000154, produced in this action by Plaintiffs pursuant to the above-referenced discovery requests;
   c.   Subscription Agreement for Lucas Venture Group XI, LLC, bates stamped TH-PLTF-000097 – TH-PLTF-000116, produced in this action by Plaintiffs pursuant to the above-referenced discovery requests;

Exhibit 3:      The following documents related to Defendant Theranos's discovery requests to Plaintiff Hilary Taubman-Dye:

   a.   Defendant Theranos's First Set of Requests For Production of Documents to Plaintiff Hilary Taubman-Dye, dated May 26, 2017;
   b.   Celadon Technology Fund VII, LLC Series B (Theranos, Inc.) Transmittal Letter, Offering Memo, Subscription Agreement, and Operating Agreement, bates stamped TH-PLTF-001078 – TH-PLTF-001150, produced in this action by Plaintiffs pursuant to the above-referenced discovery requests;

Exhibit 4:      The following documents related to Defendant Theranos's discovery requests to Thomas Brodie:

a.   Defendant Theranos's First Set of Requests for Production of Documents To Plaintiff Thomas Brodie, dated February 17, 2018;

b.   Black Diamond Ventures XII-B, LLC Subscription Agreement, bates stamped TH-PLTF-001207 – TH-PLTF-001220, produced in this action by Plaintiffs pursuant to the above-referenced discovery requests;

c.   Black Diamond Ventures XII-B, LLC Operating Agreement, bates stamped TH-PLTF-001221 – TH-PLTF-001273, produced in this action by Plaintiffs pursuant to the above-referenced discovery requests;

d.   Plaintiffs' Notice of Subpoena for Production of Documents to Third Parties, dated January 12, 2018

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 27th day of June 2018, at Berkeley, California.

By: /s/ Reed R. Kathrein
REED R. KATHREIN

# Exhibit 1

| | |
|---|---|
| **From:** | Lewis, Jessica |
| **To:** | Reed Kathrein; Steve Berman; Peter Borkon; Danielle Smith; "JForge@rgrdlaw.com"; "DennisH@rgrdlaw.com"; Paul Geller |
| **Cc:** | Smith, Robert Kingsley; "Rummage, Steve (SteveRummage@DWT.COM)"; allisondavis@dwt.com; "kgoodhart@cooley.com"; "Stephen C. Neal Esq. (nealsc@cooley.com)"; Perla, Timothy; Davies, Christopher; Mugmon, Michael; "Kort, Jacqueline"; "Gorton, Kelly" |
| **Subject:** | Colman et al. v. Theranos, Inc. et al., Dkt. No. 5:16-cv-06822 (N.D. Cal.) |
| **Date:** | Saturday, February 17, 2018 7:05:38 PM |
| **Attachments:** | 2018-02-17 Theranos"s First RFAs to Plaintiff Mai Pogue.pdf |
| | 2018-02-17 Theranos"s First RFPs to Plaintiff Mai Pogue.pdf |
| | 2018-02-17 Theranos"s First RFAs to Plaintiff Thomas Brodie.pdf |
| | 2018-02-17 Theranos"s First Rogs to Plaintiff Thomas Brodie.pdf |
| | 2018-02-17 Theranos"s First Rogs to Plaintiff Mai Pogue.pdf |
| | 2018-02-17 Theranos"s First RFPs to Plaintiff Thomas Brodie.pdf |

All,

Attached are Defendant Theranos, Inc.'s First Set of Interrogatories, Requests for Production, and Requests for Admission to Plaintiff Thomas Brodie and Plaintiff Mai Pogue.  Note that these requests contain references to Plaintiffs' declarations, which were provisionally filed under seal.

Please let us know if you will agree to produce the materials and respond to these requests this coming week.  Additionally, please confirm that we have been provided with copies of all third-party subpoenas and productions (including, but not limited to, OPA).

Jessica

**Jessica Lewis | <span style="color:maroon">WilmerHale</span>**
60 State Street
Boston, MA 02109 USA
+1 617 526 6906 (t)
+1 617 526 5000 (f)
jessica.lewis@wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

# Exhibit 2a

1  Michael A. Mugmon (251958)
   WILMER CUTLER PICKERING
2      HALE AND DORR LLP
   950 Page Mill Road
3  Palo Alto, CA 94304
   Telephone: +1 650 858 6000
4  Facsimile: +1 650 858 6100
   michael.mugmon@wilmerhale.com
5
   Christopher Davies (admitted *pro hac vice*)
6  WILMER CUTLER PICKERING
       HALE AND DORR LLP
7  1875 Pennsylvania Avenue, NW
   Washington, DC 20006
8  Telephone: +1 202 663 6000
   Facsimile: +1 202 663 6363
9  christopher.davies@wilmerhale.com

10 Timothy Perla (admitted *pro hac vice*)
   Robert K. Smith (admitted *pro hac vice*)
11 Megan E. Barriger (admitted *pro hac vice*)
   WILMER CUTLER PICKERING
12     HALE AND DORR LLP
   60 State Street
13 Boston, MA 02109
   Telephone: +1 617 526 6000
14 Facsimile: +1 617 526 5000
   timothy.perla@wilmerhale.com
15 robert.smith@wilmerhale.com
   megan.barriger@wilmerhale.com
16
   *Attorneys for Defendant Theranos, Inc.*
17
                 **UNITED STATES DISTRICT COURT**
18
                **NORTHERN DISTRICT OF CALIFORNIA**
19
                       **SAN JOSE DIVISION**
20

21 ROBERT COLMAN and HILARY          Case No.  5:16-cv-06822-NC
   TAUBMAN-DYE, Individually and on
22 Behalf of All Others Similarly Situated,   **DEFENDANT THERANOS'S FIRST SET**
                                               **OF REQUESTS FOR PRODUCTION OF**
23                             Plaintiffs,     **DOCUMENTS TO PLAINTIFF ROBERT**
                                               **COLMAN**
24      vs.

25 THERANOS, INC., ELIZABETH
   HOLMES, and RAMESH BALWANI,
26
                             Defendants.
27

28

---

1    Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant Theranos,

2  Inc., by and through its attorneys of record in this action, hereby requests that Plaintiff Robert

3  Colman produce the following documents for inspection and copying at the offices of Wilmer

4  Cutler Pickering Hale and Dorr LLP, 950 Page Mill Road, Palo Alto, CA 94304, within thirty

5  (30) days of service of Defendant Theranos's First Set of Requests for Production of Documents

6  to Plaintiff Robert Colman.

7  **I.      DEFINITIONS**

8    1.    The term "ACTION" refers to *Colman v. Theranos, Inc.*, Case No. 5:16-cv-

9  06822-NC (N.D. Cal.).

10   2.    The term "BALWANI" means Ramesh Balwani.

11   3.    The term "CLASS" means "[a]ll persons or entities who, directly or indirectly,

12  purchased or committed to purchase (and subsequently closed a binding commitment to purchase)

13  an interest in Theranos securities" during the CLASS PERIOD, as defined in Paragraph 82 of the

14  COMPLAINT.

15   4.    The term "CLASS PERIOD" means the period from July 29, 2013 through

16  October 5, 2016, inclusive of July 29, 2013 and October 5, 2016.

17   5.    The term "COMMUNICATION" or "COMMUNICATIONS" shall be interpreted

18  in its broadest sense, and means any transmission of information between two or more

19  PERSONS, whether by, without limitation: personal meeting; telephone; letter; telegraph; e-mail;

20  electronic bulletin board; electronic "chat room"; instant message, text message, any other form

21  of electronic correspondence; teleconference; facsimile; telex; or any other means whatsoever.

22   6.    The term "COMPLAINT" shall mean the November 28, 2016 Class Action

23  Complaint for Violations of California's Securities, Unfair Competition, and Common Laws,

24  filed in the ACTION (ECF No. 1).  All paragraph references herein are to the COMPLAINT.

25   7.    The term "DEFENDANTS" shall mean THERANOS, HOLMES, and BALWANI.

26   8.    The term "DOCUMENT" or "DOCUMENTS" shall have the broadest meaning

27  permitted by the Federal Rules of Civil Procedure and shall include, without limitation, all

28

DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFF ROBERT COLMAN
Case No.  5:16-cv-06822-NC

written or graphic matter, whether stored, displayed, communicated, or transmitted, of every kind or description, however produced or reproduced, whether draft or final, original or reproduction, signed or unsigned, and regardless of whether approved, signed, sent, received, redrafted, or executed, including, without limitation: ESI, written communications, letters, correspondence, memoranda of telephone conversations or personal conversations, diaries, desk calendars, interoffice communications, records, studies, analyses, statistical and financial statements, charts, graphs, reports, minutes, telegrams, telexes, facsimiles, emails, voicemails, bulletins, instructions, notes, sound or video recordings of any type, catalogues, results of investigations, contracts, licenses, agreements, working papers, statistical records, ledgers, computer diskettes, CDs or DVDs, computer tapes or data in any form, stenographers' notebooks or material similar to any of the foregoing, however denominated, by whomever prepared, and to whomever addressed, which are in Your possession, custody or control or to which You have, have had or can obtain access.  The term "DOCUMENT" or "DOCUMENTS" shall also include (1) each copy that is not identical to the original or to any other copy, and (2) any tangible thing that is called for or identified in response to any request.

9.    The term "ELECTRONICALLY STORED INFORMATION" or "ESI" means all "potentially discoverable electronically stored information" and refers to the party's(ies') ESI that contains or potentially contains information RELATING TO facts at issue in this litigation. The term "ELECTRONICALLY STORED INFORMATION" or "ESI" includes, without limitation, all electronically stored DOCUMENTS.  The term "ELECTRONICALLY STORED INFORMATION" or "ESI" further includes, without limitation, the following: (i) information or data generated, received, processed, and recorded by any computer or other electronic device, including, without limitation, metadata (e.g., author, recipient, file creation date, file modification date, etc.); (ii) internal or external web sites; (iii) output resulting from the use of any software program, including, without limitation, word processing DOCUMENTS, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messenger or similar programs, bulletin board programs, operating systems, source code, PRF files, PRC files,

1  batch files, ASCII files, and all miscellaneous media on which they reside and regardless of

2  whether said electronic data exists in an active file, a deleted file, or file fragment; and (iv)

3  activity listings of electronic mail receipts or transmittals, and any and all items stored on

4  computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, or on any

5  other media for digital data storage or transmittal, such as, without limitation, a personal digital

6  assistants, handheld wireless devices (e.g., BlackBerrys and iPhones), or similar devices, and file

7  folder tabs, or containers and labels appended to, or RELATING TO, any physical storage

8  device associated with each original or copy of all DOCUMENTS requested herein.

9       10.    The term "HOLMES" means Elizabeth Holmes.

10      11.    The term "INCLUDING" shall mean including but not limited to.

11      12.    The term "LUCAS" shall mean Donald A. Lucas, as described in Paragraph 11 of

12  the COMPLAINT, or Lucas Venture Group, as described in Paragraph 3 of the Declaration of

13  Donald A. Lucas in Support of Non-Party Lucas Venture Group XI, LLC's Response to the

14  Court's Order to Show Cause (ECF No. 71-1).

15      13.    The term "LVG XI" shall mean Lucas Venture Group XI, LLC, as described in

16  Paragraph 11 of the COMPLAINT and also described in Paragraph 3 of the Declaration of

17  Donald A. Lucas in Support of Non-Party Lucas Venture Group XI, LLC's Response to the

18  Court's Order to Show Cause (ECF No. 71-1).

19      14.    The term "MEMBER INTEREST" means the "member interest" as described in

20  Paragraph 11 of the COMPLAINT.

21      15.    The term "PERSON" or "PERSONS" means, without limitation, any natural

22  person, firm, association, partnership, trust, or any other form of legal entity.

23      16.    The terms "RELATING TO" or "CONCERNING" mean, without limitation,

24  constituting, comprising, pertaining to, referencing, recording, evidencing, containing, setting

25  forth, reflecting, discussing, showing, disclosing, describing, explaining, summarizing,

26  supporting, contradicting, refuting, or concerning, whether directly or indirectly.

27

28

17.     The term "TENDER OFFER" means the share exchange offered by THERANOS to is shareholders that is the subject of the March 20, 2017 Information Statement and supplements thereto.

18.     The term "THERANOS" means Theranos, Inc.

19.     The terms "YOU" and "YOUR" shall mean Plaintiff Robert Colman, and any other PERSON acting or purporting to act on YOUR behalf or under YOUR control, including YOUR counsel of record in this ACTION.

## II.    INSTRUCTIONS

1.     The definitions and requirements contained in the Federal Rules of Civil Procedure are incorporated herein by reference.

2.     Each request contained herein extends to all DOCUMENTS in YOUR possession, custody, or control, regardless of location.

3.     Unless otherwise indicated, these requests seek DOCUMENTS and things created, generated, dated or coming into YOUR possession, custody or control at any time, without restriction as to date.

4.     Wherever the word "any" appears herein, it shall be read and applied so as to include the word "all," and wherever the word "all" appears herein, it shall be read and applied so as to include the word "any."

5.     All references herein to the singular include the plural, and all references to the plural include the singular.

6.     The terms "and" and "or" as used herein each mean "and/or."

7.     If YOU claim that there is any ambiguity in any request herein, YOU are instructed to resolve such perceived ambiguity in favor of production of more documents rather than limiting the number of documents to be produced.

8.     Any DOCUMENT attached to another DOCUMENT must not be separated.

9.     If YOU assert any privilege, work product claim, or other protection in responding to any requests, furnish a privilege log in a mutually agreeable format.

4

DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF ROBERT COLMAN
Case No.  5:16-cv-06822-NC

10. To the extent a DOCUMENT subject to an assertion of privilege, a work product claim or other objection contains any responsive information not subject to such assertion or objection, the responsive information must be produced.

11. If, after making YOUR initial production and inspection, YOU obtain or become aware of any further DOCUMENTS responsive to these requests, YOU are requested to produce such additional DOCUMENTS to the DEFENDANTS, in accordance with the Federal Rule of Civil Procedure 26.

## III.    DOCUMENTS TO BE PRODUCED

Subject to the foregoing Definitions and Instructions, as well as Federal Rule of Civil Procedure 34, YOU are requested to produce all of the following:

**REQUEST NO. 1:**

DOCUMENTS sufficient to show YOUR educational background and work history from YOUR graduation from high school through the present.

**REQUEST NO. 2:**

DOCUMENTS sufficient to show YOUR financial holdings throughout the CLASS PERIOD.

**REQUEST NO. 3:**

All DOCUMENTS and COMMUNICATIONS CONCERNING THERANOS.

**REQUEST NO. 4:**

All DOCUMENTS and COMMUNICATIONS CONCERNING HOLMES.

**REQUEST NO. 5:**

All DOCUMENTS and COMMUNICATIONS CONCERNING BALWANI.

**REQUEST NO. 6:**

All agreements with or involving LUCAS or LVG XI.

**REQUEST NO. 7:**

All DOCUMENTS CONCERNING YOUR MEMBER INTEREST in LVG XI.

**REQUEST NO. 8:**

All DOCUMENTS and COMMUNICATIONS CONCERNING LUCAS or LVG XI.

**REQUEST NO. 9:**

All DOCUMENTS provided to YOU by LUCAS or LVG XI, or any PERSON acting on behalf of LUCAS or LVG XI.

**REQUEST NO. 10:**

All DOCUMENTS that YOU read, reviewed or relied upon in purchasing a MEMBER INTEREST in LVG XI.

**REQUEST NO. 11:**

All DOCUMENTS CONCERNING any losses or gains incurred in connection with YOUR purchase of a MEMBER INTEREST in LVG XI.

**REQUEST NO. 12:**

All DOCUMENTS CONCERNING any transaction in securities issued by THERANOS.

**REQUEST NO. 13:**

All DOCUMENTS that YOU contend contain a misrepresentation or material omission by THERANOS, HOLMES, or BALWANI.

**REQUEST NO. 14:**

All DOCUMENTS CONCERNING COMMUNICATIONS between YOU and any purported CLASS member or their counsel, INCLUDING COMMUNICATIONS CONCERNING the TENDER OFFER or the ACTION.

**REQUEST NO. 15:**

DOCUMENTS sufficient to identify any other litigation to which YOU have been a party, affiant, deponent, declarant, or trial witness.

1    Dated:  May 26, 2017                      By: /s/  Michael A. Mugmon
2                                                  Michael A. Mugmon (251958)
                                                   WILMER CUTLER PICKERING
3                                                     HALE AND DORR LLP
                                                   950 Page Mill Road
4                                                  Palo Alto, CA 94304
                                                   Telephone: +1 650 858 6000
5                                                  Facsimile: +1 650 858 6100
                                                   michael.mugmon@wilmehale.com
6
                                                   Christopher Davies (admitted *pro hac vice*)
7                                                  WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP
8                                                  1875 Pennsylvania Ave., NW
                                                   Washington, DC 20006
9                                                  Telephone: +1 202 663 6000
                                                   Facsimile: +1 202 663 6363
10                                                 christopher.davies@wilmehale.com
11                                                 Timothy Perla (admitted *pro hac vice*)
                                                   Robert K. Smith (admitted *pro hac vice*)
12                                                 Megan E. Barriger (admitted *pro hac vice*)
                                                   WILMER CUTLER PICKERING
13                                                    HALE AND DORR LLP
                                                   60 State Street
14                                                 Boston, MA 02109
                                                   Telephone: +1 617 526 6000
15                                                 Facsimile: +1 617 526 5000
                                                   timothy.perla@wilmerhale.com
16                                                 robert.smith@wilmerhale.com
                                                   megan.barriger@wilmerhale.com
17
                                                   *Attorneys for Defendant Theranos, Inc.*
18
19
20
21
22
23
24
25
26
27
28
                                              7

1

## CERTIFICATE OF SERVICE

2      I, Michael A. Mugmon, hereby certify that, on May 26, 2017, a true and correct copy of

3  the foregoing DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION

4  OF DOCUMENTS TO PLAINTIFF ROBERT COLMAN was served upon the following

5  attorneys of record by electronic mail:

6      Kathleen Goodhart (kgoodhart@cooley.com)
       COOLEY LLP
7      101 California Street, 5th Floor
       San Francisco, CA 94111
8
9      Stephen C. Neal (nealsc@cooley.com)
       COOLEY LLP
       3175 Hanover Street
10     Palo Alto, CA 94304

11     *Attorneys for Defendant Elizabeth Holmes*

12     Allison A. Davis (allisondavis@dwt.com)
       DAVIS WRIGHT TREMAINE LLP
13     505 Montgomery Street, Suite 800
       San Francisco, CA 94111
14
15     Stephen M. Rummage (steverummage@dwt.com)
       DAVIS WRIGHT TREMAINE LLP
       1201 Third Avenue, Suite 2200
16     Seattle, WA 98101-3045

17     *Attorneys for Defendant Ramesh Balwani*

18
       Reed R. Kathrein (reed@hbsslaw.com)
19     Peter E. Borkon (peterb@hbsslaw.com)
       HAGENS BERMAN SOBOL SHAPIRO LLP
20     715 Hearst Avenue, Suite 202
       Berkeley, CA  94710
21
22     Steve W. Berman (steve@hbsslaw.com)
       HAGENS BERMAN SOBOL SHAPIRO LLP
23     1918 Eighth Avenue, Suite 3300
       Seattle, WA  98101
24
25     *Attorneys for Plaintiffs and Proposed Lead Counsel for the Class*

26

27

28

8

Paul J. Geller (pgeller@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432

Dennis J. Herman (dennish@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104

Jason A. Forge (jforge@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

*Additional Counsel for Plaintiffs*

By:    /s/ Michael A. Mugmon
       Michael A. Mugmon (251958)
       WILMER CUTLER PICKERING
           HALE AND DORR LLP
       950 Page Mill Road
       Palo Alto, CA 94304
       Telephone: +1 650 858 6000
       Facsimile: +1 650 858 6100
       michael.mugmon@wilmehale.com

       *Attorney for Defendant Theranos, Inc.*

DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFF ROBERT COLMAN
Case No. 5:16-cv-06822-NC

# Exhibit 2b

**OPERATING AGREEMENT**
**FOR**
**LUCAS VENTURE GROUP XI, LLC,**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

**September __, 2013**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

310534462.3

## TABLE OF CONTENTS

**Page**

**ARTICLE I**      ORGANIZATIONAL MATTERS ................................................................. 1

    **1.1**   Formation ................................................................................................. 1

    **1.2**   Name ........................................................................................................ 1

    **1.3**   Term ......................................................................................................... 2

    **1.4**   Office and Agent ...................................................................................... 2

    **1.5**   Addresses of the Members and the Managing Member ......................... 2

    **1.6**   Purpose and Business of the Company .................................................... 2

    **1.7**   Title to Properties .................................................................................... 2

**ARTICLE II**     DEFINITIONS; DETERMINATIONS ...................................................... 2

    **2.1**   Definitions ............................................................................................... 2

    **2.2**   Determinations ......................................................................................... 6

**ARTICLE III**    CAPITAL CONTRIBUTIONS ................................................................. 6

    **3.1**   Capital Contributions; Capital Accounts and Allocations ..................... 6

    **3.2**   Capital Accounts ...................................................................................... 6

**ARTICLE IV**    DISTRIBUTIONS .................................................................................... 7

    **4.1**   Distribution Policy ................................................................................... 7

    **4.2**   Cash Distributions ................................................................................... 7

    **4.3**   Distributions in Kind ............................................................................... 8

**ARTICLE V**     MANAGING MEMBER; COMPENSATION AND
                    ORGANIZATIONAL EXPENSES .......................................................... 8

    **5.1**   Election of Managing Member ................................................................ 8

    **5.2**   Management Authority ............................................................................. 9

    **5.3**   No Liability to Members .......................................................................... 9

    **5.4**   Permitted Investments ........................................................................... 10

    **5.5**   Other Managing Member-Sponsored Funds .......................................... 10

    **5.6**   Management Fee ..................................................................................... 10

    **5.7**   Expenses ................................................................................................ 11

    **5.8**   No Transfer of Managing Member's Interest; No Withdrawal or Loans ........... 11

**ARTICLE VI**    MEMBERS .............................................................................................. 11

    **6.1**   Limited Liability .................................................................................... 11

TH-PLTF-000119

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 6.2 | Transfer of Membership Interests | 11 |
| 6.3 | Withdrawals or Resignations | 13 |
| 6.4 | No Termination | 13 |
| 6.5 | Formation of New Fund or Business Endeavor | 13 |
| 6.6 | Interest as a Member | 13 |
| 6.7 | Indemnification and Reimbursement for Payments on Behalf of a Member | 13 |
| 6.8 | Section 754 Election | 14 |
| 6.9 | Voting Rights | 14 |
| 6.10 | Meetings of Non-Managing Members | 15 |
| 6.11 | Non-Managing Member as Trustee for the Company | 15 |
| 6.12 | No Responsibility for Pre-formation Commitments | 15 |
| 6.13 | Rights of Judgment Creditor of Member | 15 |
| 6.14 | Non-Managing Member's Default on Payment of Company Expenses | 15 |
| **ARTICLE VII** | DISSOLUTION AND WINDING UP | 17 |
| 7.1 | Dissolution | 17 |
| 7.2 | Certificate of Dissolution | 17 |
| 7.3 | Winding Up | 17 |
| 7.4 | Final Allocation and Distribution | 17 |
| 7.5 | Limitations on Payments Made in Dissolution | 18 |
| 7.6 | Certificate of Cancellation | 18 |
| 7.7 | No Action for Dissolution | 18 |
| **ARTICLE VIII** | VALUATION OF COMPANY ASSETS | 18 |
| 8.1 | Normal Valuation | 18 |
| 8.2 | Restrictions on Transfer or Blockage | 19 |
| 8.3 | Write-down to Value | 19 |
| **ARTICLE IX** | ACCOUNTING, RECORDS, REPORTING BY MEMBERS | 19 |
| 9.1 | Bank Accounts | 19 |
| 9.2 | Accounting Decisions and Reliance on Others | 19 |
| 9.3 | Tax Matters for the Company Handled by Managing Member and Tax Matters Member | 19 |

TH-PLTF-000120

# TABLE OF CONTENTS
(continued)

Page

**ARTICLE X** INDEMNIFICATION AND INSURANCE .................................................. 20

 **10.1** Indemnification of the Non-Managing Members and Managing Member .......... 20

 **10.2** Advance Undertakings for Indemnification ........................................................ 20

 **10.3** Advancement of Expenses .................................................................................. 20

 **10.4** Standards of Conduct for Indemnification ......................................................... 21

 **10.5** Procedures to Determine Indemnification .......................................................... 21

 **10.6** Court Order of Indemnification .......................................................................... 21

 **10.7** Described Indemnification Rights Non-exhaustive ............................................ 21

 **10.8** Construction of Indemnification Rights .............................................................. 22

 **10.9** Definitions for Indemnification Provisions ........................................................ 22

 **10.10** Insurance for Indemnification ............................................................................. 22

**ARTICLE XI** INVESTMENT REPRESENTATIONS ....................................................... 23

 **11.1** "Accredited Investor"; Preexisting Relationship or Experience ......................... 23

 **11.2** No Advertising ..................................................................................................... 23

 **11.3** Investment Intent ................................................................................................. 23

 **11.4** Purpose of Entity ................................................................................................. 23

 **11.5** No Registration of Membership Interest ............................................................. 23

 **11.6** Membership Interest is a Restricted Security ...................................................... 23

 **11.7** No Obligation to Register .................................................................................... 24

 **11.8** No Disposition in Violation of Law .................................................................... 24

 **11.9** Investment Risk ................................................................................................... 24

 **11.10** Information Reviewed .......................................................................................... 24

 **11.11** No Representations By Company ......................................................................... 24

 **11.12** Consultation with Attorney ................................................................................. 25

 **11.13** Tax Consequences ............................................................................................... 25

 **11.14** No Assurance of Tax Benefits ............................................................................. 25

 **11.15** Indemnity ............................................................................................................. 25

**ARTICLE XII** MISCELLANEOUS ................................................................................... 25

 **12.1** Counsel to the Company ...................................................................................... 25

 **12.2** Complete Agreement ........................................................................................... 26

TH-PLTF-000121

# TABLE OF CONTENTS
(continued)

Page

**12.3**  Amendments ........................................................................ 26

**12.4**  Pronouns; Statutory References ........................................ 26

**12.5**  Headings ............................................................................. 27

**12.6**  Interpretation ..................................................................... 27

**12.7**  References to this Agreement .............................................. 27

**12.8**  Jurisdiction ........................................................................ 27

**12.9**  Severability ........................................................................ 27

**12.10**  Additional Documents and Acts ........................................ 27

**12.11**  Notices ................................................................................ 27

**12.12**  Reliance on Authority of Person Signing Agreement ......... 27

**12.13**  No Interest in Company Property; Waiver of Action for Partition ...................... 28

**12.14**  Attorney Fees ..................................................................... 28

**12.15**  Remedies Cumulative ......................................................... 28

**12.16**  Statement of Restrictions ................................................... 28

**12.17**  No Third Party Beneficiary ................................................ 28

**12.18**  Not for Benefit of Creditors ............................................... 28

**12.19**  Publicity ............................................................................. 28

**12.20**  Warranties and Representations .......................................... 29

**12.21**  No Representations .............................................................. 29

**12.22**  Binding Effect of Agreement .............................................. 29

**12.23**  Counterparts ....................................................................... 29

**12.24**  Governing Law ................................................................... 29

-iv-

TH-PLTF-000122

# OPERATING AGREEMENT
# FOR
# LUCAS VENTURE GROUP XI, LLC
# A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement is made as of September __, 2013 (the "Effective Date"), by and among the Managing Member and the Non-Managing Members of Lucas Venture Group XI, LLC, a California limited liability company (the "Company"), with reference to the following facts:

A.      On April 9, 2012, Articles of Organization (the "Articles") for the Company were filed with the California Secretary of State.

B       The parties hereto desire to adopt and approve an operating agreement for the Company.

C.      The parties hereto intend that the Company will be classified as a partnership for tax purposes.

NOW, THEREFORE, the parties, by this Agreement, set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1     Formation.   The Members have formed the Company as a California limited liability company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement, which Agreement shall be deemed effective as of the date the Articles were so filed.   The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.   To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

1.2     Name.   The name of the Company shall be "LUCAS VENTURE GROUP XI, LLC."   The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managing Member deems appropriate or advisable.   The Managing Member shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managing Member considers appropriate or advisable. The phrase "LLC" shall always appear as part of the name of the Company on all correspondence, stationery, checks, invoices and any and all documents and papers executed by the Company.

TH-PLTF-000123

1.3     Term.  The Company will terminate on December 31, 2041, unless the Company is dissolved earlier in accordance with Section 7.1 hereof, except that, with the consent of a Majority-in-Interest of the Members, the term of the Company may be extended by the Managing Member for additional one-year periods (but not for more than a total of two additional years).

1.4     Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of California.  The principal office of the Company shall be 545 Middlefield Road, Suite 220, Menlo Park, California, 94025, or such other location as the Managing Member may determine from time to time.  The Company may also have such offices, anywhere within and without the State of California, as the Managing Member may determine from time to time, or the business of the Company may require.  The registered agent shall be as stated in the Articles or as otherwise determined by the Managing Member.

1.5     Addresses of the Members and the Managing Member.  The respective addresses of the Non-Managing Members and the Managing Member shall be maintained in the records of the Company at its principal executive offices.  A Non-Managing Member shall notify the Managing Member if his, her or its address changes.

1.6     Purpose and Business of the Company.  The Company is organized for the specific object and purpose of making an equity investment in [_____] (the "Portfolio Company").

1.7     Title to Properties.  Real and personal property owned or purchased by Company shall be held and owned, and conveyance made, in the name of the Company.  Instruments and documents providing for the acquisition, mortgage or disposition of property of the Company shall be valid and binding upon the Company, except as otherwise limited in the Agreement, if executed by the Managing Member.

## ARTICLE II

## DEFINITIONS; DETERMINATIONS

2.1     Definitions.  For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

"Act" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

"Affiliate" of a Non-Managing Member or Managing Member shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Non-Managing Member or Managing Member, as applicable.  The term "control," as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or

TH-PLTF-000124

association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

"Assignee" shall mean the owner of an Economic Interest who has not been admitted as a Member in accordance with Section 6.2.

"Basis" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to clause (iii) of the definition of Realized Investment Loss (as the case may be).

"Capital Account" has the meaning set forth in Section 3.2.

"Capital Contribution" means the aggregate amount of cash agreed to be contributed to the Company as capital by a Member in such Member's subscription agreement, to the extent such amount was accepted by the Managing Member, plus additional expenses contributed pursuant to Section 5.7, as such amount is adjusted pursuant tot the terms of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company Expenses" means all costs and expenses relating to the Company's activities and business including, but not limited to, (i) legal, accounting, auditing and other fees and expenses (including, but not limited to, expenses associated with the preparation of Company financial statements, tax returns and forms K-1), (ii) extraordinary expenses of the Company (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements), (iii) all costs and expenses attributable to acquiring, holding, monitoring and disposing of the Portfolio Company securities (including, but not limited to, registration expenses and brokerage, finders', custodial and other fees) and (iv) the Organizational Expenses.

"Current Income" means all interest and dividend income (including original issue discount and payment of in-kind income) from investments (other than Short-Term Investments).

"Defaulting Member" has the meaning set forth in Section 6.14.

"Dissolution Event" shall mean the death, insanity, withdrawal, resignation, retirement, expulsion, Bankruptcy or dissolution of the Managing Member.

"Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company or, except as provided in Section 17106 of the California Corporations Code, any right to information concerning the business and affairs of the Company.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Indemnifying Member" has the meaning set forth in Section 6.7.

TH-PLTF-000125

"Majority-In-Interest" shall mean those Non-Managing Members who hold a majority Percentage Interests.

"Management Fee" has the meaning set forth in Section 5.6.

"Managing Member" means LVG GP IV, LLC, or any other Person that may accompany or succeed it as a Managing Member of the Company.

"Managing Member-Sponsored Fund" means any private venture capital equity fund hereafter sponsored by the Managing Member, and the "Managing Member-Sponsored Funds" means all of such funds, collectively.

"Members" means the Persons admitted as members of the Company pursuant to the terms of this Agreement and such Person's subscription agreement, and each Assignee who is admitted to the Company as a member pursuant to Section 6.2, so long as each such Person continues to be a member of the Company hereunder.

"Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company, together with the obligations of such Member to comply with all terms and provisions of the Agreement.  A Membership Interest constitutes personal property.  A Member or Assignee of any Membership Interest has no interest in specific property of the Company.

"Net Loss" for any period means, (x) the sum of (1) the Company's Realized Investment Loss and (2) Company Expenses for such period minus (y) the sum of (3) the Company's Current Income and (4) Realized Investment Gain for such period.

"Net Profits" for any period means  (x) the sum of (1) the Company's Current Income and (2) Realized Investment Gain for such period minus (y) the sum of (3) the Company's Realized Investment Loss and (4) Company Expenses for such period.

"NMS" means the National Association of Securities Dealers Automated Quotation System, National Market System.

"Non-Managing Members" means all Members other than the Managing Member in his capacity as the managing member of the Company.

"Opinion of Member's Counsel" means a written opinion of any counsel selected by a Non-Managing Member which counsel and opinion shall be reasonably acceptable in form and substance to the Managing Member in its sole and absolute discretion.

"Organizational Expenses" means the reasonable expenses (including, without limitation, travel, printing, legal and accounting fees and expenses) incurred in connection with the organization and funding of the Company.

"Payout" means the time when each Member has received cumulative distributions from the Company (regardless of the source or character thereof) in an amount equal to his or her

TH-PLTF-000126

aggregate Capital Contributions. If a distribution of cash or securities causes the Company to reach and exceed Payout, the portion of the amount distributed which was necessary to reach Payout will be deemed to have been distributed before Payout, and any remaining amount will be deemed to have been distributed after Payout.

"Percentage Interests" shall mean, at any point in time, the percentage obtained by dividing the aggregate Capital Account balances of the relevant Member or Members at such time by the aggregate Capital Account balance of all Members at such time.

"Person" means an individual, partnership, corporation, association, joint stock company, trust, joint venture, unincorporated organization, or governmental entity or any department, agency or political subdivision thereof.

"Portfolio Company Fees" means (i) all compensation (whether in cash or securities) directly or indirectly received by the Managing Member or its employees or agents from the Portfolio Company, whether as director fees, management fees, consultant fees or investment banking fees, and (ii) all breakup fees, litigation proceeds or commitment fees received by the Managing Member or any of its employees or agents from transactions not consummated by the Company (in each case, net of all amounts necessary to reimburse the Managing Member and any of its employees or agents for all costs and expenses incurred by any of them in connection with consummated or unconsummated transactions or in connection with generating any such fees and not previously reimbursed), but not including any amount received by the Managing Member or any of its employees or agents from the Portfolio Company as reimbursement for out-of-pocket expenses directly related to the Portfolio Company.

"Prime Rate" means, on any date, a variable rate per annum equal to the rate of interest published, from time to time by *The Wall Street Journal* as the "prime rate" at large U.S. money center banks.

"Realized Investment Gain" means the difference between (i) the sum of (A) the proceeds from the sale of the Portfolio Company securities plus (B) the value (as determined pursuant to Article VIII) of the Portfolio Company securities distributed to the Members minus (ii) the Basis of such Portfolio Company securities, where such difference is a positive number.

"Realized Investment Loss" means the difference between  (i) the sum of (A) the proceeds from the sale of the Portfolio Company securities plus (B) the value (as determined pursuant to Article VIII) of the Portfolio Company securities distributed to the Members minus (ii) the Basis of such Portfolio Company securities, where such difference is a negative number, minus (iii) the amount, as determined by the Managing Member, by which the Portfolio Company securities have permanently declined in value pursuant to Section 8.3.

"Securities Act" means the Securities Act of 1933, as amended.

"Segregated Transactions" has the meaning set forth in Section 4.4.

TH-PLTF-000127

"Short-Term Investment Income or Short-Term Investment Loss" means the income earned on Short-Term Investments, including any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means commercial paper, governmental obligations, money market instruments, certificates of deposit and other similar obligations and securities, in each case having a maturity of one year or less at the time of purchase by the Company.

"Tax Matters Member" (as defined in Code Section 6231) shall be the Managing Member or its successor as designated pursuant to Section 9.3.

2.2    Determinations.

Any determination by the Members pursuant to this Agreement shall be made based upon each Member's Percentage Interest.

## ARTICLE III

### CAPITAL CONTRIBUTIONS

3.1    Capital Contributions; Capital Accounts and Allocations.

(a)    Each Member agrees to make the capital contributions to the Company equal to such Member's Capital Contribution. Each Member's Capital Contribution will be made by delivery of a check made payable to the Company or by means of a wire transfer of funds to an account designated by the Managing Member.

(b)    The Managing Member may cause the Company to return to the Members all or any portion of any Capital Contribution which is not invested in the Portfolio Company or used to pay Company Expenses or Organizational Expenses. Each such return of Capital Contributions shall be made pro rata among all Members in the same proportion as the Members made such Capital Contributions.

3.2    Capital Accounts. A capital account ("Capital Account") will be established for each Member on the books of the Company in accordance with the rules in the Treasury Regulations promulgated under Section 704 of the Code, and will be adjusted as follows:

(a)    Capital Contributions. A Member's Capital Contribution will be credited to his, her or its Capital Account when received by the Company.

(b)    Short-Term Investment Income or Loss. Short-Term Investment Income or Loss accrued in each quarterly period will be credited or debited to the Capital Accounts of the Members pro rata according to their respective Capital Contributions.

(c)    Net Profits. For any period in which the Company has Net Profits, such Net Profits shall be credited:

TH-PLTF-000128

(i)    First, in the ratio and to the extent that Net Loss was allocated under <u>Section 3.2(d)(iii)</u> below so as to offset all such Net Loss allocations with Net Profit allocations;

(ii)    Next, in the ratio and to the extent that Net Loss was allocated under <u>Section 3.2(d)(ii)</u> below so as to offset all such Net Loss allocations with Net Profit allocations; and

(iii)    Then, twenty percent (20%) to the Capital Account of the Managing Member and eighty (80%) to the Capital Accounts of the Members pro rata according to their respective Capital Contributions.

(d)    <u>Net Loss</u>.  For any period in which the Company has Net Loss, such Net Loss shall be debited:

(i)    First, in the ratio and to the extent that Net Profits were allocated under <u>Section 3.2(c)</u> above in the reverse order of such Net Profit allocations so as to offset all such Net Profit allocations with Net Loss allocations under this section;

(ii)    Next, in the ratio of Member positive Capital Account balances until no Member has a positive Capital Account balance; and

(iii)    Then, in accordance with Percentage Interests.

(e)    <u>Distributions</u>.  Any amount distributed to a Member will be debited against such Member's Capital Account.

(f)    <u>Timing of Adjustments</u>.  The Managing Member normally will adjust the Member's Capital Accounts at the end of each quarterly period, but may adjust them more often if a new Member is admitted to the Company or circumstances otherwise make it advisable in the Managing Member's judgment.

## ARTICLE IV

### DISTRIBUTIONS

4.1    <u>Distribution Policy</u>.  The Managing Member, at its sole discretion, shall make distributions of cash or securities at any time; provided, however, that no securities will be distributed in kind to the Members until the earlier to occur of (a) such time as such securities may be sold by or for the account of any Member pursuant to Rule 144 promulgated under the Securities Act, or any successor rule, following the initial public offering of the Portfolio Company, (b) any sale, refinancing or similar transaction involving the Portfolio Company ("<u>Portfolio Company Transaction</u>") in which shareholders of the Portfolio Company receive cash, (c) any Portfolio Company Transaction in which shareholders of the Portfolio Company receive securities, provided that all restrictions affecting transfer have lapsed, or (d) final distribution of the assets of the Company to the Members pursuant to <u>Section 7.4(b)</u>.

TH-PLTF-000129

4.2   <u>Cash Distributions</u>.  The Managing Member may, at its sole discretion, distribute any portion of the net amount of Current Income, cash proceeds of any sale, refinancing or similar transaction involving the Portfolio Company, as follows:

(a)   Until such time as Payout is achieved, one hundred percent (100%) of all distributions of cash shall be made to the Members pro rata according to their Capital Contributions.

(b)   After such time as Payout is achieved, all distributions of cash shall be made twenty percent (20%) to the Managing Member and eighty percent (80%) to the Members pro rata according to their Capital Contributions.

4.3   <u>Distributions in Kind</u>.

(a)   If any securities are to be distributed in kind to the Members, such securities will first be written up or down to their value (as determined pursuant to <u>Article VIII</u> as of the date of such distribution), thus creating Realized Investment Gain or Realized Investment Loss (if any), which shall be allocated in accordance with <u>Section 3.2</u> to the Capital Accounts of the Members, and upon the distribution of such securities to such Members, the value of such securities shall be debited, in accordance with <u>Section 3.2</u>, to the Capital Accounts of the Members.

(b)   All distributions of securities shall be made to the Members in the ratios set forth in <u>Section 4.2</u> above.

4.4   <u>Segregated Transactions</u>.  Anything herein to the contrary notwithstanding, the Managing Member is authorized, in its discretion, to cause the Company to segregate its investments into two or more parts and to engage in transactions ("<u>Segregated Transactions</u>") with affiliated or unaffiliated entities which shall affect the Capital Accounts of, and provide Short-Term Investment Income or Loss, Net Profit, Net Loss and/or any distributions to only those Members who elect to participate in such transactions.  Segregated Transactions may involve investments in other limited liability companies or in partnerships.  In the event that the Managing Member causes the Company to engage in any Segregated Transactions:

(a)   The capital required for any Segregated Transaction may be obtained for the Company through specially identified Capital Contributions made by the Members or by a segregation of assets (or interests therein) held by the Company;

(b)   All amounts so contributed, and all assets so segregated, for such purpose shall be segregated for accounting purposes from the other assets of the Company;

(c)   The Members participating with respect to any Segregated Transaction shall be assigned Company interests attributable to such Segregated Transaction only, and any Short-Term Investment Income or Loss, Net Profit, Net Loss and/or any distributions relating to such Segregated Transaction shall be allocated and distributed among such Members in accordance with the provisions of Article III or of this Article IV, as applicable, as though such

TH-PLTF-000130

items and such Company interests pertaining to the Segregated Transaction were the only items and interests of the Company; and

(d)     The Managing Member is specifically authorized to offer at its discretion, participation in Segregated Transactions to some but not all of the Members, or to new Members admitted for the sole purpose of such Segregated Transactions.

## ARTICLE V

### MANAGING MEMBER; COMPENSATION AND ORGANIZATIONAL EXPENSES

5.1     Election of Managing Member.

(a)     <u>Number, Term, and Qualifications</u>.   The Company shall have one (1) Managing Member.  Unless it resigns or is removed, the Managing Member shall hold office until a successor shall have been elected and qualified.  The Managing Member shall be elected by the affirmative vote or written consent of a Majority-in-Interest of the Non-Managing Members.  A Managing Member need not be an individual, a resident of the State of California, or a citizen of the United States.

(b)     <u>Resignation</u>.  The Managing Member may resign at any time by giving written notice to the Non-Managing Members without prejudice to the rights, if any, of the Company under any contract to which the Managing Member is a party.  The resignation of the Managing Member shall take effect upon receipt of that notice or at such later time as shall be specified in the notice.  Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The resignation of the Managing Member shall not affect the Managing Member's rights as a Member, if applicable, and shall not constitute a withdrawal of a Member.

(c)     <u>Removal</u>.  The Managing Member may be removed as the managing member of the Company for "cause" by the affirmative vote of a Majority-in-Interest at a meeting called expressly for that purpose.  For purposes of this Section, "cause" shall mean fraud, gross negligence, willful misconduct, embezzlement or breach of the Managing Member's obligations under this Agreement or any employment contract with the Company.

(d)     <u>Vacancies</u>.   Any vacancy in the position of the number of Managing Member may be filled by the affirmative vote or written consent of a Majority-in-Interest of the Non-Managing Members.

5.2     Management Authority.

(a)     The management of the Company will be vested exclusively in the Managing Member, and the Managing Member will have full control over the business and affairs of the Company.  The Managing Member will have the power on behalf and in the name of the Company to buy, sell, hold, sell short and otherwise invest in the securities of the Portfolio Company and Short-Term Investments; to exercise all rights, powers, privileges and other

TH-PLTF-000131

incidents of ownership or possession with respect to securities held or owned by the Company; to enter into, make, and perform all contracts and other undertakings; manage and supervise such investments and engaging in such activities incidental or ancillary thereto as the Managing Member deems necessary or advisable to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole and absolute discretion, it deems necessary or advisable or incidental thereto, including the power to acquire or dispose of any security (including marketable securities).

(b)     The Managing Member shall pay (i) all ordinary overhead and administrative expenses of the Company (including salaries and related benefits, rent, travel, entertainment and equipment expenses <u>but excluding</u> any Company Expenses and any Organizational Expenses reimbursable under <u>Section 5.7</u>) incurred by the Managing Member, or any of its agents or employees (to the extent not borne or reimbursed by the Portfolio Company) in connection with (A) identifying and investigating investment opportunities for the Company, (B) monitoring the Company's investments, and (C) providing Portfolio Company reports and information to the Non-Managing Members, and (ii) Organizational Expenses to the extent not reimbursed under <u>Section 5.7</u>.

(c)     All matters concerning (i) the allocation of Short-Term Investment Income, Current Income, Net Profits, Net Loss, Realized Investment Gain, Realized Investment Loss, Company Expenses, Organizational Expenses and the distribution of net proceeds and the return of capital among the Members, including the withholding of taxes thereon, and (ii) accounting procedures and determinations and other determinations not specifically and expressly provided far by the terms of this Agreement, shall be determined by the Managing Member in accordance with its reasonable interpretation of the provisions of this Agreement, whose determination shall be final and conclusive as to all the Members.

(d)     <u>No Individual Authority for a Non-Managing Member</u>.   No Non-Managing Member acting alone shall have any authority to act for, or to undertake or assume, any obligation, responsibility, debt or duty on behalf of the Company.

5.3    <u>No Liability to Members</u>.   Neither the Managing Member nor any employee, agent or Affiliate of the Managing Member (or any of their respective shareholders, the Non-Managing Members, directors, officers, employees, agents or Affiliates), shall be liable to any Member or to the Company for any action taken, or omitted to be taken, as the Managing Member, or on behalf of the Managing Member, with respect to the Company or for any action taken, or omitted to be taken, by it, or any of its employees, agents or Affiliates (or any of their respective shareholders, the Non-Managing Members, directors, officers, employees, agents or Affiliates), so long as such person (a) acted in good faith, (b) acted in a manner reasonably believed to be in the best interests of the Company, and (c) was neither grossly negligent nor engaged in fraud, embezzlement or willful malfeasance.

5.4    <u>Permitted Investments</u>.   Nothing in this Agreement will restrict the Managing Member from acquiring shares of stock of the Portfolio Company or rights convertible into or exercisable or exchangeable for any such stock, for its own account.

TH-PLTF-000132

5.5     Other Managing Member-Sponsored Funds.

(a)     The Company will not purchase from or sell to another Managing Member-Sponsored Fund, except with the prior approval of a Majority-in-Interest of the Non-Managing Members.

(b)     The extent to which the Company purchases securities in the Portfolio Company (relative to the amount, if any, to be invested in the Portfolio Company by another Managing Member-Sponsored Fund) will be determined by the Managing Member in its sole and absolute discretion.

5.6     Management Fee.

(a)     As compensation for services rendered by the Managing Member and its Affiliates on behalf of the Company, the Members shall pay a fee in cash on an annual basis to Lucas Venture Management, LLC, an Affiliate of the Managing Member equal to 2.25% of the Capital Contributions of such Member (the "Management Fee").

(b)     Partial Year. The Management Fee in any partial year will be prorated on a daily basis according to the actual number of days in such period.

(c)     Portfolio Company Fees. The Management Fee payable with respect to any period will be reduced by all Portfolio Company Fees received during the immediately preceding period by the Managing Member, his employees or agents, with respect to Portfolio Company Fees, and if such Portfolio Company Fees are comprised of stock or rights convertible into or exercisable or exchangeable for stock, provided, however that such property will not be deemed to be received, for purposes of the foregoing, and therefore will not reduce the Management Fee, until such time as, and only to the extent that, the recipient thereof realizes cash proceeds with respect to such property, whether upon the sale or other transfer of such property or as distributions with respect thereto; and provided, further, that any such Portfolio Company Fees held as of the ninth anniversary of the Effective Date and not previously deemed received pursuant to this sentence will be deemed to have been received as of such date. In the event that the amount of Portfolio Company Fees to be applied against the Management Fee for any period exceeds the Management Fee for the immediately succeeding period, such excess shall be carried forward to reduce the Management Fee payable in the following period.

(d)     Early Termination. In the event of an early termination of the Company pursuant to Section 7.1, the Management Fee will be payable to the Managing Member through the date six months after the final distribution in connection therewith.

5.7     Expenses.   Subject to the terms and conditions below, each Non-Managing Member shall pay his, her or its pro rata share, as determined by the allocation rules in Article III, of Organizational Expenses and Company Expenses directly to the Company. The Company shall reimburse the Managing Member for Organizational Expenses and Company Expenses. The Company shall bill each Non-Managing Member (x) on or about the date hereof for the Organizational Expenses, (y) annually in advance for the Management Fee, and (z) annually in arrears for other Company Expenses incurred solely in the immediately prior fiscal year, unless

TH-PLTF-000133

the Managing Member determines in its sole and absolute discretion to bill each Non-Managing Member for Company Expenses when incurred. The other Company Expenses billed to Non-Managing Members each fiscal year pursuant to Section 5.7(z) shall not exceed an aggregate amount of Thirty Thousand Dollars ($30,000), unless otherwise approved by a Majority-in-Interest.  For purposes of calculating gains, losses, distributions and sharing ratios, all amounts so paid shall be treated as having been paid into the Company as a Capital Contribution by each Non-Managing Member and as then having been paid by the Company to the Managing Member as Organizational Expenses or as Company Expenses.

     5.8   No Transfer of Managing Member's Interest; No Withdrawal or Loans.  The Managing Member will not sell, assign, pledge, mortgage or otherwise dispose of his Managing Member interest in the Company and will not borrow or withdraw any amount from the Company.

# ARTICLE VI

## MEMBERS

     6.1   Limited Liability.  Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, and no Member shall be liable to make a contribution to the capital of the Company to restore a negative Capital Account balance for such Member, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.  No Member shall be required to lend any funds to the Company.

     6.2   Transfer of Membership Interests.

     (a)   A Non-Managing Member may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Company (including any transfer or assignment of all or any part of its interest to a Person who becomes an assignee of a beneficial interest in the Company even though not becoming a substitute Non-Managing Member) unless the Managing Member has consented, in its sole and absolute discretion, to such transfer or assignment in writing, except that a Non-Managing Member which is a trust under an employee benefit plan may, upon prior written notice to the Managing Member, assign a beneficial interest in all or a portion of its interest in the Company to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor (in which case the transferor shall remain liable for all liabilities and obligations relating to the transferred beneficial interest).  For purposes of this Section 6.2, a change in any trustee or fiduciary of a Non-Managing Member will not be deemed to be an assignment or transfer of a Membership Interest pursuant to this Agreement, provided any such replacement trustee or fiduciary is also a fiduciary as defined under applicable state law and provided that income and loss allocable to the Non-Managing Member of the Company will continue to be included in the same filings under the same employee identification number with the Internal Revenue Service.  Accordingly, such a change in a trustee or fiduciary may be made without the prior written consent of the Managing Member, in its sole and absolute discretion, provided that the Non-Managing Member agrees to provide prompt written notice of such change to the Managing Member.  The voting rights of

TH-PLTF-000134

any Non-Managing Member's interest shall automatically terminate upon any transfer of such interest to a trust, heir, beneficiary, guardian or conservator or upon any other transfer if the transferor no longer retains control over such voting rights and the Managing Member has not consented pursuant to Section 6.2(b) to such transferee becoming a substitute Non-Managing Member.  No consent of any other Non-Managing Member will be required as a condition precedent to any such transfer or substitution.  As a condition to any transfer of a Membership Interest (including a transfer not requiring the consent of the Managing Member), the transferor and the transferee shall provide such legal opinions and documentation as the Managing Member shall reasonably request; provided that if the transfer is to be made from a Non-Managing Member to a co-trustee or trustee as contemplated above, an officer's certificate in form reasonably satisfactory to the Managing Member shall be delivered by the Non-Managing Member to the Managing Member in lieu of such legal opinions and other documentation. Notwithstanding anything to the contrary contained in this Section 6.2, a Non-Managing Member may sell, assign, transfer or pledge all or any portion of the Non-Managing Member's interest in the Company to a "Related Person."  A "Related Person" means (a) the spouse, children, siblings, grandchildren, parents and grandparents (such persons being referred to as "Immediate Family Members") of (i) a Non-Managing Member and/or (ii) any individual holding an ownership interest in a Non-Managing Member (whether as shareholder, member, partner, beneficiary or otherwise), (b) any entity at least seventy-five percent (75%) directly or indirectly owned and controlled by, or trusts established for the benefit of, one or more Immediate Family Members and/or (c) any individual or entity directly or indirectly holding an ownership interest in a Non-Managing Member (whether as shareholder, member, partner, beneficiary or otherwise).  For purposes of the foregoing, indirectly means ownership or control through one or more entities.

(b)    Notwithstanding anything to the contrary contained in this Section 6.2 or Section 6.14, a transferee or assignee will not become a substitute Non-Managing Member without (i) the consent of the Managing Member, which he may grant or withhold in its sole and absolute discretion, and (ii) executing and delivering to the Managing Member a copy of this Agreement or amendment hereto in form and substance satisfactory to the Managing Member in its sole and absolute discretion.  Notwithstanding the foregoing, a Related Person shall be a substitute Non-Managing Member upon executing and delivering to the Managing Member a copy of this Agreement or amendment hereto in form and substance satisfactory to the Managing Member in its sole and absolute discretion.  Any substitute Non-Managing Member admitted to the Company with the consent of the Managing Member will succeed to all rights and be subject to all the obligations of the transferring or assigning Non-Managing Member with respect to the interest to which such Non-Managing Member was substituted.

(c)    The transferor and transferee of any Non-Managing Member's interest shall be jointly and severally obligated to reimburse the Managing Member and the Company for all reasonable expenses (including reasonable attorneys' fees and expenses) of any transfer or proposed transfer of a Non-Managing Member's interest, whether or not consummated.

(d)    The transferee of any Membership Interest shall be treated as having made all of the Capital Contributions made by, and received all of the distributions received by, the transferor of such Membership Interest.

TH-PLTF-000135

(e)     Anything in this Agreement to the contrary notwithstanding, no Company interest shall be transferred if such transfer would cause the Company to be classified as a publicly traded partnership under the Code.

6.3     Withdrawals or Resignations.   Subject to the provisions of Section 6.2 and Section 6.14, no other Non-Managing Member may withdraw or resign from the Company.

6.4     No Termination.  The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Non-Managing Member will not affect the existence of the Company, and the Company will continue for the term of this Agreement until its existence is terminated as provided herein.

6.5     Formation of New Fund or Business Endeavor.  No Non-Managing Member will, on account of entering into this Agreement or on account of his, her or its status as a Non-Managing Member of the Company, have any interest in the other business endeavors of the Managing Member or the other Non-Managing Members other than his, her or its interest in the Company, and no Non-Managing Member is, on account of entering into this Agreement or on account of his, her or its status as a Non-Managing Member of the Company, restricted from entering into any future business activity, including with any other Non-Managing Member.

6.6     Interest as a Member.  To the extent that the Managing Member (x) acquires the interest of a Defaulting Member or any other Non-Managing Member or (y) contributes capital to the Company pursuant to Section 3.1(a) hereof, the Managing Member will be deemed to be a Non-Managing Member with respect to such interest for all purposes of this Agreement.

6.7     Indemnification and Reimbursement for Payments on Behalf of a Member.

(a)     If the Company is obligated to pay any amount to a governmental agency or to any other Person (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign Members, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the "Indemnifying Member") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payment).  The amount to be indemnified may be charged against the Capital Account of the Indemnifying Member and, at the option of the Managing Member, either:

(i)     promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account), or

(ii)     the Company shall reduce subsequent distributions which would otherwise be made to the Indemnifying Member until the Company has recovered the amount to be indemnified (provided that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement).

TH-PLTF-000136

(b)     A Member's obligation to make contributions to the Company under this Section 6.7 shall survive the termination, dissolution, liquidation and winding up of the Company and, for purposes of this Section 6.7, the Company shall be treated as continuing in existence.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.7, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Prime Rate plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

6.8     Section 754 Election.  The Managing Member may, and upon the written request of a Majority-in-Interest the Managing Member shall, make an election provided for in Section 754 of the Code, if then permitted by applicable law.

6.9     Voting Rights.

(a)     Except as expressly provided in this Agreement or the Articles, the Non-Managing Members shall have no voting, approval or consent rights.

(b)     The Non-Managing Members shall have the right to approve or disapprove only the following matters:

(i)     A decision made pursuant to Section 7.1(e) to continue the business of the Company after the occurrence of a Dissolution Event.

(ii)     Any amendment of the Articles or this Agreement;

(iii)     A decision to compromise the obligation of a Non-Managing Member to make a Capital Contribution or return money or property paid or distributed in violation of the Act; and

(iv)     Removal of the Managing Member pursuant to Section 5.1(c).

(c)     Approval by Non-Managing Members Holding a Majority-in-Interest.  In all matters in which a vote, approval or consent of the Non-Managing Members is required, a vote, consent or approval of a Majority-in-Interest (or, in instances in which there are defaulting or remaining Non-Managing Members, non-defaulting or remaining Non-Managing Members who hold a Majority-in-Interest of the Membership Interests held by all non-defaulting or remaining Non-Managing Members) shall be sufficient to authorize or approve such act.

(d)     Approval Standard.  Except as otherwise specifically provided in this Agreement, all votes, approvals or consents of the Non-Managing Members may be given or withheld, conditioned or delayed as the Non-Managing Members may determine in their sole and absolute discretion.

6.10     Meetings of Non-Managing Members.  No regular meetings of the Non-Managing Members are contemplated or required by this Agreement.  Meetings of Non-Managing Members may be held at such date, time and place within or without the State of California as the Managing Member may fix from time to time.

TH-PLTF-000137

6.11   <u>Non-Managing Member as Trustee for the Company</u>.  A Non-Managing Member shall hold as trustee for the Company (a) specific property stated in the Articles, Agreement, or other document executed by the Non-Managing Member as contributed by such Non-Managing Member, but which was not contributed or which has been wrongfully or erroneously returned, and (b) money or other property wrongfully paid or conveyed to such Non-Managing Member from the Company.

6.12   <u>No Responsibility for Pre-formation Commitments</u>.  In the event that any Non-Managing Member (or any of such Non-Managing Member's shareholders or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects the Company, neither the Company nor any other Non-Managing Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument signed by all Non-Managing Members. Furthermore, neither the Company nor any Non-Managing Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Non-Managing Member (or any of such Non-Managing Member's shareholders or Affiliates).  In the event that a Non-Managing Member (or any of such Non-Managing Member's shareholders or Affiliates, collectively, the "<u>Liable Member</u>"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor the other Non-Managing Members has any responsibility or liability for, the Liable Member shall indemnify and hold harmless the Company and the other Non-Managing Members from any liability or obligation they may incur in respect thereof.

6.13   <u>Rights of Judgment Creditor of Member</u>.  On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's Membership Interest with payment of the unsatisfied amount of the judgment with interest.  To the extent so charged, the judgment creditor has only the rights of an Assignee of the Member's Membership Interest.   This Section does not deprive any Member of the benefit of any exemption applicable to his Membership Interest.

6.14   <u>Non-Managing Member's Default on Payment of Company Expenses</u>.  If any Non-Managing Member fails to make full payment of any portion of his, her or its pro rata share of the Company Expenses when due (a "<u>Defaulting Member</u>") and such failure is not cured within ten (10) business days after receipt by such Non-Managing Member of written notice from the Managing Member with respect to such failure to pay, the Managing Member may in his discretion undertake any one or more of the following steps:

(a)   The Managing Member may assist the Defaulting Member in finding a buyer for the Defaulting Member's Interest, <u>provided that</u> the Managing Member will have no obligation to contact any particular Non-Managing Member or other Person with regard to such sale.

(b)   The Company may pursue and enforce all rights and remedies the Company may have against such Defaulting Member with respect thereto, including a lawsuit to collect the overdue portion of any amounts due the Company or Managing Member hereunder, with interest at a rate equal to the Prime Rate plus six percentage points (but not in excess of the highest rate per annum permitted by law).

TH-PLTF-000138

(c)     The Managing Member may offer the Defaulting Member's Membership Interest to the Non-Managing Members (other than any other Defaulting Members) pro rata in accordance with their Membership Interests on the terms set forth below.  If any Non-Managing Member does not elect to purchase the entire Membership Interest offered to it, the remaining Membership Interest allocable to the Non-Managing Members will be reoffered pro rata to the Non-Managing Members who have purchased the entire Membership Interest offered to them until either all of such Membership Interest is acquired or no Non-Managing Member wishes to make a further investment.  At the closing of such purchase (on a date and at a place designated by the Managing Member), each purchasing Non-Managing Member shall deliver a non-interest bearing, non-recourse (except to the extent of the Company interest purchased and the proceeds therefrom) ten-year promissory note (in a form approved by the Managing Member) payable to the Defaulting Member in an amount equal to the portion of the Defaulting Member's Membership Interest being purchased by such Non-Managing Member.  The Managing Member will handle the mechanics of making the offers set forth herein and will in its sole and absolute discretion impose reasonable time limits for acceptance.

(d)     If the entire Defaulting Member's Membership Interest is not purchased in the manner set forth in (c) above, the Managing Member, in its sole and absolute discretion, may (i) purchase all or any portion of the remaining Membership Interest or (ii) offer the remaining Membership Interest to a third party or parties on the same terms as originally offered to the Non-Managing Members pursuant to (c) above (in which case such third party or parties will, as a condition of purchasing such Membership Interest, become a party to this Agreement).

Notwithstanding anything contained herein to the contrary, from and after the date of a default, (A) such Defaulting Member will have no right to receive any distributions, (B) such Defaulting Member's Capital Account will not be credited with any Net Profits or Short-Term Investment Income which shall instead be allocated to the Non-Managing Members (other that any Defaulting Members) in accordance with Section 3.2 (and as adjusted to treat the Defaulting Member's Capital Contribution as equal to zero).

(e)     No consent of any Non-Managing Member shall be required as a condition precedent to any transfer, assignment or other disposition of a Defaulting Member's Membership Interest pursuant to this Section 6.14.

## ARTICLE VII

## DISSOLUTION AND WINDING UP

7.1     Dissolution.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a)     At the time specified in the Articles or Section 1.3 of this Agreement;

(b)     The happening of any event of dissolution specified in the Articles;

(c)     The entry of a decree of judicial dissolution pursuant to California Corporations Code Section 17351;

310534462.3                                 17

TH-PLTF-000139

(d)     The vote of Non-Managing Members holding eighty percent (80%) of the Percentage Interests;

(e)     The occurrence of a Dissolution Event and the failure of a Majority-in-Interest of the remaining Non-Managing Members to consent in accordance with Section 6.9(b)(i) to continue the business of the Company within ninety (90) days after the occurrence of such event; or

(f)     The entry of a decree of judicial dissolution under the Act.

7.2     Certificate of Dissolution.  As soon as possible following the occurrence of any of the events specified in Section 7.1, the Managing Member who has not wrongfully dissolved the Company or, if none, the Non-Managing Members, shall execute a Certificate of Dissolution in such form prescribed by the California Secretary of State and file such certificate as required by the Act.

7.3     Winding Up.  Upon the occurrence of any event specified in Section 7.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Managing Member who has not wrongfully dissolved the Company or, if none, the Non-Managing Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 7.4.  The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company.  The Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

7.4     Final Allocation and Distribution.

(a)     Upon termination of the Company (whether or not an early termination), the Managing Member will make a final allocation of all kinds of income, loss and expense in accordance with Article III hereof and the Company's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Members.

(b)     After determining that all the known debts and liabilities of the Company, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in the ratio of their positive Capital Account balances.

(c)     The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment has been provided for by either of the following means:

(i)     Payment thereof has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency

TH-PLTF-000140

thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Non-Managing Members or Managing Member to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)     The amount of the debt or liability has been deposited as provided in Section 2008 of the California Corporations Code.

This <u>Section 7.4(c)</u> shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

7.5     <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Non-Managing Member shall be entitled to look solely to the assets of the Company for the return of his, her or its positive Capital Account balance and shall have no recourse for his, her or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managing Member or any other Non-Managing Member.

7.6     <u>Certificate of Cancellation</u>.  The Managing Member or the Non-Managing Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a Certificate of Cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

7.7     <u>No Action for Dissolution</u>.  Except as expressly permitted in this Agreement, a Non-Managing Member shall not take any voluntary action that causes a Dissolution Event.

## ARTICLE VIII

### VALUATION OF COMPANY ASSETS

8.1     <u>Normal Valuation</u>.  For purposes of this Agreement, the value of any security as of any date (or in the event such date is a holiday or other day which is not a business day, as of the next preceding business day) will be determined as follows:

(a)     a security which is listed on a recognized securities exchange or the NMS will be valued at its last sales price or, if no sale occurred on such date, at the last "bid" price thereon;

(b)     a security which is traded over-the-counter (other than on the NMS) will be valued at the most recent "bid" price; and

(c)     all other securities will be valued on such date by the Managing Member at fair market value in such manner as it may reasonably determine.

8.2     <u>Restrictions on Transfer or Blockage</u>.  Any security which is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Company's holdings compared to the trading volume would affect its marketability, will be valued at such discount from the value determined under <u>Section 8.1</u> above as the Managing Member deems necessary to reflect properly the marketability of such security.

TH-PLTF-000141

8.3     Write-down to Value.  Any securities which have permanently declined in value as determined by the Managing Member will be written down to their value pursuant to the provisions of this Article VIII as of the date of such determination.

## ARTICLE IX

## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1     Bank Accounts.  The Managing Member shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.2     Accounting Decisions and Reliance on Others.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managing Member.  The Managing Member may rely upon the advice of their accountants as to whether such decisions are in accordance with generally accepted accounting principles or with accounting methods followed for federal income tax purposes.

9.3     Tax Matters for the Company Handled by Managing Member and Tax Matters Member.  The Managing Member shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Non-Managing Members.  The Tax Matters Member shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.  The Tax Matters Member shall oversee the Company tax affairs in the overall best interests of the Company but shall not have the right to agree to extend any statute of limitations without the approval of a Majority-in-Interest.  If for any reason the Tax Matters Member can no longer serve in that capacity or ceases to be a Non-Managing Member or Managing Member, as the case may be, a Majority-in-Interest may designate another to be Tax Matters Member.

## ARTICLE X

## INDEMNIFICATION AND INSURANCE

10.1    Indemnification of the Non-Managing Members and Managing Member.  To the greatest extent not inconsistent with the Act and the other laws and public policies of the State of California, the Company shall indemnify each of their respective employees, agents and Affiliates, including without limitation the Managing Member and the Non-Managing Members, stockholders and employees of the Managing Member, against any losses, liabilities, damages or expenses (including amounts paid for reasonable attorneys fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative) to which any of such Persons may become subject in connection with the Company or in connection with any involvement with the Portfolio Company (including serving as an officer, director, consultant or employee of the Portfolio Company) directly or indirectly on behalf of the Company, provided that it shall be determined in the specific case in accordance with Section 10.4 of this Article X that indemnification of such

TH-PLTF-000142

Person is permissible in the circumstances because the Person has met the standard of conduct for indemnification set forth in this <u>Article X</u>.  Notwithstanding any provision hereof, no Non-Managing Member shall have any obligation to indemnify any such Person if such indemnification would cause such Non-Managing Member to violate any provision of ERISA or the rules and regulations promulgated thereunder.

10.2   <u>Advance Undertakings for Indemnification</u>.   To the greatest extent not inconsistent with the Act and other laws and public policies of the State of California, the Company shall pay for or reimburse the reasonable expenses incurred by a Non-Managing Member or Managing Member in connection with any such proceeding as incurred in advance of final disposition of the action, suit, or proceeding thereof if (a) the Person furnishes the Company a written affirmation of the Person's good faith belief that it has met the standard of conduct for indemnification described in <u>Section 10.4</u>, (b) the Person furnishes the Company a written undertaking, executed personally or on such Person's behalf, to repay the advance if it is ultimately determined by a court of competent jurisdiction that such Person did not meet such standard of conduct and that it is not entitled to be indemnified, and (c) a determination is made in accordance with <u>Section 10.5</u> that based upon facts then known to those making the determination, indemnification would not be precluded under this Article.

The undertaking described above must be a general obligation of the Person, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment.   The Company shall indemnify a Non-Managing Member or Managing Member who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the Person in connection with the proceeding without the requirement of a determination as set forth in <u>Section 10.5</u>.

10.3   <u>Advancement of Expenses</u>.   Upon demand by a Non-Managing Member or Managing Member for indemnification or advancement of expenses incurred in defending a civil or criminal suit or proceeding, as the case may be, the Company shall expeditiously determine whether the Non-Managing Member or Managing Member is entitled thereto in accordance with this <u>Article X</u>.  The indemnification and advancement of expenses provided for under this <u>Article X</u> shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Agreement.

10.4   <u>Standards of Conduct for Indemnification</u>.   Indemnification of a Managing Member or Non-Managing Member is permissible under this <u>Article X</u> only if (a) such Person conducted itself in good faith, and (b) reasonably believed that its conduct was in or at least not opposed to Company's best interest; and (c) in the case of any criminal proceeding, it had no reasonable cause to believe its conduct was unlawful.  The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Person did not meet the standard of conduct described in this <u>Section 10.4</u>.

10.5   <u>Procedures to Determine Indemnification</u>.   A determination as to whether indemnification of or advancement of expenses is permissible shall be made by any one of the following procedures:

TH-PLTF-000143

(a)     By the Non-Managing Members in good faith by a vote of a Majority-in-Interest of Non-Managing Members not at the time parties to the proceedings; or

(b)     By counsel to the Company.

10.6    Court Order of Indemnification.    A Non-Managing Member or Managing Member of Company who is a party to a proceeding may apply for indemnification from Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction.  On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(a)     In a proceeding in which the Non-Managing Member or Managing Member is wholly successful, on the merits or otherwise, the Non-Managing Member or Managing Member is entitled to indemnification under this Article, in which case the court shall order Company to pay the Non-Managing Member or Managing Member its reasonable expenses incurred to obtain such court ordered indemnification; or

(b)     The Non-Managing Member or Managing Member is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Non-Managing Member or Managing Member met the standard of conduct set forth in Section 10.4 above.

10.7    Described Indemnification Rights Non-exhaustive.    Nothing contained in this Article shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any Person who is or was a Non-Managing Member or Managing Member of the Company or is or was serving at the Company's request as a director, officer, partner, Managing Member, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.

10.8    Construction of Indemnification Rights.  Nothing contained in this Article X shall limit the ability of the Company to otherwise indemnify or advance expenses to any person.  It is the intent of this Article to provide indemnification to the Non-Managing Members and Managing Member to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Article X.  Indemnification shall be provided in accordance with this Article X irrespective of the nature of the legal or equitable theory upon which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of ERISA or violation of any other state or federal law.

10.9    Definitions for Indemnification Provisions.

(a)     "Expenses" mean all direct and indirect costs (including without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in

TH-PLTF-000144

connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Article, applicable law or otherwise.

(b)     "Liabilities" mean the obligations (including one incurred by way of settlement) to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(c)     "Party" means a Person who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(d)     "Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

10.10   Insurance for Indemnification.   To the greatest extent not inconsistent with the Act and other laws and public policies of the State of California, the Company may purchase and maintain insurance or other financial arrangements for the benefit of any Person who is or was a Non-Managing Member or Managing Member, employee or agent, against any liability asserted against or expenses incurred by such Person in any capacity or arising out of such Person's service with Company, whether or not Company would have the power to indemnify such Person against such liability.   The other financial arrangements made by Company may include:

(a)     The creation of a trust fund;

(b)     The establishment of a program of self-insurance;

(c)     The securing of its obligation of indemnification by granting a security interest or other lien on any assets of the Company; or

(d)     The establishment of a letter of credit, guaranty or surety.

No financial arrangement may provide protection for a Person adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable for intentional misconduct, fraud, or a knowing violation of law, except with respect to the advancement of expenses or indemnification ordered by a court.

## ARTICLE XI

### INVESTMENT REPRESENTATIONS

Each Non-Managing Member hereby represents and warrants to, and agrees with, the Managing Member, the other Non-Managing Members, and the Company as follows:

11.1   "Accredited Investor", Preexisting Relationship or Experience.   (a) He, she or it is an "accredited investor" within the meaning of Rule 501 promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Act, (b) he, she or it has a preexisting personal or business relationship with the Company or one or more of its or control Persons, or

TH-PLTF-000145

(c) by reason of his, her or its business or financial experience, or by reason of the business or financial experience of his, her or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, her or its own interests in connection with this investment.

11.2   No Advertising. He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3   Investment Intent.   He, she or it is acquiring the Membership Interest for investment purposes for his, her or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest.  No other Person will have any direct or indirect beneficial interest in or right to the Membership Interest.

11.4   Purpose of Entity.  If the Non-Managing Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

11.5   No Registration of Membership Interest.   He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act, or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his, her or its representations, warranties, and agreements herein.

11.6   Membership Interest is a Restricted Security.   He, she or it understands that the Membership Interest is a "restricted security" under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely.  In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for that Rule to be available for resale of "restricted securities," including the requirement that the securities must be held for at least one year after purchase thereof from the Company prior to resale (two years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances.  He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

11.7   No Obligation to Register.  He, she or it represents, warrants, and agrees that the Company and the Managing Member are under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist it or her in complying with any exemption from registration and qualification.

11.8   No Disposition in Violation of Law.  Without limiting the representations set forth above, and without limiting Article VI of this Agreement, he, she or it will not make any

TH-PLTF-000146

disposition of all or any part of the Membership Interest which will result in the violation by him or her or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws.  Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

(a)   There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

(b)   (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Managing Member, he, she or it has furnished the Company with a written Opinion of Member's Counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

11.9   Investment Risk.  He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him or her of his, her or its entire investment in the Company, that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.  He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof.

11.10   Information Reviewed.  He, she or it has received and reviewed the Agreement and all business plan information for the Company, and all other information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest.

11.11   No Representations By Company.  Neither the Managing Member, any agent or employee of the Company or of the Managing Member, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him or her that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Managing Member or his Affiliates, any other Person, or the Portfolio Company in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any distributions from the Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

11.12   Consultation with Attorney.  He, she or it has been advised to consult with his, her or its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he, she or it considers necessary.

TH-PLTF-000147

11.13  <u>Tax Consequences</u>.  He, she or it acknowledges that he, she or it will look solely to, and rely upon, his, her or its own advisers with respect to the tax consequences of this investment.

11.14  <u>No Assurance of Tax Benefits</u>.  He, she or it acknowledges that there can be no assurance that the Code or the Treasury Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service or state or local tax authorities.

11.15  <u>Indemnity</u>.  He, she or it shall defend, indemnify and hold harmless the Company, each and every Managing Member, each and every other Non-Managing Member, and any officers, directors, shareholders, the Managing Member, members, employees, partners, agents, attorneys, registered representatives, and control Persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or her including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, the Managing Member, each and every other Non-Managing Member, and any officers, directors, shareholders, the Managing Member, members, employees, partners, attorneys, accountants, agents, registered representatives, and control Persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XII

### MISCELLANEOUS

12.1  <u>Counsel to the Company</u>.  Counsel to the Company may also be counsel to an Affiliate of a Non-Managing Member or Managing Member.  The Managing Member may execute on behalf of the Company and the Non-Managing Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules").  The Company has initially selected Manatt, Phelps & Phillips, LLP ("Company Counsel") as legal counsel to the Company.  Each Member acknowledges that Company Counsel does not represent any Member in connection with their acquisition of or participation, and ownership interest, in the Company in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member.  Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Non-Managing Members or the Company, on the one hand, and a Managing Member (or Affiliate of a Managing Member) that Company Counsel represents, on the other hand, then each Non-Managing Member agrees that Company Counsel may represent either the Company or such Managing Member (or his, her or its Affiliate) or both, in any such dispute or controversy to the extent permitted by the Rules, and each Non-Managing Member hereby consents to such

TH-PLTF-000148

representation.  Each Non-Managing Member further acknowledges that Company Counsel has represented solely the interests of the Company in connection with the formation of the Company and the preparation and negotiation of this Agreement and while communications with Company Counsel concerning the formation of the Company, its Non-Managing Members and Managing Member may be confidential with respect to third parties, no Non-Managing Member has any expectation that such communications are confidential with respect to each other.

12.2    Complete Agreement.  This Agreement, and the Articles constitute the complete and exclusive statement of agreement among the Non-Managing Members and Managing Member with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Non-Managing Members and Managing Member or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Non-Managing Members or Managing Member or have any force or effect whatsoever.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.3    Amendments.  This Agreement may be amended by the Managing Member in any manner that does not adversely affect the rights of any Non-Managing Member and the Managing Member shall furnish notice of any such amendment to the Non-Managing Members. This Agreement may also be amended by action taken by both (a) the Managing Member and (b) a Majority-In-Interest at the time of the amendment, provided that such amendment does not discriminate among the Non-Managing Members.

12.4    Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Treasury Regulations, the Act, California Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5    Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.6    Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, her or its counsel.

12.7    References to this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

12.8    Jurisdiction.  Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement.  Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.11 of this Agreement,

TH-PLTF-000149

and that when so made shall be as if served upon him or her personally within the State of California.

12.9    Severability.  If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.10    Additional Documents and Acts.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.11    Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member or Managing Member at the address specified in such Member's subscription agreement or to the Managing Member at the address of the Company's principal office.  Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.12    Reliance on Authority of Person Signing Agreement.  If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

12.13    No Interest in Company Property; Waiver of Action for Partition.  No Member or Assignee has any interest in specific property of the Company.  Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

12.14    Attorney Fees.  In the event that any dispute between the Company and the Non-Managing Members or among the Non-Managing Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment.  Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law.  For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following:  (i) post-judgment motions; (ii) contempt proceedings; (iii) garnishment, levy, and debtor and third party examinations; (iv) discovery; and

TH-PLTF-000150

(v) bankruptcy litigation and (b) "prevailing party" shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

12.15   Remedies Cumulative.   The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

12.16   Statement of Restrictions.   This Agreement and any amendments hereto constitute an "Initial Transaction Statement" as described in California Commercial Code Section 8408.

12.17   No Third Party Beneficiary.   The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

12.18   Not for Benefit of Creditors.   The provisions of the Agreement are intended only for the regulation of relations among Members and Company and the Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other Person who is not a Member or an officer.

12.19   Publicity.   None of the parties will make any disclosure of the transactions contemplated by the Agreement or any related agreements, or any discussions in connection therewith, without the prior written consent of each of the other parties.   The preceding sentence shall not apply to any disclosure required to be made by the Act or other applicable law as reasonably determined by counsel to the party determining that such disclosure is required, except that such party, whenever practicable, shall be required to consult with the other parties concerning the timing and content of such disclosure before making it.

12.20   Warranties and Representations.   Each Member separately represents and warrants that he, she or it is not a party to any pending or threatened suit, action or legal, administrative, arbitration or other proceeding which might materially and adversely affect the business of the Company or the transactions contemplated by this Agreement, nor does such Member know of any facts which are likely with the passage of time to give rise to such a suit, action or proceeding.   Each Member separately represents and warrants that he, she or it is not a party to any agreement, understanding, commitment or other obligation that prohibits or restricts such Member's performance under this Agreement.

12.21   No Representations.   Each of the Members acknowledges and agrees (a) that no representation or promise not expressly contained in this Agreement has been made by any of the other Members or by any of such Member's agents, employees, representatives or attorneys; and (b) that this Agreement is not being entered into on the basis of, or in reliance upon, any promise or representation, express or implied, other than such as are set forth expressly in this Agreement.

12.22   Binding Effect of Agreement.   This Agreement, including Section 6.2 hereof, shall be binding on the successors, assigns and the legal representatives of each of the Members.

TH-PLTF-000151

12.23   <u>Counterparts</u>.   This Agreement may be executed in more than one counterpart with the same effect as if the Members executing the several counterparts had all executed one document.

12.24   <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the principles of conflicts of law thereof.

* * * *

TH-PLTF-000152

IN WITNESS WHEREOF, The Managing Member and all of the Non-Managing Members of LUCAS VENTURE GROUP XI, LLC, a California limited liability company, have executed this Agreement, effective as of the date first written above.

**MANAGING MEMBER**:

LVG GP IV, LLC

By: _____

      Donald A. Lucas
      Managing Member

[*Signature pages follow.*]

TH-PLTF-000153

IN WITNESS WHEREOF, The Managing Member and all of the Non-Managing Members of LUCAS VENTURE GROUP XI, LLC, a California limited liability company, have executed this Agreement, effective as of the date first written above.

**NON-MANAGING MEMBERS**:

**For Business Entities and Trusts:**

_____
*Printed name of entity or trust*

_____
*Printed name and position of person authorized to sign for entity or trust*

_____
*Signature of person authorized to sign for entity or trust*

Dated:_____

**For Individuals:**

_____
*Printed name*

_____
*Signature*

Dated: _____

TH-PLTF-000154

# TH-PLTF-000118

## Metadata

| | | |
|---|---|---|
| **All Custodians** | Bob Colman | USER |
| **Author** | Martin | USER |
| **BeginFamily** | TH-PLTF-000118 | ORIGINAL |
| **Custodian** | Bob Colman | USER |
| **Date Modified** | 2016/10/25 6:35 pm UTC | ORIGINAL |
| **EndFamily** | TH-PLTF-000154 | ORIGINAL |
| **Filename** | Lucas Venture Group XI LLC Operating Agreement 2013.pdf | ORIGINAL |
| **MD5 Hash** | 1ba17e7452383526d7354e3b06d2304b | ORIGINAL |
| **Produced From** | #415.1 | ORIGINAL |
| **SHA1 Hash** | 45f12e8b886ff8282e8c0b64d846db6e9fd70379 | ORIGINAL |
| **Title** | Microsoft Word - Modified Document Operating Agreement (Lucas Venture Group XI LLC) | USER |

# Exhibit 2c

# LUCAS VENTURE GROUP XI, LLC
## SUBSCRIPTION AGREEMENT

Lucas Venture Group XI, LLC
545 Middlefield Rd, Suite 220,
Menlo Park, California, 94025

Ladies and Gentlemen:

The undersigned subscribing investor(s) (the "Subscriber") in connection with a prospective investment in Membership Interests ("Interests") in Lucas Venture Group XI, LLC, a California limited liability company (the "Company"), hereby agrees as follows:

1.    Subscription.

(a)    Pursuant to the terms and conditions of this subscription agreement (this "Subscription Agreement"), the Subscriber, intending to be legally bound, hereby irrevocably subscribes for Interests in the Company and agrees:  (i) to make a capital contribution to the Company in the amount set forth on the signature page hereof in accordance with the terms and conditions described herein and in the Operating Agreement for Lucas Venture Group XI, LLC, a form of which is attached hereto as Exhibit A (the "Operating Agreement"); (ii) as provided in the Operating Agreement to become a Member of the Company; and (iii) to be bound by the terms of the Operating Agreement.

(b)    The Subscriber acknowledges and agrees that the Subscriber is not entitled to cancel, terminate or revoke this subscription, any agreements of the Subscriber hereunder, or the power of attorney granted hereby, except as otherwise set forth in this Section 1(b), and such subscription, agreements and power of attorney shall survive (i) changes in the transaction, documents and instruments described in the information furnished to the Subscriber ("Information") which in the aggregate are not material or which are contemplated by such Information, and (ii) the death or disability of the Subscriber; provided, however, that if the Managing Member does not accept this subscription, then this subscription, all agreements of the Subscriber hereunder and the power of attorney granted hereby shall be cancelled and this Subscription Agreement will be of no force and effect.

(c)    The Subscriber hereby irrevocably constitutes and appoints the Managing Member of the Company the Subscriber's true and lawful representative and attorney-in-fact in the Subscriber's name, place and stead, (1) to sign the initial Operating Agreement, in form attached hereto as Exhibit A, on behalf of the Subscriber, (2) to receive and pay over to the Company on behalf of the Subscriber, to the extent set forth in this Subscription Agreement, all funds received hereunder, (3) to complete or correct, on behalf of the Subscriber, all documents to be executed by the Subscriber in connection with the Subscriber's subscription for Interests, including, without limitation, filling in or amending amounts, dates, and other pertinent information, and (4) provided that no such action shall, in any manner whatsoever, impose any liability upon any Member beyond that contained in the Operating Agreement, to execute,

CONFIDENTIAL

acknowledge, swear to and file:  (i) any counterparts of the Operating Agreement to be entered into pursuant to this Subscription Agreement and any amendments to which the Subscriber is a signatory, (ii) any amendments to any such amendments as provided in the Operating Agreement), (iii) any agreements or other documents of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, as limited and defined in the Operating Agreement, (iv) any certificates of the limited liability company required by law and all amendments thereto, (v) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business, (vi) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company, and (vii) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which the Managing Member considers necessary or desirable to carry out the purposes of this Subscription Agreement, the Operating Agreement and the business of the Company.  This power of attorney shall be deemed coupled with an interest, shall be irrevocable, shall survive the transfer of the Subscriber's Interest and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the Subscriber.

      2.    <u>Payment</u>.  The Subscriber shall either (i) enclose herewith a certified or official bank check payable to Lucas Venture Group XI, LLC, *or* (ii) transmit by wire transfer the amount of the capital contribution of the Subscriber to the Company's bank account with Silicon Valley Bank pursuant to the following wire instructions:

**PAY BY WIRE - DOMESTIC**

| | |
|---|---|
| BANK: | Silicon Valley Bank (SIL VLY BK SJ) |
| ROUTING & TRANSIT #: | 121140399 |
| FOR CREDIT OF: | Lucas Venture Group |
| CREDIT ACCT #: | 3300847600 |
| BY ORDER OF: | *Your Investing Entity Name* |

**PAY BY WIRE - INTERNATIONAL**

| | |
|---|---|
| PAY TO: | FC - SILICON VALLEY BANK |
| | 3003 TASMAN DRIVE |
| | SANTA CLARA, CA  95054, USA |
| ROUTING & TRANSIT #: | 121140399 |
| SWIFT CODE: | SVBKUS6S |
| FOR CREDIT OF: | Lucas Venture Group |
| FINAL CREDIT ACCOUNT #: | 3300847600 |
| BY ORDER OF: | *Your Investing Entity Name* |

      3.    <u>Acceptance of Subscription</u>.  The Subscriber understands and agrees that the Company in its sole discretion reserves the right to accept or reject this or any other subscription in whole or in part or to cancel the offering.  No subscription shall be deemed accepted until the Subscriber has been admitted as a Member in the Company.  Such admission shall be deemed an acceptance of this subscription by the Company and the Managing Member.  If this subscription is rejected by the Company in whole or in part, or if the offering is cancelled, the Company shall promptly return all or part of the funds received from the Subscriber, as the case may be, without interest, and this Subscription Agreement shall thereafter be for the amount accepted, or of no further force or effect if the subscription is rejected in full, or the offering is cancelled.  Upon the Managing Member's acceptance of this Subscription and admission of the Subscriber to the

CONFIDENTIAL

TH-PLTF-000098

Company, the Subscriber's payment to the Company deposited herewith may be transferred to the Company and will constitute the Subscriber's initial Capital Contribution.

      4.    <u>Representations and Warranties</u>.  To induce the Managing Member to accept this subscription on behalf of the Company, the Subscriber represents and warrants to the Company and the Managing Member, which representations and warranties shall survive the execution and delivery of this Subscription Agreement and the purchase of the Interests, as follows:

      (a)    All information which Subscriber has provided to the Managing Member and the Company, including the information in the subscriber questionnaire, attached hereto as <u>Exhibit B</u> (the "<u>Subscriber Questionnaire</u>"), and in the applicable certificate of Investor, attached hereto as <u>Exhibits C-1</u>, <u>C-2</u> , <u>C-3</u> and <u>C-4</u>, is correct and complete as of the date hereof.

      (b)    Subscriber understands that the offer and sale of the Interest is intended to be exempt from registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), for U.S. Persons in reliance on Rule 506 of the Securities and Exchange Commission promulgated under the Securities Act and for non-U.S. Persons in reliance on Regulation S thereunder, and is intended to be exempt from registration under the securities laws of every state and foreign jurisdiction in which the offer and sale are deemed to be made, by virtue of a transactional exemption set forth in such securities laws.  For purposes of this Subscription Agreement, U.S. Persons shall have the meanings set forth for United States Persons in Section 7701(a)(30) of the Code ("<u>U.S. Persons</u>").

      (c)    Subscriber understands that the Company is relying on Section 3(c)(1) of the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>") as the basis for its exemption from regulation as an "Investment Company" under said statute.

      (d)    Subscriber is an "accredited investor" within the meaning of Rule 501 under the Securities Act, and Subscriber shall promptly notify the Managing Member of any change in the structure of, or other event relating to, such Subscriber that terminates Subscriber's status as an "accredited investor" relative to the Company.

      (e)    Subscriber is a highly sophisticated investor.  Subscriber has such knowledge and experience in financial, tax and business matters so as to enable Subscriber to utilize the information made available to Subscriber in connection with the offering of the Interest in order to evaluate the merits and risks of an investment in the Interest and to make an informed investment decision with respect thereto.

      (f)    Subscriber has consulted to the extent deemed appropriate by Subscriber with skillful legal, tax and business advisors, and on that basis believes that an investment in the Interest is suitable and appropriate for Subscriber.  Subscriber has consulted with, and relied solely on, Subscriber's own advisors concerning the tax considerations applicable to Subscriber's investment in the Company, as well as tax considerations applicable to Company's operation and the eventual disposition of Subscriber's Interest.  Subscriber has not relied upon any tax advice of any kind from the Company or its affiliates or advisors.  Subscriber understands and acknowledges that the Company intends to qualify as a partnership for federal and state income

3

TH-PLTF-000099

tax purposes, which will cause Subscriber to include in Subscriber's reportable income for income tax purposes its allocable share of the Company's income.

(g)    Subscriber acknowledges and agrees that its investment in the Interest is a speculative investment that involves a material risk of loss of such entire investment.

(h)    Subscriber has been furnished and has carefully read the Operating Agreement and this Subscription Agreement, and understands the information contained therein relating to this investment.

(i)    To the full satisfaction of Subscriber, Subscriber has been furnished any materials Subscriber has requested relating to the Company and the offering of Interests, and Subscriber has been afforded the opportunity to ask questions of representatives of the Company concerning the terms and conditions of the offering and to obtain any additional information necessary to make an informed investment decision.

(j)    Subscriber has a pre-existing personal or business relationship with the Company or its Managing Member to enable the Subscriber to be aware of the character, business acumen and general business and financial circumstances of the person with whom such relationship exists.

(k)    Subscriber is not subscribing for the Interest as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or any other form of general advertising.

(l)    Subscriber is acquiring the Interest for investment purposes only and not with a view to the resale or distribution thereof, in whole or in part, and no other person has a direct or indirect beneficial interest in such Interest.  Subscriber does not have any contract, undertaking, agreement, or arrangement with any person to sell, transfer, or grant participation to such person, or to any third person, with respect to Subscriber's Interest in the Company. Subscriber has adequate means of providing for its current needs and possible contingencies. Subscriber's overall capital contribution to the Company and other investments which are not readily marketable is not disproportionate to Subscriber's net worth.  Subscriber has no need for immediate liquidity in Subscriber's investment in the Interest.

(m)    Subscriber will sell or otherwise transfer the Interest only in compliance with the Operating Agreement and will not sell or otherwise transfer the Interest without registration under the Securities Act unless exemption from the registration requirements of the Securities Act is available.  Subscriber fully understands and agrees that it must bear the economic risk of its purchase for an indefinite period because, among other reasons, the Interest has not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless it is subsequently registered under the Securities Act and under the applicable state securities laws or unless an exemption from such registration is available.

(n)    Subscriber acknowledges and agrees that the Operating Agreement, together with the representations set forth in this Subscription Agreement as well as the terms and provisions of any written agreement executed by the Managing Member on behalf of the

4

Company and Subscriber and designated as a "side letter," shall contain the entire understanding and agreement with respect to Subscriber's subscription for, and purchase and ownership of the Interests, and shall supersede any and all other written materials respecting the Company.  Other than as set forth herein, in the Operating Agreement, and in any such side letter, Subscriber is not relying upon any other information, representation or warranty by the Company, the Managing Member or any agent or representative of them in determining whether to invest in the Company.

(o)      Subscriber agrees that Subscriber shall have no actionable claim or claims against the Managing Member, any of its members, any principal, or any respective Affiliate of any of the foregoing, with respect to or arising out of any information, statement or projection respecting the Company, whether written or oral, and including, but not limited to, any such information, statement or projection made or provided in any other materials provided to Subscriber, which is not fully expressed in this Subscription Agreement, the Operating Agreement, or in any side letter to which Subscriber is a party.  Further, Subscriber acknowledges and agrees that this Subscription Agreement and any side letter to which Subscriber is a party are each separate agreements by and between Subscriber and the Managing Member on behalf of the Company, and that no such agreement shall apply to any member in the Company other than Subscriber.

(p)      Subscriber has the full power and authority to execute and deliver this Subscription Agreement, the Operating Agreement, and each other document required to be executed and delivered by Subscriber in connection with this subscription for the Interest, and to perform its obligations thereunder and consummate the transactions contemplated thereby.  If Subscriber is an entity, the person signing this Subscription Agreement on behalf of Subscriber has been duly authorized to execute and deliver this Subscription Agreement, the Operating Agreement and each other document required to be executed and delivered by Subscriber in connection with this subscription for the Interest.  The execution and delivery by Subscriber of, and compliance by Subscriber with, this Subscription Agreement, the Operating Agreement and each other document required to be executed and delivered by Subscriber in connection with this subscription for the Interest does not conflict with, or constitute a default under, any instrument governing Subscriber, any law, regulation or order, or any agreement to which Subscriber is a party or by which Subscriber is bound.  This Subscription Agreement has been duly executed by Subscriber and constitutes, and the Operating Agreement, when Subscriber is admitted as a Limited Partner (as defined in the Operating Agreement), will constitute, a valid and legally binding agreement of Subscriber, enforceable against Subscriber according to their terms.  If Subscriber is purchasing the Interest in a representative or fiduciary capacity, the representations and warranties contained herein (and in any other written statement or document delivered to the Managing Member in connection herewith) shall be deemed to have been made on behalf of the person or persons for whom the Interest is being purchased.

(q)      If Subscriber is, or is acting on behalf of, a trust established under, or is investing "plan assets" of, an employee benefit plan (a "Plan") as defined in and subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"): (i) it is aware of and has taken into consideration its fiduciary duties including the diversification requirements of Section 404(a)(1)(c) of ERISA; (ii) it has concluded that its proposed investment in the Company is a prudent one; (iii) the fiduciary trustee or other person signing this Subscription Agreement on behalf of Subscriber is independent of the Managing Member; (iv) this subscription and the

5

investment contemplated hereby are in accordance with all requirements applicable to the Plan under its governing instruments and under ERISA; and (v) Subscriber acknowledges and agrees that the Managing Member is not a "fiduciary" (within the meaning of Section 3(21) of ERISA) with respect to any assets of the Plan by reason of Subscriber's investment in the Company and that Subscriber has not and is not relying on the Managing Member to provide, and it has not provided, any kind of investment advice with respect to Subscriber's purchase.

(r)     Subscriber was offered the Interests in the state and country listed as Subscriber's permanent address set forth in the Subscriber Questionnaire attached hereto or previously provided to the Managing Member and intends that the securities laws of that state and country govern Subscriber's subscription.

(s)     If Subscriber is not a U.S. Person, except for offers and sales to discretionary or similar accounts held for the benefit or account of a non U.S. Person by a U.S. dealer or other professional fiduciary, all offers to sell and offers to buy the Interests were made to or by Subscriber while Subscriber was outside the United States and at the time that Subscriber's order to buy the Interests was originated Subscriber was outside the United States.

(t)     If Subscriber is not a U.S. Person, Subscriber (i) is not subscribing on behalf of or funding its capital contributions with funds obtained from U.S. Person and (ii) will notify the Managing Member immediately if Subscriber becomes a U.S. Person at any time during which Subscriber holds or owns any Interests.

5.    Indemnification.    The Subscriber agrees to indemnify and hold harmless the Company and its Managing Member against any and all loss, liability, claim, damage, and expense whatsoever (including, without limitation, any and all expenses including attorneys fees reasonably incurred in investigating, preparing, or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false representation or warranty or breach or failure by the Subscriber to comply with any covenant or agreement made by the Subscriber herein or in any other document furnished by the Subscriber to any of the foregoing in connection with this transaction, including without limitation arising as a result of the sale or distribution of the Interests by the Subscriber in violation of the Securities Act or other applicable law.

6.    Irrevocability; Binding Effect; Entire Agreement.    The Subscriber hereby acknowledges and agrees that the subscription hereunder is irrevocable by the Subscriber, that, except as required by law, the Subscriber is not entitled to cancel, terminate, or revoke this Subscription Agreement or any agreements of the Subscriber hereunder, and that this Subscription Agreement and such other agreements shall survive the death or disability of the Subscriber and shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.    If the Subscriber is more than one person, the obligations of the Subscriber hereunder shall be joint and several and the agreements, representations, warranties, and acknowledgments herein contained shall be deemed to be made by and be binding upon each such person and his/her heirs, executors, administrators, successors, legal representatives, and permitted assigns.    This Subscription Agreement sets forth the entire agreement and understanding among the parties

6

TH-PLTF-000102

hereto with respect to the transactions contemplated hereby and supersedes any and all prior agreements and understandings relating to the subject matter hereof.

7.     <u>Modification</u>.  Neither this Subscription Agreement nor any provision hereof shall be waived, modified, discharged, or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge, or termination is sought.

8.     <u>Notices</u>.  Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by certified mail, return receipt requested, sent by reputable overnight delivery service, or be personally delivered to the party to whom it is to be given (a) if to the Company, at the address set forth above, or (b) if to the Subscriber, at the address set forth on the signature page hereof (or, in either case, to such other address as the party shall have furnished in writing in accordance with the provision of this Section 8).  Any notice or other communication given by certified mail shall be deemed given two business days after deposit in the mail, one business day after deposit with a reputable overnight delivery service, or on personal delivery, except for a notice changing a party's address which shall be deemed given at the time of receipt thereof.

9.     <u>Definitions</u>.  All capitalized terms not defined herein shall have the meanings given in the Operating Agreement.

10.     <u>Assignability</u>.  This Subscription Agreement and the rights and obligations hereunder are not transferable or assignable by the Subscriber.

11.     <u>Applicable Law</u>.  This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to residents of California executing contracts wholly to be performed in California.

12.     <u>Further Assurances</u>.  The Subscriber hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances to which the Company is subject, including without limitation, such additional information as the Company may deem appropriate with regard to the Subscriber's suitability to invest in the Company

[Remainder of page left intentionally blank]

7

CONFIDENTIAL

TH-PLTF-000103

**LUCAS VENTURE GROUP XI, LLC**
SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned Subscriber represents the foregoing statements are true and correct and that it has executed this Subscription Agreement on the date set forth below at the residence address set forth in the Subscriber Questionnaire.

Amount of Desired Investment:                    $_____

<u>If Subscriber is an individual or individuals:</u>        <u>If Subscriber is an entity:</u>

_____  _____        _____  _____
Signature                      Date              Signature                      Date

_____  _____        _____
Signature                      Date              Name (print)
(if multiple individuals)
                                                 _____
                                                 Title (print)

**ACCEPTANCE OF SUBSCRIPTION**

(to be filled out <u>only</u> by the Managing Member)

The Managing Member of Lucas Venture Group XI, LLC hereby accepts the above application for subscription for Interests of Lucas Venture Group XI, LLC, and upon the date set forth below the subscriber will be admitted as a Member.

Amount of Investment Accepted:          _____

Date of Acceptance:                     _____

                    LVG GP IV, LLC,
                    the Managing Member of Lucas Venture Group XI,
                    LLC


                    By:   _____
                    Name: Donald A. Lucas
                    Its:    Managing Member

8

## EXHIBIT A

OPERATING AGREEMENT OF LUCAS VENTURE GROUP XI, LLC

A-1

CONFIDENTIAL

TH-PLTF-000105

## EXHIBIT B

SUBSCRIBER QUESTIONNAIRE

**A.  General Information**

1.  Print Full Name of Subscriber:  _____

2.  Identify form of Subscriber (Individual,
    Partnership, Corporation, Limited          _____
    Liability Company, Trust, Custodial
    Account, Other):

3.  Address for Notices:  _____
    _____
    _____
    _____

4.  Name of Primary Contact Person:  _____

5.  Telephone Number:  _____

6.  Telecopier/Facsimile Number:  _____

7.  Permanent Address:  _____
    (if different from Address   _____
    For Notices above)           _____
    _____

8.  Email Address:  _____
    _____

9.  U.S. Taxpayer Identification or  _____
    Social Security Number:  _____

10. Authorized Signatory:  _____
    Title:  _____
    Telephone Number:  _____
    Telecopier/Facsimile Number:  _____
    Email Address:  _____

B-1

TH-PLTF-000106

## B.     Accredited Investor Status

Subscriber represents and warrants that Subscriber is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and has checked the box or boxes below which are next to <u>ALL</u> of the categories under which Subscriber qualifies as an accredited investor:

☐        (1)        A natural person with individual net worth (or joint net worth with spouse) in excess of $1 million. For purposes of this item, "net worth" means the excess of total assets owned by such person (and such person's spouse) at fair market value, excluding the value of such person's primary residence (and the value of the primary residence of such person's spouse), over total liabilities. "Total liabilities" excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Interests are purchased, but include (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the sale of the Interests.

☐        (2)        A natural person with individual income (without including any income of such person's spouse) in excess of $200,000, or joint income with such person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.  "Income" means annual adjusted gross income, as reported for federal income tax purposes, plus (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any dedication claimed for depletion; (iv) amounts contributed to an IRA or Keogh retirement plan; (v) alimony paid, and (vi) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code.

☐        (3)        A bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐        (4)        An insurance company as defined in Section 2(13) of the Securities Act.

☐        (5)        A broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

B-2

TH-PLTF-000107

☐     (6)      An investment company registered under the Investment Company Act of 1940.  If Subscriber has checked this box, please contact the Managing Member for additional information that will be required.

☐     (7)      A business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940.

☐     (8)      A small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐     (9)      A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.  If Subscriber has checked this box, please contact the Managing Member for additional information that will be required.

☐     (10)      An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring Interests, with total assets in excess of $5 million.

☐     (11)      A trust with total assets in excess of $5 million not formed for the specific purpose of acquiring Interests, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Interests.

☐     (12)      An employee benefit plan within the meaning of ERISA if the decision to invest in the Interests is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

☐     (13)      A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5 million.

CONFIDENTIAL

TH-PLTF-000108

☐      (14)      An entity, including a grantor trust, in which all of the equity owners are "accredited investors" as defined in (1) through (11) above (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust is an equity owner) or in which all of the equity owners meet one of the following tests: (a) a natural person with individual net worth (or joint net worth with spouse) in excess of $1 million (for purposes of this item, "net worth" means the excess of total assets owned by such person (and such person's spouse) at fair market value, excluding the value of such person's primary residence (and the value of the primary residence of such person's spouse), over total liabilities) or (b) a natural person with individual income (without including any income of such person's spouse) in excess of $200,000, or joint income with such person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

## C.     Related Parties

1.      To the best of Subscriber's knowledge, does Subscriber control, or is Subscriber controlled by or under common control with, any other investor in the Company?

                     ☐ Yes          ☐ No

If the question above was answered "Yes," please identify such related investor(s) below.

Name(s) of related investor(s): **_____**

2.      Will any other person or persons have a beneficial interest in the Interests to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity Interests in Subscriber)?

                     ☐ Yes          ☐ No

If either question above was answered "Yes," please contact Sarah Fergusson Chambless of Manatt, Phelps & Phillips, LLP at (310) 312-4255 for additional information that will be required.

B-4

**D.    Supplemental Data for Entities** (Only complete this section if you are investing through an entity)

1.    Furnish the following supplemental data:

Legal form of entity (trust, corporation, partnership, etc.): _____

Jurisdiction of organization: _____

2.    Was Subscriber organized for the specific purpose of acquiring Interests?

☐ Yes        ☐ No

If the answer to the above question is "Yes," please contact Sarah Fergusson Chambless of Manatt, Phelps & Phillips, LLP at (310) 312-4255 for additional information that will be required.

3.    Are shareholders, partners or other holders of equity or beneficial interests in Subscriber able to decide individually whether to participate, or the extent of their participation, in Subscriber's investment in the Company (i.e., can shareholders, partners or other holders of equity or beneficial interests in Subscriber determine whether their capital will form part of the capital invested by Subscriber in the Company)?

☐ Yes        ☐ No

If the answer to the above question is "Yes," please contact Sarah Fergusson Chambless of Manatt, Phelps & Phillips, LLP at (310) 312-4255 for additional information that will be required.

4.    (a)    Please indicate whether or not Subscriber is, or is acting on behalf of, (i) an employee benefit plan subject to Title I of ERISA, or (ii) a plan described in Section 4975 of the Internal Revenue Code or (iii) an entity which is deemed to hold the assets of any plan described in either clause (i) or clause (ii) pursuant to U.S. Department of Labor Regulations 29 C.F.R. §2510.3-101 and Section 3(40) of ERISA.

☐ Yes        ☐ No

(b)    If Subscriber answered "Yes" to question 4.(a), please indicate what percentage of Subscriber's assets invested in the Company are "plan assets" as defined in 29 C.F.R. §2510.3-101 and Section 3(40) of ERISA.

_____%.

B-5

5.     Does the amount of Subscriber's subscription for Interests in the Company exceed 40% of the total assets (on a consolidated basis with its subsidiaries) of Subscriber?

☐ Yes          ☐ No

If the answer to the above question is "Yes," please contact Sarah Fergusson Chambless of Manatt, Phelps & Phillips, LLP at (310) 312-4255 for additional information that will be required.

6.     (a)     Is Subscriber a private investment company which is not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act") in reliance on Section 3(c)(1) or Section 3(c)(7) thereof?

☐ Yes          ☐ No

(b)     If the question above was answered "Yes," was Subscriber formed prior to April 30, 1996?

☐ Yes          ☐ No

If the questions set forth in (a) and (b) above were both answered "Yes," please contact Sarah Fergusson Chambless of Manatt, Phelps & Phillips, LLP at (310) 312-4255 for additional information that will be required.

(c)     Is Subscriber an investment company registered under the Investment Company Act of 1940?

☐ Yes          ☐ No

7.     (a)     Is Subscriber a grantor trust, a partnership or an S-Corporation for U.S. federal income tax purposes?

☐ Yes          ☐ No

(b)     If the question above was answered "Yes," please indicate whether or not:

(i)     more than 50 percent of the value of the ownership interest of any beneficial owner in Subscriber is (or may at any time during the term of the Company be) attributable to Subscriber's (direct or indirect) Interest in the Company; or

B-6

☐ Yes          ☐ No

(ii)      it is a principal purpose of Subscriber's participation in the Company to permit the Company to satisfy the 100 partner limitation contained in U.S. Treasury Regulation Section 1.7704-1(h)(3).

☐ Yes          ☐ No

If the answer to either question above is "Yes," please contact Sarah Fergusson Chambless of  Manatt, Phelps & Phillips, LLP at (310) 312-4255 for additional information that will be required.

8.      If Subscriber's tax year ends on a date other than December 31, please indicate such date below:

_____
(Date)

[end of Subscriber Questionnaire]

B-7

CONFIDENTIAL

**EXHIBIT C-1**

CERTIFICATE OF PARTNERSHIP INVESTOR

CERTIFICATE OF _____ (the "<u>Partnership</u>")
(Name of Partnership)

        The undersigned, constituting all of the partners of the Partnership who must consent to the proposed investment by the Partnership, hereby certify as follows:

    1.    That the Partnership commenced business on and was established pursuant to a Partnership Agreement dated _____ (the "<u>Partnership Agreement</u>").

    2.    That a true and correct copy of the Partnership Agreement is attached hereto and that, as of the date hereof, the Partnership Agreement has not been amended (except as to any attached amendments) or revoked and is still in full force and effect.

    3.    That, we have the authority to determine, and have determined, (i) that the investment in, and the purchase of an interest in Lucas Venture Group XI, LLC is of benefit to the Partnership and (ii) to make such investment on behalf of the Partnership.

    4.    That _____ is _____ (are) authorized to execute all necessary documents in connection with the Partnership's investment in Lucas Venture Group XI, LLC.

        IN WITNESS WHEREOF, I/we have executed this certificate as the General Partner(s) of the Partnership on the dates set forth below and declare that it is truthful and correct.


_____
(Name of Partnership)


Date: _____    By:_____
                                     General Partner


Date: _____    By:_____
                                     General Partner


(attach additional sheets if necessary)


C-1

TH-PLTF-000113

**EXHIBIT C-2**

CERTIFICATE OF LIMITED LIABILITY COMPANY INVESTOR

CERTIFICATE OF _____ (the "<u>Limited Liability Company</u>")
                          (Name of Limited Liability Company)

        The undersigned, constituting all of the members of the Limited Liability Company who must consent to the proposed investment by the Limited Liability Company, hereby certify as follows:

        1.     That the Limited Liability Company commenced business on and was established pursuant to an Operating Agreement dated _____ (the "<u>LLC Agreement</u>").

        2.     That a true and correct copy of the LLC Agreement is attached hereto and that, as of the date hereof, the LLC Agreement has not been amended (except as to any attached amendments) or revoked and is still in full force and effect.

        3.     That, we have the authority to determine, and have determined, (i) that the investment in, and the purchase of an interest in Lucas Venture Group XI, LLC, is of benefit to the Limited Liability Company and (ii) to make such investment on behalf of the Limited Liability Company.

        4.     That _____
_____ is (are) authorized to execute all necessary documents in connection with the Limited Liability Company's investment in Lucas Venture Group XI, LLC.

        IN WITNESS WHEREOF, I/we have executed this certificate as the Managing Member(s) and/or _____ of the Limited Liability Company on the dates set forth below and declare that it is truthful and correct.

                                      _____
                                      (Name of Limited Liability Company)

Date:  _____     By:_____
                                Managing Member or _____

Date:  _____     By:_____
                                Managing Member or _____

                    (attach additional sheets if necessary)

C-2

TH-PLTF-000114

**EXHIBIT C-3**

CERTIFICATE OF TRUST INVESTOR

CERTIFICATE OF _____ (the "<u>Trust</u>")
(Name of Trust)

The undersigned, constituting all of the trustees of the Trust who must consent to the proposed investment by the Trust, hereby certify as follows:

1.  That the Trust was established pursuant to a Trust Agreement dated _____ (the "<u>Trust Agreement</u>").

2.  That a true and correct copy of the Trust Agreement is attached hereto and that, as of the date hereof, the Trust Agreement has not been amended (except as to any attached amendments) or revoked and is still in full force and effect.

3.  That, as the Trustee(s) of the Trust, I/we have determined that an investment in, and the purchase of, an interest in Lucas Venture Group XI, LLC, is of benefit to the Trust and have determined to make such investment on behalf of the Trust.

4.  That _____
_____
is/are authorized to execute on behalf of the Trust, any and all documents in connection with the Trust's investment in Lucas Venture Group XI, LLC.

IN WITNESS WHEREOF, we have executed this certificate as the Trustee(s) of the Trust on the dates set forth below, and declare that it is truthful and correct.

_____
(Name of Trust)

Date: _____     By:_____
Trustee

Date: _____     By:_____
Trustee

(attach additional sheets if necessary)

C-3

                                                    TH-PLTF-000115

**EXHIBIT C-4**

CERTIFICATE OF CORPORATE INVESTOR

CERTIFICATE OF _____ (the "Corporation")

(Name of Corporation)

    The undersigned, being the duly elected and acting Secretary or Assistant Secretary of the Corporation, hereby certifies as follows:

    1.  That the Corporation was incorporated under the laws of the State of _____ and commenced business on _____.

    2.  That a true and correct copy of the Certificate or Articles of Incorporation and Bylaws of the Corporation are attached hereto and that, as of the date hereof, the Certificate, Articles of Incorporation and Bylaws have not been amended (except as to any attached amendments) or revoked and are still in full force and effect.

    3.  That the Board of Directors of the Corporation has determined that the investment in, and the purchase of, an interest in Lucas Venture Group XI, LLC, is of benefit to the Corporation and has determined to make such investment on behalf of the Corporation. Attached hereto is a true, correct and complete copy of resolutions of the Board of Directors (or an appropriate committee thereof) of the Corporation duly authorizing this investment, and said resolutions have not been revoked, rescinded or modified and, at the date hereof, are in full force and effect.

    4.  That the following named individuals are duly elected officers of the Corporation, who hold the offices set opposite their respective names and who are duly authorized to execute any and all documents in connection with the Corporation's investment in Lucas Venture Group XI, LLC, and that the signatures written opposite their names and titles are correct and genuine signatures.

| Name | | Title | | Signature |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

    IN WITNESS THEREOF, the undersigned has executed this certificate on the date set forth below, and declares that it is truthful and correct.

_____

(Name of Corporation)

Date: _____  By:_____

       Name:

       Title

C-4

TH-PLTF-000116

310535905.2

CONFIDENTIAL

TH-PLTF-000117

## TH-PLTF-000097

## Metadata

| | | |
|---|---|---|
| **All Custodians** | Bob Colman | USER |
| **Author** | Martin | USER |
| **BeginFamily** | TH-PLTF-000097 | ORIGINAL |
| **Custodian** | Bob Colman | USER |
| **Date Modified** | 2016/10/25 6:35 pm UTC | ORIGINAL |
| **EndFamily** | TH-PLTF-000117 | ORIGINAL |
| **Filename** | Lucas Venture Group XI LLC - Subscription Agreement 2013.pdf | ORIGINAL |
| **MD5 Hash** | ace0beb91cb7691a5bb8624956887331 | ORIGINAL |
| **Produced From** | #403.1 | ORIGINAL |
| **SHA1 Hash** | 479b79302445935ddb0310b4831c68a74a105f8c | ORIGINAL |
| **Title** | Microsoft Word - Lucas Venture Group XI LLC - Subscription Agreement 2013 | USER |

# Exhibit 3a

Michael A. Mugmon (251958)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100
michael.mugmon@wilmerhale.com

Christopher Davies (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile: +1 202 663 6363
christopher.davies@wilmerhale.com

Timothy Perla (admitted *pro hac vice*)
Robert K. Smith (admitted *pro hac vice*)
Megan E. Barriger (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000
timothy.perla@wilmerhale.com
robert.smith@wilmerhale.com
megan.barriger@wilmerhale.com

*Attorneys for Defendant Theranos, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ROBERT COLMAN and HILARY TAUBMAN-DYE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THERANOS, INC., ELIZABETH HOLMES, and RAMESH BALWANI,<br><br>Defendants. | Case No.  5:16-cv-06822-NC<br><br>**DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF HILARY TAUBMAN-DYE** |

1    Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant Theranos,

2    Inc., by and through its attorneys of record in this action, hereby requests that Plaintiff Hilary

3    Taubman-Dye produce the following documents for inspection and copying at the offices of

4    Wilmer Cutler Pickering Hale and Dorr LLP, 950 Page Mill Road, Palo Alto, CA 94304, within

5    thirty (30) days of service of Defendant Theranos's First Set of Requests for Production of

6    Documents to Plaintiff Hilary Taubman-Dye.

7    **I.    DEFINITIONS**

8    1.    The term "ACTION" refers to *Colman v. Theranos, Inc.*, Case No. 5:16-cv-

9    06822-NC (N.D. Cal.).

10    2.    The term "BALWANI" means Ramesh Balwani.

11    3.    The term "CELADON" shall mean the SHARESPOST-affiliated fund, Celadon

12    Technology Fund VII, LLC, as described in Paragraph 12 of the COMPLAINT.

13    4.    The term "CLASS" means "[a]ll persons or entities who, directly or indirectly,

14    purchased or committed to purchase (and subsequently closed a binding commitment to purchase)

15    an interest in Theranos securities" during the CLASS PERIOD, as defined in Paragraph 82 of the

16    COMPLAINT.

17    5.    The term "CLASS PERIOD" means the period from July 29, 2013 through

18    October 5, 2016, inclusive of July 29, 2013 and October 5, 2016.

19    6.    The term "COMMUNICATION" or "COMMUNICATIONS" shall be interpreted

20    in its broadest sense, and means any transmission of information between two or more

21    PERSONS, whether by, without limitation: personal meeting; telephone; letter; telegraph; e-mail;

22    electronic bulletin board; electronic "chat room"; instant message, text message, any other form

23    of electronic correspondence; teleconference; facsimile; telex; or any other means whatsoever.

24    7.    The term "COMPLAINT" shall mean the November 28, 2016 Class Action

25    Complaint for Violations of California's Securities, Unfair Competition, and Common Laws,

26    filed in the ACTION (ECF No. 1).  All paragraph references herein are to the COMPLAINT.

27    8.    The term "DEFENDANTS" shall mean THERANOS, HOLMES, and BALWANI.

28

9. The term "DOCUMENT" or "DOCUMENTS" shall have the broadest meaning permitted by the Federal Rules of Civil Procedure and shall include, without limitation, all written or graphic matter, whether stored, displayed, communicated, or transmitted, of every kind or description, however produced or reproduced, whether draft or final, original or reproduction, signed or unsigned, and regardless of whether approved, signed, sent, received, redrafted, or executed, including, without limitation: ESI, written communications, letters, correspondence, memoranda of telephone conversations or personal conversations, diaries, desk calendars, interoffice communications, records, studies, analyses, statistical and financial statements, charts, graphs, reports, minutes, telegrams, telexes, facsimiles, emails, voicemails, bulletins, instructions, notes, sound or video recordings of any type, catalogues, results of investigations, contracts, licenses, agreements, working papers, statistical records, ledgers, computer diskettes, CDs or DVDs, computer tapes or data in any form, stenographers' notebooks or material similar to any of the foregoing, however denominated, by whomever prepared, and to whomever addressed, which are in Your possession, custody or control or to which You have, have had or can obtain access. The term "DOCUMENT" or "DOCUMENTS" shall also include (1) each copy that is not identical to the original or to any other copy, and (2) any tangible thing that is called for or identified in response to any request.

10. The term "ELECTRONICALLY STORED INFORMATION" or "ESI" means all "potentially discoverable electronically stored information" and refers to the party's(ies') ESI that contains or potentially contains information RELATING TO facts at issue in this litigation. The term "ELECTRONICALLY STORED INFORMATION" or "ESI" includes, without limitation, all electronically stored DOCUMENTS. The term "ELECTRONICALLY STORED INFORMATION" or "ESI" further includes, without limitation, the following: (i) information or data generated, received, processed, and recorded by any computer or other electronic device, including, without limitation, metadata (e.g., author, recipient, file creation date, file modification date, etc.); (ii) internal or external web sites; (iii) output resulting from the use of any software program, including, without limitation, word processing DOCUMENTS,

1  spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messenger or

2  similar programs, bulletin board programs, operating systems, source code, PRF files, PRC files,

3  batch files, ASCII files, and all miscellaneous media on which they reside and regardless of

4  whether said electronic data exists in an active file, a deleted file, or file fragment; and (iv)

5  activity listings of electronic mail receipts or transmittals, and any and all items stored on

6  computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, or on any

7  other media for digital data storage or transmittal, such as, without limitation, a personal digital

8  assistants, handheld wireless devices (e.g., BlackBerrys and iPhones), or similar devices, and file

9  folder tabs, or containers and labels appended to, or RELATING TO, any physical storage

10 device associated with each original or copy of all DOCUMENTS requested herein.

11      11.     The term "HOLMES" means Elizabeth Holmes.

12      12.     The term "INCLUDING" shall mean including but not limited to.

13      13.     The term "PERSON" or "PERSONS" means, without limitation, any natural

14 person, firm, association, partnership, trust, or any other form of legal entity.

15      14.     The term "SHARESPOST" shall mean SharesPost Financial Corporation and

16 SharesPost, Inc., as described in Paragraph 12 of the COMPLAINT.

17      15.     The terms "RELATING TO" or "CONCERNING" mean, without limitation,

18 constituting, comprising, pertaining to, referencing, recording, evidencing, containing, setting

19 forth, reflecting, discussing, showing, disclosing, describing, explaining, summarizing,

20 supporting, contradicting, refuting, or concerning, whether directly or indirectly.

21      16.     The term "TENDER OFFER" means the share exchange offered by THERANOS

22 to is shareholders that is the subject of the March 20, 2017 Information Statement and

23 supplements thereto.

24      17.     The term "THERANOS" means Theranos, Inc.

25      18.     The terms "YOU" and "YOUR" shall mean Plaintiff Hilary Taubman-Dye, and

26 any other PERSON acting or purporting to act on YOUR behalf or under YOUR control,

27 including YOUR counsel of record in this ACTION.

28

## II.     INSTRUCTIONS

1.     The definitions and requirements contained in the Federal Rules of Civil Procedure are incorporated herein by reference.

2.     Each request contained herein extends to all DOCUMENTS in YOUR possession, custody, or control, regardless of location.

3.     Unless otherwise indicated, these requests seek DOCUMENTS and things created, generated, dated or coming into YOUR possession, custody or control at any time, without restriction as to date.

4.     Wherever the word "any" appears herein, it shall be read and applied so as to include the word "all," and wherever the word "all" appears herein, it shall be read and applied so as to include the word "any."

5.     All references herein to the singular include the plural, and all references to the plural include the singular.

6.     The terms "and" and "or" as used herein each mean "and/or."

7.     If YOU claim that there is any ambiguity in any request herein, YOU are instructed to resolve such perceived ambiguity in favor of production of more documents rather than limiting the number of documents to be produced.

8.     Any DOCUMENT attached to another DOCUMENT must not be separated.

9.     If YOU assert any privilege, work product claim or other protection in responding to any requests, furnish a privilege log in a mutually agreeable format.

10.     To the extent a DOCUMENT subject to an assertion of privilege, a work product claim or other objection contains any responsive information not subject to such assertion or objection, the responsive information must be produced.

11.     If, after making YOUR initial production and inspection, YOU obtain or become aware of any further DOCUMENTS responsive to these requests, YOU are requested to produce such additional DOCUMENTS to the DEFENDANTS, in accordance with the Federal Rule of Civil Procedure 26.

## III.    DOCUMENTS TO BE PRODUCED

Subject to the foregoing Definitions and Instructions, as well as Federal Rule of Civil Procedure 34, YOU are requested to produce all of the following:

**REQUEST NO. 1:**

DOCUMENTS sufficient to show YOUR educational background and work history from YOUR graduation from high school through the present.

**REQUEST NO. 2:**

DOCUMENTS sufficient to show YOUR financial holdings throughout the CLASS PERIOD.

**REQUEST NO. 3:**

All DOCUMENTS and COMMUNICATIONS CONCERNING THERANOS.

**REQUEST NO. 4:**

All DOCUMENTS and COMMUNICATIONS CONCERNING HOLMES.

**REQUEST NO. 5:**

All DOCUMENTS and COMMUNICATIONS CONCERNING BALWANI.

**REQUEST NO. 6:**

All agreements with or involving SHARESPOST or CELADON.

**REQUEST NO. 7:**

All DOCUMENTS CONCERNING YOUR Series B units of CELADON.

**REQUEST NO. 8:**

All DOCUMENTS and COMMUNICATIONS CONCERNING SHARESPOST or CELADON.

**REQUEST NO. 9:**

All DOCUMENTS provided to YOU by SHARESPOST or CELADON, or any PERSON acting on behalf of SHARESPOST or CELADON.

**REQUEST NO. 10:**

All DOCUMENTS that YOU read, reviewed or relied upon in purchasing Series B units of CELADON.

**REQUEST NO. 11:**

All DOCUMENTS CONCERNING any losses or gains incurred in connection with YOUR purchase of Series B units of CELADON.

**REQUEST NO. 12:**

All DOCUMENTS CONCERNING any transaction in securities issued by THERANOS.

**REQUEST NO. 13:**

All DOCUMENTS that YOU contend contain a misrepresentation or material omission by THERANOS, HOLMES, or BALWANI.

**REQUEST NO. 14:**

All DOCUMENTS CONCERNING COMMUNICATIONS between YOU and any purported CLASS member or their counsel, INCLUDING COMMUNICATIONS CONCERNING the TENDER OFFER or the ACTION.

**REQUEST NO. 15:**

DOCUMENTS sufficient to identify any other litigation to which YOU have been a party, affiant, deponent, declarant, or trial witness.

DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFF HILARY TAUBMAN-DYE
Case No.  5:16-cv-06822-NC

1   Dated:  May 26, 2017                              By: /s/  Michael A. Mugmon
2                                                         Michael A. Mugmon (251958)
                                                          WILMER CUTLER PICKERING
3                                                            HALE AND DORR LLP
                                                          950 Page Mill Road
4                                                         Palo Alto, CA 94304
                                                          Telephone: +1 650 858 6000
5                                                         Facsimile: +1 650 858 6100
                                                          michael.mugmon@wilmehale.com
6
                                                          Christopher Davies (admitted *pro hac vice*)
7                                                         WILMER CUTLER PICKERING
                                                             HALE AND DORR LLP
8                                                         1875 Pennsylvania Ave., NW
                                                          Washington, DC 20006
9                                                         Telephone: +1 202 663 6000
                                                          Facsimile: +1 202 663 6363
10                                                        christopher.davies@wilmehale.com
11                                                        Timothy Perla (admitted *pro hac vice*)
                                                          Robert K. Smith (admitted *pro hac vice*)
12                                                        Megan E. Barriger (admitted *pro hac vice*)
                                                          WILMER CUTLER PICKERING
13                                                           HALE AND DORR LLP
                                                          60 State Street
14                                                        Boston, MA 02109
                                                          Telephone: +1 617 526 6000
15                                                        Facsimile: +1 617 526 5000
                                                          timothy.perla@wilmerhale.com
16                                                        robert.smith@wilmerhale.com
                                                          megan.barriger@wilmerhale.com
17
                                                          *Attorneys for Defendant Theranos, Inc.*
18
19
20
21
22
23
24
25
26
27
28
                                                          7

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I, Michael A. Mugmon, hereby certify that, on May 26, 2017, a true and correct copy of

3

the foregoing DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION

4

OF DOCUMENTS TO PLAINTIFF HILARY TAUBMAN-DYE was served upon the following

5

attorneys of record by electronic mail:

6

Kathleen Goodhart (kgoodhart@cooley.com)

7

COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111

8

9

Stephen C. Neal (nealsc@cooley.com)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

10

11

*Attorneys for Defendant Elizabeth Holmes*

12

Allison A. Davis (allisondavis@dwt.com)

13

DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111

14

15

Stephen M. Rummage (steverummage@dwt.com)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

16

17

*Attorneys for Defendant Ramesh Balwani*

18

Reed R. Kathrein (reed@hbsslaw.com)

19

Peter E. Borkon (peterb@hbsslaw.com)
HAGENS BERMAN SOBOL SHAPIRO LLP

20

715 Hearst Avenue, Suite 202
Berkeley, CA 94710

21

22

Steve W. Berman (steve@hbsslaw.com)
HAGENS BERMAN SOBOL SHAPIRO LLP

23

1918 Eighth Avenue, Suite 3300
Seattle, WA 98101

24

25

*Attorneys for Plaintiffs and Proposed Lead Counsel for the Class*

26

27

28

8

1

Paul J. Geller (pgeller@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP

2

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432

3

4

Dennis J. Herman (dennish@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP

5

Post Montgomery Center
One Montgomery Street, Suite 1800

6

San Francisco, CA 94104

7

Jason A. Forge (jforge@rgrdlaw.com)

8

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900

9

San Diego, CA 92101

10

*Additional Counsel for Plaintiffs*

11

12

13

By:   /s/ Michael A. Mugmon

14

Michael A. Mugmon (251958)
WILMER CUTLER PICKERING

15

    HALE AND DORR LLP
950 Page Mill Road

16

Palo Alto, CA 94304
Telephone: +1 650 858 6000

17

Facsimile: +1 650 858 6100
michael.mugmon@wilmehale.com

18

*Attorney for Defendant Theranos, Inc.*

19

20

21

22

23

24

25

26

27

28

9

DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFF HILARY TAUBMAN-DYE
Case No.  5:16-cv-06822-NC

# Exhibit 3b

# SHARESPOST

## Celadon Technology Fund VII, LLC
## Series B (Theranos, Inc.)

- Transmittal Letter
- Offering Memo
- Subscription Agreement
- Operating Agreement

For the exclusive use of: Mary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

# SHARESPOST

# Transmittal Letter

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

TH-PLTF-001079

**Celadon Technology Fund VII, LLC**
221 Pine Street, 6th Floor
San Francisco, CA 94104

July 7, 2015

Dear Investor:

This confidential letter (this "**Transmittal Letter**"), offering memorandum (the "**Offering Memorandum**"), subscription package (the "**Subscription Package**"), operating agreement (the "**Operating Agreement**") and the exhibits thereto relate to an offering (the "**Offering**") of Membership Units (the "**Series B Units**") of Celadon Technology Fund VII, LLC, a Delaware limited liability company (the "**Company**").

The Company is offering Series B Units to fund its purchase of shares of Series A Preferred stock of Theranos Inc. (the "**Theranos Securities**") pursuant to one or more binding letter agreements between the Company and third-party holders of such stock (the "**Letter Agreements**"). The Company is offering the Series B Units in this Offering at a price per unit of $19.40 (the "**Unit Price**"). Each Unit purchased in the Offering will initiallycorrespond to one share of Theranos Securities purchased by the Company pursuant to the Letter Agreements.

The investment strategy of the Company is to:

- use the proceeds from the sale of the Series B Units to fund the purchase up to 2,000,000 shares of the Theranos Securities pursuant to Letter Agreements;

- hold the Theranos Securities until such time as Theranos Inc. ("**Theranos**") conducts an initial public offering of its shares or is sold for cash or publicly traded securities (a "**Theranos Liquidity Event**"), and then

- distribute to the Series B Unit holders the Theranos Securities or cash from sale of the Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities.

Each investor wishing to participate in the Offering must complete and submit an executed subscription package, including the Subscription Agreement, and deposit the subscription funds into an escrow account (a "**Subscription**"). Once an investor has completed a Subscription, SUCH INVESTOR MAY NOT WITHDRAW SUCH SUBSCRIPTION FOR ANY REASON. Each investor must indicate the total number of Series B Units it desires to purchase on the signature page to the Subscription Agreement submitted to the Company's Manager, Celadon Capital Management, LLC, a Delaware limited liability company (the "**Manager**"). From time to time, the Manager, in its sole and absolute discretion, shall determine whether to accept or reject, in whole or in part, the Subscriptions it has received. Once the Manager accepts a Subscription and admits the investor as a member of the Company (a "**Subscriber**"), the Manager shall thereafter deliver to such Subscriber copies of the fully executed Subscription Agreement and Operating Agreement.

Notwithstanding anything else to the contrary herein, the Manager reserves the right to accept or reject

Private and Confidential
Celadon Technology Fund VII LLC

CONFIDENTIAL

TH-PLTF-001080

any Subscription to purchase Series B Units, in whole or in part, in its sole discretion.  If the Manager rejects a Subscription, either in whole or in part, the rejected subscription funds, will be returned to the investor, without interest, penalty or offset.

At each closing of Series B Units, the Company will pay the Manager a one-time fee equal to $0.40 per unit sold at such closing (the "**Service Fee**").  The Service Fee includes a one-time placement fee of approximately $0.14 per unit sold at such closing which shall be paid by the Manager to the Company's placement agent, SharesPost Financial Corporation (the "**Placement Agent**"), an affiliate of the Company. The remainder of the Service Fee will compensate the Manager for its expenses and efforts in organizing the Company and for the services to be provided by the Manager.

Except for the Service Fee, the Manager will not charge any other fees or share in any profits with the Members or charge Members any other commission or placement fee.  However, the Company may allocate certain extraordinary expenses incurred by the Company or the Manager to the Members.

---

**Investment Example, Theranos Inc., "Theranos".**

| | | |
|---|---|---|
| Price Per Share of Theranos Securities | = | $19.00 |
| Series B Membership Unit Price | | $19.40 |
| Subscriber's Investment Amount for 10,000 Series B Units | = | $194,000 |
| Service Fee | = | $4,000 |
| | | |
| Subscriber's Investment Basis | = | $190,000 |
| (Subscriber's Investment Amount Less Service Fee) | | |
| | | |
| Subscriber receives | = | 10,000 Series B Units |

Upon a subsequent Company distribution of the Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities, subscriber receives 10,000 shares of the Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities, less transfer or registration fees charged by Theranos or its transfer agent, if any.

Upon a subsequent Company distribution of cash proceeds from the sale of Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities, subscriber receives cash calculated as follows:

(Sale price per share of Theranos Securities) x (10,000 shares of Theranos Securities)

---

The ability of the Company to complete its purchase of the Theranos Securities pursuant to Letter Agreements is subject to the procedures and conditions set forth in "THE COMPANY" section of the Offering Memorandum.

The Series B Units are being offered in increments of $10,000, with a minimum required initial investment of $100,000, but the Manager may in its sole discretion accept Subscriptions for lesser

CONFIDENTIAL

amounts. This Offering may continue on a "rolling admission" basis until terminated by the Manager in its sole discretion; provided, however, that if the Company has not completed its first purchase of Theranos Securities on or prior to December 1, 2015 (the "**Offering Period**"), the Company will return all funds to Subscribers without interest, deduction or setoff.  Prior to a closing, all Subscription funds will be held in an escrow account maintained by the Company with U.S. Bank National Association, the Company's Escrow Agent (or other suitable escrow agent selected by the Manager), until the earliest of the closing at which such Subscription is accepted by the Company, the rejection of the Subscription or the termination of this Offering.

Subscribers must represent to the Company that they are "accredited investors" as that term is defined in Rule 501 of Regulation D ("**Regulation D**") as promulgated under the Securities Act of 1933, as amended (the "**1933 Act**") and "qualified clients" as defined in Rule 205-3 as promulgated under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"). If you do not meet these criteria, please return this Transmittal Letter to the Company immediately as you will not be permitted to subscribe to this Offering.

Each Subscriber must make further representations to the Company regarding, among other things, such Subscriber's investment sophistication and experience investing in privately-held securities and liquidity needs, and acknowledge the lack of information upon which the Subscriber's decision to invest in the Company is made.

The terms and conditions of this Offering, the rights, preferences, privileges and restrictions with respect to the Series B Units and the rights and liabilities of the Company, the Manager and the Members are governed by the Company's Operating Agreement, as may be amended from time to time and the Subscription Package, which includes the Subscription Agreement (the "**Subscription Agreement**"), between each Subscriber and the Company. The descriptions of any of such matters in this Transmittal Letter are subject to and qualified in their entirety by reference to the Operating Agreement and the Subscription Agreement, as applicable.

This Transmittal Letter and the documents provided with it relate solely to the business of the Company and this Offering. Potential investors are required to conduct their own inquiries and consult with their own legal, tax and financial advisors regarding the advisability and suitability of an investment in the Series B Units. Subscribers will be required to represent to the Company that they are informed, sophisticated investors of the opinion that a purchase of Series B Units at the Unit Price (and the corresponding price per share of the Theranos Securities) is a reasonable and suitable investment for them and that such opinion is not made in reliance on any representation from the Manager or any of its affiliates.  No representation is made by the Company, its Manager, or any of their affiliates regarding the business, financial condition or prospects of Theranos or the advisability of an indirect purchase of Theranos Securities. No person acting on behalf of the Company, the Manager or any of their affiliates is authorized to make any such statement, and any statement, if made, may not be relied upon by a Subscriber in making a decision to invest in the Company.

Theranos is not affiliated with the Offering, the Company, the Manager or the offering of Series B Units.

THIS TRANSMITTAL LETTER IS NOT, NOR IS IT INTENDED TO BE, AN OFFERING OF SECURITIES OF THERANOS NOR A SOLICITATION OF AN OFFER TO PURCHASE SECURITIES OF THERANOS.

Private and Confidential
Celadon Technology Fund VII LLC

THIS TRANSMITTAL LETTER, THE ATTACHED OFFERING MEMORANDUM, THE SUBSCRIPTION PACKAGE AND THE OPERATING AGREEMENT, SHOULD BE READ CAREFULLY BY YOU AND YOUR LEGAL, TAX AND FINANCIAL ADVISORS PRIOR TO MAKING ANY DECISION CONCERNING AN INVESTMENT IN THE COMPANY.

Sincerely yours,
Celadon Technology Fund VII, LLC

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

Private and Confidential
Celadon Technology Fund VII LLC

# SHARESPOST

# Offering Memo

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

CONFIDENTIAL

# OFFERING MEMORANDUM

### UNIT INTERESTS IN

### CELADON TECHNOLOGY FUND VII, LLC

### SERIES B

**JULY 7, 2015**

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
7/10/2015

Private and Confidential
Celadon Technology Fund VII, LLC

## **TABLE OF CONTENTS**

THE OFFERING.................................................................................................................................1

THE COMPANY AND THE SERIES B UNITS...............................................................................4

THE MANAGER.................................................................................................................................6

RISK FACTORS.................................................................................................................................7

SUITABILITY STANDARDS...........................................................................................................13

SUMMARY OF THE OPERATING AGREEMENT.......................................................................15

PRIVACY NOTICE ..........................................................................................................................18

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

**Private and Confidential**
**Celadon Technology Fund VII LLC**

**THE OFFERING**

**The Proposed Offering**

Celadon Technology Fund VII, LLC, a Delaware limited liability company (the "**Company**") is offering (the "**Offering**") Series B Membership Units of the Company (the "**Series B Units**") to fund the purchase of up to 2,000,000 shares of Series A Preferred stock of Theranos Inc, (the "**Theranos Securities**" and "**Theranos**", respectively) pursuant to one or more binding letter agreements between the Company and third-party holders of such stock (the "**Letter Agreements**"). Each Unit sold by the Company will initially correspond to one share of the Theranos Securities purchased by the Company.

Upon such time as Theranos conducts an initial public offering of its shares or is sold for cash or publicly traded securities (a "**Theranos Liquidity Event**"), the Company will distribute to the Series B Unit holders either the Theranos Securities or cash proceeds from the sale of the Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities (a "**Distribution**").

The Company is offering Series B Units only to high net worth individuals, trusts, entities, and other eligible investors that qualify as "accredited investors" as defined in Rule 501 of Regulation D ("**Regulation D**") promulgated under the Securities Act of 1933, as amended (the "**1933 Act**"). The Series B Units are being offered in a private offering based on the Company's belief that it may rely upon the exemption from registration provided by Section 4(a)(2) and Regulation D under the 1933 Act. The Company is not registered as an "investment company" under the Investment Company Act of 1940, as amended (the "**Investment Company Act**") and the Manager is not registered as an "investment adviser" under the Advisers Act, based on exceptions from registration contained in the respective statutes and regulations. Subscribers will be required to make such representations as the Company's Manager, Celadon Capital Management, LLC, a Delaware limited liability company (the "**Manager**") requests to enable the Company to conclude that it qualifies for these exemptions, including, as applicable, representations regarding the number of its beneficial owners and/or its status as an "accredited investor". If you are not qualified as an accredited investor, you may not participate in this investment.

Each subscriber in the Offering (a "**Subscriber**"), either alone or together with a purchaser representative, will be required to make representations that it/he/she: (i) are not compensated by or affiliated with the Company or the Manager, (ii) have such knowledge and experience in financial and business matters that such Subscriber is capable of evaluating the merits and risks of this investment, and (iii) are able to bear the economic risks including a total loss of this investment.

This Offering Memorandum does not constitute an offer to sell or a solicitation of an offer to buy any securities in any state to any person to whom it is unlawful to make such an offer or solicitation in such state.

**SUBSCRIBERS SHOULD CAREFULLY REVIEW THIS OFFERING MEMORANDUM, INCLUDING THE SECTION TITLED "RISK FACTORS", AND THE COMPANY'S OPERATING AGREEMENT (THE "OPERATING AGREEMENT") AND THE SUBSCRIPTION PACKAGE (THE "SUBSCRIPTION PACKAGE"), ACCOMPANYING THIS OFFERING MEMORANDUM, PRIOR TO SUBSCRIBING FOR SERIES B UNITS OF THE COMPANY.**

CONFIDENTIAL

**Terms of the Offering**

The Letter Agreements entitle the Company to purchase up to 2,000,000 shares of the Theranos Securities.  The ability of the Company to complete such purchase is subject to the procedures and conditions set forth in the "COMPANY" and the "RISK FACTORS" sections of this Offering Memorandum. The Series B Units are being offered in increments of $10,000, with a minimum required initial investment of $100,000, but the Manager may in its sole discretion accept subscriptions for lesser amounts.

The Company is offering the Series B Units in this Offering at a price per unit of $19.40 (the "**Unit Price**"). The Company intends to acquire the Theranos Securities pursuant to the Letter Agreements at a price per share of $19.00.  The Company will charge each Subscriber purchasing Series B Units in the Offering, the Service Fee (as defined below) equal to $0.40 per unit, which shall be paid to the Manager for its role as manager of the Company, and is inclusive of a placement fee equal to approximately $0.14 per unit, which shall be paid by the Manager to SharesPost Financial Corporation ("**SPFC**"), a California corporation and affiliate of the Company and the Manager for its role as a placement agent (the "**Placement Agent**").  See "Fees and Expenses" below.

This Offering will continue on a "rolling admission" basis until terminated by the Manager in its sole discretion; provided, that if the Company has not completed its first purchase of Theranos Securities by December 1, 2015 (the "**Offering Period**") the Company will return all funds to Subscribers without interest, deduction or setoff.

In order to participate in the Offering, Subscribers must complete and submit an executed Subscription Package and deposit the corresponding subscription funds into an escrow account described below (a "**Subscription**"). Once a Subscriber has completed a Subscription, SUCH SUBSCRIBER MAY NOT WITHDRAW SUCH SUBSCRIPTION FOR ANY REASON.  From time to time, the Manager, in its sole and absolute discretion, shall determine whether to accept or reject, in whole or in part, the Subscriptions it has received. Once the Manager accepts a Subscription and admits the Subscriber as a Member (as defined below), the Manager shall thereafter deliver to such Member copies of the fully executed Subscription Agreement and Operating Agreement.

**The Manager reserves the right to accept or reject any Subscription to purchase Series B Units, in whole or in part, in its sole discretion.**  If the Manager rejects a Subscription, either in whole or in part, the rejected Subscription funds, will be returned to the investor, without interest, penalty or offset.

Prior to a closing, all Subscription funds will be held in an escrow account maintained by the Company with US Bank National Association or such other entity selected by the Manager (the "**Escrow Agent**"), until the earlier of the closing at which such Subscription is accepted by the Company, the rejection of the Subscription or the termination of this Offering. Subscription funds will be held by the Escrow Agent pursuant to the terms of an escrow agreement between the Company and the Escrow Agent. The Escrow Agent will not accept or reject any Subscriptions or review the adequacy of documents delivered by prospective investors.

**No Theranos Disclosure Materials**

*Neither the Company nor the Manager will provide investors with any disclosure materials of any kind*

*regarding Theranos or the Theranos Securities. Subscribers will be required to explicitly acknowledge this and represent that such disclosure materials are not provided, and that they are purchasing the Series B Units based on their own informed assessment of Theranos and the Theranos Securities and their own appraisal of the advisability of the Unit Price and the corresponding Company net purchase price for the Theranos Securities.*

**Use of Proceeds**

The Company will use the proceeds from each closing solely to: (i) purchase the Theranos Securities at the price per share to the Company of $19.00 as specified in Letter Agreements, and (ii) pay the Service Fee to the Manager (which includes the payment of the placement fee to the Placement Agent).

**Fees and Expenses**

At each closing of Series B Units, the Company will pay the Manager a one-time fee equal to $0.40 per unit sold at such closing (the **"Service Fee"**).  The Service Fee includes a one-time placement fee of approximately $0.14 per unit sold at such closing which shall be paid by the Manager to SPFC for its role as the Placement Agent with respect to the Series B Units. The remainder of the Service Fee will compensate the Manager for its expenses and efforts in organizing the Company and for the services to be provided by the Manager.

Except for the Service Fee, the Manager will not charge any other fees or share in any profits with the Members or charge Members any other commission or placement fee.  However, the Company may allocate certain extraordinary expenses incurred by the Company or the Manager to the Members.

For the exclusive use of Hilary Taubman-Dye
CTF VII (Series B – Theranos).
07/10/2016

CONFIDENTIAL

## THE COMPANY AND THE SERIES B UNITS

### The Company

The Company is a Delaware limited liability company formed for the general purpose of investing in private companies. The Company is seeking to raise funds through the sale of its Series B Units in this Offering in order to specifically invest in, acquire, hold and/or distribute or dispose of the Theranos Securities. The Company will be managed by Celadon Capital Management, LLC (its **"Manager"**). Please see the section of this Offering Memorandum titled "MANAGER" for a description of the Manager. Subscribers who are admitted as members of the Company (**"Members"**) will not participate in the management of the Company. The primary investment objective of the Company is to purchase the Theranos Securities pursuant to Letter Agreements and hold such stock until a Theranos Liquidity Event, at which point the Company will distribute the Theranos Securities or sell the Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities and distribute the proceeds of such sale to the holders of the Series B Units. In addition to the following description of the Series B Units, potential Subscribers should consider the more detailed description of the Operating Agreement contained in this Offering Memorandum under "SUMMARY OF THE OPERATING AGREEMENT" and the form of the Operating Agreement.

### Purchases of Theranos Securities

The Company intends to enter into Letter Agreements with third-party holders of Theranos Securities to acquire up to 2,000,000 shares of the Theranos Securities at a per share purchase price equal to $19.00.

The Theranos Securities are subject to a right of first refusal (the "ROFR"), pursuant to which Theranos may elect to purchase the Theranos Securities that are the subject of the Letter Agreements. The Manager does not know if Theranos will exercise its ROFR or assign the ROFR to a third party who will exercise the ROFR. In the event that Theranos (or its assignee) does exercise the ROFR, then the Company will be unable to purchase some or all of the Theranos Securities. It is possible that even if Theranos (or its assignee) waives its ROFR, one or more Sellers may, for whatever reason, default on their contractual obligation and be unable or unwilling to sell and transfer the Theranos Securities to the Company. The Theranos Securities may also be subject to co-sale rights, which may affect the amount and timing of the acquisition of the Theranos Securities by the Company. If for any of these or any other reason, the Company is unable to acquire the Theranos Securities during the Offering Period, the Company will return to Subscribers the proportionate amount of their Subscription funds without interest, deduction or offset.

### Restrictive Securities Agreements and Lockup

Any Theranos Securities purchased by the Company will be subject to the same restrictions on transfer and ROFR in the hands of the Company as they are in the hands of the Sellers. Those agreements generally include a ROFR with respect to proposed sales and a lock-up by which the Company would not be permitted to sell or distribute the Theranos Securities for a period of 180 days following the effective date of an initial public offering by Theranos.

CONFIDENTIAL

TH-PLTF-001090

**The Series B Units in the Company**

Upon the Manager's acceptance of a Subscription and receipt of funds into the escrow account, the Company will conduct a closing at which Series B Units will be sold to each Subscriber whose Subscription has been accepted by the Manager. Each Series B Unit represents ownership of an interest in the Company's B Series, the sole asset of which will be shares of Theranos Securities, including the right of such Member to any and all benefits to which a Member may be entitled pursuant to the Operating Agreement and under the Act, together with all obligations of the Member to comply with the terms and provisions of the Operating Agreement and the Act.

**Capital Accounts**

The Company shall maintain a capital account (the **"Capital Account"**) for each Member in respect of the Series B Units held by such Member. The Capital Account of each Member shall be determined by reference to such Member's initial capital contribution, less the Service Fee paid to the Manager, any subsequent capital contributions, and the Member's pro rata share of the Company's profits and losses and distributions.  All profits and losses (including realized and unrealized gains and losses) for each fiscal year will be allocated to the Members in proportion to their respective Capital Account balances as of the beginning of the fiscal year. See "SUMMARY OF THE OPERATING AGREEMENT."

**Distributions**

The Manager is required to make a distribution of cash or property upon a Theranos Liquidity Event as set forth below and in the Operating Agreement. The Manager may also, in its discretion, make distributions of cash, Theranos Securities or other Company property to the Members at any other time. Any such distributions shall generally be made in the following proportions and priorities:

(i) First, to the repayment of outstanding debts and liabilities, if any, of the Company, and then

(ii) the distribution amount to the Members.

Subject to the payment priorities and fees set forth above, following a Theranos Liquidity Event, the Manager shall distribute Theranos Securities or the cash proceeds from the sale of the Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities as determined by the Manager to the Series B Unit holders pro rata in accordance with the number of Series B Units held by them as soon as practicable. Costs, if any, relating to the transfer or sale of Theranos Securities following a Theranos Liquidity Event shall be paid by the Company prior to any distributions to the Members.

The terms and conditions of this Offering, the rights, preferences, privileges and restrictions with respect to the Series B Units and the rights and liabilities of the Company, the Manager and the Members are governed by the Company's Operating Agreement and the Subscription Agreement (together, the **"Subscription Documents"**) between each Member and the Company. The description of any of such matters in this Offering Memorandum is subject to and qualified in its entirety by reference to the Subscription Documents.

CONFIDENTIAL

TH-PLTF-001091

**Limited Liquidity of Investments**

There is presently no market for the Series B Units and Members must accept the possibility that there will be no such market for the Series B Units subsequent to this Offering. Accordingly, potential investors must continue to bear the economic risk of an investment in the Series B Units for an indefinite period and must be able to afford the loss of their entire investment. In addition, there are legal restrictions on the transfer of Series B Units, as the Series B Units have not been registered under the 1933 Act or registered or qualified under any applicable state securities laws, and are offered in reliance on exemptions from such registration and qualification contained in Section 4(a)(2) of the 1933 Act and Regulation D thereunder and in similar provisions of state laws. Series B Units cannot be sold to third parties unless they are subsequently registered under the 1933 Act and registered and qualified under applicable state securities laws or are exempt from such registration and qualification. In addition, the Operating Agreement prohibits any transfer of Series B Units without the prior consent of the Manager, which consent the Manager may withhold in its sole discretion.

THE MANAGER

Celadon Capital Management, LLC, a Delaware limited liability company, is the Manager of the Company. The Manager is a wholly owned subsidiary of SharesPost, Inc.

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SF-12
07/10/2015

CONFIDENTIAL                                                                                    TH-PLTF-001092

## RISK FACTORS

You should be aware that an investment in the Company, and the Company's anticipated investment in the Theranos Securities, involves considerable potential risks, including the possible loss of all or a material portion of your investment. The risks set forth below are not the only risks facing the Company. *Additional risks with respect to an investment in the Series B Units at the Unit Price and indirect investment in Theranos Securities exist, and no additional disclosure to potential Subscribers regarding such risk factors will be made by Theranos, the Company, the Manager, or any of their respective affiliates.*

Among the significant risk factors you should consider carefully before investing in the Company are the following:

*Potential Loss of Investment.* There is no assurance that the Company will be successful in purchasing Theranos Securities or, if successful, that their value will not be less than the Unit Price upon their distribution. The Company is a newly formed entity with no performance record. As is true of any investment in illiquid assets where information regarding the issuer may not be reliable and is limited, there is a risk that an investment in the Company will be lost entirely or in part. The Company is not a diversified investment program and should represent only a small portion of a Subscriber's portfolio.

*Limited Liquidity of Series B Units.* Members will not be able to sell, redeem, or transfer their membership interests in the Company, except under limited circumstances or with the consent of the Manager, which may be withheld or conditioned in its sole discretion.  Membership interests in the Series will not be registered under the 1933 Act, state securities laws or the securities laws of any non-U.S. jurisdiction, and cannot be resold, pledged, assigned or otherwise disposed of in the United States unless subsequently registered under applicable securities laws or an exemption from such registration is available.  Furthermore, it is not intended that a secondary market in the membership interests will be established.  In addition, Members will not have the right to withdraw any amount of its investment in the Company without the prior consent of the Manager, which consent may be withheld or delayed for any or no reason. In general, Members should expect to hold their Series B Units for the full life of the applicable Series.   As a result, an investment in the Company is not suitable for an investor who needs liquidity. See "SUITABILITY STANDARDS" and "SUMMARY OF THE OPERATING AGREEMENT."

*Concentration of Investment.* The Series B Units are being offered for the primary purpose of funding the acquisition of the Theranos Securities.  Given the concentration of the Company's investments in shares of Theranos, the value of an investment in the Company is subject to greater volatility and is more susceptible to any single economic, political or regulatory occurrence than would be the case if the Company's investments were diversified.

*No Control over Theranos.* The Company will not obtain representation on the board of directors or have any control over the management of Theranos.  The success of its investment depends on the ability and success of the management of Theranos, in addition to economic and market factors. Furthermore, the Company will be acquiring Series A Preferred stock of Theranos, which may be junior to the rights of other preferred shareholders and debt holders with respect to right of payment in connection with a liquidation event and in certain other circumstances.  The preference rights of other preferred shareholders and debt holders may have a significant negative impact to the value of Series A Preferred stock in connection with a liquidation event and there is no assurance that you will receive all or a

CONFIDENTIAL

TH-PLTF-001093

portion of your investment back, as other preferred shareholders and debt holders may be entitled to all or a majority of the liquidation proceeds.

*Future Valuation Fluctuations*. There is a limited, privately negotiated market for the Theranos Securities. Accordingly, valuations may fluctuate considerably and the Unit Price may bear limited or no relationship to future valuations of the Theranos Securities in any market that may develop for such shares, whether private or public.

*Limited Liquidity of Theranos Securities*. In the event that the Manager determines to make distributions of Theranos Securities, there may be no market through which the Theranos Securities may be sold, and even if there were such a market, the transfer of the Theranos Securities may be subject to significant legal and contractual restrictions.   In addition, the Theranos Securities will not be registered under Federal securities laws or qualified under any state securities law and are being sold in reliance upon exemptions under such laws. Unless the Theranos Securities are registered with the Securities and Exchange Commission (the "**SEC**") and any required state authorities, or an appropriate exemption from registration is available, Members who receive Theranos Securities in a distribution by the Company may be unable to liquidate such securities, even though his or her personal financial condition may dictate such liquidation. Moreover, the resale of any Theranos Securities following a distribution of Theranos Securities may be subject to Rule 144 of the 1933 Act and Members intending to sell Theranos Securities distributed to them by the Company may be required to aggregate their sales of Theranos Securities with sales made by the Company and other Members for some period of time following the distribution of such securities by the Company. Therefore, prospective Subscribers who require liquidity in their investments should not invest in the Series B Units.

*No Public Market in Theranos Securities*. An investment in the Series B Units at the Unit Price involves a high degree of business and financial risk that can result in substantial losses. No public market currently exists for the Theranos Securities and no assurance can be given that a Theranos Liquidity Event will occur in the future, or that upon such Theranos Liquidity Event, the Theranos Securities will be freely tradable at a price per share that is higher than the price per share paid by the Company or at a price per share that is higher than the Unit Price paid by a Member.

*Expenses Incurred by a Member that Would Not be Incurred through Direct Purchase of Theranos Securities*.  By investing in the Company, rather than directly purchasing Theranos Securities, the Members will incur expenses that they would otherwise not incur, including the Service Fee, equal to $0.40 per unit.  A Member may or may not be able to directly purchase Theranos Securities at a price and upon terms that would be more economically advantageous than the Member is receiving from the Company.

*Reliance on the Manager; No Voting or Dispositive Power over the Theranos Securities*. Decisions with respect to the management of the Company will be made by the Manager, and the Members will have no right to take part in the management of the Company. All rights, preferences, privileges and restrictions with respect to the Theranos Securities, including registration rights and other decisions that holders of Theranos Securities may have, will belong to the Company and will be the sole responsibility of the Manager and the Members will have no ability to make any decisions with respect thereto. No Member will have the right to either vote or dispose of any of the Theranos Securities owned by the Company. The determination to make distributions, whether in cash, in kind, or a combination thereof, will be made at the sole discretion of the Manager, even if the Theranos Securities have been registered

CONFIDENTIAL

for resale under the 1933 Act; notwithstanding the foregoing, following a Theranos Liquidity Event, the Manager shall distribute the Theranos Securities or the cash proceeds from sale of the Theranos Securities or any publicly traded securities received in exchange for the Theranos Securities to the Members in accordance with Section 4 of the Operating Agreement.  In addition, no Member will have the right to withdraw all or any amount of its investment in the Company (either in cash or in the form of Theranos Securities) at any time without the prior consent of the Manager, which consent may be withheld or delayed for any or no reason. Accordingly, no person should make any investment in the Company unless they are able to indefinitely hold their investment without liquidity or a return.

*Expenses Charged to the Company*. The Company may allocate certain extraordinary expenses under the terms of the Operating Agreement and such expenses will be allocated among the Members in accordance with terms of the Operating Agreement.  Such fees or expenses will reduce, perhaps materially, a Subscriber's return on investment.

*Conflicts of Interest*. Certain inherent conflicts of interest arise from the activities of the Manager. The Manager will manage the Company and related parties will manage other businesses (including, without limitation, those associated with SharesPost Financial Corporation). Conflicts of interest may arise as to, among other things, the order in which the Manager, its affiliates and the Company proceed to acquire or dispose of Theranos Securities.    Further, each of the Manager, the Company, and SharesPost Financial Corporation are affiliated and related parties. Nothing in this Offering or under the Operating Agreement prohibits each from engaging in transactions, service arrangements or a business relationship with any or all of the others, except that, with respect to the Company, any such transactions, services or relationships shall be entered into on terms reasonably comparable to those that could be obtained from unaffiliated third parties in the San Francisco metropolitan area.

The Manager and related parties will seek to resolve these conflicts in as equitable a manner as possible under the relevant facts and circumstances, but there is no assurance that any such conflicts will be resolved in a manner advantageous to the Company and the Manager and its Affiliates are under no obligation to ensure that the Company acquire the Theranos Securities at the same or lower price than such securities are acquired by the Manager or its affiliates for their own accounts.

*Related Party Transactions*. The Operating Agreement gives the Manager the authority to engage affiliates of the Manager (including affiliates that provide brokerage services and investment advisory services) on the Company's behalf.  The Manager may acquire and sell the Theranos Securities using affiliated brokerage firms and such firms may receive commissions in connection with such purchases and sales. These affiliated companies of the Manager may be managed by principals that are executives of the Manager, which could cause the interests of these principals and executives to be different and adverse to those of the Members.  While the Operating Agreement requires that the costs of services provided by affiliated entities be no less favorable to the Company than those of an unrelated third party providing similar services obtained in accordance with applicable law, there can be no assurance that the Company could not obtain such services on more favorable terms from third-party service providers.  Any such relatively higher costs and conflicts of interest between the Manager, its principals and employees, on the one hand, and the Company and its Members, on the other hand, could have a material and adverse effect on the value of the Members' investment in the Company.

*No Independent Experts Representing Members*. The rights of the Manager to the Service Fee has not been negotiated at arm's length. Further, while the Manager has consulted with counsel, accountants

CONFIDENTIAL

and other experts regarding the structure and terms of the Company, such counsel does not represent the Subscribers or Members. The Company and the Manager urge each prospective investor to consult its own legal, tax and financial advisers regarding the desirability and appropriateness of purchasing Series B Units and the suitability of an investment in the Company.

*Limitation on Liability; Indemnification.* The Operating Agreement contains limitations on the liability of the Manager and its affiliates for any action taken, or any failure to act, on behalf of the Company unless there shall be a judgment or other final adjudication adverse to such Manager establishing that: (a) the Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law; (b) the Manager personally gained in fact a financial profit or other advantage to which such Manager was not legally entitled; or (c) with respect to distributions under the Operating Agreement, the Manager's acts were not performed in good faith and with a degree of care that an ordinarily prudent person in a like position would use under similar circumstances. The Operating Agreement also provides for indemnification of the Manager and its affiliates and advance of certain expenses for any losses for which the Manager is absolved from liability under the terms of the Operating Agreement. Such agreements could result in the Company becoming financially responsible for the costs of litigation and amounts paid in the settlement or discharge of claims against the Manager, which may be substantial in amount and which could have a material and adverse effect on the Company's business and results and the value of the Members' investment in the Company.

*Cross-Series Liability.* The Manager intends that Series B of the Company be considered a separate and distinct "series" for purposes of the Delaware Limited Liability Company Act.  As such, the Manager intends that the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to Series B will be enforceable against the assets of Series B only, and not against the assets of Celadon Technology Fund VII, LLC generally or any other series, and that none of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to Celadon Technology Fund VII, LLC generally or any other series will be enforceable against the assets of that series. However, this concept has not been subject to judicial scrutiny, either in Delaware or in other jurisdictions. Thus, it is possible that, notwithstanding the Delaware Limited Liability Company Act and the provisions of the Operating Agreement, a court considering the matter may determine that the liabilities of Celadon Technology Fund VII, LLC generally should be enforceable against the assets of all of the series. Any such determination could subject an investor in Series B to substantial financial liabilities, including liabilities of a series which the investor did not actually invest.

*Potential Liability to Return Prior Distributions.* Under the Act, Members may be liable to return prior distributions made to them by the Company in the event that the Company becomes insolvent subsequent to the date of such distributions.  The Operating Agreement further provides that any Member who receives a distribution in violation of the Operating Agreement or that is required to be returned to the Company under applicable law return such distribution within 30 days upon demand.

*Manager's Right to Dissolve the Company or Terminate the Series.* The Operating Agreement provides that the Manager may at any time dissolve the Company or terminate any series of the Company upon notice to the Members and distribute its remaining assets to the Members even if this is at a time when dissolution may be disadvantageous to the Members. See "SUMMARY OF THE OPERATING AGREEMENT."

*State and Federal Securities Laws.* This Offering has not been registered under the 1933 Act, in reliance,

CONFIDENTIAL

TH-PLTF-001096

among other exemptions, on the exemptive provisions of Section 4(a)(2) of the 1933 Act and Regulation D under the 1933 Act. Similar reliance has been placed on available exemptions from securities registration or qualification requirements under applicable state securities laws. Nonetheless, no assurance can be given that this Offering currently qualifies or will continue to qualify under one or more of such exemptive provisions due to, among other things, the adequacy of disclosure and the manner of distribution, the existence of similar offerings in the past or in the future, or a change of any securities law or regulation that has retroactive effect. If, and to the extent that, claims or suits for rescission are brought and successfully concluded for failure to register this Offering or other offerings or for acts or omissions constituting offenses under the 1933 Act, the Securities Exchange Act of 1934 Act (the "**1934 Act**") or applicable state securities laws, the Company could be materially and adversely affected, jeopardizing its ability to operate successfully or at all. Furthermore, the human and capital resources of the Company and the Manager could be adversely affected by the need to defend actions under these laws, even if the Company is ultimately successful in its defense. Moreover, the Company is not registered under the Investment Company Act and is acting pursuant to an exception therefrom. Accordingly, failure to maintain the Company's exempt status could result in consequences to the Company and Members similar to a failure to maintain the exempt status of the Offering under the 1933 Act or state securities laws.

Neither the Company nor the Manager is or currently intends to be registered as a broker or dealer under the 1934 Act, any state securities law or any other securities law. The Manager believes that neither the Manager nor the Company is required to be registered as a broker or dealer, but if the SEC or any other state securities law administrator were to assert that such registration is required, the Company would bear the resulting increased expenses and its activities would be restricted, which could lead to dissolution of the Company and liquidation of its investments at a time when such liquidation may be disadvantageous to the Company, or could lead to other materially adverse effects on the Company's business.

Securities and investment businesses generally are comprehensively and intensively regulated under state and federal laws and regulations. Any investigation, litigation or other proceeding undertaken by state or federal regulatory agencies or private parties could require spending material amounts of Company funds for legal and other costs and could have other materially adverse consequences for the Company. In addition, because this Offering has not been registered under the 1933 Act, the Company is not registered under the Investment Company Act and the Manager is not registered under the Advisers Act, the Subscribers are not afforded certain regulatory protection afforded to investors in offerings or entities that are registered under such laws.

*Tax Considerations; Taxation as a Partnership.* The tax aspects of an investment in the Company are complicated, and each Subscriber should have them reviewed by professional advisers familiar with the Subscriber's personal tax situation and with the tax laws and regulations applicable to the investor and investment limited liability companies. The Company intends to be taxed as a "partnership" for federal, state, local and foreign income tax purposes, and that each series likewise be taxed as a separate partnership for such purposes. If the IRS classifies the Company as a corporation rather than a partnership, distributions would be reduced under current tax law. It is our expectation that the Company will be taxed as a partnership and not as a corporation for federal income tax purposes. However, this position is not binding on the IRS, and the IRS has not ruled on any federal income tax issue relating to the Company. If the IRS successfully contends that the Company should be treated as a corporation for federal income tax purposes rather than as a partnership, then: (i) losses realized by the

CONFIDENTIAL

TH-PLTF-001097

Company would not be passed through to you; (ii) the income of the Company would be taxed at tax rates applicable to corporations, thereby reducing the Company's cash available to distribute to you; and (iii) your distributions would be taxed as dividend income to the extent of the Company's current and accumulated earnings and profits. The Company will not apply for an IRS ruling that it will be classified as a partnership for federal income tax purposes. You and your legal, tax and financial advisors should carefully review your tax circumstances in the context of the Company.

*Common Counsel*. The Company, the Manager and certain of their affiliates may be represented in matters concerning the Company and this Offering by common legal counsel. Consequently, Subscribers should not consider the Company's law firm or the law firm of any of their affiliates to be their independent counsel and should consult with their own legal counsel on all matters concerning the Company or an investment therein.

*Inability to Acquire Theranos Securities.*  If (a) the Theranos Securities are purchased by Theranos or Theranos assignee pursuant to Theranos's ROFR with respect to the Theranos Securities, (b) if a Seller should default on its obligation to sell and transfer the Theranos Securities to the Company pursuant to a Letter Agreement, or (c) if the Company fails to raise adequate funds to purchase the Theranos Securities, then the Company will be unable to acquire the Theranos Securities.  In this event, the Company will return to Subscribers their Subscription funds, but Subscribers will have expended effort in connection with the Offering and lost the benefit of the amount of their capital contribution placed in escrow for some period of time.

*Limited Information About Theranos.*  Neither the Company, the Manager nor any of their affiliates is providing Subscribers with any information, financial, operating or otherwise regarding Theranos and very limited information about Theranos and its performance, prospects for growth, success or a liquidity event is publicly available given that Theranos is not a publicly reporting company or listed on any national securities exchanges. Accordingly, an investment decision to purchase shares of Theranos indirectly through the Company must be made by the Subscriber without certain Theranos financial and operating data that in the context of other investment decisions might be a necessary part of an investor's appraisal of the investment's advisability.   Investors considering an investment in the Company must be aware that there is a risk that: (i) there are facts or circumstances pertaining to Theranos the public and the investor are not aware of, and (ii) publicly available information concerning Theranos upon which the investor relies proves to be inaccurate, and, as a result of (i) or (ii), the investor suffers a partial or complete loss on its investment.

CONFIDENTIAL                                                                                            TH-PLTF-001098

**SUITABILITY STANDARDS**

Prospective Subscribers should satisfy themselves that an investment in the Series B Units is suitable for them, should examine this Offering Memorandum, the Subscription Package and the Operating Agreement, and should avail themselves of access to such additional information about Theranos, this Offering, the Company, the Manager and their businesses as they consider necessary to make an informed investment decision.

Series B Units will be sold only to "accredited investors," as defined in Regulation D under the 1933 Act. In addition to net worth and income standards, each Subscriber must have funds adequate to meet personal needs and contingencies, must have no need for prompt liquidity from the investment, and must purchase Series B Units for investment only and not with a view to their sale or distribution.

Generally, an "accredited investor" is (a) an individual who, either individually or jointly with his or her spouse, has a net worth of more than $1,000,000 excluding the individual's primary residence, (b) an individual whose annual individual income exceeded $200,000 for each of the two most recent years and who reasonably expects an individual income in excess of $200,000 in the current year, or whose joint income with his or her spouse exceeds $300,000 for each of the two most recent years and who reasonably expects joint income with his or her spouse in excess of $300,000 in the current year, (c) an institutional investor meeting certain qualifications, (d) a corporation, business trust or company, in each case not formed for the specific purpose of acquiring Series B Units and with total assets in excess of $5,000,000, (e) any trust with total assets in excess of $5,000,000, not formed specifically to purchase Series B Units and whose investment in the Company is directed by a sophisticated person, or (f) an entity in which all of the equity owners are "accredited investors".

Each Subscriber must also, either alone or together with a purchaser representative, have sufficient knowledge and experience in financial and business matters generally and in securities investment in particular to be capable of evaluating the merits and risks of investing in the Company. Because of the extremely limited ability to withdraw funds from the Company and the risks of investment (some of which are discussed under "RISK FACTORS"), a purchase of Series B Units would not be suitable for a Subscriber who does not meet the suitability standards discussed in these offering materials.

The Manager may reject the Subscription Agreement of any prospective Subscriber for whom it appears that Series B Units may not be a suitable investment. A prospective Subscriber may not, however, rely on the Manager to determine the suitability of an investment in Series B Units for such prospective Subscriber. The Manager assumes no liability for a Subscriber's decision to invest in the Company.

*Reliance on Subscriber Information.* The Company requests certain information regarding the satisfaction of Subscriber suitability standards in the Investor Suitability Certification that each prospective Subscriber must complete. Members will make representations to the Company and certain third-party beneficiaries in the Subscription Agreement that they rely upon in accepting the Member's Subscription Agreement or otherwise facilitating Member's participation in the Offering. The Series B Units have not been registered under the 1933 Act and are being offered in reliance on Section 4(a)(2) thereof and Regulation D promulgated by the SEC thereunder, and in reliance on applicable exemptions from state law registration or qualification provisions. Accordingly, prior to accepting a Subscription, the Manager may make all inquiries reasonably necessary to satisfy itself that the prerequisites of such exemptions have been met. Each prospective Subscriber will also be required to provide whatever

Private and Confidential
Celadon Technology Fund VII LLC
13

CONFIDENTIAL

additional evidence is deemed necessary by the Manager to substantiate information or representations contained in its Subscription Agreement and Investor Suitability Certification. The Manager may reject any Subscription for any reason, regardless of whether a prospective Subscriber meets the suitability standards. In addition, the Manager may waive minimum suitability standards not imposed by law. The standards set forth above are only minimum standards.

*Investment Company Act*. As a result of provisions of the Investment Company Act, no corporation, limited liability company, partnership, trust, association, or other entity that is registered as an investment company under the Investment Company Act or that relies on an exclusion from the definition of investment company provided by Section 3(c)(1) or 3(c)(7) of the Investment Company Act may own 10% or more of the outstanding equity Series B Units in the Company. If any such entity subscribes for Series B Units, unless the Manager determines it has the desire and the legal right to waive this provision, the Manager will limit the Series B Units, if any, issued to such entity to less than 10% of the Members' aggregate Capital Account balances after such entity's investment. If such entity's Subscription is for a greater amount and such representations are not made, the difference will be refunded.

*Additional Requirements*. The Company is not registered as an investment company under the Investment Company Act and is relying on an exception from such registration under Section 3(c)(1) for entities with 100 or fewer beneficial owners.  The Company expects to close the Offering if it has reached this threshold even if the maximum amount of the Offering has not been reached.

For the exclusive use of: Hien Ngo, John Dy 12
CTF VII (Series B - Therangs)
07/10/2015

CONFIDENTIAL                                                    TH-PLTF-001100

## SUMMARY OF THE OPERATING AGREEMENT

*The following discussion briefly summarizes certain provisions of the Operating Agreement. As with all other references to or descriptions of the Operating Agreement in this Offering Memorandum, the following description is only a summary and is qualified in its entirety by reference to the Operating Agreement, the form of which is enclosed with this Offering Memorandum.*

The holders of Series B Units will be admitted as Members and entitled to all rights of Members under the Operating Agreement and the Delaware Limited Liability Company Act. The Operating Agreement is the governing instrument that contains the terms under which the Company will operate and establishes the rights and obligations of the Members, in their capacities as such. Capitalized terms in the following discussion that are not defined herein have the meanings ascribed to them in the Operating Agreement.

*Term.* The term of the Company will continue into perpetuity unless terminated earlier in the sole discretion of the Manager, subject to certain mandatory dissolution events as more fully set forth in the Operating Agreement.

*Capital Contributions.* Each Member participating in this Offering will be obligated to make a capital contribution of at least $100,000, but the Manager may waive this minimum for any Subscriber in its sole discretion. After the Company commences operations, no Member will be required to make any additional capital contributions to the Company.

*Voting Rights.* Members will have only limited voting rights and no management rights. The voting rights are limited to approving modifications of the business purpose of the Company.

*Allocations.* A capital account ("**Capital Account**") will be maintained by the Company for each Member on a Series by Series basis. Each Member's Capital Account will be credited or debited with the Member's Initial Capital Contribution and shall be thereafter reduced by the Service Fee, each Member's pro-rata share of the Company's profits and losses and distributions to the Member with respect to such series. All profits and losses (including realized and unrealized gains and losses) for each fiscal year will be allocated to the Members in proportion to their respective Capital Account balances as of the beginning of the fiscal year.

*Distributions.* The Manager may make distributions to the Members in its sole discretion of cash, Theranos Securities or other Company Property. Any distributions will generally be made in the following proportions and priorities:

(i) First, to the repayment of outstanding debts and liabilities, if any, of the Company, and then

(ii) the distribution amount to the Members.

Subject to the payment priorities set forth above, following a Theranos Liquidity Event, the Manager shall distribute Theranos Securities, cash or a combination thereof to the Series B Unit holders pro rata in proportion to the members respective Capital Account balances as soon as practicable after the release of such Theranos Securities held by the Company from restrictions on transferability, including any market stand-off agreements.

CONFIDENTIAL

*Company Expenses.* The Manager generally will bear all operating and administrative expenses including investment-related expenses, consulting and other professional fees relating to particular investments or contemplated investments, legal expenses related to the Company's formation and the offering of the Membership Units, software, accounting, audit and tax preparation expenses, expenses related to the maintenance of the Company's registered office, and other similar expenses related to administration of the Company. The Company will bear all extraordinary expenses, including, without limitation, costs of regulatory compliance with Rules and Regulations, any litigation-related costs and expenses and any transfer or registration fees charged by an Issuer or its transfer agent. The Manager has broad discretion in allocating extraordinary expenses, which may impact the economics of ownership of the Series B Units.

*No Rights of Withdrawal of Members without the Consent of the Manager.* No Member will have the right to withdraw all or any partial amount of such Member's Capital Account (either in cash or Theranos Securities) during the term of the Operating Agreement, without the prior consent of the Manager, which consent may be delayed or withheld for any or no reason. The Manager may require any Member to withdraw in whole or in part from any Series B Units if the Manager believes that such withdrawal is in the best interest of the Company. In such event, the withdrawing Member is entitled to receive the fair market value of the Series B Units from which it is withdrawing, pursuant to the applicable formula specified in the Operating Agreement.

*Transfers of Series B Units.* No transfers of Series B Units are allowed without the consent of the Manager, except to certain persons related to the Member, and the provision of such documentation and the satisfaction of such other conditions as the Manager may require.

*Limitation on Liability; Indemnification.* The Operating Agreement contains limitations on the liability of the Manager and the Affiliates for any action taken, or any failure to act, on behalf of the Company unless there shall be a judgment or other final adjudication adverse to such Manager establishing that: (a) the Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law; (b) the Manager personally gained in fact a financial profit or other advantage to which such Manager was not legally entitled; or (c) with respect to distributions under the Operating Agreement, the Manager's acts were not performed in good faith and with a degree of care that an ordinarily prudent person in a like position would use under similar circumstances. The Operating Agreement also provides for indemnification of the Manager and the Affiliates and advance of expenses for any losses for which the Manager is absolved from liability under the terms of the Operating Agreement.

*Amendments to the Operating Agreement.* The Operating Agreement provides broad discretion to the Manager to amend the Operating Agreement without the consent of the Members. Subscribers are encouraged to read the provisions of the Operating Agreement relating to amendments, provided, however, that the Manager shall not amend the Operating Agreement without the consent of each of the affected Member(s) (a) to impose any liability on any Member for any debts, obligations or liabilities of the Company (b) to impose any obligation upon, or increase any obligation of, any Member to make additional capital contributions to the Company or (c) subject to certain exceptions, to alter the allocation for tax purposes of any items of income, gain, loss, deduction, or credit or alter the manner of computing the distributions among the Members.

CONFIDENTIAL

TH-PLTF-001102

_Dissolution of the Company_. The Company will be dissolved upon the first to occur of the following: (a) the sale or other disposition of all or substantially all of the Company property outside of the ordinary course of business and the collection of all the proceeds of such disposition; (b) the determination of the Manager in its sole discretion to dissolve the Company; or (c) upon a judicial determination under Section 18-802 of the Delaware Limited Liability Company Act. Each series shall be terminated under similar circumstances, as well as upon the distribution of all or substantially all of the Company's property associated with such series. Upon dissolution of the Company, the Manager, or if there is no Manager, such other Person appointed in accordance with applicable law to wind up the Company's affairs shall liquidate the assets of the Company as promptly as possible in an orderly and businesslike manner. The proceeds of liquidation shall be applied and distributed in the following order of priority: (a) first, to the payment of the debts and liabilities of the Company (other than any loans or advances made by any of the Members to the Company) and the expenses of liquidation; (b) second, to the creation of any reserves deemed reasonably necessary for the payment of any contingent or unforeseen liabilities or obligations of the arising out of or in connection with the business and operation of the Company; (c) third, to the payment of any loans or advances made by any of the Members to the Company; and (d) thereafter, to the Members in accordance with the distribution priorities set forth in Operating Agreement. The Company will not be dissolved until all of its affairs have been wound up and its assets distributed as provided in the Operating Agreement.

For the exclusive use of: Hilary & Joel Cox
CTF VII (Series B - Theranos): SPX XVI
07/10/2015

CONFIDENTIAL

TH-PLTF-001103

**Privacy Notice**

Pursuant to the US Gramm-Leach Bliley Act, Public Law No. 106-102, and the rules issued by the Federal Trade Commission regarding the Privacy of Consumer Financial Information, 16 C.F.R. Part 313, institutions that provide certain financial products or services to individuals to be used for personal, family, or household purposes are required to provide written notices to their customers regarding disclosure of nonpublic personal information. This notice is being provided to comply with this requirement.

In the normal course of its formation, operation and dissolution, the Company will collect and disclose certain private information about its Members. Personal financial information about the Members, such as their names, addresses, social security or tax identification numbers, assets and incomes, will be obtained from subscription agreements, investor questionnaires and other documents. Other personal information about the Members, such as capital account balances, contributions, distributions, account data and information about their participation in other investments, will be obtained in the course of transactions between the Members and the Company or its affiliates.

Except as described below, this private information will be disclosed only as permitted by applicable law to the Company's affiliates and service providers, including the Company's accountants, attorneys, broker-dealers, escrow agents, custodians, transfer agents, and any other parties whose services are necessary or convenient to the formation, operation, business analysis or dissolution of the Company. Any party receiving private information about the Members pursuant to the preceding sentence will be authorized to use such information only to perform the services required and as permitted by applicable law.

Access to private information about the Members will be restricted to those employees of the Company who require such access to provide services to the Company and its Members. The Company will maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard private information about its Members. In addition, the Company will continue to assess new technology for protecting information with regard to its Members. In all events, the Company may disclose Member information: (a) to other Members as required or permitted under the Operating Agreement; (b) to entities other than its affiliates and service providers with consent of the Member and (c) as otherwise required by applicable law.

The foregoing privacy notice reflects a privacy policy that has been adopted by the Manager. It may be updated from time to time upon notice to the Members.

READ & Approved    _Ashley Ted Dwyle_ *

8·13·15

CONFIDENTIAL                                    TH-PLTF-001104

# SHARESPOST

# Subscription Agreement

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

CONFIDENTIAL

# INSTRUCTIONS FOR SUBMISSION OF SUBSCRIPTION DOCUMENTS

For your subscription (your "**Subscription**") to be considered for acceptance by Celadon Technology Fund VII, LLC (the "**Company**"), you must take the following actions:

1.  *Complete* and *sign*:

    (a) The Subscription Agreement for the purchase of Units (the "**Series B Units**") of the Company;

    (b) The signature page to the Company's Operating Agreement;

    (c) An IRS Form W-9 or W-8BEN, or other forms, as applicable; and ✓

    (d) The Subscriber Suitability Certification.

2.  **You are *required* to provide government-issued identification for the Subscriber.**

    (a) **Individual Subscribers**: If the Subscriber is an individual, the Company requires a copy of a form of government-issued identification such as a driver's license or passport.  If more than one person is signing the Subscription document, both signers are required to submit government-issued identification.

    (b) **Entity Subscribers**: If the Subscriber is an entity, the Company requires (i) a copy of the ✓ entity's certificate of formation, trust or other organizational document, and (ii) a copy of a form of government-issued identification such as a driver's license or passport of the person authorized to enter into this Subscription Agreement.

    (c) **Identification may be:**

        (i) **faxed** to (650) 409-2182; or

        (ii) **e-mailed** to operations@sharespost.com.

**YOUR SUBSCRIPTION WILL NOT BE CONSIDERED FOR ACCEPTANCE UNLESS AND UNTIL EACH OF THE ACTIONS LISTED ABOVE ARE COMPLETED.**

Upon receipt of the executed Subscription Agreement, Operating Agreement, IRS Form W-9 or W-8BEN, or other form (as applicable), the Subscriber Suitability Certification, the Escrow Agreement and copy(ies) of government-issued identification, your Subscription will be considered for acceptance by the Celadon Capital Management LLC (the "**Manager**").

You will be required to wire funds to U.S. Bank National Association or other suitable escrow agent selected by the Manager (the "**Escrow Agent**"), according to wire instructions provided by the Manager.

All Subscription funds will be held in an escrow account in the Company's name at the Escrow Agent, pending a closing.  If the Manager, in its sole discretion, rejects a subscription, either in whole or in part, the rejected portion of the subscription funds will be returned to the Subscriber without interest or deduction.  The minimum subscription is $100,000 per investor, which may be increased

Private and Confidential
Celadon Technology Fund VII, LLC

TH-PLTF-001106

in $10,000 increments. The Manager may, in its sole discretion, waive the minimum investment and increments requirement.

**Questions regarding execution and submission of these documents and wire transfers should be directed to the SharesPost Financial Corporation Private Securities Group at (800) 279-7754 Option #2 or privatesecurities@sharespost.com**

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

Private and Confidential
Celadon Technology Fund VII, LLC
2

TH-PLTF-001107

**CELADON TECHNOLOGY FUND VII, LLC**
**SERIES B UNITS**
**SUBSCRIPTION AGREEMENT**

Celadon Technology Fund VII, LLC
221 Pine Street, 6th Floor
San Francisco, CA 94104

Prospective Subscribers:

The undersigned subscriber (the "**Subscriber**") has received and carefully read the Celadon Technology Fund VII, LLC Offering Memorandum dated July 7, 2015 including any attached supplements, exhibits and appendices (collectively, the "**Offering Memorandum**"), and the Operating Agreement (the "**Operating Agreement**"), which describes the terms and conditions by which a Subscriber may participate and invest in the Series B Units (the "**Series B Units**") of Celadon Technology Fund VII, LLC, a Delaware limited liability company (the "**Company**"). Capitalized terms used and not defined in this subscription agreement (this "**Subscription Agreement**") have the meanings given them in the Operating Agreement.

1.     *Subscription*.  Subject to the terms and conditions of this Subscription Agreement and the Operating Agreement, the Subscriber hereby subscribes for and agrees to purchase the number of Series B Units of the Company in an aggregate dollar amount (the "**Investment Amount**") equal to the (i) number of Series B Units, multiplied by (ii) $19.00 per Series B Unit, which is inclusive of a $0.40 per unit Service Fee, as indicated by the Subscriber on the signature page hereof. Upon receipt of the (i) executed Subscription Agreement, (ii) executed Operating Agreement, (iii) executed IRS Form W-9, W-8BEN, or other form (as applicable), (iv) executed Subscriber Suitability Certification, and (v) copy(ies) of government-issued identification, your Subscription will be considered for acceptance by the Company. **Failure to provide any one of the foregoing may result in the Celadon Capital Management LLC (the "Manager") rejecting this Subscription Agreement without further notice.**

**The Subscriber agrees that this Subscription is irrevocable and binding on the Subscriber**. The Subscriber understands that if, for any reason, this transaction is not consummated, the funds received by the Company pursuant to this transaction will be returned to the Subscriber, without interest or deduction of any kind.

2.     *Acceptance of Subscription; Series B Unit Price*.  The Subscriber acknowledges that the Manager has the right to accept or reject this Subscription, in whole or in part, for any reason, and that this Subscription is deemed accepted by the Manager only when the Manager has provided the Subscriber notice that this Subscription is accepted. ONCE YOU HAVE SUBMITTED YOUR SUBSCRIPTION, YOU MAY NOT WITHDRAW SUCH SUBSCRIPTION FOR ANY REASON. The Subscriber agrees that subscriptions need not be accepted in the order received or any other allocation rational. Upon rejection of this Subscription Agreement for any reason, this Subscription Agreement will be deemed null and void and of no further force or effect.

CONFIDENTIAL   TH-PLTF-001108

3.      *Representations, Warranties and Covenants of the Subscriber.*   The Subscriber hereby represents, warrants to and covenants with the Company as follows:

(a)  The Subscriber agrees to pay all costs and expenses incurred by or on behalf of the Company, including reasonable attorneys' fees and disbursements, to enforce the Subscriber's obligations in the event of any default in respect of its obligations under this Subscription Agreement.

(b)  Under Sections 1441, 1442 and 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), the Company may be required to withhold tax on certain transfers or distributions to a Subscriber who becomes a unit holder of the Company (a "**Unit Holder**") if the Unit Holder is a non-U.S. person (see Section 7).  In addition, backup withholding may be required under certain circumstances.  To inform the Company whether withholding or backup withholding is required with respect to the Subscriber's Series B Units, the Subscriber must complete a Form W-9 or applicable Form W-8 and must furnish the Company with an updated IRS Form W-9 or updated IRS Form W-8 as may be required under the IRS instructions to such forms, the Code or any applicable Treasury Regulations.

(c)  The Subscriber acknowledges and agrees that the Series B Units will be issued subject to the terms of this Subscription Agreement and the restrictions and limitations on ownership and transfer described in the Operating Agreement.

(d)  The Subscriber is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "**Securities Act**") and that the information provided by the Subscriber to the Company in its Subscriber Suitability Certification is complete, accurate and true in every respect.

(e)  The Subscriber has carefully examined the Offering Memorandum and acknowledges that the Company has no financial or operating history and that an investment in the Company and the Company's proposed investment in the securities of Theranos Inc. ("**Theranos**" and the "**Theranos Securities**") is highly speculative and involves a high degree of risk.

(f)  The Series B Units in the Company will be associated exclusively with the Theranos Securities to be purchased with the proceeds of this offering.

(g)  The Subscriber has been advised that there will be no market for the Series B Units or otherwise for its investment in the Company; and it will not be possible to readily liquidate this investment.  The Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to such Subscriber's net worth; the Subscriber's investment in the Company will not cause such overall commitment to become excessive; and the Subscriber can afford to bear the loss of such Subscriber's entire investment in the Company.

(h)  The Subscriber has adequate means of providing for the Subscriber's current needs and personal contingencies and has no need for liquidity in the Subscriber's investment in the Company.

(i)  The Subscriber satisfies any special suitability or other applicable requirements of its state of residence and the state in which the transaction by which the Series B Units are purchased occurs. The Subscriber understands that if the jurisdiction of its principal place of business, residence or

CONFIDENTIAL

domicile is outside the United States, it is the Subscriber's responsibility to satisfy itself as to full observance of the law of any relevant territory outside the United States in connection with the offer and sale of the Series B Units, including obtaining any required governmental or other consent and observing any other applicable formalities.  The Subscriber represents that it meets any additional or different suitability standards imposed by the securities and other laws of the jurisdiction of its principal place of business, residence or domicile applicable to or required in connection with an investment in the Company and that it has received any required governmental or other consents or approvals in connection with its purchase of Series B Units in the Company.  The Subscriber understands that if it is a person or entity described in this paragraph, it may be required to make additional representations to the Manager and the Company in connection with the applicable laws of the applicable jurisdiction.

(j)  The Subscriber understands and agrees that the Manager may cause the Company to make an election under Section 754 of the Code or an election to be treated as an "electing investment partnership" for purposes of Section 743 of the Code.  If the Company elects to be treated as an electing investment partnership, the Subscriber shall cooperate with the Company and the Manager to maintain that status and shall not take any action that would be inconsistent with such election.  Upon request, the Subscriber shall provide the Manager with any information necessary to allow the Company to comply with (a) its obligations to make tax basis adjustments under Sections 734 or 743 of the Code and (b) its obligations as an electing investment partnership.

(k)  Unless the Subscriber has indicated otherwise in the Subscriber Suitability Certification submitted by it herewith, if the Subscriber is, for United States federal income tax purposes, a partnership, a grantor trust, an S corporation or an entity that is disregarded as an entity separate from its owner for U.S. federal income tax purposes that is owned by any of the foregoing (each a "Flow Through Entity"), the Subscriber hereby represents that no other person (a "Beneficial Owner") will be treated as a Member in the Company pursuant to Treas. Section 1.7704-1(h)(3) by reason of the fact that: (a) substantially all of the value of such Beneficial Owner's interest in the Flow Through Entity is attributable to the Flow Through Entity's interest (direct or indirect) in the Company; and (b) a principal purpose of the use of the tiered arrangement is to permit the Company to satisfy the 100 partner limitation set forth in Treas. Reg. Section 1.7704-1(h)(1)(ii).

(l)  The Subscriber represents that no part of the funds used by the Subscriber to acquire an Interest constitutes assets of any "employee benefit plan" with the meaning of Section 3(3) of the United States Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or assets allocated to any insurance company separate account in which any such employee benefit plan (or its related trust) has any interest, or any "individual retirement account" or "individual retirement annuity" within the meaning of Section 408 of the Code.

(m) The Subscriber has such knowledge and experience in financial and business matters that such Subscriber is capable of evaluating the merits and risks of an investment in the Company, or the Subscriber has employed the services of an investment adviser, attorney or accountant to read all of the documents furnished or made available by the Company to such Subscriber and to evaluate the merits and risks of such an investment on the Subscriber's behalf.

CONFIDENTIAL

(n)  The Subscriber confirms that the Company has made available to Subscriber the opportunity to ask questions of, and receive answers from, the Manager concerning the Company and the Company's investments in the Theranos Securities, as described in the Offering Memorandum, and otherwise to receive any additional information, to the extent that the Company or the Manager possess such information or could acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information contained in the Offering Memorandum.

(o)  The Subscriber acknowledges that it has been advised that there will be no disclosure materials of any kind regarding Theranos or the Theranos Securities provided by Theranos, the Company, the Manager, SharesPost Financial Corporation or any of their respective officers, directors, members, managers, employees or related parties in connection with the Subscriber's investment.

(p)  The Subscriber acknowledges that it will have no direct interest in any Theranos Securities, and that Theranos Securities shall be held solely by the Company. Further, the Subscriber acknowledges that they shall make no representations as to any direct ownership in the Theranos Securities.

(q)  The Subscriber acknowledges that the Company has no affiliation with Theranos.

(r)  The Subscriber acknowledges that none of the Manager, the Company or any of their affiliates is rendering or has rendered any advice or recommendations to invest in the Company and that no oral or written representations have been made to the Subscriber other than those in the Offering Memorandum.

(S)  THE SUBSCRIBER ACKNOWLEDGES THAT THE MANAGER SHALL HAVE THE AUTHORITY TO ENGAGE AFFILIATES OF THE MANAGER (INCLUDING, WITHOUT LIMITATION, AFFILIATES THAT PROVIDE BROKERAGE SERVICES AND INVESTMENT ADVISORY SERVICES) ON THE COMPANY'S BEHALF, PROVIDED THAT THE COSTS OF SUCH SERVICES ARE ON TERMS NO LESS FAVORABLE TO THE COMPANY THAN THE COMPANY COULD OBTAIN FROM AN UNRELATED THIRD PARTY PROVIDING SIMILAR SERVICES AND THAT SUCH SERVICES ARE OBTAINED IN ACCORDANCE WITH APPLICABLE LAW.  THE SUBSCRIBER EXPRESSLY ACKNOWLEDGES THAT THE COMPANY MAY ACQUIRE THERANOS SECURITIES FROM THIRD PARTIES REPRESENTED BY AN AFFILIATED BROKERAGE FIRM AND THAT THE BROKERAGE FIRM MAY RECEIVE COMMISSIONS FOR SUCH SALES.  THE SUBSCRIBER EXPRESSLY ACKNOWLEDGES THAT THE COMPANY AND THE MANAGER ARE AFFILIATES OF SHARESPOST, INC.

(T)  THE SUBSCRIBER ACKNOWLEDGES THAT THE SUBSCRIBER IS PURCHASING THE SERIES B UNITS BASED ON THE SUBSCRIBER'S OWN ASSESSMENT AND KNOWLEDGE OF THERANOS INC. AND THE THERANOS SECURITIES.  SUBSCRIBER REPRESENTS THAT SUBSCRIBER IS SUFFICIENTLY SOPHISTICATED IN VALUING PRIVATE COMPANY SECURITIES WITHOUT THE BENEFIT OF FINANCIAL, OPERATING OR OTHER INFORMATION PROVIDED BY THERANOS INC. AND DETERMINING A PRICE THAT REFLECTS THE ABSENCE OF SUCH INFORMATION AND LIQUIDITY FOR THE THERANOS SECURITIES. SUBSCRIBER FURTHER REPRESENTS THAT SUBSCRIBER HAS COMPLETED A VALUATION OF THE THERANOS SECURITIES TO BE PURCHASED WITH THE SALE PROCEEDS OF THE SERIES B UNITS AND THAT THE PRICE PER SHARE TO THE COMPANY OF THE THERANOS SECURITIES (EQUAL

CONFIDENTIAL

TH-PLTF-001111

**TO THE PER SERIES B UNIT PRICE BEFORE THE SERVICE FEE) FAIRLY REFLECTS THE LACK OF INFORMATION AND LIQUIDITY OF THE THERANOS SECURITIES AND REPRESENTS AN ATTRACTIVE INVESTMENT TO SUBSCRIBER GIVEN SUBSCRIBERS FINANCIAL AND INVESTMENT FACTS AND CIRCUMSTANCES.**

(u) The Subscriber hereby acknowledges that the Subscriber has been advised that this offering has not been registered with, or reviewed by, the Securities and Exchange Commission ("**SEC**") because this offering is intended to be a non-public offering pursuant to Section 4(a)(2) and Regulation D of the Securities Act. The Subscriber represents that the Series B Units are being purchased for the Subscriber's own account, for investment purposes only and not with a view for distribution or resale to others. The Subscriber agrees that the Subscriber will not sell or otherwise transfer the Series B Units unless they are registered under the Securities Act or unless in the opinion of counsel satisfactory to the Manager an exemption from registration is available. The Subscriber understands that the Series B Units have not been registered under the Securities Act by reason of a claimed exemption under the provisions of the Securities Act that depends, in part, upon the Subscriber's investment intention. The Subscriber understands that it is the position of the SEC that the statutory basis for such exemption would not be present if the Subscriber's representation merely meant that the Subscriber's present intention was to hold such Series B Units for a short period, such as the capital gains period of tax statutes, for a deferred sale or for any other fixed period.

(v) The execution, delivery and performance by the Subscriber of the Subscription Agreement are within the powers of the Subscriber, have been duly authorized and will not constitute or result in a breach or default under, or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency or any agreement or other undertaking to which the Subscriber is a party or by which the Subscriber is bound; and, if the Subscriber is not an individual, will not violate any provision of documents governing the Subscriber. The signatures on the Subscription Agreement are genuine and the signatory, if the Subscriber is an individual, has legal competence and capacity to sign it, or, if the Subscriber is not an individual, the signatory has been duly authorized to execute the same; and the Subscription Agreement constitutes the legal, valid and binding obligations of the Subscriber, enforceable in accordance with its terms.

(w) The Subscriber acknowledges that Subscriber has received no general solicitation or general advertising (including communications published in any newspaper, magazine, e-mail or by electronic means on the Internet or other broadcast) and that no public solicitation or advertisement with respect to the offering of the Series B Units has been made to such Subscriber.

(x) The Subscriber has relied solely upon the advice of its own tax and legal advisors with respect to the tax and other legal aspects of this investment, and not upon the Company, the Manager or SharesPost Financial Corporation for such advice.

(y) The Subscriber understands that the Company will not register as an investment company under the Investment Company Act of 1940, as amended (the "**Investment Company Act**") under one or more exceptions thereto. If the Subscriber is not a natural person, the Subscriber certifies that:

CONFIDENTIAL

(i)   it is "one person" for purposes of Section 3(c)(1) of the Investment Company Act.

(ii)  it was not formed for the purpose of investing in the Company nor did or will the equity owners of the Subscriber entity contribute additional capital to purchase Series B Units.

(iii) its equity owners are not permitted to opt in or out of particular investments made by the Subscriber, and each person participates in investments made by the Subscriber pro rata in accordance with its interests in the Subscriber and

(iv)  if the Subscriber is subscribing to purchase interests in excess of ten percent (10%) of the aggregate capital contributions made to the Company, the Subscriber is not an investment company within the meaning of the Investment Company Act or a company excepted from such definition thereunder.

(z)  By executing and delivering this Subscription Agreement, the Subscriber covenants to the Company that, except with the prior written permission of the Company, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any information contained in the Offering Memorandum, the Subscription Package and the Company's Operating Agreement, including the exhibits and attachments thereto.  For the avoidance of doubt, the aforementioned covenant shall preclude the Subscriber from making public disclosure regarding the investment in the Series B Units or the Theranos Securities. The provisions of this Section 3(z) shall be in addition to, and not in substitution for, the provisions of any separate nondisclosure agreement executed by the parties hereto with respect to the transactions contemplated hereby.

(aa) THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  THE SECURITIES HAVE NOT BEEN APPROVED, DISAPPROVED OR RECOMMENDED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE OFFERING MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(bb) There are no contracts, agreements or understandings between the Subscriber and any person that would give rise to a claim for any brokerage commission, finder's fee or other like payment with respect to the offer or sale of the Series B Units to the Subscriber.

(cc) The Subscriber represents and warrants that the amounts contributed by it to the Company in respect of this Subscription Agreement were not and are not directly, or to the Subscriber's knowledge indirectly, derived from activities that may contravene federal, state or foreign laws and regulations, including anti-money laundering and terrorist financing laws and regulations.  The Subscriber also represents and warrants to, and agrees and covenants with, the Company, as of the date hereof that none of (i) the Subscriber, (ii) any person controlling or controlled by the Subscriber, (iii) if the Subscriber is a privately held entity, any person having a beneficial interest in the

CONFIDENTIAL

TH-PLTF-001113

Subscriber, or (iv) any person for which the Subscriber is acting as agent or nominee in connection with this Subscription Agreement is located in a country or territory or is an individual or entity named on any list administered by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), nor is any such person or entity prohibited from investing in the Company under any OFAC administered sanctions or embargo programs.   Federal regulations and Executive Orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals:  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at www.treas.gov/ofac.

(dd) The Subscriber agrees to notify promptly the Company should the Subscriber become aware of, or has any reason to suspect, any change in anti-money laundering representations in Section 3(cc) above, or if there is any change in the information affecting these representations.   The Subscriber acknowledges that, if at any time it is discovered that any of the representations set forth in Section 3(cc) are incorrect, or if otherwise required by applicable laws or regulations related to money laundering and similar activities, the Company may be obligated to freeze the account of the Subscriber by segregating assets of the Subscriber in compliance with government regulations, and if required by law, the Company may also be required to report such action and to disclose the Subscriber's identity to OFAC.  The Subscriber further acknowledges and agrees that the Company may, by written notice to the Subscriber, suspend any payment to the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company.  The Subscriber also understands and agrees that the Company may release confidential information about the Subscriber and, if applicable, any underlying beneficial owners of the Subscriber, to law enforcement agencies to the extent necessary to ensure compliance with all applicable laws, rules and regulations.

(ee) The Subscriber understands that information relating to the Subscriber shall appear on the financial statements and other records of the Company.  The Subscriber acknowledges and agrees that (i) other Members may receive such information as permitted by the Operating Agreement or as required by applicable laws and may share such information with their advisors and other parties and (ii) the Company, the Manager and their respective affiliates may disclose the Subscriber's nonpublic personal information to the Company's accountants, attorneys and other service providers, and to securities regulatory authorities and governmental authorities, as necessary or appropriate to effect, administer and enforce the Operating Agreement and the Members' rights and obligations thereunder.  The Company, the Manager and their respective affiliates may also release information about the Subscriber if directed to do so by the Subscriber, or if compelled to do so by law or in connection with any government or self-regulatory organization request or investigation.   By executing this Agreement, the Subscriber consents to the foregoing collection, use and disclosure of its personal information.   In addition, the Subscriber hereby acknowledges and agrees to the disclosure by the Manager, the Company and their respective affiliates of the Subscriber's Capital Commitment to Members and to the agents and representative of the Manager, the Company and their affiliates in connection with the management and the operation of the Company.

(ff) The Company reserves the right to request such information as is necessary to verify the identity of the Subscriber – as well any individual or entity having a beneficial interest in, or signatory or other similar authority over, the Subscriber and any transferee of the Series B Units – and may

CONFIDENTIAL

TH-PLTF-001114

seek to verify such identity and the source of funds for the Subscription.  The Subscriber shall promptly on demand provide such information and execute and deliver such documents as the Company may request to verify the accuracy of the Subscriber's representations and warranties herein or to comply with any law or regulation to which the Company may be subject.  In the event of any delay or failure by the Subscriber to produce any information required for verification purposes, the Company may refuse to accept this Subscription Agreement or may suspend any payment to the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations.  The Subscriber warrants that the investment in the Series B Units is not being acquired, and will not be held, in violation of any applicable laws.  The Subscriber agrees to indemnify and hold harmless the Company against any loss, claim, cost, damage or expense arising from a failure to process any subscription or distribution if such information as has been required by the Company has not been provided by the Subscriber or which the Company may suffer as a result of any violations of law, rule or regulation committed by the Subscriber.

4.      *Indemnification*. The Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations, warranties and covenants in Section 3 and that the Company and the Manager have relied upon such representations, warranties and covenants, and the Subscriber hereby agrees to indemnify and hold harmless the Company, its Manager, SharesPost Financial Corporation and their respective officers, directors, controlling persons, agents, managers and employees, from and against any and all losses, damages or liabilities (including without limitation, reasonable attorney's fees) due to or arising out of a breach of any representation, warranty or covenant made by the Subscriber herein.  Notwithstanding the foregoing, however, no representation, warranty, covenant, acknowledgment or agreement made by the Subscriber shall in any manner constitute a waiver of any rights granted to the Subscriber under federal or state securities laws.

5.      *Survival of Agreements, Representations and Warranties*. All representations, warranties and covenants contained in this Subscription Agreement and the indemnification contained in Section 4 shall survive the acceptance of this Subscription.

6.      *Restrictions on Transfer*.  The Subscriber understands and agrees that the Subscriber's investment in the Series B Units pursuant to Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D thereunder, the Series B Units shall not be sold, pledged, hypothecated or otherwise transferred unless they are registered under the Securities Act and applicable state securities laws or are exempt from such securities laws.  The Subscriber also understands that Series B Units are subject to contractual restrictions on transfer contained in the Operating Agreement.

7.      *Withholding*. The Manager is required to withhold a certain portion of the taxable income and gain allocated or distributed to each Subscriber unless the Subscriber provides documentation confirming that such Subscriber is not subject to withholding, or is subject to a reduced rate of withholding.  The following information is provided to assist the Subscriber in complying with the U.S. rules for backup withholding and withholding with respect to income earned by foreign persons. This information is only a summary, and is not a substitute for the advice of a tax advisor. Each Subscriber is urged to consult with a tax advisor concerning the application of the U.S. withholding rules to such Subscriber.

CONFIDENTIAL

TH-PLTF-001115

The type of documentation required by the Subscriber is a function of whether the Subscriber is a Foreign Person.   "**Foreign Persons**" include nonresident aliens, foreign corporations, foreign partnerships, foreign trusts or foreign estates (as each of those terms is defined in the Code and Treasury Regulations).  In the case of entities that are disregarded for purposes of U.S. tax law (e.g. fiscally transparent entities with a single owner that have not elected to be taxed as a corporation for U.S. tax purposes), such entities are treated as U.S. persons of Foreign Persons depending on the residence and status of their owners, rather than on where the disregarded entities are organized. Thus, a Subscriber that is a U.S. disregarded entity with a foreign owner will generally be treated as a Foreign person and should complete and submit the appropriate Form W-8 (as discussed below) based on the owner's status.  A Subscriber that is a foreign disregarded entity with a U.S. owner will generally be treated as a U.S. person and should complete and submit a Form W-9 (as discussed below).

If the Subscriber is a U.S. person, please complete IRS Form W-9.  Such Subscriber agrees to notify the Manager within sixty (60) days if the Subscriber ceases to be a U.S. person.

If the Subscriber is a Foreign Person, please complete Form W-8BEN, Form W-8ECI, Form W-8EXP or Form W-8IMY (along with any accompanying withholding certificates) as appropriate.

8.      *Subscriber Qualification.*  The Subscriber has furnished the Company with a completed and executed Subscriber Suitability Certification, the information in which is true and correct in all respects and which is incorporated by reference in this Subscription Agreement.

9.      *Modification.*  Neither this Subscription Agreement nor any provision hereof shall be waived, modified, changed, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, change, discharge or termination is sought to be enforced.

10.     *Notices.*  All notices, requests, consents and other communications shall be given pursuant to the relevant provisions of the Operating Agreement.

11.     *Binding Effect.*  Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and assigns.  If the Subscriber is more than one person, the obligation of such Subscriber shall be joint and several and the agreements, representations, warranties, covenants and acknowledgments herein contained shall be deemed to be made by and be binding upon each such person and his, her or its heirs, executors, administrators, successors, legal representatives and assigns.

12.     *Entire Agreement.*  This Subscription Agreement, together with the Operating Agreement and any exhibits hereto and the other items included in the subscription materials of which this Subscription Agreement is a part, and together with any other agreements that may be entered into between the parties hereto pursuant to the Operating Agreement, contains the entire agreement of the parties with respect to the matters set forth herein and there are no representations, covenants or other agreements except as stated or referred to herein or as are embodied in the Operating Agreement.  To the extent the provisions of the Operating Agreement conflict with the provisions of this Subscription Agreement, the provisions of the Operating Agreement shall control.

CONFIDENTIAL

13.     *Severability*.  Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such provision(s) shall be reinterpreted to the fullest extent enforceable, and such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Subscription Agreement which are valid, enforceable and legal.

14.     *Assignability*.  This Subscription Agreement is not transferable or assignable by the Subscriber or any successor thereto.

15.     *Applicable Law*.  This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to the principles relating to the conflict of laws.

16.     *Arbitration*.  The parties agree to submit all controversies relating to the subject matter of this Subscription Agreement to arbitration in accordance with the following provisions and understand that:

(a)  Arbitration is final and binding on the parties.

(b)  The parties are waiving their right to seek remedies in court, including the right to a jury trial.

(c)  Pre-arbitration discovery is generally more limited and different from court proceedings.

(d)  The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by arbitrators is strictly limited.

(e)  Arbitrators typically include a minority of arbitrators affiliated with the securities industry.

(f)  All controversies which may arise between the parties concerning this Subscription Agreement shall be determined by arbitration pursuant to the rules then pertaining to the Financial Industry Regulatory Authority, Inc. in San Francisco, California.  Judgment on any award of any such arbitration may be entered in the courts of the State of California or in any other court having jurisdiction of the party against whom such award is rendered.  Any notice of such arbitration or for the confirmation of any award in any arbitration shall be sufficient if given pursuant to this Subscription Agreement.  The parties agree that the determination of the arbitrators shall be binding and conclusive upon them.

17.     *Confidentiality; Certain Disclosures*.  The Manager, the Company and SharesPost Financial Corporation will use best efforts to keep the information provided in the Subscriber Suitability Certification strictly confidential.  They may present this Subscription Agreement and the information provided in the Subscriber Suitability Certification to such parties as they deem advisable if compelled by law or called upon to establish the availability under any federal or state securities laws of an exemption from registration of the offering or if the contents thereof are relevant to any issue in any action, suit, or proceeding to which the Manager or the Company is a party or by which it is or may be bound.

CONFIDENTIAL                                                                     TH-PLTF-001117

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

CONFIDENTIAL

TH-PLTF-001118

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement as of
_____, 2015.


**TOTAL INVESTMENT AMOUNT:**              $_____

If the Subscriber is an INDIVIDUAL, or if purchased as JOINT TENANTS, as TENANTS IN COMMON, or as COMMUNITY PROPERTY by more than one individual:

_____
Signature of Subscriber

_____
Print Name of Subscriber

_____
Signature of Co-Subscriber

_____
Print Name of Co-Subscriber

_____          _____
Mailing Address                          Residence Address
(if not residence)

_____          _____
City, State and Zip Code                 City, State and Zip Code


_____
Social Security Number of Subscriber

_____
Social Security Number of Co-Subscriber

Read + Approved

*Hilary Tal Oye*   X

8.13.15

For the exclusive use of: Hilary & John Oye
CTF VII (Series B - Theranos) SP-12
07/10/2018

Private and Confidential
Celadon Technology Fund VII, LLC
(Signature Page to Subscription Agreement)

If the Subscriber is an ENTITY:

Type of Ownership:
    (Check One)

\_\_\_\_ Corporation
\_\_\_\_ Partnership
\_\_\_\_ Limited Liability Company
\_\_\_\_ Limited Liability Partnership
\_\_\_\_ Trust
\_\_\_\_ Pension or Profit Sharing Plan or Trust
✓ Individual Retirement Account
\_\_\_\_ Tax Exempt Organization
\_\_\_\_ Estate
\_\_\_\_ Other (specify) _____

The Entrust Group FBO *Hilary Dye IRA # 7230013381*

_____
Print Name of Entity

The Entrust Group
By: Monica Blaz
Its: Authorized Signer
555 12th Street, Suite 1250
Oakland, California 94607
Tax ID Number:
27-0422099

_____
Signature of Subscriber's Authorized Signatory

_____
Print Name of Subscriber's Authorized Signatory

_____
Print Title of Authorized Signatory

_____
Principal Business or Mailing Address

_____
City, State and Zip Code

_____
Federal Tax Identification Number

*Read & Approved*

*Hilary Tal Dye*

*8·13·15*

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Therapies), SPT
07/10/2015

THE ENTRUST GROUP
555 12th Street, Suite 1250
Oakland, California 94607
www.TheEntrustGroup.com

The Entrust Group Inc.
Tax ID Number:
27-0422099

Private and Confidential
Celadon Technology Fund VII, LLC
(Signature Page to Subscription Agreement)

TH-PLTF-001120

Accepted as of _____, 2015

**CELADON TECHNOLOGY FUND VII, LLC**

By:   Celadon   Capital   Management,   LLC,
      its Manager

_____

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

Private and Confidential
Celadon Technology Fund VII, LLC
(Signature Page to Subscription Agreement)

CONFIDENTIAL

# SHARESPOST

# Operating Agreement

For the exclusive use of: Hilary & John Dye
CTF VII (Series B - Theranos): SP-12
07/10/2015

TH-PLTF-001122

# OPERATING AGREEMENT OF CELADON TECHNOLOGY FUND VII, LLC

This Operating Agreement (this "**Agreement**") of Celadon Technology Fund VII, LLC a Delaware limited liability company (the "**Company**"), is made and entered into as of _____, 2015 by and among Celadon Capital Management, LLC, as the "**Manager**", and the other persons whose names are set forth on the Unit Register attached hereto as <u>Appendix A</u>, collectively referred to hereafter as "**Members.**"

WHEREAS, the Manager formed the Company and caused to be filed its Certificate of Formation (the "**Certificate**") with the Delaware Secretary of State on April 7, 2015;

WHEREAS, the Company was formed principally to invest in, acquire and hold one or more Issuer Securities and, upon the occurrence of certain conditions or events specified herein, to dispose of, or distribute, Issuer Securities or Available Cash, as applicable;

WHEREAS, each of the Members desires to acquire an indirect interest in the Issuer Securities by acquiring an interest in the Company in exchange for a capital contribution;

WHEREAS, the Members desire to retain the Manager to manage the Company's investment in Issuer Securities and other Company Property and to administer the Members' ownership of the Issuer Securities and other Company Property; and

WHEREAS, the Members desire to adopt this Agreement under the Delaware Limited Liability Company Act (the "**Act**").

NOW, THEREFORE, in consideration of their mutual promises, covenants and agreements, the Members hereby promise, covenant and agree as follows:

## ARTICLE I
### Definitions

1.1    <u>Definitions.</u> The following defined terms as used in this Agreement shall, unless otherwise defined, each have the following meaning.

(a)    "**Accounting Period**" means the period beginning on the day immediately succeeding the last day of the immediately preceding Accounting Period (or, in the case of the first Accounting Period, the date of this Agreement) and ending on the earliest to occur of the following:  (i) the last day of the Fiscal Year; (ii) the day immediately preceding the day on which a Member makes an additional contribution to, or a full or partial withdrawal from, its Capital Account; (iii) the day immediately preceding the day on which a new Member is admitted to the Company; or (iv) the date of dissolution of the Company or termination of the applicable  in accordance with Article IX of this Agreement.

(b)    "**Affiliate**" means any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager.  The term "**control**," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession,

NY 75646398v4

CONFIDENTIAL

TH-PLTF-001123

directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

(c)     "**Agreement**" means this Operating Agreement, including all appendices, as amended from time to time.

(d)     "**Available Cash**" means at any time, cash and cash equivalents received as Capital Contributions from the Members or as a result of the sale of Issuer Securities in excess of an amount that the Manager determines to be a reasonable reserve for the payment of Company liabilities, costs and expenditures.

(e)     "**Bankruptcy**" means with respect to any Person, a "**Voluntary Bankruptcy**" or an "**Involuntary Bankruptcy**."  A "**Voluntary Bankruptcy**" means the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above. An "**Involuntary Bankruptcy**" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency, or similar statute, law, or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within 90 days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within 60 days.

(f)     "**Business Day**" means any day other than Saturday or Sunday on which the New York Stock Exchange is open for trading.

(g)     "**Capital Account**" means as to any Member of a Series, such Member's Capital Contribution (i) increased by such Member's share of Net Profits and (ii) reduced by (x) such Member's share of Net Losses and (y) distributions and withdrawals of cash or the fair market value of assets distributed to or withdrawn by such Member in respect of such Series.

(h)     "**Capital Contributions**" means the sum of the amount of cash plus the aggregate Fair Market Value of all property contributed by a Member to the capital of the Company, including, without limitation, any amounts paid by a Member in respect of any claims, liabilities, or obligations of or against the Company or pursuant to any guaranty of any Company indebtedness by such Member.

(i)     "**Certificate**" is defined in the preamble.

(j)     "**Closing Capital Account Balance**" is defined in Section 3.2.

(k)     "**Code**" means the Internal Revenue Code of 1986, as amended (or any corresponding provision of succeeding law).

(l)     "**Company**" means Celadon Technology Fund VII, LLC.

CONFIDENTIAL                                                                      TH-PLTF-001124

(m)     **"Company Property"** means Issuer Securities, Available Cash, Short-Term Investments and any other tangible and intangible assets of the Company.

(n)     **"Consent"** means the prior written approval of a Person to do the act or thing for which the consent, vote or approval is solicited.

(o)     **"Distribution Fee"** means a fee payable to the Manager equal to a percentage, as specified on Appendix A, of (i) the Fair Market Value of any Issuer Securities or (ii) the cash proceeds from the sale of Issuer Securities or any publicly traded securities received in exchange for Issuer Securities, in each case if and when distributed to the Members pursuant to Section 4.2(b).

(p)     **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

(q)     **"Fair Market Value"** is defined in Section 4.2(e).

(r)     **"FINRA"** means the Financial Industry Regulatory Authority, Inc.

(s)     **"FINRA Event"** means the determination by the Corporate Finance Department of FINRA that the Company is deemed to be a "related person" of a FINRA member firm as defined in Rule 5110(a)(6) of the Corporate Financing Rules of FINRA or any successor rule.

(t)     **"Fiscal Year"** is defined in Section 7.4.

(u)     **"Initial Capital Contribution"** means the Capital Contribution of a Member set forth on Appendix A.

(v)     **"Investment Advisers Act"** means the Investment Advisers Act of 1940, as amended.

(w)     **"Investment Company Act"** means the Investment Company Act of 1940, as amended.

(x)     **"Issuer"** means the issuer of certain privately held securities.

(y)     **"Issuer Securities"** means the securities of Issuers purchased by the Company.

(z)     **"Issuer Liquidity Event"** means the initial public offering of an Issuer of its securities or the sale by an Issuer of all or substantially all of its assets or the merger of the Issuer with another company where the sale or merger consideration is cash and/or publicly traded securities.

(aa)    **"Majority in Interests"** means Membership Units representing more than 50% of the total Membership Units of all Members in a Series.

(bb)    **"Manager"** initially means Celadon Capital Management, LLC or its successors.

(cc)    **"Member"** means any Person who is admitted as a Member of the Company pursuant to the terms of this Agreement and who is a Member at the time of reference thereto.

(dd)    **"Membership Unit"** means a unit of interest issued by the Company in one or more Series; the sum of a Member's Membership Units represents the totality of the Member's interests, and the right of such Member to any and all benefits (including, without limitation, allocations of Net Profits and Net Losses and the receipt of distributions) to which a Member of such Series may be entitled pursuant to this

3

Private and Confidential

CONFIDENTIAL

Agreement and under the Act, together with all obligations of such Member to comply with the terms and provisions of this Agreement and the Act. If any provision requires the Consent of a specified percentage of Membership Units, such percentage shall be determined by reference to the aggregate Membership Units of Members in such Series granting Consent on the applicable date.

(ee)     "**Net Profits**" and "**Net Losses**" means, with respect to any Accounting Period, net profits or net losses of the Company for such Accounting Period, determined in accordance with generally accepted accounting principles, and items of income, gain, loss, deduction or credit used to compute such amounts shall include any unrealized profits and unrealized losses; provided that if, in keeping with the provisions of Treas. Reg. 1.704-1(b) and Temp. Reg. 1.704-1T(b)(4)(iv), any asset of the Company is accounted for on the Company books and in the Capital Accounts of the Members at an amount other than its adjusted basis for tax purposes, then, for purposes of accounting for such items on the Company books and in the Capital Accounts of the Members, items of income, gain, loss, deduction or credit shall be calculated based upon the carrying value of the asset on the Company books.

(ff)     "**Notice**" means a writing containing information to be communicated to any Person pursuant to this Agreement.

(gg)     "**Opening Capital Account Balance**" is defined in Section 3.1.

(hh)     "**Person**" means any natural person, corporation (stock or non-stock), limited liability company, limited liability partnership, limited partnership, partnership, joint stock company, joint venture, association (profit or non-profit), company, estate, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any government agency or political subdivision.

(ii)     "**Positive Basis**" means, with respect to any withdrawing Member and as of any time of calculation, the product of (i) such Member's Withdrawal Percentage related to such withdrawal and (ii) the excess of (x) such Member's Closing Capital Account for the Accounting Period in which such withdrawal occurs (determined without taking the amount of such withdrawal into account), over (y) such Member's adjusted tax basis for federal income tax purposes, in such Member's Membership Units as of such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any transfer or assignment of such interest, including by reason of death, and without taking such withdrawal into account).

(jj)     "**Positive Basis Member**" means any Member who withdraws (in whole or in part) from the Company and who has a Positive Basis as of the effective date of such Member's withdrawal, provided that such Member shall cease to be a Positive Basis Member at such time as such Member has received allocations under Section 3.4(b) equal to such Member's Positive Basis as of the effective date of withdrawal.

(kk)     "**Related Brokerage Firm**" means a securities brokerage firm where any or all principals of the Manager or any SharesPost Entity may be employed from time to time.

(ll)     "**Related Investment Adviser**" means an investment adviser firm where any or all principals of the Manager or any SharesPost Entity may be employed from time to time.

(mm)     "**Rules and Regulations**" means the applicable rules and regulations of the SEC.

(nn)     "**SEC**" means the United States Securities and Exchange Commission or any successor thereto.

CONFIDENTIAL                                                                                     TH-PLTF-001126

(oo)    "**Securities Act**" means the Securities Act of 1933, as amended.

(pp)    "**Security**" means the meaning set forth in Section 2(1) of the Securities Act and Securities shall mean the plural of Security.

(qq)    "**Series**" means a designated series of interests pursuant to Section 18-215 of the Act as set forth on one or more appendices to this Agreement by the Manager in its sole discretion.

(rr)    "**Series Creation Date**" means the date set forth on <u>Appendix A</u> hereto as the date upon which the applicable Series was created pursuant to Section 2.2(a).

(ss)    "**Service Fee**" means a service fee equal to a percentage, as specified on <u>Appendix A</u>, of the Members' Initial Capital Contributions, which shall be payable to the Manager prior to the establishment of any Member's Capital Account under Section 3.1 in respect of the organization, administration and operations of each Series of the Company.

(tt)    "**SharesPost Entities**" means SharesPost Inc., SharesPost Financial Corporation and Celadon Capital Management, LLC, wholly owned subsidiaries of SharesPost, Inc., and each of its officers, directors, subsidiaries and Affiliates.

(uu)    "**Short-Term Investments**" means (i) short-term obligations of, or guaranteed by, the United States or any of its agencies or instrumentalities, and repurchase agreements with respect to any of them, (ii) time deposits, bankers' acceptances and certificates of deposit issued by, and money market accounts or other accounts with, commercial banks or savings institutions (whether or not organized under the laws of the United States) having total assets of not less than $1,000,000,000, (iii) corporate commercial paper rated, at the date of purchase, Prime-1, or equivalent or better, by Moody's Investors Service, Inc., Standard & Poor's Corporation, or a comparable rating institution, or if unrated, issued by companies having an outstanding unsecured debt issued currently rated within the two highest ratings of such a rating institution, or (iv) pooled investment funds or accounts that invest only in any of them.

(vv)    "**SPFC**" means SharesPost Financial Corporation, a registered broker-dealer, Member FINRA and the Securities Investor Protection Corporation.

(ww)    "**Tax Matters Partner**" is defined in Section 7.5.

(xx)    "**Transfer**" means and includes a sale, exchange, gift, encumbrance, assignment, pledge, mortgage, and other hypothecation or disposition, whether voluntary or involuntary, of Membership Units.

(yy)    "**Treasury Regulations**" means regulations adopted by the United States Treasury Department governing application and enforcement of the Code. Any reference to a section or provision of the Treasury Regulations also refers to such section or provision as amended or superseded.

(zz)    "**Withdrawal Date**" is defined in Section 8.9(a).

(aaa)    "**Withdrawal Payment**" is defined in Section 8.9(a).

(bbb)    "**Withdrawal Percentage**" means with respect to any Member who is permitted or required, in the sole discretion of the Manager, to make a full or partial withdrawal, a fraction, the numerator of which is the amount of the withdrawal made by such Member and the denominator of which is such Member's

CONFIDENTIAL                                                                  TH-PLTF-001127

Closing Capital Account for the Accounting Period during which such withdrawal is made (determined without taking into account the withdrawal in question).

(ccc)   **"Withdrawal Value"** is defined in Section 8.9(a).

## ARTICLE II
## THE COMPANY

2.1   <u>Sale of Membership Units; Admission of Members</u>. The Manager is authorized to cause the Company to raise capital by offering Membership Units to be sold from time to time, in accordance with the provisions of this Agreement upon the acceptance by the Manager of a subscription agreement, suitability questionnaire and subscription funds from each prospective Member. In exchange for the issuance of Membership Units, each Member shall pay to the Manager the Service Fee and/or the Distribution Fee set forth on Appendix A, which shall be payable out of each Member's Initial Capital Contribution in the manner as set forth in Section 3.1 or out of distributions made to a Member in the manner set forth in Section 4.2, respectively.

2.2   <u>Members.</u>

(a)   The names and addresses of the Members are set forth in <u>Appendix A</u>. The Members shall have the rights, powers, preferences and limitations set forth in this Agreement. The Manager may amend or, in respect of a new Series, create a new <u>Appendix A</u> from time to time to include new Members and to delete Members that have withdrawn from the Company, in each case, as permitted by this Agreement.

(b)   Each Member represents, warrants and agrees that it is, an "accredited investor" as defined in Rule 501 of Regulation D of the Securities Act.

(c)   The Members acknowledge that the Company has complied, and intends to continue to comply, with the exception set forth in Section 3(c)(1) of the Investment Company Act from the definition of "investment company" (as defined in Section 3(a)(1) of the Investment Company Act). In furtherance whereof, in no event shall the total number of beneficial owners of Membership Units exceed 100, as determined in accordance with Section 3(c)(1) of the Investment Company Act.  Furthermore, each Member that is a "company" (as defined in Section 2(a)(8) of the Investment Company Act) represents and warrants that (i) it is not nor, but for the exception provided for in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act, would it be an investment company, (ii) it has not been organized specifically for the purpose of investing in the Company and (iii) its individual owners are not permitted, either by contract, under the terms of such Member's organizational documents, contract, or otherwise, legally or in fact, to decide whether or how much of their own capital contribution to the Member may be invested in the Company or any Series.

(d)   In no event shall the total number of beneficial owners of Membership Units be held in a manner that would cause any Series to constitute a publicly traded partnership for purposes of Section 7704 of the Code.

(e)   Each Member agrees that it shall promptly notify the Manager in the event that any representation, warranty or agreement made by it under this Agreement ceases to remain true, complete, accurate and correct in all respects.

2.3   <u>Primary Purpose of the Company</u>. The primary purpose of the Company is to:

6

CONFIDENTIAL

TH-PLTF-001128

(a)    Seek income and gain by the acquisition, holding and disposition of Issuer Securities;

(b)    Engage in any other lawful activities for which a limited liability company may be organized under the Act as determined by the Manager to be necessary or advisable in connection with the foregoing.

2.4    <u>Principal Office; Registered Office.</u>

(a)    The principal office of the Company shall be located at 221 Pine Street, 6th Floor, San Francisco, CA 94104 or such other location as determined by the Manager. ✗

(b)    The Company's registered office in the State of Delaware is 108 West 13th Street, Wilmington, Delaware 19801, and Business Filings Incorporated is its registered agent for service of process in the State of Delaware, unless the Manager designates a different registered office or agent.

2.5    <u>Series of Interests.</u>  Pursuant to Section 18-215 of the Act, the Members intend hereby to establish separate Series of Membership Units, each having separate rights, powers and/or duties with respect to specified property or obligations of the Company or profits and losses associated with specified property or obligations of the Company.  Subject to the provisions of this Agreement, a Member may participate in some or each of the Series in the Company.  The Manager shall designate each investment made by the Company as corresponding to a particular Series.  The Manager in its sole and absolute discretion may create and issue additional Series to Members with such rights, powers and duties, including rights, powers, and duties different from or senior to existing Series, all as the Manager may determine in its sole and absolute discretion subject to the terms and provisions hereof, and may admit any Person as a Member of any such additional Series without the consent of any other existing Member.  Each Member, by its execution hereof, shall be deemed to have granted the Manager the irrevocable power of attorney (which, it is hereby agreed among the Members, is coupled with an interest, shall be irrevocable and shall survive and not be affected by the subsequent disability or incapacity of such Manager (or if such Member is a corporation, partnership, trust, association, limited liability company or other legal entity, by the dissolution or termination thereof)) to amend this Agreement in such ways as may be necessary to create and issue any separate Series and to admit any Person as a Member of the Company associated with any such Series as permitted by this Section 2.5 without any further action or approval by any other Member.  The power of attorney granted in this Section 2.5 shall be deemed to be coupled with an interest, shall be irrevocable, shall survive and not be affected by the dissolution, bankruptcy or legal disability of a Member and shall extend to its successors and assigns; and may be exercisable by such attorney-in-fact and agent for all Members (or any of them) required to execute any such instrument, and executing such instrument acting as attorney-in-fact.  No Member shall revoke the above power of attorney.  The debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable only against the assets of such Series, and not against the assets of any other Series or the assets of the Company generally, and, except to the extent otherwise provided in this Agreement or required by the Act, none of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to the Company generally or any other Series shall be enforceable against the assets of such Series.  Notwithstanding any provision in this Agreement to the contrary, records shall be maintained with respect to each Series that account for the assets associated with such Series separately from the other assets of the Company or any other Series thereof.  Without limiting the generality of the foregoing, provisions of this Agreement relating to Capital Contributions, the maintenance of Capital Accounts under Article III, allocations and distributions under Article IV shall be interpreted to apply on a Series-by-Series basis.

CONFIDENTIAL                                                                      TH-PLTF-001129

2.6   <u>Taxation</u>. The Members intend that the Company, and each Series of the Company, be classified as a separate partnership for U.S. federal, state, local and non-U.S. income tax purposes. The Members agree to take all reasonable actions, including but not limited to, amending this Agreement and executing any other documents as may be required for the Company, and each Series of the Company, to qualify for and receive "partnership" tax treatment for income tax purposes, and each Member agrees not to take any actions inconsistent with qualifying for and receiving such treatment.

2.7   <u>Capital Contributions</u>. As of this date, each applicable Member shall make a Capital Contribution in the aggregate amount of such Member's Initial Capital Contribution in exchange for Membership Units in an amount and tenor as set forth on Appendix A. The Initial Capital Account balance of each Member is equal to such Member's Initial Capital Contribution (reduced by the Service Fee as set forth on Appendix A), any pro rata allocation by the Manager of extraordinary expenses incurred in complying with securities laws and expenses incurred related to the transfer of Issuer Securities upon an Issuer Liquidity Event.  No Member is required to make any additional Capital Contribution to the Company. ✓

### ARTICLE III
### CAPITAL ACCOUNTS

3.1   <u>Opening Capital Accounts</u>. The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member, which shall be immediately reduced for such Member's share of any Service Fee paid to the Manager.  For each Accounting Period during the term of this Agreement, the Company shall establish for each Member an Opening Capital Account Balance (defined below) and a Closing Capital Account Balance (defined below).  The initial Opening Capital Account Balance of each Member shall be equal to such Member's Initial Capital Contribution, which shall be made in cash only. The Opening Capital Account Balance of a Member for each Accounting Period subsequent to the Accounting Period in which such Member was admitted to the Company shall be an amount equal to the Closing Capital Account Balance of such Member, determined in accordance with Section 3.2, for the immediately preceding Accounting Period, to the extent consistent with the terms of this Agreement, in accordance with Code Sections 704(b) and (c) and the Treasury Regulations (the "**Opening Capital Account Balance**").

3.2   <u>Closing Capital Account Balance</u>. A closing Capital Account Balance shall be established for each Member on the Company's books as of the last day of each Accounting Period for such Accounting Period (the "**Closing Capital Account Balance**") determined by adjusting the Opening Capital Account Balance of such Member, first, for allocations pursuant to Section 4.1, and then for distributions pursuant to Section 4.2, for the amount of any withdrawals pursuant to Section 8.9 and for adjustments pursuant to Section 3.4, for such Accounting Period.

3.3   <u>Other Capital Account Provisions</u>.  With respect to the Capital Account of any Member:

(a)     No Member shall have any liability to restore all or any portion of any negative Capital Account;

(b)     No Member shall be paid interest on the balance of its Capital Account at any time; and

(c)     A Member shall not be required to make any Capital Contributions to the Company other than as provided in this Agreement or to lend any funds to the Company;

(d)     Except as otherwise provided in this Agreement, no Member shall have any right to demand or receive (i) any Company Property in return of its Capital Contribution or the balance of its Capital

8
Private and Confidential

Account in respect of any Membership Unit until the dissolution of the Company or termination of the applicable Series under Article IX or (ii) any distribution from the Company in any form other than cash;

(e)     If any Membership Unit is transferred as permitted by this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account relates to the transferred Membership Unit in accordance with Treas. Reg. Section 1.704-1(b)(2)(iv)(l);

(f)     A creditor who makes a nonrecourse loan to the Company shall not have or acquire at any time, solely as a result of making the loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor or secured creditor, as the case may be, and the rights of such creditor shall be determined by the terms and conditions of the agreement entered into between the Company and such creditor in connection with the making of such advance; and

(g)     Loans by Members to the Company shall not be considered Capital Contributions. If any Member advances funds to the Company in excess of such Member's Capital Contribution, such advances shall not increase the Capital Account balance of such Member.  The amount of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of Company assets in accordance with the terms and conditions upon which such advances are made.

3.4     <u>Adjustments to Capital Accounts.</u>

(a)     The Manager may, in its sole discretion, adjust the Capital Accounts of the Members to reflect a re-valuation of the Company's assets upon the occurrence of any of the following events:

(i)     a Capital Contribution by a new or existing Member as consideration for the issuance of Membership Units; or

(ii)     any of the events described in Treas. Reg. Section 1.704-1(b)(2)(iv).

(b)     Any adjustment pursuant to Section 3.4(a) shall be based on the Fair Market Value of Company Property on the date of adjustment, and shall reflect the manner in which the unrealized income, gain, loss or deduction inherent in the property, not previously reflected in Capital Accounts, would be allocated among the Members if there were a taxable disposition of the property for fair market value on that date.

(c)     If there is any basis adjustment pursuant to an election under Code Section 754, the Capital Accounts shall be adjusted to the extent required by Treas. Reg. Section 1.7041(b)(2)(iv)(m).

(d)     Notwithstanding anything contained herein to the contrary, except for Section 3.4(e), the manner in which Capital Accounts are maintained shall be modified, in the discretion of the Manager, to comply with applicable law; provided that no such change shall materially alter the economic agreement among the Members and the Manager as set forth in this Agreement.

(e)     Notwithstanding any other provision of this Agreement, upon the occurrence of a FINRA Event, the Manager shall have the authority, in its sole discretion and without the consent of any other Member, to restate any Member's Opening Capital Account upon the admission of such Member, to any other lower or higher amount which, in the opinion of the Manager, will result in the Company no longer being deemed to be a "related person" in a FINRA Event.

For the exclusive use of Hillary & John Doe (Series B - Thetahops). SP-12 01/10/2015

9

Private and Confidential

CONFIDENTIAL

3.5     Limitations on Withdrawal of Capital. Except as expressly provided in this Agreement or as otherwise consented to by the Manager at its sole discretion, no Member shall:

(a)     have the right to withdraw or receive any return on such Member's Capital Contributions, or any claim to any Company capital prior to the dissolution of the Company or termination of the applicable Series under Article IX;

(b)     subject to Section 10.10, be liable to any other Member for the return to such Member of such Member's Capital Contributions, or any portion of it (except as otherwise expressly required under the Act), it being expressly understood that such return shall be made solely from Company assets; or

(c)     have any claim to distributions (whether of cash or property) or other payments or consideration from or resulting from the liquidation of any assets that are attributable to Membership Units other than Membership Units held by such Member.

## ARTICLE IV
## PROFITS AND LOSSES; DISTRIBUTIONS

4.1     Allocations of Profits and Losses.

(a)     Book Allocations. Except as otherwise provided in this Article IV, as of the last day of each Accounting Period, the Net Profits and Net Losses (including each Member's share of any Service Fee or Distribution Fee) of the Company for such Accounting Period shall be allocated to the Capital Accounts of each Member pro rata in proportion to the number of such Member's Membership Units on that day.

(b)     General Allocations for Income Tax Purposes.

(i)     For each Accounting Period, items of income, deduction, gain, loss or credit shall be allocated for income tax purposes (but not for book purposes) among the Members in such manner as to reflect equitably amounts credited or debited to each Member's Capital Account for the current and prior Accounting Periods. Such allocations shall be made pursuant to the principles of Sections 704(b) and 704(c) of the Code and the Treasury Regulations.

(ii)     If the Company realizes Net Profits for federal income tax purposes in any Accounting Period during which one or more Positive Basis Members ceases to hold Membership Units, the Manager may elect to (x) allocate such Net Profits among such Positive Basis Members, pro rata in proportion to the respective Positive Basis of each such Positive Basis Member, until either the full amount of such Net Profits shall have been so allocated or the Positive Basis of each such Positive Basis Member shall have been eliminated and (y) allocate any Net Profits not so allocated to Positive Basis Members to the Members in such manner as shall reflect equitably the amounts credited to such Members' Capital Accounts pursuant to Section 4.1(a).

(c)     Special Allocations for Income Tax Purposes. Notwithstanding anything to the contrary contained in this Article IV, special allocations of Net Income, Net Loss or specific items of income, gain, loss or deduction shall be required for any Fiscal Year as follows:

(i)     Company Minimum Gain Chargeback and Member Minimum Gain Chargeback. The Company shall allocate items of income and gain among the Members at such times and in such amounts as necessary to satisfy the minimum gain chargeback requirements of Treasury Regulation Sections 1.704-2(f) and 1.704-2(i)(4).

10
Private and Confidential

CONFIDENTIAL

(ii)    <u>Allocation of Deductions Attributable to Member Nonrecourse Liabilities</u>. Any nonrecourse deductions attributable to a Member Nonrecourse Debt (as defined in Treasury Regulation Section 1.704-2(b)(4) shall be allocated among the Members that bear the economic risk of loss for such Member Nonrecourse Debt in accordance with the ratios in which such Members share such economic risk of loss and in a manner consistent with Treasury Regulation Sections 1.704-2(i) and 1.704-2(j).

(iii)    <u>Qualified Income Offset</u>. No Net Loss shall be allocated to a Member if such allocation would cause or increase a deficit in such Member's Capital Account after crediting to such Capital Account any amounts which such Member is deemed obligated to restore under Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5) in respect of the member's Membership Units.  In addition, the Company shall specially allocate Net Income (or items of income and gain) when and to the extent required to satisfy the "qualified income offset" requirement within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d). Accordingly, if a Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) in respect of such Member's Membership Units, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of Company income, including gross income and gain for a Fiscal Year attributable to such Series) in an amount and manner sufficient to eliminate a deficit balance as quickly as possible.

(iv)    <u>Allocations of Deductions Attributable to Nonrecourse Liabilities</u>. Any Company Nonrecourse Deductions (as defined in Treasury Regulation Section 1.704-2(b)(1)) shall be specially allocated to the Members pro rata in accordance with each Member's Membership Units within the meaning of Treasury Regulation Section 1.704-2(b)(1).

4.2    <u>Distributions.</u>

(a)    <u>Generally</u>. Subject to Section 4.2(b), the Manager in its sole discretion shall have the right, but not the obligation, to distribute Issuer Securities, Available Cash, or other Company Property to the Members.  Distributions shall be made to Members holding Membership Units, or any Series thereof, and the Manager pro rata in accordance with each Member's Membership Units, or any Series thereof, as set forth in <u>Appendix A</u>, subject at all times to the Distribution Fee.

(b)    <u>Mandatory Distributions</u>.  If an Issuer Liquidity Event occurs, then the Manager shall make a distribution to the applicable Members as soon as practicable following the expiration of any transfer restrictions, including without limitation, any underwriter imposed lock-up or market stand-off agreement, applicable to such Issuer Securities.  Each such distribution shall be made, according to the discretion of the Manager, in the form of (i) all of the Issuer Securities, (ii) Available Cash from the Company's sale of Issuer Securities or any publicly traded securities received in exchange for Issuer Securities, or (iii) any combination of (i) and (ii).  Each such distribution shall be made in accordance with the distribution priorities set forth in Section 4.2(a).

(c)    <u>Withholding</u>. The Manager may withhold from distributions to any Member any amount required to be withheld pursuant to the Code or any other law, rule or regulation.  Any amount so withheld shall be treated as a distribution to the affected Member.

(d)    <u>Distributions in Kind</u>.  Prior to the effectiveness of any distribution of Issuer Securities to any Member and as a condition thereto, such Member shall agree to take such Issuer Securities subject to and will be fully bound by the terms of any agreements applicable to the Issuer Securities to which the Company is a party or is otherwise bound or as the Company may otherwise reasonably require, including without limitation any lock-up or holdback agreements, and the Members agree to execute and deliver such other instruments in

11
Private and Confidential

order to effectuate the foregoing as the Manager shall request.  If property other than cash or Issuer Securities is distributed to the Members then, for all purposes of this Agreement, including, without limitation, for the purpose of charging the Members' Capital Accounts, such property shall be valued at its fair market value as determined by the Manager in accordance with clause (e), below, and any unrealized gain or loss inherent in such property and not previously taken into account in computing Net Profits or Net Losses shall be credited or charged, as the case may be, to the Capital Accounts of Members in accordance with the provisions of Section 4.1 above.

        (e)    <u>Fair Market Value of Securities</u>. For purposes of this Agreement, "**Fair Market Value**" shall mean with respect to:

        (i)    Issuer Securities and other Company Property, in each case if quoted on a national exchange, the closing price quoted on such exchange on the date of determination established by the Manager; and

        (ii)    Issuer Securities and other Company Property, in each case if not traded on a national exchange, the value determined by the Manager reasonably and in good faith. Notwithstanding the foregoing, if the Manager, in its sole discretion, reasonably determines in good faith that special circumstances exist where the Fair Market Value should be determined in a manner other than as in clause (i) of this Section 4.2(e), the Fair Market Value of such Issuer Securities shall mean the value so determined by the Manager.

### ARTICLE V
### MANAGEMENT

    5.1    <u>Manager</u>.  The Members hereby appoint the Manager pursuant to the terms and conditions of this Agreement and with the authority to service, administer and manage (including the exercise of rights and remedies related thereto) the Company Property on behalf of the Company.  The Manager shall continue to serve as a Manager until its resignation pursuant to Section 5.6. Upon its resignation, the Manager shall have the right to appoint a replacement Manager.  Any replacement Manager shall continue to serve as a Manager until such Person's resignation pursuant to Section 5.6.

    5.2    <u>Manager's Authority</u>.

        (a)    Subject to the terms and conditions of this Agreement, the management of the Company will be vested exclusively in the Manager, and the Manager will have full control over the business and affairs of the Company.  The Manager will have the sole, full and exclusive right, power and authority on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and perform all contracts and other undertakings that, in its sole and absolute discretion, it deems necessary or advisable or incidental thereto.

        (b)    The Manager hereby accepts its appointment as manager of the Company to service, administer and manage the Company Property, and agrees to perform the duties and responsibilities of the Manager pursuant to the terms hereof.   The Manager acknowledges and agrees that the principal purpose of the Company is to acquire, hold and invest in the Issuer Securities, and that its role as manager of the Company is to manage such Issuer Securities during the term of the Company such as for example through the exercise of voting right for holders of Issuer Securities, and to seek capital appreciation through the disposition or distribution of the Issuer Securities (or associated Available Cash) upon an Issuer Liquidity Event.  Subject to the limitations set forth in this Agreement, the Manager has all necessary powers to manage the Company Property and to make all decisions affecting the Company Property, including without limitation, the power to:

CONFIDENTIAL

TH-PLTF-001134

(i)    acquire, hold, dispose of and make distributions of Issuer Securities (or associated Available Cash) whether through direct purchase or purchase of interests in entities solely holding Issuer Securities, or other activities related thereto, to maximize capital appreciation; provided that nothing in this Agreement shall limit the Company's ability to hold any portion of its assets at any time in cash or other Short-Term Investments; and

(ii)    invest in Short-Term Investments.

(c)    Subject to the limitations set forth in this Agreement, the Manager has all necessary powers to service and administer the Company Property and to make all decisions affecting such Company Property in relation to such servicing and administration, including without limitation, the power to:

(i)    enter into discussions and negotiations, including with management of the Issuer, stockholders or optionholders of the Issuer, Persons with business or other financial relationships or interests in the Issuer, or any other third party regarding the acquisition or disposition of Issuer Securities and other transactions

(ii)    open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii)    open, maintain and close accounts, including escrow accounts, with brokers, dealers and others, including with any SharesPost Entity (provided, however, that any such escrow or brokerage services provided by such SharesPost Entity shall be on terms reasonably comparable to terms that could be obtained from an unaffiliated third party in the San Francisco metropolitan area), and issue all instructions regarding the Issuer Securities and/or money therein;

(iv)    deposit, withdraw, pay, retain and distribute the Company's assets in any manner consistent with the provisions of this Agreement, including to purchase, sell, invest in, trade or dispose of Issuer Securities even if SPFC or any successor entity has acted as placement agent of the Issuer;

(v)    determine and establish the costs and expenses of the Company, including, without limitation, organizational costs and expenses of the Company, and, if applicable, allocate such costs and expenses amongst the Members and several Series of the Company;

(vi)    pay, or otherwise cause the payment of, distributions to the Members and expenses of the Company;

(vii)    engage attorneys, accountants, or such other professionals as the Manager deems necessary or advisable;

(viii)    organize or participate and invest in one or more Persons, whether or not controlled by the Company, and any other business approved by the Manager as incidental to the principal purposes and objectives of the Company;

(ix)    act as Tax Matters Partner and to make any elections on behalf of the Company under the Code or any other applicable federal, state or local tax law as the Manager determines to be in the best interests of the Company;

CONFIDENTIAL

TH-PLTF-001135

(x)    withhold and pay all taxes, licenses, or assessments or whatever kind or nature imposed upon or against the Company, and for such purposes to make such returns and do all other such acts or things as are necessary or advisable;

(xi)    withhold and pay to any governmental authority any amount required to discharge any legal obligation of the Company to withhold or make payments with respect to the federal, state or local tax liability of any Member;

(xii)    do any and all acts on behalf of the Company and exercise all rights of the Company with respect to its interest in any Person, including the voting of Issuer Securities, by proxy, consent or otherwise, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(xiii)    organize one or more corporations or other entities formed to hold record title, as nominee for the Company, to Issuer Securities or funds of the Company;

(xiv)    commence and defend actions and proceedings at law or in equity before any governmental, administrative or other regulatory body or commission;

(xv)    authorize any manager, officer, employee or other agent of the Manager to act for or on behalf of the Company in all matters incidental to the foregoing;

(xvi)    enter into, make and perform such contracts, agreements, documents, certifications, and instruments of any kind as deemed necessary or advisable to conduct the Company's affairs;

(xvii)    sell Issuer Securities short and cover such sales;

(xviii)    establish reserves for anticipated liabilities;

(xix)    have and maintain one or more offices within or without the State of California and do such things as may be necessary or advisable for the maintenance of such office or offices;

(xx)    carry on any other activities necessary or incidental to, or in connection with, any of the foregoing or the Company's business; and

(xxi)    add or, upon its termination and winding up in accordance with the terms hereof, remove one or more Series of interests to the Company by creating, amending or deleting an appendix to this Agreement, which shall be in the Manager's sole discretion, and shall not require an amendment to this Agreement pursuant to Section 10.8.

All determinations and judgments made by the Manager in good faith and in accordance with the terms of this Agreement shall be conclusive and binding on all Members.

5.3    Actions Requiring a Consent of the Members. The Consent of a majority of Membership Units representing each affected Series shall be required prior to modification of the business purpose of the Company as set forth in Section 2.3.

5.4    Compensation and Reimbursement of the Manager. The Manager shall receive no compensation in connection with its servicing, administration or management of the Company Property

CONFIDENTIAL

TH-PLTF-001136

hereunder.  The Manager shall only be entitled to the Servicing Fee and/or Distribution Fee, which shall be payable in connection with a Capital Contribution by a Member to the Company or certain distributions as specified in Section 4.2, respectively.  The Company shall pay or reimburse the Manager for all extraordinary expenses incurred by the Manager on the Company's behalf, including, without limitation, costs of regulatory compliance with Rules and Regulations, any litigation-related costs and expenses and any transfer or registration fees charged by an Issuer or its transfer agent.

5.5    <u>Management Authority of the Members</u>. Only the Manager shall have the authority to bind the Company.  No action of any Member in its capacity as a Member shall bind the Company, and each Member shall indemnify the Company for any costs or damages (including, without limitation, reasonable attorney's fees) incurred by the Company as the result of any unauthorized action of such Member.

5.6    <u>Resignation of Manager; Death, Disability, Etc.</u>

(a)    The Manager may resign or withdraw at any time by giving 30 days prior written Notice to the Company.  The resignation of the Manager shall take effect upon the expiration of 30 days from the date of receipt of such Notice or at any later time specified in such Notice. Unless otherwise specified in such Notice, the acceptance of the resignation is not necessary to make it effective. The Manager's retirement or withdrawal shall not dissolve or terminate the Company but rather a successor Manager shall be appointed by the Manager to serve as and to perform the duties of the Manager effective upon such retirement or withdrawal.  Any successor Manager(s) shall have the same rights, duties and obligations as the Manager has to the Company.

(b)    The Bankruptcy of a Manager shall not dissolve or terminate the Company or terminate any Series. A successor Manager or Managers shall be appointed by a SharesPost entity to serve as and to perform the duties of the Manager effective upon such event.  Any successor Manager shall have the same rights, duties and obligations as the Manager with respect to the Company.

5.7    <u>Duties of Manager</u>.  The Manager shall perform its duties as Manager in good faith. In performing such duties, the Manager shall be entitled to rely on information, opinions, reports, or financial statements and financial data prepared by:

(a)    agents or employees of the Company;

(b)    counsel, public accountants, or other Persons as to matters the Manager believes are within such Person's professional or expert competence; or

(c)    any other Manager;

so long as the Manager acts in good faith. The Manager shall not be considered to be acting in good faith if it has actual knowledge causing such reliance to be unwarranted.

5.8    <u>Interested Manager(s)</u>. No contract or other transaction between the Company and a Manager, or between the Company and any other Person with which Manager is affiliated or in which Manager is a manager, officer, or director, or has a substantial financial interest, including, but not limited to any of the SharesPost Entities, shall be either void or voidable if such contract or transaction is fair and reasonable to the Company in accordance with the Act.

5.9    <u>Limitation on Liability</u>. No Manager shall be liable, responsible, or accountable in damages or otherwise to the Company or to any Member for any action taken, or any failure to act, on behalf of the

CONFIDENTIAL

Company within the scope of authority conferred on such Manager under this Agreement or the Act, unless a final adjudication adverse to the Manager establishes that:

(a)     such Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law; or

(b)     such Manager personally gained in fact a financial profit or other advantage to which such Manager was not legally entitled; or

(c)     with respect to a distribution described in Article IV above, such Manager's acts were not performed in accordance with Section 5.7 above.

Additionally, none of the Manager, the Company nor any of their respective Affiliates shall have any responsibility for the accuracy or completeness of information regarding the Issuer provided to the Members. Members shall be solely responsible for conducting their own inquiries regarding the Issuer.

5.10     Indemnification by Company. The Company shall indemnify and hold harmless, and advance expenses to, the Manager with respect to all claims, costs, expenses, losses, liabilities and damages (including, without limitation, reasonable attorneys fees) asserted against, or paid or incurred by, the Manager in connection with the business of the Company (or paid or incurred while such Manager was serving, at the request of the Company, as a director, officer, employee or agent of a corporation, partnership, trust or other enterprise), to the fullest extent provided or permitted by the laws of the State of Delaware; provided, however, that no indemnification may be provided to, or on behalf of, any Manager if a judgment or other final adjudication adverse to such Manager establishes that either:

(a)     such Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law; or

(b)     such Manager personally gained in fact a financial profit or other advantage to which such Manager was not legally entitled.

5.11     Transactions with Affiliates Acknowledgment; Reimbursement of Expenses.

(a)     The Manager shall have the authority to engage any other Member or any Affiliate (including, without limitation, Related Brokerage Firms and Related Investment Advisers) to provide services (including, without limitation, brokerage services and escrow agent services) to the Company, so long as the costs of such services are on terms no less favorable to the Company than it could obtain from an unrelated third party providing similar services obtained in accordance with applicable law. The Members expressly acknowledge that the Manager may acquire Issuer Securities sold by Persons using Related Brokerage Firms and such firms may receive commissions in connection with such purchases and sales. The Members expressly acknowledge that the Manager is a SharesPost Entity and managed by principals that are executives at other SharesPost Entities.

(b)     The Company shall pay or reimburse the Manager for all extraordinary expenses incurred by the Manager on the Company's behalf, including, without limitation, costs of regulatory compliance with Rules and Regulations, any litigation-related costs and expenses and any transfer or registration fees charged by an Issuer or its transfer agent. Such costs and expenses shall be allocated by the Manager among the individual Capital Accounts of the Members pro rata in accordance with Membership Units. Other than such costs and expenses, which the Company will bear, the Manager will generally bear all Company-related

CONFIDENTIAL

TH-PLTF-001138

operating and administrative expenses, including investment-related expenses, brokerage commissions, clearing and settlement charges, custodial fees, consulting and other professional fees relating to particular investments or contemplated investments, legal expenses with respect to the Company's formation and the offering of Membership Units, software, accounting, audit and tax preparation expenses, expenses related to the maintenance of the Company's registered office, and other similar expenses related to administration of the Company.

(c)     Each Member acknowledges by executing this Agreement that neither the Company nor the Manager is registered as a broker-dealer under the Exchange Act or any state securities laws.  Each Member further acknowledges that all services performed under or pursuant to this Agreement by the Manager are in its capacity as manager of the Company.  Each Member forever waives any rights that such Member may have on such Member's own behalf and on behalf of his, her or its heirs, successors or assigns, whether at law, in equity or otherwise against the Manager and its Affiliates on the basis that neither the Company nor the Manager is registered as a broker-dealer under the Exchange Act or any state securities laws.

5.12     Activities of Manager; Other Ventures.

(a)     The Manager and its Affiliates (including any members, partners, officers, directors and stockholders of such Persons), employees or other agents shall devote whatever time, effort and skill as it deems appropriate for the operation of the Company.  Nothing contained herein shall preclude the Manager or, as the case may be, any of its Affiliates, employees or other agents from engaging directly or indirectly in any other business, or from directly or indirectly purchasing, selling and holding Issuer Securities for the accounts of any Persons other than the Company, for their own accounts or for the accounts of Affiliates of the Company, including any SharesPost Entity, as well as establishing and operating other entities engaged in a similar "investment partnership" business, including entities established for the purpose of investing in Issuer Securities. No Member shall, by reason of being a Member, have any right to participate in any manner in the profits or income earned or derived by or accruing to the Manager or its members or any of their officers, directors, shareholders, members, partners, Affiliates, employees or other agents from the conduct of any business other than the business of the Company or from any transaction in Issuer Securities effected by the Manager or its Affiliates, employees or other agents for any account other than the account of the Company.

(b)     Neither the Manager nor any of its Affiliates (including, but not limited to any SharesPost Entity) shall be obligated to present any particular investment opportunity to the Company.  The Manager and its Affiliates (including, but not limited to any SharesPost Entity) shall each have the right to take for their own account (individually or as a trustee, partner or fiduciary), or to provide to others, any particular investment opportunity including investments in Issuer Securities.  The Members expressly waive any claim of conflict of interest or similar claim arising out of or related to any transactions entered into by the Manager or its Affiliates related to Issuer Securities.

(c)     The Members expressly acknowledge that the Manager and its Affiliates (including, but not limited to any SharesPost Entity) have and will continue to have funds under management (individually, or as trustee, partner, member, broker or fiduciary) which may from time to time be used to acquire, hold or dispose of Issuer Securities. The Members expressly agree that the Manager and its Affiliates (including, but not limited to any SharesPost Entity) may allocate, as the Manager, any investment opportunity relating to Issuer Securities to any other Person and may allocate any opportunity to acquire or dispose of any Issuer Securities as determined in its sole and absolute discretion.  The Manager shall have no fiduciary or other duty to afford to the Company or any Member any priority in connection with any acquisition or disposition of Issuer Securities prior to selling any Issuer Securities held by Persons holding such other funds, if any. Any Manager (and Affiliates

17
Private and Confidential

of any Manager) may engage, directly or indirectly, in any other business venture or ventures of any nature or description and may acquire and dispose of such interests or be a party to contracts for their purchase or sale, independently or with others, and neither the Company nor any Member shall have any rights in or to any such business ventures or their related income or profits.

5.13    Assignability of Economic Interest. The Manager may assign to any third party, including without limitation related parties or Affiliates, any portion of its rights to receive distributions or other economic benefits under this Agreement.

## ARTICLE VI
## MEETINGS OF MEMBERS; CERTAIN OBLIGATIONS OF MEMBERS

6.1    General. There is no requirement to hold any annual or other periodic meeting of the Members. The Manager may in its discretion call a meeting of the Members, or any Series thereof, from time to time. Unless otherwise determined by the Manager, all meetings shall be held at the principal office of the Company. Any Member may participate at such meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Such participation shall constitute presence in person at the meeting. Any Member may participate at any meeting by proxy.

6.2    Notice of Meeting. Notice of all meetings shall be given to the Members, or any applicable Series thereof, entitled to attend such meeting not less than 10, nor more than 60, days before the date of the meeting. Each such Notice shall state the place, date and hour of the meeting and the purpose or purposes for which the meeting was called.

6.3    Action by Members Without a Meeting. Any action that is required or permitted to be taken by Consent of the Members, or any Series thereof, as the case may be, may be taken without a meeting if a Consent setting forth the action so taken is signed by Members holding Membership Units, or any applicable Series thereof, constituting not less than the minimum percentage of Membership Units, or any applicable Series thereof, that would be necessary to authorize such action at a meeting at which all of the Members, or any applicable Series thereof, were present and voted.

6.4    Duties and Obligations of Members. Each Member shall provide or cause to be provided to the Manager, promptly upon request by the Manager, information with respect to such Member and its Affiliates and its and their holdings of Issuer Securities as the Manager deems necessary or appropriate to complete any tax returns or any reports, schedules, notices, proxy statements and other statements required to be filed by the Company under the Code or the Exchange Act, the Securities Act or the Rules and Regulations, or for any other purpose. Without limiting the generality of the foregoing, each Member shall provide Internal Revenue Service Form W-8, W-9, 1001 or 4224, as applicable, or any other form as may be reasonably requested by the Manager, promptly following such request.

## ARTICLE VII
## BOOKS AND RECORDS; BANK ACCOUNTS; FISCAL YEAR

7.1    Bank Accounts. The funds of the Company shall be deposited in such bank account or accounts as the Manager determines appropriate for the purpose, and the Manager shall arrange for the appropriate conduct of such accounts including, without limitation, the designation of one or more signatories of such account.

CONFIDENTIAL

TH-PLTF-001140

7.2   Records. The books and records of the Company shall be kept at the Company's principal place of business or at such other place as the Manager designates. The books of the Company shall be kept in accordance with generally accepted accounting principles. Each Member shall have the right to examine the books and records of the Company, subject to 7.3(b) during usual business hours of Business Days, and upon 15 business days advance Notice.  Each Member shall bear all expenses incurred in any such examination made by such Member.  Members shall not be entitled to inspect or copy any information which the Manager in its discretion believes to be in the nature of trade secrets or other information the disclosure of which the Manager believes is not in the best interests of the Company or its business, any Member, or which the Company is required by law or agreement with a third party to keep confidential.

7.3   Reporting.

(a)   The Company shall, within 100 days after the end of each fiscal year, provide the Members with financial information with respect to their investment in the Company, delivered to their respective addresses set forth in the records of the Company, which shall set forth, as of the end of such fiscal year: (i) information in sufficient detail to enable the Members to prepare their federal, state and other tax returns; and (ii) any other information which the Manager deems necessary or appropriate. The Company will provide the Members with such interim reports as the Manager deems necessary or appropriate.

(b)   The Manager shall keep complete and accurate books and records of the Company, including separate books and records for each Series at the principal place of business of the Company.  The books and records shall be available for inspection and copying by the Members at such Member's expense, upon 15 days advance written Notice for any purpose reasonably related to the Member's Membership Units, subject to reasonable standards (including standards governing what information and documents are to be furnished and at what time and location) established by the Manager. Members shall not be entitled to inspect or copy any information which the Manager in its discretion believes to be in the nature of trade secrets or other information the disclosure of which the Manager believes is not in the best interests of the Company or its business, any Member, or which the Company is required by law or agreement with a third party to keep confidential.

7.4   Fiscal Year. The fiscal year of the Company shall be the calendar year.

7.5   Tax Matters Partner. The Manager shall be the Tax Matters Partner of the Company for the Company for the purposes of Code Section 6231.

**ARTICLE VIII**
**RESTRICTIONS ON TRANSFER OF INTERESTS;**
**ADMISSION OF ADDITIONAL MEMBERS; WITHDRAWALS**

8.1   Restrictions on the Transfer of Membership Units. Subject to the exceptions below, no Member may Transfer any Membership Units to any other Person without the prior Consent of the Manager, which Consent may be granted or withheld for any or no reason in its discretion; provided that any Member may Transfer all or such Membership Units (i) to another Member, (ii) if a Member is a natural person, to such Member's spouse, children or grandchildren or any trust, limited partnership or limited liability company primarily for their benefit; or (iii) in the case of a Member who is not a natural person, to any Affiliate of such Member; provided that any transferee under clauses (i), (ii) or (iii) above agree in writing to be bound by, and Membership Units so transferred shall remain subject to, the terms and conditions of this Agreement; provided, further, that any proposed transfer under this Section 8.1 must meet the following conditions which are

19
Private and Confidential

CONFIDENTIAL

TH-PLTF-001141

8.7     Withdrawals of Capital. No Member shall have the right or authority to withdraw all or any portion of such Member's Capital Account without the express prior written consent of the Manager, which Consent may be withheld or delayed by the Manager in its sole discretion.

8.8     Required Withdrawal. The Manager may require any Member to withdraw either generally in any other circumstance in which the Manager, in its discretion, with or without cause, deems such withdrawal to be in the best interest of the Company.  Such withdrawal shall be effective 5 Business Days after Notice in writing is given to such Member, unless rescinded by the Manager within such 5 Business Day period.

8.9     Withdrawal Payment.

(a)     A withdrawing Member shall be entitled to receive an amount equal to the Withdrawal Value of such Member's Membership Units as of the Withdrawal Date. "Withdrawal Date" means a date following the effective date of withdrawal as determined by the Manager, but in no event later than December 31 of the Fiscal Year during which the effective date of the withdrawal occurs. The amount of the Withdrawal Value is hereinafter referred to as the "Withdrawal Payment." The withdrawing Member shall have no right to receive any profits attributable to the use of such Member's Membership Units, any Issuer Securities or any Company Property after the Withdrawal Date. The Withdrawal Payment shall be payable in cash or in kind or in a combination of them, in the discretion of the Manager at the time of payment, and, to the extent paid in kind, the assets so distributed shall be valued at their Fair Market Value (the "Withdrawal Value") as of the Withdrawal Date. The Withdrawal Payment shall be paid not later than 3 months after the Withdrawal Date, except in extraordinary circumstances determined in the Manager's sole discretion.

(b)     The Withdrawal Value of a Member's Membership Units shall be calculated on the balance of the withdrawing Member's Capital Account as of the Withdrawal Date adjusted as if (i) all Company assets had been sold for their Fair Market Value, (ii) all Company liabilities had been paid, and (iii) all allocations required by Article IV had been made, all on the Withdrawal Date.

8.10     Assignment by the Manager. Nothing in this Article VIII shall be construed to limit the right of the Manager to assign to any third party, including without limitation related parties, any portion of its rights to receive distributions or other economic benefits under this Agreement as set forth in Section 5.13.

## ARTICLE IX
## TERM; DISSOLUTION

9.1     Term. The term of the Company shall be perpetual, unless sooner dissolved and liquidated in accordance with the terms of this Agreement. The exercise or use of one of the terms contained in this Article IX shall not preclude the exercise or use of any other provision.

9.2     Death, Incompetency, Bankruptcy, Disability or Dissolution of a Member. The death, adjudication of incompetency, Bankruptcy, disability, termination or dissolution of a Member shall not dissolve the Company or terminate any Series.  The legal representative of any such Member shall succeed as assignee to the Member's Membership Units but shall not be admitted as a Member unless the requirements of Section 8.1 are met.

9.3     Dissolution of the Company. The Company shall be dissolved upon the first to occur of the following:

CONFIDENTIAL

(a)    the sale or other disposition of all or substantially all Company Property other than in the ordinary course of business and the collection of all the proceeds from Company Property;

(b)    the determination of the Manager in its sole discretion to dissolve the Company; or

(c)    the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act.

The Company's dissolution shall be effective on the date of the event giving rise to the dissolution, and a certificate of cancellation shall be filed as provided in this Article IX.

9.4    Procedures Upon Dissolution. Upon dissolution of the Company, the Company shall be dissolved, and the Manager, or if there is no Manager, such other Person appointed in accordance with this Agreement and applicable law to wind up the Company's affairs (the "Liquidator") shall liquidate the assets of the Company as promptly as possible in an orderly and businesslike manner and to not involve undue sacrifice. The proceeds of liquidation shall be applied and distributed in the following order of priority:

(a)    first, to the payment of the debts and liabilities of the Company (other than any loans or advances made by any of the Members to the Company) and the expenses of liquidation, including the payment of any Distribution Fee owed to the Manager;

(b)    second, to the creation of any reserves that the Liquidator(s) deem(s) reasonably necessary for the payment of any contingent or unforeseen liabilities or obligations of the arising out of or in connection with the business and operation of the Company;

(c)    third, to the payment of any loans or advances made by any of the Members to the Company; and

(d)    thereafter, to the Members in accordance with Article IV.

9.5    Series Termination. Any Series shall be terminated and its affairs shall be wound up upon the first to occur of the following:

(a)    the distribution of all or substantially all Company Property associated with such Series pursuant to Section 4.2;

(b)    the sale or other disposition of all or substantially all Company Property associated with such Series, other than in the ordinary course of business, and the collection of all the proceeds from Company Property associated with such Series;

(c)    the determination of the Manager in its sole discretion to terminate such Series;

(d)    the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act; or

(e)    the dissolution and winding up of the Company.

Subject to Section 18-801 of the Act, a Series may be terminated and its affairs wound up without causing the dissolution of the Company. The termination of a Series shall not affect the limitation on liabilities of such Series. Upon the termination of a Series, the Manager shall dispose of the assets associated with such Series in a manner consistent with the procedure and relative preferences set forth in Section 9.4.

CONFIDENTIAL

TH-PLTF-001143

9.6 <u>Cancellation of the Company</u>. Within 90 days following the liquidation of the Company and the distribution of all Company assets, the Manager shall cause the execution and filing of a certificate of cancellation of the Company as well as any other documents required to effectively dissolve the Company.

## ARTICLE X
## MISCELLANEOUS

10.1 <u>Members' Covenants</u>. Each Member covenants on behalf of itself, its permitted assigns, heirs, personal representatives, and successors:

(a)  To execute and deliver with acknowledgement or affidavit, if required, all documents and writings determined by the Manager to be necessary or appropriate to effect amendments to this Agreement made its accordance with its terms or to satisfy any tax or other information reporting responsibilities of the Company; and

(b)  That, at all times while a Member owns an Membership Unit, the Member (i) shall be an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act and (ii) shall maintain its business and operations in compliance, and shall not take or permit to be taken any action that would reasonably be expected to cause it to be in noncompliance, with the representations and warranties set forth in Section 2.2(c). If, notwithstanding the forgoing, Member shall, at any time while a Member owns an Membership Unit, fail to comply, or receive notice from any governmental or other regulatory agency that it is alleged to have failed to comply, with any of the agreements set forth in the immediately preceding sentence (whether or not any such noncompliance or alleged noncompliance is then continuing), then Member shall (i) promptly notify the Manager of any such noncompliance or alleged noncompliance, (ii) promptly respond to all reasonable information requests by Manager in relation to the same, (iii) promptly comply with all reasonable requests and directives that Manager may provide to such Member for the purpose of curing or rectifying any such noncompliance or alleged noncompliance and (iv) indemnify and hold harmless, and advance expenses to, the Company with respect to all claims, costs, expenses, losses, liabilities and damages (including, without limitation, reasonable attorneys fees) asserted against, or paid or incurred by, the Company that may result, in whole or in part, from any such noncompliance or alleged noncompliance with any of the agreements set forth in the immediately preceding sentence, to the fullest extent provided or permitted by the laws of the State of Delaware.

10.2 <u>Approvals</u>. Unless otherwise specified in this Agreement, all Consents to be given under this Agreement shall not unreasonably delayed, conditioned, or withheld. In the event that a Member having the right to Consent takes no action within 5 Business Days subsequent to receipt of the documents or agreements subject to approval of such Consent, the Consent of said Member shall be deemed given.

10.3 <u>Binding Agreement</u>. Subject to the restrictions on transfers and encumbrances set forth herein, this Agreement shall inure to the benefit of, and be binding upon, the undersigned Members and their respective heirs, executors, legal representatives, successors and assigns. Whenever, in this instrument, a reference to any party or Member is made, such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors and assigns of such party or Member.

10.4 <u>Counterparts</u>. This agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same document. In the event that any signature (including a financing signature page) is digitally delivered by facsimile transmission or by e-mail delivery of a data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature were an original.

CONFIDENTIAL

10.5   Effect of Consent or Waiver.  No Consent or waiver, express or implied, by any Member to or of any breach or default by any other Member in the performance by such other Member of its obligations hereunder shall be deemed or construed to be a Consent or waiver to or of any other breach or default by such other Member in the performance by such other Member of the same or any other obligations of such Member. Except as set forth in Section 10.2 of this Agreement, failure on the part of any Member to object to any act or failure to act of any of the other Members, or to declare any of the other Members in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member of its rights.

10.6   Enforceability. If any provision of this Agreement is held invalid or unenforceable to any extent, the remainder of this Agreement, and the application of such provisions to other Persons or circumstances, shall not be affected and shall be enforced to the greatest extent permitted by law.

10.7   Entire Agreement. This Agreement and the Certificate are the complete and exclusive statement of agreement among the Company and the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Company, the Members or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Certificate conflicts with any provision of this Agreement, the Certificate shall control.

10.8   Amendment. Except as otherwise provided below or in the Act, this Agreement and all certificates, documents, the Certificate, instruments and other writings executed by the Members in connection with their membership in the Company may be amended from time to time by the Manager without the Consent of any Member to the extent the Manager determines such amendment is necessary, desirable, or appropriate in connection with the administration, management or control of the Company or its business and affairs. Such amendments may, without limitation:

(a)   admit additional or substituted Members into the Company pursuant to the terms of this Agreement;

(b)   clarify, or correct an administrative error in, any one or more of the provisions of this Agreement;

(c)   cause this Agreement to comply with, or satisfy the requirements of, the Code, the Treasury Regulations, any federal or state securities laws, Rules and Regulations, or any other law, statute, ordinance, rule, regulation, interpretation, decision, or order of, or issued, promulgated, or enacted by, any governmental authority or self-regulatory body including FINRA or a national securities exchange or under the Investment Advisers Act; or

(d)   add, remove or terminate one or more Series listed as an appendix hereto.

Any such amendment may, in the sole discretion of the Manager, relate back to the original date of this Agreement with such force and effect as if originally incorporated. Notwithstanding the foregoing:

(i)   any provision of this Agreement requiring the Consent of a specified pro rata proportion of Membership Units with respect to any action may be modified, amended, restated, or revoked only by the Consent of Members holding at least such specified percentage;

(ii)   no amendment of this Agreement or of any certificate, document, the Certificate, instrument or other writing executed by the Members in connection herewith shall:

CONFIDENTIAL

(1)     impose any liability on any Member for any debts, obligations or liabilities of the Company;

(2)     impose any obligation upon, or increase any obligation of, any Member to make additional Capital Contributions to the Company; or

(3)     except to the extent necessary to clarify a provision, provided that such clarification does not change the substance of the amended provision in the opinion of the Company's counsel, alter the allocation for tax purposes of any items of income, gain, loss, deduction, or credit with respect to any Member or Members or alter the manner of computing the distributions of any Member or Members, may be made without the Consent of each of the Members who are adversely affected thereby; and

(iii)     no amendment of this Agreement or of any certificate, document, the Certificate, instrument or other writing executed by the Members that may render any one or more of the Members liable, in their capacity as Members or the Manager, for any or all of the debts, obligations or liabilities of the Company or of any of the other Members (whether arising in tort, contract, or otherwise) may be made without the Consent of each of the Members adversely affected thereby.

10.9     <u>Governing Law</u>. This Agreement is made and shall be construed under, and in accordance with, the laws of the State of Delaware for contracts made and to be wholly performed therein.

10.10    <u>Liability Among Members</u>. No Member shall be liable, responsible, or accountable in damages or otherwise to the Company or to any Member by reason of such Member's acts or omissions in connection with the Company, unless:

(a)     such liability, responsibility or accountability is specifically provided for in this Agreement under the circumstances in question; or

(b)     there shall be a judgment or other final adjudication adverse to such Member establishing that either:

(i)     such Member's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law; or

(ii)     such Member personally gained in fact a financial profit or other advantage to which such Member was not legally entitled.

10.11    <u>Limitation of Liability to Third Parties; Return/Withholding of Certain Distributions</u>.

(a)     Except as otherwise required by applicable law, no Member or Manager shall have any personal liability for the debts, obligations and liabilities of the Company solely by reason of being a member or acting as a manager of the Company.

(b)     A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by any Member. The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member. Nothing in this Section 10.11 shall be applied to release (i) any Member from its obligation to make Capital Contributions or other payments specifically required under this Agreement or (ii) release any Member or Manager from its obligations pursuant

CONFIDENTIAL

TH-PLTF-001146

to any relationship between the Company and such Member or Manager acting in a capacity other than as a Member or Manager (including, for example, as a borrower, employee or independent contractor).

10.12   No Partnership Intended for Non-Tax Purposes. The Members hereby recognize that each Series of the Company will be a separate partnership for United States federal income tax purposes, and that the Company will be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided that the Manager may at its sole discretion cause the Company to make an election under Internal Revenue Code Section 761(a) and Internal Revenue Regulation Section 1.761-2 to exclude the Company from the application of Subchapter K. One effect of such an election, if made, is that Members will not receive a Schedule K-1 with respect to their Membership in the Company. The Members expressly do not intend to form a partnership under the Act, and neither anything contained herein nor the filing of partnership returns of income by the Company shall be deemed or construed to alter the nature of the Company or to expand the obligations or liabilities of the Members. Without limiting the generality of the foregoing, the Members do not intend to be partners one to another, or partners as to any third party. To the extent that any Member, by word or action, represents to another Person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member or the Company who or which incurs liability by reason of such wrongful representation.

10.13   Notices. All Notices required or permitted hereunder shall be in writing and shall be deemed effectively given or delivered: (a) upon personal delivery to the party to be notified; (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (c) 5 days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company's principal office and to a Member at the address set forth on Appendix A for such Member or at such other address as the Company or such Member may designate by 10 days advance written notice to the other parties hereto.

10.14   References. References herein to the singular shall include the plural and to the plural shall include the singular, and references to one gender shall include the others, as the context requires.

10.15   Titles and Captions. Titles or captions contained in this Agreement are for convenience only and shall not be deemed a part of the content of this Agreement.

10.16   Legal Counsel. No legal counsel has been engaged to protect or represent the interest of any Member vis-à-vis the Company, the Manager or this Agreement. Each Member: (i) acknowledges that actual or potential conflicts of interest exist among the Members, that such Member's interests will not be represented by legal counsel unless such Member engages counsel on its own behalf, and that such Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement; (ii) agrees that, in the event of a dispute between one or more Members, on the one hand, and the Manager or the Company, on the other hand, legal counsel engaged by the Company may represent the Manager, one or more of its members or the Company; and (iii) acknowledges that the approvals, acknowledgments and waivers made by such Member pursuant to this Section 10.16 do not reflect or create a right under this Agreement on the part of any Member to approve the Manager's selection of legal counsel to the Manager or the Company. Legal counsel engaged by the Manager or the Company under this Section 10.16 is entitled to enforce the terms contained in this Agreement as a third-party beneficiary of this Section 10.16.

10.17   Arbitration. The parties agree to submit all controversies to arbitration in accordance with the provisions set forth below and understand that:

CONFIDENTIAL

(a)     Arbitration is final and binding on the parties.

(b)     The parties are waiving their right to seek remedies in court, including to a jury trial.

(c)     Pre-arbitration discovery is generally more limited and different from court proceedings.

(d)     The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by arbitrators is strictly limited.

(e)     The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

(f)     All controversies which may arise between the parties concerning this Agreement shall be determined by arbitration pursuant to the rules then pertaining to the Financial Industry Regulatory Authority.  Judgment on any award of any such arbitration may be entered in the courts of the State of California or in any other court having jurisdiction of the Person or Persons against whom such award is rendered.

(g)     Any Notice of such arbitration or for the confirmation of any award in any arbitration shall be sufficient if given in accordance with the provisions of this Agreement.  The parties agree that the determination of the arbitrators shall be binding and conclusive upon them.

[Signature Page Follows]

27
Private and Confidential

CONFIDENTIAL

TH-PLTF-001148

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

CELADON TECHNOLOGY FUND VII, LLC

By: Celadon Capital Management, LLC, its Manager

By:_____
Ryan Stroub
Chief Financial Officer

MEMBER SIGNATURE

The undersigned agrees to be bound by the terms of the Operating Agreement of Celadon Technology Fund VII, LLC.

*If an individual(s):*

Name:
Date:

Name:
Date:

*If an Entity:*

The Entrust Group FBO
Acct #
Name Of Entity: Hilary Taulsman Dye

By:
Name:
Title:
Date:

The Entrust Group
By: Monica Blaz
Its: Authorized Signer
555 12th Street, Suite 1250
Oakland, California 94607
Tax ID Number:

*(handwritten annotations):* Read & Approved    Hilary Taul Dye    8·13·15

*(diagonal stamp):* For the exclusive use of Hilary & John Dye — CTF VII (Series B - Theranos) - SP 12    07/10/2015

*(printed block, upper right):* The Entrust Group
By: Monica Blaz
Its: Authorized Signer
555 12th Street, Suite 1250
Oakland, California 94607
Tax ID Number:

CONFIDENTIAL    TH-PLTF-001149

**Appendix A**

**CELADON TECHNOLOGY FUND VII, LLC**

**SERIES B**

**ISSUER INFORMATION**
| | |
|---|---|
| **Issuer of Issuer Securities held by Company:** | Theranos, Inc. |
| **Type of Issuer Securities:** | Series A Preferred |
| **Number of Issuer Securities:** | 2,000,000 |

**PLEASE READ THROUGH THE SUBSCRIPTION AGREEMENT AND THE OFFERING MEMORANDUM, IN PARTICULAR THE SECTIONS TITLED TERMS OF THE OFFERING AND RISK FACTORS, FOR FURTHER INFORMATION ON THIS INVESTMENT.**

**PRICE PER MEMBERSHIP UNIT:**  $19.40

**FEES**
Service Fee:  $0.40 per unit
Distribution Fee:  NONE

| INVESTOR NAME/ADDRESS | CAPITAL CONTRIBUTION | MEMBERSHIP UNITS |
|---|---|---|
| | | |
| | | |
| | | |

READ + Approved

Hilary Tal Oye  *

8.13.15

29
Private and Confidential

For the exclusive use of: Hilary & John Dye CTF VII (Series B Theranos): SP-12 07/10/2015

  TH-PLTF-001150

# TH-PLTF-001078

## Metadata

| | | |
|---|---|---|
| **All Custodians** | Hilary Taubman-Dye | USER |
| **Author** | Accusoft Pegasus ImageGear Library 18.0.0 | USER |
| **BeginFamily** | TH-PLTF-001072 | ORIGINAL |
| **Custodian** | Hilary Taubman-Dye | USER |
| **EndFamily** | TH-PLTF-001150 | ORIGINAL |
| **Filename** | celadon.PDF | ORIGINAL |
| **MD5 Hash** | 32d7a8f4336c80e8bd60eff5899388d1 | ORIGINAL |
| **Produced From** | #513.1 | ORIGINAL |
| **SHA1 Hash** | 01b027b92aa110b6d1586b4e508707291505fd5f | ORIGINAL |

# Exhibit 4a

1   Michael A. Mugmon (251958)
    WILMER CUTLER PICKERING
2       HALE AND DORR LLP
    950 Page Mill Road
3   Palo Alto, CA 94304
    Telephone: +1 650 858 6000
4   Facsimile: +1 650 858 6100
    michael.mugmon@wilmerhale.com
5
    Christopher Davies (admitted *pro hac vice*)
6   WILMER CUTLER PICKERING
        HALE AND DORR LLP
7   1875 Pennsylvania Avenue, NW
    Washington, DC 20006
8   Telephone: +1 202 663 6000
    Facsimile: +1 202 663 6363
9   christopher.davies@wilmerhale.com

10  Timothy Perla (admitted *pro hac vice*)
    Robert K. Smith (admitted *pro hac vice*)
11  WILMER CUTLER PICKERING
        HALE AND DORR LLP
12  60 State Street
    Boston, MA 02109
13  Telephone: +1 617 526 6000
    Facsimile: +1 617 526 5000
14  timothy.perla@wilmerhale.com
    robert.smith@wilmerhale.com
15
    *Attorneys for Defendant Theranos, Inc.*
16
                **UNITED STATES DISTRICT COURT**
17
                **NORTHERN DISTRICT OF CALIFORNIA**
18
                    **SAN JOSE DIVISION**
19
    ROBERT COLMAN and HILARY            Case No.  5:16-cv-06822-NC
20  TAUBMAN-DYE, Individually and on
    Behalf of All Others Similarly Situated,   **DEFENDANT THERANOS'S FIRST SET**
21                                             **OF REQUESTS FOR PRODUCTION OF**
                            Plaintiffs,        **DOCUMENTS TO PLAINTIFF THOMAS**
22                                             **BRODIE**
                vs.
23
    THERANOS, INC., ELIZABETH
24  HOLMES, and RAMESH BALWANI,

25                          Defendants.

26

27

28

1    Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant Theranos,

2    Inc., by and through its attorneys of record in this action, hereby requests that Plaintiff Thomas

3    Brodie produce the following documents for inspection and copying at the offices of Wilmer

4    Cutler Pickering Hale and Dorr LLP, 950 Page Mill Road, Palo Alto, CA 94304, within thirty

5    (30) days of service of Defendant Theranos's First Set of Requests for Production of Documents

6    to Plaintiff Thomas Brodie.

7    **I.    DEFINITIONS**

8    1.    The term "ACTION" refers to *Colman v. Theranos, Inc.*, Case No. 5:16-cv-

9    06822-NC (N.D. Cal.).

10    2.    The term "AMENDED COMPLAINT" shall mean the January 5, 2018 Amended

11    Class Action Complaint for Violations of California's Securities, Unfair Competition, and

12    Common Laws, filed in *Colman v. Theranos, Inc.*, Case No. 5:16-cv-06822-NC (N.D. Cal.)

13    (ECF No. 173).

14    3.    The term "BALWANI" means Ramesh Balwani.

15    4.    The term "BDV" shall mean Black Diamond Ventures XII-B, LLC, as described

16    in in Paragraph 1 of the Declaration of Thomas Brodie in Support of Plaintiffs' Motion for Class

17    Certification (ECF No. 177-07, Exhibit QQ).

18    5.    The term "CLASS" means "[a]ll persons or entities who, from July 29, 2013,

19    through October 5, 2016, purchased or acquired securities of an entity for the express purpose of

20    making corresponding purchases of Theranos securities" during the CLASS PERIOD, as defined

21    in Paragraph 86 of the AMENDED COMPLAINT.

22    6.    The term "COMMUNICATION" or "COMMUNICATIONS" shall be interpreted

23    in its broadest sense, and means any transmission of information between two or more

24    PERSONS, whether by, without limitation: personal meeting; telephone; letter; telegraph; e-mail;

25    electronic bulletin board; electronic "chat room"; instant message, text message, any other form

26    of electronic correspondence; teleconference; facsimile; telex; or any other means whatsoever.

27    7.    The term "DEFENDANTS" shall mean THERANOS, HOLMES, and BALWANI.

28

- 1 -

8.      The term "DOCUMENT" or "DOCUMENTS" shall have the broadest meaning permitted by the Federal Rules of Civil Procedure and shall include, without limitation, all written or graphic matter, whether stored, displayed, communicated, or transmitted, of every kind or description, however produced or reproduced, whether draft or final, original or reproduction, signed or unsigned, and regardless of whether approved, signed, sent, received, redrafted, or executed, including, without limitation: ESI, written communications, letters, correspondence, memoranda of telephone conversations or personal conversations, diaries, desk calendars, interoffice communications, records, studies, analyses, statistical and financial statements, charts, graphs, reports, minutes, telegrams, telexes, facsimiles, emails, voicemails, bulletins, instructions, notes, sound or video recordings of any type, catalogues, results of investigations, contracts, licenses, agreements, working papers, statistical records, ledgers, computer diskettes, CDs or DVDs, computer tapes or data in any form, stenographers' notebooks or material similar to any of the foregoing, however denominated, by whomever prepared, and to whomever addressed, which are in Your possession, custody or control or to which You have, have had or can obtain access.  The term "DOCUMENT" or "DOCUMENTS" shall also include (1) each copy that is not identical to the original or to any other copy, and (2) any tangible thing that is called for or identified in response to any request.

9.      The term "ELECTRONICALLY STORED INFORMATION" or "ESI" means all "potentially discoverable electronically stored information" and refers to the party's(ies') ESI that contains or potentially contains information RELATING TO facts at issue in this litigation. The term "ELECTRONICALLY STORED INFORMATION" or "ESI" includes, without limitation, all electronically stored DOCUMENTS.  The term "ELECTRONICALLY STORED INFORMATION" or "ESI" further includes, without limitation, the following: (i) information or data generated, received, processed, and recorded by any computer or other electronic device, including, without limitation, metadata (e.g., author, recipient, file creation date, file modification date, etc.); (ii) internal or external web sites; (iii) output resulting from the use of any software program, including, without limitation, word processing DOCUMENTS,

spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messenger or similar programs, bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; and (iv) activity listings of electronic mail receipts or transmittals, and any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, or on any other media for digital data storage or transmittal, such as, without limitation, a personal digital assistants, handheld wireless devices (e.g., BlackBerrys and iPhones), or similar devices, and file folder tabs, or containers and labels appended to, or RELATING TO, any physical storage device associated with each original or copy of all DOCUMENTS requested herein.

10. The term "HOLMES" means Elizabeth Holmes.

11. The term "INCLUDING" shall mean including but not limited to.

12. The term "MEMBERSHIP INTEREST" means the "membership interest" as described in Paragraph 1 of the Declaration of Thomas Brodie in Support of Plaintiffs' Motion for Class Certification (ECF No. 177-07).

13. The term "PERSON" or "PERSONS" means, without limitation, any natural person, firm, association, partnership, trust, or any other form of legal entity.

14. The terms "RELATING TO" or "CONCERNING" mean, without limitation, constituting, comprising, pertaining to, referencing, recording, evidencing, containing, setting forth, reflecting, discussing, showing, disclosing, describing, explaining, summarizing, supporting, contradicting, refuting, or concerning, whether directly or indirectly.

15. The term "THERANOS" means Theranos, Inc.

16. The terms "YOU" and "YOUR" shall mean Plaintiff Thomas Brodie, acting individually or on behalf of BF Last Investments, LLC, and any other PERSON acting or purporting to act on YOUR behalf or under YOUR control, including YOUR counsel of record in this ACTION.

## II.    INSTRUCTIONS

1.    The definitions and requirements contained in the Federal Rules of Civil Procedure are incorporated herein by reference.

2.    Each request contained herein extends to all DOCUMENTS in YOUR possession, custody, or control, regardless of location.

3.    Unless otherwise indicated, these requests seek DOCUMENTS and things created, generated, dated or coming into YOUR possession, custody or control at any time, without restriction as to date.

4.    Wherever the word "any" appears herein, it shall be read and applied so as to include the word "all," and wherever the word "all" appears herein, it shall be read and applied so as to include the word "any."

5.    All references herein to the singular include the plural, and all references to the plural include the singular.

6.    The terms "and" and "or" as used herein each mean "and/or."

7.    If YOU claim that there is any ambiguity in any request herein, YOU are instructed to resolve such perceived ambiguity in favor of production of more documents rather than limiting the number of documents to be produced.

8.    Any DOCUMENT attached to another DOCUMENT must not be separated.

9.    If YOU assert any privilege, work product claim, or other protection in responding to any requests, furnish a privilege log in a mutually agreeable format.

10.    To the extent a DOCUMENT subject to an assertion of privilege, a work product claim or other objection contains any responsive information not subject to such assertion or objection, the responsive information must be produced.

11.    If, after making YOUR initial production and inspection, YOU obtain or become aware of any further DOCUMENTS responsive to these requests, YOU are requested to produce such additional DOCUMENTS to the DEFENDANTS, in accordance with the Federal Rule of Civil Procedure 26.

4

## III.      DOCUMENTS TO BE PRODUCED

Subject to the foregoing Definitions and Instructions, as well as Federal Rule of Civil Procedure 34, YOU are requested to produce all of the following:

**REQUEST NO. 1:**

DOCUMENTS sufficient to show YOUR educational background and work history from YOUR graduation from high school through the present.

**REQUEST NO. 2:**

DOCUMENTS sufficient to show YOUR financial holdings throughout the CLASS PERIOD.

**REQUEST NO. 3:**

All DOCUMENTS and COMMUNICATIONS CONCERNING THERANOS.

**REQUEST NO. 4:**

All DOCUMENTS and COMMUNICATIONS CONCERNING HOLMES.

**REQUEST NO. 5:**

All DOCUMENTS and COMMUNICATIONS CONCERNING BALWANI.

**REQUEST NO. 6:**

All agreements with or involving BDV.

**REQUEST NO. 7:**

All DOCUMENTS CONCERNING YOUR MEMBERSHIP INTEREST in BDV.

**REQUEST NO. 8:**

All DOCUMENTS and COMMUNICATIONS CONCERNING BDV.

**REQUEST NO. 9:**

All DOCUMENTS provided to YOU by BDV, or any PERSON acting on behalf of BDV.

**REQUEST NO. 10:**

All DOCUMENTS that YOU read, reviewed or relied upon in purchasing a MEMBERSHIP INTEREST in BDV.

**REQUEST NO. 11:**

All DOCUMENTS CONCERNING any losses or gains incurred in connection with YOUR purchase of a MEMBERSHIP INTEREST in BDV.

**REQUEST NO. 12:**

All DOCUMENTS CONCERNING any transaction in securities issued by THERANOS.

**REQUEST NO. 13:**

All DOCUMENTS that YOU contend contain a misrepresentation or material omission by THERANOS, HOLMES, or BALWANI.

**REQUEST NO. 14:**

DOCUMENTS sufficient to identify any other litigation to which YOU have been a party, affiant, deponent, declarant, or trial witness.

**REQUEST NO. 15:**

All DOCUMENTS CONCERNING the financial arrangement between YOU and YOUR counsel in this ACTION, INCLUDING DOCUMENTS RELATING TO any retainer or fee agreement.

**REQUEST NO. 16:**

All engagement letters with YOUR counsel RELATING TO this ACTION.

**REQUEST NO. 17:**

All DOCUMENTS CONCERNING the formation of BF Last Investments, LLC, INCLUDING DOCUMENTS RELATING TO its purpose, foundation date, state of formation, and principle place of business.

**REQUEST NO. 18:**

All DOCUMENTS CONCERNING the ownership interests in BF Last Investments, LLC during the CLASS PERIOD INCLUDING DOCUMENTS RELATING TO capital contributions, membership lists, and units rights and distribution agreements.

**REQUEST NO. 19:**

All DOCUMENTS and COMMUNICATIONS CONCERNING the relationship between BF Last Investments, LLC and BDV.

Dated:  February 17, 2018

By: /s/ Timothy Perla
Timothy Perla (admitted *pro hac vice*)
Robert K. Smith (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000
timothy.perla@wilmerhale.com
robert.smith@wilmerhale.com

Michael A. Mugmon (251958)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100
michael.mugmon@wilmehale.com

Christopher Davies (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile: +1 202 663 6363
christopher.davies@wilmehale.com

*Attorneys for Defendant Theranos, Inc.*

8

1

## CERTIFICATE OF SERVICE

2   I, Timothy Perla, hereby certify that, on February 17, 2017, a true and correct copy of the

3   foregoing DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF

4   DOCUMENTS TO PLAINTIFF THOMAS BRODIE was served upon the following attorneys

5   of record by electronic mail:

6   Kathleen Goodhart (kgoodhart@cooley.com)
    COOLEY LLP
7   101 California Street, 5th Floor
    San Francisco, CA 94111
8

9   Stephen C. Neal (nealsc@cooley.com)
    COOLEY LLP
    3175 Hanover Street
10  Palo Alto, CA 94304

11  *Attorneys for Defendant Elizabeth Holmes*

12  Allison A. Davis (allisondavis@dwt.com)
    DAVIS WRIGHT TREMAINE LLP
13  505 Montgomery Street, Suite 800
    San Francisco, CA 94111
14

15  Stephen M. Rummage (steverummage@dwt.com)
    DAVIS WRIGHT TREMAINE LLP
16  1201 Third Avenue, Suite 2200
    Seattle, WA 98101-3045

17  *Attorneys for Defendant Ramesh Balwani*

18
    Reed R. Kathrein (reed@hbsslaw.com)
19  Peter E. Borkon (peterb@hbsslaw.com)
    HAGENS BERMAN SOBOL SHAPIRO LLP
20  715 Hearst Avenue, Suite 202
    Berkeley, CA  94710
21

22  Steve W. Berman (steve@hbsslaw.com)
    HAGENS BERMAN SOBOL SHAPIRO LLP
23  1918 Eighth Avenue, Suite 3300
    Seattle, WA  98101
24

25  *Attorneys for Plaintiffs and Proposed Lead Counsel for the Class*

26

27

28

9

Paul J. Geller (pgeller@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432

Dennis J. Herman (dennish@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104

Jason A. Forge (jforge@rgrdlaw.com)
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

*Additional Counsel for Plaintiffs*

By:/s/ Timothy Perla
    Timothy Perla (admitted *pro hac vice*)
    WILMER CUTLER PICKERING
       HALE AND DORR LLP
    60 State Street
    Boston, MA 02109
    Telephone: +1 617 526 6000
    Facsimile: +1 617 526 5000
    timothy.perla@wilmerhale.com

    *Attorney for Defendant Theranos, Inc*

DEFENDANT THERANOS'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFF THOMAS BRODIE
Case No.  5:16-cv-06822-NC

# Exhibit 4b

**Black Diamond Ventures XII-B, LLC**
SUBSCRIPTION AGREEMENT

Black Diamond Ventures XII-B, LLC
400 N. Brand Blvd., Suite 950
Glendale, CA 91203

Ladies and Gentlemen:

The undersigned subscribing investor (the "undersigned") in connection with a prospective investment in Membership Interests ("Interests") in Black Diamond Ventures XII-B, LLC, a California limited liability company (the "Company"), hereby agrees as follows:

1.   Subscription.

(a)   The undersigned, intending to be legally bound, hereby irrevocably subscribes for Interests in the Company and agrees:  (i) to make a capital contribution to the Company in the amount set forth on the signature page hereof in accordance with the terms and conditions described herein and in the Operating Agreement for Black Diamond Ventures XII-B, LLC dated December 23, 2013 ("LLC Agreement"); (ii) as provided in the LLC Agreement to become a Member of the Company; and (iii) to be bound by the terms of the LLC Agreement.

(b)   The undersigned acknowledges and agrees that the undersigned is not entitled to cancel, terminate or revoke this subscription, any agreements of the undersigned hereunder, or the power of attorney granted hereby, except as otherwise set forth in this Section 1(b), and such subscription, agreements and power of attorney shall survive (i) changes in the transaction, documents and instruments described in the information furnished to the undersigned ("Information") which in the aggregate are not material or which are contemplated by such Information, and (ii) the death or disability of the undersigned; provided, however, that if the Managing Director does not accept this subscription, then this subscription, all agreements of the undersigned hereunder and the power of attorney granted hereby shall be cancelled and this Subscription Agreement will be of no force and effect.

(c)   The undersigned hereby irrevocably constitutes and appoints the Managing Director of the Company the undersigned's true and lawful representative and attorney-in-fact in the undersigned's name, place and stead, (1) to receive and pay over to the Company on behalf of the undersigned, to the extent set forth in this Subscription Agreement, all funds received hereunder, (2) to complete or correct, on behalf of the undersigned, all documents to be executed by the undersigned in connection with the undersigned's subscription for Interests, including, without limitation, filling in or amending amounts, dates, and other pertinent information, and (3) provided that no such action shall, in any manner whatsoever, impose any liability upon any Member beyond that contained in the LLC Agreement, to execute, acknowledge, swear to and file: (i) any counterparts of the LLC Agreement to be entered into pursuant to this Subscription Agreement and any amendments to which the undersigned is a signatory, (ii) any amendments to any such amendments as provided in the LLC Agreement),

TH-PLTF-001207

(iii) any agreements or other documents of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, as limited and defined in the LLC Agreement, (iv) any certificates of the limited liability company required by law and all amendments thereto, (v) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business, (vi) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company, and (vii) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which the Managing Director considers necessary or desirable to carry out the purposes of this Subscription Agreement, the LLC Agreement and the business of the Company. This power of attorney shall be deemed coupled with an interest, shall be irrevocable, shall survive the transfer of the undersigned's Interest and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the undersigned.

     2.    <u>Payment</u>.  The undersigned shall either (i) enclose herewith a certified or official bank check payable to Black Diamond Ventures XII-B, LLC, or (ii) transmit by wire transfer the amount of the capital contribution of the undersigned to an account designated by the Company pursuant to arrangements to be made with California Federal Bank.

     3.    <u>Acceptance of Subscription</u>.  The undersigned understands and agrees that the Company in its sole discretion reserves the right to accept or reject this or any other subscription in whole or in part or to cancel the offering.  No subscription shall be deemed accepted until the undersigned has been admitted as a Member in the Company.  Such admission shall be deemed an acceptance of this subscription by the Company and the Managing Director.  If this subscription is rejected by the Company in whole or in part, or if the offering is cancelled, the Company shall promptly return all or part of the funds received from the undersigned, as the case may be, without interest, and this Subscription Agreement shall thereafter be for the amount accepted, or of no further force or effect if the subscription is rejected in full, or the offering is cancelled.

     4.    <u>Representations and Warranties</u>.  The undersigned hereby acknowledges, represents and warrants to, and agrees with, the Company as follows:

     (a)    The undersigned understands that the offering and sale of the Interests is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") and/or regulations thereunder and exempt from registration or qualification under any state law, and in accordance therewith and in furtherance thereof, the undersigned for the undersigned and the undersigned's heirs, personal representatives, successors and assigns represents and warrants and agrees as follows:

     (i)    The undersigned and/or the undersigned's advisor(s) has/have received the Information and has/have carefully reviewed it and understand(s) the information contained therein as well as the LLC Agreement.

     (ii)    Standard financial information relating to the Portfolio Company (as such term is defined in the LLC Agreement) have not been provided to the Company, the Managing Director or the undersigned in connection with the undersigned's investment in the

2

Interests, but not withstanding the foregoing, the undersigned agrees that all documents, records, and books pertaining to this investment (including, without limitation, the Information) that the undersigned believes necessary for consideration and evaluation of the investment have been made available for inspection by the undersigned, and the undersigned's attorney(ies), accountant(s), or advisor(s).

(iii)     The undersigned and/or the undersigned's advisor(s) has/have had a reasonable opportunity to ask questions of and receive answers from a person or persons on behalf of the Company concerning the terms and conditions of offering of the Interests and all such questions have been answered to the full satisfaction of the undersigned and/or the undersigned's advisors, and the undersigned has/have had the opportunity to obtain any additional Information which the Company possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the Information or any other information furnished in connection with the investment.

(iv)     No oral or written representations have been made other than as stated, or in addition to those stated, in the Information, and no oral or written information furnished to the undersigned or the undersigned's advisors in connection with the offering of the Interests were in any way inconsistent with the information stated in the information.

(v)     The undersigned is not subscribing for the Interests as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or presented at any seminar or meeting, or any solicitation of a subscription by a person other than a representative of the Company.

(vi)     If the undersigned is a natural person, the undersigned has reached the age of majority in the state in which the undersigned resides.

(vii)     If the undersigned is not a natural person, the undersigned was not formed, and is not being utilized, for the specific purpose of acquiring the Interests, or, if it has been organized for such specific purpose, each of its beneficial owners is a separately "accredited investor" within the meaning given to such term in Regulation D under the Securities Act. in the event the undersigned was formed for the specific purpose of acquiring the Interests, each of the beneficial owners will complete and return to the Managing Director a copy of this Subscription Agreement verifying such individual's accredited investor status.

(viii)     Either (A) the undersigned is not purchasing the Interests with the assets of any employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA") or a plan subject to Section 4975 of the Internal Revenue Code of 1986 (the "Code"), or other similar law or (B) the use of such assets to acquire the Interests does not constitute a non-exempt prohibited transaction for purposes of ERISA and Section 4975 of the Code.

(ix)     The undersigned has consulted to the extent deemed appropriate by the undersigned with the undersigned's own advisers as to the financial, tax, legal and related matters concerning an investment in the Interests and on that basis believes that an investment in

3

the Interests is suitable and appropriate to the undersigned and has adequate means of providing for the undersigned's current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the Interests for an indefinite period of time, has no need for liquidity in such investment, and, at the present time, could afford a complete loss of such investment.

(x)     The undersigned or the undersigned's purchaser representative (including the undersigned's professional advisor(s), who are unaffiliated with and are not compensated by the Company or any affiliate or Selling Agent of the Company, as the case may be), has such knowledge and experience in financial, tax, and business matters so as to enable the undersigned to evaluate the merits and risks of an investment in the Interests, to protect the undersigned's own interests in connection with the investment, and to make an informed investment decision with respect thereto.

(xi)    The undersigned is not relying on the Company with respect to the tax and other economic considerations of an investment.

(xii)    The undersigned understands and acknowledges that the Interests have not been registered under the Securities Act or any state securities law, that transferability of the Interests is restricted under such laws and that consequently the undersigned must bear the economic risks of investment for an indefinite period. The undersigned will not sell or otherwise transfer the Interests without registration under the Securities Act or applicable state securities laws or an exemption therefrom. The undersigned represents that the undersigned is purchasing the Interests for the undersigned's own account, for investment and not with a view to or in connection with resale or distribution except in compliance with the Securities Act and applicable state law. The undersigned has not offered or sold any portion of the Interests being acquired nor does the undersigned have any present intention of dividing such Interests with others or of selling, distributing or otherwise disposing of any portion of such Interests either currently or after the passage of a fixed or determinable period of time or upon the occurrence or non-occurrence of any predetermined event or circumstance in violation of the Securities Act or applicable state law. The undersigned is aware that an exemption from the registration requirements of the Securities Act pursuant to Rule 144 promulgated thereunder is not presently available; that the Company has no obligation to register the Interests or to make available an exemption from the registration requirements pursuant to such Rule 144 or any successor rule for resale of the Interests.

(xiii)    The undersigned recognizes that investment in the Company involves substantial risks, including loss of the entire amount of such investment, and has taken full cognizance of and understands all of the risks related to the purchase of the Interests.

(xiv)    If the undersigned is a natural person, the undersigned maintains the undersigned's domicile and in not merely a transient or temporary resident in the state and at the residence address shown on the signature page of this Subscription Agreement; and if the undersigned is not a natural person, the undersigned's principal place of business is in the state and at the business address shown on the signature page of this Subscription Agreement. The offer of the Interests was made to the undersigned in such state, and the undersigned intends that the state securities laws of that state (excluding any other state law) shall govern this transaction.

4

(b)     The undersigned has a preexisting personal or business relationship with the Company, or its Managing Director to enable the undersigned to be aware of the character, business acumen and general business and financial circumstances of the person with whom such relationship exists.

(c)     The undersigned is an "accredited investor" within the meaning given to such term in Regulation D promulgated under the Securities Act.  The undersigned agrees, prior to ceasing to be a Member, to notify the Company of any change that would make the representations and warranties set forth in this Section 4(c) inaccurate or untrue or any change provided to the Company by the undersigned.  **The undersigned has initialed _all_ appropriate blank(s) next to the description of "Accredited Investor" as defined in Regulation D under the Securities Act** applicable to the undersigned.

(Initial) _____          (i)     The undersigned is a natural person who had individual income (without including any income of the person's spouse) of more than $200,000 in each of the most recent two years or joint income with the undersigned's spouse in excess of $300,000 in each of the two most recent years and who reasonably expects to reach that same income level in the current year.

(Initial) _____          (ii)    The undersigned is a natural person whose individual net worth, or joint net worth with the undersigned's spouse, is in excess of $1,000,000.[1]

(Initial) _TB_ Per Authorization   (iii)   The undersigned is an executive officer, manager or managing member of the Company or an executive officer, manager or managing member of the Managing Director.

(Initial) _____          (iv)    The undersigned is an organization described in Section 501(c)(3) of the Code, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the Interests,[2] with total assets in excess of $5,000,000.

(Initial) _____          (v)     The undersigned is a trust, with total assets in excess of $5,000,000, which was not formed for the purpose of acquiring the Interests and whose purchase

---

[1] For purposes of calculating net worth under this paragraph (the amount of assets in excess of liabilities): (A) the value of the person's primary residence shall not be included as an asset; (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of the Interests, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of the Interests exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of the Interests shall be included as a liability.

[2] The undersigned may be deemed to be "formed for the specific purpose of acquiring the Interests" if either (A) the amount of the undersigned's subscription for Interests exceeds 40% of the total assets of the undersigned or (B) interest holders of the undersigned are able to decide individually whether to participate, or the extent of their participation, in the undersigned's investment in the Company (i.e., holders of interests of the undersigned are able to determine whether their capital will form part of the capital invested by the undersigned in the Company).

TH-PLTF-001211

is directed by a person who has such knowledge and experience in financial business matters that such person is capable of evaluating the risks and merits of an investment in the Interests.

(Initial) _____          (vi)    The undersigned is a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

(Initial) _____          (vii)   The undersigned is an insurance company as defined in Section 2(13) of the Securities Act.

(Initial) _____          (viii)  The undersigned is an investment company registered under the Investment Company Act of 1940, as amended.  The undersigned acknowledges and agrees that the Company may limit the undersigned's subscription in the Interests to less than 10% of the Company's outstanding Interests.

(Initial) _____          (ix)    The undersigned is a business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940.

(Initial) _____          (x) The undersigned is a small business investment company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

(Initial) _____          (xi)    The undersigned is a plan established and maintained by a state, its political subdivisions, or an agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, with total assets in excess of $5,000,000, or an employee benefit plan within the meaning of Title I of ERISA, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of the Employee Retirement Income Security Act of 1974, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if the employee benefit plan is a self-directed plan, the investment decisions are made solely by persons that are accredited investors as defined in Regulation D under the Securities Act.  If the undersigned is, or is acting on behalf of, a trust established under an employee benefit plan as defined in and subject to ERISA, or a "plan" subject to Section 4975 of the Code (collectively, "Plans"): (A) it is aware of and has taken into consideration its fiduciary duties including the diversification requirements of Section 404(a)(1)(c) of ERISA; (B) it has concluded that its proposed investment in the Company is a prudent one; (C) the fiduciary trustee or other person signing this Subscription Agreement on behalf of the undersigned is independent of the Managing Director; (D) this subscription and the investment contemplated hereby are in accordance with all requirements applicable to the Plan under its governing instruments and under ERISA; (E) the undersigned acknowledges and agrees that the Managing Director is not a "fiduciary" (within the meaning of Section 3(21) of ERISA) with respect to any assets of the Plan by reason of the undersigned's investment in the Company and that the undersigned has not and is not relying on the Managing Director to provide, and it has not provided, any kind of investment advice with respect to the Company's purchase; (F) the undersigned acknowledges and agrees that in the event the managing Director or any member, employee, agent or Affiliate of the Managing Director is ever held to be a fiduciary of the Plan, the person acting for the Plan

6

and not the Managing Director nor any member, employee, agent or Affiliate of the Managing Director will bear the fiduciary responsibility to the Plan with respect to the overall prudence, liquidity nd diversification of the underlying assets (including the specific investments, as they may be constituted from time to time) of the Company; and (G) the undersigned acknowledges and agrees that the Managing Director may, in its sole discretion, for the purpose of avoiding "significant participation" by Plans, restrict investments in the Company by the Plan, exclude additional investments by the Plan or require the Plan to withdraw part or all of the Plan's investment in the Company at any time and from time to time.

(Initial) _____          (xii)   The undersigned is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(Initial) _____          (xiii)   The undersigned is an entity, including a grantor trust, in which all of the equity owners meet the requirements of at least one of the above subparagraphs for accredited investors.  For this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust is an equity owner.

(d)    The Financial Industry Regulatory Authority ("FINRA) restricts certain persons from holding a beneficial interest in "new issues," which is defined by FINRA Rule 5130 to mean any initial public offering of equity securities.  The Company may, from time to time, directly or indirectly participate in new issues, from which allocations to certain persons may be restricted.  In order to determine the undersigned's eligibility to participate in new issues, the undersigned must complete Schedule A attached hereto.  **If the undersigned fails to supply all the information requested in Schedule A, the undersigned will not be eligible to participate in new issues.**

(e)    The undersigned's overall commitment to investments which are not readily marketable is reasonable in relation to the undersigned's net worth.

(f)    The undersigned agrees to notify the Managing Director immediately if any representation or warranty contained in this Subscription Agreement, including all attachments, becomes untrue at any time.  The undersigned agrees to provide such information and execute and deliver such documents as the Company may reasonably request to determine the undersigned's eligibility to purchase Interests in the Company or to verify the accuracy of the undersigned's representations and warranties herein, to comply with any law or regulation to which the Company may be subject or for any other reasonable purpose.

(g)    The undersigned hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances to which the Company is subject, including without limitation, such additional information as the Company may deem appropriate with regard to the undersigned's suitability to invest in the Company.

(h)    The undersigned acknowledges:

(i)    In making an investment decision the undersigned has relied on the undersigned's own examination of the Company and the terms of the Offering, including the merits and risks involved.  THESE INTERESTS HAVE NOT BEEN RECOMMENDED OR

7

TH-PLTF-001213

APPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE INFORMATION IN THIS DOCUMENT OR ANY OTHER INFORMATION FURNISHED TO THE UNDERSIGNED. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

(ii)     The execution and delivery by the undersigned and compliance by the undersigned with this Subscription Agreement, the LLC Agreement and each other document required to be executed and delivered by the undersigned in connection with this subscription for Interests does not conflict with, or constitute a default under, any instrument governing the undersigned, any law, regulation or order, or any agreement to which the undersigned is a party or by which the undersigned is bound.

(iii)     This Subscription Agreement and the LLC Agreement have been duly executed by the undersigned and constitutes, and, in the case of the LLC Agreement, when the undersigned is admitted as a Member, will constitute, a valid and legally binding agreement of the undersigned, enforceable against the undersigned according to their terms.

(iv)     The undersigned, if executing this Subscription Agreement in a representative or fiduciary capacity, has full power and authority to execute and deliver this Subscription Agreement in such capacity and on behalf of the subscribing individual, ward, partnership, trust, estate, corporation, or other entity for whom the undersigned is executing this Subscription Agreement, and such individual, ward, partnership, trust, estate, corporation, or other entity has full right and power to perform pursuant to this Subscription Agreement and make an investment in the Company.

(v)     The representations, warranties, and agreements of the undersigned contained herein and in any other writing delivered in connection with the transactions contemplated hereby are made with the intent that they be relied on by the Company and the Managing Director in determining the undersigned's suitability as a purchaser of an Interest, shall be true and correct in all respects on and as of the date of the acceptance of the subscription, as if made on and as of such date, and shall survive the execution and delivery of this Subscription Agreement and the purchase of the Interests.

(vi)     The undersigned acknowledges and agrees that the LLC Agreement, together with the representations set forth in this Subscription Agreement, shall contain the entire understanding and agreement with respect to the undersigned's subscription for, and purchase and ownership of, the Interests, and shall supersede any and all other written materials respecting the Company, including, but not limited to, the Information. Other than as set forth herein or in the LLC Agreement or the Information, the undersigned is not relying upon any other information, representation or warranty by the Company, the Managing Director or any agent or representative of them in determining whether to invest in the Company.

(m)     The undersigned agrees that, except in cases of actual fraud or willful misconduct or gross negligence, it shall have no actionable claim or claims against the Company, the Managing Director, any of their respective partners members, employees, agents or any

8

respective Affiliate (as defined in the LLC Agreement) of any of the foregoing, with respect to or arising out of any information, statement or projection respecting the Company, whether written or oral, and including, but not limited to, any such information, statement or projection made or provided in the Information, which is not fully expressed in this Subscription Agreement, the LLC Agreement, or in any side letter to which the undersigned is a party.  Further, the undersigned acknowledges and agrees that this Subscription Agreement and any side letter to which the undersigned is a party are each separate agreements by and between the undersigned and the Managing Director.

(n)    The undersigned acknowledges that the Company, and the Managing Director and certain of their Affiliates are subject to certain anti-money laundering and related provisions and otherwise prohibited from engaging in transactions with, or providing services to, certain foreign countries, territories, entities and individuals, including without limitation, specially designated nationals, specially designated narcotics traffickers and other parties subject to United States government or United Nations sanctions and embargo programs. In furtherance of the foregoing:

(i)    The undersigned hereby represents and warrants the following and shall promptly notify the Managing Director if any of the following ceases to be true and accurate:

A.    To the best of the undersigned's knowledge based upon appropriate diligence and investigation, none of the cash or property that the undersigned has paid or will pay or contribute to the Company has been or shall be derived from or related to any activity that is deemed criminal under United States law, nor will the proposed investment by the undersigned in the Company, which is being made on its own behalf or, if applicable, on behalf of any beneficial owners, directly or indirectly contravene United States federal, state, international or other laws or regulations, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the USA Patriot Act and the United States International Money Laundering Abatement and Financial Anti-Terrorist Act of 2001 (collectively, the "AML Laws").

B.    No contribution or payment by the undersigned to the Company or the Managing Director, to the extent within the undersigned's control, shall cause the Company or Managing Director to be in violation of any AML Laws.

(ii)    The undersigned understands and agrees that if at any time it is discovered that any of the representations in this Section 4(n)(ii) are untrue or inaccurate, or if otherwise required by applicable law or regulation related to money laundering and similar activities, the Managing Director may undertake appropriate actions to ensure compliance with applicable law or regulation, including, but not limited to, segregation or redemption of the undersigned's investment in the Company.

(iii)    The undersigned is not (i) identified on the U.S. Department of Treasury Office of Foreign Assets Control ("OFAC") list of Specially Designated Nationals and Blocked Persons (the "SDN List") codified at 31 CFR Ch. V Annex A, as amended from time to

TH-PLTF-001215

time;[3] (ii) owned or controlled by or acting on behalf of any person or entity listed on the SDN List; (iii) the target of any sanction, regulation or law promulgated by OFAC or any other U.S. governmental entity (such sanctions, regulations and laws, together with any supplement or amendment thereto, the "U.S. Sanctions Laws") such that the entry into this Subscription Agreement or the performance of any of the transactions contemplated hereby would contravene such U.S. Sanctions Laws; or (iv) owned or controlled by or acting on behalf of any person or entity that is the target of any U.S. Sanctions Laws such that the entry into this Subscription Agreement or the performance of any of the transactions contemplated hereby would contravene such U.S. Sanctions Laws.

(iv)     The undersigned understands, acknowledges, represents and agrees (i) that the acceptance of this Subscription Agreement, together with the appropriate remittance, will not breach any applicable money laundering or related rules or regulations (including, without limitation, any statutes, rules or regulations in effect under the laws of the United States pertaining to prohibitions on money laundering or to transacting business or dealing in property that may be blocked or may belong to Specially Designated Nationals (as such term is used by the OFAC); (ii) to promptly provide to the Company or the Managing Director, any administrator administrating the Company (the "Administrator"), or any other party designated for receipt of such information, documentation verifying its identity and/or source of funds, as well as the identity of any of its legal or beneficial owners or related parties or Affiliates; (iii) that, due to anti-money laundering requirements within their respective jurisdictions (which requirements are in effect at the time this Subscription Agreement is submitted to the Company or the Managing Director or which become effective at any future time), the Company and the Managing Director may require further evidence of the undersigned's identity and/or source of funds before this Subscription Agreement can be processed, and the Company or the Managing Director may be required to take such other actions as may be necessary for the Company or the Managing Director to comply with such anti-money laundering regulations; (iv) that it hereby consents to disclosure to third parties of information provided pursuant to this Section 2(p); and (v) to hold harmless and indemnify each of the Company, the Managing Director and their respective Affiliates against any losses arising from the failure to process the undersigned's Subscription Agreement if the undersigned does not provide such requested information.

(v)     The undersigned understands, acknowledges, represents and agrees that many jurisdictions are in the process of changing or creating anti-money laundering, embargo and trade sanctions, or similar laws, regulations, requirements (whether or not with force of law) or regulatory policies and that many financial intermediaries are in the process of changing or creating responsive disclosure and compliance policies (collectively, "Requirements"), and that the Company and/or the Managing Director, as applicable, could be requested or required to obtain certain assurances from the undersigned and disclose information pertaining to the undersigned to governmental, regulatory or other authorities or to financial intermediaries or engage in further due diligence or take other related actions in the future.  The undersigned understands, acknowledges, represents and agrees that it is the Company's and the Managing Director's policy to comply with Requirements to which it is or may become subject and to interpret them broadly in favor of disclosure.  The undersigned hereby agrees, and by reason of owning any Interests will be deemed to have agreed, to provide additional information or take such other actions as may be necessary or advisable for the Company (in the Managing

---

[3] The OFAC SDN list may be found at http://www.ustreas.gov/offices/enforcement/ofac/sdn/index.html.

TH-PLTF-001216

Director's sole judgment) and/or the Managing Director to comply with any Requirements, related legal process or appropriate requests (whether formal or informal) or otherwise. The undersigned hereby consents, and by reason of owning any Interests will be deemed to have consented, to any disclosure by the Company and its agents or delegates to relevant third parties of information pertaining to such undersigned in respect of Requirements or information requests related thereto. If the undersigned is acquiring its Interests through a broker-dealer, the undersigned hereby expressly consents to such broker-dealer or its Affiliates sharing any and all customer identification, "know your client," anti-money laundering and other similar identifying personal and/or corporate, organizational or beneficial ownership information or data that may be, or is, subject to any privacy laws with the Company, the Managing Director and their respective Affiliates, designees, officers, employees, directors, partners, agents, legal representatives and controlling persons.

(vi)   The undersigned understands, acknowledges and agrees that the Company may not accept any amounts from a prospective Limited Partner if it cannot make the representations set forth in this Section 2(p). If an existing Limited Partner cannot make these representations, the Company and/or the Managing Director may take such action as may be required under applicable law and the LLC Agreement. The undersigned is advised that, by law, the Company and/or the Managing Director may be obligated to "freeze the account" of the undersigned by prohibiting additional subscriptions from the undersigned, declining any withdrawal requests and/or segregating the assets in the account in compliance with governmental regulations, and the Company and/or the Managing Director may also be required to report such action and to disclose the undersigned's identity to applicable governmental authorities. The undersigned further acknowledges that the Company and/or the Managing Director may, by written notice to the undersigned, suspend the payment of withdrawal proceeds payable to the undersigned if the Company and/or the Managing Director reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company and/or the Managing Director or any of the Company's other service providers.

(vii)   The undersigned understands, acknowledges, represents and agrees that, to the best of its knowledge, none of (i) the undersigned; (ii) any person controlling or controlled by the undersigned; (iii) if the undersigned is a privately held entity, any person having a beneficial interest in the undersigned; or (iv) any person for whom the undersigned is acting as agent or nominee in connection with this investment is a senior foreign political figure[4] or any immediate family member[5] or close associate[6] of a senior foreign political figure as such terms are defined in the footnotes below.

---

[4] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.
[5] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.
[6] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure and includes a person who

TH-PLTF-001217

(viii)   If the undersigned is a non-U.S. banking institution (a "Non-U.S. Bank") or if the undersigned receives deposits from, makes payments on behalf of, or handles other financial transactions related to, a Non-U.S. Bank, the undersigned understands, acknowledges, represents and agrees to the Company that: (i) the Non-U.S. Bank has a fixed address, other than solely an electronic address, in a country in which the Non-U.S. Bank is authorized to conduct banking activities; (ii) the Non-U.S. Bank employs one or more individuals on a full-time basis; (iii) the Non-U.S. Bank maintains operating records related to its banking activities; (iv) the Non-U.S. Bank is subject to inspection by the banking authority that licensed the Non-U.S. Bank to conduct banking activities; and (v) the Non-U.S. Bank does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a regulated Affiliate.

(ix)   The undersigned agrees to notify the Company and/or the Managing Director promptly in writing should the undersigned become aware of any change in the information set forth in these representations.

(x)   The undersigned acknowledges that the Company, the Managing Director or any administrator or management company or company acting on behalf of the Company may require further documentation verifying the undersigned's identity or the identity of the undersigned's beneficial owners, if any, and the source of funds used to purchase the Interest. The undersigned hereby agrees to provide such documentation as may be requested by the Managing Director. Furthermore, the undersigned acknowledges and agrees that the Company or Managing Director may release confidential information regarding the undersigned and, if applicable, any of the undersigned's beneficial owners, to government authorities if the Managing Director, in its sole discretion, determines after consultation with counsel that releasing such information is in the best interest of the Company in light of any AML Law.

(o)   Upon the Managing Director's acceptance of this Subscription by admitting the undersigned to the Company, and receipt of the minimum subscriptions, the undersigned's contribution to the Company deposited herewith may be transferred to the Company.

5.   <u>Indemnification</u>.   The undersigned agrees to indemnify and hold harmless the Company and its Managing Director and any of their partners, members, employers, agents or any respective Affiliate from and against any and all loss, liability, claim, damage, and expense whatsoever (including, without limitation, any and all expenses including attorneys fees reasonably incurred in investigating, preparing, or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any breach of a representation or warranty or breach or failure by the undersigned to comply with any covenant or agreement made by the undersigned herein or in any other document furnished by the undersigned to any of the foregoing in connection with this transaction, including without limitation arising as a result of the sale or distribution of the Interests by the undersigned in violation of the Securities Act or other applicable law. This indemnity is given in favor of the Managing Director in its own capacity and as trustee and agent for and on behalf of each beneficiary of a party to this Subscription Agreement.

---

is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

TH-PLTF-001218

6.    Irrevocability; Binding Effect; Entire Agreement.    The undersigned hereby acknowledges and agrees that the subscription hereunder is irrevocable by the undersigned, that, except as required by law, the undersigned is not entitled to cancel, terminate, or revoke this Subscription Agreement or any agreements of the undersigned hereunder, and that this Subscription Agreement and such other agreements shall survive the death or disability of the undersigned and shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.    If the undersigned is more than one person, the obligations of the undersigned hereunder shall be joint and several and the agreements, representations, warranties, and acknowledgments herein contained shall be deemed to be made by and be binding upon each such person and his/her heirs, executors, administrators, successors, legal representatives, and permitted assigns.  This Subscription Agreement sets forth the entire agreement and understanding among the parties hereto with respect to the transactions contemplated hereby and supersedes any and all prior agreements and understandings relating to the subject matter hereof.

7.    Modification.  Neither this Subscription Agreement nor any provision hereof shall be waived, modified, discharged, or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge, or termination is sought.

8.    Notices.  Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by certified mail, return receipt requested, sent by reputable overnight delivery service, or be personally delivered to the party to whom it is to be given (a) if to the Company, at the address set forth above, or (b) if to the undersigned, at the address set forth on the signature page hereof (or, in either case, to such other address as the party shall have furnished in writing in accordance with the provision of this Section 8).  Any notice or other communication given by certified mail shall be deemed given two business days after deposit in the mail, one business day after deposit with a reputable overnight delivery service, or on personal delivery, except for a notice changing a party's address which shall be deemed given at the time of receipt thereof.

9.    Assignability.  This Subscription Agreement and the rights and obligations hereunder are not transferable or assignable by the undersigned.

10.    Applicable Law.  This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to residents of California executing contracts wholly to be performed in California.

11.    Nature of Subscriber.  The undersigned is (check one):

☐    (a)    One or more individuals;
☐    (b)    A corporation;
☐    (c)    A partnership;
☒    (d)    A limited liability company;
☐    (e)    A trust; or
☐    (f)    Another entity or organization, namely (please specify) _____

13

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement.

*BF hast Investments LLC*

Subscriber Name (Please Print)

*Thomas Brodie   Manager*

Subscriber Name, (Please Print)
[If more than one.]

*#1 Hummingbird lane*

Residence Address

*Rolling Hills CA 90274*

City, State, Zip Code

*Calif*

State in which Subscription Agreement signed
[if other than state of residence]:

*Thomasbrodieno@gmail.com*

E-mail Address

State and date of organization, if entity:

*CA    12/7/2009*

Total Amount of Investment:

$ *100,000*

Fill in Mailing Address only if different from Residence Address:

_____

Mailing Address

_____

City, State, Zip Code *same*

_____

Signature of Investor(s) (individual)

_____

Signature of Investor(s) (individual),
[if more than one]

By: _____

Signature of Authorized
Representative (if an organization)

Authorized Representative (Please Print)

*Thomas Brodie*

Title (Please Print)

Date of execution by Investor(s):

*12/30/13*

*27-149/135*

Social Security or Taxpayer I.D. No. (If joint purchase indicate both numbers)

Please check appropriate box:
U.S. Citizen: Yes:_____ No:_____

14

TH-PLTF-001220

# Exhibit 4c



January 21, 2014

**VIA FIRST CLASS MAIL**

Thomas Brodie, MD
BF Last Investments, LLC
#1 Hummingbird Ln.
Rolling Hills, CA 90274

       **Re:** **Black Diamond Ventures XII-B, LLC | Theranos, Inc.**
              **Series C-1 Stock Financing**

Dear Dr. Brodie:

    Enclosed please find an executed copy of the Operating Agreement regarding your investment in the above-referenced financing.

    Please do not hesitate to contact Ana Quintana at 818.245.6252 or me at 818.245.6253 should you have any questions.

Best regards,

Yasmin C. Ibarra
Office Manager

YCI:cq

Enclosure

**Black Diamond Ventures XII-B, LLC**
**400 N. Brand Blvd., Suite 950**
**Glendale, California 91203**
**T | 818.245.6252**

December 29, 2013

Dear Black Diamond Investor:

You have expressed interest in an investment in membership interests in Black Diamond Ventures XII-B, LLC, a special purpose entity that we intend to use to make an investment in Series C-1 Preferred Stock of Theranos, Inc., a Delaware corporation. Due to the unique nature and compressed timing of this investment, we have been advised by our counsel to outline the material terms and risks of this investment for you. Attached as Exhibit A to this letter is a summary of these terms and risks for your review.

Although this information has been previously communicated to you over the last couple of weeks, we are following up further as our counsel believes we should share additional information and disclosures. As you have heard on our conference calls, we are pleased with the progress of the company and are optimistic that we are participating in building a company which will significantly change the health care industry on so many levels.

To briefly summarize, the price per share of Theranos Series C-1 Preferred Stock in the transactions closing between now and December 31, 2013 is $15/share (post-split). The transaction documents implement the 5:1 forward stock split previously approved by the board and holders of a majority of the capital stock. All terms of these transactions were unanimously approved by a special committee, consisting only of directors who are independent of the founder operating on the advice of leading counsel from the top law firms in the country. The new terms are conditioned on approval of a majority of the capital stock and a majority of the common stock held by stockholders that are independent of the founder. On the recommendation of the special committee, the Board also unanimously approved the new terms.

In fulfilling those transactions and in anticipation of future equity related transactions in 2014 (from large strategic and financial partners) and opportunities under consideration and review as the company enters its next stage of growth, the Company's board of directors and management have decided to amend and restate certain of its governing and other corporate documents, enter into new agreements, adopt a new stock incentive plan, adopt certain corporate actions in order to maintain the control necessary to continue pursuing long-term value creation, and lay the foundation for future transactions. As you may know, Elizabeth Holmes, Founder and CEO of Theranos, has always maintained majority voting control since she founded the company. Elizabeth has now solidified these terms under this new stock plan.

You should not construe the contents of this letter and attached Exhibit A as legal or investment advice, but rather, you should consult with your own attorney and personal business and tax advisers to arrive at your own evaluation of the investment.

We ask that you countersign and date this letter where indicated below, acknowledging that you have read and understand the contents of this letter.  Please return your countersigned copy of this letter to us electronically via PDF or as a hard copy at the address set forth above.  Again, please feel free to call Ana Quintana at 818.245.6252 or Chris Lucas at 818.245.6251 should you have any questions regarding the enclosed.

Sincerely,

**BLACK DIAMOND VENTURES XII-B, LLC**
By:     **Black Diamond Ventures Manager XII-B, LLC, its Managing Director**

Name:   Christopher B. Lucas
Title:   Managing Director

ACKNOWLEDGED AND
AGREED:

BF Last Investments LLC
Name of Entity

Signature

Thomas Burr
Print Name

Manager
Title

311219393.1

## **EXHIBIT A**

**The information contained in this Exhibit and the letter to which it is attached is confidential. Accordingly, we request that you keep this Exhibit, its corresponding letter and the contents of each confidential. Please do not disclose, disseminate or otherwise give any information contained in this Exhibit or its corresponding letter to any other individual, other than your legal and financial advisors in connection with their provision of professional advice and counsel to you.**

You have expressed interest in an investment in membership interests in Black Diamond Ventures XII-B, LLC ("BDV"), a special purpose entity that we intend to use to make an investment in Series C-1 Preferred Stock (the "Series C-1 Financing") of Theranos, Inc., a Delaware corporation ("Theranos"). Due to the unique nature and compressed timing of this investment, we wish to outline the material terms and material risks of this investment for you, as it directly impacts your decision to invest in BDV.

### Voting Rights

The management of Theranos, Theranos's Board of Directors and an independent committee of Theranos's Board recommended that in conjunction with the Series C-1 Financing, Theranos amend and restate its governing documents to create a dual-class structure of Class A and Class B Common Stock. The purpose of this dual-class structure is to provide the founder and Chief Executive Officer of Theranos, Elizabeth Holmes (the "Founder") (who already beneficially owns a majority of Theranos's capital stock) with 100-to-1 voting rights as the sole holder of Class B Common Stock. All employee options will be issued in Class A Common Stock, and all Preferred Stock of Theranos (the "Preferred Stock") (including the Series C-1 Preferred Stock) will be convertible into Class A Common Stock, which has 1 vote per share. The Class B Common Stock receives 100 votes per share  The major implications of this change for the existing holders of Preferred Stock, as well as the recipients of Class C-1 Preferred Stock (including BDV) are outlined below.

     **(a)**    **Elimination of Consent Rights; Combined Voting.** All consent rights previously held by each series of the Preferred Stock have been eliminated, and all matters on which stockholders have the right to vote are voted on an as-converted basis with the Class A and Class B Common Stock. Due to the 100-to-1 voting rights of the Class B Common Stock, the Founder will exercise unilateral stockholder control over all decisions required under law to be put to stockholders, including, but not limited to the following:

        **(i)**     election of Theranos's Board;

        **(ii)**    amendment and/or restatement of Theranos's Certificate of Incorporation (enabling the Founder to change or derogate the rights/preferences of the Preferred Stock at will);

        **(iii)**   increasing/decreasing the number of authorized shares of existing classes/series of stock of Theranos;

1

(iv)    acquiring the equity or assets of another entity;

(v)     disposing of any of the assets of Theranos or liquidating Theranos;

(vi)    incurring debt;

(vii)   materially changing the business of Theranos; and

(viii)  creating subsidiaries.

**(b)    Mandatory Conversion of Preferred into Common.** The Founder has the power, as the holder of majority voting power, to force the Preferred Stock (including the Series C-1 Preferred Stock) to convert to Class A Common Stock at will. This would mean a loss of the Series C-1's current liquidation preference (which is discussed in further detail below). This also means that that BDV may buy Series C-1 Preferred Stock today at $15.00 per share, which tomorrow may be converted into Series A Common Stock worth significantly less.

## Governance

**(a)    Proxy Granted to Founder to Elect Board.** In the Amended and Restated Voting Agreement to be put in place in connection with the Series C-1 Financing, the Preferred Stock has granted the Founder an irrevocable proxy and power of attorney to vote for the election and removal (with or without cause) of all members of the Board. The Founder also holds a proxy and power of attorney to vote all shares granted to employees and service providers pursuant to Theranos's stock option plan. The Founder's presence is required for a quorum of the Board and any committee of the Board on which she sits (i.e., the Founder must be present for the Board or any committee of the Board on which the Founder sits to take any action).

**(b)    Stockholder Special Meetings; Inspection Rights.** Pursuant to the Amended and Restated Bylaws to be put in place in connection with the Series C-1 Financing, the stockholders of Theranos may no longer call special meetings independently of the Board or officers of Theranos. All inspection rights of Theranos's stockholders (including those previously held by the holders of Preferred Stock) are also expressly eliminated, "unless otherwise required by law or approved by the Board."

## Other rights of the holders of Preferred Stock are curtailed compared to rights typically given in venture capital preferred stock financings.

**(a)    Unilateral Redemption Right.** Theranos may unilaterally redeem any Preferred Stock (including the Series C-1 Preferred Stock) or Class A Common Stock at a price determined by Theranos's Board in good faith to be fair market value. There are no provisions allowing for appraisal or valuation of stock by an independent valuation expert. Furthermore, Theranos may redeem some shares and not others within a class or series.

**(b)    Dividends.** Whereas typically a corporation would have to declare a dividend on all series of preferred stock before declaring a dividend on common stock, in this case, Theranos's Board can declare dividends on Common Stock to the exclusion of Preferred Stock.

2

TH-PLTF-001225

This includes dividends of stock, so Theranos's Board can declare a dividend of stock on one series or class of stock to the exclusion of the others, thus diluting down the excluded classes/series of stock.

 **(c)**  **Consent Right to Future Issuances**. Whereas typically the approval of a majority in interest of the preferred stock (or specified series of preferred stock) would be required to approve the creation and issuance of new series of stock having rights superior to their own, in this case, Theranos's Board can create and issue additional series of stock without the approval of Preferred Stock.

 **(d)**  **No Demand Registration Rights or Co-Sale Rights**. Typically, preferred stockholders would receive demand registration rights and co-sale rights in a financing of this type. In this case, however, demand registration rights for Preferred Stock will be eliminated in connection with the Series C-1 Financing. The existing Right of First Refusal and Co-Sale Agreement will also be terminated in connection with the Series C-1 Financing, although a right of first refusal benefitting Theranos, and after Theranos, the Founder, stays in place via the Amended and Restated Bylaws.

 **(e)**  **Liquidation Preference.** Upon the occurrence of a liquidation event, Series C-1 Preferred Stock and Series C Preferred Stock receive a liquidation preference pro rata of $3.00 per share and $.564 per share, respectively. The liquidation price of the Series C-1 Preferred Stock is $3.00 per share, although the current price of the Series C-1 Preferred Stock in the Series C-1 Financing is $15.00 per share, because the Series C-1 Financing has been open since July 1, 2010 and the original price of the Series C-1 Preferred Stock at that time was $3.00 per share. This means that you are paying approximately five times more for your Series C-1 Preferred Stock than earlier investors in the same series stock paid. After the Series C-1 Preferred Stock and Series C Preferred Stock, the Series B Preferred Stock and Series A Preferred Stock then receive a liquidation preference pro rata of $.184628 per share and $.15 per share, respectively. In the event that amounts are insufficient to fully pay out the Series B and Series A, however, the Series B still receive a preference over the Series A.

 **(f)**  **Participating Preferred Stock**. Upon the occurrence of a liquidation event, after the Preferred Stock have received their liquidation preferences, the Preferred Stock participate with the Common Stock.

**Representations, Warranties, Deliverables and Covenants given to Series C-1 Investors.**

 **(a)**  **The Series C-1 Preferred Stock Purchase Agreement (the "Purchase Agreement") lacks representations, warranties and deliverables standard for an investment of this type**. The Purchase Agreement does not provide many of the standard representations, warranties and deliverables we would expect to see in an investment of this nature, and those that have been provided are seriously curtailed. Specifically, the Purchase Agreement does not provide the following:

   **(i)**  legal opinion,

3

(ii)     Secretary Certificate (attaching and certifying to the authenticity of such standard deliverables as Theranos's Certificate of Incorporation, Bylaws and resolutions of its Board of Directors approving the offering);

(iii)    Compliance Certificate of an officer of Theranos, certifying to the truth and correctness of Theranos's representations and warranties in the Purchase Agreement; or

(iv)    representations and warranties regarding its subsidiaries (or lack thereof), financial statements, absence of materially adverse changes, good title to properties and assets, absence of liens, absence of litigation, requisite permits; required tax returns and payments, obligations to related parties, environmental and safety laws, adequacy of corporate documents, obligations of management, 83(b) elections, material contracts, requisite consents and approvals, no conflict or violation with applicable law, material customers and suppliers, and 10b-5 disclosures.

Furthermore, the Purchase Agreement provides only curtailed representations and warranties regarding employee agreements, intellectual property and Theranos's compliance with its existing agreements.

**(b)    The Amended and Restated Investors' Rights Agreement lacks representations, warranties and covenants typical for an investment of this type**.  The Amended and Restated Investors' Rights Agreement that will be put in place in connection with the Series C-1 Financing lacks a number of standard representations, warranties and covenants to the holders of Preferred Stock, including the following:

(i)     pro rata right to future stock issuances;

(ii)    right of first refusal to preferred stockholders after exercise by Theranos; and

(iii)   standard representations and warranties, including, but not limited to, representations and warranties regarding insurance, employee agreements, employee stock, compliance with the Foreign Corrupt Practices Act and indemnification matters.

311219000.2

4

TH-PLTF-001228

# OPERATING AGREEMENT
## FOR
## BLACK DIAMOND VENTURES XII-B, LLC,
## A CALIFORNIA LIMITED LIABILITY COMPANY

## DECEMBER 23, 2013

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

311205944.5

# TABLE OF CONTENTS

**Page**

ARTICLE I ORGANIZATIONAL MATTERS ........................................................ 1

    1.1    Formation ........................................................................... 1

    1.2    Name ................................................................................ 1

    1.3    Term ................................................................................. 1

    1.4    Office and Agent .............................................................. 2

    1.5    Addresses of the Members and the Managing Director.................. 2

    1.6    Purpose and Business of the Company .................................. 2

    1.7    Title to Properties ............................................................ 2

ARTICLE II DEFINITIONS; DETERMINATIONS .................................................. 2

    2.1    Definitions........................................................................ 2

    2.2    Determinations ................................................................. 6

ARTICLE III CAPITAL CONTRIBUTIONS ........................................................ 6

    3.1    Capital Contributions; Capital Accounts and Allocations ........... 6

    3.2    Capital Accounts .............................................................. 6

ARTICLE IV DISTRIBUTIONS ...................................................................... 7

    4.1    Distribution Policy ............................................................ 7

    4.2    Cash Distributions ............................................................ 8

    4.3    Distributions in Kind......................................................... 8

ARTICLE V MANAGING DIRECTOR; MANAGEMENT FEES  AND
ORGANIZATIONAL EXPENSES ........................................................ 8

    5.1    Election of Managing Director ............................................ 8

    5.2    Management Authority ...................................................... 9

    5.3    No Liability to Members.................................................... 10

    5.4    Permitted Investments ....................................................... 10

    5.5    Other Managing Director-Sponsored Funds ........................... 10

    5.6    Management Fee .............................................................. 11

    5.7    Expenses ........................................................................ 11

    5.8    No Transfer of Managing Director's Interest; No Withdrawal or Loans ............... 11

ARTICLE VI MEMBERS .............................................................................. 12

    6.1    Limited Liability .............................................................. 12

TH-PLTF-001230

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 6.2 | Transfer of Membership Interests | 12 |
| 6.3 | Withdrawals or Resignations | 13 |
| 6.4 | No Termination | 13 |
| 6.5 | Formation of New Fund or Business Endeavor | 14 |
| 6.6 | Interest as a Member | 14 |
| 6.7 | Indemnification and Reimbursement for Payments on Behalf of a Member | 14 |
| 6.8 | Section 754 Election | 15 |
| 6.9 | Voting Rights | 15 |
| 6.10 | Meetings of Members | 15 |
| 6.11 | Member as Trustee for the Company | 15 |
| 6.12 | No Responsibility for Preformation Commitments | 15 |
| 6.13 | Rights of Judgment Creditor of Member | 16 |
| 6.14 | Member's Default on Payment of Company Expenses | 16 |
| ARTICLE VII | DISSOLUTION AND WINDING UP | 17 |
| 7.1 | Dissolution | 17 |
| 7.2 | Certificate of Dissolution | 17 |
| 7.3 | Winding Up | 18 |
| 7.4 | Final Allocation and Distribution | 18 |
| 7.5 | Limitations on Payments Made in Dissolution | 18 |
| 7.6 | Certificate of Cancellation | 19 |
| 7.7 | No Action for Dissolution | 19 |
| ARTICLE VIII | VALUATION OF COMPANY ASSETS | 19 |
| 8.1 | Normal Valuation | 19 |
| 8.2 | Restrictions on Transfer or Blockage | 19 |
| 8.3 | Objection to Valuation | 19 |
| 8.4 | Write-down to Value | 19 |
| ARTICLE IX | ACCOUNTING, RECORDS, REPORTING BY MEMBERS | 20 |
| 9.1 | Bank Accounts | 20 |
| 9.2 | Accounting Decisions and Reliance on Others | 20 |

TH-PLTF-001231

**TABLE OF CONTENTS**
(continued)

Page

9.3    Tax Matters for the Company Handled by Managing Director and Tax Matters Member ........................................................................................................ 20

ARTICLE X INDEMNIFICATION AND INSURANCE ................................................ 20

10.1    Indemnification of Members and Managing Director ............................. 20

10.2    Advance Undertakings for Indemnification............................................ 21

10.3    Advancement of Expenses ...................................................................... 21

10.4    Standards of Conduct for Indemnification.............................................. 21

10.5    Procedures to Determine Indemnification .............................................. 21

10.6    Court Order of Indemnification .............................................................. 22

10.7    Described Indemnification Rights Nonexhaustive ................................. 22

10.8    Construction of Indemnification Rights.................................................. 22

10.9    Definitions for Indemnification Provisions ............................................ 22

10.10   Insurance for Indemnification ................................................................ 23

ARTICLE XI INVESTMENT REPRESENTATIONS.................................................... 23

11.1    "Accredited Investor"; Preexisting Relationship or Experience............................ 23

11.2    No Advertising ....................................................................................... 24

11.3    Investment Intent .................................................................................... 24

11.4    Purpose of Entity.................................................................................... 24

11.5    No Registration of Membership Interest................................................. 24

11.6    Membership Interest is a Restricted Security ......................................... 24

11.7    No Obligation to Register ....................................................................... 24

11.8    No Disposition in Violation of Law........................................................ 24

11.9    Investment Risk ...................................................................................... 25

11.10   Information Reviewed ............................................................................. 25

11.11   No Representations By Company ............................................................ 25

11.12   Consultation with Attorney..................................................................... 25

11.13   Tax Consequences .................................................................................. 25

11.14   No Assurance of Tax Benefits ................................................................ 25

11.15   Indemnity ............................................................................................... 26

ARTICLE XII MISCELLANEOUS................................................................................. 26

TH-PLTF-001232

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 12.1 | Counsel to the Company | 26 |
| 12.2 | Complete Agreement | 27 |
| 12.3 | Amendments | 27 |
| 12.4 | Pronouns; Statutory References | 27 |
| 12.5 | Headings | 27 |
| 12.6 | Interpretation | 27 |
| 12.7 | References to this Agreement | 27 |
| 12.8 | Jurisdiction | 27 |
| 12.9 | Severability | 27 |
| 12.10 | Additional Documents and Acts | 28 |
| 12.11 | Notices | 28 |
| 12.12 | Reliance on Authority of Person Signing Agreement | 28 |
| 12.13 | No Interest in Company Property; Waiver of Action for Partition | 28 |
| 12.14 | Attorney Fees | 28 |
| 12.15 | Remedies Cumulative | 28 |
| 12.16 | Statement of Restrictions | 29 |
| 12.17 | No Third Party Beneficiary | 29 |
| 12.18 | Not for Benefit of Creditors | 29 |
| 12.19 | Publicity | 29 |
| 12.20 | Warranties and Representations | 29 |
| 12.21 | No Representations | 29 |
| 12.22 | Binding Effect of Agreement | 29 |
| 12.23 | Counterparts | 29 |
| 12.24 | Governing Law | 30 |

TH-PLTF-001233

# OPERATING AGREEMENT
# FOR
# BLACK DIAMOND VENTURES XII-B, LLC
# A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement is made effective as of December 23, 2013 by and among the parties listed on the signature pages hereof, with reference to the following facts:

A.     On December 23, 2013, Articles of Organization for Black Diamond Ventures XII, LLC (the "Company"), a limited liability company organized under the laws of the State of California, were filed with the California Secretary of State.

B.     The Parties desire to adopt and approve an operating agreement for the Company.

C.     The Parties intend that the Company will be classified as a partnership for tax purposes.

NOW, THEREFORE, the parties, by this Agreement, set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

## ARTICLE I

## ORGANIZATIONAL MATTERS

1.1     <u>Formation</u>.   The Members have formed a California limited liability company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement, which Agreement shall be deemed effective as of the date the Articles were so filed.   The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.   To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

1.2     <u>Name</u>. The name of the Company shall be "Black Diamond Ventures XII-B, LLC." The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managing Director deems appropriate or advisable. The Managing Director shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managing Director considers appropriate or advisable. The phrase "LLC" shall always appear as part of the name of the Company on all correspondence, stationery, checks, invoices and any and all documents and papers executed by the Company.

1.3     <u>Term</u>. The Company will terminate on December 23, 2043, except that, with the consent of a Majority-in-Interest of the Members, the term of the Company may be

TH-PLTF-001234

extended by the Managing Director for additional one-year periods (but not for more than a total of two additional years).

      1.4    Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of California.  The principal office of the Company shall be 400 North Brand Boulevard, Suite 950, Glendale, California, 91203, or such other location as the Managing Director may determine from time to time.  The Company may also have such offices, anywhere within and without the State of California, as the Managing Director may determine from time to time, or the business of the Company may require.  The registered agent shall be as stated in the Articles or as otherwise determined by the Managing Director.

      1.5    Addresses of the Members and the Managing Director.  The respective addresses of the Members and the Managing Director shall be maintained in the records of the Company at its principal executive offices.  A Member shall notify the Managing Director if his or her address changes.

      1.6    Purpose and Business of the Company.  The Company is organized for the specific object and purpose of making an equity investment in Theranos, Inc.

      1.7    Title to Properties.  Real and personal property owned or purchased by Company shall be held and owned, and conveyance made, in the name of the Company. Instruments and documents providing for the acquisition, mortgage or disposition of property of the Company shall be valid and binding upon the Company, except as otherwise limited in the Agreement, if executed by the Managing Director.

## ARTICLE II

### DEFINITIONS; DETERMINATIONS

      2.1    Definitions.  For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

      "Act" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

      "Affiliate" of a Member or Managing Director shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member or Managing Director, as applicable.  The term "control," as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

2

TH-PLTF-001235

"Assignee" shall mean the owner of an Economic Interest who has not been admitted as a Member in accordance with Section 6.2.

"Basis" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to clause (iii) of the definition of Realized Investment Loss (as the case may be) and as further adjusted to reflect the effects of any transaction described in Section 2.2(a).

"Capital Account" has the meaning set forth in Section 3.2.

"Capital Contribution" means the aggregate amount of cash agreed to be contributed as capital by the Members, as set forth on Schedule I, plus additional expenses contributed pursuant to Section 5.7.

"Carried Interest" means the Managing Director's 20% interest in the Net Profits and Net Loss allocated to the Managing Director pursuant to Sections 3.2(c)(iii) and 3.2(d)(iii).

"Code" means the Internal Revenue Code of 1986, as in effect on the date hereof and, at the discretion of the Managing Director, including any such amendment thereto which does not change the economic terms hereof.

"Company Expenses" means all costs and expenses relating to the Company's activities and business including, but not limited to, (i) legal, accounting, auditing and other fees and expenses (including, but not limited to, expenses associated with the preparation of Company financial statements, tax returns and forms K-1), (ii) extraordinary expenses of the Company (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements), (iii) all costs and expenses attributable to acquiring, holding, monitoring and disposing of the Portfolio Company securities (including, but not limited to, registration expenses and brokerage, finders', custodial and other fees) and (iv) the Management Fee, including Organizational Expenses.

"Current Income" means all interest and dividend income (including original issue discount and payment of in-kind income) from investments (other than Short-Term Investments).

"Defaulting Member" has the meaning set forth in Section 6.14.

"Dissolution Event" shall mean the death, insanity, withdrawal, resignation, removal, retirement, expulsion, Bankruptcy or dissolution of the Managing Director.

"Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company or, except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of the Company.

"Effective Date" means December 23, 2013.

3

311205944.5

TH-PLTF-001236

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Indemnifying Member" has the meaning set forth in Section 6.7.

"Majority-In-Interest" shall mean those Members who hold a majority Percentage Interests as set forth in Schedule I.

"Management Fee" has the meaning set forth in Section 5.6.

"Managing Director" means Black Diamond Ventures Manager XII-B, LLC, or any other Person that may accompany or succeed such entity as a Managing Director of the Company.

"Managing Director-Sponsored Fund" means any private venture capital equity fund hereafter sponsored by the Managing Director, and the "Managing Director-Sponsored Funds" means all of such funds, collectively.

"Members" means the Persons listed in Schedule I hereto in their capacity as Members of the Company and each Assignee who is admitted to the Company as a Member pursuant to Section 6.2, so long as each such Person continues to be a Member of the Company hereunder.

"Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company, together with the obligations of such Member to comply with all terms and provisions of the Agreement. A Membership Interest constitutes personal property. A Member or Assignee of any Membership Interest has no interest in specific property of the Company.

"Net Loss" for any period means, (x) the sum of (1) the Company's Realized Investment Loss and (2) Company Expenses for such period minus (y) the sum of (3) the Company's Current Income and (4) Realized Investment Gain for such period.

"Net Profits" for any period means (x) the sum of (1) the Company's Current Income and (2) Realized Investment Gain for such period minus (y) the sum of (3) the Company's Realized Investment Loss and (4) Company Expenses for such period.

"NMS" means the National Association of Securities Dealers Automated Quotation System, National Market System.

"Organizational Expenses" means the reasonable expenses (including, without limitation, travel, printing, legal and accounting fees and expenses) incurred in connection with the organization and funding of the Company.

"Payout" means the time when each Member has received cumulative distributions from the Company (regardless of the source or character thereof) in an amount equal to his or her aggregate Capital Contributions. If a distribution of cash or securities causes

4

TH-PLTF-001237

the Company to reach and exceed Payout, the portion of the amount distributed which was necessary to reach Payout will be deemed to have been distributed before Payout, and any remaining amount will be deemed to have been distributed after Payout.

"Percentage Interests" shall mean a Member's percentage interest in the Company as set forth in Schedule I hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

"Person" means an individual, partnership, corporation, association, joint stock company, trust, joint venture, unincorporated organization, or governmental entity or any department, agency or political subdivision thereof.

"Portfolio Company" means Theranos, Inc.

"Portfolio Company Fees" means (i) all compensation (whether in cash or securities) directly or indirectly received by the Managing Director or his employees or agents from the Portfolio Company, whether as director fees, management fees, consultant fees or investment banking fees, and (ii) all breakup fees, litigation proceeds or commitment fees received by the Managing Director or any of his employees or agents from transactions not consummated by the Company (in each case, net of all amounts necessary to reimburse the Managing Director and any of his employees or agents for all costs and expenses incurred by any of them in connection with consummated or unconsummated transactions or in connection with generating any such fees and not previously reimbursed), but not including any amount received by the Managing Director or any of his employees or agents from the Portfolio Company as reimbursement for out-of-pocket expenses directly related to the Portfolio Company.

"Prime Rate" means, on any date, a variable rate per annum equal to the rate of interest published, from time to time by *The Wall Street Journal* as the "prime rate" at large U.S. money center banks.

"Realized Investment Gain" means the difference between (i) the sum of (A) the proceeds from the sale of the Portfolio Company securities plus (B) the value (as determined pursuant to Article VIII) of the Portfolio Company securities distributed to the Members minus (ii) the Basis of such Portfolio Company securities, where such difference is a positive number.

"Realized Investment Loss" means the difference between (i) the sum of (A) the proceeds from the sale of the Portfolio Company securities plus (B) the value (as determined pursuant to Article VIII) of the Portfolio Company securities distributed to the Members minus (ii) the Basis of such Portfolio Company securities, where such difference is a negative number, minus (iii) the amount, as determined by the Managing Director, by which the Portfolio Company securities have permanently declined in value pursuant to Section 8.4.

"Securities Act" means the Securities Act of 1933, as amended.

"Short-Term Investment Income or Short-Term Investment Loss" means the income earned on Short-Term Investments, including any gains and net of any losses from

311205944.5

TH-PLTF-001238

dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means commercial paper, governmental obligations, money market instruments, certificates of deposit and other similar obligations and securities, in each case having a maturity of one year or less at the time of purchase by the Company.

"Tax Matters Member" (as defined in Code Section 6231) shall be Christopher B. Lucas, or his successor as designated pursuant to Section 9.3.

2.2     Determinations.

(a)     An "exchange of securities" will be treated as a sale if under generally accepted accounting principles the Company realizes gain or loss on such exchange, in which case, the Basis of the securities received in the exchange will be adjusted to take account of the gain or loss from such exchange.

(b)     Any determination by the Members pursuant to this Agreement shall be made based upon each Member's Percentage Interest.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1     Capital Contributions; Capital Accounts and Allocations.

(a)     Each Member agrees to make the Capital Contribution specified in Schedule I. Each Capital Contribution will be made by delivery of a check made payable to the Company or by means of a wire transfer of funds to an account designated by the Managing Director.

(b)     The Managing Director may cause the Company to return to the Members all or any portion of any Capital Contribution which is not invested in the Portfolio Company or used to pay Company Expenses (including Management Fees) or Organizational Expenses. Each such return of Capital Contributions shall be made pro rata among all Members in the same proportion as the Members made such Capital Contributions.

3.2     Capital Accounts. A capital account ("Capital Account") will be established for each Member on the books of the Company in accordance with the rules in the Treasury Regulations promulgated under Section 704 of the Code, and will be adjusted as follows:

(a)     Capital Contributions. A Member's Capital Contribution will be credited to his or her Capital Account when received by the Company.

(b)     Short-Term Investment Income or Loss. Short-Term Investment Income or Loss accrued in each quarterly period will be credited or debited to the Capital Accounts of the Members pro rata according to their respective Capital Contributions.

6

TH-PLTF-001239

(c)    <u>Net Profits</u>. For any period in which the Company has Net Profits, such Net Profits shall be credited:

(i)    First, in the ratio and to the extent that Net Loss was allocated under 3.2(d)(iii) below so as to offset all such Net Loss allocations with Net Profits allocations under this section 3.2(d)(ii);

(ii)    Next, in the ratio and to the extent that Net Loss was allocated under 3.2(d)(ii) below so as to offset all such Net Loss allocations with Net Profit allocations;

(iii)    Next, until such time as Payout is achieved, 100% to the Capital Accounts of the members pro rata according to their respective Capital Contributions; and

(iv)    Then, 80% to the Capital Accounts of the Members pro rata according to their respective Capital Contributions and 20% to the Capital Account of the Managing Director.

(d)    <u>Net Loss</u>.  For any period in which the Company has Net Loss, such Net Loss shall be debited:

(i)    First, in the ratio and to the extent that Net Profits were allocated under 3.2(c) above in the reverse order of such Net Profit allocations so as to offset all such Net Profit allocations with Net Loss allocations under this section;

(ii)    Next, in the ratio of Member positive Capital Account balances until no Member has a positive Capital Account balance; and

(iii)    Then, 100% against the Capital Account of the  Managing Director.

(e)    <u>Distributions</u>.  Any amount distributed to a Member will be debited against such Member's Capital Account.

(f)    <u>Timing of Adjustments</u>.  The Managing Director normally will adjust the Member's Capital Accounts at the end of each quarterly period, but may adjust them more often if a new Member is admitted to the Company or circumstances otherwise make it advisable in the Managing Director's judgment.

## ARTICLE IV

## DISTRIBUTIONS

4.1    <u>Distribution Policy</u>.  The Managing Director, at its sole discretion, shall make distributions of cash or securities at any time; provided, however, that no securities will be distributed in kind to the Members until the earlier to occur of (a) such time as such securities may be sold by or for the account of any Member pursuant to Rule 144 promulgated under the

7

TH-PLTF-001240

Securities Act, or any successor rule, following the initial public offering of the Portfolio Company, (b) any sale, refinancing or similar transaction involving the Portfolio Company ("Portfolio Company Transaction") in which shareholders of the Portfolio Company receive cash, (c) any Portfolio Company Transaction in which shareholders of the Portfolio Company receive securities, provided that all restrictions affecting transfer have lapsed, or (d) final distribution of the assets of the Company to the Members pursuant to Section 7.4(b).

  4.2 <u>Cash Distributions</u>.  The Managing Director may, at its sole discretion, distribute any portion of the net amount of Current Income, cash proceeds of any sale, refinancing or similar transaction involving the Portfolio Company, as follows:

    (i) Until such time as Payout is achieved, 100% of all distributions of cash shall be made to the Members pro rata according to their Capital Contributions.

    (ii) After such time as Payout is achieved, all distributions of cash shall be made 20% to the Managing Director and 80% to the Members pro rata according to their Capital Contributions.

  4.3 <u>Distributions in Kind</u>.

    (a) If any securities are to be distributed in kind to the Members, such securities will first be written up or down to their value (as determined pursuant to Article VIII as of the date of such distribution), thus creating Realized Investment Gain or Realized Investment Loss (if any), which shall be allocated in accordance with Section 3.2 to the Capital Accounts of the Members, and upon the distribution of such securities to such Members, the value of such securities shall be debited, in accordance with Section 3.2, to the Capital Accounts of the Members.

    (b) All distributions of securities shall be made in the ratios set forth in Section 4.2 above.

**ARTICLE V**

**MANAGING DIRECTOR; MANAGEMENT FEES
AND ORGANIZATIONAL EXPENSES**

  5.1 <u>Election of Managing Director.</u>

    (a) <u>Number, Term, and Qualifications</u>.  The Company shall initially have one (1) Managing Director.  The number of Managing Directors of the Company shall be fixed from time to time by the affirmative vote or written consent of a Majority-in-Interest, provided that in no instance shall there be less than one Managing Director.  Unless he resigns or is removed, the Managing Director shall hold office until a successor shall have been elected and qualified.  The Managing Director shall be elected by the affirmative vote or written

8

TH-PLTF-001241

consent of a Majority-in-Interest of the Members.  A Managing Director need not be a Member, an individual, a resident of the State of California, or a citizen of the United States.

(b)     <u>Resignation</u>.  The Managing Director may resign at any time by giving written notice to the Members and remaining Managing Directors, if any, without prejudice to the rights, if any, of the Company under any contract to which the Managing Director is a party.  The resignation of the Managing Director shall take effect upon receipt of that notice or at such later time as shall be specified in the notice.  Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The resignation of the Managing Director shall not affect the Managing Director's rights as a Member and shall not constitute a withdrawal of a Member.

(c)     <u>Removal</u>.  The Managing Director may be removed for "cause" by the affirmative vote of a Majority-in-Interest at a meeting called expressly for that purpose.  For purposes of this Section, "cause" shall mean fraud, gross negligence, willful misconduct, embezzlement or breach of the Managing Director's obligations under this Agreement or any employment contract with the Company.

The resignation of the Managing Director under Section 5.1(b) above or the removal of the Managing Director under Section 5.1(c) above is considered a Disuultion Event, the occurrence of which shall be treated in accordance with Section 6.9(b)(i) and Section 7.1 hereof.

5.2     <u>Management Authority</u>.

(a)     The management of the Company will be vested exclusively in the Managing Director, and the Managing Director will have full control over the business and affairs of the Company.  The Managing Director will have the power on behalf and in the name of the Company to buy, sell, hold, sell short and otherwise invest in securities of the Portfolio Company and Short-Term Investments; to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to securities held or owned by the Company; to enter into, make, and perform all contracts and other undertakings; manage and supervise such investments and engaging in such activities incidental or ancillary thereto as the Managing Director deems necessary or advisable to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole and absolute discretion, the Managing Director deems necessary or advisable or incidental thereto, including the power to acquire or dispose of any security (including marketable securities).

(b)     The Managing Director shall pay (i) all ordinary overhead and administrative expenses of the Company (including salaries and related benefits, rent, travel, entertainment and equipment expenses <u>but excluding</u> any Company Expenses and any Organizational Expenses reimbursable under Section 5.7) incurred by the Managing Director, or any of its agents or employees (to the extent not borne or reimbursed by the Portfolio Company) in connection with (A) identifying and investigating investment opportunities for the Company, (B) monitoring the Company's investments, and (C) providing Portfolio Company reports and

9

TH-PLTF-001242

information to the Members, and (ii) Organizational Expenses to the extent not reimbursed under Section 5.7.

(c)       All matters concerning (i) the allocation of Short-Term Investment Income, Current Income, Net Profits, Net Loss, Realized Investment Gain, Realized Investment Loss, Company Expenses, Organizational Expenses, Carried Interest and the distribution of net proceeds and the return of capital among the Members, including the withholding of taxes thereon, and (ii) accounting procedures and determinations, the amount of Management Fees payable by any Member, and other determinations not specifically and expressly provided far by the terms of this Agreement, shall be determined by the Managing Director in accordance with its reasonable interpretation of the provisions of this Agreement, whose determination shall be final and conclusive as to all the Members.

(d)       <u>No Individual Authority for a Member</u>.  No Member acting alone shall have any authority to act for, or to undertake or assume, any obligation, responsibility, debt or duty on behalf of the Company.

5.3       <u>No Liability to Members</u>.   Neither the Managing Director nor any employee, agent or affiliate of the Managing Director (or any of their respective shareholders, Members, directors, officers, employees, agents or affiliates), shall be liable to any Member or to the Company for any action taken, or omitted to be taken, as the Managing Director, or on behalf of the Managing Director, with respect to the Company or for any action taken, or omitted to be taken, by the Managing Director, or any of its employees, agents or Affiliates (or any of their respective shareholders, Members, directors, officers, employees, agents or Affiliates), so long as such person (a) acted in good faith, (b) acted in a manner reasonably believed to be in the best interests of the Company, and (c) was neither grossly negligent nor engaged in fraud, embezzlement or willful malfeasance.

5.4       <u>Permitted Investments</u>.   Nothing in this Agreement will restrict the Managing Director from acquiring shares of stock of the Portfolio Company, or rights convertible into or exercisable or exchangeable for any such stock, for its own account.

5.5       <u>Other Managing Director-Sponsored Funds</u>.

(a)       The Company will not purchase from or sell to another Managing Director-Sponsored Fund, except with the prior approval of a Majority-in-Interest of the Members.

(b)       The extent to which the Company purchases securities in the Portfolio Company (relative to the amount, if any, to be invested in the Portfolio Company by another Managing Director-Sponsored Fund) will be determined by the Managing Director in its sole and absolute discretion.

5.6       <u>Management Fee</u>.

(a)       The Managing Director shall be compensated, on an annual basis, for services rendered on behalf of the Company by the payment by the Members, in cash

10

TH-PLTF-001243

to the Managing Director, a fee (the "Management Fee"), equal to 2 ½% of the Capital Contributions of such Member.

(b)     Partial Year.  The Management Fee in any partial year will be prorated on a daily basis according to the actual number of days in such period.

(c)     Portfolio Company Fees.  The Management Fee payable with respect to any period will be reduced by all Portfolio Company Fees received during the immediately preceding period by the Managing Director, its employees or agents, with respect to Portfolio Company Fees, and if such Portfolio Company Fees are comprised of stock or rights convertible into or exercisable or exchangeable for stock, provided, however that such property will not be deemed to be received, for purposes of the foregoing, and therefore will not reduce the Management Fee, until such time as, and only to the extent that, the recipient thereof realizes cash proceeds with respect to such property, whether upon the sale or other transfer of such property or as distributions with respect thereto; and provided, further, that any such Portfolio Company Fees held as of the ninth anniversary of the Effective Date and not previously deemed received pursuant to this sentence will be deemed to have been received as of such date.  In the event that the amount of Portfolio Company Fees to be applied against the Management Fee for any period exceeds the Management Fee for the immediately succeeding period, such excess shall be carried forward to reduce the Management Fee payable in the following period.

(d)     Early Termination.  In the event of an early termination of the Company pursuant to Section 7.1, the Management Fee will be payable to the Managing Director through the date six months after the final distribution in connection therewith.

5.7     Expenses.  Each Member shall pay his or her pro rata share, as determined by the allocation rules in Article III, of Organizational Expenses and Company Expenses directly to the Company.  The Company shall reimburse the Managing Director for Organizational Expenses and Company Expenses.  The Company shall bill each Member annually in advance for the Management Fee.  The Company shall bill each Member annually in arrears for other Company Expenses, unless the Managing Director determines in its sole and absolute discretion to bill each Member for Company Expenses when incurred.  Such other Company Expenses billed to Members shall not exceed an aggregate $10,000 on an annual basis, unless otherwise approved by a Majority-in-Interest. For purposes of calculating gains, losses, distributions and sharing ratios, all amounts so paid shall be treated as having been paid into the Company as a Capital Contribution by each Member and as then having been paid by the Company to the Managing Director as Organizational Expenses or as Company Expenses.

5.8     No Transfer of Managing Director's Interest; No Withdrawal or Loans. The Managing Director will not sell, assign, pledge, mortgage or otherwise dispose of its Managing Director interest in the Company and will not borrow or withdraw any amount from the Company.

11

TH-PLTF-001244

## ARTICLE VI

## MEMBERS

6.1     Limited Liability.  Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, and no Member shall be liable to make a contribution to the capital of the Company to restore a negative Capital Account balance for such Member, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.  No Member shall be required to lend any funds to the Company.

6.2     Transfer of Membership Interests.

(a)     A Member may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Company (including any transfer or assignment of all or any part of its interest to a Person who becomes an assignee of a beneficial interest in the Company even though not becoming a substitute Member) unless the Managing Director has consented, in its sole and absolute discretion, to such transfer or assignment in writing, except that a Member which is a trust under an employee benefit plan may, upon prior written notice to the Managing Director, assign a beneficial interest in all or a portion of its interest in the Company to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor (in which case the transferor shall remain liable for all liabilities and obligations relating to the transferred beneficial interest).  For purposes of this Section 6.2, a change in any trustee or fiduciary of a Member will not be deemed to be an assignment or transfer of a Membership Interest pursuant to this Agreement, provided any such replacement trustee or fiduciary is also a fiduciary as defined under applicable state law and provided that income and loss allocable to the Member of the Company will continue to be included in the same filings under the same employee identification number with the Internal Revenue Service.  Accordingly, such a change in a trustee or fiduciary may be made without the prior written consent of the Managing Director, in its sole and absolute discretion, provided that the Member agrees to provide prompt written notice of such change to the Managing Director.  The voting rights of any Member's interest shall automatically terminate upon any transfer of such interest to a trust, heir, beneficiary, guardian or conservator or upon any other transfer if the transferor no longer retains control over such voting rights and the Managing Director has not consented pursuant to Section 6.2(b) to such transferee becoming a substitute Member.  No consent of any other Member will be required as a condition precedent to any such transfer or substitution.  As a condition to any transfer of a Membership Interest (including a transfer not requiring the consent of the Managing Director), the transferor and the transferee shall provide such legal opinions and documentation as the Managing Director shall reasonably request; provided that if the transfer is to be made from a Member to a co-trustee or trustee as contemplated above, an officer's certificate in form reasonably satisfactory to the Managing Director shall be delivered by the Member to the Managing Director in lieu of such legal opinions and other documentation.  Notwithstanding anything to the contrary contained in this Section 6.2, a Member may sell, assign, transfer or pledge all or any portion of the Member's interest in the Company to a "Related Person."   A "Related Person" means (a) the spouse, children, siblings, grandchildren, parents and grandparents (such persons being referred to as

12

TH-PLTF-001245

"Immediate Family Members") of (i) a Member and/or (ii) any individual holding an ownership interest in a Member (whether as shareholder, member, partner, beneficiary or otherwise), (b) any entity at least 75% directly or indirectly owned and controlled by, or trusts established for the benefit of, one or more Immediate Family Members and/or (c) any individual or entity directly or indirectly holding an ownership interest in a Member (whether as shareholder, member, partner, beneficiary or otherwise).  For purposes of the foregoing, indirectly means ownership or control through one or more entities.

        (b)      Notwithstanding anything to the contrary contained in this Section 6.2 or Section 6.14, a transferee or assignee will not become a substitute Member without the consent of the Managing Director, which the Managing Director may grant or withhold in its sole and absolute discretion, and without executing and delivering to the Managing Director a copy of this Agreement or amendment hereto in form and substance satisfactory to the Managing Director in his sole and absolute discretion.  Notwithstanding the foregoing, a Related Person shall be a substitute Member.  Any substitute Member admitted to the Company with the consent of the Managing Director will succeed to all rights and be subject to all the obligations of the transferring or assigning Member with respect to the interest to which such Member was substituted.

        (c)      The transferor and transferee of any Member's interest shall be jointly and severally obligated to reimburse the Managing Director and the Company for all reasonable expenses (including reasonable attorneys' fees and expenses) of any transfer or proposed transfer of a Member's interest, whether or not consummated.

        (d)      The transferee of any Membership Interest shall be treated as having made all of the Capital Contributions made by, and received all of the distributions received by, the transferor of such interest.

        (e)      Anything in this Agreement to the contrary notwithstanding, no Company interest shall be transferred if such transfer would cause the Company to be classified as a publicly traded partnership under the Code.

      6.3    <u>Withdrawals or Resignations</u>.  Any Member who is under an obligation solely to render services to the Company in return for its Membership Interest may withdraw or resign as a Member at any time upon one hundred twenty (120) days' prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party.  In the event of such withdrawal, the Member's Membership Interest shall be distributed pro rata among the other Members in accordance with each Member's Capital Account.  Subject to the provisions of Section 6.2 and Section 6.14, no other Member may withdraw or resign from the Company.

      6.4    <u>No Termination</u>.  The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Member will not affect the existence of the Company, and the Company will continue for the term of this Agreement until its existence is terminated as provided herein.

311205944.5

TH-PLTF-001246

6.5     Formation of New Fund or Business Endeavor.  No Member will, on account of entering into this Agreement or on account of his or her status as a Member of the Company, have any interest in the other business endeavors of the Managing Director or the other Members other than his or her interest in the Company, and no Member is, on account of entering into this Agreement or on account of his or her status as a Member of the Company, restricted from entering into any future business activity, including with any other Member.

6.6     Interest as a Member.  To the extent that the Managing Director acquires the interest of a Defaulting Member or any other Member, the Managing Director will be deemed to be a Member with respect to such interest for all purposes of this Agreement.

6.7     Indemnification and Reimbursement for Payments on Behalf of a Member.

(a)     If the Company is obligated to pay any amount to a governmental agency or to any other Person (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign Members, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the "Indemnifying Member") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payment).  At the option of the Managing Director, the amount to be indemnified may be charged against the Capital Account of the Indemnifying Member and, at the option of the Managing Director, either:

(i)     promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account but shall not be deemed a Capital Contribution hereunder), or

(ii)     the Company shall reduce subsequent distributions which would otherwise be made to the Indemnifying Member until the Company has recovered the amount to be indemnified (provided that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Indemnifying Member's Capital Account).

(b)     A Member's obligation to make contributions to the Company under this Section 6.7 shall survive the termination, dissolution, liquidation and winding up of the Company and, for purposes of this Section 6.7, the Company shall be treated as continuing in existence.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.7, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Prime Rate plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

6.8     Section 754 Election.  The Managing Director may, and upon the written request of Members holding a Majority-in-Interest the Managing Director shall, make an election provided for in Section 754 of the Code, if then permitted by applicable law.

14

311205944.5

6.9    Voting Rights.

(a)    Except as expressly provided in this Agreement or the Articles, Members shall have no voting, approval or consent rights.

(b)    Members shall have the right to approve or disapprove only the following matters:

(i)    A decision made pursuant to Section 7.1(e) to continue the business of the Company after the occurrence of a Dissolution Event.

(ii)    Except as provided in Section 6.2, the transfer of a Membership Interest and admission of the assignee as a Member of the Company.

(iii)    Any amendment of the Articles or this Agreement; and

(iv)    A decision to compromise the obligation of a Member to make a Capital Contribution or return money or property paid or distributed in violation of the Act.

(c)    Approval by Members Holding a Majority-in-Interest.  In all matters in which a vote, approval or consent of the Members is required, a vote, consent or approval of a Majority-in-Interest (or, in instances in which there are defaulting or remaining Members, non-defaulting or remaining Members who hold a Majority-in-Interest of the Membership Interests held by all non-defaulting or remaining Members) shall be sufficient to authorize or approve such act.

(d)    Approval Standard.  Except as otherwise specifically provided in this Agreement, all votes, approvals or consents of the Members may be given or withheld, conditioned or delayed as the Members may determine in their sole and absolute discretion.

6.10    Meetings of Members.  Meetings of Members may be held at such date, time and place within or without the State of California as the Managing Director may fix from time to time.

6.11    Member as Trustee for the Company.  A Member shall hold as trustee for the Company (a) specific property stated in the Articles, Agreement, or other document executed by the Member as contributed by such Member, but which was not contributed or which has been wrongfully or erroneously returned, and (b) money or other property wrongfully paid or conveyed to such Member from the Company.

6.12    No Responsibility for Preformation Commitments.  In the event that any Member (or any of such Member's shareholders or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects the Company, neither the Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument signed by all Members. Furthermore, neither the Company nor any Member shall be responsible or liable for any indebtedness or obligation that

15

TH-PLTF-001248

is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates). In the event that a Member (or any of such Member's shareholders or Affiliates, collectively, the "Liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor the other Members has any responsibility or liability for, the Liable Member shall indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur in respect thereof.

6.13    Rights of Judgment Creditor of Member. On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's Membership Interest with payment of the unsatisfied amount of the judgment with interest. To the extent so charged, the judgment creditor has only the rights of an Assignee of the Member's Membership Interest. This Section does not deprive any Member of the benefit of any exemption applicable to his Membership Interest.

6.14    Member's Default on Payment of Company Expenses. If any Member (a "Defaulting Member") fails to make full payment of any portion of his or her pro rata share of the Company Expenses when due and such failure is not cured within ten (10) business days after receipt by such Member of written notice from the Managing Director with respect to such failure to pay, the Managing Director may in its discretion undertake any one or more of the following steps:

(a)    The Managing Director may assist the Defaulting Member in finding a buyer for the Defaulting Member's Interest, provided that the Managing Director will have no obligation to contact any particular Member or other Person with regard to such sale.

(b)    The Company may pursue and enforce all rights and remedies the Company may have against such Defaulting Member with respect thereto, including a lawsuit to collect the overdue portion of the pro rata share of the Management Fees and an other amounts due the Company or Managing Director hereunder, with interest at a rate equal to the Prime Rate plus six percentage points (but not in excess of the highest rate per annum permitted by law).

(c)    The Managing Director may offer the Defaulting Member's interest to the Members (other than any Defaulting Members) pro rata in accordance with their Membership Interests on the terms set forth below. If any Member does not elect to purchase the entire interest offered to it, the remaining interest allocable to the Members will be reoffered pro rata to the Members who have purchased the entire interest offered to them until either all of such interest is acquired or no Member wishes to make a further investment. At the closing of such purchase (on a date and at a place designated by the Managing Director), each purchasing Member shall deliver a non-interest bearing, non-recourse (except to the extent of the Company interest purchased and the proceeds therefrom) ten-year promissory note (in a form approved by the Managing Director) payable to the Defaulting Member in an amount equal to the portion of the Defaulting Member's Capital Account being purchased by such Member. The Managing Director will handle the mechanics of making the offers set forth herein and will in its sole and absolute discretion impose reasonable time limits for acceptance.

16

TH-PLTF-001249

(d)     If the entire Defaulting Member's interest is not purchased in the manner set forth in (c) above, the Managing Director in its sole and absolute discretion may offer the remaining interest to a third party or parties on the same terms as originally offered to the Members pursuant to (c) above (in which case such third party or parties will, as a condition of purchasing such interest, become a party to this Agreement).

Notwithstanding anything contained herein to the contrary, from and after any date, (A) such Defaulting Member will have no right to receive any distributions, except for distributions made upon the Company's liquidation, (B) such Defaulting Member's Capital Account will not be credited with any Net Profits or Short-Term Investment Income which shall instead be allocated to the Members (other that any Defaulting Members) in accordance with Section 3.2 (and as adjusted to treat the Defaulting Member's Capital Contribution as equal to zero).

(e)     No consent of any Member shall be required as a condition precedent to any transfer, assignment or other disposition of a Defaulting Member's interest pursuant to this Section 6.14.

## ARTICLE VII

## DISSOLUTION AND WINDING UP

7.1     <u>Dissolution</u>.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a)     At the time specified in the Articles or Section 1.3 of this Agreement;

(b)     The happening of any event of dissolution specified in the Articles;

(c)     The entry of a decree of judicial dissolution pursuant to Corporations Code Section 17351;

(d)     The vote of Members holding 80% of the Percentage Interests;

(e)     The occurrence of a Dissolution Event and the failure of a Majority-in-Interest of the remaining Members to consent in accordance with Section 6.9(b)(i) to continue the business of the Company within ninety (90) days after the occurrence of such event; or

(f)     The entry of a decree of judicial dissolution under the Act.

7.2     <u>Certificate of Dissolution</u>.  As soon as possible following the occurrence of any of the events specified in Section 7.1, the Managing Directors who have not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form prescribed by the California Secretary of State and file the Certificate as required by the Act.

17

TH-PLTF-001250

7.3     <u>Winding Up</u>.  Upon the occurrence of any event specified in Section 7.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Managing Directors who have not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 7.4.  The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company.  The Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

7.4     <u>Final Allocation and Distribution</u>.

(a)     Upon termination of the Company (whether or not an early termination), the Managing Director will make a final allocation of all kinds of income, loss and expense in accordance with Article III hereof and the Company's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Members.

(b)     After determining that all the known debts and liabilities of the Company, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in the ratio of their positive Capital Account balances.

(c)     The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, has been adequately provided for if the payment has been provided for by either of the following means:

(i)     Payment thereof has been assumed or guaranteed in good faith by one or more financially responsible persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Managing Directors to be adequate at the time of any Distribution of the assets pursuant to this Section.

(ii)    The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 7.4(c) shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

7.5     <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look solely to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managing Director or any other Member.

18

311205944.5

7.6     Certificate of Cancellation. The Managing Director or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a Certificate of Cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

7.7     No Action for Dissolution.    Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that causes a Dissolution Event.

## ARTICLE VIII

## VALUATION OF COMPANY ASSETS

8.1     Normal Valuation.    For purposes of this Agreement, the value of any security as of any date (or in the event such date is a holiday or other day which is not a business day, as of the next preceding business day) will be determined as follows:

(a)     a security which is listed on a recognized securities exchange or the NMS will be valued at its last sales price or, if no sale occurred on such date, at the last "bid" price thereon;

(b)     a security which is traded over-the-counter (other than on the NMS) will be valued at the most recent "bid" price; and

(c)     all other securities will be valued on such date by the Managing Director at fair market value in such manner as it may reasonably determine.

8.2     Restrictions on Transfer or Blockage.  Any security which is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Company's holdings compared to the trading volume would affect its marketability, will be valued at such discount from the value determined under Section 8.1 above as the Managing Director deems necessary to reflect properly the marketability of such security.

8.3     Objection to Valuation.  Prior to acting upon its final valuation of any security pursuant to Section 8.1(c) or 8.2, the Managing Director shall provide the Members with notice of the Managing Director's valuation of such security.  If within 15 days after delivery of such notice Members holding a Majority-In-Interest of the Membership Interests deliver written notice to the Managing Director objecting to the valuation of such security, then the Managing Director will (at the Company's expense) cause an independent securities expert mutually acceptable to the Managing Director and Members holding a majority of the Membership Interests to review such valuation, and such expert's determination will be binding on the parties.

8.4     Write-down to Value. Any securities which have permanently declined in value as determined by the Managing Director will be written down to their value pursuant to the provisions of this Article VIII as of the date of such determination.

311205944.5

TH-PLTF-001252

## ARTICLE IX

## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1     Bank Accounts. The Managing Director shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.2     Accounting Decisions and Reliance on Others.   All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managing Director. The Managing Director may rely upon the advice of their accountants as to whether such decisions are in accordance with generally accepted accounting principles or with accounting methods followed for federal income tax purposes.

9.3     Tax Matters for the Company Handled by Managing Director and Tax Matters Member. The Managing Director shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Member shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Member shall oversee the Company tax affairs in the overall best interests of the Company but shall not have the right to agree to extend any statute of limitations without the approval of a Majority-in-Interest. If for any reason the Tax Matters Member can no longer serve in that capacity or ceases to be a Member or Managing Director, as the case may be, a Majority-in-Interest may designate another to be Tax Matters Member.

## ARTICLE X

## INDEMNIFICATION AND INSURANCE

10.1     Indemnification of Members and Managing Director.   To the greatest extent not inconsistent with the Act and the other laws and public policies of the State of California, the Company shall indemnify each of their respective employees, agents and affiliates, including without limitation the Managing Director and the Members, stockholders and employees of the Managing Director, against any losses, liabilities, damages or expenses (including amounts paid for reasonable attorneys fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative) to which any of such Persons may become subject in connection with the Company or in connection with any involvement with the Portfolio Company (including serving as an officer, director, consultant or employee of the Portfolio Company) directly or indirectly on behalf of the Company, provided that it shall be determined in the specific case in accordance with Section 10.4 of this Article X that indemnification of such Person is permissible in the circumstances because the Person has met the standard of conduct for indemnification set forth in this Article X.   Notwithstanding any provision hereof, no Member shall have any

20

TH-PLTF-001253

obligation to indemnify any such Person if such indemnification would cause such Member to violate any provision of ERISA or the rules and regulations promulgated thereunder.

10.2 <u>Advance Undertakings for Indemnification</u>. To the greatest extent not inconsistent with the Act and other laws and public policies of the State of California, Company shall pay for or reimburse the reasonable expenses incurred by a Member or Managing Director in connection with any such proceeding as incurred in the advance of final disposition of the action, suit, or proceeding thereof if (a) the Person furnishes Company a written affirmation of the Person's good faith belief that it has met the standard of conduct for indemnification described in Section 10.4, (b) the Person furnishes the Company a written undertaking, executed personally or on such Person's behalf, to repay the advance if it is ultimately determined by a court of competent jurisdiction that such Person did not meet such standard of conduct and that it is not entitled to be indemnified, and (c) a determination is made in accordance with Section 10.5 that based upon facts then known to those making the determination, indemnification would not be precluded under this Article.

The undertaking described above must be a general obligation of the Person, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify a Member or Managing Director who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the Person in connection with the proceeding without the requirement of a determination as set forth in Section 10.5.

10.3 <u>Advancement of Expenses</u>. Upon demand by a Member or Managing Director for indemnification or advancement of expenses incurred in defending a civil or criminal suit or proceeding, as the case may be, the Company shall expeditiously determine whether the Member or Managing Director is entitled thereto in accordance with this Article X. The indemnification and advancement of expenses provided for under this Article X shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Agreement.

10.4 <u>Standards of Conduct for Indemnification</u>. Indemnification of a Managing Director or Member is permissible under this Article X only if (a) such Person conducted itself in good faith, and (b) reasonably believed that its conduct was in or at least not opposed to Company's best interest; and (c) in the case of any criminal proceeding, it had no reasonable cause to believe its conduct was unlawful. The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Person did not meet the standard of conduct described in this Section 10.4.

10.5 <u>Procedures to Determine Indemnification</u>. A determination as to whether indemnification of or advancement of expenses is permissible shall be made by any one of the following procedures:

(a) By the Members in good faith by a vote of a Majority-in-Interest of Members not at the time parties to the proceedings; or

311205944.5

TH-PLTF-001254

(b)    By counsel to the Company.

10.6    Court Order of Indemnification.    A Member or Managing Director of Company who is a party to a proceeding may apply for indemnification from Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(a)    In a proceeding in which the Member or Managing Director is wholly successful, on the merits or otherwise, the Member or Managing Director is entitled to indemnification under this Article, in which case the court shall order Company to pay the Member or Managing Director its reasonable expenses incurred to obtain such court ordered indemnification; or

(b)    The Member or Managing Director is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Member or Managing Director met the standard of conduct set forth in Section 10.4 above.

10.7    Described Indemnification Rights Nonexhaustive.    Nothing contained in this Article shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any Person who is or was a Member or Managing Director of the Company or is or was serving at the Company's request as a director, officer, partner, Managing Director, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.

10.8    Construction of Indemnification Rights.    Nothing contained in this Article X shall limit the ability of the Company to otherwise indemnify or advance expenses to any person.    It is the intent of this Article to provide indemnification to Members and Managing Director to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Article X.    Indemnification shall be provided in accordance with this Article X irrespective of the nature of the legal or equitable theory upon which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of ERISA or violation of any other state or federal law.

10.9    Definitions for Indemnification Provisions.

(a)    "Expenses" mean all direct and indirect costs (including without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Article, applicable law or otherwise.

22

TH-PLTF-001255

(b)      "Liabilities" mean the obligations (including one incurred by way of settlement) to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(c)      "Party" means a Person who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(d)      "Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

10.10   Insurance for Indemnification.  To the greatest extent not inconsistent with the Act and other laws and public policies of the State of California, the Company may purchase and maintain insurance or other financial arrangements for the benefit of any Person who is or was a Member or Managing Director, employee or agent, against any liability asserted against or expenses incurred by such Person in any capacity or arising out of such Person's service with Company, whether or not Company would have the power to indemnify such Person against such liability.  The other financial arrangements made by Company may include:

(a)      The creation of a trust fund;

(b)      The establishment of a program of self-insurance;

(c)      The securing of its obligation of indemnification by granting a security interest or other lien on any assets of the Company; or

(d)      The establishment of a letter of credit, guaranty or surety.

No financial arrangement may provide protection for a Person adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable for intentional misconduct, fraud, or a knowing violation of law, except with respect to the advancement of expenses or indemnification ordered by a court.

## ARTICLE XI

## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Managing Director, the other Members, and the Company as follows:

11.1   "Accredited Investor"; Preexisting Relationship or Experience.  (a) He or she is an "accredited investor" as defined in Rule 501(a) of the general Rules and Regulations promulgated under the Securities Act by the Securities and Exchange Commission (the "SEC"), (b) he or she has a preexisting personal or business relationship with the Company or one or more of its or control Persons, or (c) by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any

23

TH-PLTF-001256

affiliate or selling agent of the Company, he or she is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his or her own interests in connection with this investment.

11.2   No Advertising.  He or she has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3   Investment Intent.  He or she is acquiring the Membership Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest.  No other Person will have any direct or indirect beneficial interest in or right to the Membership Interest.

11.4   Purpose of Entity.  If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

11.5   No Registration of Membership Interest.  He or she acknowledges that the Membership Interest has not been registered under the Securities Act, or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his or her representations, warranties, and agreements herein.

11.6   Membership Interest is a Restricted Security.  He or she understands that the Membership Interest is a "restricted security" under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely.  In this connection, he or she understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for that Rule to be available for resale of "restricted securities," including the requirement that the securities must be held for at least one year after purchase thereof from the Company prior to resale (two years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances.  He or she understands that the Company has not made such information available to the public and has no present plans to do so.

11.7   No Obligation to Register.  He or she represents, warrants, and agrees that the Company and the Managing Director are under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or her in complying with any exemption from registration and qualification.

11.8   No Disposition in Violation of Law.  Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he or she will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or her or by the Company of the Securities Act, the California Corporate Securities Law of 1968,

24

or any other applicable securities laws. Without limiting the foregoing, he or she agrees not to make any disposition of all or any part of the Membership Interest unless and until:

(a)      There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

(b)      (i) He or she has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Managing Director, he or she has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

11.9    <u>Investment Risk</u>.  He or she acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him or her of his or her entire investment in the Company, that he or she understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.   He or she is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof.

11.10    <u>Information Reviewed</u>.   He or she has received and reviewed the Agreement and all business plan information for the Company, and all other information he or she considers necessary or appropriate for deciding whether to purchase the Membership Interest.

11.11    <u>No Representations By Company</u>.   Neither the Managing Director, any agent or employee of the Company or of the Managing Director, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him or her that he or she may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Managing Director or its Affiliates or any other Person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any Distributions from the Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

11.12    <u>Consultation with Attorney</u>.   He or she has been advised to consult with his or her own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he or she considers necessary.

11.13    <u>Tax Consequences</u>.   He or she acknowledges that he or she will look solely to, and rely upon, his or her own advisers with respect to the tax consequences of this investment.

311205944.5

TH-PLTF-001258

11.14   No Assurance of Tax Benefits.  He or she acknowledges that there can be no assurance that the Code or the Treasury Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service or state or local tax authorities.

11.15   Indemnity.  He or she shall defend, indemnify and hold harmless the Company, each and every Managing Director, each and every other Member, and any officers, directors, shareholders, Managing Directors, members, employees, partners, agents, attorneys, registered representatives, and control Persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or her including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Managing Director, each and every other Member, and any officers, directors, shareholders, Managing Directors, members, employees, partners, attorneys, accountants, agents, registered representatives, and control Persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XII

## MISCELLANEOUS

12.1   Counsel to the Company.  Counsel to the Company may also be counsel to an Affiliate of a Member or Managing Director.  The Managing Director may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules").  The Company has initially selected Manatt, Phelps & Phillips, LLP ("Company Counsel") as legal counsel to the Company.  Each Member acknowledges that Company Counsel does not represent any Member in connection with their acquisition of or participation, and ownership interest, in the Company in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Managing Director (or Affiliate of a Managing Director) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Managing Director (or his or her Affiliate) or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.   Each Member further acknowledges that:  Company Counsel has represented solely the interests of the Company in connection with the formation of the Company and the preparation and negotiation of this Agreement and while communications with Company Counsel concerning the formation of the Company, its Members and Managing

26

TH-PLTF-001259

Director may be confidential with respect to third parties, no Member has any expectation that such communications are confidential with respect to each other.

12.2   Complete Agreement.  This Agreement, and the Articles constitute the complete and exclusive statement of agreement among the Members and Managing Director with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managing Director or any of them.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Managing Director or have any force or effect whatsoever.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.3   Amendments.  This Agreement may be amended by the Managing Director in any manner that does not adversely affect the rights of any Member and the Managing Director shall furnish notice of any such amendment to the Members.  This Agreement may also be amended by action taken by both (a) the Managing Director and (b) the Members owning a Majority-In-Interest of the Capital Accounts of all the Members at the time of the amendment, provided that such amendment does not discriminate among the Members.

12.4   Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Treasury Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5   Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.6   Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

12.7   References to this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

12.8   Jurisdiction.  Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.11 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California.

311205944.5

TH-PLTF-001260

12.9   Severability. If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.10   Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.11   Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Managing Director at the address specified in Schedule I hereto. Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.12   Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

12.13   No Interest in Company Property; Waiver of Action for Partition. No Member or Assignee has any interest in specific property of the Company. Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

12.14   Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (i) post-judgment motions; (ii) contempt proceedings; (iii) garnishment, levy, and debtor and third party examinations; (iv) discovery; and (v) bankruptcy litigation and (b) "prevailing party" shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

28

TH-PLTF-001261

12.15 <u>Remedies Cumulative</u>.   The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

12.16 <u>Statement of Restrictions</u>.  This Agreement and any amendments hereto constitute an "Initial Transaction Statement" as described in California Commercial Code Section 8408.

12.17 <u>No Third Party Beneficiary</u>.   The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

12.18 <u>Not for Benefit of Creditors</u>.   The provisions of the Agreement are intended only for the regulation of relations among Members and Company and the Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other Person who is not a Member, a Managing Director, or an officer.

12.19 <u>Publicity</u>.  None of the parties will make any disclosure of the transactions contemplated by the Agreement or any related agreements, or any discussions in connection therewith, without the prior written consent of each of the other parties.  The preceding sentence shall not apply to any disclosure required to be made by the Act or other applicable law as reasonably determined by counsel to the party determining that such disclosure is required, except that such party, whenever practicable, shall be required to consult with the other parties concerning the timing and content of such disclosure before making it.

12.20 <u>Warranties and Representations</u>.  Each Member separately represents and warrants that he/she/it is not a party to any pending or threatened suit, action or legal, administrative, arbitration or other proceeding which might materially and adversely affect the business of the Company or the transactions contemplated by this Agreement, nor does such Member know of any facts which are likely with the passage of time to give rise to such a suit, action or proceeding.  Each Member separately represents and warrants that he/she/it is not a party to any agreement, understanding, commitment or other obligation that prohibits or restricts such Member's performance under this Agreement.

12.21 <u>No Representations</u>.  Each of the Members acknowledges and agrees (a) that no representation or promise not expressly contained in this Agreement has been made by any of the other Members or by any of such Member's agents, employees, representatives or attorneys; and (b) that this Agreement is not being entered into on the basis of, or in reliance upon, any promise or representation, express or implied, other than such as are set forth expressly in this Agreement.

12.22 <u>Binding Effect of Agreement</u>.   This Agreement, including Section 6.2 hereof, shall be binding on the successors, assigns and the legal representatives of each of the Members.

29

TH-PLTF-001262

12.23   <u>Counterparts</u>.   This Agreement may be executed in more than one counterpart with the same effect as if the Members executing the several counterparts had all executed one document.

12.24   <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the principles of conflicts of law thereof.

311205944.5

TH-PLTF-001263

The Managing Director and all of the Members of Black Diamond Ventures XII-B, LLC, a California limited liability company, have executed this Agreement, effective as of the date first written above.

Managing Director:

BLACK DIAMOND VENTURES MANAGER XII-B, LLC, a California limited liability company

_____
Christopher B. Lucas
Managing Director

Member:

By  BFLAST Investments, LLC
Print or Type Name

By  Thomas Beadre HD, manager
Signature

12/34/13

Its
Title (for Members other than individuals)

29

311205944.5

TH-PLTF-001264

SIGNATURE PAGE FOR

LIMITED LIABILITY COMPANY AGREEMENT

OF

BLACK DIAMOND VENTURES XII-B, LLC

A CALIFORNIA LIMITED LIABILITY COMPANY

    I understand that the signature(s) subscribed below together with the signatures on the counterpart pages will be attached to the Operating Agreement for Black Diamond Ventures XII-B, LLC, a California limited liability company.

MEMBERS:

Date: 1/31/13

_____
Print Name of Member

_____
Signature
Title (for Members other than individuals)

# SCHEDULE I

## MEMBERS AND MANAGING DIRECTORS AS OF

## December 31, 2013

| Member's Name | Member's Capital Contribution | Member's Percentage Interest |
|---|---|---|
| BF Last Investments, LLC | $100,000 | 1.73% |

Managing Director's Name
Black Diamond Ventures XII – B, LLC

TH-PLTF-001266

EXHIBIT A

CERTIFICATE OF PARTNERSHIP INVESTOR

CERTIFICATE OF _____ (the "Partnership")
(Name of Partnership)

        The undersigned, constituting all of the partners of the Partnership who must consent to the proposed investment by the Partnership, hereby certify as follows:

        1.    That the Partnership commenced business on and was established pursuant to a Partnership Agreement dated _____ (the "Agreement").

        2.    That a true and correct copy of the Agreement is attached hereto and that, as of the date hereof, the Agreement has not been amended (except as to any attached amendments) or revoked and is still in full force and effect.

        3.    That, we have the authority to determine, and have determined, (i) that the investment in, and the purchase of an interest in Black Diamond Ventures XII-B, LLC is of benefit to the Partnership and (ii) to make such investment on behalf of the Partnership.

        4.    That_____
_____ is
(are) authorized to execute all necessary documents in connection with the Partnership's investment in Black Diamond Ventures XII-B, LLC.

        IN WITNESS WHEREOF, I/we have executed this certificate as the General Partner(s) of the Partnership this ____ day of _____ 201_ and declare that it is truthful and correct.

_____
(Name of Partnership)

By:_____
      General Partner

By:_____
      General Partner

(attach additional sheets if necessary)

EXHIBIT B
CERTIFICATE OF LIMITED LIABILITY COMPANY INVESTOR

CERTIFICATE OF _BF hart Investments LLC_ (the "Limited Liability Company")
<u>(Name of Limited Liability Company)</u>

      The undersigned, constituting all of the members of the Limited Liability Company who must consent to the proposed investment by the Limited Liability Company, hereby certify as follows:

      1.    That the Limited Liability Company commenced business on and was established pursuant to an Operating Agreement dated _12/7/05_ (the "Agreement").

      2.    That a true and correct copy of the Agreement is attached hereto and that, as of the date hereof, the Agreement has not been amended (except as to any attached amendments) or revoked and is still in full force and effect.

      3.    That, we have the authority to determine, and have determined, (i) that the investment in, and the purchase of an interest in _Theranos (Black Diamond)_ is of benefit to the Limited Liability Company and (ii) to make such investment on behalf of the Limited Liability Company.

      4.    That _Thomas S Burre MD_

is (are) authorized to execute all necessary documents in connection with the Limited Liability Company's investment in _Theranos (Black Diamond)_

      IN WITNESS WHEREOF, I/we have executed this certificate as the Managing Member(s) and/or _____ of the Limited Liability Company this _30_ day of _Dec_ 201_3_ and declare that it is truthful and correct.

_BF hart Investments, LLC_
<u>(Name of Limited Liability Company)</u>

By: _____
    <u>Managing Member or _____</u>

By: _____
    <u>Managing Member or _____</u>

(attach additional sheets if necessary)

EXHIBIT C

CERTIFICATE OF TRUST INVESTOR

CERTIFICATE OF _____ (the "Trust")
(Name of Trust)

        The undersigned, constituting all of the trustees of the Trust who must consent to the proposed investment by the Trust, hereby certify as follows:

        1.    That the Trust was established pursuant to a Trust Agreement dated _____ (the "Agreement").

        2.    That a true and correct copy of the Agreement is attached hereto and that, as of the date hereof, the Agreement has not been amended (except as to any attached amendments) or revoked and is still in full force and effect.

        3.    That, as the Trustee(s) of the Trust, I/we have determined that an investment in, and the purchase of, an interest in Black Diamond Ventures XII-B, LLC, is of benefit to the Trust and have determined to make such investment on behalf of the Trust.

        4.    That _____

is/are authorized to execute on behalf of the Trust, any and all documents in connection with the Trust's investment in Black Diamond Ventures XII-B, LLC.

        IN WITNESS WHEREOF, we have executed this certificate as the Trustee(s) of the Trust this ___ day of _____, 201_, and declare that it is truthful and correct.

_____
(Name of Trust)

By:_____
            Trustee

By:_____
            Trustee

(attach additional sheets if necessary)

EXHIBIT D

CERTIFICATE OF CORPORATE INVESTOR

CERTIFICATE OF _____ (the "Corporation")
(Name of Corporation)

   The undersigned, being the duly elected and acting Secretary or Assistant Secretary of the Corporation, hereby certifies as follows:

    1. That the Corporation was incorporated under the laws of the State of _____ and commenced business on _____.

    2. That a true and correct copy of the Certificate or Articles of Incorporation and Bylaws of the Corporation are attached hereto and that, as of the date hereof, the Certificate, Articles of Incorporation and Bylaws have not been amended (except as to any attached amendments) or revoked and are still in full force and effect.

    3. That the Board of Directors of the Corporation has determined that the investment in, and the purchase of, an interest in Black Diamond Ventures XII-B, LLC, is of benefit to the Corporation and has determined to make such investment on behalf of the Corporation. Attached hereto is a true, correct and complete copy of resolutions of the Board of Directors (or an appropriate committee thereof) of the Corporation duly authorizing this investment, and said resolutions have not been revoked, rescinded or modified and, at the date hereof, are in full force and effect.

    4. That the following named individuals are duly elected officers of the Corporation, who hold the offices set opposite their respective names and who are duly authorized to execute any and all documents in connection with the Corporation's investment in Black Diamond Ventures XII-B, LLC, and that the signatures written opposite their names and titles are correct and genuine signatures.

| Name | | Title | | Signature |
|------|---|-------|---|-----------|
| | | | | |
| | | | | |
| | | | | |

   IN WITNESS THEREOF, I have executed this certificate and affixed the seal of the Corporation this ____ day of _____, 201_, and declare that it is truthful and correct.

_____
(Name of Corporation)

By:_____
   Name:
   Title:

SCHEDULE A

VERIFICATION OF STATUS AS ELIGIBLE PARTICIPANT IN "NEW ISSUES"

*PLEASE INITIAL ALL APPLICABLE STATEMENTS BELOW*

A.    The undersigned is any of the following:

1.    _____    A FINRA member firm or other broker-dealer.

2.    _____    An general partner or associated person of a FINRA member firm or other broker-dealer (other than a limited business broker-dealer)[7].

3.    _____    An agent of a FINRA member firm or other broker-dealer (other than a limited business broker-dealer) that is engaged in the investment banking or securities business.

4.    _____    An immediate family member[8] of a person specified in 2 or 3 above if such person (i) receives from, or provides to, the immediate family member material support;[9] (ii) is employed by or associated with the member, or an affiliate of the member, selling the new issue to the immediate family member; or (iii) has the ability to control the allocation of the new issue..

5.    _____    A finder or other person acting in a fiduciary capacity to the managing underwriter of the new issue, including, but limited to, attorneys, accountants and financial consultants.

6.    _____    A person who has the authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment adviser or collective investment account[10].

7.    _____    An immediate family member of a person specified in 6 or 7 above who receives from, or provides to, such person material support.

8.    _____    A person listed (or required to be listed) in Schedule A of Form BD (other than with respect to a limited broker-dealer), except persons identified by an ownership code of less than 10%.

9.    _____    A person listed (or required to be listed) in Schedule B of Form BD (other than with respect to a limited broker-dealer), except persons whose listing on Schedule B relates to an ownership interest in a person listed on Schedule A identified by an ownership code of less than 10%.

10.    _____    A person listed (or required to be listed) in Schedule C of Form BD that meets the criteria specified in 8 and 9 above.

11.    _____    A person that directly or indirectly owns 10% or more of a public reporting company that is listed (or required to be listed) in Schedule A of Form BD, other than a reporting company that is listed on a national securities exchange or traded on the NASDAQ or other than with respect to a limited business broker-dealer.

12.    _____    A person that directly or indirectly owns 25% or more of a public reporting company that is listed (or required to be listed) in Schedule B of Form BD, other than a reporting company that is listed on a national securities exchange or traded on the NASDAQ or other than with respect to a limited business broker-dealer.

13.    _____    An immediate family member of a person specified in 8-12 above unless such person (i) does not receive from, or provide to, the immediate family member material support; (ii) is not an owner of the member, or an affiliate of the member, selling the new issue to the immediate family

---

[7] "Limited business broker-dealer" means a broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

[8] "Immediate family member" includes a person's parents, mother-in-law, father-in-law, spouse, brother, sister, brother-in-law, sister-in-law, son-in-law, daughter-in-law and children and any other individual to whom the person provides material support.

[9] "Material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing one another with material support.

[10] "Collective investment account" means any hedge fund, investment partnership, investment corporation or any other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities but does not include a family investment vehicle (i.e., a legal entity that is beneficially owned solely by immediate family members) or an investment club (i.e., a group of friends, neighbors or business associates or others that pool their money to invest in securities and are collectively responsible for making investment decisions).

member; and (iii) has no ability to control the allocation of a new issue.

14. _____ An account in which any of the persons referred to in 1 through 13 above has a beneficial interest.

    (a) If the undersigned initialed this statement (14), does the undersigned employ "carve out" procedures in accordance with FINRA Rule 5130?

               _____ Yes        _____ No

    (b) If the undersigned responded "No" to question 14(a), please provide the percentage of the account that is beneficially owned by persons listed in 1 through 13 above.

       _____ %

15. _____ An executive officer or director of a public company[11].

       Name of company: _____

                        _____

                        _____

16. _____ An executive officer or director of a covered non-public company[12].

       Name of company: _____

                        _____

                        _____

17. _____ A person who receives material support from an executive officer or director of a public company or covered non-public company.

       Name of company: _____

                        _____

                        _____

18. _____ A collective investment account in which an executive officer or director of a public company[13] or covered non-public company[14], or any person that receives material support from any such executive officer or director (each, a "**Restricted Participant**"), has a beneficial interest.

    (a) If the undersigned initialed this statement (18), please indicate the name of each public company or covered non-public company with respect to which a person with a beneficial interest in the undersigned is a Restricted Participant and the aggregate percentage share of beneficial interests in the undersigned that is held by such company's Restricted Participants.

       Name of company:     _____ _____ %

                        _____ _____ %

                        _____ _____ %

    (b) If the undersigned initialed this statement (18), do the Restricted Participants affiliated with each public company or covered non-public company hold, in the aggregate, more than 25% of the beneficial interests in the undersigned that participate in new issues received by the undersigned?

             _____ Yes        _____ No

---

[11] "Public company" means any company that is registered under Section 12 of the Exchange Act or files periodic reports pursuant to Section 15(d) of the Exchange Act.

[12] "Covered non-public company" means any non-public company satisfying the following criteria: (i) income of at least $1 million in the last fiscal year or in two of the last three fiscal years and shareholders' equity of at least $15 million; (ii) shareholders' equity of at least $30 million and a two-year operating history; or (iii) total assets and total revenue of at least $75 million in the latest fiscal year or in two of the last three fiscal years.

[13] "Public company" means any company that is registered under Section 12 of the Exchange Act or files periodic reports pursuant to Section 15(d) of the Exchange Act.

[14] "Covered non-public company" means any non-public company satisfying the following criteria: (i) income of at least $1 million in the last fiscal year or in two of the last three fiscal years and shareholders' equity of at least $15 million; (ii) shareholders' equity of at least $30 million and a two-year operating history; or (iii) total assets and total revenue of at least $75 million in the latest fiscal year or in two of the last three fiscal years.

(c)     If the undersigned initialed this statement (18), please indicate the name of each public company or covered non-public company to which the Restricted Participants are affiliated and the aggregate percentage share of beneficial interests in the undersigned that participate in new issues held by such Restricted Participants in such company.

Name of company:     _____     ____ %

_____     ____ %

_____     ____ %

19.   ___✓___   The undersigned is none of the above.

B.     If any of statements 1-18 in Part A was initialed, please complete the following:

The undersigned is any of the following (please check all applicable):

1.     ____     An investment company registered under the 1940 Act.

2.     ____     A common trust fund or similar fund described in Section 3(a)(12)(A)(iii) of the Exchange Act, that (i) has investments from 1,000 or more accounts and (ii) does not limit beneficial interests in such fund principally to trust accounts of persons enumerated in Part A above (each, a **"Restricted Person"**).

3.     ____     An insurance company general, separate, or investment account, provided that (i) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders and (ii) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons.

4.     ____     An account whose beneficial interests that are owned by Restricted Persons do not exceed in the aggregate 10% of such account.

5.     ____     A publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that (i) is listed on a national securities exchange or traded on the NASDAQ or (ii) is a foreign issuer whose securities meet the quantitative designation for listing on a national securities exchange or trading on the NASDAQ.

6.     ____     An investment company organized under the laws of a foreign jurisdiction, provided that (i) the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority and (ii) no person owning more than 5% of the shares of the investment company is a Restricted Person.

7.     ____     An ERISA benefits plan that is qualified under Section 401(a) of the Code, provided such plan is not sponsored solely by a broker-dealer.

8.     ____     A state or municipal government benefits plan that is subject to state and/or municipal regulation.

9.     ____     A tax-exempt charitable organization under Section 501(c)(3) of the Code.

10.     ____     A church plan under Section 414(e) of the Code.

311211809.3

# Exhibit 4d

Reed R. Kathrein (139304)
Peter E. Borkon (212596)
Danielle Charles (291237)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com
daniellec@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs and Proposed Lead
Counsel for the Class*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| ROBERT COLMAN and HILARY TAUBMAN-DYE, Individually and on Behalf of All Others Similarly Situated, )<br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>THERANOS, INC., et al., )<br>)<br>Defendants. )<br>)<br>)<br>)<br>)<br>)<br>_____ ) | No. 5:16-cv-06822-NC<br><br>CLASS ACTION<br><br>**PLAINTIFFS' NOTICE OF SUBPOENA FOR PRODUCTION OF DOCUMENTS TO THIRD PARTIES** |

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that pursuant to Rule 26, 34(c) and 45 of the Federal Rules of

3    Civil Procedure, Plaintiffs will serve the attached subpoenas upon the following third parties,

4    requesting the production of documents and electronically stored information as set forth in

5    Attachment 1 hereto:

| Propounded Party | Date/Time | Location |
| --- | --- | --- |
| BLACK DIAMOND VENTURES XII-B, LLC (Document Production Only) | Jan. 26, 2018 at 8:00 AM | Hagens Berman Sobol Shapiro LLP 715 Hearst Ave., Suite 202 Berkeley, CA 94710 |
| PEER VENTURES GROUP IV, L.P. (Document Production Only) | Jan. 26, 2018 at 8:00 AM | Hagens Berman Sobol Shapiro LLP 715 Hearst Ave., Suite 202 Berkeley, CA 94710 |

    Production shall be made at the date and time specified above, or such other locations as are

mutually acceptable to and agreed upon by the above-named third parties and plaintiffs' counsel.

DATED:  January 18, 2018            **HAGENS BERMAN SOBOL SHAPIRO LLP**

                                    By: */s/ Reed R.Kathrein*
                                    Reed R. Kathrein (139304)
                                    Peter E. Borkon (212596)
                                    Danielle Charles (291237)
                                    715 Hearst Ave., Suite 202
                                    Berkeley, CA 94710
                                    Telephone: (510) 725-3000
                                    Facsimile: (510) 725-3001
                                    reed@hbsslaw.com
                                    peterb@hbsslaw.com
                                    daniellec@hbsslaw.com

                                    Steve W. Berman (admitted *Pro Hac Vice*)
                                    1918 Eighth Ave., Suite 3300
                                    Seattle, WA 98101
                                    Telephone: (206) 623-7292
                                    Facsimile: (206) 623-0594
                                    steve@hbsslaw.com

                                    *Counsel for Plaintiffs and Proposed Lead*
                                    *Counsel for the Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul J. Geller (admitted *Pro Hac Vice*)
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile:  (561) 750-3364
pgeller@rdrdlaw.com

Dennis J. Herman
ROBBINS GELLER RUDMAN
  & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile:  (415) 288-4534
dennish@rgrdlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423
jforge@rgrdlaw.com

*Additional Counsel for Plaintiffs*

1

### DECLARATION OF SERVICE BY ELECTRONIC MAIL

2

I, the undersigned, declare:

3

That declarant is and was, at all times herein mentioned, a resident of the United States and

4

employed in the City of Berkeley, in the County of Alameda, over the age of 18 years, and not a

5

party to or interested party in the within action; that declarant's business address is 715 Hearst

6

Avenue, Suite 202, Berkeley, California 94710.

7

That on January 18, 2018, declarant served by e-mail NOTICE OF SUBPOENA FOR

8

PRODUCTION OF DOCUMENTS to the parties' e-mail addresses listed on the attached service

9

list.

10

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th

11

day of January 2018, at Berkeley, California.

12

13
/s/ Alessandra Lin
ALESSANDRA LIN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## SERVICE LIST

2

Michael A. Mugmon
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
michael.mugmon@wilmerhale.com

Timothy Perla
Robert K. Smith
Megan E. Barriger
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
timothy.perla@wilmerhale.com
robert.smith@wilmerhale.com
megan.barriger@wilmerhale.com

3

4

5

6

7

8

Kathleen Goodhart
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
kgoodhart@cooley.com

Patrick Gibbs
Jackie Kort
Alli Davidscon
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
pgibbs@cooley.com
jkort@cooley.com
adavidson@cooley.com

9

10

11

12

13

14

Allison A. Davis
Kelly Gorton
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
allisondavis@dwt.com
kellygorton@dwt.com

Stephen M. Rummage
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
steverummage@dwt.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLTFS' NOTICE OF SUBPOENAS PROD. OF DOCS. TO
THIRD PARTIES – Case No. 5:16-CV-06822-NC

- 4 -

010650-11 1009459 V1

# Attachment 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | | |
|---|---|---|
| Robert Colman and Hilary Taubman-Dye, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   5:16-cv-06822-NC |
| Theranos, Inc., Elizabeth Holmes, Ramesh Balwani, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:　　　　　　　　　　　　　　　Peer Ventures Group IV, L.P.,
　　　　　c/o Jeff Hayes, Hayes Legal Consulting, 7 Hanceford Rd., Ladera Ranch, CA 92694-1024

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: Hagens Berman Sobol Shapiro LLP<br>715 Hearst Ave., Suite 202<br>Berkeley, CA 94710 | Date and Time:<br><br>01/26/2018 8:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:　　01/12/2018

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Plaintiffs Robert Colman and Hilary Taubman-Dye, et al.　　　　　　　　 , who issues or requests this subpoena, are:

Reed R. Kathrein, 715 Hearst Ave., Suite 202, Berkeley, CA 94710, 510-725-3000, reed@hbsslaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   5:16-cv-06822-NC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

**I.    DEFINITIONS**

Unless otherwise stated, the terms set forth below are defined as follows:

1.    "Communication" or "communications" refers to every manner or means of disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries or otherwise), whether orally, electronically, by document, telecopier, mail, personal delivery or otherwise.

2.    "Complaint" refers to Plaintiffs' Class Action Complaint for Violations of California's Securities, Unfair Competition, and Common Laws (Dkt. No. 1).

3.    "Concerning" means relating to, referring to, describing, discussing, evidencing, regarding or constituting.

4.    "Defendants" refers to Theranos, Inc., Elizabeth Holmes and Ramesh Balwani.

5.    "Document" or "documents" has the same meaning as in Fed. R. Civ. P. 34(a) and Federal Rule of Evidence 1001, including, but not limited to, writings, drawings, graphs, charts, photographs, sound recordings, images and other data or data compilations stored in any medium from which information can be translated, if necessary, by the respondent into reasonably usable form, to inspect, copy, test or sample any designated tangible things, which constitute or contain matters within the scope of Fed. R. Civ. P. 26(b).  This definition includes copies or duplicates of documents contemporaneously or subsequently created that have any notes or other markings. Without limiting the generality of the foregoing, document (or documents) includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, diagrams, instructions, notes or minutes of meetings or other communications of any type, including inter- and intra-office communications, questionnaires, surveys, photographic recordings, films, tapes, disks, data cells, print-outs of information stored or maintained by electronic data processing or word processing equipment, including e-mail, and all other

1

electronically stored information and any preliminary versions, drafts, or revisions of the foregoing.

6.      "Identify" or "identifying":

(a)      when used to refer to a document, "identify" or "identifying" means to provide: (i) the date of each document; (ii) the type of each document (*e.g.*, letters, memos, etc.); (iii) the name of the author(s) of each document; and (iv) the present location of each such document or copies thereof;

(b)      when used in reference to a communication, "identify" or "identifying" means to state the date and participants in the communication and, if the communication is written, to identify the documents containing the communication or, if the communication is oral, to identify the date and participants in and identify all documents describing or memorializing or, if no such documents are available, to briefly describe the contents and subject matter of the communication;

(c)      when used to refer to a natural person, "identify" or "identifying" means to set forth that person's: (i) full name and title, if any; and (ii) present or last known address and telephone number(s); and

(d)      when used in any other context, "identify" or "identifying" means to define or describe completely the requested item or information, including sufficient detail such that the item or information: (i) is distinguishable from any other items or information or any parent category of items or information; and (ii) includes a sufficiently detailed description of any sub-categories of items or information.

7.      "Person" or "persons" refers to any natural person, proprietorship, public or private corporation, partnership, joint venture, trust, association, company, firm, government or governmental entity (including any government agency, board, authority, commission or political subdivision or department thereof), or any other form of business or legal entity, organization or arrangement.

8.      "Putative Class," "Member of the Putative Class" or "Putative Class Member," as defined in ¶82 of the Complaint, refers to:

2

All persons or entities who, directly or indirectly, purchased or committed to purchase (and subsequently closed a binding commitment to purchase) an interest in Theranos securities from July 29, 2013, through October 5, 2016.

9.     "Refer" or "relate" or "referring" or "relating" means all documents that reflect, record, memorialize, discuss, describe, compare, consider, concern, constitute, embody, evaluate, analyze, review, report on, comment on, impinge upon or impact the subject matter of the request.

10.     "Theranos" or the "Company" refers to defendant Theranos, Inc. and its parents, subsidiaries, predecessors, successors, divisions, affiliates, operating units, controlling persons, controlled persons, officers, directors, employees, representatives or agents.

11.     "You" or "your" refers to Peer Ventures Group IV, L.P. and its parents, subsidiaries, predecessors, successors, divisions, affiliates, operating units, controlling persons, controlled persons, officers, directors, employees, representatives or agents.

12.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to give the request the broadest possible application.

13.     The term "any" means any and all. The term "all" has the same meaning.

14.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate in the context.

**II.     INSTRUCTIONS**

1.     Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying original documents as they are kept in the usual course of business, and you shall organize and label them to correspond with the categories in these requests.

2.     If production of items or documents responsive to these requests is withheld under a claim of privilege or upon any other ground, as to each such item or document, state the following information in sufficient detail to permit the Court to rule on your claim:

(a)     Which privilege is claimed;

(b)     A precise statement of the facts upon which said claim of privilege is based; and

(c)     If a document is privileged, include the following information describing each purportedly privileged document:

3

(i)     Its nature, *e.g.*, agreement, letter, memorandum, tape, etc.

(ii)    The date it was prepared;

(iii)   The date it bears;

(iv)    The date it was sent;

(v)     The date it was received;

(vi)    The number of pages or Bates numbers of the document;

(vii)   The identity of the person preparing it;

(viii)  The identity of the person sending it;

(ix)    The identity of each person to whom it was sent or was to have been sent, including all addresses and all recipients of copies;

(x)     A statement as to whom each identified person represented or purported to represent at all relevant times; and

(xi)    A precise description of the place where each item, or a copy of that document, is kept, including the title or description of the file in which said item or document may be found and the location of such.

3.      If an item or document responsive to these requests was at any time in your possession, custody or control but is no longer available for production, as to each such document state the following information:

(a)     Whether the item or document is missing or lost;

(b)     Whether the item or document has been destroyed;

(c)     Whether the item or document has been transferred or delivered to another person and, if so, at whose request;

(d)     Whether the item or document has been otherwise disposed of; and

(e)     A precise statement of the circumstances surrounding the disposition of the item or document and the date of disposition.

4.      With respect to any items or documents, the production of which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for that objection.

4

1    5.    Do not redact any information from any document you produce in response to these

2  requests unless you are asserting a privilege with respect to the redacted portion.  If any document

3  is produced in redacted form, prepare a log identifying all portions of the document that have been

4  withheld and the reason why they are being withheld, including information sufficient to comply

5  with the requirements of Fed. R. Civ. P. 26(b)(5).

6    6.    Whenever a document is not produced in full or is produced in redacted form, so

7  indicate on the document and state with particularity the reason or reasons why it is not being

8  produced in full and describe to the best of your knowledge, information and belief, and with as

9  much particularity as possible, those portions of the document that are not being produced.

10  **III.    RELEVANT TIME PERIOD**

11    All requests and topics herein refer to the period from July 29, 2013 through and including

12  the date of this Subpoena, unless otherwise specifically indicated, and shall include all documents

13  and information that relate to such period, even though prepared or published outside of the

14  Relevant Time Period.

15  **IV.    DOCUMENTS TO BE PRODUCED**

16    1.    DOCUMENTS sufficient to IDENTIFY investors who invested in YOUR funds

17  which purchased Theranos securities, their contact information and the amount, timing and terms

18  of their investment.

19    2.    ALL contracts or agreements between YOU and YOUR investors relating to their

20  investments in YOUR funds invested in Theranos securities, including the subscription and

21  operating agreements.

22

23

24

25

26

27

28

5

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Northern District of California

| | |
|---|---|
| Robert Colman and Hilary Taubman-Dye, et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| Theranos, Inc., Elizabeth Holmes, Ramesh Balwani, et al. | ) |
| *Defendant* | ) |

Civil Action No.   5:16-cv-06822-NC

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      Black Diamond Ventures XII-B, LLC, c/o John P. Stigi III
Sheppard, Mullin, Richter & Hampton LLP, 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA  90067

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: Hagens Berman Sobol Shapiro LLP<br>715 Hearst Ave., Suite 202<br>Berkeley, CA 94710 | Date and Time:<br><br>01/26/2018 8:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      01/12/2018

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Plaintiffs Robert Colman and Hilary Taubman-Dye, et al. _____ , who issues or requests this subpoena, are:

Reed R. Kathrein, 715 Hearst Ave., Suite 202, Berkeley, CA 94710, 510-725-3000, reed@hbsslaw.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   5:16-cv-06822-NC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☒ I served the subpoena by delivering a copy to the named person as follows:   Sent by email to John Stigli,
counsel for Black Diamond Ventures, jstigli@sheppardmullin.com

_____   on *(date)*   Jan. 12, 2018   ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$   0          .

My fees are $     0          for travel and $   0          for services, for a total of $       0.00        .

I declare under penalty of perjury that this information is true.

Date:   Jan. 12, 2018          /s/Danielle Charles
                                      *Server's signature*

                              Danielle Charles, Associate
                                      *Printed name and title*

                              715 Hearst Ave., Suite 202, Berkeley, CA 94710
                                      *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

**I.    DEFINITIONS**

Unless otherwise stated, the terms set forth below are defined as follows:

1.    "Communication" or "communications" refers to every manner or means of disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries or otherwise), whether orally, electronically, by document, telecopier, mail, personal delivery or otherwise.

2.    "Complaint" refers to Plaintiffs' Class Action Complaint for Violations of California's Securities, Unfair Competition, and Common Laws (Dkt. No. 1).

3.    "Concerning" means relating to, referring to, describing, discussing, evidencing, regarding or constituting.

4.    "Defendants" refers to Theranos, Inc., Elizabeth Holmes and Ramesh Balwani.

5.    "Document" or "documents" has the same meaning as in Fed. R. Civ. P. 34(a) and Federal Rule of Evidence 1001, including, but not limited to, writings, drawings, graphs, charts, photographs, sound recordings, images and other data or data compilations stored in any medium from which information can be translated, if necessary, by the respondent into reasonably usable form, to inspect, copy, test or sample any designated tangible things, which constitute or contain matters within the scope of Fed. R. Civ. P. 26(b). This definition includes copies or duplicates of documents contemporaneously or subsequently created that have any notes or other markings. Without limiting the generality of the foregoing, document (or documents) includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, diagrams, instructions, notes or minutes of meetings or other communications of any type, including inter- and intra-office communications, questionnaires, surveys, photographic recordings, films, tapes, disks, data cells, print-outs of information stored or maintained by electronic data processing or word processing equipment, including e-mail, and all other

1

electronically stored information and any preliminary versions, drafts, or revisions of the foregoing.

6.      "Identify" or "identifying":

(a)      when used to refer to a document, "identify" or "identifying" means to provide: (i) the date of each document; (ii) the type of each document (*e.g.*, letters, memos, etc.); (iii) the name of the author(s) of each document; and (iv) the present location of each such document or copies thereof;

(b)      when used in reference to a communication, "identify" or "identifying" means to state the date and participants in the communication and, if the communication is written, to identify the documents containing the communication or, if the communication is oral, to identify the date and participants in and identify all documents describing or memorializing or, if no such documents are available, to briefly describe the contents and subject matter of the communication;

(c)      when used to refer to a natural person, "identify" or "identifying" means to set forth that person's: (i) full name and title, if any; and (ii) present or last known address and telephone number(s); and

(d)      when used in any other context, "identify" or "identifying" means to define or describe completely the requested item or information, including sufficient detail such that the item or information: (i) is distinguishable from any other items or information or any parent category of items or information; and (ii) includes a sufficiently detailed description of any sub-categories of items or information.

7.      "Person" or "persons" refers to any natural person, proprietorship, public or private corporation, partnership, joint venture, trust, association, company, firm, government or governmental entity (including any government agency, board, authority, commission or political subdivision or department thereof), or any other form of business or legal entity, organization or arrangement.

8.      "Putative Class," "Member of the Putative Class" or "Putative Class Member," as defined in ¶82 of the Complaint, refers to:

1     All persons or entities who, directly or indirectly, purchased or committed to purchase (and subsequently closed a binding commitment to purchase) an interest
2     in Theranos securities from July 29, 2013, through October 5, 2016.

3       9.    "Refer" or "relate" or "referring" or "relating" means all documents that reflect,

4 record, memorialize, discuss, describe, compare, consider, concern, constitute, embody, evaluate,

5 analyze, review, report on, comment on, impinge upon or impact the subject matter of the request.

6       10.    "Theranos" or the "Company" refers to defendant Theranos, Inc. and its parents,

7 subsidiaries, predecessors, successors, divisions, affiliates, operating units, controlling persons,

8 controlled persons, officers, directors, employees, representatives or agents.

9       11.    "You" or "your" refers to Black Diamond Ventures XII-B, LLC and its parents,

10 subsidiaries, predecessors, successors, divisions, affiliates, operating units, controlling persons,

11 controlled persons, officers, directors, employees, representatives or agents.

12       12.    The connectives "and" and "or" shall be construed either disjunctively or

13 conjunctively as necessary to give the request the broadest possible application.

14       13.    The term "any" means any and all. The term "all" has the same meaning.

15       14.    The use of the singular shall be deemed to include the plural, and the use of one

16 gender shall include all others, as appropriate in the context.

17 **II.**   **INSTRUCTIONS**

18       1.    Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection

19 and copying original documents as they are kept in the usual course of business, and you shall

20 organize and label them to correspond with the categories in these requests.

21       2.    If production of items or documents responsive to these requests is withheld under

22 a claim of privilege or upon any other ground, as to each such item or document, state the following

23 information in sufficient detail to permit the Court to rule on your claim:

24           (a)    Which privilege is claimed;

25           (b)    A precise statement of the facts upon which said claim of privilege is based;

26 and

27           (c)    If a document is privileged, include the following information describing

28 each purportedly privileged document:

1             (i)          Its nature, *e.g.*, agreement, letter, memorandum, tape, etc.

2             (ii)         The date it was prepared;

3             (iii)        The date it bears;

4             (iv)        The date it was sent;

5             (v)         The date it was received;

6             (vi)        The number of pages or Bates numbers of the document;

7             (vii)      The identity of the person preparing it;

8             (viii)     The identity of the person sending it;

9             (ix)       The identity of each person to whom it was sent or was to have been

10 sent, including all addresses and all recipients of copies;

11           (x)        A statement as to whom each identified person represented or

12 purported to represent at all relevant times; and

13           (xi)       A precise description of the place where each item, or a copy of that

14 document, is kept, including the title or description of the file in which said item or document may

15 be found and the location of such.

16      3.     If an item or document responsive to these requests was at any time in your

17 possession, custody or control but is no longer available for production, as to each such document

18 state the following information:

19          (a)     Whether the item or document is missing or lost;

20          (b)     Whether the item or document has been destroyed;

21          (c)     Whether the item or document has been transferred or delivered to another

22 person and, if so, at whose request;

23          (d)     Whether the item or document has been otherwise disposed of; and

24          (e)     A precise statement of the circumstances surrounding the disposition of the

25 item or document and the date of disposition.

26      4.     With respect to any items or documents, the production of which you contend is in

27 some way "burdensome" or "oppressive," please state the specific reasons for that objection.

28

4

1   5.  Do not redact any information from any document you produce in response to these

2 requests unless you are asserting a privilege with respect to the redacted portion.  If any document

3 is produced in redacted form, prepare a log identifying all portions of the document that have been

4 withheld and the reason why they are being withheld, including information sufficient to comply

5 with the requirements of Fed. R. Civ. P. 26(b)(5).

6   6.  Whenever a document is not produced in full or is produced in redacted form, so

7 indicate on the document and state with particularity the reason or reasons why it is not being

8 produced in full and describe to the best of your knowledge, information and belief, and with as

9 much particularity as possible, those portions of the document that are not being produced.

10 **III. RELEVANT TIME PERIOD**

11   All requests and topics herein refer to the period from July 29, 2013 through and including

12 the date of this Subpoena, unless otherwise specifically indicated, and shall include all documents

13 and information that relate to such period, even though prepared or published outside of the

14 Relevant Time Period.

15 **IV. DOCUMENTS TO BE PRODUCED**

16   1.  DOCUMENTS sufficient to IDENTIFY investors who invested in YOUR funds

17 which purchased Theranos securities, their contact information and the amount, timing and terms

18 of their investment.

19   2.  ALL contracts or agreements between YOU and YOUR investors relating to their

20 investments in YOUR funds invested in Theranos securities, including the subscription and

21 operating agreements.

22

23

24

25

26

27

28