**\* \* \* UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 315 DATED JULY 23, 2018 \* \* \***

1  Reed R. Kathrein (139304)
   Peter E. Borkon (212596)
2  Danielle Smith (291237)
   HAGENS BERMAN SOBOL SHAPIRO LLP
3  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
4  Telephone: (510) 725-3000
   Facsimile:  (510) 725-3001
5  reed@hbsslaw.com
   peterb@hbsslaw.com
6  danielles@hbsslaw.com

7  Steve W. Berman (admitted *Pro Hac Vice*)
   HAGENS BERMAN SOBOL SHAPIRO LLP
8  1918 8th Avenue, Suite 3300
   Seattle, WA 98101
9  Telephone: (206) 623-7292
   Facsimile:  (206) 623-0594
10 steve@hbsslaw.com

11 *Counsel for Plaintiffs and Proposed Lead*
   *Counsel for the Class*

12 [Additional counsel appear on signature page.]

13

                    UNITED STATES DISTRICT COURT

14

                   NORTHERN DISTRICT OF CALIFORNIA

15

                         SAN JOSE DIVISION

16

17 ROBERT COLMAN and HILARY              No. 5:16-cv-06822-NC
   TAUBMAN-DYE, Individually and on Behalf
   of All Others Similarly Situated,     CLASS ACTION
18
                                         **PLAINTIFFS' NOTICE AND**
19                       Plaintiff,      **RENEWED MOTION FOR CLASS**
                                         **CERTIFICATION OR,**
20       v.                              **ALTERNATIVELY, TO ALTER OR**
                                         **AMEND DENIAL UNDER FED. R.**
21 THERANOS, INC., et al.,               **CIV. P. 23(c)(1)(C)**

                         Defendant.
22                                       Date:        TBD
                                         Time:        TBD
23                                       Courtroom:   7, 4th Floor
                                         Judge:       Hon. Nathanael Cousins
24
                                         DATE ACTION FILED: Nov. 28, 2016
25

26

27

28

1

**TABLE OF CONTENTS**

2

3   I.    INTRODUCTION ................................................................................................5

4   II.   THE AMENDED PROPOSED CLASS AND REPRESENTATIVES ..................................7

5   III.  STATEMENT OF RELEVANT FACTS.................................................................8

6   IV.   LEGAL STANDARDS ....................................................................................11

7   V.    ARGUMENT ................................................................................................12

8         A.    The Revised Class Definition Is "Definite" .............................................12

9         B.    The Proposed Class Representatives are Adequate....................................12

10        C.    "Liquidation Preferences" of the Three Funds Have Minimal Bearing on Damages
                Between the Two Series and Present No Antagonism Between Class Members .....14

11
          D.    The Releases Signed by Don and Chris Lucas Do Not Present Unique Issues and Do
12              Not Release the Fund Investors' Individual Claims................................................15

13        E.    A Common Question and Strong Likelihood Exists That Investors in These Particular
                Funds Were Exposed to Defendants to the *sine qua non* Misrepresentations...........16

14
          F.    Plaintiffs' Individual Claims are Not Viable When All Factors are Considered,
15              Including the Recent *China Agritech* decision, and the Cost and Complexity of the
                Litigation ................................................................................................................19

16
          G.    Individual Fraud Claims Are Unlikely and Do not Create a Net Inefficiency....22

17
     VI.  CONCLUSION ................................................................................................23

18

19

20

21

22

23

24

25

26

27

28

Case No.: 5:16-cv-06822-NC
010650-11 1039552 V1

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**FEDERAL CASES**

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ........................................................................ 20

*Apple iPod iTunes Antitrust Litig.*,
2011 WL 5864036 (Nov.22, 2011) ........................................................... 11, 12

*China Agritech, Inc. v. Resh*,
2018 WL 2767565 (June 11, 2018) ...................................................... 6, 19, 23

*In re Clorox Consumer Litig.*,
301 F.R.D. 436 (N.D. Cal. 2014) ............................................................ 17, 18

*Cole v. Gene by Gene, Ltd.*,
322 F.R.D. 500 (D. Alaska 2017) ............................................................ 20, 21

*Dukes v. Wal-Mart Stores, Inc.*,
2012 WL 4329009 (N.D. Cal. Sept. 21, 2012) ............................................. 11

*Ehret v. Uber Technologies, Inc.*,
148 F. Supp. 3d 884 (N.D. Cal. 2015) ..................................................... 17, 18

*Epifano v. Boardroom Business Products, Inc.*,
130 F.R.D. 295 (S.D. N.Y. 1990) ....................................................... 19, 20, 21

*ESI Ergonomic Sols., LLC v. United Artists Theatre Circuit, Inc.*,
203 Ariz. 94 (Ct. App. Div. 1 2002) ............................................................ 20

*In re: Facebook Privacy Litig.*,
2015 WL 2453734 (N.D. Cal. May 22, 2015) .............................................. 12

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ................................................................. 13

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
485 U.S. 271 (1988) .................................................................................... 11

*In re Hyundai & Kia Fuel Econ. Litig.*,
881 F.3d 679 (9th Cir. 2018) ................................................................. 17, 18

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) .................................................................. 20

*Makaeff v. Trump University, LLC*,
2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ............................................. 6, 18

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Mazza v. Am. Honda Motor Co.*,
 666 F.3d 581 (9th Cir. 2012) ............................................................... 17, 18

*McIntosh v. Irwin Union Bank & Trust Co.*,
 215 F.R.D. 26 (D.Mass.2003) ...................................................................... 22

*In re MyFord Touch Consumer Litig.*,
 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ............................................ 18

*In re Revco Sec. Litig.*,
 142 F.R.D. 659 (N.D. Ohio 1992) ............................................................... 19

*Stoudt v. E.F. Hutton & Co., Inc.*,
 121 F.R.D. 36 (S.D.N.Y. 1988) ................................................................... 21

*In re Telectronics Pacing Sys., Inc.*,
 172 F.R.D. 271 (S.D. Ohio 1997) ................................................................ 12

*In re Tobacco II Cases*,
 46 Cal. 4th 298 (2009) ................................................................................. 18

*Zinser v. Accufix Research Inst., Inc.*,
 253 F.3d 1180 (9th Cir. 2001) ............................................................... 11, 19

## FEDERAL STATUTES

15 U.S.C. § 78bb(f)(1) .......................................................................................... 10

## STATE STATUTES

CAL. CORP. CODE § 25400(D) ............................................................................ 7, 23

CAL. CORP. CODE § 25500 ..................................................................................... 14

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(a) .............................................................................................. 11

Fed. R. Civ. P. 23(b)(3) .............................................................................. 3, 11, 20

Fed. R. Civ. P. 23(c)(1)(C) ............................................................................. 5, 11

## SECONDARY AUTHORITIES

RUBENSTEIN ET AL., 2 NEWBERG ON CLASS ACTIONS
 § 4:65 (5th ed. 2018) .................................................................................... 11

**NOTICE OF MOTION AND MOTION**

TO:     THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that on a date to be determined by the Court, before the Honorable Nathanael M. Cousins in Courtroom 7, 4th Floor, of the above-entitled Court located at 280 South First Street, San Jose, California, Plaintiffs Robert Colman and Hilary Taubman-Dye ("Plaintiffs"), will and hereby renew their motion for class certification of an amended class, or in the alternative, to amend or alter the order denying class certification pursuant to Fed. R. Civ. P. 23(c)(1)(C), to address the specific concerns raised by the Court in its May 31, 2018 Order [ECF. No. 240] ("Order").  The proposed amended class and subclasses are more cohesive, more precisely defined and represented, comprised of the bulk of class investors whose losses are, on average, much smaller than would be economical to litigate via individual claims.

