**\* \* \* UNSEALED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 315 DATED JULY 23, 2018 \* \* \***

# Exhibit A

1              UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4   ROBERT COLMAN and HILARY
    TAUBMAN-DYE, et al.,

5
                 Plaintiffs,
6
         vs.                    Case No. 5:16-cv-06822-NC
7
    THERANOS, INC., ELIZABETH
8   HOLMES, RAMESH BALWANI, et
    al.,

9
                 Defendants.
10  _____

11

12

13       VIDEO DEPOSITION OF CHANNING REX ROBERTSON

14                     Volume I

15                   May 14, 2018

16                    10:03 a.m.

17

18           715 Hearst Avenue, Suite 202

19              Berkeley, California

20

21

22  Reported by:

23  QUYEN N. DO

24  CSR No. 12447

25

```
 1   APPEARANCES:

 2

 3        For Plaintiff:

 4            HAGENS BERMAN SOBOL SHAPIRO LLP
             REED R. KATHREIN, ESQ.
 5            DANIELLE SMITH, ESQ.
             715 Hearst Avenue, Suite 202
 6            Berkeley, California  94710
             510.725.3000
 7            510.725.3038
             510.725.3001 Fax
 8            reed@hbsslaw.com
             danielles@hbsslaw.com
 9

10        For Defendant Elizabeth Holmes:

11            COOLEY LLP
             KATHLEEN GOODHART, ESQ.
12            101 California Street, 5th Floor
             San Francisco, California  94111-5800
13            415.693.2012
             415.693.2222 Fax
14            kgoodhart@cooley.com

15

         For Defendant Ramesh Balwani:
16
             DAVIS WRIGHT TREMAINE LLP
17            KELLY M. GORTON, ESQ.
             505 Montgomery Street, Suite 800
18            San Francisco, California  94111-6533
             415.276.6584
19            415.276.6500 Fax
             kellygorton@dwt.com
20

21        For Defendant Theranos, Inc.:

22            WILMER CUTLER PICKERING HALE AND DORR LLP
             MICHAEL MUGMON, ESQ.
23            950 Page Mill Road
             Palo Alto, California  94304
24            650.858.6103
             650.858.6100 Fax
25            michael.mugmon@wilmerhale.com
```

```
 1    APPEARANCES (cont.):


 2


 3         For Channing R. Robertson:


 4              ARGUEDAS, CASSMAN & HEADLEY, LLP
                RAPHAEL M. GOLDMAN, ESQ.
 5              803 Hearst Avenue
                Berkeley, California  94710
 6              510.845.3000
                510.845.3003 Fax
 7              goldman@achlaw.com


 8
           Also Present:
 9
                Lorenzo Fernandez-Kopec, Videographer
10


11


12


13


14


15


16


17


18


19


20


21


22


23


24


25
```

1                    INDEX TO EXAMINATION

2

3          WITNESS:   CHANNING REX ROBERTSON, Volume I

4    EXAMINATION                                         PAGE

5    By Mr. Kathrein                                        9

6    Afternoon Session                                     79

7    (Resumed) By Mr. Kathrein                             79

8

9                         --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX TO EXHIBITS

 2              CHANNING REX ROBERTSON, VOLUME I

 3         COLMAN, et al. vs. THERANOS, INC., et al.

 4                   Monday, May 14, 2018

 5                 Quyen N. Do, CSR No. 12447

 6
```

| MARKED | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 63 | Subpoena to Testify at a Deposition in a Civil Action to Channing Rex Robertson | 11 |
| Exhibit 64 | E-mail chain; 10/7/2013; Anjali Jain to Channing Robertson; re Theranos lab results; TH-COL0003954714 through -717 | 93 |
| Exhibit 65 | E-mail chain; 3/22/2015; Sunny Balwani to Elizabeth Holmes; re FW: Steve Quake; TH-COL000941624 | 107 |
| Exhibit 66 | E-mail chain; 6/16/2015; Channing Robertson to Elizabeth Holmes; re Diamandis article; TH-COL0001057127 through -132 | 108 |
| Exhibit 67 | E-mail chain; 7/22/2015; Elizabeth Holmes to Channing Robertson; re WSJ; TH-COL0001836293 and -294 | 111 |
| Exhibit 68 | E-mail chain; 9/25/2015; Lauren Vroom to Elizabeth Holmes; re Briefing for Churchill Event tomorrow; TH-COL0001422648 through -652 | 111 |
| Exhibit 69 | Document entitled "Hot Startup Theranos Has Struggle With Its Blood-Test Technology"; TH-COL0002294567 through -578 | 114 |
| Exhibit 70 | E-mail chain; 10/19/2015; Channing Robertson to Elizabeth Holmes; re Phone Call; TH-COL0001832060 and -061 | 122 |

```
25  //
```

```
                          Channing R. Robertson
                          May 14, 2018                            6
```

```
 1                   INDEX TO EXHIBITS (cont.)

 2                CHANNING REX ROBERTSON, VOLUME I

 3            COLMAN, et al. vs. THERANOS, INC., et al.

 4                     Monday, May 14, 2018

 5                   Quyen N. Do, CSR No. 12447

 6

 7   MARKED               DESCRIPTION                  PAGE

 8   Exhibit 71   E-mail chain; 10/22/2015; Daniel Edlin
                  to Channing Robertson; re Wsj;
 9                TH-COL0000340020 through -022        128

10   Exhibit 72   E-mail chain; 10/26/2015; Tony Klein
                  to Channing Robertson;
11                TH-COL0001422648 through -618        130

12   Exhibit 73   The Wall Street Journal article,
                  "Theranos Ran Tests Despite Quality
13                Problems"; TH-COL000785498 through
                  -502                                 133
14
     Exhibit 74   Transcript of Channing Robertson's CBS
15                Interview February 29, 2015;
                  TH-COL0000300938 through -944         137
16
     Exhibit 75   E-mail with attachment; 3/21/2016;
17                Donald A. Lucas to Mark Madden; Pat;
                  Rick Terrell; re Theranos Shareholder
18                Letter; TH-COLMAN00030643 through -672 143

19   Exhibit 76   Stanford Report, June 11, 1997,
                  "Channing Robertson: People, not
20                things, are 'what matter'"           145

21   Exhibit 77   Article entitled "The not-so-retiring
                  retirement of Channing Robertson"    147
22
     Exhibit 78   June 12, 2014, Fortune article by
23                Roger Parloff entitled "This CEO is
                  out for blood"                       150
24   //

25   //
```

May 14, 2018

```
 1                    INDEX TO EXHIBITS (cont.)

 2               CHANNING REX ROBERTSON, VOLUME I

 3          COLMAN, et al. vs. THERANOS, INC., et al.

 4                    Monday, May 14, 2018

 5                 Quyen N. Do, CSR No. 12447

 6

 7   MARKED                DESCRIPTION                   PAGE

 8   Exhibit 79   March 9, 2016, CBS This Morning
                  article entitled "Why much-hyped
 9                biotech company is fighting to save
                  its reputation"                        150
10
     Exhibit 80   E-mail chain; 10/4/2007; Elizabeth
11                Holmes to Peter Thomas; re A couple of
                  things; TH-COLMAN0003224745 through
12                -785                                    157

13   Exhibit 81   Reference Guide on Engineering          159

14   Exhibit 82   Securities and Exchange Commission vs.
                  Elizabeth Holmes and Theranos, Inc.,
15                complaint                               162

16   Exhibit 83   medium.com article entitled "Don't
                  bash the dropout and ignore the
17                professors"                             168

18                        --oOo--

19

20

21

22

23

24

25
```

```
 1                     BERKELEY, CALIFORNIA;

 2                MONDAY, MAY 14, 2018, 10:03 A.M.

 3

 4                         --oOo--

 5

 6            THE VIDEOGRAPHER:  Good morning.  This begins

 7    the videotape deposition of Channing Robertson in the

 8    matter of Colman vs. Theranos filed in the U.S. District

 9    Court, Northern District of California, San Jose

10    district, Case No. 5:16-CV-06822-NC.  This deposition is

11    being held at 715 Hearst Avenue in Berkeley, California

12    on May 14th, 2018.

13            My name is Lorenzo Fernandez-Kopec.  I'm the

14    videographer.  The court reporter today is Quyen Do.  We

15    are both here representing U.S. Legal Support.

16            Please note that audio and video recording

17    will taking place unless all parties have agreed to go

18    off the record.

19            The time is 10:04.  We are on the record now.

20            Counsel and all present, will you please state

21    your experience and affiliation for the record, after

22    which the court reporter will swear in the witness.

23            MR. KATHREIN:  Reed Kathrein with Hagens

24    Berman on behalf of Plaintiffs.

25            MS. SMITH:  Danielle Smith, Hagens Berman,
```

```
 1  behalf of Plaintiffs.

 2          MS. GOODHART:  Kathleen Goodhart with Cooley

 3  on behalf Elizabeth Holmes.

 4          MS. GORTON:  Kelly Gorton with Davis Wright

 5  Tremaine on behalf of Ramesh Balwani.

 6          MR. MUGMON:  Michael Mugmon of Wilmer Hale on

 7  behalf of Theranos.

 8          MR. GOLDMAN:  And Raphael Goldman from

 9  Arguedas, Cassman & Headley.  I represent Dr. Robertson.

10                       --oOo--

11                CHANNING REX ROBERTSON,

12      having been first duly sworn, was examined and

13                  testified as follows:

14

15                     EXAMINATION

16

17  BY MR. KATHREIN:

18      Q    Mr. Robertson, my name is Reed Kathrein.  I

19  represent the Plaintiffs in the lawsuit Robert

20  Colman, et al., vs. Elizabeth Holmes, Theranos, and

21  Ramesh Balwani.  Today I'll be asking you questions

22  relating to that lawsuit.

23          Is there any reason today that you feel that

24  you can't testify?

25      A    No.
```

 1        Q     Okay.  You -- you're very familiar with

 2   deposition testimony, correct?

 3        A     I've been deposed in the past, yes.

 4        Q     You also acted as an expert witness and

 5   testified on the stand, correct?

 6        A     That's correct.

 7        Q     Okay.  So you understand that the court

 8   reporter can't take down a nod of the head or an "uh-uh"

 9   or "uh-huh," correct?

10        A     Yes.

11        Q     So your answers to have to be verbal so she

12   could take that down; is that fair?

13        A     It is.

14        Q     Okay.  At any time, if you want to take a

15   break, feel free to ask.  We're not -- unlike in court,

16   we're -- we're not beholden to the Court's schedule.

17   So, if you feel uncomfortable, need to take a break,

18   just ask, and we can usually do that.  The only times

19   that we have any sort of issue with doing that is when

20   we're in the middle of a question or subject matter.  Do

21   you understand that?

22        A     Yes.

23        Q     Okay.  And you feel free to ask for a

24   question -- ask for a break at any time, correct?

25        A     Yes.

```
 1      Q    Okay.  You're not appearing here voluntarily,

 2  correct?

 3      A    [No response.]

 4      Q    Today.  You're not -- you're here because we

 5  subpoenaed you, correct?

 6      A    That's right.

 7      Q    Okay.  I'm going to have this marked as the

 8  next deposition exhibit number, 63.

 9                 (Exhibit 63 marked)

10  BY MR. KATHREIN:

11      Q    I'll represent, for the record, that this is

12  the deposition exhibit that we issued for your

13  deposition.  Have you seen this?

14      A    No.

15      Q    Okay.  But you're aware that you were

16  subpoenaed, and I assume that you -- your counsel has

17  talked to you about the subpoena, correct?

18      A    Yes.

19      Q    Okay.  Did you search for any documents in

20  preparation for this deposition?  I mean, you

21  personally --

22      A    No.

23      Q    -- not your counsel.

24           And, Counsel, do I understand that our

25  agreement for this deposition was the production of all
```

```
 1   documents produced in the PFM litigation -- are produced

 2   to this -- the SEC?

 3           MR. GOLDMAN:  I don't remember the SEC part,

 4   actually.  I remember the PFM.

 5           MR. KATHREIN:  Okay.  This -- this is my

 6   understanding, though, that's the same --

 7           MR. GOLDMAN:  I --

 8           MR. KATHREIN:  -- group of documents.

 9           MR. GOLDMAN:  -- I actually don't know.  I'd

10   have to defer to Theranos counsel.

11           MR. MUGMON:  And -- and we -- we provided a

12   letter on Friday night -- I think that is the case --

13   what we produced.

14           MR. KATHREIN:  That was at 11:58 on Friday

15   night, correct?

16           MR. MUGMON:  That is correct.

17           MR. KATHREIN:  Okay.  So that -- so nothing

18   has been produced on behalf of Mr. Robertson beyond

19   what's in that letter, correct?

20           MR. MUGMON:  That's correct.

21           MR. KATHREIN:  Okay.

22       Q   (By Mr. Kathrein)  Mr. Robertson, I'd like to

23   go a little bit through your back- -- background.

24   Rather than me stating what I read about you, why don't

25   tell me what your degrees are in and where you received
```

 1   those degrees?

 2        A    I have a bachelor's degree in chemical

 3   engineering from University of California at Berkeley.

 4   I have a master's degree and a PhD degree in chemical

 5   engineering from Stanford University.

 6        Q    Do you have any degrees in biomedical

 7   diagnostics?

 8        A    No.

 9        Q    Let's go through -- what years did you receive

10   those degrees?

11        A    Received the bachelor's degree in 1965.

12        Q    Mm-hm.

13        A    The master's degree was, I believe, 1967 or

14   thereabouts, and PhD was 1969.

15        Q    And since then, can you tell me where

16   you've -- where your primary employment has been?  Other

17   than things like consulting arrangements.

18        A    My first job was with the research division of

19   the Marathon Oil Company in Littleton, Colorado.  And my

20   second and last job was on the faculty at Stanford

21   University.

22        Q    Okay.  Tell me a little bit about your

23   position with Marathon Oil.  That was from what year to

24   what year?

25        A    That would have been 1969 to 1970.

     1        Q    And what did you do for Marathon Oil?

     2        A    I was a research scientist.

     3        Q    In what area?

     4        A    Broadly speaking, chemical engineering.

     5        Q    Can you give me an example of the type of

     6    matters you were researching in chemical engineering?

     7        A    I worked on a . . . MicroPilot plant, which

     8    was using a new process to make polyurethane.  I also

     9    worked on a project of sulfonating heavy crude oil to be

    10    used as a displacement fluid in tertiary oil recovery.

    11        Q    And from '71 through what year were you on the

    12    faculty of Stanford?

    13        A    Until I retired in 2013.

    14        Q    Let's -- if you could tell us what positions

    15    you've held on the faculty at Stanford.

    16        A    I was an assistant professor.

    17        Q    And let's go through each year for that.

    18        A    From 1970 until approximately 1977.

    19        Q    And then after that, from '77.

    20        A    I was an associate professor -- these -- these

    21    are not things I think about often -- until probably

    22    about 1984 thereabouts.

    23        Q    And this is in chemical engineering?

    24        A    Yes.

    25        Q    And then from '84 thereabouts.

```
 1        A     I was promoted to full professor.

 2        Q     In chemical engineering?

 3        A     Yes.

 4        Q     To what -- to what year?  Was that your final

 5   position?

 6        A     Yes.  There's nothing more.

 7        Q     And you chaired the department at Stanford

 8   also?

 9        A     Yes.

10        Q     Okay, from what year to year what year did you

11   chair the department of chemical engineering?  Do I have

12   that right?  Was it the department of chemical

13   engineering?

14        A     You have it right.

15        Q     Okay.

16        A     The question is just whether or not I can give

17   you precise answers, which I don't believe I can, but

18   I'll --

19        Q     Approximately.

20        A     -- approximate.

21        Q     Yeah.

22        A     I became chair after I was promoted to

23   associate professor with tenure, so that would have been

24   about 1977, and I served for five years, so that would

25   have taken me into roughly about 1982.  And then, in the
```

 1   late '80s, I was appointed chair, once again, for a

 2   three-year period, which, I think, took me into the

 3   early 1990s.

 4        Q    And was that the last time you were chair of

 5   the department?

 6        A    Yes.

 7        Q    Do you know about when in 1990 you -- you quit

 8   being chair?

 9        A    I don't know that it was 1990 or 1991.  But it

10   was a three-year term.

11        Q    How does one become chair of the department?

12   Is that an elected position by the faculty?

13        A    No.  You're appointed by the dean of the

14   school of engineering.

15        Q    And what does the -- the department chair do?

16        A    Oversees the operations of the department,

17   including the staff, handles the department finances,

18   appoints committees.  Those committees handle such

19   things as teaching assignments; departmental matters

20   that -- that come up, having to do with the graduate

21   program, graduate admissions; also represents the

22   department at the -- what's called Stanford Executive

23   Committee, which meets once a week during the three

24   academic quarters to -- and that consists of all the

25   chairs of the departments --

```
 1       Q    Mm-hm.

 2       A    -- meet with the dean and the senior associate

 3   dean to discuss school matters.

 4       Q    So it's essentially -- it's an administrative

 5   position.

 6       A    It is.

 7       Q    What was your compensation at Stanford, your

 8   annual compensation, at Stanford around the year 2000?

 9       A    Not sure I can tell you.

10       Q    Can you give me an approximate?

11       A    This is really approximate, because I don't

12   actually recall.  So can we just guess?

13       Q    No.  Let's do --

14       A    I mean, I -- I --

15       Q    -- let's try another way.

16            What was your last annual compensation as a

17   professor at Stanford?  I believe that would have been

18   around the year 2013.

19       A    That would have been something over $300,000 a

20   year.

21       Q    Was the -- would the compensation in the year

22   2000 have been less?

23       A    Definitely.

24       Q    And, when you say "definitely," can you give

25   me a gauge as to how much less you think it might be?
```

1    Anywhere in the year 2000 to 2005.

2         A    It would be a total guess.  No.

3         Q    After working -- let me ask you this:  During

4    your employment at Stanford, were you employed by any

5    other companies as an employee?

6         A    While at Stanford?

7         Q    Yes, while at Stanford.

8         A    No.

9         Q    Okay.  While at Stanford, you had other

10   employment, correct, in terms of -- let -- let me put it

11   this way:  You had other professional engagements where

12   you received compensation, correct?

13        A    Correct.

14        Q    And were -- can you tell us about what kind

15   of -- what kind of matters those were?

16        A    Yes.  They fell, roughly, into two categories:

17   one would be consulting for companies, and the other

18   was serving as expert witness in a number of litigation

19   actions.

20        Q    Okay, let's discuss the consulting

21   arrangements that -- for which you were compensated

22   while at Stanford.  Can you tell us what companies you

23   consulted with, and what generally were the subject

24   matters?

25        A    I'll tell you as many as I can --

```
 1        Q     Okay.

 2        A     -- recall.

 3              The first was with a company called Alza.

 4        Q     Can you spell that?

 5        A     A-l-z-a.

 6        Q     Okay, and what did you do for them?

 7        A     I worked in the area of designing devices to

 8  release drugs in a prescribed, controlled manner.

 9        Q     And from when to when did you work with Alza?

10        A     I began in 1970.  It went on for a number of

11  years, but I don't recall exactly when it ended.

12        Q     Mm-hm.  Did this include patches?

13        A     Yes.

14        Q     Okay, and -- and approximately how much did

15  they compensate you for that?

16        A     I don't recall.

17        Q     What's the next company -- next consultant?

18        A     The next one I remember was Biotrack.

19        Q     And what did you do for -- from when to when

20  was your consulting with Biotrack?

21        A     I think it was in the early '80s.

22        Q     And what did you consult on for them?

23        A     Designing blood-test diagnostic devices.

24        Q     Can you tell me what kind of blood-test

25  diagnostic devices these were?
```

 1      A     They were microfluidic devices.

 2      Q     And what does that mean?

 3      A     It means the fluids are migrated through the

 4   device through very small features.

 5      Q     And what was your role in working and

 6   designing these blood-test diagnostic devices?

 7      A     Designing them.

 8      Q     Were you part of a team, or were you the sole

 9   designer?

10      A     It's part of a -- in that case, it was

11   primarily myself and a -- another person, working on

12   this -- the -- the cartridges that I worked on.

13      Q     So you were working on cartridges.

14      A     Well, that's what we called them.

15      Q     Okay.

16      A     That were micro- -- microfluidic devices.

17      Q     Okay.  Can you describe what these cartridges

18   did?

19      A     They measured -- the first one measured

20   prothrombin time, which a anticoagulation or coagulation

21   measurement.

22      Q     The cartridge itself did the measurement?

23      A     Not in and of itself, no.  It was interrogated

24   by a laser.

25      Q     Does Biotrack still exist today?

```
 1        A     No.

 2        Q     Were these devices, the cartridges, ever

 3   brought to commercial application?

 4        A     Yes.

 5        Q     Okay.  And they were sold by Biotrack?

 6        A     Initially, yes.

 7        Q     Mm-hm.  Do you know what these devices were

 8   called as they were sold by Biotrack?

 9        A     I don't recall, no.

10        Q     And you said initially by Biotrack.  Who sold

11   them after Biotrack?

12        A     The company was sold or bought.

13        Q     By who?

14        A     I can't be sure.  I want to say Dade Behring,

15   but I'm not totally sure about that.

16        Q     If I wanted to find out more about these

17   devices beyond your description today, is there a source

18   or a name that you would direct me to?

19             MR. MUGMON:  Objection.

20             THE WITNESS:  The -- the only source would be

21   the person I worked with when we were doing the -- the

22   design of the devices.

23   BY MR. KATHREIN:

24        Q     Who was that?

25        A     His name is Robert Hillman.
```

1     Q     Can you spell his last name?

2     A     H-i-, double -l-m-a-n.

3     Q     And is he a -- where does he live?

4     A     In the San Diego area.

5     Q     Is he a professor or a doctor?

6     A     He has a PhD.

7     Q     Okay, is there -- do you know -- are these

8  devices still sold today?

9     A     I don't know.

10    Q     Okay, approximately what was your compensation

11 at Biotrack?

12    A     I -- I don't recall.

13    Q     Did you bill hourly?

14    A     Generally, yes.

15    Q     Do you know what your hourly rate was?

16    A     It was probably on the order of a hundred

17 dollars an hour.

18    Q     So what was the next company, then, after

19 Biotrack, that you can recall?

20    A     Might be Abaxis.

21    Q     Can you spell that?

22    A     A-b-a-x-i-s.

23    Q     And when did you consult for them?

24    A     I don't recall exactly.  It was probably in

25 the late -- in the late '80s.  It was after Biotrack.

```
 1      Q    And what did you do for them?

 2      A    I consulted with them on the design of a

 3 blood-testing device.

 4      Q    And what was that blood-testing device?

 5      A    It was a device that was capable of measuring

 6 multiple analytes.

 7      Q    Do you know what analytes or what category of

 8 analytes?

 9      A    I don't remember specifically, no.

10      Q    Do you know how many analytes?

11      A    I think it was on the order of a -- a dozen or

12 a few more than that.

13      Q    And how long did you work for Abaxis from?

14      A    I don't recall.

15      Q    Do you recall approximately when you quit?

16      A    No, I don't.

17           MR. MUGMON:  Objection.

18 BY MR. KATHREIN:

19      Q    Do you know if this product ever became

20 commercially available?

21      A    Yes, it did.

22      Q    Okay, did it have a name when it was

23 commercially available?

24      A    It may have, but I don't recall what it was.

25      Q    Do you know if it's still commercially
```

1  available today?

2       A    A -- yes, it is, in -- in some form, although

3  I haven't had an opportunity to see it or encounter it

4  or use it.

5       Q    Do you know who sells it?

6       A    Abaxis.

7       Q    And were you also paid on an hourly rate by

8  Abaxis?

9       A    Yes.

10      Q    Was that also around a hundred per hour?

11      A    It may have been a little more, because my

12 rates slowly increased over the years.

13      Q    After Abaxis, who did you next consult with?

14      A    This may not be in the proper chronological

15 order, but another company I did consult for was Mercury

16 Diagnostics.

17      Q    What did you do for them?

18      A    That was in designing a device to measure

19 glucose and interstitial fluid.

20      Q    From approximately what period of time did you

21 work for Mercury Diagnostics?

22      A    I don't recall.

23      Q    Did this device ever seek commercial

24 application?

25      A    I don't believe it did.

1        Q     And, when you say "interstitial fluid," what

2    do you mean, as opposed to blood?

3        A     This is a fluid that can be found in between

4    the -- the cells that occupy tissues in your body.

5        Q     Your compensation was approximately a hundred

6    dollars an hour plus?

7        A     I would estimate that to be the case, yes.

8        Q     Okay.  What's the next company that you can --

9    that you recall?

10       A     There was a -- a company called Aclara.

11       Q     And what did you do for them?

12       A     They worked in the area of microfluidics.

13       Q     Relating to blood?

14       A     Yes.

15       Q     Is -- by definition, "microfluidics", does

16   that mean blood?

17       A     No.

18       Q     Okay.  And what did you do for them?

19       A     I don't recall exactly.  They -- they had a

20   need for someone who had an expertise in microfluidics

21   in terms of design and -- and . . . terms of design and

22   layouts.  So I helped in those areas.

23       Q     Approximately how long did you work for them?

24       A     I don't recall.

25       Q     And your compensation was approximately the

```
 1   same hourly rate, a hundred plus?

 2        A    I honestly don't --

 3        Q    Okay.

 4        A    -- know.

 5        Q    So what's the next company, then, that you can

 6   recall?

 7        A    Caliper was another company.

 8        Q    Can you spell that?  Was that with a "C"?

 9        A    Yes.

10        Q    Just as the normal word is for caliper,

11   c-a-l-i-p-e-r?

12        A    Yes.

13        Q    And what did you do for them?

14        A    Also worked in the area of microfluidics.

15   They were working in the area of -- of a -- a different

16   kind of propulsion mechanism for moving fluids through

17   the devices, called electroosmosis.

18        Q    Did that result in a commercial product?

19        A    I don't know.

20        Q    Would it be fair to say that your work in

21   design relating to -- to microfluidics and blood testing

22   devices was in the area of the movement of the blood

23   through devices?

24        A    Generally involves the movement, plus the --

25   the measurement part, the -- the -- the chemistry of --
```

1  related to detection in an interrogation in order to

2  be -- be able to obtain a -- a signal that would be

3  representative of the amount of analyte that we were

4  seeking to measure.

5       Q    So, after Caliper, who did you work for?

6  What -- who do you recall that you consulted with?

7       A    There was a company called Signature

8  Biosciences.

9       Q    What did you do -- approximately when did you

10 work with them?

11      A    It would have been in -- I -- I'm guessing in

12 the '90s.

13      Q    And what did you do for them?

14      A    They were working in the area of -- of

15 biodiagnostics and in the area of devices that had small

16 features, much like -- much like the others.

17      Q    And what did you do for them?

18      A    Advise them in those areas that I just

19 mentioned.

20      Q    Did any products, commercial product, come out

21 from your work with them?

22      A    I -- I don't recall any.

23      Q    How about are there any others that you can

24 remember?

25      A    There was one called Molecular Devices.

1       Q    Why don't we just list the -- the rest of the

2   ones you can recall right now.  Molecular Devices.  Who

3   else?

4       A    Seurat.

5       Q    Spell that.

6       A    Like the artist.

7       Q    S-e-r-a-t?  Okay.  We're close.  We'll

8   Wikipedia that.

9       A    I think it's S-e-u-r-a-t.

10      Q    S-e-u-r-a-t, okay.

11      A    He was a -- well, what was called, in the

12  French, a pointillist.

13      Q    So -- okay.

14               (Reporter clarification)

15  BY MR. KATHREIN:

16      Q    Okay, so we got Molecular Devices, Seurat.

17  Who else do you recall?

18      A    Biocircuit.

19      Q    Okay.  Who else?

20      A    Engenics.

21      Q    Spell that.

22      A    E-n-g-e-n-i-c-s.

23      Q    Anyone else?

24      A    Advanced Cardiovascular Systems.

25      Q    Anyone else?

```
 1        A    Hewlett-Packard.

 2        Q    Okay, let's go back.  Maybe you'll think of

 3   some others.

 4             Molecular Devices, what were you consulting

 5   for them?

 6        A    They did time-based kinetic measurements of

 7   analytes.

 8        Q    And what did you do for them?

 9        A    I worked on various aspects of the -- the

10   design of components of their device.

11        Q    And do you know if the device became

12   commercially available?

13        A    It did.

14        Q    Do you know what it was called?

15        A    No.  Don't recall.

16        Q    Do you know what analytes it measured?

17        A    I don't recall that either.

18        Q    And from when to when did you work with them?

19        A    It would have been in the '80s or '90s.

20        Q    Seurat, what did you do for them?

21        A    Again, that was working in the area of

22   microfluidics, blood diagnostics.

23        Q    Did a device result out of your work with

24   them?

25        A    I don't believe it -- I don't believe so.
```

     Q     How about Biocircuits?

     A     It was, again, in the same broad area.

     Q     Time frame?

     A     That would have been in the same '80s and
'90s.

     Q     And did a device result from your work with
them?

     A     I don't -- I don't recall.  I don't believe
so.

     Q     And Egenics, did I say that right?

     A     Engenics.

     Q     Engenics.

           And what was your work for them?

     A     That was in the area of bioproduction.  And
some aspects of -- of measurement detection.

     Q     When you say bioproduction, can you be a
little bit more particular as to what you're talking
about with respect to Engenics?

     A     We developed a process to produce
phenylalanine from recombinant organisms.

     Q     What was your work with advanced -- what was
the time frame for Engenics that you worked with them?

     A     That was in the early '80s.

     Q     How about Advanced Cardiovascular System?

     A     That was in the area of catheter design, so

 1   invasive insertions into the cardiovascular system.

 2       Q    And from what time frame did you work with

 3   them?

 4       A    It would have been that same period.

 5       Q    And HP, what did you do for them?

 6       A    Worked on the design of a valveless inkjet

 7   print head.

 8       Q    And from what time to what time did you work

 9   with them?

10       A    Again, be the same answer.

11       Q    Okay, and would that be considered

12   microfluidics?

13       A    Yes.

14       Q    And your compensation for each of these was

15   based on an hourly rate, correct?

16       A    Yes.

17       Q    And it was somewhere between a hundred to a

18   hundred an hour, I assume.

19       A    As I said, it increased over time, but . . .

20       Q    Do you know what your highest hourly rate has

21   been for consulting work?  Not litigation consulting.

22   I'm talking about the type of consulting we're talking

23   about here that relates to design and working with

24   companies on their products.

25       A    Not offhand, no.

        Q    Okay.  You also have done significant

litigation consulting, correct?

        A    I've done litigation consulting, yes.

        Q    Approximately how many instances are there

where you've been engaged as a litigation consultant as

an -- as an expert witness?

        A    This is an approximation.  Maybe 15, 16, 17

times, some- -- somewhere in that range.

        Q    And, in litigation consulting, have you always

been compensated hourly?

        A    Yes.

        Q    Okay.  Do you know what hourly rates you've

charged, over time, for litigation consulting?

        A    Not -- not specifically.

        Q    Can you give me generally?

        A    Perhaps when I started, it was several hundred

dollars an hour and . . . again, I don't recall exactly,

but more recently perhaps between 5- and $600 an hour.

        Q    What's the most recent litigation consulting

you've done?

        A    I don't recall exactly.  There were two cases

that I was working on that were happening somewhat in

parallel.

        Q    And when were those?

        A    I think the -- the last one would have been

1   perhaps in 2007, 2008.

2        Q    Is there some reason you're excluding your

3   testimony on behalf of Theranos in 2013 or 2014 in the

4   Fuisz litigation?

5        A    No.  I just simply forgot it.

6        Q    You forgot?

7        A    I -- yes, when you asked me that question, it

8   didn't come to my mind.

9        Q    Okay.  To the best of your recollection, tell

10  me each case where you have given expert testimony

11  that's been transcribed, like in this setting, with a

12  court reporter, or where you have actually testified on

13  the stand.

14       A    All right.  So the first would have been the

15  Dalkon Shield case.

16       Q    Was that deposition testimony, trial testimony

17  or both?

18       A    That was a deposition.  I remember it since it

19  was my first one.  It was taken by Fern Smith, later

20  became a federal judge.

21       Q    Really?  I didn't know she was on the defense

22  side.

23       A    She was representing Robins.

24       Q    Okay, next case that you can recall where

25  you -- where your testimony has been transcribed either

1   at deposition or at trial.

2        A    Most likely would have been with Copper-7

3   litigation.

4        Q    Was that deposition?

5             Was that at a deposition, trial or both?

6        A    Both.

7        Q    Next one.

8        A    There was a patent dispute, but that was done

9   by arbitration, so I don't know if that generated a

10  record or not.

11       Q    Who were the parties in that case?

12       A    Syva vs. Abbott.

13       Q    And for who did you testify?

14       A    Syva.

15       Q    Can you spell Syva?

16       A    S-y-v-a.

17       Q    Approximately what year was that?

18       A    I don't know.  Perhaps in the '80s.

19       Q    Okay.  So -- okay, next one where you

20  testified either as a -- at deposition or at trial.

21       A    I'm not sure I'm remembering these in correct

22  order, but I'll give you the ones that come to mind.

23       Q    Why don't you -- we list them, and then I can

24  ask you whether it's deposition, trial or both?  Or if

25  you want to just say, that'd be fine.

 1      A    There was a -- a -- another patent litigation,

 2  which was Abbott vs. Biosite.  I believe it was

 3  deposition only.

 4      Q    Which side did you testify for?

 5      A    Abbott.

 6           There was a -- another case called Vanasen vs.

 7  Tradewinds.  And I -- that was both deposition and

 8  trial.  There was another one, but I don't recall the

 9  parties.  That was both deposition and trial.  It had to

10  do with a battery explosion.

11      Q    Can you tell me what kind of battery?

12      A    I believe it was a -- I believe it was

13  nickel-iron, but I'm not -- can't be sure about that.

14  But . . .

15      Q    Okay.  Next one?

16      A    There was another case, which involved a

17  polypropylene workbench that caught fire and caused a

18  lot of destruction to a semiconductor fabrication

19  facility, but I don't recall who the parties were.

20      Q    Dep or trial?

21      A    I . . . don't remember trial.  I --

22      Q    Any others?

23      A    -- I presume, but I don't remember, a

24  deposition.

25           Yes.  There was what was known as the

```
 1   Stringfellow case, and that was a litigation over a

 2   toxic waste dump site in Southern California.

 3       Q    Which side did you represent?

 4       A    The plaintiffs.

 5       Q    Do you know who the attorneys were on that?

 6       A    The initial firm was Klein, et al., from

 7   Bakersfield.

 8       Q    Deposition or trial or both?

 9       A    Both.

10       Q    Any other cases?

11       A    There was another case having to do with

12   disposal of -- of toxic waste, which was against

13   Motorola in the Phoenix area.

14       Q    And who did you represent?

15       A    The plaintiffs.

16       Q    Do you know what -- what firm?

17       A    It was -- well, there were several, but I

18   remember John O'Quinn was one of them.

19       Q    Approximately what year was that?

20       A    It could have been in the late '90s or early

21   2000s.

