**\* \* \* REDACTED VERSION FILED PURSUANT TO COURT ORDER ECF NO. 315 DATED JULY 23, 2018 \* \* \***

# Exhibit C

IMPORTANT INFORMATION!   IMPORTANT INFORMATION!

It is understood by all attorneys and/or their staff using, saving onto a hard computer disk, rough draft transcript that:

1. The following is an unedited rough draft transcript. Various corrections and/or changes may be made before the final version is complete. The use of this rough draft transcript is limited by C.C.P. 2025.540(b). This rough draft transcript may not be certified and may not be used, cited or transcribed as the certified transcript of the deposition proceedings, nor may it be cited or used in any way or at any time to rebut or contradict the certified transcript of deposition proceedings. This reporter, as well as any affiliated court reporting agency, will not be responsible for any variance of this draft from the final transcript.

2. Because of the nature of stenographic outlines, differences WILL exist between the (real-time) rough draft copy and the certified transcript prepared by the reporter. Those differences will include the following, among others:

        A. Words/spellings may change;
        B. Page and line numbers will change;
        C. Punctuation may change; and/or
        D. Quotes may change.

3. Providing a real-time ASCII and/or e-mail or saving real-time/rough draft onto a computer hard drive will only be provided when a certified copy is purchased, and there will be a charge for the real-time rough transcript in addition to the charge for the certified copy.

--oOo--

THE VIDEOGRAPHER: Good morning. We are on

the record. This is the recorded video deposition of

Richard Kovacevich in the matter of Colman vs. Theranos

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **                    ** ROUGH DRAFT **                    ** ROUGH DRAFT **

incorporated in the United States District Court,

Northern District of California, San Jose division, Case

No. 5:16-CV-06822-NC taken on behalf of the plaintiff.

This deposition is taking place at Hagens Berman, 715

Hearst Avenue, Berkeley, California, on May 24, 2018, at

9:40 a.m.  My name is Andrew Martin.  I'm the

videographer with U.S. Legal Support, located at 44

Montgomery Street, Suite 550, San Francisco, California.

Video and audio recording will be taking place unless

all counsel have agreed to go off the record.

            Would all present please introduce themselves,

beginning with the witness.

            THE WITNESS:  Dick Kovacevich.

            MR. RUBINSKY:  Thomas Rubinsky of Munger

Tolles and Olson for the witness.

            MR. OLSON:  Ron Olson, Munger Tolles and

Olson.

            MS. EAGAN:  Shannon Eagan of Cooley LLP for

Elizabeth Holmes.

            MR. RUMMAGE:  Steve Rummage of Davis Wright

Tremaine for defendant Ramesh Balwani.

            MR. MUGMON:  Michael Mugmon of Wilmer Hale for

defendant Theranos.

            MR. KATHREIN:  Reed Kathrein with Hagens

Berman for plaintiffs.


UNEDITED AND UNCERTIFIED

        MS. SMITH:  Danielle Smith with Hagens Berman

for plaintiffs.

        THE VIDEOGRAPHER:  The certified court

reporter with Quyen Do.

        Would you please swear in the witness.

                --oOo--

            **RICHARD MARCO KOVACEVICH,**

    having been first duly sworn, was examined and

                testified as follows:


                    EXAMINATION

BY MS. SMITH:

        Q    Good morning.  Please state your name for the

record.

        A    Dick Kovacevich.

        Q    Is that your legal name?

        A    Richard Kovacevich.  Richard Marco Kovacevich.

        Q    Could you spell the middle name?

        A    M-a-r-c-o.

        Q    How old are you?

        A    74.

        Q    Where do you live?

        A    San Francisco, California.

        Q    Have you ever had your deposition taken

before?

                UNEDITED AND UNCERTIFIED

         A    I have.

         Q    Are you familiar with the deposition

procedures and how can could take a break if you wanted

you could use the restroom if you want to?

         A    Yes.

         Q    Okay.  Are you -- do you understand that even

though we're sitting in an informal conference room your

he answers here today are made under penalty of perjury

and you are required to tell the truth as if you were

sitting in court?

         A    I am familiar with that.

         Q    Okay.  Okay, going to hand you our first

Exhibit, Plaintiff's Exhibit 111.

                  (Exhibit 111 marked)

BY MS. SMITH:

         Q    So are you here today because you are

subpoenaed?

         A    Yes.

         Q    Is that the subpoena you received?

         A    I believe so.

         Q    Could you review this?

         A    I have previously, yes.

         Q    And did you speak with your attorney about it?

         A    I did.

         Q    Okay, and you agree to produce documents

                  UNEDITED AND UNCERTIFIED

before speaking to your attorney, correct?

    A    Correct.

    Q    Okay.  Can you describe your educational background, please?

    A    I graduated from high school and I went to Stanford University and had a bachelor of science in industrial engineering, master of science in industrial engineering and a master's in business administration.

    Q    Could you describe your work background?

    A    I joined General Mills out of business school. From there, I went to Citicorp in New York, from there, to Norwest Bank in Minnesota.  And from there -- Norwest acquired Wells Fargo and then -- and became part of -- they changed their name and became Wells Fargo.

    Q    What -- what was your position at Wells Fargo?

    A    I was chairman and CEO.

    Q    How many years?

    A    I was CEO for eight years and chairman for nine years -- for -- yeah, 10 years as chairman.

    Q    For 10 years you served as CEO?

    A    Again, that's -- that's of the entity called Wells Fargo, but before that I was CEO of Norwest, so I don't know which firm you want to be talking about.  So maybe you can add . . . six years to all of those, if you want to start with Norwest.

**ROUGH DRAFT**          **ROUGH DRAFT**          **ROUGH DRAFT**

Q     What year did Norwest acquire Wells Fargo?

A     It was 1998, November 2nd.

Q     So you were chairman of Wells Fargo from 1998
through . . . ?

A     2007.  Excuse me.  Chairman?  Through 2009.
CEO through 2007.

Q     What did you do after that?

A     I retired.

Q     You've been retired for the past 10 or so
years?

A     Right.  Since 2009.

Q     What do you do now?

A     I'm retired.

Q     You serve on any boards?

A     I serve on some not for profit boards.

Q     Any other boards?

A     No.

Q     What are the nonfor plaintiff boards that you
serve on?

A     San Francisco Museum of Modern Art.  I'm
overseeing of Hoover Institution at Stanford University.

Q     Anything else?

A     No.

Q     Since you retired, have you held any other
positions?

UNEDITED AND UNCERTIFIED

A    Yes.  I've been on other corporate boards, and I've had other not for profit boards.

Q    What other corporate boards do you serve on?

A    Let's see, since I retired, at Cisco, Cargill, Theranos.  I think that's it.

Q    Any other not for profit boards other than the San Francisco Modern Art Museum and the Hoover Institute?

A    Symphony.  San Francisco Symphony.

Q    For how many years?

A    About 18, I think, somewhere in that --

Q    When did you leave the board of the symphony?

A    About two years ago.

Q    How did you prepare for this deposition?

A    I met with my attorney for a couple hours, and that's about it.

Q    Did you review any documents?

A    I did.

Q    Which documents?

MR. RUBINSKY:  It's work product.

BY MS. SMITH:

Q    Did you search for any documents?

A    You mean through a computer or something?  No. I -- I reviewed documents with -- with Tom.

Q    You didn't have any files?

UNEDITED AND UNCERTIFIED

A    No.

Q    For yours -- for yourself?

A    I don't.

Q    Did you read any witness statements?

MR. RUBINSKY:  Are you asking which documents

reviewed.

MS. SMITH:  [Nodding.]

MR. RUBINSKY:  Again, I object on work product

grounds.  I instruct the witness not to answer.

BY MS. SMITH:

Q    Your statement is work product?

MR. BENEDETTO:  Could you speak up just a

little?

MS. SMITH:  Is a witness statement work

product.

MS. SMITH:  The question which documents did

we review together to prepare today is work product,

yes.

BY MS. SMITH:

Q    So did you didn't review any witness

statements?

MR. RUBINSKY:  We're -- we're not answering on

the grounds of work product.  That was the objection.

BY MS. SMITH:

Q    Did you review any videos?

UNEDITED AND UNCERTIFIED

MR. RUBINSKY:  Same objection.

BY MS. SMITH:

Q    You review any other materials aside from with your attorney?

A    No.

Q    Did you make any searches besides from -- with your attorney?

A    No.  Well, again, without my attorney, I did not.

Q    Have you ever been involved in a lawsuit besides this one?

A    Yes.

Q    Which ones?

A    I don't know if I can remember.  I was chairman and CEO of Wells Fargo.  There there were many lawsuits.  Well, this was at Norwest.  There was a class action on -- I forget what the class action was.  I'm -- a couple -- I believe their laws or something and this was a long long time ago.  There were lawsuits relative to corporate trust.  Many, many lawsuits.  These are -- I'm talking about depositions.  I mean, I don't -- I -- I couldn't even count the number of lawsuits that I was -- I was named in.  But depositions and so on, and there was -- that . . . I can't remember.

Q    How many depositions have you ever taken?

A    I would say this is probably my fifth, if I can remember correctly.

Q    Your fifth deposition?

A    Yeah.

(Discussion off the record)

MS. SMITH:  Which also I can now remember a tax issue, state tax issue in Minnesota what was lawsuit -- a state -- this was for Wells Fargo -- well, it was actually Norwest, but during my time at Wells Fargo.

BY MS. SMITH:

Q    Anything else come to mind?

A    No response.

Q    Do you have any background or training in laboratory science?

A    No.

Q    In pathology?

A    No.

Q    Clinical science?

A    No.

Q    Do you have any background in drug testing?

A    No.

Q    Do you have any science background?

A    I have a bachelor's and master's in engineering.  I don't know if that's science, but . . .

UNEDITED AND UNCERTIFIED

Q    So -- but your engineering master's has nothing to do with blood testing or laboratory science or anything like that?

A    No.

MR. RUBINSKY:  Objection.  Compound.

BY MS. SMITH:

Q    Your master's in engineering has nothing to do with laboratory science, correct?

A    That's correct.

Q    Your master's in engineering has nothing to do with pathology, correct?

A    Correct.

MS. EAGAN:  Object to form.

BY MS. SMITH:

Q    At the time you joined the Theranos board, where did you get your general understanding about blood testing technology?

MR. RUMMAGE:  Object to form.

MS. SMITH:  I didn't have any knowledge prior to joining the Theranos board.

BY MS. SMITH:

Q    Did -- did anyone explain anything to you?

MS. EAGAN:  Object to form.

MR. RUBINSKY:  Objection.  Vague.

THE WITNESS:  I had discussions with Elizabeth

before deciding to join the advisory board.

BY MS. SMITH:

    Q    What were the discussions you had?

    A    Talking about the company and -- and her vision for the company and and where she wanted -- where the company was at the time and where she wanted to take the company.

    Q    Where did she want to take the company?

    MS. EAGAN:  Object to form.

    MS. SMITH:  She wanted to start out with invasive technology related blood testing and go beyond that to be a leader in health care, starting out in the blood testing field and to revolutionize health care I think would be her words.

BY MS. SMITH:

    Q    You said she talked about where the company was.  Where was she describe as where the company was?

    A    It was just starting up and they were hopefully within a few years of -- would beginning delivering blood testing.  When did you join the board of Theranos.

    A    I think it was in the middle of 2013.

    Q    Do you remember being towards the end of July 2013?

    A    That -- yeah, I think that's exactly, right --

Q    Were you there been Dave Bois joined in
July 2015?

A    I thought he had joined before me, but
I -- I'm not totally sure of that.

Q    When do you think he joined?

A    Well, I think he was the counsel -- I know he
was a counsel on a big lawsuit for many years before I
joined.

Q    But I wasn't formally on the board when you
joined?

A    I -- I --

    MS. EAGAN:  Object to form.

    MS. SMITH:  -- I don't know the answer to
that.

BY MS. SMITH:

Q    Are you still on the board of Theranos?

A    I'm not.

Q    Do you remember when you left?

A    I believe it was early 2017, like February.
But, again, not sure of the exact date.

Q    Was there a point where you left and you came
back on?

A    No.  I was -- I started in -- as -- an
advisory director, and -- and then later on, joined as a
fiduciary director.

UNEDITED AND UNCERTIFIED

Q    Remember the dates?  You said at first you
started as an advisory director.  At what point did you
become a fiduciary director?

A    I think it was the middle of 2016.

Q    Did you resign from the board?

A    I did.

Q    What was early 2017, right?

A    Mm-hm.

     THE REPORTER:  Is that a yes?

     MS. SMITH:  Yes.

BY MS. SMITH:

Q    Where did you tell the other directors about
while you were leaving?

A    Well, I joined the board as an advisor and I
would no have joined the board if it had been a
fiduciary board at that time.  And I expected that it
would continue to be an advisor and then when some of
the issues occurred with Theranos, Elizabeth asked me if
I join the fiduciary board.  I told her that -- that I
did not wanted to do that, because it was never my
desire to be on a fiduciary board or to spend that much
time again asked if I would do that and I said I would
do that for only a short period of time, and when I felt
that I had done as much as I could do, I would resign
and under the circumstances that's what we decided to

                    UNEDITED AND UNCERTIFIED

do.

    Q    So that's what you explained to Elizabeth, right?

    MR. RUBINSKY:  Objection.  Misstates testimony.

    MS. SMITH:  I said what I said.  I'm not sure that I understand the question.

BY MS. SMITH:

    Q    Was that explanation what you told the other detectors about why you were leaving?

    A    Yes.

    Q    What did you tell Elizabeth Holmes about why you were leaving?

    A    I told her that -- and she recalled that this was the agreement, and we both felt that at the time that I resigned, it was appropriate.  I had done what I was asked to do, and so it was complete agreement.

    Q    What were you asked to do?

    A    To be on the fiduciary board to help through the crisis and -- and then leave as soon as I thought -- we thought that I had contributed as much as I could contribute.

    Q    Did any other directors leave the board?

    MR. MUGMON:  Object.  Form.

    MS. SMITH:  Yes, I -- I'm trying -- I think --

well, again, we're talking about the fiduciary board.  I

think at the time that it was clear that there were two

boards:  The advisory board and a fiduciary board.

The -- which I was not on at the time.  It was after

that.  Some directors left the fiduciary board, and then

some more came on the fiduciary board and I'm trying to

remember.  I think -- I think general -- general Mattis

stayed on until his payment -- before the appointment,

when was asked to consider being secretary of defense.

I think Reilley Bechtel left.  I can't remember if it

was at the -- right at the first time before I got on

or -- or shortly after that.  And I think that's it.

But, again, I don't recollect.

        Q    You said you're referring to the fiduciary

board?

        A    I am.

        Q    You remember if any directors left the

advisory board?

                MR. MUGMON:  Objection.  Form.

                MS. SMITH:  The advisory board was eventually

shut down.  So all the other people who were not on the

fiduciary board, but were on the -- the board of

counselors, the advisory board, all left when it was

shut down.

BY MS. SMITH:


                    UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **    ** ROUGH DRAFT **    ** ROUGH DRAFT **

Q    When was the advisory board shut down?

A    I don't remember, but it was probably 2016 sometime, late 2015, somewhere in there.

Q    You were there when it was shut down, right?

A    Yes.

Q    So everyone who was on the advisory board when it was shut down got moved over to the fiduciary --

A    No.  No.  I'm saying most of them did not go to the fiduciary board.  It was shut down.

Q    They just left?

A    Right.

Q    Do you remember why they left?

A    Because they -- because Elizabeth shut it down.

Q    Was that all?

A    That's what they were there for.  I'm not sure, again, I understand the question.  If they shut the board down, then the people who were on that board were no longer on that board.

Q    Do you remember why David Bois left the board?

A    David felt it was time for him to the leave the board as well.  I don't know his reasons.

Q    Did it have anything to do with Elizabeth Holmes refusing having him toed customary active blood test with the Edison?

UNEDITED AND UNCERTIFIED

MR. RUBINSKY:  Objection.  Calls for speculation.

MS. SMITH:  I have no idea why he left the board.

BY MS. SMITH:

Q    Did you ever have disagreement with Theranos management, meaning Elizabeth Holmes Ramesh Balwani?

MR. RUBINSKY:  Objection.  Compound.

MS. SMITH:  Would you.

BY MS. SMITH:

Q    Did you ever have disagreement with Theranos management as in Elizabeth Holmes?

MS. EAGAN:  Object to form.

THE WITNESS:  Again, repeat the question, I'm still trying to understand what . . . ?

MS. SMITH:  Can you please repeat the question?

(Record read as follows:

"QUESTION/ANSWER          :  ")

THE WITNESS:  As of Elizabeth Holmes, you mean did I have a disagreement with Elizabeth Holmes is that the same thing as your question.

MS. SMITH:  Yes.

MS. EAGAN:  Object to form.

THE WITNESS:  I wouldn't call it anything as a

UNEDITED AND UNCERTIFIED

disagreement.  We've had discussions and there might

have been differences of opinion, but I wouldn't put it

into a disagreement category.

BY MS. SMITH:

    Q    So you approved of everything she did?

        MR. RUBINSKY:  Objection.  Misstates

testimony.

        MS. EAGAN:  Object to form.

        THE WITNESS:  That's not what I said.

BY MS. SMITH:

    Q    What did you approve of what she's been?

        MS. EAGAN:  Object to form.

        MR. MUGMON:  Objection to form.

        THE WITNESS:  I didn't either -- there are

many things I neither approve or disapproved.

BY MS. SMITH:

    Q    What are some of the things that you

disapproved of?

        MS. EAGAN:  Object to form.

        MR. RUBINSKY:  Objection.  Vague.

        THE WITNESS:  Well, I -- I don't remember

disapproving with anything that she did.

BY MS. SMITH:

    Q    What didn't you approve of, but also didn't

disapprove of?

        MS. EAGAN:  Object to form.

        MR. RUBINSKY:  Objection.  Vague.

        MS. EAGAN:  Sorry.

        THE WITNESS:  There's probably thousands of things that we discussed, but we didn't take an approval of it.  It was just discussed, and she told us what she was doing and she did it.

BY MS. SMITH:

    Q   Can you give an example?

        MR. RUBINSKY:  Objection.  Vague.

        THE WITNESS:  She decided to open stores at -- with Walgreens.  Maybe I should put this in context.  We were an advisory board, not a fiduciary board, and our job was to advise Elizabeth on things that she wanted to do, give our opinions, and then she would decide what to do.

BY MS. SMITH:

    Q   So you didn't have any management role with Theranos?

    A   None.

    Q   Did you have any decision-making authority at Theranos?

    A   None.

    Q   Who made the decisions?

    A   Ultimately Elizabeth made the decisions.

Q    Did you make any statements to investors about Theranos?

A    I -- I wouldn't call it statements.  I had conversation with terminals investors of Theranos.

Q    Which one?

A    The Eccles family »»»[SP]«««  in salt lake City.

Q    Could you spell that?

A    E-c-c-l-e-s.

Q    Do you remember what you told them?

A    We were simply talking about how things were going at Theranos and general comments on -- on the activities at Theranos.

Q    Did they decide to investor after talking to you?

A    This discussion was years after they had invested.

Q    Did your blood tested at Theranos?

A    I did.

Q    It was a finger stick or venue news draw?

A    Finger stick.

Q    How was the process explained to you?

MR. MUGMON:  Object to form.

THE WITNESS:  It wasn't explained.  Elizabeth said do you want to see how this done I said, yes, and

and she pricked my finger and took -- took the test.

BY MS. SMITH:

    Q    Was this at headquarters?

    A    In headquarters.

    Q    In Palo Alto?

    A    Well, it was the headquarters in Palo Alto
before the last headquarters.

    Q    Did she tell you where the blood was going to
be tested?

    A    She tested it right there on -- on the
machine.

    Q    What machine?

    A    Her proprietary technology machine.  At that
time.

    Q    Was it the Edison?

    A    I -- I don't know the names of the machines.

    Q    Do you recall the size of the machine?

    A    It was I don't know about something like this
[indicating], what, 2 feet by 2 feet -- 2 feet cube,
something in that category.

    Q    Did she say anything about any third-party
devices being used?

    A    No.

    Q    Did she say anything about the blood being
tested on a Siemens on ADVIA machine?

** ROUGH DRAFT **      ** ROUGH DRAFT **      ** ROUGH DRAFT **

            MR. RUBINSKY:  Objection.  Compound.

            THE WITNESS:  She didn't.

BY MS. SMITH:

    Q    She didn't mention Siemens or ADVIA, correct?

    A    Correct.

    Q    Going back to my earlier question, did you ever have any disagreements with Theranos management as in Ramesh Balwani?

            MR. RUMMAGE:  Object to the form.

            THE WITNESS:  What's the last words?  With -- what --

            MS. SMITH:  Ramesh Balwani.

            THE WITNESS:  About him?  I'm still -- don't understand --

            MS. SMITH:  Any disagreement whatsoever.

            THE WITNESS:  With either one?  I'm still trying to figure out what you're asking.

            MS. SMITH:  Could you please repeat the question.

            MR. OLSON:  Could you raise your voice.  That is not a microphone.  This is -- your talking about whole table and I'm having trouble picking up.  Partly it's my own ears.  I'm not -- shot too many shotguns.  I would really appreciate if you could lift up your voice.

            (Record read as follows:

            UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **       ** ROUGH DRAFT **       ** ROUGH DRAFT **

"QUESTION/ANSWER        :  ")

MR. RUMMAGE:  Object to the form of the question.

THE WITNESS:  I repeat we were -- I was an advisory director, and most likely Elizabeth, but sometimes Sonny would present -- with talk about things that they were -- wanted to do or arguing and so on.  We would give opinions.  We might be giving opinions on what they were doing, and then they would do it or not do it as the case may be.  So there was -- there was nothing to disagree with, because we were simply there to advise and they made the decisions.

BY MS. SMITH:

Q    Did you agree with everything Sonny Balwani did?

MR. RUMMAGE:  Object to the form of the question.

THE WITNESS:  I -- as I already mentioned, I -- I didn't agree or disagree.  I advised, and they made the decision.

BY MS. SMITH:

Q    Did they ever make a decision that went again your advisement?

MR. RUBINSKY:  Objection.  Vague.

MR. RUMMAGE:  Object to form of the question.

UNEDITED AND UNCERTIFIED

THE WITNESS:  I -- I can't -- I don't remember anything that was, you know, monumental.  I -- I -- you know, when I -- when I say me, it was us, the advisory committee.  We were -- maybe have differences of opinions within the complete and we may change our decisions as we discussed, but with the activity was not about agreeing or disagreeing.  It was here's our opinion.  You know, the business better than we do, and -- and I never thought of it as either agreement or disagreement.  It was here's -- here's our thoughts on the activities and we were not in the room and people would change their thoughts.

BY MS. SMITH:

     Q     Did you take votes on your thoughts?

     A     No, because it was advisory.

     Q     Did you take any votes at all?

          MR. RUMMAGE:  Object to the form of the question.

          THE WITNESS:  Not that I recall.

BY MS. SMITH:

     Q     As a fiduciary board, did you ever take any votes?

     A     Yes.

     Q     Do you recall what?

          MR. MUGMON:  Sorry.  Could you speak up?  We

UNEDITED AND UNCERTIFIED

don't have a live feed down here.

BY MS. SMITH:

    Q    I asked do you recall what votes you took on the fiduciary board.

    A    I don't.  I mean, I -- it's . . .

    Q    But you recall taking votes?

    A    Yes.

    MR. OLSON:  Presume to have the minutes.

BY MS. SMITH:

    Q    How did you meet Elizabeth Holmes?

    A    So, I have a very close relationship with George Schultz, and George asked me several times whether I would consider joining the advisory board of Theranos, and I said, no, thank you.  And -- and eventually, he convinced me to at least meet with Elizabeth, which I did agree to do.  And he set that up.

    Q    Is that how you were introduced to Theranos?

    A    Yes.

    Q    What conversations did you have with Elizabeth Holmes with Theranos' technology?

    MR. MUGMON:  Objection.  Form.

    THE WITNESS:  The technology was discussed many, many times, the very first meeting when we -- when we pricked my finger we talked about this machine that she put the test in, and it peeled out what the test

results were.

BY MS. SMITH:

     Q     Did she say anything about finger Stick vs.

venous draws?

     A     Not at that time.

     Q     What is it about the technology that she

discussed?

          MR. RUMMAGE:  Object to form.

          THE WITNESS:  She just said it was a

proprietary machine that it was able to test blood in

small samples of blood with this -- finger stick and

that she believed it had would be faster, cheaper, and

better than what is the existing way of testing blood.

BY MS. SMITH:

     Q     When did you have these conversations?

     A     At -- at -- just before I joined the board at

the meeting that George Schultz set up.

     Q     Was is that in July 2013?

     A     I -- I -- it was before that, and I don't

remember I -- I -- I recollect I might have had two

meetings with her before I joined the board, so it could

have been, you know, early in July or before the July

time frame.

     Q     2013, right?

     A     2013 -- yeah, 2013, yeah.

                    UNEDITED AND UNCERTIFIED

Q       When she said small samples of blood, what you

did understand that to mean?

A       The prick that she took instead of a big

needle.

Q       A prick where?

A       I think it was this finger, somewhere

indicating].   One -- took one of my fingers and

[indicating].

Q       Did she say anything else about the

proprietary technology or small samples of blood?

MR. RUMMAGE:   Object to form.   Vague as to

time.

THE WITNESS:   Not that I recall.

BY MS. SMITH:

Q       You recall having two meetings before you

joined the board in -- and what you could remember was

proprietary machines and small samples much blood?

A       I think you're asking a question about

machines.   We talked about other things that --

Q       What did she say about the machines?

A       She -- she said that this -- it was a

proprietary machine that would be capable of conducting

test with very small blood samples such as the prick she

did to me and that technology with be cheaper, faster

and better than current blood testing procedures.   And

UNEDITED AND UNCERTIFIED

less painful.