Plaintiffs seek (i) certification of this action as a class action based on the description of the Class and Subclasses herein, (ii) appointment of named Plaintiffs Robert Colman and Hilary Taubman-Dye, and Class Member B.F. Last Investments as representatives of the Class and Subclasses, (iii) appointment of the named Plaintiffs' attorneys of record as class counsel, and (iv) leave to amend the complaint accordingly.

Plaintiffs seek to certify the following Class:

> All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in the following funds: Lucas Ventures Group XI, LLC, Black Diamond Ventures XII-B, LLC and Celadon Technology Fund VII, LLC.

Plaintiffs propose three Subclasses defined as follows including one class representative for each of the named funds:

- The "Lucas Ventures" Subclass:  All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in Lucas Ventures Group XI, LLC. Plaintiff Robert Colman is an appropriate representative.

- The "Black Diamond" Subclass:  All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in Black Diamond Ventures XII-B, LLC. Class member B.F. Last Investments LLC is an appropriate representative.

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 1 -

- • <u>The "Celadon" Subclass</u>:  All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in Celadon Technology Fund VII, LLC. Plaintiff Hilary Taubman-Dye is an appropriate representative.

Plaintiffs' Renewed Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the supporting declarations and exhibits of evidence, any reply memorandum Plaintiffs file, the orders, pleadings, and files in this action, and such other matters as may be presented at or before the hearing.

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 2 -

1

**STATEMENT OF ISSUES TO BE DECIDED**

2        1.      Whether an amended smaller class should be certified under Fed. R. Civ. P. 23(b)(3)

3   of: "All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares

4   in the following funds:  Lucas Ventures Group XI, LLC, Black Diamond Ventures XII-B, LLC and

5   Celadon Technology Fund VII, LLC."

6        2.      Whether to appoint Plaintiffs Robert Colman and Hilary Taubman-Dye, and Class

7   Members BF Last Investments as Class Representatives for each of the afore-mentioned funds'

8   investors or for the subclasses consisting of those funds' investors;

9        3.      Whether to appoint the firms of Hagens Berman Sobol Shapiro LLP and Robbins

10  Geller Rudman & Dowd LLP as counsel for the class;

11       4       Whether the amended class addresses the Court's concern that class members

12  invested in funds that purchased different series of stock with purportedly "different liquidation

13  preferences" as any differences would be only one adjustment for the two different series, if any;

14       5.      Whether the amended class addresses the Court's concern that some "intermediate

15  funds' releases" could impact class member claims, given that the operating agreements of Lucas

16  Ventures and Black Diamond are the same, neither provides the power of the fund to release

17  individual claims, and Defendants have offered no evidence to the contrary, and Celadon never

18  executed a release;

19       6.      Whether the amended class addresses the Court's concern for inferring reliance on

20  Defendants' large-scale advertising by investors in Lucas Ventures and Black Diamond, since emails

21  were sent to investors in both funds prior to their investment, repeating Defendants' claims and

22  attaching links to the article in which Defendants made those claims, and as such investors in those

23  two funds were exposed to the material misrepresentations;

24       7.      Whether the amended class addresses the Court's concern for inferring reliance on

25  Defendants large-scale advertising by investors in Celadon, since Theranos was in stealth mode until

26  the July of 2013, Celadon investors were not solicited by intermediary funds and invested two years

27  after the start of the media blitz containing the targeted *sine qua non* of Theranos's existence – that

28

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                                                    - 3 -

Theranos had a real fiduciary Board of Directors, that Theranos' proprietary technology was commercially ready, and was currently being rolled out by Walgreens as Walgreens expected – and as such, it is highly likely that investors Celadon were exposed to the material misrepresentations.

8.      Whether the amended class addresses the Court's concern that individual actions are a logistically and economically viable alternative to class treatment, as the median amended class claims of the 127 potential class members, is between $25,000 and $100,000, and the largest claim is only $1 million;

9.      Whether leave to amend the complaint to add BF Last Investments LLC should be granted as Defendants suffer no prejudice, Defendants have already taken discovery of BF Last, and the scope of discovery will not change.

010650-11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                                            - 4 -

# I.    INTRODUCTION

Plaintiffs now renew their motion for class certification of an amended class, or in the alternative to amend or alter the order denying class-certification pursuant to Fed. R. Civ. P. 23(c)(1)(C), to address the issues raised by the Court concerning the original motion.  The Court should certify Plaintiffs' proposed narrower, simplified class and subclasses as a necessary step to remedy the scheme perpetrated by Defendants and assist investors in recouping their losses. Plaintiffs' renewed motion comes in light of new testimony and evidence discovered in recent depositions, and addresses the Court's specific concerns raised in its May 31, 2018 Order [ECF. No. 240] ("Order").  The proposed class is more cohesive, more precisely defined and represented, comprised of the bulk of class investors whose losses on average and in the absolute, are much smaller than would be economical to litigate individual claims, and is superior to the original proposed class.

*First*, Plaintiffs have narrowed the amended class definition, limiting the class to investors in only three funds, each represented by a proposed class representative who can testify to or represent any purported issues uniquely relevant to each fund.  Two of the funds are funds run by the two Lucas cousins,[1] are for the same series of stock, and cover approximately 127 investors.  The Lucas cousins sent the members of each fund emails referring the investors to the media campaign and false statements that pervaded the class period.  The third fund, representing purchases late in the class period and two years into the media campaign, did not have an intermediary fund manager who passed on any representations to the fund investors, and did not, as a fund, sign any releases.

*Second*, since Plaintiffs' original motion, two former Theranos board members and a former Vice President and Lab Director, have verified via deposition testimony that Defendants deliberately

---

[1] *See* Plaintiffs' Motion for Class Certification Under Rule 23(b)(3) ("Motion"), ECF No. 217 at p. 2-3 (describing Lucas family connections to Theranos's fund-raising efforts).