22       Q    And was that deposition or trial?

23       A    Certainly deposition.

24       Q    Okay.  Any others?

25       A    There was another case, another toxic waste
```

```
 1   case, against Dow Chemical.

 2        Q    Dep or trial?

 3        A    That was deposition for sure.  I don't recall

 4   trial.

 5        Q    Any others?

 6        A    There was a case against DuPont involving a

 7   company called Brass-Craft, and this had to do with

 8   plastic plumbing that had failed.

 9        Q    Deposition or trial?

10        A    It was certainly deposition.

11             There was another case involving a company

12   called Banner Pharmacaps.  This was a patent dispute

13   having to do with intellectual property covering the

14   means by which gelatinous films can be applied to the

15   cores of active ingredients to make pills.

16        Q    Deposition or trial?

17        A    That was deposition for sure.  I don't recall

18   trial.

19        Q    Any others?

20        A    There was litigation involving a Chinese

21   company.  This was a international trade dispute of a

22   patent infringement of a Chinese company that was

23   producing glucosamine and imported into the United

24   States.

25        Q    Deposition or trial?
```

```
 1              And, by "trial," it could be testimony at the

 2    arbitration, if it's an arbitration.

 3        A    I just don't remember on that one.

 4        Q    Any other testimony that you recall?

 5        A    There was a litigation involving Goodyear over

 6    a product known as Entran, which is a hydronic heating

 7    hose.  That was deposition and trial.  E-n-t-r-a-n.

 8        Q    Any others?

 9        A    There was one against DuPont for claims of

10    adverse effects due to the -- a fungicide they produced

11    known as Benlate.  That was deposition and trial.

12    Benlate, B-e-n-l-a-t-e.

13        Q    Any others?

14        A    Well, if there are any others as with your

15    question regarding the Fuisz trial, there -- there may

16    be some, but I -- none come to mind right now.

17        Q    Okay.  How about big tobacco?

18        A    How could I forget that?  Of course, and that

19    was deposition and trial.

20        Q    Have you ever consulted with a CLIA-certified

21    laboratory.  CLIA, C-L-I-A, laboratory, certified

22    laboratory?

23        A    No.

24        Q    Do you know what a CLIA certified laboratory

25    is?
```

1        A     Yes, I'm generally familiar.

2        Q     Have you ever performed proficiency testing on

3   blood tests?

4        A     No.

5        Q     Would you consider yourself an expert in

6   proficiency testing?

7        A     No.

8        Q     Have you ever validated blood tests?

9              MR. MUGMON:  Objection.

10             THE WITNESS:  Personally working at a lab

11  bench?

12             MR. KATHREIN:  Yes.

13             THE WITNESS:  No.

14  BY MR. KATHREIN:

15       Q     To what extent -- you say you haven't done it

16  personally.  To what extent have you, if you have at

17  all, performed validated blood testing?

18             MR. MUGMON:  Same objection.

19             MR. KATHREIN:  Let me withdraw that.

20       Q     (By Mr. Kathrein)  To what extent have you been

21  involved with the validation of blood tests?

22             MR. MUGMON:  Objection.

23             THE WITNESS:  Well, in -- certainly, in --

24  with Biotrack.  And there's another company I forgot to

25  mention to you called First Medical, comes to my mind.

1    BY MR. KATHREIN:

2        Q    Tell me about First Medical.  What did you do

3    for them?

4        A    It was the same, blood diagnostics.  That was

5    a fluorescence-based detection system for troponin,

6    which is a cardiovascular biomarker.

7        Q    Would you consider yourself an expert in the

8    validation of blood tests for commercial application?

9            MS. GOODHART:  Objection.  Form.

10            THE WITNESS:  To the extent that I am aware of

11   the process and I have seen validation data, I probably

12   have a more-than-average understanding than the average

13   person does about that.

14   BY MR. KATHREIN:

15       Q    You've never testified an -- as an expert in

16   the validation of blood testing, correct?

17       A    No.

18       Q    And you've never written on the -- as an

19   expert on the validation of blood testing, correct?

20       A    I've never done what?

21       Q    You've never written/published as an expert on

22   validation of blood testing.

23       A    No.

24       Q    Could you tell us how you first became

25   involved with Elizabeth Holmes and how it led to the

1  beginning and start of Theranos?

2      A    I first met her when she came to my office

3  when she was a freshman at Stanford in -- I believe it

4  was the fall of 2002.

5      Q    And how did the relationship develop from

6  there that Theranos was started?

7      A    She was a presidential scholar, which meant

8  that she had been among the top 10 percent of Stanford

9  admits that year and was given a -- a -- a fellowship,

10 you might say, or a -- a stipend to -- to do research,

11 in the laboratory of her choice, and she inquired as to

12 whether or not she could work in my lab, and this was

13 happening pretty much simultaneously with her being in a

14 class I was teaching on advanced -- or on drug delivery

15 systems, controlled drug delivery systems.  So I came to

16 know her as a student in class, and then following that

17 she worked in my laboratory, and I had her in class,

18 once again, toward the end of her -- if I recall, toward

19 the end of her freshman year.

20     Q    And how did that lead to the starting of

21 Theranos?

22          MS. GOODHART:  Objection.  Form.

23          MR. MUGMON:  Same objection.

24          THE WITNESS:  I -- I don't know what the exact

25 connection is, although that -- she came back from

1  having worked a summer in Singapore at the Genomics

2  Institute, and when she came back in the fall of her

3  sophomore year, she showed me a patent application that

4  she had written and wanted me to read it and provide her

5  with some feedback.  And during the course of that time

6  period, she said she wanted to start a company to begin

7  to explore ways of putting together a -- ultimately a --

8  a -- a product which would embody many of the aspects

9  contained within this patent application.

10  BY MR. KATHREIN:

11      Q    And then what happened?

12      A    She continued to work in my laboratory and

13  was, I think, maybe persistent in wanting to -- to start

14  a company; and -- and, ultimately, I introduced her to a

15  couple of venture capitalists that I felt would sit down

16  and chat with her about her vision and her aspirations,

17  ultimately; and I think it was in -- roughly in the

18  spring of 2004 she actually raised an init- -- initial

19  set of funds and started the company, which, at that

20  time, was called Real-Time Cures.

21      Q    Who were the venture capitalists that you

22  introduced her to?

23      A    I -- the one I remember introducing her to was

24  William Bowes, B-o-w-e-s.

25      Q    Did he invest with her?

 1        A    No.

 2        Q    Any others?

 3        A    I think, but I can't be a hundred percent

 4   sure.  I may have introduced her to Reid Dennis,

 5   R-e-i-d.

 6        Q    Did he invest?

 7        A    I -- I believe, ultimately, he -- he did at

 8   some point, yes.

 9        Q    Anyone else?

10        A    No.

11        Q    Other than help introducing her to these

12   couple of VCs, did you help her raise the initial

13   capital?

14        A    No.

15        Q    Did you attend meetings with the VCs with her?

16        A    No.

17        Q    Did you take her on campus and introduce her

18   to other professors?

19        A    No.

20        Q    Did you help her build prototypes prior to the

21   starting of the company?

22             MR. MUGMON:  Objection.

23             THE WITNESS:  No.

24   BY MR. KATHREIN:

25        Q    You were the first director of Real-Time

May 14, 2018                                          44

 1   Cures, correct?

 2        A    She and I were directors, yes.

 3        Q    Mm-hm.  How did that happen?

 4        A    She asked me if -- if I would be on her board,

 5   and I said yes.

 6        Q    How long were just you and her directors of

 7   Real-Time Cures?

 8        A    Until the next director came on board.

 9        Q    And who was the next director who came

10   onboard?

11        A    I think it was Jennie Mather.

12        Q    And who was she?

13        A    She was the CEO of a company, I believe,

14   called Raven.

15        Q    Was she also an investor?

16        A    I don't know.

17        Q    About what year was that?

18        A    I think that would have been in 2004.

19        Q    Had you ever been a director of a company

20   before?

21        A    No.

22        Q    Were you compensated as a director?  Let me

23   withdraw that.

24             How long were you a director of Theranos?

25        A    Until --

 1              MS. GORTON:  Objection.  Form.

 2              MR. MUGMON:  Same objection.

 3              THE WITNESS:  So Real-Time Cures became

 4   Theranos.

 5   BY MR. KATHREIN:

 6      Q    Correct.  So how long were you a director of

 7   Real-Time Cures/Theranos?

 8      A    Until 2013.

 9      Q    Do you know what month of 2013?

10      A    It was certainly by July 1st, but I don't know

11   the exact date.

12      Q    And did you resign from -- did you resign from

13   the board?  Were you asked to step off the board?  Why

14   did you step off the board --

15              MR. MUGMON:  Objection.

16   BY MR. KATHREIN:

17      Q    -- in July of 2013?

18      A    She and I were discussing my role going

19   forward, and my situation at Stanford was changing, and

20   we both felt there was perhaps other ways in which I

21   could be helpful to the company.

22      Q    How was your position at Stanford changing?

23      A    I was retiring.

24      Q    Was this mandatory retirement?

25      A    There is no such thing.

1        Q     So why were you retiring?

2        A     I felt I wanted to open up as -- as much of my

3   time as I could to work with the company and help it

4   become successful.

5        Q     And did you retire from Stanford?

6        A     I did.

7        Q     Approximately same times, July of 2013?

8        A     June 30th, 2013.

9        Q     And then you became an employee of the

10  company?

11       A     No.

12       Q     When did you become an employee of Theranos?

13             MR. MUGMON:  Objection.

14             THE WITNESS:  I never did.

15  BY MR. KATHREIN:

16       Q     You became a consultant for Theranos?  Let

17  me -- let me withdraw that.

18             What was your -- well, let -- let me keep

19  that.  Did you become a consultant for Theranos?

20             MR. MUGMON:  Objection.

21             THE WITNESS:  I guess you could call it that.

22  I think they called it a contractor, but, yes,

23  effectively, a consultant.

24  BY MR. KATHREIN:

25       Q     Now, I understand, from the letter, that maybe

1  you -- you guys have produced the -- the contract, but

2  we have not seen it.  We have not been able to get

3  access to the documents since they were produced in --

4  over Friday night, but you had a written contract

5  with -- let me withdraw that.

6          You had -- had -- had a written contract with

7  Theranos after July of 2013?

8      A    Yes.

9      Q    Okay, when was that contract entered into?

10     A    I think earlier in the year.  I can't be sure.

11     Q    And why do you think it was earlier in the

12 year rather than July of 2013?

13     A    It's just what comes to my memory.

14     Q    And could you tell me what you were contracted

15 to do for the company?

16     A    It was not highly defined, which is what we

17 had agreed to, other than to provide advice and counsel

18 on developing and advancing the technology with the

19 company.

20     Q    How long did that contract last?

21     A    It was renewed on a -- on an annual basis.

22     Q    Are you still under that contract with

23 Theranos?

24     A    No.

25     Q    And are you under any contract with Theranos

 1  now?

 2      A    No.

 3      Q    Okay.  When did that contract end?

 4      A    Last June 30th, 2017.

 5      Q    Why wasn't the contract renewed?

 6           MR. MUGMON:  Objection.

 7           THE WITNESS:  It's not clear to me that it

 8  wasn't, because it was somewhat automatic, but I have

 9  not been compensated since then.

10  BY MR. KATHREIN:

11      Q    And how much were you compensated under this

12  contract from June 2013 to June 2017?

13      A    It was $505,000 a year.

14      Q    So approximately $2 million total?

15      A    Yes, approximately.

16      Q    And did you -- during this term of the

17  contract, did you have an office at Theranos?

18      A    Yes.

19      Q    And do I understand correctly that office is

20  right next to Elizabeth Holmes' office?

21      A    Well, it varied from location to location, but

22  it was close to her office each time, yes.

23      Q    During 2013 through 2017, did you have several

24  moves?

25           MR. MUGMON:  Objection.

```
 1              THE WITNESS:  We moved into the California

 2   Avenue facility, I believe, in 2012, and we moved to the

 3   Page Mill facility in late 2014.  So there were two

 4   moves.

 5   BY MR. KATHREIN:

 6        Q    So, between 2012 and 2014, how close was your

 7   office to Elizabeth's?

 8              MS. GOODHART:  Objection.

 9              MR. MUGMON:  Objection.

10              THE WITNESS:  I would -- I would say on my --

11   let me think the configuration.  So, in the

12   configuration on -- on Page Mill Road, which was the

13   most recent one, I was, I don't know, 40 feet, 50 feet.

14   I mean . . .

15   BY MR. KATHREIN:

16        Q    How about in the . . . ?

17              MS. GOODHART:  Reed, I'm sorry to interrupt.

18   Can we --

19              MR. KATHREIN:  Yes.

20              MS. GOODHART:  -- agree that an objection by

21   one Defendant is joined by all, without --

22              MR. KATHREIN:  Yes, we can.  Yes, we can.

23        Q    (By Mr. Kathrein)  So between 2012 and 2014,

24   was that the Page Mill Road, or that was at the

25   California location?
```

```
 1      A    No.  That was the California location.

 2      Q    Okay.  So just focusing on the California

 3  location between 2012 and 2014, was your office right

 4  next to Ms. Holmes?

 5      A    I was out in an open floor space.  I -- I

 6  didn't -- I had a desk.  I think this is better than

 7  saying I had an office.  On the -- in the California

 8  Avenue facility, she initially gave me an office, which

 9  was next to hers, but I told her I didn't want to be in

10  an office.  I'd rather be out on the floor with the

11  scientists and engineers, and -- and it was an

12  open-floor seating, which was nearby her office.

13      Q    During this time frame, where was Sunny

14  Balwani's office?

15           MR. MUGMON:  Objection.

16           THE WITNESS:  Which time frame?

17           MR. KATHREIN:  2012 to 2014.

18           MR. MUGMON:  Objection.

19           THE WITNESS:  I -- I believe it was adjacent,

20  as I recall.

21  BY MR. KATHREIN:

22      Q    Adjacent to Ms. Holmes?

23      A    Yes.

24      Q    You know Daniel Young, correct?

25      A    Daniel?  Yes.
```

```
 1        Q    Yeah.

 2        A    Yes.

 3        Q    Where was his office in relationship to Sunny

 4   and Elizabeth's?

 5             MR. MUGMON:  Objection.

 6             THE WITNESS:  In the Page Mill facility, he

 7   was just down a short hallway from the biocomputation

 8   group, which I was sitting next to.  So it was on the

 9   same -- in the same general area where I was.

10   BY MR. KATHREIN:

11        Q    Do you still have an office at Theranos today?

12        A    I have a desk, yes.

13        Q    Do you still go to that desk?

14        A    Yes.  I was there last week.

15        Q    Between . . . the time you first started as a

16   director with Theranos or Real-Time Cures and your

17   contract in 2017, did you receive compensation from

18   Theranos or Real-Time Cures?

19        A    I didn't receive any cash compensation until

20   sometime in 2009.

21        Q    So what kind of -- after 2009 -- or in 2009

22   through 2013, what kind of cash compensation did you

23   receive from Theranos?

24        A    It was $185,000 a year.

25             MR. MUGMON:  And, Reed, we've been going about
```

 1   an hour and a half.  If there's a convenient time to

 2   take a break --

 3              MR. KATHREIN:  There will --

 4              MR. MUGMON:  -- be appreciated.

 5              MR. KATHREIN:  There will be shortly.

 6        Q   (By Mr. Kathrein)  $185,000 a year as a

 7   director, was that the compensation, or was it for

 8   something else?

 9        A    No.  It was basically the beginning of my

10   transitioning to devoting more of my time to the

11   company.  It was in recognition of that.

12        Q    Did you receive compensation as a director?

13        A    Cash compensation?

14        Q    Yes.

15        A    No.

16        Q    What kind of stock compensation or options did

17   you receive from Real-Time Cures or Theranos?

18        A    Over what period of time?

19        Q    From 2000 -- from the beginning, from 2004

20   through today.

21        A    I think I had -- I -- I had accumulated, over

22   time, 700,000 shares, and then that was -- not quite

23   sure what the right term is -- split by a factor of

24   five, so those turned into 3 1/2 million shares.

25        Q    Were those common shares?  Preferred shares?

```
 1      A    I don't know.

 2      Q    Is there any other compensation than what

 3 we've testified to today that you received from

 4 Theranos?

 5      A    I don't think so.

 6           MR. KATHREIN:  Okay.  It's a good time to

 7 break.

 8           THE VIDEOGRAPHER:  The time is 11:34.  We're

 9 going off the record.

10              (Break taken from 11:34 a.m. to be

11               11:48 a.m.)

12           THE VIDEOGRAPHER:  The time is 11:48.  We're

13 back on the record.

14 BY MR. KATHREIN:

15      Q    Mr. Robertson, do you understand you're still

16 under oath, correct?

17      A    Yes.

18      Q    Okay.  I want to go back now to -- well,

19 let -- let me state for the record first.  When I say

20 "Theranos" in terms of going back on the history of the

21 company, I'm including Real-Time Cures; is that fair?

22      A    Yes.

23      Q    Okay.  Because it's essentially the same

24 company.  It was just a name change, correct?

25           MR. MUGMON:  Objection.
```

```
 1              THE WITNESS:  It was a name change.

 2   BY MR. KATHREIN:

 3      Q     Yeah.  But you were a director, along with

 4   Elizabeth, of Real-Time Cures, and you stayed on as

 5   director, along with Elizabeth, as Theranos.

 6      A     During the name change, yes.

 7      Q     Okay.  And when was the name change?

 8      A     I don't recall.  It was early on, but I don't

 9   recall.

10      Q     Okay, also looking at my notes, and I have

11   some notes that indicate that you became a director in

12   2003; is that correct?  Because I think you said today

13   2004.

14      A     Well, I -- I don't know when the company was

15   actually incorporated.  I -- I -- I thought it was 2004.

16      Q     Do you have a month in mind?

17      A     I have a -- I think it was around spring, but

18   I'm not sure.

19      Q     So how did Elizabeth Holmes convince you to

20   become a director of Real-Time Cures or Theranos?

21              MR. MUGMON:  Objection.

22              THE WITNESS:  Didn't take much convincing.

23   BY MR. KATHREIN:

24      Q     Tell me why.  Because you were -- it was going

25   to take time away from your work at the university,
```

1  correct?

2      A    Yes, and I'm allowed a certain amount of

3  time --

4      Q    Mm-hm.

5      A    -- for outside activities, and I thought that

6  I could participate and do that within the confines of

7  my commitment to Stanford.

8      Q    Well, what was it about her company that you

9  were willing to give your time to that as opposed to

10  other consulting arrangements or other testimony and

11  litigation?

12      A    I was very intrigued by her vision and felt it

13  would be a really interesting proposition to -- to be

14  engaged with.

15      Q    And what was that vision that you were so

16  intrigued about?

17      A    At that time, the -- the notion of -- the

18  potential for, at some point, in the future to develop a

19  closed-loop feedback drug delivery diagnostic system.

20      Q    Can you explain what you mean by "closed-loop

21  feedback drug delivery diagnostic system"?

22      A    So, if you think of taking a drug which is

23  intended to promote a -- a cure, a wellness or treat

24  some kind of malady, and you're interested in knowing

25  the titer of that compound or that drug in your body

1    (let's say in your -- in your -- in your blood), and if

2    you're delivering it through a controlled delivery

3    system, you need to ask the question about what kind of

4    level of control do I need in order to deliver the right

5    amount of drug for the right period of time.  In order

6    to assess that, you need to make a measurement of that

7    drug concentration, and if it's not in the range in

8    which you expect it to be, you'd like to be able to feed

9    that information back to the device that's releasing the

10   drug so that it can change its rate.  So, the notion was

11   being able to, in real time, deliver a drug, assess

12   its -- in this case, a concentration; and then, if it

13   needs to be altered, to alter that delivery; and at --

14   is a -- I found, a very interesting concept; and there

15   was no device or -- that I knew of that could perform

16   that -- that task.

17        Q    Prior to -- let me withdraw that.

18             The patent that Elizabeth Holmes first asked

19   your assistance on reviewing, that was a patent for

20   what?

21        A    It was a -- a patent that basically describes

22   a -- what I just told you about, how that might be done.

23   But this -- this notion of a closed-loop feedback

24   system.

25        Q    And was it this vision that was used to obtain

 1  the VCs' first funding?

 2            MR. MUGMON:  Objection.

 3            THE WITNESS:  I don't know the answer to that,

 4  because I wasn't there.

 5  BY MR. KATHREIN:

 6      Q    What was your understanding -- what was the

 7  first product that Theranos worked on?

 8            MS. GOODHART:  Objection.  Form.

 9            THE WITNESS:  We worked on a microfluidic

10  platform for essentially doing analytical measurements.

11  BY MR. KATHREIN:

12      Q    Was there a name for that platform?

13      A    I think the first one that was given a name

14  was called the Theranos Version 1.0 device.

15      Q    Okay, and when you say to do analytic --

16  analytical measurement, what was it to do an analytical

17  measurement of?

18      A    I don't recall what analytes we were

19  investigating, but it was a platform to receive blood

20  manipulated within a confined geometry; do whatever

21  preanalytical steps might have to be done on the sample;

22  add reagents; have a -- a detection mechanism, a way to

23  detect the presence of the analyte; and if it's

24  quantitative, the amount.  We, at the time, called it

25  a -- a -- a reader-plus-cartridge platform.

 1      Q    And you worked on that?

 2      A    I -- not -- not really.  It -- at the time the

 3  company started, she had taken or hired one of my PhD

 4  students, a student that she had worked with in my

 5  laboratory, and an undergraduate that had also worked --

 6  that she had worked with in my laboratory, and they went

 7  to a -- a spot in Burlingame, I believe it was, that

 8  they rented, and they began building prototypes.  But I

 9  was really not involved in -- in that.  I didn't have

10  time to get deeply involved.

11           I was -- had just been appointed senior

12  associate dean for the school of engineering.  I had 250

13  faculty reporting to me, and, occasionally, but actually

14  not very often, Elizabeth and two former students would

15  come down to my office on campus and give me an update

16  on what they were doing and what they were thinking

17  about.  But I -- I had actually very little to do with

18  the -- the design of those devices.

19      Q    This device, the Theranos Version 1.0, sounds

20  a lot like the -- either the Edison or the miniLab.  How

21  did it differ from those?

22           MR. MUGMON:  Objection.

23           THE WITNESS:  It embodied, I would say,

24  certain characteristics that are common between the two,

25  which is a -- a platform that serves as an interrogation

1    site for a remote cartridge on which a test is -- is --

2    is done and a signal is generated, and this platform is

3    used to interact with that cartridge in such a way as to

4    accomplish the measurement.  So it had similarities.

5    But the various instruments that have been produced,

6    over the years, have a common core, a thread to them,

7    but each is also distinct.

8    BY MR. KATHREIN:

9        Q    Okay, let's go over -- what are those various

10   instruments that were produced over the years by

11   Theranos?

12       A    There was the Theranos 1.0, Theranos 2.0,

13   Theranos 3.0, Theranos 3.5, the TPSU4 -- I think it was

14   4.0 -- TPSU 4.S, and TPSU 4.1 on the instrument side.

15   There were also couple of versions of sample-collecting

16   units.

17       Q    What do you mean by that?

18       A    Devices or -- I guess devices that allow

19   access to the blood compartment and sample acquisition

20   and stabilization.

21       Q    Did those have names?

22       A    They had acronyms.

23       Q    What were the acronyms?

24       A    I remember one was BCD, the blood-collecting

25   device.  The other was the . . . CTN (Capillary Tube and

1    Nanotainer), and there were a couple versions of that.

2    And then there was the TSCU, I believe it was, the

3    Theranos sample-collecting -- TCSD, I think, Theranos

4    Sample Collecting Device.  But that was essentially

5    renamed the Capillary Tube and Nanotainer, which went by

6    the acronym CTN.

7        Q    Okay.  So how does the -- most the documents

8    I've seen refer to the nanotainer when they -- or the

9    letter references are to the nanotainer.  That is

10   different from the BCD?

11            MR. GOLDMAN:  Objection.  Form.

12            THE WITNESS:  The -- the BCD was a -- a

13   predecessor to that.

14   BY MR. KATHREIN:

15       Q    Okay, any other instruments that Theranos

16   produced?

17       A    In terms of hardware as a -- as a unit, I

18   don't believe so.

19       Q    When you say "produced," what do you mean?

20            MR. MUGMON:  Objection.  I think "produced"

21   was your term.

22            THE WITNESS:  Fabricated.

23   BY MR. KATHREIN:

24       Q    Okay.  Were any of these instruments -- let --

25   let me withdraw that.

```
 1              You mentioned "instruments," and I wasn't sure

 2    if you meant instruments related to the BCD, the CTM and

 3    the -- the TSD, or if that related to Theranos 1 through

 4    TPSU 4.1.

 5       A    So there's -- those numbers I gave you (1, 2,

 6    4.1), are self-contained, shall I say, monolithic

 7    instruments.  They -- they . . . like a laser printer.

 8       Q    As opposed to?

 9       A    Well, then there's another element, which is

10    the cartridge.  So the -- the cartridge interfaces with

11    the instrument in such a way as to carry out the

12    analysis, and the TCSD, or the -- the Capillary Tube

13    Nanotainer, is a third entity, which is used to pierce

14    the skin and acquire capillary blood; and that -- the

15    nanotainer is attached to that; it's a part of that.

16    And then the nanotainer is removed, with the blood

17    sample in it, and inserted into the cartridge, and the

18    cartridge is inserted into the instrument.

19       Q    So let's go back to the monolithic

20    instruments.  Were any of these that you listed, 1.0

21    through TPSU 4.1 -- were any of those ever sold

22    commercially to anyone?

23       A    No.

24       Q    Okay.  Were any of them used in any clinical

25    trials?
```

 1        A     I believe the 3.0 was.

 2        Q     Any others?

 3        A     So are you referring to third parties who use

 4   the instrument to verify its utility?

 5        Q     No.  Use the instruments for performing blood

 6   tests for their clinical trials.

 7        A     The only ones I'm aware of are -- are the ones

 8   that, I believe, were performed on the 3.0 system.

 9        Q     And --

10        A     That's my understanding.  I -- I had nothing

11   to do with those clinical trials.

12        Q     And whose clinical trials did you have an

13   understanding that it was used for?

14        A     Well, I've seen presentations or reports, over

15   the years, that we did work for -- I may not remember

16   them all, but people like GlaxoSmithKline, Pfizer,

17   Centocor, Celgene, Novartis.  I think perhaps Merck.  My

18   recollection is, there were approximately a -- a -- a --

19   a dozen or so, but I -- those are the ones I remember.

20        Q     What are these presentations reports that

21   you're referring to?

22        A     Occasionally, there'd be presentations made

23   internally to inform employees of activities, and when I

24   was on the board, these contracts would be mentioned or

25   discussed.

 1      Q    By who?

 2      A    Elizabeth.

 3      Q    Did you ever talk to anyone at Pfizer,

 4  GlaxoSmithKline, Centocor, Novartis, Merck or the others

 5  about the clinical trials?

 6      A    No.

 7      Q    Do you believe today that those clinical

 8  trials happened?

 9      A    I believe that.

10      Q    And what's the basis of that belief?

11      A    That I believe what we were told in the board

12  meetings, that that was happening, and those contracts

13  were active, and that I recall actually seeing some

14  materials for one or more of those companies

15  expressed . . . made expressions which would lead you to

16  believe they had -- that that they -- that they had been

17  working with Theranos in the clinical trial.  I had no

18  reason not to.

19      Q    Tell me what the 3.0 -- the Theranos 3.0 --

20  what was that instrument?  What did it test?

21          MR. MUGMON:  Objection.  Form.

22          THE WITNESS:  The -- the version I'm familiar

23  with was the result of a transition from the use of a

24  vacuum as a means of moving samples around in the early

25  devices, the -- the 1.0, I believe; and the -- and the

1   2.0, I believe, the company went to using positive

2   piston displacement to move fluids.

3   BY MR. KATHREIN:

4       Q    Okay.  Let's back up second.  So I think I'm

5   sort of taking it out of order, and it's going to make

6   it confusing.

7            So, the -- you -- you discussed what the --

8   you discussed the Theranos 1.0 as being the -- the first

9   instrument, and that instrument, you said, was a

10  platform to receive blood, manipulate it in a confined

11  geometry, re-add -- add reagents to it, have detection

12  mechanism, et cetera.

13           How did the 1.0 differ from the 2.0?

14      A    If my memory serves me correctly, the 1.0 used

15  a vacuum to essentially pull fluids through tracks or

16  pathways on the -- on the -- in the microfluidics

17  device.  We -- another mechanism for propulsion is -- is

18  capillary forces, but as -- as I recall, that was never

19  used.  And then, in the 2.0, if I'm recalling correctly,

20  it was a -- a positive displacement rather than using a

21  vacuum, using a -- a piston or, if you will, a small

22  pump to push the fluids.  And there -- there came a -- a

23  point in time where . . . and, as I recall, it was

24  Elizabeth who said, Why -- why can't we just miniaturize

25  the protocols that are used, in a macroscopic sense, on

1   the -- the bench to do analyses, and just do it in a

2   much smaller and more confined footprint?  And that led

3   to the 3.0 device, which used a -- a series of pipets to

4   aspirate and dispense fluids into chambers or into

5   vessels that were held on the cartridge in order to

6   mimic, if you will, the manner in which analyses are

7   commonly done, as we say, on the -- on the bench.  And

8   so it was a -- highly distinct from the 1.0 and 2.0,

9   shall we say, design paradigms.

10       Q    And what is the difference between the 3.0 and

11  the 3.5?

12       A    I believe the software on the 3.0 system was

13  Linux based, and my understanding is that the primary

14  difference between the 3.0 and 3.5 is, the -- is, the

15  3.5 was Windows based.

16       Q    And then what's the difference between the 3.5

17  and the PCSU [sic] 4.0?

18            MR. MUGMON:  Objection.

19            THE WITNESS:  The 4 series has built into it

20  four -- essentially four detector systems, a sonicator

21  and a centrifuge, so it's -- has much more expanded

22  capability than the 3 series did.

23  BY MR. KATHREIN:

24       Q    And so that would be true -- so what's the

25  difference between -- let me withdraw that.

```
 1              And what's the difference between the 4.0 and

 2   the 4.S?

 3              MR. MUGMON:  Objection.

 4              THE WITNESS:  So there were changes in --

 5   well, there were, I think, incremental changes in the

 6   hardware architecture, which I can't describe in detail

 7   to you.  There were changes in the -- the Gantry system,

 8   which moves the pipet head around.  There were changes

 9   in pipet head itself.  All, I would call, evolutionary

10   improvements in the device, but . . . and I think there

11   were changes with the software.  I mean, it's -- it --

12   it became an evolution of the -- of the 4.0 device to

13   become the 4.S and the 4.1.

14   BY MR. KATHREIN:

15      Q    And how would you describe the difference

16   between the 4.S and the 4.1?

17      A    I don't know what -- what all the

18   modifications were.  I think just -- I think the touch

19   screen got bigger.  But in terms of what aspects of the

20   hardware were changed, I -- I -- I couldn't tell you.

21      Q    Okay.  So, I've heard of the miniLab and the

22   Edison.  Are any of these instruments also referred to

23   as the Edison?