    Q    Remember anything else?

    MR. RUBINSKY:  Objection.  Vague.

BY MS. SMITH:

    Q    From your discussions with Elizabeth Holmes
prior to joining the board, do you remember anything
else?

    MS. EAGAN:  Objection.  Vague.

    THE WITNESS:  We talked about George and my
background and her background, and so on, but nothing --
again, I thought we start with the question of
technology, nothing more on technology.  It was -- it
was on my career and so forth and her needs for advice
and where I could with my background would be useful to
her and whether I would be interested in providing
advice to her from time to time.

BY MS. SMITH:

    Q    Your understanding at the time you join the
board was the Edison Theranos' signature device?

    MS. EAGAN:  Objection.  Form.

    THE WITNESS:  I don't know anything about
Edison or some device that was on a table.  I don't know
the name of it.  She called it proprietary technology.

BY MS. SMITH:

    Q    The device she showed you when you met with

her, do you think that was the signature device?

        MS. EAGAN:  Object to form.

        THE WITNESS:  I have no idea what it was.

BY MS. SMITH:

    Q    Did she tell you anything about Walgreens?

        MR. RUBINSKY:  Objection.  Vague.

        THE WITNESS:  I don't remember whether it was
at that time or a later time, but she did discuss
that -- that she was about retail, she was likely going
to go retail at some time, but I don't remember whether
it was a specific name or not.  At that time.

BY MS. SMITH:

    Q    Did she tell you that the device that was on
the table that she used to prick your blood with, did
she tell you that she wanted to eventually sell that
device?

        MR. MUGMON:  Objection.  Form.

        THE WITNESS:  We had -- I don't recall having
any more conversations with the device other than what I
said, that this is the proprietary technology that -- we
didn't talk about devices or technology to.

BY MS. SMITH:

    Q    Did she say any.

    A    To my recollection

    Q    Did she say anything about the technology

UNEDITED AND UNCERTIFIED

being used for rolled out for commercial use?

          MS. EAGAN:  Object to form.

          THE WITNESS:  What do you mean by commercial

use.

BY MS. SMITH:

     Q    As in being sold to other companies?

     A    She was never talked about selling the device.

     Q    Did?

     A    It was just using device.

     Q    Did she talk about the device being used by

Walgreens or CVS or other companies?

          MS. EAGAN:  Object to form.

          THE WITNESS:  As I said, I don't recall her

talking about specific companies.  I just recall her

saying that she would -- she was seriously thinking

of -- of -- of using the device with retailers.  Again,

at that time.  Later talked a lot of other -- other

retails or about specific retailers.

BY MS. SMITH:

     Q    She did not mention any specific retailers?

     A    I don't recall that she did at that time.

     Q    So at the time you joined the board, what did

you understand Theranos' technology to consist of?

     A    A -- a nanotainer, which was the prick -- the

device to easily prick your finger, the proprietary

                    UNEDITED AND UNCERTIFIED

technology machine that I described to you, and then software that would -- which was capable of taking the data from the machine, capturing that data, keeping that data so that it could be available to whoever they thought would want it, from doctors to customers, et cetera.

    Q    Has your understanding changed since then?

    A    No.  Did Elizabeth Holmes wants you to find investors for Theranos.

    A    No.

    MS. EAGAN:  Object to form.

BY MS. SMITH:

    Q    Was it understood that as a board member, you would use your contacts to help Theranos get venture capital and private equity investors?

    MS. EAGAN:  Object to form.

    MR. RUMMAGE:  Object to the form.

    THE WITNESS:  No.

BY MS. SMITH:

    Q    Did you just so happen to introduce VCs and private equity investors to Elizabeth Holmes?

    MS. EAGAN:  Object to form.

    THE WITNESS:  I didn't introduce any.

BY MS. SMITH:

    Q    What other board members did you know?

A    George Schultz -- before I became a board

member, obviously I know them all now they were board

members, but before became board members I knew George

Schultzs.  I knew Henry Kissinger.  I knew Reilley

Bechtel who came in after I did.  I think that is all

that I knew before becoming a director.

Q    Do you remember how you got on the board?

A    I -- I thought I explained that.  George

Schultz asked me if I would be on the board.  I said I

didn't want to be on any boards.  He kept asking and he

said would you, at least meet with Elizabeth and then I

told --

Q    Let me rephrase that.  Do you recall the

specific procedures that took place that allowed you to

join the board?

MR. RUMMAGE:  Object to the form.  Vague.

THE WITNESS:  I -- I don't.  Other than

Elizabeth said she wanted me to be on the board.  I

mean, I -- I don't know which -- I --

BY MS. SMITH:

Q    Did anyone --

THE WITNESS:  I'm not.

BY MS. SMITH:

Q    -- vote you on?

(Reporter clarification)


UNEDITED AND UNCERTIFIED

THE WITNESS:  Huh?

BY MS. SMITH:

Q    Were you voted on the board?

A    Not that I'm aware of.

Q    So how did your role as a director of Theranos
differ from the role of a director of Wells Fargo?

MS. EAGAN:  Object to form.

THE WITNESS:  It was completely and totally
different.  It was again strictly advisory.  We met two
to four times a year for a half a day.  The schedule was
not determined until a few months after meetings were
made and it was totally advice with no voting or
responsibility of -- of the directors or committees.  So
it was very, very different.

BY MS. SMITH:

Q    In contrast, what was the role of director at
Wells Fargo when you were CEO?

A    Well, you have fiduciary responsibility.  You
have a different -- you have a -- a structure.  You have
board meetings that are -- are scheduled two years in
advance.  You have several committees who each of which
have certain responsibilities to perform.  You have --
you have articles of incorporation that require that the
board proceed in certain matters and vote in certain
ways.  You have SEC requirements of how the board is

expected to perform.  You have -- you have auditors that
are doing the financial reports.  It's -- it's just
completely different.

     Q    Do they have a duty of care?

        MR. RUMMAGE:  Object to form.  Vague.

        MR. RUBINSKY:  Objection.  Calls for a legal
conclusion.

BY MS. SMITH:

     Q    To their shareholders.  Do they have a duty of
care to shareholders?

     A    Absolutely.

        MR. RUMMAGE:  Same objection.

BY MS. SMITH:

     Q    Do they have a fiduciary role to their
shareholders?

     A    They do.

     Q    Did you consider your role at Theranos any
less?

     A    I did.

     Q    Why is that?

     A    Because we were simply advisors.

     Q    I'm going to hand you the next exhibit.

        (Exhibit 112 marked)

BY MS. SMITH:

     Q    I'm handing you a document Bates number ending

952868.  This appears to be e-mail correspondence between yourself and Elizabeth Holmes; is that correct?

     A    That's correct.

     Q    Could you please read -- I'm sorry, and this is dated July 25th, 2013.

     A    Mm-hm.

     Q    Could you please read Elizabeth Holmes' first sentence to you?

     A    You should expect the binder I reference formalizing your directorship at your office by tomorrow.

     Q    Does this reflect the formalization of your joining the board?

     A    I believe it does.

     Q    Did Elizabeth Holmes make the decision?

          MS. EAGAN:  Object to form.

          THE WITNESS:  I -- I do not know who made the decision.

BY MS. SMITH:

     Q    Have any reason to think anyone else was involved in making the decision?

     A    I -- I would guess because George was the person who was trying to get me on the board that Elizabeth and George probably had conversations.

     Q    Anyone else?

                    UNEDITED AND UNCERTIFIED

        A     Not that I know of.

        Q     Does this e-mail at any point say the word
"advisor"?

        A     I don't know.  I haven't read it all.

              I don't see that it does.

        Q     Okay.  Aside from George, did you meet with
any of the existing board members prior to this?

        A     I did not.

        Q     Was there a -- do you recall a formal meeting
approving you to be on the board?

        A     I do not.

        Q     Handing you the next exhibit.

                    (Exhibit 113 marked)

BY MS. SMITH:

        Q     This is Exhibit 113, this is a document
Bates-numbered 952860 through 952862.  Appears to be
e-mail correspondence ending July 28th, 2013, between
yourself and Elizabeth Holmes and a couple others cc'd.

              Does that seem accurate?

        A     It does.

        Q     On the first page, do you see your e-mail to
Elizabeth on July 28th, 2013 at 4:41 p.m.?

        A     I do.

        Q     Could you please read the third sentence of
your e-mail to her?

                    UNEDITED AND UNCERTIFIED

A   We'll take note to transfer to Jeff.  Janine
Rae Joe.  How does October 8th look.  Always let me if I
can be of help to you.

Q   Would you please read the sentence before
that?

A   A mutually beneficial reason to do business
with each other.  As a director I never talk to the
media unless you want me to do so.

Q   Do you see Elizabeth Holmes' response to your
e-mail?

A   Look forward to our next conversation or is it
the one below.

Q   Above that.

A   Look forward to our next conversation, yes.

Q   What did she say about that?

A   She says thanks for this Dick, I look forward
to our next conversation.

Q   Does the word advisor appear anywhere in this
e-mail chain?

MR. RUBINSKY:  There's also text on the other
side.

THE WITNESS:  I do not.

MS. SMITH:  Okay.

MR. RUMMAGE:  What was the witness's answer?
I we're not getting real time.

UNEDITED AND UNCERTIFIED

THE WITNESS:  I do not.

MR. RUMMAGE:  Okay.  Thank you.

BY MS. SMITH:

Q    Earlier when you read the e-mail to Elizabeth
Holmes on July 28th, 2013 at 4:41 p.m., your sentence
beginning with as a director, I never talked to to the
media unless you want me to do so, was that a true
statement.

A    Yes.

Q    Did you make statements to the media at
Elizabeth Holmes' request or direction?

MS. EAGAN:  Object to form.

THE WITNESS:  I did.

BY MS. SMITH:

Q    Did you seek Elizabeth Holmes' approval before
making statements to media?

MS. EAGAN:  Object to form.

THE WITNESS:  Yes.

BY MS. SMITH:

Q    Is there any reason why it wasn't the other
way around?

MR. RUMMAGE:  Object to form.  Vague.

BY MS. SMITH:

Q    Why didn't Elizabeth Holmes seek board
approval before making public statements?

UNEDITED AND UNCERTIFIED

MS. EAGAN:  Object to form.

MR. RUBINSKY:  Objection.  Calls for speculation.

THE WITNESS:  This is an advisory board that purpose was to advise Elizabeth on things that they presented to us that she wanted to be advised of.  So she directed what she wanted, and we responded based upon her wants.

BY MS. SMITH:

Q   So, your interviews later on with The New York Times, Bloomberg and CNBC, were those made with Elizabeth Holmes' approval?

A   Yes.

Q   The joint statement you submitted along with Channing robots to The New York Times was that made with Elizabeth Holmes' approval?

A   She -- or her staff set up the appointment for that.

Q   Did you ever approve the use of your name in press releases and articles or PowerPoints to investor?

MR. RUBINSKY:  Objection.  Compound.

THE WITNESS:  Not that I'm aware of.

BY MS. SMITH:

Q   Were you aware of the use of your name in press releases, articles and in PowerPoints to

UNEDITED AND UNCERTIFIED

investors?

    A    So you're only referring to investors?

    Q    Yes.

    A    I -- I was not aware of use of any of those to investors.

    Q    Would you agree that your presence on the board was to vouch for the company?

    MR. RUMMAGE:  Object to the form of the question.  Calls for speculation.

    THE WITNESS:  I would not say that was what I was on the board for.

BY MS. SMITH:

    Q    Did your presence on the board help in vouching for the company?

    MR. OLSON:  Objection.  Form.

    MR. RUMMAGE:  Objection.  Form.

    THE WITNESS:  I don't -- I don't know how to value -- how to know that.

BY MS. SMITH:

    Q    Going back to Exhibit 113, could you please have a look at Elizabeth Holmes' e-mail to you on July 28th, 2013 at 4:27 p.m.?

    A    Mm-hm.

    Q    The fifth paragraph down, could you read the first sentence.

UNEDITED AND UNCERTIFIED

A    The PR contact point at Theranos reference

below is Jeff Blickman.  His contact information will an

on the new Theranos Web site.

Q    Do you recall having any conversations with

Jeff Blickman?

A    I do not recall having . . .

Q    Any e-mails with Mr. Blickman?

A    Not that I recall.

Q    On the following page, Bates ending

952861 . . .

A    Mm-hm.

Q    You see your e-mail to Elizabeth Holmes dated

July 25th, 2013 at 6:25 p.m.?

A    I do.

Q    Could you please read the sixth sentence in

that e-mail?

A    One, two, three -- I only see four -- five.

Q    Could you please read the middle -- the -- in

the second pipeline, could you please read the -- the

first and second sentences?

A    Use anything you want.  I was with George the

pest weekend at the grove and he keep saying he wants

Wells Fargo to be involved with your company.

Q    When you say George, are you referring to

George Schultz?

A     I am.

Q     When you say the grove, are you referring to the bow hemoI can't grove?

A     I am.

Q     Did anything else happen at the Bohemian Grove related to Theranos?

A     Not that I --

MS. EAGAN:  Object to form.

THE WITNESS:  -- recall.

BY MS. SMITH:

Q     Did anything else happen at Bohemian Grove that you're aware of?

MS. EAGAN:  Object to form.

MR. RUBINSKY:  Objection.  Vague.

THE WITNESS:  I'm not sure I understand your question.  Related to Theranos?

MS. SMITH:  Let me withdraw that.

THE WITNESS:  Okay.

BY MS. SMITH:

Q     Could you please have a look at the -- the e-mail before the last one you were just looking at. The one above it, same page.  This is the one from Elizabeth --

A     Elizabeth to me?

Q     -- Holmes to you --

UNEDITED AND UNCERTIFIED

A    Mm-hm.

Q    -- at 9:47 p.m. on July 25th, 2013.

A    Mm-hm.

Q    Could you please read on the third line
Elizabeth's sentence to you.

A    "I will -- I will also raise the Wells Fargo
relationship with Walgreens CEO and CFO in the context
of our discussion with them about partnerships with
financial institutions."

Q    What was your understanding of this sentence?

A    I don't recall what she meant by partnerships
with financial institutions other than we -- we were
a -- with Wells -- Walgreens was a customer of Wells
Fargo, and we handled a lot of their cash and -- and
payments systems, and -- and she was probably talking
about banks and -- and -- and -- and Walgreens and so
on, but that would be --

Q    When she says the Wells Fargo relationship,
she's referring to her relationship with you?

        MR. MUGMON:  Objection.

        THE WITNESS:  I don't know what she thought.
I mean, I don't know what she was -- what's -- was in
her mind when she talked about that.

BY MS. SMITH:

Q    Handing you the next exhibit, 114.


                UNEDITED AND UNCERTIFIED

(Exhibit 114 marked)

BY MS. SMITH:

    Q    This is a document Bates-numbered ending in 1073166 through 1073171.  Appears to be e-mail correspondence between yourself and Elizabeth Holmes, ending July 31st, 2013.  Does that appear accurate?

    A    It does.

    Q    On the first page, in the third e-mail from Elizabeth Holmes to yourself on July 29th, 2013 at 7:43 p.m., could you please read her e-mail to you?

    A    Valuation of C1 was $15 per share.  Based on the total number of outstanding shares, valuation of the total company is 6,356,000,000.  Let me know if -- if want any additional.

    MR. OLSON:  Can we skip the reading of what's reported?

    Dick is tied up this afternoon, so, you know, right --

    MS. SMITH:  Right.

    MR. OLSON:  -- making good use of your time is good idea.

    MS. SMITH:  Okay.

    MR. KATHREIN:  We reserve the right to take the full seven hours, so if -- if she thinks that's what's needed for the questioning, she can ask it that

UNEDITED AND UNCERTIFIED

way.

BY MS. SMITH:

    Q     The e-mail at the top of the page, do you see where Elizabeth says she's -- she is sending folders with -- a folder with projections at your office tomorrow?

    A     I do.

    Q     Okay, handing you the next exhibit.

            (Exhibit 115 marked)

BY MS. SMITH:

    Q     This is a document labeled Kovacevich Theranos Bates ending 333 through 420.

    A     I'm sorry.  I don't see Kovacevich anywhere.

    MR. RUBINSKY:  [Indicating.]

    THE WITNESS:  Oh, there we go.  I'm sorry.

BY MS. SMITH:

    Q     Entitled in a Rocco report Theranos Inc.  Fair market value of stock as of September 30th, 2014, dated 21st October 2014.  Does that appear accurate?

    A     That's what it says, yes.

    Q     Is this the report you received from Theranos?

    A     I think it is.

    MR. RUBINSKY:  I'm sorry.  Are you asking if this is the report he received in 2013?

BY MS. SMITH:

Q    Did you receive this report from Theranos?

A    I -- I received it -- I think I received it at

at some time.  I don't know when it was.

Q    Did you receive a similar report at any point

in time?

A    I said I think --

MR. MUGMON:  Objection.  Form.

THE WITNESS:  -- I said I think I did, yes.

BY MS. SMITH:

Q    Let's turn to the page ending in Bates 339.

A    Mm-hm.

Q    Do you -- do you see the section titled 1.5.1

summary of findings?

A    I do.

Q    Could you please read the last sentence?

A    Basis market value of its common stock as a

class is $1.19 per share.

Q    Could you read the -- the whole sentence

there.

A    Based on our analysis -- based on our

analysis, and after considering all relevant factors

described in the detailed report, presented hereinafter

in our opinion as of -- as of September 30th, 2014, the

minority and nonmarketable basis fair market value of

its common stock as a class is $1.19 per share.

UNEDITED AND UNCERTIFIED

Q    Did you see that when you received this?

A    I -- I think so.

Q    In 2013, when Elizabeth Holmes sent you a
report, do you recall that being the same amount per
share?

           MR. RUMMAGE:  Object to the form the question.

           THE WITNESS:  I'm not sure I understand the
question.  This says as of September 30th, 2014.  So I
don't know how it could be in 2013, but maybe I'm
missing something here.

BY MS. SMITH:

Q    Let me go to the next exhibit.

                (Exhibit 116 marked)

BY MS. SMITH:

Q    Exhibit 116.  It's a document -- spreadsheet
produced by defendants Bates-numbered ending in
366-2629.  Like you to turning to the fourth page of the
spreadsheet.  At the very bottom, do you see your name?

A    I don't.  Oh, you mean -- are you calling this
one page or two pages.

Q    Two pages?

A    Oh, I'm sorry.  I do.

Q    You see where it says 133,333 appears?

A    I do.

Q    Is that $15?

                UNEDITED AND UNCERTIFIED

**\*ROUGH DRAFT\*\***          **\*\*ROUGH DRAFT\*\***          **\*\*ROUGH DRAFT\*\***

A     I do.

Q     And at the far, right, the 1.9 million?

A     I do.

Q     The two Rosendorf below that you see your name there?

A     I do.

Q     Do these three Rosendorf accurately reflect your investment in Theranos?

A     I believe they do.

Q     So going back to the spreadsheet for a minute, it looks like you invested over four millions in Theranos; is that correct?

A     That's correct.

Q     Do you remember --

A     Not at this time, I don't believe.

Q     What do you mean "not at this time"?

A     I made two investments.  One at one time and one at another time, but the total was four-point -- over 4 million.

Q     Do you remember why you were willing to spend --invest $4 million in Theranos?

A     Because I thought it was a great opportunity.

Q     Okay, why did you think it was great opportunity?

MS. EAGAN:  Object to form.

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **        ** ROUGH DRAFT **        ** ROUGH DRAFT **

          THE WITNESS:  Because I believe that if she

was successful in creating a less painful, cheaper,

faster, easier blood testing process, it would -- she'd

gain great market share, and the -- my investment would

be worth a lot of money.

BY MS. SMITH:

     Q    You believed she had developed new technology?

          MS. EAGAN:  Object to form.

          MR. RUBINSKY:  Objection.  Misstates

testimony.

          MS. SMITH:  Could you please repeat the

question.

               (Record read as follows:

               "QUESTION/ANSWER          :  ")

          THE WITNESS:  I am not capable of determining

whether she invented a new technology.  I believe that

she believed, and therefore I invested.

BY MS. SMITH:

     Q    You invested based on her belief?

     A    I did.

     Q    Handing you the next exhibit.

               (Exhibit 117 marked)

BY MS. SMITH:

     Q    Handing you a document, Exhibit 117, Bates

number ending in 4075608.  This appears to be

                    UNEDITED AND UNCERTIFIED

correspondence between yourself and Elizabeth Holmes ending September 5th 2013; is that accurate?

A    That's accurate.

Q    So, it appears that you two are discussing setting up a tour for you to see the facility; is that correct?

A    That's correct.

Q    Did the -- did the tour ever take place?

A    It never -- it never took place with me alone as we were -- so what happened -- and I don't remember exactly when -- is that the full advisory board -- she set up a -- a -- a tour either -- I think it was either before or after advisory board meeting with any advisory board members who wanted to take the tour and I did that with the other board members.

Q    You remember when?

A    I do not.

Q    Do you remember what you saw?

A    We saw everything that was in Newark.

Q    You recall anything specifically?

A    We saw the lab.  We saw machines that made elements of the proprietary technology machine.  We saw the tech -- proprietary technology machine.

Q    What did the proprietary technology machine look like?

UNEDITED AND UNCERTIFIED

        A    It look like it was about this big
[indicating], with all kinds of things internally,
circuit boards and so forth.  Small robots.  Lots of
gadgets.

        Q    How big was it?

        A    Again, about this [indicating], you know, the
2 1/2 feet cube type thing.  It had a stand, but the
actual machine was -- was this 2 1/2 and maybe there was
something in stand, but I don't know.  We didn't a
locate that.  Thought it was more of a stand, but . . .

        Q    Do you remember seeing any third-party
machines?

        A    I do not.

        Q    Would you know if you saw one?

        A    No.

                (Exhibit 118 marked)
BY MS. SMITH:

        Q    Hand you the next exhibit, 118.  This is a
document Bates number ending in 3618735 through 3618736.

             This appears to be e-mail correspondence
between yourself an Elizabeth Holmes, ending
December 7th, 2013.  Is that correct?

        A    That's correct.

        Q    The first page, could you have a look at the
e-mail, dated December 5th, 2013 at 4:22 p.m.  From

                 UNEDITED AND UNCERTIFIED

Elizabeth Holmes to yourself.

    A    I -- I have that, yes.

    Q    Does this e-mail reflect your recollection of
the contents of that board meeting?

        MR. RUMMAGE:  Object to the form of the
question.

        THE WITNESS:  I don't even recollect this --
that -- this board meeting.

BY MS. SMITH:

    Q    You don't recall any of these things being
discussed?

    A    I do recall some of these things were
discussed, but I don't remember what board meeting it
was or what date it was or whatever.  But the items of
dual structures and so on, I have a reelection --
recollection of.

    Q    You recall the use of third-party machines
being mentioned at any board meeting?

    A    At any board meeting?

    Q    Yes?

    A    Yes.

    Q    Do you remember when?

    A    It was after the -- the recollection I have is
after The Wall Street Journal article sometime.

    Q    In 2013?

UNEDITED AND UNCERTIFIED

A    Well, I don't know whether it was in 2015 that we discussed, but I know it was after the -- sometime after the publication of The Wall Street Journal article.

Q    But during this time in 2013, you recall the use of third-party machines being mentioned at any meeting of the -- do you recall anyone mentioning the validation of blood tests?

A    I do not recall.

Q    Going back to the e-mail I just referenced, did Elizabeth Holmes sends you a form for you to sign?

A    For.

Q    It's referring to a consent.

A    I -- I don't recall.

Q    In the first bullet point, third line, do you see where it says make indemnification of officers and directors mandatory?

A    Mm-hm.

Q    What was your understanding of that?

A    My understanding is that an insurance company -- my understanding is that in order to get -- that they were -- soliciting insurance companies to ensure for the indemnification of officers and -- and directors.

Q    At the top of the e-mail, mm mentions a

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **          ** ROUGH DRAFT **          ** ROUGH DRAFT **

special committee meeting.  Were you on the meeting --
were you on that committee?  I'm sorry?

     A    I don't recall.

     Q    The indemnification mentioned in the first
bullet point, third line, were you covered by that
insurance?

     A    I was.

     Q    Was Elizabeth Holmes covered by that
insurance?

     A    I do not know.

     Q    Was Ramesh Balwani covered by that insurance?

     A    I do not know.

     Q    Do you remember who was on the special
committee?

     A    I do not.

     Q    Do you remember what the special committee was
about?

     A    I do not.

     Q    Handing you the next exhibit, 119.

               (Exhibit 119 marked)

BY MS. SMITH:

     Q    This is a document Bates number ending in
4077431.  Appears to be an e-mail from Elizabeth Holmes
to yourself; is that accurate?

     A    It is.


                  UNEDITED AND UNCERTIFIED

Q    Do you recall receiving this e-mail?

A    I -- I don't recall seeing -- receiving the e-mail, but I recall talking about an issue like this.

Q    Do you recall having any follow-up discussions regarding this -- this e-mail?

A    Yes.  There was numerous interchanges about what was going on with Safeway at our advisory meetings.

Q    Did you have informal phone calls with Elizabeth Holmes about this?

        MS. EAGAN:  Object to form.

        THE WITNESS:  Not that I recall.

BY MS. SMITH:

Q    Can you read the third paragraph last sentence?

A    Very much looking forward to your next conversation.  No, no, excuse -- for our CV conversation we don't want to disclose the specific hepatitis C opportunity until we -- until we know we're working with --

Q    Prior to that?

A    We got -- we got is that the paragraph you're talking about?

Q    Yeah.

A    Okay.  We got a note back from Safeway's GC last night on the impending deal to rent our space at --

                UNEDITED AND UNCERTIFIED

you know, it might be easier for you to just . . .

Q    I meant the -- just the last sentence --

MR. OLSON:  -- read that for anyway.