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                                                    - 5 -

issued false statements, issued false press releases, coordinated with media representatives and reporters to perpetuate their false narrative, and misled investors with news of the Walgreens partnership while simultaneously misleading Walgreens itself.  Moreover, a well-known Board Director, and former CEO of Wells Fargo, recently testified that the highly touted Board – announced in Theranos first public press release which starts the class period – was not real.[2]

*Third*, the amended class definition addresses the predominance, reliance, typicality, and superiority issues the Court raised.

- **Uniform communication of specific misstatements**:  The investors in the three funds represented received emails or undeniable media exposure restating specific false claims from Defendants, and the email communications were sufficiently "targeted, concentrated, and efficient" that all potential class members can be presumed to have seen it. (Order at 22 (citing *Makaeff v. Trump University, LLC*, No. 3:10-cv-0940-GPC-WVG, 2014 WL 688164, at *13 (S.D. Cal. Feb. 21, 2014).

- **Only two series of stock purchases are applicable**.  The proposed Class and Subclasses consist only of purchases of Series C (Celadon) and C1 stock (Black Diamond and Lucas Ventures). The division of the proposed Class into Subclasses further removes any additional complexity of differing stock purchases.

- **Individual investor losses now make the pursuit of individual claims unfeasible**. The median claim for the investors in the amended class is now $25,000 to $100,000, making litigation of those individual claim impractical and unfeasible for these investors.

*Fourth*, since Plaintiffs' original motion and the Court's Order, the Supreme Court's decision in *China Agritech, Inc. v. Resh*, No. 17-432, 2018 WL 2767565, at *5 (June 11, 2018) has

---

[2] *See infra*, at ft nts. 7-8.

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 6 -

significantly altered the feasibility of the pursuit of follow-on investors' claims through litigation. The majority of individual investors now definitively lack any recourse to recover their losses through litigation as the amount of legal fees in prosecuting the case would far exceed their likely recovery.  It has additionally come to light that several investors are in fact having difficulty obtaining legal representation for claims against Theranos.[3]  As a result, the superiority of class treatment been shifted to the point where the interests of justice necessitate class certification.

Finally, the Court found that Plaintiffs carried their burden, at least minimally, on the adequacy of two of the proposed class representatives, counsel, application of California law, and class wide application of the California market manipulation claim.  At minimum, the order should be amended to allow for a class for Plaintiffs' market manipulation claim under California Corporations Code §§ 25500 and 25400(d) for this narrower class.

For all of these reasons, as further explained below and in the attached exhibits, the Court should grant Plaintiffs' renewed motion for class certification.

## II.     THE AMENDED PROPOSED CLASS AND REPRESENTATIVES

Specifically, Plaintiffs will and hereby do move this Court to certify the following class or subclasses:

> All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in the following funds:  Lucas Ventures Group XI, LLC, Black Diamond Ventures XII-B, LLC and Celadon Technology Fund VII, LLC.

Plaintiffs move the Court to appoint the following class representatives:

- Robert Colman as the class representative for Lucas Ventures Group XI;

- BF Last Investments LLC as the class representative for Black Diamond Ventures XII-B, LLC; and

- Hilary Taubman-Dye for Celadon Technology Fund VII, LLC.

---

[3] See *infra*, at ft nt. 55.

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                                                    - 7 -

Plaintiffs additionally propose three Subclasses defined as follows including one class representative for each of the named funds:

- The "Lucas Ventures" Subclass:  All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in Lucas Ventures Group XI, LLC. Plaintiff Robert Colman is an appropriate representative.
- The "Black Diamond" Subclass:  All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in Black Diamond Ventures XII-B, LLC. Class member BF Last Investments LLC is an appropriate representative.
- The "Celadon" Subclass:  All persons or entities who, between July 29, 2013, through October 5, 2016, purchased shares in Celadon Technology Fund VII, LLC.  Plaintiff Hilary Taubman-Dye is an appropriate representative.

Plaintiffs propose these Subclasses because Defendants have pointed to the larger group of investors originally proposed (and their respective stock purchases) as having significant differences among them that undermine commonality and typicality.  These Subclasses do not have such significant differences.

Plaintiffs also move to appoint the law firms of Hagens Berman Sobol Shapiro LLP and Robbins Geller Rudman & Dowd LLP as counsel for the class, for leave to amend the complaint pursuant to the foregoing.

### III.   STATEMENT OF RELEVANT FACTS

Plaintiffs adopt the statement of facts in Plaintiffs' original motion for class certification, and the declarations and evidence submitted therein.  In addition, since the motion was filed and argued, the falsity of Theranos's targeted story, as well as Defendants' efforts in publicly disseminating the false story to Class and Subclass members, has been made clear by testimony.

Both Channing Robertson (former Director and $500,000/year consultant) and Daniel Young (V.P. and Laboratory Director) testified that the statement in Theranos's September 9, 2013 "Walgreens" press release claiming that "consumers can now complete any clinician-directed lab test

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                                          - 8 -

1    with as little as a few drops of blood and results available in a matter of hours"[4] was false.[5]

2    This claim was repeated publicly and to investors throughout the class period.[6]

3        Former Director Richard Kovacevich testified that Theranos's very first press release, starting

4    the class period by touting Kovacevich, General Mattis and others as being on the Board of Directors

5    was also false.[7]  Mr. Kovacevich testified that they were merely an advisory board, and not a full

6    blown fiduciary board.  They had no voice in management or decision making authority.[8]  Nor did he

7    approve use of his name in press releases or presentations to investors.

8        Defendants recently produced the deposition transcript of Walgreens executive Nimesh

9    Jhaveri who testified that Defendants represented to Walgreens that Theranos could conduct 98 to

10    99% of its blood tests via finger-stick draws on Theranos-manufactured devices and that was crucial

11    to Walgreens partnering with Theranos.[9]  Both of these representations were false as Theranos used

12    third-party equipment and at least over 40% of the tests required venous draws.[10]  Before the

13    Walgreens announcement, Theranos staged fake and altered blood tests on Walgreens executives to

14    ────────────

        [4] *See Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service*, Theranos Press Release (Sep. 9, 2013), https://news.theranos.com/2013/09/09/theranos-selects-walgreens-as-a-long-term-partner-through-which-to-offer-its-new-clinical-laboratory-service/ (Marked as Ex. 46 to the Deposition of Donald A. Lucas on Jan. 12, 2018).

        [5] *See* Ex. A to the Declaration of Danielle Smith In Support Of Renewed Motion For Class Certification (hereinafter, "D. Smith Decl.") (Transcript from the Deposition of Channing Rex Robertson ("Robertson Dep."), at 105:16-20 (admitting that it was not his "understanding that Theranos had the capability, at this time, to run any clinician-directed lab tests with as little as a few drops of blood")); and D. Smith Decl. Ex. B (Rough Tr. from the Deposition of Daniel Young Ph. D ("Young Dep."), at pp 128-129 (admitting that the statement is "not true", and stating "on the face of it, I don't think it's accurate.")).