24              MS. GOODHART:  Objection.  Form.

25              THE WITNESS:  I have seen the 3.0 Series
```

1  referred to as Edison.  And --

2          MR. KATHREIN:  Go ahead.

3          THE WITNESS:  I don't know the origin.  I

4  always thought of these in terms of the numbering

5  system, although I suspect, although I can't confirm it,

6  that it arose from the fact that Elizabeth named all of

7  the rooms in our buildings after notable scientists and

8  engineers, and it was in what I would call the Edison

9  lab or Edison room in which much of the hardware

10 engineering was done, that contributed to the -- to the

11 3.0 platform, which has acquired the name Edison.

12 BY MR. KATHREIN:

13     Q    And are any of these units what has been

14 referred to as the miniLab?

15     A    No.

16     Q    So, you did not include the miniLab in your

17 description of any of the instruments or devices

18 fabricated by Theranos?  Was this another category of

19 instruments?

20          MR. MUGMON:  Objection.

21 BY MR. KATHREIN:

22     Q    So, why did you not list the miniLab?

23          MR. MUGMON:  Objection.  I think that

24 mischaracterizes prior testimony.

25          THE WITNESS:  It wasn't an omission.  It's

1  that the miniLab to the 4 series is almost like the

2  Edison is to the 3 series.  It's a name that's attached

3  to it, but it's -- that's what the miniLab is.  It's the

4  4 series.

5  BY MR. KATHREIN:

6     Q    Now, if I refer to Edison here or the miniLab,

7  I mean -- I'm going to refer to in that context, as

8  miniLab relates to the 4 Series and Edison relates to

9  the 3 series.  Is that fair?

10    A    That's fair.

11    Q    What analytes could the Edison test?

12    A    Well, I know it's capable of -- of doing what

13 we call immunoassays, and I can't give you a litany of

14 all the various analytes that were around on a -- on a

15 3.0 machine, but it -- it -- it would coverage primarily

16 immunoassays.  Whether any general chemistry was brought

17 up on that, I don't know, which is another category of

18 assays.  I don't believe any molecular assays were

19 brought onto that, and I don't believe any imaging

20 assays were brought onto that platform.

21    Q    What kind of assays would be viruses and

22 bacteria?  Would they be any of these?

23    A    Well, they would be molecular -- biology or

24 molecular assays.  They don't have to be, but -- but

25 generally, if you're looking at RNA or DNA, yes.

 1      Q     Okay, would that be the same for any sort of

 2  genetic testing?

 3      A     By that, you mean sequencing?

 4      Q     You know what, I'm just going to withdraw that

 5  question.  I'm out of my element, so let me withdraw

 6  that.  But what would be imaging?  What -- what kind of

 7  assays would imaging be?

 8      A     Those would be hematology or a -- a -- a -- a

 9  big piece of hematology.  They're cellular assays.

10      Q     And can you give me some examples of general

11  chemistry assays?

12      A     That would be sodium, potassium, calcium,

13  bilirubin, chloride, carbon dioxide, aspartate

14  aminotransferase, alanine aminotransferase, alkaline

15  phosphatase.  It's a --

16      Q     Can you give me--?

17      A     There are others.

18      Q     Can you give me some examples of immunoassays,

19  common immunoassays?

20      A     Oh, PSA, HCG (that's human chorionic

21  gonadotropin).  PSA is prostate-specific antigen.

22  Hemoglobin A1c.  So anything to which you can raise

23  an -- an antibody that will attach to the antigen.

24      Q     Now, what analytes could the miniLab or the

25  4.0 series test?

1      A    It's capable of doing immunoassays.  It's

2  capable of doing general chemistry.  It's capable of

3  doing molecular testing, and it's capable of doing

4  hematology, which are the four -- four main categories

5  in clinic -- clinical laboratory testing.

6      Q    Now did you work on the design of any of these

7  instruments, 1.0 through the 4 series?

8      A    I -- I did to the extent that I would attend

9  meetings of the various groups that typically were

10  formed around these four -- these four items, the --

11  that I just mentioned to you and --

12      Q    Well, let -- just so the record's clear, the

13  four items, you mean the monolithic instrument, the

14  cartridge interface, which included the -- well, the

15  cartridge interface, the nanotainer, and the, I guess

16  I'd say, piercing device?

17      A    No.  It -- they were -- so we had teams

18  grouped around essentially the general chemistry,

19  immunology, molecular chemistry, and --

20      Q    Okay.

21      A    -- hematology.  So that formed a group of

22  teams.  There were another set of teams that worked on

23  what I would call the hardware.  That would be the

24  embodiment of the -- of the instrument and its

25  components.

1      Q    Mm-hm.

2      A    And then there'd be a consumables team, which

3  would be concerned with the cartridge design and the

4  vessels that go with the cartridge and the means by

5  which the reagent vessels can be filled and stabilized

6  and capped and so forth.  And then there was a team that

7  worked on the sample collection devices.  And there was

8  a software team that was writing the -- the -- the --

9  the operating system for the device to -- to control it,

10  and then there was the software that dealt with

11  transmission of the raw results of the cloud, where the

12  analyses were done and the distribution of those results

13  back to either the patient or the consumer or to the

14  physician, whoever had -- was supposed to see those

15  results.  And . . .

16      Q    Okay, well, then let's go back.  You -- you

17  were beginning to state -- when I asked you if you

18  worked on the design, you said to the extent that you

19  would attend meetings of the various groups, and by that

20  you meant immunology, general chemistry, molecular

21  testing, and hematology, correct?

22      A    And I occasionally would -- would also attend

23  the hard- -- hardware meetings when issues came up where

24  I felt I had some expertise in that, primarily in the

25  area of thermal control and heat transfer, but not so

1  much on the mechanical side, nor the electrical side.  I

2  also participated in many of the design meetings on the

3  detector side, because the detectors involves complex

4  optics, and I was familiar enough with many of the

5  concepts that I could listen and contribute when I felt

6  I had something to contribute, because I was coming with

7  quite a bit different kind of background, but quite of

8  bit experience.  So, I wanted to be useful and helpful

9  whenever I could be.  So, I was not involved in

10 software; that's not my field.  But in other aspects,

11 over the years, yes.  And then there were times where I

12 would get deeply involved in the design, such as the

13 design of the centrifuge.  So I worked with that team

14 closely and also the design of a second-generation

15 sample-collecting device.  I -- I worked on that quite a

16 bit.

17     Q    Okay.  The second-generation sample-collecting

18 device, is that the nanotainer?

19     A    No.  The nanotainer is a part of the

20 sample-collecting device.  It's unitary, but it comes

21 apart.  So the second-generation sample-collecting

22 device that I worked on had a nanotainer attached to it.

23     Q    So we're talking about the -- the part that

24 would pierce the blood [sic] -- or pierce the skin to

25 acquire capillary blood?

 1      A      No.  To -- to pierce the skin -- maybe I

 2   misled you a little bit.  But to -- to pierce the skin,

 3   that's done with a piercing tool that is -- is available

 4   commercially.  That's very similar to the kind of

 5   piercing tools that are used for point-of-care

 6   cholesterol/glucose test.  But once the skin is pierced

 7   and a drop of blood forms at the site of the pierce,

 8   that's when the sample-collecting device comes into

 9   play.

10      Q      And that's the TCSD, Theranos Capillary --

11   well, maybe I got it wrong.  Theranos Capillary Sample

12   Testing Device, I guess.  Can you clarify that?

13   Which -- have that right?

14      A      That's close.

15      Q      That's close.  Okay, well . . .

16      A      The -- because, actually, the -- the -- the

17   latest terminology is CTN.

18      Q      CTM?

19      A      CTN, Capillary Tube and Nanotainer.

20      Q      Okay.

21      A      What that does is, distinguishes between the

22   two parts.

23             They're -- they're manufactured differently --

24   I mean, separately, and then brought together and

25   assembled.

1      Q    So which of these groups was Daniel young in

2   charge of?

3           MR. MUGMON:  Objection.

4           THE WITNESS:  Well, Daniel's had a -- a -- a

5   variety of roles, so I can't tell you exactly.  We can

6   ask him.  I -- I do know he was first brought into the

7   biocomputation group and then rose up to actually more

8   of a -- a leadership position on the science and

9   technology side.  But I can't represent to you exactly

10  what his duties were over the -- over the years.

11  BY MR. KATHREIN:

12     Q    Did you work with -- or attend meetings of

13  teams that were responsible for verification of the

14  accuracy of these blood tests?

15          MR. MUGMON:  Objection.

16          MS. GOODHART:  Objection.

17          THE WITNESS:  So what I would see on the R&D

18  side are the results of precision and accuracy

19  assessments of the assays as they were developed.  And

20  so I would -- I would see those as parts of

21  presentations that would -- would be given at these

22  meetings.

23  BY MR. KATHREIN:

24     Q    Where -- where were meetings -- what meetings

25  are you referring to, where you would see slides of --

Chemu-Sing-2 Reporter 07/30

May 14, 2018                                                75

1   or presentations of precision and accuracy of

2   assessments?

3        A    The general chemistry meetings, the immunology

4   assay meetings, the hematology -- we called it also

5   cytometry meetings, and the molecular biology or

6   molecular chemistry meetings.  So, they -- they would

7   all present data and show the progress that they've made

8   in -- in assay development.

9        Q    And, when you say "they would all," you're

10  referring to who?

11       A    People that were members of those teams.

12       Q    Are you familiar with a device called the RDX

13  metabolic profiler?

14       A    I don't know why, but that seems to remind me

15  of something from the Fuisz case, but it's -- it's not a

16  term that I -- I've seen used within -- within the

17  company, if that's what you're asking.

18       Q    Are you familiar with a device that was a

19  handheld device that you would hold up to your finger or

20  arm, would take a small sample of blood, and its tiny

21  needle would get a drop of blood, run it through a

22  biotrip -- biochip and separate out all the cells and

23  other types of analyze -- analytes and then in real time

24  run different chemistries?

25       A    Are you referring to a product?

```
 1        Q    Yes.

 2        A    And -- and what product is that?  And I'll let

 3   you know if I've heard of it.

 4        Q    So you don't recall hearing of that product?

 5   You're not familiar with that product?

 6             MR. MUGMON:  Objection.

 7   BY MR. KATHREIN:

 8        Q    Developed at Theranos.

 9             MR. MUGMON:  I think that mischaracterizes his

10   testimony as well.

11             MR. GOLDMAN:  Sorry, the last thing thing you

12   said was "developed at Theranos"?

13             MR. KATHREIN:  Mm-hm.  Or are -- or at

14   Real-Time Cures.

15             THE WITNESS:  All I can tell you is, it rang a

16   bell in the back of my head, but I can't -- I can't

17   place it in time, no.

18   BY MR. KATHREIN:

19        Q    Did Real-Time Cures or Theranos have a product

20   that was going into the production phase in 2005?

21        A    By "production phase," you mean an instrument

22   that would be sold commercially?

23        Q    Yes.

24        A    I don't recall that, no.

25        Q    Are you familiar with a product being
```

1  developed at Theranos for monitoring acute painkillers?

2       A    I don't recall us having a product that was

3  specific for that particular application.

4       Q    Have you had any product that was being

5  developed for monitoring acute painkillers?

6       A    Well, I don't know what you mean by acute --

7  you know, it's a class of compounds, and it could very

8  well be that -- whether they're opioids or -- or some

9  molecular class of compounds, that it would fall within

10 the context of analytes that Theranos has -- either can

11 or has attempted to measure.

12      Q    Were you involved in -- in the development of

13 any device that would monitor acute painkillers such as

14 what you just said?

15      A    Well, if the -- if -- depends on what the

16 painkiller is, and if it's an immunoassay or if it's

17 spectrophotometic -- -metric assay, a chemistry assay,

18 then, yes, in general, because I contributed to the --

19 the design of the platform.

20      Q    What I'm asking is whether you're aware of a

21 device be- -- that you worked on being developed for the

22 purpose of testing and monitoring acute painkillers.

23           MR. MUGMON:  Objection.  Asked and answered.

24           THE WITNESS:  Specifically for that purpose --

25           MR. KATHREIN:  Yes.

```
 1              THE WITNESS:  -- and no other --

 2              MR. KATHREIN:  Yes.

 3              THE WITNESS:  -- purpose?

 4              MR. KATHREIN:  Well, no.  That -- that that

 5   was the purpose that it was going to be rolled out for.

 6              MR. MUGMON:  Same objection.

 7              THE WITNESS:  So this is a -- a -- you're --

 8   you're speaking about a general platform that has the

 9   capability of doing this --

10              MR. KATHREIN:  I'm talking about a -- I'm

11   talking about a handheld device.

12              MR. MUGMON:  Objection.  Same one.

13              THE WITNESS:  I don't recall that.

14   BY MR. KATHREIN:

15       Q    Okay.  While you were at -- well, in -- in

16   your work at Theranos, have you -- are you aware of any

17   of the devices that we've talked about that were going

18   to into the productions phase to be sold to third

19   parties?

20       A    I told you the devices that -- that I'm aware

21   of, and to my knowledge none of those were sold to third

22   parties.

23       Q    But were you aware of any that were being

24   prepared to be sold to third parties and -- and actually

25   going into production phase --
```

```
 1              MR. MUGMON:  Objection.  Form.

 2  BY MR. KATHREIN:

 3     Q    -- regardless whether or not they were

 4  actually sold?

 5              MR. MUGMON:  Objection.  Form, compound, and

 6  asked and answered.

 7              THE WITNESS:  Whatever it is you're referring

 8  to, I don't -- I don't have a recollection.

 9              MR. KATHREIN:  Let's go off the record for a

10  second.

11              THE VIDEOGRAPHER:  The time is 12:45.  We're

12  going off the record.

13                      --oOo--

14              (LUNCHEON RECESS TAKEN FROM

15              12:45 P.M. TO 1:36 P.M.)

16                      --oOo--

17              THE VIDEOGRAPHER:  The time is 1:36.  We are

18  back on the record.

19                  EXAMINATION (Resumed)

20  BY MR. KATHREIN:

21     Q    Dr. Robertson, you understand you're still

22  under oath?

23     A    Yes.

24     Q    Okay.  Switch subjects a little bit here and

25  talk about Sunny Balwani.
```

```
 1              When did you first meet Sunny Balwani?

 2      A    When he joined Theranos.

 3      Q    And what year was that?

 4      A    I'm not sure exactly.  2010, somewhere around

 5 there.

 6      Q    Did you have any input into the hiring of

 7 Sunny Balwani?

 8      A    It was -- his hiring was discussed at a board

 9 meeting.

10      Q    And who was at the board meeting?

11      A    Well, I can't be sure who was at the board

12 meeting.

13      Q    Do you remember who else were directors around

14 that time besides you and Elizabeth?

15      A    Yes.  Don Lucas.

16      Q    For sake of the record, let's refer to him as

17 Don Lucas Sr., okay?  Because there's another Don Lucas

18 in the case.

19      A    Okay.

20      Q    Okay.

21      A    There was a fellow named Pete Thomas who was

22 on the board for a while, but he left, and I'm not sure

23 if he was still on it then.  Another fellow named Bob

24 Shapiro.  Of course, Elizabeth and myself.  There was

25 another fellow named -- last name was Sheehan.  And,
```

1  again, these are people that came on the board and left

2  the board, so I can't be certain they were there at --

3  at that time.

4        There was one other fellow, and I again don't

5  know if he was there one -- for that meeting or was on

6  the board.  Avie -- and I'm not going to be able to

7  spell his last name, but it sounds alike something like

8  Tevanian.

9     Q    Did you have anything to do with the bringing

10 of these individuals on to the board?

11    A    No.

12    Q    Did you make the introductions?

13    A    No.

14    Q    Did you know them before they were brought on

15 the board?

16    A    No.

17    Q    In 2010 Sunny was brought on to be what in the

18 company?

19        MR. MUGMON:  Objection.

20        THE WITNESS:  Well, as I said, I'm not quite

21 sure about the date, and I'm not sure exactly what his

22 initial title was, but he ultimately became, perhaps

23 even then, president and COO of the company.

24 BY MR. KATHREIN:

25    Q    And he also became a director?

```
 1        A    I don't recall that.

 2        Q    Did you have any role in the bringing of

 3   George Schultz or Henry Kissinger on to the board?

 4        A    No.

 5        Q    Okay, did you know them beforehand?

 6        A    I had met -- I had met Schultz, but I don't

 7   think he knew who I was, because he was -- had a --

 8   taken a position at Stanford, and he would occasionally

 9   be at events that I would attend; and Kissinger, no.

10        Q    Did you know that Sunny and Elizabeth Holmes,

11   Sunny Balwani and Elizabeth Holmes, were romantically

12   involved at the time he was brought on to the board?

13             MS. GOODHART:  Objection.  Form.

14             THE WITNESS:  Not at the time he was brought

15   on the board, no, I didn't know that.

16   BY MR. KATHREIN:

17        Q    When did you learn the -- that they were

18   romantically involved?

19             MS. GORTON:  Objection.  Form.

20             THE WITNESS:  The impression I was given was

21   that they had been romantically involved, but were no

22   longer when they came on the board.

23   BY MR. KATHREIN:

24        Q    So, when he came on the board, you had an

25   impression that they had been romantically involved?
```

1      A    Yes.

2      Q    And how did you get that impression?

3      A    It -- it came up in the board meeting.

4      Q    And what board meeting?

5      A    The board meeting when Elizabeth discussed his

6  being hired in to the company.

7      Q    Was it discussed at any of the board meetings

8  that you attended with Henry Kissinger, George Schultz,

9  General Mattis, Rick -- or Dick Kovacevich?

10          MS. GOODHART:  Objection.  Form.

11          THE WITNESS:  I'm sorry.  Could you repeat

12 that?

13 BY MR. KATHREIN:

14     Q    Was the fact that they had -- was the -- was

15 her representation that they had been romantically

16 involved, her and Mr. Balwani, discussed at any board

17 meetings where Richard Kovacevich, George Schultz, Henry

18 Kissinger or General Mattis were present?

19          MS. GOODHART:  Objection.  Form.

20          THE WITNESS:  I can't possibly know that,

21 because I wasn't on the board when they were on the

22 board.

23 BY MR. KATHREIN:

24     Q    Did you know that her relationship with Sunny

25 Balwani did not end until he left the company?

```
 1              MR. MUGMON:  Objection.  Form.

 2              THE WITNESS:  I'm not aware of that, no.

 3  BY MR. KATHREIN:

 4      Q    Did you know that they lived together?

 5              MR. MUGMON:  Objection.  Form.

 6              THE WITNESS:  No, not -- no, I didn't.

 7  BY MR. KATHREIN:

 8      Q    Were you involved with the termination of

 9  Mr. Balwani?

10              MR. MUGMON:  Objection.  Form.

11              THE WITNESS:  No.

12  BY MR. KATHREIN:

13      Q    Okay, what were you -- were you informed as to

14  why he left the company?

15      A    No.

16      Q    You have any understanding as to why he left

17  the company?

18      A    No details.  No detailed information, no.

19      Q    Did you ever inquire?

20      A    No.

21      Q    How often are you in contact with Elizabeth

22  Holmes today?

23      A    I would say several -- several times a month.

24      Q    How often do you go into Theranos's office, to

25  your desk?
```

 1      A    Oh, typically, I would go in a couple days a

 2   week.

 3      Q    Would you say you and Elizabeth Holmes are

 4   still friends today?

 5      A    Yes.

 6      Q    When did you learn that Theranos had a

 7   contract with Walgreens to roll out the blood testing at

 8   Walgreens?

 9           MR. MUGMON:  Objection.  Form.

10           THE WITNESS:  I don't have a date in mind.

11   BY MR. KATHREIN:

12      Q    You were director, correct?

13      A    Yes.  At -- yes.

14      Q    What was your understanding of what Theranos

15   would be doing for Walgreens under this contract?

16           MR. MUGMON:  Objection.  Form.

17           THE WITNESS:  Well, I never saw a contract, so

18   I -- I don't know exactly what that said.  My impression

19   was that they would provide retail space in their stores

20   where the company could establish wellness centers to

21   which the -- the public would have access to have bodily

22   fluid tests made.

23   BY MR. KATHREIN:

24      Q    Did you understand that those tests would be

25   using Theranos technology?

 1      A    Yes.

 2      Q    And, by that, was it your understanding that

 3 they would be using one or more of the instruments which

 4 we've previously discussed?

 5           MR. MUGMON:  Objection.  Form.

 6           THE WITNESS:  I did not have -- was not

 7 involved in any of that, so I didn't actually know what

 8 instrument, set of instruments, or -- or technologies

 9 were going to be used in the CLIA labs where this

10 testing was to be done.

11 BY MR. KATHREIN:

12      Q    Did you have an impression that it was going

13 to be Theranos?

14      A    I had an --

15           MR. MUGMON:  Objection.  Form.

16           THE WITNESS:  I had an impression, yes, that

17 it -- it would be Theranos technologies, yes.

18 BY MR. KATHREIN:

19      Q    Did you have an impression that it would be

20 Theranos instruments, which we've previously discussed?

21           MR. MUGMON:  Objection.  Form.

22           THE WITNESS:  Well, I actually didn't know,

23 because no one disclosed to me what was actually being

24 used in the CLIA lab.

25 BY MR. KATHREIN:

1      Q    Were you aware of any development of blood

2  tests on third-party equipment prior to July, August or

3  September 2013?

4           MS. GOODHART:  Objection.  Form.

5           THE WITNESS:  I'm sorry.  Could you say that

6  again?

7           MR. KATHREIN:  Can you read it back?

8               (Record read as follows:

9               "QUESTION:  Were you aware of any

10               development of blood tests on

11               third-party equipment prior to

12               July, August or September 2013?")

13           THE WITNESS:  So, on the R&D side, third-party

14  machines were used frequently as predicate instruments

15  for the development of the Theranos instruments.  So I

16  was aware of their use in that capacity.

17  BY MR. KATHREIN:

18      Q    Would you explain what "predicate" means, as

19  you're using the term here?

20      A    It -- it means that a -- a device which is

21  known to be accepted or reliable for the measurement of

22  a particular analyte to which you could compare tests

23  done on your own developed equipment.

24      Q    Were you aware of any design development at

25  Theranos, on these 30 -- third-party devices, to enable

1   them to run finger-prick samples on patients?

2       A    At what point in time?

3       Q    Well, that begs the question that, at some

4   point, you learned.  So when did you learn that?

5       A    Well, I learned after the CLIA lab was up and

6   running, performing tests on clinical samples coming in

7   from the public.

8       Q    So, at the time of the Walgreen's

9   announcement, you were not aware of the lab running

10  third-party devices?

11              (Reporter clarification)

12          MR. KATHREIN:  The CLIA lab running

13  third-party devices.

14          MR. MUGMON:  Objection.  Form.

15          THE WITNESS:  So the CLIA lab had third-party

16  devices in it, because we were using them for predicate

17  measurements.  We also had third-party devices in the

18  outside -- outside the CLIA lab.  I had never stepped

19  foot into any of the CLIA labs that the -- the company

20  had.  So I can't tell you what was inside of the . . .

21  BY MR. KATHREIN:

22      Q    So when did you learn that -- you -- you

23  said that you learned after the CLIA lab was up and

24  running -- how do I go back on this?  Hold on.

25          You said you learned after the CLEA lab was up

1   and running and performing tests on clinical samples

2   coming from -- coming in from the public.

3            When did you learn that?

4       A    I can't tell you precisely when I learned

5   that.

6       Q    How did you learn that?

7       A    I believe I learned it from conversations with

8   people who knew at -- at -- at -- at the company, and I

9   could ultimately discern from the fact that I actually

10  had a finger-stick test done, and I wasn't sure whether

11  or not the Theranos instruments had -- where an

12  instrument had been validated for --

13                (Reporter clarification)

14           THE WITNESS:  -- which Theranos tests had been

15  validated for use in the -- in the -- in the CLIA lab.

16  BY MR. KATHREIN:

17      Q    How does that relate to the fact that you had

18  a finger-stick test done?  That is something you would

19  have not been able to discern before, right?

20           MS. GOODHART:  Objection.  Form.

21           THE WITNESS:  Because I had a lipid panel

22  done, and I wasn't aware that we had validated that.  I

23  wasn't involved in any of the validation studies that

24  were needed in order to bring up a -- a

25  laboratory-developed instrument in the CLIA lab, so I

 1  just didn't know.

 2  BY MR. KATHREIN:

 3      Q    So, if I understand you, you were unaware of

 4  any validation studies . . . hold on.

 5                  (Discussion off the record)

 6  BY MR. KATHREIN:

 7      Q    So am I correct that you were -- you've never

 8  been aware of any validation studies that were needed in

 9  order to bring up a laboratory-developed instrument in

10  the CLIA lab?

11              MR. MUGMON:  Objection.  Form.

12  Mischaracterizes prior testimony.

13              THE WITNESS:  What I know that validation

14  studies have to be carried out, and proficiency testing

15  has to be done, but the -- the data that I saw was

16  research-and-development data validating assays,

17  translating those assays onto an instrument platform.

18  Typically, it was something I was -- I was not involved

19  with, and I was not involved at all with the

20  establishment of the CLIA labs or whatever testing had

21  to be done or was done.  I worked under the presumption

22  that other people in the company were aware of the

23  requirements and that they were meeting those

24  requirements.  But I was focused on technology

25  development and not on operations.

1   BY MR. KATHREIN:

2       Q    When you had this blood test taken, did you

3   suspect that third-party equipment was being used?

4       A    No.  I -- no.  That was very shortly after

5   the . . . literally days after the first Walgreen's

6   store opened.

7       Q    So when did you first suspect that -- this is

8   when you first suspected third-party equipment was being

9   used, correct?

10          MS. GOODHART:  Objection.  Form.

11          MR. MUGMON:  Yeah.

12          THE WITNESS:  I -- I don't know when I first

13  suspected it, because much as reflecting back on --

14  reflecting back on -- you know, on -- on this, but I did

15  come to understand, at -- at a point in time, that a --

16  a group of Theranos engineers and scientists (I'm not

17  sure who they were) carried out the work that was

18  required to modify third-party instruments so that they

19  could accept essentially small samples of blood, smaller

20  than they were -- that they were designed for; and I

21  understood that to be part of a -- part of a business

22  plan to build the company and ultimately arrive at the

23  end game that I was focused on, which was decentralized

24  lab testing.

25  BY MR. KATHREIN:

```
 1      Q    By "decentralized," you mean having units not
 2 at a CLIA lab in one location that would be able to do
 3 all the blood testing.
 4      A    Yes.  Distributed -- a distributed testing
 5 system.  That -- that was what I have always been
 6 focused on.
 7      Q    And how did you come to that understanding,
 8 that a group of scientists were working on that project?
 9      A    I presume we did it at Theranos.  Employees
10 engineered those modifications.
11      Q    But how -- how did you learn about these
12 employees doing these modifications?
13      A    I can't tell you.  Just, over time, I -- I
14 became aware of it.  It wasn't necessarily an epiphany
15 that I can point to.
16      Q    So, when The Wall Street Journal article came
17 out, in October of 2015, stating that blood tests were
18 being done on third-party equipment, you weren't
19 surprised.
20           MR. MUGMON:  Objection.  Form.
21           THE WITNESS:  No.  I think I had an awareness
22 before then.  No.  I don't think I was surprised.
23 BY MR. KATHREIN:
24      Q    And had you ever talked to any of the
25 directors about this?
```

```
 1      A    Well, I wasn't a director during this time,

 2 so, no, I never met with any of them.

 3      Q    Have you since talked to any directors about

 4 this?

 5      A    No.

 6      Q    You've never talked to Richard Kovacevich

 7 about this?

 8      A    About this subject?

 9      Q    Yes.

10      A    Not that I recall, no.

11                (Exhibit 64 marked)

12 BY MR. KATHREIN:

13      Q    Plaintiff's Exhibit 64 bears Bates Stamp

14 Nos. -4714, -4715, -4716, -17.  It's a series of

15 e-mails.  Attached to it is a blood test.

16           Could you look at this, Mr. Robertson, and

17 tell me whether or not this is the blood test that

18 you're referring to?

19      A    No, actually, I -- the -- the -- that blood

20 test was a year later that I was referring to.

21      Q    Okay.  So this --

22      A    But I -- I do remember this was a

23 friends-and-family opportunity, I guess, you'd say --

24      Q    Mm-hm.

25      A    -- and . . .
```

May 14, 2018                                    94

```
 1      Q    Was it your understanding that each of these

 2   blood tests could be run on the 3.0?

 3           MR. MUGMON:  Objection.  Form.

 4   BY MR. KATHREIN:

 5      Q    The Edison.

 6      A    So I -- when I told you it was a lipid test,

 7   I -- I misspoke.  I meant a hematology test, because

 8   that's what this is.

 9      Q    Okay, you're saying that blood test was a year

10   later, so . . .

11      A    It was.  But when we were discussing that, so

12   this was what I was thinking about --

13      Q    Mm-hm.

14      A    -- and I was not aware that we were doing

15   hematology testing on the 3.0.  And, if indeed we

16   weren't doing hematology testing on the 3.0, then this

17   would have to have been done on some other instrument,

18   but this was a finger prick.  So, as I began to

19   formulate this, I realize that the -- the company had

20   the ability, in the CLIA lab, to do a full hematology

21   test on a -- on a finger prick of blood and -- and,

22   connecting those dots, had to come to the conclusion

23   that we must have modified third-party machines to take

24   small samples.

25      Q    Were you aware that -- or were these tests
```

1   that could have been run on the miniLab?

2        A    Yes, these could have been run on the miniLab.

3        Q    So why isn't it that they could have been

4   running these on the miniLab instead of third party

5   equipment?

6        A    Because I don't believe, at the time that the

7   launch happened, that the required verification had been

8   done to put the miniLab into a CLIA lab commercial

9   setting.

10       Q    And why do you believe that that verification

11  had not been done?

12       A    Well, for the -- for the hematology portion,

13  it was -- at -- at that time, I would have viewed it

14  still as an R&D effort as opposed to something that was

15  ready for that level of -- of verification.  We had

16  shown that the assays could be done, though I don't know

17  at -- at what stage verification was at the time.  As I

18  said, I wasn't involved in making the decisions as to

19  readiness and to the extent to which verification had

20  been accomplished.

21       Q    Did you believe that the Edison had been

22  verified?

23       A    I believe that, if the Edison was being used

24  to make clinical measurements in the CLIA lab setting

25  that were being reported to patients, I did believe that

1   whatever verification was required had been done in

2   accordance with the regulations that govern a CLIA lab.

3       Q    Well, as -- I'm sensing that you had a

4   different opinion as to the miniLab's ability to do its

5   test versus the Edison at that point in time.

6           MR. MUGMON:  Objection.  Form.

7           THE WITNESS:  No, I -- I'm not aware that the

8   Edison was capable of doing a hematology panel.

9   BY MR. KATHREIN:

10      Q    No.  But was the Edison capable of doing the

11  panels, the immunology panels?

12      A    That's, in part, yes.  I mean, there's over

13  a -- on a Siemens Centaur XP machine, they do over a

14  hundred immunology tests, and I don't how many were up

15  and running on the 3.5 Edison instruments that were in

16  the -- in the CLIA lab.

17      Q    I'd like you to go forward, in this e-mail, to

18  the first page -- or to the second page, so we're going

19  backwards, October 1st at 9:29, 2013, Dr. Anjali Jain.

20          MR. GOLDMAN:  Bates 15?

21          MR. KATHREIN:  Page, yeah, -15, -4715.

22      Q    (By Mr. Kathrein)  On that page, Dr. Anjali

23  Jain says, in writing to you:

24              "I am the authorizing physician for your

25              laboratory test orders.  I reviewed your tests

```
 1              and would like to discuss them with you at

 2              your convenience -- NOT" -- "NOT urgent.

 3              I['m] available . . . either [by] phone or

 4              in-person consultation at Theranos' offices."

 5              You see that?

 6              MR. GOLDMAN:  Next page, Channing.

 7              THE WITNESS:  Oh.

 8              I see that, yes.

 9  BY MR. KATHREIN:

10       Q    Okay, and who is Dr. Anjali Jain?

11       A    She was a physician that, I believe, the

12  company contracted to write orders for those people who

13  wanted to take advantage of the opportunity of the

14  friends-and-family access to having a blood test done at

15  Walgreens.

16       Q    Was she an employee of Theranos?

17       A    I don't believe so.

18       Q    Okay, because it says "@theranos.com" up here.

19       A    I -- I believe she was -- well, I have the

20  same e-mail address, as well, and I'm not an employee,

21  so I -- I don't think she was one.

22       Q    Did you speak to her about -- in response to

23  this blood test -- in response to this e-mail?

24       A    I don't remember speaking to her.  I did

25  e-mail her back and said had that I'd be in the office.
```

```
 1   And then she e-mailed me back and said that there was no

 2   need to talk to her, because the reference range had

 3   been readjusted.

 4        Q    No.  She said:

 5             "I just wanted to let you know that since

 6             I e-mailed you about the abnormal results [o]n

 7             your test, I've been notified that the lab

 8             team is adjusting the reference ranges for the

 9             two variables that were reported as elevated

10             in your lab test."

11        Correct?

12        A    Well, she didn't actually refer to them as

13   being abnormal lab tests in her e-mail to me.

14        Q    But she's saying that here, correct?

15        A    She said that there, yes.

16        Q    Did you read this e-mail?

17        A    Of course.

18        Q    Were you concerned that the lab team at

19   Theranos was adjusting the reference ranges?

20        A    No.  That's common practice.

21        Q    To adjust the reference ranges on the

22   equipment after you've gotten results?

23        A    I don't know when they actually adjusted

24   the -- the reference range, but relative to having --

25   saying, from here on out, the reference range is "X,"
```

1    and all the tests that done after that are under the new

2    reference range.  That's the way I read this.

3        Q    You don't find that unusual at all, that labs

4    just adjust the reference ranges in response to abnormal

5    results?

6            MR. MUGMON:  Objection.  Form.  Asked and

7    answered.

8            THE WITNESS:  That's not the way they do it.

9    A reference range is defined to -- to capture 95 percent

10   of the normal people in which tests are done, and since

11   tests are done in different ways on different machines

12   in different labs, they establish the reference ranges,

13   and the laboratory director, from time to time, adjusts

14   them.  It's -- it's common practice.  So, no, it didn't

15   strike me as being unusual.

16   BY MR. KATHREIN:

17       Q    Okay.  So, your testimony today is, that's a

18   common practice.

19           MS. GOODHART:  Objection.  Form.

20           THE WITNESS:  It is -- it is done, and I have

21   test results from the Palo Alto Medical Foundation where

22   I have blood tests done, and I've had notifications of

23   reference-range changes.

24   BY MR. KATHREIN:

25       Q    Who does test testing for the Palo Alto

 1  Medical Foundation?

 2       A    I believe they have their own laboratory.

 3       Q    We're not marking this one.

 4            Showing you what has previously been marked as

 5  Lucas Exhibit 42, and it's a presentation by Theranos.

 6  Why don't you tell me if you've looked at this before?

 7            MS. GOODHART:  Objection.  Form.

 8  BY MR. KATHREIN:

 9       Q    If you've seen this before.

10       A    I don't recall having seen this slide deck

11  before.

12       Q    Okay, have you seen slide decks like it?

13            MS. GOODHART:  Objection.  Form.

14            MR. MUGMON:  Objection.  Form.

15            THE WITNESS:  I -- I've seen slide decks that

16  describe various aspects of what the company is doing,

17  but I haven't seen this one in particular, as far as I

18  know.

19  BY MR. KATHREIN:

20       Q    Okay.  Like to draw your attention to page 12,

21  of the Slide No. 12.  You see that?  It's entitled

22  "Excerpts from Theranos' Test Menu."

23       A    Okay.

24       Q    Okay.  And there's various categories of tests

25  (bacteria, viral, complete blood count with

 1  differential, et cetera) that are bolded and underlined.

 2           Which one on those tests could be run on the

 3  Edison, as you are aware?

 4       A    What I would -- the only answer I can give you

 5  on that is any of these that might have been done by

 6  immunoassay could conceivably have been done.  And, as I

 7  told you earlier, I was not aware of the extent to which

 8  general chemistry tests could be done on the -- the --

 9  the 3.5 system.

10       Q    You weren't aware that it could be done at all

11  on the 3.5 system.

12           MS. GOODHART:  Objection.  Form.

13           MR. MUGMON:  Same.

14           THE WITNESS:  I was aware immunoassays could

15  be done on the 3.5 system.

16  BY MR. KATHREIN:

17       Q    So which one of these, or which tests on this

18  page 12 of the slide deck, are immunoassays?

19       A    Well, of the ones I know that are not, I do

20  know those.  There are some that I just don't know,

21  because I don't know the analyte.  I haven't worked with

22  it.

23       Q    Which ones are not?

24           MS. GOODHART:  Objection.  Form.

25  BY MR. KATHREIN:

 1     Q     Are any -- let's -- let's do it this way:

 2  Under "Bacteria," are any of those immunoassays?  To

 3  your knowledge.

 4     A     Not -- not to my knowledge.

 5     Q     Under "Viral" --

 6     A     Because I'm not sure what test is -- is being

 7  done, if it's the detection of that.  Typically, one

 8  would use -- try to identify through molecular means.

 9     Q     Okay.

10     A     Same for "Viral."  Complete blood cell --

11  "Complete Blood Count," that's hematology.  I -- I don't

12  believe it could do that.  The -- the "Renal" and -- and

13  "Liver" panels and the "Complete Metabolic Panel," you

14  see there's overlap.  Those are basically chemistry

15  panels.

16     Q     Not immunoassays.

17     A     Not -- not immunoassays, as far as I know.

18           The "STDs & Drugs of" -- "of Abuse," those are

19  not assays that I am conversant with for those

20  compounds.  And the lipid panel is a -- that's a

21  chemistry panel and, as I also believe, is the

22  cardiovascular panel.

23     Q     So the only ones here that you're sure that

24  are immunoassays that you believe could be run on the

25  Edison are the three under "Thyroid Panel."

1      A    Well, thyroid-stimulating hormone, I

2  believe -- I believe so.  Again, I'm -- this is a little

3  bit out of my bailiwick, to -- to identify compounds

4  with -- except the ones that are obvious, with the assay

5  itself, unless I've actually had some experience with

6  it.

7      Q    I'm going to show you what we're marking as --

8  what previously marked as Lucas Exhibit No. 45.

9           This is an article written by Joseph Rago in

10 The Wall Street Journal on September 8th, 2013.  You're

11 familiar with this article, correct?

12     A    I've seen it, yes.

13     Q    You read it when it came out, did you not?

14     A    I -- I believe I did, yes.

15     Q    Were you interviewed for the article?

16     A    By this man?

17     Q    Yes.

18     A    No.  Not that I recall.

19     Q    Like to draw your attention to page 4 of the

20 article.  The first highlight there entitled -- well,

21 I'll read the sentence.  It's written by Joe Rago.  It

22 says:

23           "Theranos's technology eliminates multiple

24           lab trips because it can 'run any combination

25           of tests, including sets of follow-on tests'

```
 1              at once, very quickly, from a single

 2              microsample."