MS. SMITH:  -- just the last sentence of that paragraph?

A    They are now blatantly breaching the intent of the agreement.

Q    What did you think when you saw this?

A    I thought that she thought they were blatantly breaching the intent of the agreement.

Q    Did this summary satisfy you?

A    Yes.  I mean, it explained what she thought was going on to me.

(Exhibit 120 marked)

BY MS. SMITH:

Q    Going to hand you the next exhibit, 120.  It's a document Bates number ending in 397686759.  Appears to be e-mail correspondence between yourself an Elizabeth Holmes ending May 30th, 2014.

A    Mm-hm.

Q    Is that accurate?

A    That is.

Q    You see where Elizabeth Holmes says in her first e-mail to you, where she mentions speaking with serve Russ pretty equity head today.  You see where it

says that?

    A    I do.

    Q    Regarding Safeway?

    A    Mm-hm.

    Q    Do you see where Elizabeth Holmes says she can brief you on the conversation?

    A    Mm-hm.

    Q    Do you -- did you understand her to be referring to Cerberus Capital Management?

    A    I do.

    Q    You recall having a follow-up discussion?

    A    I recall talking -- yeah, yes, the answer to that is, yes.

    Q    What do you recall discussing?

    A    That Cerberus bus was going -- was in the process or maybe even been completed by this time of buying Safeway.  And so they then would be in charge of the -- of the contract, the -- between Theranos and Safeway, and she was briefing me on that -- on the conversation of -- of how Cerberus may -- or how -- how would they be receiving on the Theranos negotiations and whatever and my recollection was that what she basically said is this is not their highest priority, and I don't know really what's going to happen, because they -- they want to close this thing, get the right management and

so on and her feelings was, Theranos was not at their

highest priority, given all the other stuff that was

going on.

Q    Do you --

A    I don't know if it was this conversation on

whatever, but I know there was conversation like I just

said, which were -- because it was important, is what my

memory has.  I don't know when I.

Q    Okay.

A    Talked.

Q    Do you remember what happened with this?

MR. RUMMAGE:  Object to the form of the

question.  Vague.

THE WITNESS:  Well, they did acquire and there

were many, many discussions after that when there was

time to do so, and I don't believe the contract was ever

signed.

BY MS. SMITH:

Q    You remember why not?

A    Because there was disagreement between the

parties of how to proceed.

Q    Do you recall what the disagreement was?

A    Compensation, who's going to do what.

Appeared to be many areas of disagreement.

Q    Did the deal fall apart after The Wall Street

UNEDITED AND UNCERTIFIED

Journal article?

    A    I don't remember the timing of when it fell apart.

    MS. SMITH:  Handing you to next exhibit, 120 narcotic mark.

        (Exhibit 122 marked)

    THE REPORTER:  121.

    MS. SMITH:  121, sorry.

    Q    This is a document Bates number ending in 3976762.

    A    Mm-hm.

    Q    Appears to be e-mail correspondence between yourself an Elizabeth Holmes ending May 22nd, 2014.

    A    Mm-hm.

    Q    Is that correct?

    A    That's correct.

    Q    You see at the bottom of the page -- you appear to be summarizing a meeting with Larry Merlot president and CEO of CBS?

    A    I do.

    Q    You see an Elizabeth Holmes e-mail to you above it says I'll give you a call tomorrow to briefly touch base on this?

    A    I do.

    Q    Do you recall the substance of that

        UNEDITED AND UNCERTIFIED

conversation?

MR. RUMMAGE:  Object to the form the question.

THE WITNESS:  I don't recall the subject of that conversation, but I recall conversations that I had with Elizabeth on CBS.

BY MS. SMITH:

Q    What do you remember?

A    Well, that basically she was interested in -- in addition to having Walgreens, which was proceeding, she was -- CVS is stronger in some markets than Walgreens are, and so she was interested to see if CVS would want to the also participate in a retail rollout of the -- of her testing system.  Blood testing system.

Q    Do you mean by retail rollout of the blood testing system?

A    The rollout of testing -- of doing blood testing in retail stores.

Q    Do you remember why that deal fell through?

MR. RUMMAGE:  Object to the form the question. Assumes facts.

THE WITNESS:  I think by -- by the time the discussions advanced, The Wall Street Journal article came out, and -- and then I don't know what conversations took place after that.

MS. SMITH:  Handing you the next exhibit,

UNEDITED AND UNCERTIFIED

Exhibit 122.

(Exhibit 122 marked)

BY MS. SMITH:

Q    This exhibit is -- is a set of four different

documents.  One is e-mail correspondence Bates number

ending in 4077595.  That's -- that's one page.  The next

one is an e-mail correspondence, along with the

attachment to that e-mail.  The e-mail correspondence is

Bates number 915977.

A    Mm-hm.

Q    The attachment to that e-mail is Bates number

ending in 915978 through 915986.  Appears to be an

article by Fortune, and the document after that is

e-mail correspondence Bates-numbered 944571 through

944573.

MR. RUMMAGE:  Are these all marked as a single

exhibit?

MS. SMITH:  Yes.

MR. RUMMAGE:  Okay.  I'm going to object to

the use of this exhibit unless it was produced with the

highlighting that's on it.

(Reporter clarification)

MR. OLSON:  With the highlighting that appears

on it.  Is that -- Danielle, do you know whether this

was produced with that highlighting or was that affixed

UNEDITED AND UNCERTIFIED

by your law firm?

        MS. SMITH:  Yes, the highlighting is ours.

        MR. RUMMAGE:  Okay.  Then I object to the use
of the exhibit.  And I also object to marking the
multiple documents in this same exhibit.

BY MS. SMITH:

    Q    The first page of this exhibit appears to be
correspondence between yourself and Elizabeth Holmes
dated July 6 -- I'm sorry, June 6th, 2014.

    A    Yes.

    Q    The last e-mail is dated June 6th, 2014, at
12:47 p.m.; is that correct?

    A    That's correct.

    Q    Does this appear to be correspondence between
yourself and Elizabeth Holmes?

    A    It does.

    Q    Do you see in Elizabeth Holmes' e-mail to you
on June 5th, 2014, same page, where she asked you to
sends information to Roger Parlov, the reporter from
Fortune magazine?

    A    I do.

    Q    Did you -- do you see where she drafts
correspondence, suggested correspondence for you to send
him?

    A    I don't see.  She drafted something for me.

Where was that.

Q    I'm looking it first page in the exhibit,
Bates number ending in 4077595?

A    Mm-hm.

Q    Do you see Elizabeth Holmes' e-mail to you
date June 5th, 2014, at 9:06 p.m.?

A    Okay, yes.

Q    Do you see the e-mail to from Elizabeth Holmes
to you that begins with the words I hope your travels --

A    I do.

Q    -- later on in that e-mail, do you see where
she says in the second paragraph, where she's Discussing
magazine and Roger Parlov?  Do you see that?

A    I do.

Q    Do you see where she is asking you to send
Roger Parlov an e-mail with the numbers on headcount
valuation and equity raised?

A    I now do, yes.

Q    Now, do you see the -- you see in that same
e-mail, where she's drafting an e-mail for you to send
to Roger Parlov?

A    I do.

Q    Did you end up sending that e-mail?

A    I don't recall, but I do recall sending him
and e-mail.

Q    Did you send him and e-mail with these numbers number?

A    I don't -- I don't recall that.

Q    Turn tots next page of this exhibit at Bates No. ending 915977?

A    Uh-huh.

Q    Appears to be another set of e-mail correspondence between yourself and Elizabeth Holmes?

A    Mm-hm.

Q    Is that correct?

A    That's correct.

Q    Do you see the e-mail from Roger Parlov to yourself dated June 12, 2014 at 6:25 a.m.?

A    I do.

Q    Why was Roger Parlov contracting you?

MR. RUMMAGE:  Objection to form.  Calls for speculation.

THE WITNESS:  He was contacting me to verify some statistics of the size, market valuation, and so on of Theranos at that time.

BY MS. SMITH:

Q    Did you give him the information he requested?

A    I gave -- I gave him -- yes, I think I did, yes.  To the best of -- I gave him some information about this --

UNEDITED AND UNCERTIFIED

Q    Where did you get the information?

A    From Elizabeth.

Q    Do you see at the top of the e-mail, where you're forwarding the e-mail from Roger Parlov to Elizabeth Holmes?

A    Is this at the very top here now, all sounds good?

Q    I'm looking at the page ending in Bates No. 915977?

A    Oh, I'm sorry.

A    And I'm -- what.

Q    Did the same e-mail where Roger Parlov initiated the conversation it looks like and you forwarded to Elizabeth Holmes.

A    Right.

Q    Is that accurate?

A    That's correct.

Q    The document behind this e-mail, does that appear to be the attachment to this e-mail?

        MR. RUMMAGE:  Object to the form.

        THE WITNESS:  I don't --

BY MS. SMITH:

Q    I'm referring to Bates -- the document labeled Bates 915978?

A    Are we talking about the new blood is that

UNEDITED AND UNCERTIFIED

request what you're talking about.

Q    Yes.  Through 915 --

A    And -- and so what's the question.

Q    -- 986.

A    Mm-hm.

Q    Does it look like the attachment that Roger
Parlov was sending to you you were, in turn, forwarding
to Elizabeth Holmes?

A    I don't recall.

Q    Do you see where in Roger Parlov's e-mail to
you in his second sentence, he says here's a PDF showing
almost exam what the article will look like in the
magazine?

A    I do.

Q    Do you have any reason to think that this
document, with Bates Nos. 915978 through 915986, with
the title new blood, do you have any reason to think
that's not the article, that's not the attachment?

A    How do I say this.  I have no reason not to
believe that that is -- I'm agreeing with you.

Q    Okay?

A    There's a couple double negatives there.

Q    Okay, and you did forward that e-mail to
Elizabeth Holmes?

A    Yes.

Q    What role did you have in the development of
this drug?

MR. RUMMAGE:  Sorry, repeat that what role did
you have that.

BY MS. SMITH:

Q    Do you see that Roger Parlov is referring to
this article that I just referenced before, which states
new blood on the title of the article?

A    My recollection is the only thing that we
discussed was to try to verify to the best of my ability
that -- that these size numbers were reasonably,
correct.

Q    You just discussed numbers size valuation?

A    That's -- that's my recollection.

Q    Turning to the last couple documents of this
exhibit, I'm referring to Bates Nos. 944571 through
944573.

A    Mm-hm.

Q    Appears to be e-mail correspondence from
Elizabeth Holmes to yourself ending June 12, 2014 at
11:03 p.m.; is that accurate?

A    It is.

Q    Do you see where Elizabeth Holmes says below
is the e-mail I sent to our employees, the Web link is
on our Web site where we always post relevant articles?

UNEDITED AND UNCERTIFIED

A    I do.

Q    Did you understand this to mean that Elizabeth Holmes sent the Fortune article to all Theranos employees?

A    That's what she says.

Q    Is that what you understood?

A    That's what I understood.

Q    Did you understand this to mean that Elizabeth Holmes had a link to the article posted on the Theranos Web site?

A    You know, I -- I don't even recall any of this, so I don't understand your questions.  I don't recall receiving this.  I don't recall seeing it.

Q    What do you think it means when she writes the Web link is on our Web site where we always post relevant articles?

A    I think it means that the Web link is on our Web site where we always with link relevant articles.

Q    The Web link to what?

A    Web -- Web link to Theranos' Web site.

Q    But there ash that there's a Web site that shows the link that the Fortune magazine article.

Q    That the link was and the Theranos Web site?

A    Yes.  But I have no recollection of any of this.


UNEDITED AND UNCERTIFIED

Q    Turning back to the Fortune article,
specifically at the page ending in Bates Nos. 915983.

On the left-hand column.  Could you please
read the third paragraph?

A    Is that begin with Theranos.

Q    Yes.

A    Theranos, which does not buy any analyzers
from third party is therefore in a unique position.
While it would need FDA approval to sell its own
analyzers to labs, it doesn't do that.  It uses its
analyzers only in its on CMS certified lab of the all
tests therefore LTT -- LDTs, effectively exempt from FDA
oversight.

Q    Do you believe that was true?

MR. RUMMAGE:  Object to form of the question.

THE WITNESS:  I have no basis of believing or
not believing.

BY MS. SMITH:

Q    Did you understand it to be true?

A    I do not even sure -- I don't even understand
is it quite frankly.

Q    How much time did you spend confirming this
statement?

A    I didn't confirm any statement.  I have
nothing to do with the article, other than supplying

UNEDITED AND UNCERTIFIED

some data of the size of Theranos.

     Q    Why did you forward this article to Elizabeth
Holmes I thought she would be interested?

       MS. SMITH:  Okay.  Let's go off the record.

       THE VIDEOGRAPHER:  This marks the end of Media
No. 1 in the deposition of Richard Kovacevich.  Off the
record 10:36 a.m.

          (Break taken from 10:36 a.m. to

          10:51 a.m.)

       THE VIDEOGRAPHER:  This marks the beginning of
Media No. 2 in the deposition of Richard Kovacevich on
the record 10:51 a.m.

BY MS. SMITH:

     Q    Let's go back to the Fortune article.

     A    Mm-hm.

     Q    On page ending in Bates No. 915983.

     A    Mm-hm.

     Q    So in the paragraph you read earlier you see
that?

     A    I do.

     Q    Did you have any reason to think that anything
in that paragraph was not true?

     A    I don't remember the paragraph.  I just read
it.  And I'm not even sure that I understand it.  I
don't know what an LDT is.  You know, I -- I'm just not

** ROUGH DRAFT **      ** ROUGH DRAFT **      ** ROUGH DRAFT **

don't know an expert in analyzers or labs or -- so

forth.

    Q    So no one had ever discussed buying analyzers

from third parties at Theranos?

        MS. EAGAN:  Object to form.

BY MS. SMITH:

    Q    With you?

    A    Say that one more time.  No one ever.

    Q    No one at Theranos had ever discussed buying

third-party analyzers before.

        MS. EAGAN:  Same objection.

        THE WITNESS:  Not that I recall.

        Correction.  Today or -- in the last six

months, the mini lab, I think, would be described as a

third-party analyzer and -- of which they are creating

to be sold by -- to be sold to third parties.  And

that's relatively recent.  When they announced their

mini lab.

BY MS. SMITH:

    Q    Where did you get that understanding?

        MR. KATHREIN:  Let -- let counsel -- let the

record reflect counsel is shaking his -- nodding his

head yes to Mr. Kovacevich.

        MR. RUBINSKY:  Let the --

        MR. OLSON:  Which way was he shaking?  Up and

down or --

          MS. SMITH:  I was --

          MR. OLSON:  Mr. Kovacevich looked at counsel,

and counsel is nodding his head yes.

          MR. RUBINSKY:  And let the record reflect that

we were leaning over to assist the court reporter,

making sure that she understood what Mr. Kovacevich was

saying.

          MR. KATHREIN:  I don't appreciate coaching the

witness.

          THE WITNESS:  Well, he didn't coach me as far

as I -- I'm concerned.  I -- I would keep my message --

I -- I was worried about the correction that I hadn't

answered and wanted to make sure that I was okay to say

a correction.  But, anyway . . .

BY MS. SMITH:

     Q    So, did you just describe the mini lab as a

third-party device?

     A    I -- I say my understanding is the mini lab

will be -- is expected to be sold to third parties,

and -- and -- and she has somewhere in the past told me.

So -- and that's why I was correcting that -- you said

you never heard about third-party analyzers and that's

true unless the mini lab, which I -- I think is a

third -- would be described as a third-party analyzer,

                    UNEDITED AND UNCERTIFIED

**ROUGH DRAFT** ** ROUGH DRAFT ** ** ROUGH DRAFT **

because they expected to sell or lease it to third
parties.

    Q   Was the board ever told about Siemens or ADVIA
machines?

       MS. EAGAN:  Object to form.

       THE WITNESS:  Yes.  I don't know the second
thing you said, but Siemens.

BY MS. SMITH:

    Q   In 2014 were you told about this?

       MS. EAGAN:  Object to form.

       THE WITNESS:  Not that I recall.

BY MS. SMITH:

    Q   Before The Wall Street Journal article at any
point, was the board--?

    A   Not that I recall.  I -- I only recall hearing
about Siemens after, as I said earlier to you, after The
Wall Street Journal t Journal report.

    Q   So going back to the first sentence of that --
the paragraph you looked at says Theranos does not buy
any analyzers from third parties what -- you said that
was not your understanding or that was your
understanding?

    A   I have --

       MR. RUMMAGE:  Object to the no.

       THE WITNESS:  Understanding.  I don't have no.

      MR. RUBINSKY:  Form of the question.  I don't even know what an analyzer is.

BY MS. SMITH:

    Q   Second-to-last it says it uses it's analyzers only in it's own CMS certified lab.  Was that your understanding?

      MR. RUMMAGE:  Object to the form the question.  Lacks foundation.

      THE WITNESS:  Again, my understanding is very simple, that their analyzers -- what their calling analyzer, to my understanding was their analyzer.  That's what this little machine is.  Sometimes referred to as and analyzer.  That my understanding is they did not sell their analyzer to any third party until they developed what is called the mini lab, which is not considered in her language I think an analyzer is a different description of this thing now, which they do expect to do so in the future.

BY MS. SMITH:

    Q   So you understand Theranos to be using their own machines, right?

      MS. EAGAN:  Object to form.

      MR. RUMMAGE:  Object to form.

      THE WITNESS:  I wouldn't -- I wouldn't say that.  I don't know what they were doing.  We were

talking about whether they sold them to somebody else.
And I'm saying you I was not aware that they were
selling their analyzer to anyone else.

BY MS. SMITH:

    Q    The first sentence of the paragraph that you
read from earlier it says Theranos does not buy any
analyzers from third parties.  So, with respect to
buying analyzers from third parties, did you have any
understanding about that?

        MS. EAGAN:  Object to form.

        THE WITNESS:  The only thing that I know --

BY MS. SMITH:

    Q    And, again, this is at the point in time not
after the Wall Street Journal?

        MS. EAGAN:  Object to form.

        THE WITNESS:  The only thing that I know an
analyzer referred to as a analyzer is her machine.  I
don't know if there's any other analyzers out there or
that they buy them or they sell them.  I always thought
the word analyzer was what she produced, and -- and she
had told us -- this is about the third time now I repeat
it -- that she did not sell analyzers to outside
parties, and and then I corrected that I heard her say
when she developed the mini lab, that she expected to
sell her analyzers to third parties.  That's all I know.

UNEDITED AND UNCERTIFIED

BY MS. SMITH:

Q   So other than what you just said, you had no understanding at all of the information in this paragraph?

A   The only other thing I told you is that -- which you may call an analyzer, I don't know, is that after The Wall Street Journal article, who understood that she had Siemens machines.  Now I don't know if that's a analyzer.  I've never heard Siemens referred as analyzer, but I said that is Siemens.

Q   So going back to the last three pages in this exhibit, referring to 122?

A   Mm-hm.

Q   Could you turn to the second page in Elizabeth Holmes' e-mail to all Theranos employees at the page ending at Bates Nos. 944572.

A   Okay.  Yes which part?  The last one?

Q   In the -- her last paragraph to the employees?

A   On the page, however, that has all changed?

Q   Are -- I'm looking at page with Bates numbers ending in 9445728?

A   So am I.  And the last paragraph on that page starts with however that has changed.  Is that what you're referring to.

Q   At the section above the page?

UNEDITED AND UNCERTIFIED

A    Oh.

Q    That's Elizabeth Holmes' writing is that your understanding?

A    I'm still not -- dear all or where . . . ? an anecdote or the one above that.

Q    Where it begins dear all and it ends with Elizabeth.  Do you see that?

A    Yes okay.

Q    Okay.  In her last paragraph --

A    Mm-hm.

Q    -- you see where she says tomorrow more of our story will go out to millions of people in Fortune magazine.  Fortune did in-depth research to understand the impact our mission and our work will have on the world, and we selectively shared more of our work for this piece.

A    I do see that.

Q    Did you understand the Fortune magazine article to reflect Theranos' story?

A    I -- I don't recall the Fortune magazine article.  I mean, I know issue read it years ago, but I don't recall anything that was in that magazine at this time.

Q    Well, do you recall Fortune conducting any in-depth research?

UNEDITED AND UNCERTIFIED

A    No.  I snow that Roger spent a lot of time at Theranos, if that's what -- if that's what in-depth research is, but . . .

Q    Were you personally involved aside from sending the -- the numbers of valuation size and what you mentioned?

A    I was not.

Q    Did Roger Parlov spend time with Elizabeth when you weren't present?

            MR. RUBINSKY:  Objection.  Form.

            MS. EAGAN:  Object to form.

            MR. RUBINSKY:  Calls for speculation.

            THE WITNESS:  Of course.  She was within an article.  I was never present at that.  She says she was there and how else would they find out if they didn't talk to Elizabeth?

BY MS. SMITH:

Q    Okay.  So you -- you think he did other research aside from asking you those numbers, correct?

            MR. RUMMAGE:  Objection to form.

            MS. EAGAN:  Object to form.

            MR. RUBINSKY:  Objection.  Calls for speculation.

            THE WITNESS:  He wrote a whole article.  I mean --

                    UNEDITED AND UNCERTIFIED

BY MS. SMITH:

    Q    Where did he get the information for the article?

        MR. MUGMON:  Objection.  Form.

        MR. RUBINSKY:  Objection.  Calls for speculation.

        THE WITNESS:  When did I get what?

BY MS. SMITH:

    Q    Where did Roger Parlov get the information that he used to write the Fortune magazine article?

        MR. RUBINSKY:  Objection.

        MR. MUGMON:  Objection.

        MR. RUBINSKY:  Calls for speculation.

        THE WITNESS:  I -- I don't know.

BY MS. SMITH:

    Q    Do you have any idea?

    A    Sure it's from Elizabeth.  She -- I'm sure he interviewed Elizabeth.  The whole story.  She's got her picture on the paper.  Who else would she -- who else would she interview [unintelligible] other people --

        (Reporter clarification)

        THE WITNESS:  Who else would he interview other than the CEO for an article on Theranos?  So -- and -- and we know that's the case because she ask me to give figures to Roger.  So -- and I was not in on the

        UNEDITED AND UNCERTIFIED

interviews and she had to be.  All the e-mails are about
her and her interview.

      MS. SMITH:  I'm going to hand you the next
exhibit, Exhibit 124.

        (Exhibit 123 marked)

BY MS. SMITH:

    Q    Exhibit 123 is a document ending in Bates
Nos. 3976726.  Appears to be correspondence from
yourself to Elizabeth Holmes dated June 11th, 2015.  At
6:39 a.m.  Is that accurate?

    A    That's accurate.

    Q    You recall sending this e-mail.

    A    I do.

    Q    What is this e-mail about, could you explain?

    A    I have a granddaughter.  She's a straight A
student and -- and ██████████  She's interested in
internships, and I wanted her at some time to meet
Elizabeth, because she's a biology major, and -- and
math and science major, and I think that what was -- she
had heard about Elizabeth and I think that she would be
a -- someone that -- being a female as well in math and
science that this would be a -- a potential mentor or --
or someone who would reinforce that -- that math and
science would -- females have a future in math and
science, and therefore we need to perhaps introduce her

UNEDITED AND UNCERTIFIED

at some time to her.

     Q     Were you hoping your granddaughter would be an

intern at Theranos?

     A     I -- I was -- I -- I don't know about hopeful.

I said that I thought that it would be interesting to

see it would make sense to both her and Theranos.

     Q     Was it more important that your granddaughter

get an internship than accurate statements about

Theranos be published?

     A     As it turned out, she's never met her.  We

never discussed internships after that.  But I don't

like the tenor of your comment, quite frankly.

     Q     Going to hand you the next exhibit.  This is

previously -- this is Exhibit 42 from the Lucas

deposition.

          MR. RUBINSKY:  So is Exhibit 42 here as well?

          MR. KATHREIN:  Yeah.

          MS. SMITH:  Yes.

          MR. KATHREIN:  Well, we're just marking all of

them consecutively in the case so we're not renumbering.

          MR. RUBINSKY:  Okay.

            (Discussion off the record)

BY MS. SMITH:

     Q     So before we go to that Exhibit, just going

back to Exhibit 123, your e-mail to Elizabeth Holmes on

                   UNEDITED AND UNCERTIFIED

June 11, 2015, I'm not sure you answered my question.

Was it more important or not?

    A    They're not related.  I don't . . . what --

what was -- what was the comparison?

    Q    Is it more important for your granddaughter to

get an internship than accurate statements about

Theranos be published?

          MR. RUBINSKY:  Same objection.

          THE WITNESS:  Of course, it's accurate.

There's no comparison.  Accurate statements are a

thousand times more important to an internship that

never happened particularly.

BY MS. SMITH:

    Q    Why you spend more time writing this e-mail

than confirming the statements made publicly about

Therano's technology?

          MR. RUBINSKY:  Objection.

          MR. RUMMAGE:  Objection to the form of the

question.

          MR. RUBINSKY:  Misstates testimony.

          THE WITNESS:  Do I have to answer these

questions?

          MR. OLSON:  Go ahead and answer.  The

argumentative --

          THE WITNESS:  I -- I don't like the tenor of

your questions.  You're -- you're questioning my

integrity, and it

BY MS. SMITH:

     Q    Do you have an answer?

          MR. OLSON:  He's already answered.

          THE WITNESS:  I've answered it.

BY MS. SMITH:

     Q    Okay.  I'll move on.

          You did ever draft or assist in drafting any

press releases with Theranos?

     A    I did not.

     Q    Did you approve any press releases before

they're released?

     A    I -- -- let me revise that statement.  I

recall a draft of some press release.  I -- I think it

was related to technology or something.  And it said

that board members understood the technology or

validated the technology or something like that, which I

did not think was appropriate, because I don't think the

board members did do that.  And there was a wording

change upon my suggestion that a change be made, that

said we were -- I don't know, aware of it or something

to the extent, but what the word that was used -- that

was in the press release was what we understood it or

knew about it or it was more involved than I thought we

UNEDITED AND UNCERTIFIED

were in technology.