        [6] For instance, Plaintiff Taubman-Dye specifically remembered reading *This CEO Is Out for Blood* by Roger Parloff, FORTUNE (June 12, 2014).  *See* Ex. 2 to the Declaration of Timothy Perla in Support Of Defendants' Opposition to Plaintiffs' Motion for Class Certification Under Rule 23(b)(3) ("Perla Decl."), ECF No. 216-5 (Taubman-Dye Dep. 136:18-23, Feb. 27, 2018).

        [7] Answer to First Amended Complaint ("Answer to FAC"), ECF No. 175 ¶22; and D. Smith. Decl. Ex. C (Kovacevich Dep.) at 20 (stating "We were an advisory board, not a fiduciary board, and our job was to advise Elizabeth on things that she wanted to do, give our opinions, and then she would decide what to do.").

        [8] *Id.* (stating he had no "decision-making authority" and that "[u]ltimately Elizabeth made the decisions.").

        [9] D. Smith. Decl. Ex. D (Jhaveri Dep. 11:16-14:20, 22:16-24:9, Apr. 26, 2017).

        [10] *Id.* at 91:11-14 (stating:  "the initial number that I saw was about 40 percent were venous draws versus finger stick").

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                                                          - 9 -

1   demonstrate its technology.[11]  And before the October 15, 2015 Wall Street Journal article, no one

2   told Walgreens that their tests were being conducted, not on Theranos-manufactured devices, but via

3   third-party commercial analyzers.[12]

4       As set out in the motion for class certification [ECF No. 217 and supporting exhibits], after

5   these and other repetitive articles, Black Diamond Ventures XII-B, LLC and Lucas Ventures Group

6   XI, LLC closed their purchases of Theranos C-1 shares within two weeks of each other in December

7   2013 and January 2014 for $15 per share.[13]  Lucas Ventures Group XI has 52 investors with losses

8   ranging from $12,500 to $1 million with a median of $25,000-$50,000 for a total of $7,069,995.[14]

9   Black Diamond Ventures has 35 members with losses ranging from $100,000 to $1 million with a

10  median of $100,000 for a total of $5,349,900.[15]  Celadon has over 40 investors for a total of

11  $7,790,000.[16]  In total the proposed class consists of at least 127 investors who invested

12  $20,209,895.[17]

13      According to Defendants, the Lucas Ventures and Black Diamond funds released the fund

14  claims against Theranos.  But neither fund released the individual claims of its investors.  Neither

15  fund agreement has language allowing the fund to release individual claims, nor a power of attorney

16  that would extend to such claims.[18]  Nor do Defendants claim that any investor in these two funds

17  provided an individual release of claims to Defendants.

---

[11] *Id*. at 24:12-61:7; Exs. 936-943.

[12] *Id*. at 140:11-24.

[13] Ex. A to Reed Kathrein's Declaration In Support of Plaintiffs' Motion for Class Certification Under Rule 23(b)(3) ("Kathrein Decl."), ECF No. 217-2, May 3, 2018.

[14] Kathrein Decl. Ex. DD, ECF No. 217-5.

[15] Kathrein Decl. Ex. FF, ECF No. 177-7 (showing that investor losses range from $100,000 to $1 million with a median of $100,000).

[16] Kathrein Decl. Ex. HH, ECF No. 217-29.

[17] Compare presumed 50-person class size under SLUSA 15 U.S.C. § 78bb(f)(1).

[18] Kathrein Decl. Ex. KK, ECF No. 217-31 (Black Diamond) and Kathrein Decl. Ex. LL, ECF No. 217-32 (Lucas Ventures).  As these two funds are related and organized and run by cousins, Don

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                              - 10 -

1    Finally, both Don Lucas and Chris Lucas provided investors in each fund with emails linking

2    the press releases or articles containing the misrepresentations prior to the close of the funds

3    transactions with Theranos.[19]

4    ## IV.    LEGAL STANDARDS

5    The legal standards governing Plaintiffs' renewed class certification motion are set forth in

6    the Court's Order.  Plaintiffs must show they satisfy each requirement of Federal Rule of Civil

7    Procedure 23(a):  numerosity, commonality, typicality and adequacy of representation.  Order at 7

8    (citing Fed. R. Civ. P. 23(a)(1)-(4)).  As Plaintiffs seek certification under Rule 23(b)(3), they must

9    also show "that questions of fact common to Class members predominate over any questions

10   affecting only individual members" and that a class action is "superior to other available methods for

11   fairly and efficiently adjudicating the controversy." *Id*. at 7-8 (citing Fed. R. Civ. P. 23(b)(3)).

12   Importantly, "the decision whether to certify a class is entrusted to the sound discretion of the

13   district court."  Order at 8 (citing *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186 (9th

14   Cir. 2001), amended by 273 F.3d 1266 (9th Cir. 2001)).  As stated under Rule 23(c)(1)(C):  "[a]n

15   order that grants or denies class certification may be altered or amended before final judgment."

16   The Court's board discretion extends to its ability to reassess and revise any order denying class

17   certification in response to events "occurring in the ordinary course of litigation."  *Dukes v. Wal-*

18   *Mart Stores, Inc*., No. C 01-02252 CRB, 2012 WL 4329009, at *4 (N.D. Cal. Sept. 21, 2012) (citing

19   *Gulfstream Aerospace Corp. v. Mayacamas Corp*., 485 U.S. 271, 277 (1988)).  "Accordingly, it is

20   not uncommon for district courts to permit renewed certification motions that set out a narrower

21   class definition or that rely upon different evidence or legal theories."  *Id*. (citing *The Apple iPod*

---

Lucas and Chris Lucas, it is not surprising that the language of the operating agreements are identical.

[19] *See e.g*., D. Smith Ex. E (Brodie Dep. Ex. 2034, Mar. 2, 2018); D. Smith Ex. D (Brodie Dep. 63:25-64:20; 65:25-66:9) (noting Brodie read or scanned articles with stars next them); D. Smith Ex. D (Brodie Dep. Ex. 2024; and Perla Decl. Ex. 3 (Colman Dep. 74:19-76:18, Feb. 28, 2018), ECF No. 191-3 (confirming that Colman received the emails and opened both links to articles).

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 11 -

1   *iTunes Antitrust Litig.*, No. C 05-0037 JW, 2011 WL 5864036, at *1-2, *4 (N.D. Cal. Nov.22,

2   2011)).