 3              Do you see that?

 4      A    Yes.

 5      Q    Okay.  Did you have an understanding, at this

 6  time, that the Edison could run any combination test and

 7  follow-up tests from a single microsample?

 8      A    Any combination of any possible test?

 9      Q    Yes.

10      A    No.

11      Q    When you read that, did that give you pause or

12  concern as to what was being written by The Wall Street

13  Journal?

14              MS. GOODHART:  Objection.  Form.

15              THE WITNESS:  I don't recall it, at least in

16  the way I read the article.  Maybe I did not read it

17  carefully enough, but, no, I don't recall that jumping

18  out at me.

19  BY MR. KATHREIN:

20      Q    I show you Exhibit 46.

21              What I am showing you is deposition

22  Exhibit 46.  Just tell me I'm mumbling.

23              Showing you what has been marked as

24  Deposition 46, it's a press releases dated

25  September 9th, 2013, which is -- which is one day after
```

1    the article you just read from Joseph Rago.  Have you

2    seen this press releases?

3         A    I -- I don't remember it.

4         Q    It's entitled "Theranos Selects Walgreens as a

5    Long-Term Partner Through Which to Offer Its New

6    Clinical Laboratory Service."  See that?

7         A    Yes.

8         Q    Okay.  And then it says:

9                   "With" -- "with first location launching

10                  this month in Silicon Valley, consumers can

11                  now complete any clinician-directed lab test

12                  with as little as a few drops of blood and

13                  results available in a matter of hours."

14                  Do you see that?

15        A    Yes.

16        Q    Was it your understanding that Theranos had

17   the capability, at this time, to run any

18   clinician-directed lab tests with as little as a few

19   drops of blood?

20        A    No.  I -- not on the 3.0.  It would -- one

21   could only surmise that there were other instruments

22   involved that were suitable for accepting small drops of

23   blood.

24        Q    But you weren't aware of any in your capacity

25   as a director who resigned -- or who stepped down in

 1   June of 2013 and an individual as on contract with the

 2   company at half a million dollars a year?

 3            MS. GOODHART:  Objection.

 4            MR. MUGMON:  Objection.

 5            MS. GOODHART:  Form.

 6            MR. MUGMON:  Form.

 7            THE WITNESS:  As I told you earlier, I -- I

 8   was not aware of any development activities aimed at

 9   modifying third-party instrumentation.

10   BY MR. KATHREIN:

11       Q    Do you know when the modification of

12   third-party instruments began at Theranos?

13       A    I don't, because I wasn't involved, nor was I

14   told about it.

15       Q    Have you ever inquired?

16       A    No.

17       Q    Okay, would it surprise you to learn that it

18   didn't begin until August of 2013 --

19            MR. MUGMON:  Objection.  Form.

20   BY MR. KATHREIN:

21       Q    -- just a month before these came out?

22            MR. MUGMON:  Objection.  Form.

23            THE WITNESS:  I don't know that to be the

24   case.

25   BY MR. KATHREIN:

 1      Q    Well, if it was the case, would you be

 2  surprised?

 3           MR. MUGMON:  Objection.  Form.  Calls for

 4  speculation.

 5           THE WITNESS:  I would have thought it would

 6  take longer to do it and to verify.

 7  BY MR. KATHREIN:

 8      Q    Show you what we're going to mark as the next

 9  deposition exhibit.

10                   (Exhibit 65 marked)

11  BY MR. KATHREIN:

12      Q    Deposition Exhibit 65 bears Bates-stamp

13  No. -1624.  The first in the sequence, meaning the

14  bottom, is an e-mail from you to Jeff Blickman,

15  Christian Holmes, and Daniel Edlin, copying Elizabeth

16  Holmes.  The subject is "Steve Quake."

17           Who is Steve Quake?

18      A    He's a professor in our bioengineering

19  department at Stanford.

20      Q    Mm-hm.  Did you write this letter, this

21  e-mail?

22      A    Yes.

23      Q    So you sent it to Blickman, primarily to

24  Jeffrey Blickman, Christian Holmes, and Dan Edlin.  Why

25  is that?

 1      A    They were the folks that, as I understood it,

 2  were basically working at the consumer interface.

 3      Q    Do you have an understanding as to what

 4  position Jeff Blickman held in the company, what his

 5  responsibilities were?

 6      A    I -- I believe, at least at one time, they --

 7  they had the titles of -- I believe it was product

 8  managers.

 9      Q    Blickman and Edlin are no longer at the

10  company, correct?

11           MR. MUGMON:  Objection.  Form.

12           THE WITNESS:  That's correct.

13  BY MR. KATHREIN:

14      Q    Is Christian Holmes still at the company?

15      A    No.

16           MR. MUGMON:  Same objection.

17               (Exhibit 66 marked)

18  BY MR. KATHREIN:

19      Q    Dr. Robertson, please look at Exhibit No. 66,

20  which the court reporter just handed you.

21           For the record, it bears Bates Stamp No. -7127

22  and -7129 through -7132.

23           It's an Elizabeth -- it's -- excuse me.

24           It's an e-mail from you to Elizabeth Holmes

25  dated June 16th, 2015, attaching an article written by

1   Mr. Diamandis.  I will spell it for you.  It's

2   E-l-e-f-t-h-e-r-i-o-s-t.  "P" is the middle initial.

3   Diamandis, D-i-m-a-n-d-i-s [sic].  And it's entitled

4   "Theranos Phenomenon:  promises and fallacies."

5           And you write -- did you write this e-mail?

6       A   I did.

7       Q   Okay.  And why did you send this e-mail to

8   Ms. Holmes?

9       A   I was upset.

10      Q   And why were you upset?

11      A   I was upset because I -- I thought this was

12  a -- basically, an attack piece on the -- on the company

13  and simply thought it was a very unbalanced report.

14      Q   Did you, from time to time, speak with

15  reporters about the company?

16      A   Yes.

17      Q   Okay.  Prior to this time, did you speak to

18  reporters?

19      A   Yes.

20      Q   Okay.

21      A   Yes.

22      Q   And, before you spoke to reporters, did you

23  get clearance from the company?

24      A   Normally, the company told me about the

25  reporters.

1       Q    Can you tell me, prior to this date, the

2  Diamandis article, what reporters you recall speaking to

3  about the company?

4       A    I remember speaking with Roger Parloff from

5  Fortune and Ken Auletta from The New Yorker.

6       Q    And, after this article, who do you recall

7  speaking to?

8       A    I'm sorry?

9       Q    And, after this article by Mr. Diamandis, who

10  do you recall speaking to, what reporters, on behalf of

11  the company?

12             MR. MUGMON:  Objection.  Form.

13             THE WITNESS:  After this, the only one I can

14  recall is a -- a -- a woman from CBS.

15  BY MR. KATHREIN:

16       Q    Do you recall, in the summer of 2015, being

17  asked by Elizabeth Holmes not to speak to John

18  Carreyrou?

19             MS. GOODHART:  Objection.  Form.

20             THE WITNESS:  I don't recall in that -- in

21  those terms.

22  BY MR. KATHREIN:

23       Q    In what terms do you recall it?

24       A    That I had been contacted by a reporter at The

25  Wall Street Journal, and he had left a voice mail, and

1   my recollection was that the company would handle it,

2   and there was no need for me to get involved.

3        Q    Show you the next exhibit.

4                   (Exhibit 67 marked)

5   BY MR. KATHREIN:

6        Q    Showing you deposition Exhibit 67, which bears

7   Bates Stamp Nos. -6293 through -6294.

8             Does this exhibit reflect the conversation

9   which -- reflect the communication you just testified

10  to?

11       A    Yes.

12       Q    And you wrote the e-mails on here, correct?

13       A    Yes.

14       Q    From time to time, did you write scripts for

15  Ms. Holmes, talking points for her, when making

16  presentations publicly?

17            MS. GOODHART:  Objection.  Form.

18            THE WITNESS:  If I did, it was few and far

19  between.  Normally, no.

20                   (Exhibit 68 marked)

21  BY MR. KATHREIN:

22       Q    Showing you what has been marked as -- as

23  Exhibit 68, there's Bates Stamp Nos. -22648 through

24  -22652.

25            Have you seen these e-mails before?

```
 1      A    I don't believe I have, no.

 2      Q    You see that, on the page -649, in the e-mail

 3 from Lauren to Elizabeth, dated September 23rd, 2015,

 4 she says:

 5             "Channing and I spent time together

 6             creating this outline for your 18 minute

 7             fireside chat . . . at the Churchill Club

 8             event."

 9      Do you recall working with the author of this

10 e-mail, Lauren Vroom, to create an outline for

11 Elizabeth?

12      A    Actually, I don't remember -- remember that.

13 She was a -- in the communications area, so we certainly

14 could have had a chat about it, but I don't remember it.

15      Q    Okay, the -- the next e-mail from her to

16 Elizabeth says, "Below are Channing' s [sic] talking

17 points."

18      Do you recall putting together these talking

19 points for Elizabeth?

20      A    I -- I don't.

21      Q    Do you have any reason to believe that you did

22 not put together these talking points?

23      A    No.  As said, it happened from time to time,

24 but I don't actually remember this, and this isn't

25 jogging my memory.
```

```
 1       Q    At this point in time, which is September of

 2  2015, did you know about how many blood tests,

 3  percentage of blood tests, Theranos was performing on

 4  patients, using a finger stick as opposed to venous

 5  draw?

 6                     (Reporter clarification)

 7               THE WITNESS:  No.

 8  BY MR. KATHREIN:

 9       Q    Were you aware that the FDA had, at this point

10  in time, determined that the nanotainer was an

11  unapproved medical device?

12               MR. MUGMON:  Objection.  Form.

13               MS. GOODHART:  Objection.  Form.

14               THE WITNESS:  I was, I believe, aware that the

15  company had thought it was a -- a Class I device, and

16  the FDA wanted to regulate it as a Class II device,

17  which then precipitated, I think, several 510-K

18  applications to the FDA to have the nanotainer regulated

19  as a Class II device in and around this time.

20  BY MR. KATHREIN:

21       Q    Do you know if it was before The Wall Street

22  Journal article came out by John Carreyrou?

23               MS. GOODHART:  Objection.  Form.

24               THE WITNESS:  No.  I don't know the precise

25  date.
```

```
 1  BY MR. KATHREIN:

 2      Q    Okay.  Did you learn it from the company, or

 3  did you learn it from the press first?

 4           MR. MUGMON:  Objection.  Form.

 5           THE WITNESS:  Learn . . . ?

 6  BY MR. KATHREIN:

 7      Q    That the nanotainer -- that the FDA wanted to

 8  regulate the nanotainer and that Theranos quit doing

 9  blood tests with the nanotainer.

10           MS. GOODHART:  Objection.  Form.

11           THE WITNESS:  My only recollection of that --

12  and I don't know if that was in conversations or from

13  a -- perhaps a town hall meeting where I learn that use

14  of the nanotainer was -- had been put on pause, I think,

15  the -- words that they used.

16  BY MR. KATHREIN:

17      Q    I'm going to show you what . . .

18           MR. GOLDMAN:  Reed, after this document, maybe

19  we can take a break?

20           MR. KATHREIN:  Yeah.

21                (Exhibit 69 marked)

22  BY MR. KATHREIN:

23      Q    Showing you what has been marked as

24  Plaintiff's Exhibit 69.  It bears Bates Stamp Nos. -4567

25  through -4578, and it's entitled "Hot Startup Theranos
```

1    Has Struggled With Its Blood-Test Technology."  It's

2    Wall Street Journal article written by John Carreyou

3    dated October 16, 2015.

4            You're familiar with this article, correct?

5        A    I'm familiar with this article, yes.

6        Q    You read it when it came out, correct?

7        A    I did.

8        Q    Okay.  When it came out, did you have any

9    conversations with Elizabeth Holmes about this article?

10       A    I don't remember any specific conversations

11   with her about it.

12       Q    You remember, generally, you had conversations

13   with her?

14           MS. GOODHART:  Objection.  Form.

15           THE WITNESS:  No, I don't.

16   BY MR. KATHREIN:

17       Q    Did you have any conversations with Ramesh

18   Balwani?

19       A    Not that I can recall, no.

20       Q    Did you have conversations with any Theranos

21   employee about this article?

22       A    Yes.

23       Q    And who was that?

24       A    Dan Edlin.

25       Q    And when did you have that conversation?

1        A     The -- essentially the day it was published.

2        Q     Okay, and what did you say to him, and what

3   did he say to you?

4        A     I don't read The Wall Street Journal.

5        Q     Mm-hm.

6        A     So I got an e-mail that morning from a friend

7   of mine, saying that this article had come out.  I don't

8   recall how he characterized it, but he said I would-- I

9   ought to take a look at it or something like that.  And

10  I went into the office, and I asked Dan Edlin if he knew

11  about this, and he said he did, and he sent me a copy of

12  it, and it was the first time I saw it.

13       Q     Is that the extent of your conversation with

14  anyone at Theranos regarding this article?

15       A     In terms of remembering specific items, no.

16  But, obviously, it -- it caused a -- quite a stir.  So

17  I -- I presume I talked with people about it.

18       Q     Did you help put together a response to this

19  article?

20       A     No.

21       Q     Did you ask questions of anyone at Theranos

22  about the veracity of this article?

23       A     I presume I did, but I don't have any

24  recollection of it.

25             MR. KATHREIN:  Okay, let's take a break.

```
 1              THE VIDEOGRAPHER:  The time is 2:54.  We are

 2   go off the record.

 3                   (Break taken from 2:54 p.m. to

 4                   3:07 p.m.)

 5              THE VIDEOGRAPHER:  The time is 3:08.  We are

 6   back on the record.

 7              MR. GOLDMAN:  So, Reed, can we clarify a

 8   couple issues before with you go forward?

 9              MR. KATHREIN:  Sure.

10              MR. GOLDMAN:  Okay, so, Dr. Robertson, do you

11   remember -- it's been a little while now, but there --

12   but counsel was asking you about whether you knew, at

13   the time the Carreyrou Wall Street Journal article came

14   out, that Theranos was using third-party machines in its

15   CLIA lab.  Do you remember him asking you those

16   questions?

17              THE WITNESS:  Vaguely.

18              MR. GOLDMAN:  So, I just want to make a

19   distinction between modified and unmodified third-party

20   machines.  Does -- is that a distinction make sense to

21   you?

22              THE WITNESS:  I understand the difference,

23   yes.

24              MR. GOLDMAN:  Okay.  So, am I right that, when

25   you were answering his questions, you were thinking
```

1    about modified third-party machines, whether you knew

2    that there was modified third-party machines being used

3    in the CLIA lab before the Carreyrou article.

4         A     I would think we covered that.

5              MR. GOLDMAN:  Yeah.  With respect to

6    unmodified third-party machines, you remember whether

7    you knew, at the time of the article, that those were

8    being used in the CLIA lab?

9              THE WITNESS:  No, I didn't.

10             MR. GOLDMAN:  Okay.  And then another very

11   small issue --

12             THE WITNESS:  I didn't know one way or the

13   other.

14             MR. GOLDMAN:  One way or the other, right.

15             Wait.  You don't remember whether you --

16             THE WITNESS:  No.

17             MR. GOLDMAN:  -- knew, or you didn't know?

18             THE WITNESS:  Oh, I don't . . . I don't know

19   when I learned that --

20             MR. GOLDMAN:  Okay.

21             THE WITNESS:  -- but it -- it could have been

22   after The Wall Street article came out.

23             MR. GOLDMAN:  Okay.  Second thing is, counsel

24   asked you how often you go into Theranos, and you said a

25   couple times a week generally.  Remember that?

```
 1              THE WITNESS:  Yes.

 2              MR. GOLDMAN:  Did that change recently?

 3              THE WITNESS:  Yes.

 4              MR. GOLDMAN:  So just describe that.

 5              THE WITNESS:  So about a week ago the company

 6  has transitioned to what's called document preparal

 7  [sic] mode or preparing, where they're taking

 8  documentation, computer files, lab notebooks, and

 9  indexing them in a way that would be helpful if someone

10  were to come along and -- in the future and want to have

11  access to this technology.

12              So it's a -- it's a cataloging process, and

13  the development activities have been put on hold, which

14  is what I was actively engaged in.

15              MR. GOLDMAN:  So what does that mean about

16  whether you're going into the office?

17              THE WITNESS:  It means I don't have a real

18  reason to go over there until such time that situation

19  may change where we reengage with development

20  activities.

21              MR. GOLDMAN:  Okay.  Thanks.

22  BY MR. KATHREIN:

23     Q    Is it your understanding, Dr. Robertson, that

24  the company is no longer developing the -- the Zika --

25  Zika virus test?
```

```
 1      A    It's been put on hold.

 2      Q    Okay, let's -- still on 69.

 3           Did you think that the Carreyrou article,

 4  which is Exhibit 69, was unfair to Theranos?

 5           MS. GOODHART:  Objection.  Vague.

 6           THE WITNESS:  It's hard for me to characterize

 7  it that way in that I was not knowledgeable about much

 8  of what he said, and I had no way to -- to determine the

 9  veracity of it.  Although, as I recall, there was a set

10  of remarks in here about Ian Gibbons, and they conveyed

11  a very inaccurate picture of what actually was the

12  truth, and so in that one place where I really had

13  intimate knowledge (and I know that was not the case), I

14  didn't know, really, how to interpret the rest of it.

15  BY MR. KATHREIN:

16      Q    Let's just focus on the part about Ian

17  Gibbons.  What is the truth, in your opinion, as opposed

18  to what John Carreyrou -- the impression John Carreyrou

19  gave?

20      A    The impression he gave, due to a quote from

21  his wife, he said -- told me nothing was working.  From

22  what I -- and I worked with Ian for -- from the early

23  days at Biotrack, so maybe 25, 30 years, and I worked

24  with him closely at Theranos, and he never, ever, even

25  hinted that he believed nothing was working, and it was,
```

1  in fact, the opposite.  He thought the company had

2  accomplished -- has accomplishments that he himself even

3  marveled at and didn't think it would be possible to do

4  when we first set out on this journey.  And knowing Ian

5  and working with him during working hours on many

6  aspects of Theranos, from intellectual property to

7  general chemistry, which he was in -- in -- in charge

8  of, he never gave a hint that that's what he -- he

9  believed.  So, I think that did not convey the Ian

10  Gibbons I knew, nor his attitude toward the company or

11  what he felt.

12       Q    How long had you -- how long before his

13  suicide had you spoken with him?

14            MS. GORTON:  Objection.  Form.

15            THE WITNESS:  I . . . I can't tell you,

16  although he was ill, and he -- he was working from home,

17  and he would come in less frequently.  When the last

18  time I saw him, because I believe he passed away in May

19  of 2013, I can't -- I -- I -- I -- I can't tell you, but

20  we had a working relationship, I would -- I would have

21  characterized it, up to the end or close to the end.

22  BY MR. KATHREIN:

23       Q    You say he was ill.  What was he ill with?

24       A    I believe he had cancer, and it -- it took its

25  toll on him.  And Elizabeth worked out a -- a -- a plan

1  where he could spend less time in the office, but work

2  on things from home, and he changed his focus a little

3  bit more towards intellectual property, which I had

4  worked on with him for years in terms of patent

5  applications and inventions and so forth.

6                    (Exhibit 70 marked)

7  BY MR. KATHREIN:

8     Q    Showing you Exhibit 20 -- Exhibit 70, bears

9  Bates Stamp Nos. -2060, -2061.  It's an e-mail from you

10 to Elizabeth Holmes a few days after The Wall Street

11 Journal article, approximately three days after The Wall

12 Street Journal article, where you're conveying to

13 Ms. Holmes a conversation you had with Brian Grossman.

14 Did I characterize that correctly?

15    A    Yes.

16    Q    Okay, and who is Brian Grossman?

17    A    He's a partner in Partner Fund Management, a

18 hedge fund.

19    Q    Mm.  And you write in here, "Elizabeth" -- I'm

20 talking first one -- "Brian Grossman called and we had a

21 chat."

22         Now Elizabeth writes back:  "Thanks for

23 sending.  Let me know background as I know Sunny's

24 talking to him too."

25         So you knew that Brian was trying to get

1   answers from Sunny, correct, with respect to The Wall

2   Street Journal article?

3            MS. GORTON:  Objection.  Form.

4            THE WITNESS:  So it's -- it's evident from

5   this that Brian . . . had are was -- was going to talk

6   to Sunny, yes.

7   BY MR. KATHREIN:

8       Q    Mm-hm.  And your -- this is -- this was

9   because of the issues raised in The Wall Street Journal

10  article.  Brian Grossman wanted answers, correct?

11           MR. MUGMON:  Objection.  Form.

12           THE WITNESS:  He wanted to discuss,

13  presumably, with Sunny and/or -- and me what had been

14  represented in the article.

15  BY MR. KATHREIN:

16      Q    You write, on the e-mail to Elizabeth Holmes

17  on October 19th, 2015:  "He called [me] about 45 minutes

18  ago.  We spoke for about 20 min[utes]."

19           And then you write:

20               "Basically I think he wanted to hear from

21           me that our science and technology is sound.

22           I told him so.  I told him we were preparing a

23           point by point response to

24           W[all]S[treet]J[ournal article] and that . . .

25           should be available soon."

```
 1              Did you write that?

 2      A    Yes.

 3      Q    When you say that he wanted to hear from you

 4  that our science and technology is sound and you told

 5  him so, what did you tell him?

 6      A    Just that.  I don't recall the words.

 7      Q    Okay.  Had you ever spoken to Brian Grossman

 8  before?

 9      A    I may have, but I don't recall having done so.

10      Q    Did you give any presentations to partners?

11      A    No.

12      Q    Why would he call you?

13           MR. MUGMON:  Objection.  Form.

14           THE WITNESS:  He knew, presumably, my

15  involvement with the company, since his father-in-law is

16  my next-door neighbor.

17  BY MR. KATHREIN:

18      Q    And what's his father-in-law's name?

19      A    David Brady.

20      Q    You told him that Theranos is preparing a

21  point-by-point response.  Were you part of preparing

22  that point-by-point response?

23      A    No.

24      Q    How did you know they were preparing a

25  point-by-point response?
```

```
 1      A    I don't know who I heard it from.  It may have

 2  been from Dan Edlin, somebody on the staff.

 3      Q    You say that he wondered why Theranos didn't

 4  just go to the medical community and show them its data.

 5  And you respond, saying:

 6              "I told him doing so would divulge what

 7              took us 10 years to invent and develop and we

 8              need to protect that - no company would follow

 9              that path unless they did not care if everyone

10              knew all [its] details . . . ."

11          You wrote that, correct?

12      A    That's right.

13      Q    And was that something that Elizabeth had told

14  you was the reason why they didn't go to the medical

15  community and show them the data?

16      A    Elizabeth didn't tell me that.

17      Q    Who told you that?

18      A    That's my own opinion.

19      Q    Did you ever ask Elizabeth why they didn't go

20  to the medical community and show them the data?

21      A    I don't having -- recall having discussions

22  with her about this.  I -- I did have a discussion with

23  Sunny about this at one time.

24      Q    And tell me about that discussion.  When and

25  where did that take place?
```

 1      A    I don't know when.  It took place in the

 2   offices.

 3      Q    Was it prior to this or after this?

 4      A    That, I can't tell you.

 5      Q    And was there anyone else present?

 6      A    No.

 7      Q    And what did he say?  What did you say?

 8      A    I can't recreate a conversation from years ago

 9   to that level of detail.  I -- I can tell you that the

10   principles that I put forth here are ones that I thought

11   were appropriate to apply when it comes to walking --

12   how I would call the knife edge between full

13   transparency disclosure into the public of either trade

14   secrets that other people then could use to copy what it

15   was we were doing, and we needed to protect those.  And,

16   in a peer-review article that we would -- we would

17   write, which we ultimately did, we would have to

18   disclose the architecture.

19           We would have to disclose the manner in which

20   we were doing the testing, because that's what's

21   required.  You generally have to be able to read a

22   peer-reviewed paper and be able to reproduce it if you

23   so wish.  And so consistent with the company's policy to

24   maintain a high level of secrecy, this was consistent

25   with that, and I told that to Brian, and I also told him

1    that we this do divulge information to the FDA, and that

2    is a form of -- of -- I say it's a -- it -- it's a --

3    it's a form of having someone else verify or -- or

4    validate or agree with what it was you are and had been

5    doing with regard to, in this case, our testing.  And

6    there are some public documents and findings that come

7    out, FDA submissions, but told him we weren't prepared,

8    at that time -- or at least I wasn't prepared, to be a

9    promoter of telling the world how it was we performed

10   analyses in the kind of detail that would be required in

11   a peer-review publication.  Ultimately, that position

12   changed.

13        Q    And when did that position change?

14        A    I would say it changed from Elizabeth gave the

15   talk at the American Association of Clinical Chemistry

16   in August of 2016, I believe it was.

17        Q    And you say that there was a peer-review

18   article that was published?

19        A    There had been several peer-review articles

20   that had been published since that time.  The one that

21   I'm most familiar with, because I helped to co-author

22   it, is a paper that was published in January of 2018.

23        Q    And what did that article cover?

24        A    It covered the miniLab, its architecture, its

25   components, and provided examples from each of the four

1  classes of -- of tests that I described to you earlier:

2  general chemistry, immunology, hematology, and

3  molecular biology.  That was published in the American

4  Institute of Chemical Engineer[ing] journal,

5  Bioengineering & Translational Medicine.

6       Q    And was that co-authored at the direction of

7  Elizabeth?

8       A    What do you mean?

9       Q    Well, I presume that you would not have just

10 written that and submitted it without her permission,

11 correct?

12      A    Well, no.  She's a co-author.

13      Q    Okay.  Did she ask you to be a co-author on

14 it?

15      A    No.  I think it was just a given that she

16 would be a co-author, I would be a co-author, and there

17 are perhaps 20 other co-authors on that paper.

18      Q    How much of it did you write?

19      A    I don't know in terms of percentage, but I --

20 I had a significant hand in it.

21      Q    Let me show you . . . next -- 23.

22               (Exhibit 71 marked)

23 BY MR. GOLDMAN:

24      Q    Showing you Exhibit 71, it's an e-mail from

25 Dan Edlin to you, attaching an article written by John

 1   Carreyrou, and then your response, and then Dan's

 2   response to you.  Did I characterize that correctly?

 3       A    I'm not sure.  Let me take a look.

 4            Okay.

 5       Q    Did you write this e-mail?  The one in the

 6   middle?

 7       A    The -- the short paragraph in the middle.

 8       Q    Right.  So, Dan Edlin sent you e-mail, copying

 9   John Carreyrou's article in The Wall Street Journal on

10   October 21st, and then you respond:

11            "So Carreyrou's reaction is pretty much

12            what one would expect.  Hopefully our detailed

13            response gives the necessary background to

14            begin convincing people that we can rise above

15            finger pointing and 'she said, he said'."

16            You wrote that, correct?

17       A    I did.

18       Q    Okay.  And I thought you said you didn't have

19   an opinion as to what was accurate or inaccurate about

20   his story.  So why are you here saying that,

21   "Hopefully . . . [we] can begin convincing people that

22   we can rise above finger pointing and 'she said, he

23   said'"?

24            MR. MUGMON:  Objection.  Form.

25   Mischaracterizes prior testimony.

 1              THE WITNESS:  As I recall, what I told you is

 2   that, based on what he had written about Ian Gibbons, I

 3   had questions about the veracity of that article and --

 4              MR. KATHREIN:  Oh, you --

 5              THE WITNESS:  -- what was said in the --

 6   BY MR. KATHREIN:

 7       Q    You had questions about the entire veracity.

 8       A    I had no reason to pick anything out that I

 9   can recall, that I had evidence of an allegation he

10   may -- might have made that was true or -- or not true.

11   So --

12       Q    Well, today you know those allegations are

13   true, correct?

14              MR. MUGMON:  Objection.

15              THE WITNESS:  No, I don't.

16   BY MR. KATHREIN:

17       Q    Okay.  Let me show you the next exhibit, 24.

18                   (Exhibit 72 marked)

19   BY MR. KATHREIN:

20       Q    This is a letter from -- well, this document

21   bears Bates Nos. -4324 and -3618.  They're related

22   e-mails from -- involving an inquiry you made at the

23   front of your -- Tony Klein about his outside

24   perspective of Theranos's response to The Wall Street

25   Journal articles, correct?

1        A     Well, let me take a look.

2              All right.

3        Q     Okay, you -- you wrote that e-mail,

4    Exhibit 72, correct?

5              MR. MUGMON:  Objection.

6    BY MR. KATHREIN:

7        Q     I'm talking on page -3618 from you to

8    Christian Holmes on October 30th, 2015, correct?

9        A     To -- to Dan Edlin and Christian Holmes, yes.

10       Q     Yes.

11             And that was -- that information came from the

12   e-mail on the prior page, on -4324, from Tony Klein to

13   you, correct?

14       A     I copied his e-mail.

15       Q     Mm-hm.  Could you go back to Exhibit 69 a

16   second?  Turn to page -4574.

17             This is the John Carreyrou article of

18   October 16th, 2015, and, on page -574, halfway down,

19   Carreyrou writes:

20             "As of end of 2014, Theranos did less than

21             10%  of its tests on Edison machines,

22             including tests for prostate cancer and

23             pregnancy, one form-" -- "one former senior

24             employee says."

25             Do you have any reason to believe that

```
 1   statement by John Carreyrou was incorrect?

 2             MS. GOODHART:  Objection.  Form.

 3             THE WITNESS:  I had no reason either way,

 4   whether it was correct or incorrect.  But I didn't know.

 5   I didn't have any information to allow me to make that

 6   judgment.

 7   BY MR. KATHREIN:

 8        Q    And you didn't ask anyone if it was correct.

 9        A    I don't recall having done that, no.

10        Q    Okay.  And the next sentence, John Carreyrou

11   writes:

12                  "In addition to the 15 tests run on the

13                  Edison system, Theranos did about 60 more on

14                  traditional machines using a special dilution

15                  method, the former senior employee says."

16             Do you have any reason to believe that

17   statement was incorrect?

18        A    Well, I don't know if 15 tests is correct.  I

19   don't know if the number 60 is correct.  It's clearly

20   referring to the -- I believe the modified -- yes, to

21   the modified commercial machines, which he refers to as

22   a special dilution method.

23        Q    Did you make any inquiries as to whether that

24   statement was correct?

25        A    I don't recall.
```

```
 1      Q    The next paragraph says:

 2               "A third set of about 130 tests was run on

 3           traditional machines using larger samples

 4           drawn from the patients' arms with a needle."

 5      Do you have any reason to believe that

 6  statement was incorrect?

 7           MR. MUGMON:  Objection.

 8           THE WITNESS:  Again, I don't have a -- I did

 9  not have a basis to evaluate it.

10  BY MR. KATHREIN:

11      Q    Did have a basis, at any time, to evaluate it?

12      A    I don't recall knowing whether these numbers

13  were correct or -- or incorrect other than what we've

14  already discussed with regard to how these measurements

15  were made with a combination of the Edison system and

16  modified third-party machines.  And, as far as the

17  venous draws are concerned, I was not aware of that

18  either.

19      Q    Did you know that in 2015, well before the FDA

20  put the hold on use of the nanotainer, that Theranos had

21  quit using the Edison machines?

22           MR. MUGMON:  Objection.  Form.

23           THE WITNESS:  I'm not aware of that.

24                   (Exhibit 73 marked)

25  BY MR. KATHREIN:
```

 1      Q      Showing you Exhibit 73, it's a article from

 2   The Wall Street Journal entitled "Theranos Ran Tests

 3   Despite Quality Problems," from John Carreyrou and

 4   Christopher Weaver, and while there's not a date on the

 5   document, the metadata on the last page has this as

 6   being March 9th, 2016, as the date this PDF was first

 7   saved or created by, apparently, Elizabeth Holmes or

 8   Shea Maney.

 9           Have you read -- did -- have you read this

10   Wall Street Journal article before?

11           MS. GOODHART:  Objection to the form.

12           THE WITNESS:  No, I don't remember.  I don't

13   remember this article.

14   BY MR. KATHREIN:

15      Q      Okay.  Do you recall, after the John Carreyrou

16   article, that you were asked to vouch for the

17   veracity -- the accuracy and -- and veracity of Theranos

18   blood tests?

19           MS. GOODHART:  Objection.  Form.

20           THE WITNESS:  Are you referring to the CBS

21   interview?

22   BY MR. KATHREIN:

23      Q      Well, let's -- let's start with the CBS

24   interview, yes.  Were you asked to do that interview?

25           MS. GOODHART:  Objection.  Form.

1              THE WITNESS:  Yes, I was asked to do the

2   interview.

3   BY MR. KATHREIN:

4       Q    Okay, and who asked you to do that interview?

5       A    It was someone from the communications team.

6   Might have been Brooke Buchanan at that time.

7       Q    And when did that interview occur?

8       A    It was in -- sometime, I think, around spring

9   of 2016.

10      Q    So it was after -- it was several months after

11  the John Carreyrou article in The Wall Street Journal.

12      A    Yes.

13      Q    And what did she say to you when she asked you

14  to do this interview?

15      A    Brooke?

16      Q    Yes.

17      A    I don't know specifically what she said other

18  than CBS was coming to do a piece and would I be willing

19  to be interviewed.  It was pretty straightforward.

20      Q    Did you talk to Elizabeth about the interview?

21      A    I don't recall.  I -- I may have.

22      Q    Do you recall that David Boies was also

23  interviewed at the same time?

24             MR. MUGMON:  Objection.  Form.

25             THE WITNESS:  I didn't . . . no, I don't think

1    I knew that at the -- at the time.

2    BY MR. KATHREIN:

3        Q    And what was your understanding as to why you

4    were being asked to do the interview?

5        A    I think to answer questions this reporter

6    would have regarding issues that had been raised about

7    the company and that I could perhaps contribute in

8    a . . .

9        Q    But given the fact that you have testified

10   today that you weren't in a position to know either way

11   whether or not the Carieau article was -- was true,

12   didn't you feel uncomfortable about giving this

13   interview?

14           MR. MUGMON:  Objection.  Form.

15           THE WITNESS:  I didn't feel uncomfortable

16   about it, as I recall, no.

17   BY MR. KATHREIN:

18       Q    What did you understand was the subject matter

19   on which you were supposed to be interviewed?

20       A    I can't recall, with any certainty, as to what

21   they said other than it would be a -- a discussion about

22   my journey with the company and my understanding of the

23   company's technology.

24       Q    So you were being put out there as a spokesman

25   to vouch for the company's technology.

 1              MR. MUGMON:  Objection.  Form.

 2              THE WITNESS:  I don't view myself as having

 3  been put out there.  I was willing to have a

 4  conversation with this reporter and answer her questions

 5  as best I could.

 6  BY MR. KATHREIN:

 7      Q    Show you what we're going to mark as the next

 8  exhibit.

 9                    (Exhibit 74 marked)

10  BY MR. KATHREIN:

11      Q    Take a minute and look at Exhibit 74 and tell

12  me whether or not this is the transcript of your

13  interview in the spring of 2016.  I will point out that

14  it says February 29th, 2015, on the top, but I think

15  that's just a typo.  It should be 2016, because it

16  discusses events that happened after that date.

17      A    Yes, I think this is a transcript of that

18  interview.

19      Q    So I want to focus your attention on the top

20  of page -940, or maybe we should begin at -- back on

21  -939, where -- beginning with:

22              "And so our focus is developing this

23          platform, a technology platform on which we

24          could run the tests that physicians order for

25          blood and for urine, for infectious diseases

```
 1              and so forth.  So, it was, a, first of all, a
 2              brand new paradigm and thinking about how to
 3              go to" -- "how you go about laboratory
 4              testing.  And the other is reducing the
 5              footprint.  Instead of having a room the size
 6              of" -- "that we're in today, this laboratory,
 7              can . . . do it on a footprint of a table?
 8              Can it be distributed?  Can it be portable?
 9              Can it be mobile Can [sic] it be done with
10              much smaller volumes?  Why are the kinds of
11              volumes drawn today from venous puncture in
12              order to acquire the information that
13              physicians seek?  Our view was, there really
14              is no need.  Why not do it at smaller volumes?
15              Maybe as a small" -- "Maybe as small as a drop
16              of blood.  These were challenges we put forth
17              on us.  So, our technology is really an
18              assemblage of technologies and methodologies
19              and procedures, from acquiring the sample,
20              transporting the sample, making a measurement
21              on that sample.  And one has to do hundreds of
22              measurements on very different kinds of
23              molecules, proteins, nucleic acids, cells.
24              And that all has to be done robustly and
25              accurately, precisely.  That was [a] big" --
```

```
 1                    "big question.  And our technology does that.