Q    You were -- are you referring to one specific press release?

A    Yes.

Q    Do you remember when that was?

A    I do not.

Q    Was it after The Wall Street Journal article?

A    I would presume so, but I can't say for sure.

Q    Okay, we'll come back to that.

Did you ever draft or assist in drafting or have any input in any presentations or PowerPoint slides for Theranos?

A    I certainly didn't draft or whatever and I'm think -- I'm just thinking of input and I can't think of a time that I had input.  Even input.

Q    Did you approve of any presentations or PowerPoint slides before they were sent to investors?

A    I did not.

Q    Turning to Exhibit 42 . . . do you recall any presentations such as this one being given to you or presented to you as a board member?

A    I recall pictures and so forth, and some words in other documents.  I do not recall ever seeing this particular document and all the things that are in this document at the same time.  Or even the format of this

UNEDITED AND UNCERTIFIED

document.

    Q    Could you please turn to page 4 of the presentation.

    A    Mm-hm.  The blue hand?  It says four on it.

    Q    Before that?

    A    Three is red.  Are we talking about the same stuff here?  This says 4.  This says 3.  Next one says 5.  So your pages must be different than mine.  And what page do you want me to be on?

    Q    There's a page that says "our.

    MR. RUMMAGE:  We may have a different document.  Abuse you notice there was an extra copy of this document, which makes we wonder whether something . . .

    MR. KATHREIN:  What he has there.

    THE WITNESS:  I -- I don't see our board anywhere here.

    (Discussion off the record)

    THE WITNESS:  Excuse me, you wanted me on page 4.

    MS. SMITH:  Yes.

    THE WITNESS:  Okay.  I see, yes.

BY MS. SMITH:

    Q    Do you see your name there?

    A    I do.

            UNEDITED AND UNCERTIFIED

Q    Did you approve your name being on this document?

A    I was on the advisory board.  Of course, I do.

Q    Does the document say "advisory"?

A    It does not, but this is the advisory board.

I also want to make a correction.  I think sometime you asked me if I knew any of the advisory board members prior to joining the board.  I did know Sam nun, N-U-N-N.

Q    Thank you.

You said you don't recall seeing this and you don't recall approving this?

A    I didn't look at the whole thing.  I just turned to page 4 like you asked me to.

Well, I answered same way.  I -- I recall pictures like this picture [indicating], the blue glove and so on, but I don't recall this presentation.

Q    Going back to page 4 --

A    Mm-hm.

Q    -- you see the individual that's listed under our board?

A    Yes.

Q    Are all those individuals part of the advisory board?

A    Yes.  Were -- were part of advisory board.

UNEDITED AND UNCERTIFIED

Q     Where did you get the understanding that you were part the advisory board?

A     Well, I started with George Schultz.  We'll go through all of this one more time.  George Schultz asked me if I would join their advisory board.  I said, no, I don't want to be on any boards.  He said that it would be very helpful to have you.  We'll only meet two or three times a year, and -- and -- and the role of the advisory board -- for about a half a day and the role of the advisory board would be that -- is to help Elizabeth while she's working on her business issues, and advise -- and advise her of -- whatever she wanted to be advised of.  And -- and then I kept saying no and he -- he said well, will you, at least meet with her.  I said I would.  And she reiterated that this wouldn't take a lot of time that we would meet two or three times a year for 456 a day and that the role of the advisory board was to allow her to bounce thoughts and ideas of what she was working on and to hear -- to hear and get input from us about how to -- of our thoughts of -- of -- of how to proceed with whatever it is that she wanted to do.

Q     Isn't it a fact that the term advisory was never used until after The Wall Street Journal article?

A     It was always used by us, by the members of

the board.  There isn't anyone on this board that I know
of that -- I'm going to put it in the positive.  All
members of this board -- well, I don't know about Sonny
board -- and Elizabeth.  All outside members of this
board considered themselves as advisory board members.

Q    And you knew this by talking to them.

A    And discussing within our advisory board
meetings, and all confirmed that Elizabeth told them in
my case, both Elizabeth and George told me that we were
advisory board members.  And I can tell you that if it
was not an advisory board member for sure I wouldn't
have joined the board.

Q    Can you please turn to page 10 of the
presentation?

A    Mm-hm.

Q    You see where it says Theranos runs any tests
available in central laboratories and processes are all
sample sizes -- sample types?

A    Yes.

Q    Do you see where it says same test a whole new
approach?

A    Yes.

Q    Could you read the -- the sentence right
underneath that title?

A    The actual information you need is one one

UNEDITED AND UNCERTIFIED

thousandth the size of a typical blood draw.

Q    Did you understand this to be true?

MS. EAGAN:  Object to form.

THE WITNESS:  I can't verify the 1/1,000.  I
confirm it's a lot of less than a needle.  It's a prick.

BY MS. SMITH:

Q    First sentence where it says Theranos runs any
tests, et cetera, do you see that?

A    Right, yes.

Q    Did you understand that to be true?

MS. EAGAN:  Object to form.

THE WITNESS:  My understanding is that
Theranos, when they went -- when they decided go,
understood that they needed to provide all -- most all
of the tests that the customer needed.  You -- because
you couldn't have a customer come in and say we don't do
that test.  So, they decided that they would have to
do -- they would have to have available most all the
tests that the customer wanted.

BY MS. SMITH:

Q    But not able on their own machines?

A    But -- but they could not get whatever was
necessary -- and there's about 225 of these as I recall
she said tests that some people ask for.  And I -- I
recall her saying they did not have enough time to get

UNEDITED AND UNCERTIFIED

all 25 -- 225 of these tests on their machines.  And so

they were taking the 80/20 approach.  You know,

80 percent of the businesses and 20 percent of the

tests, and that they would concentrate on those, and

thin they would have to use other machines to -- for the

other tests that they did not have.  But eventually they

hoped to have maybe not all, but most all, of the tests

available on their machines.

      Q   And where did you get that information?

      A   This information -- I -- I don't recall when I

first heard of this.  But I certainly recall that, after

The Wall Street Journal article, that this was explained

in great detail and was part of the discussion which I

mentioned to you before, when I first heard of the use

of the Siemens machine.  It might have been earlier than

that too.  I just don't recall.  I know specifically it

was done at the -- sometime after The Wall Street

Journal article.

      Q   Who explained that to you?

      A   Elizabeth.

      Q   Could you describe what you mean by 80/20

approach?

      A   That 80 percent -- which is often used in

business.  It's just kind of a general formula.  It

turns out to be true that 80 percent of your volume,

your -- your revenue, comes from about 20 percent of the

tests.  You know, common tests that are done all the

time, you know, and --

     Q    Mm-hm.

     A    -- there's exotic tests.  And there's seldom

needed, and so they were concentrating on the -- on

those tests that had the most dollar volume and getting

those done and then those going, as opposed to waiting

to get all 20 -- 225 done because their people would

come in as I said and if the customer wanted one these

exotics or at least infrequent probably is better way of

saying infrequent tests -- you know, it's not good

customer service -- I'm sorry we don't do those.  You

don't want a customer to come in with an -- and want an

infrequent test and say, I'm sorry we don't do those

tests because then they may not come back.  So it was

better for it them to have an alternative to use the

infrequent test until they developed all the tests on

their machine.

BY MS. SMITH:

     Q    So I want to show you saying 20 percent the

tests were the more common tests?

          MS. EAGAN:  Object to form.

          THE WITNESS:  Yes.  Roughly.  That's common --

most businesses use that technology -- I mean use that

phrase.  It may not -- it may be 81 and 19, but, you
know, most frequent tests you you -- the most -- the
highest volume tests you want to be sure you get done
quickly.

BY MS. SMITH:

    Q    Quickly as in on-site?

    A    No.  I don't mean do it quickly.  You wanted
to be able to perform those quickly, the -- sooner than
the ones that are infrequent.  You want to -- if you
have a --

    Q    How do they perform those quickly?

    MS. EAGAN:  Object to form.

    THE WITNESS:  They develop on the machines.

BY MS. SMITH:

    Q    By that, you mean they test -- they perform
the tests on their machines?

    A    Yes, except -- except in another situation,
which I can explain.  And and so the second thing she
said is that if a customer comes in and has tests that
they can't do on their machine, as well as tests that
they can do on their machine, they will use Siemens for
both, because they don't want to cause the customer to
have to take two samples.  With the blood -- the -- the
venous and you have to do the finger stick.  And it was
better for the customer if they only do one of those,

and so they did the venous for the ones where they had

both.

     Q    So your understanding from Elizabeth Holmes

was that Siemens machines were only used when the

customers came in who had a mix of tests, some of which

they can and can't do.

          MR. RUMMAGE:  Objection.  Form of the

question.  Misstates testimony.

          MR. RUBINSKY:  Same objection.

          THE WITNESS:  And, no, they were always used

for those -- relatively infrequent tests that they had

not yet perfected or whatever on the -- on their own

machines.  Two uses.  One of the tests they had not yet

done -- or -- or had not yet formulated on their

machines, plus those that were -- were tests that -- of

those types of tests, even though another test could be

done on theirs, they didn't require them to go through

two processes.  They used a Siemens for both of those

when it was -- whenever they have two types.

BY MS. SMITH:

     Q    So the 80 percent of tests, you're saying are

the infrequent or the exotic tests?

     A    80 percent of -- of -- of ones are the

frequent ones.

     Q    80 percent of the frequent ones?

                    UNEDITED AND UNCERTIFIED

A    Yes.

Q    And 20 percent are the infrequent ones --

A    Exactly, yes.  Of the revenue roughly.

MR. OLSON:  Yeah, of the revenue.

THE WITNESS:  Roughly.

BY MS. SMITH:

Q    When was your first conversation about this --
the 80/20 conversation with Elizabeth Holmes?

A    I think I told you.  I -- my only recollection
of this discussion was sometime after The Wall Street
Journal.  It could have -- it could have also happened
at some other time.  I just don't recall the time
schedule.

Q    Could you please turn to page 12 of the
presentation.

Have you ever seen this list?

A    Not that I recall.

Q    Were any of these tests ever discussed with
you?

A    Well, there were -- the small number of tests
that were discussed with us, so I assume they're in
here, but I don't remember what -- the I believe one
remember is herpes that got FDA approval.  I don't
remember other -- I know discussed tests from time to
time, but I don't know -- I don't recall which ones, and

UNEDITED AND UNCERTIFIED

I don't know that they are in here or not in here.  It

is not a -- a -- a topic that was discussed a lot.

Q    Do you recall ever being told that overa

hundred tests could be performed?

A    I -- I don't recall that, no.

Q    Did you have any reason to think that this

list is not accurate?

A    Double negative again, to me.

Q    Do you have any --

A    I can't say that it's accurate or inaccurate.

Q    Okay.  Did you understanding that this was

being sent out to investors?

A    I have no idea.

Q    You don't know what this presentation was used

for.

A    I have no idea, no.

Q    When you -- Exhibit 46.  This was, again,

previously used at the Lucas deposition.

     This is a -- a Theranos press release dated

September 9th, 2013, announcing the Walgreens

partnership.  Can you please read the highlighted

section of the at the first sentence?

A    Consumers can now complete any clinical

directed lab tests -- consumers can now complete any

clinician-directed lab test with as little a few drops

of blood, and results available in a matter of hours.

MR. RUMMAGE:  Can you confirm Danielle was this highlighting on the document as produced?  Did your law firm provide the highlighting?

MS. SMITH:  Yes.

MR. RUMMAGE:  Yes which.

MS. SMITH:  Yes, we provided the highlighting.

MR. RUMMAGE:  Okay.  Then I object to the use of the exhibit as a not true and correct copy of what was produced.

MR. RUBINSKY:  We object as well.

BY MS. SMITH:

Q    The text that you just read, do you understand that to be accurate?

A    I had -- I have no opinion of whether it's accurate or inaccurate.

Q    Have you seen this before?

A    Not that I recall, but I -- well, I -- I don't recall it, no.

Q    Do you recall the Walgreens partnership being announced?

A    Absolutely.

I'm just talking about this specific document, I don't recall.

Q    So the -- the parts that you just read, you

have no opinion about whether this is accurate or not?

    A    Right.  That's correct.

    Q    Did you ever have any impression about whether this is accurate or not?

    A    I'm -- I have no impression whether it's accurate or inaccurate.

    Q    Did you feel any duty to fact check the information that Theranos was releasing?

    A    I did not.

    Q    You have any -- did you ever have any opinion about whether any of the other highlighted sections were accurate or not?

    MS. EAGAN:  Object to form.

    THE WITNESS:  I have no opinion whether they're accurate or inaccurate.

BY MS. SMITH:

    Q    Can you describe your understanding of Theranos' relationship with Walgreens?

    A    The relationship, I think, was even signed, but certainly was in works before I joined the advisory board, and Walgreens -- and -- and -- and Elizabeth had decided that she was going to state of the art -- well, not start.  That she was going to expand the testing that she had been doing to retail stores, and I don't know -- and -- and she had had discussions with Safeway

to do that, and she had discussions with Walgreens, and

I don't know how many others, and as we already have

talked about the Safeway thing was not moving along.

And -- and Walgreens did, and there was a decision --

they -- they signed a contract that -- that Walgreens

would -- that they would go forward on this, and -- and,

you know, all the details of the compensation and

configures within the store, et cetera, et cetera.  And

that Walgreens would have the right of first refusal in

certain states as they were doing all this, and -- they

started with one store in I think Palo Alto and then it

was expanded into Arizona.

     Q    Did you have anything to do with negotiations

with Walgreens?

     A    None.

     Q    Where did you get your information about what

was happening with Walgreens?

     A    From Elizabeth.

     Q    When?

     A    At our advisory board managements and -- and

maybe, you know -- I don't -- maybe in conversations at

other times, too, but we consistent times where that --

the advisory board managements.

     Q    Did you participate any demonstrations -- let

me withdraw that.

Did you know about any demonstrations in front of Walgreens?

A     I know nothing about demonstrations.

Q     Did you sit in it on any meetings with Walgreens executives?

A     None.

Q     Did you speak with any Walgreens executives?

A     I don't think so.  They're a customer of ours and I meet with them, but I -- I think -- I don't think I met with them as a customer after I joined Theranos. So I don't recall doing it, but I knew the people, and -- because they were customers.

Q     So your understanding about how the relationship between Walgreens and Theranos ended?

A     Say the.

MR. RUMMAGE:  Object -- go ahead.

THE WITNESS:  Say that question again.

MS. SMITH:  Could you please repeat it.

(Record read as follows:

"QUESTION/ANSWER          :  ")

BY MS. SMITH:

Q     Could you please describe your understanding of --

A     Okay, that's.

Q     How the relationship between Walgreens and

UNEDITED AND UNCERTIFIED

Theranos ended?

    MR. RUMMAGE:  Object to form of the question.

    MR. RUBINSKY:  You can answer.

    THE WITNESS:  My understanding is -- is

Walgreens decided at a time after the -- The Wall Street

Journal article, to stop the relationship and to not

allow any more tests within Walgreens sometime after

the -- The Wall Street Journal article. and to -- and

to --

BY MS. SMITH:

  Q    What was your understanding of what was

supposed to happen before this relationship ended?

    MS. EAGAN:  Object to form.

    MR. RUBINSKY:  Objection.  Vague.

    THE WITNESS:  They were going to -- that

Theranos would of exclusive rights to do blood testing

in Walgreens -- in those Walgreens stores where it was a

mutually agreed to do those tests.

BY MS. SMITH:

  Q    What's your understanding of the devices that

Theranos would use to conduct those tests?

    MS. EAGAN:  Object to form.

    THE WITNESS:  The -- there would be devices

in -- there would be central devices where the tests

would go to be analyzed and sent out, and there would

be, when enough volume was created, locally, to have

machines in an area, say, like a Phoenix or so, that

would -- would do the work there as opposed to sending

them in centrally.

BY MS. SMITH:

    Q    When you say do the work you mean perform the

tests?

    A    Perform the tests.

    Q    You say this would only happen when there was

enough volume?

    A    Volume, uh-huh.

    Q    As in enough customers?

    A    Enough customers.

    Q    Why did Walgreens decide to stop the

relationship?

        MR. RUMMAGE:  Object to form.  Calls for

speculation.

        MR. RUBINSKY:  Objection.  Calls for

speculation.

        THE WITNESS:  I have no idea.  I mean, I --

you have to ask Walgreens.  I don't know.  I just know

they stopped it.

BY MS. SMITH:

    Q    And they stopped after The Wall Street Journal

article.

UNEDITED AND UNCERTIFIED

A    Yes.

Sometime after.  I'm not saying it happened
the day -- I -- I don't know when they stopped it, but
it was -- I know for sure after The Wall Street
Journal -- sometime after The Wall Street Journal
article.

Q    I'm going to hand you Exhibit 45 from the
Lucas deposition?

MR. RUBINSKY:  And counsel did you add the
highlighting.

MS. SMITH:  Yes.

MR. RUBINSKY:  Okay, we'll object to using
this.

BY MS. SMITH:

Q    This is a Wall Street Journal article,
originally introduced it at the Lucas on September 8th,
2013, authored by Joseph Rago, you see that?

A    I do.

Q    Do you recall this article?

A    I do.

Q    Have you seen this?

A    I assume I did.  I -- remember an article by
Joseph Rago and I assume this is the one.

Q    Could you look at page 2.  The first
highlighted section.  Would you please read that?

UNEDITED AND UNCERTIFIED

A    Theranos processes are faster, cheaper, and more accurate than the conventional methods and require only microscopic blood volumes, not vial or after vial of this stuff.

Q    At the time this article was published, was Theranos' processes faster cheaper and more accurate than conventional methods?

A    I have no idea.

Q    Could you please have -- take a moment to look at the other highlighted sections and let me know if there's anything that you had any reason to believe was not true?

MS. EAGAN:  Object to form.

MR. MUGMON:  Object to form.

THE WITNESS:  I have no reason to believe that these are accurate or inaccurate.

BY MS. SMITH:

Q    Was any of this information conveyed to you at any point through Elizabeth Holmes?

MR. MUGMON:  Objection as to form.

THE WITNESS:  The -- the article was not. The -- there's things in here that were either in marketing materials that I saw or were discussed or -- with her, or were discussed in advisory board meetings.

BY MS. SMITH:

UNEDITED AND UNCERTIFIED

Q    Have a look at page 2, the bottom section, the paragraph that begins with a Theranos technician?

A    Mm-hm.

Q    Is that the description of Theranos' blood testing process that was conveyed to you at some point?

A    Yes.

Q    Do you recall when?

A    Well, it -- it seems accurate to the first prick of my finger that the time that I first met her. Or I may -- it wasn't the first time I met her, but the time that I met her before I became an advisory, which we've already discussed.

Q    Could you turn to page 4.  I'm sorry go back to page 2.  Could you please read that second highlighted section that we were just referring to.

A    The whole thing?

Q    Yes, please.

A    "A Theranos technician first increases blood flow to your hand by applying a wrap similar to one of those skiing pocket warmers then uses a finger stick to draw a few droplets of blood from capillaries at the end of of your hand.  The blood wicks into a tube in a cartridge that diplomas calls a nanotainer, which hold microliters of the sample about -- or about the amount of a rain drop.  The nanotainer is then run through the

UNEDITED AND UNCERTIFIED

analyzers, as we talked about earlier, in the Theranos laboratory.  Results are usually sent back to a physician, but a full blood work -- workup, metabolic and immune markers cell count and so on was in my in-box by the time I walked out the door.  Phew.  All clear.

Q    And you said that was what diplomas explained to you on your first meeting correct?

A    Reasonably accurate description.  I don't know about metabolic and markers and --

Q    That was the substance of what she --

A    That was the substance.

Q    -- on the first meeting?

A    Yes.

Q    Can you please turn to page four would you please read that first highlighted section?

A    Theranos' technology eliminates multiple lab trips, because it can run any combination of test, including sets of follow on test at once very quickly, all from a single microsample.

Q    Does that contradict what you said earlier?

MS. EAGAN:  Objection.  Form.

MR. RUBINSKY:  Objection.  Vague.

THE WITNESS:  I don't think.  I think that's what I said, they can run any test -- or they're going to run any test and the only addition is that if you

need further follow on tests, because they keep your

blood sample, they can even do a follow on test without

you coming in, which is what she has said.

BY MS. SMITH:

    Q    So you would say this sentence that you just

read is --

    A    I don't know.

    Q    -- not complete?

    A    Well, I don't know if it's accurate or

inaccurate, but I understand what it says.  Pretty

clear.

    Q    So you wouldn't say that you can run any

combination of tests, including sets of follow on tests?

        MR. RUBINSKY:  Objection.  Vague.

        THE WITNESS:  I don't understand what you're

saying.  What it says is that they can.  What I said I

don't know if it's accurate or inaccurate.

BY MS. SMITH:

    Q    Okay, so earlier you said if a customer comes

in and has a mix of tests, tests that they can't do,

then with they might use the Siemens; is that correct?

    A    That's correct.

    Q    Okay.  So would you say this statement that

you just read, beginning with Theranos' technology would

be more accurate had it mentioned that?

A    No.  I don't think -- personally this is businessperson the customer cares what machine somebody's running on.  Whatever.  They just want to get the test and this says you're going to be able to get all the tests you want.  I don't know anyone -- I know very people people says how they do  which machines using or anything else.

Q    Introduce a new exhibit.

(Exhibit 125 marked)

BY MS. SMITH:

Q    This is a document ending in Bates numbers ending in 1114546 through 1114553.  Appears to be a -- a copy or the content of a Wall Street Journal article by John Carieau.  Says state's updated October 16, 2016, titled hot start-up Theranos has struggled with its blood test technology.  You see that?

A    I do.

Q    Does this appear to be The Wall Street Journal article that came out in October 2015?

A    That's the date on here so it -- they appear to be it is the case.

Q    Do you recall this article?

A    I do.

Q    You recall reading this article?

A    I do, but I must tell you I don't remember the

contents.

    Q    What do you recall hang at Theranos when this article was released?

        MS. EAGAN:  Object to the form.

        MR. RUBINSKY:  Objection.  Vague.

        THE WITNESS:  It is a lot of -- I don't know exactly what Theranos did, because I'm sure they did many more things than -- than I -- than I was aware of. They sent the article to the advisory board.  They -- we had a meeting shortly thereafter and maybe it was even telephonic I don't remember, about the article.  They -- and -- and one way or another, they said that they do not believe the article was accurate, and -- and, you know, they were going to proceed with how to correct the inaccuracies of the article.

BY MS. SMITH:

    Q    Who was it that told you that?

    A    Well, I don't there was many people involved. But the leader of it was -- was Elizabeth.  And -- and she would have done I don't know, 80 percent of the talking, if I -- if I recollect correctly, but there might have been other people talking about it.

    Q    Did she explain why the article was in- -- inaccurate?

    A    She did, but I don't recall exactly what she

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **        ** ROUGH DRAFT **        ** ROUGH DRAFT **

said.

Q    Is that all you recall from the -- the phone call for the meeting following this article?

A    Well, I mean, that's the substance, yes.

Q    Do you --

A    Well, I -- I would say I wanted to -- she said that the people who were -- the employees who were supposedly providing information to The Wall Street Journal were -- were people who did not understand the whole process, that they understood -- they understood a small process -- a small part of the process, and that's why they may have felt the way they did and that some others were -- were people who had been fired and perhaps were upset enough to provide information that they -- that they, Elizabeth and the group believe was inaccurate.

Q    You said there was a meeting of the advisory board shortly after this, a migrate or a phone call of the advisory board shortly after this article.  Do you recall who else was -- was in that meeting?

A    I -- I -- I don't.  But -- I don't, but it's very likely to have been Heather Kings and -- and people working on this.

Q    Heather king you said?

A    Mm-hm.

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **   ** ROUGH DRAFT **   ** ROUGH DRAFT **

    Q    Do you recall what board members were in the
meeting with you?

    A    I don't, but -- but I know all advisory board
members were invited.  I don't know whether everyone
could -- could make the meeting or -- or the telephonic.
But eventually, all of the advisory board meetings heard
from Elizabeth about this and so on, however it was
done.

    Q    Did you have any reason to think that any
advisory board members couldn't make that meeting?

    A    I don't recall.  But if they didn't, I know
that they caught up with her and so on, that that people
were -- everyone was informed one way or another within
a reasonable time after the article.

    Q    And the explanation that Elizabeth Holmes
provided to you, you believe reached all board members?

    A    I would guess, but I can't --

    Q    Okay?

    A    -- confirm that.  It certainly at the meeting
we had whoever was there, because that's how I heard it.

    Q    Did you have any information or do you know
how the staff at Theranos reacted to this article?

            MR. RUBINSKY:  Objection.

            MR. MUGMON:  Objection.

            THE WITNESS:  I -- I do not.  I know know that

                UNEDITED AND UNCERTIFIED

they informed the staff of it at some time after the

Article.

BY MS. SMITH:

     Q    Did the meeting take place the same day?

     A    I have no idea.

     Q    Same week?

     A    I don't -- I don't know.

     Q    You said shortly after.  So probably within --

     A    I have no idea.

     Q    In the same month at least?

     A    I think it would probably, but I can't verify

that.

     Q    Would you have a look at the -- the article

that is comprises Exhibit 125.

     A    125?

     Q    Exhibit 125.

     A    Oh, yeah, I'm sorry.

     A    Yes, where?  You want me to look?

     Q    Would you please look at page Bates numbers

ending 1114547 --

     A    Mm-hm.

     Q    -- in the article.

     A    Mm-hm.

     Q    Third from the bottom paragraph?

     A    Mm-hm.

UNEDITED AND UNCERTIFIED

Q    Could you please read that paragraph beginning with during?