3          The Court also has the power to appoint, as a class representative, any class member

4   regardless of whether or not they are a party to the case, named in the complaint or have intervened

5   in the action.[20]  Even if untimely, amendment of the complaint, should be allowed where there is no

6   prejudice to defendants or good cause exists.[21]

7

8                              **V.    ARGUMENT**

9   **A.    The Revised Class Definition Is "Definite"**

10          The proposed class definition, consisting of investors in three funds is definite.  Unlike

11  Defendants' concerns that the prior definition could be interpreted to include investors in funds that

12  invested in funds, this definition takes care of any such concern.  The definition also eliminates the

13  requirement to assess if the fund was created for the "express purpose" of purchasing Theranos

14  shares.  Each of these funds are express purpose funds that invested solely in Theranos shares.

15  **B.    The Proposed Class Representatives are Adequate**

16          In denying class certification, the Court found Robert Colman and Hilary Dye-Taubman to be

17  adequate.

18          BF Last Investments LLC is also adequate.  That Thomas Brodie, rather than his fund, BF

19  Last Investments LLC was named as a proposed class representative in the original motion is

20  immaterial.  Defendants were informed of this prior to filing their opposition, deposed Mr. Brodie

21  who made the investment decisions for his LLC, and have never argued prejudice.  Moreover, Mr.

22

23          [20] *See In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. 271, 283 (S.D. Ohio 1997) (" While it
    seems unusual that a class representative has not sued individually, the Court finds no requirement in
24  Rule 23 that they do so . . . .  Thus, Rule 23 seems to contemplate the possible substitution of non-
    parties as class representatives.  Furthermore, the class representatives, whether named in an
25  individual action or not, will be bound by any judgment in the class action.  Accordingly, we find it
    is unnecessary for a class member to have filed an individual action in order to qualify as a class
26  representative.").

27          [21] *In re: Facebook Privacy Litig., No.* 10-cv-02389(RMW), 2015 WL 2453734, at *5 (N.D. Cal.
    May 22, 2015) ("First, plaintiff is not seeking new categories or avenues of discovery.  Second,
28  Facebook has not identified any new issues or defenses that may arise out of Marfeo's addition as a
    class representative.').

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 12 -

1   Brodie submitted a declaration in support of Class Certification,[22] produced the documents

2   requested,[23] and in his deposition testified as to his control and ownership of BF Last Investments.[24]

3        BF Last Investments purchased an interest in Black Diamond, at least in part, in reliance on

4   the same false statements made in the media blitz created by Theranos that Plaintiffs Colman and

5   Dye-Taubman also relied on.[25]  *See also In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 312 F.R.D.

6   332, 345 (S.D.N.Y. 2015) (appointing as class representatives persons who were "not named in the

7   Complaint," explaining "Rule 23 gives the Court the power to designate class representatives who

8   are not lead plaintiffs").

9        Hilary Dye-Taubman testified that she was exposed to the same false and misleading

10  statements, such as the *Fortune* article, which states "[Theranos] currently offers more than 200 –

11  and is ramping up to offer more than 1,000 – of the most commonly ordered blood diagnostic tests,

12  all without the need for a syringe . . . on just a few drops of blood" and confirming that "Its

13  phlebotomists currently take physician-ordered blood draws . . . at collection centers the company

14  operates . . . at 21 Walgreens."  She furthermore confirmed reading stories from *The Wall Street

15  Journal* and, which repeated the same claims, prior to making her investment in 2015.[26]  *Compare* to

16  September 8, 2013 *Wall Street Journal* article based on interview of Defendant Holmes:  Theranos

17  could "run any combination of tests, including sets of follow-on tests" at once, very quickly, all from

18  a single small blood sample."  Additionally, prior to the October 2015 *Wall Street Journal* exposé,

19  the Theranos's website prominently featured a nanotainer balanced on the tip of a finger and the

20  slogan:  "one tiny drop changes everything."  "Now, for the first time," the website claimed,

21  Theranos's "laboratory can perform your tests quickly and accurately on samples as small as a single

22  drop."  Afterwards it read "Smaller Samples.  Smaller Needles."[27]

23  ───────────────

24     [22] *See* Brody Decl. In Supp. Of Motion, ECF No. 217-37.

25     [23] *See e.g.*, D. Smith Ex. E (Brodie Dep. Exs. 2030, 2031, and 2034).

26     [24] *See* Brodie Dep. 25:12-16, ECF No. 216-6 (testifying that he is the "managing director of BF Last Investments, LLC", and that the entity serves as a "family investment vehicle for [his] family").

   [25] *See* Plaintiffs' App. B to ECF No. 195, 218:29-30.

27     [26] Taubman-Dye Dep. 143:4-19; *See also* Answer to FAC, ECF No. 175 ¶¶31-33.

28     [27] Answer to FAC, ECF No. 175 ¶¶24, 55.

010650-11 1039552 V1

PLS' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 13 -

1

2

**C.      "Liquidation Preferences" of the Three Funds Have Minimal Bearing on Damages Between the Two Series and Present No Antagonism Between Class Members**

3

4

5

In denying class certification, the Court rested its decision, in part, on a concern about liquidation preferences.  However, as paired down to only two remaining series of stock, it is clear that no real or disabling issue exists.

6

7

8

9

10

Defendants only briefly raised that the funds bought different stock at different times, and the White Declaration only asserted that the C, C-1 and C-2 series have a senior liquidation preference to Series A and B.  Regardless it is Defendants burden to show any complexity that the liquidation preference would create that would threaten superiority.[28]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Beyond mere speculation, Plaintiffs can only discern that liquidation preferences may have some impact on damage calculations.  Under Cal. Corp. Code § 25500 damage calculations do not vary by the type of stock purchased.  Rather, "damages shall be the difference between the price at which such other person purchased or sold securities and the market value which such securities would have had at the time of his purchase or sale in the absence of" the "act or transaction" that violated Section 25400)."  At most, a liquidation preference between the C-1 and C series may mean, a damage calculation must simply allocate damages between the series in accordance with the liquidation rights spelled out in the incorporating documents – assuming there is a liquidation and that there are any liquidation proceeds distributed to the three funds.  Only then would a calculation need to be made to account for those distributions.  Those types of calculations are commonly provided for in a plan of allocation in securities fraud class actions that include different classes of stock.[29]

25

26

[28] Moreover, Plaintiffs alleged that Theranos is near worthless, rendering any liquidation preference and distribution or minimal impact to any deduction from a recovery.

27

28

[29] § 6:23.Certification of a settlement class—Plan of allocation of settlement consideration, 2 McLaughlin on Class Actions § 6:23 (14th ed.).