 2              We've been able to actually crack that nut to

 3              make it happen."

 4              Did I read that correctly?

 5     A     Yes.

 6     Q     Okay, and did you say that?

 7     A     Yes.

 8     Q     And then you go on, and the interview [sic]

 9  asked another question.  She goes:

10                    "I want to talk about cracking that nut.

11              So, you say there's no question in your mind

12              that Theranos tests, as designed today, are

13              accurate and reliable."

14              And your response:

15                    "Absolutely.  Our tests are reliable and

16              they're accurate, precise.  If they weren't,

17              we couldn't provide the service that we want

18              to provide and that is required of us by the

19              medical healthcare community and the people

20              that we serve."

21              Did you say that?

22     A     Yes.

23     Q     Why did you say that if you didn't know what

24  tests were being run on what equipment?

25                    MR. MUGMON:  Objection.  Form.
```

 1          THE WITNESS:  I was referring, in -- in

 2   answering this question, about the data that I know

 3   about, which was on the R&D side, which showed that we

 4   had the reliability, accuracy, and precision that would

 5   be required in order to carry out this vision.  My

 6   presumption was that, once this was transferred into the

 7   CLIA lab setting, that whatever tests were done would be

 8   run in such a way as to achieve the accuracy and

 9   precision that was required and is expected; and that's

10   whether it's running on one of our instruments, such as

11   a 3.5, or whether it's a third-party modified

12   instrument.

13   BY MR. KATHREIN:

14       Q    But --

15       A    So I had no reason to believe otherwise.

16       Q    But you also had no reason to understand what

17   was going on in the CLIA lab, because you weren't part

18   of the CLIA lab, correct?

19       A    I told you that was my presumption, is, once

20   that was transferred into the CLIA lab, that they were

21   operated in a way that was consistent with the

22   achievement of the accuracy and precision with which

23   they had shown to have when they were in the R&D side of

24   the company.

25       Q    You knew you were putting yourself out on a

 1  limb here, making a statement on behalf of the company,

 2  without selling that presumption, correct?

 3          MR. MUGMON:  Objection.  Form.

 4          THE WITNESS:  I don't know that to be the

 5  case.

 6  BY MR. KATHREIN:

 7     Q    Is a reason you didn't want to disclose that

 8  presumption and that fact that you didn't know what was

 9  going on in the CLIA lab?

10          MR. MUGMON:  Objection.

11          THE WITNESS:  No, it didn't occur to me

12  and . . . well, I told you my presumption was, is, what

13  was going on in the CLIA lab was consistent with how a

14  CLIA lab is -- is to be run and -- and operated.  It --

15  and I -- I believe that was a -- a -- a -- a correct

16  presumption, because the lab is regulated, and it's

17  inspected, and there's proficiency testing that is done

18  to ensure that that's happening.

19  BY MR. KATHREIN:

20     Q    But you know today that the lab wasn't being

21  run.  You're aware of the CMS reports on the lab, the

22  CMS respect -- inspections, correct?

23          MR. MUGMON:  What's the question?

24  BY MR. KATHREIN:

25     Q    You are aware of those inspections, correct?

 1      A     I'm aware there were inspections, yes, of

 2   course.

 3      Q     Did you read those reports by the CMS?

 4      A     No.

 5      Q     Why not?  You were vouching for the accuracy

 6   of the testing.

 7            MR. MUGMON:  Objection.

 8   BY MR. KATHREIN:

 9      Q     Didn't you have any interest in those?

10            MS. GOODHART:  Objection.

11            MR. MUGMON:  Objection.

12            THE WITNESS:  My understanding was that the

13   issue was not about reliability or accuracy or

14   precision, but about personnel and training and

15   recordkeeping in the -- in the CLIA lab.  That was my --

16   my understanding.

17   BY MR. KATHREIN:

18      Q     But you never read those reports.

19      A     But I talked to people who did, and -- and

20   this is what I assimilated from those conversations.

21      Q     So . . .

22            So what people did you talk to about the CLIA

23   lab that gave your impression as to what the CMS

24   findings were?

25      A     I can't tell you.

1        Q     Can you tell me when?

2        A     Well, I -- I presume it was after the

3    inspection reports were released and the company was

4    reacting to them.

5        Q     When did you learn that the CLIA lab director

6    was a dermatologist who only worked one day a week?

7               MR. MUGMON:  Objection.

8               THE WITNESS:  I didn't know he only worked one

9    day a week.  If that's your representation, I didn't

10   know that.  And I did learn, at some point, he was a --

11   a -- a -- a dermatologist, but I never met the man,

12   never had any discussions with him, and know little of

13   his -- if anything, about his background.

14   BY MR. KATHREIN:

15       Q     Let me show you what's -- is being marked as

16   Exhibit 75.

17               (Exhibit 75 marked) --

18   BY MR. KATHREIN:

19       Q     Exhibit 75 is -- consists of e-mails -643

20   through -672, and the top one is an e-mail from Don

21   Lucas.  The subject is a shareholder letter.  And

22   attached to it is a document entitle -- on page -645, a

23   document entitled "theranos TABLE OF CONTENTS."

24               Do you see that?

25       A     Yes.

```
 1      Q    Have you -- were -- were you involved in the

 2  preparation of this document, beginning on page -645

 3  until Theranos -- and then it says "TABLE OF CONTENTS,"

 4  and the first bullet point is "Where We Are Now."

 5      A    I did not help prepare this.

 6      Q    Okay, but you provided a statement for it,

 7  correct?

 8           Draw your attention to page 13.

 9      A    Yes, that's true.

10      Q    So you read and approved that statement here

11  that says -- begins, "Between the four of us" -- and

12  refers to Dick Kovacevich, Tim Draper, Bill Frist and

13  Channing Robertson.  "Between the four of us, we spent

14  many hours talking to reporter [sic]," and it goes on

15  down, and ends with:

16           "We will continue to tell the story of

17           Theranos, and applaud the company for telling

18           its own story in the months ahead and years

19           ahead as the company makes its data public and

20           shows time and time again through factual

21           evidence that its promise will continue to

22           become a reality."

23           You approved that --

24      A    I did.

25      Q    -- language.
```

 1           And, in approving that language, did you talk

 2  with Dick Kovacevich, Tim Draper or Bill Frist?

 3       A    No.

 4       Q    So who interfaced with you to get approval of

 5  this statement?

 6       A    I don't recall who that was.

 7            MR. KATHREIN:  Now is good time for a short

 8  break, if you want.

 9            MR. GOLDMAN:  Okay.

10            THE VIDEOGRAPHER:  The time is 4:05.  We're

11  going off the record.

12                (Break taken from 4:05 p.m. to

13                4:17 p.m.)

14            THE VIDEOGRAPHER:  The time is 4:17.  We are

15  back on the record.

16  BY MR. KATHREIN:

17       Q    Dr. Robertson, you understand you're still

18  under oath?

19       A    I do.

20       Q    Okay, let me show you what we're going to mark

21  as Exhibit 75.

22                  (Exhibit 76 marked)

23            MR. KATHREIN:  76.

24       Q    (By Mr. Kathrein)  Dr. Robertson, have you seen

25  this article before?  It's dated June 11th, 1997, and it

1    appears to be an interview of you.

2         A    I -- I remember the "What Matters to Me and

3    Why" series, yes.

4         Q    At the time that you read it, did you believe

5    that -- that anything in this was inaccurate in terms of

6    its quotes of you?

7         A    Well, I -- it's been nearly 20 years.  I

8    don't -- I don't -- I don't know.  I don't -- I don't

9    believe so.

10        Q    On the end of the article, you say, "Besides,

11   he admitted, with a wry smile, he enjoys the adversarial

12   nature of the legal proceedings."

13             Did you say that?

14        A    I -- I don't know.  It's not in quotes.  I

15   don't know if I said that or not.

16        Q    Do you have any reason to believe you didn't

17   say that?

18        A    It doesn't sound like --

19             MR. MUGMON:  Objection.  Form.

20             THE WITNESS:  -- something I -- it doesn't

21   sound like . . .

22                   (Reporter clarification)

23             MR. MUGMON:  I just issued an objection to his

24   question before he began speaking.

25             THE REPORTER:  I'm sorry.  What was the

1   objection?

2            MR. MUGMON:  It was just, "Objection.  Form."

3   BY MR. KATHREIN:

4       Q    Were you saying, "It doesn't sounds like me"?

5       A    I don't think I would have used the term

6   "enjoy adversarial nature of legal proceedings."  But I

7   don't know if I did or I didn't.  Just -- I'm just

8   telling you it doesn't sounds like me, and since it's

9   not in quotes I can't --

10      Q    Do you?

11      A    -- verify that.

12      Q    Do you?

13      A    Do I?

14      Q    Yeah.

15      A    Enjoy this?

16      Q    The adversarial nature of legal proceedings.

17      A    It depends on who I'm interacting with.

18      Q    Okay.  Let me show you what we're going to

19  mark as Exhibit 77.

20                      (Exhibit 77 marked)

21  BY MR. KATHREIN:

22      Q    For the record, it's an article entitle --

23  entitled and "The not-so-retiring retirement of Channing

24  Robertson," dated February 28th, 2012.

25            Have you seen this article before?

1      A     Well, I remember it, yes, I do.

2      Q     Okay.  On second-to-the-last sentence, you

3   say . . . well, let me go to the third.  It says:

4               "And then there['s] Theranos, the biomed

5          startup founded in 2003 by Robertson's student

6          Elizabeth Holmes when she was still an

7          undergraduate . . . where she's now" -- where

8          he's now an active director."

9          Then in quotes:

10              "'It's in the biomedical diagnostics

11         arena,' Robertson says.  'And I think, if

12         we're successful, we have the opportunity to

13         change health care delivery as we know it.'"

14         And then you go on to say, "Stay tuned."

15         Is that a correct quote of you at the time?

16     A     Well, it's in quotes, so I -- I presume I said

17   that.

18     Q     At the time, were you aware of a contract with

19   Walgreens, the contract with Walgreens?

20              MR. MUGMON:  Objection.  Form.

21              THE WITNESS:  In 2012?

22              MR. KATHREIN:  Correct.

23              THE WITNESS:  I believe I knew that there were

24   discussions going on with Walgreens.  I wasn't -- I

25   can't confirm that I knew of the contract at that time.

 1  BY MR. KATHREIN:

 2       Q    How about with Safeway?

 3       A    I knew there had been discussions with Safeway

 4  as well.

 5       Q    How about Blue Cross Blue Shield of North

 6  Carolina?

 7       A    North Carolina, I don't recall that.

 8       Q    What was the -- what were the negotiations

 9  that you were aware of with respect to what Theranos

10  would do for Safeway?

11       A    What do I know about the negotiations?

12       Q    Yeah.

13       A    Nothing.

14       Q    What do you know about the contract that was

15  entered into with Safeway?

16       A    Nothing.  I -- I never saw it.

17       Q    Are you familiar with that there was a

18  contract with Safeway?

19       A    I don't know what kind of agreement we had

20  with them.

21       Q    Are you aware of a cancellation of an

22  agreement with Safeway?

23            MR. MUGMON:  Objection.  Form.

24            THE WITNESS:  I guess I'm aware that we're not

25  working with them, and I don't know if "cancellation"

 1  was the right word or not, but . . .

 2                    (Exhibit 78 marked)

 3  BY MR. KATHREIN:

 4      Q    Showing you what has been marked as

 5  Exhibit 78.  It's a Fortune Magazine article entitled

 6  "This CEO is out for blood," and it's written by Roger

 7  Parloff on June 12, 2014.

 8           Is this the interview with Roger Parloff you

 9  referred to earlier?  Is this the article that is based

10  off your interview with Roger Parloff?

11      A    He interviewed me for this article, yeah.

12      Q    And you've read this article, correct?

13      A    I did read it at one time, yes.

14      Q    At the time, was there anything in it that was

15  inaccurate in the way he characterized your interview or

16  in the things that he quoted you?

17      A    If -- if there were, it didn't -- nothing

18  jumped out at me.  I don't recall.

19                    (Exhibit 79 marked)

20  BY MR. KATHREIN:

21      Q    Showing you what has been marked as

22  Exhibit 79.  It's called "Why much-hyped biotech company

23  is fighting to save its reputation."  It's dated

24  March 9th, 2016.

25           Have you read this article before?

 1      A    Where was this published?

 2      Q    If you look just above the "Why much-hyped

 3 biotech" --

 4      A    Mm-hm.

 5      Q    -- it says, "CBS NEWS / March 9[th], 2016."

 6      A    But what is that?  Is that a magazine or -- I

 7 don't know.

 8      Q    It's off a Web page for CBS News.  If you look

 9 at the bottom, you can see the . . .

10      A    I may have seen this.  I don't -- I don't

11 recall.  So this was Web accessible.

12      Q    Did you only have one interview with CBS, to

13 your recollection?

14      A    To my recollection, yes.

15      Q    Did you -- did you -- on the second page, it

16 says:

17           "Theranos said it has voluntarily

18           suspended using its Nanotainer while it waits

19           for clearance and has submitted a plan of

20           correction to CMS."

21           Then it quotes you.  It says:  "I was there

22 when it was invented.  I was in the laboratory, putting

23 the screws in the first instruments."

24           Did you say that?

25      A    Yes.

```
 1     Q     And then, skipping the line, says:

 2                 "'I expect we'll be under . . . microscope

 3            and we'll be scrutinized.  We welcome that.

 4            We're not afraid of it.  Because we know what

 5            we've done works,' Robertson said."

 6            Did you say that?

 7     A     Yes.

 8     Q     Then further down, about the fifth line from

 9  the bottom, or sixth paragraph from the bottom, it says:

10                 "Theranos told CBS News it invited top

11            laboratory experts to evaluate its work late

12            last month.  We were able to speak to one

13            doctor who confirmed the meeting took place."

14            Then it says in quotes:

15                 "'We had six independent medical

16            professionals in here, all day long, going

17            over our data...  They were -- in sort of the

18            local vernacular -- blown away,' Robertson

19            said."

20            Did you say that?

21     A     Yes, I did.

22     Q     And can you tell me what you were referring to

23  there?

24     A     This was a -- a time when Elizabeth was

25  forming a scientific medical and advisory board for the
```

1    company, and she invited prospective candidates to the

2    board for an all-day-long meeting.  To my knowledge,

3    none of these people had ever been to the company

4    before, and they were presented with comprehensive

5    summary of the company activities and its technology.

6    At the end the day, because of what they had seen and

7    heard, they all joined the board.

8         Q    Were you there that day?

9         A    I can't say for sure, but I -- I believe I --

10   I believe I was there for -- for that.

11        Q    And what did they say that led you to believe

12   that they were blown away?

13        A    They were impressed with what they saw and

14   with what they heard with regard to the . . . execution

15   of her vision of developing the miniature --

16   miniaturized laboratory, and several of them were

17   actually in the clinical laboratory or associated with

18   clinical laboratory business; and, in fact, two -- maybe

19   three of them were past presidents of the American

20   Association of Clinical Chemistry.  So, these were

21   people who were very, very experienced with

22   understanding clinical laboratory chemistry and --

23        Q    And who are they?

24        A    There was Ann Grogowski -- Gronowski from

25   Washington University.  There was Larry Kricka.

```
 1    There --

 2         Q    Can you spell that?

 3         A    I think it's K-r-i-c-k-a.

 4              There was Jack Ladenson, Ladenson; Sue Evans,

 5    David Helfelt -- Helfet, and I believe -- I can't --

 6    Steve Spitano -- Spitalnik from Columbia.

 7         Q    They're all members of the advisory board?

 8         A    And then there's Andy Miller.

 9              So I think I gave you seven names, which means

10    that perhaps not every one of them was there, but that

11    is -- that constitutes -- well, not the entire board.

12    Some people came on later on to that board.

13         Q    What is that board?

14         A    The Scientific Medical Advisory board is --

15         Q    And you're on that board, right?

16         A    No.

17         Q    Were you ever on that board?

18         A    No.

19         Q    What board are you on?

20         A    So later, in the year, I formed a --

21    another -- another board called the Technology Advisory

22    board.  I felt, in discussions with Elizabeth, that

23    we -- we needed a board of folks with a wealth of

24    experience and -- and that -- that -- that have -- could

25    focus on the engineering and technical problems, and
```

1    helping advise the company going forward, whereas the

2    scientific and medical side was -- was covered with

3    the -- what we call the SMAB, S-M-A-B, board.  And I

4    approached a -- a former student of mine who had most --

5    who had been president of the Alza Corporation and

6    also -- I think he was VP for business development at

7    Gilead Biosciences, if he would join me as being

8    cochair, and then we went out and solicited people we

9    thought would contribute in meaningful ways to this new

10   technology advisory board.  So during the period of

11   about August 2016 until the end of the year --

12       Q    End of this year?

13       A    2016.

14       Q    Till the end of 2016?

15       A    Yes.

16            We -- we grew that board to eight.

17       Q    Has it disbanded?

18       A    No.

19            And I believe four of the members are also

20   members of the National Academy of Engineering, which

21   is --

22       Q    Okay, I'm going to stop you, okay.  Let me ask

23   some questions.  You're -- you're going on here, and I

24   want to be respectful of everyone's time here, and so

25   you're wandering off a little bit here, so I'd like to

 1   be a little bit more specific on some questions here.

 2          Is there -- are these--?

 3          MR. MUGMON:  I think he was just answering

 4   your question.

 5          Were you done with your -- your answer?

 6          MR. KATHREIN:  I -- I appreciate what you're

 7   doing.  If you want to be here all night, that's fine

 8   with me.

 9          MR. MUGMON:  I certainly don't, but I also

10   want to respect the witness's ability to answer the

11   question that you asked, the very broad question that

12   you asked.

13          MR. KATHREIN:  Which was, Was he on a board?

14          MR. MUGMON:  And he was answering your

15   question the best of his ability.

16          MR. KATHREIN:  This is quite humorous.

17          MR. MUGMON:  Glad you find it --

18   BY MR. KATHREIN:

19      Q    Do you --

20          MR. MUGMON:  -- funny.

21   BY MR. KATHREIN:

22      Q    -- do you -- do you need to say more to answer

23   the question?

24      A    I'll -- I -- I can stop where I stopped.

25      Q    Okay, were these compensated positions?

 1      A    Yes.

 2      Q    And how much did the -- the board members

 3  make?

 4      A    $50,000 a year.

 5      Q    And were there -- is that also true for the

 6  Scientific and Medical Advisory Board?

 7      A    Yes.

 8           By the way, that compensation has ended as of

 9  January 1st, 2018, and has been changed to equity

10  compensation.

11      Q    So what's the equity compensation?

12      A    30,000 RSUs.

13      Q    And what does RSU stand for?

14      A    Restricted stock unit.

15      Q    Per year?

16      A    Yes.

17      Q    Let me show you -- No. 3.

18                (Exhibit 80 marked)

19  BY MR. KATHREIN:

20      Q    Exhibit 80 bears Bates Stamp Nos. -4745

21  through -4785, and it's an e-mail, but -- and what

22  follows it -- and I guess I don't know if it's -- if

23  this is an attachment to it or not, but what follows it

24  is what I want to draw your attention to, which is

25  slides of a board of directors meeting dated

1  September 14th, 2007.

2          As a member of the board of directors -- well,

3  first of all, let me ask you, do you recall seeing this

4  before?

5      A    [No response.]

6      Q    Let me withdraw the question.

7          As a member of the board of directors, did you

8  regularly see presentations such as this?

9          MS. GOODHART:  Objection.  Form.

10         THE WITNESS:  I don't know that I would use

11  the word "regularly," but, yes, we -- we did have slide

12  decks like this presented to us.

13  BY MR. KATHREIN:

14      Q    Just want to draw your attention to

15  paragraph 30 -- I mean page 30.  Okay, what is that a

16  picture of?

17         MR. MUGMON:  Objection.

18         THE WITNESS:  Well, this was in 2007.

19         MR. KATHREIN:  Correct.

20         THE WITNESS:  So, this is an early version of

21  the -- predecessor to the 3.0.  I would expect -- it

22  looks like it's -- I'm not sure if it's a photograph or

23  a -- a drawing, but . . .

24  BY MR. KATHREIN:

25      Q    And -- and how did the miniLab look different

1    from this?

2         A    I can't tell the size here.  The miniLab has a

3    similar form factor to it, a slanted face and the -- a

4    place to insert a cartridge.

5         Q    Mm-hm.

6         A    And has a touch screen.

7         Q    Are you aware of any public pictures of the

8    miniLab or of the Edison 3.0?

9         A    Certainly, of the miniLab, because we

10   published a paper on it.

11        Q    Is that the January paper?

12        A    Yes.

13        Q    How about the Edison?

14        A    Oh, there may be.  I'm just -- none come to

15   mind now or that's available.

16        Q    Okay.  Show you what we're going to mark as

17   Exhibit . . .

18             THE REPORTER:  81.

19                  (Exhibit 81 marked)

20   BY MR. KATHREIN:

21        Q    Exhibit 81 is a document entitled "Reference

22   Guide on Engineering," and it lists you, John Moalli,

23   M-o-a-l-l-i, and David Black as authors.

24             Can you tell me what this is?

25        A    So you may be aware that there's -- there

1  exists a reference manual on scientific evidence that's

2  used by most federal judges and state court judges, to

3  which they have access, and there has been a first

4  edition and a second edition, and this reference manual

5  is published by the National Academy of Sciences.  So,

6  when it was time to consider having a third edition, I

7  was asked by the National Academy of Sciences and . . .

8  to -- whether I would participate in a committee to

9  think about a third edition to the reference manual and

10 to work on reconfiguring it to be updated in terms of

11 the content, and this was also done in conjunction with

12 the -- the Department of Justice.

13     Q    And so you wrote this, with your coauthors,

14 for judges to refer to in terms of looking at scientific

15 evidence.

16     A    The reference manual covers many subjects, and

17 I was on -- as I said, on the committee, to determine

18 what the subject matter would be, a part of that.  For

19 instance, there's a reference guide on statistics, and

20 there's a -- a -- a reference guide on many subjects

21 that come up in -- in litigation that relate to science

22 and how scientists think, and I suggested we should

23 rewrite the chapter on engineering.

24          There was a chapter that pre -- preceded ours,

25 but I felt it was a bit out of date and -- and not a

1    helpful as to could be.  So I then recruited -- I

2    then -- I then volunteered to write a chapter on

3    engineering, and recruited Dr. Moalli, who is a -- was a

4    vice president of Exponent Systems in Menlo Park, and

5    David Black, who is a lawyer that I've worked with on a

6    couple of cases, and the three of us wrote this chapter,

7    which is now published in -- in the third edition.

8        Q    And you wrote it with the intent that federal

9    judges would refer to it when they're trying to

10   determine whether or not to admit scientific evidence?

11       A    That's part of it.  This also talks to how

12   engineers think about problem-solving and risk, and the

13   kinds of issues that come up on the technical side of --

14   of litigation, and, yes, I think it's fair to say that

15   federal judges do rely on this reference -- reference

16   manual.

17            We had several judges who we worked with on

18   this:  Judge Jed -- Jed Rakoff in the southern district,

19   Kate O'Malley from Ohio.  I'm not trying to blank on the

20   others, but it -- their -- their names are -- are in

21   this -- at the -- at the front piece.  And then the --

22   the whole collection of articles was introduced by

23   Justice Breyers, Breyers, on the Supreme Court.

24       Q    Going to show you what we're going to mark as

25   Exhibit 82.

```
 1                    (Exhibit 82 marked)

 2   BY MR. KATHREIN:

 3       Q    Exhibit 82 is a series of related federal

 4   filings.  The first is the Securities and Exchange

 5   complaint against Elizabeth Holmes and Theranos; the

 6   second is the consent of Defendant Theranos; the third

 7   is the consent of Defendant Elizabeth Anne Holmes; and

 8   the fourth is the final judgment as to Defendant

 9   Elizabeth Anne Holmes.

10            Have you seen these before?

11       A    I've seen the complaint, but I haven't seen

12   the consents.

13       Q    Have you talked to Elizabeth Holmes about it?

14            MR. MUGMON:  Objection.  Form.

15            THE WITNESS:  About?

16            MR. KATHREIN:  The complaint.

17            THE WITNESS:  No, not in a -- no, I didn't

18   think it was appropriate.

19   BY MR. KATHREIN:

20       Q    Why did you think it wasn't appropriate?

21       A    Because it -- it seemed to me we were in

22   the -- in -- in the middle of something that it would be

23   best that I not have conversations with her.

24       Q    And that's because the Department of Justice

25   investigation is ongoing, correct?
```

 1              MR. MUGMON:  Objection.  Form.

 2              He never testified as to that.

 3              THE WITNESS:  No.  Actually, our general

 4    counsel at Theranos.

 5              MR. MUGMON:  Hold on.

 6              MR. KATHREIN:  Yeah, don't tell me what the

 7    general counsel told -- don't tell me what the lawyers

 8    told you, okay?

 9              MR. GOLDMAN:  That may make that question hard

10    to answer.

11              MR. KATHREIN:  It will make it very hard to

12    answer unless he knows otherwise.

13        Q    (By Mr. Kathrein)  Other than speaking to your

14    lawyers -- let me withdraw the question.  I'm just going

15    to withdraw the question.

16              You know that Elizabeth Holmes has consented

17    to judgment based on this complaint, correct?

18              MS. GOODHART:  Objection.  Form.

19              THE WITNESS:  I've not seen this consent

20    of . . . of -- I have not seen this.  So I don't know

21    what it says.

22    BY MR. KATHREIN:

23        Q    When did you hear about it?

24              MR. MUGMON:  Objection.  Form.

25              THE WITNESS:  Hear about the complaint?

```
 1              MR. KATHREIN:  Yes.

 2              THE WITNESS:  I received . . . well, again

 3   this gets into the -- this gets into -- I don't know

 4   what I can --

 5   BY MR. KATHREIN:

 6        Q    Well, it -- of it -- yeah, just -- just say --

 7              MR. GOLDMAN:  He just wants --

 8   BY MR. KATHREIN:

 9        Q    -- "I can't answer, because it may involve" --

10   or "I can't answer without divulging an attorney-client

11   communication."  If all -- if -- if it -- you received

12   it from them they told you, that's all you need to say,

13   okay?  And so is that what you were going to say?

14        A    Yes.

15        Q    Okay.

16        A    But, as I said, I have not seen the -- these

17   consents.

18        Q    Are you aware that Theranos faked blood tests

19   of executives -- let me withdraw that.

20              Are you aware that Theranos pretended to run

21   blood tests on the Edison or the miniLab for investors,

22   including Theranos, but in reality they ran the blood

23   tests on third-party analyzers?

24              MR. MUGMON:  Objection.  Form.

25              THE WITNESS:  No, I'm not aware of -- of that.
```

1    BY MR. KATHREIN:

2        Q    Have you heard rumor to that effect?

3             MR. GOLDMAN:  Same objection.

4             THE WITNESS:  I think there's a reference to

5    that in the -- in this complaint.

6    BY MR. KATHREIN:

7        Q    Have you inquired of anyone as to whether or

8    not that was true?

9        A    I have not talked to anybody about this

10   complaint or anything that it contains.

11       Q    Are you aware that Elizabeth Holmes told the

12   CEO of Safeway that Theranos analyzers were being

13   deployed in the battlefield?

14            MS. GOODHART:  Objection.  Form.

15            THE WITNESS:  Again, I've -- no, I don't -- I

16   don't know that she told the Safeway CEO that.

17   BY MR. KATHREIN:

18       Q    Were you ever aware of Theranos systems or

19   equipment being deployed in any battlefield context?

20       A    No.

21       Q    Or by the Department of Defense?

22       A    No.

23       Q    Are you aware that Theranos never told

24   Walgreens that it was using third-party analyzers?

25            MR. MUGMON:  Objection.  Form.

```
 1              THE WITNESS:  No.

 2  BY MR. KATHREIN:

 3     Q     Are you aware that in 2009 Balwani guaranteed

 4  a line of credit for the company?

 5     A     I was not aware of that.

 6     Q     Were you aware that Elizabeth Holmes told

 7  Walgreens that its analyzers were being deployed in

 8  military helicopters?

 9              MR. MUGMON:  Objection.  Form.

10              THE WITNESS:  I was not aware of that.

11  BY MR. KATHREIN:

12     Q     Do you know that Elizabeth Holmes instructed

13  Theranos employees to place numerous mini labs in the

14  CLIA laboratory to make it look like blood tests were

15  being run on the miniLabs when Walgreens executives

16  visited?

17              MS. GOODHART:  Objection.

18              MR. MUGMON:  Objection.

19              MS. GOODHART:  Form.

20              MR. MUGMON:  Form.

21              THE WITNESS:  No.

22  BY MR. KATHREIN:

23     Q     Have you heard of any of these things before I

24  mentioned them to you today?

25              MS. GOODHART:  Objection.  Form.
```

```
 1              THE WITNESS:  I read them in the complaint.

 2   BY MR. KATHREIN:

 3       Q    Okay, so you have read the complaint.

 4       A    I told you that.

 5       Q    Okay.  And you know that Elizabeth Holmes does

 6   not deny what's in the complaint.

 7              MS. GOODHART:  Objection --

 8   BY MR. KATHREIN:

 9       Q    -- correct?

10              MS. GOODHART:  Objection.  Form.

11              THE WITNESS:  I think she does not deny nor

12   admit.

13   BY MR. KATHREIN:

14       Q    Well, if she doesn't deny it, doesn't that

15   mean it's true?

16              MR. MUGMON:  Objection.

17              MS. GOODHART:  Objection.

18              THE WITNESS:  I don't know legalities

19   involved.  All I know is that I was told that it -- she

20   did not admit to or deny.

21   BY MR. KATHREIN:

22       Q    You know she cannot publicly deny these

23   allegations if asked, right?

24              MS. GORTON:  Objection.

25              MR. MUGMON:  Objection.
```

```
 1              MS. GOODHART:  Objection.  Form.

 2              THE WITNESS:  I don't know what the

 3   constraints are.

 4              MR. KATHREIN:  Let me take a break, see if

 5   I've got any more questions.

 6              THE VIDEOGRAPHER:  The time is 4:57.  We're

 7   going off the record.

 8                  (Break taken from 4:57 p.m. to

 9                  5:01 p.m.)

10              THE VIDEOGRAPHER:  The time is 5:02.  We are

11   back on the record.

12              MR. KATHREIN:  Let's mark this as 83.

13                  (Exhibit 83 marked)

14   BY MR. KATHREIN:

15      Q    Dr. Channing [sic], you understand you're

16   still under oath?

17      A    That's my first name.

18      Q    Excuse me, Dr. Robertson.

19           Does that happen very often?

20      A    Not often, but it happens.  It's both a first

21   and last name.

22      Q    I apologize.

23      A    Apology accepted.

24      Q    Dr. Robertson, have you seen this article?

25      A    No.
```

 1      Q    On the third page, there's a highlighted

 2   paragraph.  It says (and I'll read it) -- this -- but

 3   for the record, this article is called "Don't bash the

 4   dropout and ignore the professors."  It's dated

 5   March 23rd, 2016.

 6           MR. MUGMON:  It's also written by a law

 7   student, Thoughtless.  Whoever that is.

 8   BY MR. KATHREIN:

 9      Q    Would you take a look at that paragraph.

10      A    Okay.

11      Q    Would you read that?

12      A    Into the record?

13      Q    Yes.

14      A    Beginning with "for a company"?

15      Q    No.  Next sentence down, "From this short

16   list."

17      A         "From this short list, it appears that

18              only Robertson was in any position to know the

19              failings within the company.  Maybe he felt

20              that he could turn things around before the

21              authorities would take notice.  Maybe he has a

22              few more tricks up his sleeves, and Theranos

23              would pivot to do something else tomorrow.  Or

24              maybe he just doesn't want to be the person to

25              burst the bubble--one which he currently

 1              resides in."

 2        Q    Does that accurately describe you?

 3        A    No.

 4        Q    Do you think someone else was in a better

 5   position to notice the failings of Theranos?

 6              MS. GOODHART:  Objection.  Form.

 7              THE WITNESS:  What failings are you speaking

 8   about?

 9              MR. KATHREIN:  I have no further questions,

10   except I will reserve the right, after we review the --

11   the documents, to resume, but we'll take that under

12   negotiation.  Okay.

13              MR. MUGMON:  I think defense counsel have no

14   further questions, but we do want to designate this

15   deposition transcript and video as "Confidential."

16              MR. KATHREIN:  We disagree with that.  If you

17   want to designate portions that you think reveal trade

18   secrets that would be detrimental to the company, we ask

19   you to do that, but we're not agreeing to the entire

20   deposition transcript being designated "Confidential."

21              MR. MUGMON:  Well, then we'd like to

22   tentatively designate the entire thing as "Confidential"

23   pending that determination if we determine that we need

24   to do that.

25              MR. KATHREIN:  Well, we will put you on notice

 1  right now that we disagree with that, which means under

 2  the local rules, you'll have 14 days to do that once you

 3  get a transcript.  Okay.

 4          MR. MUGMON:  Disagreement noted.

 5          MR. KATHREIN:  Okay.

 6          THE VIDEOGRAPHER:  Okay, this concludes the

 7  deposition for today.  The time is 5:05.  We're going

 8  off the record.

 9          THE REPORTER:  Counsel, would you please

10  indicate whether you'd like a copy of the transcript.

11          MR. MUGMON:  Yes.

12          MS. GOODHART:  Yes, please.

13          MS. GORTON:  Yes, please.

14          MR. GOLDMAN:  Yep.

15          THE REPORTER:  Roughs?

16          MR. GOLDMAN:  Yeah.

17          MR. MUGMON:  Yes, please.

18          MS. GOODHART:  Yeah, actually we'll take a

19  rough.

20          (The deposition adjourned at 5:06 p.m.)

21                          --oOo--

22

23

24

25

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, CHANNING REX ROBERTSON, do hereby certify,

4    under penalty of perjury, that I have read the foregoing

5    transcript of my deposition taken on May 14, 2018; that

6    I have made such corrections as appear noted on the

7    Deposition Errata Page, attached hereto, signed by me;

8    that my testimony as contained herein, as corrected, is

9    true and correct.

10          Dated this _____ day of _____,

11    2018, at _____, _____.
                          (City)                      (State)

12

13

14          _____
            CHANNING REX ROBERTSON

15

16

17

18

19

20

21

22

23

24

25

```
 1                   DEPOSITION ERRATA SHEET

 2    Page No._____ Line No._____

 3    Change:_____

 4    Reason for change:_____

 5    Page No._____ Line No._____

 6    Change:_____

 7    Reason for change:_____

 8    Page No._____ Line No._____

 9    Change:_____

10    Reason for change:_____

11    Page No._____ Line No._____

12    Change:_____

13    Reason for change:_____

14    Page No._____ Line No._____

15    Change:_____

16    Reason for change:_____

17    Page No._____ Line No._____

18    Change:_____

19    Reason for change:_____

20    Page No._____ Line No._____

21    Change:_____

22    Reason for change:_____

23    _____

24    Channing Rex Robertson

25    Dated: _____
```

```
 1              CERTIFICATE OF REPORTER

 2         I, Quyen N. Do, CSR No. 12447, a Certified

 3  Shorthand Reporter, hereby certify that the witness in

 4  the foregoing deposition was, by me, duly sworn to tell

 5  the truth, the whole truth, and nothing but the truth in

 6  the within-entitled cause;

 7         That said deposition was taken down in

 8  shorthand by me, a disinterested person, at the time and

 9  place therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12         That before completion of the deposition,

13  review of the transcript [ ] was [X] was not requested.