A    During the journal's reporting, Theranos deleted a sentence on its Web site that said many of our tests require only a few drops of blood.  It also dropped a reference to collecting usually only three tiny microvials per sample instead of the usual six or more larger ones.  Heather king, company's general counsel said that changes were made for marketing accuracy.

Q    Do you recall discussing the removal of information from the Theranos Web site with Heather king?

MR. MUGMON:  Objection.

THE WITNESS:  I do not.

MR. MUGMON:  Potentially calls for the provision of privileged information.

MS. SMITH:  Do you recall.

MR. MUGMON:  I instruct the witness not to answer if it does.

BY MS. SMITH:

Q    Do you recall discussing the removal of the information from the Theranos Web site with Elizabeth Holmes?

A    I'm sorry.

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **   ** ROUGH DRAFT **   ** ROUGH DRAFT **

Q     Please repeat it.

(Record read as follows:

"QUESTION/ANSWER          :  ")

MR. RUMMAGE:  Object to form.  Vague.

THE WITNESS:  Am I supposed to answer.

MR. RUBINSKY:  You can answer.

THE WITNESS:  I do not.

BY MS. SMITH:

Q     Do you recall discussing with Ramesh Balwani?

A     With whom.

Q     Ramesh Balwani.  Sonny Balwani?

A     I do not.

Q     Were you aware of this of the removal of
information from the Theranos Web site?

A     Not that I recall.

Q      were you at all concerned with the -- the
allegations made in this article?

A     I was.

Q     What did you do to follow up on your concerns?

A     Well, I wouldn't want to use the word "I,"
because it was -- the follow-ups were done with the
advisory board -- or the follow-ups that I participated
in were follow-up by the advisory board, and and the --
I don't know whether -- I don't recall whether Elizabeth
said this is what we're going to do or the advisory

UNEDITED AND UNCERTIFIED

board suggested what we're going to do, but it was going
to set up -- Heather King was is instructed to
thoroughly look at these allegations and -- and
particularly work with David Bois who was a member -- I
don't -- I don't know if it was a member of the -- maybe
not, but anyway he was at -- he was at all of our
meetings and was the -- he wasn't the general counsel,
but he was whatever you call him legal advisor to
Elizabeth and company and they were to report back, do a
thorough investigation and report back to the advisory
board what they found and -- and so forth.

 Q But you -- did they end up reporting back?

 A Yes.

 Q What did they report back?

 MR. MUGMON:  I would again to the extent your
answer calls for the provision of privileged
information, I would instruct you not to answer.  To
that extent, if doesn't call for the provision of
privileged information, you may absolutely provide that.

 THE WITNESS:  So am I going to jail if I
answer that?  No, no I'm just kidding.

 MR. OLSON:  You could not answer the whatever
information you got from the advisor.

 THE WITNESS:  I think the -- the substance of
the investigation was that most of the information in

here was inaccurate, as I said earlier; that the

allegations were from people who didn't understand the

entire process, and there -- and the allegations were

from disgruntled employees who are no longer employed.

And that was the -- the bottom line, if you . . . there

was lots of discussions on -- this gets back to numbers

of tests and Siemens machines and so on.  I don't

remember if it was in this meeting that we talked about

those or a later meeting or whatever.  Because this went

on for a long time.

BY MS. SMITH:

    Q    Do you?

    A    Substance was what I said.

    Q    Did you receive a report regarding that

investigation?

    A    I say reports.  Again, this went on for a long

time, had all kinds of meetings, discussions, that we

might have informally with Elizabeth.  I mean, this --

you know, it's still going on --

    Q    Did you receive a written report about the

investigation?

    A    I don't -- I don't recall a written report.

But there -- there might have been one.

    Q    You -- at minimum you recall verbal reports,

though.

UNEDITED AND UNCERTIFIED

**ROUGH DRAFT **   **ROUGH DRAFT **   **ROUGH DRAFT **

A    Yes.

Q    Do you recall who gave the verbal reports?

A    A lot of people were participants at various times in the reports. -- of reports.  I certainly recall Elizabeth always, Sonny to some extent.  Heather king looted.  David Bois a lot and some others who were in the room that I don't remember their names.

Q    You recall Daniel?

A    Periodic.  We were not there all the time, but grinning bringing in people from the lab and other places.

Q    You recall Daniel Young?

A    I do not.

Q    So you said the substance of the investigation was that most of the information was inaccurate.  The allegations were from people who didn't understand the process fully and from disgruntled employees who were fired.

So, the substance of the investigation basically repeated what Holmes said in her initial conversation with the advisory board after the article came out?

MR. MUGMON:  So Miss Smith I'd ask you not to ask questions that delve into the provision of privileged information and I -- I really fear that the

line you're going down tends to do that.  So I'd ask you
to move on.

      MR. KATHREIN:  Read back the question.

      MS. SMITH:  Could you please read back -- read
back the question.

      (Record read as follows:

      "QUESTION/ANSWER          :  ")

      MR. RUBINSKY:  And again you should not reveal
the contents of any communications from a lawyer.

      MR. OLSON:  And.

      MR. RUBINSKY:  If your answer requires that
then you should not answer with the question.

      THE WITNESS:  Okay.

      MR. OLSON:  Let me get a clarification on the
question on this.  I'm just looking at it here.  As I --
the substance of the investigation basically repeated
what Holmes said in her initial conversation.  Are you
saying that the substance of the investigation was to be
what she said?  Or are you saying that what was told to
the board was an investigative report repeatings what
Holmes said?  I -- I find that a very confusing question
myself, and they're very different, and the second would
be clearly a communication that would be protected.
BY MS. SMITH:

      Q    What did you mean when you said the substance

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **     ** ROUGH DRAFT **     ** ROUGH DRAFT **

of the investigation if you answer that without delving

in the attorney-client privilege?

        MR. OLSON:  What he understood the nuisance of

the investigation was to be?

        MS. SMITH:  Yes.

        MR. OLSON:  Well, I think he said it was the

report and the paper is what I heard.

BY MS. SMITH:

    Q    When you said substance?

        MR. OLSON:  You can ask it again.  Let me just

be sure.  You said there -- said employees who -- who

were fired?  Change that to who had been fired.  It

almost sounds like they were fired as a result of this.

I don't know when they were fired, but I think who had

been fired disgruntled people who had been fired.

        So -- so let's start again, then.  What --

what were you asking?

BY MS. SMITH:

    Q    Earlier when you said substance of

investigation, were you talking about the conclusions of

the investigation or were you talking about the scope of

the investigation?

    A    First of all, I wouldn't say the investigation

is even concluded yet.  There was a lot of things that

were going on about the Wall Street Journal.  I'm saying

UNEDITED AND UNCERTIFIED

at the initial discussion -- or the initial report from
Heather and David, and Elizabeth, not the day after or
whatever, but whenever we met not what she put in the
press release or anything else, I would say the
substance was, as I described, that they -- they felt
that the people who complained -- or what provided
information to The Wall Street Journal did not
understand the entire process, and -- and others were --
who were dis -- disgruntled employees who had been
fired.

       MR. OLSON:  I don't think as you go further if
you had Bois in that discussion.

       MS. SMITH:  That's fine.

       MR. OLSON:  That he was operating, at least as
as I understand as lawyer through the that time.

       MR. KATHREIN:  Well, according to Elizabeth
Holmes, he joined the board in July of 2015.  So,.

       MR. OLSON:  No, I'm not contesting that he was
on the board.

       MR. KATHREIN:  Well -- well, anything that he
says unless there a clear delineation.

       MR. OLSON:  We'll discuss that at another
time.  Just don't say anything more.

       THE WITNESS:  Okay.

       MR. KATHREIN:  I appreciate that.  That's

better deal with.

        MR. OLSON:  Sure.  You and I will talk about
this at another time.

        MR. KATHREIN:  Okay.

        MR. OLSON:  But for the time being.  Dick
should not go on.

        (Discussion off the record)

BY MS. SMITH:

    Q    Do you recall any follow up conversations
amongst the advisory board, without Elizabeth Holmes,
Heather King or David Bois involved?

    A    Well, there was certainly conversations
between all of is, you know, talking with each other,
and, you know, many times.  At -- monotonous about this
information, you're always talking about -- with your
colleagues, No. 1.  Number two, at -- I believe it's
true at this time, Ron -- I don't know when all the
other lawyers were brought in to the.

        MR. OLSON:  Well, we don't know either and --
and there were -- well, obviously other lawyers at
various times.  From other law firms, but if what you're
getting at is what was said at that meeting that
included the lawyers, then I think it is attorney-client
privilege, and I would instruct the witness not to
answer further about that.  Whether the communication

was from a board member to -- or from the lawyer, it's
not just the lawyers thought.  It's the lawyer hearing
communications which may well, been part of the
privileged communication.

          THE WITNESS:  Because lawyers, there was all
kinds of lawyers, besides David in the rooms in these
discussions.  All the time.  And -- and many times
without Elizabeth or David in the meeting.

          MR. KATHREIN:  Okay, can we get the objection
the instruction not to answer the clear.  Are you saying
any -- he can't talk about any conversation in any
meeting where Bois was present.

          MR. OLSON:  No, no, that's not what I'm
saying, but as I understood it here, there was a request
to.

          MR. KATHREIN:  We're just talking about this
report, then?  You know, the -- the.

          MR. OLSON:  This was not -- any time a lawyer
was present doesn't necessarily mean.

          MR. KATHREIN:  Okay. .

          MR. OLSON:  The communication is privileged.
But here it was preceded by as I understood it a request
to carry out an investigation and then there was further
discussion about that.  And my guess is, that is a
privileged communication.  Defining the scope of the

                    UNEDITED AND UNCERTIFIED

investigation, what it is that was said back and forth is privileged.  But, you know, just because you got a lawyer in the room doesn't mean you got protected conversation.  I think you and I can get on the same page on that.

          MR. KATHREIN:  I just want her to have a little bit.

          MR. OLSON:  Yeah.

          MR. KATHREIN:  Of understanding as to what the boundaries are that you're creating.

          MR. OLSON:  Yeah.  Well, we'll try to . . .

          MR. KATHREIN:  Okay.

BY MS. SMITH:

     Q    Do you recall having discussions with George Schultz about the Wall Street Journal article?

     A    Yes.

     Q    What do you recall.  Do you recall the substance of those conversations?

          MR. RUBINSKY:  And begin if the conversation were about privileged can conversations you received from attorney you should not reveal is that ol' ol' or that you said to the lawyer.

          MR. RUBINSKY:  Right.  Either way, either party.

          MR. OLSON:  These are separate from this.

                    UNEDITED AND UNCERTIFIED

THE WITNESS:  Well, I think what's fair to describe is George was obviously torn, you know.  He had a grandson who was supposedly -- as was talking to Wall Street Journal, which I don't know whether it's true or not.  And he was also a member of the advisory board, and he was I -- I would say he was conflicted by his passionate belief of Theranos and their vision, and knowing Elizabeth for all of her life, and -- and this report by his grandson, and he tried to thread that throughout this the whole time.  It was -- it was difficult.  And -- and we -- he and I agree we weren't going to talk about it, you know, because he was conflicted.  But he expressed his emotions, and -- and we never have talked about it in -- in the context of this.

BY MS. SMITH:

    Q    Do you recall having conversations with Bill Perry about The Wall Street Journal article?

    A    I would call Bill being at in at all -- if not all most of the advisory meetings, and he along with all of us are -- had lots of conversations at the meeting, outside the meetings, and then individually as well as as a group and so on that went on for months and months and months.

    Q    What do you recall his -- his impressions

being?

        MR. RUBINSKY:  And, again, same warning.

        MR. OLSON:  What -- what -- what is the
question?

        MS. SMITH:  Please repeat.

        (Record read as follows:

        "QUESTION/ANSWER      :  ")

        MR. MUGMON:  It was what -- what do you recall
his impressions being.

        MR. OLSON:  His impression.

        MR. MUGMON:  This is what the question --

        MR. OLSON:  Yeah, well, the impression outside
the meeting or in private conversations, you can -- you
can answer that, but if it was in this meeting where
they were back and forth with the lawyers in -- then you
should not give that --

        THE WITNESS:  Yeah, I --

        MR. OLSON:  Response.

        THE WITNESS:  -- would say most of this is in
these meetings with lawyers and so on.  I think
practically everything you are asking is related to
lawyers and the investigation and results of the
investigation, and what we should do about it and I
don't know how to separate these things.

        MR. OLSON:  Well, then you shouldn't say

            UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **   ** ROUGH DRAFT **   ** ROUGH DRAFT **

anything further.

THE WITNESS:  Okay.

MS. SMITH:  I think we should.

MR. MUGMON:  And this is precisely why I'd ask you to move on.  You're you're -- you continue to ask questions.

MS. SMITH:  Okay.  I want to --

MR. MUGMON:  About the substance.

MS. SMITH:  I want to take a break.

MR. MUGMON:  Of of of provision of legal information and I'm uncomfortable with that.

MS. SMITH:  Okay.  Let's take a break.

THE VIDEOGRAPHER:  This mark the end of Media No. 2 in the deposition Richard Kovacevich.  Off the record, 12:22 p.m.

(Break taken from 12:22 p.m. to

12:39 p.m.)

THE VIDEOGRAPHER:  This the mark the beginning of Media No. 3 in the deposition of Richard Kovacevich.  On the record, 12:39 p.m.

BY MS. SMITH:

Q    Going back to Exhibit 125, The Wall Street Journal article.  You mentioned earlier that you had some concerns about the article.

A    I did?

UNEDITED AND UNCERTIFIED

Q    Do you recall what specific -- what those specifics concerns were?

A    I don't remember.  Did I say I had concerns?

Q    I believe I asked you something to the effect of were you concerned when you read this article?

A    Oh, oh, yeah, yeah.  Well, I was concerned about the allegations.

Q    Anything specifically that you were concerned about that you recall?

A    Well, the all the things in here that he mentioned that were either -- that implied false information or whatever, I mean, you know, I didn't reread this.  I just remember that the entire article to me was that he was -- there were -- he was making allegations that the technology didn't work and -- and he said things that were untrue and so forth and so on. I mean, I can read this whole thing and tell you what they were, but that was I think everyone who those this article knows that it was some serious allegations being made by.

Q    Okay, but you relied on Holmes and Balwani and David Bois and Heather King to take care of it?

MR. RUMMAGE:  Objection.  Form.

MR. MUGMON:  Misstates testimony.

THE WITNESS:  No, that's not what I said.

UNEDITED AND UNCERTIFIED

MS. SMITH:  Okay.

THE WITNESS:  I said they were given the responsibility to look into these things and report back to us of what -- how they -- what they felt about the allegations and then I gave you what I said was the substance of what the -- initial reports were -- report was.

BY MS. SMITH:

Q    Is that the -- the substance of the follow up to this?

A    We -- we --

MR. RUBINSKY:  Counsel.

THE WITNESS:  -- we've already said we're not going through it anymore, I thought.

MS. SMITH:  Okay, that's fine.

THE WITNESS:  We're not going through it anymore, I thought.

MS. SMITH:  I'm going to hand you the next exhibit.

(Exhibit 126 marked)

MS. SMITH:  This is Exhibit.

MR. KATHREIN:  126.

MS. SMITH:  126.  This is document Bates No. 1110901.  Sorry, ending in Bates Nos. 1110901 through 1110902.

UNEDITED AND UNCERTIFIED

    A    Mm-hm.

    Q    This appears to be an e-mail correspondence
between Heather King, Elizabeth Holmes, Sonny Balwani
and the rest of the board; is that accurate?

    A    It is.

         MR. RUBINSKY:  And, Counsel, can we confirm
that you added highlighting?

         MS. SMITH:  Yes.

         MR. RUBINSKY:  Okay, I will object to use of
this document.

BY MS. SMITH:

    Q    Do you recall the e-mail in the middle of the
page?  You recall sending that?

    A    I do not.

    Q    Do you see the e-mail dated October 15th,
2015, at 6:54 a.m., appears to be from you to Heather
King and the rest of the board?

    A    I do.

         MR. OLSON:  Can we just stop a minute?  Was
this not claimed as a privileged e-mail?

         MR. MUGMON:  This -- this was produced, but
in -- in looking at it now, this -- this may indeed be a
privileged document, and we'll -- I -- I think it's
something over which we would -- we would like to claim
privilege, and so we'd ask that you not base your

                    UNEDITED AND UNCERTIFIED

questions on it.

        MR. KATHREIN:  Well, are you instructing the witness not to answer.

        MR. MUGMON:  Yes.

        MR. KATHREIN:  No, you -- you cannot do that.

        MR. OLSON:  I will --

        MS. SMITH:  I will instruct.

        MR. OLSON:  Instruct.

        MS. SMITH:  You not to answer.

        MR. OLSON:  The witness not to answer as long as this is an open question.

BY MS. SMITH:

    Q   What was your understanding of the issues that the Wall Street Journal article raised?

        MR. RUBINSKY:  Objection.  Vague.

        THE WITNESS:  I think we're back into what I had said, and I can't say any more because it's privileged.

BY MS. SMITH:

    Q   Is your attorney instructing you not to answer?

        Are you instructing him not to answer?

        MR. RUBINSKY:  Well, for -- the answer to which question?

        MS. SMITH:  Your understanding of what the

                   UNEDITED AND UNCERTIFIED

issues that The Wall Street Journal article raised.

MR. RUBINSKY:  Before the investigation was conducted.

MR. KATHREIN:  Let's -- here, let's -- we're going to be arguing over attorney-client privilege for half hour.  If we can move on and -- and not fight over that.  But the -- the reason they're raising is because there were -- issues isn't there.  You're -- you're talking

MS. SMITH:  Okay.  Then move to the next one.

MR. KATHREIN:  I mean, for the record, we don't agree, and we reserve the right to resume if need be.

MR. OLSON:  We understand that.

MS. SMITH:  Okay.

MR. OLSON:  We'll.

MR. KATHREIN:  I just --

MR. OLSON:  We'll -- we'll deal with it.

MR. KATHREIN:  Okay.

MR. OLSON:  As appropriate.

MR. KATHREIN:  I understand.

MR. OLSON:  Thank you.

MR. KATHREIN:  Okay.

MS. SMITH:  Handing you the next exhibit.

(Exhibit 127 marked)

UNEDITED AND UNCERTIFIED

BY MS. SMITH:

    Q    Exhibit 127 is a document with Bates numbers
ending in 18318776 through 1831779?

    A    Mm-hm.

    Q    So appears to be e-mail correspondence amongst
the board, following The Wall Street Journal article, of
which you are cc'd on or involved in sending e-mails.
Is that accurate?

    A    Are we take -- are we talking about the one
from Elizabeth to all of us there?  I'm -- I don't I'm
not sure.

    Q    Does this exhibit consist of e-mails between
yourself, the board, Elizabeth?

    A    Yes.  Mm-hm.

         MR. MUGMON:  I'd like it to reflect, too, that
it also includes Theranos counsel, and we produced a lot
of documents in this matter, and some of them may have
been inadvertently produced that are indeed privileged.
So we would express the same concern as to the use of
this document as to the last one.

         MR. KATHREIN:  So you're claiming privilege on
this document?

         MR. MUGMON:  Yes.

         MR. RUBINSKY:  And I would instruct you not to
answer based on the company's claim of privilege.


                    UNEDITED AND UNCERTIFIED

THE WITNESS:  Okay.

MS. SMITH:  We reiterate our last --

MR. KATHREIN:  Well, we don't need to reiterate.

MS. SMITH:  Okay.

MR. KATHREIN:  It's understood.  Let's move on.

MS. SMITH:  Handing the next exhibit, 128.

(Exhibit 128 marked)

BY MS. SMITH:

Q    This is a document Kovacevich Theranos 000108 through Kovacevich Theranos 0000135.  Sorry the -- beginning 0000108 through 0000125.  This is a document which is entitled Theranos facts.

MR. RUMMAGE:  Counsel did you guys get a production from Mr. Kovacevich's counsel?

MR. OLSON:  I'm sorry.

MR. RUMMAGE:  Was there a production of documents by Mr. Kovacevich.

MR. RUBINSKY:  Yes.

MR. RUMMAGE:  To just plaintiffs' counsel.

MR. RUBINSKY:  And to company as well.  I would assume that he have those as well.  We can send them to you if you didn't receive it's the same -- we can get those to you.

UNEDITED AND UNCERTIFIED

MS. EAGAN:  All right.

MR. RUMMAGE:  Okay.  I'm sorry I interrupted.

MR. OLSON:  I'm glad you did.

BY MS. SMITH:

Q    So, this document as I said is entitled
"Theranos facts."  This appears to be come type of
official statement from Theranos; is that accurate?

A    I think so, yes.

Q    Whose handwriting is that on the first page on
the bottom?

A    That's mine.

Q    Is that your handwriting throughout this
document?

A    It's illegible, so it's must be mine.

Yes.

Q    Did you -- do you recall reviewing this fact
statement?

A    I do.

Q    Did this response from Theranos satisfy you?

A    It did.

Q    Could you please read the handwriting on the
bottom right on the first page?

A    It says what date was that?  And I think I got
it -- response December of 13.  Were you using lab
experience before this?  How many tests before Wall

Street Journal was exclusively with both finger stick
and your proprietary technology -- finger stick and your
proprietary technology and for -- I don't know long
years and months for I guess how many years and months.

    Q    What was the answers to those question?

    A    Oh, this -- this gets back to, as I told you,
kind of confirms that after The Wall Street Journal was
when we got into the fact that they couldn't do all the
tests, the 235.  They had to use a Siemens for tests
that they couldn't do themselves.  They had to use
Siemens when you took a -- a -- a -- when someone came
in with a test that Theranos didn't do.  Even though
they could do other test, they still took the venous so
that the -- the Siemens machine was used for that and
and.

    Q    I'm not sure that answers your second question
that you -- that you handwrote on the page.

    THE WITNESS:  Well, then -- then the question
was how many -- and -- and the -- they did not have --
they did not give us -- they said they did not have
information on the amount of tests that were done on one
versus the other.

BY MS. SMITH:

    Q    So you didn't get answers to your opinion
questions.

UNEDITED AND UNCERTIFIED

A    I didn't get answers to that question.  I
don't know about others that I had.

Q    Could you repeat what the first question was
that you wrote down?

A    What date was that where it says our lab --
our lob at the launch of our retail operations.  I
wanted to know what date did we launch the retail
operations and they must have answered December -- and I
don't know what that other one is.  Maybe it's August.
I don't know, December, August 2013.

Q    And your last question where you said for how
many months, did you get an answer to that?

A    No.  I mean, I don't know.  I don't remember.
I don't even know what -- it's not a very intelligent
question.  I'm not even sure I knew what I was thinking
about.

Q    Would you please turn to page 4?

A    Yeah.

Q    The at the top?

A    Mm-hm.

Q    Is that your handwriting up there?

A    It is.

Q    What did you write there?

A    How -- how many?

Q    So I were referring to that sentence is that

UNEDITED AND UNCERTIFIED

says Theranos offered more than 80 of the tests on our online test menu, et cetera, and you wanted to know 80 of how many?

    A    And that's when I -- my recollection is they came back with -- again, at a -- advisory meeting with 225, which I said about 25 times.

    Q    Zero eight out of 225?

    A    Yeah.  That's what I recall they -- the number they gave me.

    Q    And the -- the following page, page 5, see in a handwriting to the left side of the page?

    A    Mm-hm.

    Q    Is that -- that's also your handwriting, right?

    A    Right.

    Q    What does that say?

    A    Same thing.  How many tests of run exclusively with both the nanotainer and ourself proprietary technology for those -- I don't know what that -- I don't know what the last part is, but we're back to trying to figure out how many tests were done on proprietary technology and proprietary nanotainers versus not.

    Q    And your answer to that was 80 out of 225?

    A    That was their answer that -- wasn't even 80.

It was back to trying to do this 80 percent of the
revenue with 20 percent of the tests. that meeting of
explanation of all these questions was done not just for
me now.  It was done for everybody.

Q    At the bottom of the page, are you said
something about the FDA.  What are you writing there?

A    I said -- it says somewhere, I assume, I'm
saying what's this about an FDA surprise visit?  Why was
it a surprise?  Why did they come?  What did they find?

Q    Were you posing these questions for Elizabeth
Holmes?

A    Yeah, basically.

Q    What was --

A    Whoever -- whoever -- I was asking whoever had
the answer to it, and -- and if Elizabeth had the
answer, then they retained.  And if somebody else had
the answer I'm sure they answer.

Q    Did anyone aside from an attorney answer these
questions for you?

A    I don't recall.

Q    Did Elizabeth Holmes ever answer these
questions for you?

A    Elizabeth Holmes for sure was the person who
talked about what we've talked about before, about
how -- the Siemens worked versus proprietary technology.

I -- I would -- I -- I don't remember, but it's most
likely that we would have talked about the FDA surprise
visit and so forth.

    Q   Did she explain why the FDA had a surprise
visit?

        MS. EAGAN:  Object to form.

        THE WITNESS:  She said that that's -- they can
come anytime they want to.  It's not unusual that they
would come and -- and I can tell you my own experience
it isn't unusual that an auditor would -- regulatory
auditor come in unannounced.

BY MS. SMITH:

    Q   Did she explain what did she find?

        MS. EAGAN:  Object to form.

        THE WITNESS:  I -- I -- I don't recall what --
I don't recall that they either told her what they find
or that she conveyed to us what they found.  It was all
part of this whole process that was going on that time
with audits from CLEA.  Audits from FDA.  Everyone was
coming in and looking at things because of the article.
SEC was in.  It was a lot of stuff going on. and -- and
I would guess that whatever she told me is probably
client privilege, but I don't know.

BY MS. SMITH:

    Q   So at the time you wrote these questions on

UNEDITED AND UNCERTIFIED

this -- this document, none of the information that you were asking questions about had been explained to you?