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 14 -

1    Plaintiffs' proposed reduced class now consists of only two series Theranos stock.  Black

2    Diamond and Lucas Ventures both purchased C-1 shares with a close on December 31, 2013 and

3    January 14, 2014 at $15 per share, respectively.  Celadon purchased Preferred C shares with a close

4    on December 15, 2015 at $19 per share.  Calculations for this one difference would not be complex,

5    and are relatively simple compared to most securities fraud cases, where each day of trading impacts

6    the amount of a class members trades.[30]

7    **D.     The Releases Signed by Don and Chris Lucas Do Not Present Unique Issues and Do Not Release the Fund Investors' Individual Claims**

8

9    In finding a lack of superiority for the larger class, this Court rested its concern on

10   Defendants' claims that fund releases create individual issues.  Defendants provided no recognizable

11   factual or legal support for this claim.  If there was support, they should have shown it by now.

12   In May of 2017, Defendants made this same argument and convinced the Court that any early

13   motion to strike the class allegations, was an efficient way to end this litigation:  "Our position will

14   be assuming that when we have all the operative documents it confirms that the fund shareholders

15   were released by the actions of the partnership in signing the release."[31]  Defendants never made this

16   motion against the fund shareholders.  Instead, it only moved against the funds themselves – a

17   motion to which plaintiffs agreed.  (*See* Pl.'s Reply Br. In Supp. of Mot. for Inj. Relief, ECF No.

18   120-8).

19

20   Since, Defendants have had plenty of opportunity to take class discovery, yet they fail to

21   point to a single agreement which released the personal claims of the fund investors.  Rather,

22   Defendants acknowledge possession of the fund agreements which were produced, and by the

23   absence of language releasing individual claims, show otherwise.

24

25   [30] *Id.*  Here, the vast majority of the class purchased series C-1 stock for $15 per share on two date two weeks apart (December 31, 2013 and January 14, 2014).  C-2 stock was purchased on two

26   dates for $17 per share.  Those two types of stock then make up 78% of the Class.  Adding just one more series of stock, Celadon, which purchased Preferred C at $19 per share and 90% of the class is

27   accounted covered with just these 5 calculations, which if any are required.

28   [31] Discovery Dispute Hr'g Tr. 6:24-7:2, May 24, 2017.

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

1   Finally, since Plaintiffs propose a reduced class of purchasers in only two intermediary funds

2   run by the Lucas cousins, which claim to have released claims, and the fund language is virtually

3   identical, any burden to review these claims is minimal.[32]   Absent a showing by Defendants that the

4   release issues are real or destroy superiority, the reduced class or fund sub-classes should be

5   certified.

6   **E.      A Common Question and Strong Likelihood Exists That Investors in These Particular
            Funds Were Exposed to Defendants to the *sine qua non* Misrepresentations**

7

8   As alleged in the Complaint, and as presented to the Court, Theranos purported to have

9   developed proprietary technology that would allow commercial pharmacies to run a multitude of

10  highly accurate blood tests from a few drops of a patient's blood.  Beginning in 2013, Theranos

11  began an extensive and highly coordinated advertising campaign and concluded a contract with

12  Walgreens to promote its technology.  From 2013 to 2015, Holmes and other Theranos

13  spokespersons gave dozens of interviews and distributed numerous press releases discussing the

14  groundbreaking possibilities of their technology.  Answer to FAC, ECF No. 175 ¶¶ 31-33

15  (delineating media campaign containing same *sine qua non* statements over a two-and-a-half year

16  period prior to the closing of the Celadon fund purchase).  Media outlets repeated Theranos's tightly

17  controlled claims that with its technology, a tiny "nanotainer," small enough to balance on one

18  finger, it was able to, as the Wall Street Journal repeated, quickly "run any combination of tests,

    including sets of follow-on tests."

19

20  Theranos also promoted its Board of Directors which included famous and impressive public

21  figures.  And it promoted a contract with Walgreens to roll out its technology.  These three facts,

22  were the *sine qua non* of Theranos, and the reason for any investment in Theranos . . . and none were

    true.

23

24  Unlike *Mazza*[33] or *Hyundai*[34], there was no other reason to invest in Theranos at a valuation

25  of $10 billion dollars.  This was not a startup, it had no other business, and the only growth that

26  _____

    [32] *See* Kathrein Decl. Exs. KK and NN (Operating agreements for Black Diamond and Lucas
    Ventures IV.)

27  [33] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

28  [34] *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 691 (9th Cir. 2018).

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 16 -

1    could be expected was from a functional and commercially ready and viable product.  *Mazza* and

2    *Hyundai* involved cars, which had been advertised for years, and had a variety of features, any of

3    which could have been a basis for a customers' purchase, and the campaign was neither so long nor

4    intense enough that it "was likely that many class members were never exposed to the alleged

5    misleading advertisements."  Similary, in *Ehret*, the Court found that because Defendants actually

6    could show that many Uber users had never been exposed to the misrepresentation, it too found it

7    was likely many members never saw the misleading statement.  Similarly in *Clorox*[35] an advertising

8    analytics company concluded "not enough people are seeing or even remembering the advertising."

9    Defendants presented no such rebuttal evidence here.

10          Here, the Court recognized that the media campaign by Defendants was highly targeted and

11   orchestrated.  In fact, Plaintiffs as well as Defendants presented evidence of the repeated campaign,

12   and distribution of identical materials and statements to the managers of investing funds, and their

13   repetition to their potential fund investors.  Theranos own media plan shows how it planned to

14   manipulate the press to present *its* story as Defendants wanted:

15
16              With our guiding principles, objective, target audience and
                strategies in place, its time to pull back the curtain and unveil
17              Theranos and its revolutionary offering to the media and its wider
                world.
18
                Critical to success is that the Theranos story is told with the highest
19              level of credibility to immediately convey to the medical
                community that we're introducing a groundbreaking laboratory
20              service that will offer significant benefits to them and their
                patients.
21
                Therefore, it is essential that we launch with a major partner
22              customer that commands attention and respect.  While Theranos is
                young and "unproven," we must draw on the respect and
23              credibility of "the company we keep' to begin the long process of
                establishing credibility in our own right.[36]
24

25

26

27          ────────────────
            [35] *In re Clorox Consumer Litig.,* 301 F.R.D. 436, 439 (N.D. Cal. 2014).
28          [36] Kathrein Decl. Ex F. at 14.

Unlike in *Mazza*, *Hyundai, Clorox, MyFord Touch*[37] and *Ehret*[38] – or even *Tobacco II* [39] – prior to the class period, there was no pre-existing knowledge of Theranos. Theranos had been in "stealth mode" prior to the announcements of its esteemed Board of Directors and the Walgreens partnership.[40] Prior to the Class Period, Class Members knew little, if anything, about Theranos products. Since Theranos had been secretive, and in stealth mode, unlike cigarettes, or cars for that matter—both of which have been around for over a century—a long campaign is not needed to pervade the public exposure and thus, this case is more like *Trump University*[41], which was new, and the *sine qua non* was Trump University itself and its "tightly orchestrated promotional campaign."