14  If requested, any changes made by the deponent (and

15  provided to the reporter) during the period allowed are

16  appended hereto.

17         I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22  Dated:  June 8, 2018

23

24  _____
    Quyen N. Do
25  CSR No. 12447
```

## Exhibits

EX 0063 Channing Rober
tson 051418   5:8 11:9
EX 0064 Channing Rober
tson 051418   5:10
 93:11,13
EX 0065 Channing Rober
tson 051418   5:12
 107:10,12
EX 0066 Channing Rober
tson 051418   5:14
 108:17,19
EX 0067 Channing Rober
tson 051418   5:16
 111:4,6
EX 0068 Channing Rober
tson 051418   5:18
 111:20,23
EX 0069 Channing Rober
tson 051418   5:21
 114:21,24 120:4
 131:15
EX 0070 Channing Rober
tson 051418   5:23
 122:6,8
EX 0071 Channing Rober
tson 051418   6:8
 128:22,24
EX 0072 Channing Rober
tson 051418   6:10
 130:18 131:4
EX 0073 Channing Rober
tson 051418   6:12
 133:24 134:1
EX 0074 Channing Rober
tson 051418   6:14
 137:9,11
EX 0075 Channing Rober
tson 051418   6:16
 143:16,17,19 145:21
EX 0076 Channing Rober
tson 051418   6:19
 145:22
EX 0077 Channing Rober
tson 051418   6:21
 147:19,20
EX 0078 Channing Rober
tson 051418   6:22
 150:2,5

EX 0079 Channing Rober
tson 051418   7:8
 150:19,22
EX 0080 Channing Rober
tson 051418   7:10
 157:18,20
EX 0081 Channing Rober
tson 051418   7:13
 159:19,21
EX 0082 Channing Rober
tson 051418   7:14
 161:25 162:1,3
EX 0083 Channing Rober
tson 051418   7:16
 168:13

## $

$185,000   51:24 52:6
$2   48:14
$300,000   17:19
$50,000   157:4
$505,000   48:13
$600   32:18

## -

--ooo--   8:4 9:10
 79:13,16 171:21
-15   96:21
-1624   107:13
-17   93:14
-2060   122:9
-2061   122:9
-22648   111:23
-22652   111:24
-3618   130:21 131:7
-4324   130:21 131:12
-4567   114:24
-4574   131:16
-4578   114:25
-4714   93:14
-4715   93:14 96:21
-4716   93:14
-4745   157:20
-4785   157:21
-574   131:18
-6293   111:7
-6294   111:7

-643   143:19
-645   143:22 144:2
-649   112:2
-672   143:20
-7127   108:21
-7129   108:22
-7132   108:22
-939   137:21
-940   137:20
-l-m-a-n   22:2
-metric   77:17

## 1

1   61:3,5
1.0   57:14 58:19 59:12
 61:20 63:25 64:8,13,
 14 65:8 70:7
1/2   52:24
10   41:8 125:7
10%   131:21
10:03   8:2
10:04   8:19
11:34   53:8,10
11:48   53:11,12
11:58   12:14
11th   145:25
12   100:20,21 101:18
 150:7
12:45   79:11,15
13   144:8
130   133:2
14   8:2 171:2
14th   8:12 158:1
15   32:7 96:20 132:12,
 18
16   32:7 115:3
16th   108:25 131:18
17   32:7
18   112:6
1965   13:11
1967   13:13
1969   13:14,25
1970   13:25 14:18
 19:10
1977   14:18 15:24
1982   15:25
1984   14:22

**1990**  16:7,9
**1990s**  16:3
**1991**  16:9
**1997**  145:25
**19th**  123:17
**1:36**  79:15,17
**1st**  45:10 96:19 157:9

---

2

---

**2**  61:5
**2.0**  59:12 64:1,13,19
  65:8
**20**  122:8 123:18
  128:17 146:7
**2000**  17:8,22 18:1
  52:19
**2000s**  36:21
**2002**  41:4
**2003**  54:12 148:5
**2004**  42:18 44:18
  52:19 54:13,15
**2005**  18:1 76:20
**2007**  33:1 158:1,18
**2008**  33:1
**2009**  51:20,21 166:3
**2010**  80:4 81:17
**2012**  49:2,6,23 50:3,
  17 147:24 148:21
**2013**  14:13 17:18 33:3
  45:8,9,17 46:7,8
  47:7,12 48:12,23
  51:22 87:3,12 96:19
  103:10 104:25 106:1,
  18 121:19
**2014**  33:3 49:3,6,23
  50:3,17 131:20 150:7
**2015**  92:17 108:25
  110:16 112:3 113:2
  115:3 123:17 131:8,
  18 133:19 137:14
**2016**  127:16 134:6
  135:9 137:13,15
  150:24 151:5 155:11,
  13,14 169:5
**2017**  48:4,12,23 51:17
**2018**  8:2,12 127:22
  157:9
**21st**  129:10

**23**  128:21
**23rd**  112:3 169:5
**24**  130:17
**25**  120:23
**250**  58:12
**28th**  147:24
**29th**  137:14
**2:54**  117:1,3

---

3

---

**3**  52:24 65:22 68:2,9
  157:17
**3.0**  59:13 62:1,8
  63:19 65:3,10,12,14
  66:25 67:11 68:15
  94:2,15,16 105:20
  158:21 159:8
**3.5**  59:13 65:11,14,
  15,16 96:15 101:9,
  11,15 140:11
**30**  87:25 120:23
  158:15
**30,000**  157:12
**30th**  46:8 48:4 131:8
**3:07**  117:4
**3:08**  117:5

---

4

---

**4**  65:19 68:1,4,8 70:7
  103:19
**4.0**  59:14 65:17 66:1,
  12 69:25
**4.1**  59:14 61:4,6,21
  66:13,16
**4.S**  59:14 66:2,13,16
**40**  49:13
**42**  100:5
**45**  103:8 123:17
**46**  104:20,22,24
**4:05**  145:10,12
**4:17**  145:13,14
**4:57**  168:6,8

---

5

---

**5-**  32:18
**50**  49:13

**510-K**  113:17
**5:01**  168:9
**5:02**  168:10
**5:05**  171:7
**5:06**  171:20
**5:16-CV-06822-NC**  8:10

---

6

---

**60**  132:13,19
**63**  11:8,9
**64**  93:11,13
**65**  107:10,12
**66**  108:17,19
**67**  111:4,6
**68**  111:20,23
**69**  114:21,24 120:2,4
  131:15

---

7

---

**70**  122:6,8
**700,000**  52:22
**71**  14:11 128:22,24
**715**  8:11
**72**  130:18 131:4
**73**  133:24 134:1
**74**  137:9,11
**75**  143:16,17,19
  145:21
**76**  145:22,23
**77**  14:19 147:19,20
**78**  150:2,5
**79**  150:19,22

---

8

---

**80**  157:18,20
**80s**  16:1 19:21 22:25
  29:19 30:4,23 34:18
**81**  159:18,19,21
**82**  161:25 162:1,3
**83**  168:12,13
**84**  14:25
**8th**  103:10

**9**

**90s** 27:12 29:19 30:5
36:20
**95** 99:9
**9:29** 96:19
**9[th** 151:5
**9th** 104:25 134:6
150:24

**@**

**@theranos.com** 97:18

**A**

**A-B-A-X-I-S** 22:22
**A-L-Z-A** 19:5
**a.m.** 8:2 53:10,11
**A1c** 69:22
**Abaxis** 22:20 23:13
24:6,8,13
**Abbott** 34:12 35:2,5
**ability** 94:20 96:4
156:10,15
**abnormal** 98:6,13 99:4
**Absolutely** 139:15
**Abuse** 102:18
**academic** 16:24
**Academy** 155:20 160:5,
7
**accept** 91:19
**accepted** 87:21 168:23
**accepting** 105:22
**access** 47:3 59:19
85:21 97:14 119:11
160:3
**accessible** 151:11
**accomplish** 59:4
**accomplished** 95:20
121:2
**accomplishments** 121:2
**accordance** 96:2
**accumulated** 52:21
**accuracy** 74:14,18
75:1 134:17 140:4,8,
22 142:5,13
**accurate** 129:19

**accurately** 138:25
170:2
**achieve** 140:8
**achievement** 140:22
**acids** 138:23
**Aclara** 25:10
**acquire** 61:14 72:25
138:12
**acquired** 67:11
**acquiring** 138:19
**acquisition** 59:19
**acronym** 60:6
**acronyms** 59:22,23
**acted** 10:4
**actions** 18:19
**active** 37:15 63:13
148:8
**actively** 119:14
**activities** 55:5 62:23
106:8 119:13,20
153:5
**acute** 77:1,5,6,13,22
**add** 57:22 64:11
**addition** 132:12
**address** 97:20
**adjacent** 50:19,22
**adjourned** 171:20
**adjust** 98:21 99:4
**adjusted** 98:23
**adjusting** 98:8,19
**adjusts** 99:13
**administrative** 17:4
**admissions** 16:21
**admit** 161:10 167:12,
20
**admits** 41:9
**admitted** 146:11
**advanced** 28:24 30:21,
24 41:14
**advancing** 47:18
**advantage** 97:13
**adversarial** 146:11
147:6,16
**adverse** 38:10
**advice** 47:17
**advise** 27:18 155:1
**advisory** 152:25
154:7,14,21 155:10

157:6
**affiliation** 8:21
**afraid** 152:4
**agree** 49:20 127:4
**agreed** 8:17 47:17
**agreeing** 170:19
**agreement** 11:25
149:19,22
**ahead** 67:2 144:18,19
**aimed** 106:8
**alanine** 69:14
**alike** 81:7
**alkaline** 69:14
**all-day-long** 153:2
**allegation** 130:9
**allegations** 130:12
167:23
**allowed** 55:2
**alter** 56:13
**altered** 56:13
**Alto** 99:21,25
**Alza** 19:3,9 155:5
**American** 127:15 128:3
153:19
**aminotransferase**
69:14
**amount** 27:3 55:2 56:5
57:24
**analyses** 65:1,6 71:12
127:10
**analysis** 61:12
**analyte** 27:3 57:23
87:22 101:21
**analytes** 23:6,7,8,10
29:7,16 57:18 68:11,
14 69:24 75:23 77:10
**analytic** 57:15
**analytical** 57:10,16
**analyze** 75:23
**analyzers** 164:23
165:12,24 166:7
**and/or** 123:13
**Andy** 154:8
**Anjali** 96:19,22 97:10
**Ann** 153:24
**Anne** 162:7,9
**announcement** 88:9
**annual** 17:8,16 47:21
**answering** 117:25
140:2 156:3,14

answers  10:11 15:17
  123:1,10
antibody  69:23
anticoagulation  20:20
antigen  69:21,23
apologize  168:22
Apology  168:23
apparently  134:7
appearing  11:1
appears  146:1 169:17
applaud  144:17
application  21:3
  24:24 40:8 42:3,9
  77:3
applications  113:18
  122:5
applied  37:14
apply  126:11
appointed  16:1,13
  58:11
appoints  16:18
appreciated  52:4
approached  155:4
approval  145:4
approved  144:10,23
approving  145:1
approximate  15:20
  17:10,11
approximately  14:18
  15:19 19:14 22:10
  23:15 24:20 25:5,23,
  25 27:9 32:4 34:17
  36:19 46:7 48:14,15
  62:18 122:11
approximation  32:7
arbitration  34:9 38:2
architecture  66:6
  126:18 127:24
area  14:3 19:7 22:4
  25:12 26:14,15,22
  27:14,15 29:21 30:2,
  14,25 36:13 51:9
  71:25 112:13
areas  25:22 27:18
arena,'  148:11
Arguedas  9:9
arm  75:20
arms  133:4
arose  67:6

arrangements  13:17
  18:21 55:10
arrive  91:22
article  92:16 103:9,
  11,15,20 104:16
  105:1 108:25 110:2,
  6,9 113:22 115:2,4,
  5,9,21 116:7,14,19,
  22 117:13 118:3,7,22
  120:3 122:11,12
  123:2,10,14,24
  126:16 127:18,23
  128:25 129:9 130:3
  131:17 134:1,10,13,
  16 135:11 136:11
  145:25 146:10
  147:22,25 150:5,9,
  11,12,25 168:24
  169:3
articles  127:19
  130:25 161:22
artist  28:6
aspartate  69:13
aspects  29:9 30:15
  42:8 66:19 72:10
  100:16 121:6
aspirate  65:4
aspirations  42:16
assay  75:4,8 77:17
  103:4
assays  68:18,20,21,24
  69:7,9,11 74:19
  90:16,17 95:16
  102:19
assemblage  138:18
assembled  73:25
assess  56:6,11
assessments  74:19
  75:2
assignments  16:19
assimilated  142:20
assistance  56:19
assistant  14:16
associate  14:20 15:23
  17:2 58:12
Association  127:15
  153:20
assume  11:16 31:18
attach  69:23
attached  61:15 68:2
  72:22 93:15 143:22

attaching  108:25
  128:25
attachment  157:23
attack  109:12
attempted  77:11
attend  43:15 70:8
  71:19,22 74:12 82:9
attended  83:8
attention  100:20
  103:19 137:19 144:8
  157:24 158:14
attitude  121:10
attorney-client
  164:10
attorneys  36:5
audio  8:16
August  87:2,12 106:18
  127:16 155:11
Auletta  110:5
author  112:9
authorities  169:21
authorizing  96:24
authors  159:23
automatic  48:8
Avenue  8:11 49:2 50:8
average  40:12
Avie  81:6
aware  11:15 40:10
  62:7 77:20 78:16,20,
  23 84:2 87:1,9,16,24
  88:9 89:22 90:8,22
  92:14 94:14,25 96:7
  101:3,7,10,14 105:24
  106:8 113:9,14
  133:17,23 141:21,25
  142:1 148:18 149:9,
  21,24 159:7,25
  164:18,20,25 165:11,
  18,23 166:3,5,6,10
awareness  92:21
away,'  152:18

                B

B-E-N-L-A-T-E  38:12
B-O-W-E-S  42:24
bachelor's  13:2,11
back  29:2 41:25 42:2
  53:13,18,20 56:9
  61:19 64:4 71:13,16

76:16 79:18 87:7
88:24 91:13,14 97:25
98:1 117:6 122:22
131:15 137:20 145:15
168:11
back-  12:23
background  12:23 72:7
122:23 129:13 143:13
backwards  96:19
bacteria  68:22 100:25
102:2
bailiwick  103:3
Bakersfield  36:7
Balwani  9:5,21 79:25
80:1,7 82:11 83:16,
25 84:9 115:18 166:3
Balwani's  50:14
Banner  37:12
based  31:15 65:13,15
130:2 150:9 163:17
bash  169:3
basically  52:9 56:21
102:14 108:2 109:12
123:20
basis  47:21 63:10
133:9,11
Bates  93:13 96:20
108:21 111:7,23
114:24 122:9 130:21
157:20
Bates-stamp  107:12
battery  35:10,11
battlefield  165:13,19
BCD  59:24 60:10,12
61:2
be-  77:21
bears  93:13 107:12
108:21 111:6 114:24
122:8 130:21 157:20
began  19:10 58:8
94:18 106:12 146:24
begin  42:6 106:18
129:14,21 137:20
beginning  41:1 52:9,
19 71:17 137:21
144:2 169:14
begins  8:6 144:11
begs  88:3
behalf  8:24 9:1,3,5,7
12:18 33:3 110:10
141:1

beholden  10:16
Behring  21:14
belief  63:10
believed  120:25 121:9
bell  76:16
bench  39:11 65:1,7
Benlate  38:11,12
Berkeley  8:1,11 13:3
Berman  8:24,25
big  38:17 69:9 138:25
139:1
bigger  66:19
bilirubin  69:13
bill  22:13 144:12
145:2
biochip  75:22
Biocircuit  28:18
Biocircuits  30:1
biocomputation  51:7
74:7
biodiagnostics  27:15
bioengineering  107:18
128:5
biology  68:23 75:5
128:3
biomarker  40:6
biomed  148:4
biomedical  13:6
148:10
bioproduction  30:14,
16
Biosciences  27:8
155:7
Biosite  35:2
biotech  150:22 151:3
Biotrack  19:18,20
20:25 21:5,8,10,11
22:11,19,25 39:24
120:23
biotrip  75:22
bit  12:23 13:22 30:17
72:7,8,16 73:2 79:24
103:3 122:3 155:25
156:1 160:25
Black  159:23 161:5
blank  161:19
Blickman  107:14,23,24
108:4,9
blood  25:2,13,16
26:21,22 29:22 39:3,

8,17,21 40:4,8,16,
19,22 56:1 57:19
59:19 61:14,16 62:5
64:10 72:24,25 73:7
74:14 75:20,21 85:7
87:1,10 91:2,19
92:3,17 93:15,17,19
94:2,9,21 97:14,23
99:22 100:25 102:10,
11 105:12,19,23
113:2,3 114:9 134:18
137:25 138:16 150:6
164:18,21,22 166:14
blood-collecting
59:24
blood-test  19:23,24
20:6 115:1
blood-testing  23:3,4
blown  152:18 153:12
Blue  149:5
board  44:4,8 45:13,14
62:24 63:11 80:8,10,
11,22 81:1,2,6,10,15
82:3,12,15,22,24
83:3,4,5,7,16,21,22
152:25 153:2,7
154:7,11,12,13,14,
15,17,19,21,22,23
155:3,10,16 156:13
157:2,6,25 158:2,7
Bob  80:23
bodily  85:21
body  25:4 55:25
Boies  135:22
bolded  101:1
bottom  107:14 151:9
152:9
bought  21:12
Bowes  42:24
Brady  124:19
brand  138:2
Brass-craft  37:7
break  10:15,17,24
52:2 53:7,10 114:19
116:25 117:3 145:8,
12 168:4,8
Breyers  161:23
Brian  122:13,16,20,25
123:5,10 124:7
126:25
bring  89:24 90:9

bringing  81:9 82:2
broad  30:2 156:11
Broadly  14:4
Brooke  135:6,15
brought  21:3 68:16,
  19,20 73:24 74:6
  81:14,17 82:12,14
bubble--one  169:25
Buchanan  135:6
build  43:20 91:22
building  58:8
buildings  67:7
built  65:19
bullet  144:4
Burlingame  58:7
burst  169:25
business  91:21 153:18
  155:6

C

c-a-l-i-p-e-r  26:11
C-L-I-A  38:21
calcium  69:12
California  8:1,9,11
  13:3 36:2 49:1,25
  50:1,2,7
caliper  26:7,10 27:5
call  46:21 66:9 67:8
  68:13 70:23 124:12
  126:12 155:3
called  16:22 19:3
  20:14 21:8 25:10
  26:17 27:7,25 28:11
  29:14 35:6 37:7,12
  39:25 42:20 44:14
  46:22 57:14,24 75:4,
  12 119:6 122:20
  123:17 150:22 154:21
  169:3
Calls  107:3
campus  43:17 58:15
cancellation  149:21,
  25
cancer  121:24 131:22
candidates  153:1
capability  65:22 78:9
  105:17
capable  23:5 68:12
  70:1,2,3 96:8,10

capacity  87:16 105:24
capillary  59:25 60:5
  61:12,14 64:18 72:25
  73:10,11,19
capital  43:13
capitalists  42:15,21
capped  71:6
capture  99:9
carbon  69:13
cardiovascular  28:24
  30:24 31:1 40:6
  102:22
care  125:9 148:13
carefully  104:17
Carieau  136:11
Carolina  149:6,7
Carreyou  115:2
Carreyrou  110:18
  113:22 117:13 118:3
  120:3,18 129:1
  131:17,19 132:1,10
  134:3,15 135:11
Carreyrou's  129:9,11
carried  90:14 91:17
carry  61:11 140:5
cartridge  20:22 59:1,
  3 61:10,17,18 65:5
  70:14,15 71:3,4
  159:4
cartridges  20:12,13,
  17 21:2
case  8:10 12:12 20:10
  25:7 33:10,15,24
  34:11 35:6,16 36:1,
  11,25 37:1,6,11
  56:12 75:15 80:18
  106:24 107:1 120:13
  127:5 141:5
cases  32:21 36:10
  161:6
cash  51:19,22 52:13
Cassman  9:9
cataloging  119:12
categories  18:16 70:4
  100:24
category  23:7 67:18
  68:17
catheter  30:25
caught  35:17
caused  35:17 116:16

CBS  110:14 134:20,23
  135:18 151:5,8,12
  152:10
Celgene  62:17
cell  102:10
cells  25:4 75:22
  138:23
cellular  69:9
Centaur  96:13
centers  85:20
Centocor  62:17 63:4
centrifuge  65:21
  72:13
CEO  44:13 150:6
  165:12,16
certainty  136:20
certified  38:21,24
cetera  64:12 101:1
chair  15:11,22 16:1,
  4,8,11,15
chaired  15:7
chairs  16:25
challenges  138:16
chambers  65:4
change  53:24 54:1,6,7
  56:10 119:2,19
  127:13 148:13
changed  66:20 122:2
  127:12,14 157:9
changing  45:19,22
Channing  8:7 9:11
  97:6 112:5 144:13
  147:23 168:15
Channing'  112:16
chapter  160:23,24
  161:2,6
characteristics  58:24
characterize  120:6
  122:14 129:2
characterized  116:8
  121:21 150:15
charge  74:2 121:7
charged  32:13
chat  42:16 112:7,14
  122:21
chemical  13:2,4 14:4,
  6,23 15:2,11,12 37:1
  128:4
chemistries  75:24

chemistry  26:25 68:16
  69:11 70:2,18,19
  71:20 75:3,6 77:17
  101:8 102:14,21
  121:7 127:15 128:2
  153:20,22
Chinese  37:20,22
chloride  69:13
choice  41:11
cholesterol/glucose
  73:6
chorionic  69:20
Christian  107:15,24
  108:14 131:8,9
Christopher  134:4
chronological  24:14
Churchill  112:7
claims  38:9
clarification  28:14
  88:11 89:13 113:6
  146:22
clarify  73:12 117:7
class  41:14,16,17
  77:7,9 113:15,16,19
classes  128:1
CLEA  88:25
clear  48:7 70:12
clearance  109:23
  151:19
CLIA  38:21,24 86:9,24
  88:5,12,15,18,19,23
  89:15,25 90:10,20
  92:2 94:20 95:8,24
  96:2,16 117:15
  118:3,8 140:7,17,18,
  20 141:9,13,14
  142:15,22 143:5
  166:14
CLIA-CERTIFIED  38:20
clinic  70:5
clinical  61:24 62:6,
  11,12 63:5,7,17 70:5
  88:6 89:1 95:24
  105:6 127:15 153:17,
  18,20,22
clinician-directed
  105:11,18
close  28:7 48:22 49:6
  73:14,15 121:21
closed-loop  55:19,20
  56:23

closely  72:14 120:24
cloud  71:11
Club  112:7
CMS  141:21,22 142:3,
  23 151:20
co-author  127:21
  128:12,13,16
co-authored  128:6
co-authors  128:17
coagulation  20:20
coauthors  160:13
cochair  155:8
Collecting  60:4
collection  71:7
  161:22
Colman  8:8 9:20
Colorado  13:19
Columbia  154:6
combination  103:24
  104:6,8 133:15
commercial  21:3 24:23
  26:18 27:20 40:8
  95:8 132:21
commercially  23:20,
  23,25 29:12 61:22
  73:4 76:22
commitment  55:7
committee  16:23
  160:8,17
committees  16:18
common  52:25 58:24
  59:6 69:19 98:20
  99:14,18
commonly  65:7
communication  111:9
  164:11
communications  112:13
  135:5
community  125:4,15,20
  139:19
companies  18:5,17,22
  31:24 63:14
company  13:19 19:3,17
  21:12 22:18 24:15
  25:8,10 26:5,7 27:7
  37:7,11,21,22 39:24
  42:6,14,19 43:21
  44:13,19 45:21 46:3,
  10 47:15,19 52:11
  53:21,24 54:14 55:8
  58:3 64:1 75:17

81:18,23 83:6,25
  84:14,17 85:20 88:19
  89:8 90:22 91:22
  94:19 97:12 100:16
  106:2 108:4,10,14
  109:12,15,23,24
  110:3,11 111:1
  113:15 114:2 119:5,
  24 121:1,10 124:15
  125:8 136:7,22
  140:24 141:1 143:3
  144:17,19 150:22
  153:1,3,5 155:1
  166:4 169:14,19
  170:18
company's  126:23
  136:23,25
compare  87:22
compartment  59:19
compensate  19:15
compensated  18:21
  32:10 44:22 48:9,11
  156:25
compensation  17:7,8,
  16,21 18:12 22:10
  25:5,25 31:14 51:17,
  19,22 52:7,12,13,16
  53:2 157:8,10,11
complaint  162:5,11,16
  163:17,25 165:5,10
  167:1,3,6
complete  100:25
  102:10,11,13 105:11
complex  72:3
components  29:10
  70:25 127:25
compound  55:25 79:5
compounds  77:7,9
  102:20 103:3
comprehensive  153:4
computer  119:8
conceivably  101:6
concentration  56:7,12
concept  56:14
concepts  72:5
concern  104:12
concerned  71:3 98:18
  133:17
concludes  171:6
conclusion  94:22

**Confidential** 170:15,
 20,22
**configuration** 49:11,
 12
**confined** 57:20 64:10
 65:2
**confines** 55:6
**confirm** 67:5 148:25
**confirmed** 152:13
**confusing** 64:6
**conjunction** 160:11
**connecting** 94:22
**connection** 41:25
**consent** 162:6,7
 163:19
**consented** 163:16
**consents** 162:12
 164:17
**considered** 31:11
**consistent** 126:23,24
 140:21 141:13
**consists** 16:24 143:19
**constitutes** 154:11
**constraints** 168:3
**consult** 19:22 22:23
 24:13,15
**consultant** 19:17 32:5
 46:16,19,23
**consultation** 97:4
**consulted** 18:23 23:2
 27:6 38:20
**consulting** 13:17
 18:17,20 19:20 29:4
 31:21,22 32:2,3,9,
 13,19 55:10
**consumables** 71:2
**consumer** 71:13 108:2
**consumers** 105:10
**contact** 84:21
**contacted** 110:24
**contained** 42:9
**content** 160:11
**CONTENTS** 143:23 144:3
**context** 68:7 77:10
 165:19
**continue** 144:16,21
**continued** 42:12
**contract** 47:1,4,6,9,
 20,22,25 48:3,5,12,
 17 51:17 85:7,15,17

106:1 148:18,19,25
 149:14,18
**contracted** 47:14
 97:12
**contractor** 46:22
**contracts** 62:24 63:12
**contribute** 72:5,6
 136:7 155:9
**contributed** 67:10
 77:18
**control** 56:4 71:9,25
**controlled** 19:8 41:15
 56:2
**convenience** 97:2
**convenient** 52:1
**conversant** 102:19
**conversation** 111:8
 115:25 116:13 122:13
 126:8 137:4
**conversations** 89:7
 114:12 115:9,10,12,
 17,20 142:20 162:23
**convey** 121:9
**conveyed** 120:10
**conveying** 122:12
**convince** 54:19
**convincing** 54:22
 129:14,21
**COO** 81:23
**Cooley** 9:2
**copied** 131:14
**Copper-7** 34:2
**copy** 116:11 126:14
 171:10
**copying** 107:15 129:8
**core** 59:6
**cores** 37:15
**Corporation** 155:5
**correct** 10:2,5,6,9,24
 11:2,5,17 12:15,16,
 19,20 18:10,12,13
 31:15 32:2 34:21
 40:16,19 44:1 45:6
 50:24 53:16,24 54:12
 55:1 71:21 85:12
 90:7 91:9 98:11,14
 103:11 108:10,12
 111:12 115:4,6
 123:1,10 125:11
 128:11 129:16
 130:13,25 131:4,8,13

132:4,8,18,19,24
 133:13 140:18 141:2,
 15,22,25 144:7
 148:15,22 150:12
 158:19 162:25 163:17
 167:9
**correction** 151:20
**correctly** 48:19
 64:14,19 122:14
 129:2 139:4
**counsel** 8:20 11:16,
 23,24 12:10 47:17
 117:12 118:23 163:4,
 7 170:13 171:9
**count** 100:25 102:11
**couple** 42:15 43:12
 59:15 60:1 85:1
 117:8 118:25 161:6
**court** 8:9,14,22 10:7,
 15 33:12 108:20
 160:2 161:23
**Court's** 10:16
**cover** 127:23
**coverage** 68:15
**covered** 118:4 127:24
 155:2
**covering** 37:13
**covers** 160:16
**crack** 139:2
**cracking** 139:10
**create** 112:10
**created** 134:7
**creating** 112:6
**credit** 166:4
**Cross** 149:5
**crude** 14:9
**CTM** 61:2 73:18
**CTN** 59:25 60:6 73:17,
 19
**cure** 55:23
**Cures** 42:20 44:1,7
 45:3 51:16,18 52:17
 53:21 54:4,20 76:14,
 19
**Cures/theranos** 45:7
**cytometry** 75:5

_____

                  **D**
_____

**D-I-M-A-N-D-I-S** 109:3

Dade  21:14
Dalkon  33:15
Dan  107:24 115:24
  116:10 125:2 128:25
  129:8 131:9
Dan's  129:1
Daniel  50:24,25 74:1
  107:15
Daniel's  74:4
Danielle  8:25
data  40:11 75:7
  90:15,16 125:4,15,20
  140:2 144:19 152:17
date  45:11 81:21
  85:10 110:1 113:25
  134:4,6 137:16
  160:25
dated  104:24 108:25
  112:3 115:3 145:25
  147:24 150:23 157:25
  169:4
David  124:19 135:22
  154:5 159:23 161:5
Davis  9:4
day  104:25 116:1
  143:6,9 152:16
  153:6,8
days  85:1 91:5 120:23
  122:10,11 171:2
dealt  71:10
dean  16:13 17:2,3
  58:12
decentralized  91:23
  92:1
decisions  95:18
deck  100:10 101:18
decks  100:12,15
  158:12
deeply  58:10 72:12
Defendant  49:21
  162:6,7,8
defense  33:21 165:21
  170:13
defer  12:10
defined  47:16 99:9
definition  25:15
degree  13:2,4,11,13
degrees  12:25 13:1,6,
  10
deliver  56:4,11

delivering  56:2
delivery  41:14,15
  55:19,21 56:2,13
  148:13
Dennis  43:4
deny  167:6,11,14,20,
  22
Dep  35:20 37:2
department  15:7,11,12
  16:5,11,15,16,17,22
  107:19 160:12 162:24
  165:21
departmental  16:19
departments  16:25
depends  77:15 147:17
deployed  165:13,19
  166:7
deposed  10:3
deposition  8:7,10
  10:2 11:8,12,13,20,
  25 33:16,18 34:1,4,
  5,20,24 35:3,7,9,24
  36:8,22,23 37:3,9,
  10,16,17,25 38:7,11,
  19 104:21,24 107:9,
  12 111:6 170:15,20
  171:7,20
dermatologist  143:6,
  11
describe  20:17 66:6,
  15 100:16 119:4
  170:2
describes  56:21
description  21:17
  67:17
design  21:22 23:2
  25:21 26:21 29:10
  30:25 31:6,23 58:18
  65:9 70:6 71:3,18
  72:2,12,13,14 77:19
  87:24
designate  170:14,17,
  22
designated  170:20
designed  91:20 139:12
designer  20:9
designing  19:7,23
  20:6,7 24:18
desk  50:6 51:12,13
  84:25

destruction  35:18
detail  66:6 126:9
  127:10
detailed  84:18 129:12
details  84:18 125:10
detect  57:23
detection  27:1 30:15
  40:5 57:22 64:11
  102:7
detector  65:20 72:3
detectors  72:3
determination  170:23
determine  120:8
  160:17 161:10 170:23
determined  113:10
detrimental  170:18
develop  41:5 55:18
  125:7
developed  30:19 74:19
  76:8,12 77:1,5,21
  87:23
developing  47:18
  119:24 137:22 153:15
development  75:8
  77:12 87:1,10,15,24
  90:25 106:8 119:13,
  19 155:6
device  20:4 23:3,4,5
  24:18,23 29:10,11,23
  30:6 56:9,15 57:14
  58:19 59:25 60:4
  64:17 65:3 66:10,12
  70:16 71:9 72:15,18,
  20,22 73:8,12 75:12,
  18,19 77:13,21 78:11
  87:20 113:11,15,16,
  19
devices  19:7,23,25
  20:1,6,16 21:2,7,17,
  22 22:8 26:17,22,23
  27:15,25 28:2,16
  29:4 58:18 59:18
  63:25 67:17 71:7
  78:17,20 87:25
  88:10,13,16,17
devoting  52:10
diagnostic  19:23,25
  20:6 55:19,21
diagnostics  13:7
  24:16,21 29:22 40:4
  148:10

Diamandis 109:1,3
 110:2,9
Dick 83:9 144:12
 145:2
Diego 22:4
differ 58:21 64:13
difference 65:10,14,
 16,25 66:1,15 117:22
differential 101:1
differently 73:23
dilution 132:14,22
dioxide 69:13
direct 21:18
direction 128:6
director 43:25 44:8,
 9,19,22,24 45:6
 51:16 52:7,12 54:3,
 5,11,20 81:25 85:12
 93:1 99:13 105:25
 143:5 148:8
directors 44:2,6
 80:13 92:25 93:3
 157:25 158:2,7
disagree 170:16 171:1
Disagreement 171:4
disbanded 155:17
discern 89:9,19
disclose 126:18,19
 141:7
disclosed 86:23
disclosure 126:13
discuss 17:3 18:20
 97:1 123:12
discussed 62:25 64:7,
 8 80:8 83:5,7,16
 86:4,20 133:14
discusses 137:16
discussing 45:18
 94:11
discussion 90:5
 125:22,24 136:21
discussions 125:21
 143:12 148:24 149:3
 154:22
diseases 137:25
dispense 65:4
displacement 14:10
 64:2,20
disposal 36:12
dispute 34:8 37:12,21

distinct 59:7 65:8
distinction 117:19,20
distinguishes 73:21
distributed 92:4
 138:8
distribution 71:12
district 8:8,9,10
 161:18
division 13:18
divulge 125:6 127:1
divulging 164:10