A    It may have been and I don't remember, but I was asking because I didn't know the answers to them.

Q    On -- could you please turn to page 15?

A    Mm-hm.

Q    So the -- that first set of handwriting on left-hand side you were, again asking about FDA surprise visit, right?

A    Mm-hm.

Q    What about towards the about the, what are you saying here?

A    Why -- what if this takes a long time to approve?  Won't this bad publicity result in business loss?

Q    What was the response when you said what if this takes a long time to approve?

A    I -- I -- I don't recall.  I mean, I think I -- my recollection is, there was a -- they thought that they could show that they were in compliance and so forth and that it wouldn't last forever.

Q    Can you please turn to the following page the left-hand side.  What does that say?

A    So this is they figure out a way to use small samples at using Siemens equipment, apparently, our

competitors never figured out how to do.  And so when --

when they said that we have figured out a way now to do

small samples on -- and, of course, you one of the

advantages of Theranos technology is this finger stick

using small samples so my question is, If you figured

out how to use small samples online Siemens machine, why

won't our competitors find out how to do small samples

ongoing Theranos -- ongoing Siemens machines. I should

have brought my lunch box with me.

        (Discussion off the record)

        MS. SMITH:  Handing you the next exhibit.

         (Exhibit 129 marked)

        MR. RUBINSKY:  Did you at the highlighting

counsel

        MS. SMITH:  Yes,.

        MR. RUBINSKY:  I will object to the use of

this document.

BY MS. SMITH:

    Q   This is a document beats number ending in

1970603 through 1970610.  Appears to be e-mail

correspondence amongst the board, along with Elizabeth

Holmes and Sonny Balwani around -- ending in

October 9th, 2015.

        MR. MUGMON:  Okay, again just looking at this

document briefly, I mean, looking at the -- the very

               UNEDITED AND UNCERTIFIED

first sentence that, apparently, you've highlighted, as
I said we -- we produced a lot of documents we quickly.
It's entirely possible as is the case here that we
produced documents that inadvertently that are
privileged, and I believe this one is privileged as
well.  So, we'd ask you not to ask any questions based
on this document.

      MR. RUBINSKY:  I'll instruct you not to answer
any questions based ongoing the company's claim of
privilege.

      MS. SMITH:  Well, we disagree.

      Hand you the next exhibit.

      MR. KATHREIN:  While she's looking at -- what
is -- what are -- what part of this document are you
claiming privilege for?  I only see -- and why are you
claiming privilege?  What part of this document are you
claiming privilege for and why.

      MR. MUGMON:  Very first sentence -- the very
first question talks about liability.

      MR. KATHREIN:  So if we were to exclude the
very -- the very first sentence -- do we have a copy one
that's -- is that this extra one?

      (Discussion off the record)

      MR. MUGMON:  We can cover this now or we can
cover this off the record, but, you know, he --

          UNEDITED AND UNCERTIFIED

MR. KATHREIN:  Also question of whether we need to bring Mr. Kovacevich back.  So in all fairness

MR. OLSON:  I hope not.

MS. EAGAN:  May I make a suggestion?  Why don't we take a look at this at a break and then you can -- we can --

MR. KATHREIN:  Okay.

MS. EAGAN:  And then

MR. KATHREIN:  Okay, because I -- from what I can tell, it's just that first question.

MS. EAGAN:  There's more from Heather King at the bottom, so I don't know what the company is going to say about that, but I see a lot of from Heather King.

MR. OLSON:  You all sort it out, and then maybe we can do it by interrogatory.

MR. KATHREIN:  No, we won't do it by interrogatory.  Go ahead.

MR. OLSON:  We'll talk about that.

MR. KATHREIN:  Okay, go -- go ahead with the next one.  This is -- we'll talk about it.

MS. SMITH:  Well, that's 128.  This is --

MR. KATHREIN:  Why don't counsel and I review it now so that we can talk about it at a break.

MS. EAGAN:  So you want us to review it now on record?

UNEDITED AND UNCERTIFIED

MR. KATHREIN:  No.  While we're go -- while

we're proceeding.

MR. MUGMON:  I I prefer.

MS. EAGAN:  No.

MR. MUGMON:  Not to do two things.

MS. EAGAN:  Yeah

MR. KATHREIN:  Okay.

MS. SMITH:  I'm going to hand you the next

exhibit, Exhibit 130.  Correct, next exhibit.

(Exhibit 130 marked)

BY MS. SMITH:

Q    Exhibit 130 is a document Bates number ending

in 0004079890 through 0004079896.  Appears to be another

set of e-mail correspondence stemming from the same

e-mail chain as Exhibit 129.  This time between yourself

and Elizabeth Holmes.  Ending in October 28th, 2015, at

4:05 p.m.  Is that correct?

A    That's correct.

MR. MUGMON:  So, again, I think this is

another document we'll need to look at more closely

during a break.

MR. KATHREIN:  Okay.  Okay, we got it.

MR. MUGMON:  She she didn't hear me so I

wanted -- yeah, I said I think this is a document we're

going to to need to review more closely during a break.

UNEDITED AND UNCERTIFIED

MR. OLSON:  So you're asserting the --

MR. MUGMON:  Yes.

MR. OLSON:  -- attorney-client privilege,
okay.

So you shouldn't respond yet.

MR. MUGMON:  Sorry.  I said for same reason
earlier, but that's exactly yes.

MR. OLSON:  Okay, got it.

MR. MUGMON:  Yeah.

MS. SMITH:  Introduce the next exhibit,
Exhibit 131.

(Exhibit 131 marked)

BY MS. SMITH:

Q   This is a document Bates number ending in
1839075 through 1839083.  Appears to be another set of
e-mails amongst the board, ending in October 30th, 2015
at 11:56 p.m.  This is also stemming from same e-mail
chain as Exhibits 129 and 130.

MR. MUGMON:  Same same concern here for the
reasons I stated earlier regarding privilege, and I
think we should hold this one as well.

BY MS. SMITH:

Q   Is that an accurate description?

MR. RUBINSKY:  I'll instruct you not to answer
the question based on the company's assertion of

UNEDITED AND UNCERTIFIED

privilege.

        MS. SMITH:  Okay, okay.  Are we take a break

now or.

        MR. KATHREIN:  No.

        MS. SMITH:  Handing you the next exhibit, 132.

          (Exhibit 132 marked)

BY MS. SMITH:

    Q    Exhibit 132 is two sets of e-mails the first

one beginning with Bates numbers ending in

3977124 through 3977128 the next set of e-mails is

single page Bates numbers ending in 3976701.

        MR. RUMMAGE:  So I'll object as before to the

similar use of the exhibit for two incident documents.

        MR. KATHREIN:  Let's break this -- take you

have.

        MR. MUGMON:  And I also see we got some

commentary.

        MR. KATHREIN:  Wait, wait.

        MS. SMITH:  I'm just going to clarify the

exhibit.

        MR. KATHREIN:  76701 would be 133.

        MS. SMITH:  To the last document, I'm going to

create a new exhibit and make it Exhibit 133, and that's

the document with Bates numbers ending in 3976701.

        MR. MUGMON:  And I see we're also got some

** ROUGH DRAFT **       ** ROUGH DRAFT **       ** ROUGH DRAFT **

commentary from Miss King along the lines of the concern

I raised with respect to the last one I think we should

we hold this document as well on the ground of

privilege.

      MS. EAGAN:  You're talking about 132, I

believe.

      MR. MUGMON:  I am talking --

      MS. EAGAN:  Not 133.

      MR. MUGMON:  I think my -- my group only has

one got got got.  I haven't seen the last page here.

Yes, exactly, thank you.

BY MS. SMITH:

    Q    Okay, so I'm going to move on to Exhibit 133.

That's the next page.  This is the -- a document Bates

numbers ending in 3976701.  Exhibit 133, this appears to

be an e-mail correspondence between yourself and

Elizabeth Holmes, ending on Friday, October 30th, 2015,

at 4:15 p.m.

      Is that accurate?

    A    That's what it says.

    Q    Do you recall this e-mail correspondence?

    A    I don't -- I don't have any recollection of

this e-mail or what it's about.  It's my birthday, too,

so . . .

    Q    At the very bottom of the e-mail

UNEDITED AND UNCERTIFIED

correspondence it says on October 30th, 2015, at

7:07 a.m.  Can you -- can you read the sentence after

that.

A    Had a very interesting call from a reporter

this morning that may be of interest to you.

Q    What do you say after that?

A    It will take five minutes at the most.  I gave

my phone number.

Q    You have any reason to think that you never

sent this e-mail?

A    No.  No, I don't have any reason to think I

didn't.

Q    Do you recall having a conversation with

Elizabeth Holmes around this time?

A    No.  Since I don't -- have any recollection.

Q    You don't recall Elizabeth Holmes calling you?

A    I don't.

Q    Who was the reporter you're referring to --

A    I -- I have no recollection of who it could be

or . . .

Q    Why would the call from the reporter be of

interest to Elizabeth Holmes?

A    I have no recollection of the reporter or what

the subject matter was, so I don't know how to answer

your question.

UNEDITED AND UNCERTIFIED

Q    Hand you the next exhibit.

(Exhibit 134 marked)

BY MS. SMITH:

Q    Exhibit 134 is a document with Bates numbers
ending in 915771 through 915775.  This appears to be
e-mail correspondence amongst the board ending with a
separate correspondence between Elizabeth Holmes and Jim
Mattis on November 2nd, at 1:49 a.m.  Does that appear
to an accurate description of this e-mail?

A    Mm-hm.

Q    Could you please look at the second page,
which is the document ending in Bates number 915772?

A    Mm-hm.

MR. RUMMAGE:  This appears to be get another
exhibit with highlighting added to so I object to the
use of the exhibit on grounds previously stated it's not
a correct copy of what was produced

BY MS. SMITH:

Q    The page I'm referring to, do you see the
e-mail at the top, coming from Elizabeth Holmes to the
board --

A    I do.

Q    -- on Sunday, November 1st, 2015 at 3:48 p.m.?

A    Mm-hm.

Q    Do you recall receiving this e-mail?

UNEDITED AND UNCERTIFIED

A    I don't.

Q    Do you have any reason to think you didn't
receive this e-mail?

A    I'm -- have no I probably received it, I think
it's -- the answer I want to . . .

Q    On the third line of this page, is that your
e-mail address?

A    Yes, it is.

Q    Towards the bottom of this -- or the second
half of this page, -- I'm sorry.  Withdraw that.  At the
beginning the e-mail where she says, -- what does
Elizabeth Holmes say -- what does Elizabeth Holmes say
in her first sentence of that e-mail?

A    Of the one -- no first.

Q    Yes.

A    I wanted to first thank all of you.  Is that
what you're referring to.

Q    Yes?

A    Who have reached out to shows your support the
company and experience of --

Q    I'm sorry I'm referring to the first -- at
the -- the top half of the page.

A    I want to share -- I'm -- I have no idea where
you wanted -- where you want me.

Q    Yeah, where it begins I want to share the

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **    ** ROUGH DRAFT **    ** ROUGH DRAFT **

below?

     A    Okay I and and you want me to repeat that

sentence.

     Q    Yes?

     A    I wanted to share the below communication

associated attachment that went out to our investors

today for your reference.

     Q    Turn to the next page ending in Bates

Nos. 1 -- 915773.

     A    Mm-hm.

     Q    Can you turn towards the bottom of that page?

          (Mr. Olson exits the deposition

          room)

     MS. SMITH:  The second highlighted section,

could you read what it says?

     A    It is with great pride that one.

     Q    Yes.

     A    It is with with great pride that I can write

that David Bois our long-time counselor formally joined

our board effective this July 2015.

     Q    Was that your understanding, that David Bois

joined the board effective July 2015?

     A    I -- I think that's my understanding.  I -- I

think that meant the proprietary board.  I could be

wrong.

                UNEDITED AND UNCERTIFIED

Q    Proprietary board?  You mean the fiduciary?

A    Fiduciary.  Excuse me, the fiduciary board.

Q    Did anyone ask why this was being announced in November?

A    I don't understand.  He -- he was not on the -- the fiduciary board.  He was just on -- in fact, I don't know if he was even on the -- I don't even think he was on the advisory board.  I think he was just there as -- as counselor.  But I don't know that.

Q    Turn to the -- the next page.  At the top of the page, could you read just that first sentence?

A    All existing board members including --

Q    No.  The very first at the top.

A    When we appointed David we formalized the governing structure was already in place, naming a board of -- yeah, okay, that's -- that's what I thought. He's -- he was announcing that he is now on the fiduciary board, not the board of counselors or the -- or the advisory board.  As I call the advisory board. And that's answer to your question, this codifies the way we have been running the business for a number of years, namely, that there's a board of counselors and there's a fiduciary board.

Q    Do you understand yourself to be serving on the board of counselors?

**ROUGH DRAFT**       **ROUGH DRAFT**       **ROUGH DRAFT**

A    That's the board of counselors I've been calling the advisory board, yes.

Q    Did you know you were on both boards?

A    I wasn't -- I was only on the advisory board until I think I told you beginning of 19 -- of 2016, when I also joined the fiduciary board, and at that time, or around that time, the board of counselors was eliminated.  Which we talked about several hours ago. So this is David going to show the fiduciary board and the rest of us down here, were still on the counselor board, but not on the fiduciary board.  So fiduciary board at that time then consisted David Riley.  Jim Bechtel.  Jim Mattis and Sonny.  Outline the rest of us were still on the advisory board, which is now called the board of counselors.

Q    Are there any earlier documents that made the distinction that you're referring to?

A    Well --

MR. RUBINSKY:  Objection.  Calls for speculation.

THE WITNESS:  There wasn't -- there wasn't a fiduciary board until -- I don't remember the date, which refers here and consisted of Reilley Bechtel, Jim Mattis Elizabeth Holmes and Sonny.  And -- and I don't remember when that started.  And -- and David was -- was

put on that board.  Everybody else was on the board of counselors.

BY MS. SMITH:

    Q    Did you make any public statements to the effect that you were on the advisory board of Theranos as opposed to a fiduciary board?

    A    Many times.  I mean, I didn't put it on a billboard, but people would ask me, you know, on the board and I said I'm on the advisory board of Theranos.

    Q    Is there -- are there any written documents reflecting that you were serving on an advisory board?

         MR. RUBINSKY:  Objection.  Calls for speculation.

         THE WITNESS:  We've been through all those documents.  That's -- that's how we started.  That's how George Schultz got me.  That's what she said.  That's what was the deal and so on.

BY MS. SMITH:

    Q    If I wanted --

    A    In fact, it was on the Web site that that we were advisors.

    Q    Are from any -- you're saying the Web site make the distinction between the advisory board the fiduciary board?

    A    Until -- I don't know what date.  There was

**ROUGH DRAFT**   **ROUGH DRAFT**   **ROUGH DRAFT**

only one board, the advisory board.  Some date after

that -- I don't remember what it was -- in addition

there, was a fiduciary board created.  It was comprised

initially of Riley Bechtel, Jim Mattis, Elizabeth Holmes

and Sonny on July of 2015, so this fiduciary board was

created prior to July.  I don't know when.  David Bois

was added to that fiduciary board.  But no one was on a

fiduciary board at the beginning.

Q    But to your understanding it wasn't posted on

the Web site that there was a distinction between an

advisory board and --

A    Because it wasn't a fiduciary board.  Why

would you distinguish between a board that existed and

one that did not exist.  I don't understand.

Q    So?

A    The question.

Q    In Theranos' public statements did they ever

say advisory board as?

A    I

Q    Opposed to board?

A    I don't know what they said publicly.  I know

what we were and what we were told and what they said

publicly I don't know.

Q    So you can't point to any documents that made

the distinction between advisory and fiduciary?

UNEDITED AND UNCERTIFIED

**ROUGH DRAFT** **ROUGH DRAFT** **ROUGH DRAFT**

        A    I can't point to any documents that say
anything.  I don't know.

        Q    Hand you the next exhibit.

                (Exhibit 135 marked)

BY MS. SMITH:

        Q    Exhibit 135 is a document that is a snapshot
of a page as it appeared on the Bloomberg.com Web site,
and it is and rely entitled "Can Elizabeth Holmes save
her unicorn?"  Dated December tenth, 2015.

                Is that please turn to the second-to-last page
of this document.

        A    Mm-hm.

        Q    The second paragraph, could you please read
that second paragraph?

        A    Another advisor and board member Richard
Kovacevich a former CEO of Wells Fargo says some of the
bumps Theranos has encountered are specific to private
companies which aren't usually prepared to deal with
such intense public criticisms.  Responding to a
situation like this you need speed you need evidence
it's a full court press he says.  Theranos doesn't have
the infrastructure to respond in a way and so that
probably led people think, oh, God there must be some
truth to this.  It's been behind in my opinion up until
lately in refuting the allegations and not focusing on

                    UNEDITED AND UNCERTIFIED

test results.

    Q    Did you make those statements?

    A    I believe I did, yes.

    Q    When you made those statements, did you belief there was no truth to The Wall Street Journal article?

    A    No truth, I don't know if I'd go that far.  I would go back to the substance that I reported previously as I had told her previously of the discussions that we had at the advisory board.

    MR. MUGMON:  And we need to be again careful about the divulging any of those conversations that are subject to privilege.

BY MS. SMITH:

    Q    Was this -- a peer-reviewed article that you submitted a statement for?

    A    I believe it is.

    Q    I'm going to hand you the next exhibit.

        (Exhibit 136 marked)

    MR. KATHREIN:  So it looks like we've got about four or five more exhibits and so further questions to go through.  So do you guys want to take a break now to discuss this, go over this?

    MR. MUGMON:  Up to the witness really.

    MR. RUBINSKY:  Use a break?

    THE WITNESS:  Sure.

        UNEDITED AND UNCERTIFIED

MR. KATHREIN:  How long do you want to break?

MR. RUBINSKY:  Do you want to grab something
to eat or?

THE WITNESS:  No.  No.  Let's keep going.  I
mean, you don't have any food here, right?

MS. EAGAN:  Right.

THE WITNESS:  So there's -- it's the first
deposition I've been to that didn't have food, but
that's okay.  All right let's go.

THE VIDEOGRAPHER:  Off the record.

THE WITNESS:  Thank you for your hospitality.

THE VIDEOGRAPHER:  Off the record.  Microphone
sir.  Microphone.

THE WITNESS:  I'm sorry.

THE VIDEOGRAPHER:  Off the record.  1:29 p.m.

(Break taken from 1:30 p.m. to
1:44 p.m.)

THE VIDEOGRAPHER:  On the record.  1:44 p.m.

BY MS. SMITH:

Q    You have Exhibit 136?

A    I do.

Q    Exhibit 136 is an article from The New York
Times dated December 20th, 2015, entitled Theranos
founder faces a test of technology and reputation.

I'm sorry, dated December 19th, 2015.  Have

UNEDITED AND UNCERTIFIED

you seen this article?

    A    I have.

    Q    Does that appear to be an accurate description of this article?

    A    It does.

    Q    I'm going to hand you you the next exhibit?

    A    I'm sorry.

    Q    Said I'm going to hand you the next exhibit.

            (Exhibit 137 marked)

BY MS. SMITH:

    Q    Exhibit 137 is a document Bates numbers ending in 127940 through 127946.  Appears to be e-mail correspondence from Brooke Buchanan at Theranos.

        And within the e-mail contains the text of the New York Times article from Exhibit 136.

    A    Mm-hm.

    Q    Is that -- is that an accurate description?

    A    It is.

    Q    Could you have a look at the first page, in Brooke's e-mail?  She mentions a statement from senator Bill Frist, Richard Kovacevich, Tim Draper, Dr. Waldo conception and Dr. Channing Robertson.  Do you see that?

    A    I do

    Q    Could you please read, first of all, is that -- did you contributed to the drafting of this

** ROUGH DRAFT **   ** ROUGH DRAFT **   ** ROUGH DRAFT **

statement, or did you have any enumerate in it?

MS. EAGAN:  Object to form.

THE WITNESS:  I don't recall if this is the one that I told you earlier that there was some minor language changes, or -- or not, but there was one that I remember, and this could have been it.  I just don't know.

BY MS. SMITH:

Q    Do you recall someone from Theranos organizing a joint statement between yourself and the others mentioned on this e-mail?

A    I do.

Q    Could this have been that statement?

A    Could have been.

Q    Could you please read the first three sentences of this statement?

A    Between the five of us, we spent many hours talking to The New York Times Reed M. Ableson, because we are committed to making sure that the world learns the true story of Theranos, a successful innovative company that is right where it should be in its growth. We believe in the innovative technology that Theranos has introduced to the world and the meaningful equation it has already brought to health care by introducing lower cost, more accessible, less painful lab testing.

UNEDITED AND UNCERTIFIED

We have seen the data that shows the technology works.

It is indisputable that Theranos' ground-breaking even

beyond this innovative technologies from creating a

model for all laboratories to undergo the rigorous

scrutiny of the FDA to calling for transparency in

pricing and access to health information.

    I think that's --

Q    Yeah.

A    I'm just -- do you want me to keep reading or.

Q    No?

A    Is that enough.

Q    That's enough.

A    Okay.

Q    So where you stated we have seen data that

shows the technology works, on what were you basing that

statement?

A    Well, on the information that we receive on

the tests that were taken.  And the accuracy of these

tests.  It includes -- there was a nanotainer test that

were made, I think -- I think within the FDA or in

cooperation with the FDA where they did venous versus

nanotainer and the data said it was very accurate.

There was comparisons of -- made between results from

our -- from our proprietary technology and lab

technologies that shows the data was accurate, and --

UNEDITED AND UNCERTIFIED

and there was even the tests taken through CLEA, where
you send the test samples into CLEA, and they compare
what -- redo the test and then with the same sample CLEA
does the test, and we were shown data that was, you
know, I don't know, 99.8 percent accuracy, et cetera et
cetera.

Q     Who showed you the data?

A     In the -- Theranos.

Q     Who specifically?

A     I don't remember.  I know that Sonny and --
and Elizabeth were in the room, and I don't recognize
whether the data was supplied by -- they described the
data or some other person came in to do it.

Q     In what form did they present this data?

A     Usually, PowerPoint of some -- of some degree,
showing the statistics, the -- the statistics of every
sample and percentage of accuracy and -- and -- of all
the samples, et cetera.

Q     Were you ever given a copy of this PowerPoint?

A     We certainly could -- some people asked for
copies, and I don't think I did, but it was -- readily
available.

Q     Did you ever have an expert perform an
independent review of the data?

A     I did?  No.

UNEDITED AND UNCERTIFIED

Q    Did the board ever have an expert perform an independent review of the data?

MR. RUBINSKY:  Can I ask what time period you're talking about?  Again, are we getting in privilege and investigates or are you asking before?

MS. SMITH:  I'm referring to the data that Mr. Kovacevich was referring to that he was shown, which in reference to the -- the statement in his joint statement, where he says we have seen data that shows the technology works.

MR. RUBINSKY:  So you can answer to the question -- to the extent that it comes before the privilege investigation.

THE WITNESS:  It was 12/20 so it would be after.

MR. RUBINSKY:  You can't -- if you cannot answer without revealing privileged information when I instruct the not to answer the question.

MR. KATHREIN:  Are you saying that in -- the board making a direction that there would be an independent review is privileged.

MR. RUBINSKY:  I think the question was, Did the board ever have an expert perform an independent review of the data.

MR. KATHREIN:  Right.

UNEDITED AND UNCERTIFIED

MR. RUBINSKY:  So the scope of the.

MR. KATHREIN:  You think that's privileged.

MR. RUBINSKY:  Investigation.

MR. KATHREIN:  That's not the scope.  It's did the board ever ask anyone Elizabeth -- I mean, you're -- you're -- you're cloaking the privilege way too broad.  So, you're -- instruct him not to answer that question?

MR. RUBINSKY:  To the extent it involves the privilege investigation.

MR. KATHREIN:  Well.

MR. RUBINSKY:  If you can answer without talking.

THE WITNESS:  Well well.

MR. RUBINSKY:  About the investigation.

THE WITNESS:  Yeah, yeah, let me -- I don't think he was asking for the conclusions.  I -- I can tell you and I've been waiting to tell you for some time on on these issues, that -- that that because of the Wall Street Journal article and the statements made by Theranos that they thought there were gross inaccuracies myself, Bill Perry, and the rest of the advisory committee said that the veracity of the -- of Theranos in the papers is not going to change the -- the readers impression of whether this technology works or not.  We must get third-party peer-reviewed validation of the

technology and we kept saying that and saying that and
saying that and a number of initiatives were undertaken
to do that.  And I mentioned FDA study that was done
between nanotainer and -- and -- and venous and -- and
they came back to us, saying that the FDA was very
compressed with the results of that and I, go into
others, but from about this period of time can or so,
because it's after The Wall Street Journal, the board
was insisting on a process to get third-party validation
of, quote, unquote, technology.  A big picture of their
technology.

BY MS. SMITH:

    Q    Okay, you said the board was insisting on
this.

    A    The advisory board.

    Q    The advisory board was insisting on this.  Who
are they insist -- who exactly are you referring to when
you say the board and who were you insisting --

    A    It was the advisory board who was still in
existence at that time and too Elizabeth and -- and,
usually, Sonny's in the room, too, but it's you know,
it's to Elizabeth.

    Q    Did the board ever on its own initiative,
without Holmes or Balwani ever undertake its own study
or undertake -- or have someone else undertake a study?

MR. RUBINSKY:  And again you should not talk about the privilege investigation that occurred.

THE WITNESS:  Well, I -- I stand what I stayed, the board insisted that we get third-party appear review of the technology, and that Theranos was to line up the test and line up the peer review -- the acceptable industry magazines and whatever which are considered to be the peer review people, they're the outsiders.  You don't -- you don't need outsiders, because they are the outsiders and you you submit these -- these tests and the results of these tests to the -- to the magazines, and -- and then they assign some -- this is my understanding now, how this works, okay.  And they assign people to do peer review of these findings and then they publish those findings in their magazines and that's how things work in the health-care industry.  So the outsiders are -- and outside independent organization like the editors of these magazines, picks on outside group of people to do peer review so it's all done outside.