Finally, as in *Ehret*, both Lucas Ventures and Black Diamond Ventures sent emails to their investors referencing Theranos's misstatements about its revolutionary technology, esteemed Board of Directors, and Walgreens partnership, and providing links to the false statements.[42] In *Ehret*, the court certified a narrower class on fraud claims, when defined as those who received emails from Uber that contained the offending misrepresentation. Here too, both Lucas Ventures and Black Diamond sent their investors in the intermediary funds who were sent and such emails from the intermediary funds repeating or providing links to the Theranos story, and so exposure is shown and not speculative.

---

[37] *In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2016 WL 7734558, at *22 (N.D. Cal. Sept. 14, 2016).

[38] *Ehret v. Uber Technologies, Inc.,* 148 F. Supp. 3d 884, 899-901 (N.D. Cal. 2015).

[39] *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009).

[40] *See e.g.*, Email from Theranos to shareholders dated July 30, 2013 (stating: "we have been working in stealth mode for several years").

[41] *Makaeff v. Trump University, LLC,* 2014 WL 688164, at *1, *8.

[42] *See* D. Smith Ex. F (Colman Dep. Ex. 2024) (containing email from Don Lucas to investors linking to news re Walgreens partnership, mentioning esteemed board members, and repeating Theranos's statement about its technology being able to "run any test available in central laboratories"); and D. Smith Ex. E (Brodie Dep. Ex. 2034) (email from Black Diamond Ventures to investors providing links to Theranos's website and press releases).

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 18 -

1
2
3
4
5
6

For Celadon investors, no such emails can be shown.  But their investment was two years into the media campaign, and the intermediary fund just acted, in its own words, as a broker.[43]  Rather, all they had was the media campaign, the press releases and the website, on which to base their decisions to invest, and this campaign told the same story prior to their investment. Defendants have not shown otherwise.

7
8

**F.    Plaintiffs' Individual Claims are Not Viable When All Factors are Considered, Including the Recent *China Agritech* decision, and the Cost and Complexity of the Litigation**

9
10
11
12
13
14
15
16
17

The Supreme Court's recent decision in *China Agritech, Inc. v. Resh*, No. 17-432, 2018 WL 2767565 (June 11, 2018) ("*China Agritech*") has now made individual fraud claims all but impossible for the majority of investors in Theranos.  The case held that putative class members <u>cannot</u> commence a class action beyond the applicable statute of limitations upon the denial of class certification.  *China Agritech*, 2018 WL 2767565 at *1.  This case, along with the Class and Subclasses definitions as amended, changes the superiority analysis, as the proposed the Class and Subclasses do not include members with claims in excess of $1 million.  Rather, the median claim is $25,000 to $100,000.

18
19
20
21
22

In determining superiority, the Ninth Circuit instructs "the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis."[44]  To gauge the costs of individual suits for comparative purposes, courts look to multiple factors including

23
24
25
26
27
28

---

[43] Decl. of Matthew Larabee.  Kathrein Decl. Ex. HH, ECF No. 217-29.

[44] *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d at 1190, *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (Recognizing that a party with a claim of $50,000 may have a difficult time pursuing a complex claim); *see also In re Revco Sec. Litig.*, 142 F.R.D. 659, 669 (N.D. Ohio 1992) ("While members of the class may be capable of litigating separate actions, Rule 23 has no restrictions on wealth").

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC                                                          - 19 -

the complexity of the underlying substantive law,[45] the litigiousness of the defendant,[46] and the ability of plaintiffs to recover attorney's fees under the relevant statute.[47]  The potential benefits of individual litigation, including the ability to control litigation strategy and, in certain cases, recover greater statutory damages, can also play a part in the comparative analysis; these matters are considered under the first Rule 23(b)(3) factor, the interests of members of class in individually controlling prosecution or defense of separate actions.

Here, proper consideration should be given to the complexity of this particular securities fraud action which combines difficult issues of science and federal regulation beyond the schooling of most investors, and even lawyers.  It is that complexity that contributed to Defendants' ability to conceal the truth from the public, investors, doctors, Walgreens and Safeway.

*Cole v. Gene by Gene, Ltd.* distinguishes itself as its class members had "relatively straight forward and concise law" – unlike *Epifano v. Boardroom Business Products* which found, 28 years ago, that it was not clear that claims between $50,000 and $285,000, not

---

[45] *See* RUBENSTEIN ET AL., 2 NEWBERG ON CLASS ACTIONS § 4:65 (5th ed. 2018) citing *Epifano v. Boardroom Business Products, Inc.*, 130 F.R.D. 295, 299 (S.D. N.Y. 1990) ("Although the damages the plaintiffs claim to have suffered range from $50,000 for Solar to $285,000 for Epifano, given the complexity of securities law cases, and the high cost of litigation, it is not clear that the cases would have been pursued without the class action possibility.  In addition . . . there are class members with very small claims who would not be able to proceed on their own.").

[46] 2 NEWBERG *Id.* Citing *Klay v. Humana, Inc.*, 382 F.3d 1241, (11th Cir. 2004) (affirming certification of a class of nearly all doctors in a suit against HMOs for underpayment:  "the amounts in controversy would make it unlikely that most of the plaintiffs, or attorneys working on a contingency fee basis, would be willing to pursue the claims individually.  This is especially true when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings.").

[47] 2 NEWBERG *Id.* Citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420, (5th Cir. 1998) (finding the class action form not superior in Title VII case because "[t]he relatively substantial value of these claims (for the statutory maximum of $300,000 per plaintiff) and the availability of attorneys' fees eliminate financial barriers that might make individual lawsuits unlikely or infeasible.").  *ESI Ergonomic Sols., LLC v. United Artists Theatre Circuit, Inc.*, 203 Ariz. 94 (Ct. App. Div. 1 2002) (finding class action superior because, *inter alia*, attorney's fees would not be available in individual litigation under the Telephone Consumer Protection Act).

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 20 -

adjusted for inflation, "would have been pursued without the class action possibility".[48] *Stoudt*,

an even older case than *Epifano* involved a relatively simple tax shelter claim, back in 1988.[49]

Also distinguishing is the well-documented litigiousness of Defendants,[50] the inability to

recover attorneys' fees, and the costs of litigation. The cost of each individual investor's

deposition, including the cost of the court reporter and videographer, and attorney time, would

approach $10,000 a pop.[51] In a simple personal injury case attorney's fees range from $220,000

(609 hours to close) to $474,090 (1,319 hours to close), whereas a more comparable patent case

costs between $727,935 and $2.2 million on average (whether that be favorable or not).[52] A two

week trial in a simple case would likely cost, after motions to dismiss, discovery and summary

judgment would likely cost well in excess of $200,000, without the cost of experts.[53] The SEC

took years to bring Elizabeth Holmes and Theranos to a settlement, and the Defendant Balwani

is continuing to fight it out. So even the SEC with its resources has been unable to bring its

---

[48] *Cole v. Gene by Gene, Ltd.*, 322 F.R.D. 500, 508 (D. Alaska 2017) (distinguishing itself as a "relatively straightforward case, as opposed to a securities case, citing *Epifano v. Boardroom Business Products, Inc.*, 130 F.R.D. 295, 299 (S.D.N.Y. 1990) ("Although the damages the plaintiffs claim to have suffered range from $50,000 for Solar to $285,000 for Epifano, given the complexity of securities law cases, and the high cost of litigation, it is not clear that the cases would have been pursued without the class action possibility. In addition . . . there are class members with very small claims who would not be able to proceed on their own.").