DNA 68:25
doctor 22:5 152:13
document 114:18 119:6
 130:20 134:5 143:22,
 23 144:2 159:21
documentation 119:8
documents 11:19 12:1,
 8 47:3 60:7 127:6
 170:11
dollars 22:17 25:6
 32:17 106:2
Don 80:15,17 143:20
dots 94:22
double 22:2
Dow 37:1
dozen 23:11 62:19
Draper 144:12 145:2
draw 100:20 103:19
 113:5 144:8 157:24
 158:14
drawing 158:23
drawn 133:4 138:11
draws 133:17
drop 73:7 75:21
 138:15
dropout 169:4
drops 105:12,19,22
drug 41:14,15 55:19,
 21,22,25 56:5,7,10,
 11
drugs 19:8 102:18
due 38:10 120:20
duly 9:12
dump 36:2
Dupont 37:6 38:9
duties 74:10

E

E-L-E-F-T-H-E-R-I-O-S-
T 109:2
e-mail 96:17 97:20,
 23,25 98:13,16
 107:14,21 108:24
 109:5,7 112:2,10,15
 116:6 122:9 123:16
 128:24 129:5,8
 131:3,12,14 143:20
 157:21
e-mailed 98:1,6
e-mails 93:15 111:12,
 25 130:22 143:19
E-N-G-E-N-I-C-S 28:22
E-N-T-R-A-N 38:7
earlier 47:10,11
 101:7 106:7 128:1
 150:9
early 16:3 19:21
 30:23 36:20 54:8
 63:24 120:22 158:20
edge 126:12
Edison 58:20 66:22,23
 67:1,8,9,11 68:2,6,
 8,11 94:5 95:21,23
 96:5,8,10,15 101:3
 102:25 104:6 131:21
 132:13 133:15,21
 159:8,13 164:21
edition 160:4,6,9
 161:7
Edlin 107:15,24 108:9
 115:24 116:10 125:2
 128:25 129:8 131:9
effect 165:2
effectively 46:23
effects 38:10
effort 95:14
Egenics 30:10
elected 16:12
electrical 72:1
electroosmosis 26:17
element 61:9 69:5
elevated 98:9
eliminates 103:23
Elizabeth 9:3,20
 40:25 48:20 54:4,5,
 19 56:18 58:14 63:2

64:24 67:6 80:14,24
82:10,11 83:5 84:21
85:3 107:15 108:23,
24 110:17 112:3,11,
16,19 115:9 121:25
122:10,19,22 123:16
125:13,16,19 127:14
128:7 134:7 135:20
148:6 152:24 154:22
162:5,7,9,13 163:16
165:11 166:6,12
167:5

**Elizabeth's**  49:7 51:4
**embodied**  58:23
**embodiment**  70:24
**embody**  42:8
**employed**  18:4
**employee**  18:5 46:9,12
97:16,20 115:21
131:24 132:15
**employees**  62:23 92:9,
12 166:13
**employment**  13:16
18:4,10
**enable**  87:25
**encounter**  24:3
**end**  41:18,19 48:3
83:25 91:23 121:21
131:20 146:10 153:6
155:11,12,14
**ended**  19:11 157:8
**ends**  144:15
**engaged**  32:5 55:14
119:14
**engagements**  18:11
**Engenics**  28:20 30:11,
12,18,22
**Engineer[ing**  128:4
**engineered**  92:10
**engineering**  13:3,5
14:4,6,23 15:2,11,13
16:14 58:12 67:10
154:25 155:20 159:22
160:23 161:3
**engineers**  50:11 67:8
91:16 161:12
**enjoy**  147:6,15
**enjoys**  146:11
**ensure**  141:18
**entered**  47:9 149:15

**entire**  130:7 154:11
170:19,22
**entitle**  143:22 147:22
**entitled**  100:21
103:20 105:4 109:3
114:25 134:2 143:23
147:23 150:5 159:21
**entity**  61:13
**Entran**  38:6
**epiphany**  92:14
**equipment**  87:2,11,23
91:3,8 92:18 95:5
98:22 139:24 165:19
**equity**  157:9,11
**essentially**  17:4
53:23 57:10 60:4
64:15 65:20 70:18
91:19 116:1
**establish**  85:20 99:12
**establishment**  90:20
**estimate**  25:7
**et al**  9:20 36:6
**evaluate**  133:9,11
152:11
**Evans**  154:4
**event**  112:8
**events**  82:9 137:16
**everyone's**  155:24
**evidence**  130:9 144:21
160:1,15 161:10
**evident**  123:4
**evolution**  66:12
**evolutionary**  66:9
**exact**  41:24 45:11
**EXAMINATION**  9:15
79:19
**examined**  9:12
**examples**  69:10,18
127:25
**Excerpts**  100:22
**Exchange**  162:4
**excluding**  33:2
**excuse**  108:23 168:18
**execution**  153:14
**Executive**  16:22
**executives**  164:19
166:15
**exhibit**  11:8,9,12
93:11,13 100:5 103:8
104:20,22 107:9,10,

12 108:17,19 111:3,
4,6,8,20,23 114:21,
24 120:4 122:6,8
128:22,24 130:17,18
131:4,15 133:24
134:1 137:8,9,11
143:16,17,19 145:21,
22 147:19,20 150:2,
5,19,22 157:18,20
159:17,19,21 161:25
162:1,3 168:13
**exist**  20:25
**exists**  160:1
**expanded**  65:21
**expect**  56:8 129:12
152:2 158:21
**expected**  140:9
**experience**  8:21 72:8
103:5 154:24
**experienced**  153:21
**expert**  10:4 18:18
32:6 33:10 39:5
40:7,15,19,21
**expertise**  25:20 71:24
**experts**  152:11
**explain**  55:20 87:18
**explore**  42:7
**explosion**  35:10
**Exponent**  161:4
**expressed**  63:15
**expressions**  63:15
**extent**  39:15,16,20
40:10 70:8 71:18
95:19 101:7 116:13

---

### F

**fabricated**  60:22
67:18
**fabrication**  35:18
**face**  159:3
**facility**  35:19 49:2,3
50:8 51:6
**fact**  67:6 83:14 89:9,
17 121:1 136:9 141:8
153:18
**factor**  52:23 159:3
**factual**  144:20
**faculty**  13:20 14:12,
15 16:12 58:13

failed  37:8
failings  169:19
  170:5,7
fair  10:12 26:20
  53:21 68:9,10 161:14
faked  164:18
fall  41:4 42:2 77:9
fallacies  109:4
familiar  10:1 39:1
  63:22 72:4 75:12,18
  76:5,25 103:11
  115:4,5 127:21
  149:17
father-in-law  124:15
father-in-law's
  124:18
FDA  113:9,16,18 114:7
  127:1,7 133:19
features  20:4 27:16
February  137:14
  147:24
federal  33:20 160:2
  161:8,15 162:3
feed  56:8
feedback  42:5 55:19,
  21 56:23
feel  9:23 10:15,17,23
  136:12,15
feet  49:13
fell  18:16
fellow  80:21,23,25
  81:4
fellowship  41:9
felt  42:15 45:20 46:2
  55:12 71:24 72:5
  121:11 154:22 160:25
  169:19
Fern  33:19
Fernandez-kopec  8:13
field  72:10
fighting  150:23
filed  8:8
files  119:8
filings  162:4
filled  71:5
films  37:14
final  15:4 162:8
finances  16:17
find  21:16 99:3
  156:17

findings  127:6 142:24
fine  34:25 156:7
finger  75:19 94:18,21
  113:4 129:15,22
finger-prick  88:1
finger-stick  89:10,18
fire  35:17
fireside  112:7
firm  36:6,16
floor  50:5,10
fluid  14:10 24:19
  25:1,3 85:22
fluids  20:3 26:16
  64:2,15,22 65:4
fluorescence-based
  40:5
focus  120:16 122:2
  137:19,22 154:25
focused  90:24 91:23
  92:6
focusing  50:2
folks  108:1 154:23
follow  125:8
follow-on  103:25
follow-up  104:7
foot  88:19
footprint  65:2 138:5,
  7
forces  64:18
forget  38:18
forgot  33:5,6 39:24
form  24:2 40:9 41:22
  45:1 57:8 60:11
  63:21 66:24 79:1,5
  82:13,19 83:10,19
  84:1,5,10 85:9,16
  86:5,15,21 87:4
  88:14 89:20 90:11
  91:10 92:20 94:3
  96:6 99:6,19 100:7,
  13,14 101:12,24
  104:14 106:5,6,19,22
  107:3 108:11 110:12,
  19 111:17 113:12,13,
  23 114:4,10 115:14
  121:14 123:3,11
  124:13 127:2,3
  129:24 132:2 133:22
  134:11,19,25 135:24
  136:14 137:1 139:25
  141:3 146:19 147:2

  148:20 149:23 158:9
  159:3 162:14 163:1,
  18,24 164:24 165:14,
  25 166:9,19,20,25
  167:10 168:1 170:6
form-  131:23
formed  70:10,21
  154:20
forming  152:25
forms  73:7
formulate  94:19
Fortune  110:5 150:5
forward  45:19 96:17
  117:8 155:1
found  25:3 56:14
Foundation  99:21
  100:1
founded  148:5
fourth  162:8
frame  30:3,22 31:2
  50:13,16
free  10:15,23
French  28:12
frequently  87:14
  121:17
freshman  41:3,19
Friday  12:12,14 47:4
friend  116:6
friends  85:4
friends-and-family
  93:23 97:14
Frist  144:12 145:2
front  130:23 161:21
Fuisz  33:4 38:15
  75:15
full  15:1 94:20
  126:12
fund  122:17,18
funding  57:1
funds  42:19
fungicide  38:10
funny  156:20
future  55:18 119:10

---

                  G

game  91:23
Gantry  66:7
gauge  17:25

**gave** 50:8 61:5
120:19,20 121:8
127:14 142:23 154:9
**gelatinous** 37:14
**general** 51:9 68:16
69:10 70:2,18 71:20
75:3 77:18 78:8
83:9,18 101:8 121:7
128:2 163:3,7
**generally** 18:23 22:14
26:24 32:15 39:1
68:25 115:12 118:25
126:21
**generated** 34:9 59:2
**genetic** 69:2
**Genomics** 42:1
**geometry** 57:20 64:11
**George** 82:3 83:8,17
**Gibbons** 120:10,17
121:10 130:2
**Gilead** 155:7
**give** 14:5 15:16
17:10,24 32:15 34:22
55:9 58:15 68:13
69:10,16,18 101:4
104:11 124:10
**giving** 136:12
**Glad** 156:17
**Glaxosmithkline** 62:16
63:4
**glucosamine** 37:23
**glucose** 24:19
**Goldman** 9:8 12:3,7,9
60:11 76:11 96:20
97:6 114:18 117:7,
10,18,24 118:5,10,
14,17,20,23 119:2,4,
15,21 128:23 145:9
163:9 164:7 165:3
171:14,16
**gonadotropin** 69:21
**good** 8:6 53:6 145:7
**Goodhart** 9:2 40:9
41:22 49:8,17,20
57:8 66:24 74:16
82:13 83:10,19 87:4
89:20 91:10 99:19
100:7,13 101:12,24
104:14 106:3,5
110:19 111:17
113:13,23 114:10
115:14 120:5 132:2

134:11,19,25 142:10
158:9 163:18 165:14
166:17,19,25 167:7,
10,17 168:1 170:6
171:12,18
**Goodyear** 38:5
**Gorton** 9:4 45:1 82:19
121:14 123:3 167:24
171:13
**govern** 96:2
**graduate** 16:20,21
**grew** 155:16
**Grogowski** 153:24
**Gronowski** 153:24
**Grossman** 122:13,16,20
123:10 124:7
**group** 12:8 51:8 70:21
74:7 91:16 92:8
**grouped** 70:18
**groups** 70:9 71:19
74:1
**guaranteed** 166:3
**guess** 17:12 18:2
46:21 59:18 70:15
73:12 93:23 149:24
157:22
**guessing** 27:11
**guide** 159:22 160:19,
20
**guys** 47:1

---

### H

**H-I-** 22:2
**Hagens** 8:23,25
**Hale** 9:6
**half** 52:1 106:2
**halfway** 131:18
**hall** 114:13
**hallway** 51:7
**hand** 128:20
**handed** 108:20
**handheld** 75:19 78:11
**handle** 16:18 111:1
**handles** 16:17
**happen** 44:3 139:3
168:19
**happened** 42:11 63:8
95:7 112:23 137:16

**happening** 32:22 41:13
63:12 141:18
**hard** 120:6 163:9,11
**hard-** 71:23
**hardware** 60:17 66:6,
20 67:9 70:23 71:23
**HCG** 69:20
**head** 10:8 31:7 66:8,9
76:16
**Headley** 9:9
**health** 148:13
**healthcare** 139:19
**hear** 123:20 124:3
163:23,25
**heard** 66:21 76:3
125:1 153:7,14 165:2
166:23
**hearing** 76:4
**Hearst** 8:11
**heat** 71:25
**heating** 38:6
**heavy** 14:9
**hedge** 122:18
**held** 8:11 14:15 65:5
108:4
**Helfelt** 154:5
**Helfet** 154:5
**helicopters** 166:8
**helped** 25:22 127:21
**helpful** 45:21 72:8
119:9 161:1
**helping** 155:1
**hematology** 69:8,9
70:4,21 71:21 75:4
94:7,15,16,20 95:12
96:8 102:11 128:2
**Hemoglobin** 69:22
**Henry** 82:3 83:8,17
**Hewlett-packard** 29:1
**high** 126:24
**highest** 31:20
**highlight** 103:20
**highlighted** 169:1
**highly** 47:16 65:8
**Hillman** 21:25
**hint** 121:8
**hinted** 120:25
**hired** 58:3 83:6
**hiring** 80:6,8

history  53:20
hold  75:19 88:24 90:4
  119:13 120:1 133:20
  163:5
Holmes  9:3,20 40:25
  50:4,22 54:19 56:18
  82:10,11 84:22 85:3
  107:15,16,24 108:14,
  24 109:8 110:17
  111:15 115:9 122:10,
  13 123:16 131:8,9
  134:7 148:6 162:5,7,
  9,13 163:16 165:11
  166:6,12 167:5
Holmes'  48:20
home  121:16 122:2
honestly  26:2
hormone  103:1
hose  38:7
Hot  114:25
hour  22:17 24:10 25:6
  31:18 32:17,18 52:1
hourly  22:13,15 24:7
  26:1 31:15,20 32:10,
  12
hours  105:13 121:5
  144:14
HP  31:5
human  69:20
humorous  156:16
hundred  22:16 24:10
  25:5 26:1 31:17,18
  32:16 43:3 96:14
hundreds  138:21
hydronic  38:6

---

                I

I['m  97:3
Ian  120:10,16,22
  121:4,9 130:2
identify  102:8 103:3
ignore  169:4
II  113:16,19
ill  121:16,23
imaging  68:19 69:6,7
immunoassay  77:16
  101:6
immunoassays  68:13,16
  69:18,19 70:1
  101:14,18 102:2,16,

17,24
immunology  70:19
  71:20 75:3 96:11,14
  128:2
imported  37:23
impressed  153:13
impression  82:20,25
  83:2 85:18 86:12,16,
  19 120:18,20 142:23
improvements  66:10
in-person  97:4
inaccurate  120:11
  129:19 146:5 150:15
include  19:12 67:16
included  70:14
including  16:17 53:21
  103:25 131:22 164:22
incorporated  54:15
incorrect  132:1,4,17
  133:6,13
increased  24:12 31:19
incremental  66:5
independent  152:15
indexing  119:9
individual  106:1
individuals  81:10
infectious  137:25
inform  62:23
information  56:9
  84:18 127:1 131:11
  132:5 138:12
informed  84:13
infringement  37:22
ingredients  37:15
init-  42:18
initial  36:6 42:18
  43:12 81:22 109:2
initially  21:6,10
  50:8
inkjet  31:6
input  80:6
inquire  84:19
inquired  41:11 106:15
  165:7
inquiries  132:23
inquiry  130:22
insert  159:4
inserted  61:17,18
insertions  31:1

inside  88:20
inspected  141:17
inspection  143:3
inspections  141:22,25
  142:1
instance  160:19
instances  32:4
Institute  42:2 128:4
instructed  166:12
instrument  59:14
  61:11,18 62:4 63:20
  64:9 70:13,24 76:21
  86:8 89:12,25 90:9,
  17 94:17 140:12
instrumentation  106:9
instruments  59:5,10
  60:15,24 61:1,2,7,20
  62:5 66:22 67:17,19
  70:7 86:3,8,20
  87:14,15 89:11 91:18
  96:15 105:21 106:12
  140:10 151:23
intellectual  37:13
  121:6 122:3
intended  55:23
intent  161:8
interact  59:3
interacting  147:17
interest  142:9
interested  55:24
interesting  55:13
  56:14
interface  70:14,15
  108:2
interfaced  145:4
interfaces  61:10
internally  62:23
international  37:21
interpret  120:14
interrogated  20:23
interrogation  27:1
  58:25
interrupt  49:17
interstitial  24:19
  25:1
interview  134:21,24
  135:2,4,7,14,20
  136:4,13 137:13,18
  139:8 146:1 150:8,
  10,15 151:12

interviewed 103:15
  135:19,23 136:19
  150:11
intimate 120:13
intrigued 55:12,16
introduce 43:17
introduced 42:14,22
  43:4 161:22
introducing 42:23
  43:11
introductions 81:12
invasive 31:1
invent 125:7
invented 151:22
inventions 122:5
invest 42:25 43:6
investigating 57:19
investigation 162:25
investor 44:15
investors 164:21
invited 152:10 153:1
involve 164:9
involved 35:16 39:21
  40:25 58:9,10 72:9,
  12 77:12 82:12,18,
  21,25 83:16 84:8
  86:7 89:23 90:18,19
  95:18 105:22 106:13
  111:2 144:1 167:19
involvement 124:15
involves 26:24 72:3
involving 37:6,11,20
  38:5 130:22
issue 10:19 118:11
  142:13
issued 11:12 146:23
issues 71:23 117:8
  123:9 136:6 161:13
it.' 148:13
items 70:10,13 116:15

J

Jack 154:4
Jain 96:19,23 97:10
January 127:22 157:9
  159:11
Jed 161:18
Jeff 107:14 108:4

Jeffrey 107:24
Jennie 44:11
job 13:18,20
Joe 103:21
jogging 112:25
John 36:18 110:17
  113:22 115:2 120:18
  128:25 129:9 131:17
  132:1,10 134:3,15
  135:11 159:22
join 155:7
joined 49:21 80:2
  153:7
Jose 8:9
Joseph 103:9 105:1
journal 92:16 103:10
  104:13 110:25 113:22
  115:2 116:4 117:13
  122:11,12 123:2,9
  128:4 129:9 130:25
  134:2,10 135:11
journey 121:4 136:22
judge 33:20 161:18
judges 160:2,14
  161:9,15,17
judgment 132:6 162:8
  163:17
July 45:10,17 46:7
  47:7,12 87:2,12
jumped 150:18
jumping 104:17
June 46:8 48:4,12
  106:1 108:25 145:25
  150:7
Justice 160:12 161:23
  162:24

K

K-R-I-C-K-A 154:3
Kate 161:19
Kathleen 9:2
Kathrein 8:23 9:17,18
  11:10 12:5,8,14,17,
  21,22 21:23 23:18
  28:15 39:12,14,19,20
  40:1,14 42:10 43:24
  45:5,16 46:15,24
  48:10 49:5,15,19,22,
  23 50:17,21 51:10
  52:3,5,6 53:6,14

54:2,23 57:5,11 59:8
  60:14,23 64:3 65:23
  66:14 67:2,12,21
  68:5 74:11,23 76:7,
  13,18 77:25 78:2,4,
  10,14 79:2,9,20
  81:24 82:16,23
  83:13,23 84:3,7,12
  85:11,23 86:11,18,25
  87:7,17 88:12,21
  89:16 90:2,6 91:1,25
  92:23 93:12 94:4
  96:9,21,22 97:9
  99:16,24 100:8,19
  101:16,25 104:19
  106:10,20,25 107:7,
  11 108:13,18 110:15,
  22 111:5,21 113:8,20
  114:1,6,16,20,22
  115:16 116:25 117:9
  119:22 120:15 121:22
  122:7 123:7,15
  124:17 130:4,6,16,19
  131:6 132:7 133:10,
  25 134:14,22 135:3
  136:2,17 137:6,10
  140:13 141:6,19,24
  142:8,17 143:14,18
  145:7,16,23,24
  147:3,21 148:22
  149:1 150:3,20
  156:6,13,16,18,21
  157:19 158:13,19,24
  159:20 162:2,16,19
  163:6,11,13,22
  164:1,5,8 165:1,6,17
  166:2,11,22 167:2,8,
  13,21 168:4,12,14
  169:8 170:9,16,25
  171:5
Kelly 9:4
Ken 110:5
kind 18:14,15 19:24
  26:16 35:11 51:21,22
  52:16 55:24 56:3
  68:21 69:6 72:7 73:4
  127:10 149:19
kinds 138:10,22
  161:13
kinetic 29:6
Kissinger 82:3,9
  83:8,18

**Klein**  36:6 130:23
  131:12
**knew**  56:15 82:7 89:8
  116:10 117:12 118:1,
  7,17 121:10 122:25
  124:14 125:10 136:1
  140:25 148:23,25
  149:3
**knife**  126:12
**knowing**  55:24 121:4
  133:12
**knowledge**  78:21
  102:3,4 120:13 153:2
**knowledgeable**  120:7
**Kovacevich**  83:9,17
  93:6 144:12 145:2
**Kricka**  153:25

**L**

**lab**  39:10 41:12 67:9
  86:24 88:5,9,12,15,
  18,23,25 89:15,25
  90:10 91:24 92:2
  94:20 95:8,24 96:2,
  16 98:7,10,13,18
  103:24 105:11,18
  117:15 118:3,8 119:8
  140:7,17,18,20
  141:9,13,14,16,20,21
  142:15,23 143:5
**laboratory**  38:21,22,
  24 41:11,17 42:12
  58:5,6 70:5 96:25
  99:13 100:2 105:6
  138:3,6 151:22
  152:11 153:16,17,18,
  22 166:14
**laboratory-developed**
  89:25 90:9
**labs**  86:9 88:19 90:20
  99:3,12 166:13
**Ladenson**  154:4
**language**  144:25 145:1
**larger**  133:3
**Larry**  153:25
**laser**  20:24 61:7
**late**  16:1 22:25 36:20
  49:3 152:11
**latest**  73:17

**launch**  95:7
**launching**  105:9
**Lauren**  112:3,10
**law**  169:6
**lawsuit**  9:19,22
**lawyer**  161:5
**lawyers**  163:7,14
**layouts**  25:22
**lead**  41:20 63:15
**leadership**  74:8
**learn**  82:17 85:6
  88:4,22 89:3,6 92:11
  106:17 114:2,3,5,13
  143:5,10
**learned**  88:4,5,23,25
  89:4,7 118:19
**led**  40:25 65:2 153:11
**left**  80:22 81:1 83:25
  84:14,16 110:25
**legal**  8:15 146:12
  147:6,16
**legalities**  167:18
**letter**  12:12,19 46:25
  60:9 107:20 130:20
  143:21
**level**  56:4 95:15
  126:9,24
**limb**  141:1
**Linux**  65:13
**lipid**  89:21 94:6
  102:20
**list**  28:1 34:23 67:22
  169:16,17
**listed**  61:20
**listen**  72:5
**lists**  159:22
**litany**  68:13
**literally**  91:5
**litigation**  12:1 18:18
  31:21 32:2,3,5,9,13,
  19 33:4 34:3 35:1
  36:1 37:20 38:5
  55:11 160:21 161:14
**Littleton**  13:19
**live**  22:3
**lived**  84:4
**Liver**  102:13
**local**  152:18 171:2
**location**  48:21 49:25
  50:1,3 92:2 105:9

**long**  23:13 25:23
  44:6,24 45:6 47:20
  121:12 152:16
**Long-term**  105:5
**longer**  82:22 107:6
  108:9 119:24
**looked**  100:6
**Lorenzo**  8:13
**lot**  35:18 58:20
**Lucas**  80:15,17 100:5
  103:8 143:21
**LUNCHEON**  79:14

**M**

**M-O-A-L-L-I**  159:23
**machine**  68:15 96:13
**machines**  87:14 94:23
  99:11 117:14,20
  118:1,2,6 131:21
  132:14,21 133:3,16,
  21
**macroscopic**  64:25
**made**  62:22 63:15 75:7
  85:22 130:10,22
  133:15
**magazine**  150:5 151:6
**mail**  110:25
**main**  70:4
**maintain**  126:24
**make**  14:8 37:15 56:6
  64:5 81:12 95:24
  117:18,20 132:5,23
  139:3 157:3 163:9,11
  166:14
**makes**  144:19
**making**  95:18 111:15
  138:20 141:1
**malady**  55:24
**man**  103:16 143:11
**Management**  122:17
**managers**  108:8
**mandatory**  45:24
**Maney**  134:8
**manipulate**  64:10
**manipulated**  57:20
**manner**  19:8 65:6
  126:19
**manual**  160:1,4,9,16
  161:16

manufactured  73:23
Marathon  13:19,23
  14:1
March  134:6 150:24
  151:5 169:5
mark  107:8 137:7
  145:20 147:19 159:16
  161:24 168:12
marked  11:7,9 93:11
  100:4 103:8 104:23
  107:10 108:17 111:4,
  20,22 114:21,23
  122:6 128:22 130:18
  133:24 137:9 143:15,
  17 145:22 147:20
  150:2,4,19,21 157:18
  159:19 162:1 168:13
marking  100:3 103:7
marveled  121:3
master's  13:4,13
materials  63:14
Mather  44:11
matter  8:8 10:20
  105:13 136:18 160:18
matters  14:6 16:19
  17:3 18:15,24 146:2
Mattis  83:9,18
me--  69:16
meaning  107:13
meaningful  155:9
means  20:3 37:14
  63:24 71:4 87:18,20
  102:8 119:17 154:9
  171:1
meant  41:7 61:2 71:20
  94:7
measure  24:18 27:4
  77:11
measured  20:19 29:16
measurement  20:21,22
  26:25 30:15 56:6
  57:16,17 59:4 87:21
  138:20
measurements  29:6
  57:10 88:17 95:24
  133:14 138:22
measuring  23:5
mechanical  72:1
mechanism  26:16 57:22
  64:12,17

medical  39:25 40:2
  99:21 100:1 113:11
  125:4,14,20 139:19
  152:15,25 154:14
  155:2 157:6
Medicine  128:5
meet  17:2 80:1
meeting  80:9,10,12
  81:5 83:3,4,5 90:23
  114:13 152:13 153:2
  157:25
meetings  43:15 63:12
  70:9 71:19,23 72:2
  74:12,22,24 75:3,4,
  5,6 83:7,17
meets  16:23
member  158:2,7
members  75:11 154:7
  155:19,20 157:2
memory  47:13 64:14
  112:25
Menlo  161:4
mention  39:25
mentioned  27:19 61:1
  62:24 70:11 166:24
Menu  100:22
Merck  62:17 63:4
Mercury  24:15,21
met  41:2 82:6 93:2
  143:11
metabolic  75:13
  102:13
metadata  134:5
method  132:15,22
methodologies  138:18
Michael  9:6
micro-  20:16
microfluidic  20:1,16
  57:9
microfluidics  25:12,
  15,20 26:14,21 29:22
  31:12 64:16
Micropilot  14:7
microsample  104:2,7
microscope  152:2
middle  10:20 109:2
  129:6,7 162:22
migrated  20:3
military  166:8
Mill  49:3,12,24 51:6

Miller  154:8
million  48:14 52:24
  106:2
mimic  65:6
min[utes]  123:18
mind  33:8 34:22 38:16
  39:25 54:16 85:10
  139:11 159:15
mine  116:7 155:4
mini  166:13
miniature  153:15
miniaturize  64:24
miniaturized  153:16
minilab  58:20 66:21
  67:14,16,22 68:1,3,
  6,8 69:24 95:1,2,4,8
  127:24 158:25 159:2,
  8,9 164:21
minilab's  96:4
minilabs  166:15
minute  112:6 137:11
minutes  123:17
mischaracterizes
  67:24 76:9 90:12
  129:25
misled  73:2
misspoke  94:7
Mm  122:19
Mm-hm  13:12 17:1
  19:12 21:7 44:3 55:4
  71:1 76:13 93:24
  94:13 107:20 116:5
  123:8 131:15 151:4
  159:5
Moalli  159:22 161:3
mobile  138:9
mode  119:7
modification  106:11
modifications  66:18
  92:10,12
modified  94:23 117:19
  118:1,2 132:20,21
  133:16 140:11
modify  91:18
modifying  106:9
molecular  27:25 28:2,
  16 29:4 68:18,23,24
  70:3,19 71:20 75:5,6
  77:9 102:8 128:3
molecules  138:23

MONDAY  8:2
monitor  77:13
monitoring  77:1,5,22
monolithic  61:6,19
  70:13
month  45:9 54:16
  84:23 105:10 106:21
  152:12
months  135:10 144:18
more-than-average
  40:12
morning  8:6 116:6
Motorola  36:13
move  64:2
moved  49:1,2
movement  26:22,24
moves  48:24 49:4 66:8
moving  26:16 63:24
much-hyped  150:22
  151:2
Mugmon  9:6 12:11,16,
  20 21:19 23:17 39:9,
  18,22 41:23 43:22
  45:2,15 46:13,20
  48:6,25 49:9 50:15,
  18 51:5,25 52:4
  53:25 54:21 57:2
  58:22 60:20 63:21
  65:18 66:3 67:20,23
  74:3,15 76:6,9 77:23
  78:6,12 79:1,5 81:19
  84:1,5,10 85:9,16
  86:5,15,21 88:14
  90:11 91:11 92:20
  94:3 96:6 99:6
  100:14 101:13 106:4,
  6,19,22 107:3
  108:11,16 110:12
  113:12 114:4 123:11
  124:13 129:24 130:14
  131:5 133:7,22
  135:24 136:14 137:1
  139:25 141:3,10,23
  142:7,11 143:7
  146:19,23 147:2
  148:20 149:23 156:3,
  9,14,17,20 158:17
  162:14 163:1,5,24
  164:24 165:15 166:9,
  18,20 167:16,25
  169:6 170:13,21
  171:4,11,17

multiple  23:6 103:23
mumbling  104:22

_____

N

_____

named  67:6 80:21,23,
  25
names  59:21 154:9
  161:20
nanotainer  60:1,5,8,9
  61:13,15,16 70:15
  72:18,19,22 73:19
  113:10,18 114:7,8,9,
  14 133:20 151:18
National  155:20
  160:5,7
nature  146:12 147:6,
  16
nearby  50:12
necessarily  92:14
needed  89:24 90:8
  126:15 154:23
needle  75:21 133:4
negotiation  170:12
negotiations  149:8,11
neighbor  124:16
News  151:5,8 152:10
next-door  124:16
nickel-iron  35:13
night  12:12,15 47:4
  156:7
nod  10:8
normal  26:10 99:10
North  149:5,7
Northern  8:9
Nos  93:14 111:7,23
  114:24 122:9 130:21
  157:20
not-so-retiring
  147:23
notable  67:7
note  8:16
notebooks  119:8
noted  171:4
notes  54:10,11
notice  169:21 170:5,
  25
notifications  99:22
notified  98:7

notion  55:17 56:10,23
Novartis  62:17 63:4
nucleic  138:23
number  11:8 18:18
  19:10 132:19
numbering  67:4
numbers  61:5 133:12
numerous  166:13
nut  139:2,10

_____

O

_____

O'MALLEY  161:19
O'QUINN  36:18
o]n  98:6
oath  53:16 79:22
  145:18 168:16
objection  21:19 23:17
  39:9,18,22 40:9
  41:22,23 43:22 45:1,
  2,15 46:13,20 48:6,
  25 49:8,9,20 50:15,
  18 51:5 53:25 54:21
  57:2,8 58:22 60:11,
  20 63:21 65:18 66:3,
  24 67:20,23 74:3,15,
  16 76:6 77:23 78:6,
  12 79:1,5 81:19
  82:13,19 83:10,19
  84:1,5,10 85:9,16
  86:5,15,21 87:4
  88:14 89:20 90:11
  91:10 92:20 94:3
  96:6 99:6,19 100:7,
  13,14 101:12,24
  104:14 106:3,4,19,22
  107:3 108:11,16
  110:12,19 111:17
  113:12,13,23 114:4,
  10 115:14 120:5
  121:14 123:3,11
  124:13 129:24 130:14
  131:5 132:2 133:7,22
  134:11,19,25 135:24
  136:14 137:1 139:25
  141:3,10 142:7,10,11
  143:7 146:19,23
  147:1,2 148:20
  149:23 158:9,17
  162:14 163:1,18,24
  164:24 165:3,14,25
  166:9,17,18,25

167:7,10,16,17,24,25
168:1 170:6
**obtain**  27:2 56:25
**obvious**  103:4
**occasionally**  58:13
62:22 71:22 82:8
**occupy**  25:4
**occur**  135:7 141:11
**October**  92:17 96:19
115:3 123:17 129:10
131:8,18
**Offer**  105:5
**offhand**  31:25
**office**  41:2 48:17,19,
20,22 49:7 50:3,7,8,
10,12,14 51:3,11
58:15 84:24 97:25
116:10 119:16 122:1
**offices**  97:4 126:2
**Ohio**  161:11
**oil**  13:19,23 14:1,9,
10
**omission**  67:25
**onboard**  44:10
**ongoing**  162:25
**open**  46:2 50:5
**open-floor**  50:12
**opened**  91:6
**operated**  140:21
141:14
**operating**  71:9
**operations**  16:16
90:25
**opinion**  96:4 120:17
125:18 129:19
**opioids**  77:8
**opportunity**  24:3
93:23 97:13 148:12
**opposed**  25:2 55:9
61:8 95:14 113:4
120:17
**opposite**  121:1
**optics**  72:4
**options**  52:16
**order**  22:16 23:11
24:15 27:1 34:22
56:4,5 64:5 65:5
89:24 90:9 137:24
138:12 140:5
**orders**  96:25 97:12

**organisms**  30:20
**origin**  67:3
**outline**  112:6,10
**overlap**  102:14
**Oversees**  16:16

---

### P

**p.m.**  79:15 117:3,4
145:12,13 168:8,9
171:20
**paid**  24:7
**painkiller**  77:16
**painkillers**  77:1,5,
13,22
**Palo**  99:21,25
**panel**  89:21 96:8
102:13,20,21,22,25
**panels**  96:11 102:13,
15
**paper**  126:22 127:22
128:17 159:10,11
**paradigm**  138:2
**paradigms**  65:9
**paragraph**  129:7 133:1
152:9 158:15 169:2,9