Q    Did this --

A    If that answers your question.

Q    So did this peer review as you describe it ever take place?

MR. RUBINSKY:  Again, you should not talk

about the privilege investigation.

    THE WITNESS:  The --

    MR. KATHREIN:  You know, you're inferring that
that's privilege investigation.  I don't appreciate your
talking about that, okay?

    MR. RUBINSKY:  I don't know how to keep giving
the warning without -- we -- we've sort of already
explained that --

    MR. KATHREIN:  Well, he knows that he's not
supposed to say -- talk about communications with the
attorneys.

    MR. RUBINSKY:  Okay, you can answer to the
extent that it doesn't reveal privileged communications.

    THE WITNESS:  Well, and I don't know whether
it does or not -- I don't know whether it does or
doesn't, but -- but the -- the questions is, is that
we -- we did -- we were -- we -- we may have got a lot
of of by now for all I know, because I left.  About you
to there were all kinds of -- of initiatives being taken
with UCSF, with Cleveland Clinic at one time, Stanford
and so on to set up these -- these comparisons and tests
for outside peer review app one that I mentioned now
several times was the data that was submitted to the FDA
on the finger stick, again, an outside agency, comparing
the -- what's the word? -- the -- -- well, the -- the

comparison -- comparing the results of doing tests with

finger -- with the nanotainer compared to doing test

with the -- with venous.  And so a lot of these things

were under way when I was there, and I don't know what

happened to them after that.

BY MS. SMITH:

       Q    Did you ever see the results of these

initiatives?

       A    I have not seen the results.  Well, only one I

saw the results was FDA and nanotainer versus venous.

       Q    So you had left by the time these results or

these initiatives came to fruition?

       A    I -- they were weren't in fruition when I

there.  I don't know if they ever came into fruition.

But while I was there I didn't see the results.  These

tests were being set up and data being taken and so

forth.

       Q    Do you know if the results were ever

published?

       A    I don't know.

       Q    Do you know if they were ever otherwise made

public?

       A    I do not know.

       Q    Handing you Exhibit 73.  This document was

introduced in the Channing Robertson deposition?

                    UNEDITED AND UNCERTIFIED

A    Who was that?  Channing?

Q    Channing.

This was a document dates numbers ending in 785498 through 785502.  The copy of a Wall Street Journal article entitled Theranos ran tests despite quality problems?

A    You have a date of this article?  I don't see one.

Q    March 9th, 2016.

A    March 9th, 2016, okay.

Q    Have you seen this article?

A    That's I'm trying to think.  I -- I don't -- I don't relect -- recollect seeing it.

Q    Do you recall a similar article coming around -- coming out from The Wall Street Journal--?

A    Let me just read it for a minute, see.

Yes, I did see this.

Q    Can you please read the first sentence of this article?

A    A federal inspection report said Theranos, Inc., laboratory ran an important blood test on 81 patients in a sex -- six month period despite erratic results from quality control checks meant to ensure the test's accuracy, people with -- familiar with the report said.

UNEDITED AND UNCERTIFIED

** ROUGH DRAFT **   ** ROUGH DRAFT **   ** ROUGH DRAFT **

Q    Do you recall discussing this article with the board?

A    Yes.

Q    Do you recall the substance of those conversations?

A    Privilege?

Q    Outside of attorney communications.

A    I -- it was -- it was attorneys all over the place.

Q    Was there a follow-up investigation specifically pertaining to the sentence or the content of the sentence that you just read?

A    Again,.

MR. MUGMON:  What was -- I'm sorry what was the question?  I'm trying to was -- was from a follow-up -- I'm just not clear from the -- the live feed.

MS. SMITH:  Did you get what I said.

(Record read as follows:

"QUESTION/ANSWER        :  ")

MR. MUGMON:  I think the -- the fact of investigation is not privileged, but I would -- I would -- so I think you can answer whether there was an investigation.  I don't think you can speak to any substance of an investigation.

UNEDITED AND UNCERTIFIED

THE WITNESS:  There was an investigation, but
I -- I wouldn't think I can report on the substance of
the -- I would -- I would expect that the substance of
the investigation was privileged, but that's up to
the --

BY MS. SMITH:

Q    Were you involved in the investigation?

A    No.

Q    Who was involved?

A    The lab people, Sonny, Theranos compliance --
I don't know.  All kinds of people were in the room,
most of which I didn't know.

Q    But there were no outside --

A    Legal.  There could have been.

Q    Do you specifically recall any outside
investigators that were unaffiliated with Theranos?

A    Not specifically.  But there could have been.

Q    Were you on the board LinkedIn enough to see
an outcome of this investigation?

A    I was not.

Q    You were unaware that -- whether or not there
was any outcome.

A    Well, I think an outcome of some investigation
which -- which was publicly acknowledged by the company
is that there had been some issues within the lab, and

they found those issues and corrected them and so on,
and -- and I believe they said publicly, but they redid
the test an I know that they did.  But this was a --
this was the admission of some deficiencies in the lab
process that got all kinds of publicity, and this was
one of the items that were --

    Q    Okay, so your recollection is that -- the
investigation that took place, the results -- I'm sorry.

        Your recollection is that the results of the
investigation that took place were released publicly?

        MR. MUGMON:  Objection.  I think that -- that
misstates his -- his testimony.

BY MS. SMITH:

    Q    Were the results of this investigation
released publicly?

    A    I don't know that.  I said I believe that it
was, that the -- that -- no, not the results of the
investigation, that the -- that they were undertaking an
investigation, knowing that there were issues within the
lab, that that was publicly announced, that there were
issues.  The admission that there were issues of quality
a in the lab was publicly announced.

    Q    The issues that you're referring to, are
they --

    A    I don't know.

            UNEDITED AND UNCERTIFIED

Q    -- consistent with what's in this article?

A    Like I said I don't know an that it was related to this one, but it could have been, but the general comment was made publicly that indeed there were issues with the lab.  In fact, they closed the lab in -- in Newark.

Q    So you were aware that there were issues in the lab?

MR. MUGMON:  Objection.  Vague.

THE WITNESS:  Well, yeah, they admitted there was issues in the LAN and they closed lab so there must have been issues.

BY MS. SMITH:

Q    Are those the issues same--?

A    I don't know that.  I said that.  I don't know whether this one was specifically there, but there were issues admitted issues that resulted in the closing of the Newark lab.

Q    So you just know that there were issues, but you don't know what the issue were?

A    I don't know.

Q    Do you recall who called for the investigation?

A    Who called for the investigation, I'm not sure I know what you mean.

UNEDITED AND UNCERTIFIED

Q    Give you the next exhibit.

(Exhibit 138 marked)

BY MS. SMITH:

Q    I'll also give you Exhibit 139.

(Exhibit 139 marked)

BY MS. SMITH:

Q    Exhibit 138 is?

MR. RUMMAGE:  Pause for a second.  Is 139 on its way down here?

THE WITNESS:  I'm sorry.

MR. RUMMAGE:  Thank you.

BY MS. SMITH:

Q    Exhibit 138 is New York Times article entitled "Theranos' fate resins with the founders who answers only to herself," dated April 25th, 2016.  If you please turn to the second-to-last page of this article?

A    Mm-hm.

Q    Could you read the last sentence of the article?

A    Starting with the lab?  Starting with lab or starting with, "but while."

Q    The second-to-last page of the exhibit and the last page of the article.

A    Are we talking 138?

Q    Yes.

UNEDITED AND UNCERTIFIED

A    The last page has nothing on it.  The second-to-the-last page is this [indicating].

Q    Yes.  I'm referring to the second-to-last page?

A    Okay, now, where do you want me to start?  Give me the start of the paragraph you want me to read.

Q    The paragraph beginning with "and."

A    And.  And Mr. Kovacevich emphasized Ms. Holmes will ultimately determine what happens next.  We have to ask Ms. Holmes what steps there are.

Q    Did you make this statement?

A    I don't recall making it, but I wouldn't doubt that I did.

Q    Did you make any statements to The New York Times?

            MR. MUGMON:  Objection.  Form.

            THE WITNESS:  I said I don't -- I said I didn't recall.

BY MS. SMITH:

Q    Would you please turn to the -- the page before that statement.  Third paragraph.  Could you please read that?

A    Starting with the the medicare.

Q    Starting with, but Mr. Kovacevich?

A    Oh, I'm sorry.  But Mr. Kovacevich who was

                    UNEDITED AND UNCERTIFIED

also an investor emphasized that Theranos was a publicly
held company with the same responsibilities of the
shareholders under -- and the shareholders understood
this.

    Q    Do you recall making that statement?

    A    I do.

    Q    Does this appear to the article for which the
statements were submitted?

    A    I -- it appears that -- but I can't -- as I
say, I don't really remember the article.  I remember
the at the same times.

    Q    Do you have any reason to think this --

    A    No.

    Q    -- and article for which you submitted?  Okay.

    So the first sentence you write before, which
is towards end of the article?

    A    Right.

    Q    Can you explain what you mean by that?

    A    Well, it goes back to what we've been talking
about.  We were advisory directors.  She owns 60 to
70 percent of the company.  It's a totally private
company.  It doesn't even have audit statements in it.
It's typical of what happens in Silicon Valley, and the
person who runs the company and owns the company makes
the decisions.  Even -- even if she could all -- if it

**ROUGH DRAFT **ROUGH DRAFT** **ROUGH DRAFT**

was a vote of the stockholders, she wins, because she
owns most of the stock.  So, it's just the way things
work in Silicon Valley prior to IPOing and prior to
being a substantial company with -- with all the bells
and whistles an expense goes with the -- developing into
a -- a larger and successful company.  This happens all
the time.

Q    Could you turn to Exhibit 139.

A    Mm-hm. oh, that's a new one, okay, yes.

Q    Exhibit 139 is document with Bates numbers
ending in 3644833 through 3646835.  Appears to be e-mail
correspondence sending with Elizabeth -- I mean, with
Christian Holmes forwarding an e-mail to Elizabeth
Holmes.

A    I think it's the same statement.  Am I missing
something?

Q    The e-mail appears to be referencing the --
the same article on Exhibit 138.  Does that appear to be
the case?

A    That appears to be the case.

Q    Okay.  The date the e-mail from Christian
Holmes to Elizabeth Holmes is May 2nd, 2016.

Do you see that at the top?

A    Yes.

Q    Okay.  You said this is the same article.

UNEDITED AND UNCERTIFIED

You're -- you're --

     A    Well, it's the same statement.  I don't know if it's the same article that I just read to you.

     Q    I'm going to hand you the next exhibit.

       (Exhibit 140 and Exhibit 141 marked)

BY MS. SMITH:

     Q    Exhibit 140 . . . ?

      MR. RUMMAGE:  It's going to be 140 and 141.

      MS. SMITH:  These are Exhibits 140 and 141

     Q    (By Ms. Smith)  Okay, starting with Exhibit 140 is a document with Bates numbers ending in 185080 through 185083?

     A    Mm-hm --

     Q    This appears to be an e-mail from Daren owes center to Brooke Buchanan and some others at Theranos, and dated June 2nd, 2016, at 5:08 p.m., containing a transcript entitled "CNBC squawk box?

     A    Right.

     Q    -- Theranos and Kovacevich interview June 22nd, 2016.  Is that an accurate description of this?

     A    Yes.

     Q    Does this appear to be an accurate transcript of your interview with CNBC?

     A    Yes.

Q    Do you recall giving the interview with CNBC?

A    I do.

Q    Who asked you to give the interview?

MR. RUBINSKY:  Objection.  Assumes facts.

THE WITNESS:  I don't remember.  Well, I -- I
think what happened is, I was interviewed on another
subject and then asked about Theranos.

BY MS. SMITH:

Q    Do you recall what the other subject was?

A    Probably -- I don't recall.

Q    On the second page of Exhibit 140, on the page
ending in Bates Nos. 185081, a couple paragraphs down I
believe you're us discussing Sonny Balwani and his
departure from Theranos; is that correct.

A    Is this on 81?

Q    81.

A    I don't see anything on Sonny.  Are we talking
about 140?

Q    Yeah.  One -- Exhibit 140?

A    Second page.

Q    Second page.

A    At the bottom.

Q    No at the?

A    Bill Kiernan and.

Q    Towards the top of the --

UNEDITED AND UNCERTIFIED

A    Oh.

Q    Page?

A    I'm sorry.

Q    Do you see on the second paragraph, where it says Becky quick the president and CEO -- COO stepping?

A    Oh.

Q    Down as well?

A    Yes.  Yes.

Q    Do you see the language after that, and your response after that?

A    Right.

Q    Could you please read your response?

A    There are some personal reasons why he decided to do that.  But -- but, again, you know, I think these are all normal things that happen with the start-up and is just -- there's been excessive publicity for something that is not unusual in start-ups.

Q    What were you told about Sonny Balwani's departure?

A    That she fired him.

Q    Were you given any reasons why?

A    No.

Q    Who told you that?

A    I don't recall.  I mean, -- well, there was a -- I don't know if it was a -- if there was a press

release, but there was a release to the advisory board that -- that she fired Sonny.  I -- I would guess that's how I heard about it.

Q   Do you recall the substance of that e-mail? Is it an e-mail?

A   I -- I don't remember how many it came to me, but I know there was a release also.  Just that I don't remember the -- the word, but I remember what the word said and that he's fired.  I'm sure it wasn't that direct, but that was the -- an essence of e-mail.

Q   Did you ask why Balwani was leaving Theranos?

A   I didn't.

Q   Were you interested?

A   Well, I -- you're always interested when someone's fired, but I guess I thought I probably knew why it was happening, but that's just a -- it wasn't -- put it this way it wasn't a surprise to me that he was fired.

Q   Why wasn't it a surprise?

A   Because there were issues with the labs and -- and so on that reported to Sonny.

Q   There were issue with labs and personnel in the labs that reported to Sonny, you said?

A   Mm-hm.  As we already talked about, Newark was closed.

UNEDITED AND UNCERTIFIED

Q    Can you describe those issues?

A    I described them already.  Said there were
quality issues with the Newark lab and they closed it,
and this -- the labs and the people in the labs reported
to Sonny.

Q    Can you turn to Exhibit 141?

Exhibit 141 is an article from CNBC entitled
Kovacevich I still believe in Theranos and its
technology" published June 2nd, 2016.  Does this appear
to be the article for which you submitted this statement
or gave the interview in Exhibit 140?

A    It does.

Q    What was your understanding of Theranos'
technology at that -- at the time you made this
statement?

          MR. MUGMON:  Objection.  Form.

          THE WITNESS:  Do I answer?

          MR. RUBINSKY:  [Nodding.]

          THE WITNESS:  So, as I mentioned a lot
earlier, I'm not a technician.  I don't know medical
technology.  So, my opinions rely on other people and --
and other facts, and there was a gentleman named Bill
Fogey who was head of the Center of Disease Control for
United States, tremendously respected person who served
on the advisory board with me for I don't know how long,

a long time, who felt that this was a breakthrough in
health care that had so many applications especially in
poor countries because you could bring the testing to
the people.  Again, it can be done electronically.
Tremendous breakthrough.  Theranos had discussions with
every major hospital in the United States.  Dignity,
intermountain Cedar -- Cedars-Sinai, Sloan-Kettering
Cleveland clinic.  All of them excited about the
technology -- and -- and -- and many of these people,
the technology was either taken to them or they came
into Theranos.  Very excited about the application of
the technology.  Several of them actually made
investment -- I believe made investments in Theranos.
The -- Theranos had medical advisory board that very
excited about the technology and was, you know, they met
I don't know quarterly something, advising the Theranos
on this.  They had a technology board that not only
hypothetical the department heads of people from
Berkeley, Stanford, MIT, UCSF, but oftentimes the head
of the actual -- the whole school of engineering, all of
them, agreeing to be on the board and -- and -- and --
and supporting this was a leading technology.

BY MS. SMITH:

    Q    Did you have any understanding --

    A    Can I finish?

UNEDITED AND UNCERTIFIED

MR. KATHREIN:  Let him finish.

MS. SMITH:  Sorry.

THE WITNESS:  And so it was collectively, all of these activities, that to me gave me the impression -- or -- or gave me that I support and have confidence in the vision and confidence in the technology because was these multiple experts, practitioners, hospitals, to theoretical engineers and so on that this was leading-edge technology that had great applications in the future.

BY MS. SMITH:

Q     But your understanding wasn't based on an in-depth understanding of Theranos' technical capabilities?

A     I said that earlier.  That's not my skill.

Q     Okay.  I want to go back to 134.

(Discussion off the record)

BY MS. SMITH:

Q     Go back to Exhibit 127?

A     Okay.

Q     127, again is a document labeled Bates numbers 1831776 through 1831779?

A     Mm-hm.

Q     Appears to be an e-mail correspondence amongst the board, yourself included, ending in an e-mail dated

October 17th, 2015, at 9:27 p.m.; is that accurate?

A    Are you saying at the end of this --
October 16th, 312, is that what you're saying or what
what -- what e-mail are you looking at?

Q    Yeah.  The e-mail chain begins on
October 16th, 2015, and it ends on October 17th, 2015.

A    Right.  And what -- what do you want me to
look at?

Q    Is that an accurate description of this
document?

A    Yes.

Q    Okay.  Could you please turn to the page
ending in Bates No. 1831778.

A    778 did you say.

Q    Yes?

A    Yes, I have that page.

Q    Do you see the e-mail a little bit towards the
top dated October 16th, 2015, at 3:12 --

A    I do.

Q    -- from yourself to some other individuals on
board?

A    I do.

Q    Cc'ing Elizabeth Holmes and Sonny Balwani?

A    Mm-hm.

Q    Could you -- did you -- do you remember

UNEDITED AND UNCERTIFIED

sending that?

     A    I don't.

     Q    Is there any reason for you to think that you

didn't send this e-mail?

     A    There no reason.

          (Discussion off the record)

BY MS. SMITH:

     Q    Okay, so after -- from the last e-mail I just

referenced and everything above that, do you recall

this -- sending receiving this e-mail correspondence?

     A    I --I guess the answer is yes.  I don't

remember e-mails, but I remember the substance of these

e-mails.

     Q    Going on to Exhibit 129.

     A    Mm-hm.

     Q    Exhibit 129 is a document ending in Bates

numbers 12970603 through 1970610?

     A    Mm-hm.

     Q    This appears to be e-mail correspondence

amongst the board, yourself included, ending with an

e-mail dated October 29th, 2015, at 4:48 a.m.

     A    Ending with that, yes.

          MR. MUGMON:  And just for the sake of the

record, this was a document over which I had claimed

privilege.  We are going to with -- withdraw that

                 UNEDITED AND UNCERTIFIED

objection.

BY MS. SMITH:

    Q    Does that employ to the other document that is

you claim privilege on?

        MR. KATHREIN:  Just do one at time.

        MS. SMITH:  Oh, just do one at a time.

    Q    Would you please turn to the page with Bates

Nos. -- does it appear to be an accurate reflection of

the documents that were --

    A    Yes.

    Q    -- the -- the e-mails that -- did you -- do

you recall receiving these e-mails?

    A    As I said, I don't recall receiving the

e-mails, but I recall the substance of these e-mails.

So I must have received them.

    Q    Would you please turn to the page with Bates

numbers ending in 1970605,?

    A    Mm-hm.

    Q    Do you see the highlighted section of the

e-mail from William Perry no to the rest of the board?

    A    The highlight starting with in particular.

    Q    Yes?

    A    Yes, I do.

    Q    Does it reflect what you were saying earlier

about the board insisting on a --

A    Yes.

Q    Investigation taking --

A    Yes.

Q    -- place or and independent agency conducting
test?

A    Exactly.  And -- and I probably should use the
word insisting advising strongly, because, again, again
are just advisors, but strong unanimous feeling that
that only our credibility would only -- well, not only
would be primarily determined by having outsiders look
at this, because of the -- of -- because of allegations
of The Wall Street Journal, not just comments made by
Theranos personnel.  And 131 talks about what we already
discussed on FDA.

Q    Hold on.  Exhibit 130 is a document with Bates
numbers ending in 4079890.

A    I don't have that one handy at the moment.
Somebody have a copy?

          MR. RUBINSKY:  This might be your copy.

          THE WITNESS:  Oh, no wonder.  Okay.  Excuse
me.

BY MS. SMITH:

Q    I said it was a document labeled with Bates
numbers ending in 4079890 through 4079896?

A    That's correct.

UNEDITED AND UNCERTIFIED

MR. RUBINSKY:  I'm sorry to interrupt.  I don't actually have a copy of that document.  Is there an extra one lying around?

THE WITNESS:  You can have mine after I look at it.

MR. RUMMAGE:  I can give you mine.  I would use during the examination, but I will first object to the use of a document with highlighting supplied by counsel rather -- that was not on the produced document.

BY MS. SMITH:

Q    Exhibit 130 appears to be an e-mail chain or set of e-mails stemming from the same e-mail chain as Exhibit 129 it ends with an e-mail dated October 28th, 2015, at 4:05 p.m. from yourself to Elizabeth Holmes.

MR. MUGMON:  So Ms. Smith do you want know make the same withdraw with respect to every document.

MS. SMITH:  Yes, please.

MR. MUGMON:  Yes.

MS. SMITH:  Yes, please, unless you have a standing withdrawal for specific ones.

MR. MUGMON:  I think -- I think we to go document by document, but I -- I have -- I have lodged an objection with respect to the use of this document on the ground that it was privileged, and I withdraw that objection.

UNEDITED AND UNCERTIFIED

BY MS. SMITH:

Q    Did you sends this e-mail?

A    I don't recall, but I -- accept that I
probably did.

Q    If we go back to Exhibit 129.

(Discussion off the record)

BY MS. SMITH:

Q    I'm sorry, go back to Exhibit 130.  Did you
receive -- if you look through the entire exhibit, you
see that the board is copied or e-mailed throughout.  Do
you recall receiving these e-mails?

A    I don't, but I accept that I probably did.

Q    Okay.  If you go back to Exhibit 129 for --
briefly.  Would you please turn to the second page of
Exhibit 129 in the document ending in Bates
Nos. 1970604.  Could you look towards the middle of the
page on October 28th, 2015, at 9:37 a.m., Elizabeth
Holmes writes for the rest of the group's reference, I
have been e-mailing with Bill on the clinical
correlations, et cetera?

A    Mm-hm.

Q    Would you turn back to Exhibit 130?

A    Mm-hm.

Q    Do you see the e-mail that's highlighted from
Elizabeth Holmes on October 28th, 2015, at 9:03 a.m. to

UNEDITED AND UNCERTIFIED

yourself, cc'ing Bill Perry?

A    October 28th, yeah, mm-hm.

Q    You sees where Elizabeth Holmes writes that is correct Bill I can follow up with you on this in detail?

A    I do.

Q    Do you know if that's what Ms. Holmes was referring to when she said I've been e-mailing Bill?

MR. RUMMAGE:  Object to the form.  Calls for speculation.

MR. MUGMON:  Same objection.

THE WITNESS:  I have no idea.  If I keep going back and forth here, I'm going to get seasick.

BY MS. SMITH:

Q    On your e-mail dated October 28th, 2015, at 8:58 a.m. the very last sentence, could you read that please?

A    Which -- which -- we're in 130 again.

Q    We're in Exhibit 130?

A    And -- and what is the e-mail?  You're referring to.

Q    The -- the very last highlighted section?

A    Last meaning first up here or -- first page or last page.

Q    First page?

A    Okay, yes.


UNEDITED AND UNCERTIFIED

Q     Your e-mail to -- it looks like to Bill Perry
and to Elizabeth Holmes?

A     Okay, yes, I'm sorry go ahead.

Q     Could you read what you wrote there, beginning
with the I would be wrong?

A     I only see I understand that.  Where am I.

Q     Above that in the middle of the e-mail.

A     My understanding is that?

Q     That --

A     Oh, at the end I got.  See.  Why highlighted,
but I could be wrong.  Elizabeth would -- would somehow
need to verify so that's why I'm -- okay, now I gotcha.

Q     Do you remember why you wrote that?

A     Yeah, because I was -- I said to her my
understanding is that -- so, we -- I think I mentioned
this earlier.  With CLEA, what you did is, you -- my
understanding of what you do with CLEA.  Could be wrong
is that you would test a sample on whatever machines you
were working on and test whether they were accurate --
or -- or -- or give the results of the testing of that
sample.  That same sample would then be sent to CLEA.
They would test it and you would compare the results,
and so on.  And -- and as I told you, you were receiving
reports on -- on the results of those tests and the
advisory board.  And so I was asking -- I was say --

UNEDITED AND UNCERTIFIED

and, again, Bill was saying he wanted this kind of -- of
result.  And so I -- I was saying that my understanding
is that we were doing -- doing this with CLEA, and --
and we were testing those results and we got our results
back and -- and -- but I could be wrong and asking
Elizabeth if I was right and she said, no, you're right
these things are being tested like that.

     Q    Where did you get that understanding from?

     A    From -- from the advisory board when we were
receiving reports showing the accuracy of our test
versus CLEA.

     Q    Where -- Elizabeth Holmes writes I can follow
up with you on this in detail, do you recall what the
follow-up was?

     A    It's with Bill so I don't know what the
follow-up was.  Didn't report it to me.

     Q    Are you aware that there was any follow-up?

     A    I'm not aware.  I -- I should say I know that
Bill was confused about these tests, and -- and that's
why I was trying to give my understanding of it, and I'm
not sure Bill still understood it and I think that's why
she said I'll follow up, because she said.

     MR. MUGMON:  And for the record I previously
lodged an objection with the respect to use of 131 on
the ground that it was privileged.  I withdraw that

objection.