[49] *Stoudt v. E.F. Hutton & Co., Inc.*, 121 F.R.D. 36, 38 (S.D.N.Y. 1988).

[50] *See, e.g.*, Julia Belluz, *How Silicon Valley got played by Theranos*, Vox (June 12, 2018), https://www.vox.com/science-and-health/2018/6/12/17448584/theranos-elizabeth-holmes-bad-blood (Carreyrou noting that Holmes has gotten "to the point of digging your heels in and continuing to burn investor money on lawyers. You know, hundreds of millions of dollars have been paid to lawyers over the past two and a half years.").

[51] *Compar*e, Thomas E. Willging and Emery G. Lee III, *In Their Words: Attorney Views About Costs and Procedures in Federal Civil Litigation*, Federal Judicial Center (March 2010) at page 15, https://www.fjc.gov/sites/default/files/2012/CostCiv3.pdf.

[52] *Implementing Discovery Proportionality Standard Conference Papers Data on Total Billable Hours and Actual Law Firms' Fees and the Proportionate Share Attributable to Discovery Expenses in Certain Patent, Product Liability, and Personal Injury Litigation*, Tymetrix Legal Analytics (2014), https://law.duke.edu/judicialstudies/conferences/november2014/papers/.

[53] A typical three day trial in Canada in 2007 was estimated to cost $60,738. Tracey Tyler, *A 3-day trial likely to cost you $60,*000, The Star (Mar. 3, 2017), https://www.thestar.com/news/2007/03/03/a_3day_trial_likely_to_cost_you_60000.html.

010650-
11 1039552 V1

PLS' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 21 -

1   cases to finality.  To expect a lone investor to do what the SEC has not been able to do, is

2   beyond conjecture.

3        Finally, it cannot be reiterated too strongly that denial of class certification is the

4   effective death knell of this litigation.[54]  And even if the investors they did want to take the risk,

5   and undue expense, forcing class members to file individual suits in different courts, does not

6

7   benefit the other courts, nor does it benefit defendants.

8   **G.     Individual Fraud Claims Are Unlikely and Do not Create a Net Inefficiency**

9        History of the case has shown that investors are not particularly inclined to pursue their own

10  fraud claims, and attempts by class members to engage an attorney for individual claims since denial

11  of class certification has failed.[55] Moreover, since this class action was filed, no individual fund

12  investor suits have been filed despite the complete obliteration of their investment caused by a clear

13  fraud.  The only suits have been *Partners*[56] (claiming $90 million) and *Walgreens*[57] (claiming over

14  $100 million).  As shown above, the median investment of the Class Members ranges between

15  $25,000 and $100,000.  Unlike the large individual damages asserted by *Partners* and *Walgreens*, the

16

17  likelihood that investors with these claims will bring individual actions is close to zero.

18       In short, the majority of investors are precluded from bringing individual fraud claims due to

19  the sheer economic impracticality of such litigation, and are now – due to the Supreme Court's

20

21       [54] *See McIntosh v. Irwin Union Bank & Trust Co.*, 215 F.R.D. 26, 35 (D.Mass.2003) *abrogated
    in part on other grounds by* McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 423 (1st
22  Cir.2007).

23       [55] *See* D. Smith Exs. H, I and J (recent emails from attorneys declining to represent investors in
    Lucas Ventures, including an email stating, "[I]t does not make economic sense for us to represent
24  you in your case concerning Theranos.  Given the amount of money we understand to be at issue for
    you individually, the amount of legal fees in prosecuting the case would far exceed your likely
25  recovery"; and another email stating "As we discussed, litigation is expensive and $50,000, although
    a significant sum of money, is simply not enough to make it economically viable for us to take your
26  matter on a contingency basis.").

27       [56] *Partner Investments, L.P. et al. v. Theranos, Inc., et al.*, C.A. No. 12816-VCL (Del. Ch. Mar.
    23, 2017).

28       [57] *Walgreen Co. v. Theranos, Inc*. No. 1:16-cv-01040 (D. Del. Nov. 8, 2016).

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 22 -

decision in *China Agritech* – additionally precluded from commencing a class action due to the running of the statute of limitations on such claims.  In these circumstances, at the very minimum, the efficiency to be gained by "determining in one fell swoop whether Defendants made intentional misrepresentations that inflated securities prices" (Order at 33-34) (i.e., Plaintiffs' market manipulation claim) is not a net inefficiency – it is the last remaining hope of investors seeking to recoup their losses.

### VI.    CONCLUSION

For the reasons stated above, the Court should alter or amend its class certification order as proposed above, and at the very least,  the order should be amended to allow for a class for Plaintiffs' market manipulation claim under California Corporations Code §§ 25500 and 25400(d).  As a further alternative, Plaintiffs request leave to amend the complaint for the limited purpose of adding BF Last Investments LLC as a named plaintiff.

DATED: June 14, 2018                      HAGENS BERMAN SOBOL SHAPIRO LLP

By:  */s/ Reed R. Kathrein*
          Reed R. Kathrein (139304)
Peter E. Borkon (212596)
Danielle Smith (291237)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com
danielles@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs and Proposed Lead*

010650-
11 1039552 V1

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

- 23 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Counsel for the Class*

Paul J. Geller (admitted *Pro Hac Vice*)
Constantine P. Economides (admitted *Pro Hac Vice*)
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile:  (561) 750-3364
pgeller@rgrdlaw.com
ceconomides@rgrdlaw.com

Dennis J. Herman
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 228-4545
Facsimile:  (415) 288-4534
dennish@rgrdlaw.com

Jason A. Forge
Kevin S. Sciarani
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423
jforge@rgrdlaw.com
ksciarani@rgrdlaw.com

*Additional Counsel for Plaintiffs*

PL.S' RENEWED MOT. FOR CLASS CERT. OR, ALTERNATIVELY
TO ALTER OR AMEND DENIAL UNDER FED R. CIV. P. 23(c)(1)(C)
5:16-cv-06822-NC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28