**parallel**  32:23
**Park**  161:4
**Parloff**  110:4 150:7,
8,10
**part**  12:3 20:8,10
26:25 61:15 72:19,23
91:21 96:12 120:16
124:21 140:17 160:18
161:11
**participate**  55:6
160:8
**participated**  72:2
**parties**  8:17 34:11
35:9,19 62:3 78:19,
22,24
**partner**  105:5 122:17
**partners**  124:10
**parts**  73:22 74:20
**party**  95:4
**passed**  121:18
**past**  10:3 153:19
**patches**  19:12
**patent**  34:8 35:1
37:12,22 42:3,9

56:18,19,21 122:4
**path**  125:9
**pathways**  64:16
**patient**  71:13
**patients**  88:1 95:25
113:4
**patients'**  133:4
**pause**  104:11 114:14
**PCSU**  65:17
**PDF**  134:6
**peer-review**  126:16
127:11,17,19
**peer-reviewed**  126:22
**pending**  170:23
**people**  62:16 75:11
81:1 89:8 90:22
97:12 99:10 116:17
126:14 129:14,21
139:19 142:19,22
153:3,21 154:12
155:8
**percent**  41:8 43:3
99:9
**percentage**  113:3
128:19
**perform**  56:15
**performed**  39:2,17
62:8 127:9
**performing**  62:5 88:6
89:1 113:3
**period**  16:2 24:20
31:4 42:6 52:18 56:5
155:10
**permission**  128:10
**persistent**  42:13
**person**  20:11 21:21
40:13 169:24
**personally**  11:21
39:10,16
**personnel**  142:14
**perspective**  130:24
**Pete**  80:21
**Pfizer**  62:16 63:3
**PFM**  12:1,4
**Pharmacaps**  37:12
**phase**  76:20,21 78:18,
25
**Phd**  13:4,14 22:6 58:3
**Phenomenon**  109:4

phenylalanine  30:20
Phoenix  36:13
phone  97:3
phosphatase  69:15
photograph  158:22
physician  71:14 96:24
  97:11
physicians  137:24
  138:13
pick  130:8
picture  120:11 158:16
pictures  159:7
piece  69:9 109:12
  135:18 161:21
pierce  61:13 72:24
  73:1,2,7
pierced  73:6
piercing  70:16 73:3,5
pills  37:15
pipet  66:8,9
pipets  65:3
piston  64:2,21
pivot  169:23
place  8:17 76:17
  120:12 125:25 126:1
  152:13 159:4 166:13
Plaintiff's  93:13
  114:24
plaintiffs  8:24 9:1,
  19 36:4,15
plan  91:22 121:25
  151:19
plant  14:7
plastic  37:8
platform  57:10,12,19,
  25 58:25 59:2 64:10
  67:11 68:20 77:19
  78:8 90:17 137:23
play  73:9
plumbing  37:8
point  43:8 55:18
  64:23 88:2,4 91:15
  92:15 96:5 113:1,9
  123:23 137:13 143:10
  144:4
point-by-point
  124:21,22,25
point-of-care  73:5
pointillist  28:12

pointing  129:15,22
points  111:15 112:17,
  19,22
policy  126:23
polypropylene  35:17
polyurethane  14:8
portable  138:8
portion  95:12
portions  170:17
position  13:23 15:5
  16:12 17:5 45:22
  74:8 82:8 108:4
  127:11,13 136:10
  169:18 170:5
positions  14:14
  156:25
positive  64:1,20
possibly  83:20
potassium  69:12
potential  55:18
practice  98:20 99:14,
  18
pre  160:24
preanalytical  57:21
preceded  160:24
precipitated  113:17
precise  15:17 113:24
  139:16
precisely  89:4 138:25
precision  74:18 75:1
  140:4,9,22 142:14
predecessor  60:13
  158:21
predicate  87:14,18
  88:16
Preferred  52:25
pregnancy  131:23
preparal  119:6
preparation  11:20
  144:2
prepare  144:5
prepared  78:24 127:7,
  8
preparing  119:7
  123:22 124:20,21,24
prescribed  19:8
presence  57:23
present  8:20 75:7
  83:18 126:5

presentation  100:5
presentations  62:14,
  20,22 74:21 75:1
  111:16 124:10 158:8
presented  153:4
  158:12
president  81:23 155:5
  161:4
presidential  41:7
presidents  153:19
press  104:24 105:2
  114:3
presume  35:23 92:9
  116:17,23 128:9
  143:2 148:16
presumption  90:21
  140:6,19 141:2,8,12,
  16
pretended  164:20
pretty  41:13 129:11
  135:19
previously  86:4,20
  100:4 103:8
prick  94:18,21
primarily  20:11 68:15
  71:24 107:23
primary  13:16 65:13
principles  126:10
print  31:7
printer  61:7
prior  43:20 56:17
  67:24 87:2,11 90:12
  109:17 110:1 126:3
  129:25 131:12
problem-solving
  161:12
problems  134:3 154:25
procedures  138:19
proceedings  146:12
  147:6,16
process  14:8 30:19
  40:11 119:12
produce  30:19
produced  12:1,13,18
  38:10 47:1,3 59:5,10
  60:16,19,20
producing  37:23
product  23:19 26:18
  27:20 38:6 42:8 57:7
  75:25 76:2,4,5,19,25
  77:2,4 108:7

production 11:25
76:20,21 78:25
productions 78:18
products 27:20 31:24
professional 18:11
professionals 152:16
professor 14:16,20
15:1,23 17:17 22:5
107:18
professors 43:18
169:4
proficiency 39:2,6
90:14 141:17
profiler 75:13
program 16:21
progress 75:7
project 14:9 92:8
promise 144:21
promises 109:4
promote 55:23
promoted 15:1,22
promoter 127:9
proper 24:14
property 37:13 121:6
122:3
proposition 55:13
propulsion 26:16
64:17
prospective 153:1
prostate 131:22
prostate-specific
69:21
protect 125:8 126:15
proteins 138:23
prothrombin 20:20
protocols 64:25
prototypes 43:20 58:8
provide 42:4 47:17
85:19 139:17,18
provided 12:11 127:25
144:6
PSA 69:20,21
public 85:21 88:7
89:2 126:13 127:6
144:19 159:7
publication 127:11
publicly 111:16
167:22
published 116:1
127:18,20,22 128:3

151:1 159:10 160:5
161:7
pull 64:15
pump 64:22
puncture 138:11
purpose 77:22,24
78:3,5
push 64:22
put 18:10 95:8 112:22
114:14 116:18 119:13
120:1 126:10 133:20
136:24 137:3 138:16
170:25
putting 42:7 112:18
140:25 151:22

---

## Q

Quake 107:16,17
Quality 134:3
quantitative 57:24
quarters 16:24
question 10:20,24
15:16 33:7 38:15
56:3 69:5 87:9 88:3
139:1,9,11 140:2
141:23 146:24 156:4,
11,15,23 158:6
163:9,14,15
questions 9:21 116:21
117:16,25 130:3,7
136:5 137:4 155:23
156:1 168:5 170:9,14
quickly 104:1
quit 16:7 23:15 114:8
133:21
quote 120:20 148:15
quoted 150:16
quotes 146:6,14 147:9
148:9,16 151:21
152:14
Quyen 8:14

---

## R

R&d 74:17 87:13 95:14
140:3,23
R-E-I-D 43:5
Rago 103:9,21 105:1
raise 43:12 69:22

raised 42:18 123:9
136:6
Rakoff 161:18
Ramesh 9:5,21 115:17
ran 134:2 164:22
rang 76:15
range 32:8 56:7 98:2,
24,25 99:2,9
ranges 98:8,19,21
99:4,12
Raphael 9:8
rate 22:15 24:7 26:1
31:15,20 56:10
rates 24:12 32:12
Raven 44:14
raw 71:11
RDX 75:12
re-add 64:11
reacting 143:4
reaction 129:11
read 12:24 42:4 87:7,
8 98:16 99:2 103:13,
21 104:11,16 105:1
115:6 116:4 126:21
134:9 139:4 142:3,18
144:10 146:4 150:12,
13,25 167:1,3 169:2,
11
reader-plus-cartridge
57:25
readiness 95:19
readjusted 98:3
ready 95:15
reagent 71:5
reagents 57:22 64:11
real 56:11 75:23
119:17
Real-time 42:20 43:25
44:7 45:3,7 51:16,18
52:17 53:21 54:4,20
76:14,19
reality 144:22 164:22
realize 94:19
reason 9:23 33:2
63:18 112:21 119:18
125:14 130:8 131:25
132:3,16 133:5
140:15,16 141:7
146:16
recall 17:12 19:2,11,
16 21:9 22:12,19,24

23:14,15,24 24:22
25:9,19,24 26:6
27:6,22 28:2,17
29:15,17 30:8 32:17,
21 33:24 35:8,19
37:3,17 38:4 41:18
50:20 54:8,9 57:18
63:13 64:18,23 76:4,
24 77:2 78:13 82:1
93:10 100:10 103:18
104:15,17 110:2,6,
10,14,16,20,23
112:9,18 115:19
116:8 120:9 124:6,9
125:21 130:1,9
132:9,25 133:12
134:15 135:21,22
136:16,20 145:6
149:7 150:18 151:11
158:3
**recalling** 64:19
**receive** 13:9 51:17,
19,23 52:12,17 57:19
64:10
**received** 12:25 13:11
18:12 53:3 164:2,11
**recent** 32:19 49:13
**recently** 32:18 119:2
**RECESS** 79:14
**recognition** 52:11
**recollection** 33:9
62:18 79:8 111:1
114:11 116:24
151:13,14
**recombinant** 30:20
**reconfiguring** 160:10
**record** 8:18,19,21
11:11 34:10 53:9,13,
19 79:9,12,18 80:16
87:8 90:5 108:21
117:2,6 145:11,15
147:22 168:7,11
169:3,12 171:8
**record's** 70:12
**recording** 8:16
**recordkeeping** 142:15
**recovery** 14:10
**recreate** 126:8
**recruited** 161:1,3
**reducing** 138:4
**Reed** 8:23 9:18 49:17
51:25 114:18 117:7

**reengage** 119:19
**refer** 60:8 68:6,7
80:16 98:12 160:14
161:9
**reference** 98:2,8,19,
21,24,25 99:2,4,9,12
159:21 160:1,4,9,16,
19,20 161:15 165:4
**reference-range** 99:23
**references** 60:9
**referred** 66:22 67:1,
14 150:9
**referring** 62:3,21
74:25 75:10,25 79:7
93:18,20 132:20
134:20 140:1 152:22
**refers** 132:21 144:12
**reflect** 111:8,9
**reflecting** 91:13,14
**regard** 127:5 133:14
153:14
**regularly** 158:8,11
**regulate** 113:16 114:8
**regulated** 113:18
141:16
**regulations** 96:2
**Reid** 43:4
**relate** 89:17 160:21
**related** 27:1 61:2,3
130:21 162:3
**relates** 31:23 68:8
**relating** 9:22 25:13
26:21
**relationship** 41:5
51:3 83:24 121:20
**relative** 98:24
**release** 19:8
**released** 143:3
**releases** 104:24 105:2
**releasing** 56:9
**reliability** 140:4
142:13
**reliable** 87:21
139:13,15
**rely** 161:15
**remarks** 120:10
**remember** 12:3,4 19:18
23:9 27:24 33:18
35:21,23 36:18 38:3
42:23 59:24 62:15,19

80:13 93:22 97:24
105:3 110:4 112:12,
14,24 115:10,12
117:11,15 118:6,15,
25 134:12,13 146:2
148:1
**remembering** 34:21
116:15
**remind** 75:14
**remote** 59:1
**removed** 61:16
**Renal** 102:12
**renamed** 60:5
**renewed** 47:21 48:5
**rented** 58:8
**repeat** 83:11
**report** 109:13
**reported** 95:25 98:9
**reporter** 8:14,22 10:8
28:14 33:12 88:11
89:13 108:20 110:24
113:6 136:5 137:4
144:14 146:22,25
159:18 171:9,15
**reporters** 109:15,18,
22,25 110:2,10
**reporting** 58:13
**reports** 62:14,20
141:21 142:3,18
143:3
**represent** 9:9,19
11:11 36:3,14 74:9
**representation** 83:15
143:9
**representative** 27:3
**represented** 123:14
**representing** 8:15
33:23
**represents** 16:21
**reproduce** 126:22
**reputation** 150:23
**required** 91:18 95:7
96:1 126:21 127:10
139:18 140:5,9
**requirements** 90:23,24
**research** 13:18 14:2
41:10
**research-and-
development** 90:16
**researching** 14:6

reserve  170:10
resides  170:1
resign  45:12
resigned  105:25
respect  30:18 118:5
  123:1 141:22 149:9
  156:10
respectful  155:24
respond  125:5 129:10
response  11:3 97:22,
  23 99:4 116:18
  123:23 124:21,22,25
  129:1,2,13 130:24
  139:14 158:5
responsibilities
  108:5
responsible  74:13
rest  28:1 120:14
Restricted  157:14
result  26:18 29:23
  30:6 63:23
results  71:11,12,15
  74:18 98:6,22 99:5,
  21 105:13
resume  170:11
Resumed  79:19
retail  85:19
retire  46:5
retired  14:13
retirement  45:24
  147:23
retiring  45:23 46:1
reveal  170:17
review  170:10
reviewed  96:25
reviewing  56:19
rewrite  160:23
REX  9:11
Richard  83:17 93:6
Rick  83:9
rise  129:14,22
risk  161:12
RNA  68:25
Road  49:12,24
Robert  9:19 21:25
Robertson  8:7 9:9,11,
  18 12:18,22 53:15
  79:21 93:16 108:19
  117:10 119:23 144:13
  145:17,24 147:24

148:11 152:5,18
  168:18,24 169:18
Robertson's  148:5
Robins  33:23
robustly  138:24
Roger  110:4 150:6,8,
  10
role  20:5 45:18 82:2
roles  74:5
roll  85:7
rolled  78:5
romantically  82:11,
  18,21,25 83:15
room  67:9 138:5
rooms  67:7
rose  74:7
rough  171:19
roughly  15:25 18:16
  42:17
Roughs  171:15
RSU  157:13
RSUS  157:12
rules  171:2
rumor  165:2
run  75:21,24 88:1
  94:2 95:1,2 101:2
  102:24 103:24 104:6
  105:17 132:12 133:2
  137:24 139:24 140:8
  141:14,21 164:20
  166:15
running  88:6,9,12,24
  89:1 95:4 96:15
  140:10

_____

                S

_____

S-E-R-A-T  28:7
S-E-U-R-A-T  28:9,10
S-M-A-B  155:3
S-Y-V-A  34:16
Safeway  149:2,3,10,
  15,18,22 165:12,16
said'  129:15,23
sake  80:16
sample  57:21 59:19
  60:4 61:17 71:7
  73:11 75:20 138:19,
  20,21

sample-collecting
  59:15 60:3 72:15,17,
  20,21 73:8
samples  63:24 88:1,6
  89:1 91:19 94:24
  133:3
San  8:9 22:4
save  150:23
saved  134:7
schedule  10:16
scholar  41:7
school  16:14 17:3
  58:12
Schultz  82:3,6 83:8,
  17
science  74:8 123:21
  124:4 160:21
Sciences  160:5,7
scientific  152:25
  154:14 155:2 157:6
  160:1,14 161:10
scientist  14:2
scientists  50:11 67:7
  91:16 92:8 160:22
screen  66:19 159:6
screws  151:23
scripts  111:14
scrutinized  152:3
search  11:19
seating  50:12
SEC  12:2,3
second-generation
  72:14,17,21
second-to-the-last
  148:2
secrecy  126:24
secrets  126:14 170:18
Securities  162:4
seek  24:23 138:13
seeking  27:4
Selects  105:4
self-contained  61:6
selling  141:2
sells  24:5
semiconductor  35:18
send  109:7
sending  122:23
senior  17:2 58:11
  131:23 132:15

sense  64:25 117:20
sensing  96:3
sentence  103:21
  132:10 148:2 169:15
separate  75:22
separately  73:24
September  87:3,12
  103:10 104:25 112:3
  113:1 158:1
sequence  107:13
sequencing  69:3
series  65:3,19,22
  66:25 68:1,2,4,8,9
  69:25 70:7 93:14
  146:3 162:3
serve  139:20
served  15:24
serves  58:25 64:14
service  105:6 139:17
serving  18:18
set  42:19 70:22 86:8
  120:9 121:4 133:2
sets  103:25
setting  33:11 95:9,24
  140:7
Seurat  28:4,16 29:20
Shapiro  80:24
shareholder  143:21
shares  52:22,24,25
Shea  134:8
Sheehan  80:25
Shield  33:15 149:5
short  51:7 129:7
  145:7 169:15,17
shortly  52:5 91:4
show  75:7 103:7
  104:20 107:8 111:3
  114:17 125:4,15,20
  128:21 130:17 137:7
  143:15 145:20 147:18
  157:17 159:16 161:24
showed  42:3 140:3
showing  100:4 104:21,
  23 111:6,22 114:23
  122:8 128:24 134:1
  150:4,21
shown  95:16 140:23
shows  144:20
sic  65:17 72:24 109:3
  112:16 119:7 138:9

139:8 144:14 168:15
side  33:22 35:4 36:3
  59:14 72:1,3 74:9,18
  87:13 140:3,23 155:2
  161:13
Siemens  96:13
signal  27:2 59:2
Signature  27:7
significant  32:1
  128:20
Silicon  105:10
similar  73:4 159:3
similarities  59:4
simply  33:5 109:13
simultaneously  41:13
Singapore  42:1
single  104:1,7
sit  42:15
site  36:2 59:1 73:7
sitting  51:8
situation  45:19
  119:18
sixth  152:9
size  138:5 159:2
skin  61:14 72:24
  73:1,2,6
skipping  152:1
slanted  159:3
sleeves  169:22
slide  100:10,12,15,21
  101:18 158:11
slides  74:25 157:25
slowly  24:12
SMAB  155:3
small  20:4 27:15
  64:21 75:20 91:19
  94:24 105:22 118:11
  138:15
smaller  65:2 91:19
  138:10,14
smile  146:11
Smith  8:25 33:19
sodium  69:12
software  65:12 66:11
  71:8,10 72:10
sold  21:5,8,10,12
  22:8 61:21 76:22
  78:18,21,24 79:4
sole  20:8

solicited  155:8
some-  32:8
sonicator  65:20
sophomore  42:3
sort  10:19 64:5 69:1
  152:17
sound  123:21 124:4
  146:18,21
sounds  58:19 81:7
  147:4,8
source  21:17,20
southern  36:2 161:18
space  50:5 85:19
speak  97:22 109:14,17
  110:17 152:12
speaking  14:4 78:8
  97:24 110:2,4,7,10
  146:24 163:13 170:7
special  132:14,22
specific  77:3 115:10
  116:15 156:1
specifically  23:9
  32:14 77:24 135:17
spectrophotometic
  77:17
speculation  107:4
spell  19:4 22:1,21
  26:8 28:5,21 34:15
  81:7 109:1 154:2
spend  122:1
spent  112:5 144:13
Spitalnik  154:6
Spitano  154:6
split  52:23
spoke  109:22 123:18
spoken  121:13 124:7
spokesman  136:24
spot  58:7
spring  42:18 54:17
  135:8 137:13
Sr  80:17
stabilization  59:20
stabilized  71:5
staff  16:17 125:2
stage  95:17
Stamp  93:13 108:21
  111:7,23 114:24
  122:9 157:20
stand  10:5 33:13
  157:13

Stanford  13:5,20
  14:12,15 15:7 16:22
  17:7,8,17 18:4,6,7,
  9,22 41:3,8 45:19,22
  46:5 55:7 82:8
  107:19
start  41:1 42:6,13
  134:23
started  32:16 41:6
  42:19 51:15 58:3
starting  41:20 43:21
startup  114:25 148:5
state  8:20 53:19
  71:17 160:2
statement  132:1,17,24
  133:6 141:1 144:6,10
  145:5
States  37:24
stating  12:24 92:17
statistics  160:19
Stay  148:14
stayed  54:4
STDS  102:18
step  45:13,14
stepped  88:18 105:25
steps  57:21
Steve  107:16,17 154:6
stick  113:4
stipend  41:10
stir  116:16
stock  52:16 157:14
stop  155:22 156:24
stopped  156:24
store  91:6
stores  85:19
story  129:20 144:16,
  18
straightforward
  135:19
Street  92:16 103:10
  104:12 110:25 113:21
  115:2 116:4 117:13
  118:22 122:10,12
  123:2,9 129:9 130:24
  134:2,10 135:11
strike  99:15
Stringfellow  36:1
Struggled  115:1
student  41:16 58:4
  148:5 155:4 169:7

students  58:4,14
studies  89:23 90:4,8,
  14
subject  10:20 18:23
  93:8 107:16 136:18
  143:21 160:18
subjects  79:24
  160:16,20
submissions  127:7
submitted  128:10
  151:19
subpoena  11:17
subpoenaed  11:5,16
successful  46:4
  148:12
Sue  154:4
suggested  160:22
suicide  121:13
suitable  105:22
sulfonating  14:9
summary  153:5
summer  42:1 110:16
Sunny  50:13 51:3
  79:25 80:1,7 81:17
  82:10,11 83:24
  123:1,6,13 125:23
Sunny's  122:23
Support  8:15
supposed  71:14 136:19
Supreme  161:23
surmise  105:21
surprise  106:17
surprised  92:19,22
  107:2
suspect  67:5 91:3,7
suspected  91:8,13
suspended  151:18
swear  8:22
Switch  79:24
sworn  9:12
system  30:24 31:1
  40:5 55:19,21 56:3,
  24 62:8 65:12 66:7
  67:5 71:9 92:5
  101:9,11,15 132:13
  133:15
systems  28:24 41:15
  65:20 161:4 165:18
Syva  34:12,14,15

## T

table  138:7 143:23
  144:3
taking  8:17 55:22
  64:5 119:7
talk  63:3 79:25 98:2
  123:5 127:15 135:20
  139:10 142:22 145:1
talked  11:17 78:17
  92:24 93:3,6 116:17
  142:19 162:13 165:9
talking  30:17 31:22
  72:23 78:10,11
  111:15 112:16,18,22
  122:20,24 131:7
  144:14
talks  161:11
task  56:16
TCSD  60:3 61:12 73:10
teaching  16:19 41:14
team  20:8 71:2,6,8
  72:13 98:8,18 135:5
teams  70:17,22 74:13
  75:11
technical  154:25
  161:13
technologies  86:8,17
  138:18
technology  47:18 74:9
  85:25 90:24 103:23
  115:1 119:11 123:21
  124:4 136:23,25
  137:23 138:17 139:1
  153:5 154:21 155:10
telling  127:9 144:17
  147:8
tentatively  170:22
tenure  15:23
term  16:10 48:16
  52:23 60:21 75:16
  87:19 147:5
termination  84:8
terminology  73:17
terms  18:10 25:21
  53:20 60:17 66:19
  67:4 110:21,23
  116:15 122:4 128:19
  146:5 160:10,14

tertiary  14:10

test  59:1 63:20 68:11
 69:25 73:6 89:10,18
 91:2 93:15,17,20
 94:6,7,9,21 96:5,25
 97:14,23 98:7,10
 99:21,25 100:22
 102:6 104:6,8 105:11
 119:25

testified  9:13 10:5
 33:12 34:20 40:15
 53:3 111:9 136:9
 163:2

testify  9:24 34:13
 35:4

testimony  10:2 33:3,
 10,16,25 38:1,4
 55:10 67:24 76:10
 90:12 99:17 129:25

testing  26:21 39:2,6,
 17 40:16,19,22 69:2
 70:3,5 71:21 73:12
 77:22 85:7 86:10
 90:14,20 91:24 92:3,
 4 94:15,16 99:25
 126:20 127:5 138:4
 141:17 142:6

tests  39:3,8,21 40:8
 62:6 74:14 85:22,24
 87:2,10,22 88:6
 89:1,14 92:17 94:2,
 25 96:14,25 98:13
 99:1,10,11,22 100:24
 101:2,8,17 103:25
 104:7 105:18 113:2,3
 114:9 128:1 131:21,
 22 132:12,18 133:2
 134:2,18 137:24
 139:12,15,24 140:7
 164:18,21,23 166:14

tests'  103:25

Tevanian  81:8

that'd  34:25

theranos  8:8 9:7,20
 12:10 33:3 41:1,6,21
 44:24 45:4 46:12,16,
 19 47:7,23,25 48:17
 51:11,16,18,23 52:17
 53:4,20 54:5,20
 57:7,14 58:19 59:11,
 12,13 60:3,15 61:3
 63:17,19 64:8 67:18
 73:10,11 76:8,12,19

77:1,10 78:16 80:2
 85:6,14,25 86:13,17,
 20 87:15,25 89:11,14
 91:16 92:9 97:16
 98:19 100:5 105:4,16
 106:12 109:4 113:3
 114:8,25 115:20
 116:14,21 117:14
 118:24 120:4,24
 121:6 124:20 125:3
 131:20 132:13 133:20
 134:2,17 139:12
 143:23 144:3,17
 148:4 149:9 151:17
 152:10 162:5,6 163:4
 164:18,20,22 165:12,
 18,23 166:13 169:22
 170:5

Theranos'  97:4 100:22

Theranos's  84:24
 103:23 130:24

there'd  62:22 71:2

there['s  148:4

thereabouts  13:14
 14:22,25

thermal  71:25

these--  156:2

thing  45:25 76:11
 118:23 170:22

things  13:17 14:21
 16:19 122:2 150:16
 166:23 169:20

thinking  58:16 94:12
 117:25 138:2

third-party  87:2,11,
 13,25 88:10,13,15,17
 91:3,8,18 92:18
 94:23 106:9,12
 117:14,19 118:1,2,6
 133:16 140:11 164:23
 165:24

Thomas  80:21

thought  54:15 55:5
 67:4 107:5 109:11,13
 113:15 121:1 126:10
 129:18 155:9

Thoughtless  169:7

thread  59:6

three-year  16:2,10

Thyroid  102:25

thyroid-stimulating
 103:1

Till  155:14

Tim  144:12 145:2

time  8:19 10:14,24
 16:4 20:20 24:20
 30:3,22 31:2,8,19
 32:13 42:5,20 46:3
 48:22 50:13,16 51:15
 52:1,10,18,22 53:6,
 8,12 54:24 55:3,9,17
 56:5,11 57:24 58:2,
 10 64:23 75:23 76:17
 79:11,17 80:14 81:3
 82:12,14 88:2,8
 91:15 92:13 93:1
 95:6,13,17 96:5
 99:13 104:6 105:17
 108:6 109:14,17
 111:14 112:5,23
 113:1,10,19 116:12
 117:1,5,13 118:7
 119:18 121:18 122:1
 125:23 127:8,20
 133:11 135:6,23
 136:1 144:20 145:7,
 10,14 146:4 148:15,
 18,25 150:13,14
 152:24 155:24 160:6
 168:6,10 171:7

time-based  29:6

times  10:18 32:8 46:7
 72:11 84:23 118:25

tiny  75:20

tissues  25:4

titer  55:25

title  81:22

titles  108:7

tobacco  38:17

today  8:14 9:21,23
 11:4 20:25 21:17
 22:8 24:1 51:11
 52:20 53:3 54:12
 63:7 84:22 85:4
 99:17 130:12 136:10
 138:6,11 139:12
 141:20 166:24 171:7

told  50:9 56:22 63:11
 78:20 94:6 101:7
 106:7,14 109:24
 120:21 123:22 124:4,
 20 125:6,13,17
 126:25 127:7 130:1
 140:19 141:12 152:10

toll  121:25
tomorrow  169:23
Tony  130:23 131:12
tool  73:3
tools  73:5
top  41:8 137:14,19
  143:20 152:10
total  18:2 48:14
totally  21:15
touch  66:18 159:6
town  114:13
toxic  36:2,12,25
TPSU  59:14 61:4,21
TPSU4  59:13
tracks  64:15
trade  37:21 126:13
  170:17
Tradewinds  35:7
traditional  132:14
  133:3
training  142:14
transcribed  33:11,25
transcript  137:12,17
  170:15,20 171:3,10
transfer  71:25
transferred  140:6,20
transition  63:23
transitioned  119:6
transitioning  52:10
translating  90:17
Translational  128:5
transmission  71:11
transparency  126:13
transporting  138:20
treat  55:23
Tremaine  9:5
trial  33:16 34:1,5,
  20,24 35:8,9,20,21
  36:8,22 37:2,4,9,16,
  18,25 38:1,7,11,15,
  19 63:17
trials  61:25 62:6,11,
  12 63:5,8
tricks  169:22
trips  103:24
troponin  40:5

163:7,8 164:12
165:11,16,23 166:6
167:4,19

true  65:24 130:10,13
  136:11 144:9 157:5
  165:8 167:15
truth  120:12,17
TSCU  60:2
TSD  61:3
Tube  59:25 60:5 61:12
  73:19
tuned  148:14
turn  131:16 169:20
turned  52:24
type  14:5 31:22
types  75:23
typically  70:9 85:1
  90:18 102:7
typo  137:15

U

U.S.  8:8,15
uh-huh  10:9
uh-uh  10:8
ultimately  42:7,14,17
  43:7 81:22 89:9
  91:22 126:17 127:11
unapproved  113:11
unaware  90:3
unbalanced  109:13
uncomfortable  10:17
  136:12,15
undergraduate  58:5
  148:7
underlined  101:1
understand  10:7,21
  11:24 46:25 48:19
  53:15 79:21 85:24
  90:3 91:15 117:22
  136:18 140:16 145:17
  168:15
understanding  12:6
  40:12 57:6 62:10,13
  65:13 84:16 85:14
  86:2 92:7 94:1 104:5
  105:16 108:3 119:23
  136:3,22 142:12,16
  153:22
understood  91:21
  108:1
unfair  120:4
unit  60:17 157:14

unitary  72:20
United  37:23
units  59:16 67:13
  92:1
university  13:3,5,21
  54:25 153:25
unlike  10:15
unmodified  117:19
  118:6
unusual  99:3,15
update  58:15
updated  160:10
upset  109:9,10,11
urgent  97:2
urine  137:25
utility  62:4

V

vacuum  63:24 64:15,21
Vague  120:5
Vaguely  117:17
validate  127:4
validated  39:8,17
  89:12,15,22
validating  90:16
validation  39:21
  40:8,11,16,19,22
  89:23 90:4,8,13
Valley  105:10
valveless  31:6
Vanasen  35:6
variables  98:9
varied  48:21
variety  74:5
VCS  43:12,15
VCS'  57:1
venous  113:4 133:17
  138:11
venture  42:15,21
veracity  116:22 120:9
  130:3,7 134:17
verbal  10:11
verification  74:13
  95:7,10,15,17,19
  96:1
verified  95:22
verify  62:4 107:6
  127:3 147:11

vernacular 152:18
version 57:14 58:19
 63:22 158:20
versions 59:15 60:1
versus 96:5
vessels 65:5 71:4,5
vice 161:4
video 8:16 170:15
videotape 8:7
view 137:2 138:13
viewed 95:13
viral 100:25 102:5,10
virus 119:25
viruses 68:21
vision 42:16 55:12,15
 56:25 140:5 153:15
visited 166:16
voice 110:25
volumes 138:10,11,14
voluntarily 11:1
 151:17
volunteered 161:2
vouch 134:16 136:25
vouching 142:5
VP 155:6
Vroom 112:10

## W

W[all]s[treet]j[ournal
 123:24
Wait 118:15
waits 151:18
Walgreen's 88:8 91:5
Walgreens 85:7,8,15
 97:15 105:4 148:19,
 24 165:24 166:7,15
walking 126:11
wall 92:16 103:10
 104:12 110:25 113:21
 115:2 116:4 117:13
 118:22 122:10,11
 123:1,9 129:9 130:24
 134:2,10 135:11
wandering 155:25
wanted 21:16 42:4,6
 46:2 72:8 97:13 98:5
 113:16 114:7 123:10,
 12,20 124:3

wanting 42:13
Washington 153:25
waste 36:2,12,25
ways 42:7 45:20 99:11
 155:9
wealth 154:23
Weaver 134:4
Web 151:8,11
week 16:23 51:14 85:2
 118:25 119:5 143:6,9
wellness 55:23 85:20
wife 120:21
Wikipedia 28:8
William 42:24
Wilmer 9:6
Windows 65:15
withdraw 39:19 44:23
 46:17 47:5 56:17
 60:25 65:25 69:4,5
 158:6 163:14,15
 164:19
witness's 156:10
woman 110:14
wondered 125:3
word 26:10 150:1
 158:11
words 114:15 124:6
work 19:9 23:13 24:21
 25:23 26:20 27:5,10,
 21 29:18,23 30:6,13,
 21 31:2,8,21 41:12
 42:12 46:3 54:25
 62:15 70:6 74:12
 78:16 91:17 122:1
 152:11 160:10
workbench 35:17
worked 14:7,9 19:7
 20:12 21:21 25:12
 26:14 29:9 30:22
 31:6 41:17 42:1
 57:7,9 58:1,4,5,6
 70:22 71:7,18 72:13,
 15,22 77:21 90:21
 101:21 120:22,23
 121:25 122:4 143:6,8
 161:5,17
working 18:3 20:5,11,
 13 26:15 27:14 29:21
 31:23 32:22 39:10
 63:17 92:8 108:2
 112:9 120:21,25

121:5,16,20 149:25
works,' 152:5
world 127:9
would-- 116:8
Wright 9:4
write 97:12 107:20
 109:5 111:14 122:19
 123:16,19 124:1
 126:17 128:18 129:5
 161:2
writes 122:22 131:19
 132:11
writing 71:8 96:23
written 40:18 42:4
 47:4,6 103:9,21
 104:12 108:25 115:2
 128:10,25 130:2
 150:6 169:6
written/published
 40:21
wrong 73:11
wrote 111:12 125:11
 129:16 131:3 160:13
 161:6,8
wry 146:11

## X

XP 96:13

## Y

year 13:23,24 14:11,
 17 15:4,10 17:8,18,
 20,21 18:1 34:17
 36:19 41:9,19 42:3
 44:17 47:10,12 48:13
 51:24 52:6 80:3
 93:20 94:9 106:2
 154:20 155:11,12
 157:4,15
years 13:9 15:24
 19:11 24:12 59:6,10
 62:15 72:11 74:10
 120:23 122:4 125:7
 126:8 144:18 146:7
Yorker 110:5
young 50:24 74:1

**Z**

**Zika**  119:24,25