BY MS. SMITH:

Q    Okay, Exhibit 131 is a document with Bates
numbers ending in 1839075 through 183983.  Appears to be
a set of e-mails amongst the board ending with
correspondence request Balwani, the board and this set
of e-mails also stems from the same e-mail chain as
exhibits 129 and 130.  And the final e-mail in this set
of e-mails ends on October 30th, 2015 at 11:56 p.m. from
William J. Perry to Sonny Balwani.

Do you recall receiving this e-mail?

A    I don't.  But I'm sure I did.

Q    Would you have a look on the second page of
this exhibit at the very top.  Could you read Bill
Perry's e-mail to Balwani?

A    Not that I recall.

Q    The very top of the second page?

A    I assume your finger stick, yeah, mm-hm.

Q    Yes.  Would you please read that?

A    I assume that your finger stick samples are
being analyzed on Edison.

Q    Would you have a look at Sonny Balwani's
response to that e-mail on the first page, which is
dated October 30th 2015 at 10:31 a.m.?

A    Mm-hm.

UNEDITED AND UNCERTIFIED

Q    So, was Mr. Balwani answering Mr. Perry's --

A    Yes.

Q    -- concern or question about the finger stick samples being analyzed on the Edison?

MR. RUMMAGE:  Object to the form of the question.  It calls for complete speculation.

MR. RUBINSKY:  Same objection.

THE WITNESS:  You'd have to ask Dr. Perry.

BY MS. SMITH:

Q    Could you please read the -- Mr. Balwani's -- the highlighted section of Mr. Balwani's answer?

A    Yes.  These studies run on a hundred percent Theranos devices and nanotainers.

Q    Okay.  You have anything else?

(Discussion off the record)

MS. SMITH:  Let's go off the record.

THE VIDEOGRAPHER:  This marks the end of Media No. 3 in the deposition of Richard Kovacevich.  Off the record.  2:50 p.m.

(Break taken from 2:50 p.m. to

3:06 p.m.)

THE VIDEOGRAPHER:  This marks the beginning of Media No. 4 in the deposition of Richard Kovacevich.  On the record at 3:06 p.m.

BY MS. SMITH:


UNEDITED AND UNCERTIFIED

Q    Let's go back to Exhibit 132.

A    Okay.

MR. MUGMON:  And with respect to Exhibit 132 I previously lodged an objection that was privileged or potentially privilege.  I will withdraw that objection.

BY MS. SMITH:

Q    Exhibit 132 is a document labeled Bates numbers ending in 3977124 through 3977128.  It is set of e-mail correspondence between yourself and Elizabeth Holmes at the very beginning, the board is copied and towards the end, it's yourself and Ms. Holmes with an e-mail -- the e-mail ending with an e-mail dated October 30th, 2015 at 1:34 a.m. from Ms. Holmes to yourself.  Is that accurate?

A    It is.

Q    Do you recall receiving these e-mails?

A    I do not.

Q    You have any reason to think that you --

A    No.

Q    Did not receive . . . ?

Do you see on -- at the very top of the first page the e-mail from Elizabeth Holmes to yourself on October 30th, 2015, at 1:34 a.m., where it says one other thought I wanted to run by you, give me a callback.  Do you see that?

UNEDITED AND UNCERTIFIED

**ROUGH DRAFT**       **ROUGH DRAFT**       **ROUGH DRAFT**

A     I do.

Q     Dialer what you discussed?

A     I do not.

Q     Do you recall the discussions you had with

with Elizabeth Holmes one-on-one during this time?

A     I do not.

MS. SMITH:  I think we're ready to move on.

MR. KATHREIN:  I'm sorry.

MS. SMITH:  I am handing you Exhibit 142.

(Exhibit 142 marked)

BY MS. SMITH:

Q     Exhibit 142 is a press release issued by

Theranos entitled Theranos announces new members of its

board of directors, dated July 29th, 2013.

Did you see this press release when it came

out?

A     I believe I did.  I -- I don't know, I can't

be sure.  I don't know.

Q     Did this appear to be the press release that

was issued on that date?

A     It appears to be.

Q     Do you see this -- this press release announce

you -- your joining of this board?

A     It does.

Q     Did you flow that Elizabeth Holmes and Sonny

UNEDITED AND UNCERTIFIED

**ROUGH DRAFT**   **ROUGH DRAFT**   **ROUGH DRAFT**

Balwani were romantically involved?

     A    I heard rumors to that effect.

     Q    What rumors did you hear?

     A    That they were romantically involved.

     Q    Anything else?

     A    No.

     Q    Do you recall when intellectual property heard those rumors?

     A    I do not.

     Q    Do you know from whom you heard those rumors?

     A    I do not.

     Q    Did you hear it from--?

     A    Well, I -- I shouldn't say that.  I -- I know I heard it from somebody, either the board or Theranos or whatever, and I also remember hearing it from someone at the country club believe it or not, but . . .

     Q    What country club?

     A    San Francisco golf club.

     Q    You recall hearing it from multiple people?

     A    I remember -- -- I remember hearing it from two people.

     Q    Do you recall hearing that they live together?

     A    I do not recall hearing that.

     Q    Did you know when you objection.  Misstates his testimony the board that they were romantically

UNEDITED AND UNCERTIFIED

involved?

    A    I do not.

    Q    Have you ever spoken with Robert Colman?

    A    I have not to my knowledge.

    Q    You don't recall having any conversation with Robert Colman?

    A    I don't know who Robert Colman is.

    Q    When was the last time you talked with Elizabeth Holmes?

    A    Hm.  I would say -- let me think now.  Late last year.  I think that's correct.

    Q    That's 2017, right?

    A    Yeah.

    Q    You recall the substance of your conversation?

    A    Yes.  I was in the process of abandoning any ownership and taking a tax deduction as a result of that.

    Q    Was anything else about Theranos discussed?

    A    Not that I recall.

    Q    What do you mean by you were in the process of abandoning ownership?

    A    You can -- you can abandon ownership of -- of a -- of a stock of -- equity, and if you abandon it, then you can take a tax loss.

    Q    Why did you need to talk to her?

UNEDITED AND UNCERTIFIED

A    I just -- just told her that I was going to do
that -- I was thinking of doing that, and that who did
she want me to talk with to get that done.

Q    Who did you end up talking to to get this
done?

A    I -- well, I think talk to anyone.  It was
mostly done on online with David Taylor and -- I forget
the name of the lawyer that in his department that ended
up interacting with.

Q    Was it Alexander White?

A    No.

Q    Was the last time you talked with Sonny
Balwani?

A    Years ago.  I'd say sometime before he left
the company.  And I did not talk to him after that.

Q    Do you recall how often you would speak with
Sonny Balwani?

A    I --

     MS. EAGAN:  Objection.  Vague.

     THE WITNESS:  I think the only time basically
that I talked to him was at a advisory board meeting.
BY MS. SMITH:

Q    When you were on the board, do you recall how
often you would speak with Elizabeth Holmes?

     MS. EAGAN:  Objection.  Vague.

                UNEDITED AND UNCERTIFIED

            THE WITNESS:  Outside of the board meetings, I
would guess it's half a dozen times a year, -- half a --
the -- probably about half a dozen times a year once
every other month in addition to talking to him at the
advisory board meetings.

BY MS. SMITH:

    Q    Did you ever tell anyone that you were leaving
the board because Elizabeth Holmes or Sonny Balwani had
lied to you?

            MS. EAGAN:  Object to form.

            MR. RUMMAGE:  Object to form.

            MR. RUBINSKY:  You can answer.

            THE WITNESS:  I don't think they lied to me.

BY MS. SMITH:

    Q    Do you recall saying they were untruthful or
hid things from you?

            MS. EAGAN:  Object to form.

            THE WITNESS:  I didn't -- I didn't -- did I
talk to anyone say that -- the answer is no.

            Ask that question again.  You're asking if I
talked to somebody about it, not that I -- that.

BY MS. SMITH:

    Q    Yeah, did you talk to someone.

    A    I I accused them of.

    Q    Did you talk to someone about that?


                 UNEDITED AND UNCERTIFIED

A     No.  No.

Q     Have you seen the SEC complaint?

A     I have.

Q     Did you read it?

A     Not all of it?  Did see Elizabeth Holmes'
consents to judgment.

A     I did.

Q     Did you see Theranos' consent to judgment?

A     Not that I recall.

Q     Do you have any reason to believe now that the
allegations in the SEC complaints are not true?

          MS. EAGAN:  Object to form.

          THE WITNESS:  You keep coming up with these
double negatives, but I'll try to answer I think on what
you're asking.  I can understand why some people may
think that the allegations in the SEC are true.  I
cannot come to that conclusion.

BY MS. SMITH:

Q     Have you been interviewed by the SEC or the
DOJ?

          MR. RUBINSKY:  You can answer.

          THE WITNESS:  I can close -- I can disclose
disclose.

          MR. RUBINSKY:  You can -- yes or no?

          THE WITNESS:  Yes.


                    UNEDITED AND UNCERTIFIED

BY MS. SMITH:

    Q    Did you make a statement to them?

        THE WITNESS:  Can I say I was deposed?

        MR. KATHREIN:  Yes.

        THE WITNESS:  I I I thought all this was
supposed to secret.  I mean, -- I thought these were
supposed to be secret things and so forth.  I mean, I
don't know.

BY MS. SMITH:

    Q    Okay, you were deposed?

        MR. RUBINSKY:  It wasn't a formal deposition.

        THE WITNESS:  That's true.  Tell me what I
was.  What I was.

        MR. RUBINSKY:  Interview.

        THE WITNESS:  I was interviewed.

BY MS. SMITH:

    Q    Were you interviewed the SEC or the DOJ?

    A    SEC.  There were other people in the room who
I don't know.

    Q    But not the DOJ?

    A    I don't know.  I said there were other people
in the room I don't know.

    Q    Do you know if there's a transcript of that
interview?

    A    I do not know.

UNEDITED AND UNCERTIFIED

Q     I'm going to go back over some questions I
have left over that I didn't get a chance to go through
before?

A     There can't be many of those.

      MR. KATHREIN:  That's a compliment.

BY MS. SMITH:

Q     Are you familiar with the FDA's classification
CAP tube nanotainer?

A     I don't understand that language.  I do
understand that they feel they have authority over the
nanotainer because it's a device, if that's what you
mean.

Q     Did anyone at Theranos, including Elizabeth
Holmes or Ramesh Balwani ever explain the difference
between the Class 1 and Class 2 device to you?

A     Not that I recall.

Q     Turn briefly back to Exhibit 129.

A     Eight, six, three, two, 134.  Does somebody
have 129 handy?

            (Discussion off the record)

BY MS. SMITH:

Q     Can we just have a look at the second page of
Exhibit 129 at the very middle of the page, do you see
let me know' e-mail on October 28th, 2015, at 9:37 a.m.?

A     I do.


                  UNEDITED AND UNCERTIFIED

Q    Do you see where she's referring to sample
scores in our auditors?

A    Right.

Q    Are you aware of the auditors that she's
referring to?

A    Well, I think it's her auditors, the
auditors -- this is the thing we talked about before,
where she would show the board of the results that Bill
was a little confused about, I think where you sent a
sample in, and -- and you test it on on your machines
and then the -- the CLEA sends a sample of -- does a
test same sample and you do independent blind samples,
and the scores that came from her auditors, were -- were
reviewed with the advisory board.

Q    But you weren't personally involved in dealing
with auditors?

A    No.

Q    Were you involved in hiring auditors?

A    No.

Q    Were you involved in reviewing auditors'
reports?

A    Only if -- Elizabeth shared those with us.

Q    Okay.  So the extent of what you know about
the auditors comes from -- either comes from Elizabeth
or --

UNEDITED AND UNCERTIFIED

A    You can stop there.

Q    Well, the extent of what you know about auditors comes from Elizabeth?

A    Right.

Q    Okay.  Are you aware that CLEA is not an auditor?

A    No.  CLEA is regulator.  I don't know what you mean.  They -- my understanding is they regulate labs.

Q    Are you aware that the CMS is not an auditor?

A    I'm not even sure I know what CMS is, but I do remember the initials.  Tell me what that is.

Q    Centers for Medicaid or something like that they were the ones who conducted an investigation and inspection?

A    Oh, yes.  I'm aware that they conduct -- yes, that's what CMS does.  I'm aware --

Q    You're aware that they -- but are you aware that they're not auditors?

A    I don't know what you mean by that.  I don't know where that they -- they come in and inspect on behalf of CLEA and others laboratories and assess or whatever they call themselves, I calm ever call them CMS.

Q    Are you -- you mentioned earlier at the time you left the board this there was and -- investigation

UNEDITED AND UNCERTIFIED

ongoing pertaining to the allegations raised by the Wall

Street Journal article, correct?

    A    I'm not sure I understand.

    Q    You mentioned earlier that while you -- when

you -- at the time you left the board, you didn't stay

long enough to see the results of the full investigation

of the allegations arising from The Wall Street Journal

correct?

        MR. MUGMON:  Objection.

        THE WITNESS:  I didn't say anything about the

investigation.  I said that these peer review activities

that were going on, I didn't say we -- we -- we said

when it gets to investigations that's clearly peer

review an I didn't talk about that anymore.

        MR. KATHREIN:  You mean clearly privileged.

Is that what you mean?

        THE WITNESS:  No.

        MR. KATHREIN:  I'm sorry.  I'm sorry.

BY MS. SMITH:

    Q    Was there an investigation ongoing at the time

you left the Theranos board?

        MR. MUGMON:  You can answer -- you can answer

questions about the fact of an investigation, to the

extent it is covers privileged material we ask you to

not to answer that.

           THE WITNESS:  Right.  Yes, I believe it was
still going on.
BY MS. SMITH:
     Q    Did the results come in?
     A    I don't know.  I left the board.
     Q    So, at the time you left the board the
investigation was still ongoing?
     A    Yes.
     Q    Did any of the results of the investigation in
while you were on the board?
           MR. MUGMON:  Objection.  It's been asked and
answered.  This has been covered several time to time I
mean, I don't know why we're wasting time with the
witness on this.
           THE WITNESS:  I concur with him.
BY MS. SMITH:
     Q    Without divulging the contents of the results
of the investigation, did any results of any
investigation come forward while you were on the board?
           MR. MUGMON:  It's the same question.  Okay
asked and answered.
           THE WITNESS:  I don't know what you mean by
same results of investigation isn't complete until the
investigation is complete.
BY MS. SMITH:

                    UNEDITED AND UNCERTIFIED

Q    But you're not aware of any results of any investigation?

A    Not that I recall.

Q    Okay.  Just to clarify from earlier, what exactly is Safeway deal?

A    The Safeway what.

Q    The Safeway deal?

MR. RUBINSKY:  Objection.  Vague.

BY MS. SMITH:

Q    That was supposed to take place between Theranos and Safeway?

A    Safeway you.

Q    Deal.  The Safeway deal?

A    Oh, I'm sorry.  So what's the question?

Q    What was the -- what were the negotiations or what -- what were the negotiations working towards or what was the deal about?

A    To put.

MR. MUGMON:  Objection.  Compound.

THE WITNESS:  To put Theranos in Safeway stores, to -- the -- to put facilities in Safeway stores of Theranos so they can conduct blood tests, just like Walgreens.

BY MS. SMITH:

Q    You mean to create facilities to put Theranos

UNEDITED AND UNCERTIFIED

devices in?

            MR. RUMMAGE:  Object -- object to the form of

the question.  Misstates testimony.

            MR. RUBINSKY:  Objection.  Misstates

testimony.

            THE WITNESS:  Within Safeway stores they would

create a Theranos small -- Theranos whatever you want to

call it, department, so they can conduct tests in the --

the Theranos -- in the Safeway store.

BY MS. SMITH:

      Q    Is that along the lines of the Walgreens

wellness centers?

      A    That's what I said.  Just like Walgreens.

      Q    With CVS that was supposed --

            The same with the CVS negotiations, was that

supposed to be something along the lines of the

Walgreens wellness centers?

            MR. RUMMAGE:  Object to the form of the

question.

            THE WITNESS:  I don't know that.  It never got

started.  But . . . they didn't advance enough to talk

about how it would be done.

BY MS. SMITH:

      Q    To your knowledge, could Theranos ever perform

nearly all lab tests on a few drops of blood drawn from

                  UNEDITED AND UNCERTIFIED

a patient's finger or?

        MR. RUMMAGE:  Objection.

        MS. SMITH:  Or enable reliable comprehensive

blood tests from as little as a few drops of blood drawn

from a patient's finger.

        MS. EAGAN:  Object to form.

        MR. RUMMAGE:  Objection.  Asked and answered.

        THE WITNESS:  I have no opinion on that.

BY MS. SMITH:

    Q    You don't have any knowledge about whether

that's true?

        MR. RUMMAGE:  Objection.

        MR. RUBINSKY:  Objection.  Argumentative.

        MR. RUMMAGE:  Asked and answered.

        THE WITNESS:  Correct.

BY MS. SMITH:

    Q    To your knowledge, was Theranos ever on the

cusp of receiving all necessary regulatory cleaners an

approvals?

        MS. EAGAN:  Object to form.

        THE WITNESS:  I don't know what on the cusp

means.

BY MS. SMITH:

    Q    Was Theranos ever just about to receive all

necessary regulatory clearances and approvals?

UNEDITED AND UNCERTIFIED

  A Not to my knowledge.

    MS. EAGAN:  Object to form.

BY MS. SMITH:

  Q To your knowledge, could Theranos ever run zero seven blood tests on a single capillary sample?

    MS. EAGAN:  Object to form.

    THE WITNESS:  I do not know.

BY MS. SMITH:

  Q Could Theranos ever provide accurate blood tests in a matter of hours?

    MS. EAGAN:  Object to form.

    THE WITNESS:  I believe they did it on me.  In minutes.

BY MS. SMITH:

  Q To your knowledge, could Theranos ever provide accurate blood test results that minimize the risk of human error?

    MS. EAGAN:  Object to form.

    THE WITNESS:  I'm not capable of -- of -- of answering that question.

BY MS. SMITH:

  Q To your knowledge, could Theranos ever provide accurate blood tests that increase accuracy of results compared to traditional venous blood draws?

    MS. EAGAN:  Object to form.

          THE WITNESS:  I'm not capable of assessing

that.

BY MS. SMITH:

     Q    To your knowledge, did Theranos ever provide

accurate blood tests that were being used by

pharmaceutical companies in clinical trials?

          MS. EAGAN:  Object to form.

          THE WITNESS:  I'm -- I'm not aware of that.

BY MS. SMITH:

     Q    To your knowledge, did Theranos ever provided

blood testing technology that was being use bid the U.S.

mill stair, including a board medicine vacuum by

helicopters?

          MS. EAGAN:  Object to form.

          THE WITNESS:  I'm not aware of that.

BY MS. SMITH:

     Q    To your knowledge, could Theranos ever

phenomenon 99 to 99 percent of all laboratory requests

using its proprietary technologies?

          MS. EAGAN:  Object to form.

          THE WITNESS:  I do not know the answer.

BY MS. SMITH:

     Q    To your knowledge, did Theranos ever do so?

          MS. EAGAN:  Same objection.

          THE WITNESS:  I do not know.

                   UNEDITED AND UNCERTIFIED

BY MS. SMITH:

Q    To your knowledge, was Theranos' proprietary technologies ever able to perform 300 blood tests of which only one to 20 percent of those blood tests could the no be used.

To your knowledge, were Theranos' proprietary technologies ever able to perform 300 blood tests of which only 18 to 2 percent of those tests could not be performed using Theranos' capillary samples and has to can performed about microsamples attending from venous blood draws instead?

MS. EAGAN:  Object to form.

THE WITNESS:  I'm not capable of answering that.

BY MS. SMITH:

Q    To your knowledge, was Theranos ever actively involved in the process of obtaining FDA clearance or approval as to each of the blood tests Theranos had developed and validated?

MS. EAGAN:  Object to form.

THE WITNESS:  I know that they received approval of herpes.

BY MS. SMITH:

Q    Anything else?

A    There may have been a lot of other things.  I

UNEDITED AND UNCERTIFIED

just say I know that they did ground rule got approval
for herpes.

Q    You don't personally know of hi other FDA
clearances, right?

A    I do not.

Q    To your knowledge, did Theranos ever have
proprietary their analyzers that yielded test data with
correlation coefficients of .95 or higher compared to
traditional laboratory machines.

A    I do not know.

MS. EAGAN:  Object to form.

BY MS. SMITH:

Q    To your knowledge, had Theranos' proprietary
technology ever been comprehensibly validated over the
course of the last seven years by 10 of the 15 largest
pharmaceutical companies?

MR. RUBINSKY:  Objection.  Vague.

MS. EAGAN:  Object to form.

THE WITNESS:  I do not know.

BY MS. SMITH:

Q    To your knowledge, had Theranos' proprietary
technology ever been used by numerous current and past
clients, including the same pharmaceutical companies
mid-sized biopharma accompanies.  Predominant research
institutions and U.S. formed and health sources?

UNEDITED AND UNCERTIFIED

MS. EAGAN:  Object to form.

THE WITNESS:  I do not know.

BY MS. SMITH:

Q    To your knowledge, had Theranos' proprietary
technology ever been validated under FDA guidelines and
classified as nonsignificant risk devices?

MS. EAGAN:  Object to form.

THE WITNESS:  I do not know.

BY MS. SMITH:

Q    What was your understanding of Theranos' need
for financing in 2013?

MR. RUMMAGE:  Object to the form.  Vague and
ambiguous.

MR. MUGMON:  Same objection.

THE WITNESS:  In 2013, I was under the
impression that -- that they were quite robustly
financed.

BY MS. SMITH:

Q    When you said earlier --

A    I am correct that.  I -- I don't want to put
the date as 2013.  Some early stage of my relationship
with Theranos, I -- they seem to be quite robustly
financed.

Q    For what was your understanding of why they
raises over $700 million after 2013?

UNEDITED AND UNCERTIFIED

        A    Well --

        MR. RUMMAGE:  I understand that, but I still
have to assert the objection.  So objection to the form
of the question.

        THE WITNESS:  That's what I'm saying I
think -- after they raise the 700 million that I was
robustly finance it was probably 2014 or whenever they
raised.

        Q    Back when you objection.  Asked and answered
the boards you said you had a discussion with Elizabeth
Holmeses with her vision and where she wanted to take
the company.  What was your understanding of what it
would take to take the company where she wanted it to
be?

        MR. RUBINSKY:  Objection.  Vague.

        THE WITNESS:  You mean dollars and cents?
What -- you're asking me -- what -- what are you asking
me?  What it would take?
BY MS. SMITH:

        Q    Yeah, what would it take?

        A    In dollars and cents?

        Q    Yes.

        A    No we didn't really discuss that until
sometime after I got to know the company better, and --
and she came forward about raising money, and so forth

                    UNEDITED AND UNCERTIFIED

that --

    Q    You assume it would take more fundraising to take the company --

    A    I I don'.

    Q    Where she wanted it to be?

    MR. RUBINSKY:  Objection.  Misstates testimony.

    A    I didn't win -- we didn't even discuss thatment didn't seem to be an issue.  And, you know, I decided to join the board because George wanted me to and I -- I figured that I would find out the financial situation and what the needs might be after joining rather than before joining.  She seemed to think that she was fine, and -- but that she would be raising money in the future.

BY MS. SMITH:

    Q    Did you have any discussions with Elizabeth Holmes about the company's cash burn rate?

    MR. MUGMON:  Objection.  Form.

    THE WITNESS:  We had that quite often.  We were always look at the burn rate versus the money that she had.  On -- and the advisory board.

BY MS. SMITH:

    Q    What do you recall about that?

    A    That in -- until the later stages the

financing looked like -- the -- the -- the -- the -- the
need for -- the burn rate was such that the financing
that was available would be sufficient to get this
launched and -- and prove the business model and -- to
improve the business model and the ability to go
forward.

     Q    Was this discussion before or after they
raised 700 million?

     A    It was -- I don't know whether the discussion
was before or after, but by raising the 700 million, it
would be sufficient to move forward and prove the
business model and -- and with burn rate at that time,
versus the timeline that she put forward for launching
the -- the -- the wellness centers and so on was --
looked at the sufficient to be able to do that and then
move forward.

     Q    (By Ms. Smith)  I have no further questions.

     A    Well, God bless America.

        MR. RUMMAGE:  I attempted to say I have a
couple of hours.  But I -- but I won't say it.

        THE WITNESS:  Thank you very much.

        MR. RUMMAGE:  I have no questions.

        MR. KATHREIN:  Ow you say God bless him.

        MS. EAGAN:  No questions.  Thank you.

        MR. MUGMON:  In questions from me, but he we

UNEDITED AND UNCERTIFIED

plain and ordinary like to designates this deposition

asks confidence.

       MR. KATHREIN:  Okay acted convey don't agree

to designate with.  You should do to so under the

protective snowboard and we also would request the

opportunities too read and sign this deposition.

       THE VIDEOGRAPHER:  Before closing deposition

the court reporter and videographer will ask for your

orders if there are any for transcript and video

beginning with the witness's attorney.

       MR. RUBINSKY:  Weighed like the a certified

copy and, yeah, outline the electronics as well please,.

       MS. EAGAN:  We'll just take just a copy of the

transcript.

       MR. RUMMAGE:  We'll take a copy.

       MR. MUGMON:  We will as well.

       THE VIDEOGRAPHER:  Of the transcript.

       THE VIDEOGRAPHER:  This marks the ends of mood

No. 4, and the conclusion of today's deposition of

Richard Kovacevich.  Off the record.  It's 3:43 p.m.

       THE REPORTER:  Counsel, roughs?

       MR. RUBINSKY:  Yeah, sure.

       MS. EAGAN:  Yes, please.

       MR. MUGMON:  Yes, please.

       MR. RUMMAGE:  Why not.

            UNEDITED AND UNCERTIFIED